Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
541.778.6626
971.285.3632

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER**, **OREGON WILD**, and **CASCADIA WILDLANDS**,<br><br>     *Plaintiffs*,<br><br>   v.<br><br><br>**DOUGLAS JAMES BURGUM** in his official capacity as Secretary of the Interior, **U.S. FISH & WILDLIFE SERVICE**, and **U.S. BUREAU OF LAND MANAGEMENT**,<br><br>     *Defendants*. | Case No. 1:25-cv-2296<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violations of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*.; the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq*.; the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.) |

## NATURE OF ACTION

1.      This action challenges the U.S. Bureau of Land Management's (BLM) authorization of the Last Chance Forest Management Project ("Last Chance" or "Project") and the U.S. Fish and Wildlife Service's (FWS) accompanying Biological Opinion (BiOp). Located in the Medford District of southwestern Oregon, the Project authorizes commercial timber harvest on approximately 8,240 acres, including the logging of mature and old-growth forests, and the construction of 28 miles of new roads and renovation of an additional 241 miles of roads. Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, and Cascadia Wildlands seek declaratory and injunctive relief to prevent irreversible harm to threatened wildlife and unique ecological resources.

2.      First, Plaintiffs allege FWS's July 2023 BiOp violates the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.* The BiOp is arbitrary and capricious because it analyzes a project description that significantly understates the Project's actual impacts. Specifically, FWS analyzed impacts to 3,093 acres of northern spotted owl critical habitat, whereas BLM's authorized Project affects 8,311 acres of critical habitat—a discrepancy of over 5,000 acres. Additionally, FWS failed to use the best available science, ignoring a 2023 peer-reviewed study demonstrating that the survey protocol the BiOp relies on systematically undercounts spotted owl pairs. Consequently, FWS's conclusion that the Project will result in "zero incidental take" relies on a flawed and scientifically unsupported take-avoidance strategy.

3.      Second, Plaintiffs allege BLM violated the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, by authorizing a project that fails to conform to the 2016 Southwestern Oregon Resource Management Plan (RMP). The RMP mandates that BLM implement conservation measures to mitigate threats to Bureau Sensitive Species during project planning. However, BLM refused to implement such measures for the northwestern pond turtle—a

Bureau Sensitive Species and proposed for ESA listing—expressly deferring conservation actions unless and until the species is formally listed.

4.      Third, Plaintiffs allege BLM violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, by failing to prepare an Environmental Impact Statement (EIS). The Project authorizes extensive logging in fire-resilient old-growth forests and serpentine ecosystems that provide essential habitat for imperiled species, and will increase wildfire risk in portions of the Project area for the next two decades. These actions will significantly affect the quality of the human environment, rendering BLM's Finding of No Significant Impact (FONSI) arbitrary and capricious.

## JURISDICTION

5.      This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) (ESA citizen suit) and 28 U.S.C. § 1331 (federal question). A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201; the requested injunctive relief is proper under 28 U.S.C. § 2202; and the requested relief for vacatur is proper under 5 U.S.C. § 706(2).

6.      Plaintiffs have exhausted their administrative remedies. With respect to the claims brought under the ESA, Plaintiffs provided Defendants with written notice of the violations more than sixty days prior to the commencement of this action, as required by 16 U.S.C. § 1540(g)(2). With respect to the claims brought under the APA, Plaintiffs timely participated throughout the BLM's timber sale planning and NEPA process. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

## VENUE

7.      Venue is proper in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. §

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    2

1540(g)(3)(A) because all, or a substantial portion, of the events or omissions giving rise to this litigation occurred within the District of Oregon. The offices of the officials that authorized the decisions at issue in this litigation are located within the District of Oregon. The decisions at issue in this litigation pertain to public lands within the District of Oregon. Plaintiffs maintain their offices within the District of Oregon.

## DIVISIONAL ASSIGNMENT

8.    Assignment to the Medford Division is appropriate under Local Rule 3-2 because most of the Project area is located within Jackson and Josephine counties, and BLM's office where its decision was signed is in Grants Pass in Josephine County. FWS's office where its BiOp was signed, however, is in Roseburg in Douglas County.

## PARTIES

9.    Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members who would be

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          3

irreparably injured by implementation of the Decision Records and associated timber sales.

10.    Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Last Chance Project area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of the Decision Records and associated timber sales would irreparably harm the interests of Oregon Wild and its members.

11.    Plaintiff CASCADIA WILDLANDS is a non-profit corporation based in Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the Project area for a variety of professional and personal pursuits including viewing threatened and endangered species and their habitat. Implementation of the Decision Records and associated timber sales would irreparably harm the interests of Cascadia Wildlands and its members.

12.    Defendant DOUGLAS JAMES BURGUM is sued in his official capacity as the Secretary of the United States Department of the Interior. Secretary Burgum has the ultimate responsibility to ensure that the Department and its bureaus, including the Bureau of Land Management and the Fish and Wildlife Service, comply with all applicable federal laws and regulations, including the ESA, FLPMA, and NEPA.

13.     Defendant U.S. FISH AND WILDLIFE SERVICE ("FWS") is an agency within the United States Department of the Interior. FWS is responsible for administering the ESA for terrestrial wildlife and their critical habitat. FWS prepared and issued the July 3, 2023 Biological Opinion for the FY23 Batch of Projects, including the Last Chance Project, which is challenged in this action.

14.     Defendant U.S. BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the United States Department of the Interior charged with managing the federal public lands and resources at issue in this case. BLM served as the action agency under the ESA, prepared the Environmental Assessment and Finding of No Significant Impact, and authorized the Last Chance Project.

## FACTS

### Northern Spotted Owl (*Strix occidentalis caurina*)

15.     The northern spotted owl is a subspecies of spotted owl (*Strix occidentalis*) adapted to the late-successional, mature, and old-growth coniferous forest ecosystems of the Pacific Northwest. The species' historic range extended from British Columbia, primarily west of the Cascade mountains, to Marin County, California. The last population in southern British Columbia is now functionally extinct, with a single known individual alive in the wild there in 2023.

16.     The northern spotted owl is one of the most studied birds in the world. The habitat requirements of the northern spotted owl are well documented in established science.

17.     The northern spotted owl relies on mature and old-growth forest habitats that contain structures and characteristics necessary to sustain the species' essential biological functions of nesting, roosting, foraging, and dispersal. The northern spotted owl relies on mature and old-growth forest habitats with multi-story, multi-species tree canopies featuring large overstory trees. The northern spotted owl relies on mature and old-growth forest habitats with moderate to high

canopy closure to provide adequate thermal cover and escape from predation by other raptor species. The northern spotted owl relies on mature and old-growth forest habitats with a high proportion of mature conifers featuring large cavities and deformities, and large snags and other decadent components characteristic of late-seral forest ecosystems.

18.    Northern spotted owls rely heavily on small mammals as prey. In southern Oregon, the species' nutritional needs are met predominantly through foraging red tree voles, Sonoma tree voles, and woodrats. These prey species occur in mature and old-growth forest habitats with abundant large, dead wood on the forest floor. The northern spotted owl depends on adequate populations of these small mammal prey species to forage successfully and sufficiently.

19.    The northern spotted owl requires some open space to fly below and within the upper canopy of the multi-story stands it inhabits.

20.    Juvenile spotted owls—and spotted owls displaced by disturbance events or barred owl competition—require adequate dispersal habitat connecting local home ranges to suitable habitat elsewhere to successfully colonize new territories. Dispersal habitat allows spotted owls to recolonize territorial vacancies after resident spotted owls die or leave. Dispersal habitat is necessary to provide adequate gene flow across the species' range. Dispersal habitat consists of stands with sufficient tree size and canopy closure affording adequate foraging opportunities and protection from avian predators. Dispersing owls may temporarily tolerate younger or less complex or diverse stands before reaching suitable new territories, provided such stands contain a minimum level of roosting structures that provide adequate opportunity for rest and foraging.

21.    The northern spotted owl's average lifespan in the wild is 10 years, though some individuals have been documented surviving up to 17 years. The northern spotted owl is site-tenacious, and individual owls have been documented completing

their adult lifecycle without ever leaving their home range.

22.     In 1990, FWS listed the northern spotted owl as a "threatened" species under the Endangered Species Act. At the time, unabating habitat loss due to rampant logging primarily drove the species' population decline. Since that time, habitat loss has continued across the northern spotted owl's range, with a corresponding decline in population. Northern spotted owl populations in southern Oregon, including at research sites in Jackson, Josephine, and Douglas counties, continue their decline.

23.     Logging has eliminated 80–85% of mature and old-growth forests in the Pacific Northwest.

24.     Logging causes direct harm to northern spotted owls, including potential injury and mortality to individual territorial owls, and displacement of owls from nests when nest trees and trees near nest trees are felled.

25.     Logging causes further harm to northern spotted owls. Among the owl species, the northern spotted owl is particularly intolerant of habitat disturbance. Habitat disturbance events known to particularly impair the essential behaviors and life history requirements of northern spotted owls—nesting, roosting, breeding, foraging, and dispersal—include the noise and physical disturbance from mechanical timber harvest, brushing, roadbuilding, and log hauling.

26.     Logging and associated roadbuilding cause and contribute to habitat loss and fragmentation that may expose a local spotted owl population to heightened risk of mortality and other adverse outcomes during subsequent disturbance events or competitive interactions with barred owls. Logging that eliminates local foraging habitat may contribute to a heightened risk of depredation and starvation when individual owls are forced to travel further for foraging opportunities. Logging that degrades or eliminates suitable habitat increases mortality risk and decreases the likelihood of successful dispersal among juvenile northern spotted owls.

27.     Logging can also cause deferred harm to northern spotted owl populations

when trees comprising unoccupied but suitable sites are felled, precluding future territory establishment and occupancy.

28. The survival and fitness of northern spotted owls are positively correlated with larger patch sizes of forest containing large trees and old-growth characteristics. The survival and fitness of northern spotted owls are inversely correlated with habitat fragmentation.

29. Increased fragmentation and reduced habitat connectivity inhibit gene flow. Reduced gene flow can lead to genetic bottlenecks that heighten the risk of local extirpation in isolated spotted owl subpopulations.

30. Barred owls (*Strix varia*) are native to eastern North America. Barred owls arrived only recently in southern Oregon, after intensified wildland fire suppression and expanded tree plantations across the northern United States and southern Canadian provinces by the mid-20th century created a patchwork of suitable habitat across the landscape enabling westward colonization.

31. Barred owls are larger and more aggressive than northern spotted owls. Barred owls and northern spotted owls compete for the same habitat and prey. Barred owls use a wider range of habitat types than northern spotted owls. Barred owls forage on a wider range of prey species than northern spotted owls. Barred owls consistently outcompete northern spotted owls across habitat types.

32. The presence of barred owls suppresses the vocalization behavior of northern spotted owls. Northern spotted owls are less likely to respond to broadcasted calls—the protocol survey method used by federal agencies to survey for the species—when barred owls are present in the vicinity. This suppression effect creates a high risk of "false negative" survey results, where surveyors incorrectly conclude a site is unoccupied because resident owls remained silent to avoid detection by aggressive barred owls.

33. Federal agencies generally determine northern spotted owl territory

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          8

occupancy through protocol broadcast call surveys conducted over two years. This protocol relies on the assumption that if owls are present, they will respond to broadcasted calls. The protocol includes guidelines for determining the occupancy status of spotted owl sites. A site is occupied by a territorial pair if a male and female are heard and/or observed in close proximity to each other on the same visit, a male takes a mouse to a female, a female is detected on a nest, one of both adults are observed with young, or a young owl is observed at the site late in the season. A site is occupied by a resident single if a single owl is detected in the same general area on three or more occasions within a breeding season or multiple responses are detected over several years from the same general area. If an owl is detected at a site but does not meet these requirements, its status is considered unknown.

34.    Recent scientific research, however, challenges this assumption. The best available science demonstrates that Passive Acoustic Monitoring (PAM) surveys are significantly more effective at detecting northern spotted owls than traditional broadcast surveys. PAM detects natural calling behavior rather than relying on an elicited response.

35.    *Appel et al.* (2023), for example, found that traditional survey methods, including broadcast call surveys, systematically undercount northern spotted owl pairs. Using PAM, the study concluded that true pair occupancy is between 1.3 and 4.1 times greater than the rates observed using traditional survey methods. Additionally, the study found a high probability (0.72) that any single detected northern spotted owl belongs to a resident pair, contradicting the assumption that single detections represent non-territorial or transient individuals.

36.    Other scientific data in the Project record further validates the efficacy of PAM over traditional survey protocols, including broadcast call surveys. *Kramer et al.* (2023) found that acoustic monitoring confirmed spotted owl occupancy across all occupied territories in a study area within just 3 weeks, whereas traditional active

survey protocols "typically necessitate[] 2 years to complete."

37. By demonstrating the superior efficiency and detection probability of PAM, *Kramer et al.* (2023) corroborates the findings of *Appel et al.* (2023) that broadcast surveys are less effective and prone to significant delays in confirming occupancy.

38. Researchers have tracked northern spotted owl demography for decades. Researchers have tracked estimated populations across the range of the species. Since listing under the ESA, northern spotted owl populations have continued to decline. In 2018 and again in 2021, researchers found that populations in all eleven demography study sites were in an ongoing state of decline.

<u>Northwestern Pond Turtle (*Actinemys marmorata*)</u>

39. The northwestern pond turtle (*Actinemys marmorata*) ("NWPT") is one of only two native freshwater turtle species in Oregon and the only freshwater turtle native to southern Oregon. The NWPT and southwestern pond turtle (*Actinemys pallida*) were considered one species—the "western pond turtle"—until 2017, when the scientific community recognized them as two distinct species.

40. The historic range of the western pond turtle extended along the Pacific coast from British Columbia, Canada to the northern part of Baja California, Mexico, primarily west of the Sierra Nevada and Cascade ranges. The NWPT, which now ranges from Central California to Washington, has since been extirpated from Canada. In Washington state, the NWPT was close to extirpation until the state listed the species as endangered and began supplementing the wild population with captive-bred NWPTs. The range of the NWPT is now fragmented, with some sites extirpated, and in many cases, only small, isolated groups or individuals remaining across much of its range.

41. In Oregon, the NWPT is native to and occurs in watersheds west of the Cascades. The species is primarily associated with low- to mid-elevation rivers, large-order streams, and wetland habitats, with the largest Oregon populations

found in the Willamette, Umpqua, Rogue, and Klamath River drainages.

42.    The NWPT is a long-lived species which exhibits low reproductive output, traits which collectively result in a slow population growth rate and limited capacity for rapid recovery following population declines. Other characteristics which render the species particularly vulnerable to population declines are delayed sexual maturity, temperature-dependent sex determination, limited ability to disperse, and high egg and hatchling mortality.

43.    Threats to the species include habitat loss and fragmentation, altered hydrology, predation, competition, road mortality, collection, contaminants, and climate change. Habitat loss and fragmentation have reduced the number of, and connectivity between, NWPT populations, resulting in the isolation of NWPT populations across the species' range. Isolated populations are at particular risk of extirpation from catastrophic events, particularly a species like the NWPT with a limited ability to disperse and recolonize an area following a catastrophic event.

44.    FWS projects the NWPT will further lose adaptability to environmental conditions, have reduced reproduction, and have a low likelihood of responding to catastrophic events in the future.

45.    The NWPT requires aquatic and upland, terrestrial habitats within close proximity and connected to one another for survival. Upland habitat is essential for key life stages including nesting and overwintering. In Oregon, the NWPT has been observed to spend up to ten months a year total in upland habitat.

46.    NWPTs commonly leave aquatic habitat in late summer or early fall to overwinter up to 500 meters upland in forest debris or duff, and do not return to aquatic habitat until spring. Many NWPT exhibit site fidelity, returning to the same area annually to overwinter.

47.    Nesting typically occurs from mid-May through July. Females excavate nests up to 500 meters from aquatic habitat and make several trips between aquatic

habitat and a nest site while excavating the nest. Hatchlings may emerge in late summer or early fall, but oftentimes overwinter in the nest, emerging in the spring.

48.     FWS has recognized that habitat loss and fragmentation have reduced the availability of suitable NWPT upland nesting habitat adjacent to aquatic habitat, with suitable nest sites increasingly scare and vulnerable to nearby threats.  Loss of habitat, including upland habitat, has resulted in the extirpation of many NWPT populations. Any activity in upland habitat may destroy NWPT nests or cause mortality to nesting females and overwintering NWPTs.

49.     Roads negatively affect NWPT viability through direct mortality and habitat fragmentation. NWPTs are susceptible to vehicle strike due to their regular movement between aquatic and upland areas for nesting and overwintering. There have been numerous reports of vehicle strikes in Oregon, with one study documenting a three percent decline in the local population over a four-month period. Another study documented a gravid female killed by a logging truck while moving to nest. Roads also affect the NWPT by reducing connectivity between aquatic and upland habitat.

50.     The NWPT is designated a "Bureau Special Status Species" and "Bureau Sensitive Species" by BLM.

51.     On October 3, 2023, FWS determined that listing the NWPT as threatened under the ESA is warranted and proposed the species for listing under the ESA. FWS has not issued a final rule listing the NWPT as threatened.

        Medford District BLM's Fiscal Year 2023 Batch of Projects

52.     On April 24, 2023, the Medford District of BLM transmitted its Biological Assessment ("BA") for the "FY23 Batch of Projects," comprised of the Rogue Gold, Trail Creek, and Last Chance forest management projects. In the BA, BLM determined that all three timber sale projects may affect, and are likely to adversely affect, the northern spotted owl and its designated critical habitat, and therefore

required formal consultation under Section 7(a)(2) of the ESA.

53.    On July 3, 2023, the FWS Roseburg Field Office transmitted its combined Biological Opinion ("2023 BiOp") for the FY23 Batch of Projects. In the 2023 BiOp, FWS concluded that the Rogue Gold, Trail Creek, and Last Chance timber sales were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its designated critical habitat.

54.    The Last Chance Project is located northeast of the city of Grants Pass in Josephine County, Oregon, within the Klamath Mountains Physiographic Province and the Klamath Mountains ecoregion.

55.    Portions of the Project area contain serpentine soils. Serpentine soils are ultramafic soils characterized by high magnesium and heavy metal concentrations and low calcium levels.

56.    The Project area contains mature and old-growth conifer forests.

57.    The Last Chance Project is located on BLM land that is heavily "checkerboarded": every other square mile of land owned and managed by BLM alternates with lands managed by other landowners, primarily private landowners that manage their lands for timber production on short rotations.

58.    The 2023 BiOp analyzed the effects of the Last Chance Project based on acreage figures provided by BLM in the BA. FWS analyzed a project that authorizes vegetation treatments on 12,087 acres, including treatments on 6,177 acres of northern spotted owl NRF habitat and 4,409 acres of dispersal-only habitat.

59.    The Last Chance Project overlaps the KLE-2 Critical Habitat Subunit of the Klamath East Critical Habitat Unit. FWS determined that special management considerations or protections are required in this subunit to address threats from timber harvest, wildfire, and barred owl competition.

60.    The KLE-2 subunit facilitates northern spotted owl connectivity and movement between the western Cascades and coastal Oregon and the Klamath

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          13

Mountains. The KLE-2 subunit helps facilitate genetic exchange between populations in these areas.

61.    In the KLE-2 subunit, FWS analyzed a Last Chance Project that would treat a total of 3,093 acres of designated critical habitat. FWS analyzed the removal or downgrade of 791 acres of NRF critical habitat (1.8% of the subunit total) and the removal of 336 acres of dispersal-only critical habitat (2.3% of the subunit total).

62.    FWS acknowledged in the 2023 BiOp that NRF removal and downgrade activities in the Last Chance Project "would remove large trees that could support spotted owl nesting structure, reduce the overall average canopy cover within the affected stand to near or below approximately 40 percent, diminish the existing multi-canopy layering, and other key habitat features, rendering the affected stands non-functional as spotted owl NRF or dispersal-only habitat." FWS concluded these treatments are "expected to result in mostly unusable NRF habitat within the affected stands for decades post-treatment."

63.    There are 33 known spotted owl home ranges completely contained within the Last Chance Project area.

64.    BLM and FWS utilized the protocol survey method for determining occupancy. Of the known spotted owl sites in the Last Chance Project area, FWS identified eight as occupied by a pair or resident single spotted owl at the time of consultation. Surveys detected spotted owls at an additional thirteen sites in the Last Chance Project area between 2018 and 2022, including eight sites with multiple detections during this period. There were "incidental" detections at three sites in the Project area in 2022 alone. BLM and FWS considered these thirteen sites, including the three sites with "incidental detections, "unoccupied" in the BA and 2023 BiOp and classified the detected owls as non-territorial "floaters" or transient owls.

65.    FWS determined that the Last Chance Project is likely to adversely affect

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          14

habitat in 29 of the known spotted owl sites in the Project area.

66.    Despite finding the Project is likely to adversely affect spotted owls and their critical habitat, FWS concluded the Project would result in "zero incidental take" of northern spotted owls.

67.    FWS's "zero incidental take" conclusion is predicated on a "take avoidance" strategy. FWS relied on BLM's commitment to conduct pre-implementation protocol surveys to determine occupancy. If resident spotted owls are located during these future surveys, BLM committed to "drop or modify the units as appropriate" to avoid take.

68.    FWS determined that BLM would avoid incidentally taking northern spotted owls in occupied sites by employing "modify" treatments rather than "removal" treatments. FWS determined that "modify" treatments—which reduce canopy cover, simplify stand structure, and remove understory vegetation but retain at least 60 percent canopy cover—do not constitute incidental take.

69.    FWS's conclusion that the take avoidance strategy would be effective relied on the assumption that protocol surveys are effective at detecting northern spotted owls and accurately determining occupancy when they are present in the Project area.

70.    In the 2023 BiOp, FWS concluded that the Last Chance Project is not likely to jeopardize the northern spotted owl or result in the destruction or adverse modification of the species' critical habitat.

BLM's Environmental Review and Decision for the Last Chance Project

71.    BLM initiated the NEPA process for the Last Chance Project by releasing a draft Environmental Assessment ("EA") in July 2024. On September 10, 2024, BLM issued a Finding of No Significant Impact ("FONSI") and Decision Record authorizing the "Paul's Payoff" timber sale.

72.    Following a legal challenge to that decision by Plaintiffs KS Wild, Oregon

Wild, and Cascadia Wildlands, BLM voluntarily sought a remand of its decision to conduct further environmental analysis. The Court stayed proceedings in that prior litigation in January 2025. Order Granting Motion for Stay, *Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, No. 1:24-cv-01930 (D. Or. Jan. 22, 2024), ECF No. 7.

73.    On March 14, 2025, BLM released a Revised Environmental Assessment for public comment.

74.    On May 12, 2025, BLM issued the Final Revised Environmental Assessment ("Final EA"), a Revised FONSI, and Decision Record #1 ("DR #1").

75.    In DR #1, BLM selected a modified version of Alternative 2 (referred to as the "Selected Alternative"). This decision authorizes commercial timber harvest on approximately 8,240 acres and hazardous fuels reduction treatments on 3,446 acres.

76.    The Final EA states that the Selected Alternative authorizes "variable retention harvest" and "gap creation" logging prescriptions in mature and old-growth stands.

77.    The Final EA acknowledges that variable retention harvest will shift the forest structural stage from "mature" or "structurally complex" to "stand establishment."

78.    The Final EA assigns a "high" fire hazard rating to the "stand establishment" structural stage, and discloses that this stage will persist for approximately 20 years post-harvest.

79.    The chosen alternative authorizes extensive road work to facilitate logging, including 28 miles of new road construction and 241 miles of road renovation.

80.    The Final EA discloses that the authorized Project will have a substantially larger footprint within designated northern spotted owl critical habitat than was analyzed by FWS in the 2023 BiOp.

81.    Whereas the 2023 BiOp analyzed impacts to only 3,093 acres of critical

habitat in the KLE-2 subunit, the Final EA discloses that the authorized Project will treat a total of 8,311 acres of critical habitat in the Project area.

82.    Whereas the 2023 BiOp analyzed the removal or downgrade of 791 acres of NRF critical habitat, the Final EA discloses that the authorized Project will remove 2,137 acres of NRF critical habitat—nearly triple the amount analyzed by FWS.

83.    Whereas the 2023 BiOp analyzed the removal of 336 acres of dispersal-only critical habitat, the Final EA discloses that the authorized Project will remove 1,115 acres of dispersal-only critical habitat—more than triple the amount analyzed by FWS.

84.    BLM did not reinitiate formal consultation with FWS to address these increased impacts to critical habitat before issuing DR #1 or any subsequent Decision Records.

85.    Regarding the NWPT, the Final EA acknowledges the species is proposed for listing as threatened under the ESA and is currently classified as a Bureau Sensitive Species.

86.    The Final EA states that Project activities will modify or remove 2,251 acres of NWPT overwintering habitat within 1,640 feet of aquatic habitat (Zones 1 and 2). The Project will remove or modify 42 percent of NWPT overwintering habitat in the Analysis Area. The Project will construct roads through NWPT overwintering habitat.

87.    The RMP mandates that BLM "implement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects."

88.    In the Final EA, BLM identified Project Design Features ("PDFs") to mitigate threats to the NWPT, including seasonal restrictions on road construction and timber treatments in overwintering habitat, and requirements to install turtle-passable culverts.

89.     However, BLM decided that it will not implement these conservation measures unless and until the species is formally listed under the ESA. The Final EA states that if the NWPT is not listed, it will continue to be managed under bureau sensitive species guidelines.

90.     BLM issued a Finding of No Significant Impact (FONSI) for the Last Chance Project, determining that an Environmental Impact Statement (EIS) is not required.

91.     In reaching its FONSI, BLM concluded that the Project's effects on the quality of the human environment—including impacts to unique geographic characteristics, ecologically critical areas, and threatened or endangered species—were not significant.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF:

## Violations of Section 7 of the Endangered Species Act

## (Against All Defendants)

## COUNT 1: BLM Arbitrarily and Capriciously Relied on a Biological Opinion that Fails to Analyze the Project's Actual Impacts to Northern Spotted Owl Critical Habitat.

92.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

93.     Section 7(a)(2) of the Endangered Species Act (ESA) requires federal agencies to ensure their actions are not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2). To fulfill this duty, the "action agency," here BLM, must consult with the "consulting agency," here FWS.

94.     The consultation process imposes mandatory procedural duties on the action and consulting agencies. To initiate formal consultation, BLM must provide FWS with a description of the proposed action in "sufficient detail to assess the effects of

the action on listed species and critical habitat," using the "best scientific and commercial data available." 50 C.F.R. §§ 402.14(c)–(d); 16 U.S.C. § 1536(a)(2). Second, BLM and FWS have a continuing mandatory obligation to reinitiate consultation if "the identified action is subsequently modified in a manner that causes an effect to the listed species or habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16(a)(3).

95.   Here, the administrative record for the Project shows that BLM relies on the July 3, 2023, BiOp, which was based on data from BLM's April 24, 2023, BA. These documents state that the project will remove or modify 3,093 acres of northern spotted owl critical habitat in the affected subunit, including the removal of 791 acres of Nesting, Roosting, and Foraging (NRF) habitat.

96.   However, the Project authorized by BLM is materially distinct from the action analyzed in the BiOp. The Final EA discloses that the Project will result in the removal or modification of 8,311 acres of northern spotted owl critical habitat, including the removal of 2,137 acres of NRF habitat and 1,115 acres of dispersal-only habitat. The authorized Project therefore results in nearly triple the amount of NRF critical habitat removal analyzed by FWS.

97.   BLM arbitrarily and capriciously relied on the 2023 BiOp because it does not analyze the project that BLM ultimately approved. Therefore, BLM either failed to accurately describe the proposed action at the outset, in violation of 50 C.F.R. § 402.14(d), or failed to complete a mandatory consultation reinitiation due to the project's modification, in violation of 50 C.F.R. § 402.16(a)(3).

98.   BLM's reliance on the 2023 BiOp despite these material discrepancies is arbitrary, capricious, and violates Section 7 of the ESA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(c)–(d), 402.16(a)(3).

**COUNT 2: FWS Failed to Use the Best Available Science Regarding Northern Spotted Owl Site Occupancy and Survey Efficacy, Rendering the**

**BiOp Arbitrary and Capricious.**

99.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

100.    FWS must use the "best scientific and commercial data available" when preparing a BiOp. 16 U.S.C. § 1536(a)(2).

101.    The July 2023 BiOp for the Project concludes there will be "zero incidental take" of the northern spotted owl. This conclusion is based on a "take avoidance" strategy which requires BLM to conduct protocol surveys to locate spotted owls then "drop or modify" units if owls occupy the site to avoid take. The BiOp outlines criteria for determining occupancy, adopted from the 2012 Survey Protocol, which requires establishing the presence of a "Territorial Pair" or "Resident Single." Occupancy requires documentation of a spotted owl pair or specified nesting or fledgling activity in the case of a Territorial Pair, or at least three observations of a single owl over a two-year period in the case of a Resident Single. Spotted owl detections that do not meet these criteria are considered transient "floaters" which do not receive special management protections.

102.    In February 2023, approximately five months before FWS issued the Project's BiOp, the peer-reviewed study *Appel et al.* (2023) was published in the journal of Ecosphere. The *Appel* study shows that: (1) protocol surveys systematically undercount northern spotted owl pairs and that pairs may often go undetected, estimating that that the true occupancy rate is 1.3 to 4.1 times greater than observed rates; (2) there is a high probability (0.72) that any single detected northern spotted owl belongs to a territorial pair, undermining the agencies' practice of dismissing single detections as non-territorial "floaters"; and (3) the intensity of barred owl vocalizations, not just their presence, negatively correlates with northern spotted owl pairing, an effect on survey detectability the BiOp does not consider. *Appel* directly challenges the BiOp's assumption that protocol surveys are effective at detecting resident northern spotted owls when they are present and

shows that the BiOp sets the bar for occupancy, underrepresents actual spotted owl occupancy. This is further supported by the best available science. By ignoring this science, FWS arbitrarily treated high-probability resident pairs as "floaters" that do not benefit from site protections.

103.    The administrative record contains no indication that FWS considered the *Appel* study or fully grappled with the best available science, rendering the BiOp arbitrary and capricious. Because the *Appel* study was available for five months before the BiOp was issued, FWS violated its duty under 16 U.S.C. § 1536(a)(2) to use the best available science. Alternatively, if the study is considered "new information," its findings reveal that the project's effects will occur to an "extent not previously considered," triggering FWS's duty to reinitiate consultation under 50 C.F.R. § 402.16(a)(2).

104.    FWS's failure to use the best scientific and commercial data available concerning spotted owl occupancy and survey efficacy is arbitrary and capricious, and violates the ESA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

**COUNT 3: FWS Failed to Accurately Define the Environmental Baseline by Systematically Excluding Likely Occupied Sites.**

105.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

106.    When preparing a BiOp under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), FWS must evaluate the "effects of the action" against the "environmental baseline," which represents the condition of the listed species in the action area without the consequences to the listed species caused by the proposed action. 50 C.F.R. §§ 402.02; 402.14(g)–(h). Accurately defining the environmental baseline is vital for a lawful jeopardy and take analysis.

107.    The 2023 BiOp defines the environmental baseline for northern spotted owl occupancy in the action area utilizing the occupancy determination methodology

outlined in the 2012 Survey Protocol, which classifies sites with fewer than three detections as unoccupied "floaters" or "transients." Based on this methodology, FWS excluded at least seven sites within the action area that had "incidental" owl detections from its baseline count of occupied territories.

108.    This environmental baseline is arbitrary and capricious because it contradicts the best available science regarding occupancy. First, FWS ignores the best available science demonstrating that, in the current biological context of Barred Owl suppression, the 2012 Survey Protocol systematically underrepresents spotted owl occupancy. *Appel et al.* (2023), for example, demonstrates that a detection of a single spotted owl has a 72-percent probability of belonging to a territorial pair. By classifying these seven sites as "unoccupied" based on detection frequency, FWS arbitrarily excluded sites that have a high statistical probability of being occupied by territorial pairs.

109.    Ignoring and misapplying the best available science, including *Appel et al.* (2023), FWS defined a distorted environmental baseline that undercounts the number of occupied spotted owl sites exposed to the Last Chance Project's effects. This failure renders the BiOp arbitrary and capricious and violates the ESA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g)–(h).

## COUNT 4: FWS's "Zero Incidental Take" Determination is Arbitrary and Capricious.

110.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

111.    The July 2023 BiOp for the Project concludes that there will be "zero incidental take" of the northern spotted owl. This conclusion rests on a two-part take avoidance strategy: (1) BLM will conduct pre-implementation protocol surveys to locate resident owls, and (2) if owls are located, BLM will "modify or drop the units as appropriate." This strategy is applied across a project that FWS acknowledges will adversely affect habitat in 58 known northern spotted owl sites,

including 11 occupied sites.

112.    FWS's zero take determination is arbitrary and capricious because it excludes sites where owls were detected but dismissed as transient "floater" owls, an error that will likely be repeated in future protocol surveys during Project implementation. As alleged in Count 2 and Count 3, FWS acknowledges that seven sites in the action area had owl detections that did not meet the 2012 Survey Protocol's threshold for occupancy. FWS concluded that logging these sites would result in no incidental take. This conclusion is irrational because it ignores the best available science, including *Appel et al.* (2023), demonstrating a 72-percent probability that such detections represent territorial pairs. FWS failed to analyze the likelihood that the Project will incidentally take resident owls at these seven sites. This mistake is compounded by FWS's failure to consider the likelihood that future protocol surveys carried out during Project implementation will similarly misidentify site occupancy in the Project area, allowing activities to proceed that may take territorial owls at these sites.

113.    Second, for the 11 sites FWS acknowledges are occupied, the "zero take" determination is arbitrary and capricious because it concludes without adequate support that "modify" treatments found likely to adversely affect resident northern spotted owls will not "harm" and therefore "take" those owls. FWS assumes that avoiding "removal" of nesting habitat avoids take entirely. However, the BiOp fails to analyze whether "modify" treatments—which include removing understory vegetation and simplifying stand structure—will significantly impair essential breeding, feeding, or sheltering behaviors in these occupied sites.

114.    Third, the BiOp's zero take determination is arbitrary and capricious because its underlying avoidance strategy is speculative and unenforceable. It provides no binding criteria for what triggers a unit being dropped versus modified, leaving the decision to the agency's discretion without ensuring take will be avoided.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          23

115.    FWS's conclusion that the Last Chance project will not result in incidental take is arbitrary and capricious, and violates the ESA. 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1535(a)(2), 50 C.F.R. § 402.14(g)–(i).

116.    FWS's conclusion that no incidental take authorization is required is required is arbitrary and capricious, and violates the ESA. 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14(g)–(i).

## SECOND CLAIM FOR RELIEF:

## Violation of Federal Land Policy and Management Act

## (Against U.S. Bureau of Land Management)

117.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

118.    The Federal Land Policy and Management Act (FLPMA) requires that all BLM management actions "conform to" the approved Resource Management Plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

119.    The RMP contains a mandatory "Management Direction" for Bureau Sensitive Species. BLM must "[i]mplement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions." RMP p. 115. The stated purpose of this rule is to "minimize the likelihood and need for ESA listing." RMP p. 115.

120.    The NWPT is a Bureau Sensitive Species under the RMP and is proposed for listing as threatened under the ESA. The Project area includes at least three resident groups of northwestern pond turtles, and potentially more, since BLM did not survey for the species.

121.    The Project will modify or remove 2,251 acres of NWPT overwintering habitat within 1,640 feet of aquatic habitat (Zones 1 and 2). BLM identified project design features (PDFs) to mitigate impacts to overwintering habitat, but decided these PDFs will only be implemented if the species is listed in the future. Final EA p. 78.

Otherwise, BLM stated it will manage NWPT habitat in the Project area under the unspecified "bureau sensitive species guidelines" and that the PDFs "could be waived."

122. BLM violates FLPMA because it fails to conform to the RMP's mandatory management direction to implement conservation measures to mitigate threats to Bureau Sensitive species during project planning. By refusing to implement the necessary conservation measures for the NWPT unless and until FWS lists the species, and failing to explain how the bureau guidelines it relies on in the interim satisfy the RMP management direction for the Bureau Sensitive species, BLM has failed to conform to the RMP.

123. BLM's failure to conform to the 2016 RMP by authorizing the Last Chance project without implementing mandatory conservation measures for the northwestern pond turtle is arbitrary and capricious, and violates FLPMA. 5 U.S.C. § 706(2)(A); 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

### THIRD CLAIM FOR RELIEF:

### Violation of National Environmental Policy Act
### (Against U.S. Bureau of Land Management)

124. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

125. Federal agencies are required to prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

126. BLM's FONSI for the Project is arbitrary and capricious because substantial questions exist regarding the project's significant effects on unique ecological areas.

127. The Last Chance Project will affect areas with unique geographic characteristics, including rare serpentine soils and associated endemic plant communities, mature and old-growth forests, critical habitat for ESA-listed species and other special status wildlife species, and riparian reserves.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                 25

128.    The Project will result in significant effects to public safety and ecologically critical areas by increasing fire hazard. The Final EA acknowledges that the Project's extensive use of variable retention harvest will shift fire-resilient mature stands into the "stand establishment" phase, creating a "high" fire hazard rating for a period of 20 years.

129.    The Project will result in effects that are highly uncertain, including the impact of logging on mature and old-growth forest stands, northern spotted owl critical habitat, northwestern pond turtle overwintering habitat, and water quality.

130.    BLM's FONSI for the Last Chance Project is arbitrary and capricious and violates NEPA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C).

131.    BLM's failure to prepare an EIS for the Last Chance Project is arbitrary and capricious and violates NEPA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C).

132.    BLM's decision to authorize the Last Chance Project Decision Records without complying with NEPA and is arbitrary and capricious and not in accordance with law. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Based upon the foregoing, Plaintiffs respectfully request that this Court:

I.    Declare that FWS violated the ESA and APA by failing to use the best available scientific and commercial data regarding northern spotted owl survey efficacy and site occupancy in the 2023 Biological Opinion;

II.    Declare that FWS violated the ESA and APA by defining the environmental baseline relying on the 2012 Survey Protocol that systematically undercounts northern spotted owl occupancy in the 2023 Biological Opinion;

III.    Declare that FWS violated the ESA and APA by arbitrarily and capriciously concluding that the Last Chance Project will result in "zero incidental take" of the northern spotted owl;

IV.    Declare that BLM violated the ESA and APA by arbitrarily and capriciously

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF              26

relying on the 2023 Biological Opinion and failing to reinitiate consultation despite modifying the Project to increase adverse effects to designated critical habitat;

V. Declare that BLM violated FLPMA and the APA by authorizing a Project that fails to conform to the RMP's mandatory management direction for Bureau Sensitive Species;

VI. Declare that BLM violated NEPA and the APA by issuing a Finding of No Significant Impact and failing to prepare an Environmental Impact Statement despite substantial questions regarding the Project's significant effects;

VII. Vacate and set aside the 2023 Biological Opinion and Incidental Take Statement until the Court finds that FWS has complied with the ESA and APA;

VIII. Vacate and set aside the Final Revised Environmental Assessment, the Finding of No Significant Impact, and any and all associated Decision Records until the Court finds that BLM has complied with the ESA, FLPMA, NEPA, and APA;

IX. Enjoin BLM and its contractors, assigns, and other agents from proceeding with the Last Chance Project until Defendants demonstrate compliance with the law;

X. Award Plaintiffs their reasonable fees, costs, and expenses, including attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered Species Act, 16 U.S.C. § 1540(g);

XI. Issue any other relief, including preliminary or permanent injunctive relief, that Plaintiffs may subsequently request; and

XII. Grant Plaintiffs such other and further relief as the Court deems equitable and just.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          27

Respectfully submitted this 9th day of December, 2025,

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
+1 541.778.6626
+1 971.285.3632