Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
541.778.6626
971.285.3632

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER**, **OREGON WILD**, and **CASCADIA WILDLANDS**, | Case No. 1:25-cv-2296-CL |
| *Plaintiffs*, | |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM** |
| **DOUGLAS JAMES BURGUM** in his official capacity as Secretary of the Interior, **U.S. FISH & WILDLIFE SERVICE**, and **U.S. BUREAU OF LAND MANAGEMENT**, | **EXPEDITED HEARING REQUESTED** |
| *Defendants;* | |
| and | |
| **MURPHY COMPANY,** | |
| *Applicant-Defendant-Intervenor.* | |

# TABLE OF CONTENTS

Table of Contents...................................................................................................... i

Table of Authorities ............................................................................................... iii

Glossary of Acronyms ........................................................................................... vii

Motion ...................................................................................................................... 1

Memorandum ........................................................................................................... 3

I.    Factual Background ........................................................................................... 3

    A.    The Northern Spotted Owl .................................................................... 3

        1.    Species Status and Habitat Requirements............................. 3

        2.    Population Decline and Threats to Habitat............................ 3

        3.    The Barred Owl Threat and Detection Challenges............... 4

        4.    Best Available Science on Occupancy .................................. 5

    B.    The Northwestern Pond Turtle .............................................................. 6

        1.    Habitat Requirements and Overwintering Behavior............. 6

        2.    Threats from Logging and Roads .......................................... 7

    C.    Last Chance Timber Sale....................................................................... 7

        1.    Consultation History (FY 2023 BA and BiOp) ..................... 8

        2.    NEPA Process and Decision (EAs and DRs)......................... 9

    D.    Plaintiffs' Interests and Exhaustion ................................................... 10

II.    Standard of Review ........................................................................................ 11

III.    Likelihood of Success on the Merits .............................................................. 12

    A.    BLM and FWS Violated the Endangered Species Act. ........................... 12

        1.    BLM Arbitrarily and Capriciously Relies on a Biological Opinion that Fails to Analyze the Project's Actual Impacts on Spotted Owl Critical Habitat....................................................................................... 13

        2.    FWS's "Zero Take" Determination Rests on a Distorted Environmental Baseline that Ignores Best Available Science. ......... 15

            a.    The ESA Requires FWS to Define the Environmental Baseline and Estimate Take Using the Best Available Science............... 16

            b.    FWS and BLM Used a Frequency Threshold to Determine Occupancy.................................................................................. 17

            c.    Appel Demonstrates that Single Detections are Highly Predictive of Resident Pairs. ...................................................... 18

d.   FWS Incorrectly Defined the Environmental Baseline by Ignoring *Appel* and Excluding Seven Sites with Detections. .... 19

e.   The Distorted Baseline Renders the "Zero Take" Determination Arbitrary and Capricious............................................. 20

B.   BLM Violated FLPMA by Authorizing a Project that Fails to Conform to the RMP's Mandatory Management Direction for Bureau Sensitive Species ........................................................................... 21

IV.   Irreparable Harm ........................................................................... 24

A.   The Project Will Cause Irreparable Harm to the Spotted Owl. ................ 24

B.   The Project Will Cause Irreparable Harm to the Pond Turtle. ................ 25

C.   The Project Will Cause Irreparable Harm to Plaintiffs' Interests. ........... 26

V.   Balance of Equities and Public Interest ............................................. 27

VI.   Requiring a Bond Would Effectively Deny Access to Judicial Review ............. 30

Conclusion........................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell,*

    632 F.3d 1127 (9th Cir. 2011) .................................................................*passim*

*All. for the Wild Rockies v. Gassman,*

    604 F. Supp. 3d 1022, 1037 (D. Mont. 2022) ............................................ 29, 30

*Amoco Prod. Co. v. Vill. of Gambell,*

    480 U.S. 531 (1987) ............................................................................... 24, 26

*Appalachian Voices v. U.S. Dep't of Interior,*

    25 F.4th 259 (4th Cir. 2022) ........................................................................ 13

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*

    789 F.3d 1075 (9th Cir. 2015) ..................................................... 24, 25, 26, 28

*Ctr. for Biological Diversity v. BLM,*

    698 F.3d 1101 (9th Cir. 2012) ................................................................. 14, 15

*Central Or. Landwatch v. Connaughton,*

    905 F. Supp. 2d 1192 (D. Or. 2012) ............................................................. 30

*Citizens to Pres. Overton Park, Inc. v. Volpe,*

    401 U.S. 402 (1971) ..................................................................................... 11

*City of Tacoma v. FERC,*

    460 F.3d 53 (D.C. Cir. 2006) ....................................................................... 14

*Envtl. Prot. Info. Ctr. v. Carlson,*

    968 F.3d 985 (9th Cir. 2020) ....................................................................... 28

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*

    98 F.4th 1180 (9th Cir. 2024) ...................................................................... 12

*Forest Conservation Council v. Rosboro Lumber Co.,*

    50 F.3d 781 (9th Cir. 1995) .......................................................................... 24

*Greater Yellowstone Coal., Inc. v. Servheen,*

    665 F.3d 1015 (9th Cir. 2011) ............................................................ 12

*League of Wilderness Defs. v. Connaughton,*

    752 F.3d 755 (9th Cir. 2014) ...................................................*passim*

*Marbled Murrelet v. Babbitt,*

    83 F.3d 1060 (9th Cir. 1996) ............................................................ 24

*Mayo v. Jarvis,*

    177 F. Supp. 3d 91 (D.D.C. 2016) ...................................... 17, 20, 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*

    184 F. Supp. 3d 861 (D. Or. 2016) ......................................... 17, 20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*

    524 F.3d 917 (9th Cir. 2008) ............................................................ 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*

    886 F.3d 803 (9th Cir. 2018) ..................................................... 11, 27

*Native Ecosystems Council v. Dombeck,*

    304 F.3d 886 (9th Cir. 2002) ............................................................ 11

*Native Ecosystems Council v. U.S. Forest Service,*

    418 F.3d 953 (9th Cir. 2005) ............................................................ 23

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.,*

    992 F. Supp. 2d 1095 (D. Or. 2014) ............................................... 13

*Or. Nat. Res. Council Fund v. Brong,*

    492 F.3d 1120 (9th Cir. 2007) .................................................. 22, 23

*San Luis & Delta-Mendota Water Auth. v. Locke,*

    776 F.3d 971 (9th Cir. 2014) .................................................... 17, 20

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo,*

    161 F.4th 590 (9th Cir. 2025) ......................................................... 28

*Sierra Forest Legacy v. Rey*,

    577 F.3d 1015 (9th Cir. 2009) ............................................................................ 28

*W. Watersheds Project v. Kraayenbrink*,

    632 F.3d 472 (9th Cir. 2011) ............................................................................. 12

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,

    32 F.4th 852 (9th Cir. 2022) .............................................................................. 11

*Willamette Riverkeeper v. Nat'l Marine Fisheries Service*,

    763 F. Supp. 3d 1203 (D. Or. 2025) ................................................................. 13

*Winter v. Nat. Res. Def. Council*,

    555 U.S. 7 (2008) ....................................................................................... 11, 24


**Statutes**

5 U.S.C. § 706 ......................................................................................................... 11

16 U.S.C. § 1536 ................................................................................................*passim*

16 U.S.C. § 1540 ..................................................................................................... 11

43 U.S.C. § 1732 ..................................................................................................... 22


**Regulations**

43 C.F.R. § 1610.5-3 ............................................................................................... 22

50 C.F.R. § 402.02 ...................................................................................... 13, 17, 20

50 C.F.R. § 402.14 .................................................................................. 13, 15, 17, 21

50 C.F.R. § 402.16 ................................................................................................... 15


**Federal Register**

*Determination of Threatened Status for Northern Spotted Owl*,

    55 Fed. Reg. 26,114 (June 26, 1990) ............................................................... 3, 4

*Revised Critical Habitat for Northern Spotted Owl,*

    77 Fed. Reg. 71,876 (Dec. 4, 2012) ..................................................... 8, 25

*12-Month Finding for Northern Spotted Owl,*

    85 Fed. Reg. 81,144 (Dec. 15, 2020) ................................................... 3, 4

*Threatened Species Status for Pond Turtles: Proposed Rule,*

    88 Fed. Reg. 68,370 (Oct. 3, 2023) .............................................. 6, 7, 22

**Miscellaneous**

FED. R. CIV. P. 65 ............................................................................................ 1

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BLM | U.S. Bureau of Land Management |
| DR | Decision Record |
| EA | Environmental Assessment |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FWS | U.S. Fish & Wildlife Service |
| NEPA | National Environmental Policy Act |
| NRF | Nesting, Roosting, and Foraging |
| PAM | Passive Acoustic Monitoring |
| RMP | Resource Management Plan |

## **MOTION**

Plaintiffs Klamath-Siskiyou Wildlands Center et al. respectfully move for a limited preliminary injunction pursuant to FED. R. CIV. P. 65(a) to enjoin Defendants Douglas James Burgum, the U.S. Bureau of Land Management (BLM), and U.S. Fish & Wildlife Service (FWS) from authorizing or implementing ground-disturbing activities within parts of the Last Chance Project area in southern Oregon. Plaintiffs' request is narrowly tailored to enjoin logging and road construction only within northern spotted owl nesting, roosting, and foraging habitat, and northwestern pond turtle overwintering habitat. Plaintiffs request an expedited hearing and expedited consideration of this motion because project activities are scheduled to resume in April 2026, Declaration of Sangye Ince-Johannsen ¶ 4 (Dkt. No. 17), threatening imminent and irreparable harm to these imperiled species and to Plaintiffs' members. Pursuant to LR 7-1, the parties made a good faith effort through electronic communications and telephone conferences to resolve this dispute and have been unable to do so. Ince-Johannsen Decl. ¶¶ 3–8, 10. Defendants oppose this motion but do not oppose Plaintiffs' request for an expedited hearing. *Id*. ¶ 10. Proposed Defendant-Intervenors oppose this motion and Plaintiffs' request for an expedited hearing. *Id*. Counsel for American Forest Resource Council and Association of O&C Counties have notified Plaintiffs they intend to move to intervene in this case and oppose this motion and reserve taking a position on Plaintiffs' request for an expedited hearing. *Id*.

The Project authorizes logging in 11,686 acres of largely intact, ecologically rich forests. The Project would log up to 4,536 acres of spotted owl nesting, roosting, and foraging habitat in a critical connectivity corridor identified by FWS as essential to the species' survival. The Project also authorizes logging of over 3,100 acres of overwintering habitat for the pond turtle, a species FWS has proposed for listing as threatened primarily due to habitat loss and fragmentation.

The urgency of this motion is driven by imminent implementation of the "Paul's Payoff" and "Take A Chance" timber sales that are part of the Project.[1] On January 28, 2026, Proposed Defendant-Intervenor Murphy Company indicated its intent to begin logging in Paul's Payoff in April 2026 and build roads in the summer of 2026. Declaration of Nate Root ¶ 6 (Dkt. No. 10). Plaintiffs confirmed that logging or right-of-way clearance had already begun in multiple units containing owl and turtle habitat. Ince-Johannsen Decl. ¶¶ 3–5. The scope of Murphy Company's activities increased until, by February 9, 2026, it had logged in six units, including in spotted owl nesting, roosting, and foraging habitat, and pond turtle overwintering habitat. *Id*. ¶¶ 5–6. While Murphy has represented it intends to stop logging by February 19, 2026, and not resume until May 2026, *id*. ¶¶ 6–7, resumption of these activities will result in the immediate destruction of essential habitat and irreparable harm to the species that depend on it and to Plaintiffs' interests. Plaintiffs respectfully reserve the right to seek a Temporary Restraining Order if activities resume before this motion is resolved.

As detailed below, Plaintiffs are likely to succeed on the merits of their claims. BLM authorized the Project based on a biological opinion (BiOp) that analyzes only a small fraction of the Project's actual impacts to critical habitat, and BLM arbitrarily ignored best available science indicating the likely presence of resident spotted owls where logging is authorized. Moreover, logging will cause irreparable injury to threatened species and to Plaintiffs' interests that cannot be remedied by money damages. Because the balance of equities and the public interest favor preserving imperiled species and their habitat, the Court should grant this preliminary injunction.

---

[1]  BLM is assembling final contract packages for two additional sales: "Rotor's Up" and "King Graves." Ince-Johannsen Decl. ¶ 2.

## MEMORANDUM

## I.    FACTUAL BACKGROUND

### A.    The Northern Spotted Owl

The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized, dark brown owl primarily adapted to the late-successional and old-growth coniferous forests of the Pacific Northwest. *Determination of Threatened Status for Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990). With strong site fidelity and a long lifespan but low reproductive rate, the spotted owl relies on specific habitat structures to survive and propagate. *12-Month Finding for Northern Spotted Owl*, 85 Fed. Reg. 81,144, 81,145 (Dec. 15, 2020).

### 1.    Species Status and Habitat Requirements

Spotted owls require mature and old-growth forests with multi-layered canopies, large overstory trees, and moderate to high canopy closure (typically 60 percent or greater). Ince-Johannsen Decl. ¶ 11, Exh. A at KSW00126 (FWS, Northern Spotted Owl Recovery Plan (2011)). These features provide essential thermal cover and protection from predators. *Id*. The species also depends on forest complexity—including large snags, cavities, and down wood—to support its primary prey base of small mammals, such as the northern flying squirrel and red tree vole. *Id*. Recognizing the critical importance of these features, the Recovery Plan recommends "conserving occupied sites and unoccupied, high-value spotted owl habitat on [federal] lands wherever possible." *Id*. at KSW00082. Because spotted owls are intolerant of disturbance and fragmented habitat, survival of local owl populations depends on preserving large, contiguous patches of suitable habitat and adequate dispersal corridors to facilitate gene flow. *Id*. at KSW00030.

### 2.    Population Decline and Threats to Habitat

FWS listed the northern spotted owl as threatened in 1990 because logging had already eliminated an estimated 60 to 88 percent of the species' historic

habitat. 55 Fed. Reg. at 26,177. Since then, spotted owl habitat loss has continued. Between 1993 and 2017 alone, the species lost an additional 2.9 million acres of nesting and roosting habitat. Ince-Johannsen Decl. ¶ 12, Exh. B at KSW00503 (FWS, BiOp App. A). In southwestern Oregon, the loss of owl habitat is exacerbated by the "checkerboard" land ownership pattern, where alternating square miles of federal land are interspersed with private industrial timberlands managed on short rotations that generally lack suitable habitat. Ince-Johannsen Decl. ¶ 13, Exh. C at KSW00813 (BLM, Final EA). This fragmentation leaves federal lands as the primary—and often only—refuge for the species in the region.

Despite ESA protections, the species has continued to decline. In 2020, FWS determined that reclassifying the spotted owl from "threatened" to "endangered" status is warranted because stressors—particularly habitat loss and competition from the invasive barred owl—are of such "imminence, intensity, and magnitude" that the owl is now in danger of extinction throughout its range. 85 Fed. Reg. at 81,146. Demographic studies confirm populations in all monitoring areas, including southern Oregon, are in a state of decline. KSW00512.

### 3.    The Barred Owl Threat and Detection Challenges

The invasive barred owl (*Strix varia*) poses a significant threat to the spotted owl through direct competition and behavioral suppression. Barred owls are larger, more aggressive, and adaptable to a wider range of prey and habitat types. KSW00336. Habitat loss exacerbates this threat; as older forests are fragmented, spotted owls are forced into smaller patches of remaining habitat where they are more vulnerable to displacement or predation by barred owls. KSW00343.

Critical to this case, the presence of barred owls suppresses the vocalization behavior of spotted owls. Ince-Johannsen Decl. ¶ 14, Exh. D at KSW01015 (Appel *et al.* (2023)). Resident spotted owls are less likely to respond to broadcasted calls when barred owls are present, adopting a "cryptic" behavior to avoid detection and

conflict. KSW00336. This behavioral suppression complicates efforts to locate spotted owls.

Federal agencies typically rely on a "Protocol Survey" method that uses broadcasted calls to elicit a response. Ince-Johannsen Decl. ¶ 15, Exh. E at KSW01023 (2012 Protocol). Under the Protocol, a site is classified as occupied by a "Resident Single" spotted owl only if one is detected on three or more occasions within a breeding season. KSW01047. Detections that do not meet this frequency threshold—such as a single response—are classified as "Status Unknown," and are treated as evidence of non-territorial "floater" or transient owls. *Id.*; *see also* KSW00328, 00421 (BiOp).

### 4.    Best Available Science on Occupancy

Recent scientific research challenges the reliability of the Protocol's frequency-based thresholds. Passive Acoustic Monitoring (PAM), which records natural vocalizations without human presence, has proven significantly more effective than broadcast surveys at detecting cryptic owls. KSW01001, 01015. Notably, Appel *et al.* (2023) demonstrated that traditional survey methods systematically undercount resident owls. KSW01013.[2] Using PAM, the study found that true pair occupancy is 1.3 to 4.1 times greater than rates observed using traditional methods. KSW01000, 01010–11. Appel quantified the predictive value of single detections, finding that a single acoustic detection carries a 0.72 probability of indicating a resident pair. KSW01012. This finding contradicts the assumption that single or infrequent detections represent non-territorial "floaters," suggesting instead that such detections are often the only evidence provided by cryptic resident

---

[2]  Scientists from the U.S. Forest Service co-authored Appel with funding from the BLM. KSW01000. These authors include the federal scientists currently responsible for overseeing the range-wide northern spotted owl monitoring program. The study was conducted specifically to address the limitations of the traditional survey methods used by the agencies.

pairs.

### B.    The Northwestern Pond Turtle

The northwestern pond turtle (*Actinemys marmorata*) is one of only two native freshwater turtle species in Oregon. Ince-Johannsen Decl. ¶ 16, Exh. F at KSW01073 (Rosenberg *et al.* (2009)). Long-lived but with low reproductive output, the species exhibits delayed sexual maturity and high egg and hatchling mortality. KSW01088, 01091–92; Ince-Johannsen Decl. ¶ 17, Exh. G at KSW01184 (FWS, Special Status Assessment (April 2023)). Consequently, the pond turtle relies on high adult survivorship to maintain viable populations. KSW01176.

Due to significant population declines driven primarily by habitat loss and fragmentation, in 2023, FWS proposed listing the northwestern pond turtle as threatened under the ESA. *Threatened Species Status for Pond Turtles: Proposed Rule*, 88 Fed. Reg. 68,370 (Oct. 3, 2023). FWS found that listing was warranted to address threats including anthropogenic impacts. *Id*. at 68,377. BLM has designated the turtle as a "Bureau Sensitive Species." KSW00659.

### 1.    Habitat Requirements and Overwintering Behavior

The pond turtle requires both aquatic and terrestrial upland habitat to complete its life cycle. 88 Fed. Reg. at 68,376. They can spend up to ten months of the year on land for nesting and overwintering. KSW01174. Turtles typically leave aquatic habitat in late summer or early fall to overwinter in upland forests, traveling up to 500 meters (1,640 feet) from the water's edge. KSW01172; KSW00659. During this overwintering period, turtles burrow deep into leaf litter, duff, or soil at the base of trees and shrubs, where they remain dormant and virtually invisible until spring. KSW01176–77. Pond turtles have been observed exhibiting strong site fidelity, returning to the same upland overwintering sites year after year. KSW01172. Nesting also occurs in upland habitats, typically from mid-May through July, with hatchlings often remaining in the nest through the

winter. KSW01168–69; KSW01087–88.

### 2.    Threats from Logging and Roads

Because of their aquatic and terrestrial habitat needs, pond turtles are vulnerable to land management activities adjacent to streams and rivers. KSW01105. Heavy equipment operation, timber harvest, and road construction in overwintering habitat can crush dormant turtles buried in the duff, and destroy nests. Ince-Johannsen Decl. ¶ 18, Exh. H at KSW01390–91 (Or. Dept. of Fish & Wildlife, Guidance for Conserving Oregon's Native Turtles (2015)). Roads pose a dual threat: they cause direct mortality through vehicle strikes when turtles migrate between aquatic and upland habitats, and they fragment populations by severing connectivity. KSW01201–02. Logging removes and modifies upland nesting and overwintering habitat. 88 Fed. Reg. 68,377–78; KSW01390.

### C.    Last Chance Timber Sale

The Last Chance Project lies within the rugged Klamath Mountains geomorphic province, in a landscape characterized by the unique geology of the Inland Siskiyous ecoregion. KSW00691. Here, granite and peridotite intrusions have altered to serpentinite, forming ultramafic soils with a unique nutrient profile. *Id*. These soils support rare plant communities and diverse, fire-resilient old-growth forests characterized by sugar pine, ponderosa pine, incense cedar, and Douglas-fir. *Id*.; KSW00297–98.

The Project area is characterized by a "checkerboard" ownership pattern, where square miles of BLM-managed public land alternate with private industrial timberlands managed on short rotations. KSW00439. Due to extensive logging on these adjacent private lands, which are typically harvested on 40- to 60-year rotations, federal lands in the Project area provide the essential habitat necessary to support the species' recovery. *Id*. (private lands); KSW00368 (federal lands as 'source' populations).

The Project falls within the Klamath East 2 (KLE-2) critical habitat subunit, a landscape FWS identified as "essential for the conservation of the species." *Revised Critical Habitat for Northern Spotted Owl*, 77 Fed. Reg. 71,876, 71,934 (Dec. 4, 2012). FWS designated this subunit to function as a vital connectivity corridor, facilitating east-west movement of spotted owls between the western Cascades, coastal Oregon, and the Klamath Mountains. *Id.* Because of its strategic location, FWS determined "all of the unoccupied and likely occupied areas" within this subunit are necessary to provide demographic support and buffer spotted owls from competition with barred owls. *Id.*

### 1.     Consultation History (FY 2023 BA and BiOp)

In April 2023, BLM initiated consultation with FWS for its "FY23 Batch of Projects," which included the Last Chance project. In its Biological Assessment (BA), BLM determined the Project was "likely to adversely affect" the northern spotted owl and its designated critical habitat. Ince-Johannsen Decl. ¶ 19, Exh. I at KSW01436. In 2023, FWS issued a BiOp for the batch of projects. KSW00280.

The BiOp analyzes the Project's effects on critical habitat based on acreage figures provided by BLM in the BA. Specifically, FWS analyzed a project that would treat a total of 3,093 acres of critical habitat within the affected subunit (KLE-2). KSW00425. Within this footprint, FWS analyzed the removal or downgrade of 791 acres of Nesting, Roosting, and Foraging (NRF) habitat and the removal of 336 acres of dispersal-only habitat. *Id.* Based on this scope of impact, FWS concluded the Project would not result in the destruction or adverse modification of critical habitat. KSW00444.

Despite finding that the Project would adversely affect habitat in 29 known spotted owl sites, FWS concluded the Project would result in "zero incidental take." KSW00444. This conclusion relied on a "take avoidance" strategy: BLM would conduct pre-implementation protocol surveys and to "drop or modify" units if

resident owls were located. KSW00444–45.

In defining the environmental baseline for this analysis, FWS identified eight sites in the Project area as occupied by pairs or resident single spotted owls. KSW00364. However, the BiOp also acknowledged that surveys had detected spotted owls at many other locations that did not meet the Protocol's residency threshold. Specifically, the BiOp notes "[s]even of the unoccupied sites have detected incidental spotted owl responses . . . in the last two years." KSW00366. FWS classified these seven sites as "unoccupied" or used by non-territorial "floaters" and afforded them no site-specific protections. *Id*.

For the sites FWS acknowledged as occupied, the BiOp concluded that take would be avoided by using "modify" treatments—which remove understory vegetation and reduce canopy cover to 60 percent—rather than "removal" treatments. KSW00372, 00415–16. FWS determined that such habitat modification would not constitute "harm" under the ESA. KSW00415–16.

## 2.  NEPA Process and Decision (EAs and DRs)

BLM initiated the NEPA process for the Last Chance Project in 2024. KSW01621. After voluntarily withdrawing an initial decision to conduct further analysis, BLM issued a Final Revised Environmental Assessment, KSW00582 (Final EA), and Decision Record #1 on May 12, 2025. Ince-Johannsen Decl. ¶ 21, Exh. K at KSW01621 (DR #1). DR #1 authorizes commercial logging on approximately 575 acres, employing "variable retention harvest" that will convert mature stands into early-seral "stand establishment" conditions. KSW01621; KSW00640.

The Final EA discloses a Project footprint that is materially larger than the action analyzed by FWS. Whereas the BiOp analyzed impacts to 3,093 acres of critical habitat, the Final EA reveals the Project will treat 8,311 acres of critical habitat in the affected subunit. KSW00787. Most significantly, the authorized

Project will remove 2,137 acres of NRF critical habitat—nearly triple the 791 acres analyzed in the BiOp. *Id.* Similarly, the Project will remove 1,115 acres of dispersal-only habitat, more than triple the 336 acres considered by FWS. *Id.*

Regarding the pond turtle, the Final EA acknowledges that Project activities will modify or remove 3,118 acres of overwintering habitat, and road construction poses a threat to the species. KSW00663. To mitigate these threats, BLM identified Project Design Features (PDFs), including seasonal restrictions on heavy equipment operation. KSW00660, 00842–43. However, despite the 2016 RMP's mandate to "implement conservation measures to mitigate specific threats to Bureau Sensitive species," Ince-Johannsen Decl. ¶ 22, Exh. L at KSW02152, BLM decided it would not implement these PDFs unless and until FWS lists the pond turtle under the ESA. KSW00660, 00842. The Final EA states that if the turtle remains a Bureau Sensitive Species, these protections "could be waived." KSW00660, 00842.

### D.    Plaintiffs' Interests and Exhaustion

Plaintiffs are non-profit conservation groups dedicated to protecting the forests and wildlife of the Pacific Northwest. Compl. ¶¶ 9–11 (Dkt. No. 1). Plaintiffs' members engage in hiking, birdwatching, photography, and wildlife observation within the Last Chance Project area, and have concrete plans to return to the units scheduled for logging. Compl. ¶¶ 9–11; *see* Declaration of George Sexton ¶ 6 (Dkt. No. 18); Declaration of Chandra LeGue ¶ 8 (Dkt. No. 19); Declaration of Madeline Cowen ¶¶ 8–10 (Dkt. No. 20). These members derive recreational, aesthetic, and professional enjoyment from the mature forests, northern spotted owls, and northwestern pond turtles found in the Project area, interests that would be irreparably harmed by the authorized logging and road construction. *Id.*

Plaintiffs have exhausted their administrative remedies. Plaintiffs submitted timely comments on the Draft and Revised Environmental Assessments, raising the ESA, FLPMA, and NEPA violations alleged herein. Compl. ¶ 6. Regarding the ESA

claims, Plaintiffs provided Defendants with written notice of the violations on September 24, 2025, more than sixty days prior to the commencement of this action. *Id.*; 16 U.S.C. § 1540(g)(2). Defendants have not cured the violations asserted in the notice letter.

## II.    STANDARD OF REVIEW

To obtain preliminary relief, Plaintiffs must generally show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs a "sliding scale" approach in considering these factors in which "a strong showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Plaintiffs need only show "serious questions" on the merits when the balance of equities tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). In cases involving the ESA, the balance of equities and public interest always favor protecting endangered species. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018).

When it comes to the merits of Plaintiffs' claims, ESA and Federal Land Policy and Management Act (FLPMA) claims are reviewed under the Administrative Procedure Act (APA). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The APA directs courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, courts may not substitute their judgment for that of the agency, but must nonetheless engage in a "thorough, probing, in depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Courts must "ensure the agency considered the relevant

factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). An agency's action is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## III.    LIKELIHOOD OF SUCCESS ON THE MERITS

To obtain injunctive relief, Plaintiffs need only show a likelihood of success on any one of their claims. *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014). As established below, Plaintiffs do so. However, because the balance of equities tips sharply in Plaintiffs favor, all that is required for an injunction here is that Plaintiffs raise "serious questions on the merits." *All. for the Wild Rockies*, 632 F.3d at 1131–32. Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (cleaned up)).

### A.    BLM and FWS Violated the Endangered Species Act.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). The heart of the ESA is Section 7. *Id.* It directs all federal agencies to consult with the Service to ensure its actions are not likely to jeopardize listed species or result in destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce

appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

When a federal action is "likely to adversely affect" a listed species, the agency must obtain a biological opinion from FWS on whether the action is likely to result in jeopardy or the destruction or adverse modification of critical habitat. 50 C.F.R. §§ 402.14(a), (g). BiOps must be based solely on the best available science. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). In formulating a BiOp, the Service must review all relevant information on the species and then carefully evaluate the status of the species, the environmental baseline, cumulative effects, and the effects of the action. *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 270 (4th Cir. 2022). The Service must then add the effects of the action and cumulative effects to the baseline and formulate its jeopardy finding. 50 C.F.R. § 402.14(g)(4).

A BiOp must disclose all "effects of the action." *Willamette Riverkeeper v. Nat'l Marine Fisheries Service*, 763 F. Supp. 3d 1203, 1230 (D. Or. 2025). Failure to do so renders the BiOp arbitrary and capricious as it fails to consider an important aspect of the problem. *Id.* This is because under the ESA, "the problem is whether a proposed project will cause jeopardy to a listed species" or destroy or modify critical habitat, and "any effect that is likely to adversely affect the species" or critical habitat is "plainly an important aspect of this problem." *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1111 (D. Or. 2014) (cleaned up).

Here, FWS's BiOp and BLM's reliance on it violates the ESA in two ways.

1.  **BLM Arbitrarily and Capriciously Relies on a Biological Opinion that Fails to Analyze the Project's Actual Impacts on Spotted Owl Critical Habitat.**

ESA Section 7(a)(2) requires all federal agencies to ensure their actions are not likely to jeopardize listed species or result in destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). While an action agency typically fulfills this duty by consulting with FWS, it must not blindly adopt the resulting BiOp. *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006). The ultimate responsibility for compliance with Section 7(a)(2) accordingly falls on the action agency. *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1127 (9th Cir. 2012). The Ninth Circuit holds that an action agency violates its substantive duty if it relies on a BiOp that is "legally flawed" or "fail[s] to discuss information that would undercut the opinion's conclusions." *Id.* at 1127–28.

The BiOp relies on acreage figures from BLM's Biological Assessment (BA) that significantly understate the Project's authorized impact. The BA analyzes a project that would remove or modify 3,093 acres of northern spotted owl critical habitat, including 2,086 acres of nesting/roosting/foraging habitat. KSW01524 (BA Table 20). These acreage numbers were carried over to the BiOp, which includes the same chart as the BA. KSW00425 (BiOp Table 21). This determination was central to the FWS's evaluation of the Project's effects on spotted owls and determination the project will not jeopardize the species or destroy or modify its critical habitat. KSW00424–31, 443. These numbers, however, do not match the project as evaluated in Final EA. BLM's initial and Final EA for the Project determined it would remove or modify 7,300 acres of spotted owl critical habitat—over twice as much as analyzed in the BiOp—including 4,536 acres of nesting/roosting/foraging habitat.[3] KSW01807 (EA Table B-33.1); KSW00787 (Final EA Table B-32.1). BLM relied on this analysis in approving the Project. *See, e.g.*, KSW01961 (DR #1).

In *Center for Biological Diversity v. BLM*, the Ninth Circuit held that an

---

[3] The Project authorizes an additional 1,011 acres of treatment in "unsuitable habitat." KSW00787 (8,311 acres of spotted owl critical habitat in total).

action agency violates the ESA when it relies on a BiOp that fails to consider impacts disclosed in the agency's environmental review. 698 F.3d at 1127–28. There, the Ninth Circuit held that BLM relied on a BiOp for a pipeline project that failed to analyze the effects of groundwater withdrawal on listed fish. *Id.* By contrast, the EIS for the project acknowledged the potential for groundwater drawdown. *Id.* at 1123. Because BLM possessed information in the NEPA analysis that contradicted the scope of the BiOp, the Ninth Circuit held BLM could not rely on the flawed BiOp to comply with Section 7. *Id.* at 1127–28. It reasoned that an agency acts arbitrarily when it "fail[s] to discuss information that would undercut the opinion's conclusions." *Id.*

The same logic applies here. It is unclear whether the BiOp was flawed from the outset because BLM provided incorrect figures in its BA (contrary to 50 C.F.R. § 402.14(d)), or whether the project was subsequently modified without reinitiating consultation (contrary to 50 C.F.R. § 402.16(a)(3)). The result is the same. Either way, the BiOp analyzes a fraction of the Project's actual impacts and thus omits a "key aspect of the problem": impacts on over 4,000 acres of spotted owl critical habitat. BLM possessed its own EA demonstrating the Project it authorized would impact thousands more acres of critical habitat than FWS considered. BLM's reliance is arbitrary, capricious, and violates the ESA. *Ctr. for Biological Diversity*, 698 F.3d at 1127.

### 2. FWS's "Zero Take" Determination Rests on a Distorted Environmental Baseline that Ignores Best Available Science.

FWS's conclusion that the Project will result in "zero incidental take" of the northern spotted owl is arbitrary and capricious. This conclusion relies on a fundamental error in the agency's analysis: the exclusion of seven likely-occupied owl sites from the environmental baseline. Surveys detected owls at these locations.

Yet FWS dismissed the detections as non-territorial "floaters" because it required at least three detections to establish residency. This dismissal ignores the best available science, specifically Appel, which demonstrates that in the current ecological context, single acoustic detections carry a 72 percent probability of representing resident pairs. In other words, the best available science demonstrates that a single acoustic detection more likely reflects the presence of resident spotted owls than a floater. By requiring multiple detections to establish residency while ignoring superior scientific evidence that discredits this approach, FWS defined a distorted environmental baseline that undercounts the number of occupied sites in the action area. Because the environmental baseline is the foundation of the jeopardy and take analysis, this error renders the agency's "zero take" conclusion irrational.

This argument proceeds in five parts. First, Plaintiffs set forth the legal standards governing the use of best available science in defining the environmental baseline. Second, Plaintiffs explain how the 2012 Survey Protocol classifies survey detections and how FWS applied these classifications in determining spotted owl occupancy in the Project area. Third, Plaintiffs present the findings of Appel, which demonstrate the high probability of occupancy associated with single detections. Fourth, Plaintiffs show how FWS incorrectly defined the environmental baseline by ignoring Appel and mischaracterizing likely occupied sites as unoccupied. Finally, Plaintiffs explain why this distorted baseline renders the "zero take" determination arbitrary and capricious.

> **a.    The ESA Requires FWS to Define the Environmental Baseline and Estimate Take Using the Best Available Science.**

Section 7(a)(2) of the ESA requires federal agencies to ensure their actions are not likely to jeopardize the continued existence of any listed species. 16 U.S.C. §

1536(a)(2). To fulfill this duty, FWS must evaluate the "effects of the action" against an accurate "environmental baseline," which includes the past and present impacts of all human activities in the action area and the current status of the species. 50 C.F.R. § 402.02. An accurate baseline is a prerequisite for a lawful BiOp; an action's impact "cannot be determined or analyzed in a vacuum," but must be addressed in the context of the baseline conditions. *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 137 (D.D.C. 2016).

The ESA requires FWS to use the "best scientific and commercial data available" throughout this analysis. 16 U.S.C. § 1536(a)(2). This standard prohibits an agency from "disregarding available scientific evidence that is in some way better than the evidence it relies on." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (cleaned up). An agency cannot satisfy this duty by making "general assertions that it applied the 'best available science' . . . without providing a reasonable explanation" for why it rejected relevant data. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 904 (D. Or. 2016).

Finally, if FWS determines an action is reasonably certain to result in incidental take, it must prepare an Incidental Take Statement (ITS) specifying the extent of such take. 16 U.S.C. § 1536(b)(4). Because the take analysis is derived by adding the effects of the action to the environmental baseline, 50 C.F.R. § 402.14(g)(4), a rational ITS depends entirely on an accurate baseline determination.

### b.  FWS and BLM Used a Frequency Threshold to Determine Occupancy.

The 2012 Survey Protocol, which FWS used to define the environmental baseline for spotted owl occupancy, establishes criteria for classifying occupancy. KSW01046-47. Under the Protocol, a spotted owl detection is not definitive to

establish occupancy. *Id.* The Protocol requires surveyors to document specific frequencies of detection or behavioral interactions to classify a detection as "resident" status. *Id.*

To establish "Resident Single Status," the Protocol requires "[t]he presence or response of a single owl within the same general area on 3 or more occasions within the breeding season." KSW01047. Alternatively, residency can be established by "[m]ultiple responses over several years (e.g., 2 responses in year 1 and 1 response in year 2)" from the same area. *Id.* To establish "Territorial Pair Status," the Protocol requires surveyors to observe a male and female in close proximity (less than one-quarter mile apart) on the same visit, observe nesting behavior, or observe adults with young. KSW01046–47.

The Protocol defines any detection that falls short of these thresholds as "Status Unknown." KSW01047. If a surveyor detects a single owl on one or two occasions during a season but fails to elicit a third response, the Protocol classifies the site as "Status Unknown." *Id.* The Protocol does not specify if "Status Unknown" detections should be treated as occupied or unoccupied sites in the project specific context. *Id.*

Yet for Last Chance, FWS and BLM treat all "Status Unknown" detections as non-territorial "floater" or "transient" owls. KSW00289; KSW01444. These sites are treated as "unoccupied" and not afforded site-specific take protections in the BiOp. KSW00289, 00364. The "3 or more occasions" and Territorial Pair thresholds determines whether a site is treated as occupied by a resident owl for the purpose of the jeopardy and take analysis. KSW00364.

### c.    Appel Demonstrates that Single Detections Are Highly Predictive of Resident Pairs.

Appel provides the best available science regarding spotted owl residency,

and accordingly of site occupancy, in the current biological context of barred owl colonization and competition. The study analyzed spotted owl vocalization patterns using passive acoustic monitoring to determine the probability of pair occupancy. Appel found that resident spotted owls, particularly females, exhibit cryptic behavior and reduced vocalization rates in the presence of barred owls. KSW01014–15. This behavioral suppression makes detecting both members of a pair—or eliciting repeated responses from a single owl—more difficult than in previous decades. KSW01014.

Specifically, Appel calculated the probability a single detection of any spotted owl indicates the site is occupied by a resident pair. The study found that when any owl was detected, "it was highly likely that the owl belonged to a pair," estimating this probability at 0.72. KSW01012. In other words, there is a 72 percent probability that a single acoustic detection represents a resident pair, even if the female is never heard.

> ### d. FWS Incorrectly Defined the Environmental Baseline by Ignoring *Appel* and Excluding Seven Sites with Detections.

In the BiOp, FWS employed the 2012 Protocol's classification scheme in defining the environmental baseline for northern spotted owl occupancy. The BiOp acknowledges that "[s]even of the unoccupied sites have detected incidental spotted owl responses (responses that do not meet residency status) in the last two years." KSW00366; *see also* KSW00421 ("Seven sites have had incidental observations (i.e., potential floaters) within the last two years.").

Despite these detections, FWS classified all seven sites as "unoccupied" in the environmental baseline because the owls did not respond with sufficient frequency to meet the Protocol's definition of "residency status." KSW00366. The agency dismissed these detections as evidence of "non-territorial" or "floater" owls, noting

that such owls are "difficult to detect" and assuming that maintaining general dispersal habitat is sufficient to support them. KSW00328, 00421.

This classification violates the ESA's mandate to use the best available science to define the environmental baseline. FWS cannot disregard available scientific evidence that is in some way better than, and casts doubt on, the evidence on which it relies. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995. Here, Appel constitutes the "best" evidence because it quantifies the probability of occupancy based on the specific type of data FWS possessed—single, cryptic detections. The Protocol defines these detections as "Status Unknown." KSW01047. Appel informs how these "Status Unknown" detections should be treated when determining occupancy in the project-specific context. It reveals "Status Unknown" sites are more likely than not occupied. By ignoring Appel's empirical findings and treating all these sites as unoccupied, FWS failed to "consider an important aspect of the problem." *Mayo*, 177 F. Supp. 3d at 143.

The result is a distorted environmental baseline that mischaracterizes the "condition of the listed species . . . in the action area." 50 C.F.R. § 402.02. By treating seven sites with a 72 percent probability of occupancy as "unoccupied," FWS underestimated the number of resident owls affected by the Project. An agency cannot satisfy its Section 7 duties by making "general assertions that it applied the 'best available science'" while ignoring information that contradicts its conclusions. *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 904. FWS provided no explanation for why it rejected the statistical probability of occupancy established by Appel and characterized all "Status Unknown" sites as unoccupied.

### e. The Distorted Baseline Renders the "Zero Take" Determination Arbitrary and Capricious.

The distorted environmental baseline renders the BiOp's "zero incidental

take" conclusion arbitrary and capricious. Under the ESA, FWS formulates its BiOp and ITS by adding the effects of the action to the environmental baseline. 50 C.F.R. § 402.14(g)(4). Because the take analysis depends on the baseline, a fundamental error in defining the baseline necessarily invalidates the take determination. *See Mayo*, 177 F. Supp. 3d at 141 (holding that an incidental take statement cannot be valid if the agency fails to adequately consider the environmental baseline).

Here, FWS concluded that logging the seven sites with incidental detections would result in no incidental take because it assumed the sites were unoccupied. That assumption is contradicted by the best available science. Appel indicates a 72 percent probability that each of these seven sites is occupied by a resident pair. By authorizing the removal or modification of habitat at these locations without analyzing the likelihood of occupancy established by Appel, FWS failed to account for the take of resident owls that are likely present. An agency decision is arbitrary and capricious if the agency offers an explanation that runs counter to the evidence before it. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008). Here, FWS possessed evidence of occupancy (the detections) and evidence of the significance of those detections (Appel), yet concluded "zero take" would occur. This conclusion is disconnected from the facts in the record. FWS cannot rationally conclude the Project will result in no take when it authorizes logging in seven territories that have a high statistical probability of containing resident spotted owl pairs. Because the ITS relies on a baseline that systematically undercounts the number of owls exposed to the Project, it is invalid.

### B.    BLM Violated FLPMA by Authorizing a Project that Fails to Conform to the RMP's Mandatory Management Direction for Bureau Sensitive Species.

The Federal Land Policy and Management Act (FLPMA) requires that all BLM management actions "strictly conform" to the approved Resource Management

Plan (RMP). 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). An agency action that is inconsistent with the RMP is arbitrary, capricious, and unlawful. *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125–26 (9th Cir. 2007) (an RMP "embodies the substantive management directives with which the BLM must comply under FLPMA").

Here, the 2016 RMP includes a mandatory "Management Directive" for Bureau Sensitive species. It requires BLM to "[i]mplement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects . . . including altering the type, timing, location, and intensity of management actions." KSW02152.

BLM violated this mandatory directive by expressly declining to adopt conservation measures for the northwestern pond turtle unless it is listed under the ESA. The turtle is a Bureau Sensitive species and proposed for ESA listing. 88 Fed. Reg. at 68,378 (listing is warranted due in part to habitat loss, alteration, and fragmentation). The Project would modify or remove up to 3,118 acres of the species' overwintering habitat, including habitat for recently observed groups of resident pond turtles.[4] KSW00663. This is 55 percent of the species' overwintering habitat in the project area. *Id.* Recognizing the project's impacts on the species, BLM developed Project Design Features (PDFs)—"additional surveys, timing restriction, and/or dropping or modifying (reduction in intensity) treatment areas"—to minimize Project impacts to the species, including the risk of overwintering turtles being crushed by heavy equipment. However, BLM determined these PDFs will only be implemented "[i]f the NWPT is listed under ESA." KSW00660, 00842–43.

---

[4] This figure includes 2,251 acres of habitat modification or removal from timber harvest and approximately 867 additional acres of modification from hazardous fuels reduction. KSW00663 (Table 7.1). The total number of northwestern pond turtles in the project area is unknown as BLM did not survey for the species. *See* KSW00661.

This decision is per se inconsistent with the RMP. The RMP *requires* BLM implement measures to mitigate threats to Bureau Sensitive species. In developing PDFs, BLM demonstrated such measures are readily available for the northwestern pond turtle. Not only that, but the PDFs are the very type of measures contemplated by RMP Management Directive for Bureau Sensitive species, as they involve "altering the type, timing, location, and intensity of management actions." KSW02152. In nevertheless effectively deferring implementation of these measures unless and until the species is listed under the ESA, BLM acted in clear contradiction of the RMP's mandate.

BLM's reference to unspecified "bureau sensitive species guidelines" does not cure this violation. While the EA asserts BLM will continue to manage the species' habitat under these guidelines if the species remains unlisted, KSW00660, 00842, the EA fails to explain what those guidelines are, how they would apply to the project, or how they satisfy the RMP's specific mandate to mitigate threats to the species. Nor is there any explanation for why the guidelines are an adequate substitute for the PDFs—the measures BLM determined would effectively mitigate the project's impacts on northwestern pond turtle. *See* KSW00660. This falls far short of BLM's duty to demonstrate consistency with the RMP before approving an action. See *Brong*, 492 F.3d at 1131; *see also Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 963 (9th Cir. 2005) (noting court must be "able reasonably to ascertain from the record" compliance with land use plan standards).

By refusing to implement the specific PDFs it developed to address the threat Project activities pose to overwintering turtles, BLM failed to conform to the RMP's requirement to alter the "timing, location, and intensity" of the action to protect sensitive species. KSW02152. Because the Project is inconsistent with the 2016 RMP, it violates FLPMA.

## IV.    IRREPARABLE HARM

To obtain a preliminary injunction, a plaintiff must demonstrate that irreparable injury is "likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Environmental injury, by its nature, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). In cases involving the ESA, "establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). A "reasonably certain threat of imminent harm to a protected species is sufficient." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996).

### A.    The Project Will Cause Irreparable Harm to the Spotted Owl.

In the absence of an injunction, the Project will cause permanent injury to the spotted owls in two ways. First, the Project will likely result in the unauthorized take of resident owls at the seven sites where FWS dismissed evidence of occupancy. As established above, the best available science indicates a 72 percent probability that these sites are occupied by resident pairs. Logging these units will destroy essential breeding, feeding, and sheltering habitat, likely causing injury, mortality, or displacement of resident owls. *See Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995) (holding that habitat modification that impairs essential behaviors constitutes irreparable harm because "[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult"). Any injury to these owls constitutes irreparable harm to the species.

Second, the Project will permanently destroy designated critical habitat that FWS never analyzed. The Project authorizes the removal of 2,137 acres of NRF critical habitat—nearly triple the amount FWS considered to make its no-jeopardy

analysis. This loss is permanent for multiple generations of spotted owls; the complex forest structure required by spotted owls will not return for at least a century. *League of Wilderness Defs.*, 752 F.3d at 764 ("The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all.").

Further, this habitat will be lost in an area of outsized importance to the range-wide persistence of the species. KLE-2, the critical habitat unit where the Project is located, is an essential connectivity corridor between spotted owl subpopulations in the western Cascades and coastal range. 77 Fed. Reg. at 71,934. It facilitates genetic exchange and is "essential for the conservation of the species." *Id.* The Project is also situated in a "checkerboard" of BLM-managed lands interspersed with private lands. Many of the private lands have been so heavily logged they no longer provide any spotted owl habitat, further elevating the importance of habitat on adjacent public lands. Unanalyzed removal of critical habitat in this area would fragment the critical habitat network in an already disjointed landscape and create a likelihood of irreparable injury to the species' recovery potential. *See Cottonwood*, 789 F.3d at 1091.

## B.    The Project Will Cause Irreparable Harm to the Pond Turtle.

Implementation of the Project will also likely cause irreparable harm to the northwestern pond turtle, a species proposed for listing as threatened due to its declining population and vulnerability to habitat loss. The Project authorizes heavy equipment operation and road construction across 3,118 acres of overwintering habitat—nearly half of the available habitat in the analysis area. Because turtles in upland habitat are typically buried in duff and invisible to operators, these activities risk crushing adult turtles. For a long-lived species with low reproductive rates and delayed sexual maturity, the loss of individuals, including juveniles and adults of breeding age, constitutes an irreparable loss to the local population's

viability that cannot be remedied by money damages. *See Amoco Prod. Co.*, 480 U.S. at 545. This risk results directly from BLM's decision to defer mandatory conservation measures—such as seasonal restrictions designed to prevent such mortality—until after the species is listed. Absent an injunction, the Project risks destroying individuals and will remove or irreparably alter habitat necessary to the species' persistence in the Project area.

### C.    The Project Will Cause Irreparable Harm to Plaintiffs' Interests.

Finally, the irreparable injury to the environment described above will directly injure the recreational, aesthetic, and professional interests of Plaintiffs' members.[5] Plaintiffs' members frequently visit the Last Chance Project area to hike, photograph nature, forage, and observe wildlife. *See* Cowen Decl. ¶¶ 8–10; LeGue Decl. ¶ 8; Sexton Decl. ¶ 6. One member, for example, has been visiting the area for the past 23 years and led numerous public hikes in the Paul's Payoff sale area "due to the unique old-growth forest characteristics," "serpentine soil inclusions," and "natural beauty and native biodiversity." Sexton Decl. ¶¶ 6, 8, 12. He and other Plaintiffs' members describe the area as "irreplaceable" and "not replicable elsewhere," deriving specific enjoyment from the mature and old-growth forests, and associated wildlife, that BLM intends to log. Sexton Decl. ¶¶ 8, 14; LeGue Decl. ¶ 15; Cowen Decl. ¶ 14.

The logging of these mature forests constitutes a per se irreparable injury to Plaintiffs' interests because "the logging of mature trees . . . cannot be remedied

---

[5]  For these same reasons, Plaintiffs have Article III standing to bring this action. Plaintiffs have demonstrated that their members have concrete recreational and aesthetic interests in the specific units scheduled for harvest, that these interests will be injured by the Project, and that this injury is redressable by a favorable decision. *See Cottonwood*, 789 F.3d at 1079–83; *All. for the Wild Rockies*, 632 F.3d at 1133.

easily if at all." *League of Wilderness Defs.*, 752 F.3d at 764. Once these stands are converted to the "stand establishment" phase, Plaintiffs' members will be unable to use and enjoy them in their undisturbed state for the remainder of their lifetimes. *See All. for the Wild Rockies*, 632 F.3d at 1135 (holding that the loss of ability to view areas in their undisturbed state is a cognizable, irreparable injury). This harm is concrete and imminent; members have visited specific units scheduled for harvest, including Units 34-1, 35-10, 03-05, and 10-01, and have definite plans to return in the immediate future. Cowen Decl. ¶¶ 12–13; LeGue Decl. ¶ 9; Sexton Decl. ¶¶ 8, 10 ("I . . . plan to continue visiting these forests throughout the remainder of my lifetime due to the presence of increasingly rare old-growth forests" and associated wildlife).

Further, the likely unauthorized take of resident owls and turtles and irreversible damage to their habitat will irreparably harm Plaintiffs' members who specifically visit the Project area in search of these species. Members have a deep personal and professional interest in viewing northern spotted owls and northwestern pond turtles within the Project boundaries. Cowen Decl. ¶ 12 ("I traversed the area with hopes that I might come across an owl"); LeGue Decl. ¶ 8; Sexton Decl. ¶¶ 6, 8, 10. The extirpation or displacement of these animals due to habitat destruction or direct mortality would permanently deprive these members of the opportunity to observe them in the wild. *See Nat'l Wildlife Fed'n*, 886 F.3d at 822 (holding that plaintiffs established "irreparable harm to their own interests stemming from the irreparable harm to the listed species"). Because Plaintiffs have demonstrated a likelihood of irreparable harm to their concrete interests, they have standing to seek injunctive relief.

## V.    BALANCE OF EQUITIES AND PUBLIC INTEREST

The balance of equities and public interest favor Plaintiffs as a matter of law. In cases involving the ESA, courts do not have discretion to balance the parties'

competing interests. *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 599 (9th Cir. 2025) ("courts have no discretion to balance equities or the public interest when considering . . . any injunction" in an ESA case). This is because the ESA strips courts of some of their equitable discretion; Congress has determined that endangered species are afforded the highest priority, and the balance of equities and public interest "always tip in favor of the protected species." *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1090–91.

Yet even if the Court were to reach these factors, the result is the same. When the government is a party, the balance of equities and public interest merge. *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020). Here, this combined factor tips sharply toward Plaintiffs because there is a "well-established public interest in preserving nature and avoiding irreparable environmental injury," including an "extremely strong" interest in the survival and flourishing of endangered species. *Alliance for the Wild Rockies*, 632 F.3d at 1138. The harm Plaintiffs seek to prevent—the permanent logging of old-growth habitat and the take of threatened owls—cannot be remedied by monetary damages. Once an area like Last Chance is logged, the ecological benefits and associated ecosystem services that would otherwise be available are "irreparably lost." *Id*. Furthermore, the public interest is served by requiring BLM and FWS to comply with their legal obligations in managing public trust resources. *Carlson*, 968 F.3d at 992.

By contrast, injunctive relief would have a limited impact on timber harvest and wildfire management activities in the project area given the narrow scope of Plaintiffs' request. When considering whether to issue a narrowly tailored injunction, courts only consider the harms pertaining to the narrow injunction and the limited time it would be in place. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009); *League of Wilderness Defs.*, 752 F.3d at 765.

Plaintiffs are not asking this Court to halt all project activities. Rather,

Plaintiff's request is tailored to impacts to the two species central to this case—the spotted owl and pond turtle. A pause on activities in spotted owl nesting/roosting/foraging and northwestern pond turtle overwintering habitat would implicate, at most, approximately 65 percent of the 11,686 acres authorized for commercial and non-commercial treatments under the Last Chance project. KSW00663, 00425 (Table 21). However, this figure significantly overstates the operational impact. Given the overlap of northern spotted owl NRF and northwestern pond turtle overwintering habitat, an injunction would likely temporarily forestall activities in less than half the project area. KSW00661 (noting BLM used northern spotted owl nesting/roosting/foraging habitat as proxy for northwestern pond turtle overwintering habitat in evaluating project impacts). In other words, even if Plaintiff's request is granted, commercial harvest and wildfire mitigation activities would be able to proceed over much of the project area.

This is particularly notable when viewed in the context of the overall timeframe for the Last Chance project. The project's 11,686 acres of commercial and non-commercial treatments will not be implemented all at once. They will be staged over a 15-year period, averaging approximately 780 acres per year. Ince-Johannsen Decl. ¶ 23, Exh. M at KSW02362 (Finding of No Significant Impact). Even if this court issues an injunction, Defendants can still achieve this annual harvest level and associated benefits, such as wildfire management and logging jobs and revenue, while this case proceeds by focusing near-term treatments in areas with minimal nesting/roosting/foraging and overwintering habitat. As for the areas where activities would be barred by an injunction, "[b]ecause the jobs and revenue [from timber harvest] will be realized if the project is approved," the marginal harm of a preliminary injunction is limited to the temporary delay in receiving these benefits. *League of Wilderness Defs.*, 752 F.3d at 765–66; *see also All. for the Wild Rockies v. Gassman*, 604 F. Supp. 3d 1022, 1037 (D. Mont. 2022) (noting economic harms

diminished by project's 25-year duration).

## VI. REQUIRING A BOND WOULD EFFECTIVELY DENY ACCESS TO JUDICIAL REVIEW

Plaintiffs respectfully request this Court exercise its discretion to not require a bond for their requested preliminary injunction. Although security is generally required for a preliminary injunction, the court has discretion to dispense of the security requirement where requiring security would effectively deny access to judicial review. *Gassmann*, 604 F. Supp. 3d at 1037. As this Court has found, "'[i]t is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Central Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). Plaintiffs, non-profit environmental conservation organizations, request this Court follow that well-established precedent here.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion for Preliminary Injunction.

Respectfully submitted this 13th day of February, 2026,

> /s/ Sangye Ince-Johannsen
> Sangye Ince-Johannsen, OSB # 193827
> David T. Woodsmall, OSB # 240631
> WESTERN ENVIRONMENTAL LAW CENTER
> 120 Shelton McMurphey Boulevard, Suite 340
> Eugene, Oregon 97401
> sangyeij@westernlaw.org
> woodsmall@westernlaw.org
> +1 541.778.6626
> +1 971.285.3632