# Exhibit J

U.S. Bureau of Land Management

Medford District, Grants Pass Field Office

Last Chance Forest Management Project

Environmental Assessment

DOI-BLM-ORWA-M070-2022-0007-EA

September 2024

KSW01616



**U.S. Department of the Interior
Bureau of Land Management**

**Last Chance Forest Management Project
Environmental Assessment
DOI-BLM-ORWA-M070-2022-0007-EA**

*September 2024*

Medford District
Grants Pass Field Office
2164 NE Spalding Avenue
Grants Pass, Oregon 97526
541-471-6500



**TABLE OF CONTENTS**

CHAPTER 1.     INTRODUCTION ....................................................................................................1

1.1.     Project Location .................................................................................................1

1.2.     Background ........................................................................................................3

1.3.     Decision to be Made...........................................................................................4

1.4.     Purpose and Need ..............................................................................................5

1.5.     Conformance with Land Use Plan .....................................................................6

1.6.     Scoping...............................................................................................................6

1.7.     Issues Identified for Analysis ............................................................................6

CHAPTER 2.     ALTERNATIVES ...................................................................................................8

2.1.     Alternative 1 – No Action Alternative ..............................................................8

2.2.     Project Elements Common to All Action Alternatives.......................................8

    2.2.1.     HLB-UTA & LSR-Dry .............................................................................9

    2.2.2.     LSR-Dry, RR-Dry & RR-Moist ...............................................................9

    2.2.3.     DDR-TPCC ...............................................................................................9

    2.2.4.     RR-Dry and RR-Moist ..............................................................................9

    2.2.5.     Inner Riparian Zone ..................................................................................9

    2.2.6.     Outer and Middle Riparian Zone ..............................................................9

    2.2.7.     Stream Restoration...................................................................................10

    2.2.8.     Commercial Treatments...........................................................................10

    2.2.9.     Harvest Systems ......................................................................................10

    2.2.10.     Harvest Activity Fuels Reduction ..........................................................11

    2.2.11.     Non-commercial Hazardous Fuels Reduction (HFR) ..............................11

    2.2.12.     Transportation Activities.........................................................................11

2.3.     Alternative 2 ....................................................................................................11

    2.3.1.     Harvest Land Base – Low Intensity Timber Area (LITA)........................12

    2.3.2.     Harvest Land Base – Moderate Intensity Timber Area (MITA)................13

    2.3.3.     Harvest Land Base – Uneven-aged Timber Area (UTA)...........................14

    2.3.4.     Late-Successional Reserve (LSR) – Dry .................................................15

    2.3.5.     Riparian Reserve (RR) – Moist and Dry .................................................16

    2.3.6.     District Designated Reserve (DDR) – Timber Production Capability Classification (TPCC) 16

    2.3.7.     Transportation Management .....................................................................16

2.4.     Sub-Alternative 2a ...........................................................................................16

**2.5.     Alternative 3** ...................................................................................................... **16**

2.5.1.    Harvest Land Base (HLB) – Low Intensity Timber Area (LITA) ...................................... 17

2.5.2.    Harvest Land Base (HLB) – Moderate Intensity Timber Area (MITA) ........................... 17

2.5.3.    Harvest Land Base (HLB) – Uneven-aged Timber Area (UTA) ...................................... 17

2.5.4.    Late-Successional Reserve (LSR) – Dry .......................................................................... 17

2.5.5.    Riparian Reserve (RR) – Dry and Moist ......................................................................... 17

2.5.6.    Transportation Management ......................................................................................... 18

**2.6.     Alternatives Considered but Eliminated from Detailed Analysis** ........................ **18**

**2.7.     Comparison of Alternatives** ................................................................................... **20**

**CHAPTER 3.     AFFECTED ENVIRONMENT & ENVIRONMENTAL CONSEQUENCES** ...................... **23**

**3.1.     Forest Management** .................................................................................................. **23**

3.1.1.    Issue 1: What would be the economic viability and operational feasibility of commercial treatments in each alternative? ...................................................................................................... 23

3.1.2.    Issue 2: How would the proposed commercial treatments in HLB contribute to the Medford Sustained Yield Unit's declared ASQ? ....................................................................... 31

3.1.3.    Issue 3: How would the proposed treatments in HLB affect stand vigor and insect- and disease susceptibility in residual stands? ................................................................................... 36

3.1.4.    Issue 4: How would silviculture and fuels treatments in the DDR-TPCC LUA promote desired species composition and ecological conditions? ........................................................... 49

**3.2.     Fire and Fuels** .......................................................................................................... **52**

3.2.1.    Issue 5: How would the proposed treatments affect stand level fire resistance (or fire hazard)? 52

**3.3.     Northern Spotted Owl (NSO)** .................................................................................. **59**

3.3.1.    Issue 6: How would the proposed treatments in the LSR-Dry LUA speed the development or improve the quality of habitat in the long term, and not preclude or delay by 20 years or more the development of NSO nesting-roosting habitat as compared to development without treatment? ..... 59

**3.4.     Northwestern Pond Turtle (NWPT)** ........................................................................ **74**

3.4.1.    Issue 7: How would proposed treatments affect the NWPT? ....................................... 74

**3.5.     Hydrology and Water Quality** ................................................................................. **78**

3.5.1.    Issue 8: How would the proposed treatments affect sediment production, delivery and transport beyond the historical, existing, and baseline conditions and would predicted sedimentation rates have the potential to reduce the quality of aquatic habitats donstream and/or exceed water quality standards? ....................................................................................................................... 78

**3.6.     Fisheries and Aquatic Habitat** ................................................................................ **98**

3.6.1.    Issue 9: How would timber hauling and road related activities, including decommissioning affect Southern Oregon/Northern California Coast (SONCC) Coho Salmon and Oregon Coast (OC) Coho Salmon species and their habitat? ................................................................................... 98

**3.7.     Soil Resources** ........................................................................................................ **104**

3.7.1.    Issue 10: How would the proposed treatments (ground-based logging, cable yarding, road construction, road renovation, activity fuels and HFR) affect detrimental soil disturbance, soil productivity, slope stability, and surface erosion? ........................................................................... 104

**3.8.    Recreation ........................................................................................................... 110**

3.8.1.    Issue 11: How would the proposed treatments affect recreation opportunities, objectives, and Recreation Setting Characteristics (RSC) of the following Special Recreation Management Areas (SRMA) within the Last Chance Project Area? (King Mountain Trail SRA, and Burma Pond Campground and Trailhead SRMA). ..................................................................... 110

**CHAPTER 4.    CONSULTATION AND COORDINATION ................................................ 116**

**4.1.    U.S. Fish and Wildlife Service ............................................................................ 116**

**4.2.    National Marine Fisheries Service ...................................................................... 116**

**4.3.    Tribal Consultation ............................................................................................. 116**

**4.4.    State Historic Preservation Office Consultation ................................................ 116**

**4.5.    Local Agency Coordination ................................................................................ 116**

**CHAPTER 5.    LIST OF PREPARERS ............................................................................ 117**

**APPENDIX A: REFERENCES .......................................................................................... A-1**

**APPENDIX B: ISSUES CONSIDERED BUT NOT ANALYZED IN DETAIL ............................ B-1**

**APPENDIX C: BEST MANAGEMENT PRACTICES AND PROJECT DESIGN FEATURES .......... C-1**

**APPENDIX D: ADDITIONAL INFORMATION .................................................................. D-1**

**D.1.    Project Area Location ........................................................................................ D-1**

**D.2.    Tree Harvesting and Yarding Systems ............................................................. D-1**

**D.3.    Transportation Management .............................................................................. D-2**

**D.4.    Watershed Analysis .......................................................................................... D-30**

D.4.1 Hydrology and Water Quality Calculations and Tables ....................................... D-30

D4.2 Soils Calculations and Tables .............................................................................. D-34

**D.5.    Wildland Fuel Profile ...................................................................................... D-43**

**APPENDIX E: GLOSSARY .............................................................................................. E-1**

**APPENDIX F: MAPS ...................................................................................................... F-1**

**APPENDIX G: BLM RESPONSE TO PUBLIC COMMENTS .............................................. G-1**

# CHAPTER 1. INTRODUCTION

The Bureau of Land Management (BLM), Grants Pass Field Office (GPFO) is proposing the Last Chance Forest Management Project (LCFMP) on approximately 11,686 analysis acres0F[1] within 32,272 acres of BLM-administered lands within the project boundary (56,888 acres total, see Table 1-1). The LCFMP includes 30,573 acres of BLM Oregon & California Railroad Lands (O&C) and 1,699 acres of BLM Public Domain (PD) lands. BLM-administered lands are intermixed with private and county lands, creating a mosaic of ownership patterns across the GPFO.

Table 1-1 Land Ownership Summary of the LCFMP Area

| Jurisdiction | Acres | Percent |
|---|---|---|
| Bureau of Land Management | 32,272 | 57% |
| Private Land | 22,662 | 40% |
| Josephine County | 1,407 | 2% |
| State of Oregon | 547 | 1% |
| Total | 56,888 | 100% |

## 1.1.    Project Location

The LCFMP is located within Douglas, Jackson, and Josephine counties of Oregon, east of I-5, between Sunny Valley and Galesville Reservoir/Azalea exits (Map 1). The Project is within three Hydrologic Unit Code (HUC) 10-digit watersheds: Grave Creek, Middle Cow Creek, and Upper Cow Creek. The Middle- and Upper Cow Creek watersheds drain into the South Umpqua River, and Grave Creek watershed drains into the Rogue River. The project can be found within the legal descriptions Willamette Meridian (Table 1-2).

Table 1-2 BLM-administered lands within the Project

| Township | Range | Sections |
|---|---|---|
| 32 South | 3 West | 19, 30 |
| 32 South | 4 West | 9, 10, 13, 15, 19, 20, 23, 24, 25, 28, 29, 30, 31, 32, 33, 34, 35 |
| 32 South | 5 West | 13, 23, 25, 27, 29, 33, 34, 35 |
| 33 South | 4 West | 3, 5, 6, 7, 9, 11, 15, 17, 19, 21, 23, 29, 30, 31 |
| 33 South | 5 West | 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 19, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 34, 35 |
| 34 South | 5 West | 1, 2, 3, 4, 5, 6, 9, 11 |
| 34 South | 6 West | 1 |

---

[1] These GIS acres are estimates based on current data and have been rounded to the nearest whole acre.

Map 1. LCFMP Vicinity Map



The 2016 Southwest Oregon Resource Management Plan (SWORMP) describes different management objectives and directions based on the designated Land Use Allocation (LUA) (USDI/BLM 2016b, pp. 53-87). The GPFO is proposing forest management activities including Variable Retention Harvest

KSW01622

(VRH), commercial thinning, selection harvest, and hazardous fuels reduction (HFR) on approximately 11,686 acres of BLM-administered lands. Forest management treatments consist of commercial and non-commercial treatments that would occur in the following Land Use Allocations1F[2] (LUA): Harvest Land Base (HLB)-Low Intensity Timber Area (LITA), HLB-Moderate Intensity Timber Area (MITA), HLB-Uneven-Aged Timber Area (UTA), Late- Successional Reserve (LSR)-Dry, Riparian Reserve (RR)-Dry, Riparian Reserve (RR)-Moist, District Designated Reserve – Roads (DDR-Roads), and District Designated Reserve – Timber Production Capability Classification (DDR-TPCC) (Table 1-3).

Table 1-3 BLM Land by Land Use Allocation in the LCFMP

| Land Use Allocation | Acres | Percentage |
|---|---|---|
| HLB – LITA | 1,805 | 5.6% |
| HLB – MITA | 136 | 0.4% |
| HLB – UTA | 14,074 | 43.6% |
| LSR-Dry | 4,878 | 15.1% |
| RR-Dry | 6,633 | 20.6% |
| RR-Moist | 68 | 0.2% |
| DDR-TPCC | 3,720 | 11.5% |
| DDR-Roads | 907 | 2.8% |
| DDR-ACEC2F[3] | 51 | 0.2% |
| Total | 32,272 | 100% |

## 1.2.    Background

The BLM selected the LCFMP area to conduct forest treatments for the following reasons:

- Fifty percent (50%) of the LCFMP area is designated as HLB, which are lands allocated for sustained-yield forest management to produce a permanent supply of timber. Only timber offered from the HLB contributes to the Allowable Sale Quantity (ASQ). The ASQ targets are described in further detail on p. 5-7 of the SWO ROD/RMP.

- Stands identified for treatment are overly dense (>45% relative density3F[4]) in relation to the carrying capacity of the site. Forest stands between 45-65% relative density are at greater risk of

---

[2] "Reserves" as stated in the Resource Management Plan and in the LCFMP are not in reference to areas where no commercial harvest activity is to occur. The Management Direction for treatment in the Dry-LSR sets a target for commercial thinning treatments on at least 17,000 acres per decade for the Medford District. Currently, for the period of 2019 to present, only 3,087 acres of Dry-LSR have been treated, which is less than 18% of the target for the decadal period starting in 2019 and ending 2028. The RMP states that "many important outcomes of the RMP will result from the total amount of timber harvested, including both the sustained-yield timber production from the Harvest Land Base (ASQ volume), and the timber produced as a by-product of habitat restoration in other land use allocations, such as Late Successional Reserve and Riparian Reserve (non-ASQ volume)." SWO RMP pg. 22.

[3] The only actions proposed in the ACEC are Transportation Management.

[4] RMP Glossary p. 311: Relative density (RD) – A means of describing the level of competition among trees or site occupancy in a stand, relative to some theoretical maximum based on tree density, size, and species composition. Relative density percent is calculated by expressing Stand Density Index (SDI) (Reineke 1933) as a percentage of the theoretical maximum SDI, which varies by tree species and range. RMP Glossary p. 314: Stand Density Index (SDI) – Reineke's (1933) stand density index is a

competition-induced tree mortality and are more susceptible to stand-replacing disturbances (McCusker 2011). Recent local studies have shown that in southwest Oregon more Douglas-fir trees died between 2015-2019 than in the previous four decades (Bennett et al. 2023a, Bennett et al 2023b). These trees are dying in the largest numbers in the driest areas in the region. Douglas-fir are at a higher risk of dying in areas with an average precipitation of less than 45 inches, particularly on harsh warm and drier sites (Bennett et al. 2023a). Approximately 44% of the project area contains average annual precipitation values of less than 45 inches. BLM expects mortality to continue to occur where Douglas-fir trees are further stressed by drought and then exploited by the flatheaded fir borer beetle (*Phaenops drummondi*).

- These stands provide an opportunity for commercial treatment because they contain one or more of the following tree species: Douglas-fir, white fir, western hemlock, incense-cedar, ponderosa pine, Jeffrey pine, and sugar pine. Commercial treatments are assessed for economic viability4F[5] if the prescription removes more than five thousand board feet per acre (Mbf/acre) and if the stands have road access. Economic viability is a prerequisite for treatments to be offered and implemented as a timber sale contract5F[6]. The BLM receives limited appropriated funds to carry out such activities and relies upon combinations of stewardship contracts (stands where timber is of insufficient volume to exceed the cost of treatment) and timber sale contracts (those that are economically viable to achieve project treatment acreage goals). All proposed commercial treatments have been designed to be implemented as timber sale contracts because previous stewardship contracts received limited interest from prospective purchasers in the local area and limited funding to subsidize the treatment not offset by the value of the timber.

- Portions of the LCFMP are on lands allocated as LSR-Dry and RR. The BLM and U.S. Fish and Wildlife Service (USFWS) have determined that active management of reserves is needed to promote the development of habitat for the northern spotted owl (NSO) and to address the loss of existing habitat from wildfire and other disturbances.

Map 3. in Appendix F. shows the project area vicinity and other projects nearby which are considered in the analysis of cumulative effects. The LCFMP area is bordered by the 2018 Poor Windy project area to the west and northwest, and by the 2016 Upper Cow project area to the north. The eastern edge of the Last Chance project area is bordered by the 2018 Grave Creek fire of the Garner Complex wildfire and the BLM Butte Falls Field Office boundary. These projects are in various stages of implementation.

## 1.3.    Decision to be Made

The BLM GPFO would decide whether to implement the actions outlined in the alternatives described in Chapter 2. The Authorized Officer would decide whether to offer timber for sale, and if timber is offered for sale, how many commercial sales to offer, and whether to implement other actions, including HFR, road construction and road renovation. These decisions would be documented through Decision Record documents that would identify specific approved actions and would be made available to the public.

---

function of quadratic mean diameter and number of trees per unit area. SDI can be interpreted as the number of 10 inch trees that would experience approximately the same level of inter-tree competition as the observed number of trees with the observed mean diameter. See also relative density.
[5] Economic Viability of wood product contracts: For the purposes of this EA, Economic Viability describes the likelihood that a wood product contract would be sold when offered at auction for competitive bidding. To be considered economically viable, the value of the wood products harvested under the contract must exceed related contract costs, which can be expressed as an estimate of stumpage value.
[6] Synonymous with wood product contracts.

## 1.4.    Purpose and Need

The need for the LCFMP is:

1. The stands identified for treatment are overly dense, at high risk of stand replacing wildfire, and have a reduced resistance to disturbance in HLB-UTA, RR-Dry (class I & III), RR-Moist (class I), DDR-TPCC, and LSR-Dry. The top 50 communities in the State of Oregon with the highest wildfire risk were identified by Scott et al. in 2018. Nearly half of those communities are within southwestern Oregon. The cities of Grants Pass, Rogue River, Glendale, and Merlin, Oregon are all within a 20-mile radius of the LCFMP boundary.

    a. These dense conditions have reduced the quality and developmental trajectory of northern spotted owl (NSO) nesting-roosting (NR) habitat in LSR-Dry.

        i. The RMP requires the BLM to apply commercial treatments to at least 17,000 acres in the Medford District LSR-Dry per decade (USDI/BLM 2016b p.74). As of June 17, 2024, the Medford district has applied such treatments to 1,043 acres, leaving 15,957 more acres to treat between now and the end of fiscal year (FY) 2026.

    b. These conditions reduce the amount of available large stable wood contributions over time to streams in RR-Moist class I and RR-Dry class I (USDI/BLM 2016b p.78, 82).

2. The 2016 ROD/RMP requires the BLM to offer ASQ from HLB-LITA, MITA, & UTA (O&C lands) annually (USDI/BLM 2016b p. 62, 64, 66, 68).

3. Timber sale contracts must be economically viable to be offered for sale at auction.

The purpose for the LCFMP as informed by the ROD/RMP (USDI/BLM 2016b pp. 43, 63, 73).

1. HLB: Conduct silvicultural treatments to produce timber to contribute to the attainment of the declared ASQ for the Medford Annual Sustained Yield Unit (SYU) (USDI/BLM 2016b, p. 62, 66, 68), and reduce fire risk and insect/disease outbreaks (USDI/BLM 2016b, p. 62).

    a. UTA: Contribute to ASQ, fuels reduction, reduce stand susceptibility to disturbance.

    b. LITA: Contribute to ASQ

    c. MITA: Contribute to ASQ

2. LSR-DRY: Accelerate or improve the development of NSO nesting-roosting habitat and complete treatments required by RMP (USDI/BLM 2016b, p. 71-72, 74-75, 92).

3. RR-Moist: Class I: Commercial thinning (middle & outer zones) to create structurally-complex stands and ensure stable wood contribution to streams in class I (USDI/BLM 2016b, p. 78, 79).

4. RR-Dry Class I & III: Commercial thinning (middle & outer zones) to create structurally-complex stands and ensure stable wood contribution to streams in class I and reduce the risk of stand replacing crown fires and ensure stable instream wood (USDI/BLM 2016b, p. 82-86).

5. DDR/TPCC: Reduce stand susceptibility to disturbances and promote desired species composition (USDI/BLM 2016b, p. 55).

6. All commercial treatments will be implemented as timber sale contracts.

7. Implement hazardous fuels reduction (HFR) treatments (maintenance and new treatments) in all LUAs (USDI/BLM 2016b, p. 91).

    a. Activity fuels in commercial treatment units.

b. Natural fuels.

## 1.5.    Conformance with Land Use Plan

The BLM signed the ROD/RMP on August 5, 2016. All alternatives for the LCFMP have been designed to conform with the management direction in the ROD/RMP, which addresses how the BLM will comply with applicable laws, regulations, and policies in western Oregon including, but not limited to: Oregon and California Railroad (O&C) Act, Federal Land Policy and Management Act (FLPMA), Endangered Species Act (ESA), National Environmental Policy Act (NEPA), National Historic Preservation Act (NHPA), Clean Air Act, and Clean Water Act.

## 1.6.    Scoping

The GPFO mailed public scoping letters in December of 2020 to adjacent landowners, permittees, agencies, and other interested citizens. The BLM received five comments during the 30-day scoping period. On July 15, 2021, a public scoping letter was sent to interested mining claimants. No comments were received. In August of 2022, the Rum Creek Fire ignited via lightning strike in the northwestern portion of the GPFO. This fire did not burn within the LCFMP. However, project development was put on hold while the BLM worked to manage the fire and conduct post-fire Emergency Stabilization and Rehabilitation (ESR). In January of 2023, the planning of the LCFMP resumed. On February 22, 2023, scoping letters were sent to tribal governments including the Cow Creek Band of Umpqua, Confederated Tribes of Grand Ronde, and the Confederated Tribes of the Siletz Indians. No comments were received. On July 8, 2024, a draft EA was published on ePlanning for a 30-day public comment period and 917 comments were received.

## 1.7.    Issues Identified for Analysis

Internal and external scoping was completed. The following issues were raised by the public or BLM specialists during the scoping for this project. These issues will be analyzed in detail in Chapter 3. Issues identified for detailed analysis address impacts related to the purpose and need. The issues are listed in the same order as they are analyzed in Chapter 3.

Forest Actions

Issue 1: What would be the economic viability and operational feasibility of commercial treatments in each alternative?

Issue 2: How would the proposed commercial treatments in HLB contribute to the Medford Sustained Yield Unit's declared ASQ?

Issue 3: How would the proposed treatments in HLB affect stand vigor, and insect- and disease susceptibility in residual stands?

Issue 4: How would the proposed silviculture and fuels treatments in the DDR-TPCC LUA promote desired species composition and ecological conditions?

Fire and Fuels

Issue 5: How would the proposed treatments affect stand level fire resistance (or fire hazard)?

Northern Spotted Owl Habitat

Issue 6: How would the proposed treatments in LSR-Dry speed the development or improve the quality of nesting-roosting habitat in the long term, and not preclude or delay by 20 years or more the development of NSO nesting-roosting habitat as compared to development without treatment?

Northwestern Pond Turtle

---

Issue 7: How would the proposed treatments affect the northwestern pond turtle (NWPT)?

Hydrology and Sedimentation

Issue 8: How would the proposed treatments affect sediment production, delivery and transport beyond the historical, existing, and baseline conditions and would predicted sedimentation rates have the potential to reduce the quality of aquatic habitats downstream and/or exceed water quality standards?

Fisheries and Aquatic Habitat

Issue 9: How would timber hauling and road related activities, including decommissioning affect Southern Oregon/Northern California Coast (SONCC) Coho Salmon and Oregon Coast (OC) Coho Salmon species and their habitat?

Soil Resources

Issue 10: How would the proposed treatments (ground-based logging, cable yarding, road construction, road renovation, activity fuels and HFR) affect detrimental soil disturbance, soil productivity, slope stability, and surface erosion?

Recreation

Issue 11: How would the proposed treatments affect recreation opportunities, objectives, and Recreation Setting Characteristics of the following Special Recreation Management Areas (SRMA) within the Last Chance Project Area? (King Mountain Trail SRMA, and Burma Pond Campground and Trailhead SRMA).

# CHAPTER 2.  ALTERNATIVES

This chapter describes the three potential alternatives, one sub-alternative, and alternatives identified but eliminated from further consideration. In developing the action alternatives, the BLM considered numerous ways to meet the purpose and need, including alternatives proposed or suggested by the public. These alternatives selected for detailed analysis reflect a reasonable range of alternatives that respond to the purpose and need identified in Chapter 1.

## 2.1.    Alternative 1 – No Action Alternative

Under the No Action Alternative, the following actions would not occur in relation to this project on BLM-managed lands:

- Non-Commercial HFR
- Stream Restoration
- Transportation Activities
- Commercial Forest Management Activities and Harvest Activity Fuels Reduction
- Timber Sale Contracts

Under the No Action Alternative:

The GPFO would not contribute to the ASQ by offering timber volume through individual timber sale contracts from the HLB in FY2024-FY2026 and would not contribute to the decadal ASQ volume declared in the ROD/RMP for the Medford District SYU.

Silviculture and fuels treatments would not occur in the LSR-Dry LUA and would not speed the development or improve the quality of NSO nesting-roosting habitat, or reduce the risk of large-scale high intensity fire, or contribute to the Medford District's commercial decadal acreage treatment target directed by the ROD/RMP.

In RR-Dry and Moist no commercial or HFR treatments would occur to protect and promote structurally-complex stands, a continued supply of large diameter stable wood recruitment into streams, and reduce the risk of stand replacing crown fires.

In DDR-TPCC, silviculture and fuels treatments to restore and maintain community level structural characteristics by culturing minor species such as pine, oak, and cedar would not occur.

The No Action Alternative serves as a baseline which represents current conditions and a reference point from which to compare the environmental effects of the action alternatives.

Existing activities in the project boundary would continue and the present environmental conditions and trends in the LCFMP would continue. Since the proposed treatments for timber harvest consist of lands designated as HLB by the RMP, the No Action Alternative does not preclude future timber harvest. If no action were selected at this time, it is reasonably foreseeable that the BLM would implement a forest management project in this area within the next five to 10 years to contribute to the Medford District ASQ.

## 2.2.    Project Elements Common to All Action Alternatives

Commercial and non-commercial treatments in all action alternatives would occur in HLB-LITA, UTA & MITA, LSR-Dry, DDR-TPCC, DDR-Roads, and RR-Dry & Moist. In these treatments, the BLM would apply Best Management Practices (BMPs) and Project Design Features (PDFs) and would follow RMP management direction including but not limited to:

### 2.2.1.    HLB-UTA & LSR-Dry

Retain Douglas-fir and pine trees that are both ≥ 36 inches DBH and that the BLM identifies were established prior to 1850 and retain madrone, bigleaf maple, and oak trees ≥ 24 inches DBH, except where falling is necessary for safety or operational reasons (USDI/BLM. 2016b, pp. 68, 74).

### 2.2.2.    LSR-Dry, RR-Dry & RR-Moist

Retain 2 percent cover of down woody material > 4 inches diameter post-treatment, when implementing fuels reduction or prescribed fire treatments, as described in the RMP (USDI/BLM. 2016b, p. 73).

### 2.2.3.    DDR-TPCC

Commercial and non-commercial treatments in DDR-TPCC would implement silvicultural prescriptions to restore and maintain community-level structural characteristics and promote desired species composition by culturing more drought tolerant species such as pine, oak, and cedar (see Appendix C). This would be accomplished by removing encroaching Douglas-fir and young madrone from these characteristically less-densely forested areas. The project would also re-introduce prescribed fire to reduce the presence of dense understory vegetation, therefore, emulating ecological conditions produced by historic fire regimes. Some units may require understory reduction treatments to remove excess vegetation prior to the re-introduction of prescribed fire to ensure that ecological conditions produced by historic fire regimes can be achieved.

### 2.2.4.    RR-Dry and RR-Moist

The project area contains Class I and Class III sub-watersheds. McGinnis Creek is a tributary to Snow Creek and Cow Creek and is in the Upper Cow watershed. It is a Class III RR-Dry watershed and is 2% of the LCFMP. RR buffers are determined and measured on slope distance (UDSI/BLM. 2016b, p. 77)

### 2.2.5.    Inner Riparian Zone

No commercial harvest would occur in the Inner Riparian Zone. For fish bearing and perennial streams in both Class I and III sub-watersheds, the Inner Riparian Zone buffer occurs within 120 feet from streams. For intermittent streams in both Class I and III sub-watersheds, the Inner Riparian Zone buffer occurs within 50 feet from the stream. LCFMP proposes non-commercial HFR within the Inner Riparian Zone; however, these treatments would not occur within 60 feet of perennial and fish-bearing streams (USDI/BLM. 2016b, p. 82 and 86). Individual tree cutting or tipping is proposed in the Inner Riparian Zone to meet the tree-tipping management direction associated with outer zone commercial thinning (USDI/BLM. 2016b, p. 76-77).

### 2.2.6.    Outer and Middle Riparian Zone

For fish-bearing, perennial, and intermittent streams in Class I sub watersheds, the Outer Riparian Zone buffer occurs 120 feet from the stream outward to the edge of the RR-Dry which is the Site Potential Tree Height for each watershed (Upper Cow Creek (200ft), Middle Cow Creek (195ft), and Grave Creek (200ft). For intermittent non-fish bearing streams in Class I watersheds, there is an additional Middle Riparian Zone that occurs from 50 to 120 feet (USDI/BLM. 2016b, p. 82-83). Within the Outer and Middle Riparian Zone, LCFMP proposes commercial thinning, activity fuels reduction treatments, and non-commercial treatments including HFR and stream restoration activities. For Class III watersheds, there is a 50ft RR width for intermittent streams (USDI/BLM. 2016b, p. 87). There are no Middle or

KSW01629

Outer Riparian Zones for intermittent streams in the Class III sub-watersheds. Commercial treatments would retain between 120 and 200 square feet of basal area post-harvest.

## 2.2.7.    Stream Restoration

The BLM is proposing individual tree cutting or tipping to provide logs for stream restoration activities (USDI/BLM 2016b, p. 76-77). Tree tipping is mechanically tipping or pulling over trees to keep root wads attached using an excavator or a truck mounted cable system, into or near a stream, to mimic natural wood recruitment (USDI/BLM 2016b, p. 315). The cut or tipped trees can be of any size and come from any zone in the Riparian Reserve LUA. Tree cutting, tipping and stream restoration actions would occur as opportunities allow. Emphasis would be placed on trees which could be removed via existing corridors, skid trails and roads. Snags would be created and scaled to the proportion of the thinned RR area to provide additional wood for streams over time from the Riparian Reserve (USDI/BLM 2016b, p. 82-86).

## 2.2.8.    Commercial Treatments

### 2.2.8.1.    *RMP Management Direction*

In commercial treatments for all action alternatives, the BLM would follow RMP management direction including but not limited to:

All LUA's

- Limit detrimental soil disturbance from forest management operations to a total of <20 percent of the harvest unit area in all LUAs (USDI/BLM. 2016b, p 109),
- Timber sales would not cause the incidental take of northern spotted owl (NSO) (USDI/BLM. 2016b, p. 127).

HLB-LITA, HLB-MITA, RR-Dry & RR-Moist

- Retain trees that are both ≥40 inches DBH and that the BLM identifies were established prior to 1850, except where falling is necessary for safety or operational reasons (USDI/BLM. 2016b, pp. 64-67, 76).

LSR-Dry, RR-Dry & RR-Moist

- Retain existing snags and existing down woody material ≥ 6" in diameter at the large end and > 20 feet in length except for safety, operational, or fuels reduction reasons (USDI/BLM. 2016b, pp. 71, 76).
- Create one snag per acre > 20 inches DBH and one snag per acre > 10 inches DBH, scaled to the proportion of the thinned area (USDI/BLM. 2016b, p. 73).

RR-Dry & RR-Moist

- Maintain at least 30% canopy cover and 60 trees per acre (USDI/BLM. 2016b, p. 78-79, 83-84)."

## 2.2.9.    Harvest Systems

To facilitate forest management treatments, this project would include ground-based, skyline cable, tethered, and helicopter harvest and yarding methods. These harvest operations would utilize landings, skid trails, yarding corridor construction, guy-line anchors, and tail-hold trees in HLB-LITA, MITA, UTA, LSR-Dry, RR-Dry & Moist, DDR-Roads, and DDR-TPCC LUAs. Complete descriptions of these methods can be found in, Appendix D.2 "Tree Harvesting and Yarding Systems."

KSW01630

2.2.10.    Harvest Activity Fuels Reduction

Following harvest, the BLM would determine the type of treatment needed to reduce the amount or depth of remaining residual activity fuels (e.g., live and dead tree branches and treetops) based on location. In commercial units located adjacent to values such as communities or private property and along access routes, activity fuel load would be reduced to result in expected flame lengths less than 4 feet under typical fire weather conditions (see Appendix D.5). Activity fuel loading would be reduced through hand or machine pile and burn, and/or broadcast burning within 1-2 years following completion of harvest to allow fuels time to cure prior to burning. In commercial units not adjacent to values or access routes, the depth of activity fuels will be reduced to less than 18 inches in height by lop and scatter within one year of harvest.

2.2.11.    Non-commercial Hazardous Fuels Reduction (HFR)

HFR treatments are designed to treat understory vegetation (less than eight inches DBH) to reduce surface fuels, ladder fuels, and to promote retention tree growth and vigor. LCFMP proposes HFR retreatment of 5,321 acres in areas treated in the past twenty years to maintain low to moderate surface fuel loading and initial investments (see Appendix F. Maps). A portion of these acres overlap with commercial treatments. HFR treatments are proposed in areas which aid in wildland fire fighting operations, were evaluated during the planning phase of this project, and were identified as in need of treatment. The BLM anticipates the first phase of this project to be implemented in FY 2025 and could take up to 15 years for small diameter HFR thinning and prescribed fire actions to occur and would be dependent on availability of funding, staffing, and contracting tools or agreements. In addition to the 5,321 acres of HFR retreatment, HFR treatments are proposed by alternative.

Treatments could include slashing, hand piling, hand pile burning, chipping, lop and scatter, and/or understory burning. Tree spacing and species preference would be based on site conditions to effectively reduce ladder fuels. Under-burning would involve the application of fire to understory vegetation and downed woody material when fuel moisture, soil moisture, and weather allows for the fire to be confined to a predetermined area, at a prescribed intensity, to achieve the planned resource objectives. Under-burning would occur within 15 years from the initial or follow-up maintenance fuels reduction treatments. See Project Design Features, Table C-19 for more details.

2.2.12.    Transportation Activities

The BLM is proposing transportation management actions, including road construction, road renovation, using existing quarries, and hauling throughout LCFMP (see Appendix D.3). The BLM would identify roads available for wet season haul, depending on road surface type and current condition for each timber sale contract. In all LUAs, the BLM would monitor the renovation of all haul roads to accommodate the safe movement of vehicles and machines in the contractual mechanism used to implement proposed actions (Oregon OSHA 2003 Chapter 437, Division 7, Section F). Roads may be decommissioned (long-term closure status) once timber harvest activities end.

## 2.3.    Alternative 2

This alternative proposes commercial and non-commercial forest management activities on approximately 11,686 acres of BLM-administrative lands. Of these treatment areas, 8,420 acres are proposed for commercial treatments. The prescribed treatments within each stand are driven by a number of factors including LUA, NSO occupancy/habitat type, stand growth rates, species composition, and stand composition/structure. The various LUAs would be treated with VRH, commercial thinning, selection harvest, HFR treatments, and activity fuels reduction treatments.

Additionally, 6,365 acres proposed for commercial timber harvest which were not previously treated for HFR would be evaluated for non-commercial HFR if not treated under Decision Records for commercial treatment.

### 2.3.1. Harvest Land Base – Low Intensity Timber Area (LITA)

Alternative 2 proposes commercial treatments on approximately 938 acres within HLB-LITA. Of those treatment acres, approximately 729 acres, outside of NSO occupied home ranges, are proposed for VRH, and approximately 209 acres, located within occupied NSO home ranges, are proposed for commercial thinning (see Table 2-1). Both treatments would meet the need to produce timber which contributes to the attainment of the declared ASQ. VRH treatments would include commercial harvest, followed by site preparation, and planting a mix of native tree species (USDI/BLM. 2016b, p. 64-65). VRH treatments would retain 15-30 percent of the pre-harvest stand basal area of live trees. Trees would be retained in a diversity of spatial arrangements, including aggregated groups, and individual trees. Natural or artificial regeneration (planting) or both would occur to reforest the site to attain stand-level averages of at least 130 trees/acre within five years of harvest (USDI/BLM. 2016b, p. 65).

Commercial thinning harvests would retain an average relative density of 35 (+/- 10) percent post-harvest, would leave skips on five percent of the stand, and create group selection openings (up to 4 acres in size) on less than ten percent of the stand.

Alternative 2 also proposes non-commercial HFR treatments of approximately 231 acres in HLB-LITA. Of those treatment acres, 168 acres overlap with the areas proposed for commercial harvest in HLB-LITA.

Table 2-1: NSO & Proposed Treatments within HLB-LITA

| NSO Site Occupancy and NSO Habitat Type | Prescription Type and Post-Harvest Basal Area6F[7] or Relative Density Retention: | Group Selections |
| --- | --- | --- |
| Unoccupied NSO home ranges or outside of NSO home ranges – Dispersal, Foraging, and/or Nesting habitat | VRH: Retain 15-30% of the pre-harvest stand basal area in live trees post-harvest | |
| Unoccupied NSO home ranges or outside of NSO home ranges – Dispersal, Foraging, and/or Nesting habitat | Commercial Thin: Retain 25-45% post-harvest relative density | Group selections up to 4 acres in size and up to 10% of the stand area. |
| Occupied NSO home ranges7F[8] – Dispersal habitat | Commercial Thin – Retain 25-45% post-harvest relative density and retain 80-150 square feet of basal area/acre | Group selections under 1 acre in size and up to 10% of the stand area. |
| Occupied NSO home ranges[8] – Foraging habitat | Commercial Thin: Retain 25-45% post-harvest relative density and 150-200 square feet of basal area/acre | Group selection under 1 acre in size and up to 10% of the stand area. |

[7] Post harvest retention metrics are quantified in basal area to be consistent with NSO consultation (USDI BLM 2023, pp. 29-33).
[8] No treatment would occur in NSO occupied nest patches.

KSW01632

| NSO Site Occupancy and NSO Habitat Type | Prescription Type and Post-Harvest Basal Area6F[7] or Relative Density Retention: | Group Selections |
|---|---|---|
| | | |
| Occupied NSO home ranges[8] – Nesting habitat | Commercial Thin: Retain 25-45% post-harvest relative density and 180-200 square feet basal area/acre | Group selection under 1 acre in size and up to 10% of the stand area. |

### 2.3.2.    Harvest Land Base – Moderate Intensity Timber Area (MITA)

Alternative 2 proposes commercial VRH treatment in approximately 57 acres of HLB-MITA. The HLB-MITA, outside of NSO occupied home ranges, are proposed for VRH. If portions of the treatment area become occupied, the treatment would change to commercial thinning. All treatments in HLB-MITA would produce timber which would contribute to the attainment of the declared ASQ. Treatments within HLB-MITA vary depending on the NSO site occupancy and the field verified NSO habitat type within a stand (Table 2-2).

VRH treatments activities would include commercial harvest, followed by site preparation, and planting a mix of native tree species (USDI/BLM. 2016b, p. 64-65). VRH would retain 5-15 percent of the pre-harvest stand basal area in live trees. Trees would be retained in a variety of spatial patterns, including aggregated groups, and individual trees. Natural or artificial regeneration or both would occur to reforest the site to attain stand-level averages of at least 150 trees/acre within 5 years of harvest (USDI/BLM. 2016b, p. 65).

Commercial thin harvests would retain an average stand relative density of 35 (+/- 10) percent post-harvest, would leave skips on five percent of the stand, and create group selection openings (up to 4 acres in size) on less than ten percent of the stand.

Alternative 2 proposes non-commercial HFR treatments on approximately 24 acres within HLB-MITA. None of the 24 acres proposed for HFR treatment overlap with the areas proposed for commercial harvest.

Table 2-2: NSO & Proposed Treatments in HLB-MITA

| NSO Site Occupancy and NSO Habitat Type | Prescription Type and Post-Harvest Basal Area8F[9] or Relative Density Retention: | Group Selections |
|---|---|---|
| Unoccupied NSO home ranges or outside of NSO home ranges – Dispersal, Foraging, and/or Nesting habitat | VRH: Retain 5-15% of the basal area in live trees post-harvest | |
| Unoccupied NSO home ranges or outside of NSO home ranges – Dispersal, Foraging, and/or Nesting habitat | Commercial Thin: Retain 25-45% post-harvest relative density | Group selections up to 4 acres in size and up to 10% of the stand area |

[9] Post harvest retention metrics are quantified in basal area to be consistent with NSO consultation (USDI BLM 2023, pp. 29-33).

| NSO Site Occupancy and NSO Habitat Type | Prescription Type and Post-Harvest Basal Area8F[9] or Relative Density Retention: | Group Selections |
|---|---|---|
| Occupied NSO home ranges9F[10] – Dispersal habitat | Commercial Thin – Retain 25-45% post-harvest relative density and retain 80-150 square feet of basal area/acre | Group selections under 1 acre in size and up to 10% of the stand area |
| Occupied NSO home ranges[10] – Foraging habitat | Commercial Thin: Retain 25-45% post-harvest relative density and 150-200 square feet of basal area/acre | Group selection under 1 acre in size and up to 10% of the stand area |
| Occupied NSO home ranges[10] – Nesting habitat | Commercial Thin: Retain 25-45% post-harvest relative density and 180-200 square feet of basal area/acre | Group selection under 1 acre in size and up to 10% of the stand area |

### 2.3.3.    Harvest Land Base – Uneven-aged Timber Area (UTA)

Alternative 2 proposes commercial treatments on approximately 4,994 acres within HLB-UTA. Activities would include selection harvest, and reforestation (USDI/BLM. 2016b, p. 68-69). Treatments within the HLB-UTA vary depending on the NSO site occupancy and the field verified NSO habitat type within a stand (Table 2-3).

In stands ≥ 10 acres, selection harvest would retain an average stand relative density of 30 (+/- 10) percent post-harvest, would leave skips on at least 10 percent of the stand, and create group selection openings on less than 30 percent of the stand. The group selection openings would be less than 4 acres in size.

Alternative 2 proposes non-commercial HFR treatments on approximately 2,773 acres in HLB-UTA. Of those treatment acres, 1,242 acres overlap with the areas proposed for commercial harvest in HLB-UTA.

Table 2-3: NSO & Proposed Treatments within HLB-UTA

| NSO Site Occupancy and NSO Habitat Type | Post-Harvest Basal Area10F[11] or Relative Density Retention: | Group Selections |
|---|---|---|
| Unoccupied NSO home ranges or outside of NSO home ranges – Dispersal, Foraging, and/or Nesting habitat | Retain 20-40% post-harvest relative density | Group selections up to 4 acres in size and up to 30% of the stand area |

---

[10] No treatment would occur in NSO occupied nest patches.
[11] Post harvest retention metrics are quantified in basal area to be consistent with NSO consultation (USDI BLM 2023, pp. 29-33).

| NSO Site Occupancy and NSO Habitat Type | Post-Harvest Basal Area10F[11] or Relative Density Retention: | Group Selections |
|---|---|---|
| Occupied NSO home ranges11F[12]– Dispersal habitat | Retain 20-40% post-harvest relative density and retain 80-150 square feet of basal area/acre | Group selections under 1 acre in size and up to 10% of the stand area |
| Occupied NSO home ranges[12] – Foraging habitat | Retain 20-40% post-harvest relative density and 150-200 square feet of basal area/acre | Group selection under 1 acre in size and up to 10% of the stand area |
| Occupied NSO home ranges[12] – Nesting habitat | Retain 20-40% post-harvest relative density and 180-200 square feet of basal area/acre | Group selection under 1 acre in size and up to 10% of the stand area |

### 2.3.4.    Late-Successional Reserve (LSR) – Dry

Alternative 2 proposes commercial treatments on approximately 291 acres in LSR-Dry. Within LSR-Dry, integrated vegetation management treatments are proposed to promote the development of NSO habitat (USDI/BLM. 2016b, p. 70-72) and to improve and maintain landscape and ecosystem resilience to large-scale high-intensity/high-severity wildfire (USDI/BLM. 2016b, p. 74). Activities would include selection harvest, HFR, and prescribed fire (USDI/BLM. 2016b, p. 74-75).

In stands ≥ 10 acres, selection harvest would retain an average stand relative density of 30 (+/- 10) percent post-harvest, would leave skips on at least 10 percent of the stand, and create group selection openings on less than 10 percent of the stand. The group selection openings would be less than 1 acre in size.

Alternative 2 proposes non-commercial HFR treatments on approximately 758 acres in LSR-Dry. Of those treatment acres, 99 acres overlap with the areas proposed for commercial harvest in LSR-Dry.

Treatments within the LSR-Dry vary depending on the NSO site occupancy and the field verified NSO habitat type within a unit (Table 2-4). Overall, the proposed logging, yarding, and hauling activities in the LSR-Dry would provide for the conservation and recovery of the NSO in the short and long term.

Table 2-4: NSO & Proposed Treatments in LSR-Dry

| NSO Habitat Type | Post-Harvest Basal Area12F[13] or Relative Density Retention: | Group Selections |
|---|---|---|
| Dispersal habitat13F[14] | Retain 20-40% post-harvest relative density and retain 80-150 square feet of basal area/acre | Group selection less than 1 acre and up to 10% of the stand |

---

[12] No treatment would occur in NSO occupied nest patches.
[13] Post harvest retention metrics are quantified in basal area to be consistent with NSO consultation (USDI BLM 2023, pp. 29-33).
[14] No treatment would occur in NSO occupied nest patches.

| NSO Habitat Type | Post-Harvest Basal Area12F[13] or Relative Density Retention: | Group Selections |
|---|---|---|
| Foraging habitat[14] | Retain 20-40% post-harvest relative density and 150-180 square feet of basal area/acre | Group selection less than 1 acre and up to 10% of the stand |
| Nesting habitat[14] | Retain 20-40% post-harvest relative density and 180 or greater square feet basal area/acre, consider no treatment | Group selection less than 1 acre and up to 10% of the stand |

### 2.3.5.        Riparian Reserve (RR) – Moist and Dry

Alternative 2 proposes commercial treatment of approximately 7 acres in RR-Moist and approximately 1,290 acres in RR-Dry.

Alternative 2 proposes HFR treatments on approximately 22 acres in RR-Moist. Of the 22 acres proposed for treatment, none overlap with the areas proposed for commercial harvest in RR-Moist. Alternative 2 also proposes HFR treatments on approximately 1,010 acres within the RR-Dry. Of those treatment acres, 247 acres overlap with the areas proposed for commercial harvest in RR-Dry.

### 2.3.6.        District Designated Reserve (DDR) – Timber Production Capability Classification (TPCC)

Alternative 2 proposes commercial treatment on approximately 663 acres in DDR-TPCC. Alternative 2 also includes HFR treatments on approximately 503 acres with 119 acres overlapping areas proposed for commercial harvest.

### 2.3.7.        Transportation Management

Alternative 2 proposes 241 miles of road renovation, 28 miles of road construction, and potential entry into 14 existing rock quarries. Previously decommissioned roads, or roads placed in a long-term closure status, are proposed to be renovated for the project and may be closed upon project completion (USDI/BLM 2016b p. 311, 312). For a detailed discussion on Transportation Management please see Appendix D.3.

## 2.4.    Sub-Alternative 2a

This alternative is a sub-alternative stemming from Alternative 2 above. It is identical to Alternative 2 with the difference being the 786 acres proposed for VRH in Alternative 2 would instead be treated only with commercial thinning.

## 2.5.    Alternative 3

Alternative 3 was developed from external scoping. Alternative 3 proposes commercial harvest activities, consisting of commercial thinning and selection harvest, on approximately 1,059 acres.

Alternative 3 includes:

- No VRH,
- No commercial treatment in occupied NSO home ranges,
- No commercial treatment of NSO nesting-roosting habitat outside of occupied NSO home ranges,

- Increased tree retention levels to 40-45 percent relative density in each unit
- Decreased diameter limit, no cutting or removal of trees > 20 inches DBH, and
- No road construction.

Commercial harvest in Alternative 3 is reduced from 8,240 acres to 1,059 acres when compared to Alternatives 2 and 2a in order to comply with the above bullets and the need to produce economically viable timber sales. Multiple factors are considered when determining economic viability for Alternative 3, such as needing 5 Mbf per acre, road access, and the bullets described above.

Areas only accessible via helicopter were deferred in this alternative because empirical data shows that helicopter logging needs to extract at least 10 Mbf/acre to be economically viable. Operationally, helicopter yarding cannot safely nor efficiently operate in stands with canopy cover greater than 60 percent. For these reasons, helicopter yarding in Alternative 3 would not be economically viable to offer timber sale contracts, therefore areas that could only be logged with helicopter yarding were deferred from Alternative 3.

HFR treatments are proposed on 11,083 acres (of which, 456 acres overlap with areas proposed for commercial treatments). This includes 7,181 acres of initial entry HFR treatments. Additionally, 1,059 acres proposed for commercial timber harvest which were not previously treated for HFR would be evaluated for non-commercial HFR if not treated under Decision Records for commercial treatment.

### 2.5.1. Harvest Land Base (HLB) – Low Intensity Timber Area (LITA)

Alternative 3 proposes commercial thinning of 23 acres within HLB-LITA to post-harvest relative density of 40-45 percent, would leave skips on 5 percent of the stand, and would create group selection openings less than 1 acre in size on less than 10 percent of the stand. Alternative 3 proposes 1,001 acres within the HLB-LITA for HFR (of which, 3 acres overlaps with the area proposed for commercial thinning).

### 2.5.2. Harvest Land Base (HLB) – Moderate Intensity Timber Area (MITA)

Alternative 3 proposes commercial thinning of 5 acres within HLB-MITA to post-harvest relative density of 40-45 percent, would leave skips on five percent of the stand, and would create group selection openings less than one acre in size on less than ten percent of the stand. Alternative 3 proposes 76 acres within the HLB-MITA for HFR (of which, no acres overlap with the area proposed for commercial thinning).

### 2.5.3. Harvest Land Base (HLB) – Uneven-aged Timber Area (UTA)

Alternative 3 proposes treating 763 acres with selection harvest in HLB-UTA to post-harvest 40-45 percent relative density, would leave skips on at least 10 percent of the stand. Group selection openings would not exceed 1 acre in size and 25-30 percent of the stand area. Alternative 3 proposes 6,092 acres within the HLB-UTA for HFR (of which, 330 acres overlap with the area proposed for selection harvest).

### 2.5.4. Late-Successional Reserve (LSR) – Dry

This alternative proposes selection harvest on 65 acres of LSR-Dry with a post-harvest relative density of 40-45%. Group selection openings would not exceed 1 acre in size and 10 percent of the stand area. Alternative 3 proposes 912 acres within the LSR-Dry for HFR (of which, 27 acres overlap with the area proposed for selection harvest).

### 2.5.5. Riparian Reserve (RR) – Dry and Moist

Alternative 3 proposes treating 1 acre in RR-Moist and 159 acres in RR-Dry with commercial thinning to post-harvest relative densities of 40-45 percent. Alternative 3 proposes 29 acres within the RR-Moist for HFR (of which no overlap occurs with the area proposed for commercial thinning) and 1,948 acres within

the RR-Dry for HFR (of which, 54 acres overlaps with the area proposed for commercial thinning). As in Alternatives 2 and 2a, no commercial harvest would occur in the Inner Riparian Zone.

2.5.6.        Transportation Management

This alternative proposes 51 miles of road renovation and potential entry into 6 existing rock quarries. As proposed in Alternatives 2 and 2a, previously decommissioned roads, or roads placed in a long-term closure status, are proposed to be renovated for the project and may be closed upon project completion (USDI/BLM 2016b p. 311, 312). For a detailed discussion on Transportation Management please see Appendix D.3.

## 2.6.     Alternatives Considered but Eliminated from Detailed Analysis

During the project's public scoping period, the BLM received comments, some of which contained suggestions to the alternatives. Alternatives may be considered but eliminated from detailed analysis for any of the following reasons:

- They do not meet the purpose and need,
- are technically or economically infeasible,
- they are inconsistent with the basic policy objectives for the management of the area,
- implementation is remote or speculative,
- they are substantially similar in design to an alternative that is analyzed in detail, or
- it would have substantially similar effects to an alternative that is analyzed in detail, BLM NEPA Handbook (USDI/BLM. 2008a p. 52).

The IDT considered other alternatives for analysis during the interdisciplinary process. Although there were no fully developed alternatives submitted by the public many of the requested elements submitted have been incorporated into the Alternatives. The BLM has considered the following additional actions and provides rationale as to why detailed analysis was not completed or how detailed analysis has been incorporated into the Alternatives. Below are summarized comments:

1. **Summarized Comment:** The BLM should follow the sustained yield harvest regimes used for analysis in the FEIS and adhere to what was modeled in the first decade of implementation in the FEIS.

   **Rationale:** It is not technically feasible to determine if the LCFMP would "adhere" to what was modeled in the first decade of plan implementation in the Medford SYU, because the only appropriate scale at which to interpret the vegetation modeling is across the entire SYU and over an entire decade of RMP implementation. Due to these limitations, it is technically infeasible to design an LCFMP alternative that adheres to the model.

   Consistent with the strategic nature of the sustained-yield calculation, the vegetation modeling in the Proposed RMP/Final EIS characterized forest condition and timber harvest outputs in 10-year increments based on a set of modeling assumptions and projections (Proposed RMP/ Final EIS, pp. 1163-1228). The BLM used that analytical information to declare an ASQ of timber in the ROD/RMP (SWO ROD/RMP, pp. 5-9). The sustained-yield calculation in the Proposed RMP/Final EIS and the declaration of the ASQ in the ROD/RMP are based on each entire sustained-yield unit. Therefore, the appropriate scale to consider whether the implementation of timber harvest is within the scope of the vegetation modeling is over a 10-year period across the sustained-yield unit. The strategic nature and broad temporal and spatial scale of the vegetation modeling renders meaningless any determination of whether an individual project "adheres" to the vegetation modeling in the Proposed RMP/Final EIS.

   When BLM conducts regular plan evaluations (approximately every five years), the BLM will need to consider many individual actions summarized across the SYU over each decade of implementation to draw even preliminary conclusions about whether the implementation of timber harvest is on a trend

to be within the scope of the vegetation modeling. See the Western Oregon RMP's 5-year evaluation report here,

https://eplanning.blm.gov/public_projects/57902/200093077/20056257/250062439/BLM0029795_W estern%20OR%20RMPs%205-Year%20Evaluation%20Report%2003.16.2022.pdf.

2. **Summarized Comment:** The BLM should develop an alternative that creates the minimum number of "skips" (10%) and the maximum amount of group selections (30%) in the commercial HLB-UTA.

   **Rationale:** This action is a part of Alternatives 2 and 2a, HLB-UTA.

3. **Summarized Comment:** The BLM should develop an alternative that treats HLB-UTA stands to the lowest relative density percent allowed by the RMP.
   **Rationale:** The 2016 RMP management direction calls for forest stands ≥ 10 acres treated with selection harvest or commercial thinning, to result in stand average relative density between 20 and 45 percent after harvest (USDI/BLM. 2016b p.68). Alternatives 2 and 2a proposes that selection harvests would retain an average stand relative density of 30 (+/- 10) percent which is within the allowable range given in the RMP. The BLM may elect to defer harvest at times on particular stands in the HLB-UTA for reasons described in the management direction or in Appendix A (USDI/BLM. 2016b p. 126-127). Alternatives 2 and 2a allows for post-harvest relative density as low as 20 percent. Each treatment unit has specific circumstances, such as the occupancy status of NSO sites, which may limit the treatment of HLB-UTA stands to the lowest relative density percent allowed by the RMP while also avoiding "take" as required by the RMP. The retention of the lowest relative density percent allowed by the RMP is incorporated into Alternatives 2 and 2a, where appropriate, therefore this component is substantially similar in design and does not warrant an additional alternative.

4. **Summarized Comment:** The BLM should maximize forest health and fire resilience objectives while maintaining NSO nesting-roosting habitat in the LSR-Dry.

   **Rationale:** This action has been incorporated into Alternatives 2 and 2a for the LSR-Dry. The project proposes treatment of approximately 950 acres within the LSR-Dry. Within in the LSR-Dry integrated vegetation management treatments are intended to promote the development of NSO habitat (USDI/BLM 2016b, p. 70-72) and improve, enhance, and maintain landscape and ecosystem resilience to large-scale high-intensity/high-severity wildfires (USDI/BLM 2016b, p. 74). Activities would include commercial thinning, selection harvest, HFR, and prescribed fire (USDI/BLM 2016b, p. 74-75). A majority of the 950 acres of LSR-Dry proposed for treatment in the LCFMP are prescribed to maintain the current habitat type and function. Only 4 acres of LSR-Dry would not maintain nesting-roosting habitat function because, as allowed by RMP management direction, these areas are needed for access routes (such as road construction) to enter adjacent HLB and LSR-Dry stands.

5. **Summarized Comment:** The BLM should focus on small diameter thinning. BLM interprets this as retaining mature forests and fire-resilient large-diameter trees over 20 inches.

   **Rationale:** This action is incorporated into Alternative 3, applicable to all LUA's.

6. **Summarized Comment:** The BLM should avoid the downgrade and removal of suitable NSO habitat, especially within the LSR.

   **Rationale:** This is substantially similar to Alternative 3. Alternatives 2 and 2a also incorporates this in LSR and all LUAs within occupied NSO home ranges.

7. **Summarized Comment:** The BLM should upgrade existing roads and avoid new road construction.

**Rationale:** This component is substantially similar in design to Alternative 3 and does not warrant an additional alternative.

## 2.7. Comparison of Alternatives

Table 2-5 Treatment Acreage Comparisons between Alternatives by Land Use Allocation

| Treatment Management Actions | Land Use Allocation | Alternative 1 – No Action (Acres) | Alternative 2 (Acres) | Sub-Alternative 2a (Acres) | Alternative 3 (Acres) |
|---|---|---|---|---|---|
| Commercial Treatments14F[15] | | | | | |
| VRH | HLB-LITA | 0 | 729 | 0 | 0 |
| | HLB-MITA | 0 | 57 | 0 | 0 |
| Commercial Thin | HLB-LITA | 0 | 209 | 938 | 23 |
| | HLB-MITA | 0 | 0 | 57 | 5 |
| | RR-Dry | 0 | 1,290 | 1290 | 159 |
| | RR-Moist | 0 | 7 | 7 | 1 |
| Selection Harvest | HLB-UTA | 0 | 4,994 | 4,994 | 763 |
| | LSR-Dry | 0 | 291 | 291 | 65 |
| | DDR-TPCC | 0 | 663 | 663 | 43 |
| Sub-Total | | **0** | **8,240** | **8,240** | **1,059** |
| Non-Commercial HFR Maintenance Treatments which DO overlap with Commercial Treatments | | | | | |
| VRH + HFR, Commercial Thin + HFR, and Selection Harvest + HFR | HLB-LITA | 0 | 168 | 168 | 3 |
| | HLB-MITA | 0 | 0 | 0 | 0 |
| | HLB-UTA | 0 | 1,242 | 1,242 | 330 |
| | LSR-Dry | 0 | 99 | 99 | 27 |
| | RR-Dry | 0 | 247 | 247 | 54 |
| | RR-Moist | 0 | 0 | 0 | 0 |

[15] If commercial treatments are not implemented, these areas would be treated for HFR.

| Treatment Management Actions | Land Use Allocation | Alternative 1 – No Action (Acres) | Alternative 2 (Acres) | Sub-Alternative 2a (Acres) | Alternative 3 (Acres) |
|---|---|---|---|---|---|
| | DDR-TPCC | 0 | 119 | 119 | 42 |
| Sub-Total | | 0 | **1,875** | **1,875** | **456** |
| Non-Commercial HFR Treatments which DO NOT overlap with Commercial Treatments | | | | | |
| HFR Only | HLB-LITA | 0 | 63 | 63 | 978 |
| | HLB-MITA | 0 | 24 | 24 | 76 |
| | HLB-UTA | 0 | 1,531 | 1,531 | 5,762 |
| | LSR-Dry | 0 | 659 | 659 | 885 |
| | RR-Dry | 0 | 763 | 763 | 1,894 |
| | RR-Moist | 0 | 22 | 22 | 28 |
| | DDR-TPCC | 0 | 384 | 384 | 1,004 |
| Sub-Total | | **0** | **3,446** | **3,446** | **10,627** |
| **Total Treatment Acres** | | | | | |
| Total Commercial and/or Non-Commercial Treatments | HLB-LITA | 0 | 1,001 | 1,001 | 1,001 |
| | HLB-MITA | 0 | 81 | 81 | 81 |
| | HLB-UTA | 0 | 6,525 | 6,525 | 6,525 |
| | LSR-Dry | 0 | 950 | 950 | 950 |
| | RR-Dry | 0 | 2,053 | 2,053 | 2,053 |
| | RR-Moist | 0 | 29 | 29 | 29 |
| | DDR-TPCC | 0 | 1,047 | 1,047 | 1,047 |
| Total Treatment Acres | | **0** | **11,686** | **11,686** | **11,686** |
| Logging Systems | | (Acres) | (Acres) | (Acres) | (Acres) |
| Cable Yarding | | 0 | 2,590 | 2,590 | 387 |
| Ground-based Yarding | | 0 | 5,080 | 5,080 | 672 |
| Helicopter Yarding | | 0 | 570 | 570 | 0 |

| Treatment Management Actions | Land Use Allocation | Alternative 1 – No Action (Acres) | Alternative 2 (Acres) | Sub-Alternative 2a (Acres) | Alternative 3 (Acres) |
|---|---|---|---|---|---|
| Helicopter Landing Construction | | 0 | 15 | 15 | 0 |
| Total | | **0** | **8,255** | **8,255** | **1,059** |
| Transportation Management Activities | | (Miles) | (Miles) | (Miles) | (Miles) |
| Road Construction | | 0 | 28 | 28 | 0 |
| Road Renovation | | 0 | 241 | 241 | 51 |
| Total Haul Roads | | **0** | **269** | **269** | **51** |
| Existing Quarry Entries | DDR, DDR-TPCC, HLB-UTA, HLB-LITA, RR-DRY, & LSR-DRY | Entries at 0 Quarries | Entries at 14 Quarries | Entries at 14 Quarries | Entries at 6 Quarries |

## CHAPTER 3. AFFECTED ENVIRONMENT & ENVIRONMENTAL CONSEQUENCES

In this section the BLM discloses the affected environment (a description of the current condition for a baseline comparison) and the environmental consequences which include: the methods and assumptions of the analysis, beneficial and detrimental effects, and short- and long-term effects by alternative.

### 3.1. Forest Management

3.1.1.    Issue 1: What would be the economic viability and operational feasibility of commercial treatments in each alternative?

#### 3.1.1.1.    *Affected Environment*

The BLM sells timber and other wood products as authorized under 43 CFR 5000 regulations. Wood product sale contracts include provisions that ensure that harvest and other silvicultural treatments are implemented consistent with the Decision Record for the project. Wood product sales are an important tool used by the BLM to implement forestry treatments to accomplish multiple objectives described in the RMP (e.g., habitat improvement, fuels reduction, timber harvest, forest resistance to disturbance).

43 CFR Part 5420 requires BLM timber to be appraised to estimated fair market value15F[16]. When conducting this appraisal, the BLM estimates the delivered price16F[17] of harvested wood products and all associated operational costs included in the contract (e.g., costs of logging, transportation, road construction and maintenance, fuels treatment, snag creation), with allowance for a profit and risk. The BLM estimate of fair market value is calculated using empirical data from previous regional BLM timber sales and most current compiled log market summary statistics. The fair market value is the base value for calculating the stumpage value17F[18]. The stumpage value is the fair market value of the timber less any estimated and calculated operational costs required in the sale of wood products contract. The stumpage price sets the minimum acceptable bid price by species per unit of wood product volume. The minimum bid price is the beginning price that all initial and subsequent bids are based on for both sealed bid and oral auction timber sales.  If operational costs exceed the fair market value of the timber, then the timber sale would not be considered economically viable, because stumpage value would be negative. The lower the operational costs are, the higher the estimated stumpage value would be relative to the fair market value. Timber markets fluctuate. The empirical data used to determine economic viability uses the market low for timber value to ensure that the treatment is economically viable even if the market is low when the final wood product sale contract is ready for auction. If a timber sale fails to sell, BLM would attempt to reconfigure and reoffer the contract package. Ultimately, if the contract is not sold, then the wood product sale and associated silvicultural treatments would not be implemented.

The relative economic viability18F[19] of each alternative commercial treatment can be expressed in terms of dollars per MBF. The economic viability analysis is not as exhaustive as a full timber sale appraisal in

---

[16] Fair market value means the price forest products will return when offered for competitive sale on the open market (43 CFR 5400.0-5 Definitions).

[17] Delivered Price: Estimated price that would be paid for delivered wood products to a utilization center. This is often referred to as pond value.

[18] Stumpage Value is the estimated value of commercial wood products after deducting all associated contract costs and an allowance for profit and risk; this is the estimated price that would be paid for wood products if offered on the open market.

[19] Economic Viability of wood product contracts: For the purposes of this EA, economic viability describes the likelihood that a wood product contract would be sold when offered at auction for competitive bidding. To be considered economically viable, the value of the wood products harvested under the contract must exceed related contract costs, which can be expressed as an estimate of stumpage value.

KSW01643

that it only analyzes and describes the general costs that differ between each commercial treatment alternative (i.e., harvest acres, road construction costs, logging costs by harvest method, and fuels work costs). The economic viability analysis discloses the likelihood that a treatment would be executed by displaying reasonable proof that a wood product sale contract would sell when offered at auction. If the analysis shows that the treatment is not economically viable, then that presents to the BLM the need for alternative contracting mechanisms (service or stewardship contracts) to execute the treatment or that the alternative is not a reasonable choice. If BLM finds a commercial treatment to not be economically viable, treatment could be implemented under service or stewardship contracts. No new NEPA and subsequent analysis would need to be issued (see Background section 1.2 for more information).

The other factor that BLM must consider when evaluating the likelihood that a wood product sale would sell when offered at auction is operational feasibility. This refers to whether or not a typical prospective BLM wood product sale contract purchaser19F[20] could fulfill the terms of the contract safely and efficiently with available and standard equipment and expertise for the task. These considerations cannot be expressed in terms of dollars per MBF, rather they are qualitative considerations that impact whether or not a contract would sell if offered at action. The safety feasibility considerations are qualitative as well as measured for their compliance with applicable laws and regulations.

This analysis is not intended to fulfill BLM's regulatory requirements to estimate fair market value, nor is it intended to estimate the actual stumpage value of wood product sale contracts. Rather this analysis is intended to estimate relative differences between alternatives, to inform the BLM and the public about economic and operational tradeoffs among the alternatives considered, and the relative likelihood that resulting wood product sales would sell if offered. The contract costs described below are not exhaustive of all the costs that are typically included in a formal wood product contract sale appraisal.

3.1.1.2.        *Environmental Consequences*

Assumptions

The BLM used the following assumed costs to estimate the average stumpage value in each alternative:

**Delivered Price**
To estimate the delivered price of timber, BLM assumed all volume offered is Douglas-fir to simplify the analysis and because this species represents the substantial majority of timber that would be harvested. The bid price of timber sales is based on the bid price of Douglas-fir. The price used for Douglas-fir is an average of all of the prices for each lumber grade.

To estimate the delivered price of Douglas-fir, BLM reviewed the range of prices over the last 4 years of GPFO appraisals and chose a price at the low end of the range to ensure that resulting timber sale contracts would be economically viable in any reasonably foreseeable future market.

Source: Evaluation of completed timber sale appraisals performed on the Grants Pass Field Office between 2020 and 2024.

**Logging Costs**

---

[20] Purchaser means a business entity including, but not limited to, an individual, partnership, corporation, or association that buys Federal timber or other vegetative resources (43 CFR 5400.0-5 Definitions).

KSW01644

BLM assumed a single cost per Mbf/acre for a thinning20F[21] prescription using cable, ground-based, and ground-based tethered assist harvest methods; a single cost per Mbf/acre for a thinning prescription using a helicopter harvest method; and a single cost per Mbf/acre for a VRH prescription using cable, ground-based, and ground-based tethered assist harvest methods. A cost for VRH prescription using helicopter logging systems was not established because that combination of prescription and logging system is not proposed in LCFMP.

- VRH Prescription using Cable, Ground-based and/or Tethered Logging System = $239/Mbf

- Thinning Prescription using Cable, Ground-based and/or Tethered Logging System = $252/Mbf

- Thinning Prescription using Helicopter Logging System = $618/Mbf

Source: Evaluation of completed timber sale appraisals21F[22] performed on the Grants Pass Field Office between 2020 and 2024.

**Roadwork Costs**

The BLM assumed prices for each activity would be similar to prices appraised in recent timber sale contracts. To simplify this analysis, the road construction cost below does not include the cost of rock surfacing because this cost will not vary between alternatives.

- Road Construction = $133,914/mile
- Road Renovation = $32,445/mile
- Road Decommissioning = $11,919/mile
- Helicopter Landing Construction = $20,472/landing

Source: Evaluation of completed timber sale appraisals performed on the Grants Pass Field Office between 2023 and 2024

**Fuels Treatment Costs**

The actual cost of activity fuels treatments implemented in each harvest unit, under each alternative, will depend on an evaluation of post-harvest fuel loading. The values in Table 3.1.1. below come from the current Indefinite Delivery Indefinite Quantity (IDIQ) contract that BLM has in place to implement fuels treatments in the Medford District. This IDIQ contract describes different fuels treatment levels depending on the complexity and difficulty of the work, increasing from Level I to Level III. In general, the amount of activity fuels (e.g., tree branches, limbs, tops) generated from commercial treatments vary by the amount of timber that is removed, so the more timber removed per acre, the more activity fuels that are produced.

---

[21] For this analysis, the word Thin or Thinning prescription type refers to either Commercial Thin or Selection Harvest as described by LUA in Chapter 2.

[22] GPFO has not implemented VRH silviculture treatments since the adoption of the 2016 RMP. Post-fire salvage logging costs were used as a surrogate for VRH logging costs because logging efficiency and productivity based on volume removed is greater in fire salvage sales compared to thinning sales and are therefore reasonably comparable to VRH logging costs. The helicopter logging cost from recent sale appraisals was increased by 10 percent to account for recent inflation costs associated with this industry.

Table 3.1.1. Assumed Fuels Treatment Costs

| Activity Fuels Treatment | Hand Pile and Cover Cost ($/acre) | Hand Pile Burn and Mop-Up Cost ($/acre) | Total Fuels Treatment Cost per Acre |
|---|---|---|---|
| Alternative 2 VRH Prescription, Level III Fuels Treatment Intensity | $882.28 | $168.17 | $990.45 |
| Alternative 2 & 2a Thinning Prescription, Level II Fuels Treatment Intensity | $576.41 | $114.82 | $691.23 |
| Alternative 3 Thinning Prescription, Level I Fuels Treatment Intensity | $423.32 | $71.91 | $495.23 |

Source: Medford IDIQ for Hazardous Fuels Reduction Service Contract, Rates Effective 9/1/2024

**Other Costs and Allowances Not Included in the Analysis**
The following costs are not included in this analysis because they would not vary between alternatives on the per MBF basis: profit & risk, snag creation, road construction rock surfacing, timber hauling and variances in costs and delivered price resulting from seasonal restrictions.

Methodology

**Treatment and Harvest Acres**
The Last Chance prescriptions require the integration of aggregates and skips22F[23] into the treatment unit in HLB and LSR-dry. Timber is generally not harvested from aggregate retention or skip areas, so the total harvest acres are smaller than the total treatment acres. Prescriptions in all Alternatives in Riparian Reserves and DDR-TPCC do not require aggregates nor skips, therefore the harvest acres are equal to the treatment acres. Table 3.1.2. below summarizes, by Alternative, the LUA treatment and harvest acres of each treatment type.

Table 3.1.2. Commercial Treatment Acres and Harvest Acres[24] by LUA

| Commercial Treatment and Harvest Acres by LUA | Alternative and Prescription Type | | | |
|---|---|---|---|---|
| | Alt. 2 VRH | Alt. 2 Thin | Alt. 2a Thin | Alt. 3 Thin |
| Commercial Treatment Acres in HLB-LITA | 729 | 209 | 938 | 23 |
| Harvest Acres in HLB-LITA | 693 | 195 | 887 | 17 |
| Commercial Treatment Acres in HLB-MITA | 57 | 0 | 57 | 5 |
| Harvest Acres in HLB-MITA | 54 | 0 | 54 | 4 |
| Commercial Treatment Acres in HLB-UTA | 0 | 4,994 | 4,994 | 763 |
| Harvest Acres in HLB-UTA | 0 | 4,461 | 4,461 | 653 |

[23] Aggregates and skips are included in the treatment acreage estimates contributing to Relative Density and Basal Area retention requirements as described in the RMP management direction (RMP pages 64-68, and 72), but are not considered part of the harvest area for purposes of estimating harvested wood products volume.

| Commercial Treatment and Harvest Acres by LUA | Alternative and Prescription Type | | | |
|---|---|---|---|---|
| | Alt. 2 VRH | Alt. 2 Thin | Alt. 2a Thin | Alt. 3 Thin |
| Commercial Treatment Acres in LSR-Dry | 0 | 291 | 291 | 65 |
| Harvest Acres in LSR-Dry | 0 | 194 | 194 | 58 |
| Commercial Treatment/Harvest Acres in RR | 0 | 1,297 | 1,297 | 160 |
| Commercial Treatment/Harvest Acres in DDR-TPCC | 0 | 663 | 663 | 43 |

**Volume Per Acre**

For this analysis, it was assumed that tree lists describing the current conditions of stands accurately represent the standing basal area that is available for harvest in each LUA in each alternative. Tree form and merchantability within LCFMP is similar to nearby GPFO timber sales, therefore volume to basal area ratios calculated from previous GPFO timber sale cruises accurately represent the volume generated by each alternative. Assumed harvest volume23F[24] per acre by Alternative, treatment type, and HLB LUA are shown in Table 3.1.3. below.

Table 3.1.3. Assumed average harvest volume per acre by Alternative, treatment type, and HLB LUA

| Alternative and Prescription Type | Volume Removed in HLB-LITA (Mbf/ac) | Volume Removed in HLB-MITA (Mbf/ac) | Volume Removed in HLB-UTA (Mbf/ac) | Volume Removed in LSR-Dry (Mbf/ac) | Volume Removed in RR (Mbf/ac) | Volume Removed in DDR-TPCC (Mbf/ac) |
|---|---|---|---|---|---|---|
| Alt. 2 VRH | 30 | 27 | N/A | N/A | N/A | N/A |
| Alt. 2 Thin | 6 | 9 | 9 | 11 | 8 | 8 |
| Alt. 2a Thin | 13 | 9 | 9 | 11 | 8 | 8 |
| Alt. 3 Thin | 8 | 7 | 8 | 7 | 7 | 7 |

The estimated volume by treatment type, LUA, and Alternative is calculated from the harvest acres, not total treatment acres that include reserve aggregates and skips.

**Harvest Methods**

Table 3.1.4. below shows the acres of each harvest method by prescription type by LUA for each Alternative used for this analysis. Alternative 3 excludes helicopter. See Table 2-5 in section 2.7.

Table 3.1.4. Harvest Acres by LUA, Prescription, and Harvest Method

| Commercial Treatment by LUA, Prescription & Harvest Method | Alt. 2 | Alt. 2a | Alt. 3 |
|---|---|---|---|
| HLB-LITA VRH Harvest Acres using Cable, Ground-based and/or Tethered Harvest Method | 693 | 0 | 0 |
| HLB-MITA VRH Harvest Acres using Cable, Ground-based and/or Tethered Harvest Method | 54 | 0 | 0 |

---

[24] The assumed harvest acreage and volume numbers will all be refined prior to offering for sale. During the contract preparation phase of each timber sale, the BLM establishes the final treatment unit boundaries using GPS and performs a detailed cruise to determine the appraised price of the timber sale contract as required by regulations.

KSW01647

| Commercial Treatment by LUA, Prescription & Harvest Method | Alt. 2 | Alt. 2a | Alt. 3 |
|---|---|---|---|
| HLB-LITA CT Harvest Acres using Cable, Ground-based, and/or Tethered Harvest Method | 194 | 886 | 17 |
| HLB-MITA CT Harvest Acres using Cable, Ground-based, and/or Tethered Harvest Method | 0 | 54 | 4 |
| HLB-UTA SH Harvest Acres using Cable, Ground-based, and/or Tethered Harvest Method | 4,116 | 4,116 | 653 |
| LSR-Dry SH Harvest Acres using Cable, Ground-based, and/or Tethered Harvest Method | 167 | 167 | 58 |
| RR CT Harvest Acres using Cable, Ground-based, and/or Tethered Harvest Method | 1,178 | 1,178 | 160 |
| DDR-TPCC SH Harvest Acres using Cable, Ground-based, and/or Tethered Harvest Method | 584 | 584 | 43 |
| HLB-LITA VRH Harvest Acres using Helicopter Harvest Method | 0 | 0 | 0 |
| HLB-MITA VRH Harvest Acres using Helicopter Harvest Method | 0 | 0 | 0 |
| HLB-LITA CT Harvest Acres using Helicopter Harvest Method | 1 | 1 | 0 |
| HLB-MITA CT Harvest Acres using Helicopter Harvest Method | 0 | 0 | 0 |
| HLB-UTA SH Harvest Acres using Helicopter Harvest Method | 345 | 345 | 0 |
| LSR-Dry SH Harvest Acres using Helicopter Harvest Method | 27 | 27 | 0 |
| RR CT Harvest Acres using Helicopter Harvest Method | 119 | 119 | 0 |
| DDR-TPCC SH Harvest Acres using Helicopter Harvest Method | 79 | 79 | 0 |

Estimates of acres harvested using harvest methods in each alternative represent BLM's best estimate given site conditions, the transportation network, terrain, and BLM's knowledge of logging equipment available to prospective purchasers.

**Road Work**
Table 3.1.5. below shows the miles of road work proposed for each Alternative and used for this analysis. For more information see Appendix D.3.

Table 3.1.5. Miles of Roadwork by Alternative

| Activity | Alt. 2 | Alt. 2a | Alt. 3 |
|---|---|---|---|
| Miles of Road Construction | 28 | 28 | 0 |
| Miles of Road Renovation | 241 | 241 | 51 |
| Miles of Road Decommissioning or Long-term Closure Status | 31 | 31 | 2 |
| Number of Helicopter Landings Constructed | 15 | 15 | 0 |

The actual amount and cost of road construction, road renovation, road decommissioning, and helicopter landing construction incurred for each road segment, under each alternative, will depend on an evaluation and appraisal during timber sale contract preparation.

The estimated stumpage value for each alternative is calculated by subtracting estimates of logging costs, road work and engineering costs, and fuels treatment costs from the delivered price of timber, all expressed in a dollar per MBF basis. This produces an estimate that can be used to inform the relative economic viability of commercial treatments between alternatives.

This methodology is expressed mathematically as: Stumpage value = Delivered Price – Logging Costs-Road Construction and Engineering Costs – Fuels Treatment Costs

> Spatial Scale

This analysis was conducted for the project area and based on the market area. The market area includes the closest and most relevant manufacturing sites for the merchantable material that is projected to result from the different treatment types.

Temporal Scale

This analysis is based on activity occurring from FY2024 through FY2028.

### 3.1.1.3.    *Environmental Effects*

Alternative 2 has the highest economic viability potential and therefore treatments proposed under this alt have the highest likelihood of being successfully offered, sold, and implemented. Alternative 2 offers the least amount of economic risk to purchasers and a favors high revenue system.

Alternative 2A offers the same amount treatment and harvest acres, but offers 11,401 MBF less resulting in $3,065,185.39 less potential revenue to the BLM. VRH treatments were converted to commercial thinning with accounts for the difference in the 11,401 MBF. Costs were spread over less volume (MBF) and created the increase in logging costs, roadwork engineering, and fuels costs per MBF.

Alternative 3 has the lowest economic viability resulting in $5,072,002.91 less than Alternative 2, and $2,006,817.52 less than Alternative 2a. The treatment acres are 7,181 acres less than alt 2 and 2a. The Harvest acres are 6,621 less than Alternative 2 and 2a.  The volume difference between Alternative 2 and 3 is 74,166 MBF and the volume difference between Alt. 2a and 3 is 62,765 MBF. These differences are due to deferred treatments in occupied NSO home ranges, deferred treatments of NR habitat, increased tree retention levels to 40 RD, 20-inch diameter limit, no helicopter logging, and no road construction. The reason this Alternative is economically viable is because the cost does not exceed the value of the timber (stumpage value is $10.18 and is over $0.00). The likelihood of treatments proposed under this alt have the lowest likelihood of being implemented because of their low economic viability as compared to the treatments proposed under Alts. 2 and 2a.

Each alternative was analyzed, summarized, and reported in Table 3.1.6.

Table 3.1.6. Comparative Wood Product Sale Economic Viability Analysis by Alternative

|  | Alternatives | | |
| --- | --- | --- | --- |
|  | 2 | 2a | 3 |
| Treatment Acres | 8,240 | 8,240 | 1,059 |
| Harvest Acres | 7,556 | 7,556 | 935 |
| Wood Products Volume Removed (MBF) | 81,381 | 69,980 | 7,215 |
| Average Wood Product Volume Removed per Acre (MBF/Acre) | 11 | 9 | 8 |
| Delivered Price ($/MBF) | $559 | $559 | $559 |
| Logging Costs (Rx by Harvest System in $/MBF) | $278.37 | $279.65 | $252.00 |
| Roadwork/ Engineering Costs ($/MBF) | $150.47 | $174.98 | $232.64 |
| Fuels Work Costs ($/MBF) | $66.93 | $74.63 | $64.18 |
| Stumpage Value Wood Product Sale ($/MBF) | $62.23 | $29.73 | $10.18 |

| | Alternatives | | |
|---|---|---|---|
| | 2 | 2a | 3 |
| Total Net Revenue | $5,145,434.86 | $2,080,249.47 | $73,431.95 |

Short and long-term effects are the same because economic viability is calculated prior to the offer and is not carried forward after the sale. However, the economic viability of each timber is sale is collected as empirical data to inform future economic viability assessments. The benefits of an economic viability analysis are that the results can be used to inform whether the treatments analyzed in an alternative can be successfully offered, sold, and inevitably implemented. The detrimental effects are that alternatives analyzed may potentially propose treatments that will not be economically or operationally feasible and therefore should not be proposed as an alternative.

### 3.1.1.4.        *Cumulative Effects*

Since 2017 (transition to full implementation of 2016 RMP), the Medford District has received no-bid on 16% of the offered timber sales. Of those timber sales that received no-bids at the initial auction, the timber sales were modified and reoffered. Of those that were reoffered after receiving no-bids, 66% were successfully offered. Of the 16% that initially went no-bid at auction, 33% were never awarded for an over percentage of 6% of the total timber sales that were offered for sale never being successfully sold, even after being re-packaged. Of the timber sales that were successfully reoffered and declared high-bidders (sold), the adjustment to the appraisal and inevitable sale price and presented prospective Purchasers with an economically viable timber sale, where previously the sale was not. In summary, since 2017, 16% of the offered timber sales went no-bid, 10% were reoffered and successfully sold, and 6% were never successfully sold.

Table 3.1.7. Timber Sale Results from Medford District FY2017 through Present

| | No-Bid | | | Sold | | | |
|---|---|---|---|---|---|---|---|
| Fiscal Year | Salvage | Green Tree | Total | Reoffer | Salvage | Green Tree | Total |
| 2017 | 1 | | 1 | | 2 | 9 | 11 |
| 2018 | | 5 | 5 | 4 | | 12 | 12 |
| 2019 | 3 | 2 | 5 | 2 | 5 | 12 | 15 |
| 2020 | | 2 | 2 | 2 | | 9 | 9 |
| 2021 | 1 | | 1 | 1 | 1 | 11 | 12 |
| 2022 | | | | | | 9 | 9 |
| 2023 | | | | | 5 | 10 | 15 |
| 2024 | | | | | 1 | 6 | 7 |
| Grand Total | 5 | 9 | 14 | 9 | 14 | 78 | 90 |

Table 3.1.8. Summary of No-Bid, Reoffered and Successfully Sold Timber Sales for Medford District Fiscal Year 2017 to Present

| Timber Sale Results | |
|---|---|
| No-Bid | 16% |
| Reoffered | 10% |
| No-Bid, Not Successfully Reoffered | 6% |
| Sold | 94% |

As shown by the summary results of timber sales offered by the Medford District from 2017 to Present, economic viability of timber sales plays a key role in determining whether a project will be sold at auction. The sales that were reoffered, were re-appraised after the district received feedback from prospective Purchasers that the sales as originally offered were not economically viable. For the 6% of timber sales that were never successfully sold, the number of protests and appeals received prevented the timber sale from being offered. The sales that were re-appraised and reoffered were successfully sold, supporting the requirement that timber sales offered must be economically viable.

There are no cumulative effects associated with whether a timber sale is offered and successfully sold based on the economic viability of the sale. Each timber sale that is offered is based solely on the aspects of the timber sale that relate to the economic and operational feasibility of the stipulations and requirements of the timber sale contract. Previous timber sales offered do not have an impact on the economic viability of the present timber sale to be offered, however the successful auction of a timber sale can inform on what aspects contribute to an economically viable timber sale.

3.1.2.    Issue 2: How would the proposed commercial treatments in HLB contribute to the Medford Sustained Yield Unit's declared ASQ?

3.1.2.1.    *Affected Environment*

The Medford SYU, under the 2016 SWORMP, includes the Ashland, Butte Falls, and Grants Pass Field Offices. In the SWO ROD/RMP, the BLM declared the annual ASQ for the Medford SYU to be 37 million board feet (MMbf) (see Section 1.5 and USDI/BLM. 2016b, pp. 5-6). Per the RMP, the BLM can offer ASQ timber for sale in each SYU with as much as 40% variation on an annual basis, which equates to between 22 and 52 MMbf annually, however the decadal variation is limited to 30%, which equates to a final decadal period target between 260 and 480 MMbf (accounting decade beginning in FY 2019 and ending in FY 2028) (USDI/BLM. 2016b, p. 6-7). For the purposes of this analysis, the BLM used 37 MMbf, the midpoint value of the annual ASQ range, to calculate the number of fiscal years of ASQ that each alternative would contribute towards SYU and GPFO ASQ targets. Successful accomplishment and tracking require that in some years to achieve the targets each SYU may have to plan to offer ASQ volumes at the high end of the variation range to compensate for previous years within the decadal planning period where they achieved at the low end of the annual range of variation. To allow an evaluation of this directly, this analysis also explores to what extent the alternatives could contribute towards the total decadal amount of volume that would be produced if the SYU achieved on average the midpoint of the declared ASQ each year in the decade FY19 through FY28 (370 MMbf total). The HLB is the only LUA described in the SWO RMP where timber volume harvested contributes towards achieving the ASQ target.

The GPFO encompasses 425,788 acres of BLM land, of which only 15 percent (62,035 acres) is designated as HLB. The LCFMP encompasses 32,272 acres of BLM land, of which 50 percent (16,015 acres) is designated as HLB. The LCFMP includes 26 percent of the GPFO HLB acres.

The table below shows how much ASQ timber volume that BLM has offered from the Medford SYU each FY from 2019 through 2023.

Table 3.2.1. ASQ Timber Offered from Medford SYU in MMbf (FY19 through FY23)

| Fiscal Year | ASQ Offered (MMbf) (RMP minimum 22 MMbf annually) | Deviation from Midpoint (37 MMbf) |
|---|---|---|
| 2019 | 24 | -13 |
| 2020 | 30 | -7 |
| 2021 | 29 | -8 |
| 2022 | 32 | -5 |
| 2023 | 30 | -7 |
| Average | 29 | -8 |
| Total | 145 | -40 |

The Medford SYU has offered greater than the annual minimum required by the RMP each year (22 MMbf), however has not offered the midpoint of the declared ASQ (37 MMbf) in any year since the RMPs were adopted.

For the Medford SYU to end the ASQ accounting decade with average annual accomplishments equal to the midpoint of the declared ASQ, the district would need to offer 45 MMbf of ASQ timber each year from FY24 through FY28.

Table 3.2.2 discloses how much ASQ timber the Medford SYU currently has on the 5 year timber sale plan, how much ASQ timber volume the LCFMP would need to produce each FY to achieve the annual midpoint of the declared ASQ, and how much ASQ timber volume the LCFMP would need to produce to achieve the midpoint of the declared ASQ on average by the end of the FY19 through FY28 ASQ accounting decade.

Table 3.2.2. ASQ Timber Plans from Medford SYU (Fiscal Year 24-Fiscal Year 28) in MMbf (excluding LCFMP)

| Fiscal Year | Planned ASQ expected from other projects | Difference between planned ASQ from other projects and amount needed from the LCFMP to achieve annual midpoint each year (37 MMbf) | Difference between planned ASQ from other projects and amount needed from the LCFMP to achieve midpoint on average in decade FY19-FY28 (45 MMbf) |
|---|---|---|---|
| 2024 | 21.6 | 15.4 | 23.4 |
| 2025 | 17.4 | 19.6 | 27.6 |
| 2026 | 23 | 14 | 22 |
| 2027 | 29 | 8 | 16 |
| 2028 | 17 | 20 | 28 |
| Total | 108 | 77 | 117 |

KSW01652

For the Medford SYU to meet the annual midpoint, the LCFMP would need to offer a total of 77 MMbf of ASQ timber from FY24 through FY28. For the Medford SYU to end the ASQ accounting decade with average annual accomplishments equal to the midpoint of the declared ASQ, the LCFMP would need to offer a total of 117 MMbf of ASQ timber from FY24 through FY28.

### 3.1.2.2. *Environmental Consequences*

<u>Assumptions</u>

The assumptions used to derive average volume per acre by treatment type and LUA are described above in Section 3.1.3 Volume Per Acre**.** The assumed harvest volume24F[25] per acre by Alternative, treatment type, and HLB LUA are shown in Table 3.2.3. below.

Table 3.2.3. Assumed harvest volume per acre by Alternative, treatment type, and HLB LUA

| Alternative and Prescription Type25F[26] | Average Mbf/ac Removed in HLB-LITA[8] | Average Mbf/ac Removed in HLB-MITA[8] | Average Mbf/ac Removed in HLB-UTA[8] |
|---|---|---|---|
| Alt. 2 VRH | 30 | 27 | N/A |
| Alt. 2 Thin | 6 | 9 | 9 |
| Alt. 2a Thin | 13 | 9 | 9 |
| Alt. 3 Thin | 8 | 7 | 8 |

<u>Methodology</u>

This analysis focuses on answering how well the alternatives meet the purpose and need for conducting timber harvest within the selected stands in the HLB to produce timber to contribute to the attainment of the declared ASQ for the Medford SYU for five fiscal years (FY) and in the ASQ accounting decade (FY19 through FY28). The units of measure used in this analysis is volume of timber in thousand board feet (Mbf) and million board feet (MMbf).

The estimated volume by treatment type, LUA, and Alternative is calculated from the harvest acres, not total treatment acres that include reserve aggregates and skips. For a more detailed description and comparison of treatment acres versus harvest acres, see the Assumptions in Issue 1. Table 3.2.4. summarizes, by Alternative, the HLB treatment and harvest acres of each treatment type.

---

[25] The assumed harvest acreage and volume numbers will all be refined prior to offering for sale. During the contract preparation phase of each timber sale, the BLM establishes the final treatment unit boundaries using GPS and performs a detailed cruise to determine the appraised price of the timber sale contract as required by regulations.
[26] Thin or Thinning prescription type in this analysis refers to either Commercial Thin or Selection Harvest as described by LUA in Chapter 2

Table 3.2.4. HLB Commercial Treatment Acres26F[27] and Harvest Acres by LUA

| Alternative and Prescription Type | Commercial Treatment Acres in HLB-LITA | Harvest Acres in HLB-LITA | Commercial Treatment Acres in HLB-MITA | Harvest Acres in HLB-MITA | Commercial Treatment Acres in HLB-UTA | Harvest Acres in HLB-UTA |
|---|---|---|---|---|---|---|
| Alt. 2 VRH | 729 | 693 | 57 | 54 | 0 | 0 |
| Alt. 2 Thin | 209 | 195 | 0 | 0 | 4,994 | 4,461 |
| Alt. 2a Thin | 938 | 887 | 57 | 54 | 4,994 | 4,461 |
| Alt. 3 Thin | 23 | 17 | 5 | 4 | 763 | 653 |

To calculate the estimated ASQ volume generated by each Alternative, the average volume per acre by LUA and prescription type in Table 3.2.4. above was multiplied by the harvest acres of each LUA and prescription type in each Alternative identified above.

*Summary of Analysis*
The measurement indicator for evaluating this project's contribution to the declared ASQ for the stated fiscal year is the anticipated amount of the SYU's ASQ offered volume expected to be produced during implementation of the LCFMP total and in each Fiscal Year from FY24 through FY28. The volume offered under each alternative is expressed in using two scenarios, one where the Medford SYU aims to offer the mid-point of the declared ASQ each year (37 MMBF) and the other where the Medford SYU aims to offer additional timber above the mid-point to make up for past short-falls and end the FY19-FY28 ASQ accounting decade averaging the mid-point each FY (45 MMBF) as shown in the tables above. The offered ASQ timber volume is also expressed as a percentage of the need under each scenario to provide context and improve clarity.

Spatial Scale:
This analysis evaluates only acreage in the HLB within the project boundary proposed for commercial treatment. The Last Chance project area has HLB-LITA, HLB-MITA, and HLB-UTA within the project boundary. This analysis evaluates the contribution toward the declared ASQ for the Medford Sustained Yield Unit (matching the Medford District Boundary).

Temporal Scale:
Fiscal Years 2024 through 2028 (October 1, 2023 – September 30, 2028)

---

[27] The acres in this table are estimates based on existing BLM geospatial data. The actual treatment acres and harvest acres would be revised as BLM further refines the project boundaries in the timber sale contract preparation phase.

KSW01654

3.1.2.3.        *Environmental Effects*

Table 3.2.5. ASQ Timber from LCFMP that could contribute toward Medford SYU (FY 24-FY 28) in MMbf

| Fiscal Year | LCFMP ASQ Contributions | Scenarios for Comparision between Alternatives | | | | | |
|---|---|---|---|---|---|---|---|
| | | Amount of ASQ volume (MMbf) LCFMP could offer and Percent of needed ASQ volume LCFMP could offer to achieve annual midpoint (37 MMbf) each year | | | Amount of ASQ volume (MMbf) LCFMP could offer and Percent of needed ASQ volume LCFMP could offer to achieve midpoint on average each year in decade FY19-FY28 (45 MMbf) | | |
| | | Alt. 2 | Alt. 2A | Alt. 3 | Alt. 2 | Alt. 2A | Alt. 3 |
| 2024 | ASQ Volume | 15.4 | 15.4 | 5.4 | 23.4 | 23.4 | 5.4 |
| | Percent of the ASQ needed to achieve annual midpoint | 100% | 100% | 35% | 100% | 100% | 23% |
| 2025 | ASQ Volume | 19.6 | 19.6 | 0 | 27.6 | 27.6 | 0 |
| | Percent of the ASQ needed to achieve annual midpoint | 100% | 100% | 0% | 100% | 100% | 0% |
| 2026 | ASQ Volume | 14 | 14 | 0 | 12.5 | 1.2 | 0 |
| | Percent of the ASQ needed to achieve annual midpoint | 100% | 100% | 0% | 57% | 5% | 0% |
| 2027 | ASQ Volume | 8 | 3.2 | 0 | 0 | 0 | 0 |
| | Percent of the ASQ needed to achieve annual midpoint | 100% | 40% | 0% | 0% | 0% | 0% |
| 2028 | ASQ Volume | 6.5 | 0 | 0 | 0 | 0 | 0 |
| | Percent of the ASQ needed to achieve annual midpoint | 38% | 0% | 0% | 0% | 0% | 0% |
| Total ASQ Volume | | 63.5 | 52.2 | 5.4 | 63.5 | 52.2 | 5.4 |

As shown in the table above, to achieve the annual midpoint of the declared ASQ each FY (FY24-FY28), Alt 2 would produce 100 percent of the needed ASQ each year from FY24 through FY27, and then 38 percent of the need in FY28. Alternatively, to offer timber sufficient to achieve the midpoint on average each year in decade FY19-FY28, Alt 2 would produce 100 percent of the needed ASQ in FY's 24 and 25, 57 percent in FY 26, and zero percent in FY's 27 and 28.

As shown in table above, to achieve the annual midpoint of the declared ASQ each FY (FY24-FY28), Alt 2A would produce 100 percent of the needed ASQ each year from FY24 through FY26, 40 percent of the

need in FY27, and then zero percent of the need in FY28. Alternatively, to offer timber sufficient to achieve the midpoint on average each year in decade FY19-FY28, Alt 2A would produce 100 percent of the needed ASQ in FY's 24 and 25, five percent in FY 26, and zero percent in FY's 27 and 28.

As shown in the table above, to achieve the annual midpoint of the declared ASQ each FY (FY24-FY28), Alt 3 would produce 35 percent of the needed ASQ in FY24, and then zero percent of the need in FY's 25 through 28. Alternatively, to offer timber sufficient to achieve the midpoint on average each year in decade FY19-FY28, Alt 3 would produce 23 percent of the needed ASQ in FY24, and then zero percent in FY's 25 through 28.

### 3.1.3.        Issue 3: How would the proposed treatments in HLB affect stand vigor and insect- and disease susceptibility in residual stands?

#### 3.1.3.1.        *Methods and Assumptions*

Methods for this analysis included project area reconnaissance, stand exam data collection from 2,061 plots in the project area, and multiple Geographic Information System (GIS) datasets including: US Forest Service Region 6 insect and disease aerial surveys, Google Earth imagery, Medford District Forest Operations Inventory (FOI) and BLM Micro*Storms (activity tracking databases), Rogue Basin 2012 Light Detection and Ranging (LiDAR) data products, as well as the analyses, direction and conclusions found in the Southwest Oregon ROD/RMP (2016) and the supporting Proposed Resource Management Plan/Final Environmental Impact Statement. Stand trajectories were modeled using the Forest Vegetation Simulator (FVS), ORGANON Southwest (OC) Variant was used over a 50-year time horizon starting in 2019 to model anticipated treatment outcomes. Stand exams were performed for the Last Chance project in 2019 and 2023.

#### 3.1.3.2.        *Affected Environment*

The proposed Last Chance project area encompasses 56,888 total acres.  About 57% (32,272 acres) is managed by BLM. The project area is primarily located in three HUC 5 watersheds: Upper Cow Creek and Middle Cow Creek to the north and Grave Creek watershed to the south with a small inclusion in the Evans Creek watershed on the east side of the project area.

Overstory dominant tree species and associated understory vegetation within the project area is summarized according to Plant Associations Groups (PAGs) subseries of southern Oregon (Atzet, 1990) in Table 3-1. These areas do not include roads, landing, quarries, and other areas without much vegetation. Brief descriptions of the characteristics of the most common associations follow. As shown in Table 3-1, these forests are made up of a diverse collection of Plant Association Groups that support diverse stand compositions of conifers such as Douglas-fir, ponderosa pine, sugar pine, western hemlock, white fir, and incense cedar, as well as hardwoods such as California black oak, madrone, canyon live oak, and tanoak. These PAGs exhibit a wide variety of conditions, differing by slope, aspect, elevation, and soil types.  South and west aspects exhibit relatively more cover in sugar pine, ponderosa pine, madrone, California black oak, and canyon live oak, while more northern and eastern slopes, as well as more productive soil types display more white fir, hemlock, and chinquapin.

Table 3-1. PAGs & Proposed Commercial Treatments

| Plant Association Group Subseries | BLM Proposed Commercial Units | |
| --- | --- | --- |
| | Acres | % |
| Douglas-fir, Dry | 1928 | 23% |

| Plant Association Group Subseries | BLM Proposed Commercial Units | |
|---|---|---|
| | Acres | % |
| Douglas-fir, Moist | 1310 | 16% |
| Douglas-fir, Ultramafic | 57 | 1% |
| Ponderosa pine | 184 | 2% |
| Southwest Oregon Jeffrey pine | 1035 | 13% |
| Western hemlock - dry | 1547 | 19% |
| Western hemlock - intermediate | 24 | 0% |
| White fir - intermediate | 1592 | 19% |
| White fir warm - moist | 566 | 7% |
| Non-forest vegetation | | |
| **Total** | **8240** | **100%** |

**Douglas-fir, Dry**: Douglas-fir behaves as a drought tolerant pioneer in these warm, dry sites dominated by overstory Douglas-fir, occasionally with sugar pine and ponderosa pine present. The understory often contains canyon live oak, madrone, and California black oak. The two PAGs of this series in the project area are Douglas-fir/Canyon Live Oak/Poison Oak and Douglas-fir/California Black Oak/Poison Oak.

**Douglas-fir, Moist:** While the temperature and precipitation can be comparable to Dry associations, Moist associations tend to occur on more productive sites with better soils dominated by overstory Douglas-fir with incense-cedar. The understories often contain canyon live oak, madrone, and Pacific yew.  Common PAGs of this series in the project area are Douglas-fir/Whipple vine/Western Sword Fern and Douglas-fir/Dwarf Oregon grape/Western Sword Fern.

**Ponderosa Pine:** These are mainly dry sites dominated by ponderosa pine and Douglas-fir. The understory often contains incense-cedar, canyon live oak, and sugar pine. In the project area these are often found as small inclusions on dry, exposed sites. The only PAG of this series in the project area is Ponderosa Pine/Douglas-fir/Southwest Oregon.

**Jeffrey Pine:** Jeffery pine is often the dominating species on ultramafic sites. A characteristic feature of the series is an open canopy of trees, shrubs, and herbs. Douglas-fir and incense-cedar are often found in most associations in both the overstory and the understory. The two PAGs of this series in the project area are Jeffrey Pine/Douglas-fir/Incense-cedar and Jeffrey Pine/Red Fescue.

**Western Hemlock:** At the southern edge of the hemlock range where the project is located, hemlock associations tend to exist in moist, cool drainages or north aspects. Overstories are still dominated by Douglas-fir with occasional hemlocks present, but hemlock is common in the understory along with chinquapin, madrone, and incense-cedar. By far the most common PAG of this series in the project area is Western Hemlock/Dwarf Oregon grape/Salal/Western Sword Fern.  This PAG is a dry subseries of western hemlock. The other western hemlock PAGs are very minor components and classified as intermediate subseries.

**White Fir, Intermediate:** Much like the hemlock associations above, this white fir series are dominated by Douglas-fir, with an overstory cohort of white fir that likely established after Douglas-fir pioneered the site following disturbance. Understories also include chinquapin and yew. These stands tend to occur on cool sites. Common PAGs of this series in the project area are White Fir/Douglas-fir/Creeping Snowberry/Bald hip Rose/Western Star flower, and White Fir/Dwarf Oregon grape/Common Prince's Pine/Western Twin flower.

**White Fir, warm moist:** This white fir series is also dominated by Douglas-fir. White fir and incense-cedar are frequent in the overstory and present in the understory. In the understory, golden chinquapin and

Pacific madrone are frequent, and sugar pine is common. The only PAG of this series in the project area is White Fir/Dwarf Oregon grape/Whipple vine.

Before the fire suppression and intensive management practices of the twentieth century, the project area was characterized by high frequency, low severity fires that would have reduced fuel loadings and maintained a mosaic of open stand conditions different from what is seen today. In the Last Chance project area 95% is within Fire Regime Group 1 characterized by a fire return interval of less than 35 years of low and mixed severity. The remaining 5% is Fire Regime Group 3 with fire intervals of between 35-200 years of low and mixed severity (Figure 2) (LANDFIRE, 2016).  All other groups are less than 0.5% of the project area.

Figure 2. Fire Regime Groups within the Last Chance Project Area



Under the active disturbance regime described, stands would have been dominated by drought-tolerant Douglas-fir, pines and oaks that develop fire resistant, complex forms in open growing conditions

KSW01659

following these frequent low to mixed severity fires. After missing several fire return cycles, the likelihood of uncharacteristic fire behavior and high severity fire increases due to the buildup of fuels (Brown et al. 2004, Hessberg et al. 2005, Kauffman 2004, Reinhardt et al. 2008, Ryan et al. 2013).

As shown in Table 3-1 and Figure 3-1 approximately half of the BLM lands contained in the Last Chance planning area have had some form of commercial timber management since 1950. This data comes from the BLM's Micro*Storms database. While it is the best available, it may be incomplete.

Table 3-2. History of Commercial Silvicultural Practices in the Last Chance Project Area

| Decade | Clearcut/ Regeneration (acres) | Selective Cut (acres) | Thinning (acres) | Salvage (acres) | Total by Decade (acres) |
|---|---|---|---|---|---|
| 1945-1949 | 422 | 1,673 | 60 | 0 | 2,155 |
| 1950-1959 | 1,738 | 839 | 0 | 22 | 2,599 |
| 1960-1969 | 2,210 | 824 | 0 | 22 | 3,056 |
| 1970-1979 | 1,757 | 3,803 | 0 | 53 | 5,613 |
| 1980-1989 | 4,382 | 891 | 119 | 0 | 5,392 |
| 1990-1999 | 1,469 | 99 | 169 | 0 | 1,737 |
| 2000-2009 | 39 | 0 | 275 | 7 | 321 |
| 2010-2022 | 0 | 0 | 311 | 0 | 311 |
| Total by Type | 12,017 | 8,129 | 934 | 104 | 21,184 |
| % BLM Lands | | | | | |

About a third of the planning area has undergone some form of clearcut or VRH which was the most common silvicultural management approach. Clearcut refers to the removal of all trees on a site, and is followed up by planting a new cohort, leading to an even aged stand. Regeneration also refers to a timber harvest resulting in a new cohort of trees, often overstory trees are left on site to act as a seed source and provide shade as the new stand develops. These overstory trees may or may not be removed once a new cohort is established leading to an even aged or two aged stand. These practices were most common in the 1960s, and then again in the 1980s.

Selection harvest has been implemented in the planning area, accounting for about 20% of the BLM managed lands. This approach can take on a variety of forms. Usually, it refers to the overstory removal of some of the dominant trees in a stand to release the middle and understory trees.

Approximately 7% of the stands in the planning area have been thinned. Thinning refers to the partial harvest of an overly dense stand, intending to redistribute resources and stimulate growth of residual trees. Salvage refers to the harvest of trees following disturbance, such as mortality due to wildfires, windstorms, insects, or disease. About 2% of the planning area stands have been salvage harvested. Thus removing the dead, dying and high-risk trees to slow pest progression and recoup economic value.

It is important to note that the same acres may have been treated in different years with different techniques, for example thinning in the 2000s likely is occurring on the same piece of ground that was clearcut in the 1960s. In the Last Chance project area these practices, along with fire suppression, effectively shifted the tree species diversity towards more dominance of shade tolerant Douglas-fir over less tolerant pine and oak species. This change converted late seral open and closed canopy forests into

mid seral closed canopy forest as average tree diameters decreased and the lack of regular disturbance allowed dense regeneration to persist in light limited settings.

Recent aerial surveys of forest health were conducted over the entire Last Chance project area in 2017, 2018, 2019, 2022 and 2023, (USDA Forest Service, Forest Health Protection, 2024). About 20% of the area was surveyed in 2020 and none of the area was surveyed in 2021. Based on the last five years of completed survey, acreage of mortality by pests increased from endemic levels in 2017 and no significant damage in 2018 to widespread defoliation and mortality in 2022 and 2023 (Figures 4 & 5).

Douglas-fir experienced a noticeable spike in mortality from 2019-2023 associated with flatheaded fir borer activity on lower elevations in the northwest side of the project area. This type of mortality usually occurs when overstocked lower elevation stands of Douglas-fir are weakened by drought then finished off by scavenging borers. However much of this mortality is probably from drought alone, (Bennett et al, 2023). Bear feeding and Douglas-fir beetles were other significant sources of Douglas-fir mortality. However, most of the recent mortality in the project area has been concentrated on true fir stands by the introduced balsam wooly adelgid, along with native *Cytospora* canker and fir engraver beetles. Madrone defoliation was also common in the project area in 2022.

Pests of sugar pine (mountain pine beetle) and ponderosa pine (Ips engraver and western pine beetle) were less common in later survey years compared to 2017. This is to be expected since these host trees are less common due to the introduced white pine blister rust killing sugar pine and competition induced mortality of ponderosa pine due to fire exclusion both working in concert with their respective insect pasts for much of the past century. These now relict conifer species appear most frequently in the top layer of forest stands, making up a very small legacy component of stands. Regeneration and younger trees of these species are uncommon. This simplification of stands into less fire resistant, closed canopy, mid seral conditions is an undesirable shift in terms of stand level tree species diversity and forest resilience.

Much of this mortality is in densely stocked stands of relatively shade tolerant species such as true fir and Douglas-fir. Densely stocked stands develop in the absence of disturbance, which has also increased the overall cover of Douglas-fir in all stand layers (top, middle, and bottom).  Subsequently, this substantial shift in species composition has heightened the competitive advantage of shade tolerant trees, increasing its absolute cover and relative density (BLM 1996, p.36), thereby increasing the overall fire hazard. Refer to the Fuels Report for additional information on fire risks.

Figure 3-1. Location of Past Commercial Silvicultural Treatments in the Last Chance Project Area



KSW01662

Figure 4. Location of Major Damaging Forest Agents in the Last Chance Project Area 2017-2023



Figure 5. Acreage by Survey Year of Major Damaging Forest Agents in the Last Chance Project Area



Even in areas that were not commercially harvested, the impact of fire suppression has changed the forest successional condition. As shown in Table 3-3, the forest seral stage conditions in the Last Chance project area track with the same patterns seen in the FEIS supporting the 2016 ROD/RMP (FEIS vol. 3, p. 1314). There is a prominent excess of mid-seral, closed canopy forest, and a deficiency of late seral open canopy forest as well as a shortage of high quality early seral conditions. The harvest actions proposed in Last Chance are consistent with the RMP/ROD 2016, such as Selection Harvest, VRH, and Riparian Reserve areas etc. depending on the Land Use Allocation involved. These actions would, over time, move the BLM administered lands towards the suite of desired conditions as described for the included Land Use Allocations (USDI/ROD 2016b, pg. 3, 47).

Table 3-3. Last Chance Stand Seral Class and Structure

| Stand Seral Class and Structure | Historical Range of Variation (HRV) for Douglas-fir-Dry and Moist: SW Oregon [13] | Approximate Acres in Last Chance Project Area (Percent all ownerships) | Approximate Acres in Proposed Last Chance Commercial Units (Percent of Commercial Units) |
|---|---|---|---|
| Early Seral | 7-17% | 4,448 (8%) | 313 (4%) |
| Mid Seral Closed Canopy | 2-8% | 42,466 (75%) | 6,854 (83%) |
| Mid Seral Open Canopy | 11-22% | 4,036 (7%) | 203 (2%) |
| Late Seral Open Canopy | 40-55% | 342 (1%) | 26 (0%) |
| Late Seral Closed Canopy | 16-25% | 5,596 (10%) | 843 (10%) |
| TOTAL | | 56,888 (100%) | 8,240 (100%) |

### 3.1.3.3.    *No Action Alternative Common to Issue 1 and Issue 2*

The cumulative effect of past management practices including timber harvest and fire suppression at the project boundary, BLM administered, and proposed treatment unit scales is an over representation of closed canopy, mid seral stand conditions as discussed above in Table 3-3. Because trees growing in dense conditions grow in height, but very little in diameter (Oliver and Larson 1996, pg. 75). Overall stand growth would remain stagnant as stands would be left in overly dense conditions (Tappeiner et al. 2007, p.124).

Alternative 1 ensures the direct and indirect effect of declining individual tree and stand vigor because if a stand is allowed to grow for many years within the zone of imminent competition induced mortality, such mortality would occur (Drew and Flewelling 1979). In dense stands, non-vigorous large trees would likely not persist, and a non-vigorous stand would likely not develop large woody structure. The No Action Alternative would prevent stands from attaining vigorous conifer growth because all stands proposed for management are already within the zone of competition induced mortality. As a result of the limited resources for tree growth in the stand, diameter growth would lag behind height growth (O'Hara, 2014 pg. 100), and the risk for windthrow would increase over time as height: diameter ratios continue to increase and crown ratios decrease. Forest floors would continue accumulating fuel as trees continue to self-prune. Current densities threaten the persistence of minor species composition both directly by fire risk and indirectly by the effects of competition induced mortality from Douglas-fir as shade intolerant pine and oak species continue to decline.

Young stand management in the planning area, such as tree planting, brush cutting, pre-commercial thinning, plantation maintenance and protection treatments would continue. Reduced biological and structural diversity is expected in private industrial forestland which can continue long-term if planted with single crop tree species. Forest operations on private land were anticipated in the development of the BLM Resource Management Plan (RMP/ROD 2016), the landscape planning of the Project itself. Fire suppression activities would continue on Federal and non-Federally administered lands in accordance with the fire protection contract the BLM holds with the Oregon Department of Forestry (ODF) and County Protection Agencies.

In summary, the No Action Alternative would restrict the development of uneven aged, multi-cohort stands and open grown trees. It would decrease vegetative species diversity and growing space for hardwood and pine persistence. There would be fewer opportunities for pine and hardwood regeneration. It would not produce timber to contribute to the declared Allowable Sale Quantity (ASQ). There would be a cumulative adverse effect of reduced conifer growth and vigor. The economic value of timber stands would not be enhanced in the Harvest Land Base as directed by the 2016 RMP/ROD. Fuel loadings would increase in Late Successional and Riparian Reserve allocations.

3.1.3.4.        *Direct and Indirect Effects Common to Action Alternative*

The effects of management actions common to Action Alternatives are:

A reduction in stand densities would promote growth and vigor on the remaining stand. Residual trees would increase in height and to a greater extent diameter growth as the resources of the stand are reallocated to the trees most likely to take advantage of the additional water, sunlight and soil nutrients. This increased growth would be generally in the proportion of the percentage of stand removed within the range of Relative Density Indexes considered for retention (20-45%) (Oliver and Larson 1996, pg. 36, Tappeiner et al. 2007, p.127).

By taking additional measures to promote and protect most healthy individuals of early seral tree species (primarily pines and oaks) stand diversity and resilience to fire and other damaging agents would be increased, ensuring that RMP species diversity goals could be met and sustained (RMP/ROD 2016, p. 68). This diversity in tree species and sizes is important for ecosystem function and resilience (Franklin et al. 2002).

Risk of windthrow could be increased in the short term from 2 to 10 years after thinning, before tree stems and root systems have adapted after thinning, selection harvest, or variable retention harvest of timber stands. By removing a part of the canopy, thinning immediately reduces stand stability by increasing the wind load on residual trees (Moreau et al, 2022**)**. However, windthrow occurs in both managed and unmanaged stands and predicting these events is speculative. Wind events of enough magnitude to substantially modify the post-treatment stands are inherently random in nature, and our prescriptions that favor the retention of larger, healthier, and more firmly rooted trees would suffer significantly fewer problems than the edges of large clearcuts created by other nearby ownerships. The pine species generally designated for protection in this project all form deep taproots and are considered windfirm, while Douglas-fir roots are less likely to form deep taproots and the wind firmness is more variable (Burns and Honkala, 1990).

Low levels of windthrow may be desirable for wildlife habitat and stand complexity. Silvicultural prescriptions proposed are designed to remove trees that are most susceptible, such as those with low vigor, poor crown ratios and those with high height: diameter ratios. Often 80:1 is used as a threshold, for example a 12" DBH tree at 85' tall is more likely to fall over than a 12" DBH tree at 55' tall (Worthington and Staebler, 1961, pg. 21, Moore et al. 2003, Wonn and O'Hara, 2001, pg. 92, Tappeiner et al. 2007, pg. 129-130, O'Hara, 2014). This is important because trees allocate resources to height growth before diameter growth, so in the absence of disturbance (harvest, fire, etc.) resources become limited in a stand and the risk for windthrow increases as stability decreases (O'Hara, 2014, pg. 100).

3.1.3.5.        *Alternative 2 and 3 Direct and Indirect Effects*

        The Role of Relative Density

The 2016 RMP/ROD (pg. 311) defines Relative Density as: "A means of describing the level of competition among trees or site occupancy in a stand, relative to some theoretical maximum based on tree density, size, and species composition. Relative density percent is calculated by expressing Stand Density Index (SDI) (Reineke 1933) as a percentage of the theoretical maximum SDI, which varies by tree species

and range. Curtis's relative density (Curtis 1982) is determined mathematically by dividing the stand basal area by the square root of the quadratic mean diameter."

The onset of competition is at 25%, 35% is the lower limit of full site occupancy, and 60% is associated with the lower limit of self-thinning, which is tree mortality (Long and Daniel, 1990). For the purposes of this analysis, 20-45% Relative Density Index (RMP/ROD 2016 pg. 68) is considered desirable in that trees would occupy the site, and self-thinning would not yet have occurred at the stand level.

### "Low Thinning" versus "Selection/Free Thinning" Methods

Classical thinning regimes are intermediate operations that are usually associated with even-aged systems, but are also applicable to uneven aged management. Two classical thinning methods and their effects on stand development are of particular interest in this analysis: low thinning/thinning from below which cuts mostly smaller trees to reduce densities while retaining a higher proportion of large trees, and selection harvest/free thinning which allows for tree removal of various sizes to reduce densities. The former removes entire cohorts of trees and simplifies stand structure, while the latter allows for greater structural diversity, and adjustments of species composition over time. In addition to the stand tending operations such as thinning, uneven aged management systems must consider regeneration or else the system cannot be sustained over time (O'Hara, 2014, pg. 84-97). Gap dynamics account for this.

### Gap Dynamics and Regeneration in Uneven Aged Systems

York et al. (2004) and York and Battles (2008) studied the effect of various created gap sizes on the residual stand growth and the new cohorts of trees that were established post-harvest. The results indicated that group selection needed to be larger than 0.6 hectares (about 1.5 acres) to avoid severe height suppression in the newly established seedlings, and that 1 hectare (about 2.5 acres) and larger maximized growth potential of seedlings. They also suggest that in order to maximize the availability of resources to the residual trees, thinning should also occur throughout the stand, rather than implementing group selection only. Group selections smaller than half an acre (0.2 ha) are associated with stunted growth, particularly in pine species; such a management approach would inhibit tree regeneration and is unlikely to promote the development of multi-cohort stands, open grown trees or allow for pine persistence.

### Vegetation Modeling Assumptions from the PRMP Final EIS

Appendix C of the Final Environmental Impact Statement (pg. 1163-1227) describes the assumptions applied to sustained yield vegetation modelling for use in the final RMP/ROD 2016. While these modelling assumptions are not Management Direction or Decisions found in the 2016 RMP/ROD, they did inform the Allowable Sale Quantity Decision for the Medford sustained yield unit and are relevant information as such. Page 1196 describes the modeled treatment return interval for the Uneven Aged Timber Area as 40-50 years; while this was not a required interval, and agency discretion allows for considerable variation depending on site specific considerations and a project's Purpose and Need, there was no assumption that subsequent commercial re-treatment occur within 20 years or less in a stand. As described above, uneven aged management systems must consider regeneration or else the system cannot be sustained over time (O'Hara, 2014, pg. 84-97). The assumptions applied in the model were that if a stand's initial relative density was too low to allow for economically viable commercial thinning, or if the stand was older than 80-90 years, 30% of the stand would be harvested through group selections and commercial thinning would occur elsewhere (USDI/BLM, 2016a, p. 1196). In summary, logging portions of stands through group selection would allow for a vigorous, young cohort to establish, while thinning other portions would allow for enhanced growth of reproduction that could also be available for harvest in the future, overall promoting a sustained yield of timber over time.

Moreau et al (2022) reviewed recent literature to identify the effects of thinning on both stand-and tree-level resistance and resilience to stressors. While their review suggests that thinning should not be

promoted as a tool that would universally increase the resistance and resilience of forests, their review supports that evidence strongly suggests that thinning offers great potential at limiting the overall risk at the stand level could be an effective tool to reduce forest vulnerability to drought, insects and pathogens. Thinning increases the growth and vigor by retaining trees with favorable traits, making them less susceptible to eruptive insects and pathogens, while reducing density and targeted removal of host species, susceptible individuals, and infected trees, which can slow the development and spread of outbreaks. Thinning can mitigate the impacts of insect and pathogen out-breaks by increasing the overall diversity and evenness of species. The application of thinning has been shown to significantly reduce the negative effects of bark beetles (Moreau et al 2022).

The onset of stand level competition is at 25% relative density, 35% is the lower limit of full site occupancy, and 60% is associated with the lower limit of self-thinning, which is tree mortality (Long and Daniel, 1990). For the purposes of this analysis, 20-45% Relative Density Index (RMP/ROD 2016 pg. 68) is considered desirable in that trees would occupy the site, and self-thinning would not yet have occurred at the stand level.

### 3.1.3.6.      *Alternative 1*

#### Direct, Indirect, and Cumulative Effects

The No Action Alternative would promote the continuation of increased relative density and decreased nutrients and resources available to support the higher densities, resulting in reduced individual tree and stand level vigor and until mortality from reduced resource availability or other stressors (insects, disease) occurs and self-thinning (reduced density) occurs, which may also spread to other adjacent stands.  It would not increase or promote vegetative species diversity and growing space for hardwoods and pine persistence. There would be fewer opportunities for pine and hardwood to reestablish through natural regeneration. There would be a cumulative adverse effect of reduced conifer and hardwood growth and vigor within existing stands.

### 3.1.3.7.      *Alternative 2, 2a, 3*

#### Direct, Indirect, and Cumulative Effects

A reduction in stand densities would promote growth and vigor on the remaining stand. The action alternatives all propose reducing relative densities below 60%, and residual trees would increase in height and diameter growth as the resources of the stand are reallocated to the trees most likely to take advantage of the additional water, sunlight and soil nutrients. This increased growth would be generally in proportion to the percentage of stand removed within the range of Relative Density Indexes considered for retention (20-45%) (Oliver and Larson 1996, pg. 36, Tappeiner et al. 2007, p.127).

Moreau's review (Moreau et al, 2022) determined that the positive effects of reduced drought mortality increase with thinning intensity, with heavy thinning removing more than 40 percent of basal area (BA) being most effective, short-term benefits up to 20 years, and long-term positive benefits becoming negligible within 20–40 years as crowns grow and nutrient demands increase, and that removing less than 30 percent of BA had no measurable effect on the response to drought.

The Action Alternatives would increase tree and stand vigor and resilience and resistance to insect and disease susceptibility by reducing relative densities to below levels associated with the lower limit of self-thinning (60% RD).  However, Alternative 3 may not provide enough benefit as the lower level of relative density (40%) combined with 20" DBH retention, may not achieve the minimum level of heavy thinning (40 percent of basal area removal) for most effectiveness as described by Moreau et al (2022). Increased resilience and resistance up to 729 acres in Alternative 2&2a would occur by reducing relative densities to 20-45% RD or less, in HLB (EA tables 2.1, 2.2, 2.3) compared to Alternative 3 which would retain higher 40-45% RD and basal area and would treat only up to 291 acres. Relative density does not correlate

directly with basal area, however, the benefits to vigor, resiliency, resistance, and reduced susceptibility would be generally in proportion to the percentage of the stand removed.

### 3.1.4.    Issue 4: How would silviculture and fuels treatments in the DDR-TPCC LUA promote desired species composition and ecological conditions?

Commercial and non-commercial treatments in DDR-TPCC would implement silvicultural prescriptions to restore and maintain community-level structural characteristics and promote desired species composition by culturing more drought tolerant species such as pine, oak, and cedar. This would be accomplished by removing encroaching, less drought and fire-resistant Douglas-fir and madrone from these characteristically more open forested areas. The project would also re-introduce prescribed fire to reduce the presence of dense understory vegetation, therefore, emulating ecological conditions produced by historic fire regimes. Some units may require understory reduction treatments to remove excess vegetation prior to the re-introduction of prescribed fire to ensure that ecological conditions produced by historic fire regimes can be achieved.

#### 3.1.4.1.    *Analytical Methods and Assumptions*

Eight stands containing 127 total acres of DDR were analyzed with Forest Vegetation Simulator (FVS) runs over a 40-year timeframe to determine the probable trajectories of canopy and basal area growth of each stand under the no action and the two actions scenarios.

The stand modeling applied several assumptions to the treated and untreated stands. Outside influences that could occur in the future (e.g., mortality from insects/disease, fire, windthrow, or new land management policies) were not included because these were unknown and impossible to predict. Stands were modeled to include natural seedling and sapling regeneration extrapolated from those in stand exam plots. The BLM modeled only one single entry of selection harvest during the analysis timeframe (2025-2065). No additional understory small diameter thinning, or prescribed fire treatments were applied to the stand modeling. The PRMP/FEIS "modeling team modeled the application of a combination of group selection (patch cut) harvests and thinning to various stand components at intervals of 40-50 years, depending on site productivity" (2016 PRMP/FEIS, BLM 2016b p. 1196). Skips and group selection openings would be factored into the overall residual relative density at the stand level. At least 10 percent of the stand would be in skips, and no more than 25 percent of the stand would be in group selection openings (BLM 2016a, p. 72) in stands that are 10 acres or greater in size.

#### 3.1.4.2.    *Affected Environment*

DDR-TPCC (non-suitable forest land and non-forest land) accounts for 708 acres across the project area. These areas are largely in a band running from the southwest corner to the northeast corner of the project area. Most of these acres are in the Southwest Oregon Jeffrey Pine Plant Association Group.

In this area and Plant Association group Jeffrey pine is often the dominant tree species on soils derived from ultramafic parent material. Ultramafic bedrock is high in minerals with a high proportion of nickel and chromium that is toxic to most plants, resulting in a unique species and diverse flora. These species would be frequently found yet often have low covers. Jeffrey pine is common in both the overstory and the understory, as are Douglas-fir and incense-cedar. A common feature of this Series is an open canopy of trees, shrubs, forbs, and grasses, with tree cover averaging only 35% On Bureau of Land Management sites, (Atzet et al, 1996).

However, in recent years these open forests of Jeffrey pine grasslands have been encroached upon by faster growing less fire tolerant and more shade tolerant conifers, primarily Douglas-fir and to a lesser extent incense-cedar, as well as hardwoods, primarily madrone. The action alternatives seek to use commercial harvest and fuels treatments to restore these open Jeffrey pine stands with an understory

dominated by native grasses, forbs, and other unique endemic plants. This would be accomplished by removing most of the conifers that are less resilient to fire and other disturbances than Jeffrey pine.

### 3.1.4.3.    *Environmental Consequences*

#### No Action

The no action would not remove this faster growing encroaching vegetation. The existing forest would continue to grow and suppress Jeffrey pine, ponderosa pine, oaks, and other unique early successional species. Stand structure would continue to simplify and be more uniform and more prone to disturbance.

Of the eight modelled stands basal area increased in all stands by an average of 14% over the 40-year time frame. Conversely, total canopy cover was reduced in six of eight stands and over all eight stands from 79% to 74%. This uneven reduction is probably the result of reductions of lower and middle canopy layers by the variability of dominating overstory competition from stand to stand.

#### Alternative 2 and 2a

Alternatives 2 and 2a would remove much of this faster growing encroaching vegetation throughout the 8-inch to 36-inch diameter classes. The remaining post-harvest forest would contain a much higher proportion of Jeffrey pine, ponderosa pine, oaks, and other early successional species.  Stand structure would much be less uniform than before and consist of a variable density forest with openings less than 4 acres, small gaps, and uncut areas (skips).  Remaining pines and other early seral species would have room to expand by removing many of the larger trees around them.  Open meadows and other non-forested areas would increase. The post-harvest areas would be much more resistant to disturbances.

Of the eight modelled stands basal area decreased after harvest and remained below this level after 40 years in all stands. The average of these stands went from preharvest basal area 284 square feet per acre to post harvest levels of 111. After 40 years mean basal area was back up to 163. Total canopy cover was reduced in all eight stands from 76% preharvest to 46% post-harvest and then back up to 57% after 40 years. This should give ample time for early seral vegetation to recover and maintenance operations to be performed to maintain and possibly enlarge this open forest type.

#### Alternative 3

Alternative 3 would remove only trees of the 8-inch to 20-inch diameter classes of this faster growing encroaching vegetation. To make this harvest economical, most of these trees would have to be removed. However, the remaining larger Douglas-fir would continue to grow and suppress Jeffrey pine, ponderosa pine, oaks, and other unique early successional species. Stand structure would continue to simplify and be prone to disturbance.

Of the eight modelled stands basal area decreased in 7 of 8 stands by the end of the 40-year analysis. The average of these stands went from preharvest basal area of 284 square feet per acre to post harvest levels of 189. After 40 years mean basal area was back up to 237. Total canopy cover was reduced in all eight stands from 76% preharvest to 58% post-harvest, but in contrast to alternative 2 it continued to slowly decline to 56% after 40 years. This is because of a vigorous overstory reducing much of the vegetation underneath it. Few of the desired species would be able to flourish in these conditions. Very few small trees would be left, and less open space would be available for them to grow in.

Cumulative Effects

3.1.4.4.    *Alternative 1*

Direct, Indirect, and Cumulative Effects

The No Action Alternative would promote the continuation of increased relative density and decreased nutrients and resources available to support the higher densities, resulting in reduced individual tree and stand level vigor and until mortality from reduced resource availability or other stressors (insects, disease) occurs and self-thinning (reduced density) occurs, which may also spread to other adjacent stands. It would not increase or promote vegetative species diversity and growing space for hardwoods and pine persistence, including Jeffrey pine, ponderosa pine, oaks, and other early successional species. There would be fewer opportunities for pine and hardwood to reestablish through natural regeneration. There would be a cumulative adverse effect of reduced conifer and hardwood growth and vigor within existing stands, and a highly departed tree species composition dominated by encroaching Douglas-fir. The spatial pattern of trees would remain uniform as opposed to a varied spatial pattern allowing for Jeffrey pine dominated stands with an understory of native grasses, forbs, and other unique endemic plants.

3.1.4.5.    *Alternative 2, 2a, 3*

Direct, Indirect, and Cumulative Effects

A reduction in stand densities would promote growth and vigor on the remaining stand. The action alternatives all propose reducing relative densities below 60%, and residual trees would increase in height and diameter growth as the resources of the stand are reallocated to the trees most likely to take advantage of the additional water, sunlight and soil nutrients. This increased growth would be generally in proportion to the percentage of stand removed within the range of Relative Density Indexes considered for retention (20-45%) (Oliver and Larson 1996, pg. 36, Tappeiner et al. 2007, p.127). Increased levels of light and growing space by reducing encroaching Doulgas-fir will increase the tree species composition of Jeffrey pine, ponderosa pine, oaks, and other early successional species.

Moreau's review (Moreau et al, 2022) determined that the positive effects of reduced drought mortality increase with thinning intensity, with heavy thinning removing more than 40 percent of basal area (BA) being most effective, and positive benefits becoming negligible within 20–40 years as crowns grow and nutrient demands increase, and that removing less than 30 percent of BA had no measurable effect on the response to drought.

The Action Alternatives would increase the tree species composition of Jeffrey pine, ponderosa pine, oaks, and other early successional species by reducing relative densities to below levels associated with the lower limit of self-thinning (60% RD). However, Alternative 3 may not provide enough benefit as the lower level of relative density (40%) combined with 20" DBH retention, may not achieve the minimum level of heavy thinning (40 percent of basal area removal) for most effectiveness as described by Moreau et al (2022). Increased resilience and resistance up to 663 acres in Alternative 2&2a would occur by reducing relative densities to 20-45% RD or less, in DDR-TPCC (EA tables 2.1, 2.2, 2.3) compared to Alternative 3 which would retain higher 40-45% RD and basal area and would treat only up to 43 acres. Relative density does not correlate directly with basal area, however, the benefits to tree species composition shifts towards shade intolerant species of pine and oak, tree vigor, resiliency, resistance, and reduced susceptibility would be generally in proportion to the percentage of the stand removed.

### 3.2.    Fire and Fuels

3.2.1.    Issue 5: How would the proposed treatments affect stand level fire resistance (or fire hazard)?

#### 3.2.1.1.    *Background*

See Appendix D.5 for background and more detailed information relevant to this issue.

#### 3.2.1.2.    *Summary of Analytical Methods*

The BLM evaluated direct and indirect effects to temporary (1-2 years) surface fuel hazard and short-term (up to 20 years) stand-level fire resistance and hazard following implementation of proposed actions. The BLM also evaluated direct and indirect effects for the moderate-term time frame (up to 50 years). The BLM discussed cumulative effects at the stand scale over time, considering the incremental impact of proposed actions when added to other past, present, and reasonably foreseeable future actions or natural disturbance.

In this analysis section, the BLM tiers to the assumptions and results from the 2016 PRMP/FEIS (Issue #2 pp. 243-252, Appendix H) to assess effects of the alternatives on the fuel profile continuity and thus the relative resistance to stand-replacement fire rating (i.e., expected fire behavior). To assess environmental effects by alternative the BLM calculated the percent distribution of maximum proposed action acreage in relative resistance to stand replacement fire categories by alternative as a measurement indicator. This rating is based on likely fire behavior under typical fire weather conditions, given the structural stage and wildland fuel profile (see Appendix D.5 Methods and Assumptions sections). The BLM used a standard approach to derive a relative resistance to stand-replacement fire categories, based on the relationship between indices of relative crown fire potential. The BLM generated these crown fire potential indices with the Nexus 2.1 crown fire modeling program, which links separate models of surface fire behavior and crown fire behavior. In the fire behavior modeling, the BLM accounted for slope and the sheltering effect the canopy has on windspeeds and applied standard wind adjustment factors according to NEXUS recommendations and guidance for estimating wind speeds in the Fire Behavior Field Reference Guide (NWCG 2021) and fine dead fuel moisture (Appendix D.5 Analytic Assumptions). The BLM also analyzed change in small-scale heterogeneity patterns consistent with fuel loadings and arrangements associated with frequent fire, dry forest low and mixed severity fire regimes.

#### 3.2.1.3.    *Assumptions*

The BLM applied a standard approach to derive a relative resistance to stand-replacement fire for *mixed* resistance categories, based on the relationship between indices of relative crown fire potential: crowning index (CI) and torching index (TI) (See Appendix D.5). The rating was as follows: if CI is less than 20 mph, relative resistance is *low*, however if TI is greater than 20 mph, relative resistance is *moderate-low*; if CI is between 20-30 mph, and TI is less than 20 mph, relative resistance is *moderate-low,* if CI is between 20-30 mph, and TI is greater than 20 mph, relative resistance is *moderate-high*; and if predicted CI is greater than 30 mph, relative resistance is *high*, unless the TI is less than 30 mph, then resistance would be *moderate-high*. (Appendix D.5, Table 3.5.1).

Table 3.5.1. Explanation of the relationship between crowning index (CI), torching index (TI), and relative stand replacement fire resistance.

| Crowning Index (CI) | Torching Index (TI) | Relative Stand Replacement Fire Resistance |
|---|---|---|
| <20 mph | <20 mph | LOW |

KSW01672

| Crowning Index (CI) | Torching Index (TI) | Relative Stand Replacement Fire Resistance |
|---|---|---|
| | >20 mph | MODERATE-low27F[28] |
| 20 – 30 mph | <20 mph | MODERATE-low |
| | >20 mph | MODERATE-high |
| >30 mph | <30 mph | MODERATE-high |
| | >30 mph | HIGH |

<u>Wildland Fuel Profile</u>

The BLM assumed the following metrics define continuity of the wildland fuel profile (Appendix D.5,): canopy fuels (canopy connectivity (canopy cover and canopy bulk density), ladder fuels (canopy base height), surface fuels (surface fuel models) (Scott and Burgan 2005) and fuel heterogeneity and thus influence fire resistance (or fire hazard). See Appendix D.5 for further detail around canopy fuel, ladder fuel, and surface fuel assumptions. The BLM assumed LANDFIRE (LF) (USGS 2020) data represents Canopy Base Height (CBH) and surface fuels in the affected environment. The BLM assumed that the No Action Alternative short-term (up to 20 years) fuel profile would be the same as the current condition. The BLM assumes that commercial thinning affects canopy fuels and HRF treatments affect ladder and surface fuels. The BLM assumes stand refers to the unit scale.

<u>Structural Stage</u>

Non-commercial fuels reduction (HFR) in mature forest structural stages would not shift the mature structural stage to another stage within the short-term. Commercial thinning and group selection openings conducted in mature forest structural stages would not shift the mature structural stage to another stage within the short-term. Variable retention harvest would shift forest structural stage from mature structural stage to the stand establishment structural stage over 20 years, thus shifting resistance rating from *mixed* to *moderate* (with Structural Legacies) or *low* (without Structural Legacies) (USDI BLM 2016a, Table 3-32 p. 243, Appendix H pp. 1319-1321, Appendix C pp.1203-1204), while the fire hazard rating would be *high* (USDI BLM 2016a, Table 3-34 p. 254, Appendix H pp. 1320-1321, Appendix C pp.1203-1204).

<u>Activity Fuels Treatments</u>

Common to all action alternatives, based on the unit location (e.g. aspect, slope, access, and proximity to other values, such as adjacent to communities or private property) and residual activity fuel (e.g., live and dead tree branches and treetops) remaining following harvest in commercial units, the BLM would determine the type of activity fuel treatment needed to reduce the amount or depth of residual activity fuels (Section 2.2.3.2). Adjacent to values and along access routes, activity fuel load would be reduced to result in expected flame lengths less than 4 feet under typical fire weather conditions. Activity fuel loading would be reduced through methods such as hand or machine pile and burn, and/or broadcast burning within 1-2 years following completion of harvest to allow fuels time to cure prior to burning. In areas not adjacent to values or access routes, the depth of activity fuels would be reduced to less than 18 inches in height by lop and scatter within 1 year of harvest. Similarly, following non-commercial fuels reduction of ladder fuels (i.e. thinning of small trees to raise canopy base heights) these small fuels would be placed in handpiles and allowed to cure for 1-2 years. Piles would be burned after they cure. (See

---

[28] If TI is greater than CI, this indicates that within-stand crown fire initiation is unlikely, however stand canopy connectivity may support crown fire spread from adjacent areas under windspeeds equal or below CI windspeeds (i.e., independent crownfire).

KSW01673

NAID Air Quality Issue and Project Design Features Table C-19 for more details). While piles cure, surface fuel loading and potential flame length is temporarily increased. This temporary increase [in commercial and non-commercial treatment units] is not represented in the 20 year post-treatment surface fuel model assumptions, as the temporary increase in fuels would have been reduced within 1-2 years by the treatments described above.

The effects of the temporary increase (1-2 years) in risk from residual activity fuels are within the scope of those effects analyzed for in the PRMP/FEIS (USDI BLM 2016a, pp. 260 and 263, Figure 3-380). That analysis, which is incorporated here by reference, concluded that immediately following commercial harvest, residual activity fuels left on the forest floor (e.g., tree tops and limbs) would increase surface fuel loadings and have the potential to increase surface fire behavior and pose a risk to the residual stand and other human values (e.g., Wildland Developed Areas (WDAs)), if not adequately treated (USDI BLM 2016a, p. 266, 269).

### Fuel Heterogeneity

Based on dry forest stand reconstruction reference sites located in low-mixed severity fire regimes, which provide a guide for vegetation patterning representative of the functioning fire regime, gap sizes were historically less than 2 acres and generally less than 1 acre (Appendix D.5).

### Resistance to Other Disturbances

Consistent with the PRMP/FEIS, to which this issue tiers, the BLM assumes that relative stand-level fire resistance ratings would also apply to stand-level resistance to drought and insect disturbance, as increased fire resistance often also increases resistance to drought and insects (USDI BLM 2016a, p. 201). The combined effects of reducing stand density and reintroducing fire in drought-prone and fire-prone regions, can increase water availability and tree growth and vigor (Halofsky et. al 2016; Hood et. al 2018), allowing individual trees to better withstand drought and insect attacks (Hood et. al 2015).

### Maintenance

Most treated areas would require low to moderate intensity disturbance maintenance (e.g. reducing surface and ladder fuels with prescribed fire or thinning if too much time has passed) every 15 to 30 years to maintain high to moderate relative stand level resistance (See Appendix D.5 for additional details).

### 3.2.1.4.    *Affected Environment*

Within the project area, landscape patterns of wildfire size distribution and occurrence have shifted over time (Appendix D.5). Historically, wildfire was more frequent and burned more acreage within the project area, than in recent years, however wildfires do still occur within the project area (see Appendix D.5).

Within the Last Chance project area, approximately 6,249 acres of hazardous surface and ladder fuel reduction treatments (handpile burning and underburning) have been implemented in the recent past (See Appendix D.5).  However, these treatments occurred 20+ years ago and are in need of maintenance treatments. Select areas are being proposed for maintenance under this project in order to sustain wildfire resistance.

Within the maximum footprint of proposed action acres, 76 percent of the acreage has a high amount of canopy fuels with greater than 60 percent canopy cover. The current canopy base height is variable, ranging from 2ft to 8ft across the majority of the proposed acreage. The majority (87 percent) of proposed action acreage is best represented by very high load forest surface fuel models. The general current condition of vegetation illustrates the current abundance and connectivity of canopy, ladder, and surface fuels and lack of structural and spatial heterogeneity departed from historic frequent-fire conditions in forested landscapes. (See Appendix D.5 for additional detail). Additionally, 15 percent of the proposed

action acreage is within a quarter mile of Communities at Risk, a focused component of the Wildland Urban Interface (CWPP, 2019; Metlen et al., 2017) and 43 percent is within one mile of Wildland Developed Areas (WWRA 2013) (See map Appendix D.5)

3.2.1.5.    *Environmental Consequences: No Action Alternative*

Short-term (up to 20 years) Direct and Indirect Effects

The No Action Alternative would have no short-term direct effects to the fuel profile or indirect effects to stand level fire resistance or fire hazard. Activities comprising the proposed action would not be implemented and would not directly alter the vertical and horizontal continuity of the wildland fuel profile (i.e., surface, ladder, or canopy fuels) or increase heterogeneity. Stand-level fire resistance would remain low for 75 percent of the unit acres and moderate-low for 16 percent, and moderate-high for 8 percent (Appendix D5 Table 3-7) under 90th percentile weather conditions. The lack of small-scale patchiness (or heterogeneity) would persist.

Moderate term (up to 50 years) and Cumulative Effects

Based on climate and wildfire trends discussed in Appendix H, wildfire and drought would continue to challenge the persistence of forested stands in southwestern Oregon. Heterogeneity representative of low-mixed severity fire regimes and fire-resistant species would continue to decline, and vegetation would continue to accumulate and die, increasing fuel loading and threatening the persistence of large fire-resistant trees. These aspects, coupled with expected climatological changes, such as increased background conifer mortality due to longer periods of hot drought (USDI BLM 2016a, p. 185), increase the likelihood for larger proportions of high severity fire (Mote et al. 2019) and reduced stand resistance to replacement fire or increased hazard.

Under the No Action Alternative, high fire resistance would not be created by proposed actions, so there would be no high or moderate stand-level resistance to maintain with frequent low to moderate severity disturbance and high fire hazard would persist. Intersection by wildfire would also be less likely to provide beneficial outcomes. There would be no maintenance of previous treatments, unless or conducted as part of a different vegetation management project (e.g., commercial and non-merchantable actions, including prescribed fire) or if burned by wildfire.

3.2.1.6.    *Environmental Consequences: Direct and Indirect Effects common to all Action Alternatives*

Short-term (up to 20 years) Direct and Indirect Effects

Among all action alternatives, combined direct effects from proposed commercial thinning, selection harvest, natural hazardous surface and ladder fuel reduction, and activity fuel treatments would reduce surface, ladder, and canopy fuels, reduce fuel profile continuity, and increase heterogeneity, as compared to the No Action Alternative (See Appendix D.5 for more details). Where implemented, these changes to the fuel profile would indirectly increase wildfire resistance and reduce wildfire hazard over the No Action Alternative. The most effective way to increase wildfire resistance and reduce wildfire hazard is through combined thinning and prescribed fire (Prichard et al. 2021).

In areas where only proposed commercial actions and activity fuel treatments occur, canopy fuels would be reduced, but not surface and ladder fuels, reducing the likelihood of sustained tree-to-tree crown fire under typical fire weather indices (Scott and Reinhardt 2001) and increase diameter, but crown fire initiation would not be reduced. In areas where only HFR treatments occur, surface and ladder fuels would be reduced, reducing the likelihood of crown fire initiation, however heterogeneity consistent with low to mixed severity fire regimes would not be created and the 8 inch diameter restriction diameter limits the ability to improve the growth and vigor of remaining trees. In Commercial thinning and

selection harvest, the likelihood of tree-to-tree crown fire spread under typical fire weather indices (Scott and Reinhardt 2001) would be reduced, and stand diameter increased.

Proposed actions to create openings and leave untreated skips would introduce heterogeneity in uniform stands, promote a disruption of horizontal fuel connectivity and alter patterns of litter fall and surface fuel accumulation Creation of variable sized complex ameba-like gaps less than 2 acres are reflective of low and mixed severity fire regime gap sizes (Churchill et al. 2013, Hessburg et al. 2015), where gaps were variable in size, typically less than 2 acres and generally less than 1 acre. However, recent characterization of fine-scale spatial patterning for reference conditions has focused on characterizing tree clusters, rather than delineating and identifying gaps, thus it can be challenging to reflect the entire spectrum of historic gap size range, especially in open forest stands (See Appendix D.5 for more details).

### Moderate term (up to 50 years) Effects

Over 50 years, understory fuels would re-grow (including natural or artificial regeneration), vegetation would also die, and surface and ladder fuels would re-accumulate, unless the stands experience low-moderate severity disturbance.

In 50 years, all Mature stands would shift to *Mixed* relative resistance stand-replacement fire, which can exhibit the range of *Low* to *Moderate* to *High* relative resistance to replacement fire, depending on cumulative effects of vegetation re-growth, wildfire interactions, and maintenance treatment actions (e.g. prescribed fire or thinning) implemented under other projects.

Additionally, among action alternatives, stand average tree diameter (QMD) would continue to increase in thinned and selection harvest areas, thus improving resistance to stand-replacing fire in Mature stands.

### 3.2.1.7. *Environmental Consequences: Alternative 2*

### Short-term (up to 20 years) Direct and Indirect Effects

In the short-term, of the 8,240 acres of commercial harvest and 3,446 HFR proposed action acres 3 percent of proposed acres would have high relative fire resistance, 11 percent moderate-high resistance, 69 percent moderate-low resistance, and 15 percent low resistance. Fire hazard would be slightly different, where 3 percent would have low fire hazard, 11% would have moderate-low fire hazard, 62% would have moderate-high fire hazard, and 22% would remain at high fire hazard under 90th percentile weather conditions (Table 3-10, Appendix D.5). There are 1,875 acres of commercial thinning and HFR overlap (Refer to Section 2-7, Table 2-5). The effects to canopy, ladder, and surface fuels described common to all action alternatives above apply.

In addition to effects to canopy fuels described common to all above, the 787 proposed acres of variable retention harvest would convert the mature structure stage to early successional and stand establishment, delaying promotion of large fire-resistant trees. Large trees would be protected and promoted in commercial thinning and selection harvest, however road construction may result in removal of large trees.

Across approximately, 3,860 acres of the proposed commercial actions, creation of up to 4 acre gaps would contribute to variable and patchy vegetation patterns and fuel loadings and arrangements, however larger than indicated in literature characterizing fine-scale spatial patterning of reference conditions reflective of low to mixed severity fire regimes. Moderate increases in surface winds in openings greater than 2 acres (Bigelow and North 2012) could contribute toward localized increased surface fire behavior, however as described in the methods and assumptions, the sheltering effects of canopy fuels have been incorporated into the fire behavior modeling for stand average canopy cover (Appendices D.5) additionally canopy fuels will continue to grow, increasing cover over time (Refer to Silviculture report).

Elsewhere across the approximate 3,500 acres of commercial thinning and selection harvest actions, creation of variable sized openings up to 1 acre would introduce heterogeneity more reflective of fuel loadings and arrangements comparable to low and mixed severity fire regimes, (USDI BLM 2016a, pp. 225-226; Churchill et al. 2013; Hessburg et al. 2015), where gaps were variable in size, typically less than 2 acres and most were less than 1 acre (Appendices D.5).

    Moderate term (up to 50 years) Effects

Effects common to all action alternatives would apply to Mautre stands. The early successional structural stage would remain in the Stand Establishment structural stage or begin trending into the young-stand phase, with a moderate-low relative fire resistance and high fire hazard (see Assumptions).

### 3.2.1.8. *Environmental Consequences: Alternative 2a*

    Short-term (up to 20 years) Direct and Indirect Effects

In the short-term, of the 8,240 acres of commercial harvest and 3,446 HFR fuels proposed action acres 4 percent of proposed acres would have high relative fire resistance, 14 percent moderate-high resistance, 63 percent moderate-low resistance, and 14 percent low resistance (Table 3.10, Appendix D.5). The inverse would be present for fire hazard. There are 1,875 acres of commercial thinning and HFR overlap (Refer to Section 2-7, Table 2-5). The effects to canopy, ladder, and surface fuels described common to all action alternatives above apply. Large trees would be protected and promoted in commercial thinning and selection harvest, however road construction may result in removal of large trees.

Across approximately, 3,860 acres of the proposed commercial actions, creation of up to 4 acre gaps would contribute to variable and patchy vegetation patterns and fuel loadings and arrangements, however larger than indicated in literature characterizing fine-scale spatial patterning of reference conditions reflective of low to mixed severity fire regimes. Moderate increases in surface winds in openings greater than 2 acres (Bigelow and North 2012) could contribute toward localized increased surface fire behavior, however as described in the methods and assumptions, the sheltering effects of canopy fuels have been incorporated into the fire behavior modeling for stand average canopy cover (Appendices D.5) additionally canopy fuels will continue to grow, increasing cover over time. Elsewhere across the 4,300 acres of commercial thinning and selection harvest actions, creation of variable sized openings up to 1 acre would introduce heterogeneity more reflective of fuel loadings and arrangements comparable to low and mixed severity fire regimes, (USDI BLM 2016a, pp. 225-226; Churchill et al. 2013; Hessburg et al. 2015), where gaps were variable in size, typically less than 2 acres and most were less than 1 acre (Appendices F, G, and H).

### 3.2.1.9. *Environmental Consequences: Alternative 3*

    Short-term (up to 20 years) Direct and Indirect Effects

In the short-term, of the 1,051 acres of commercial harvest and 10,627 acres of fuels (small diameter thinning only) proposed action, none of the proposed acres would have high relative fire resistance, 14 percent moderate-high resistance, 63 percent moderate-low resistance, and 17 percent low resistance (Table 3.10, Appendix D.5). The inverse would be present for fire hazard. There are 456 acres of commercial thinning and HFR overlap (Refer to Section 2-7, Table 2-5). The effects to canopy, ladder, and surface fuels described common to all action alternatives above apply.

In addition to effects to canopy fuels described common to all above, a diameter restriction of 20 inches would limit the ability to improve the growth and resiliency of remaining trees where there is a high density in these diameter classes (Riling et al. 2019).

Across the 1,051 acres of commercial treatments, the effects of opening creation of variable sized openings up to 1 acre would introduce heterogeneity fairly reflective of fuel loadings and arrangements

comparable to low and mixed severity fire regimes, (USDI BLM 2016a, pp. 225-226; Churchill et al. 2013; Hessburg et al. 2015), where gaps were variable in size, typically less than 2 acres and most were less than 1 acre (Appendices D.5).

### Moderate term (up to 50 years) Effects

Moderate -term effects common to all action alternatives would apply to the mature structural stages. The 787 acres which transition to the early successional structural stage following proposed action would begin transitioning into the young-stand phase with a moderate-low relative fire resistance and high fire hazard (see Assumptions).

### 3.2.1.10. *Cumulative Effects*

The potential stand-level cumulative effects would be a result of the proposed actions, combined with reasonably foreseeable actions at the stand-level and recent and future trends of wildfire and fire suppression efforts. Direct and indirect short-term effects have considered the incremental cumulative effect of prior stand condition, combined with commercial thinning, small diameter thinning and prescribed burning (handpile burning). There would be no additional short-term cumulative effects at the stand scale, unless intersected by a wildfire, which would provide fuel maintenance and re-set conditions to short-term effects.

Without frequent maintenance disturbance, understory fuels would re-grow (including natural or artificial regeneration), vegetation would also die, and surface and ladder fuels would re-accumulate (See Appendix D.5 for more detail). Treated areas would require maintenance every 15 to 30 years to maintain high to moderate relative stand level resistance (see assumptions). Maintenance actions, such as low intensity prescribed underburning, or thinning and handpile burning, if enough time has passed, would contribute toward maintaining high to moderate relative stand-level fire resistance and return stand-resistance to short-term conditions. As each treatment stage is completed, the stand's resistance to fire would increase and reflect short-term effects. If longer intervals go between maintenance phases, the stand-level resistance would decrease and stand-level hazard increase.

The Action alternatives vary in the amount of maintenance that would be needed to sustain stand-level fire resistance. High frequency maintenance would be needed on 5 percent of proposed action acreage in Alternative 2 and on 11 percent of proposed action acreage in Alternative 2a to sustain high to moderate-high stand-level fire resistance. Moderate frequency maintenance would be needed on 8 percent of Alternative 2 and alternative 2a proposed action acreage and on 11 percent of Alternative 3 proposed action acreage to sustain moderate-high fire resistance. Maintenance of high to moderate-high stand-level fire resistance in the frequent-fire adapted dry forest, hinges on frequent low-moderate intensity disturbance. For all action alternatives, low frequency maintenance would be needed on greater than 60% of the proposed action acreage to sustain moderate-low fire resistance. (Table 3-10, Appendix D.5).

Based on climate and wildfire trends discussed in Appendix D.5, wildfire and drought would continue to challenge the persistence of forests in southwestern Oregon. However, proactive treatments designed to moderate fire behavior and minimize uncharacteristic high severity fire, so that a wildfire can burn through a stand without detrimental consequences and allow the stand to persist and thrive when intersected by wildfire. Thus, low intensity wildfires can also provide maintenance of treated areas.

**Table 3-10:** Summary of Action Alternative metrics associated with short-term direct, indirect, and cumulative effects to stand-level fire resistance: relative stand-level fire resistance rating, structural heterogeneity consistent with fire regime, and maintenance frequency needed to sustain relative resistance (i.e. stand-level cumulative effects).

| Resistance and Hazard Metrics | | No Action | Alternative 2 | Alternative 2a | Alternative 3 |
|---|---|---|---|---|---|
| | Low | 75% | 15% | 14% | 17% |

| | | | | | |
|---|---|---|---|---|---|
| Relative Stand-level Fire Resistance Rating | Moderate-low (%) | 16% | 69% | 63% | 63% |
| | Moderate-high (%) | 8% | 11% | 14% | 14% |
| | High (%) | 0% | 3% | 4% | 0% |
| Structural Heterogeneity Aligned with Fire Regime | | Not consistent | less consistent on 3,860 acres; consistent on 3,500 acres | less consistent on 3,860 acres; most consistent4,300 acres | most consistent on 1,051 acres |
| Large Trees Promoted, Protected, and Removed28F[29] | | Not Applicable | Promoted, protected, and removed | Promoted, protected, and removed | Protected |
| Maintenance Frequency to Maintain Stand-level Resistance | High | Not Applicable | 5% | 11% | 0% |
| | Moderate | | 5% | 11% | 14% |
| | Low | | 69% | 63% | 63% |
| Relative Stand-level Fire Hazard Rating | Low | 0% | 3% | 4% | 0% |
| | Moderate-low (%) | 8% | 11% | 14% | 14% |
| | Moderate-high (%) | 16% | 62% | 63% | 63% |
| | High (%) | 75% | 22% | 14% | 17% |

*Large trees may be removed for route construction

## 3.3. Northern Spotted Owl (NSO)

3.3.1. Issue 6: How would the proposed treatments in the LSR-Dry LUA speed the development or improve the quality of habitat in the long term, and not preclude or delay by 20 years or more the development of NSO nesting-roosting habitat as compared to development without treatment?

The LCFMP proposes forest management treatments in foraging and dispersal-only NSO habitats within the LSR-Dry LUA. Would these treatments preclude or delay the development of the treated stands into (NR) habitat by 20 years or more compared to BLM leaving these stands untreated (no action alternative)?

### 3.3.1.1. *Background*

The LCFMP is located within the range of the NSO, which is listed as threatened under the ESA. NSOs prefer coniferous forest with multiple layers of vegetation; a variety of tree species and age classes; and the presence of large down, woody material (to serve as habitat for prey species) and large diameter live and dead trees (snags) for NR habitat. NSO NR and foraging habitat in southwest Oregon is mixed-conifer habitats with recurrent fire history, patchy habitat components, and higher incidences of woodrats.

---

[29] Large trees may be removed for route construction.

KSW01679

NSOs also utilize younger stands with closed canopies for foraging and dispersing. Based on studies of NSO habitat selection, including habitat structure and use, and prey preference throughout the range, NSO habitat consists of three components: NR, foraging, and dispersal (Thomas et al., 1990).

When a proposed treatment would occur in the LSR-Dry LUA, the BLM must ensure that any proposed treatment does not preclude or delay by 20 years or more the development of a treated stand into NR, as compared to development without treatment (USDI/BLM 2016b, p. 72). In the LCFMP, this purpose and need applies to stands in the LSR-Dry LUA that are currently not functioning as NSO NR habitat.

### 3.3.1.2.      *Methodology*

The analysis for this issue assesses how the proposed commercial thinning treatments in the LSR-Dry LUA under each alternative meet the following Management Direction:

"In stands that are not NSO NR habitat, apply silvicultural treatments to speed the development of NSO NR habitat or improve the quality of NSO NR habitat in the stand or in the adjacent stand in the long term. Limit such silvicultural treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of NSO NR habitat in the stand and in adjacent stands, as compared to development without treatment. Allow silvicultural treatments that do not meet the above criteria if needed to treat infestations or reduce the spread of forest pathogens." (USDI/BLM 2016b, p. 72).

All commercial treatment units proposed for the LCFMP underwent field habitat evaluations by wildlife staff during the early planning stages of the project which cataloged:

- canopy cover,
- basal area,
- tree size,
- average overstory DBH,
- the presence and amount of decadence features (snags and down woody material, broken top trees, nesting platforms, mistletoe, etc), and
- canopy layering in proposed treatment areas.

Based on these habitat evaluations, all units were categorized into three NSO habitat categories: NR, foraging, and dispersal-only habitat (See NSO Habitat Definitions, NAID Wildlife Issues, Table B-31.1), as well as two categories representing conditions currently not functioning as NSO habitat (capable and non-habitat). This analysis used the three sub-types of NSO habitat to evaluate the present and future conditions.

For this analysis, only units that contained more than five acres of LSR-dry LUA were included and summarized for this EA.  Standard practice for BLM stand exams is to generate one plot for every 10 acres, and therefore stands that are less than 5 acres are not large enough to generate meaningful stand exam data. The stands used in this effects analysis are commercial units that were classified by field evaluations as either foraging or dispersal-only habitat and do not currently function as NSO NR habitat. There is no proposed treatment of stands that are currently functioning NR habitat in LSR.

The BLM compiled stand-level inventory plot data (stand exams) collected in the field for all selected LSR-Dry stands and modeled future changes to the stands using the computer program FVS, a tree growth and yield simulator. Growth for each representative stand was modeled through time under a no-treatment scenario and two treatment scenarios based on the proposed alternatives. The models used a prescription of thinning throughout specific diameter classes corresponding with each alternative's prescriptive elements, which removed different ranges of tree sizes during the simulated treatments between alternatives. The BLM evaluated minimum thresholds for NR habitat metrics (see assumptions) to determine when these stands would reach NR conditions when modeled into the future. The treated stands were modeled for an additional 20 years of growth (beyond when they would reach NR under the

No Action Alternative) to determine if treatment would cause a delay longer than 20 years in the development of NR habitat when compared to the no action alternative. The composition of each stand prior to (pre-treatment) and after treatment modeling are presented by alternative for each proposed treatment unit by unit below (see Table 6-2).

The potential effects to stand growth and the ability of each LSR-Dry stand to reach NR conditions as modeled with FVS are presented for each Alternative. The results for all LSR-Dry stands included in this analysis are presented in Tables 6-2 and 6-3, including the results of modeling the No Action and Action Alternatives.  Table 6-2 is designed to provide a unit-by-unit overview of all LSR-Dry units included in this analysis, with values for the six stand metrics used to define minimum NR habitat and modeled stand attributes in the first decade the stand reaches NR habitat by alternative. This table can be used to compare the FVS modeling results for each proposed treatment unit by alternative. Additionally, Table 6-3 provides a summary of when each unit would reach the minimum NR habitat metrics under each alternative by decade to compare the time scales of the modeled growth response that would result under each alternative.

Table 6-2 contains six quantitative habitat metrics used to represent NSO habitat that are also available output metrics within the FVS modeling program.  Although these habitat metrics are important measures of NSO habitat quality, they are not representative of other habitat measures such as canopy/stand layering, stand heterogeneity, and decadence features that provide nesting structures (broken top trees, wolf trees, platforms, etc.) and habitat for prey (snags and down wood). The FVS modeling outputs are limited to the six quantitative variables and some qualitative assessments must be made by BLM staff to interpret the modeling results in terms of the overall effect the treatments would have on the development of NSO habitat.

For each LSR-Dry unit included in table 6-2, the baseline stand metrics are presented as the current condition under the No Action Alternative and represents the stand growth as modeled to 2025 from time of field data collection (2019-2023). The FVS program was subsequently used to model the stand growth without treatment (no action) and the data outputs were used to determine what decade the stand would first reach the minimum threshold values for all six quantitative habitat metrics used to represent NR habitat conditions without treatment. The minimum values for each metric are presented at the top of the table. The decade the stand first reaches NR habitat requirements is presented under the no treatment row of the No Action and serves as a baseline to which to compare the results of the treatments under the Action Alternatives. To comply with the 20-year standard, the BLM would need to demonstrate that any proposed treatment would not delay or preclude the development of NR habitat by more than 20 years compared to when the no action alternative reaches NR habitat without treatment. The results of each FVS modeling run are presented for each Action Alternative, including the stand metrics one year after the prescription is applied to the current conditions, which shows how the proposed treatment would alter the habitat metrics immediately following treatment for each Alternative. Finally, a row is presented for each Action Alternative that shows the decade in which the FVS model first reached the minimum thresholds for all six quantitative habitat metrics to meet NR habitat conditions within the treated stand, and what these metrics are estimated to be at the time the stand reaches NR habitat conditions.

### 3.3.1.3.    *Assumptions*

The BLM has defined the following habitat metrics as the minimum thresholds for a stand to reach NR habitat quality:

- in southwestern Oregon NR habitat are conifer stands with a multi-layered, multispecies canopy dominated by large conifer overstory trees,
- canopy cover $\geq$ 60 percent,
- overstory tree diameter of >21 inches DBH,
- >12 trees with 20 inches or greater DBH per acre,

- quadratic mean diameter (QMD) >15 DBH,
- basal area from 180 to 240 feet$^2$/acre (most often greater than 240 feet$^2$/acre), and
- a basal area from larger trees greater than 26 inches DBH and greater than 30 feet$^2$ in basal area (USDI/BLM 2022).

The BLM assumes these metrics as minimum thresholds to determine when an analyzed stand would develop into NR habitat after treatment, compared to no treatment.

The stand modeling applied several assumptions to the treatment and no treatment:

- Potential future external influences (e.g., mortality from insects/disease, fire, windthrow, or new land management policies) were not included because these are unknown and speculative.
- The BLM modeled only one single entry of selection harvest during the analysis timeframe (2023-2123). No additional understory small diameter thinning, or prescribed fire treatments were applied to the stand modeling.
- Skips and group selection openings were factored into the overall residual relative density at the stand level. At least ten percent of the stand would be in skips, and no more than ten percent of the stand would be in group selection openings (BLM 2016b, p. 72) in stands that are ten acres or greater in size.

### 3.3.1.4.    *Affected Environment*

All of the proposed commercial thinning treatments in LSR-Dry stands would occur in stands currently functioning as foraging, dispersal-only, or non-habitat and do not currently display the characteristics of NSO NR habitat (as defined in NAID Issues, Table B-31.1). These stands lack at least one or more elements of diversity, structure, layering, large trees, higher canopy cover, and other important habitat elements required to function as NR habitat. Some of these stands have average tree sizes and structure that meets the minimum values for NR habitat but were classified as foraging because of the lack of decadence features (snags, large woody debris, broken-top trees, deformities in crown structure, etc.) currently not present in the stand.

The current forest conditions limit the extent of NR habitat, increase the risk of their loss to wildfire, and delay and hinder the development of new NR habitat. As described in Chapter 1, the LCFMP is characterized by densely stocked small diameter trees. The average QMD across LSR stands in the treatment area is less than 10 inches DBH, which indicates that the trees are smaller than necessary for NSO NR. The average relative density of these stands is above the point at which competition between trees causes self-thinning (>45 RD percent) (Long and Daniel 1990, Davis and Johnson 1987). These stands have reduced tree vigor and are at increased risk of insect outbreaks and disease (Fettig et al 2007). Competition between trees slows their growth (Bennett and Main 2018, p. 4), delaying the development of NR habitat characteristics.

Under each action alternative, a small amount of project activities would occur in existing NR habitat (table 6-1), but these actions are not selection harvest or commercial thinning, they would only be actions needed to access other treatment areas (ROW development, cable yarding wedges, and untreated leave areas also called "skips") and would minimally or have no effect to NR habitat.

### 3.3.1.5.    *Environmental Consequences*

There are four Alternatives included under the LCFMP, which propose different intensities and amounts of commercial thinning across the planning area. Table 6-1 includes the acres of LSR-Dry that would be treated under each alternative.

Table 6-1. Acres of LSR-Dry proposed for treatment by NSO Habitat Type by Alternative in the LCFMP.

| Alternative | NR[1] | Foraging | Dispersal-Only | Capable or Non-Habitat | TOTAL |
|---|---|---|---|---|---|
| No Action | 0 | 0 | 0 | 0 | **0** |
| Alternative 2 and 2a | 29 acres (skips) 10 acres (ROWs) | 193 acres | 50 acres | 9 acres | **291** |
| Alternative 3 | 7 acres (skips) 5 acres (ROWs) | 53 acres | 0 acres | 0 acres | **65** |

1 = No commercial thinning or selection harvest treatments are proposed to occur in current NR habitat under any Alternative.

Alternative 1

The No Action alternative would not implement any activities. Therefore, vegetation growth rates, stand densities, fuel conditions, and the ratio of open and closed forest across the landscape would continue to change based on current existing forces and disturbance, or lack thereof. The results for each modeled stand under the No Action alternative are presented in Tables 6-2 and 6-3 below.

Alternative 2 and 2a

There are no differences between Alternatives 2 and 2a regarding the proposed treatments within the LSR-Dry LUA, and therefore, all results presented here as Alternative 2 are applicable to both Alternative 2 and 2a.

In total, there are approximately 291 acres of LSR-Dry LUA that have been identified for selection harvest or commercial thinning under Alternative 2. Within these 291 acres, approximately 252 acres would be treated with commercial thinning treatments, with approximately 39 of the 291 acres either receiving no harvest (29 acres of unharvested skips) or minimal alteration to provide access to logging other areas (10 acres). The current NSO habitat conditions of these LSR-dry stands are listed in Table 6-1.

Under Alternative 2, the proposed action in the LSR LUA would thin non-NR stands to a relative density (RD) of 30 +/- 10 percent and treatment would be deferred (no treatment) for LSR stands that are currently NR habitat. The treatments applied to LSR under Alternative 2 are also designed to modify, but maintain the NSO habitat type of the treated stand such that the stand would still provide the same level of habitat function as it did prior to treatment (e.g. foraging habitat would remain foraging habitat after treatment and would not be downgraded to a lower habitat category). The RD target for each stand is partially based on what minimum value is needed to ensure the habitat is not downgraded or removed. Given the target RD range necessary to maintain the current NSO habitat within each LSR-Dry treatment unit, the likelihood of setting the stand back in the development of NR habitat is low, because moderate canopy cover, canopy layering, higher basal area, and large trees would still be present after treatment. These elements would provide the important structure for the future development of NR habitat function. The results for each modeled stand under Alternative 2 are presented in tables 6-2 and 6-3 below.

<u>Alternative 3</u>

In total, there are approximately 65 acres of LSR-Dry LUA that have been identified for selection harvest or commercial thinning under Alternative 3 of the LCFMP. Within these 65 acres, a maximum of approximately 53 acres would be treated with selection harvest treatments, and approximately 12 of the 65 acres either receiving no harvests (seven acres unharvested as skips) or minimal alteration to provide access to logging other areas (five acres). The current NSO habitat conditions of these LSR-dry stands are listed in Table 6-1.

The prescriptions under Alternative 3 would be similar to Alternative 2 for LSR-Dry LUA stands, including thinning non-NR stands and deferring treatments in LSR stands that are currently NR habitat, but other elements of the prescription, such as only harvesting trees < 20" DBH are also included (see Chapter 2). Similar to Alternative 2, all the treatments proposed as part of Alternative 3 would treat, but only modify the NSO habitat type that was originally present in the treatment stand such that the habitat would remain the same category after treatment. The results for each modeled stand under Alternative 3 are presented in Tables 6-2 and 6-3 below.

### 3.3.1.6.    *Summary of Alternatives*

Table 6-2 is designed to provide a comparison of each Alternative on a unit-by-unit basis of all LSR-Dry units included in this analysis. This table can be used to compare the FVS modeling results for each proposed treatment unit by alternative.

Table 6-2. Unit by Unit FVS Modeling Results by Action Alternative for all LSR-Dry treatments.

| Unit 3-4<br>Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions (Minimum Metrics)** | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| **NO ACTION** | **Current Condition**<br>2025 | 89 | 208 | 40 | 14 | 26 | 144 |
| | **No Treatment**<br>NR conditions met in **2035** | 90 | 224 | 40 | 16 | 26 | 151 |
| **ALT 2** | **Alternative 2**<br>2026 (post treatment) | 76 | 157 | 43 | 17 | 18 | 123 |
| | **Alterative 2**<br>NR conditions met in **2055** | 81 | 188 | 45 | 21 | 23 | 144 |

| ALT 3 | No Treatment Proposed Under Alternative 3<br>This stand would develop in the same manner as the No Action Alternative. | | | | | | |

| Unit 5-2B<br>Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees >20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| ALT | NR Target Conditions (Minimum Metrics) | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| NO ACTION | Current Condition 2025 | 85 | 289 | 22 | 13 | 44 | 92 |
| | No Treatment NR conditions met in 2045 | 85 | 305 | 25 | 15 | 45 | 109 |
| ALT 2 | Alternative 2 2026 | 69 | 187 | 22 | 13 | 28 | 63 |
| | Alterative 2 NR conditions met in 2065 | 70 | 209 | 25 | 16 | 29 | 84 |
| ALT 3 | No Treatment Proposed Under Alternative 3<br>This stand would develop in the same manner as the No Action Alternative. | | | | | | |

| Unit 5-04<br>Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| ALT | NR Target Conditions (Minimum Metrics) | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| NO ACTION | Current Condition 2025 | 83 | 257 | 28 | 10 | 41 | 109 |

| | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| | **No Treatment** NR conditions met in **2065** | 88 | 334 | 30 | 15 | 59 | 211 |
| **ALT 2** | **Alternative 2** 2026 (post treatment) | 63 | 161 | 26 | 10 | 24 | 83 |
| | **Alterative 2** NR conditions met in **2065** | 75 | 222 | 29 | 16 | 36 | 151 |
| **ALT 3** | No Treatment Proposed Under Alternative 3 This stand would develop in the same manner as the No Action Alternative. | | | | | | |

| **Unit 15-8B** Current Habitat = Dispersal / Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions (Minimum Metrics)** | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| **NO ACTION** | **Current Condition** 2025 | 83 | 284 | 20 | 12 | 28 | 13 |
| | **No Treatment** NR conditions met in **2055** | 82 | 340 | 24 | 16 | 57 | 43 |
| **ALT 2** | **Alternative 2** 2026 (post treatment) | 62 | 166 | 18 | 11 | 16 | 7 |
| | **Alterative 2** NR conditions met in **2065** | 69 | 249 | 24 | 16 | 44 | 55 |
| **ALT 3** | No Treatment Proposed Under Alternative 3 This stand would develop in the same manner as the No Action. | | | | | | |

| Unit 15-11<br>Current Habitat =<br>Dispersal / Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions**<br>**(Minimum Metrics)** | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| **NO ACTION** | **Current Condition**<br>2025 | 89 | 323 | 18 | 7 | 32 | 0 |
| | **No Treatment**<br>NR conditions met in **2085** | 86 | 412 | 26 | 16 | 81 | 147 |
| **ALT 2** | **Alternative 2**<br>2026 | 67 | 170 | 16 | 7 | 17 | 0 |
| | **Alterative 2**<br>NR conditions met in **2095** | 77 | 317 | 25 | 16 | 41 | 131 |
| **ALT 3** | No Treatment Proposed Under Alternative 3<br>This stand would develop in the same manner as the No Action Alternative. | | | | | | |

| Unit 25-1A<br>Current Habitat =<br>Dispersal / Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions**<br>**(Minimum Metrics)** | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| **NO ACTION** | **Current Condition**<br>2025 | 83 | 215 | 23 | 18 | 31 | 76 |
| | **No Treatment**<br>NR conditions met in **2025** | 83 | 215 | 23 | 18 | 31 | 76 |

| ALT 2 | Alternative 2 2026 | 70 | 159 | 23 | 17 | 22 | 63 |
| | Alterative 2 NR conditions met in **2045** | 73 | 194 | 28 | 21 | 28 | 103 |
| ALT 3 | No Treatment Proposed Under Alternative 3 This stand would develop in the same manner as the No Action. | | | | | | |

| Unit 25-4A Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| ALT | NR Target Conditions (Minimum Metrics) | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| NO ACTION | Current Condition 2025 | 88 | 272 | 28 | 17 | 34 | 122 |
| | No Treatment NR conditions met in **2025** | 88 | 272 | 28 | 17 | 34 | 122 |
| ALT 2 | Alternative 2 2026 (post treatment) | 71 | 178 | 34 | 15 | 22 | 101 |
| | Alterative 2 NR conditions met in **2035** | 73 | 192 | 35 | 16 | 24 | 112 |
| ALT 3 | Alternative 3 2026 (post treatment) | 66 | 186 | 35 | 17 | 34 | 125 |
| | Alterative 3 NR conditions met in **2026** | 66 | 186 | 35 | 17 | 34 | 125 |

| Unit 25-05 Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| ALT | NR Target Conditions (Minimum Metrics) | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| NO ACTION | Current Condition 2025 | 88 | 326 | 26 | 12 | 37 | 136 |
| NO ACTION | No Treatment NR conditions met in 2045 | 87 | 359 | 28 | 16 | 44 | 158 |
| ALT 2 | Alternative 2 2026 (post treatment) | 57 | 168 | 37 | 15 | 18 | 100 |
| ALT 2 | Alterative 2 NR conditions met in 2045 | 60 | 190 | 38 | 17 | 22 | 114 |
| ALT 3 | Alternative 3 2026 (post treatment) | 59 | 213 | 33 | 27 | 37 | 137 |
| ALT 3 | Alterative 3 NR conditions met in 2045 | 61 | 235 | 35 | 29 | 38 | 165 |
| Unit 31-6A Current Habitat = Dispersal | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
| ALT | NR Target Conditions (Minimum Metrics) | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| NO ACTION | Current Condition 2025 | 85 | 268 | 25 | 15 | 32 | 100 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **No Treatment** NR conditions met in **2025** | 85 | 290 | 25 | 16 | 38 | 120 |
| **ALT 2** | **Alternative 2** 2026 | 72 | 199 | 25 | 13 | 23 | 83 |
| | **Alterative 2** NR conditions met in **2045** | 74 | 231 | 27 | 15 | 31 | 107 |
| **ALT 3** | No Treatment Proposed Under Alternative 3 This stand would develop in the same manner as the No Action. | | | | | | |

| **Unit 33-02** Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions (Minimum Metrics)** | ≥ 60% | ≥180 | ≥ 21" | ≥ 15" | ≥ 12 | ≥ 30 ft² |
| **NO ACTION** | **Current Condition** 2025 | 94 | 274 | 30 | 13 | 34 | 160 |
| | **No Treatment** NR conditions met in **2045** | 94 | 310 | 31 | 16 | 38 | 198 |
| **ALT 2** | **Alternative 2** 2026 | 72 | 164 | 40 | 11 | 18 | 146 |
| | **Alterative 2** NR conditions met in **2045** | 79 | 206 | 43 | 15 | 22 | 176 |
| **ALT 3** | **Alternative 3** 2026 | 74 | 205 | 39 | 12 | 34 | 161 |
| | **Alterative 3** NR conditions met in **2035** | 75 | 217 | 40 | 32 | 34 | 179 |

KSW01690

| Unit 33-03<br><br>Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions**<br><br>**(Minimum Metrics)** | **≥ 60%** | **≥180** | **≥ 21"** | **≥ 15"** | **≥ 12** | **≥ 30 ft²** |
| **NO ACTION** | **Current Condition**<br>2025 | 85 | 273 | 30 | 12 | 33 | 161 |
| | **No Treatment**<br>NR conditions met in **2045** | 86 | 305 | 33 | 15 | 37 | 196 |
| **ALT 2** | **Alternative 2**<br>2026 (post treatment) | 63 | 176 | 39 | 10 | 19 | 126 |
| | **Alterative 2**<br>NR conditions met in **2035** | 68 | 216 | 44 | 15 | 24 | 165 |
| **ALT 3** | No Treatment Proposed Under Alternative 3<br>This stand would develop in the same manner as the No Action. | | | | | | |

| Unit 35-10<br><br>Current Habitat = Foraging | | Canopy Cover (%) | Basal Area (ft²) | Overstory Mean Diameter | Quadratic Mean Diameter | Trees > 20" DBH per Acre | Basal Area Trees ≥ 26" DBH |
|---|---|---|---|---|---|---|---|
| **ALT** | **NR Target Conditions**<br><br>**(Minimum Metrics)** | **≥ 60%** | **≥180** | **≥ 21"** | **≥ 15"** | **≥ 12** | **≥ 30 ft²** |
| **NO ACTION** | **Current Condition**<br>2025 | 86 | 284 | 26 | 9 | 34 | 99 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **No Treatment**<br>NR conditions met in **2065** | 85 | 330 | 29 | 15 | 50 | 154 |
| **ALT 2** | **Alternative 2**<br>2026 | 69 | 191 | 25 | 9 | 23 | 78 |
| | **Alterative 2**<br>NR conditions met in **2085** | 73 | 245 | 29 | 15 | 37 | 132 |
| **ALT 3** | No Treatment Proposed Under Alternative 3<br>This stand would develop in the same manner as the No Action. | | | | | | |

### 3.3.1.7.    *Unit Specific Comparison of Effects by Alternative – Temporal Summary*

In order to assess if the proposed LSR-Dry treatments do not preclude or delay by 20 years or more the development of a treated stand into NR, as compared to development without treatment (USDI BLM 2016b), the BLM compared the length of time (in decades) each modeled stand required to first achieve the minimum habitat values (as shown in Table 6-2 above) of NR habitat under the various Alternatives. Table 6-3 provides a unit-by-unit summary of the length of time it took for each modeled stand to reach NR habitat under each Alternative.

Table 6-3: Summary of the Length of Time Needed and in Which Decade Each LSR-Dry Stand Reached the Minimum Habitat Thresholds for Nesting and Roosting Habitat Conditions by Alternative.

| Treatment Unit | Alternatives | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Alternative 1<br>(No Action) | | Alternative 2 and 2a<br>(RD 25-45%) | | | Alternative 3<br>(RD 40-45%) | | |
| | Year Achieved | Length of Time to NR | Year Achieved | Length of Time to NR | Difference from No Action | Year Achieved | Length of Time to NR | Difference from No Action |
| 3-4 | 2035 | 10 years | 2055 | 30 years | +20 years | No treatment under Alt 3 | | |
| 5-2B | 2045 | 20 years | 2065 | 40 years | +20 years | No treatment under Alt 3 | | |
| 5-4 | 2065 | 40 years | 2065 | 40 years | 0 years | No treatment under Alt 3 | | |
| 15-8B | 2055 | 30 years | 2065 | 40 years | +10 years | No treatment under Alt 3 | | |
| 15-11 | 2085 | 60 years | 2095 | 70 years | +10 years | No treatment under Alt 3 | | |
| 25-1A | 2025 | 0 years[1] | 2045 | 20 years | +20 years | No treatment under Alt 3 | | |
| 25-4A | 2025 | 0 years[1] | 2035 | 10 years | +10 years | 2026 | +1 year[2] | +1 year |
| 25-5 | 2045 | 20 years | 2045 | 20 years | 0 years | 2045 | +20 years | 0 years |
| 31-6A | 2025 | 10 years | 2045 | 20 years | +10 years | No treatment under Alt 3 | | |

| 33-2 | 2045 | 20 years | 2045 | 20 years | 0 years | 2035 | +10 years | -10 years |
| 33-3 | 2045 | 20 years | 2035 | 10 years | -10 years | No treatment under Alt 3 | | |
| 35-10 | 2065 | 40 years | 2085 | 60 years | +20 years | No treatment under Alt 3 | | |

1 = Stand exam data and FVS modeling indicate this stand currently meets minimum metrics for NR habitat, but on-the-ground evaluations found insufficient levels of decadence features needed for NR.
2 = Modeling indicates this stand would have reached the minimum quantitative habitat metrics used for this analysis immediately after treatment.

No Action

Under the No Action Alternative, FVS modeling results indicate that the LSR-Dry stands included under the LCFMP would take from 0-60 years of growth to reach NR habitat conditions without treatment. Two stands, 25-1A and 25-4A, have stand compositions that indicate these stands currently meets the minimum metrics for NR habitat, but on-the-ground evaluations found insufficient levels of decadence features present in the stands to be classified as NR.

Alternative 2 and 2a

Under Alternative 2 and 2a, FVS modeling results indicate that the LSR-Dry stands included under the LCFMP would take from 10-70 years of growth to reach NR habitat conditions after treatment. Four stands (15-8B, 15-11, 25-4A, 31-6A) would require 10 years of growth beyond the decade when the No Action Alternative would reach NR for that stand, and four other stands (3-4, 5-2B, 25-1A, 35-10) would require 20 years of growth beyond the No Action growth rates (Table 6-3). Three stands (5-4, 25-5, 33-2) would reach NR habitat in the same decade as they would when modeled with no treatment (Alternative 1). The modeling results for one stand, 33-3, indicate this stand would reach NR habitat 10 years faster than it would if left untreated, as shown under the no action alternative.

None the treatments proposed under alternative 2 and 2a would preclude or delay by 20 years or more the development of a treated stand into NR, as compared to development without treatment.

Alternative 3

Under Alternative 3, FVS modeling results indicate that the LSR-Dry stands included under the LCFMP Alternative 3 would take from 1-20 years of growth to reach NR habitat conditions after treatment. Only three stands would be commercially thinned under Alternative 3, the remaining stands would not be treated and would develop in the same manner as modeled for the No Action Alternative.

The results from modeling Alternative 3 treatments for unit 25-4A indicate that immediately following the treatment, this stand would have reached the minimum quantitative habitat metrics used for this analysis for NR habitat. However, it is questionable that simply thinning a stand would result in an immediate improvement of habitat quality. In particular, the overstory mean diameter (and quadratic mean diameter) variable of the quantitative stand metrics is problematic because by simply removing the smallest trees from a stand it increases the average diameter of stand in mathematical terms, but no actual tree growth happened, which is the true measure of interest. One stand, 25-5 would reach NR habitat under Alternative 3 at the same decade as it would without treatment (Alternative 1). The modeling results for one stand, 33-3, indicate this stand would reach NR habitat 10 years faster than it would if left untreated.

None the treatments proposed under alternative 3 would preclude or delay by 20 years or more the development of a treated stand into NR, as compared to development without treatment.

3.3.1.8.    *Cumulative Effects*

There are no past, present, or reasonably foreseeable planned actions that would contribute to cumulative effects as they relate to this issue because the potential effects are limited to the boundaries of the proposed LSR-Dry treatment units. There would be no other effects other than those disclosed for Alternatives 2, 2a, and 3.

## 3.4.    Northwestern Pond Turtle (NWPT)

3.4.1.    Issue 7: How would proposed treatments affect the NWPT?

3.4.1.1.    *Background Information*

The northwestern pond turtle (hereafter NWPT, *Actinemys marmorata*) was proposed for listing as a threatened species under the ESA on October 3, 2023 (USFWS 2023, p. 68370) and is currently a bureau sensitive species (see Appendix B). The range of the NWPT includes portions of Washington, Oregon, Nevada, and northern and central California. NWPTs are semi-aquatic; they require aquatic and terrestrial (upland) habitats that are connected to one another or within close proximity (USFWS 2023, p. 68376). Upland habitats are used for both nesting and overwintering.

Nesting habitat is characterized as either bare soil or having sparse vegetation with short grasses and forbs, and requires exposure to direct sunlight (USFWS 2023, p. 68376; ODFW 2015, p. 21). Although most nesting occurs within 325 ft (99 m) of occupied aquatic habitats, the majority of nests occur within 164 ft (50 m) (ODFW 2015, p. 21).

Reese and Welsh (1997) found that along the Trinity River in California, overwintering habitat typically occurs above the high-water elevation of aquatic habitat, with a mean of 666 ft (203 m) and up to 1,640 ft (500 m) from aquatic habitat. Zaragoza et al. (2015) found in the Sierra foothills in California that approximately 623 ft (190 m) of intact core terrestrial habitat would encompass the vast majority (95 percent) of the turtles' terrestrial habitat. Therefore, the terrestrial habitat needs of populations of NWPTs depend on both the aquatic and terrestrial conditions at the site (Zaragoza et al. 2015, p. 440). ODFW (2015) recommends buffering wetlands and waterbodies capable of supporting NWPT, or to utilize seasonal "no-entry" restrictions to minimize human-related disturbances in key turtle habitats (i.e., nesting, overwintering) when buffering is not feasible. While vegetation differs from site to site, open areas are typically avoided for overwintering, and leaf litter is present at most sites (Davis 1998, p. 19; Reese and Welsh Jr. 1997, pp. 355–356). The dispersal of NWPTs between populations is not well understood. However, genetic research suggests that most dispersal activity occurs within drainages or watersheds (Spinks and Shaffer 2005, p. 2057). Observed dispersal distances for the NWPT ranges from approximately 1.6 miles to 4.3 miles within aquatic habitat, with overland dispersal distances being slightly less (approximately three miles) under optimal conditions (Holland 1994, pp. 2–9, 7–28; Purcell et al. 2017, pp. 21, 24; Rosenberg et al. 2009, p. 21).

Adult NWPTs move to overwintering habitats (aquatic or upland) in autumn and hibernate through the winter (November-February) (ODFW 2015, p. 15). Davis (1998) found that most movement to terrestrial overwintering sites coincided with the onset of the first big storms of the season, in late November and early December; however, five of 30 turtles moved upland as early as September. NWPTs then emerge in the spring (March-April) to forage, migrate to aquatic habitats, and engage in courtship and mating activities (ODFW 2015, p. 15). Mature turtles lay their eggs in the summer, typically between May and July (Bury et al. 2012; Holland 1994; Rosenburg et al. 2009). Eggs hatch in autumn, and most hatchlings overwinter in their nests until the following spring (ODFW 2015, p. 15).

The USFWS identified the following as threats acting on individuals and populations to varying degrees across their respective ranges: habitat loss and fragmentation (e.g., latent impacts from past habitat impacts), altered hydrology, predation, competition, road impacts, collection, contaminants, disease, and

the effects of climate change (including increasing temperatures, severe drought, extreme flood events, and high severity wildfire) (USFWS 2023, p. 68377). The USFWS identified three key factors as most influential in driving the NWPTs current and future condition: anthropogenic impacts, predation by bullfrogs, and drought (USFWS 2023, p. 68377). According to modeling efforts and other status assessments, the NWPT populations in Oregon and northern California are less likely to be subject to the extensive habitat losses and still have numerous well distributed and well-connected populations (USFWS 2023, Appendix A; Gregory and McGowan 2023, entire; Thomson et al. 2016, p. 301). The USFWS state that populations of NWPT in Oregon are likely to withstand stochastic and catastrophic events, maintain ecological flexibility, and are likely to be able to adapt to changing environmental conditions and thereby still have a sufficient degree of resiliency, redundancy, and representation to sustain populations in the near term (USFWS 2023, p. 68389). According to modeling completed by the USFWS, the NWPT is likely to maintain populations throughout its range in the next 50 to 75 years in Oregon, Nevada, and California (USFWS 2023, p. 68391). However, during this time, the species is likely to lose adaptability to environmental conditions, have reduced reproduction, and have a low likelihood of responding to catastrophic events. The USFWS concluded that the species will be limited in their ability to maintain populations in the wild in the next 50 to 75 years; therefore, the NWPT is likely to become in danger of extinction within the foreseeable future throughout all of its range (USFWS 2023, p. 68391). If the NWPT is listed under ESA, BLM will apply the PDFs described below to LCFMP. If the NWPT is not listed under ESA, BLM would continue to manage NWPT habitat under bureau sensitive species guidelines (see Appendix C: PDFs).

3.4.1.2.        *Analytical Methods and Assumptions*

The Analysis Area for effects to NWPT includes all federal lands within the 32,272 acres of LCFMP. A habitat model for the NWPT was developed by the Institute for Natural Resources, Oregon State University for the USFS and was distributed to the BLM. This model overlaps the entire Analysis Area and displays the suitability of aquatic features for use by the NWPT. Features that were categorized as high and very high probability of habitat suitability (referred to as aquatic habitat hereafter) were included for analysis. To further hone in on aquatic habitat and to reduce small slivers across the landscape that are unlikely to be used by NWPT, any polygons that were under 0.1 acre were removed. After conducting field evaluations at seven locations of aquatic habitat (according to the model), only three were found to be suitable for NWPT. The other four were found to be unsuitable because they were either not aquatic features (upland forest) or swift flowing water with a closed canopy and no solar exposure. These four features were removed from the aquatic habitat baseline used for analysis. The BLM recognizes the model is imperfect and may overestimate habitat; however, this is currently the best available tool to identify and quantify NWPT aquatic habitat at a larger landscape scale. An additional six ponds that were identified by the hydrologist—which were not present in the waterbody GIS layer and may have been missed by the model—were also included as potential aquatic habitat. Databases were reviewed and known detections of NWPT (13 in total) were included to aid in habitat determinations. Additionally, LiDAR and satellite imagery were utilized to assist in classifying aquatic habitat.

Potential nesting habitat was identified, based on the literature (see 3.4.2. Background Information), using a buffer of 656 ft (200 m) from aquatic habitat. LiDAR and satellite imagery were used to determine suitability. Nesting habitat was not identified in proposed treatments.

To identify all potential NWPT overwintering habitat, a buffer of 1,640 ft (500 m) (see Background Information) from aquatic habitat was selected. To prevent overestimating NWPT overwintering habitat, the Medford NSO Habitat GIS layer was identified as the best cross-reference at this time (see Appendix B). Within the 1,640 ft buffer, NSO NRF and dispersal habitats were identified as suitable for overwintering due to the presence of canopy cover and leaf litter, while forest capable and non-habitat acres were not included because these features are less likely to be present. VRH treatments, group selections, quarries, and new road construction are estimated to be a loss of overwintering habitat because

KSW01695

there would be a loss of canopy cover. Although some of these gaps may be small enough to not meaningfully remove NWPT overwintering habitat, the BLM decided to analyze for maximum impact. When describing impacts, Zone 1 represents overwintering habitat within 656 ft of aquatic habitat and Zone 2 represents overwintering habitat between 656 ft and 1,640 ft of aquatic habitat.

There are two projects that have been recently implemented—Poor Windy (USDI BLM 2022) and Upper Cow (USDI BLM 2021) within the Analysis Area. To prevent overestimating NWPT habitat, acres that were harvested through these projects were not included in the available habitat. Within the Analysis Area, 942 acres from Poor Windy and 25 acres from Upper Cow were not included in the total overwintering habitat.

Lastly, for the purposes of this analysis, short-term impacts represent 0-10 years after implementation and long-term impacts represent >10 years after implementation.

### 3.4.1.3.    *Affected Environment*

There are approximately 274 acres of NWPT aquatic habitat across all ownerships and 66 acres of those are on federal lands within the Analysis Area. At this time, there is no model that estimates nesting habitat at a landscape scale. However, on federal lands, there are 38 non-forest acres (based on NSO non-habitat) within Zone 1 that may serve as nesting habitat. Additionally, within the Analysis Area on federal lands, there are 1,603 acres of overwintering habitat within Zone 1 (including aquatic habitat adjacent to the Analysis Area) and 4,069 acres of overwintering habitat within Zone 2, for a total of 5,672 acres of overwintering habitat.

### 3.4.1.4.    *Environmental Consequences*

### 3.4.1.5.    *No Action*

With the no action alternative, the NWPT populations in the Analysis Area would likely maintain resiliency in the short-term (USFWS 2023, p. 68389). However, in the long-term, the NWPT populations may decline due to the threats from human activities and habitat loss (non-federal lands), increased predation from non-native bullfrogs, and increased impacts from the effects of climate change (mainly drought) (USFWS 2023, p. 68391).

### 3.4.1.6.    *Alternative 2*

Based on BLM databases, since the 1990's there have been 13 detections of NWPT within the Analysis Area. None of these observations were within proposed units for this alternative. Treatments would not occur within aquatic habitat. If culverts need to be replaced in aquatic habitat, they would be interchanged with culverts that allow for turtle passage (see Appendix C: PDFs).

To prevent direct harm to young turtles and nesting adults, if nesting habitat is identified (based on ground discovery), treatments would be deferred, modified (reduction in intensity), and/or seasonally restricted (see Appendix C: PDFs). To reduce direct harm to adult NWPTs in upland habitat, seasonal restrictions would be implemented in Zone 1 for new road construction, quarry blasting, timber treatments, and cutting and piling for fuels treatments. For broadcast burning, only a third of a treatment area would be implemented annually within Zone 1.

Effects to Aquatic Habitat: There are no anticipated effects to NWPT aquatic habitat. Proposed new stream crossings are not in NWPT aquatic habitat.

Effects to Nesting Habitat: Based on LiDAR and satellite imagery review, there is no nesting habitat within the proposed units or new road construction. Therefore, there are no anticipated effects to nesting habitat.

KSW01696

Effects to Overwintering Habitat: The literature lacks discussion on how timber harvest and fuels treatments affect NWPTs. The BLM anticipates commercial thinning, selection harvest, harvest activity fuels reduction, and HFR would modify, but maintain overwintering habitat because important features—such as canopy cover—would be retained. However, VRH treatments, group selections, quarries, and new road construction are estimated to be a loss of overwintering habitat because there would be a loss of canopy cover. Although some of these gaps may be small enough to not meaningfully remove NWPT overwintering habitat, the BLM decided to analyze for maximum impact. Furthermore, based on the literature (see 3.4.2. Background Information), it is expected that the loss of overwintering habitat within Zone 1 would impact the majority of NWPTs; however, the loss of overwintering habitat within Zone 2 may impact some individuals. Therefore, effects within Zone 1 and 2 are discussed within this analysis.

Approximately 408 acres of overwintering habitat within Zone 1 and 987 acres of overwintering habitat within Zone 2 would be modified but maintained due to HFR. This estimate includes 528 acres of overlap with timber units. Therefore, approximately 1,395 acres (25 percent) of 5,672 acres overwintering habitat would be modified from HFR within the Analysis Area. In contrast, timber treatments (including harvest activity fuels reduction) would modify 1,515 acres of overwintering habitat (including overlap with HFR) (Table 7.1). Between HFR and timber treatments, approximately 2,382 acres (42 percent) of overwintering habitat would be modified within the Analysis Area.

At this time, it is unknown where gaps would be placed throughout LCFMP. Placement of gaps and landings would avoid Zone 1, where operationally feasible (see Appendix C: PDFs). As the majority of NWPTs overwinter within this distance, effects would be significantly reduced. The BLM included gaps within Zones 1 and 2 for analysis to account for maximum impact, while realizing implementation and the resulting impacts to NWPTs would likely be less. Based on the prescriptions under Alternative 2, it is estimated there would be a loss of 173 acres of overwintering habitat within Zone 1 and 563 acres within Zone 2 (Table 7.1). This estimate includes 43 acres of new road construction necessary for timber harvest and nine acres from quarries. In total, 736 acres (13 percent) of overwintering habitat may be removed throughout the Analysis Area. Comparable to the other alternatives, the short- and long- term effects to NWPT would be the same.

Table 7.1: Comparison of Alternatives—Effects to NWPT Overwintering Habitat from Timber Harvest[30]

| Alternative9F | Acres Modified | | Acres Removed | |
| --- | --- | --- | --- | --- |
| | Zone 1 | Zone 2 | Zone 1 | Zone 2 |
| 2 | 450 | 1,065 | 173 | 563 |
| 2a | 512 | 1,274 | 111 | 354 |
| 3 | 74 | 125 | 13 | 39 |

### 3.4.1.7.    *Alternative 2a*

Effects to the NWPT and NWPT habitat are the same as Alternative 2 (see above) except:

Effects to Overwintering Habitat: Effects to overwintering habitat due to HFR are the same as Alternative 2. However, timber treatments would modify 1,786 acres of potential overwintering habitat (including overlap with HFR). Between HFR and timber treatments, approximately 2,653 acres (47 percent) of overwintering habitat would be modified within the Analysis Area.

---

[30] Including associated activities. This is the maximum estimated. If treatments are not applied to this maximum for timber harvest, remaining acres would be modified instead through HFR treatments.

KSW01697

Similar to Alternative 2, placement of gaps and landings would avoid Zone 1, where operationally feasible (see Appendix C: PDFs). Based on the prescriptions under Alternative 2a, it is estimated there would be a loss of 111 acres of overwintering habitat within Zone 1 and 354 acres within Zone 2 (Table 7.1). This estimate includes 43 acres of new road construction necessary for timber harvest and nine acres from quarries. In total, 465 acres (eight percent) of 5,672 acres of NWPT overwintering habitat may be removed throughout the Analysis Area. Comparable to the other alternatives, the short- and long- term effects to NWPT would be the same.

### 3.4.1.8.    *Alternative 3*

Effects to the NWPT are the same as in Alternative 2 (see above) except:

Effects to Overwintering Habitat: Approximately 806 acres of overwintering habitat within Zone 1 and 2,141 acres of overwintering habitat within Zone 2 would be modified but maintained due to HFR. This estimate includes 80 acres of overlap with timber units. Therefore, approximately 2,947 acres (52 percent) of 5,672 acres overwintering habitat would be modified from HFR within the Analysis Area. In contrast, timber treatments would modify 199 acres of overwintering habitat (including overlap with HFR). Between HFR and timber treatments, approximately 3,066 acres (54 percent) of overwintering habitat would be modified within the Analysis Area.

Similar to Alternative 2, placement of gaps and landings would avoid Zone 1, where operationally feasible (see Appendix C: PDFs). Based on the prescriptions under Alternative 3, it is estimated there would be a loss of 13 acres of overwintering habitat within Zone 1 and 39 acres within Zone 2 (Table 3-17). This estimate includes four acres of habitat loss from quarries. In total, 52 acres (less than one percent) of overwintering habitat may be removed on federal lands throughout the Analysis Area. Comparable to the other alternatives, the short- and long- term effects to NWPT would be the same.

### 3.4.1.9.    *Cumulative Effects*

Impacts from past projects were removed from baseline considerations because they are assumed to no longer be habitat. Additionally, in 2018, the Grave Creek fire of the Garner Complex wildfire burned through the southeast portion of the Analysis Area. The BLM updates the NSO habitat GIS layer after each fire, so these changes were incorporated into analysis. Furthermore, the satellite imagery that was used to help with habitat determinations is updated annually. At this time, there are no BLM proposed future projects that overlap with the Analysis Area and non-federal lands were excluded from analysis; therefore, all cumulative effects have been accounted for within the analysis of alternatives above.

## 3.5.    Hydrology and Water Quality

3.5.1.    Issue 8: How would the proposed treatments affect sediment production, delivery and transport beyond the historical, existing, and baseline conditions and would predicted sedimentation rates have the potential to reduce the quality of aquatic habitats downstream and/or exceed water quality standards?

### 3.5.1.1.    *Geographic Scope and Scale*

The physical geology of LCFMP is in the Klamath lithologic province which accounts for high sediment yields relative to land area. The accreted and uplifted Klamath terrane is an exceptional source of gravel bed material for the Rogue and Umpqua River systems contributing about four times the bed material per unit area relative to the other major lithologic provinces (O'Connor et al., 2014).

Sedimentation has been identified as a problem for streams in the LCFMP, and roads have been identified as a source of fine sediment (USDI BLM, 1999a p. 12, USDI BLM, 1999b p. 21, and USDI BLM, 2005 p.35). An especially important factor in determining sediment production is the proximity of roads to streams (USDI BLM, 1999a p. 12).

KSW01698

The LCFMP has a climate characterized by moderate temperatures, wet winters, and dry summers. On average, eighty percent of the precipitation occurs between October and May (USDI BLM, 1999a, USDI BLM, 1999b and USDI BLM, 2005). Rain dominates precipitation in the lower elevations below 2,500 ft (77% of the Last Chance PA) while winter precipitation in the higher elevations occurs as snow at elevation greater than 5,000 ft (< 1%). Shallow snow-packs often build-up in the transition snow zones in elevations between 2,500 ft and 5,000 ft (22%), where snow can be melted by rain and warm winds throughout the winter (Jefferson, 2011).

The pre-European settlement period (pre 1850s) is characterized by wood-maintained stream features, periodic disturbance from wildfires, intentional seasonal fires lit by native Americans, widespread beaver dams and nutrient cycling from salmon, Pacific lamprey, and steelhead trout migration (USDI BLM, 1999a p. 140).

The post-European or the settlement period (1850-1920) is characterized by trapping and removing beaver colonies, timber harvest, and mineral extraction, removing wood from streams, rafting logs in streams, straightened channels, and increased erosion from hydro and placer mining, logging, and clearing land in floodplains for agriculture (USDI BLM, 1999a p. 143). In many of the LCFMP stream beds cobble and gravel was removed by placer mining or was eroded down to bedrock (USDI BLM, 1999a). The Middle Cow Creek WA found placer mining extensively disturbed riparian and aquatic habitats on Whitehorse, Starveout, Quines, Bull Run, Tennessee Gulch, Dads and Skull Creeks, sometimes relocating a stream channel from one side of a valley bottom to the other (USDI BLM, 1999b p. 31). Placer mining involves washing stream gravels for gold from the stream channel or floodplain.

Typical landscape features in the LCFMP resulting from historic placer mining are processing ponds, cobble and boulder dikes, entrenched straightened stream channels, and loss of flood plain or stream braids. Historic hydro-mining resulted in abandoned roads, stream diversions, ditch systems and storage ponds that were used to produce pressurized water used to "excavate" hillsides and alluvial deposits to produce fine sediment and gravel which was processed for gold. These historic mining features can periodically result in chronic sediment sources and still alter natural hydrologic processes in LCFMP watersheds (USDI BLM, 1999b p. 21).

The development period (1920 to the present) can be characterized by road building, select harvest, industrial forest management, dam and reservoir construction, active forest management, timber harvest, reforestation, wildfires, and the development of public land management. Road building and logging can result in chronic sediment sources such as destabilized slopes (e.g. old roadbeds and skid trails), extension of the surface drainage network to include road ditches, compaction, surface disturbance and other sediment generating actions (USDI BLM, 1999b, USDI BLM, 1999b and USDI BLM, 2005).

Natural disturbances include fires, beavers, and intense storms, among others can change groundwater and surface features resulting or contributing to unstable soils or mass wasting. Mass wasting is often a natural processes and landslides have beneficial effects on streams by providing gravels and large wood to stream channels (USDI BLM, 2005 p. 35). Historic and current activities in the LCFMP on BLM-administered land and other land ownership are considered part of the background conditions even when these activities cause changes in streamflow, accelerated erosion, and/or water quality. Combining these natural and background conditions gives a baseline to evaluate impacts to sedimentation for the LCFMP.

The LCFMP comprises 56,843 acres; 57% of which is managed by the BLM, 40% is private, 1% is Oregon State lands, and 2% is County lands. See Table 1-1. The LCFMP includes commercial timber harvest and non-commercial HFR treatments in the South Umpqua and Lower Rogue Sub-basins. For a complete description of proposed activities by alternative see chapters 1 and 2. The LCFMP proposes these forest management activities in the Middle Cow Creek, Upper Cow Creek, and Grave Creek watersheds. Cow Creek and Grave Creek are major tributaries to the Umpqua and Rogue Rivers, respectively (Table 8.1). Grave Creek, Middle Cow Creek, and Upper Cow Creek Middle and Upper Cow drain into the South Umpqua and Grave Creek is tributary to the Rogue River.

Table 8.1: Hydrologic Unit Code (HUC) Watersheds (5th level) and Sub-watersheds (6th level) with portions of the LCFMP.

| Watershed (5th level)<br>HUC 10-digit | Sub-watershed (6th level)<br>HUC 12-digit |
|---|---|
| Grave Creek (104,494 acres)<br>HUC# 1710031003 | Last Chance – Grave Creek (19,901 acres)<br>HUC# 171003100301 |
| | Shanks Creek – Grave Creek (12,813 acres)<br>HUC# 171003100302 |
| | Wolf Creek – Grave Creek (28,356 acres)<br>HUC# 171003100304 |
| Middle Cow Creek (113,079 acres)<br>HUC# 1710030207 | Whitehorse Creek – Cow Creek (21,949 acres)<br>HUC# 171003020701 |
| | Quines Creek – Cow Creek (18,331 acres)<br>HUC# 171003020702 |
| | Fortune Branch – Cow Creek (13,776 acres)<br>HUC# 171003020703 |
| Upper Cow Creek (47,470 acres)<br>HUC# 1710030206 | McGinnis Creek – Cow Creek (15,125 acres)<br>HUC# 171003020603 |
| **Total: 265,043 acres** | **Total: 130,251 acres** |

**Grave Creek (56% of LCFMP):** Elevations in the Grave Creek Watershed range from 690 feet to 5,265 feet at King Mountain. Annual precipitation ranges are 45-60 inches (USDI BLM, 1999a). The towns of Wolf Creek and Sunny Valley are the major communities in the watershed. There are residential areas located along Grave Creek, Coyote Creek, and Wolf Creek. Grave Creek has a history of placer gold mining, which is still ongoing (USDI BLM, 1999a).

**Middle Cow Creek (42% of the LCFMP):** This watershed includes 29 stream miles of Cow Creek from Galesville Dam to the confluence with Middle Creek. The elevation ranges between 1,029 and 5,103 feet above sea level. Annual precipitation Ranges are 36-70 inches (USDI BLM, 1999b). The City of Glendale is the only incorporated city. Other population centers are the unincorporated communities of Azalea and Quines Creek. There is a small amount of agricultural, residential, and industrial land, and is limited to the lower elevation valleys around Cow Creek. Cow Creek's riparian zone is comprised of thin strips of hardwoods, whereas many of the tributary streams are primarily conifer (USDI BLM, 1999b).

The dam for Galesville Reservoir regulates water for downstream irrigation, industrial uses, municipal uses (maintaining streamflow for fish and other aquatic life) and providing flood control. As a result of flow regulation, Cow Creek stream flows are lower during the winter and higher during the summer than unregulated flow conditions. Galesville Reservoir does not have sluiceways to move sediment below the dam, therefore all bedload sediment generated above the dam is deposited in the reservoir (USDI BLM, 1999b p.24).

**Upper Cow Creek (2% of the LCFMP):** This watershed includes 26 stream miles of Cow Creek from the headwaters of Cow Creek to Galesville Reservoir. The elevation ranges between 1,880 feet at Galesville Reservoir and 5,104 at Cedar Spring Mountain. Annual precipitation Ranges are 42-60 inches (USDI BLM, 2005). The Upper Cow Creek watershed is located within the Klamath Geomorphic Province and is characterized by deeply weathered and eroded sandstone. This watershed has some soils derived from granitic rock and are prone to extreme erosion if disturbed (USDI BLM, 2005 p.21).

This analysis makes use of Geographical Information System (GIS) to quantify values for past disturbance and estimate the potential for future disturbance. The geographic scale to determine changes to water yield, potential enhancement of peak flows, estimates for road density, roaded areas for proposed

KSW01700

haul routes on aggregate roads, road and landing construction and renovation, and other surface disturbances are calculated for the 10-digit (5th level) watersheds and 12-digit sub-watersheds within the LCFMP, depending on the parameter (Table 8.1 and Table 8.5).

### 3.5.1.2.    *Analysis Methodology*

This analysis makes use of Geographical Information System (GIS) to quantify values for past disturbance and estimate the potential for future disturbance. The geographic scale to determine changes to water yield, potential enhancement of peak flows, estimates for road density, roaded areas for proposed haul routes on aggregate roads, road and landing construction and renovation, and other surface disturbances are calculated for the 10-digit (5th level) watersheds and 12-digit sub-watersheds within the LCFMP, depending on the parameter (Table 8.1 and Table 8.5).

Watershed analysis metrics were used to evaluate potential production, delivery and transportation of sediment as a result of LCFMP activities by alternative. Equivalent Clearcut Area (ECA) and changes in roaded area are good ways to quantify vegetation disturbances. Identifying and evaluating areas with unstable soils, landslides and mass wasting account for other sources of sediment production. Road density and evaluating roads in the sediment delivery zone (200 ft of streams) are good metrics for considering sediment delivery. The potential for enhanced peak flows using the ECA and road density can be used for considering sediment transport.

This analysis determines if predicted increases in annual sediment yield, the potential for enhanced peak flow conditions, or increases in mass wasting are beyond the background conditions and natural variation. For this analysis, predicted increases in sedimentation beyond 1% from what can be expected from natural and background conditions in the LCFMP is the baseline. This is the same method used in in the FEIS but accounts for project activities and local conditions. The FEIS found increases in fine sediment less than 1% beyond background levels would not result in measurable or meaningful effects to fish or their habitats (USDI BLM 2016a p. 297). Therefore, it is expected that increases of fine sediment below 1% would result in small accumulations of fine sediment in pools and gravel substrates downstream of proposed activities used for spawning, but this sediment would be flushed during annual high flows (USDI BLM 2016a p.298).

The ECA acreage for Grave, Middle Cow, and Upper Cow ECA, by alternative was added to the baseline condition to evaluate impacts. ECA is the proportion of a watershed that responds hydrologically as a tree-less opening (less than 30 percent canopy) and is a good metric to look at hydrologic response (Winkler & Boon, 2017). For this analysis, an ocular estimate was based on the 2020 National Agriculture Imagery Program (NAIP). For LCFMP commercial harvest areas, this was considered by estimating the acres of VRH and of group selection openings (between one and four acres) by alternative. The maximum opening of 4-acres was used in ECA calculations. In this way the hydrologic response was estimated and compared by alternative (See Table 8.2). No 4-acre group select areas would occur in other LUAs such as RR and LSR (See Table 8.7).

Table 8.2: Potential Acres of ECA Assumed for Alternative 2 and 2a ECA Calculations

| Land Use Allocations | Acres of LUA within LCFMP | Potential ECA Alt. 2 | Potential ECA Alt. 2a | Percentage ECA by LUA | Grave ECA30F[31] (acres) | Middle Cow ECA (acres) | Upper Cow ECA (acres) |
|---|---|---|---|---|---|---|---|
| HLB-MITA | 146 | 57 | 6 | 39% | 337 | 0 | 0 |

---

[31] This the acres of the LUA per watershed proposed for commercial thinning multiplied by the percentage ECA by LUA.

KSW01701

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HLB-LITA | 1,895 | 729 | 91 | 39% | 22 | 28 | 0 |
| HLB-UTA | 14,787 | 1,103 | 1,103 | 7% | 208 | 141 | 22 |
| **Total Acres** | **16,828** | **1,908** | **1,200** | **11%** | **567** | **169** | **22** |

**Roaded Area and Road Density:** Roaded area is the vegetation and surface disturbance associated with roads and this is assumed to be an average of 45 feet in width. Road density is the miles of road per square mile of area (Table 8.5).

**Potential for Enhanced Peak Flows:** The largest volume of sediment delivery and transport in streams occurs with peak storm events, typically in the winter and spring. Elevated precipitation and surface runoff lead to enhanced peak flows and a reduction in water storage in the uplands. Also, increased precipitation increases the drainage network to intermittent stream systems and accelerated hillslope erosion process. These factors can interact to cause indirect changes in channel morphology by altering the streamflow timing, volume and sediment loads (Furniss, Roelofs, & Yee, 1991).

**Temporal Scale:** The temporal scale for looking at potential short-term direct and indirect impacts is 1-3 years; sustained impacts are ones that still exist after 3 years and long-term impacts are those that would persist beyond 50 years. The long-term temporal scale (50+ years) is the time needed for full vegetation recovery and amelioration of potential sediment production and delivery.

### 3.5.1.3.    *Assumptions*

Analysis methods to determine sediment production, delivery and transportation beyond the historical, existing, and baseline conditions were determined by measurement indicators (metrics) selected and identified based on the following assumptions:

- The implementation of Best Management Practices (BMPs) listed in Appendix C and Project Design Features (PDFs) would reduce erosion, sedimentation and protect riparian areas (USDI BLM, 2016b).

- Yarding corridors, skid trails, road construction, stream crossings, and road maintenance and improvement in the RR would only occur where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives.

- Landings would be constructed in existing disturbance such as roads and pull-outs. For analysis, cable and ground-based landings are estimated on average as 1/4 acre and helicopter landings as 1 acre. Project related areas of disturbances for new haul routes were estimated based on a 45-ft width (Roaded Area).

- The haul routes for commercial timber extraction would use the existing road network when possible. Haul routes would receive typical road renovation maintenance, which includes vegetation clearing in the road prism, repairing, or replacing drainage features and reshaping and resurfacing roads. Renovation includes removing brush in ditches and for site distances, removing trees within the road prism (within 15ft of the travel surface), repairing drainage features, adding aggregate (gravel), cleaning culverts and ditches, and improving travel surfaces by blading and/or adding aggregate to bring roads up to haul standards.

- Wet weather haul would occur during the wet season (Oct. 15 – May 15) only when road renovation has occurred, BLM has evaluated the condition of the road and found it suitable, and a waiver has been asked for and granted. Waivers would be revoked when wet conditions exist, resource impacts are observed by the Sale Administrator and would not be reinstated until the road network dries out and conditions for hauling improve (See Appendix C).

- Culverts would be replaced before hauling during road renovation activities if they are failing and beyond load requirements for hauling timber. Any culvert replacements that are done in fish-bearing streams would require an Aquatic Organism Passage (AOP) design and would also require the passage of a 100-year storm event with debris (USDI BLM, 2016b, p. 92).

- The mean response lines for ECA in precipitation zones are a good predictor of enhanced peak flow (Grant et al., 2008). Peak flow enhancement from harvested areas has a detection limit or mean response defined by for rain dominated areas as 29% and 15% for Transient Snow Zones (TSZ). This detection limit is not to say that forest harvest has no effect below these threshold events, just that they would be undetectable and small (Grant et al., 2008 p. 45).

- Cumulative impacts are looked at based on HUC 10 Watersheds (5th level) of which there are three that have portions in the LCFMP: Middle Cow Creek, Upper Cow Creek, and Grave Creek. The temporal scale for looking at cumulative impacts would be when full vegetation recovery would occur (50+ years) depending on the parameter. Analysis at the 5th level watershed scale is large enough to assess the cumulative effect of actions.

- Actions on non-BLM lands will be consistent with the Oregon Forest Practices Act, and all state, federal, and local laws. Land management on non-federal lands in the Analysis Areas will continue to follow current trends for timber harvest and other disturbance.

- Climate and other factors at the watershed scale can obscure cause and effect relationships for streamflow and sediment. A study of 20 large watersheds found statistically significant changes in climate could obscure streamflow, nutrients, and total suspended solids loads in as much as 30-40% of study watersheds (Johnson, et al., 2015).  Climate changes are expected to increased variability in the hydrologic parameters measured and less predictive abilities.

- Land management has resulted in extensive road networks typically paved for local access and gravel roads to access timber resources in strategic locations. This same road network is currently used for access to private forest lands and to manage public lands alike. Much of the forest road infrastructure in the LCFMP was developed in 1960-1980s, and some of the infrastructure is beyond its original design life (USDI BLM 1999a, USDI BLM 1999b, USDI BLM 2005).

- Sediment typically transports in pulses and can be stored anywhere along stream systems in banks and depositional areas and may be stabilized in place by vegetation, therefore is considered over the long-term.

### 3.5.1.4.    *Affected Environment*

The affected environment for LCFMP is defined by watershed characteristics shaped by the historical periods and activities described above. Most locations in LCFMP show evidence of the loss of beaver (eroded straightened stream channels down to bedrock), remnant ditch systems, cobble dikes, reservoirs and ponds, past skid trails and road systems for timber harvesting in the uplands, and roads in floodplains alongside straightened stream channels.

**Unstable Slopes, Landslides and Mass Wasting:** Sediment may come from landslides in the harvest land base and increases in chronic fine sediment from timber harvest activities including both hillslope ground-based or yarding activities, skid trails and landings as well as temporary and permanent roads used for hauling.  The FEIS found that less than 1 percent of the harvest land base would be susceptible to landslides (USDI BLM, 2016a, p. 394-400).  A 25-year assessment of forested watersheds in the Pacific Northwest found a reduction in landslide risk for key watersheds with the greatest reduction in the LSRs attributed to a reduction in road density overall (USDA-PNRS, 2023, p. 55).

KSW01703

**Current Stream Sediment in LCFMP:** The Aquatic and Riparian Effectiveness Monitoring Program (AREMP) was established under the Northwest Forest Plan (NWFP) to track the status and trends in stream and watershed conditions on federal lands across the NWFP area. Stream conditions were assessed by AREMP with instream data (e.g. substrate, wetted width, macroinvertebrates, eDNA) collected from multiple sites within 219 randomly selected watersheds with greater than 25 percent federal ownership in repeating 8-year rotations beginning in 2002 use (USDA-PNRS, 2023).

AREMP recently released a 25-year assessment of the NWFP looking at trends in watershed condition. This report described fine sediment conditions as measured in transect-based data in pools and pool-tail crests. AREMP found that sediments decreased overall in stream data collected from multiple forested watersheds with greater than 25 % federal ownership between 1994-2018 (USDA-PNRS, 2023, p. 55-56).

Improvements in fine sediment conditions over the last 25 years identified in the report were attributed to better road management including reductions in road density, better surfacing, reducing landslides, and reductions in peak flows. These results suggest both active (e.g., road modifications) and passive (e.g., forest management) measures have contributed individually and in combination to reduce fine sediment input to streams and specifically in BLM's Medford District (USDA-PNRS, 2023, p. 64 and 158).

The FEIS, Table 3-66, p. 403 assumed there is currently 1,738 miles of natural surface roads within 200 feet of streams on BLM administered land in 22 million acres within the geographic boundary defined for the western Oregon planning area for the FEIS. The FEIS estimated 36 % of all existing BLM roads are within 200-foot delivery distance from streams (5,096 out of 14,330 miles, 36%) (USDI BLM, 2016a, p. 402). Currently on BLM administered land within the LCFMP there is 132 miles of roads within 200 feet of streams. Based on the FEIS modeling methods, existing sediment yields from the LCFMP are 1,750 tons/year of sediment.

**Current Peak Flow Enhancement:** Peak flows can be analyzed regarding elevation breaks between the rain, transient snow, and the seasonal snow zones. For southern Oregon, these elevation breaks are 2,500 feet, 5,000 feet, and >5,000 feet, respectively (Jefferson, 2011). Seventy-seven percent of LCFMP is in the Rain Dominated Hydro-region (Table 8.2).

Table 8.3: Rain, Transient Snow, and Seasonal Snow Zones in LCFMP by Watershed.

| Analysis Areas including 5th-level Watersheds (HUC 10) | Analysis Area (acres) | Rainfall Dominated Acres (%) | Transient Snow Acres (%) | Snowfall Dominated Acres (%) |
|---|---|---|---|---|
| LCFMP | 56,843 | 43,964 (77%) | 12,654 (22%) | 225 (1%) |
| Upper Cow Creek* | 1,227 | 386 (32%) | 838 (68%) | 2.2 (<1%) |
| Middle Cow Creek* | 23,658 | 20,337 (86%) | 3,277 (14%) | 44 (<1%) |
| Grave Creek* | 31,959 | 23,241 (73%) | 8,539 (27%) | 179 (<1%) |
| *Portion of Watershed in the LCFMP | | | | |

Current ECA for the LCFMP is shown in Table 8.4. The lowest threshold is for transient snow zones and ECA would need to be 29% of the total area within this zone. The highest percent is for Middle Cow Creek, the project would need to have a percent change of 13% to change the potential for enhancing peak flows (Grant et al., 2008).

Table 8.4: Current ECA for the LCFMP for the Transient Snow Zone (TSZ).

| Analysis Area Name | Analysis Area (acres) | Current ECA (acres) | Percent ECA | Transient Snow (acres) | ECA in TSZ | Percent ECA in TSZ |
|---|---|---|---|---|---|---|
| LCFMP | 265,249 | 35,543 | 13% | 12,654 | 1,629 | 13% |
| Upper Cow Creek | 47,507 | 4,647 | 10% | 838 | 35 | 10% |
| Middle Cow Creek | 113,166 | 17,813 | 16% | 3,277 | 523 | 16% |
| Grave Creek | 104,575 | 13,083 | 13% | 8,539 | 1,071 | 13% |

**Current Road Density and Roaded Area**: The percentage of the current roaded area for each analysis area is estimated at 5% or less (Table 8.5). Road density for BLM-administered lands is 5.08 mi/mi$^2$, and for the LCFMP, it is 4.77 mi/mi$^2$. The Proposed Action would add 241 miles of road renovation and 28 miles of road construction. The percentage of roaded area for each analysis area is estimated at 5% or less, well below 12 percent, which is the threshold that may result in increases of peak flow according to most studies (Ziemer, 1981).

Table 8.5: Road Density and Estimated Road Disturbance (Roaded Area) of the Existing BLM Road System in the LCFMP

| Analysis Area Name^ | Analysis Area (Acres) | Analysis Area (mi$^2$) | Roads (mi) | Road Density (mi/mi$^2$) | Road Disturbance+ (Acres) | Percent Roaded Area |
|---|---|---|---|---|---|---|
| LCFMP | 56,843 | 88.8 | 424 | 4.77 | 2,056 | 3.62% |
| BLM-Administered Lands in LCFMP | 32,248 | 50.4 | 256 | 5.08 | 1,241 | 3.85% |
| Upper Cow Creek (5th level) & McGinnis Creek (6th level) | 1,227 | 1.9 | 7 | 3.50 | 33 | 2.65% |
| Middle Cow Creek (5th level) | 23,658 | 37.0 | 167 | 4.51 | 809 | 3.42% |
| Grave Creek (5th level) | 31,959 | 49.9 | 250 | 5.00 | 1,211 | 3.79% |
| Whitehorse Creek (6th level) | 7,951 | 12.4 | 57 | 4.60 | 277 | 3.48% |
| Quines Creek (6th level) | 13,472 | 21.1 | 95 | 4.52 | 461 | 3.42% |
| Fortune Branch (6th level) | 2,234 | 3.5 | 15 | 4.23 | 72 | 3.20% |
| Last Chance (6th level) | 16,010 | 25.0 | 123 | 4.92 | 597 | 3.73% |
| Shanks Creek (6th level) | 5,616 | 8.8 | 38 | 4.34 | 185 | 3.29% |
| Rat Creek# (6th level) | 891 | 1.4 | 9 | 6.55 | 44 | 4.96% |
| Wolf Creek (6th level) | 9,442 | 14.8 | 79 | 5.38 | 385 | 4.08% |

^ These are the portions of the 5th level (HUC5) and 6th level (HUC6) areas within LCFMP
+ Roaded Area, calculated by assuming an average disturbance width of 40 feet
# Rat Creek does not have any Commercial Timber Harvest Units

3.5.1.5.    *Effects by Alternative*

3.5.1.6.    *No Action Alternative: Environmental Effects*

Under the No Action Alternative, no LCFMP activities would occur with potential to produce sediment, soil or surface disturbance and vegetation removal that causes erosion at a specific site, including the creation and use of skid trails, landing construction and use, skyline yarding corridors, tethered assist yarding, and hauling logs with trucks. Sediment delivery is the ability to convey sediment to streams from where it is produced, and it includes hillslope processes such as rilling and gulleying and hydrologic connectivity to streams. Sediment transportation is the movement and storage of sediment within a stream channel at a watershed scale.

Under the No Action Alternative, there would be no changes to road density or roaded area. No new road construction or road renovation would occur under the No-Action Alternative. However, road use, road maintenance, silvicultural treatments, and other activities unrelated to this project would be expected to continue. Less road maintenance would occur under the no action alternative as compared to the action alternatives since no road renovation would occur. Road renovation often reduces sediment generated by roads by improving drainage, improving road surface conditions, and updating failed culverts.

No new roads would be constructed under the no action alternative. Roads that have been or would be closed due to a natural process (abandonment) would not be opened and maintained for future use, some of these roads have a portion within 200ft of a stream.

In summary, no measurable changes from current conditions are expected for fine sediment loads. However, it is likely that the trends measured in the AREMP Watershed Conditions Report over the last 25 years would continue, that is, improvement of road conditions and management reducing overall fine sediment loads and sedimentation downstream (USDA-PNRS, 2023).

3.5.1.7.    *No Action Alternative: Cumulative Effects*

The cumulative effects analysis area for Alternative 1 is for the entire the 5th level watershed areas that have portions in the LCFMP (see Table 8.1). Historical and current mining and wildfires can result in impacts that can be cumulative for hydrology and water quality over the long-term as discussed in the Geographic Scope and Scale Section.

Present actions that contribute to cumulative effects include timber harvest, vegetation treatment projects, some limited mining projects and right-of-way projects for utility corridors and roads on both BLM and non-BLM lands. Many of these projects may increase ECA or roaded area and may result in peak flow enhancement or erosion.

It is reasonable to assume timber harvest on private, State Forests and Josephine County timberlands would occur at a similar pace in the future. The WA for Grave Creek and Middle Cow Creek found non-federal lands, especially commercial timber lands have a high potential for continuing to contribute sediment to streams (USDI BLM, 1999a pp. 15, USDI BLM, 1999a pp. 24). As timber lands are replanted, there is a point where the new vegetation offsets the contribution to the potential for enhanced peak flows or water yield. This is when the soils are stabilized, and the evapotranspiration rates approximate or exceed the pre-disturbance rates (generally 5 to 15 years after harvest).

The current road density within the LCFMP is approximately 4.8 mi/mi$^2$ (Table 8.4). This road density is likely to be the same or decrease under the no-action alternative since the basic road network is in place on both private and public lands. As harvest is completed, temporary roads are often storm proofed. Any new road construction unrelated to this project is likely to be offset by decommissioning of unused roads or be so small as to not change the overall road densities.

Although no streams in the LCFMP are listed by ODEQ for sediment (See Issue NAID), there are fine sediment deposits in streams within the LCFMP (USDI BLM, 2005 p. 35).

### 3.5.1.8.        *Project Elements Common to All Action Alternatives*

Activity fuel loading in commercial timber units would be reduced through methods such as hand or machine pile and burn, and/or broadcast burning within 1-2 years following completion of harvest. HFR treatments outside of the proposed commercial thinning units (3,446 acres) would be applied as needed and as funding and personnel permit to reduce the risk of stand-replacing crown fires (USDI BLM, 2016b, p. 82).

The BLM would conduct individual tree cutting or tipping to provide logs for stream restoration activities (USDI BLM 2016b, p. 76-77). Tree tipping is mechanically tipping or pulling over trees with root wads attached using an excavator or a truck mounted cable system, generally into or near a stream, to mimic natural wood recruitment (USDI BLM 2016b, p. 315). Snags would be created in the RR area to provide additional wood for streams over time (USDI BLM 2016b, p. 82-86). Where trees are cut for road construction, maintenance, and improvement in RR associated with features other than streams, cut trees would be maintained in adjacent stands as down woody material, or cut trees would be moved for placement in streams for fish habitat restoration (USDI BLM 2016b pp. 75-76).

Surface runoff during storm events from ground disturbing activities, such as timber harvest, road construction and road renovation would produce and mobilize sediment from these sites. Timber hauling can also mobilize sediment on poorly maintained roads. Natural-surface roads more likely than surfaced roads (rocked or paved) to contribute sediment to streams. Observations of forest roads in the Oregon Coast Range, highlighted that properly maintained roads and wet condition management did not show a greater sediment yield with normal levels of active timber hauling (Luce & Black, 2001).

Because no thinning would be allowed in inner zones of RRs, and skid trails would be located away from streams whenever possible, there will be a vegetation buffer between sediment production areas that would reduce sediment delivery. Other BMPs and PDFs that would help to limit sediment delivery to streams while creating and using skid trails include using designated skid trails, installing water bars, and using other erosion control techniques such as scattering tree limbs and other fine material on skid trails (See Appendix C for a complete list).

Road renovation under the action alternatives may include rebuilding perennial stream crossings that would need to be designed and some of these are on roads planned for decommissioning. One of these crossings on Bull Run Creek is a critical stream for salmon recovery (See the Fisheries and Aquatic Habitat Issue NAID). Under this alternative all these roads would stay barricaded and continue to recover as is under the no action alternative unless they are opened to provide access to private lands as part of reciprocal ROW agreements. New or reconstructed temporary and permanent stream crossings identified for proposed haul routes would be evaluated and site-specific measures would be employed to reduce impacts.

To consider sediment delivery from new road construction, the FEIS analysis used new road construction ratios derived from six years (FY2007–FY2012) for the entire RMP analysis area (BLM lands in western Oregon). The FEIS for western Oregon found modern road construction practices produce less sediment from forest roads than older road construction practices that have been known to contribute 90% of sediment generated from overland flow to the road (USDI BLM, 2016a, p. 401).

As part of maintaining roads for the project there would be culverts replaced as a requirement of the timber and/or stewardship contracts, as part of a reciprocal Right-of-Way agreements, through a watershed partnerships, and/or with BLM funding. Plugged culverts and ditch lines can cause episodic erosion event and can contribute large amounts of sediment to streams (USDI BLM, 1999a pp. 11).

KSW01707

No new culvert replacements are proposed on fish-bearing streams for this project, but if a culvert fails during the life of the project on a fish bearing stream, it would be replaced by the timber sale purchaser/operator or the BLM. Culvert replacements on fish-bearing streams would be done within the in-stream work window and use proper dewatering (USDI BLM, 2016b, p. 169).

Eakin road accesses proposed timber extraction units 13-01, 13-03, 13-04, and 13-05 and currently has a temporary bridge installed over a failing culvert on Wildcat Creek, a perennial fish bearing stream that is designated for Coho Critical habitat.  It is unlikely this crossing could safely be used to haul timber.  If this crossing is improved to allow for timber hauling it would need to be done to allow for Aquatic Organism Passage (AOP) and allow for a crossing design that simulates natural stream function, accommodates the one-percent annual chance of a flood event allowing for bedload and anticipated floatable debris (see Appendix C).

Plans are moving forward for the replacement of this Eakin road culvert on Wildcat unrelated to this project. Planning is the engineering design stage and replacement would likely occur before these units in section 13 would be harvested. It is also possible that if the purchaser considers the current temporary bridge adequate for hauling, they may use it before the replacement. In either case the road and the crossing would be used and would be replaced with an AOP crossing as funding and time allows.

Table 8.5: Road Density and Estimated Road Disturbance (Roaded Area) in LCFMP.

|  | LCFMP (Acres) | LCFMP (mi²) 31F[32] | Roads (mi) | Road Density (mi/mi²) | Road Disturbance32F[33] (Acres) | Percent Roaded Area |
|---|---|---|---|---|---|---|
| No Action |  |  | 423 | 4.76 | 2,307 | 4.06% |
| Alt. 2 & 2a | 56,888 | 88.8 | 451 | 5.08 | 2,459 | 4.33% |
| Alternative 3 |  |  | 423 | 4.76 | 2,307 | 4.06% |

Table 8.6: Road Metrics by 12-digit (6th level) Sub-watershed Clipped by the Project Boundary

| Analysis Area Name33F[34] | Analysis Area (mi²) | Current Roads (mi) | Alt 2 &2a: Proposed Roads (mi)34F[35] | New Road Density (mi/mi²) | New Road Disturbance (mi²) | New Percent Roaded Area |
|---|---|---|---|---|---|---|
| McGinnis Creek - Upper Cow | 1.9 | 7 | 1.01 | 4.22 | 5.5 | 3.59% |
| Whitehorse Creek - Middle Cow | 12.4 | 57 | 2.65 | 4.81 | 14.5 | 4.10% |
| Quines Creek - Middle Cow | 21.1 | 95 | 4.31 | 4.71 | 23.5 | 4.01% |
| Fortune Branch - Middle Cow | 3.5 | 15 | 1.51 | 4.72 | 8.3 | 4.02% |
| Last Chance – Grave Creek | 25 | 123 | 12.82 | 5.43 | 69.9 | 4.63% |
| Shanks Creek - Grave Creek | 8.8 | 38 | 2.81 | 4.64 | 15.3 | 3.95% |
| Rat Creek - Grave Creek | 1.4 | 9 | 0.00 | 6.43 | 0.0 | 5.48% |

---

[32] miles = mi
[33] Roaded Area, calculated by assuming an average disturbance width of 45 feet
[34] These are the portions of the 12-digit (6th level) sub-watershed areas within the Last Chance Project Area
[35] Roaded Area, calculated by assuming an average disturbance width of 45 feet

| Analysis Area Name33F[34] | Analysis Area (mi²) | Current Roads (mi) | Alt 2 &2a: Proposed Roads (mi)34F[35] | New Road Density (mi/mi²) | New Road Disturbance (mi²) | New Percent Roaded Area |
|---|---|---|---|---|---|---|
| Wolf Creek - Grave Creek | 14.8 | 79 | 2.72 | 5.52 | 14.8 | 4.71% |

The potential sediment from increased risk of landslides is analyzed in detail as Issue 3 of the FEIS USDI BLM 2016a, pp. 394-400, and this analysis is incorporated here by reference. A model was developed in the RMP to evaluate the risk of landslides and the current and projected landslide density in this analysis. The RMP found that portions of the HLB would be susceptible to sediment delivery by shallow slope failures regardless of any forest management activities. The RMP model assumed that over the next 50 years, the area of increased landslide susceptibility with the potential to deliver to streams would average no more than less than 1% of the harvest land base for RMP timber harvest activities including VRH.

When roads or landings are constructed, they avoid unstable slopes and will be designed to divert road and landing runoff water away from headwalls, slide areas, high landslide hazard locations, or steep erodible fill slopes (USDI BLM 2016b p.173). Buffers for commercial timber harvest around unstable soils would be sufficient to provide a physical barrier for LCFMP activities and hence no impacts would occur (USDI BLM 2016b p.77). No measurable difference in sedimentation from landslides and slope failures is expected for the action alternatives since these areas would be avoided.

Based on the data analyzed, the risk of peak flow enhancement from roads alone would be low (See Issues NAID). All roads in the LCFMP occupy less than 4.5% of the land base. Statistically significant increases in peak flows have been shown to occur only when roads occupy at least 12% of the watershed, based on an extensive review of the literature of peak flows in western Oregon (Harr, 1976).

### 3.5.1.9. *Action Alternative 2: Environmental Effects*

LCFMP activities including harvest methods (see Appendix D.2) and transportation management (see Appendix D.3) have the potential to produce and deliver sediment to streams. Of the 32,272 acres of BLM-administered lands within the LCFMP, commercial and non-commercial activities would occur on approximately 11,686 acres (3,446 acres of HFR and 8,240 acres of commercial harvest including thinning and VRH. Commercial and non-commercial treatments are proposed within HLB, LSR, RR-Dry, RR-Moist in both Class I and Class III watersheds. The various areas would be treated with VRH, commercial thinning, activity fuels reduction, and HFR. Commercial harvest units that are not cut may have HFR treatments applied. There are also some portions of commercial harvest that have had HFR treatments in the past and may be included in an HFR treatment after commercial harvest (See Table 2-5 for a complete tally of these acres by alternative).

There is a small decrease in stand-replacing crown fires anticipated due to commercial harvest and HFR treatments and a corresponding reduction in sedimentation from wildfires. But due to the multiple factors that impact this relationship, this is unlikely to be measurable or quantifiable by alternative but would be proportional to the number of acres ultimately treated for activity fuels and HFR.

In HLB, proposed treatment prescriptions can result in less than the 30 percent canopy cover in openings large enough to be considered in the ECA calculations. These openings called group-selects and can vary from 1-4 acres in size. For this analysis these areas were calculated at their maximum (4-acre size). However, the percent change to the ECA based on estimates of openings that would be created with the proposed commercial treatments indicated there is no potential for enhancing peak flows (Table 8.3 and Table 8.4). Cow watershed would need to see a 13% increase in ECA to change the current condition of 16% to above the 29% threshold (Table 8.7).

Table 8.7: Change in ECA based on Commercial Timber Harvest by Alternative.

| Analysis Areas including 5th-level Watersheds (10-digit) | Analysis Area (acres) * | Current ECA | ECA Alt. 1 (%) | ECA Alt. 2 (% change) | ECA Alt. 2a (% change) |
|---|---|---|---|---|---|
| | | (acres) | No Action | VRH | Thinning |
| LCFMP | 103,033 | 35,543 | 34% | 1.45% | 1.43% |
| Upper Cow Creek# | 47,507 | 13,083 | 28% | 0.92% | 0.96% |
| Middle Cow Creek | 113,166 | 17,813 | 16% | 0.43% | 0.43% |
| Grave Creek | 104,575 | 13,083 | 13% | 0.54% | 0.50% |
| # These are the complete watersheds not just within the LCFMP *Alternative 3 would not create any openings that would add to the ECA. | | | | | |

In addition to the HLB, BLM has identified 291 acres of forest stands within the LCFMP's LSR-Dry land use and 1,290 acres of RR-Dry and 7 acres of RR-Moist that meet the criteria for being included in commercial thinning units. Since these units would not have VRH treatments, no open areas between 1-4 acres would be created, so thinning treatments would not add to the ECA. These RR areas are experiencing declining forest health and diversity due to high levels of density-related competition since they are typically small pieces of forest stands identified for treatment in the HLB or LSR.

Non-commercial HFR would occur on 2,053 acres of RR-Dry and 29 acres of RR-moist. Where HFR is applied this treatment would reduce stand densities and related competition to increase individual tree growth, which is expected to provide stable wood to streams and reduce the risk of stand-replacing crown fires.

Objectives for treatments in RR are to maintain and restore natural channel dynamics, processes, and proper functioning condition of riparian areas by providing forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and release, vegetation diversity and provide quality water and contribute to the restoration of degraded water quality (USDI BLM, 2016b, p. 75).

**Commercial Timber Thinning and VRH Treatments:**  The second source of sedimentation evaluated in the FEIS was empirical, using a surface erosion model (Dube, Megahan, & McCalmon, 2004) based on assumptions about harvesting by watershed.

This alternative would have VRH treatments for HLB-LITA, -MITA, and -UTA units which are outside of occupied NSO home ranges. Commercial thinning would be done in stands marked with buffers for streams (120 feet for perennial and 50 feet for intermittent streams in Class I watersheds).  These buffers are designed to protect the root network of typical trees, reduce erosion, reduce direct impacts to wetlands, reduce potential impacts to hydric soils, maintain stream temperatures by maintaining the primary shade zone and avoid sedimentation.  Studies have shown that "vegetation immediately adjacent to the stream channel is most important in maintaining bank integrity" (FEMAT, 1993).  Rashin et al, (2006) found 95% of the erosion features from timber harvest that were at least 32.8 feet from streams channels. In addition to the stabilizing effect of the tree's root networks, trees adjacent to streams dissipate energy during high or overbank flows, reducing bank erosion.

Impacts from commercial thinning can be differentiated by the type of yarding system. Yarding of the thinned timber would be done with cable suspension systems, tethered assist, helicopter yarding, or ground-based yarding using forwarder trails or traditional skid trails.  Yarding corridors and skid trails would be allowed in the RR only where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives (See Assumptions). Other resource management objectives in this case are primarily the need to traverse RR to access treatment units in

other LUAs, such as HLB or LSR. As noted before, treatment in the RR is fraction of larger treatment units and would only take place in the Middle or Outer Riparian Zones.

**Landing Construction:** Landings shall be located along existing roads, temporary routes, and/or cable-tractor swing routes or within unit boundaries where possible. For analysis, cable and ground-based landings are estimated on average as 1/4 acre and helicopter landings as 1 acre. Project related areas of disturbances for new haul routes were estimated based on a 20-foot buffer which assumes an average disturbance width of 45 feet on proposed new or reconstructed roads. The ECA was calculated for each of the 12-digit (6th level) analysis areas to see if any exceed the 29% threshold for rain dominated watersheds (Appendix D4: Watershed Analysis).

**Road Construction:** To haul timber from the commercial harvest units 28 miles of road construction is proposed (Table 2-5). New Road construction may follow old jeep trails or mining roads called pioneer roads, but also may be in new locations that have never had a road.

**Road Renovation:** To haul timber from the commercial harvest units 241 miles of road renovation is proposed (Table 2-5). Road renovation is work done to an existing road to restore it to its original design standard (See Appendix D: Transportation Management). This work would involve but is not limited to: bladed/graded, repairing of road failures, cleaning drainage features such as ditches and catch basins, brush removal, tree removal within 15 feet of the travel surface, installation or upgrading of culverts, and roads may be surfaced or spot rocked. Road renovation for currently open roads that are already at or close to their design standard would occur (200 miles). Roads that only need routine maintenance such as brushing, blading, culvert replacement, ditch maintenance and surfacing will benefit from road renovation actions and will result in less sediment generation over time. Impacts from the use of these routes and spurs can be expected during hauling and would include erosion and some increase in sedimentation. Minor elevated surface runoff and sedimentation could occur during the short term (1-2 years). Due to vegetation buffers, BMPs and PDFs to address hydrologically connected units or roads elevated runoff, produce and deliver sediment to stream channels.

Road renovation also includes work done to a closed road that was overgrown or previously decommissioned to restore it to its original design standard. This work may include clearing, grubbing, disposing of vegetation and debris from within the road prism, repairing the roads subgrade and running surface, correcting existing drainage patterns, replacing culverts where necessary.

Based on field work, 16 miles of roads would need extensive renovation to bring them back to a design standard that would allow for hauling timber. The current closure status of roads proposed for road renovation includes 17 miles of road are decommissioned. An additional 17 miles that are listed with some other type of current closure status (Table D-3 in the Transportation Management Appendix). Beyond routine renovation, extensive renovation would include repairing and/or widening, rerouting portions of roads, improving grades, improving drainage patterns, installing new ditches, or upgrading from natural surface to aggregate surface.

Native or natural surface roads are generally the largest sediment sources, especially if these roads are open to public motor vehicle use (USDI BLM, 1999a pp. 11). Proposed road renovation would occur on 15 miles of natural surface and 22 miles of unknown road surface. Twelve miles of the new road construction would be open to the public and 7 miles of the road renovation on natural surface roads would be open for public use.

Roads have been identified as a source of fine sediment (USDI BLM, 1999a p. 12, USDI BLM, 1999b p. 21, and USDI BLM, 2005 p.35). An especially important factor in determining sediment production is the proximity of roads to streams (USDI BLM, 1999a p. 12). The distance that sediment travels along roadways depends upon several factors, including underlying geology, age of road since construction, road gradient, road drainage, and ground cover. Roads have three primary effects on hydrologic processes: (1) roads intercept rainfall directly on the road surface and road cutbanks and affect subsurface

water moving down the hill slope; (2) roads concentrate flow, either on the surface or in an adjacent ditch or channel; and (3) roads divert or reroute water from paths it otherwise would take if the road was not present (Gucinski, et al., 2001).

Road management recommendations were identified in the Grave Creek and Middle Cow Creek WAs (USDI BLM 1999a p. 158 and USDI BLM 1999a p. 99). No roads are being proposed for permanent closure under this project, all road that would be decommissioned (31 miles) are proposed for long-term closure and maybe used again in the future. For a detailed discussion on proposed Transportation Management (please see Appendix D, Section D.3, Table D-3).

To ensure proper implementation of road maintenance BMPs, they would be monitored and, where necessary, modified to ensure compliance with Oregon Water Quality Standards (USDI BLM 2016b, p. 165). Improvements to road infrastructure and maintenance of existing infrastructure proposed in this project such as disconnecting hydrologically connected drainage ditches and upsizing culverts to pass higher streamflows. Road renovation would require routine maintenance such as replacing or repairing culverts, brushing, blading, and adding aggregate, these activities would generally reduce sediment loads (190 miles). These are roads that are currently open to the public and many that are well used. Of the roads proposed for road renovation there are 20 miles of temporarily/seasonal/limited closures.

**Seasonal Use of Roads and Dry Condition Requirements:** Hydrologically connected disturbance from roads, trails, landings, and logging corridors have the potential for adverse effects, including sedimentation (Furniss, Flanagan, & McFadin, 2000). The proposed 269 miles of haul routes have been evaluated at stream crossings to determine which road segments may be hydrologically connected to perennial streams (Table C-20). Of the proposed haul routes, there are 123 perennial stream crossings on natural surface and aggregate roads that are hydrologically connected to streams. Proper road renovation, BMPs and PDFs (Appendix B), and good project administration would reduce the risk of this source being above background conditions for sediment delivery to surface waters.

Dry condition requirements for ground-based activities, road renovation, construction and use of temporary routes, skid trails, and tractor swing trails, and/or hauling would reduce direct and indirect impacts to sediment loads that could occur during in wet conditions. This BMP and other project design measures accomplish the management direction for hydrology to select and implement site-level BMPs (Appendix C) to maintain water quality for BLM actions (including, but not limited to, road construction, road renovation, silvicultural treatments, recreation management, prescribed burning, and wildfire management actions/activities) and discretionary actions of others crossing BLM-administered lands (USDI BLM, 2016b, p. 92).

**Use of Existing Developed Rock Quarries:** The BLM has identified fourteen potential rock quarries in the LCFMP (see Table D-1) to be used for road aggregate. Quarry entries include the removal of and/or processing of quarry rock for use in road renovation activities. Each entry would provide crushed rock which might include blasting and processing onsite. The quarries could also provide oversized boulders for use in road repairs, or armoring, within the planning area. Stormwater containment would be required for the working surface of quarries which if effective should keep all fine sediment contained on the quarries. There may be some increase in fine particulate matter that is aerosolized during blasting the crushing that is transported offsite, but this should be temporary and small in volume.

**Road Closures (Decommissioning and Limited Access):** Newly constructed roads or renovated roads may be closed and decommissioned after use by the LCFMP (USDI BLM 2016b, p. 311-312). Of the constructed and renovated roads 51 miles would be closed to vehicles on a long-term basis after use with seasonal or limited access (20 miles) or decommissioned (31 miles). At a minimum, decommissioning would include leaving roads in a well-drained condition and blocking access to vehicular use with barriers such as trenches, rocks, or logs. Road decommissioning would be subject to stipulations by holders of reciprocal rights-of-way, easements, or other legal interests.

When a road is decommissioned and prior to closure the road would be left in an erosion-resistant condition by establishing cross drains, eliminating diversion potential at stream channels, and stabilizing or removing fills on unstable areas. For all decommissioned roads, potential fine sediment delivery would decline over time, but the amount of improvement would be difficult to estimate. Roads identified for closure after use by decommissioning are in Table D-3 in the transportation section of Appendix D (31 miles). Other roads are identified for limited access this is typically a road that has a gate that closes the road seasonally or year-round (20 miles).

The reduction in potential fine sediment delivery following decommissioning would depend on site-specific and road-specific factors, proximity to streams, and the level of decommissioning. The BLM may reopen these decommissioned roads in the future if needed to provide access for management, such as when timber stands in the HLB. Unneeded roads would remain decommissioned. Which roads would be decommissioned and whether they would remain decommissioned would depend on site-specific and road-specific conditions related to whether the road would be needed to provide access for future management actions. (USDI BLM 2016a p. 408).

**Road Density:** Road density is more likely to impact peak flows on small watersheds than with larger watersheds (Gucinski, Furniss, Ziemer, & Brookes, 2001). Therefore, road density and roaded area were also calculated for all 6th and 7th-level subwatersheds (Appendix D4: Watershed Analysis Tables 4.1). For a definition of terms and more details about transportation planning for this project see Appendix D3: Transportation Planning.

Management direction for hydrology is to, "Decommission roads that are no longer needed for resource management and are at risk of failure or are contributing sediment to streams, consistent with valid existing rights" (USDI BLM, 2016b, p. 93). Roads proposed for decommissioning would be closed to vehicle traffic after use. Prior to closure the road will be left in an erosion-resistant condition by establishing cross drains, clearing stream channels, and stabilizing or removing fills on unstable areas. Roads would be closed with an earthen barrier or its equivalent. This category can include roads that have been or will be closed due to a natural process (abandonment) and may be opened and maintained for future use. If barriers and decommissioning are successful (USDI BLM 2016a, pp. 311-312) the roads would become more stable and have less sediment production and are not expected to have long term impacts on sedimentation (50 years or more).

The proposed action includes renovating a road along an unnamed tributary to Grave Creek in T33S R04W Section 15 to access HLB. The Grave Creek tributary road re-builds a road that was decommissioned after removing a crossing on Grave Creek that provided access into Section 15 was removed. This road is proposed to avoid rebuilding this crossing on Grave Creek and will not be decommissioned after use, see Appendix D.3 for more information.

**Roads within the 200ft Sediment Delivery Zone (SDZ):** Roads in the RR have a high potential for providing sediment directly into the streams, as well as disrupting riparian habitat and connectivity along streams (USDI BLM, 1999a pp. 12). There are 0.48 miles of roads that are within the sediment delivery zone (within 200ft of a stream) proposed for road construction, 52 miles of roads proposed for road renovation within the SDZ.

Of the 52 miles of road renovation within the SDZ, 1.8 miles are currently closed due to natural processes (abandonment). These roads are barricaded and may have had culverts removed in the past. At least 8 perennial crossings need to be rebuilt or used temporarily if they are renovated and decommissioned. The potential for sediment delivery is most likely 1-3 years (short-term) after construction or renovation and would be moderated by BMPs.

Roads within the SDZ would be renovated where there are no operationally feasible and economically viable alternatives to accomplish forest management objectives, in this case timber harvest in the HLB and LSR. Where trees are cut for road construction, maintenance, and improvement in the RR, cut trees

would be retained in the adjacent stands as down woody material, move cut trees for placement in streams for fish habitat restoration, or sell trees, at the discretion of the BLM (USDI BLM 2016b pp. 75-76).

The RR LUA is in most cases within the SDZ. Not having commercial timber harvest in the Inner Riparian Zone would substantially reduce the need for road construction in the sediment delivery distance and ensure that the RR would maintain an effective sediment filtration area along streams. New construction would intrude into the 200-foot sediment delivery distance only where there would be no other reasonable routes to access upslope forest stands (USDI BLM 2016a p.407).

The FEIS, Table 3-66, p. 403 assumed there is currently 1,738 miles of natural surface roads within 200 feet of streams on BLM administered land in western Oregon. adding 0.48 miles of natural surface roads to this amount would theoretically add 6.4 tons/year of sediment production. This potential sediment load would be moderated by buffers of intact riparian in the inner zone in most cases.

On BLM administered land within the LCFMP there is currently an estimated 132 miles of roads within 200 feet of streams. Based on the FEIS modeling, existing sediment yields from the LCFMP are 1,750 tons/year of sediment. Less than ½ mile of proposed constructed roads within 200 ft of streams under Alternative 2 and this represents an increase of 0.3 % increase in roads on BLM administered lands (See Table 8.8).

Previously decommissioned roads, or roads placed in a long-term closure status, are proposed to be renovated for the project and may be closed upon project completion (USDI BLM 2016b p. 311-312). Of the 109 miles of roads with the SDZ, 31 miles of decommissioned roads (barricaded or have had crossings removed, are not drivable, closed due to abandonment). In some cases, decommissioned roads for hauling timber would need to be renovated to a design standard suitable for hauling timber. Roads decommissioned at the end of the project that may be re-opened in the future.

The FEIS for western Oregon described how road construction and decommissioning might affect soil disturbance and create sources of fine sediment that are delivered to stream channels. It is incorporated here by reference (USDI BLM 2016a pp.401-403). The FEIS used a sediment model Washington Road Surface Erosion Model (WARSEM) and modeled sediment delivery assuming a 200-foot sediment delivery distance to streams. The predicted increase in annual sediment would also be 0.3 % over the first two years, which is less than the 1% evaluated in the FEIS.

The FEIS for western Oregon described the effects of road construction and road decommissioning on sediment delivery to streams and concluded that increases in sediment would be less than 1.0 % above current levels of fine sediment delivery over the next 10-years (USDI BLM 2016a pp. 401-408), this would be minor and undetectable from background levels. No potential effects on sediment production or delivery beyond those analyzed in the FEIS for western Oregon (USDI BLM, 2016a, pp. 401-408) where identified (Table 8.8).

Table 8.8: Existing and Road Construction within 200 feet of Streams.

| Analysis Area | Road Surface Category | Existing Roads within 200ft | | Alternative 2 & 2a Road Construction within 200ft of a Stream | | | | Alternative 3 Road Construction | |
|---|---|---|---|---|---|---|---|---|---|
| | | BLM (miles) | Other (miles) | Renovated (miles) | Constructed (miles) | Total (miles) | % Increase | BLM (miles) | Total (miles) |
| Last Chance LCFMP | Natural | 70.8 | 21.0 | 6.20 | 0.48 | 92.3 | 0.5% | 0 | 91.8 |
| | Aggregate | 52.4 | 0.5 | 36.60 | 0.00 | 52.9 | 0.0% | 0 | 52.9 |
| | Paved | 9.0 | 2.4 | 9.02 | 0.00 | 11.4 | - | 0 | 11.4 |

KSW01714

| Analysis Area | Road Surface Category | Existing Roads within 200ft | | Alternative 2 & 2a Road Construction within 200ft of a Stream | | | | Alternative 3 Road Construction | |
|---|---|---|---|---|---|---|---|---|---|
| | | BLM (miles) | Other (miles) | Renovated (miles) | Constructed (miles) | Total (miles) | % Increase | BLM (miles) | Total (miles) |
| | **Total** | **132.2** | **23.9** | **51.8** | **0.5** | **156.6** | **0.3%** | **0** | **156.1** |
| **Upper Cow Creek Watershed** | Natural | 1.1 | 0.0 | 0.43 | 0.04 | 1.2 | - | 0 | 1.1 |
| | Aggregate | 0.2 | 0.0 | 0.01 | 0.00 | 0.2 | - | 0 | 0.2 |
| | Paved | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | - | 0 | 0.0 |
| | **Total** | **1.4** | **0.0** | **0.4** | **0.0** | **1.4** | **-** | | **1.4** |
| **Middle Cow Creek Watershed** | Natural | 28.3 | 2.8 | 0.51 | 0.14 | 31.2 | 0.4% | 0 | 31.1 |
| | Aggregate | 18.4 | 0.2 | 12.06 | 0.10 | 18.7 | 0.5% | 0 | 18.6 |
| | Paved | 3.3 | 1.4 | 3.23 | 0.00 | 4.7 | - | 0 | 4.7 |
| | **Total** | **50.0** | **4.4** | **15.8** | **0.2** | **54.6** | **0.4%** | | **54.4** |
| **Grave Creek Watershed** | Natural | 41.4 | 1.8 | 3.31 | 0.30 | 43.5 | 0.7% | 0 | 43.2 |
| | Aggregate | 33.8 | 1.2 | 24.52 | 0.00 | 35.0 | - | 0 | 35.0 |
| | Paved | 5.7 | 1.3 | 5.78 | 0.00 | 7.0 | - | 0 | 7.0 |
| | **Total** | **80.8** | **4.4** | **33.6** | **0.3** | **85.5** | **0.4%** | **0** | **85.2** |

The FEIS assumes 13.26 tons per mile per year for natural surface roads in the RMP analysis area (USDI BLM 2016a p.403). Based on the FEIS modeling, existing sediment yields from the LCFMP, with currently 156 miles of current roads in the LCFMP within the SDZ, these roads would generate an estimated 2,086 tons/year of sediment. Based on this estimate road construction (0.48 miles) within the SDZ, construction of these road segments would result in an additional 6.4 tons of fine sediment per year downstream (0.3% increase). Some of this sediment would be stored within stream channels along the way but there would be some increase in fine sediment input into Cow Creek and Grave Creek.

Sediment transport in a stream channel may fill pools, coat rocks and embed gravel reducing the value of aquatic habitats for insects and fish Stored sediment but it is likely this sediment would be mobilized during peak storm events and would result in impacts to fish habitat and water quality downstream that are indistinguishable from background conditions (USDI BLM 2016a pp. 297).

***New or Renovated Stream Crossings:*** Stream crossings can be a source of sediment during construction and use. There are 2 perennial stream crossing on proposed constructed roads and 149 crossing on roads proposed for renovation, of these 8 have been identified as potentially needing to be rebuilt. There are no site-specific designs for these potential stream crossings, but, when constructing new crossings in streams containing native migratory fish the crossing would meet ODFW and ARBO II fish passage criteria (See Appendix C, R17). On abandonment of a crossing (i.e., removal of a culvert without replacement) in streams containing native migratory fish, the natural stream grade would be restored, unless a lessor gradient is required for fish passage. New or reconstructed temporary and permanent stream crossings identified for proposed haul routes include a temporary crossing on Bull Run Creek. New crossings would need to be designed for a 100-year flood event, including allowance for bedload and anticipated floatable debris (USDI BLM 2016b p.92).

**Summary:** LCFMP commercial harvest and non-commercial HFR treatments would be conducted with BMPs and PDFs that are designed to reduce or remove the potential to produce fine sediment. There is no expectation of enhancing peak-flows, water yields or changes in other hydrological conditions from commercial thinning that would increase the delivery or transport of sediment downstream. Sediment production from landings, yarding corridors, skidding trails and other new disturbance would be minimized with BMPs and PDFs.

The FEIS for western Oregon described the effects of road construction and road decommissioning on sediment delivery to streams and concluded that increases in sediment would be less than 1.0 percent above current levels of fine sediment delivery over the next 10-years (USDI BLM 2016a pp. 401-408). This amount of fine sediment would be minor and undetectable from background levels. Under Alternative 2, road renovation and use for hauling would occur at levels similar to or less than levels described in the FEIS by implementing BMPs and PDFs, and therefore affects to sediment would fall within this range (i.e. less than 1% difference). This amount of change does not represent a substantial difference in comparison to the existing sediment delivery (USDI BLM, 2016a, pp. 405-410).

Road construction within the SDZ (0.48 miles) would result in 6.4 tons of fine sediment per year downstream which is a 0.3% increase over current conditions. Some of this 6.4 tons of fine sediment would be deposited in pools and stream bottoms in Cow Creek and Grave Creek and result in impacts to fish habitat and water quality downstream locally. Eventually this sediment would be transported during peak storm events downstream and would be indistinguishable from background conditions since it would be less than the 1% increase as determined by the FEIS (USDI BLM 2016a pp. 297).

Roaded area would increase 0.3% under alternative 2. The highest roaded area for Alternative 2 and 2a would be 5.5 mi/mi2 for Rat Creek, still be well under 12% where a perceptible increase in peak flows would be expected (See Tables 8.5 and 8.6).

3.5.1.10.    *Action Alternative 2: Cumulative Effects*

For this Alternative 2, no cumulatively measurable or significant alterations to the hydrologic function or quality of waters in Upper Cow Creek, Middle Cow Creek and Grave Creek or their major tributaries are expected beyond what has been described in the Affected Environment. Sediment generation from project activities (6.4 tons per year for 1-2 years following activities and diminished after that) would be indistinguishable from background conditions (less than 1% increase). Cumulative impacts from other activities in this watershed as described in Alternative 1 and would be the same under this alternative.

3.5.1.11.    *Action Alternative 2a: Environmental Effects*

This alternative proposes commercial harvest activities, consisting of commercial thinning or selection harvest only, on approximately 1,059 acres and non-commercial HFR treatments on 11,686 acres (of which, 1,059 acres overlap with commercial harvest treatments).

Instead of the group select openings that occur with VRH these stands would be commercially thinned or have selection harvest. Assuming the volume of haul would be similar and timber harvest methods would be comparable, the big difference is that there would not be an increase in ECA and therefore any impacts described for Alternative A resulting in increased potential for peak flow conditions would not occur under this alternative (See table 8.6). No changes in proposed new construction or increases in renovation of haul roads were described or anticipated for this alternative.

3.5.1.12.    *Action Alternative 2a: Cumulative Effects*

For Alternative 2a, no cumulatively measurable or significant alterations to the hydrologic function or quality of waters in Upper Cow Creek, Middle Cow Creek and Grave Creek or their major tributaries are expected beyond what has been described for Alternative 2.

3.5.1.13.    *Action Alternative 3: Environmental Effects*

Alternative 3 proposes no road construction. This alternative proposes 53 miles of road renovation and potential entry into 6 existing rock quarries. Like Alternative 2, previously decommissioned roads, or roads placed in a long-term closure status, are proposed to be renovated for the project and may be closed upon project completion (USDI BLM 2016b p. 311-312). This alternative would eliminate commercial timber harvest in occupied owl nest sites, and includes silvicultural treatments designed to increase tree retention with diameter limits for harvest.

This alternative would not include group select openings to plant new stands of trees. This means it can be assumed that there would be no contribution to ECA under this alternative, the broadcast burning described would be less likely since there would not be a need to prepare the sites for planting, and only activity piles would be burned. However, HFR projects would be the same. Therefore, potential enhancement of peak flows would be similar to impacts described for the No-Action Alternative because no additional acres of ECA would be created by harvest methods (Appendix D4: Watershed Analysis).

***Road Construction, Road Renovation, Road Closures and Decommissioning*** Alternative 3 does not propose road construction. Alternative 3 proposes 51 miles of road renovation, 2 new stream crossings and 7 perennial stream crossings that may need to be rebuilt.  Of this, 51 miles of road renovation there are 3.3 miles of road that will be closed to vehicle traffic seasonally with limited access (1.7 miles) and decommissioned (1.4 miles) after use, and 2.4 miles of roads that were decommissioned and may need to be rebuilt during renovation. This category can include roads that have been or will be closed due to a natural process (abandonment) and may be opened and maintained for future use.

For roads within 200ft of a stream, there are 12 miles would be renovated, while 0.25 miles would need major work during renovation. There would be 0.43 miles that would be closed and decommissioned.

The potential for sediment production and delivery would occur in the first 1-3 years (short-term) after construction and/or renovation and would be moderated by BMPs. If barriers and decommissioning are successful (USDI BLM 2016b, p. 311-312) the roads would become more stable and have less sediment production and are not expected to have long term impacts on sedimentation (over 50 years).

***Commercial Harvest:*** This alternative would have commercial thinning to retain 40-45 percent relative density/acre in all treatment areas and no HFR maintenance, only understory reduction treatments. This type of thinning would be less economical in some areas depending on the yarding method and therefore there would be 1,097 less acres of commercial harvest considered under this alterative. Some areas with old growth characteristics in Alternative 2 were not considered under this alternative.

***Use of Existing Developed Rock Quarries***: The BLM has identified potential entry into 6 existing rock quarries in the Last Chance planning area (see Table D-1) that would be used under this alternative. Impacts would be similar to those described in Alternative 2, but at about half the rate.

In summary, commercial harvest would be conducted with BMPs and PDFs that are designed to reduce or remove the potential for accelerated erosion and any increased sediment production because of actions. Also, there is no expectation of enhancing peak-flows, water yields or changes in other hydrological conditions from commercial thinning that would increase sediment transportation rates above background conditions (see Section 8.0). Although there may be increased erosion locally and over the short-term; if the goal is to make forest stands more resilient to catastrophic disturbance such as crown-replacing fires are achieved, long-term sedimentation rates may decrease.

3.5.1.14.    *Action Alternative 3: Cumulative Effects*

For Alternative 3, it was determined that little to no sediment loads would be produced from individual units, landings, or crossings along haul routes. No treatment buffers, BMPs, and specific associated PDFs identified in Appendix C would result in no measurable sedimentation downstream above natural

background levels described for the no-action alternative. Therefore, water quality and aquatic habitat downstream would not be negatively affected. There would also be no changes to current slope stability, the risk of slope failure and the risk of periodic slope failures are still within the range of natural variability.

Just as with the Alternative 2, some short-term direct and indirect effects to water quality were identified due to pulses in sediment and turbidity from road work, primarily during the first significant storm event of the wet season. While these effects from sediment could potentially occur, it would remain within acceptable water quality limits for turbidity, and sediment loads would be transported downstream during peak flow events and therefore would be difficult to distinguish from background levels.

### 3.6.    Fisheries and Aquatic Habitat

3.6.1.    Issue 9: How would timber hauling and road related activities, including decommissioning affect Southern Oregon/Northern California Coast (SONCC) Coho Salmon and Oregon Coast (OC) Coho Salmon species and their habitat?

3.6.1.1.    *Methodology*

- The fisheries analysis used data regarding distribution and fish presence/absence from Oregon Department of Fish and Wildlife, BLM ORWA corporate fish distribution database, and StreamNet.
- Field visits to proposed haul routes, riparian treatments, and other proposed project activities provided site-specific information.
- The LCFMP as proposed and analyzed, is using relevant BMPs and PDFs, would have insignificant effects to SONCC and OC Coho Salmon, their Critical Habitat (CH), and Essential Fish Habitat (EFH), and would be consulted on with NOAA Fisheries under the Programmatic Forest Management Biological Opinion for Western Oregon (FOMBO).

3.6.1.2.    *Assumptions*

- Fish distribution, presence, and absence data are from Oregon Department of Fish and Wildlife, BLM ORWA corporate fish distribution database, and StreamNet; these sources are considered the best and most current available data.
- Paved roads do not contribute sediment to streams.
- Coho Critical Habitat and Essential Fish Habitat are not going to be degraded due to the application of Riparian buffers on the Inner, Middle, and Outer Riparian Zones, along with the implementation of BMPs and PDFs.

3.6.1.3.    *Affected Environment*

Special Status Species, Critical Habitat, and Essential Fish Habitat

The project area contains seven Class I sub-watersheds; they contain habitat for special status species. Three of the sub-watersheds contain habitat for the threatened and endangered (T&E) Oregon Coast (OC) Coho Salmon. Four of the sub-watersheds contain habitat for the T&E species Southern Oregon/Northern California Coast (SONCC) Coho Salmon. Salmon are listed under the Endangered Species Act (ESA) by evolutionarily significant units (ESU).

On June 20, 2011, the National Oceanic and Atmospheric Administration (NOAA) Fisheries Service published a final determination to retain OC Coho Salmon as a threatened species under ESA (Federal Register Vol. 76, No. 118). Designation of Critical Habitat became effective on February 11, 2008,

KSW01718

(Federal Register Vol. 73, No. 28). The southernmost extent of the federally listed threatened OC Coho Salmon is the Umpqua Basin.

On June 28, 2005, the National Oceanic and Atmospheric Administration (NOAA) Fisheries Service published a final determination to retain SONCC Coho Salmon as a threatened species under ESA (Federal Register Vol. 70, No. 123). This ESA Listing status was updated on April 14, 2014 (Federal Register Vol. 79, No. 71). Designation of Critical Habitat became effective on May 5, 1999 (Federal Register Vol. 64, No. 86). The northernmost extent of the federally listed threatened SONCC Coho Salmon is the Rogue Basin

Streams and habitat currently or historically accessible to Chinook and coho salmon are considered Essential Fish Habitat (EFH), designated for fish species of commercial importance by the Magnuson-Stevens Fishery Conservation and Management Act of 1996 50 CFR, Part 600, Subsection J, EFH.

Many commercial treatments are adjacent to Coho Critical Habitat (CH) and EFH with a buffer of 120 feet, and many non-commercial treatments are adjacent with a buffer of 60 feet. Most treatment units are found further away from CH.

### Riparian Reserves (RR)

The RMP established RR as part of the land use allocation designation process. Riparian Reserves are the federally administered lands in which the primary objectives are to maintain and restore riparian functions, maintain water quality, and contribute toward the conservation and recovery of ESA-listed fish species (USDI/BLM 2016b, p. 75).

For the LCFMP, using the RMP Management Direction, fish-bearing and perennial streams were given a 120-foot buffer, while intermittent streams were given a 50-foot buffer. Many units contained perennial stream buffers and CH.

### 3.6.1.4.    *Environmental Effects*

### 3.6.1.5.    *No Action Alternative*

While activities associated with the proposed action would not occur under the No Action Alternative, other activities which are not associated with the proposed action may occur and are discussed below.

These projects would follow all provisions of the Clean Water Act (40 CFR Subchapter D) and Department of Environmental Quality's (DEQ's) provisions for maintenance of water quality standards. These projects would apply Riparian Reserve buffers when in proximity to streams and CH and apply PDFs and BMPs such as ones that minimize ground disturbance within the Riparian Reserves, limit expansions of landings or new landings within Riparian Reserves, minimize shade removal and sediment inputs, and maintain levels of large woody debris in order to minimize effects to listed species and their habitat. Projects associated with private lands would comply with the Oregon Forest Practices Act and are designed to protect aquatic resources.

Under the No Action Alternative, there would be no project-related road renovation activities. Road renovation activities improve the function of system roads and decrease non-point source pollution that may emanate from unmaintained roads. Thus, under the No Action Alternative, there would be no decrease to non-point source pollution within the project area. Additionally, under the No Action Alternative, riparian thinning of Middle Zones of intermittent streams would not occur.

### Cumulative Effects

BLM approved projects would apply RR buffers when in proximity to streams and CH and apply PDFs and BMPs. Projects associated with private lands would comply with Oregon Forest Practices Act and are designed to protect aquatic resources. Because there are no anticipated effects from other projects within

the project area, there are no anticipated cumulative effects to fish species and their habitat within the Last Chance project area.

There are no past, present, or reasonably foreseeable planned actions that would contribute to cumulative effects as they relate to this issue because the potential effects are limited to the boundaries of the proposed LSR-Dry treatment units. There would be no other effects other than those disclosed for Alternatives 2, 2a, and 3.

### 3.6.1.6.    *Alternatives 2 and 2a*

Timber hauling, road related activities, such as renovation, construction, decommissioning, and stream crossing renovation would affect both SONCC and OC Coho Salmon and their CH, but project activities are not expected to have significant effects to either fish species or their critical habitat, as described below.

#### Timber Haul

The Last Chance haul road segments and road-related activities intersect 27 stream segments containing SSS, CH, and EFH. Because some crossings occur on bituminous (paved) surface type and erosion from paved roads is not expected, they are removed from further analysis. Of the 27 crossings listed, only one crossing is proposed for renovation: the crossing at Bull Run Creek which contains OC CH. Sediment would not be expected to enter CH as a measurable quantity because BMPs and PDFs such as completing construction during the in-stream work window and installing sediment barriers, where needed, would prevent measurable sediment delivery into CH streams. Project activities would follow all provisions of the Clean Water Act (40 CFR Subchapter D) and Department of Environmental Quality's provisions for maintenance of water quality standards. In addition, Project Design Criteria (PDCs) from the FOMBO would be implemented and work would be in compliance with this Biological Opinion.

LCFMP haul routes intersect perennial stream systems throughout the project area. There are 27 haul routes that cross over CH (Table C-21, Appx. C.). The term 'crossings' refers to permanent structures, either culverts or bridges, associated with roads. The term 'low water stream ford' refers to stream crossings which do not have permanent structures such as culverts and bridges. Vehicles would access the areas by traveling through the low water stream channel within the in-stream work window.

#### Road Renovation/Decommissioning

Road renovation, specifically culvert and cross-drain replacements within the RRs, and the implementation of BMPs, would help protect stream shade, maintain stream temperature, and reduce sedimentation. Minimizing the width of the crossings and placing the crossing perpendicular to the stream requires the removal of fewer overstory trees. There would still be some crossing replacements and additions on streams that could decrease stream shade, however, the effects would not result in a measurable increase in stream temperature. This is because only a small amount of overstory vegetation would be removed, and the vegetation would recover over time. In addition, there would be a spatial and temporal separation of culvert replacements across the project area which would prevent an aggregation of increases in stream temperature and overall sedimentation within the project area. Following installation, there may be a short term and localized pulse of sediment during the first rain event of the wet season. The replacement of culverts and cross drains would have long-term benefits and reduce the potential for future road failures.

Road decommissioning can ameliorate the effect of increases in drainage network caused by new road construction by disconnecting runoff from roads to streams. Road decommissioning includes, but is not limited to, one or more of the following actions: blocking the road, out-sloping and adding water bars for drainage control, and culvert removal as needed. Roads that receive decommissioning would have a beneficial effect of reducing runoff to streams and decreasing the drainage network.

Rock Quarries

The BLM has identified 14 potential rock quarries in the Last Chance planning area (Table D-1 and Map 4, Appx. D.3.) and proposes to allow entry into and purchase of in place quarry rock from the BLM per 43CFR3600.

Quarry entries include the removal of and/or processing of quarry rock for use in road maintenance activities. Removal and/or processing of quarry rock consists of ripping, blasting (drilling and shooting), and breaking down larger rock material with a mobile crusher. Blasting operations would follow the FOMBO and the Routine Actions and Maintenance Biological Opinion (RAMBO) Table (Tables D-1 and D-2, Appx. D.3.) to determine appropriate charge weights and setback distances based on distance to Coho habitat. Each charge weight listed in the table refers to the charge within a single drilled hole or the total charge within a group of holes to be blasted simultaneously and includes the requirement that the separate holes/charges to be blasted would utilize a micro delay of 8 milliseconds or longer to stagger detonation of the charges in time. Setback distance from listed fish habitat is measured horizontally from the center of the drill hole to the edge of the stream or river. This would ensure that the decibel rankings specified by NOAA Fisheries would not be exceeded. It would also ensure that peak particle velocities transmitted through seismic waves would not rise to a level that would impact fish.

Bridge/Ford Construction

BLM proposes to cross Bull Run Creek at the 32-5-25.6 road using either a temporary bridge or an armored low water ford. This creek contains Critical Habitat (CH) for OC, other SSS, and EFH for coho salmon. The site is an existing crossing where the culvert had been previously removed. Minimal overstory removal would be required for construction because it is an existing crossing. The bridge or ford would be located perpendicular to the streamflow as the stream allows. Placing the structure perpendicular to the stream ensures that the smallest amount of vegetation would need to be removed.

Bridge or ford construction would follow General Aquatic Conservation Measures from the Fisheries Consultation and BMPs from the RMP which includes measures such as conducting activities during the ODFW in-stream work window when fish species are mobile; any material used during construction activities, such as riprap, would not be placed within the bankfull width of the stream; and the work area would be isolated from flows.

While there would be a pulse of sediment released during construction activities, it is expected to be short-term and localized. Because activities would occur during the ODFW in-stream work window, mobile fish would likely move from the area during construction activities. To ensure that fish are not present, the work area would be isolated and any remaining fish would be removed (BLM fish specialists have the necessary permits to perform fish relocation during construction activities). Construction and use would all be in one season and would happen between July 1 and September 15. After use, the crossing would be removed and the road blocked. Hauling would consist of approximately 30 trips and would be completed within one season.

Both placing a temporary bridge and constructing an armored low water ford would require large equipment to enter the channel. Construction would occur during the in-stream work window. The existing crossing would need minor improvements to be used during temporary bridge placement. Because the crossing is existing, few trees would be removed during either bridge placement or ford construction. Spawning substrate within Bull Run Creek may be negatively affected during construction and associated road activities, such as hauling. These impacts from machinery within the creek are expected to be limited in scope and duration due to BMPs, and PDFs such as completing the work during the in-stream work window. Sediment delivery from rocked approaches on an armored ford would be minimized. Instream disturbance of the wetted channel as vehicles cross would likely create a noticeable burst of turbidity that would be of low intensity and short duration, dissipating rapidly.

During installation of the temporary bridge, there would be a short-term impact to spawning substrate, pool quality, and gravels. Once the temporary bridge is installed there would be no impact to spawning substrate, pool quality and gravels. The same temporary impact would be expected when the temporary bridge is removed.

### Conclusion

The LCFMP is proposed in the Umpqua and Rogue Basins, and within the range of the federally threatened Oregon Coast (OC) and Southern Oregon/Northern California Coast (SONCC) Coho Salmon, respectively, and would have effects on coho and critical habitat. Consultation for the Endangered Species Act and Essential Fish Habitat for the Magnuson-Stevens Fishery Conservation and Management Act with the National Marine Fisheries Service is covered under the *Endangered Species Act Section 7(a) (2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat for the Programmatic Forest Management Program for Western Oregon* (WCR-2017-7574; *aka*: FOMBO).

Habitat access would remain unaltered under Alternatives 2 and 2a. Fish passage barrier culverts or bridges are not proposed to be replaced or upgraded under this project. Sediment production and delivery to streams would be minimized through the implementation of BMPs and PDFs and would not have measurable effects on spawning substrate and rearing habitat such as pools. This project incorporates BMPs, PDFs, and project design criteria and conservation recommendations from the FOMBO. Project activities as analyzed and consulted upon are not likely to jeopardize the continued existence of OC or SONCC Coho Salmon.

### Cumulative Effects

Within the project area, other anticipated projects include vegetation management projects such as timber sales, and fuel reduction projects, along with miscellaneous projects.

As stated above, the projects listed under the No Action Alternative are reasonably foreseeable to occur. Those projects, in association with the activities described in the proposed action, are not expected to have detrimental environmental effects.

Vegetation management projects and/or timber sales would apply RR buffers when in proximity to streams and Critical Habitat. The PDFs and BMPs such as those that minimize ground disturbance within the RR, limit expansions of landings or new landings within RR, minimize shade removal and sediment inputs, and maintain levels of large woody debris, would be applied in order to minimize effects to listed species and their habitat.

Foreseeable private forest harvest within the project area would comply with Oregon Forest Practices Act. The BLM does not regulate harvest on private land. The requirements of the Oregon Forest Practices Act are intended to protect fish, wildlife, and water quality when forest management activities occur near waters of the state and within riparian management areas. Normally, cumulative impacts to waters of the state and aquatic resources would not be expected because BLM actions and private land harvest are implemented under state and federal laws and regulations.

Miscellaneous projects would either be located outside RR so that the effect to listed species would be negligible or would apply BMPs and PDFs that minimize effects to listed species and their habitat. Road renovation activities that benefit hydrologic function within the project area would also benefit habitat for fish and aquatic species.

Under Action Alternative 2 and Alternative 2a, there would be project-related road renovation. Road renovation improves the function of system roads and decreases non-point source pollution that may emanate from unmaintained roads. In-stream restoration is expected to positively affect the watershed. Under Alternatives 2 and 2a, there would be a decrease in non-point source pollution within the project

KSW01722

area associated with project activities. Additionally, under Alternatives 2 and 2a, riparian thinning would occur. This would be a benefit to fisheries objectives or SSS associated with this alternative because it would reduce the likelihood of stand-replacing crown fire. With the implementation of the BMPs, PDFs, stream buffers, and seasonality of ground disturbance, there would be insignificant effects from Alternatives 2 and 2a. Therefore, this project is not anticipated to cumulatively affect fish species and habitat within the Last Chance project area.

### 3.6.1.7.        *Alternative 3*

Under Alternative 3, there would be fewer acres of treatment because all the Northern Spotted Owl (NSO) sites would be dropped. There would be no road construction. However, renovation of existing roads would occur. The stream crossing renovation on Bull Run Creek at the 32-5-25.6 road would no longer be needed, and the temporary bridge or armored low water ford is not proposed in this alternative.

Treatment units would retain greater levels of relative density, would apply diameter caps to the reserve land use allocation, and would require thinning only on the Low Intensity Timber Area. Therefore, some treatment acres, roads/haul routes, and logging systems were reduced. Because of this reduction in acres, the effects of this alternative from road related activities would be much less than those described in Alternatives 2 and 2a.

Alternative 3 would have similar effects to those of Alternatives 2 and 2a qualitatively because the necessary BMPs, PDFs, and General Aquatic Conservation Measures would be applied. Because some of the treatment units drop and roads and haul routes decrease, there would be less hauling and road renovation required under this alternative. Only six of the 14 rock quarries would potentially be used, as proposed in Transportation Management (Appx. D.3.). The effects would be as described above for Alternatives 2 and 2a.

With the implementation of the BMPs, PDFs, stream buffers, and seasonality of ground disturbance, there would be insignificant effects from Alternative 3. The cumulative effects analysis described previously for Alternatives 2 and 2a applies here as well. Therefore, Alternative 3 is not anticipated to cumulatively affect fish species and habitat within the Last Chance project area.

### 3.6.1.8.        *Conclusions for the Fisheries and Aquatic Habitat Analysis*

All alternatives analyzed under the Fisheries and Aquatic Habitat analysis include the implementation of BMPs, PDFs, and General Aquatic Conservation Measures. Alternative 3 project activities would affect SSS, SONCC Coho Salmon and their CH, and OC Coho and their CH but are not expected to have significant effects on fish species and their critical habitat, or to jeopardize their continued existence.

The BLM is minimizing adverse effects on freshwater EFH quantity and quality, including spawning habitat areas of particular concern by implementing EFH Conservation Recommendations Terms and Conditions #1 and #2 from Section 2.8.4 of the FOMBO.

Under Alternatives 2, 2a, and 3, there would be a temporary short-term impact to spawning substrate, pool quality, and gravels. Large wood and access to habitat would not change under these alternatives.

Therefore, all alternatives are consistent with the RMP and consultation requirements.

KSW01723

## 3.7. Soil Resources

3.7.1.    Issue 10: How would the proposed treatments (ground-based logging, cable yarding, road construction, road renovation, activity fuels and HFR) affect detrimental soil disturbance, soil productivity, slope stability, and surface erosion?

### 3.7.1.1.    *Geographic Scope and Scale*

The Last Chance project area falls within the Inland Siskiyous ecoregion of the Klamath Mountains, which is characterized by steep, rugged mountains, narrow river valleys, and a mix of mixed evergreen and broadleaf trees (Douglas-fir, ponderosa pine, oak, and madrone) (Thorson et al., 2003, Whittaker, 1960). The elevation of this area ranges from 1,200 to 5,000 feet and has an annual average precipitation of 30 to 70 inches.

The Klamath Mountains are made up of altered volcanic and sedimentary rock and intrusive igneous rock. Granite and peridotite intrusions are present, and in some cases, the peridotite altered to serpentinite, which is the metamorphic derivative of ultramafic rocks and form soils usually low in Calcium and high in Magnesium, Chromium, and Nickle (Table D.4-6). This unusual nutrient distribution creates conditions favorable for a small population of plants that are slower growing and where macro-nutrients and water availability are low (Whittaker, 1960; Wright, 2007).

The marine influence on climate is mild here due to the orographic effects of the Coastal and Klamath Mountains and the location of drainages are less connected to the Rogue River, which provides a conduit for microclimate humidity. Precipitation generally occurs in the fall, winter, and early spring, while the summers are very hot and dry. Most soils in the project area are Inceptisols and Ultisols that are dry for long periods of the year. Smaller areas of Alfisols and Mollisols also exist in the project area. Dominate soil series are Acker, Norling, Berkman and Colestine (Table D.4-5) for the proposed treatment areas.

Most of the soils in LCFMP proposed treatment units (over 75%) are categorized as having a severe or very severe erosion hazard rating (Table D.4-7) the soil surveys (NRCS, 2020). Soils in proposed units were evaluated for indications of hydric characteristics (Table D.4-9), which are formed under conditions of saturation, flooding, or ponding enough to create anaerobic (oxygen limited) conditions during the growing season. Although rare (less than 20%) these soils corresponded to wetlands within the RR LUA.

The history of this area can be characterized by impacts to soils in terms of pre-European (pre-1850's) and post-European or historic (1850's to late 1900's and 1980's to present). Mining and logging have had extensive impacts on soil resources, see Issue 8 Chapter 3 for more information.

Fires were common in the pre-European era and were generally low and moderate intensity and high frequency, whereas during post-European settlement fires were suppressed given the terrain and weather conditions (Hessburb, et al., 2005). Based on fire history data for the LCFMP fire perimeters for fires greater than 10 acres in modern fire history shows that a total of 18,304 acres burned since 1900 (32% of LCFMP). Fire history data before 1900 is not currently available. Current and historic logging is another dominant disturbance to forests and their soils in the LCFMP, on private, county, and state-owned lands, which encompasses 43% of the project area.

Since the adoption of the Northwest Forest Plan in 1994, logging practices have shifted on BLM administered lands from regeneration harvest (selective harvest and with cycles where all trees would be removed and replanting) to the most current prescriptions such as VRH, commercial thin and selection harvest. VRH, commercial thin and selection harvest incorporate skips and gaps that mimic natural forest structure in the RMP (USDI BLM 2016b). These VRH and thinning treatments have less of a negative impact on soil function because less of the treatment areas being impacted by ground disturbing activities as compared to regeneration harvest.

Harvest, mechanical, revegetation, and fuels treatments have been conducted throughout most BLM lands within the project area. Based on BLM treatment data at least 21,000 acres were treated with some form of commercial harvest in the LCFMP, approximately 57% of area were treated with regeneration harvests between the 1950 to 1980. After the 1980's, only 11% of the area was treated with harvest and all were variable density thinning treatments. Continuing soil impacts from remnants of past logging activity is captured with legacy soil disturbance, described in the Analysis Methodology and Assumptions.

Lastly, past mining activity in the project area equate to 862 acres (1.5%) of the project area and likely maintain reduced soil function. Placer and hydro mining were a common gold mining practices and involved separating cobbles and boulders from finer texture soils and sediment, which may have been lost to the system or concentrated in ponds. These practices left behind fragile slopes, old roadbeds, ditch systems, and ponds that have both reduced soil function (biological, chemical, and physical) and reduced hillslope stability. These areas may also be more prone to erosion.

### 3.7.1.2.     *Analysis Methodology*

The project area is estimated at 56,843 acres and encompasses portions of Josephine, Jackson, and Douglas counties in the Medford BLM District. Because soils are expected to be impacted where management activities occur on the ground, this report focuses on soils within the proposed commercial harvest units, noncommercial HFR units, and road construction (Table 3.7.1).

The BLM's mission of multiple-use and sustained yield of timber coincides with soil resource protection under an adaptive management framework for assessing, quantifying, monitoring, and minimizing impacts on soil quality and stability (USDI BLM, 2016b, pp. 109-151). Soil management objectives are to maintain or enhance inherent soil functions and provide for landscapes that stay within the natural soil stability failure rates during and after management activities.

Detrimental Soil Disturbance (DSD) can occur from erosion, loss of organic matter, severe heating to seeds or microbes, soil displacement, or compaction. Timber harvest causes DSD most often from displacement of surface material and soil compaction during yarding activities.

RMP management direction for soils is to limit detrimental soil disturbance from forest management operations to a total of < 20 percent of the harvest unit area (USDI BLM, 2016b, pp. 109). The extent of detrimental soil disturbance varies with the type of yarding method and the mitigation measures employed. Based on the estimates of DSD based on yarding systems can be calculated (USDI BLM 2016a p. 746). This gives a way to evaluate DSD by alternative but does not account for site specific conditions and implementation.

Therefore, a GIS based analysis was employed on 65 of the proposed units and logging systems were provided for a subset of commercial harvest units in the proposed alternatives, which was used to extrapolate the potentially impacted area. Cable corridors were buffered to a width of 8 feet, 50 feet for landings, 12 feet for skid trails, and 45 feet for temporary and permanent roads (USDI/BLM, 2016b, pp. 745-768). Based on a GIS model of these units estimates for DSD were 12% for Alternative 2 and 2a due mostly to road construction and Alternative 3 was 6% DSD (standard error of 1%). Based on this modeling approach these percentages were applied to estimate DSD.

The soil specialist used on-site investigations to verify or edit Soil Survey and TPCC mapping in spring 2019. On-site soil descriptions follow the USDA-NRCS methods (Schoeneberger et al. 2012). Prior to field work, the soil specialist reviewed LiDAR slope derivatives, Soil Survey, and TPCC mapping to target investigation locations. The soil specialist visited all areas each category of non-suitable TPCC within planned ground-based yarding areas. In areas with problematic TPCC, for example, a landslide from 2011 south of unit 20B, on-site data, historic aerial photos, and LiDAR were used to update TPCC lines (Page-Dumroese et al. 2009). Pre-harvest monitoring was completed by the soil specialist in 2019.

The area used for soils analysis includes the proposed commercial harvest units, noncommercial HFR treatment units, and buffered road construction and reconstruction (45-ft width), which is the total area expected for potential ground disturbance that may affect soil resources for each alternative. The temporal scale of this data reflects the current condition of the soil and forested landscape because no changes are expected to have occurred to soil morphology since the NRCS mapping, LiDAR data acquisition, and after field visits conducted from 2020 to 2022. Previous projects (mechanical, burning, and harvest) were incorporated into potential effects through site visits.

Analysis for soil resources included proposed project spatial data, DOGAMI landslide data (DOGAMI, 2011), NRCS soil survey data including soil types, erosion hazard ratings, hydric soils, and internal BLM soil information from TPCC. Field review was conducted from 2020 to 2022 of DDR-TPCC areas, LIDAR-identified soil anomalies indicative of mass movement potential, previous hillside failures, or areas with high detrimental soil disturbance from past forest management activities. Detrimental soil disturbance for each alternative was determined by combining legacy disturbance with projected impacts from logging and extrapolating impact areas to each alternative. These analyses were conducted using ArcGIS products, aerial photos, historic records, and satellite imagery.

### 3.7.1.3.    *Assumptions*

DSD was calculated by combining disturbances caused in the past that are still present on the landscape (legacy) and those assumed to be caused by the proposed forest management actions. Legacy soil disturbance was derived from LIDAR imagery by tracing obvious topographic features that matched that of a skid trails or roads not incorporated into the transportation data, Productive treatment unit area was calculated using the proposed treatments and subtracting buffered BLM roads existing within that footprint (to 45-ft width). These features were buffered to 12 feet in included within the proposed timber harvest and noncommercial HFR treatment units.

It can be assumed that the DSD caused by forest management activities should be no more than 35% for ground-based harvesting, 12% for cable-yarding, and 6% for aerial harvesting (USDI/BLM, 2016b, p. 746). In total, the legacy and new DSD would be less than 20% of the treatment unit area (USDI/BLM, 2016a, p. 32 and 109).

An example of logging systems was provided for a subset of commercial harvest units in the proposed alternatives, which was used to extrapolate the potentially impacted area. Cable corridors were buffered to a width of 8 feet, 50 feet for landings, 12 feet for skid trails, and 45 feet for temporary and permanent roads (USDI/BLM, 2016b, pp. 745-768). The DSD model predicts the maximum impact of forest harvest activities, an over-estimate on a landscape scale, and may be altered in the future with site-specific data from the field office monitoring program.

Reduction of activity fuels after commercial harvest and non-commercial HFR treatments would reduce the potential for wildfire spread and intensity that result in stand replacing crown fires. Stand replacing crown fires have the potential to reduce forest productivity, remove vegetation that protects soil surfaces, and in some cases can lead to soil instability.

### 3.7.1.4.    *Effects by Alternative*

### 3.7.1.5.    *No Action Alternative Environmental Effects*

This alternative would result in no change to the affected environment. No disturbance due to harvest, road building, or noncommercial HFR treatments would occur. Existing roads require regular maintenance to reduce road surface erosion and maintain the functionality of the road and no road renovation is proposed under this alternative. Short-term impacts to soils would be avoided other than naturally occurring erosion and landslides. Indirectly, without the reduction of high-risk wildfire fuel loadings from HFR treatments, a high intensity wildfire could be more common and would negatively

impact soil function and slope stability by removing vegetation, burning soil organic matter, and reducing soil structure strength.

### 3.7.1.6.        *No Action Alternative Cumulative Effects*

The cumulative effects analysis area for Alternative 1 is the potential treatment units in LCFMP. There are no other ongoing or reasonably foreseeable future timber harvests, road construction, or fuels reduction actions within the project area. Soils would maintain carbon and other nutrient levels, bulk density, soil structure, biota, and root count as compared to harvested forests (Cambi et al. 2015, James and Harrison 2016, Busse et al. 2017). Therefore, there are no expected cumulative effects of other projects to consider in relation to the direct and indirect effects of the Last Chance timber management.

### 3.7.1.7.        *Action Alternative 2 Environmental Effects*

Commercial timber harvest, non-commercial HFR treatments, and road construction and road renovation can physically impact soil functions at the micro-scale (e.g., soil pore spaces) and macro-scale (e.g., hillslope stability). While these activities have the potential to immediately reduce soil quality and stability (via compaction and removal of organic matter, for example), they also result in above-ground forest structure and composition in forest stands with long-term positive effects on soils.

To haul timber from the commercial harvest units, Alternative 2 proposes 241 miles of road renovation, 28 miles of road construction, and potential entry into 14 existing rock quarries. It is estimated that 16 miles of the renovated roads would need major work such as rebuilding stream crossings, reconstructing the road prism, and in some case rerouting the road.

This alternative would decommission 31 miles of constructed or renovated roads upon project completion (Appendix D3: Transportation Management Table D.3-3). The BLM assumed that road construction would result on average in DSD across a 45-foot width from upper cutbank to the lower toe of fill. Road construction is a long-term impact on soils since it removes the organic layer, cuts deep into the soil horizon, and produces a compacted surface. Road decommissioning can potentially ameliorate soil impacts from road construction.

Road construction and motorized travel were analyzed in the FEIS (USDI/BLM 2016a pp. 752-755 and 762-763). The FEIS form the SWO RMP also looked at how timber harvest and fuel reduction treatments would affect soil quality (USDI/BLM 2016a pp. 752-762). The combination of all these impacts were described in Issue 5 in the FEIS and this analysis for soil resources is incorporated here by reference.

A GIS and Field review was conducted from 2020 to 2022 of DDR-TPCC areas. Soils that do not support and produce forest products (20 cubic feet of wood per acre per year) may be considered non forest, noncommercial forest lands, have fragile soil areas or may be identified as having a problem with reforestation (e.g. too rocky to plant). Fragile withdrawn soils were reviewed and excluded from the unit pool if management activity (USDI/BLM, 2016b, p. 109).

Fragile soil areas are classified due to slope gradient, low nutrients, low moisture, or groundwater. A total of 207 acres of TPCC non-suitable fragile soils for nutrient limitations (172 acres FN-N) and 210 acres of non-suitable for reforestation issues (RN-K, surface rock) exist in Alternative 2 treatment areas. There are no FN-E (non-suitable for surface erosion) or FN-P (non-suitable for mass soil movement) soils in the LCFMP. No restricted fragile soils with mass movement (FP category) within treatment boundaries. There is 416 acres of surface erosion (FE category) that is listed as restricted (Appendix D4: Watershed Analysis: Table D.4-12 DDR-TPCC Soils).

When these TPCC areas are field verified, they may be excluded from the unit or if field conditions do not warrant the designation they may be reclassified. If the issue can be mitigated during harvest this also may become part of a PDF for the unit (see Issue 27: TPCC Soils)

KSW01727

An analytical approach or DSD Model was used to estimate legacy disturbance using LiDAR (See the Analysis Methodology and Assumptions sections). Based on this method, 144 acres of legacy disturbance was estimated for Alternative 2, Alternative 2a and 10 acres for Alternative 3. If projected logging systems and legacy disturbance are expected to be above 20% DSD for any unit (USDI BLM, 2016b, pp. 109)., site specific mitigation would be applied to reduce this threshold. Based on field work this is most likely for ground-based units. Therefore, the DSD Model is likely an over-estimate. Post-harvest monitoring would be conducted to ensure adherence to this threshold (Table 3.7.1).

Table 3.7.1. Estimated DSD by Alternative based on FEIS method

| Alternative | Parameter | Acres |
|---|---|---|
| **Alternate 2 & 2a** | Commercial Timber Harvest | 8,240 |
| | Non-commercial HFR | 6,446 |
| | Road Construction (45 ft wide) | 158 |
| | Estimated DSD from Yarding Methods (Table D.4.10) | 929 |
| | Modeled Legacy Disturbance in Total Affected Area | 144 |
| | Estimated Acreage of DSD (Table D.4.11) | 1,231 |
| | **Potential DSD as % of unit area** | **15%** |
| **Alternate 3** | Commercial Timber Harvest | 1,059 |
| | Non-commercial HFR | 10,627 |
| | Road Construction (buffered 45 feet) | 0 |
| | Estimated DSD from Yarding Methods (Table D.4.10) | 64 |
| | Modeled Legacy Disturbance in Units | 10 |
| | Estimated Acreage of DSD (Table D.4.11) | 74 |
| | **Potential DSD as % of unit area** | **7%** |

Non-commercial HFR treatments are proposed on 3,446 acres in the project area outside of commercial timber units and would incorporate small diameter thinning, hand piling, and broadcast burning. Activity fuels treatment would occur in the commercial harvest unit when needed. The appropriate PDFs (Appendix C) would be applied to ensure low burn intensity and reduce additional DSD. The anticipated burn severity would not likely kill shallow roots of shrubs or forbs or detrimentally reduce soil biota, it would add charcoal as organic matter, and add a short-term flush of nutrients to the forest soil (Busse et al. 2014, Pingree and DeLuca 2017, Pingree and Kobziar 2019).

Burning of hand piled, small-diameter fuels and broadcast burning do not result in DSD for the purposes of BLM project planning if the PDFs listed Appendix C are followed and the analysis of machine-pile landings was incorporated into the DSD calculations for this alternative.

### 3.7.1.8.    *Action Alternative 2: Cumulative Effects*

The cumulative effects analysis area for Alternative 2 is the potential treatment units in LCFMP. Proposed commercial harvesting operations and road construction is expected to compact soil, remove organic matter, and reduce soil productivity overall for a short time and PDFs are in place (see section 10) to limit that disturbance, reduce the impacts of ground-based operations, and decommission roads, which would help ensure a minimum timeframe for this expected impact (Cambi et al. 2015). Historic soil disturbance was included with the field-based analysis and incorporating legacy disturbance into the analysis of this alternative. With the PDFs in place, no long-term impacts to soils are expected to exceed the threshold of 20% DSD. No concurrent or expected impacts from non-BLM actions are expected to detrimentally impact soil resources on the BLM-administered land within Alternative 2 project area.

3.7.1.9.         *Action Alternative 2a: Environmental Effects*

This alternative proposes commercial harvest activities, consisting of commercial thinning or selection harvest only, on approximately 1,059 acres and non-commercial HFR treatments on 11,686 acres (of which, 1,059 acres overlap with commercial harvest treatments).

Instead of the group select openings that occur with VRH these stands would be commercially thinned or have selection harvest. Assuming the volume of haul would be similar and timber harvest methods would be comparable under this sub-alternative. No changes in proposed new construction or increases in renovation were described or anticipated for this alternative. With the PDFs in place, no long-term impacts to soils will exceed the threshold of 20% DSD. No concurrent or expected impacts from non-BLM actions are expected to detrimentally impact soil resources on the BLM-administered land within Alternative 2a.

3.7.1.10.        *Action Alternative 2a: Cumulative Effects*

The cumulative effects analysis area for Alternative 2a is the potential treatment units in LCFMP. Proposed commercial harvesting operations and road construction is expected to compact soil, remove organic matter, and reduce soil productivity overall for a short time and PDFs are in place to limit disturbance, reduce the impacts of ground-based operations, and decommission roads. Effects would be almost identical to those described for alternative 2.

3.7.1.11.        *Action Alternative 3: Environmental Effects*

Alternative 3 proposes no road construction, 51 miles of road renovation and potential entry into 6 existing rock quarries. Like Alternative 2, some of the previously decommissioned roads would be closed upon project completion (USDI/BLM 2016b p. 311, 312). New road construction is a permanent disturbance to soils that would be avoided under this alternative.

This alternative includes less proposed commercial harvest area and road construction than Alternative 2, but the same acres of noncommercial HFR treatment units. In this Alternative, 1,118 acres of commercial units are proposed and 8 acres of temporary road construction. In Alternative 3, a total of 6% of the proposed treatment areas would have detrimental effects on soils, which is below the 20% threshold analyzed in the SWO/RMP.

Noncommercial HFR treatment units are expected to undergo the same impacts as described in Alternative 2 and remain under 20% DSD. Non-suitable fragile soils included for treatment in this alternative include 73 acres of low nutrient soils and 2 acres of high-water table soils. Harvest treatments and HFR treatments are expected to help restore forest structure and provide conditions that emulate historic fire regimes, therefore, having a long-term positive effect on soil function.

3.7.1.12.        *Action Alternative 3: Cumulative Effects*

Cumulative effects to soils for Alternative 3 would be like Alternative 2 but with decreased DSD from harvest operations, road building, and fuel treatments and below the 20% threshold outlined in the RMP and these impacts are expected to decrease over time. With the PDFs in place, no long-term impacts to soils are expected to exceed the threshold of 20% DSD. No concurrent or expected impacts from non-BLM actions are expected to detrimentally impact soil resources on the BLM-administered land within the project area for Alternative 3.

3.8.    **Recreation**

3.8.1.    Issue 11: How would the proposed treatments affect recreation opportunities, objectives, and Recreation Setting Characteristics (RSC) of the following Special Recreation Management Areas (SRMA) within the Last Chance Project Area? (King Mountain Trail SRMA, and Burma Pond Campground and Trailhead SRMA).

3.8.1.1.    *Background*

The BLM developed this issue to determine if the project will have any significant impacts in the RSC and recreation objectives and opportunities of the SRMAs within the project planning area. The BLM analyzed impacts to both the current recreation opportunities and objectives within the SRMAs, as well as impacts to the proposed RSC designation for each SRMA.

As part of the RMP, the BLM designated certain areas of the landscape as either SRMAs or ERMAs, (Extensive Recreation Management Areas). Within each of these designated areas, the BLM established recreation and visitor service objectives and identified supporting management actions and allowable uses (BLM 2016b p. 259). The Recreation Management Area (RMA) Frameworks includes descriptions of ERMAs and SRMAs (discussed below) including recreation objectives, allowable management actions, and use restrictions (USDI/BLM, 2016d).

SRMAs are administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. The BLM manages SRMAs to protect and enhance a targeted set of activities, experiences, benefits, and recreation setting characteristics. Within SRMAs, recreation and visitor services management is recognized as the predominant land use plan focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis. (USDI/BLM 2016b p. 259).

ERMAs are administrative units that require specific management consideration to address recreation use, demand, or recreation and visitor services program investments. The BLM manages ERMAs to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMAs is commensurate with the management of other resources and resource uses (BLM 2016b. p. 259).

Within the project planning area there are two SRMA's:  King Mountain Trail SRMA, and Burma Pond Campground and Trailhead SRMA.  There are no other Recreation Management Areas within the project area.

3.8.1.2.    *Methodologies*

Recreation Setting Characteristics

The BLM identifies desired recreation setting characteristics for RMAs to complement the desired recreation opportunities and activities within those RMAs.

The BLM categorizes the type of recreation setting characteristic desired in a particular area through its Recreation Setting Classification System. The BLM bases the Recreation Setting Classification System on a combination of physical, social, and operational components.

Remoteness and Naturalness Characteristics

With the exception of the characteristics of remoteness and naturalness, the BLM discusses effects on all the recreation setting characteristics through analysis of RMAs, recreation opportunities, and recreation demand. The PRMP/FEIS (BLM 2016a, pp. 556-559) used remoteness and naturalness characteristics to

identify and categorize recreation setting characteristics through Recreation Opportunity Spectrum (ROS) classes. These classes range on the spectrum from Primitive to Urban.

The distance criteria used to determine the recreation opportunity spectrum class for remoteness is displayed below in Table 9.1. The term "remoteness" refers to an area's proximity to human modifications associated with roads or trails. The BLM established the recreation opportunity spectrum class for remoteness by applying its functional road classification system to assign road types based on the recreation opportunity spectrum class and identifying distance criteria. These criteria were selected with consideration for the topography, vegetation, and road type within the project area. The road types consist of arterial, collector, local, and resource roads (USDI/BLM 2016a, 556).

Table 9.1: Distance criteria for each recreation opportunity spectrum class

| PRIMITIVE | BACK COUNTRY | MIDDLE COUNTRY | FRONT COUNTRY | RURAL | URBAN |
|---|---|---|---|---|---|

| Recreation Opportunity Spectrum Class | Distance Criteria |
|---|---|
| Primitive | Greater than 1 mile from any class of road, excluding those that are permanently closed or decommissioned |
| Backcountry | 0.25 to 1 mile from any class of road, excluding those that are permanently closed or decommissioned |
| Middle Country | Within 0.25 mile of local* or resource† roads |
| Front Country | Within 0.25 mile of collector‡ roads |
| Rural | Within 0.25 mile of arterial roads or highways |
| Urban | Within 0.25 mile of arterial roads or highways |

* **Local roads.** Roads that normally serve smaller areas than collector roads, accommodate fewer uses, have lower traffic volumes, and connect with collector roads or State and County road systems.
† **Resource roads.** Roads that provide point access to public lands, typically exist for a single use, carry very low traffic volumes, and connect with local or collector roads.
‡ **Collector roads.** Roads that primarily provide access to large blocks of public land, accommodate multiple uses, have BLM's highest traffic volumes, and connect with State and County road systems.

Naturalness is defined by the level of an area's influence by human modifications other than roads and trails. Such modifications can include areas of development, utilities, rights-of-way, livestock, structures, fences, habitat treatments, or landscape alternations. The level of naturalness considers the presence of these modifications and potential impact on the visitor experience. In this planning process, management considerations would predominately address landscape alternations through forest and habitat management actions. As such, the BLM's analysis of naturalness uses forest structural stage classes as a proxy to measure changes in recreation opportunity spectrum classes for naturalness. Figure 9.1 shows a visual representation of forest structural stage classifications for naturalness for the five recreation opportunity spectrum classes with forest stand proxies.

Figure 9.1: Stand visualizations for recreations setting classifications.



Table 9.2: Level of human modification and forest structural stage class proxies by recreation opportunity spectrum class for naturalness.

| Recreation Opportunity Spectrum Class | Level of Human Modification and BLM Forest Structural Stage Class Proxies |
|---|---|
| Primitive | • Undisturbed natural landscape<br>• Structurally-complex with Existing Old or Very Old Forest |
| Backcountry | • Natural-appearing landscape having modifications not readily noticeable<br>• Mature Single- or Multi-layered Canopy |
| Middle Country | • Natural-appearing landscape having modifications that do not overpower natural features<br>• Young High Density with Structural Legacies, or Young Low Density with or without Structural Legacies |
| Front Country | • Partially modified landscape with more noticeable modifications<br>• Young High Density without Structural Legacies |
| Rural | • Substantially modified natural landscape<br>• Stand Establishment with or without Structural Legacies |
| Urban | • Urbanized developments dominate the landscape |

The BLM used the amount of timber harvest by type and acres that would occur over the next 10 years to analyze the effects to recreation opportunity spectrum classes for naturalness. For example, timber harvest that involves thinning dense, young stands would shift the naturalness of an area from the Front Country to the Middle Country setting. In contrast, the VRH of older stands would modify the naturalness of an area from Primitive to Rural. These actions would influence the distribution of recreation for visitors who prefer these different settings.

3.8.1.3.        *Assumptions*

In preparing this analysis, the BLM has made several analytical assumptions that provide the framework to the analysis of the issue below:

• The analysis area for recreation objectives and opportunities is related to the RMAs only where the proposed treatment units are within an RMA.

• The RMAs may be developed in the future based on the objectives of the Recreation Planning Framework and any plan maintenance to that framework.

*Last Chance Forest Management Project*                                    *September 2024*
*Environmental Assessment*                112

KSW01732

• Forest stand structural stage classes are utilized as a proxy to determine effects to Naturalness, similar to the analysis completed in the PRMP/FEIS (BLM 2016a, pp. 557).

• The PDFs included in the EA (Appendix C) would be adhered to during the implementation of the proposed project.

• For fuels treatments in recreation sites, a short-term closure for public health and safety could last up to 2 days.

### 3.8.1.4.    *Affected Environment*

#### Burma Pond Campground and Trailhead SRMA

Burma Pond Campground and Trailhead SRMA is 9 acres in size and consists of a vault toilet, trash can, signs, three natural surface parking spots, and a primitive trail circling a small pond. It receives low to moderate seasonal visitation, with the primary activities being fishing, camping, and walking.

Under the Recreation Management Area Framework, timber harvest, fuels treatment, and other vegetation modification are allowable in the Burma Pond SRMA if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics. There is no proposed timber harvest in the Burma Pond SRMA under any alternative. There is no road construction in this SRMA under any alternative. Maintenance fuels treatments (hand pile/burn or broadcast) are proposed in this SRMA under alternatives 2 and 3.

#### King Mountain Trail SRMA

The King Mountain Trail SRMA is six acres in size and consists of a natural surface parking area, trail signs, and a half-mile primitive trail to a rock outcropping. It receives low seasonal visitation, with the primary activity being hiking and camping at the trailhead.

Under the Recreation Management Area Framework, King Mountain Trail SRMA is closed to timber harvest. This SRMA also overlaps with the King Mountain Rock Garden ACEC which has sensitive serpentine soils and plant communities. This King Mountain Trail SRMA is within the project boundary; however, there are no proposed forest management activities, timber harvest, road construction, or fuels treatments in the SRMA under any alternative.

Both SRMAs have a proposed middle country recreation setting characteristic. Human modification is allowed in the Middle Country setting. Noticeable modifications that do not overpower natural features and allow for a natural-appearing landscape are acceptable (PRMP/FEIS, BLM 2016a, p. 559). Characteristic of a middle country setting include: Within ¼ mile of local or resource roads, natural appearing landscapes having modifications that do not overpower natural features, and forest structural stage class proxies of young high density with structural legacies, or young low density with or without structural legacies.  Field observations confirm that both SRMAs currently have RSCs that are consistent with the above description of a middle country setting.

### 3.8.1.5.    *Environmental Consequences*

#### No Action Alternative

Under the No Action Alternative, there would be no forest management activities, timber harvest, road construction, or fuels treatments in either SRMA located in the project planning area. There would be no direct effect to the SRMAs, and the current situation would remain the same.

Indirectly, under the No Action alternative, vegetation in the Burma Pond SRMA could become denser and more homogenous over time. Without proposed forest management (fuels maintenance), the RSCs at

Burma Pond may shift from the desired Middle Country setting towards more of a less desirable setting. This would also lead to an increase in hazardous understory fuels buildup, which would be accompanied with increased fire risk.

The King Mountain Trail SRMA consists of a half-mile trail, most of which is rocky, open and not heavily forested.  Under the No Action alternative, the RSCs of King Mountain Trail would remain the same.

### Alternative 2

There is no proposed timber harvest in the Burma Pond Campground and Trailhead SRMA. The only proposed action in this SRMA is maintenance fuels treatments (hand pile/burn or broadcast) which is allowed under the Recreation Management Area Frameworks (USDI/BLM 2016d. p. 34). The area was treated previously in 2005, and this type of treatment is typical of the characteristic landscape in this SRMA. The fuels treatments would not change the setting characteristics or interfere with meeting recreation objectives of this SRMA because it would not increase the road network and because the fuel treatments would not change the stand structure in the RMAs. Fuels maintenance of understory vegetation would help maintain the desired RSCs of this SRMA, and hazardous fuels reduction would decrease the overall potential for high intensity/severity fires in the SRMA which would change the stand structure. Effects include improved resilience and reduction in fuel loading and fire risk. The fuels treatments would not interfere with recreation opportunities beyond active implementation where there may be short closures for public health and safety. These short-term impacts would be brief and recreation displacement would be easily absorbed by other near-by recreation opportunities. The proposed fuels treatments in this SRMA would not impact the proposed outcome objectives of this SRMA for future development of recreation facilities, including visitor activities, visitor experiences, and visitor benefits as outlined in the RMA framework. The proposed activities within the Burma Pond SRMA are consistent with proposed recreation setting characteristics, meeting recreation objectives, and not interfering with recreation opportunities for this SRMA.

There are no proposed actions in the King Mountain Trail SRMA. There would be no effect to this SRMA, and the current situation would remain the same.

For timber harvest activities outside of the SRMAs, there are PDFs (Appendix C) to ensure that access roads are open for public access to designated recreation sites on weekends, holidays, and at least intermittently during the week.

### Sub-Alternative 2a

Under this alternative, the proposed actions (if any) in both SRMAs are the same as in Alternative 2.

There are no proposed actions in the King Mountain Trail SRMA. The only proposed action in the Burma Pond Campground and Trailhead SRMA is maintenance fuels treatments (hand pile/burn or broadcast).

Effects to the SRMAs from Sub-alternative 2a would be the same as in Alternative 2, described above.

### Alternative 3

Under this alternative, the proposed actions (if any) in both SRMAs are the same as in Alternative 2.

There are no proposed actions in the King Mountain Trail SRMA. The only proposed action in the Burma Pond Campground and Trailhead SRMA is maintenance fuels treatments (hand pile/burn or broadcast).

Effects to the SRMAs from Alternative 3 would be the same as in Alternative 2, described above.

3.8.1.6.        *Cumulative Impacts*

The affected environment for the Burma Pond Campground and Trailhead SRMA includes past fuel treatments and hazard tree removal. Past, present, and reasonably foreseeable effects include improved resilience and reduction in fuel loading and fire risk (see Fire and Fuels discussion above, 3.2.1).

There are no plans to further develop or expand either the King Mountain Trail SRMA or the Burma Pond Campground and Trailhead SRMA. If a future project is developed in the area the BLM will analyze those effects at that time. The BLM expects forest management activities to continue on surrounding BLM lands as well as on adjacent privately owned timber lands. BLM would continue to implement recreation related PDFs (Appendix C) for forest management activities within RMAs.

Because the LCFMP is not proposed within the King Mountain Trail SRMA there are no effects and therefore no cumulative effects.

The effects of all action alternatives combined with these past, present, and reasonably foreseeable effects are to continue to improve resilience, fuel loading, and fire risk.

# CHAPTER 4.   CONSULTATION AND COORDINATION

## 4.1.     U.S. Fish and Wildlife Service

In accordance with regulations pursuant to Section 7 of the Endangered Species Act of 1973, as amended, consultation concerning the potential impacts of the proposed action upon the northern spotted owl and Franklin's bumble bee have been completed within the Biological Assessment for Medford BLM FY23 Batch of Projects on April 21, 2023. The BLM received a Biological Opinion (BO) for the Biological Assessment for Medford BLM FY23 Batch of Projects from the U.S. Fish and Wildlife Service on July 3, 2023.

The proposed action for this project has been reviewed and is in compliance with the Biological Assessment of activities that may affect the federally listed plant species Gentner's Fritillary and Cook's Lomatium, on the Medford District BLM (2020) and associated Letter of Concurrence from the U.S. Fish and Wildlife Service dated November 10, 2020.

## 4.2.     National Marine Fisheries Service

The Last Chance project is within the Rogue and Umpqua Basins, which are in the range of the federally threatened Southern Oregon/Northern California Coast (SONCC) and Oregon Coast (OC) Coho Salmon. Consultation for the Endangered Species Act and Essential Fish Habitat for the Magnuson-Stevens Fishery Conservation and Management Act with the National Marine Fisheries Service (NMFS) is covered under the *Endangered Species Act Section 7(a) (2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat for the Programmatic Forest Management Program for Western Oregon* (WCR-2017-7574; *aka*: FOMBO). The BLM complied with the use of the FOMBO and applied design criteria for this project, including transmittal of a Project Notification Form to the NMFS. The alternatives are consistent with the appropriate management direction and BMPs described as project design criteria for the FOMBO. Therefore, the Last Chance project is appropriate for inclusion under the opinion. The BLM is anticipating verification from the NMFS in August of 2024, that would state that the Last Chance project is consistent with the effects analysis and conclusions of the NMFS FOMBO dated March 9, 2018.

## 4.3.     Tribal Consultation

The Confederated Tribes of the Siletz Indians, the Confederated Tribes of Grand Ronde, and the Cow Creek Band of Umpqua Tribe of Indians were notified of the LCFMP on February 22, 2023, and invited to provide input or formally consult with the BLM. The Tribes did not request consultation.

## 4.4.     State Historic Preservation Office Consultation

The BLM Medford District consulted with the State Historic Preservation Office (SHPO) per Section 106 of the National Historic Preservation Act. After completing background research and field surveys, the BLM determined LCFMP would not adversely affect any historic properties. The BLM submitted this finding along with a report detailing the results of the inventory to SHPO in March 2023. The SHPO did not respond to this submittal within 30 days. Per the 2015 State Protocol between BLM and SHPO, if BLM does not receive a response from SHPO within 30 days of submitting a no adverse effect determination, BLM assumes SHPO concurrence with their determination of effect.

## 4.5.     Local Agency Coordination

The Josephine County Board Commissioners, the Josephine County Planning Department, and the Public Works Department were sent scoping letters requesting input on the Last Chance Forest Management Project proposal. They will be sent EA release letters requesting comments.

KSW01736

# CHAPTER 5.  LIST OF PREPARERS

This section lists the BLM IDT involved in the EA for the Last Chance FMP.

Table 10.1: List of Preparers

| Interdisciplinary Team Members | Title/Specialty |
|---|---|
| Anthony Saunders | Archeologist |
| Amanda Snodgrass | Botanist |
| Erica Freeman | Roads Engineer and Rights-of-Way Specialist |
| Jon Raybourn | Fish Biologist |
| Jena Volpe and Aaron Schuh | Fire Ecologist & Fuels Specialist |
| Shawn Thornton | Geographic Information Systems (GIS) |
| Bob Lange | Hydrologist |
| Kevin Massey & Eugene Gilseth | Planning and Environmental Specialist/Coordinator |
| Ron Rhatigan | Silviculturist & Port-Orford-Cedar Specialist |
| Shawn Stapleton | Outdoor Recreation Planner |
| Melissa Pingree & Bob Lange | Soil Scientist and Soils Specialist |
| Sarah Queen-Foster | Timber Forester |
| Jason Reilly, and Samantha Langley | Wildlife Biologist |

# APPENDIX A: REFERENCES

Agee, J. K. and C. N. Skinner. 2005. Basic principles of forest fuel reduction treatments. Forest Ecology and Management 211, 83-96.

Anderson, P. D., Larson, D. J., & Chan, S. S. (2007). Riparian Buffer and Density Management Influences on Microclimate of Young Headwater Forests of Western Oregon. Forest Science 53(2), 254-269.

Andrews, P. A., and R. Rothermel. 1982. Charts for Interpreting Wildland Fire Behavior Characteristics. General Technical Report, INT-GTR-131. USDA Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah. 21 pp. http://www.fs.fed.us/rm/pubs_int/int_gtr131.pdf.

Altman, B. and J. D. Alexander. 2012. Habitat conservation for landbirds in coniferous forests of western Oregon and Washington. Version 2.0. Oregon-Washington Partners in Flight (www.orwapif.org) and American Bird Conservancy and Klamath Bird Observatory.

Arienti MC, Cumming SG, Krawchuk MA, Boutin S. 2009. Road network density correlated with increased lightning fire incidence in the Canadian western boreal forest. International Journal of Wildland Fire 18:970–82.

Aurell, J. B., K. Gullet, D. Tabor, and N. Yonker. 2016. Emissions for prescribed burning of timber slash piles in Oregon. Atmospheric Science 150, 395-406.nn

Atzet, T., D.E. White, L.A. McCrimmon, P.A. Martinez, P.R. Fong, and V.D. Randall. 1996. Field guide to the forested plant associations of Southwestern Oregon. PNW Region, Technical Paper R6-NR-ECOLTP-17-96.

Baker, S. C., Spies, T. A., Wardlaw, T. J., Balmer, J., Franklin, J. F., & Jordan, G. J. (2013). The harvested side of edges: Effect of retained forest on the re-establishment of biodiverisity in adjacent harvested areas. Forest Ecology and Management, 107-121.

Benda, L.E., S.E. Litschert, Gorn Reeves, Robert Pabst. 2016. Thinning and in-stream wood recruitment in riparian second growth forests in coastal Oregon and the use of buffers and tree tipping as mitigation. Northeast Forestry University and Springer-Verlag Berlin Heidelberg 2015.

Bennett M., Main M. 2018. Thinning in Mature Douglas-Fir Stands in Southwest Oregon: A Case Study. Oregon State University. EM 9199USDI/BLM. 1992. United States Department of the Interior, Bureau of Land Management. Manual 9015 – Integrated Weed Management.

Bennett, M., Shaw, D.C. and Lowrey, L., 2023a.: Evidence for a Decline Spiral. Journal of Forestry 121(9).

Bennett, M., Adlam, C, 2023b. Trees on Edge. Oregon State University Extension Service, EM 9406

Beschta, R. L. and R. L. Taylor. 1988. Stream temperature increases and land use in a forested Oregon watershed. Water Resources Bulletin 24(1), 19-25.

Best, A., L. Zhang, T. McMahon, A. Western, and R. Vertessy. 2003. A critical review of paired catchment studies with reference to seasonal flows and climatic variability. Canberra, Australia: Murray-Darling Basin Commission.

Bigelow, S.W. and North, M.P., 2012. Microclimate Effects of Fuels-Reduction and Group-Selection Silviculture: Implications for Fire Behavior in Sierran Mixed-Conifer Forests. Forest Ecology and Management, 264: pp. 51-59.

Brown, Matt. United State Forest Service. Plant of the Weed: Clustered Lady's Slipper (*Cypripedium fasciculatum*). Accessed Online: https://www.fs.usda.gov/wildflowers/plant-of-the-week/cypripedium_fasciculatum.shtml

Brown, R. T., J. K. Agee, and J. F. Franklin. 2004. Forest restoration and fire: principles in the context of place. Conservation Biology 18(4):903-912. http://dx.doi.org/10.1111/j.1523-1739.2004.521_1.x

Brown, A. E., Zhang, L., McMahon, T. A., Western, A. W., & Vertessy, R. A. (2005). A Review of Paired Catchment Studies for Determining Changes in Water Yield Resulting from Alterations in Vegetation. Journal of Hydrology 310, 28-61.

Buermeyer K.R., and C.A. Harrington. 2002.  Fate of Overstory Trees and Patterns of Regeneration 12 Years After Clearcutting with Reserve Trees in Southwest Washington.  Western Journal of Applied Forestry 17 (8): 78-85.

Burton, J. D.H. Olson, L.J. Puettmann. 2016. Effects of riparian buffer width on wood loading in headwater streams after repeated forest thinning. Forest Ecology and Management 372, pp. 247-257.

Bury, R.B., H.H. Welsh Jr., D.J. Germano, and D.T. Ashton. 2012. Northwest fauna 7. Western pond turtle:biology, sampling techniques, inventory and monitoring, conservation, and management. Society forNorthwestern Vertebrate Biology. Olympia, Washington. 128 pp.

Busse, M.D., Hubbert, K.R. & Moghaddas, E.E. Y. (2014). Fuel reduction practices and their effects on soil quality. *Gen. Tech. Rep. PSW-GTR-241. Albany, CA: U.S. Department of Agriculture, Forest Service, Pacific Southwest Research Station. 156 p.*

Calkin, D. E.; A. A. Ager, J. Gilbertson-Day (eds.). 2010. Wildfire Risk and Hazard: Procedures for the First Approximation. General Technical Report RMRS-GTR-235. USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado. 72 pp.

Cambi M., Certini, G., Neri, F. & E. Marchi. (2015). The Impact of Heavy Traffic on Forest Soils: A Review. *Forest Ecology and Management. 338*: *124-138*.

Churchill, D. J., A. J. Larson, M. C. Dahlgreen, J. F. Franklin, P. F. Hessburg, and J. A. Lutz. 2013. Restoring Forest Resilience: From Reference Spatial Patterns to Silvicultural Prescriptions and Monitoring. Forest Ecology and Management 291: pp. 442-457.

Council on Environmental Quality (CEQ). 1981. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations. Washington, D.C. March.

CEQ. 2020. Federal Register: Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act. Vol. 85, No. 137, pp. 43304-43376. Washington, D.C. July.

CEQ. 2021. National Environmental Policy Act Implementing Regulations Revisions. Vol. 86, No. 192, pp. 55757-55769. Washington, D.C. October.

Cristan, R., W. M. Aust, M. C. Bolding, S. M. Barrett, J. F. Munsell, and E. Schilling. 2016. Effectiveness of forestry best management practices in the United States: Literature review. Forest Ecology and Management 360, 133-151.

Cohen, J., 2008. The Wildland-Urban Interface Fire Problem: A Consequence of the Fire Exclusion Paradigm. Forest History Today. Fall: 20-26: pp. 20-26.

Community Wildfire Protection Plan (CWPP) - Rogue Valley Integrated. 2019. Jackson & Josephine Counties, Oregon. https://jacksoncountyor.org/emergency/County-Plans/Fire-Plan (with story map at) https://www.arcgis.com/home/item.html?id=613a03c1e0274c1e9f09ff5a921f67c0).

Cristan, R., Aust, M. W., Bolding, C. M., Barrett, S. M., Munsell, J. F., & Schilling, E. (2016). Effectiveness of forestry best management practices in the United State: Literature Review. Forest Ecology and Management, 360, 133-151.

Davis, C.J. 1998. Western pond turtle (Clemmys marmorata pallida) winter habitat use and behavior. Master's Thesis. UMI Company. Ann Arbor, Michigan. 64 pp.

Davis, R., K. Dugger, S. Mohoric, L. Evers, and W. Aney. 2011. Northwest Forest plan-the first 15 years (1994-2008): Status and trends of northern spotted owl populations and habitats. Portland, OR: U.S. Forest Service.

Davis, R. J., B. Hollen, J. Hobson, J. E. Gower, and D. Keenum. 2016. Status and trends of northern spotted owl habitats. General Technical Report PNW-GTR-929. Olympia, WA: U.S. Forest Service.

Davis, L. S. and K. N. Johnson. 1987. Forest Management (3rd ed). New York, NY: McGraw-Hill. p. 79.

DOGAMI (2011): Oregon Department of Geology and Mineral Industries Lidar Program airborne lidar survey. Oregon Department of Geology and Mineral Industries (DOGAMI). Distributed by Open Topography.

Drew, T.J. and J.W. Flewelling. 1979. Stand density management: an alternative approach and its application to Douglas-fir plantations. Forest Science, Vol. 25, No. 3, pp. 518-532

Dube, K., Megahan, W., & McCalmon, M. (2004). Washington Road Surface Erosin Model (WARSEM) Manual. Prepared for the State of Washighton Department of Natural Resources.

Dugger, K., R. Anthony, and L. Andrews. 2011. Transient dynamics of invasive competition: Barred owls, spotted owls, habitat, and the demons of competition present. Ecological Applications 21(7), 2459-2468.

Dugger, et. al. 2016. The effects of habitat, climate, and barred owls on long-term demography of northern spotted owls. The Condor 118(1), 57-116.

Edwards, P. J., Wood, F. & Quinlivan, R. L., 2016. Effectiveness of Best Management Practices that have Application to Forest Roads: A Literature Synthesis, Newtown Square, PA: Forest Service General Technical Report NRS-163.

FEMA. (2024). Federal Emergency Management Agency (FEMA) Flood Map Service Center. Accessed 08/04/2024. https://msc.fema.gov/portal/home.

FEMAT. (1993). Forest Ecosystem Management: An Ecological, Economic and Social Assessment. Portland Oregon: Forest Ecosystem Management Assessment Team (FEMAT).

Fettig, C. J., K. D. Klepsiz, Billings F. F., Munson A. S., T. E. Nebeker, J. F. Negron, and J. T. Nowak. 2007. The effectiveness of vegetation management practices for prevention and control of bark beetle infestations in coniferous forests of the western and southern United States. Forest Ecology and Management 238(1-3), 24-53.

Franklin, J. F., K. N. Johnson, D. J. Churchill, K. Hagmann, D. Johnson, and J. Johnston. 2013. Restoration of Dry Forests in Eastern Oregon: A Field Guide. The Nature Conservancy, Portland, Oregon. 202 pp.

Franklin, Jerry F., Spies, Thomas A, Van Pelt, Robert, Carey, Andrew B., Thornburgh, Dale A., Berg, Dean Rae., Lindenmeyer, David B., Harmon, Mark E., Keeton, William S., Shaw, David C., Bible, Ken, Chen, Jiquan. 2002. "Disturbances and structural development of natural forest ecosystems with silvicultural implications, using Douglas-fir forests as an example." Forest Ecology and Management, no. 155 (2002): 399-423.

Furniss, J. F., Roelofs, T. D., & Yee, C. S. (1991). Road construction and maintenance: Influences of forest and rangeland management on salmonid fishes and their habitats. American Fisheries Society Special Publication 19, 297-232.

Furniss, M. J., Flanagan, S., & McFadin, B. (2000). Hydrologically-connected roads: An indicator of the influence of roads on chronic sedimentation, surface water hydrlogy, and exposure to toxic chemicals. Fort Collis, CO: Stream Notes US Forest Service.

Furniss, M. J., Staab, B. P., Hazelhurst, S., F., C. C., Roby, K. B., Ilhadrt, B. L., . . . Edwards, P. J. (2010). Water, climate change, and forests: watershed stewardship for a changing climate. Gen. Tech. Rep. PNW-GTR-812. Portland: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 75 p.

Garcia, A., M. Esperanza, and R. Font. 2003. Comparison between product yields in the pyrolysis and combustion of different refuse. Journal of Analytical and Applied Pyrolysis 68-69, 577-598.

Graham, R.T., McCaffrey, S. and Jain, T.B. 2004. Science Basis for Changing Forest Structure to Modify Wildfire Behavior and Severity. USDA Forest Service, Rocky Mountain Research Station.

Geyer, N. A. (2003). LowerCow Creek Watershed Assessment and Action Plan. Roseburg, Oregon: Prepared for the Umpqua Basin Watershed Council.

Grant, G. E., S. L. Lewis, F. J. Swanson, J. H. Cissel, and J. J. McDonnell. 2008. Effects of forest Practices on peak flows and consequent channel response: A state-of-science report for western Oregon and Washington. Portland, OR: Government Printing Office.

Gregory, K.M. and C.P. McGowan. 2023. Appendix A: modeling appendix for the northwestern and southwestern pond turtle (A.marmorata, A.pallida). In species status assessment report for the northwestern pond turtle (Actinemys marmorata) and southwestern pond turtle (Actinemys pallida). U.S. Fish and Wildlife Service. Version 1.1. Ventura, CA. 43 pp.

Gregory, Stanely, Linda Ashkenas, Randall Wildman, George Lienkaemper, Ivan Arismendi, Gary A. Lamberti, Mark Meleason, Brooke E. Penaluna, and Daniel Sobota (2024). Long-term dynamics of large wood in old-growth and second-growth stream reaches in the Cascade Range of Oregon. River Research Applications 40:943–957.

Groom, J., Dent, L., Madsen, L., & Fleuret, J. (2011). Response of western Oregon (USA) stream temperatures to contemporary forest management. Forest Ecology and Management, 1618-1629.

Gucinski, H. M.H. Brookes, M.J. Furniss, Robert. R. Ziemer. 2001. Forest Roads: A Synthesis of Scientific Information. USDA/USFS. Pacific Northwest Research Station. PNW-GTR-509. May 2001.

Halofsky J.E., David P.L., Metlen K.L., Meyer M.G., Sample V.A. 2016. Developing and Implementing Climate Change Adaption Options in Forest Ecosystems: A Case Study in Southwestern Oregon, USA. Forests, 7(11), p. 268.

Harr, Dennis. R. 1976. hydrology of small forest streams in western Oregon. USDA/USFS Pacific Northwest Forest and Range Experiment Station, Portland, Oregon.

Haskins, K. and Gehring, C. 2004. Long-term effects of burning slash on plant communities and arbuscular mycorrhizae in a semi-arid woodland.

Haugo, R., Zanger, C., DeMeo, T., Ringo, C., Shlisky, A., Blankenship, K., Simpson, M., Mellen-McLean, K., Kertis, J. & Stern, M. (2015). A new approach to evaluate forest structure restoration needs across Oregon and Washington, USA. *Forest Ecology and Management, 335: 37-50.*

Hessburg, P. F., Agee, J. K., & Franklin, J. F. (2005). Dry forests and wildland fires of the inland Northwest USA: Contrasting the landscape ecology of the pre-settlement and modern eras. Forest Ecology and Management, 211, 117-139.

Hessburg, P.F., D. J. Churchill, A. J. Larson, R. D. Haugo, C. Miller, T. A. Spies, M. P. North, N. A. Povak, R.T. Belote, and P. H. Singleton. 2015. Restoring Fire-Prone Inland Pacific Landscapes: Seven Core Principles. Landscape Ecology.

Hessburg, Paul F., Thomas A. Spies, David A. Perry, Carl N. Skinner, Alan H. Taylor, Peter M. Brown, Scott L.Stephens, Andrew J. Larson, Derek J. Churchill, Nicholas A. Povak, Peter H. Singleton, Brenda McComb, William J. Zielinski, Brandon M. Collins, R. Brion Salter, John J. Keanem, Jerry F. Franklin, Greg Riegel. 2016. Tamm Review: Management of mixed-severity fire regime forests in Oregon, Washington, and Northern California. Forest Ecology and Management 366 (2016) 221–250.

Holland, D.C. 1994. The western pond turtle: habitat and history. Wildlife Diversity Program, Oregon Department of Fish and Wildlife. Portland, OR. 303 pp.

Hood S.M., Cluck D.R., Jones B.E., and Pinnell S. 2018. Radial & Stand Thinning Treatments: 15-Year Growth Response of Legacy Ponderosa & Jeffrey Pine Trees. Restoratio Ecology 26(5): pp. 813-819.

Institute for Applied Ecology. 2010. Experimental habitat manipulation of wayside aster (*Eucephalus vialis*) – Final Report.

Institute for Applied Ecology. 2012. Population Viability Analysis for the clustered lady's slipper (*Cypripedium fasciculatum*) – Report to the Bureau of Land Management, Medford District.

Institute for Applied Ecology. 2014. Effects of prescribed fire for fuel reduction on *Solanum parishii* (Parish's Horse-nettle).

Jain, T. B., M. A. Battaglia, H. Han, R.T. Graham, C. R. Keyes, J. S. Fried, and J. E. Sandquist. 2012. A Comprehensive Guide to Fuel Management Practices for Dry Mixed Conifer Forests in the Northwestern United States. General Technical Report RMRS-GTR292. USDA Forest Service, Rocky Mountain Research Station. Fort Collins, Colorado. 331 pp. http://www.fs.fed.us/rm/pubs/rmrs_gtr292.pdf.

James, J. & Harrison, R. (2016). The Effect of Harvest on Forest Soil Carbon: A Meta-Analysis. *Forests. 7: 308*.

Janisch, J. E., Wondzell, S. M., & Ehinger, W. J. (2012). Headwater Stream Temperature: Interpreting Response after Logging, with and without Riparian Buffers, Washington, USA. Forest Ecology and Management, 302-313.

Jefferson, A. J. (2011). Seasonal versus transient snow and the elevation dependence of climate sensitivity in maritime mountainous regions. Geophysical Research Letters, 38(L16402).

Johnson, S. L., & Jones, J. A. (2000). Stream Temperature Responses to Forest Harvest and Debris Flows in Western Cascades, Oregon. National Research Council Canada, 30-39.

Johnson, S. L., Argerich, A., Ashkenas, L. R., Bixby, R. J., & Plaehn, D. C. (2023). Stream nitrate enrichment and increased light yet no algal response following forest harvest and experimental manipulation of headwater riparian zones. PLoS ONE 18(4), 1-31.

Johnson, T., Butcher, J., Deb, D., Faizullabhoy, M., P Hummel, J. K., Mearns, L. O., . . . Witt, J. (2015). Modeling Streamflow and Water Quality Sensitivity to Climate Change and Urban Development in 20 US Watersheds. Journal of the American Water Resources Association, 1-21.

Jones, J. A. and G. E. Grant. 1996. Peak flow responses to clear-cutting and roads in small and large basins, western Cascades, Oregon. Water Resources Research 32(4), 959-974.

Kauffman, J. B. 2004. Death rides the forest: perceptions of fire, land use, and ecological restoration of western forests. Conservation Biology 18(4):878-882.

LANDFIRE: LANDFIRE Fire Regime Groups (2012). U.S. Department of Interior, Geological Survey. [Online2 016, October 4] http://www.landfire.gov/geoareasmaps/2012/CONUS_FRG_c12.pdf

Leinenbach, P., McFadden, G., & Torgersen, C. (2013). Effects of Riparian Management Strategies on Stream Temperature. Interagency Coordinating Sub Group Science Review Team.

Lint, J. 2005. Northwest forest plan—the first 10 years (1994-2003): Status and trends of northern spotted owl populations and habitat. Final report. Portland OR: Government Printing Office.

Liu, X., Huey, L.G., Yokelson, R.J., Selimovic, V., Simpson, I.J., Müller, M., Jimenez, J.L., Campuzano-Jost, P., Beyersdorf, A.J., Blake, D.R. and Butterfield, Z., 2017. Airborne Measurements of Western US Wildfire Emissions: Comparison with Prescribed Burning and Air Quality Implications. Journal of Geophysical Research: Atmospheres 122(11).

Long, J.N., Daniel T.W., 1990. Assessment of growing stock in uneven-aged stands. Western. Journal of Applied Forestry, pp. 93–96.

Long, J.W., Tarnay, L.W. and North, M.P. 2017. Aligning Smoke Management with Ecological and Public Health Goals. Journal of Forestry 116(1): pp. 76-86.

Luce, C. H., & Black, T. A. (2001). *Effects of Trafic and Ditch Maintenance on Forest Road Sediment Production.* Boise, ID.: USDA Forest Service, Rocky Mountain Research Station.

Martinson, E. J., and P. N. Omi. 2013. Fuel Treatments and Fire Severity: A Meta-Analysis. Research Paper RMRS-RP-103WWW. USDA Forest Service, Rocky Mountain Research Station. Fort Collins, Colorado. 38 pp. http://www.fs.fed.us/rm/pubs/rmrs_rp103.pdf.

McIver, J. and R. Ottmar. 2006. Fuel mass and stand structure after post-fire logging of a severely burned ponderosa pine forest in northeastern Oregon. Forest Ecology and Management 238(1-3), 268-279

Mellen-McLean, Kim, Bruce G. Marcot, Janet L. Ohmann, Karen Waddell, Elizabeth A. Willhite, Steven A. Acker, Susan A. Livingston, Bruce B. Hostetler, Barbara S. Webb, and Barbara A. Garcia. 2017. DecAID, the decayed wood advisor for managing snags, partially dead trees, and down wood for biodiversity in forests of Washington and Oregon. Version 3.0. USDA Forest Service, Pacific Northwest Region and Pacific Northwest Research Station; USDI Fish and Wildlife Service, Oregon State Office; Portland, Oregon. https://apps.fs.usda.gov/r6_decaid/views/index.html

Messier, Michael S., Jeff P.A. Shatford, and David E. Hibbs (2012). Fire exclusion effects on riparian forest dynamics in southwestern Oregon. Forest Ecology and Management 264: 60-71.

Metlen, K. L., D. Borgias, B. Kellogg, M. Schindel, A. Jones, G. McKinley, D. Olson, C. Zanger, M. Bennett, B. Moody, and E. Reilly. 2017. Rogue Basin Cohesive Forest Restoration Strategy: A Collaborative Vision for Resilient Landscapes and Fire Adapted Communities. The Nature Conservancy, Portland, Oregon.

Metlen, K.L., Skinner, C.N., Olson, D.R., Nichols, C. and Borgias, D., 2018. Regional and Local Controls on Historical Fire Regimes of Dry Forests and Woodlands in the Rogue River Basin, Oregon, USA. Forest Ecology and Management 430: pp. 43-58.

Montana State University Extension. 2011. Washing Vehicles to Prevent Weed Seed Dispersal.

Moore J.R., S.J. Mitchell, D.A. Maguire, C.P. Quine. 2003. Wind Damage in Alternative Silvicultural Systems: Review and Synthesis of Previous Studies. International Conference 'Wind Effects on Trees' University of Karlsruhe, Germany. September 16-18, 2003.

Moore, D.R., S.M. Wondzell. 2005. Physical Hydrology and the effects of forest harvesting in the Pacific Northwest: A Review. Journal of the American Water Resources Association. August 2005.

Mote, P.W., J. Abatzoglou, K.D. Dello, K. Hegewisch, and D.E. Rupp. 2019. Fourth Oregon Climate Assessment Report. Oregon Climate Change Research Institute.

Mullens, L., Johnson, S., Osbrack, S., and Showalter, R. 2018. Plants of Southwest Oregon.

Narayanaraj, G. and Wimberly, M.C. 2012. Influences of Forest Roads on the Spatial Patterns of Human- and Lightning-Caused Wildfire Ignitions. Applied Geography 32(2): pp. 878-888.

Natural Resources Conservation Service (NRCS) 2020, United States Department of Agriculture. Web Soil Survey. Available online at the following link: http://websoilsurvey.sc.egov.usda.gov/.

O'Connor, J. E., Mangano, J. F., Anderson, S. W., & Wallick, J. R. (2014). Geologic and physiographic controls on bed-material yield, transport, and channel morphology for alluvial and bedrock rivers, western Oregon. Geological Society of America Bulletin March/April v. 126, 377-397.

O'Hara. 2014. Multiaged Silviculture: Managing For Complex Forest Stand Structures. Oxford University Press.

Oliver, C.D. and B.A. Larson. 1996. Forest Stand Dynamics, Updated Edition. Yale University School of Forestry and Environmental Studies. Elischolar.

ODA. 2016. Oregon Department of Agriculture. Forest Practices Act. Oregon Department of Forestry. https://www.oregon.gov/ODF/Working/Pages/FPA.aspx.

ODA, Oregon Department of Agriculture. 2023. Wayside Aster (*Eucephalis vialis)*.

ODA, Oregon Department of Agriculture. 2024. Noxious Weed Profiles. Web Address: https://www.oregon.gov/oda/programs/Weeds/OregonNoxiousWeeds/Pages/AboutOregonWeeds.aspx.

ODEQ. (2022a). Oregon Nonpoint Source Pollution Program Annual Report for 2021. Portland: Oregon Department of Environmental Quality.

ODEQ. (2022b). Methodology for Oregon's 2022 Water Quality Report and List of Water Quality Limited Waters. Portland: Oregon Department of Water Quality, Water Quality Division.

ODEQ. (2023a). EPA Approved Integrated Report. Retrieved from Oregon Department of Environmental Quality Water Quality Assessment: https://www.oregon.gov/deq/wq/Pages/epaApprovedIR.aspx

ODEQ. (2023b). Water Quality Standards. Retrieved from Oregon Department of Environmental Quality Water Quality: https://www.oregon.gov/deq/wq/Pages/WQ-Standards.aspx

Oregon DEQ. (2023c). EPA Approved 2022 Integrated Report Fact Sheet. Retrieved from Oregon Department of Environmental Quality: https://www.oregon.gov/deq/wq/Documents/IR2022FactSheet.pdf

ODFW. 2015. (Oregon Department of Fish and Wildlife). Guidance for conserving Oregon's native turtles including best management practices. Oregon Department of Fish and Wildlife. 99 pp.

Oregon OSHA. 2003. Oregon Occupational Safety and Health Standards. Oregon Administrative Rules.

KSW01745

Chapter 437 Division 7. Oregon Occupational Safety and Health Division, Salem, Oregon.

Page-Dumroese, D. S., Abbott, A. M. & Rice, T. M. 2009. Forest Soil Disturbance Monitoring Protocol: Volume I: Rapid assessment. *General Technical Report-USDA Forest Service, (WO-82a).*

Page-Dumroese, D.S. 2020. The North American Long-Term Soil Productivity study: collaborations to understand forest responses to land management. In: Pile, Lauren S.; Deal, Robert L.; Dey, Daniel C.; Gwaze, David; Kabrick, John M.; Palik, Brian J.; Schuler, Thomas M., comps. The 2019 National Silviculture Workshop: a focus on forest management-research partnerships. *Gen. Tech. Rep. NRS-P-193. Madison, WI: U.S. Department of Agriculture, Forest Service, Northern Research Station: 53-61.* https://doi.org/10.2737/NRS-GTR-P-193-paper8.

Perry, T.D., J.A. Jones. 2016. Summer streamflow deficits from regenerating Douglas-fir forest in the Pacific Northwest, USA. Special Issue Paper. Ecohydrology, 2017;10:e1790.

Pingree, M.R.A. & T.H. DeLuca. 2017. Function of Wildfire-Deposited Pyrogenic Carbon in Terrestrial Ecosystems. *Front. Environ. Sci. 5:53.* doi: 10.3389/fenvs.2017.00053

Pingree, M. R. & Kobziar, L. N. 2019. The myth of the biological threshold: A review of biological responses to soil heating associated with wildland fire. *Forest Ecology and Management*, *432*, 1022-1029.

Pollet, J. and P. N. Omi. 1999. Effect of thinning and prescribed burning on wildfire severity in ponderosa pine forests. Proceedings from the 1999 joint fire science conference and workshop crossing the millennium: Integrating spatial technologies and ecological principles for a new age in fire management.

Pollock, M. M. & Beechie, T. J., 2014. Does Riparian Forest Restoration Thinning Enhance Biodiversity? The Ecological Importance of Large Wood. Journal of American Water Resources Association 50(3), pp. 543-559.

Prichard, S.J., Hessburg, P.F., Hagmann, R.K., Povak, N.A., Dobrowski, S.Z., Hurteau, M.D., Kane, V.R., Keane, R.E., Kobziar, L.N., Kolden, C.A. and North, M. 2021. Adapting Western North American Forests to Climate Change and Wildfires: 10 Common Questions. Ecological Applications, 31(8).

Purcell, K.L., E.L. McGregor, and K. Calderala. 2017. Effects of drought on western pond turtle survivaland movement patterns. Journal of Fish and Wildlife Management 8(1):1-13.

Rashin, E. B., Clishe, C. J., Loch, A. T. & Bell, J. M., 2006. Effectiveness of Timber Harvest Practices for Controlling Sediment Related Water Quality Impacts. Journal of the American Water Resources Association, pp. 1307-1327.

Reese, D.A. and H.H. Welsh. 1997. Use of terrestrial habitat by western pond turtles, Clemmysmarmorata: implications for management. Proceedings: conservation, restoration, and management of tortoises and turtles. An international conference, pp. 352-357 held by the New York Turtle and Tortoise Society.

Reinhardt, E. D., R. E. Keane, D. E. Calkin, and J. D. Cohen. 2008. Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States. Forest Ecology and Management 256:1997-2006.

Romero-Calcerrada, R., Novillo, C.J., Millington, J.D.A. and Gomez-Jimenez, I. 2008. GIS Analysis of Spatial Patterns of Human-Caused Wildfire Ignition Risk in the SW of Madrid (Central Spain). Landscape Ecology 23(3): pp. 341-354.

Ruzicka, K. J., Puettmann, K. J. & Olson, D. H., 2014. Management of Riparian Buffers: Upslope Thinning with Downslope Impacts. Forest Science 60(5), pp. 881-892.

Ryan, K. C., E. E. Knapp, and J. M. Varner. 2013. Prescribed fire in North American forests and woodlands: history, current practice, and challenges. Frontiers in Ecology and the Environment 11:e15-e24.

Rosenberg, D., J. Gervais, D. Vesely, S. Barnes, L. Holts, R. Horn, R. Swift, L. Todd, and C. Yee. 2009.Conservation assessment of the western pond turtle in Oregon (Actinemys marmorata). USDI Bureau of Land Management and Fish and Wildlife Service, USDA Forest Service Region 6, and Oregon Department of Fish and Wildlife. Portland, OR. 80 pp.

Schoeneberger, P. J., Wysocki, D. A., & E.C. Benham. (Eds.). (2012). Field book for describing and sampling soils. Government Printing Office.

Scott, J.H. and Burgan, R.E., 2005. Standard Fire Behavior Fuel Models: A Comprehensive Set for Use with Rothermel's Surface Fire Spread Model. USDA USFS, Rocky Mountain Research Station. General Technical Report RMRS-GTR-153. Fort Collins, Colorado.

Scott, J.H., Gilbertson-Day, Julie and Stratton, Richard D. 2018. Exposure of Human Communities to Wildfire in the Pacific Northwest. Briefing paper.

Scott, J. H. and E. D. Reinhardt. 2001. Assessing Crown Fire Potential by Linking Models of Surface and Crown Fire Behavior. USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado. Research Paper RMRS-RP-29. 59 pp. http://www.fs.fed.us/rm/pubs/rmrs_rp029.pdf

Segura, C., Bladon, K. D., Hatten, J. A., Jones, J. A., Hale, V. C., & Ice, G. G. (2020). Long-term effects of forest harvesting on summer low flow deficits in the Coast Range of Oregon. Journal of Hydrology 585.

Spies T, M. Pollock , G. Reeves, and T. Beechie. 2013. *Effects of Riparian Thinning on Wood Recruitment: A Scientific Synthesis.* Forest Sciences Laboratory. Northwest Fisheries Science Center. January 28, 2013.

Stednick, J. D. 1995. Monitoring the effects of timber harvest on annual water yield. Journal of Hydrology, 176, pp. 79-95.

Stratton, R.D. 2020. The Path to Strategic Wildland Fire Management Planning. Wildfire Magazine 29(1): pp. 24-31 https://www.iawfonline.org/wp-content/uploads/2020/01/Wildfire-2020-01-Strategic-fire-management-Stratton.pdf

Surfleet, C. G. and A. E. Skaugset. 2013. The effect of timber harvest on summer low flows, Hinkle Creek, Oregon. Western Journal of Applied Forestry 28(1), 13-21.

Syphard, A.D., Radeloff, V.C., Keeley, J.E., Hawbaker, T.J., Clayton, M.K., Stewart, S.I. and Hammer, R.B., 2007. Human Influence on California Fire Regimes. Ecological applications 17(5): pp. 1388-1402.

Tappeiner II, J.C. D.A. Maguire, T.B. Harrington,  J.D. Bailey. 2007. Silviculture and Ecology of Western U.S. Forests, Second Edition. Oregon State University Press

Thomas, J., J. Forsman, J. Lint, E. Meslow, B. Noon, and J. Verner. 1990. A conservation strategy for the northern spotted owl: report of the interagency scientific committee to address the conservation of the northern spotted owl. Portland, OR: Government Printing Office.

Thomson, R.C., A.N. Wright, and H.B. Shaffer. 2016. California amphibian and reptile species of special concern. University of California Press. Oakland, CA. 390 pp.

Thompson, M.P., Bowden, P., Brough, A., Scott, J.H., Gilbertson-Day, J., Taylor, A., Anderson, J. and Haas, J.R., 2016. Application of Wildfire Risk Assessment Results to Wildfire Response Planning in the Southern Sierra Nevada, California, USA. Forests 7(3): p. 64.

Thorson, T.D., Bryce, S.A., Lammers, D.A., Woods, A.J., Omernik, J.M., Kagan, J., Pater, D.E. & J.A. Comstock. (2003). Ecoregions of Oregon (color poster with map, descriptive text, summary tables, and photographs): Reston, Virginia, U.S. Geological Survey (map scale 1:1,500,000).

USDA/USFS. 2013. United States Department of Agriculture, Forest Service, Northern Research Station. General Technical Report NRS-118. Proposed BMPs for Invasive Plant Mitigation during Timber Harvesting Operations

USDA/USFS. 2001. Guide to Noxious Weed Prevention Practices.

USDA/USFS. 2023. Northwest Forest Plan- The First 25 Years (1994-2018): Watershed Condition Status and Trends. General Technical Report PNW-GTR-1010. June 2023. Pacific Northwest Research Station

USDA/ODF. 2014-2018. Forest Health Protection; Washington Department of Natural Resources, Resource Protection Division; and Oregon Department of Forestry, Forest Health Management. 2014-2018 Aerial Insect & Disease Survey.

USDA/USFS. 2013. United States Department of Agriculture, Forest Service, Northern Research Station. General Technical Report NRS-118. Proposed BMPs for Invasive Plant Mitigation during Timber Harvesting Operations.

USDA-PNRS. (2023). Northwest Forest Plan - The first 25 years (1994-2018): Watershed Conditions Status and Trends. USDA Forest Service Pacific Northwest Research Station.

USDI/BLM. 1984. United States Department of Interior, Bureau of Land Management. Manual 5251- timber production capability classification. Washington, DC: Government Printing Office.

USDI/BLM. 1992. United States Department of the Interior, Bureau of Land Management. Manual 9015 – Integrated Weed Management.

USDI/BLM. (1999a). Grave Creek Watershed Analysis. Medford, Oregon: Medford District.

USDI/BLM. (1999b). Middle Cow Creek Watershed Analysis. Grants Pass, Oregon: BLM.

USDI/BLM. (2001). Water Quality Restoration Plan, Rogue River Basin, Lower Rogue River Sub Basin, Grave Creek. Medford: US Department of Interior, Bureau of Land Management.

USDI/BLM. (2001). Water Quality Restoration Plan, Rogue River Basin, Lower Rogue River Sub Basin, Grave Creek. Medford: Bureau of Land Management.

USDI/BLM. (2004a). Water Quality Restoration Plan Umpqua River Basin, South Umpqua Subbasin, Upper Cow Creek. Medford: US Department of Interior, Bureau of Land Management.

USDI/BLM. (2004b). Water Quality Restoration Plan, Umpqua River Basin, South Umpqua Subbasin, Middle Cow Creek. Medford: Bureau of Land Management.

USDI/BLM. 2005. Land Use Planning Handbook (H-1601-1). U.S. Department of the Interior. Washington, D.C. March.

USDI/BLM. (2005b). Upper Cow Creek Watershed Analysis. Medford: US Department of Interior, Bureau of Land Management.

USDI/BLM. 2008a. NEPA Handbook. H-1790-1.

USDI/BLM. 2008b. Special Status Species Management Policy Handbook (H-6840). U.S. Department of the Interior. Washington, D.C. March.

USDI/BLM. 2016a. Western Oregon Proposed Resource Management Plan/Final Environmental Impact Statement. U.S. Department of the Interior. Portland, Oregon. August.

USDI/BLM. 2016b. Southwestern Oregon Record of Decision/Resource Management Plan. U.S. Department of the Interior. Portland, Oregon. August.

USDI/BLM. 2016d. Recreation Management Area Frameworks for the Medford District. U.S. Department of the Interior. Bureau of Land Management, Medford District. July.

USDI/BLM. (2017). MOU between USDI BLM and State of Oregon Department of Environmental Quality to meet State and Federal Water Quality Rules and Regulations. Bureau of Land Management.

USDI/BLM. 2018a. Integrated Invasive Plant Management for the Medford District, Revised Environmental Assessment. U.S. Department of the Interior. Medford, Oregon. February.

USDI/BLM. 2018b. Roseburg and Medford Districts Programmatic Aquatic Restoration Environmental Assessment, DOI-BLM-ORWA-M000-2018-0001-EA. U.S. Department of the Interior. Medford, Oregon.

USDI/BLM. 2019. Roseburg and Medford Districts Programmatic Aquatic Restoration Environmental Assessment. U.S. Department of the Interior. Medford, Oregon. December.

KSW01749

USDI/BLM. 2020. Biological Assessment: Assessment of Activities That May Affect the Federally Listed Plant Species, Gentner's Fritillary and Cook's Lomatium, on the Medford District BLM." Medford, Oregon. October.

USDI/BLM. 2021. Five Year Planning Team, Team Charter. Medford District BLM. Medford, Oregon. August 18, 2021.

USDI/BLM 2021a. Oregon/Washington State Director. Special Status Species List. Permanent Instruction Memorandum OR-P-2021-004.

USDI/BLM. 2023. Biological Assessment for Medford BLM FY23 Batch of Projects. Medford District BLM. Medford, Oregon. April, 2023.

USDI/BLM and USDA/USFS. 2018. Conservation Strategy for *Epilobium oreganum*, *Gentiana setigera*, *Hastingsia bracteosa* var. *bracteosa*, H. *bracteosa* var. *atropurpurea* and *Viola primulifolia* ssp. *occidentalis* in Serpentine *Darlingtonia* Wetlands of Southwest Oregon and Northwest California. Medford District, OR; Rogue River-Siskiyou National Forest, OR; Coos Bay District, OR; Six Rivers National Forest, CA.

USDI U.S. Geological Survey (USGS). 2020. LANDFIRE Canopy Base Heights, Canopy Bulk Density, and Surface Fuel Model. http://landfire.cr.usgs.gov/viewer/.

US EPA. 2005. United States Environmental Protection Agency. Riparian buffer width, vegetative cover, and nitrogen removal effectiveness: A review of current science and regulations.

USDI FWS (U.S. Fish and Wildlife Service). 2012. Protocol for Surveying Proposed Management Activities that May Impact Northern Spotted Owls. US Fish and Wildlife Service, Portland, OR.

USDI FWS (U.S. Fish and Wildlife Service). 2016. Biological opinion on the bureau of land management's approval of the proposed resource management plan for western Oregon [FWS reference: 1EOFW00-2015-F0279]. Portland, OR: U.S. Fish and Wildlife Service.

USDI FWS (U.S. Fish and Wildlife Service). 2023. Biological Opinion for Medford District Bureau of Land Management's FY23 Batch of Projects. ECOSphere: 2023-0084354. U.S. Fish and Wildlife Service, Roseburg Fish and Wildlife Office, Roseburg, Oregon.

USDI FWS (U.S. Fish and Wildlife Service). 2023. Endangered and Threatened Wildlife and Plants; Threatened Species Status With Section 4(d) Rule for the Northwestern Pond Turtle and Southwestern Pond Turtle. Proposed Rule. Federal Register Vol. 88 (190): 68370-68399.

USDI FWS (U.S. Fish and Wildlife Service). 2024. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Coastal Distinct Population Segment of the Pacific Marten. Final Rule. Federal Register Vol. 89 (104): 46576-46616.

Van Lanen, N. J., A. B. Franklin, K. P. Huyvaert, R. F. Reiser Ii, and P. C. Carlson. 2011. Who Hits and Hoots at Whom? Potential for Interference Competition between Barred and Northern Spotted Owls. Biological Conservation 144:2194-2201.

Van Wagner, CE. 1977. Conditions for the Start and Spread of Crown Fire. Canadian Journal of Forest Research 7: pp. 23-34.

Wampler, K., Bladon, K., & Faramarzi, M. (2023). Modeling wildfire effects on streamflow in the Cascade Mountains, Oregon, USA. Journal of Hydrology 621 (, 1-18.

Warren D, W. Keeton, H. Bechtold, and E. Marshall. 2013. *Comparing streambed light availability and canopy cover in streams with old-growth versus early-mature riparian forests in western Oregon.* Aquatic Sciences Research Across Boundaries. ISSN 1015-1621. Volume 75 Number 4. October 2013. Published June 27, 2013.

Weatherspoon, C. P. and C. N. Skinner. 1995. An assessment of factors associated with damage to tree crowns from the 1987 wildfires in northern California. Forest Science 41(3), 430-451.

Wender, B.W., C.A. Harrington, J.C. Tappeiner. 2004. Flower and fruit production of understory shrubs in western Washington and Oregon. Northwest Science 78(2): 124-140.

West Wide Risk Assessment (WWRA). 2013. (Accessed 5/6/14) http://www.odf.state.or.us/gis/data/Fire/West_Wide_Assessment/WWA_FinalReport.pdf, http://www.timmonsgis.com/projects/west-wide-wildfire-risk-assessment

Whittaker, R.H. (1954) The Ecology of Serpentine Soils. Ecology 35(2), 258-288.

Whittaker, R. H. (1960). Vegetation of the Siskiyou mountains, Oregon and California. Ecological monographs, 30(3), 279-338.

Wiens, J., R. Anthony, and E. Forsman. 2014. Competitive interactions and resource partitioning between northern spotted owls and barred owls in western Oregon. Wildlife Monographs 185(1), 1-50.

Winkler, & Boon, R. S. (2017). Equivalent Clearcut Area as an Indicator of Hydrologic Change in Snow-dominated Watersheds of Southern British Columbia. B.C. Ministry of Forests.

Wohl, Ellen, Hiromi Uno, Sarah B. Dunn, John T. Kemper, Anna Marshall, Mickey Means-Brous, Julianne E. Scamardo and Shayla P. Triantafillou (2022). Why wood should move in rivers. River Research and Applications. 40:976–987.

Wonn, H.T. and K.L. O'Hara. 2001. Height: Diameter Ratios and Stability Relationships for Four Northern Rocky Mountain Tree Species. Western Journal of Applied Forestry, Volume 16, Issue 2, April 2001, pp. 87-94. April 01, 2001.

Worthington, N.P. and G.R. Staebler. 1961. Commercial Thinning of Douglas-Fir in the Pacific Northwest. Pacific Northwest Forest and Range Experiment Station. Technical Bulletin No. 1230. U.S. Department of Agriculture, USFS.

Wright, J. W. (2007). Local adaptation to serpentine soils in Pinus ponderosa. Plant and Soil, 293, 209-217.

Wrobel, C. and T. Reinhart. 2003. Review of potential air emissions from burning polyethylene plastic sheeting with piled forest debris. Seattle, WA: U.S. Forest Service.

York, R. A., Heald, R. C., Battles, J. J. and York, J.D. 2004. Group selection management in conifer forests: relationships between opening size and tree growth. Canadian Journal of Forest Research, 34(3): 630-641.

York, R. A., Battles J. J. 2008. Growth response of mature trees versus seedlings to gaps associated with group selection management in the Sierra Nevada, California. Western Journal of Applied Forestry, 23 (2): 94-98.

Zaragoza, G., J.P. Rose, K. Purcell, and B.D. Todd. 2015. Terrestrial habitat Use by western pond turtles (Actinemys marmorata) in the Sierra foothills. Journal of Herpetology 49(3):437-441.

Zhang, M., N. Liu, R. Harper, Q. Liu, X. Wei, D. Ning, Y. Hou, S. Liu. 2017. A global review on hydrological responses to forest change across multiple spatial scales: Importance of scale, climate, forest type and hydrological regime. Journal of hydrology. 546, pp. 44-59.

Ziemer, R. R. 1981. Storm flow response to road building and partial cutting in small streams of northern California. Water Resources Research, 17(4), 907-917.

**APPENDIX B**: ISSUES CONSIDERED BUT NOT ANALYZED IN DETAIL

Issues that were considered but not analyzed in detail are concerns raised by the public or BLM specialists during scoping which did not relate to how an alternative responded to the purpose and need, did not point to a potentially significant environmental effect beyond what was anticipated and accounted for in the PRMP/FEIS, or otherwise would not assist in making a reasoned choice among alternatives (USDI/BLM 2008, p. 41-42).

Air Quality - Smoke Management

- How would smoke created from prescribed burning activities affect air quality?

Botanical Species (Rare Plants, Fungi, and Invasive Species)

- How would the proposed action including ground disturbance, decreases in woody vegetation cover, and fuels treatments affect the introduction and spread of non-native invasive botanical species?
- Would there be effects on public health from herbicide use within the project area and how would herbicide use be determined to be the appropriate treatment method?
- How would the King Mountain ACEC be managed to preserve sensitive plant and soil resources?
- What would be the potential impacts from the proposed activities to Gentner's Fritillary and its habitat?
- How would the proposed actions affect Special Status plant species and their habitat?

Carbon Storage and Greenhouse Gas Emissions

- What are the effects of proposed project actions on greenhouse gas emissions, carbon storage, climate change, and the social cost of carbon?

Cultural Resources

- How would ground disturbance from the proposed project activities affect cultural resources such as archaeological and historical sites, artifacts, and features?
- How would the project affect traditional cultural or religious significance, such as through ground disturbing activities, or altering accessibility or use?

Fire and Fuels

- How would the LCFMP affect wildfire risk to communities?
- How would road construction contribute to human caused fire ignitions?

Fish and Aquatic Habitat

- How would timber harvest actions (ground-based, skyline-cable, tethered, and helicopter yarding) affect federally listed and native fish species and their habitats (aquatic habitat)?

Hydrology and Water Quality

- Are Best Management Practices and Project Design Features effective in preventing or reducing the amount of sediment and other pollutants from LCFMP activities?
- How would commercial timber harvest and non-commercial HFR proposed for the LCFMP affect streamflow in terms of annual water yields, the resilience of water supplies to climate change, summer low flows, streamflow magnitude-intensity-duration, and/or timing of peak or low base flow conditions?

---

- How would commercial harvest and non-commercial HFR proposed for the LCFMP affect pollutants within the range of natural variability and background conditions to and meet Oregon Department of Environmental Quality (ODEQ) water quality standards?
- How would commercial harvest and non-commercial HFR proposed for the LCFMP affect stream temperature and specifically effective shade and micro-climate zones on streams?
- How would commercial harvest and non-commercial HFR proposed for the LCFMP affect floodplains, ground water, aquifers, domestic wells and points of diversion?

Riparian Reserve Forest Health and Wood Recruitment for Streams

- How would commercial harvest and non-commercial HFR proposed for the LCFMP in the RR impact the ecological and hydrologic function of the riparian areas?
- How would commercial harvest and non-commercial HFR proposed for the LCFMP impact stream wood recruitment needed to maintain the proper function of stream systems?

Silviculture

- Would the Proposed Action cause Port-Orford Cedar (POC) root disease *Phytophthora latereralis* to spread within the project area?
- How would the salvage of timber following incidental insect and disease outbreaks, and drought related mortality contribute to the Allowable Sale Quantity?

Soil Resources

- How would LCFMP activities affect soil productivity, slope stability, mass movement, and surface erosion within and outside of harvesting units?
- How would forest management actions in DDR-TPCC LUAs promote desired soil conditions and minimize or eliminate degradation to the productive capacity of these soils?
- How would decommissioning of roads and ground-based disturbance affect soil productivity, mass movement, and surface erosion?

Terrestrial Wildlife and Special Status Species

- How would the project be monitored to assure that canopy cover requirements for the northern spotted owl are met?
- How would the potential risk of windthrow and effects to post-harvest canopy and relative density retention requirements be affected by applying LUA prescriptions?
- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect spotted owl habitat?
- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect spotted owls?
- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect NSO Critical Habitat Unit function?
- How would the treatment of northern spotted owl structurally complex habitat (RA32) or nesting and roosting habitat in the Late-Successional Reserve (LSR) affect the project?
- How would noise associated with proposed timber harvest, fuels reduction activities, and roadwork affect northern spotted owls during their nesting season?
- Does the U.S. Fish and Wildlife survey protocol adequately detect northern spotted owls?
- How would proposed timber harvest and associated landings, road construction, and fuels reduction, affect northern spotted owl landscape dispersal?
- Would timber harvest, fuels reduction, and new road/landing construction affect barred owl and spotted owl encounters and interactions which could cause an increase in northern spotted owl and barred competition?
- Would the Proposed Action cause the incidental take of northern spotted owls?

- How would proposed activities affect the threatened coastal marten and its designated critical habitat?
- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect Franklin's bumble bee (Bombus franklini)?
- How would ground disturbance from proposed project activities and timber harvest affect Bureau Special Status wildlife species?
- How would timber harvest, fuels reduction, and new road and landing construction affect migratory bird/landbird focal species/BLM/USFWS bird species of concern?
- How would the proposed activities affect the Pacific fisher?
- Is the BLM required to analyze for species which are not federally listed or Bureau Sensitive species?
- How would proposed changes in forest canopy and structure from timber harvest, fuels reduction, and roadwork activities affect woodpeckers, cavity nesters, and snags?
- How would fragmentation from timber harvest affect wildlife species and their habitat?

Visual Resources, Recreation and Protected Areas

- How would proposed forest management and associated roadwork operations affect dispersed recreational activity throughout the project area, as well as unauthorized off-highway vehicle use post treatment?
- How would proposed forest management and associated roadwork operations affect Visual Resources within the project area?
- How would the Proposed Action affect the preservation of Lands with Wilderness Characteristics (LWC) or Wild and Scenic Rivers (WSR)?
- How would abandoned mine lands (AML) impact the LCFMP?

<u>Air Quality</u>

- How would smoke created from prescribed burning activities affect air quality?

Background: The combination of weather patterns and topography of the Rogue basin contribute to regional air quality problems. The American Lung Association has ranked the Medford / Grants Pass metropolitan area as 8th in their annual State of the Air report, Report Cards of U.S. Cities Most Polluted U.S cities by year-round particle pollution (Annual PM2.5; ALA 2024). Poor air quality can develop when a major polluting activity or event combines with temperature inversions and strong high-pressure systems that create stagnant air. Valleys can trap and concentrate pollutants, exacerbating the effects of stagnant air. Sources of pollutants may be chronic, such as from a factory or homes heating with wood during the winter, or transient, such as from prescribed burning or wildfires. Wildfires tend to be the primary contributor to air quality concerns within the Medford District, particularly in July and August (USDI BLM 2016a, pp. 155- 157) and into October in some recent years. The EPA daily air quality index for Josephine County indicates that daily emissions (PM 2.5) have been increasing during summer months over the past 20 years (Figure B-1).

Figure B-1.1. EPA Daily Air Quality Index in Josephine County (2000-2024).





Source: U.S. EPA AirData <https://www.epa.gov/air-data>
Generated:   June 14, 2024

Air quality during the period from November through March is characterized mostly as moderate. Most emissions during this period are attributed to residential heating with wood, which is frequently trapped beneath temperature inversions. Summer month (July – September) air quality has been mixed from good to hazardous, emissions during this period are attributed to wildfire smoke. Notable large wildfire years in southwest Oregon are evident in the record (2002, 2013, 2015, 2017, 2018, 2020, 2021, and 2023). Air quality from April to June is characterized as mostly good. This timeframe typically coincides with favorable conditions for implementation of prescribed under burning.

Air quality during the period from November through March is characterized mostly as moderate (Figure B-1). Most emissions during this period are attributed to residential heating with wood, which is frequently trapped beneath temperature inversions. Summer month (July – September) air quality has been mixed from good to hazardous, emissions during this period are attributed to wildfire smoke. Notable large wildfire years in southwest Oregon are evident in the record (2002, 2013, 2015, 2017, 2018, 2020, and 2021). Air quality from April to June is characterized as mostly good. This timeframe typically coincides with favorable conditions for implementation of prescribed under burning.

The Oregon Department of Environmental Quality (ODEQ) Air Quality Division implements the U.S. Environmental Protection Agency's air quality regulation standards. The ODEQ has delegated prescribed fire smoke management responsibilities to the ODF. For all prescribed burning activities, the Medford District is required to comply with the Oregon Smoke Management Plan (ODF 2019, OAR 629-048) as outlined in the PMRP/FEIS (USDI BLM 2016a, pp. 146-151).

The Oregon Smoke Management Plan outlines best burn practices in the Emission Reduction Techniques section (629-048-0210). The practices are designed to minimize emissions from prescribed burning, and "ensure the most rapid and complete combustion of forest fuels while nearby, "non-target" fuels are prevented from burning. These best burn practices include, "covering of piles sufficient to facilitate ignition and complete combustion, and then burning them at times of the year when all other fuels are damp, when it is raining or there is snow on the ground." The section continues, stating that "when piles are covered as a best burn practice and the covers are to be removed before burning, any effective materials may be used, as long as they are removed for re-use or properly disposed of. When covers would not be removed and thus would be burned along with the piled forest fuels," the covers must consist of approved materials, which includes polyethylene (PE) sheeting (ODF 2019, 629-048-0210).

Removal of PE sheeting from piles in advance of burning increases safety risks, operational cost, particulate emissions, and reduces the pace and scale of hazardous fuel reduction.

Piles are often burned during colder and wetter periods, punctuated by wet, icy, and snowy conditions. Removal of PE sheeting from piles in advance of burning would increase risk and exposure of field personnel to injury and illness from additional hours of driving, hiking steep terrain, rolling debris from deconstructed piles, and inclement weather. As shown in a case study on the Klamath National Forest, the additional time devoted to PE removal (up to 20 minutes per pile) and disposal resulted in a 60 percent reduction of acres burned (Pers. Comm., Klamath National Forest 2021). This reduces production, increases per unit cost, and leaves more acres of hand piles on the landscape, increasing the probability of those piles burning intensely in a wildfire. Piles from which PE sheeting has been removed become vulnerable to wetting rains and wetting of fuels, prior to ignition. Wrobel and Reinhart (2003) examined the use of PE sheeting to enhance combustion efficiency of piles, and found that uncovered piles have increased fuel moisture, reduced combustion efficiency, and require more accelerants (up to three gallons of fuel) to achieve sustained pile ignition, compared with PE covered piles, this finding is consistent with local knowledge and experience. The polyethylene ensures low moisture content of the wood and facilitates rapid and efficient ignition and consumption of fuels to minimize residual smoke (Aurell et al. 2016).

Use of Kraft paper as a substitute for PE sheeting would contribute toward decrease burning efficiency because environmental conditions in the region quickly deteriorate the material. An extensive review by Worbel and Reinhardt (2003) found Kraft paper less effective at minimizing moisture intrusion into piled wood (also consistent with local knowledge and experience), resulting in similar conditions as uncovered piles. The additional weight of Kraft paper also contributes to decreased production and increased per unit cost of covering piles. While combustion studies examining the difference in pyrolysis of polyethylene vs. lignocellulosic materials (kraft paper) have found that emission from kraft paper combustion were lower than polyethylene, both materials produce many of the same substances (Garcia et al. 2003). Additionally, Kraft paper is often coated with paraffin wax (a derivative of petroleum) or polyethylene to

improve water resistance properties. Current scientific literature does not disprove that burning PE sheeting would produce unique chemicals or classes of chemicals that are not also found in emissions from burning wood debris (Worbel and Reinhardt, 2003; Aurell et al. 2016).

Ultimately, combustion of wet piles results in more particulate emissions (smoke) than dry piles (NWCG 2020). Comparisons of post-harvest slash machine pile burning indicate that dry piles covered with polyethylene sheets have significantly lower emissions than uncovered wet piles (Aurell et al. 2016). Additionally, initial entry fuel reduction treatments (i.e., thin and hand pile burn) provide the opportunity for follow-up treatment, via maintenance under-burning, which eliminates the need for piles and thus PE sheeting.

The Oregon Smoke Management Plan designates SSRA (Smoke Sensitive Receptor Areas), which are areas designated for the highest level of protection under the smoke management plan, as described and listed in OAR 629048-0140. The SSRAs within the Medford District are Grants Pass and the Bear Creek Valley, as described in OAR 629-048-0160 (USDI BLM 2016a, Map 3-1, p. 149). The objective of the Smoke Management Plan is to minimize smoke from prescribed burning from entering the SSRAs. Medford District is also required to comply with the Oregon Visibility Protection Plan (OAR 340-200-0040, Section 5.2) which mandates that prescribed burning does not affect the visibility of Class I areas. Local Class I areas include Crater Lake National Park, Kalmiopsis Wilderness, and Rogue Wilderness (USDI BLM 2016a, Map 3-1, p. 149). The Planning Area is not within a Class I area.

Prior to conducting prescribed burning activities, the BLM must register prescribed burn locations with Oregon Department of Forestry in compliance with Oregon's administration of the Clean Air Act.

The specific location, size of the burn, fuel loadings, ignition source, time, and duration of ignition are reported prior to ignition. The timing of all prescribed burning would be dependent on weather and wind conditions to help reduce the amount of residual smoke to the local communities. The day before each planned burn, ODF meteorologists evaluate this information along with the forecasted weather for the next day to determine whether smoke from a given burn is likely to affect an SSRA or Class I area. This information is used to determine the appropriate time to conduct the planned prescribed burn, to minimize smoke emissions from prescribed fire. The BLM must follow these instructions in compliance with Oregon's administration of the Clean Air Act, including the Best Burn Practices; Emission Reduction Techniques section (629-048-0210) of the Oregon Smoke Management Plan and the Oregon State Implementation Plan for Air Quality (ODEQ 2021). Additionally, all prescribed burn plans must also comply with the Interagency Prescribed Fire Planning and Implementation Procedures Guide (NWCG 2017).

Smoke from prescribed fire and wildfire produces carbon monoxide, particulates, and other air toxins. The main criteria pollutant of concern for BLM management activities is particulate matter (PM10 and PM2.5) (ODEQ 2021); in addition to posing a human health risk due to their small size, particulate matter from wildland fuels are excellent at scattering light, thereby reducing visibility. Carbon monoxide, on the other hand, while a substantial human health risk, dilutes rapidly, making it a hazard to firefighters only. As such the BLM analyzed effects of particulate matter emissions and visibility in the PMRP/FEIS (pp. 145 – 163). That analysis, incorporated here by reference, examined emissions (PM10 and PM2.5) from prescribed fire treatment of both natural hazardous fuels and activity fuels. The PRMP/FEIS concluded that the SWO ROD/RMP would result in an approximate 7 percent increase, over current conditions, of particulate emissions (PM10 and PM2.5) created from prescribed fire actions implemented across the Western Oregon Decision Area. On the Medford District, implementation of the SWO ROD/RMP would produce an expected 690 PM2.5 tons per year (USDI BLM 2016a, p. 161 Figure 3-12), over the 50-year analytic period. However, adherence to the requirements of the Oregon Smoke Management Plan would continue to limit impacts to human health and visibility from prescribed fires.

Rationale: This issue was considered but not analyzed in detail because 1) this analysis tiers to the PRMP/FEIS analysis, which estimated the effects on air quality based on the magnitude of treatments on

KSW01758

this landscape and disclosed those activities PRMP/FEIS (USDI BLM 2016a, pp. 4-9); and 2) The Medford District projected 10,977/annual acres of activity fuels treatments for this project, coupled with other projects, would constitute only 8,240 acres of this annual amount, which is below the levels projected in the FEIS.

There is no potential for significant effects from this EA beyond the magnitude of treatments analyzed in the PRMP/FEIS, because anticipated effects under any Alternative would not exceed those analyzed in the PRMP/FEIS. Additionally, there are no new circumstances or information at the site-specific level that would change the effects anticipated for this EA.

The proposed prescribe fire actions are common to all alternatives and would be consistent with the actions analyzed in the PRMP/FEIS. Additionally, DEQ and ODF established and required reporting measures and BMPs described above would apply to all action alternatives to meet the Oregon State Implementation Plan of the Clean Air Act and the EPA's Interim Air Quality Policy on Wildland and Prescribed Fires. Common to all action alternatives, the BLM also has the discretion to haul away, as biomass, or sell, as firewood, whole trees, or treetops yarded to landings as well as the limbs removed and piled at the landings that would result in less smoke emissions than prescribed burning. However, prescribed fire may be necessary to meet ecological objectives and complete and maintain proposed actions in most instances.

Proposed actions are expected to reduce the likelihood of stand-replacing fire (Issue #3) and could result in reduced smoke production, when interacting with future wildfires (Liu et al. 2017; Long et al. 2017). The PMRP/FEIS suggests future climate impacts could create more smoke production from wildfires than historic levels (USDI BLM 2016a, p. 163), due to longer fire seasons and more severe burning conditions, which would lead to more acres burned and increased fire severity. However, as wildfires interact with areas treated to result in fire-resistant structure, smoke emissions may be reduced, as less forest fuel (e.g.,tree canopy fuel) would be consumed by wildfire (see Issue #3 effects). With the available information, it is uncertain how these future cumulative effects may interact in timing and synergy.

For the above reasons, further analysis of this issue is not necessary for making a reasoned choice among alternatives in that it would not inform the decision maker how the alternatives respond to the purpose and need. Additionally, further analysis of this issue is not necessary to determine that there is no substantial question regarding the potential for significant effects, in particular, that there is no potential for significant effects beyond those analyzed and disclosed in the PMRP/FEIS. A second, project specific EIS is not necessary to determine whether to implement the RMP as directed, to determine air effects from the project alternatives will not cause significant air effects, or how to design the alternatives to maintain project-caused smoke effects within requirements of the Oregon State Implementation Plan of the Clean Air Act and RMP management direction.

Background Information: A Best Management Practice (BMP) is a practice or combination of practices that have been determined to be effective and practicable in preventing or reducing the amount of pollution generated by non-point sources to a level compatible with water quality goals (40 CFR 130.2(m)) (USDI 2016b, p. 163). When the Grants Pass Field Office applies BMPs to site specific locations they become Project Design Features (PDFs) which, as indicated by the name, are site and project specific.

The BLM utilizes BMPs and site-specific PDFs to comply with the Clean Water Act of 1972 (as amended), State of Oregon water quality legislation, and the O&C Act (RMP, p. 163). The BLM has designed and would implement BMPs in a manner that is consistent with the ODEQ Memorandum of Understanding (ODEQ MOU) (USDI BLM, 2017). The ODEQ MOU requires monitoring to ensure that practices are properly designed and applied, to determine the effectiveness of BMPs in meeting water quality standards, and to provide for adjustments of BMPs to make them more effective (USDI BLM, 2017). Neither the most complex or costly techniques nor the total elimination of pollutants is required or

expected with BMP use. The effectiveness often requires adaptation to the natural and highly variable landscapes such as the forestlands managed by the BLM (Edwards, et al., 2016).

The proper implementation of BMPs listed in Appendix C of (USDI/BLM, 2016b) would be effective in reducing the amount of pollution by reducing erosion and sedimentation from LCFMP forest treatment activities. Timber harvest BMPs have been evaluated to determine their effectiveness at achieving water quality standards pertain to sediment related effects and found them very effective when they included stream buffers (Rashin, et al., 2006). This project delineates a stream buffer of 120 feet in the Inner Riparian Zone for Class I perennial streams and a 50 feet for intermittent streams. In this stream buffer no commercial harvest would occur and limited amount of project activities such as non-commercial HFR, stream restoration, and transportation activities would occur. Other examples of BMPs such as those for roads avoid steep slopes or sensitive resources when designing the location of new road, limiting road and landing construction to the dry season, and installing waterbars on skid trails (USDI/BLM 2016b pp. 167, 176, & 184).

BLM professionals implement BMPs and PDFs through timber sale contracts and apply professional experience to mitigate on the ground impacts. The SWO RMP states that the implementation of BMPs is an iterative process that includes the monitoring and modification of BMPs, where needed, to achieve water quality goals (USDI/BLM, 2016b, p. 137), this monitoring would occur after project implementation. Project monitoring of BMPs is part of the RMP (USDI/BLM 2026b pp. 142) and should ensure they are successfully applied.

Rationale: Further analysis of this issue is not necessary for making a reasoned choice among alternatives since the application of BMPs and PDFs would occur under all action alternatives. Additionally, further analysis of this issue is not necessary to determine the potential for significant effects and there is no potential for significant effects beyond those analyzed and disclosed in the PMRP/FEIS, and incorporated by reference into this EA, "Under all alternatives, project-level planning and analysis would identify the appropriate and applicable BMPs needed to achieve management objectives" (USDI BLM 2016a FEIS, p. 99).

<u>Botanical Species (Rare Plants, Fungi, and Invasive Species)</u>

- How would the Proposed Action including ground disturbance, decreases in woody vegetation cover, and fuels treatments affect the introduction and spread of non-native invasive botanical species?

Background: Ground disturbance associated with timber harvest activities, including: 1) haul road and skid trail construction, 2) landing construction, 3) timber extraction, 4) log hauling, and 5) use of heavy machinery, increases the risk of invasion by non-native invasive plant species by disrupting existing plant communities and exposing bare mineral soil which creates a favorable environment for colonization by invasive species (USDA/USFS, 2013).

A noxious weed risk assessment has been completed in accordance with guidance in the Medford District BLM Integrated Invasive Plant Management Revised EA (2018). The EA requires the completion of a noxious weed risk assessment when ground disturbing activities have the possibility of introducing or spreading non-native invasive species. Risk levels are defined in BLM Manual 9015, Integrated Weed Management Manual (1992). The existing risk for the spread and introduction of weed infestations is moderate because of the following factors as defined in BLM Manual 9015: 1) non-native invasive weed species located immediately adjacent to or within the project area, 2) project activities are likely to result in some area becoming infested with noxious weed species even when preventative management actions are followed, 3) control measures are essential to prevent the spread of noxious weeds within the project area, 4) possible adverse effects on site, 5) possible expansion of infestation within the project area, and 6) cumulative effects on native plant communities are likely but limited.

The recommended course of action for a project identified as moderate risk is to develop preventative management measures for the proposed project to reduce the risk of introduction or spread of non-native invasive species into the area. Preventative management measures would include modifying the project to include seeding the area to occupy disturbed sites with desirable species and monitoring of the area for a minimum of 3 consecutive years post implementation to provide control for newly established populations and follow-up treatment for previously treated infestations (BLM, 1992).

Non-native invasive species typically outcompete native plants and quickly colonize disturbed areas. They can create substantial seed banks in the soil which require long term treatment to control, and sometimes release chemicals into the soil to reduce the plant growth of competing species (BLM, 2019 and ODA, 2024).

A summary of species profiles will not be summarized here but can be found by species at the Oregon Department of Agriculture, Noxious Weed Profiles webpage: https://www.oregon.gov/oda/programs/Weeds/OregonNoxiousWeeds/Pages/AboutOregonWeeds.aspx

Tables B-3.1 through B-3.3 provide a summary of non-native invasive plant species within the project area by proposed activity. These numbers are estimated based on existing data in the BLM Vegetation Action Management Portal (VMAP), treatment history records, and pre-project surveys.

Table B-3.1. Non-native invasive plant species within the Last Chance Project Area Commercial Units

| Species and Common Name | Code | Category | Net Acres |
|---|---|---|---|
| Russian Knapweed (*Acroptilon repens*) | ACRE3 | B | .25 |
| False Brome (*Brachypodium sylvaticum*) | BRSY | B | .02 |
| Meadow Knapweed (*Centaurea spp.*) | CEDE5 | B | 28.5 |
| Spotted Knapweed (*Centaurea stroebe*) | CEST8 | B, T | 15 |
| Rush Skeletonweed (*Chondrilla juncea*) | CHJU | B, T | 1.6 |
| Canada Thistle (*Cirsium arvense*) | CIAR4 | B | 1.7 |
| Bull Thistle (*Cirsium vulgare*) | CIVU | B | 1 |
| Scotch Broom (*Cytisus scoparius*) | CYSC4 | B | 12.4 |
| English Ivy (*Hedera helix*) | HEHE | B | <.01 |
| St. Johns Wort (*Hypericum perforatum*) | HYPE | B | 1.5 |
| Perennial Pea (*Lathyrus latifolius*) | LALA4 | B | 3.6 |
| Himalayan Blackberry (*Rubus armeniacus*) | RUAR9 | B | 8.3 |
| Tansy Ragwort (*Senecio jacobaea*) | SEJA | B, T | <.01 |
| Spanish Broom (*Spartium junceum*) | SPJU2 | B | <.01 |
| Medusahead (*Taeniatherum caput-medusae*) | TACA8 | B | <.01 |
| Ventenata (*Ventenata dubia*) | VEDU | B | <.01 |
|  |  | TOTAL | 74.25 |

Table B-3.2. Non-native invasive plant species within the Last Chance Project Area Fuels Units

| Species and Common Name | Code | Category | Net Acres |
|---|---|---|---|

| Meadow Knapweed (*Centaurea spp.*) | CEDE5 | B | 6.7 |
| Diffuse Knapweed (*Centaurea diffusa*) | CEDI | B | .2 |
| Spotted Knapweed (*Centaurea stroebe*) | CEST8 | B, T | 15.1 |
| Rush Skeletonweed (*Chondrilla juncea*) | CHJU | B, T | 4 |
| Canada Thistle (*Cirsium arvense*) | CIAR4 | B | 2.9 |
| Bull Thistle (*Cirsium vulgare*) | CIVU | B | 1.9 |
| Scotch Broom (*Cytisus scoparius*) | CYSC4 | B | 16.1 |
| English Ivy (*Hedera helix*) | HEHE | B | 2.5 |
| St. Johns Wort (*Hypericum perforatum*) | HYPE | B | 1.2 |
| Perennial Pea (*Lathyrus latifolius*) | LALA4 | B | .04 |
| Himalayan Blackberry (*Rubus armeniacus*) | RUAR9 | B | 8.6 |
| Spanish Broom (*Spartium junceum*) | SPJU2 | B | <.01 |
| Medusahead (*Taeniatherum caput-medusae*) | TACA8 | B | <.01 |
| Ventenata (*Ventenata dubia*) | VEDU | B | <.01 |
|  |  | TOTAL | 59.5 |

Table B-3.3. Non-native invasive plant species within the Last Chance Project Area where Road Construction and Renovation is Proposed

| Species and Common Name | Miles Construction | Miles Renovation |
| --- | --- | --- |
| Meadow Knapweed (*Centaurea spp.*) | .76 | 1.5 |
| Spotted Knapweed (*Centaurea spp.*) | .4 | .6 |
| Canada Thistle (*Cirsium arvense*) | .06 | 0.7 |
| Bull Thistle (*Cirsium vulgare*) | 1.05 | .16 |
| Scotch Broom (*Cytisus scoparius*) | 0 | .5 |
| English Ivy (*Hedera helix*) | 0 | .2 |
| St. Johns Wort (*Hypericum perforatum*) | .65 | .9 |
| Perennial Pea (*Lathyrus latifolius*) | 0 | .8 |
| Himalayan Blackberry (*Rubus armeniacus*) | 2.3 | 3.6 |

KSW01762

| TOTAL | 4.6 | 5.85 |
|---|---|---|
| **Total Miles** | **9.82** | **14.81** |

A diverse toolbox of PDF's will be required to reduce the likelihood of introduction and spread of non-native invasive species. PDFs are discussed below and are drawn from reference materials including the 2018 BLM Integrated Invasive Plant Management Revised EA.

Treatments on existing populations will occur prior to implementation but will not be feasible for all populations and will not eliminate populations entirely due to limited resources and the existing seed bank in the soil requiring ongoing and long-term treatment. Weed populations with risk of invading disturbed areas will be flagged for avoidance. By limiting activity and disturbance in and directly adjacent to the population, the chance of seed dispersal would be reduced.

Washing of equipment will be required before entering the project area to reduce the likelihood of introducing non-native species. Weed washing is a recommended design feature (BLM, 2018, p.44) and when done properly and for a minimum of 6 minutes per vehicle, has been shown to be 77% effective at reducing the debris introduced to disturbance sites (Montana State University, 2011).

In areas where work would occur in or adjacent to an invasive plant population, such as in the event of a quarry with a persistent seed bank, preventative treatments would include activities like scraping and piling the soil surface, burying soil surfaces with weed-free material, or tarping the soil surface to prevent contact with infested soil. These methods, as they apply to rock quarries and roads, are outlined in the Western Oregon BLM Considerations when applying crushed rock in western Oregon (NW Oregon District, Coos Bay District, Roseburg District, Medford District, Klamath Falls Field Office of Lakeview District) draft guidance (2023). Quarries will require inspection and completion of a quarry inspection form prior to approval for use. Quarry inspection reports will be available to the public upon request.

Where avoidance is not possible washing on site will be required prior to moving equipment to other areas to consolidate seed sources where they already exist in the soil and reduce spread while increasing feasibility of future treatment (USDA, 2001).

All sources of mulch, rock, or imported materials will be required to be weed free and sourced from approved sources to avoid introduction of non-native species. Areas that are disturbed that have historic or adjacent non-native species populations will require seeding with certified weed free native seed post disturbance (BLM, 2018).

Rationale: This issue was considered but not analyzed in detail because a noxious weed risk assessment was performed and determined the risk level for the proposed project is moderate. Project Design Features have been assigned to mitigate increasing the risk level in accordance with direction in BLM manual 9015. In addition, this project is subject to Early Detection, Rapid Response (EDRR) as a requirement for the Medford District non-native invasive plant program. With the incorporation and proper adherence to required project design features, the proposed action complies with management direction in the 2016 SWO RMP, the 2016 Western Oregon FEIS PRMP (pp. 419-456), and the 2018 Medford District BLM Integrated Invasive Plant Management Revised EA and would be unlikely to affect the introduction or spread of non-native invasive plant species above regulatory thresholds.

- Would there be effects on public health from herbicide use within the Project Area and how would herbicide use be determined to be the appropriate treatment method?

There are no anticipated effects on public health from herbicide use within the Project Area. Herbicide treatment is proposed for the management of non-native invasive plant species as part of an integrated invasive weed management program and is utilized when it is determined as the most effective tool, while considering all impacts on human and environmental health, as well as a cost benefit analysis. A PDF has

been assigned to address compliance with human health direction. All herbicide treatment methods in LCFMP were analyzed in the Medford District Integrated Invasive Plant Management Revised EA (2018) and will be included in the Annual Treatment Plan Determination of NEPA Adequacy (DNA).

- How would the King Mountain ACEC be managed to preserve sensitive plant and soil resources?

Background: There are no proposed activities within the King Mountain ACEC, so there would not be any impacts to sensitive plant and soil resources.

Rationale: The King Mountain ACEC was excluded from any ground impacting activities related to timber harvest, fuel reduction treatments, and road construction or reconstruction under the prosed action, therefore, no impacts are expected from the proposed project for sensitive plant or soils resources.

- What would be the potential impacts from the proposed activities to Gentner's Fritillary and its habitat?

Background: There is no designated critical habitat within the project area, but a portion of the project is within the range of *Fritillaria gentneri*. *Fritillaria gentneri* is known to inhabit a wide variety of habitat types (16 different plant communities) and soil types (25) ranging from 600-5000 feet in elevation. The species prefers at least partial light, often at the edges of grasslands, chaparral, and partially open mixed evergreen woodland, especially in transitional areas and along ridgelines and aspect changes (BLM, 2020). *Fritillaria gentneri* is rarely found in dense or closed-canopy stands and is not a late-successional species. There is no evidence to support a preference for disturbed habitat; however, the species exists in stands with historically frequent fire return intervals indicating it is a fire adapted species (BLM, 2020).

Surveys have been completed on all proposed activity units within the range of *Fritillaria gentneri* in compliance with the 2020 Biological Assessment of activities that may affect the federally listed plant species, Gentner's Fritillary and Cook's Lomatium, on the Medford District BLM. The two-year survey protocol examined vegetative (indeterminate) fritillary leaves in one location which was not within an area of high habitat suitability. Second-year surveys were conducted but no flowering plants were located so the survey area is considered cleared for project implementation (BLM, 2020).

The treatments proposed for commercial extraction, non-commercial extraction, and fuels treatments would increase canopy openings, reduce the relative density index, allow increased light and moisture to reach the soil surface, and remove fuel loads which could contribute to stand replacing wildfire. Extraction would not occur in open or meadow areas due to the absence of desirable vegetation for harvest. The remaining tree cover in harvest land base would maintain 25-40% relative density index, which would provide open to moderate mottled shade in extraction units. Based on existing data, partial light (40-60%) is optimal for Gentner's Fritillary (BLM, 2020). Given these outcomes, the thinning and removal of vegetation from mixed conifer stands to manage for a reduction in canopy cover and reduced risk of severe wildfire would improve the habitat suitability for *Fritillaria gentneri*.

Rationale: This issue was considered but not analyzed in because surveys have been completed following established protocols in the Biological Assessment of activities that may affect the federally listed plant species, Gentner's Fritillary and Cook's Lomatium, on the Medford District BLM and subsequent Letter of Concurrence from the USFWS (2020). There are no populations of *Fritillaria gentneri* within the proposed activity area, and project design criteria have been developed in the event an incidental population is identified post implementation. Due to these factors the proposed activity would be not likely to effect *Fritillaria gentneri* populations or habitat.

- How would the proposed actions affect Special Status plant species and their habitat?

Background: The activities proposed (commercial thinning, non-commercial thinning, fuels treatments, and permanent and temporary road construction) have the potential to impact Bureau Sensitive Species and their habitat. Changes in light, humidity, and moisture availability associated with thinning activities can impact special status plant habitat by reducing high crown densities, increasing light levels, and

removing vegetative competition for moisture and nutrients within the soil matrix. Thinning activities can also change fire behavior. The ground disturbance associated with these activities can be detrimental to individuals or populations of existing sensitive species and increase the risk for introduction or spread of non-native invasive plants that can outcompete native species and degrade habitat suitability (BLM FEIS, 2016). For some species, there would be long-term beneficial effects from timber thinning projects by restoring suitable habitat for sensitive species. Removal of over story canopy cover that changes temperature, moisture, and light, can have positive impacts on populations and habitat depending on species requirements and site suitability. The potential for species and habitat impacts are addressed below by species for the proposed activities. Mitigation summaries are addressed by species and included in Appendix C. Project Design Features.

For the following analysis, a "population" is defined as a unique group of individuals of the same species that exist within a local geographic area more than 300 feet apart (BLM, 2018). In cases where there are scattered distributions of patches of plants within suitable habitat, buffers would be delineated as separate or aggregated depending on the site characteristics and species. Patches more than 150 feet apart will typically be buffered separately unless the use of heavy machinery is proposed (BLM, 2018).

The project area has been reviewed for known occurrences of Bureau Sensitive Species. Surveys for Bureau Sensitive Species have been completed in all activity areas proposed for commercial and non-commercial timber harvest and road renovation within the last ten years in compliance with the SWO RMP (p. 106) and the 2016 Western Oregon FEIS PRMP (pp. 517-548). Surveys have been completed in most activity areas proposed for fuels treatments only; however, some units have not been surveyed within the last 10 years due to limitation in resources and unsuitable habitat. These remaining proposed fuels only activity units will require survey prior to implementation to follow the 2016 SWO RMP and Western Oregon FEIS PRMP direction. A PDF has been assigned to dictate this. Survey records are available to the public upon request. A list of Bureau Sensitive Species populations within different proposed activity types can be found in Tables B-7.1 through B-7.4.

Table B-7.1. Bureau Sensitive Plant Species within Commercial Treatment Units

| Scientific Name | Common Name | Rating | # of Current Populations | Historic Populations |
|---|---|---|---|---|
| Camassia howellii | Howells Camas | OR-SEN | 17 | 1 |
| Cypripedium fasciculatum | Clustered Lady Slipper | OR-SEN | 0 | 2 |
| Epilobium oreganum | Oregon Willow-herb | OR-SEN | 2 | 0 |
| Phymatoceros phymatodes | Hornwort | OR-SEN | 1 | 0 |
| Silene hookeri ssp. bolanderi | Bolander's Catchfly | OR-SEN | 8 | 11 |
| | | Total | 28 | 14* |

*Historic populations, not located in recent surveys.

Table B-7.2. Known Bureau Sensitive Plant Species within Fuels Only Activity Units

| Scientific Name | Common Name | Rating | # of Populations | Historic Populations |
|---|---|---|---|---|
| Allium bolanderi var. bolanderi | Bolander's Onion | OR-SEN | 0 | 1 |
| Camassia howellii | Howells Camas | OR-SEN | 7 | 10 |

KSW01765

| | | | | |
|---|---|---|---|---|
| *Cypripedium fasciculatum* | Clustered Lady Slipper | OR-SEN | 0 | 1 |
| *Silene hookeri ssp. bolanderi* | Bolander's Catchfly | OR-SEN | 1 | 2 |
| *Solanum parishii* | Parish's Nightshade | OR-SEN | 0 | 1 |
| | | Total | 14 | 15* |

*Historic populations, not located in recent surveys.

Table B-7.3. Bureau Sensitive Plant Species and Permanent or Temporary Road Construction

| Scientific Name | Common Name | Rating | # of Populations | Historic Populations |
|---|---|---|---|---|
| *Camassia howellii* | Howells Camas | OR-SEN | 2 | 0 |
| | | Total | 1 | 0 |

Table B-7.4. Bureau Sensitive Plant Species and Road Renovation

| Scientific Name | Common Name | Rating | # of Populations | Historic Populations |
|---|---|---|---|---|
| *Camassia howellii* | Howells Camas | OR-SEN | 6 | 0 |
| *Eucephalus vialis* | Wayside Aster | OR-SEN | 0 | 1 |
| *Silene hookeri ssp. bolanderi* | Bolander's Catchfly | OR-SEN | 5 | 0 |
| | | Total | 11 | 1* |

*One population has not located in recent surveys.

Bolander's Onion (*Allium bolanderi var. bolanderi*) is an onion native to Northern California and Southern Oregon. It grows in rocky and clay serpentine soils (Mullens et al., 2018). No plants were observed at the recorded site during surveys in 2021. This one historic population is located in an area proposed for fuels treatments only and is not proposed for commercial timber treatments. Although it is likely that Bolander's Onion is fire adapted due to its native habitat on the landscape, the direct impact of fire on Bolander's Onion is not known. Due to this uncertainty this historic population would be buffered and protected with PDF's that allow for broadcast burning within a seasonal restriction to the dormant period and restrict pile placement to outside of the population. Pile restrictions are recommended because pile burning has been shown to penetrate the soil by several centimeters, altering both the seed bank viability and soil microorganisms (Haskins and Gehring, 2004).

Howells Camas (*Camassia howellii*) is a lily native to Josephine County, Oregon. It grows in grassy wet meadows, swampy areas, and transitional zones between meadow and woodland between 600-2200 feet in elevation (Oregon Flora, 2019). This species is the most common special status botanical species within the project area. Populations within the project area range from 0-5000+ individuals per population and were observed occurring in partial to full sun. Not all historically known populations were located during surveys within the last 10 years. Populations that were located during recent surveys, summarized in Tables B 7.1 through B 7.4, will be prescribed a no-activity buffer of 100' for ground based commercial activities due to the use of heavy equipment. A limited-activity buffer of 100' for full suspension commercial activities will restrict tree removal within the 100' buffer to no ground disturbance, requiring hand felling directionally away from the population boundary and full-suspension

helicopter removal. This is proposed in one location within the project area, timber unit 4-01. Fuels activities will be buffered as follows: 1) broadcast/ underburning will be allowed within the population restricted to the dormant season (October-March), and 2) small diameter fuels reduction is restricted to the dormant period and piles would not be placed with the plant populations, or within a 25' buffer of plant populations due to the possibility that the concentrated heat from pile burning would alter the seed bank or soil community directly under the piles (Haskins and Gehring, 2004).

Clustered Lady Slipper (*Cypripedium fasciculatum*) is a native orchid found in dry to moist coniferous forests across 8 western states, including Oregon. It prefers canopy cover greater than 60% (IAE, 2012). It is often associated with late-seral Douglas fir forest types. The two documented populations are historic, contained only 2 individuals, and were not relocated in most recent surveys. The extinction of small populations of *Cypripedium fasciculatum* that have long survey re-visit intervals has been documented across the Medford district (IAE, 2012). Additionally, this species is documented to typically occur in small pockets of 1-20 individuals (IAE, 2012) and seeds may grow underground for 3 or more years prior to presenting above ground (Brown, 2024). Given that this species prefers mostly to fully closed canopies, removal of overstory and increases in sunlight would not improve the habitat for the species. Cypripedium is also documented to have a relationship with mycorrhiza in the soil, which can be disrupted by soil disturbing activities. To preserve the habitat and potential existence in the seedbank, these populations are protected with a no-activity avoidance buffer of 100' for all proposed activities.

Oregon Willow Herb (*Epilobium oreganum*) was historically a federally listed species, removed from federal listing in 1996. This plant is known only to exist in Josephine County, Oregon and Trinity County, California. There are only 33 known occurrences of this species in Oregon, the majority of which occur only on the Rogue River Siskiyou National Forest and the Medford District BLM (BLM, 2018). *Epilobium oreganum* occurs in serpentine fens and serpentine rocky areas (Mullens et al., 2018). Located in one location in 2021, the known population of this species contains an estimated 25 individuals. This population is located within a unit proposed for commercial treatment. Commercial timber harvest activities will require a no-activity buffer of 100' for this population regardless of logging system or proposed prescription. Fuels maintenance activities would still occur within the population buffer, with mitigations including pile exclusion and seasonal restrictions, as prescribed fire is expected to benefit the habitat for this species (BLM, 2018). The no-activity exclusion for this population is aimed to comply with the 2016 SWO RMP and existing conservation strategy (2018) for *Epilobium oreganum*.

Wayside Aster (*Eucephalus vialis*) occurs on a range of habitat types in relatively open areas from conifer forest to deciduous woodland. It occurs in the understory of mixed conifer/hardwood forests, along roadsides, and on open slopes. The open habitat preferred by this species is expected to have been historically maintained by fire regimes (IAE, 2010). This species shows increased health and vigor in open, high light environments and lower vitality in closed canopy conditions (Oregon Department of Agriculture, 2023). There is one historic population documented within the project area in and adjacent to a proposed road renovation. The population historically contained approximately 300 individuals but has not been relocated since 2005, indicating that the population is extinct or dormant. *Eucephalus vialis* demonstrates very low recruitment, low to no reproduction, and stunted plants in environments with no disturbance and lower light penetration. Canopy thinning has shown to increase light availability leading to greater plant height, increased probability of flowering, and increased seed set (IAE, 2010) Additionally, seed germination for this species has been shown to be higher when duff is removed and bare mineral soil is exposed (IAE, 2010). This evidence suggests that the disturbance and bare soil created by road construction would create a favorable environment to reinvigorate the population or create habitat for seed germination. Mitigations are not prescribed for this population given that the population has not been located in recent surveys and the creation of more favorable habitat characteristics for the species as outlined above.

*Phymatoceros phymatodes* is a special status bryophyte. Two individuals were found in one location during surveys in 2017 and this is considered the one population within the Last Chance project. This

KSW01767

population is located adjacent to an area proposed for commercial treatment. The population was found growing in full shade (BLM survey records, 2017) and the species is known to grow in mid-successional forest openings on a thin soiled rock substrate (NatureServe, 2017). Due to the low number of individuals in the population, changes in canopy cover, soil moisture, or soil disturbance could damage the individual plants and eradicate the population at this location. To avoid damage to this population, and changes to the habitat surrounding the population, a 100' no-activity buffer is required for all proposed activities.

Bolander's Catchfly (*Silene hookeri ssp. Bolanderi*) occurs in serpentine and non-serpentine soils in oak and Douglas fir woodlands under 3200 feet in Oregon and California (Jepson, 2023). Bolander's Catchfly also occurs in forest openings and open slopes (Mullens et al., 2018). Nine current existing populations, ranging from 3-150 individuals per site were found in part sun to full sun locations adjacent to and in proposed activity areas. Some populations have overlapping proposed actions identified within them. To prevent damage to individual plants and populations, populations will be marked and treated as avoidance areas, except where populations exist adjacent to an existing road prism that will be renovated. No timber harvest activities will occur within population boundaries. Anywhere heavy equipment is proposed for use, populations will be buffered by a 100' to prevent damage to plants, soil, or habitat. In cases where timber harvest can be accomplished without ground disturbance, hand felling and full suspension will be permitted within the 100' buffer only. There is only one location within the project area where this is proposed, timber unit 4-01. Treatment and tree harvest within the buffer is permitted because all documented populations in the project area are occurring in sites that receive part to full sun and thinning without ground disturbance would increase habitat suitability.

Parish's Nightshade (*Solanum parishii*) is found in dry chaparral, oak/pine woodland, and pine forest (Jepson, 2023). Only one population has been documented within surveyed proposed activity units and was last detected in 2006 with 25 individuals. This population occurs within a unit proposed for fuels treatments only. Previous studies have indicated that fire may benefit this species; however, a report from the Institute for Applied Ecology (2014) showed that prescribed fire did not have an impact on plant survival or reproduction. The study also showed that two years after a burn, there was no difference in plant size. Fire has been found to have no effect on this species (IAE, 2014). There is a link between fire and increased presence of non-native invasive plants, so the intentional application of prescribed fire to this species would not be beneficial enough to outweigh potential consequences (IAE, 2014). Since no concrete evidence exists yet to suggest a benefit to this species regarding fuels treatments, populations of this species will be a no-activity area with a 25' no-activity buffer that restricts broadcast burning, brush removal, and pile construction.

Road renovation activities include road maintenance and improvement activities within the road prism, to bring existing roads up to standard for safe vehicle travel and timber haul. There are 11 populations of bureau sensitive species located adjacent to roads proposed for renovation. Negative impacts to these populations are not anticipated since renovation occurs on existing roads; however, if use of heavy equipment will leave the road prism, a botanist will need to review the proposed activity to ensure no sensitive botanical species are negatively impacted. This is the same methodology used for *Fritillaria gentneri* (2020).

There would be limited case by case scenarios where the above discussed mitigations would be waived after review by the project botanist. There are two currently identified scenarios where a mitigation waiver has been approved to allow for ground disturbing activity within a Bureau Sensitive plant population:

1) There is a 545' segment of permanent road construction proposed within a population of *Camassia howellii*. The documented population spans 23.7 acres and contains more than 500 individuals, occurring in full sun, and being uncommonly encountered across the population distribution. The road construction will permanently impact 1.12 acres within the population (4.7% of the population area). Although the exact number of plants that would be impacted by

KSW01768

this action is unknown, no more than 5% of the individuals within the population would be damaged given the distribution of plants and area to be disturbed. The remaining portion of the population is protected as a no-activity area.

2) A 63' segment of permanent road is proposed for construction across a corner of another population of *Camassia howellii*. The construction will permanently impact approximately .07 acres at the periphery of the population. The population impacted by this segment spans 9.4 acres and was last documented to contain over 20,000 individuals occurring in full sun. Since population boundaries are typically removed from the nearest plant by sight distance to ensure all plants are accounted for, it is expected that less than 1% of the individuals in this population would be impacted by this action.

The proposed timber harvest treatment adjacent to these populations are expected to increase light availability at the site and increase habitat suitability in the 82 acre area surrounding the populations. Given the small number of individuals expected to be impacted and the potential for habitat expansion, the risks and benefits are anticipated to be equivalent and not risk trending the species towards a higher level of listing, consistent with the direction in the FEIS PRMP (2016).

Rationale: This issue was considered but not analyzed in detail. After surveys, a review of existing populations, habitat, and proposed treatments, PDF's have been established to ensure the protection of Bureau sensitive plant species and their habitat where impacts are anticipated. Given this review, completed surveys, and project design features, it has been determined that the proposed activities in the Last Chance project would not adversely affect and trend any Bureau Sensitive botanical species towards a higher listing status and the proposed action follows the guidance set forth in the FEIS PRMP (2016), SWO RMP (2016), BLM Manual 6840, and the Interagency Special Status/Sensitive Species Program (ISSSSP).

### Carbon Storage and Greenhouse Gas Emissions

- What are the effects of proposed project actions on greenhouse gas emissions, carbon storage, climate change, and the social cost of carbon?

Background Information: The effects of the proposed action of the Last Chance FMP on carbon storage and greenhouse gas emissions, including estimates of their social cost, is not analyzed in detail, because, regardless of project-specific or site-specific information, there would be no reasonably foreseeable significant effects of the proposed action beyond those disclosed in the 2016 Final Environmental Impact Statement.

Rationale: The 2016 Final Environmental Impact Statement (FEIS) analyzed the effects of timber harvesting, prescribed burning, and livestock grazing on greenhouse gas emissions and carbon storage, and the potential impacts of climate change on major plan objectives. The FEIS also analyzed the estimated future values associated with carbon storage and greenhouse gas emissions, using methods developed at that time by the Interagency Working Group on Social Cost of Carbon, United States Government (2016),

The effects of the action Alternatives on carbon storage and greenhouse gas emissions, and their associated values, tiers to the analysis in the FEIS. As described below, the proposed action is consistent with the SWO ROD/RMP. While analysis of the project-specific and site-specific conditions could give greater specificity to the analysis in the FEIS, there is no potential for reasonably foreseeable significant effects of the proposed action beyond those disclosed in the FEIS. The analysis in the FEIS addressed the effects on carbon storage and greenhouse gas emissions of implementing the entire program of work for timber resources based on high quality and detailed information (FEIS, pp. 165-180; 1295-1304; 598-600; 621, 653; 657). The information available on project-specific and site-specific conditions, while more specific, is not fundamentally different from the information used in the FEIS analysis of effects on

KSW01769

carbon storage and greenhouse gas emissions, and their associated values, and thus cannot reveal any fundamentally different effects than that broader analysis.

The FEIS upon which the 2016 ROD/RMP was based examined the most recent science regarding climate change, carbon storage, and greenhouse gas emissions. The analysis in Volume 1 on Pages 165-211 are relevant to this project and are incorporated by reference.

The key points from 2016 FEIS analyses include (FEIS, p. 165; 590):

- Net carbon storage would increase.
- Annual greenhouse gas emissions would increase although annual emissions would remain less than 1 percent of the 2010 Statewide greenhouse gas emissions.
- Climate change increases the uncertainty that reserves will function as intended and that planned timber harvest levels can be attained, with the uncertainty increasing over time.
- Active management provides opportunities to implement climate change adaptive strategies and potentially reduce social and ecological disruptions arising from warming and drying conditions.

Social Cost of Carbon is calculated using a non-market based valuation for the storage of carbon as a good or service and greenhouse emissions expected to result from the alternatives. The analysis finds that the value would increase from current (2012) valuation of $85 million per year to a value of $159 million per year under the RMP. The FEIS concluded that the approved RMPs support the state of Oregon's interim strategy for reducing greenhouse gas emissions (FEIS, p. 173). Both the state of Oregon's strategy and Federal climate change strategies have goals to increase carbon storage on forest lands to partially mitigate greenhouse gas emissions from other sectors of the economy. Neither the state of Oregon nor the federal government have established specific carbon storage goals so quantifying BLM's contribution to that goal is not possible. Assuming no changes in disturbance regimes such as fire and insects (acres affected and severity of impact) from the recent past, timber harvesting is the primary activity affecting carbon storage (FEIS, p.169).

The FEIS estimated the effects of implementing actions consistent with the Southwestern Oregon RMP as follows in Table B-3:

Table B 8.1: Carbon Storage, Greenhouse Gas Emissions and Net Carbon Storage

| **Table B 8.1:** Carbon Storage, Greenhouse Gas Emissions and Net Carbon Storage | Current | 2033 | 2063 |
|---|---|---|---|
| Carbon Storage | 336 Tg C | 404 Tg C | 482 Tg C |
| Greenhouse Gas Emissions | 123,032 Mg CO2e/yr | 256,643 Mg CO2e/yr | 230,759 Mg CO2e/yr |
| Net Carbon Storage | $ 85 Million | $159 Million-average/year 2013-2022 | |

The carbon storage and greenhouse gas emissions analysis was based on assumptions concerning the level of management activity:

The FEIS assumed an average annual harvest level of 278 MMbf per year (205 MMbf from the Harvest Land Base and 73 MMbf from non-ASQ related harvest) over the entire decision area (FEIS, p. 307). The expected annual harvest for the Medford District for 2024 is 51 MMbf (37 MMbf from the HLB and 14 MMbf from non-ASQ related harvest). Which has been reduced in 2024 to allow BLM to focus on forest health due to Douglas Fir mortality within the District. Projected harvest levels from the Last Chance FMP, when added to projected harvest levels from other projects on the BLM Medford District, fall within the FEIS analysis.

Table B 8.2: Planned Project Acres

| Sale | NEPA | ASQ(MMBF) | Non-ASQ | Total Sale Vol. |
|---|---|---|---|---|
| Late Mungers | IVM EA | 0.0 | 5.1 | 5.1 |
| Penn Butte | IVM EA | 0.0 | 6.6 | 6.6 |
| Sugar Hill | South Clark EA | 8.0 | 0.0 | 8.0 |
| Santiam Select | South Clark EA | 4.8 | 0.1 | 4.9 |
| 2024 Sale Pending Release of EA | Last Chance EA | 7.2 | 1.8 | 9.0 |
| Dead Antelope Salvage | Cat EX | 2.4 | 0.2 | 2.6 |
| Forest Creek Salvage | Cat EX | 1.4 | 0.0 | 1.4 |
| Boaz Salvage | Cat EX | 2.6 | 0.1 | 2.7 |
| Lost Rio Salvage | Cat EX | 1.1 | 0.0 | 1.1 |
| **TOTALS** | | **27.5** | **13.9** | **41.4** |

The harvest levels remain within the range of that analyzed in the FEIS (Table 17).

Table B 8.3: Medford District Offered Harvest by Volume 2018-2022 (source: BLM Facts website)

| Year | FEIS MMBF Projected for Harvest for Medford District | MMBF Offered by Medford District | % Offered Harvest of FEIS Annual Harvest Level |
|---|---|---|---|
| 2018 | 51 | 23.4 | 46% |
| 2019 | 51 | 37 | 72.5% |
| 2020 | 51 | 41.3 | 81% |
| 2021 | 51 | 35.4 | 69% |
| 2022 | 51 | 34.8 | 68% |
| 2023 | 51 | | |

Activity fuels treatments are aligned with the harvest program with estimated acres of prescribed fire treatment type provided by the Woodstock model (FEIS, p. 1300). The decadal average of activity fuels prescribed burning for the first 20 years of the RMP would be an estimated 64,806 acres over the entire decision area (FEIS, p. 362). For the Medford District, the expected decadal average activity fuels program covers 25,221 acres.

The FEIS assumed that the non-commercial hazardous fuels (natural fuels) treatment levels would not differ from the 2003-2012 period although there is substantial year-to-year variability in the size of the program over the planning area and within any one District (FEIS, p. 270). Approximately 121,219 acres of prescribed burning associated with non-commercial natural hazardous fuels treatment is expected to occur on average each decade across the planning area (FEIS, p. 270). For the Medford District is approximately 62,497 acres of hand pile burn prescribed fire and approximately 22,064 acres of

underburning, totaling and expected 84,561 acres per decade on average is expected associated with natural hazardous fuels treatments.

Table B 8.4: Prescribed Burning Treated by Year in the BLM Medford District (GeoCortex Public Webmap)

| Year | FEIS Analysis for Annual Medford District Prescribed Fire (acres) | Total Prescribed Fire Implemented by BLM Medford District (Acres) | Percent Fuels Treated of FEIS Analysis Annual Prescribed Fire Levels |
|---|---|---|---|
| 2016 | 10,977 | 561 | 1% |
| 2017 | 10,977 | 2,420 | 3% |
| 2018 | 10,977 | 2,299 | 5% |
| 2019 | 10,977 | 2,086 | 7% |
| 2020 | 10,977 | 872 | 8% |
| 2021 | 10,977 | 1,861 | 9% |
| 2022 | 10,977 | 1,299 | 10% |
| 2023 | 10,977 | 3,007 | 13% |
| Last Chance | | 11,686 | 24% |

The FEIS modeling thus estimated the total prescribed burning program (natural and activity fuel combined) for the Medford District to be approximately 109,772 acres per decade. If all 11,686 acres analyzed in the EA would be treated with prescribed fire, they would fall within the district decadal average. The acres of prescribed burning and tonnage consumed remains within the range analyzed in the FEIS (Table 18).

The amount of activity fuels prescribed burning is the primary driver of greenhouse gas emissions (FEIS, p. 178). Greenhouse gas emissions would increase substantially largely due to the projected increases in activity fuels prescribed burning. The FEIS assumed no change in the natural fuels prescribed burning program from the recent past. Greenhouse gas emissions analyzed included those from grazing, prescribed burning, and harvest operations (FEIS, p. 174).

There is no new information or changed circumstances that would substantially change the effects anticipated in the 2016 FEIS. This is because the harvest levels remain within the range of that analyzed in the 2016 PRMP/FEIS and the acres of activity fuels prescribed burning and expected tonnage consumed remains within the range analyzed in the 2016 PRMP/FEIS.

Cultural Resources

- How would ground disturbance from LCFMP affect cultural resources such as archaeological and historical sites, artifacts, and features?

Background: Proposed project activities including transportation management (see Appendix D.3) and harvest methods (see Appendix D.2) have the potential to affect cultural resources by causing ground disturbance and modifying the landscape. These activities may cause a significant impact by affecting the physical integrity of cultural artifacts and features and their setting where "significant impacts" is defined as those that adversely affect any of the elements of a cultural resource that contribute to its National Register of Historic Places (NRHP) eligibility. This could include actions affecting the physical integrity of cultural artifacts and features as well as actions that affect their setting.

KSW01772

The GPFO archaeologist conducted archival and background research, and a consultant conducted field surveys, to identify cultural resources located within LCFMP according to RMP directives (USDI/BLM. 2016b. p. 89). The results of the field surveys are detailed in a cultural resource inventory report contained in the project record and submitted to the SHPO. This report discusses all cultural resources identified in LCFMP and assesses them in terms of their NRHP eligibility. Section 106 of the NHPA requires that federal agencies take into account the effects of their undertakings on historic properties that are included in, or eligible for inclusion in, the NRHP. Therefore, non-eligible sites and isolated finds do not require further consideration. However, historic properties (cultural resources that are eligible for the NRHP) and unevaluated cultural resources (which per the 2015 BLM-SHPO Protocol must be treated as historic properties) must be taken into consideration.

Rationale: This issue was considered but not analyzed in further detail as the project was specifically designed to avoid significant impacts to historic properties. The project avoids historic properties whenever possible. In areas where historic properties could not be avoided, PDFs would be applied to avoid impacting those elements of a historic property that contribute to NRHP eligibility. In cases where the BLM proposes to implement treatments within cultural resources that are unevaluated or eligible for the NRHP, PDFs were developed (See PDFs, Appendix C, Table C-12, PDFs 17-21) to ensure that the project does not adversely affect those resources. Concurrence was sought from SHPO on their determination of "no adverse effect to historic properties" for the project.

The BLM considered this issue but did not analyze it in detail because it does not address the purpose and need and is not associated with significant impacts (USDI/BLM. 2008a. NEPA handbook, p. 41) beyond those analyzed in the FEIS.

- How would LCFMP affect traditional cultural properties or properties of religious significance, either through ground disturbing activities or altering accessibility or use?

Background: Several Federally recognized Tribes have cultural and/or religious connections to the project area. Project activities would have the potential to disrupt or negatively impact these properties, either by inadvertently impacting the property, or limiting access to said property depending on the nature of the property. To prevent this, tribal consultation was undertaken to identify places of traditional religious or cultural significance to tribes who take an interest in the LCFMP. This consultation did not result in the identification of any sites of concern to tribes.

Rationale: The BLM considered this issue but did not analyze it in detail because it does not address the purpose and need and is not associated with significant impacts (USDI/BLM. 2008a. NEPA handbook, p. 41) beyond those analyzed in the FEIS. Consultation with the tribe identified no sites of traditional cultural or religious significance to Tribes within the LCFMP.

Fire and Fuels

- How would the LCFMP affect wildfire risk to communities?

Background: This issue evaluates how proposed actions would affect wildfire risk near communities. This issue expands on the Fire Resistance and Hazard detailed analysis, which analyzed relative stand-level resistance to replacement fire (or fire hazard). Fire hazard is a component of wildfire risk, which refers to the ease of ignition and potential fire behavior of the fuel complex, defined by the volume and arrangement of fuel layers, including surface, ladder, and canopy fuels (Calkin et al. 2010). Fire behavior has a direct effect on fire severity, mortality, suppression tactics, and the initiation of crown fire, which presents the greatest resistance to control and the largest potential to threaten wildland urban interfaces (WUI) (Graham et al. 2004) (USDI/BLM 2016a, p. 254). Wildland fire risk describes the likelihood of wildfire, intensity of wildfire (aka hazard), and susceptibility of human values (e.g., communities, homes, infrastructure, resources, etc.) to adverse wildfire effects Wildfire likelihood is high in southwest Oregon

and fires have occurred with regularity within the project area (Appendix D.5). In this issue, the BLM considers effects to the human value of a focused area around communities.

In terms of community wildfire risk, reducing loss of homes to wildfire is best achieved by reducing the susceptibility of homes to ignition and reducing the probability of home exposure to wildfire (Caulkin et al. 2014). Home material construction (i.e., fire resistant) and home ignition zone (100-200 feet circumference of vegetation around home), managed by the homeowner, influence home ignition susceptibility (Cohen 2008). The probability of home (or community) exposure to wildfire is influenced by production of embers and large wildfire growth. Treatments that reduce the probability of torching (or increase stand-level fire resistance) and limit ember production or provide effective opportunities to limit large wildfire growth and limit wildfire hazard and likelihood (Caulkin et al. 2014, Finney 2007), or probability of exposure. Additionally, Prichard et al. 2021 recently examined several of these same topics and conclude that only focusing treatments within the home ignition zone, which is critically important, ignores broader interconnected social and ecological issues, such as smoke from wildfire emissions, ecosystem service impacts, such as clean water, and impacts to other HVRAs that occur beyond the home ignition zone, such as forests providing wildlife habitat and banking carbon stores that can slow negative climate-fire feedback loops.

This analysis tiers to the PRMP/FEIS analysis of the effects of the temporary increase in risk from residual activity fuels (e.g., live and dead tree branches and tops accumulated following timber harvest) (USDI/BLM 2016a, pp. 264-270) and the effects of relative stand-level fire hazard within close proximity to Wildland Development Areas (WDA) (USDI/BLM 2016a, pp. 253-264), used as a surrogate for Wildland Urban Interface in the PRMP/FEIS. Much of the Last Chance planning area lies within a quarter mile of Communities at Risk (CaR), a locally identified focused area within the Wildland Urban Interface (WUI) (CWPP 2019; Metlen et al. 2017). Approximately 15% of the maximum proposed action extent (1,620 acres) is within the CaR (Appendix D.5) and 43% of proposed action acreage is within the WDA (Appendix D.5 Affected Environment).

The analysis for temporary increase from residual activity fuels, which is incorporated here by reference, concluded that immediately following commercial harvest, residual activity fuels left on the forest floor (e.g., tree tops and limbs) would increase surface fuel loadings and have the potential to increase surface fire behavior and pose a risk to the residual stand and other values, if not adequately treated (USDI/BLM 2016a, p. 269; Martinson and Omi 2013; Weatherspoon and Skinner 1995; Fule et al. 2001). The analysis in the PRMP/FEIS provided an estimate of potential future work needed to reduce the risk associated with activity fuels and concluded that in the interior/south, implementation of the SWO ROD/RMP would result in an average of approximately 72,000 acres/decade of very high and high risk from activity fuels on dry forest sites (USDI/BLM 2016a, pp. 268-269). The PRMP/FEIS also identified that a variety of follow-up treatments (e.g., prescribed fire, biomass removal, and mechanical manipulation, etc.) can reduce surface fuels and reduce the risk associated with activity fuels (USDI/BLM 2016a, pp. 266, 269). Proposed actions within this EA would treat activity fuels within 1-2 years following harvest similarly among alternatives (See Proposed Action 1.4). Activity fuels would be treated to reduce surface fuels to below a level that would result in expected flame lengths less than 4 feet under typical fire weather conditions. Activity fuel treatment type would be based on the remaining surface fuel loading and unit location (e.g. aspect, slope, access, and proximity to other values, such as communities). Any increase in surface fuel loading from residual activity fuels would be temporary (1-2 years). The effects of the temporary increase in risk from residual activity fuels are within the scope of those effects analyzed for in the FEIS (USDI/BLM 2016a, pp. 260 and 263, Figure 3-380) (see Issue 3). In this analysis, the BLM tiers to the FEIS assumptions (BLM 2016 p. 265-266), to assess the relative amount of residual surface activity fuel immediately following harvest, to assess the temporary increase in surface fuel loading. In that analysis, the BLM determined a relative weighting of residual activity fuel that would remain following timber management activities (BLM 2016 p. 266, Table 3-37), based on the management type and intensity, where harvest prescriptions that remove greater basal area from stands leave more surface

fuels. The BLM followed this same weighting and applied it to acres of proposed harvest types in this project, where small-diameter thinning, and commercial thinning and selection harvest would generate low loads of residual activity fuels and variable retention harvest would generate moderate loads (see Appendix D.5 Methods and Assumptions sections). As discussed in Issue 3 in the FEIS, variable retention harvest will generate higher loads of activity fuels. Alternative 2 is the only alternative that proposes variable retention harvest, of which 156 acres are within the WDA (Table B 11.1).

Table B 11.1 Action Alternative 2 proposed variable retention harvest acreage relative to the WDA.

| Row Labels | Inside WDA | Outside WDA | Grand Total |
|---|---|---|---|
| Regeneration Harvest 15-30% BA | 156 | 574 | 730 |
| Regeneration Harvest 5-15% BA | | 57 | 57 |
| Grand Total | 156 | 631 | 787 |

In the 2016 PRMP/FEIS, the BLM analyzed in detail how the alternatives would affect fire hazard within WDAs (USDI/BLM 2016a, pp. 253-264). In that analysis, the BLM assigned forest structural stages (USDI/BLM 2016a, pp. 1203-1206) to a relative ranking of stand-level fire hazard using the same methodology as in analysis of relative stand-level resistance to replacement fire in the dry forest (USDI/BLM 2016a, Table 3-32, p. 243 and Table 3-34, p. 254). The BLM conducted detailed analysis of relative stand-level resistance to replacement fire (or fire hazard) in Issue 5 of this EA, which tiered to PRMP/FEIS analysis, and concluded that "[u]nder all action alternatives, combined direct effects from proposed forest management actions would reduce (surface, ladder, and canopy fuels), reduce fuel profile continuity, and increase heterogeneity, over the No Action Alternative. These changes to the fuel profile would indirectly increase wildfire resistance or reduce wildfire hazard in the short-term (up to 20 years) and vary by alternative, which the BLM has analyzed in Issue 5 Additionally, in the cumulative effects discussion of Issue 5, the BLM indicates that stands would need maintenance treatments to sustain low-moderate surface fuel loading and maintenance needs would vary by alternative, for example more open conditions would require more frequent maintenance to sustain low-moderate fuel loading.

Rationale: This issue was considered but not analyzed in detail because 1) this analysis tiers to the PRMP/FEIS analysis, which estimated the effects of residual activity fuel hazard following on hazard (USDI/BLM 2016a, pp. 264-270) and relative stand-level fire hazard within close proximity to Wildland Development Areas (WDA) (USDI/BLM 2016a, pp. 253-264); and 2) there is no potential for significant effects from this EA beyond the magnitude of treatments analyzed in the PMRP/FEIS, because anticipated effects under any Alternative would not exceed those analyzed in the PRMP/FEIS. Additionally, there are no new circumstances or information at the site-specific level that would change the effects disclosed in the FEIS as stepped down to this project and this EA. At this time, nothing has changed relevant to the FEIS analysis and no new information has been determined that would change the outcome of the 2016 FEIS analytical conclusions.

The BLM analyzed in detail the alternative effects on stand-level fire resistance to stand replacement fire (or crown fire) and fire hazard (Fire Resistance and Fire Hazard Issue). Crown fire produces the most ember production and spot fires and presents the greatest resistance to control among fire behavior types. The BLM concluded that all Action Alternative increased short-term resistance to stand-level replacement over the No Action Alternative. Additionally, as described in the FEIS stand-replacement fire (e.g., crown

fire) presents the greatest fire hazard or resistance to control and poses the greatest risk to human constructed assets and has the largest immediate and long-term ecological effects (USDI BLM 2016a). Any increase in surface fuel loading would be temporary (1-2 years) and treatments of residual harvest activity fuels by burning or removal of slash would reduce horizontal and vertical fuel loading and connectivity and thus the temporary increase in surface fuel hazard (Fire Resistance Issue assumptions).

For the above reasons, further analysis of this issue is not necessary for making a reasoned choice among alternatives, in that it would not inform the decision maker how the alternatives respond to the purpose and need beyond detailed analysis conducted in Issue 3. Additionally, effects among all alternatives would be within those analyzed in the PMRP/FEIS, therefore, this Issue was not carried forward for further analysis.

- How would road building contribute to human caused fire ignitions?

Background: Road corridors have been found to be correlated with human ignitions (Narayanaraj and Wimberly, 2011, and Syphard et al. 2007), however roads may also contribute toward wildfire containment and limiting fire spread (Price & Bradstock, 2010; Syphard et al. 2007), particularly if aligned with an operationally strategic location that could aid in wildfire containment and limit large fire growth. Studies have shown mixed results, regarding the influence that road density and road proximity to populated areas have on wildfire ignitions. Narayanaraj and Wimberly (2011) did not find a correlation between road proximity to population density and human caused ignitions, while Romero-Calcerrada and others (2008) and Syphard and others (2007) found positive relationships. Between 2000 and 2021, human caused wildfire ignitions within the Last Chance FMP Planning Area accounted for 65 percent of all wildfires. Across the BLM Medford District between 1984 and 2013, the vast majority (91 percent) of all human caused fire ignitions occurred within one mile of Wildland Developed Areas (or where people live) (USDI/BLM 2016a, Figures 3-22 p. 227 and 3-34 p. 254).Within the project area, human caused wildfire ignitions that occurred within 50 feet of an existing road within the WDA, accounted for 21 percent of all human caused ignitions (2000-2022). During this time the majority (50 percent) of human caused ignitions that occurred within the planning area, started within the WDA beyond 50 feet of an existing road.

Table B 12.1 Human caused wildfire ignitions (2000-2022) and location relative to existing roads and the Wildland Developed Area (BLM 2016) in the project planning area. Data is from Oregon Department of Forestry (ODF).

| Location relative to existing roads | Inside WDA | | Outside WDA | |
|---|---|---|---|---|
| | Number of Fires | Percent of total | Number of Fires | Percent of total |
| Within 50ft of a road | 14 | 21% | 5 | 8% |
| Beyond 50ft of a road | 33 | 50% | 14 | 21% |
| Grand Total | 47 | 71% | 19 | 29% |

Rationale: The local data illustrates human actions have an influence on wildfire ignition patterns within the BLM Medford District and Last Chance FMP planning area, particularly within proximity to populated areas, however based on studies reviewed, there is mixed evidence on road density influence on human caused ignitions, ranging from no detectable evidence to a positive correlation. While road construction, road renovation and road decommissioning vary among action alternatives, temporary roads would be decommissioned after use common to all action alternatives. While road construction, road

renovation and road decommissioning vary among action alternatives, some roads would be decommissioned after use common to all action alternatives. In alternative 2 and 2a there are 28 miles of road construction proposed. Of the 28 miles of road construction, 1.88 miles are behind a BLM locked gate and 1.88 miles are also on a parcel of BLM-administered lands, surrounded by private lands. There are 16 miles of Road Renovation proposed. There are 241 miles of road Renovation proposed. These are roads that were not available for the public to travel previously. Additionally, as fire season increases in severity, land management agencies impose restrictions pertaining to public and work-related activities to prevent fire ignitions; in extreme fire weather conditions, restrictions can include public land closures, which is intended to limit access and reduce potential human caused ignitions. As stated in the background, roads may also contribute toward wildfire containment and limiting fire spread and approximately 2.16 miles of the proposed road construction, behind a BLM locked gate, coincide with identified Potential wildfire Operational Delineation (POD) boundaries as described by Thompson and others (2016) and Stratton (2020), which represent geographic features that could aid in wildfire containment and limit large fire growth. Additionally, long-term decommissioned roads could be easily opened for use in wildfire containment, particularly those located on ridgetops, landscape locations that would need little infrastructure (e.g., cross drains) to reduce erosion or sediment delivery to streams.

For the reasons above, the alternatives do not present the potential for significant effects from roads to human caused fire ignitions, and further analysis of this issue is not necessary for making a reasoned choice among alternatives.

<u>Fish and Aquatic Habitat</u>

- How would timber harvest actions (ground-based, skyline-cable, tethered, and helicopter yarding) affect federally listed and native fish species and their habitats (aquatic habitat)?

Background Information: Ground-disturbing activities in or near stream channels have the greatest potential to impact federally listed and native fish species and their habitat (aquatic habitat) by increasing erosion and sediment transport to, and storage in, stream channels. The following proposed project elements have the potential to contribute sediment to streams: skid trails and skyline corridors.

Aquatic habitat character and quality are directly related to sediment. Sediment can increase embeddedness and accumulate in pools, reducing depths. These effects reduce spawning and rearing habitat quality and quantity. Increased sediment production and delivery to stream channels is the primary mechanism for potential impacts to aquatic habitats. The potential impacts to aquatic habitats from these activities would be minimized or eliminated through project designs and implementation, including the use of BMPs, PDFs, and Riparian Zone buffers.

Rationale: This issue was considered but not analyzed in further detail because the activities described in the proposed actions would not be implemented in fish-bearing streams. This is achieved through the implementation of BMPs, PDFs, and Riparian Zone buffers.

Proposed skyline and tethered yarding corridors would have no hydrologic connection to stream channels, and no causal mechanism would exist for input of sediment into streams because of practices such as full suspension over streams and spacing of corridors (see TH03, Appx. C). Additionally, the activities described in the proposed actions would not affect aquatic habitat because of the distance to fish-bearing streams (the nearest action is approximately 120 feet from fish-bearing streams). In a few cases, a skid trail would cross an intermittent non-fish bearing stream in the dry season. BMPs, such as constructing water bars, using erosion-control techniques on skid trails, and limiting landing construction to the dry season, would minimize the potential for sediment delivery into streams to levels indistinguishable from background levels. No measurable effects to federally listed and native fish species and their habitats (aquatic habitat) are expected due to the implementation of PDFs and BMPs.

See Hydrology and Water Quality sections for more information on how effects to aquatic habitat were considered in this EA.

<u>Hydrology and Water Quality</u>

- Are Best Management Practices and Project Design Features effective in preventing or reducing the amount of sediment and other pollutants from LCFMP activities?

Background Information: A Best Management Practice (BMP) is a practice or combination of practices that have been determined to be effective and practicable in preventing or reducing the amount of pollution generated by non-point sources to a level compatible with water quality goals (40 CFR 130.2(m)) (USDI 2016b, p. 163). When the Grants Pass Field Office applies BMPs to site specific locations they become Project Design Features (PDFs) which, as indicated by the name, are site and project specific.

The BLM utilizes BMPs and site-specific PDFs to comply with the Clean Water Act of 1972 (as amended), State of Oregon water quality legislation, and the O&C Act (RMP, p. 163). The BLM has designed and would implement BMPs in a manner that is consistent with the ODEQ Memorandum of Understanding (ODEQ MOU) (USDI BLM, 2017). The ODEQ MOU requires monitoring to ensure that practices are properly designed and applied, to determine the effectiveness of BMPs in meeting water quality standards, and to provide for adjustments of BMPs to make them more effective (USDI BLM, 2017). Neither the most complex or costly techniques nor the complete elimination of pollutants is required or expected with BMP use. The effectiveness of BMPs often requires adaptation to the natural and highly variable landscapes such as the forestlands managed by the BLM (Edwards, et al., 2016).

The proper implementation of BMPs listed in Appendix C of (USDI/BLM, 2016b) would be effective in reducing the amount of pollution by reducing erosion and sedimentation from LCFMP forest treatment activities. Timber harvest BMPs have been evaluated to determine their effectiveness at achieving water quality standards pertain to sediment related effects and found them very effective when they included stream buffers (Rashin, et al., 2006). This project delineates a stream buffer of 120 feet in the Inner Riparian Zone for Class I perennial streams and 50 feet for intermittent streams. In this stream buffer no commercial harvest would occur and limited amount of project activities such as non-commercial HFR, stream restoration, and transportation activities would occur. Other examples of BMPs such as those for roads avoid steep slopes or sensitive resources when designing the location of new road, limiting road and landing construction to the dry season, and installing waterbars on skid trails (USDI/BLM 2016b pp. 167, 176, & 184).

BLM professionals implement BMPs and PDFs through timber sale contracts and apply professional experience to mitigate on the ground impacts. The SWO RMP states that the implementation of BMPs is an iterative process that includes the monitoring and modification of BMPs, where needed, to achieve water quality goals (USDI/BLM, 2016b, p. 137), this monitoring would occur after project implementation. Project monitoring of BMPs is part of the RMP (USDI/BLM 2026b pp. 142) and should ensure they are successfully applied.

Rationale: Further analysis of this issue is not necessary for making a reasoned choice among alternatives since the application of BMPs and PDFs would occur under all action alternatives. Additionally, further analysis of this issue is not necessary to determine the potential for significant effects and there is no potential for significant effects beyond those analyzed and disclosed in the FEIS, and incorporated by reference into this EA, "Under all alternatives, project-level planning and analysis would identify the appropriate and applicable BMPs needed to achieve management objectives" (USDI BLM 2016a, p. 99).

- How would commercial timber harvest and non-commercial HFR proposed for the LCFMP affect streamflow in terms of annual water yields, the resilience of water supplies to climate change,

summer low flows, streamflow magnitude-intensity-duration, and/or timing of peak or low base flow conditions?

**Background:**  Proposed project activities including harvest methods (see Appendix D.2) and transportation management (see Appendix D.3) have the potential to reduce canopy cover, disturb soils and vegetation and change forest hydrology. Tree removal, road construction, road renovation, landing construction and use, timber hauling, and soil compaction on skid trails have the potential to increase surface runoff, reduce groundwater storage or change the timing and magnitude of peak events.

Annual water yield, low summer flows, streamflow, and duration were analyzed in the FEIS (USDI/BLM, 2016a, pp. 408-409). The potential impact of timber harvest and road construction on peak stream flows was analyzed in detail for snow dominated hydro-regions as Issue 2 in the FEIS (USDI/BLM, 2016a, pp. 384-394) and presented under Issue 8 in this EA as part of the discussion about sedimentation.  analysis is incorporated here by reference.

**Annual Water Yield:** Commercial timber harvest generally increases the fraction of precipitation that is available to become streamflow (Moore & Wondzell, 2005). Annual water yield is the total surface water output for a given watershed per year. Studies have shown an increase in water yield in the first few years after timber harvest (Perry & Jones, 2016). Removal of trees and canopy cover shows a linear relationship to increased water yield during the first years after harvest (Harr, 1976). Reductions in forest cover above 20% can increase annual water yields to a detectable level, but reductions below 20% are not likely to result in measurable changes in annual streamflow yields (Stednick, 1996).

The FEIS for western Oregon found that "timber harvest with the alternatives and proposed actions would produce an inconsequential change in annual water yield." This analyses are incorporated here by reference (USDI/BLM, 2016a, pp. 408). On a catchment scale, the ECA and the roaded area may be evaluated to analyze potential impacts to streamflows (See the Hydrology and Sedimentation Issue analyzed in detail, Chapter 3).

Commercial timber harvest prescriptions would leave on average per harvest unit 30% canopy cover in RR and LSR  thinning treatments are not expected to reduce canopy cover enough to change ECA. Commercial timber harvest in HLB would result in openings that are 1-4 acres in size and would result in increased water yield from these sites. These openings were added to ECA calculations by alternative and evaluated for potential changes to watershed response. These areas only resulted in a small increase in ECA by watershed (less than 1%) but did predict a 0.02% difference in ECA for the LCFMP. The largest increase in ECA by alternative from LCFMP came from the proposed road construction. (See Table 8.7). Although some increase in annual water yield 1-2 years below treatment areas in these LUAs is possible, these increases would not be detectable in streamflow.

**Resilience of Water Supplies to Climate Change:** Management actions that improve and sustain watershed resilience would moderate future impacts caused by climate change (Furniss, et al., 2010). HFR treatments and reductions of activity fuels after commercial harvest would maintain or slightly improve watershed resiliency, potentially reducing the magnitude of peak flows following stand-replacing fires. (Wampler, et al., 2023). In addition, LCFMP road renovation and maintenance activities such as improving surfacing, installation of rolling dips, upsizing culverts to pass 100-year flow events, and other storm-proofing activities would increase the resilience of portions of road construction that would provide access for project activities, potentially reducing road failures and sediment delivery from peak flow events as compared to the No Action Alternative.

**Summer Low Base-flow Conditions:** Long-term paired watershed experiments indicate that the conversion of mature and old-growth conifer forests to plantations produced persistent summer streamflow deficit of up to 50% at about 25 to 45 years after planting (Perry & Jones, 2016). Paired watershed studies provide a reasonable frame of reference for interpreting the potential effects of forest management, even if the harvest methods are not identical (Grant, et al., 2008).

A long-term analysis from the Alsea Watershed Study (1950-2017) in the Coast Range of Oregon found that high evapotranspiration rates from Douglas-fir plantations appeared to explain summer the low-flow deficits from 40- to 50-yr-old forest plantations. They found that contemporary forest practices with riparian buffers had only a minor effect on the streamflow deficits (Segura, et al., 2020).

Long-term paired watershed experiments indicate that the conversion of mature and old-growth conifer forests to plantations produced persistent summer streamflow deficit of up to 50% at about 25 to 45 years after planting (Perry & Jones, 2016). No paired watershed studies provide data on forest management practices commonly used today, such as riparian buffers.

Paired watershed studies are long-term projects and provide a good range of impacts and a reasonable frame of reference for interpreting the potential effects of forest management, even if the harvest methods are not identical (Grant, et al., 2008). A long-term analysis from the Alsea Watershed Study (1950-2017) in the Coast Range of Oregon found that high evapotranspiration rates from Douglas-fir plantations appeared to explain summer the low-flow deficits from 40- to 50-yr-old forest plantations.

Segura et. Al., 2020 found contemporary forest practices such as thinning with riparian buffers had only a minor effect on the streamflow deficits. Alternative 2 would have areas of VRH, resulting in post-harvest relative density that would be less than 30 percent and all treatments would have riparian buffers. The largest openings considered for this project are 4-acre group select areas, these would occur in both action alternatives in the HLB but not the LSR or RR LUAs where openings would be less than 1 acre for commercial thinning.

An analysis of daily streamflow from paired watershed studies found summer flow deficits in basins with clearcuts replanted with young Douglas-fir (i.e., plantations). Persistent summer deficits also tend to correspond with winter surpluses. Higher evapotranspiration rates from June to September for young Douglas-fir trees are likely the primary driver of low summer flows (Segura, et al., 2020). Lower summer streamflows because of timber harvest are less likely in rain-dominated catchments (Moore & Wondzell, 2005). A rain-dominated hydrograph occurs in 77% of the LCFMP (Table 8.2).

Other paired watershed studies have shown large initial summer surpluses and persistent summer deficits with patches of 20 acres or more (Perry & Jones, 2016). The summer low base-flow relationship was less apparent in paired watersheds that had partial, shelterwood or patch cuts of 1.5 acres to 3.2 acres, and none of the studied watersheds had riparian buffers applied (Jones & Grant, 1996).

Assuming VRH and group select areas produce stands of even age Douglas-fir trees as a result proposed reforestation efforts, resulting low-flow effects would be comparable to the shelterwood or patch cuts described above. BLM typically does a mix of tree species during replanting efforts, so impacts are even less likely than from these studies. Summer low flows effects have only been found when Douglas-fir stands between 25-45 years make up a significant portion of a watershed (Perry & Jones, 2016) and 40-50 years out for the Alsea Watershed (Segura, et al., 2020). Therefore, higher evapotranspiration rates from plantings would not be expected for at least 25 years and since BLM typically does not plant just Douglas-fir is unlikely any detectible change would result from VRH or thinning proposed in the LCFMP.

**Streamflow Magnitude, Duration and/or the Timing of Peak and/or Low Flows:** Forest dominated mixed watersheds tend to be hydrologically resilient to forest cover change, and the sensitivity of annual runoff to forest cover change varies across spatial scales (Zhang, et al., 2017). If non-commercial HFR treatments are successful in reducing likelihood of wildfires in the LCFMP, the likelihood of peak flow events would decrease. Studies using modeling and compared to recently burned basins in Oregon have also show that wildfires can increase peak flows and annual water yield with higher precent change predicted for headwater watersheds (Wamplet, et al., 2023). Separating effects of road building from forest harvest is particularly difficult because, in most studies, road building and harvesting occurred either simultaneously or in close succession (Moore & Wondzell, 2005).

Any measurable enhancement of peak flows evaporates 2-4 years and not more than 5 years after the initial disturbance or forest harvest, as vegetation reestablishes as effective canopy and transpiration increase (Surfleet & Skaugset, 2013 and Best, et al., 2003).

The potential to enhance peak flows was analyzed in detail (Chapter 3: Issue 8). Based on the above analysis, under all action alternatives streamflow downstream would see a short-term local increase in peak flows and annual water yield. Flow conditions experience the maximum change in the first five years and would reach a new hydrologic equilibrium in 5 years after harvest (Brown, et al., 2005). Recovery to pre-harvest conditions for harvested units would occur within about 10 to 20 years in the rain and TSZ watersheds (Moore & Wondzell, 2005). Recovery to pre-harvest conditions for harvested units would occur within about 10 to 20 years in the rain and TSZ watersheds (Moore & Wondzell, 2005).

**Rationale:** Annual water yield, low summer flows, streamflow, and duration were analyzed in the FEIS (USDI/BLM, 2016a, pp. 408-409) and the potential for enhanced peak flows was analyzed and disclosed in Issue 8, Chapter 3. No measurable change in annual water yields, summer low flows conditions, increases in peak flows or other measurable changes to the magnitude or timing of streamflow are expected from LCFMP. Any non-measurable changes would likely occur in the first 5 years and would not persist past 10-20 years. Therefore, further analysis of this issue is not necessary for making a reasoned choice among alternatives. Additionally, further analysis of this issue is not necessary to determine if there is a potential for significant effects beyond those analyzed and disclosed in the FEIS.

- How would commercial harvest and non-commercial HFR proposed for the LCFMP affect pollutants within the range of natural variability and background conditions to and meet Oregon Department of Environmental Quality (ODEQ) water quality standards?

**Background:** The BLM addresses Federal Clean Water Act (CWA) Section 303(d)-listed waters through water quality assessments, providing data, validating listings and by working with ODEQ and other state agencies as well as local tribes to implement watershed improvement work (ODEQ, 2022a). When impairment of water quality standards is identified by ODEQ a Total Maximum Daily Limit (TMDL) is developed for non-point source pollution; ODEQ water quality standards are met by implementing Water Quality Restoration Plans (WQRPs).

Poor water quality is typically the result of several combined factors. For example, nutrients can combine with high seasonal temperatures to reduce dissolved oxygen for aquatic life and impact drinking water quality. Another common example of combined factors is increased sediment loads can lead to wider and shallower streams that have higher summer temperatures.

There are three WQRPs that cover BLM-administered lands in the Last Chance project area; they are the Upper Cow Creek (USDI BLM, 2004a), Middle Cow Creek (USDI/BLM, 2004b) and Grave Creek (USDI BLM, 2001). Specific recommendations for forest management from these plans include implementing silvicultural treatments designed to promote hardwood and conifers health in the riparian areas and to minimize sedimentation with good road management. These recommendations are consistent with the commercial timber harvest and non-commercial HFR proposed in the action alternatives.

The WQRP identified the major water quality concerns from past, present, and future activities in southern Oregon and the project area as changes in nutrients, sediment, and water temperature (USDI BLM, 2004a, USDI/BLM, 2004b and USDI BLM, 2001). These water quality concerns can all be detrimental to the habitat of aquatic species such as salmon due to the production of algal blooms, loss of dissolved oxygen, high stream temperatures, and loss of physical habitat due to sedimentation. This also applies to the resident fish and other aquatic life, particularly resident cutthroat, which are present in LCFMP streams.

The ODEQ water quality assessment was evaluated for the Upper Cow, Middle Cow and Grave Creek (ODEQ, 2023a). Oregon surface waters are assessed to determine if they contain pollutants at levels that exceed protective water quality standards (ODEQ, 2022b). The result of these analyses and conclusions is

KSW01781

called the "Integrated Report" because it combines the requirements of CWA section 305(b) to develop a status report and the section 303(d) requirement to develop a list of impaired waters.

Table B 17.1: Status of LCFMP Sub-watersheds from the Oregon 2022 Integrated Report (ODEQ, 2022b)

| Stream Name - Watershed | Waterbody | Pollutant | Status |
|---|---|---|---|
| McGinnis Creek – Cow Creek | Snow Creek | Temperature | Impaired for Fish and Aquatic Life |
| Quines Creek – Cow Creek | Little Bull Run, Bull Run, and Quines Creek | Biocriteria, Temperature | Impaired for Fish and Aquatic Life |
| Fortune Branch – Cow Creek | Woodford Creek | Temperature | Impaired for Fish and Aquatic Life |
| Wolf Creek – Grave Creek | Coyote Creek and Wolf Creek | Biocriteria, Temperature | Impaired for Fish and Aquatic Life |
| Last Chance – Grave Creek | Big Boulder Creek, Boulder Creek, and Grave Creek | Temperature | Impaired for Fish and Aquatic Life |

**Grave Creek (56% of LCFMP)**: Grave Creek and nine tributaries have been on the ODEQ 303(d) list for stream temperature. Maximum summer water temperatures in Grave Creek exceed ODEQ standards because of Grave Creek's width, low gradient, east-west orientation, and dark bedrock (Oregon DEQ, 2023c). Bedrock is a major component of Grave Creek's substrate; it absorbs heat during the day and radiates it to the stream at night. How much of the high-water temperatures are due to natural background conditions, or a result of historical practices such as mining and logging and loss of beavers; is difficult to sort out.

**Middle Cow Creek (42% of the LCFMP)**: Cow Creek and seven tributaries have been on the ODEQ 303(d) list for stream temperature. Habitat modification has been carried forward from a previous listing on the stretch from Galesville Reservoir to Starveout Creek and this same reach is currently listed for Dissolved Oxygen according to data is from the United States Geological Survey (USGS) Streamflow site near Azalea (Oregon DEQ, 2023c).

**Upper Cow Creek (2% of the LCFMP)**: There are some private residences within the watershed as well as the Cow Creek Community. Azalea is the nearest town, approximately 6 miles southwest outside of the western border of the Upper Cow Creek watershed (USDI BLM, 2005). There are no reaches in Upper Cow Creek that are on the 303(d) list for stream temperatures (Oregon DEQ, 2023c).

Pollutants identified in the LCFMP are temperature and biocriteria. The biocriteria standard states that water must be of sufficient quality to support aquatic species without detrimental changes in the resident biological communities. This protocol is based on biological community information for freshwater macroinvertebrates at reference sites. The most common water quality concern in the WQRPs is stream temperature which can also impact biocriteria (Stream Temperature is analyzed in the FEIS as Issue 1, starting on page 369), and this analysis is incorporated here by reference.

Sedimentation is analyzed in detail in Issue 8, Chapter 3. Physical and chemical characteristics of the soil, combined with past and current land use management may alter water quality over the short-term. Soils are analyzed in Issue 10, Chapter 3.

The LCFMP contains portions of Middle Cow Creek that is a source-water protection areas for the town of Glendale. There are no specific protection measures identified in the Source Water Assessments (SWAs) for these areas that are relevant to the proposed activities. There are some groundwater protection

KSW01782

areas for the Heaven on Earth restaurant, the South Star gas station, and the Longfibre campground near Cow Creek, none of these groundwater protection areas extend into BLM-administered lands or lands considered for treatments under this project (ODEQ, 2022a). No streams in the Last Chance project area or downstream are currently listed on the 303(d) list for impaired waters due to exceeding water quality standards for nutrients (ODEQ, 2023a).

The FEIS for western Oregon looked at the effect of timber harvest and road construction in source water watersheds and the Proposed Actions are consistent with FEIS analysis for public water systems (USDI BLM, 2016a p. 13 & 42). Therefore, the FEIS analysis is incorporated here by reference.

BMPs and PDFs for this project would be implemented to reduce potential impacts to water quality (USDI BLM, 2016b Appendix C) under all action alternatives. An example of implementing typical BMPs to reduce non-point source pollution to reduce impacts from project activities, would be requiring road maintenance to be done prior to the wet season (generally the wet season starts on October 15th), effective surface drainage on road surfaces and application of aggregate on roads used for timber haul would be achieved by pre-season maintenance (such as ditch proper cleaning), and when needed repairing drainage features or adding aggregate to road surfaces. Special measures such as installing straw bales to control sedimentation identified for hydrologically connected road crossings would be used during wet season haul (Table C-20).

Forestry BMPs to protect water quality when constructed correctly and in adequate numbers have been found to be effective (Cristan, et al., 2016). Stream buffers is an example of a Forestry BMP that restrict motorized equipment and commercial harvest and leaves a vegetated buffer between disturbance and surface waters. The FEIS analyzed how timber harvest might affect nutrient loading in streams, this analysis is incorporated here by reference. The FEIS analysis for nutrient loads found that the Inner Zone of the RR would be an effective nutrient filter on most or all streams and therefore timber harvest as proposed in the FEIS would have no substantive effect on nutrient loading in streams (USDI BLM, 2016a, p. 410-411).

A 2005 EPA study showed that, as a rule, in terrain with gentle side slopes, a 100-foot stream buffer retains about 80% of the nitrogen and phosphorus passing through in surface and subsurface flow from such activities (US EPA, 2005). The LCFMP only has gentle side slopes in the valley bottoms so the effectiveness of buffers may be less than what the EPA study found. The inner riparian zone is 120 feet for perennial streams and 50 feet for intermittent streams, providing some trapping and filtering of sediment and nutrients generated from LCFMP activities.

No changes to surface or groundwater quality, streamflow or groundwater infiltration rates are expected below thinned units. Therefore, no changes to the water quality in dispersed water sources or public water sources are anticipated. Dispersed water sources include private domestic drinking water wells and surface intakes that serve rural homes downstream of proposed commercial thinning and fuel treatments, no changes to water quality or availability are expected for these sources (USDI BLM, 2016a, p. 410-411).

A recent study with the experimental manipulation of headwater riparian zones found that even when forested watersheds are disturbed and increases of nutrients and light to nearby streams is measured, this may not necessarily lead to increase algae that can be a food source for aquatic organisms but can also lead to the depletion of oxygen. The authors speculated that although dissolved inorganic nitrogen increase, other nutrients such as phosphorus were still limited and therefore did not result in algal blooms (Johnson, et al., 2023).

Macroinvertebrates are often used as indicator for watershed conditions to integrate multiple components of stream habitat (e.g. temperature, sediment, dissolved oxygen). In a 25-year assessment of forested watersheds in the Pacific Northwest AREMP found metrics for macroinvertebrates appear to be improving and specifically in BLM's Medford District (USDA-PNRS, 2023, p. 72 and 163).

The SWO RMP analyzed potential impacts to water quality and found no substantive effect to water quality from the type and magnitude of activities proposed for this project. Specific contaminants that might result from proposed activities are addressed in Table 3-69 of the FEIS (USDI/BLM, 2016b, p. 412) and are incorporated here by reference. Project activities are also analyzed in detail in Chapter 3 for potential downstream impacts from sediment and riparian shading important for maintaining stream temperature was analyzed and no measurable changes are expected.

In summary, impacts to water quality from commercial thinning and fuel treatments were considered but not analyzed in detail because the BLM's primary water quality protection strategy is expected to be protective of water quality. This strategy is composed of management direction for the Riparian Reserve land use allocation and application of BMPs. The scientific literature indicates that forestry BMPs protect water quality when implemented correctly (Cristan, et al., 2016) and play an important role in protecting watersheds and water quality (Edwards, et al., 2016). These preventative measures have complementary goals with Oregon's water quality and drinking water protection programs.

It is expected that there would be local changes to nutrient and sediment loads from commercial harvest and fuels maintenance, but these impacts would be reduced by implementation of BMPs (USDI/BLM, 2016b, pp. 163-208) therefore, they would likely be unmeasurable, localized and short-term (less than 2 years). Based on water quality studies, both sediment and nutrients are generally elevated in the first 2 years after disturbances such as fire, timber harvest, and/or severe storm events, but loads tend to diminish as vegetation reestablishes or areas are stabilized and reclaimed. With PDFs that implement site specific BMPs, no measurable effects to water quality for drinking water sources or impaired water bodies is expected due to project activities (USDI/BLM, 2016a).

**Rationale:** For the above reasons, further analysis of water quality is not necessary for making a reasoned choice among alternatives since BMPs and PDFs would be applied under all Action Alternatives. Additionally, further analysis is not necessary to determine the potential for significant effects beyond those analyzed and disclosed in the FEIS (USDI/BLM 2016a pp. 369-418). Therefore, a second, project specific EIS is not necessary to determine whether the implementation of the RMP is sufficient to maintain water quality within the range of natural variability that meets ODEQ water quality standards for drinking water, contact recreation, and aquatic biodiversity.

- How would commercial harvest and non-commercial HFR proposed for the LCFMP affect stream temperature and specifically effective shade and micro-climate zones on streams?

**Background:** Water temperature in streams and rivers is critical for aquatic life success, especially for salmon, and it is an important variable in determining the availability of dissolved oxygen and downstream impacts of nutrients. Stream shading reduces radiant energy from solar radiation responsible for increasing stream temperature. Solar radiation is the most important radiant energy source for the heating of streams during daytime conditions and therefore has a strong relationship to seasonal variability of daylight (Beschta & Taylor, 1988).

Effective shade is the percentage of sunlight blocked by topography, forest trees, and vegetation during a day. Effective shade reaches an upper limit in the 80-90% range from normally stocked young to mature stands (Leinenbach, et al., 2013). In addition to effective shade, micro-climate zones are important for maintaining stream temperatures, especially in headwater systems. These micro-climate zones are likely to coincide with to the Inner Riparian Zone and can have significantly lower air temperatures due to inversions and increased moisture compared to the surrounding forest. Buffers defined by the transition from riparian to upland vegetation or topographic slope breaks appear sufficient to mitigate the impacts of upslope thinning on the microclimate above headwater streams (Anderson, et al., 2007).

The spatial extent to which stream temperature increases persist downstream depends on hydrology and geomorphology and how these factors interact in the stream heat budget (Johnson & Jones, 2000). The heat added to a stream by the sun would not be readily dissipated, and the distance over which elevated

temperatures may extend downstream may be much longer than the length of the "treatment" (Leinenbach, et al., 2013). Thus, it is not possible to characterize the exact distance at which activities would continue to impact downstream stream temperature.

Stream temperature is spatially variable depending on aquifer characteristics. For example, in stream reaches with cold tributary inflows and groundwater inputs that constitute a large percentage of the stream discharge (i.e., "gaining" reaches) stream temperature vary greatly. Similarly, reaches with extensive hyporheic exchange (Moore & Wondzell, 2005) via the streambed and floodplain may show no effects of increased solar radiation on stream temperature (Janisch, et al., 2012). In contrast, bedrock-dominated stream channels like Grave Creek are likely to require very long recovery distances because they are not buffered by hyporheic exchange (Johnson & Jones, 2000).

The analysis in the FEIS (USDI/BLM, 2016a, pp. 369-384) addresses stream shading along perennial and fish-bearing streams on BLM-administered land and is incorporated here by reference. Commercial thinning and HFR are proposed in the Dry Forest west of Highway 97 and in Class I and Class III subwatersheds.

Commercial thinning in the Inner Riparian Zone would not occur under any of the Action Alternatives. The 120-foot stream buffer for perennial streams would fully protect the primary shade zones and micro-climates on streams (Leinenbach, et al., 2013, p. 29). Thinning in the Middle and Outer Riparian Zone is expected to reduce some shading in the secondary shade zone during cooler parts of the day (2pm - 10am). The effects from thinning in the secondary shade zone have less impact to stream temperatures than does thinning in the primary shade zone (Leinenbach, et al., 2013, p. 31).

Based on a study conducted on the Rogue River Siskiyou National Forest in 2006 a no-cut buffer of 60 feet was found to be effective in maintaining the Angular Canopy Density and therefore the effective stream shade. The joint studies for implementing the Northwest Forest Plan found that density management or thinning beyond 15 meters (50 feet) from streams does not measurably affect microclimate (Leinenbach, et al., 2013). All proposed vegetation treatments, including HFR treatments, would be more than 50 feet from perennial and fish-bearing streams.

Commercial thinning in the Middle and Outer Riparian Zone and fuel treatments are expected to reduce the potential for stand replacing crown fire, insects, disease, and promote healthier riparian stands (See the Proposed Action). Healthy riparian stands are more likely to withstand future disturbance, and therefore, more able to provide shade to stream systems in the long-term (greater than 50 years) (Ruzicka, et al., 2014).

The FEIS used two analytical methods to assess potential increases to stream temperatures and considered a shade loss exceeding 3% as representing a risk to stream temperatures. The first analytical method (Method A) used tree heights for mature to structurally complex stands. The second method used an EPA calibrated model (Method B) with tree heights for mature stands (50 to 70 years old). The FEIS identified that less than 0.5% of the total perennial and fish-bearing stream miles might have increases in stream temperature.

The only areas in the LCFMP that have the potential for an increase beyond the 3% shade loss threshold identified in the FEIS are thinned stands in areas with existing low riparian canopy (i.e., streams with meadows where the secondary shade zone is important). However, there are no Outer Riparian Zones proposed for thinning in the LCFMP that could be considered to have existing low canopy cover in the Inner Riparian Zone.

In addition to managing shade in the RR, actual stream temperatures BLM monitors stream temperature to evaluate trends, test assumptions and evaluate the effectiveness of BMPs and PDFs. Stream temperature is monitored by BLM throughout the field office. There are 5 current monitoring sites in the project area (Whitehorse Creek, Russel Creek, Wolf Creek, and two sites in Grave Creek). Altogether

there are 62 sites in the Last Chance project area that have had monitoring data for stream temperature over the last 25 years.

Riparian thinning and non-commercial HFR in the middle and outer zones are likely to reduce the risk for stand replacing crown fires. Fuel treatments, snag creation and tree tipping may occur in the Inner Riparian Zone but are unlikely to impact effective shading or microclimates. BLM would continue long-term monitoring of stream temperature in the project area, but the project is not expected to result in any measurable change in stream temperatures, therefore this issue was not analyzed in further detail. Stream temperature monitoring and assessment would continue through the life of the project.

**Rationale:** For the above reasons, further analysis of this stream temperature is not necessary for making a reasoned choice among alternatives. The effects of non-commercial HFR in the RR and commercial harvest in the outer and middle riparian zones under the action alternatives on effective shade and stream temperature are not analyzed in detail, because there would be no reasonably foreseeable effects beyond those disclosed in the FEIS (USDI BLM 2016a pp. 369-384). A second, project specific EIS is not necessary to determine whether implementation of RMP to maintain shade quality along perennial, intermittent and fish-bearing streams.

- How would commercial harvest and non-commercial HFR proposed for the LCFMP affect floodplains, ground water, aquifers, domestic wells and points of diversion?

**Background:** The floodplains in the project area are predominantly privately owned. The Federal Emergency Management Agency (FEMA) has a dynamic mapping system to evaluate flood hazard information. Floodplains can be considered with a base flood elevation or in some cases the Annual Chance Flood Hazard (ACFH) is designated based on a maximum flood elevation predicted on an annual basis that has a 1% or 2% chance of occurring. There are a very small number of regulatory floodways (Zone AE) in the LCFMP and only on Cow Creek below Galesville Reservoir and none in BLM administered lands (FEMA, 2024).

Domestic groundwater drinking wells or spring sources occur on private lands adjacent to BLM-administered land considered for timber harvest, or in some cases spring sources may be located on BLM-administered land. Typically, wells are shallow, and springs may come from a spring box located in a channel feature. In some cases, these water sources are in direct contact with surface runoff and could be impacted by vegetation management actions.

Surface water points of diversion were evaluated using the Oregon Water Resources Department of Water Rights Mapping Tool. Some general locations identified during this effort or during public scoping are listed in Table 20.1.

Table B 20.1: Surface and Groundwater Points of Diversion in Proposed Treatment Areas

| Location Description | Legal | Notes |
|---|---|---|
| BLM Greenback Helipond Reservoir | T34S R5W Sec. 04 NWNW | Fire protection, road construction and wildlife use |
| BLM Eastman Gulch Pond | T33S R5W Sec. 35 SWSW | Fire protection, road construction and wildlife use |
| Cedar Mountain Tank Reservoir | T32S R4W Sec. 35 SWNE | Fire Protection |
| Small Unnamed Spring | T32S R5W Sec. 29 SENW | Spring used for domestic water |
| Tributary to Coyote Creek | T33S R5W Sec. 28 SWSW | Small amount of irrigation and domestic water |

KSW01786

| Location Description | Legal | Notes |
|---|---|---|
| Springs above Placer Road | T24S R5W Sec. 04 NWSW | Springs for domestic water for downstream private lands |
| Scholey Gulch tributary to Coyote Creek | T33S R5W Sec. 28 SENW | Domestic water source and mining for two families |
| Two springs for domestic use | T33S R5W Sec. 35 SESE T34S R5W Sec. 02 NENE | Two springs in the headwaters of Grave Creek tributary Between Clark Creek and Eastman Gulch |

Local water quality impacts from LCFMP are analyzed in detail in Issue 8 for sediment, and in Issues NAID for other water quality parameters. With proper application of BMPs and PDFs, the proposed treatments might increase surface runoff locally in the first year or two after treatment but would have no effect beyond year 3.

Commercial timber harvest and HFR would buffer domestic water sources and springs, which is a buffer distance sufficient to physically protect the spring from vegetation loss and ground disturbance. Commercial timber harvest would not cause changes locally or beyond to nutrient and sediment loads and therefore would not be measurable or long-term (Appendix B: Issues NAID). Therefore, private domestic drinking water wells, spring improvements or surface intakes that serve rural homes downstream of proposed commercial thinning and fuel treatments are not likely to be impacted by LCFMP activities.

**Rationale:** For the above reasons, further analysis of groundwater and domestic water sources is not necessary for making a reasoned choice among alternatives. Buffers around springs, lakes, ditches, streams and other water features (USDI BLM 2016b pp.77) would be sufficient to provide a physical barrier for LCFMP activities and hence no impacts would occur. Since there are no regulatory floodways in the LCFMP on BLM administered lands no impacts to floodplains are expected.

Riparian Reserve Forest Health and Wood Recruitment for Streams

- How would commercial harvest and non-commercial HFR proposed for the LCFMP in the RR impact the ecological and hydrologic function of the riparian areas?

**Background:** Riparian areas begin at the interface between hillside groundwater and surface water and are critical to support aquatic ecosystems. The boundary of this zone is typically defined by a change in vegetation, hydrology, and/or seasonally saturated soils. This boundary is typically delineated by the Site Potential Tree Height (SPTH) (Baker, et al., 2013) and the SPTH is used to delineate the RR in the LCFMP (USDI BLM 2016b p. 77).

The ecological function of RR is to providing forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates. The RR LUA includes the upland area that contributes directly to the function of riparian areas; there is 8,166 acres of BLM-administered RRs35F[1] within the project area. The area of Riparian Reserves varies by the 10-digit (5th-level) watershed.

---

[1] RR acres reflects hydrology field data and is different than Table 1-3, due to some features having multiple LUAs

Table B 22.1: Riparian Reserve width by 10-digit watershed in the Last Chance project area with Totals for BLM-administered lands within the LCFMP.

| 10-digit (5th-level) HUC Watersheds | Analysis Area (acres) * | Riparian Width (ft)[+] | Riparian Reserve (acres) | Percent of Total Riparian |
|---|---|---|---|---|
| Upper Cow Creek | 1,227 | 160 | 124 | 1% |
| Middle Cow Creek | 23,676 | 195 | 3,493 | 43% |
| Grave Creek | 31,984 | 200 | 4,549 | 56% |
| Total: | | | 8,166 | 100% |
| * Portion of the 5th-level watershed within the Last Chance project area [+] Riparian Reserves are only on BLM Administered lands acreage reflects hydrology field data and is different than acreage totals shown in Table 1-3, due to some features having multiple LUAs. | | | | |

The condition of riparian areas, channel morphology, and hydrology can be affected by land use activities such as timber harvest or road use and maintenance that changes forest characteristics (Warren, et al., 2013). Declines in biodiversity in riparian forests is due to the loss of four major structural features: large live trees, large snags, large down wood on the forest floor, and large down wood in streams (Pollock & Beechie, 2014). Hydrology field work has been done to identify inception points for streams, identifying springs and seeps, and finding wetlands or areas with unstable soils. GIS, LiDAR, and current field surveys were conducted from 2018 to the present and were used to identify the location and extent of RRs in the LCFMP. All surveys are checked during layout and calls can be adjusted based on more current surveys.

Management for the RR would only allow yarding corridors, skid trails, road construction, stream crossings, and road maintenance and improvement where there are no other operationally feasible or economically viable alternatives (USDI BLM 2016b p.75). Commercial timber harvest is restricted in the Inner Riparian Zone but allowed in the Middle and Outer Riparian Zone and non-commercial HFR treatments would not occur with 50 ft of perennial and fish bearing streams. Treatment in the Middle and Outer Zones would maintaining lower tree densities directly above riparian areas and may be beneficial to increase tree growth and vigor in riparian areas (Ruzicka, et al., 2014).

Management objectives and direction for Riparian Reserves are detailed in the Southwestern Oregon (SWO) RMP (USDI/BLM, 2016b, pp. 75-77 and 82-87). Management objectives and direction are incorporated here by reference and have already been built into the action alternatives. Inner Riparian Zones are 120 feet for fish-bearing and perennial streams and 50 feet for non-fish bearing intermittent streams.

Most of the project area is in Class I watershed classes for the Riparian Reserves, there is 1,229 acres of the project area that is in a Class III watershed, McGinnis Creek. The recommendations for timber harvest in riparian in this watershed is slightly different. Proposed unit 24-06 has an intermittent stream and is in this Class III watershed and therefor the Riparian Reserve is only 50 feet wide and does not have a middle or outer riparian zone. This unit is in the Harvest Land Base and would be dropped in Alternative 3. There is also RR Moist and RR Dry for areas west of highway 97, there is a slight difference in management actions, mostly for fuel treatments.

Within the Inner Riparian Zone logging activities may fell trees to build landings, yarding corridors or skid trails in the RRs; these trees would be left in adjacent stands as woody debris or be removed to facilitate placement for fish restoration (USDI BLM, 2016, p. 75-76). Within the Outer Riparian Zone logging activities may fell trees to build landings, yarding corridors or skid trails in the RRs; these trees

KSW01788

would be left in adjacent stands as woody debris, removed to facilitate placement for fish restoration, or sold (USDI/BLM, 2016b, p. 76). All activities would achieve post-harvest canopy cover, trees per acre, and snag requirements (USDI/BLM, 2016b, pp. 82-84). Skid trails in the RR would be scarified, seeded, water barred, mulched, and blocked after use.

Under alternative 2, there are 1,297 acres being analyzed for Outer or Middle Riparian Zone commercial thinning, of this acreage 7 acres is in RR-moist (16% of the RR within LCFMP). Non-Commercial HFR treatments would be another 785 acres in the RR, combined it would be over 25% of the RR. These actions are expected to reduce the risk of stand-replacing crown fires. Studies have found that forest management in fire-prone forests (Klamath-Siskiyou bioregion) of southwestern Oregon restoration will be most effective where it includes density reductions in overstory trees and prescribed fire in both the upland and riparian forests (Messier et al., 2012).

Canopy cover in the RR would remain above 30% with 60 trees per acre on average for the RR-Moist and RR-Dry both Class I and III watersheds. Therefore, species diversity and forest health would be maintained (USDI BLM 2016b p. 79-80 and 82-83) and with no commercial harvest in the inner riparian zone this should maintain stream shading.

All units proposed for commercial timber harvest were surveyed in the field to identify water features and define the RR. If unstable soils were identified during field surveys, non-commercial treatment buffers were extended, or units were dropped from consideration for treatment. Riparian thinning within Class I watersheds has the goal of promoting species diversity, forest health and improving resiliency to landscape disturbances. Commercial thinning and fuel management actions can achieve these goals by reducing competition for desirable species, increase tree size, reducing fuel loading, and putting forest stands on a trajectory to achieve complexity of age and structure.

Road construction, road renovation, timber hauling, ground-based harvest, yarding, landing construction and use, and timber harvest would occur with BMPs as descried in the SWO RMP (USDI/BLM, 2016b). The SWO RMP identified BMPs as the most effective and practical method for the BLM to comply with the Clean Water Act. Project's design features (BMPs implemented site specifically) would eliminate or reduce pollution generated by non-point sources and by direct actions that would impact streams and riparian areas.

**Rationale:** For the above reasons, further analysis of the function of the riparian areas after LCFMP commercial thinning is not necessary for making a reasoned choice among alternatives, since all action alternatives would employ RR management direction that would be protective of the ecological function of riparian zone. Buffers around springs, lakes, ditches, streams and other water features and restricting commercial harvest in the Inner Riparian Zone (USDI/BLM 2016b pp.77 and 82-84) would be sufficient to provide a physical barrier for LCFMP activities and hence no impacts would occur to the ecology and function of riparian areas.

- How would commercial harvest and non-commercial HFR proposed for the LCFMP impact stream wood recruitment needed to maintain the proper function of stream systems?

**Background:** Woody debris is important for maintaining the proper function of stream systems in southern Oregon. Coarse wood provides channel complexity, captures sediment, and creates pools and waterfalls. In addition to oxygenating water, increasing the storage of water, wood in streams also increases water movement in and out of the alluvial aquifer (hyporhei zone) which cools water and improves water quality. The physical and chemical benefits of coarse wood improve conditions for aquatic life including salmonids. Large woody debris is often more stable and less likely to migrate downstream with flood flows, but moderate and small diameter wood can often provide the same benefits to stream channels, both types of wood are called coarse wood.

Coarse wood in streams is primarily recruited through near-stream inputs (e.g., tree mortality and bank erosion) and landslides and debris flows. For near-stream riparian inputs, empirical and modeling studies

suggest that stream wood input rates decline exponentially with distance from the stream and vary by stand type and age (Spies et al. 2013). Mobile wood has been found to be a key part of the natural disturbance regime in forested watersheds and have very important ecological function downstream (Wohl, et al., 2022). The Interagency Coordinating Subcommittee (ICS) report compared studies and showed that 90 to 100% of the wood recruitment came from with 115 feet (35 meters) of the stream. The report found that a no treatment buffer of 120 feet (36.6 meters) would likely retain at least 95% of the wood available for recruitment to the stream from stands that have been harvested in the past (Spies, et al., 2013, p. 31).

Riparian buffers should consider the difference between short-term and long-term effects on wood recruitment. Short-term wood recruitment of snags following into perennial streams is important but is insufficient as a long-term source. Recruitment of wood near streamside (50 feet) areas appears responsible for most of the wood (short-term). Small intermittent streams comprise most of a stream network, and wood recruitment typically comes from episodic landslides and debris flows (long-term). Low tree mortality and decomposition, fewer landslides and debris flows, breakage, and redistribution of existing instream wood, may result in future wood deficits in headwater streams in the absence of natural disturbances or human-mediated recruitment (Burton, et al., 2016).

Streams in the Last Chance project area have been impacted by historic land use practice that led to losses of instream wood and degraded fish habitats. In some locations streams are bordered be dense second-growth forests (30-80 years) with low potential for wood recruitment. A 25-year evaluation of streams in the Pacific Northwest found a general declined in large woody debris (> 24-inchs in diameter) and relatively steady amount of mid-sized to small-sized material in all areas measured including the Coast Range and Klamath/Siskiyou watersheds (USDA-PNRS, 2023, p. 40).

Research using forest growth simulation models has found that wood recruitment and storage can be improved with riparian thinning and tree tipping and may be effective in restoring aquatic systems (Benda, et al., 2016). However, research in the dynamics of large wood in old-growth and second-growth stream reaches in the H.J. Andrews Experimental Forest of the Willamette National Forest in Oregon, have found that the number and volume of wood was higher in the old-growth watershed (Gregory et al., 2024). Stream restoration activities can be a way to accelerate this process to benefit aquatic ecosystems and habitat.

There are Areas within the project area that have been identified as having the potential for stream restoration based on past activities, stream quality and gradient shown in Table B 23.1.

Table B 23.1: Potential Stream Restoration Reaches Within the Last Chance Project Area

| Legal Location | Stream Name | Stream Length (miles) |
|---|---|---|
| 34S-05W-01 | Clark Creek | 0.12 |
| 33S-04W-31 | Boulder Creek | 0.32 |
| 33S-05W-27 | Coyote Creek | 0.35 |
| 33S-05W-22 | Tributary to Coyote Creek | 0.3 |
| 33S-05W-10 | Wolf Creek | 1.8 |
| 33S-05W-02 | Tennessee Gulch | 0.9 |
| 32S-05W-35 | Quines Creek | 0.6 |
| 32S-05W-25 | Bull Run | 0.6 |
| 32S-05W-13 | Wildcat Creek | 0.3 |

KSW01790

| Legal Location | Stream Name | Stream Length (miles) |
|---|---|---|
| 32S-04W-29 | Jones Creek | 0.5 |
| 32S-04W-35 | Grave Creek | 0.8 |
| 33S-04W-03 | Last Chance Creek | 0.4 |
| 33S-04W-11 | Grave Creek | 0.2 |
| 33S-04W-15 | Grave Creek | 0.8 |

Streams in the project area are generally deficient in large woody debris and only Bull Run, Quines Creek, and Tennessee Gulch on BLM-administrative land have been treated in the past. Tree tipping activities are intended to aid in the restoration of degraded instream habitat conditions by in-stream wood placement. Instream log placements or tree tipping in various configurations are usually designed to increase sediment storage in a stream reach. Instream structures reduce flow velocity resulting in the sorting and deposition of sediment, and the creation of features, including gravel spawning beds and bars and floodplains storing shallow groundwater.

The Inner Riparian Zone buffers for commercial thinning would ensure continued wood recruitment to perennial streams. Fuels treatments that would occur within 60 feet would leave tree boles greater than 6 inches on site for potential wood recruitment. Because this material would be left on site fuel treatments are not expected to impact wood recruitment to streams. Thinning with cut buffers have been shown to be effective at protecting in-stream wood recruitment. However, placement or tipping can increase the positive channel aspects more quickly than buffers alone (Benda, et al., 2016).

Individual tree cutting or tipping from Riparian Reserves in the Last Chance Project area would provide logs for stream restoration activities as funding and staffing allow. There are several reaches identified within the project area that would benefit from these stream restoration activities (Table 23.1). Thinning treatments in the Outer Riparian Zone would be done, "as needed to ensure that stands are able to provide trees that would function as stable wood in streams and fuel treatments would be done within 60 feet of fish-bearing or perennial streams as needed to reduce risk of stand-replacing crown fires. The Inner Riparian Zone buffers for commercial thinning would be protective of wood recruitment to perennial streams (USDI BLM, 2016b, p. 76-77).

Woody material from the Outer Riparian Zone typically is transported to streams via landslides, debris flows, and wind events that are more common after wildfires. These disturbance events would still occur under the Proposed Action but may be less frequent because thinning is effective at reducing the potential for catastrophic wildfire. However, thinning in the Outer Riparian Zone is not likely to reduce material available for recruitment to the Inner Riparian Zone because a portion of the cut trees may be left on site or made available for fish habitat restoration and improve forest health and stand resilience (USDI BLM, 2016b, p. 76-77).

**Rationale:** For the above reasons, further analysis of the function of the riparian areas after LCFMP commercial thinning is not necessary for making a reasoned choice among alternatives. Buffers around springs, lakes, ditches, streams and other water features and restricting commercial harvest in the Inner Riparian Zone (USDI/BLM 2016b pp.77 and 82-84) would be sufficient to provide a physical barrier for LCFMP activities and hence no impacts would occur, further tree tipping and snag creation are likely to increase wood recruitment in the short-term and result in larger trees in the riparian for the future.

Silviculture

- Would the Proposed Action cause Port-Orford Cedar (POC) root disease *Phythophthora latereralis* to spread within the project area?

Background: Port-Orford Cedar (*Chamaecyparis lawsoniana*) is a species of conifer native to southwestern Oregon and northwestern California and grows from sea level up to approximately 4,900 feet in the Klamath Mountains, often along streams.  POC root disease is primarily water-borne or is transported by humans and other vectors in mud from infested areas to un-infested areas. POC root disease infection begins when mycelium, from a germinated spore, invade the roots. The infection spreads through the inner bark and cambium around the base of the tree. Spread up the trunk is generally limited. Infected tissue dies and effectively girdles the tree. The soil on vehicle tires, especially logging and transport trucks, is considered a potential mechanism of spread, due to the volume of soil that can be carried and the traffic frequency in and between susceptible areas.

Rationale: There are no known populations of POC in the Last Chance Project Area or on haul routes. No populations are within or immediately adjacent to any Proposed Actions (units or haul routes). The POC risk key does not require mitigation to be conducted. Therefore, BLM considered this issue, but determined detailed analysis was not necessary to determine there is no potential for significant effects to POC or the spread of POC root disease.

- How would the salvage of timber following incidental insect and disease outbreaks, and drought related mortality contribute to the Allowable Sale Quantity?

Within the Harvest Land Base BLM would recover volume from insect and disease outbreaks and drought related mortality during commercial operations. Commercial timber salvage on HLB allocations, including for safety and operation reasons is permitted (USDI/BLM 2016b, pp. 62-69). Only timber offered from the HLB contributes to the ASQ. The ASQ targets are described in further detail on p. 5-7 of the SWO RMP.  Salvage would occur within the analyzed units only if the silvicultural prescription would continue to be within EA prescription analysis, RMP LUA management direction and the within the federal ESA consultation requirements. Project clearance surveys that are required for federal sensitive and T&E species would have already been completed for harvesting effects to habitat.  Both Alternatives 2 and 3 are designed to offer flexibility such that if a leave tree succumbs to insect, disease, or drought related mortality, it may be swapped with a live tree and removed from the stand. Trees which have been weakened by drought are more susceptible to insects, by removing these trees from the landscape the overall health of stands would increase by potentially slowing or preventing the spread of insects to new host trees or swapping with green trees exhibiting and more vigorous character. Removing unhealthy trees allows for continued growth, or regeneration of healthy trees which would ensure sustained yield timber production from the Harvest Land Base.

Soil Productivity and Slope Stability

- How LCFMP activities affect soil productivity, slope stability, mass movement, and surface erosion within and outside of harvesting units?

Background: The action of commercial logging operations, fuels treatments, road building, and roadside maintenance would impact soil productivity due to the removal of trees and vegetation, mixing of organic and mineral layers, compaction of soil, reduction of soil biological functioning (microbes, insects, roots), burning of organic matter and mineral soils, and the deposition of charcoal and ash from biomass burning. The impact of logging operations, road building, fuels treatments, and roadside maintenance would impact soil stability due to the removal of trees and vegetation, mixing of soil layers (organic and mineral layers), compaction of soil, reduction of soil biological functioning (microbes, insects, roots), burning of organic matter and mineral soils, and the deposition of charcoal and ash from biomass burning (Page-Dumroese, 2020; Pingree and DeLuca, 2017).

KSW01792

Timber harvest causes DSD from displacement of surface material and soil compaction during yarding activities (USDI BLM 2016a p 746). Yarding activities cause erosion, loss of organic matter, soil displacement, or compaction (USDI BLM 2016b p 109). The extent of DSD varies with the type of yarding method, amount of commercial harvest and the mitigation measures employed. Management direction in the RMP is current forest management operations and DSD from past management operations should not exceed 20% of the unit area (USDI BLM 2016b p 109). DSD by alternative can be estimated based on yarding methods (USDI BLM 2016a, Figure 3-140), issue 10 in Chapter 3, analyzes DSD in detail by alternative.

Soil disturbance assessments would be conducted after harvest activities based on the RMP Monitoring Plan to look at DSD and the results of PDFs and other mitigation (USDI/BLM, 2016b, p. 137). The timber sales would be monitored using the Forest Soil Disturbance Monitoring Protocol (FSDMP) (Page-Dumroese et al., 2009). During and after project implementation 10 percent of treatment units would be monitored according to the RMP Monitoring Plan (USDI/BLM, 2018b, p. 151). If the site follows management direction (<20% DSD), no further actions would be necessary. But if the site exceeds 20% DSD, corrective actions could be implemented prior to timber sale closure, within the scope of the sale contract. This process enables detrimental soil impacts to be predicted in advance, harvest activities to avoid unacceptable disturbance by applying mitigation, and to correct future practices during implementation to stay within 20% DSD.

The analysis in Issue 10 found LCFMP may affect up to 11,425 acres or 12% of the LCFMP (Appendix D4: Watershed Analysis: Table D.4.3 Soils Disturbance Summary). Ground-disturbing operations from commercial harvest, non-commercial HFR, and road construction or road renovation result in impacts that both positively and negatively affect soil productivity over different time scales.

These impacts would not be permanent for the function of soil since soil biological function defines the soil productivity. The impact from logging, road building, fuel treatments, and roadside maintenance would alter the productivity of soils by reducing water infiltration and storage capacity, reduce total soil nutrients, but also alter increase soil water and nutrients with the removal of vegetation and alter soil nutrient cycling with the deposition of ash and charcoal onto the forest floor.

The impact of logging operations, road building, fuels treatments, and roadside maintenance would decrease slope stability and increase the likelihood of mass movement and surface erosion events. The removal of trees and vegetation not only removes the physical anchor that trees and vegetation provide with tap roots and fine roots, but also the deposited organic matter and physical benefits therein. This organic matter provides surface texture, facilitates decomposition processes, releases organic residues, and attract organisms that also act as conglomerating agents. Mixing soil layers, organic and mineral soils, also reduces the stability of soils on a slope by removing the protective organic layer on the soil surface and destroying the physical connections between roots, microbes, and soils.

Fuel treatments that result in the burning of the forest floor would also reduce the surface organic matter content, result in severe heating to seeds or microbes in some locations, but deposit charcoal and ash, which can facilitate increase soil water storage and available nutrients that may help rebound the slope stabilizing components of the forest floor. Where impacts are detrimental, as described by the Forest Soil Disturbance Monitoring Protocol (Page-Dumroese et al., 2009), soil productivity is expected to be temporarily reduced where mitigation measures can be implemented (e.g., replace slash or add mulch, add native seed, rip/till skid trails). Slope stability, mass movement, and soil erosion may occur where ground-disturbance activities are planned on commercial harvest units, access areas to units, fuels treatment units, road construction, and road renovation.

Further, on-the-ground evaluation and adaptive management ensures that project activities would comply with the RMP management direction. and established BMPs, to address the main disturbances at the site. Typical BMPs after harvest may include de-compacting existing or newly created landings and utilizing slash, seed, or other materials as erosion control, among other actions. For example, the BMP for timber

KSW01793

harvest (TH-8) (Appendix C, Table C-2) excludes ground-based equipment on hydric soils such as those found in wetlands. Wetlands have been identified with field surveys and would be buffered by 25 ft for all activities including the use of ground-based equipment.

This project follows RMP management direction for DDR-TPCC (USDI-BLM, 2016b, pp. 55-56). The DDR-TPCC soil limitations include slope gradients, nutrients, soil moisture (coarse texture), mass movement potential, surface erosion, and groundwater issues (Appendix D: Watershed Analysis: Table D4.12 Soils TPCC Summary).

Rationale: For the above reasons, further analysis of LCFMP commercial harvest and non-commercial HFR activities impact on soils is not necessary for making a reasoned choice among alternatives. This issue was considered but not analyzed in further detail because the activities described in the proposed actions would not have impacts beyond that which was analyzed in the RMP (USDI/BLM 2016b pp. 109). This is achieved through the implementation of BMPs and PDFs (see Appendix C).

- How would forest management actions in DDR-TPCC LUAs promote desired soil conditions and minimize or eliminate degradation to the productive capacity of these soils?

Background: The impact of logging operations, road building, fuels treatments would impact soils due to the removal of trees and vegetation, mixing of soil layers (organic and mineral layers), compaction of soil, reduction of soil biological functioning (microbes, insects, roots), burning of organic matter and mineral soils, and the deposition of charcoal and ash from biomass burning. Similar to all soils within the project area, the physical impacts of timber harvest, silviculture treatments, and fuel treatments would decrease slope stability and soil productivity in the affected areas, but in some cases increase nutrient and water holding capacity with the addition of charcoal and ash on the forest floor. These processes are described in detail above (Issue 10: Soil Resources).

The DDR-TPCC LUA is reserved from sustained yield timber production. The DDR-TPCC soil limitations include slope gradients, nutrients, soil moisture (coarse texture), mass movement potential, surface erosion, and groundwater issues. Within the proposed actions that may impact soils (expected ground disturbing activities), DDR-TPCC (non-suitable forest land and non-forest land) accounts for 708 acres across the project area. The categories include fragile soils due to slope gradient, nutrient limitations, shallow groundwater, low site productivity, non-commercial species, and reforestation limitations due to surface fragments (erosion potential) (Appendix D: Watershed Analysis: Table D4.12 Soils TPCC Summary).

This project follows RMP management direction for DDR-TPCC (USDI-BLM, 2016b, pp. 55-56) land use allocation which directs the BLM to designate and undesignate these areas as DDR-TPCC when field examination indicates that those lands either did or did not meet the criteria for designation. The RMP also allows in the DDR-TPCC for the application of silvicultural or fuels treatments, including prescribed fire, that restore or maintain community-level structural characteristics, promote desired species composition, and emulate ecological conditions produced by historic fire regimens, in areas identified as unsuitable for sustained-yield timber production (USDI-BLM, 2016b, pp. 55-56).

This project also utilizes the Timber Production Capability Classification Handbook codes (1984) and the "Recommended Practices" within A Synopsis and Updated Guide of the Standard Operational Practices for Upland Soil Productivity in Western Oregon (SOP) (USDI-BLM, 2016a, pp. 27-35) to ensure that areas in both the DDR-TPCC land use allocation are correctly managed.

Table D.4.12 documents the fuels units, proposed road locations, and timber harvest units which have potential DDR-TPCC, TPCC-Withdrawn, or TPCC-Restricted soils derived from GIS that would be field verified prior to implementing actions. The outcome of field verification of these areas, which intersect with fuels, roads, and commercial units, would be disclosed in the subsequent Decision Records.

TPCC designations include FN-E and FN-P, which are non-suitable fragile soils for surface erosion and the potential for mass movement, respectively. There are no soils with this designation in the LCPMP. If there were, the BMPs in Table C-14 for fragile soils in the dry forest would be applied. The current TPCC designations of FN-E and FN-P are comparable to the old designations of FM and FP as shown in Table C-13 and Table C-14 (USDI/BLM 2016b p. 205-206).

There are 416 acres of FR-E (Units 11-02, 11-03, 24-05, and 29-06), fragile restricted for surface erosion proposed for commercial timber harvest in Alternative 2 and 2a and no acres proposed for alternative 3. If a field review finds the designation is accurate, the BMPs for Dry Forest (DF-01 – DF-04 in Table C-9) would be applied in the portions of the unit that show the potential for surface erosion as described in (note – the old designation for FE was FM, Table C-13 in the RMP (USDI/BLM 2016b p. 205).

Initial identification of DDR-TPCC land use allocation and TPCC soils occurs in the office utilizing GIS data. As project activities are refined, the GIS classifications are reviewed for accuracy in the field. Following field review, the areas identified as TPCC-Withdrawn or TPCC-Restricted would follow one of the outcomes below based on the specific TPCC designation and land use allocation:

If field review confirms the DDR-TPCC land use allocation and TPCC designations are accurate, outcomes would be one of the following:

1. The areas would be deferred from treatment because design features are unable to avoid impacts. Where access (yarding/haul) is needed through these areas, apply Operational Guidelines for road construction, yarding, and hauling. No yarding or haul would occur in areas designated as withdrawn because of surface erosion concerns. In the DDR-TPCC areas, the design features identified Table D.4.12  would be applied during treatments.
2. If field reviews determine the DDR-TPCC land use allocation and TPCC designations are NOT accurate, the TPCC designation for these lands would be changed to reflect on the ground conditions, and outcomes would be one of the following:
   - In the DDR-TPCC, if the changed TPCC classification no longer meets the reasons for allocating the lands as DDR-TPCC, these areas would be un-designated and returned to the harvest land base (USDI/BLM 2016a, p. 56). The un-designation process would be an interdisciplinary team exercise which may include a field visit with the project soils expert, the silviculturist, and the timber sale planner, soil scientist and/or hydrologist.
   - Commercial timber harvest and noncommercial HFR treatments would be applied to achieve restoration and habitat goals with mitigating measures in place for soil and reforestation limitations described by the TPCC data. Proposed activities would be designed to protect the soil characteristics identified in the DDR-TPCC LUA after field surveys indicate that the description is accurate. Site specific mitigation of activities would be expected to protect these DDR-TPCC characteristics for specific sites, for example avoiding saturated soils with seasonal restrictions or limiting ground-based yarding on steep slopes.

Rationale: For the above reasons, further analysis of LCFMP commercial harvest and non-commercial HFR activities impact on DDR-TPCC is not necessary for making a reasoned choice among alternatives. This issue was considered but not analyzed in further detail because the activities described in the proposed actions would not have impacts beyond that which was analyzed in the FEIS. This is achieved through the implementation of BMPs and PDFs (see Appendix C).  These site-specific measures would be included in timber and HFR contracts and administered by BLM sales administrators and fuels specialists on the ground and the Recommended Practices from the SOP would mitigate potential effects and minimize or eliminate degradation to the productive capacity of these soils.

   - How would decommissioning of roads and ground-based disturbance affect soil productivity, mass movement, and surface erosion?

Background: After a road or landing is constructed, to reduce the detrimental soil disturbance caused by the construction of the feature, specific mitigating activities are implemented to expedite recovery of the soil. These activities include decompaction, drainage, slash cover, and blocking routes for vehicle travel. Decompaction usually affects the upper mineral soil in order to reduce compaction caused by construction of the feature. Drainage includes forming ditches and water bars to move water off the compacted area quickly. Slash cover helps to disperse rain drops, increase infiltration rates, and reduce runoff rates. Barriers are placed at the entrance of a decommissioned road to limit motorized use and, thus, further compaction. These activities can reduce compaction from decommissioned roads and excessive ground-based disturbance, but actions should be considered in context of soil types, landscape forms, adjacent resources, and legacy disturbances. These activities can reduce compaction from decommissioned roads and ground-based disturbance, but actions should be considered in context of soil types, landscape forms, adjacent resources, and legacy disturbances.

Decompaction activities mix organic (if organic layers are present) and mineral soils, which can accelerate decomposition of organic matter and temporarily reduce organic matter, which usually reduces overall nutrient content and cycling. Soil mixing can also sever roots and provide habitat for invasive species if they are present on the route. Slash cover provides a physical input of organic matter and material that disperses water before it reaches the compacted soils, thus, reducing water-driven erosion and providing some input of nutrients. The placement of rocks at the entrance of a decommissioned roads only the soil directly below the rocks and limits the possibility of motor vehicle travel, which contributes directly to compaction and, subsequently, erosion. While vehicle barriers reduce travel, they also accelerate water-driven erosion and slope instability depending on the landscape topography.

The impacts of activities involved in decommission of roads provides an avenue to reclaim initial loss of soil productivity, soil instability, and soil erosion. All skid trails proposed on the project area would have a combination of decommissioning activities, such as drainage, slash cover, blocking, that is deemed appropriate by a BLM engineer or soil scientist when considering the site-specific soils, landscape topography, road features, and adjacent vegetation cover. All skid trails proposed on the project area would have a combination of decommissioning activities, such as drainage, slash cover, blocking, that is deemed appropriate by the BLM when considering the site-specific soils, landscape topography, road features, and adjacent vegetation cover.

Rationale: For the above reasons, further analysis of LCFMP commercial harvest and non-commercial HFR activities is not necessary for making a reasoned choice among alternatives. This issue was considered but not analyzed in further detail because the activities described in the proposed actions would not have impacts beyond that which was analyzed in the FEIS. This is achieved through the implementation of BMPs and PDFs (see Appendix C). These site-specific measures would be included in timber and HFR contracts and administered by BLM sales administrators and fuels specialists on the ground and the Recommended Practices from the SOP would mitigate potential effects and minimize or eliminate degradation to the productive capacity of these soils.

<u>Terrestrial Wildlife and Special Status Species</u>

- How would the project be monitored to assure that canopy cover requirements for the NSO are met?

Background: The Medford District developed a Guide for Planning and Implementing Vegetation Management Projects (USDI/BLM 2015) which established six steps and five checkpoints to ensure that projects are consistent with NEPA documents and with ESA Section 7 consultation requirements. Included in these steps are habitat evaluations and NSO surveys. Silviculturists work with wildlife biologists to develop forest treatment prescriptions. The foresters and wildlife biologists review the Biological Assessment and Biological Opinion. The marking crew lead and marking contract project inspector are informed of the consultation canopy cover, basal area, and specific habitat requirements to

retain prior to the tree marking. The silviculturist coordinates with a wildlife biologist and other specialists for marking reviews and monitors the marking of trees as this task is completed to ensure it meets the consultation requirements and stand management objectives. Modifications to the marking of trees would be applied as needed. The Contract Administrator monitors harvesting activities and ensures contract stipulations and RMP management directions are met. Lastly, the wildlife biologist monitors a subset of units post-treatment to evaluate consistency between implementation, NEPA analysis, and ESA consultation requirements. This includes tree retention and spacing, tree selection, structure retention, and evaluating general canopy cover retention to verify that prescribed marking is appropriately applied according to the NEPA and Consultation effects.

Rationale: Monitoring of marked prescriptions pretreatment, contract administrator monitoring, and post-implementation monitoring of activities provides assurance that canopy cover and other structural requirements for the NSO habitat would be consistent with the designed prescription, EA analysis, RMP management directions, and FWS consultation requirements. Therefore, this issue was considered but not analyzed in further detail.

- How would the potential risk of windthrow and effects to post-harvest canopy and relative density retention requirements be affected by applying LUA prescriptions?

Background: There is no known method to accurately predict harvest unit-level tree susceptibility to windthrow. While there is a level of risk for windthrow events, it depends on many biotic and abiotic influences. Predicting windthrow that would have substantial impact on proposed treatment units would be speculative. Analysis of potential windthrow would be speculative and not lead to a more reasoned decision. The FEIS describes that windthrow mortality is often irregular or episodic in nature and is inherently difficult to predict the exact time in which it would occur (USDI/BLM 2016a p. 1203). The BLM is managing forest resources to reduce impacts from natural causes. Management direction on pages 68 and 72 of the RMP states the BLM is to "Conduct integrated vegetation management for any of the following reasons: Reduce stand susceptibility to disturbances such as a fire, windstorm, disease, or insect infestation" is just one of many potential treatment goals.

Silvicultural prescriptions proposed are designed to remove trees that are most susceptible to windthrow, such as those with low vigor, poor crown ratios and those with high height to diameter ratios (Worthington and Staebler, 1961, p. 21; Moore et al., 2003; Wonn & O'Hara, p. 92; Tappenier et al. 2007, pp. 129-130; O'Hara, 2014). Prescriptions would favor retaining species with deep tap roots such as sugar and ponderosa pine, largest and most well-developed trees, and healthy vigorous trees of other species would be preferentially retained (Smith et al. 1997) to lower the potential for blowdown. The lack of thinning can prevent stands from attaining vigorous conifer growth. Trees allocate resources to height growth before diameter growth and in the absence of disturbance (thinning) resources become limited and the risk of windthrow increases as tree stability decreases (EA, p. 27). The result of limited resources within a stand, means diameter growth lags behind height growth (O'Hara, 2014, pg. 100) which actually increases the risk of windthrow over time, as height to diameter ratios continue to increase and crown ratios decrease, and the topographic position, with ridge tops more susceptible (Mitchell 2000).

In some cases, the risk of windthrow could be increased in the short-term when opening up a stand. Thinning and group selection openings may indirectly increase surface wind gusts. Bigelow and North (2012) found evidence of this, observing moderate increases in average wind gusts in thinned stands (up to 1.5mph) and greater increases in openings (up to 5.6 mph in openings of 2 acres). Increasing spacing between the canopies of trees can contribute to increased wind speeds (Agee 1996). Increased surface wind speeds could contribute toward increased windthrow. Risk of windthrow could be increased in the short term (3-5 years) when opening up a stand (Cremer et al. 1982). However, windthrow occurs in both managed and unmanaged stands, and low levels of windthrow may be desirable for wildlife habitat and

stand complexity as long as stand level RDI targets and required canopy cover for wildlife are attained overall post-harvest.

The BLM considered potential for short and long term windthrow canopy cover loss and considered this potential occurrence when developing the range of RD retention prescriptions and during the tree-mark review process. All commercial extraction units are subject to post-marking review and susceptible areas (such as laminated root disease infestations) would be ground verified to determine hazard potential. Those areas may be remedied by adding additional tree retention to avoid potential loss of canopy cover. These adjustments would be made during the monitoring implementation step of on-site post-mark field review. Provisions in the prescribed marking guidelines allow the silviculturist and other resource specialists to remedy detrimental canopy cover loss from windthrow, fragile soils, and marking discrepancies by allowing the additional retention of leave trees in susceptible areas. Site specific reviews in these areas would allow the silviculturist and wildlife biologist to determine the need for marked tree retention adjustments based on the site-specific condition and susceptibility to the hazard affecting overall stand canopy cover loss below prescribed thresholds.

Rationale: The BLM has analyzed and disclosed effects of treatments on stand susceptibility to windthrow with measures to identify and adjust retention during field and post-marking review. Prescription retention design minimizes the potential effects of windthrow from proposed treatments. This issue was considered but not analyzed further in detail because as described in the FEIS, and incorporated by reference into the EA, "this type of mortality is often irregular or episodic in nature, and is inherently difficult to predict the exact time in which it would occur" (USDI BLM 2016a, p. 1203).

- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect NSO habitat?

Background: The LCFMP is located within the range of the NSO, which is listed as threatened under the ESA. NSOs prefer coniferous forest with multiple layers of vegetation; a variety of tree species and age classes; and the presence of large down, woody material (to serve as habitat for prey species) and large diameter live and dead trees (snags) for nesting-roosting habitat. NSO nesting-roosting and foraging habitat in southwest Oregon is mixed-conifer habitats with recurrent fire history, patchy habitat components, and higher incidences of woodrats. NSOs also utilize younger stands with closed canopies for foraging and dispersing. Based on studies of owl habitat selection, including habitat structure and use, and prey preference throughout the range of the owl, NSO habitat consists of three components: nesting-roosting, foraging, and dispersal (Thomas et al., 1990). Table B-32.1 below provides habitat definitions specific to NSO.

To assess the baseline habitat values and project level impacts to NSOs that would result from implementation of the LCFMP, the Medford BLM used an Analysis Area specific to spotted owls to determine areas where spotted owls would be exposed to project effects. The NSO Analysis Area is based on the radius of a circle that would capture the average spotted owl provincial home range distance, which is 1.3 miles in the Klamath Mountains Province (Thomas et al. 1990 and Courtney et al. 2004). Therefore, for the Last Chance Project, the spotted owl Analysis Area represents all lands within 1.3 miles of proposed treatment units and all lands within any overlapping provincial home ranges of known spotted owl sites that could be directly, indirectly, or cumulatively impacted by the proposed action. The NSO Analysis Area is displayed below as figure B-1.

The following actions included in this EA have the potential to affect NSO habitat by modifying or removing habitat: timber harvest, small diameter understory thinning (hazardous fuels reduction treatments and underburning), road/route and landing construction, and quarry development. Treatment effects are described below and effects to NSO habitat by alternative are demonstrated in Table B 31.2.

*Modified* NR, F, or dispersal-only habitat occurs when an action or activity in nesting-roosting, foraging, or dispersal-only habitat removes some trees or reduces the availability of other habitat components but

does not change the current function of the habitat because the conditions that would classify the stand as NR, F, or dispersal-only habitat would remain post-treatment. Habitat elements such as multiple canopy layers, snags, down woody material, and hardwoods, must be retained to maintain habitat function post treatment. The treated stand is expected to still function as NR or F habitat because it would continue to provide at least 60 percent canopy cover (treatment unit average), large trees, multistoried canopy, standing and down dead wood, diverse understory adequate to support prey, and may have some mistletoe or other decay (when present prior to harvest). For dispersal habitat, the treated stand would still maintain its habitat function by continuing to provide at least 40 percent canopy cover (treatment unit average), flying space, and an average of trees 11 inches DBH or greater. In the Last Chance FMP, NRF and dispersal-only habitat modification would occur from selection harvest, commercial thinning, small diameter thinning, roadside vegetation management, and harvest access (yarding corridors).

*Downgraded* NR or F alters the condition of spotted owl NR or F habitat, so the habitat no longer contains the variables associated with nesting, roosting, and foraging. Downgraded units would contain trees > 11 inches DBH and enough tree canopy cover to support spotted owl dispersal. Downgrade is defined when the canopy cover in a NR or F stand is reduced to 40-60 percent (treatment unit average) and other key habitat elements are removed, such as decadent down wood, snags, multistoried canopy layers, and hunting perches. Conditions are altered such that an owl would be unlikely to continue to use that unit for nesting or foraging. The removal of these key habitat features would reduce the roosting and foraging opportunities for owls and may lead to increased predation risk by exposing owls to other raptors. Downgraded NR or F continues to provide habitat for dispersal and potentially limited foraging opportunities. In the Last Chance FMP, NRF downgrade would occur from selection harvest and commercial thinning treatments.

Table B 31.1. Medford District NSO Habitat Types

| Habitat Type | Habitat Sub-Type | Description |
|---|---|---|
| **NRF -** *Nesting, Roosting and Foraging Habitat* | Structurally Complex Habitat (RA32), A Subset of Nesting-Roosting Habitat | Older, multilayered, structurally complex forests characterized as having overstory trees greater than 17 to 21 inches in diameter (depending on annual precipitation), high canopy cover (greater than 60 percent), large trees present (at least 30" DBH), and quantifiable decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees (Figure 12). RA 32 habitat may vary due to climatic gradients across the range. Also functions as dispersal habitat. |
| **NRF -** *Nesting, Roosting and Foraging Habitat* | Nesting-Roosting | These forests have a high canopy cover (greater than 60 percent), a multilayered structure, and large overstory trees greater than 21 inches in diameter. Deformed, diseased, and broken-top trees, as well as large snags and down woody material, are also present. Nesting-roosting habitat meets all NSO life requirements. Also functions as dispersal habitat. |
| **NRF -** *Nesting, Roosting and Foraging Habitat* | Foraging | Canopy cover greater than 60 percent and canopy structure generally single layered. Overstory trees are generally greater than 16 inches in diameter. Snags and down wood not considered a requirement. Also functions as dispersal habitat. |
| **Dispersal-only** Habitat | Dispersal-only Habitat | This habitat is not for nesting, but provides requirements believed important for NSO dispersal. Canopy cover is generally between 40 and 60 percent. In stands with greater than 60 percent canopy cover, overstory tree diameters are generally between 11 and 16 inches DBH. The area has the capability of becoming nesting-roosting, or foraging habitat. Deformed trees, snags, and down wood are absent or less prevalent than in nesting-roosting habitat. |
| **Unsuitable** habitat | Capable | include forestland that is currently not functioning as spotted owl habitat but has the potential to develop into NR, F, or dispersal-only habitat in the future, as trees mature and the canopy closes. |
| **Unsuitable** habitat | Non-habitat | does not currently provide habitat for northern spotted owls and would not develop into NR, F, or dispersal-only habitat in the future (i.e. rock outcrops, meadows, barrens, etc.) |



Figure B-1. Analysis Area for Evaluating Effects to Northern Spotted Owls

The proposed action is described as spotted owl habitat *removal* when the average stand level canopy cover would drop below 40 percent and canopy layering and other key habitat would be reduced so the unit would no longer function as spotted owl habitat post-harvest. Removal of dispersal-only habitat drops canopy cover to less than 40 percent (unit treatment average) and otherwise changes the stand, so it no longer provides dispersal habitat for NSO. The post-harvest stand would be too open to provide protection from predators. In the Last Chance FMP, NRF and dispersal-only habitat removal would occur from road and landing construction, commercial thinning, and selection harvest.

While the NSO home ranges in the spotted owl Analysis Area are comprised of Federal (BLM) and private lands, the following analysis only includes effects on Federal lands. Private lands within the NSO Analysis Area are made up of early-, mid-, and late-seral forests, agricultural, and shrub/oak lands. Most private forestlands are managed as tree farms for production of wood fiber on forest rotations. It is expected that any remaining late-seral forests on private timberlands would be converted to early-seral forest over the next one or two decades (USDI/BLM 2016b, p. 173).

The total treatment acres were calculated using the above-described treatment effect categories and assigning all treatments included as part of an action alternative into a treatment effect category as shown

in table B 31.2. The effects of road and landing construction are based on reasoned assumptions that convert proposed new road/route miles and potential landing locations into acres of treatments by spotted owl habitat types.  The total acreage value presented here are higher than the values presented in Table 2-1 of chapter two in the Proposed Action Summary Table because all project effects were converted into acreage impacts for the spotted owl analyses (e.g. converted road miles into acre footprint).

Table B 31.2: Effects of the Action Alternatives to Spotted Owl Habitat in the Analysis Area.

| TREATMENT ACRES BY EFFECT TYPE | ALT 2 | ALT 3 |
|---|---|---|
| Commercial Treatments with Hazardous Fuels Reduction Treatments | | |
| NRF Modified | 967 | 779 |
| NRF Downgraded | 0 | 0 |
| NRF Removed | 3,420 | 0 |
| Dispersal-only Modified | 1,041 | 248 |
| Dispersal-only Removal | 2,332 | 0 |
| Treatments in Unsuitable Habitat (No Effect) | 480 | 32 |
| **SUBTOTAL** | **8,240** | **1,059** |
| Hazardous Fuels Reduction Only Treatments | | |
| NRF Modified | 1,701 | 5,309 |
| NRF Downgraded | 0 | 0 |
| NRF Removed | 0 | 0 |
| Dispersal-only Modified | 760 | 3,885 |
| Dispersal-only Removal | 0 | 0 |
| Treatments in Non-Habitat (No Effect) | 985 | 1,433 |
| **SUBTOTAL** | **3,446** | **10,627** |
| Effects from Road and Landing Construction | | |
| NRF Modified | 0 | 0 |
| NRF Downgraded | 0 | 0 |
| NRF Removed | 160 | 12 |
| Dispersal-only Modified | 0 | 0 |
| Dispersal-only Removal | 169 | 11 |
| Treatments in Non-Habitat (No Effect) | 44 | 1 |
| **SUBTOTAL** | **373** | **24** |
| All Treatments Combined | | |
| NRF Modified | 2,668 | 6,088 |
| NRF Downgraded | 0 | 0 |
| NRF Removed | 3,580 | 12 |

| | | |
|---|---|---|
| Dispersal-only Modified | 1,801 | 4,133 |
| Dispersal-only Removal | 2,501 | 11 |
| Treatments in Non-Habitat (No Effect) | 1,509 | 1,466 |
| **GRAND TOTAL** | **12,059** | **11,710** |

The amount of habitat modified or removed varies by alternative (Table B 31.2 above) and the overall change to the total spotted owl habitat on federal lands within the spotted owl Analysis Area as a result of full implementation of either action alternative is presented in Table B 31.3. There were no proposed habitat downgrades under any alternative. Under the Action Alternatives, the percent of federal lands containing nesting-roosting or foraging habitat in the NSO Analysis would be reduced by approximately eight percent under Alternative 2 (Alternative 2 and Sub-Alternative 2a would result in the same effect to spotted owl habitat) and two percent under Alternative 3 (Table B 31.2). Alternative 2 would result in the highest reduction in NSO NRF habitat of all action alternatives, with approximately 15.6 percent (3,580 acres) of the total NRF habitat on federal lands in the NSO Analysis Area removed. Comparatively, Alternative 3 would result in a reduction of a negligible 0.05% percent (12 acres) of NRF habitat on federal lands in the NSO Analysis Area.

**Table B 31.3:** Amount of NSO Habitat Pre- and Post-Treatment in NSO Analysis Area (Federal Land Ownerships Only).

| Habitat Type | Current Condition / Alternative 1 | Post Treatment (Acres and percent of Analysis Area) | |
|---|---|---|---|
| | | Alternative 2 | Alternative 3 |
| Nesting-Roosting or Foraging | 22,919 (49.6%) | 19,339 (41.9%) | 22,907 (49.6%) |
| Dispersal-only | 12,360 (26.8%) | 9,859 (21.3%) | 12,349 (26.7%) |
| Unsuitable (Capable or Non-Habitat) | 10,903 (23.6%) | 16,984 (36.8%) | 10,926 (23.7%) |
| TOTAL | 46,182 | 46,182 | 46,182 |

Follow-up hazardous fuels reduction in the form of small diameter thinning would occur in treated units where canopy base height remains less than 5 feet after commercial thinning. Where nesting and roosting, foraging or dispersal habitat would be modified, canopy cover would be retained, and multiple canopy, uneven-aged structure where present, and tree species present prior to treatment would continue, but be thinned to a lesser density within the understory. Snags and coarse wood would be protected to the greatest extent practicable during slashing and piling. Retaining these primary features provides the vertical and horizontal structure for NSO roosting and foraging. This includes a multi-layered canopy, sufficient overhead canopy, species composition, and down wood features, while meeting hazardous fuels reduction goals.

*RA-32*

The BLM conducted field verification of suspected structurally complex forest (see RA-32 habitat definition, Table B-8) within the proposed treatment area to identify high-quality NSO habitat for Recovery Action 32 (USFWS 2011, pp.67-68). The proposed treatments under all alternatives would include up to 113 acres of RA-32 habitat.

*Last Chance Forest Management Project*                                      *September 2024*
*Environmental Assessment*                            B-51

KSW01803

All nesting-roosting habitat in the LSR LUA, including stands identified as RA-32, treatments would maintain habitat function regardless of NSO occupancy (USDI/BLM 2016b, p.71). In the HLB, Alternatives 2 and Sub-Alternative 2a would include removal of 142 acres of field identified RA-32 habitat, and Alternative 3 would remove eight acres of field identified RA-32 habitat. There are no proposed downgrades of RA-32 habitat under any of the alternatives. This is consistent with the direction in the 2016 ROD/RMP not to forego timber harvest of stands in the Harvest Land Base to contribute to Recovery Action 32 (USDI/BLM 2016b, p. 127).

Rationale: The BLM did not analyze this issue in further detail because there is no potential for significant effects beyond those already analyzed in the 2016 PRMP/FEIS (USDI/BLM 2016a pp. 346-347; 928-947), to which this EA is tiered. The BLM designed the Last Chance FMP to follow the management direction from the 2016 ROD/RMP for each LUA. The BLM, in the 2016 PRMP/FEIS, analyzed the effect of harvest of NSO habitat together with the effects of other Proposed RMP decisions and concluded that implementation of the Proposed RMP Alternative would contribute to a landscape that supports large blocks of NSO habitat that are capable of supporting clusters of reproducing owls, distributed across a variety of ecological conditions and spaced to facilitate owl movement between the blocks (USDI/BLM 2016a, pp. 932-941). The BLM is incorporating those analyses here by reference. The U.S. Fish and Wildlife Service (USFWS) confirmed in their BO on the RMP that these analyses are a reasonable approach to assessing NSO habitat change in the Planning Area resulting from timber harvest, ingrowth, and wildfire because it reflects the application of best available science and the acreages of land that would be subject to the range of management activities in the land use allocations in the RMP (USFWS 2016, p. 603).

In conclusion, there is no potential for significant impacts to NSO habitat beyond those already analyzed in the PRMP/FEIS because the project design and site-specific information is consistent with analysis in the PRMP/FEIS. This project would not result in substantially different effects than what was analyzed for in the PRMP/FEIS and there is no new information that would substantially change the conclusion reached in the PRMP/FEIS.

- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect ***spotted owls***?

Background:  NSO site occupancy is defined as locations with evidence of continued use by spotted owls (including breeding), repeated location of a pair or single birds, presence of young before dispersal, or some other strong indication of continued occupancy. The Grants Pass Field Office conducted six years of consecutive NSO surveys following the USFWS 2012 revised protocol from 2018 to 2023 in order to determine occupancy and nesting status. Six of the known NSO sites (eight total territories) within the NSO Analysis Area are currently occupied (active in the last two years).  Across both Action Alternatives, no treatments are proposed within the 70-acre (300-meter) nest patch buffer around occupied NSO site centers, and no commercial harvest would occur within 0.5 mile of the occupied site centers.

The amount of habitat that occurs within each historic owl site / territory across the Last Chance FMP can be used as a measure to compare the effects of the Action Alternatives by assessing the percentage of NRF habitat available within each spotted owl home range and half-mile core use area before and after project implementation.  NRF habitat is a focus of the analysis because research has indicated that the quantity and configuration of "older forest" (analogous to NRF habitat) provides a valid inference into the likelihood of occupancy (Hunter, et al. 1995), survival, and reproduction (Franklin, et al. 2000; Zabel, et al. 2003; Olson, et al. 2004; Dugger, et al. 2005; Dugger, et al. 2011).  For example, when less than 40 to 60 percent of the home range is in NRF habitat, the likelihood of spotted owl occupancy is lower, and survival and reproduction may be reduced (Thomas et al., 1990; Bart and Forsman 1992; Bart 1995; Dugger et al., 2005). Generally, survival and reproduction are supported when there is between 40 and 60 percent older forest within the core-use area (Dugger et al., 2005), but local conditions and possibly pair

experience, contribute to large variance in actual amounts for individual owls. The amount of habitat within an approximate 0.5-mile radius provides reliable predictor of occupancy, and the quantity and configuration have been shown to provide reasonable inferences into survival and reproduction. Adjacent private lands have removed or could remove potential NRF habitat on their lands within spotted owl home ranges. Therefore, the BLM cannot assume private lands are contributing to the older forest conditions in these home range and core areas in the spotted owl sites for this analysis.

Table B.32.1. A comparison of the Effects of the Action Alternatives on the Number of Spotted Owl Sites Above or Below Habitat Thresholds within the Last Chance FMP.

| Scale | Project Effects | Alternatives 2 and 2a | | | Alternative 3 | | |
|---|---|---|---|---|---|---|---|
| | | Above | Below | Total | Above | Below | Total |
| Home Ranges | PRE | 6 | 27 | 33 | 6 | 27 | 33 |
| | POST | 4 | 29 | 33 | 6 | 27 | 33 |
| 0.5 Mile Cores | PRE | 12 | 21 | 33 | 12 | 21 | 33 |
| | POST | 8 | 25 | 33 | 12 | 21 | 33 |

As shown in Table B.32.1, Alternative 2 (either sub-alternative would result in the same outcome for this analysis) would reduce the number of spotted owl sites found within the Last Chance FMP that were above 40% NRF at the home range scale at two sites (from six to four), and would reduce the number of spotted owl territories with 50 percent or greater NRF at the 0.5 mile core use scale across four sites (from 12 down to eight). Alternative 3 would not result in any changes to the number of owl sites that are above 40 percent NRF of the home range, and/or 50 percent NRF at the 0.5 mile core use area scale.

Although Alternative 2 would reduce the amount of spotted owl home ranges (by two) and 0.5-mile core use areas (by four) that are above the desired habitat thresholds of 40 and 50 percent NRF, respectively, none of the occupied spotted owl sites in the Last Chance FMP would lose more that 0.4 percent of the total NRF habitat within each home range or 0.5-mile core use area, and would not drop any home range or 0.5-mile core use area that is currently above the 40 or 50 percent threshold to drop below that threshold after treatment. Generally, when less than 40 percent of the home range, and/or 50 percent of the 0.5 mile core use area is NRF habitat, the likelihood of spotted owl presence is lower and survival and reproduction may be reduced (Thomas, et al. 1990; Bart and Forsman 1992; Bart 1995; Dugger, et al. 2005).

The question of whether the effects described above lead to incidental take via harm or harassment is a determination made by the US Fish & Wildlife Service. A more detailed analysis of the affects that this project is expected to have on individual spotted owls and spotted owl habitat across the Project Area is included in the Biological Assessment (USDI BLM 2023) and the Biological Opinion (USDI FWS 2023) covering the terrestrial wildlife Threatened and Endangered species.

In general terms, small diameter thinning, in addition to all proposed treatments, could impact NSO foraging by changing habitat conditions for prey species. Effects to spotted owl prey species, such as woodrats, northern flying squirrels and other small mammals, which are the primary prey of spotted owls in the analysis area (Forsman et al. 2004), are expected to occur under the proposed treatments. Some changes to vegetation (habitat) can improve forage conditions, provided some ground cover is retained. Removal of older brush and dense understory in the treated areas may stimulate grass, forbs, younger shrub and associated seeds, providing food source for small mammals (Buermeyer and Harrington 2002, Wender et al. 2004). Woodrats are important components of the spotted owls' diet in in the Planning Area (Forsman et al., 2004). Some beneficial effects to dusky-footed woodrats due to shrub development in thinned stands is possible (Sakai and Noon 1993; Suzuki and Hayes 2003). Gomez et al. (2005) noted that

commercial thinning in young stands of coastal Oregon Douglas-fir (35-45 year) did not have a measurable short-term effect on density, survival or body mass of northern flying squirrels, an important prey species for spotted owls.

In addition to reducing the amount and intensity of treatments within the occupied spotted owl sites in the Last Chance FMP, seasonal restrictions listed as Project Design Features for this project (Appendix A) would also prevent disturbance to nesting spotted owls within the NSO Analysis Area. These PDFs would help reduce potential effects to the reproduction and survival of spotted owl territories.  Project Design Features included for this project would be utilized to avoid adverse impacts to spotted owls with respect to prey availability, although localized, short-term changes in prey species distribution and abundance are likely to occur within a treated stand. Residual trees, snags, and down wood retained in the treated stands would provide some cover for prey species over time and would help reduce harvest impacts to some prey species, such as dusky-footed woodrats. Treatment implementation would be spread out temporally and spatially within the project area, which would leave untreated areas available for spotted owl foraging, reducing the impact of these effects at the project level.

Rationale:  The effects of the proposed actions on spotted owl reproduction, survival, and the potential to cause incidental take, are not analyzed in detail, because there would be no potential for effects beyond those analyzed in the PRMP/FEIS, to which this EA is tiered. Even though spotted owl sites may be affected by the proposed action, survival and reproduction would not be affected at occupied owl sites because the BLM's commitment to conduct no harvest in the 70-acre site center and only conducting non-commercial work within 0.5 mile of the site center, and only treating NRF in any occupied owl sites with "light touch" treatments (i.e. treat and maintain or modify) would ensure that take would not occur, in compliance with the SWO ROD/RMP's management direction stating, "No Timber harvest that would cause the incidental take of northern spotted owl territorial pairs or resident singles" (USDI/BLM 2016b, p. 30; also wildlife PDF 45). The PRMP/FEIS acknowledged that the BLM would not "authorize timber sales that would cause the incidental take of northern spotted owl territorial pairs or resident singles from timber harvest until implementation of a barred owl management program consistent with the assumptions contained in the Biological Opinion on the RMP has begun" (USDI BLM 2016a, pp. 346-347). As of June 2024, no barred owl management program meeting that description has begun. One of the proposed actions that is common to all action alternatives is that there would be no incidental take to spotted owls.

The effects of the proposed actions are within the estimated effects to spotted owl populations analyzed in the PRMP/FEIS to which this EA is tiered (USDI BLM 2016a, pp. 947-973). The PRMP/FEIS analysis of the effects of management actions on spotted owl populations included population simulations. The PRMP/FEIS acknowledged that spotted owl populations in the Western Cascades and Klamath Provinces would continue to decline and the PRMP/FEIS did not show discernable differences among the alternatives when compared to the No Timber Harvest reference analysis (USDI BLM 2016a, pp. 961, 962, 969). There are two spotted owl demographic study areas associated with the Treatment Area: the KSA (within the Treatment Area), which represents the Klamath province and the SCS Demography Study Area (adjacent to the Treatment Area), which represents the West Cascades province. The last two years of annual reports for these study areas indicated a decline in the spotted owl population and an increase in barred owl detections (Dugger et al., 2019, Dugger et al., 2020, Lesmeister et al., 2019, Lesmeister et al., 2020). The findings in the most recent metadata analysis demonstrated continued declines of spotted owl populations across the range of the spotted owl. Franklin et al. (2021) found that the declines in both apparent survival and recruitment have accelerated since 2014, resulting in further losses to NSO populations beyond those reported by Dugger et al. (2016). Estimated population sizes have declined in all study areas in Oregon by over 60 percent since 1995, with Klamath Study Area declining by over 75 percent. These recent documented declines confirm the overall spotted owl population decline predicted in the PRMP/FEIS. Therefore, the results of the recent studies do not present new information that would create new effects to spotted owl populations since the PRMP/FEIS.

In conclusion, there is no potential for significant impacts to NSO habitat beyond those already analyzed in the PRMP/FEIS because the project design and site-specific information is consistent with analysis in the PRMP/FEIS. This project would not result in substantially different effects than what was analyzed for in the PRMP/FEIS and there is no new information that would substantially change the conclusion reached in the PRMP/FEIS.

- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect NSO Critical Habitat Unit function?

Background: In December 2021, the USFWS released the Designation of Revised Critical Habitat for the NSO, Final Rule, which designated NSO critical habitat on federal lands. A Critical Habitat Unit (CHU) identifies geographic areas that contain features essential for the conservation of the NSO and may require special management considerations. The Last Chance FMP NSO Analysis Area includes 19,343 acres of spotted owl CHU 10, including portions of sub-unit KLE-1, KLE-2 and KLE-3; however, treatments would only occur in KLE-2. The KLE-2 subunit, which extends well beyond the footprint of the Last Chance NSO Analysis Area, contains a total of 70,376 acres of CHU. Only a portion (8,311 acres) of the treatments proposed as part of the action alternatives overlap with lands designated as KLE-2. The proposed treatments include up to 8,311 acres of NSO critical habitat (approximately 43 percent of the Critical Habitat in the spotted owl Analysis Area and 12 percent of the entire KLE-2 sub-unit). Both Action Alternatives would treat a total of 8,311 acres of critical habitat, but Alternative 3 would treat less acres with commercial harvest (these acres would be hazardous fuels reduction, which only modifies the understory) which would result in more acres of treatments that modify habitat, as opposed to downgrade or removal. Table B 33.1 below presents the potential effects that would result from implementation of either Action Alternative on the spotted owl habitat types within the critical habitat that overlaps the treatment areas.

Table B 33.1: Effects to NSO Habitat within Spotted Owl Critical Habitat in the NSO Analysis Area (Federal Land Ownerships Only).

| TREATMENT ACRES BY EFFECT TYPE | ALT 2 | ALT 3 |
|---|---|---|
| Treatments within Spotted Owl Critical Habitat | | |
| NRF Modified | 2,399 | 4,461 |
| NRF Downgraded | 0 | 0 |
| NRF Removed | 2,137 | 8 |
| Dispersal-only Modified | 1,649 | 2,826 |
| Dispersal-only Removal | 1,115 | 5 |
| Treatments in Unsuitable Habitat (No Effect) | 1,011 | 1,011 |
| **SUBTOTAL** | **8,311** | **8,311** |

Rationale: The BLM did not analyze in detail the effects of the proposed alternatives on NSO critical habitat in the planning area because there is no potential for significant effects beyond those already analyzed in the 2016 PRMP/FEIS, to which this EA is tiered (USDI/BLM 2016b, pp. 990-993). The 2016 PRMP/FEIS analysis of the 2016 ROD/RMP on NSO critical habitat was based on the vegetation modeling (including timber harvest and growth) in the 2016 PRMP/FEIS. In the Biological Opinion for Western Oregon Resource Management Plan, the USFWS predicted that uneven-aged management would result in the loss of primary biological features, such as nesting-roosting and foraging habitat, in the HLB (USFWS 2016). The USFWS also concluded that the mitigation of these losses would occur because during the same time span, NSO critical habitat in reserved LUAs would develop through ingrowth and

through management actions, such as thinning designed to speed the development of critical habitat primary biological features (USFWS 2016, pp 690 and 691). The proposed treatments would reduce the amount of nesting-roosting, foraging, and dispersal-only habitat within critical habitat under all action alternatives. However, the potential reduction of NSO habitat would not alter the intended sub-unit function of providing connectivity between subunits and critical habitat units because these changes are immeasurable at the sub-unit scale and therefore would not affect the dispersal of NSO between sub-units. Additionally, the proposed actions would not affect the ability for the critical habitat subunits to provide demographic support because incidental take of NSOs would not occur under all action alternatives, so the proposed actions would not affect NSO occupancy at active sites.

- How would the commercial treatment of NSO structurally complex habitat (RA32) or nesting-roosting habitat in the LSR-Dry affect the project?

Background: Habitat surveys were conducted to locate structurally complex habitat and nesting-roosting habitat in the LSR. All LSR units that were identified as either nesting- roosting habitat or structurally complex habitat were deferred from the proposed action and as a result, the LCFMP does not propose commercially treating any LSR stands which are currently functioning as either nesting-roosting habitat or structurally complex habitat.

Rationale: The FEIS analysis forecasts long-term increases in mature and structurally complex habitat in the LSR (USDI/BLM 2016a, p. 850). Therefore, stand nesting function and structurally-complex habitat within LSR would be retained consistent with the RMP and is within and would not exceed the FEIS analysis. This issue was considered and not analyzed in further detail.

- How would noise associated with proposed treatments affect NSOs during their nesting season?

Background: The LCFMP is located within the range of the NSO and has the potential to cause noise disturbance near NSO nest sites. The BLM would follow guidance from the USFWS and would conduct surveys in the project area to determine occupancy and nesting status. Sites are assumed occupied unless surveys or habitat conditions indicate otherwise. Activities (such as tree felling, yarding, road construction, hauling on roads not generally used by the public, prescribed fire, muffled blasting) that produce loud noises above ambient levels would not occur within specified distances of owl site between March 1 and July 15 unless protocol surveys have determined the activity center is non-nesting or failed in the nesting attempt. The distances may be shortened if significant topographical breaks or blast blankets (or other devices) muffle sound traveling between the work location and nest sites.

Based on protocol survey results, and protocol spot check surveys during year of implementation, no chainsaw or heavy equipment activity would occur 65 yards from the NSO nest tree if known or at least 65 yards from edge of the occupied or assumed occupied 328 yards (300 meters) nest patch area and un-surveyed NRF habitat. Seasonal restrictions would also apply to prescribed burning and use (Table B-12). The BLM has the option to extend the seasonal restrictions for different project activity types up to September 30th based on site-specific conditions (such as late nesting or re-nesting attempts).

Spot check protocol surveys during the years of harvest check harvest units with NRF habitat, and within a quarter mile of nesting roosting and foraging habitat, to reduce the likelihood of disturbing nesting owls. Nesting owls are confined to an area close to the nest, but once the young fledge, they can move away from noise and activities that might cause them harm. Because all project activities would follow mandatory PDF distances and seasonal operation, as established by the USFWS, no harm to nesting owls, or their young, is expected from project-related noise. Above-ambient noises further than these distances from NSO are expected to have either negligible effects or no effect to NSOs.

Table B 35.1 – NSO Disruption and Disturbance Seasons and Distances (content adopted from USDI FWS 2016 USDI FWS 2016; Table 227, pp. 597-600 & Table 50, pp. 230-232).

| Project Activity | Disruption Distance | | Disturbance Distance |
| --- | --- | --- | --- |
| | March 1 – July 15 | July 16 – Sept. 30 | March 1 – Sept. 30 |
| Light maintenance (*e.g.*, road brushing and grading) at campgrounds, administrative facilities, and heavily-used roads | No Disruption | No Disruption | ≤ 0.25 mile |
| Log hauling on heavily-used roads | No Disruption | No Disruption | ≤ 0.25 mile |
| Chainsaws (includes felling hazard/danger trees) | ≤ 65 yards | No Disruption | 66 yards to 0.25 mile |
| Heavy equipment for logging, road construction, road repairs, bridge construction, culvert replacements, etc. | ≤ 65 yards | No Disruption | 66 yards to 0.25 mile |
| Pile-driving (steel H piles, pipe piles); Rock Crushing and Screening Equipment | ≤ 120 yards | No Disruption | 121 yards to 0.25 mile |
| Burning (prescribed fires, pile burning) | ≤ 0.25 mile | No Disruption | 0.25 mile to 1 mile |
| Blasting | ≤ 0.25 mile | No Disruption | 0.25 mile to 1 mile |
| Helicopter: Chinook 47d | ≤ 265 yards | ≤ 100 yards (hovering only) | 266 yards to 0.5 mile |
| Helicopter: Boeing Vertol 107, Sikorsky S-64 (SkyCrane) | ≤ 150 yards | ≤ 50 yards (hovering only) | 151 yards to 0.25 mile |
| Helicopters: K-MAX, Bell 206 L4, Hughes 500 | ≤ 110 yards | ≤ 50 yards (hovering only) | 111 yards to 0.25 mile |
| Small fixed-wing aircraft (Cessna 185, etc.) | ≤ 110 yards | No Disruption | 111 yards to 0.25 mile |

Rationale: This issue was considered but not analyzed in further detail because the potential for NSOs to be impacted by noise and cause Take associated with proposed project activities is reduced through the implementation of Project Design Features (PDF) (Appendix A in the Biological Assessment for Medford BLM FY23 Batch of Projects) consistent with USFWS consultation.

- Does the U.S. Fish and Wildlife survey protocol adequately detect northern spotted owls?

Background: During external scoping for this project commenters questioned the effectiveness of the survey protocol to detect northern spotted owls. In recent years, research on spotted owls provided insights that raised concerns regarding the effectiveness of surveys, particularly those which do not result in spotted owl detections. Specifically, the invasion of the Pacific Northwest by the barred owl. The FWS developed the 2011 NSO Survey Protocol to promote consistent and scientifically rigorous procedures to survey for northern spotted owls. To address this concern, the Service and cooperators conducted analyses of historical survey data, leading to estimates of detection rates for spotted owls that account for the effects of barred owl presence. The professional opinion of researchers, survey practitioners, and regulators were integrated into this product, and the development of the protocol benefitted from data analysis, input, and reviews by the interagency Barred Owl Work Group. Use of the 2011 Protocol provides a methodology that results in adequate coverage and assessment of an area for the presence of spotted owls and ensures a high probability of locating resident spotted owls and identifying owl territories thereby minimizing the potential unauthorized incidental take. Spotted owl surveys that are conducted as part of demographic long-term monitoring programs is considered a reasonable alternative to the 2011 protocol (USFWS 2011, pp.4-5).

The BLM has conducted long term NSO surveys in the project area since 1991 following the 2009 USDA PNW-GTR-440 publication protocol for known NSO sites within the Klamath Province demographic study. The BLM has also conducted NSO surveys following the 2011 Protocol for Surveying Proposed Management Activities that May Impact Northern Spotted Owls (USDI/USFWS 2012) to survey spotted owl habitat for areas not covered by long term demographic surveys. Detections for NSOs and barred owls have been recorded each year, providing knowledge and experience of NSO habitat use and NSO occurrence, which has been combined with the survey protocol to produce survey results with a high level of confidence. Barred owls have been documented since 1997 in owl sites within the project area and responses are throughout the project area and within all known occupied and historical owl sites. Because the BLM is required to follow the USFWS survey protocols, it is beyond the scope of the EA to change how surveys are conducted.

Rationale: This issue was considered but not analyzed further in detail because the BLM followed NSO survey protocols approved by the USFWS. The BLM does not establish the survey protocol for NSO surveys. The project area has a long continuous history of surveying known NSO sites in the Klamath Mountains Demographic Study Area, and project area surveys continue through project implementation.

- How would proposed timber harvest and associated landings, road construction, and fuels reduction, affect northern spotted owl landscape dispersal?

Background: Watersheds can provide a landscape-level qualitative evaluation for dispersal function using the concepts of Thomas, et al (1990), along with more recent analyses of dispersal function per Lint, et al. (2005), Davis, et al. (2011). Davis, et al. (2016) suggested that landscapes having at least 40 percent of dispersal habitat conditions (including both older and younger forests) would be sufficient to support spotted owl dispersal for adults and juveniles across the landscape. The USFWS has generally recommended using a watershed, or larger landscapes, for assessing dispersal habitat conditions because watersheds or provinces offer a more biologically meaningful way to evaluate dispersal function. Table B-13 below provides estimates of the current spotted owl habitat conditions at the landscape 5th field watershed level associated with the Last Chance project area.

Post-harvest, approximately 64 percent of federal lands in the project area (average across all watersheds) would still support and facilitate spotted owls dispersing through the landscape under the highest impact alternative (Table B-13). Each individual 5th field watershed would also have at least 60% dispersal-capable habitat or greater after project implementation under the most impactful action alterative (alternative 2a). NSOs can disperse across a fragmented mosaic of non-forested areas and a variety of

forest age classes (Forsman et al. 2002). This information represents the best available habitat data and analysis approach to evaluate landscape dispersal-habitat function for spotted owls.

**Table B 37.1:** 5th Field Watershed Current Habitat Conditions Supporting NSO Dispersal

|  | Total Watershed Acres | Total NRF Habitat Acres | Total Dispersal Acres (NRF+ Dispersal Only) | Percent Watershed Dispersal Habitat (NRF +Dispersal-only) | Proposed NRF/ Dispersal removal acres | Percent new watershed amounts |
|---|---|---|---|---|---|---|
| Grave Creek 5th Field Watershed | 104,517 | 36,502 | 67,244 | 64% | 3,323 | 61% |
| Middle Cow Creek 5th Field Watershed | 113,081 | 39,259 | 69,681 | 62% | 2,142 | 60% |
| Upper Cow Creek | 47,480 | 25,152 | 37,856 | 80% | 299 | 79% |

Rationale: The 5th field watersheds would retain approximately 60 percent nesting and roosting, foraging, and dispersal habitat, and substantially exceed the minimum 40 percent conditions consistent with recent literature sufficient to support spotted owl dispersal across the landscape. Landscape NSO habitat conditions are expected to support the foraging and roosting, and provide opportunities for nesting, for dispersing juvenile, subadult, and adult spotted owls within occupied owl sites. Therefore, this issue would not be analyzed further.

- Would timber harvest, fuels reduction, and new road/landing construction affect barred owl and spotted owl encounters and interactions which could cause an increase in northern spotted owl and barred competition?

Background: In 2006, the U.S. Fish and Wildlife Service convened seven experts to identify threats to the northern spotted owl (USDI/USFWS 2011b). The experts identified past habitat loss, current habitat loss, and competition from barred owls as the most pressing threats, even though implementation of the Northwest Forest Plan reduced the rate of timber harvest on Federal lands. They noted evidence of these threats in the scientific literature. The range of threat scores by the individual experts was narrowest for barred owl competition, indicating more agreement about the threat from barred owls.

In 2014, Northern spotted owl populations were estimated to be declining across their range at an annual rate of 3.8 percent (Dugger et al., 2016; p. 70). Franklin et al. (2021) found that the declines in both apparent survival and recruitment have accelerated since 2014, resulting in further losses to NSO populations beyond those reported by Dugger et al. (2016). Most research and modeling show a general expectation of wide scale and continuing declines in spotted owl populations regardless of retention of habitat (FEIS Figure 3-188, p. 959; Wiens et al. 2014; Yackulic et al. 2019; Franklin et al. 2021). Davis et al. (2022) estimated that the range wide carrying capacity for northern spotted owls (maximum number of owl sites that could be contained in a given landscape based on biological and physical features) on federal lands has increased by 3.5 percent from 1993 to 2017, but territory occupancy had declined by approximately 62 percent.

A principal cause of the decline is competition from barred owls, which have colonized portions of Washington, Oregon, and California during the past forty years. Barred owls now occupy the entire range of the northern spotted owl, utilize all northern spotted owl habitats and prey species, displace northern spotted owls from their breeding territories, inhibit northern spotted owls from establishing new territories, and outbreed northern spotted owls (Forsman *et al.*, 2011; Van Lanen *et al.*, 2011; Dugger *et al.*, 2011; Wiens *et al.*, 2014). The recent NSO metadata analysis found that barred owl occupancy had a negative effect on NSO colonization and a positive effect on extinction of spotted owl territories (Franklin et al. 2021, p. 28). Current research provides no evidence that the BLM can manage individual forest stands to provide northern spotted owls with a competitive advantage over barred owls (Dugger *et al.*, 2011; Wiens *et al.*, 2014). Instead, research reaffirms the importance of older forest conditions and managing for large blocks of unfragmented older forest (Dugger *et al.* 2011, p. 2463; FEIS p. 948, Wiens *et al,* 2014, pp. 36–38) and the implementation of a barred owl management program to support the recovery of the spotted owl (USDI/BLM 2016a, pp. 961-962).

During the development of the current RMP, the Final Environmental Impact Statement (FEIS) considered and evaluated the relationship between spotted owls, barred owls and late-successional habitat (USDI/BLM 2016a pp. 947-973). In general, the FEIS concluded there would be no discernable difference in the northern spotted owl population response under any of the alternatives or sub-alternative, the RMP, or a management scenario reflected by the No Timber Harvest reference analysis, indicating that northern spotted owl populations would not respond substantively to the different amounts and distributions of habitat provided by each alternative and the RMP (i.e., the habitat provided by each alternative and the RMP would not limit the population response). However, in each modeling region and physiographic province, the northern spotted owl population response would be substantively higher with implementation of the RMP and a barred owl control program. This indicates that, within the scope of the alternatives and the RMP, the northern spotted owl population response is determined by the effect of barred owl encounter rates on northern spotted owl survival (USDI/BLM 2016a, p. 961). Simulations for the Klamath-Siskiyou-West and Klamath-Siskiyou-East modeling regions and the Oregon Klamath Physiographic Province, show no discernable differences in northern spotted owl population responses among the alternatives and the RMP. The NSO population would continue to decline at a similar rate for the alternatives and the RMP, unless a barred owl management program was implemented (USDI/BLM 2016a, p. 961).

In summary, the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls. Habitat management by the BLM alone would not be sufficient to produce stable populations of northern spotted owls in the Oregon Coast Range Physiographic Province, the Oregon Western Cascades Physiographic Province, and the Klamath Basin Physiographic Province within the RMP planning area (USDI/BLM 2016a , pp. 961-962). However, habitat on BLM-administered lands plays an indispensable role in northern spotted owl conservation in the Oregon Eastern Cascades Physiographic Province (USDI/BLM 2016a, p. 962). Therefore, the greatest contribution to conservation and recovery of the northern spotted owl would come from a combination of habitat management and barred owl management (USDI/BLM 2016a, Vol 4; p. 973).

Rationale: The stand treatments and associated activities would alter habitat by maintaining, or removing habitat function, but implements a fraction of the projected annual and decadal timber harvest treatment acres within structurally-complex (RA32) stands, nesting-roosting habitat, and dispersal habitat (USDI/BLM 2016a, p. 984 and p. 1774). The project presents no potential of exceeding the effects of implementing the Sustained Yield Unit's (SYU) timber harvest program of work, which was already disclosed in the RMP FEIS.

BLM avoids treatment of Recovery Action (RA32) habitat within the LSR, the Proposed Action avoids treatment of RA32 (USDI/BLM 2016b, p. 71) and nesting-roosting habitat, applying the RA32 action. The Proposed Action potentially modifies but maintains foraging habitat to increase habitat resiliency and

reduce risk of loss to catastrophic wildlife (USDI/BLM 2016a, p. 930) and promote development of better foraging and nesting-roosting habitat (USDI/BLM 2016b, pp. 71-72) The LSR-Dry land use allocation creates large blocks of habitat, for developing, and maintaining, large blocks of older forests. The Proposed Action contributes to the development and maintenance of large blocks of habitat (USDI/BLM 2016b, pp. 1, 20, 22-23, and 70; USDI/BLM 2016a, pp. 929, 932-933, and 935) consistent with the PRMP FEIS analysis. The 290.5 acres of LSR commercial treatments do not exceed decadal average of 17,000 acres at the SYU. The Proposed Action avoids designing landscape-level stand prescriptions that would remove NSO habitat in the LSR that is capable of developing into nesting habitat.

With Project Design Features to align the project with RMP required management direction, the project presents no new or unique facts or circumstances that deviate from the modeling assumptions used in the RMP FEIS or would cause the SYU to harvest in excess of the projections, or commercially treat LSR inconsistent with management direction, or exceed owl effects analysis of the RMP FEIS. Therefore, it was considered but not analyzed in further detail because the effects of barred owls on spotted owls are within and would not exceed what was already analyzed in the RMP FEIS.

- Would the Proposed Action cause the incidental take of northern spotted owls?

Background:  There are several management directions incorporated into this project from the Southwestern Oregon RMP. The BLM would not authorize timber sales that would cause the incidental take of northern spotted owl territorial pairs or resident singles from timber harvest until implementation of a barred owl management program consistent with the assumptions contained in the Biological Opinion for the RMP (USDI/BLM 2016b, p. 30). The BLM would be authorizing timber harvest that does not result in incidental take of northern spotted owls (e.g., harvest in unoccupied home ranges or harvest within occupied home ranges that does not constitute incidental take), provided that such harvest otherwise meets BLM's obligations under the ESA Section 7 (USDI/BLM 2016b, p. 30) to, "design timber harvest treatments in a manner sufficient to avoid incidental take" (USDI/BLM 2016b, p. 121).

Rationale:  Effects to spotted owls were considered while planning this project. All project components were planned to avoid timber sales that would result in an "incidental take" determination by the USFWS. Therefore, the proposed treatments are designed where incidental take would be avoided, while contributing to the District's Allowable Sale Quantity and improving forest resiliency by reducing competition for resources in stands with high relative densities, which is consistent with the RMP and exemption language (RMP). The wildlife biologists and foresters for this project worked together to design treatments in occupied spotted owl sites that would not result in an "incidental take" determination by the USFWS, and BLM conducted consultation streamlining with USFWS during project development to ensure incidental take would be avoided.  Project units continue to be surveyed according to protocol through harvest implementation, and if resident owls are located, the BLM would consult with the USFWS. Units would be dropped or modified to reduce potential adverse effects and avoid incidental take to owls located at new owl sites or previously unoccupied owl sites, consistent with RMP USFWS Biological Opinion, therefore, it was considered but not analyzed in further detail.

- How would proposed activities affect the threatened coastal marten and its designated critical habitat?

Background:  The USFWS listed the coastal distinct population segment (DPS) of the coastal marten as a threatened species under the ESA and published the rule on October 8, 2020 (Federal Register 2020b). The coastal marten selects closed-canopy, late-successional, mesic coniferous forests with complex physical structure near the ground such as dense, extensive shrub cover.  Occupied serpentine habitats have open tree canopies, dense shrub cover, and an abundance of boulder piles, while non-serpentine sites have closed, multi-layered tree canopies, dense shrub cover, and older age-class stands.

Rationale: The proposed Project Area does not occur within the expected range of current southern coastal Oregon population area (USDI FWS 2018, p. 85) or designated critical habitat (USDI FWS 2024),

KSW01813

and there are no known den sites or detections within the Proposed Action area. Adverse effects to the marten coastal distinct population segment would not occur, and there would be no impacts to coastal marten or coastal marten critical habitat, therefore it is not analyzed in further detail.

- How would timber harvest, activity fuels treatments, fuels maintenance treatments, and new road and landing construction affect Franklin's bumble bee (*Bombus franklini*)?

Background:  The USFWS (Service) proposed to list Franklin's bumble bee as endangered on August 13, 2019 (USDI FWS 2019), and final listing decision was published on August 24th, 2021. Critical habitat has not been proposed for Franklin's bumble bee; however, High Priority Zones (HPZs) were identified. These zones contain all known historic observation locations of Franklin's bumble bee, supplemented by additional modeling of Substantial Floral Resources (SFR) and other habitat characteristics most likely to support the species within the historic range. Annual locally concentrated surveys take place in the best Franklin's bumble bee habitat in SW Oregon known to have been historically occupied (including the last known location of a Franklin's bumble bee) and these surveys have not yielded any Franklin's bumble bee detections with the last detection in 2006 on Mt Ashland, Oregon.

Franklin's bumble bee require a constant and diverse supply of flowers that bloom from spring to fall (USDI FWS 2018, p. 18), typically found in open meadows in proximity to seeps and other wet meadow environments.  Information about these habitat types is not available at the level of minute scale/detail on the corporate habitat layers the District has on hand. However, for the purposes of this analysis, the BLM employed a multipronged approach to identify potential Franklin's bumble bee habitat that may occur within the planning area. First, the BLM used a broadscale vegetation type layer (Oregon Vegetation Type Cover - GAP) as a surrogate approach to estimate potential habitat.  The wet meadow and sub-alpine meadow vegetation types were used as a reasonable surrogate for Franklin's bumble bee habitat. However, none of these vegetation types occur within the analysis area. Second, the BLM also reviewed GIS layers considering wetland presence, low canopy cover, past surveys, presence of other threatened pollinators, and past observations of Franklin's bumble bee when identifying potential habitat.  Based on this GIS review, BLM determined approximately 737 acres of potential meadow habitat occur in the planning area. All 737 acres of potential meadow habitat fall outside of HPZs. Of these 737 acres, approximately 27 acres overlap with proposed treatment areas. These 27 acres would occur in high canopy forested or young stand environments where flowering habitat is minimal, due to limited canopy openings that would allow for the growth of SFR. While some minimal floral resources may be present, these flowering plants are unlikely to sustain a colony of bees throughout its life cycle because flowering plant numbers and diversity is low. The best available evidence indicates it is unlikely that Franklin's bumble bee would be present in the planning area. If the BLM identifies any areas with SFR within proposed treatment units, the BLM will consult with the Service and apply the PDFs (see Appendix C) as appropriate to avoid any adverse impacts.

Rationale: There are no known populations of Franklin's bumble bee and no historical records of observations in the planning area. Habitat impacts are expected to be short-term in nature, with some regrowth of shrub sprouting, germination, and flowering forb growth potentially occurring in one to two years. Selected stands for hazardous fuels reduction have already been previously treated for hazardous fuels reduction and are proposed for a maintenance re-treatment, and do not include early successional habitat or open (non-forested) meadows in proximity to seeps and other wet meadow environments and would be staggered over multiple years. Proposed harvest units are not expected to be suitable habitat capable of supporting populations, and the likelihood of adverse significant impacts to Franklin's bumble bee is extremely low, therefore, it is not analyzed in further detail.

- How would ground disturbance from proposed project activities and timber harvest affect Bureau Special Status wildlife species?

Background Information: Based on BLM Manual 6840 – Special Status Species Management (USDI/BLM 2008), the BLM would address Bureau Sensitive species and their habitats in land use plans

and would implement measures to conserve these species and their habitats, to promote their conservation, and reduce the likelihood and need for these species to be listed under the Endangered Species Act (USDI/BLM 2016a, p. 830). The BLM conducts evaluations of the distribution, abundance, population trends, current threats, or habitat for Bureau Sensitive species using available information in regard to actions the BLM proposes to undertake, consistent with the BLM Special Status Species Management manual. The BLM may or may not conduct field surveys as part of these evaluations for Bureau Sensitive wildlife species (USDI/BLM 2016a, p. 831). BLM Manual 6840, and the RMP do not require project clearance surveys, habitat buffers, or seasonal restrictions for these species.

The PRMP modeled habitat availability for 66 Bureau Special Status Species. Thirty species (45 percent) would have no change in habitat availability because they are associated with special habitats (e.g., coastal dunes and oak woodlands) that would be protected under all alternatives. Habitat availability was modeled for 36 species occurring within forested habitat associations. The PRMP showed increase in habitat over current conditions for 34 species utilizing forest habitat structural stage associations of Early (Early Successional and Stand Establishment), Mid (Young), and Late (Mature and Structurally-complex). Two species (white-tailed deer and Siskiyou short-horned grasshopper) which would have a decrease in young stage habitat development do not occur in the project area.

For Riparian (Reserve) associated species, 100 percent of the species would have in increase in riparian habitat by 2063 and no change to wetland acres (USDI/BLM 2016a, p. 843; Appendix S, pp. 1667-1675). The BLM would manage naturally occurring special habitats, such as wetlands and natural ponds, to maintain their ecological function. Additionally, stream restoration would benefit pond turtle habitat. Stream restoration actions, such as log and boulder placement and fish passage improvements that are beneficial to fish habitat, would also result in short-term increases in sediment delivery to stream channels. Removal of culverts and other instream structures like blockages would cause stream channel disturbance during summer instream operation periods. The addition of structure to stream channels would create additional pools and slow-flowing, shallow areas. (USDI/BLM 2016a, p. 1971).

The Medford District manages T&E and Sensitive species following the BLM Manual 6840 guidance, including the information and status of the species in the Oregon/Washington State Director's Special Status Species List (USDI/BLM 2021a). For this project, various wildlife survey databases were reviewed for known locations of Bureau Special Status Species. For species not directly observed within the project area, the project wildlife biologist determined whether or not a species' known range extended into the project area, whether or not surveys located a species, and then whether or not a species' habitat was present within the project area, followed by whether or not treatment units contained habitat for a species and whether the treatment would have any substantial negative effects to the habitat and need to list the species under the ESA. Only those species that are known or suspected to occur on the Medford BLM District were assessed and the summarized results from this exercise are presented below in Table B 42.1. The full Oregon/Washington State list of current Bureau Special Status Species is located on the Interagency Special Status Species Program website, hosted by the Forest Service – https://www.fs.fed.us/r6/sfpnw/issssp/agency-policy/.

TABLE B 42.1.  List of the current Bureau Sensitive Species (including Federally Threatened and Endangered) and a summary of our current knowledge regarding each species within the Last Chance FMP.  See Status and Occurrence definitions below this table.

| COMMON NAME | SCIENTIFIC NAME | STATUS | PROJECT OCCURENCE | NOTES |
|---|---|---|---|---|
| **MAMMALS** | | | | |
| Gray wolf | *Canis lupus* | FE | Absent | All current gray wolf sightings in SW OR have generally been north or east of I-5, in the Cascade mountain foothills. No known occurrences in planning area. |
| Coastal Marten | *Martes caurina humboldtensis* | FT | Absent | Planning area is outside of designated coastal marten Extant Population Areas or known detections for coastal marten. No detections in project units or planning area. PDF's reduce impact to habitat (PDFs 32-38; where applicable). |
| Fisher | *Pekania pennanti* | SEN (FC) | Suspected | Planning area is outside of known distribution regionally. No verified detections in project units or planning area. PDF's reduce impact to habitat (PDFs 32-38;47 where applicable) |
| Fringed myotis | *Myotis thysanodes* | SEN | Suspected | Species known to occur across general region, no known occurrences in proposed treatment areas. PDFs for snag retention (PDFs 33-38) should minimize effects to potential roost sites. |
| Townsend's big-eared bat | *Corynorhinus townsendii* | SEN | Suspected | Species known to occur across general region, no known occurrences in proposed treatment areas. Records outside of project units in 33S-05W-22. Project would not affect primary habitat (caves and historic buildings). |
| Pallid bat | *Antrozous pallidus* | SEN | Suspected | Species known to occur across general region, no known occurrences in proposed treatment areas. PDFs for snag retention (PDFs 33-38) should minimize effects to potential roost sites. |
| **BIRDS** | | | | |
| Marbled murrelet | *Brachyramphus marmoratus* | FT | Absent | Planning area outside of known range. |

| | | | | |
|---|---|---|---|---|
| Northern Spotted Owl | *Strix occidentalis caurina* | FT | Known | Many historic sites across planning area, more details provided in NSO section issue NAID. PDFs 41-45 minimize project level impacts. |
| Bald eagle | *Haliaeetus leucocephalus* | EPA, SEN | Known | One historic territory (two nest trees) within planning area. Project Design Features (PDFs 46-47) for this species would reduce direct effects. |
| Lewis's woodpecker | *Melanerpes lewis* | SEN | Suspected | Mostly associated with oak woodland & pine habitats. Treatments would have little to no effect to primary habitat. |
| White-headed woodpecker | *Picoides albolarvatus* | SEN | Absent | Post-fire ecosystem associated / east side of cascades. Not present in project units. |
| Oregon vesper sparrow | *Pooecetes gramineus affinis* | OR-SEN | Absent | Associated with grasslands with high structural diversity for foraging and nesting. These typically include grassy areas interspersed with trees and shrubs and some bare ground. No known occurrences in planning area. Closest known site is within the Cascade Siskiyou National Monument. |
| Tricolored blackbird | *Agelaius tricolor* | OR-SEN | Unknown | Not upland forest associate and should be absent from project units. No known occurrences in planning area. |
| Purple martin | *Progne subis* | OR-SEN | Unknown | Not upland forest associate and should be absent from project units No known occurrences in planning area. |
| Grasshopper sparrow | *Ammodramus savannarum* | OR-SEN | Unknown | Not upland forest associate and should be absent from project units. No known occurrences in planning area. |
| American white pelican | *Pelecanus erythrorhynchos* | SEN | Absent | Nest on Islands in remote brackish and freshwater lakes of inland North America. Not upland forest associate and absent from project units. |
| **REPTILES & AMPHIBIANS** | | | | |

KSW01818

| Northwestern pond turtle | *Actinemys marmorata* | SEN (FP) | Present | Associated with ponds, rivers, and/or large waterbodies.  No direct impacts to aquatic habitat from project activities |
| Siskiyou mountains salamander | *Plethodon stormi* | SEN | Absent | Planning area outside of known range. |
| Black salamander | *Aneides flavipunctatus* | SEN | Absent | Planning area outside of known range. |
| Foothill yellow-legged frog | *Rana boylii* | SEN | Suspected | Could be present in larger riparian zones, but no direct impacts from project; PDFs for aquatics mitigate direct effects to this species. |
| Oregon spotted frog | *Rana pretiosa* | FT | Absent | Planning area outside of known range. East side species, closest known site is within the Cascade Siskiyou National Monument. |
| **INVERTEBRATES** | | | | |
| Vernal pool fairy shrimp | *Branchinecta lynchi* | FT | Absent | Small freshwater crustacean found in vernal pool habitat.  Planning area outside of known range. |
| Franklin's Bumble bee | *Bombus franklini* | FE | Absent | Associated with grassy coastal prairies and coast range mountain meadows, near seeps and other wet meadow environments with floral resources for nectaring flowering throughout the spring and summer. Last known sighting 2006. No known occurrences in planning area. |
| Western bumble bee | *Bombus occidentalis* | SEN | Suspected | Western bumble bees use a wide variety of natural, agricultural, urban, and rural habitat types. They are now largely confined to high-elevation sites and areas east of the Cascade Crest. No known occurrences in planning area. PDFs 291, E3 |
| Monarch butterfly | *Danaus plexippus* | SEN | Known | Summer migrant; larval foodplant is milkweed (*Asclepias* sp.), adults nectar on a variety of flowering plants. Project units should not contain primary habitat, therefore no direct impacts to this species. |

KSW01819

| Gray-blue butterfly | *Plebejus podarce klamathensis* | SEN | Absent | High elevation sub-alpine associate. No habitat in planning area. |
|---|---|---|---|---|
| Mardon skipper | *Polites mardon* | SEN | Absent | Small skipper found on prairies populated by native grasses such as Roemer's fescue (*Festuca roemeri*) and red fescue (*Festuca rubra*). Planning area outside of known range. |
| Coronis fritillary | *Speyeria coronis coronis* | SEN | Absent | Large butterfly associated with serpentine influenced, rocky hill-slopes dominated by Jeffery pine (*Pinus jeffreyi*) and other serpentine associated forbes and grasses. Project units do not contain primary habitat. No known occurrences in planning area. |
| Oregon branded skipper | *Hesperia colorado oregonia* | SEN | Absent | Small skipper associated with sparsely vegetated Garry Oak (*Quercus garryana*) and coastal sand spit ecosystems. Planning area outside of known range. |
| Johnson's hairstreak | *Callophrys johnsoni* | SEN | Suspected | Old-growth conifer mistletoe associate. No known occurrences in planning area. |
| Siskiyou short-horned grasshopper | *Chloealtis aspasma* | SEN | Suspected | Associated with forest meadows and openings, often along edges of forests and upland of wetlands. No known occurrences in planning area. |
| Oregon shoulderband | *Helminthoglypta hertleini* | SEN | Unknown | Terrestrial snail generally associated with open, grassy meadows with talus. Project should not affect primary habitat. No known occurrences in planning area. |
| Highcap lanx | *Lanx alta* | SEN | Unknown | Small freshwater clam. Inhabits spring-influenced areas of larger rivers and tributaries. No known occurrences in planning area. PDFs for aquatics should mitigate direct effects to this species if present. |

| | | | | |
|---|---|---|---|---|
| Scalloped Juga | *Juga acutifilosa* | SEN | Unknown | Medium-sized freshwater gilled snail. Closest known site is within the Cascade Siskiyou National Monument. No known occurrences in planning area. PDFs for aquatics should mitigate direct effects to this species if present. |
| Crater Lake tightcoil | *Pristiloma crateris* | SEN | Unknown | Terrestrial snail generally found in riparian areas, wet meadows, and moist forests, often among shrubs and at the bases of plants. No known occurrences in planning area. |
| Dalles hesperian | *Vespericola depressus* | SEN | Unknown | Terrestrial snail associated with moist forests.  Only 16 confirmed records in Oregon. No known occurrences in planning area. |
| Siskiyou hesperian | *Vespericola sierranus* | SEN | Unknown | Terrestrial snail associated with riparian zones, found in perennially moist habitat, including spring seeps and deep leaf litter along streambanks and under debris and rocks. Moist valley, ravine, gorge, or talus sites are preferred, near the lower portions of slopes in areas that are not subject to regular flooding. No known occurrences in planning area. |

Table B.42.1. Definitions:

*Status:*

*FT – Federally Threatened under ESA.*

*FE – Federally Endangered under ESA.*

*SEN – Bureau Sensitive Species*

*OR-SEN - Sensitive only in Oregon*

*EPA – Bald and Golden Eagle Protection Act*

*FC – Candidate for listing (nominated)*

*FP – Proposed for listing (under 12 mo. review)*

*Occurrence:*

*Absent – does not occur within the Project Area (PA).*

*Known – Species is known to occur in the PA*

*Suspected – Species has not been formally documented to occur within the PA, but reasonable potential to exist based on habitat.*

*Unknown – Insufficient information available to make precise determination.*

Under Alternative 2, for species dependent upon forested late-successional characteristics and large conifer/hardwood structure, unique stand features such as snags, large down woody material, large hardwoods, and legacy trees would be retained to maintain desired structural components and provide habitat for wildlife in treated stands (Section 3.2 and Section 3.3 of land use allocation management direction/objectives).

Up to 3,580 acres of late-successional habitat which is approximately 80 years old or older, also habitat that may function as NSO NRF which has been calculated for the project area (approximately 15.6 percent of the NSO NRF in the project area), would be removed or substantially changed by treatments that would result in downgrading/removal of habitat under the highest impact possible (alternative 2). However, occurrence of these species within the Last Chance project area would continue because there would still be up to approximately 19,339 acres retained in the project area exhibiting these late-successional characteristics, and long-term development of Riparian Reserve, and Late-Successional Reserve habitat would increase for these species as forecasted in the FEIS. Project design features and RMP management directions, such as the retention of key structural elements of legacy pine/fir trees, snags, large down woody material, large hardwoods, and untreated skip areas, or modified prescriptions would retain important features within in Late-Successional, Riparian Reserve, and Harvest Land Base treatment areas for known populations of these species, and still provide habitat in addition to untreated areas.

Under Alternative 2, no stand level structural change would occur to Riparian Reserves within the Inner Zones. For Riparian Reserve associated species, 100 percent of the species would have an increase in riparian habitat by 2063 and no change to wetland acres (USDI/BLM, p. 843; Appendix S, pp.1667-1675).

Rationale: For Bureau Sensitive species with strong wetland or riparian association (foothill yellow-legged frog, western pond turtles, Siskiyou hesperian), the Riparian Reserves/wetland throughout the project area would continue to function as habitat for these species. Long-term resilience and development of Riparian Reserve and Late-Successional Reserve habitat would increase as forecasted in the FEIS. RMP management direction, such as the retention of key structural elements would retain important features within in Late-Successional Reserve, Riparian Reserve, and Harvest Land Base treatment areas for these species, and still provide habitat in addition to untreated areas.

The Proposed Action utilizes the prescriptions parameters from the RMP land use allocation management direction and does not exceed decadal Harvest Land Base SYU harvest levels and Late-Successional Reserve decadal commercial treatment acres. Therefore, the conclusions in this EA are consistent with FEIS modeling analysis and forecasting and would not contribute to the need to list these species under the ESA as threatened or endangered. Therefore, this issue was considered but not analyzed in further detail.

- How would timber harvest, fuels reduction, and new road and landing construction affect migratory bird/landbird focal species/BLM/USFWS bird species of concern?

Background: The RMP (USDI/BLM 2016b, p. 114) stated Wildlife management objectives:

Implement conservation measures that reduce or eliminate threats to Bureau Sensitive species to minimize the likelihood of and need for the ESA listing of these species.

Conserve or create habitat for species addressed by the Migratory Bird Treaty Act and the Bald and Golden Eagle Protection Act and the ecosystems on which they depend.

Direction in the Memorandum of Understanding between the BLM and USFWS to promote the conservation of migratory birds (BLM MOU WO-230-2010-04) states that the BLM shall address the conservation of migratory bird habitat and populations when developing, amending, or revising management plans for BLM-administered lands (USDI/BLM 2016a, p. 832). All alternatives and the RMP would lead to an increase in habitat for a majority of Bureau Sensitive and landbird focal species in 50 years. Under all alternatives and the RMP, the distribution of structural stages in the decision area in 50 years would be within the range of the average historic conditions, increasing the habitat availability for many Bureau Sensitive, Bureau Strategic, and Survey and Manage species. The BLM revised the Bureau Sensitive and Bureau Strategic wildlife species considered in this analysis based on the updated State Director's Special Status Species List (July 13, 2015) (USDI/BLM 2016a, p. 830). A New State Director's Special Status Species List was published March 2019 (IM No. OR-2019-003).

Oregon-Washington Partners in Flight, the American Bird Conservancy, and the Klamath Bird Observatory have prepared a series of conservation plans for landbirds intended to inform planning efforts and habitat management actions (Altman and Alexander, 2012). The strategy for achieving functioning ecosystems for landbirds is described through the habitat requirements of focal species. By managing for a suite of species representative of important habitat attributes in functioning ecosystems, many other species and elements of biodiversity could also be conserved. Inclusion of these focal species in the analysis could help inform what the differences in effects amongst the alternatives and the RMP are for landbirds, as well as the habitat attributes and forest stages and ecosystems they represent (USDI/BLM 2016a, p. 832).

In the FEIS analysis, the BLM assumed that the structural stages used in the vegetation modeling represent habitat conditions for Bureau Sensitive and landbird focal species; this modeling is based on structural stage output from the vegetation model and using the analytical assumptions of habitat relationships described in Appendix S of the FEIS. The BLM combined the issues of habitat availability for Bureau Sensitive and landbird focal species into one issue, because the analytical procedures used were similar and the discussion of results would be similar for species with similar habitat associations. The BLM tabulated the amount of Early Successional, Stand Establishment, Young, Mature, and Structurally-complex structural stages that would be available in 50 years under the alternatives and the RMP. The BLM also generalized habitat associations for the species considered into one of seven broad categories: Early Successional or Stand Establishment habitat associate (early), Young habitat associate (mid), Mature or Structurally-complex habitat associate (late), non-forest associate (NF), oak woodland associate (oak), wetland associate (wet), and stream or near-stream associate with riparian (RR).

The RMP would lead to an increase in the development of Mature and Structurally-complex habitat through 2063, decrease of Stand Establishment (early and mid-seral) habitat from 18 percent to 1–8 percent of habitat-capable acres in 50 years, 69–73 percent of species associated with Early Successional habitats would have an increase in habitat availability, RMP would result in a decrease of Young forest habitat from 29 percent to 17 percent of habitat-capable acres in 50 years (USDI/BLM 2016a, pp. 839-840).

Under the RMP, the proportion of wildlife species that the BLM modeled as using Mature and Structurally-complex habitat would have increased availability, for at least 97 percent of the species

KSW01823

compared to the No Action Alternative, and 100 percent increased habitat for riparian associated Bureau Sensitive species. The RMP would lead to an increase in habitat in 50 years for 34 of the 66 Bureau Sensitive species for whom habitat was modeled, compared to 35 for the No Action Alternative (USDI/BLM 2016a, p. 845). An additional 45 percent (30) of Bureau Sensitive species would have no change in habitat availability, because they are associated with special habitats (e.g., coastal dunes and oak woodlands) that would be protected under all alternatives and the RMP.

The RMP would lead to an increase in habitat in 50 years for a majority (26) of the 34 landbird focal species for whom habitat was modeled, equal to the number of species in the No Action Alternative (USDI/BLM 2016a, p. 850), and twice as many as the No Timber Harvest Alternative. Of 8 species with declining or slightly declining habitat, all areas are early successional habitat groups. The purple finch, also a USFWS Birds of Conservation Concern (BCC) species would have slightly declining habitat (young high-density, mature multilayered, structurally complex) at 97 percent (USDI/BLM 2016a, Appendix S Table S-33 p.1667 and S-37 p.1691).

The BLM would manage landbird species under the Migratory Bird Treaty Act and following guidance provided by WO IB 2010-110, the Memorandum of Understanding between the BLM and USFWS to promote the conservation of migratory birds (August 31, 2010). At the project level, the BLM would implement measures to lessen take of migratory birds under the Migratory Bird Treaty Act focusing on species of concern as identified by the BLM and USFWS (USDI BLM 2016a, p. 851). USFWS BCC potentially breeding in the project area and effected by the Proposed Action include: Peregrine Falcon, Rufous Hummingbird, Allen's Hummingbird, Olive-sided Flycatcher, Willow Flycatcher (c), Horned Lark, Oregon Vesper Sparrow, and Purple Finch. None of these BCC species are closely associated with dense or closed canopy coniferous forests in the project area. One peregrine falcon site within the project area is managed with a seasonal disturbance restriction (EA, Appendix B). Commercial harvest and hazardous fuels reduction treatments would be staggered over a period of several years in multiple projects, and seasonal restrictions that were developed to minimize effects to northern spotted owls and peregrine falcon would also benefit migratory birds and minimize the amount of disturbance during their nesting season.

*Snags:* In the FEIS wildlife analysis, the effects and development of complex early successional stand development are discussed under Snags and Down Woody Material (e.g., effect to species associated with snags and down woody material in younger stands). See Appendix C of the RMP for additional details on the Forest Structural Stage Classification. Habitat for species associated with snags and down woody material in younger stands, would increase under the RMP (USDI/BLM 2016a, p. 843). Habitat for species associated with legacy structures in older stands would have an increase in habitat under the RMP (USDI/BLM 2016a, p. 844).

The RMP included snag retention and creation targets based on the desired conditions for wildlife species as interpreted from the Decayed Wood Advisor (DecAID) (Mellen-McLean *et al.*, 2012) in conjunction with estimates of the current abundance of snags and down wood from the Current Vegetation Survey inventory plots (see the Snags and Down Woody Material section of Appendix S (USDI/BLM 2016a, pp. 1663-1666 and 1972).

The BLM developed snag and down woody material creation targets by comparing the number of existing snags and down wood against desired amounts and any deficits from the desired condition was used as a creation target for silvicultural treatments (USDI/BLM 2016a, p.1663). The Last Chance project applies the RMP management direction for the retention of snags and for snag creation level (USDI/BLM 2016b, p. 63 and 73-74).

Rationale: The Proposed Action follows RMP prescriptions and snag retention management direction, therefore, long-term habitat structure supporting cavity nesting birds is expected to continue to increase for species using mature and structurally-complex habitat, and decrease for stand establishment (early and mid-seral) habitat. This is consistent with the FEIS snag analysis, and effects to bird species using snags

are not expected to exceed what was already analyzed in the FEIS. The breeding range of Bureau Sensitive cavity nesters is not expected to occur within the project area, therefore the project is not expected to contribute to listing cavity nesting birds under the ESA. Bureau Sensitive species, USFWS BCC, and bird Focal Species associated with mature and complex habitat are expected to increase, with long-term development of these habitats, while species associated with young seral forest habitat would decrease, as analyzed in the FEIS but still provide early seral habitat. Therefore, this issue was considered but not analyzed in further detail.

- How would the proposed activities affect the Pacific fisher?

Background: The fisher was proposed for federal-listing in 2019 (USDI FWS 2019b). After completing a full review of the species, including an assessment of the current population and distribution as well as a threat and long-term population viability assessment, the USFWS determined that the Northern California/Southern Oregon (NCSO) distinct population segment (DPS) of the fisher did not warrant listing under the ESA on May 15, 2020 (Federal Register 2020a). The Proposed RMP would result in an increase in total fisher habitat from 571,355 acres to 612,265 acres and denning, resting, foraging habitat from 319,503 acres to 366,541 acres on BLM-administered lands in 50 years, and exceeds the No Action reference analysis (USDI/BLM 2016a, pp. 874-875). The FEIS analysis concluded that the RMP would not reduce the fisher population below any known, critical population thresholds, the RMP would result in a slight increase in fisher populations in 50 years, and that the RMP would contribute to fisher population increases over time and would contribute to larger population increases (USDI/BLM 2016a, p. 879).

Fisher (*Pekania pennanti*) use forests with dense canopy closure and multiple canopy layers, large diameter conifers and hardwoods and snags with cavities and other deformities, and large diameter down wood with cavities. Surveys conducted by BLM and by an OSU survey team across many years have not detected fishers within the project area. There are no known or suspected natal or maternal denning sites in the project area for management (USDI/BLM 2016a, p. 117).

Rationale: The proposed project treatments would not occur near any credible observations of fisher, and there are no known den sites within the Proposed Action area. If a fisher den site is located within the Proposed Action area project specific BMPs would be implemented to mitigate any direct effects to fisher den sites and therefore it is not analyzed in further detail.

- Is the BLM required to analyze for species which are not federally listed or Bureau Sensitive species?

Background: During external scoping for this project commenters requested that the BLM not limit the project's impact analysis to federally listed or Bureau Sensitive species.

Rationale: The BLM's Special Status Species Policy in the BLM Handbook (6840) does not require pre-project surveys or analysis for species which are not threatened and endangered, candidate, or bureau sensitive species. Other Agencies produce species lists for guidance that are not Bureau Policy, but aide in meeting other regulations such as the Migratory Bird Treaty Act. For wildlife species in addition to Bureau Sensitive Species, see the Wildlife Bureau Sensitive Species/Bird Focal Species/USFWS Birds of Conservation Concern Issue addressed in that issue. Therefore, the issue is not analyzed in further detail.

- How would proposed changes in forest canopy and structure from timber harvest, fuels reduction, and roadwork activities affect woodpeckers, cavity nesters, and snags?

Background: The FEIS analysis, assumed that the structural stages used in the vegetation modeling represent habitat conditions for Bureau Sensitive species, and migratory birds, USFWS bird species of concern and landbird focal species; this modeling is based on structural stage output from the vegetation model and using the analytical assumptions of habitat relationships described in Appendix S of FEIS. The BLM combined species of concern as identified by the BLM and USFWS, and the issues of habitat

availability into one issue, because the analytical procedures used were similar and the discussion of results would be similar for species with similar habitat associations.

- How would fragmentation from timber harvest affect wildlife species and their habitat?

Background: Fragmentation for late-successional forest is a term that is used to describe the creation of smaller patches or blocks of late-successional habitat from what was previously larger contiguous landscape of late-successional habitat. Disjunct small openings within a large block of late-successional habitat create diversity of habitats but not fragmentation. Fragmentation occurs where a patch of late-successional habitat is surrounded by younger successional stage habitat and when the habitat removal and edge effects reduce interior late-successional habitat, resulting in a stand net loss of habitat.

Timber harvest, past wildfires and fire suppression, and road, landing, and gravel pit constructions throughout the planning area have fragmented forest stands. This is largely due to the mixed checkerboard ownership and intensive forest management on non-BLM land. Timber harvest on BLM-administered lands for decades, has also fragmented stands and changed the distribution and abundance of wildlife species within the analysis area. The habitat loss has negatively affected late-successional forest habitat-dependent species by reducing the size and amount of late seral stage stands. Harvest prescriptions in some stands have reduced stand complexity through intensive harvesting or reduced or modified stand components such as dying trees, large snags or coarse wood, through thinning to remove suppressed or less vigorous individuals, simplifying the stand structure. Bureau and USFWS special status species that are associated with or rely on open, early seral and younger forested conditions and edge habitat, however, have benefited from these changes due to the increased acres of young seral stands and benefit Bureau and USFWS special status species that rely on early seral and open conditions. Changes to habitat from past actions are accounted for in the NSO habitat baseline update, which was used to calculate the general current habitat conditions and late-successional habitat within the analysis area.

Private lands within the analysis area are dominated by early and mid-seral forests, agricultural, and shrub/oak lands. Most private commercial forestlands are managed as tree plantations for production of wood fiber on forest rotations, with approximately 40 to 60-year rotations. It is expected that any remaining late-seral forests on private timberlands would be converted to early-seral forest over the next one or two decades. Federal ownership within the NSO analysis area is limited at approximately 38 percent, therefore, intensive forest management practices on non-federal land is expected to have the majority of the contribution to landscape habitat loss and fragmentation from forest thinning and removal, using standard intensive forest management practices rather than ecological forestry principles. For those species dependent on early-seral habitat, private forestlands do not always provide quality habitat as competing vegetation that includes flowering plants, shrubs and hardwood trees are regularly treated to reduce competition with future harvestable trees.

Rationale: Forest fragmentation refers to a loss of forest habitat and the division of the remaining forest into smaller blocks, and the effects are species dependent. The effects of habitat loss to special status species is considered under those species which adverse effects may occur and contribute to the need to list species as threatened or endangered, or may result in incidental take of federal listed species. The proposed actions follow prescriptions and management directions as outlined in the RMP for HLB and Reserves LUA and are within the FEIS analysis and forecast for Bureau sensitive species, migratory bird, landbird focal species, and BLM/USFWS bird species of concern, and are consulted on with FWS to avoid incidental take of listed species, therefore, the issue of fragmentation to forest habitat is not considered further.

Visual Resources, Recreation, and Protected Areas

- How would the proposed treatments affect dispersed recreational activity throughout the project area, as well as unauthorized off-highway vehicle use post treatment?

KSW01826

Background: As part of the RMP, the BLM has designated portions of BLM-administered lands for recreation opportunities. Within each of these designated areas, the BLM has established recreation and visitor service objectives and identified supporting management actions and allowable uses. BLM-administered land designated for recreation opportunities are categorized into two recreation management areas: Extensive Recreation Management Areas (ERMAs) and Special Recreation Management Areas (SRMAs) (USDI/BLM 2016b, p. 259). See Issue 11 in Chapter 3 (3.8.1.1) of this EA for detailed definitions of ERMAs and SRMAs.

There are no ERMAs in the Last Chance project area, and two designated SRMAs, the Burma Pond SRMA and King Mountain Trail SRMA. The previously mentioned SRMAs were analyzed in detail in the Environmental Assessment and won't be discussed further in this section. Recreational use in the remainder of the project area is generally low and dispersed in nature, consisting primarily of hunting, dispersed camping, driving for pleasure, and exploration. The BLM does not expect that there would be any appreciable effects to recreational opportunities on the remainder of BLM-administered lands in the project area.

Forest management and associated roadwork operations have the potential to disrupt dispersed recreational activities in the following ways:

1) during harvest, noise from trucks and equipment could discourage recreational use of some areas;
2) truck and equipment noise from timber harvest and fuels treatment activity during the fall hunting seasons could scare game and cause them to leave the area proximate to treatment activity, which may negatively affect hunters' experiences by making game more difficult to locate and harvest;
3) treatments occurring adjacent to roads or trails may negatively affect the experience of those exploring the area or temporarily limit camping experiences; and
4) treatments have the potential to 'open up' land to unauthorized off-highway vehicle access.

Rationale: This issue was considered but eliminated from further detailed analysis because of the dispersed nature of the proposed treatments, and incorporation of PDFs and BMPs that would limit unauthorized OHV use post treatment. PDFs that would address potential OHV use post treatment include decommissioning of roads, blocking skid trails at end of use, covering with slash, and closing, blocking, and rehabilitating any unauthorized vehicular intrusions. PDFs that would address potential OHV use post treatment include decommissioning of roads, blocking skid trails at end of use, covering with slash, and closing, blocking, and rehabilitating any unauthorized vehicular intrusions Appendix C).

Effects to dispersed recreational activities would be low due to the dispersed nature of the proposed treatments spread widely across the project area. Only a portion of the BLM-administered lands in the project area are proposed for forest management treatments (11,686 acres) which would leave the remainder of the BLM-administered lands (32,272 acres) available for dispersed recreation. Additionally, treatments would occur in different locations over a period of three to five years, the average length of a timber sale contract. While there is the potential that some recreationists may be discouraged from recreating near treatment areas during timber harvest, there are numerous other areas that recreationists could hike, hunt, bird watch, etc. in the project area and beyond. Although some localized effects to dispersed recreation may occur as described above, it is not expected that the effects would exceed what was already analyzed in the FEIS (USDI/BLM 2016a, pp. 555-568).


- How would the proposed treatments affect Visual Resources within the project area?

Background: The 2016 SWO RMP states that scenic values on public lands are to be protected (RMP, p. 113). Visual Resource Management (VRM) is how BLM implements the management of scenic values. There are four (I-IV) VRM classes where Class I should have minimal modification to the landscape scenery while Class IV could have major modifications to the landscape scenery. The BLM lands in the

LCFMP are predominantly Class IV, with a few small blocks of Class III. The descriptions below explain the allowable levels of modification within these classes (USDI/BLM 2016b, p. 114):

- VRM Class III – manage areas for moderate levels of change to the characteristic landscape. Management activities will attract attention but will not dominate the view of the casual observer.
- VRM Class IV – management activities may dominate the view and will be the major focus of viewer attention.

There are no proposed timber harvest, fuels reduction, or associated roadwork operations on BLM-administered lands classified as VRM Class I or II. In the early planning stages, the project units were modified to exclude certain BLM-administered lands, such as SRMAs, to protect the sensitive recreation and scenic values on those lands.

A Visual Contrast Rating (VCR), a scenic value assessment, was conducted during project planning to evaluate the potential effects of the Proposed Action on BLM-administered lands. In the greater project area, there are approximately 886 acres of VRM class III and 31,385 acres of VRM class IV BLM managed lands. Of these lands, approximately 11,686 acres are proposed for forest management treatments, and are predominantly VRM Class IV. Of proposed treatment acres, 162 acres of VRM Class III are proposed for commercial harvest, and 276 acres of Class III are proposed for fuels maintenance treatments. The remainder of proposed treatments are on VRM Class IV lands. Key Observation Points including highly travelled routes such as I-5, designated trailheads, and access routes leading to SRMAs were chosen for the assessment. Lands within the SRMAs are not proposed for timber sales under this project.

Rationale: This issue was considered but eliminated from further detailed analysis because the Proposed Action would not significantly impact the scenic values of the VRM class III or IV lands within the project area. The Proposed Action would not draw attention from the casual observer due to the existing contrast of treated lands and because the project cannot be viewed from major travel corridors or communities. The project may be observed for short periods of time while travelling through the project area on logging roads. Project activities would occur on BLM lands, with many parcels adjacent to private or public lands where timber harvest has occurred in the past. Many access routes pass through previously treated lands, which is a typical and characteristic landscape in the project area. PDFs such as reclamation of skid trails and landings (Appendix C) would lessen visual contrast from project activities. Treatment prescriptions such as skips, varied prescriptions for percentage canopy cover retention, retention of larger trees, and natural resource buffers would also lessen visual contrast both short term, and long term. The project as proposed would not exceed allowable change in visual contrast and would meet all VRM objectives for both Class III and Class IV.

- How would abandoned mine lands (AML) impact the LCFMP?

Background: AML's have the potential to adversely affect the LCFMP by creating safety concerns in the form of open mine shafts and leftover hazardous materials from past mining operations. These hazards can impact the safety of the individual crew members and equipment through exposure to mining biproducts, unsteady soils resulting from subsurface workings, or physical hazards such as open mine shafts. Additionally, AML sites have the potential to be eligible for the NRHP. Cultural resources surveys conducted for this project include AML properties in their investigations. AML inventories have identified mining features within the project boundary as part of previous cultural investigations. Identified features have been mapped, and a map has been provided to timber contractors for avoidance.

Rationale: The issue was considered but not analyzed in detail because it does not address the purpose and need. Logging operations are inherently dangerous, and the presence of additional hazards has been

mitigated through PDF 24 and providing timber crews with maps of known hazards. AML sites eligible for the NRHP are addressed in Issue B9 and PDF's 17-23.

- Would there be any disproportionate, adverse impacts to environmental justice populations?

The project would take place in Jackson, Josephine, and Douglas counties. BLM IM2022-059 contains guidance for identifying environmental justice populations. Based on those criteria, all three counties are environmental justice populations because they are considered low-income. None of the three counties are considered to be minority populations. The proposed project would be expected to provide economic benefits, although the extent of these accruing to the local population is uncertain. Given the presence of these benefits, and the lack of other negative environmental impacts, low-income populations would not be disproportionately, negatively affected.

**APPENDIX C: BEST MANAGEMENT PRACTICES AND PROJECT DESIGN FEATURES**

Best Management Practices BMPs are designed to prevent and reduce nonpoint source pollution and maintain water quality at the highest practicable level to meet water quality standards and not to exceed Total Maximum Daily Level (TMDL) loads as set by Oregon Department of Environmental Quality (USDI/BLM 2016b, pp. 163-164). The BMPs would be monitored and, where necessary, modified to ensure compliance with Oregon Water Quality Standards (USDI/BLM 2016b, p. 165). A recent comprehensive evaluation of scientific literature found that BMPs based on physical principles continue to be effective in reducing non-point source pollution with the passage of time (Cristan et al., 2016).

The BMP listed below are organized by core activities (USDI/BLM 2016b, pp. 165-166). This EA uses the same list of core activities as the RMP, excluding those which are irrelevant to the analysis. The pertinent core activities are road and landing maintenance and construction, timber harvest activities, silvicultural activities, fire and fuels management, surface water sources for drinking water, recreation management, spill prevention and abatement, restoration activities, and dry forest specific BMPs. The applicable BMPs are identified by the "BMP Number" and these citations correspond to the BMP numbers listed in the tables in Appendix C of the RMP.

Project Design Features (PDFs) are an integral part of the alternatives and are considered in the analysis of project impacts. They are developed to avoid or reduce the potential for adverse impacts to resources. PDFs include seasonal restrictions on many activities that help minimize erosion and reduce disturbance to wildlife. PDFs also outline protective buffers for sensitive species, mandate the retention of snags, and delineate many measures for protecting streams and wetland features. PDFs are often site-specific applications of principles described in the BMP list. They are standard operating procedures that reflect the Management Objectives and Directions in the RMP. The PDFs listed below would be carried forward and become required specifications in timber harvest contracts. The BLM contract administrators and inspectors monitor operations to ensure that contract specifications are implemented as designed.

<u>Best Management Practices</u>

**Table C-1:** Roads and Landings

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| General Construction | | |
| R 01 | Locate temporary and permanent roads and landings on stable locations, e.g., ridge tops, stable benches, or flats, and gentle to-moderate side slopes. Minimize road construction on steep slopes (> 60 percent). | X |
| R 02 | Locate temporary and permanent road construction or improvement to minimize the number of stream crossings. | X |
| R 03 | Locate roads and landings away from wetlands, Riparian Reserve, floodplains, and waters of the State, unless there is no practicable alternative. Avoid locating landings in areas that contribute runoff to channels. | X |
| R 04 | Locate roads and landings to reduce total transportation system mileage. Renovate or improve existing roads or landings when it would cause less adverse environmental impact than new construction. Where roads traverse land in another ownership, investigate options for using those roads before constructing new roads. | X |
| R 05 | Design roads to the minimum width needed for the intended use. | X |

KSW01830

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 06 | Confine pioneer roads (i.e., clearing and grubbing of trees, stumps and boulders along a route) to the construction limits of the permanent roadway to reduce the amount of area disturbed and avoid deposition in wetlands, Riparian Reserve, floodplains, and waters of the State. Install temporary drainage, erosion, and sediment control structures, as needed to prevent sediment delivery to streams. Storm proof or close pioneer roads prior to the onset of the wet season. | X |
| R 07 | Design road cut and fill slopes with stable angles, to reduce erosion and prevent slope failure. | X |
| R 08 | End-haul material excavated during construction, renovation, or maintenance where side slopes generally exceed 60 percent and any slope where side-cast material may enter wetlands, floodplains, and waters of the State. | X |
| R 09 | Construct road fills to prevent fill failure using inorganic material, compaction, buttressing, sub-surface drainage, rock facing, or other effective means. | X |
| R 11 | Locate waste disposal areas outside wetlands, Riparian Reserve, floodplains, and unstable areas to minimize risk of sediment delivery to waters of the State. Apply surface erosion control prior to the wet season. Prevent overloading areas, which may become unstable. | X |
| R 12 | Use controlled blasting techniques to minimize loss of material on steep slopes or into wetlands, Riparian Reserve, floodplains, and waters of the State. | X |
| R 13 | Use temporary sediment control measures (e.g., check dams, silt fencing, bark bags, filter strips, and mulch) to slow runoff and contain sediment from road construction areas. Remove any accumulated sediment and the control measures when work or haul is complete. When long-term structural sediment control measures are incorporated into the final erosion control plan, remove any accumulated sediment to retain capacity of the control measure. | X |
| Permanent Stream Crossings | | |
| R 15 | Minimize fill volumes at permanent and temporary stream crossings by restricting width and height of fill to amounts needed for safe travel and adequate cover for culverts. For deep fills (generally greater than 15 feet deep), incorporate additional design criteria (e.g., rock blankets, buttressing, bioengineering techniques) to reduce the susceptibility of fill failures. | X |
| R 16 | Locate stream-crossing culverts on well-defined, unobstructed, and straight reaches of stream. Locate these crossings as close to perpendicular to the streamflow as stream allows. When structure cannot be aligned perpendicular, provide inlet and outlet structures that protect fill, and minimize bank erosion. Choose crossings that have well-defined stream channels with erosion-resistant bed and banks. | X |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 17 | On construction of a new culvert, major replacement, or fundamental change in permit status of a culvert in streams containing native migratory fish, install culverts consistent with ODFW fish passage criteria (OAR 635-412-0035 (3)), and at the natural stream grade, unless a lessor gradient is required for fish passage. On abandonment of a culvert (i.e., removal of a culvert without replacement) in streams containing native migratory fish, restore the natural stream grade, unless a lessor gradient is required for fish passage. On construction of new culverts in streams with ESA listed fish, stream crossings must also meet ARBO II (USDI/USFWS 2013) fish passage criteria and state fish passage criteria. | X |
| R 18 | Design stream crossings to minimize diversion potential if the crossing is blocked by debris during storm events. This protection could include hardening crossings, armoring fills, dipping grades, oversizing culverts, hardening inlets and outlets, and lowering the fill height. | X |
| R 19 | Design stream crossings to prevent diversion of water from streams into downgrade road ditches or down road surfaces. | X |
| R 20 | Place instream grade control structures above or below the crossing structure, if necessary, to prevent stream head cutting, culvert undermining and downstream sedimentation. Employ bioengineering measures to protect the stability of the streambed and banks. | X |
| R 21 | Prevent culvert plugging and failure in areas of active debris movement with measures such as beveled culvert inlets, flared inlets, wingwalls, over-sized culverts, trash racks, or slotted risers. | X |
| R 23 | Utilize stream diversion and isolation techniques when installing stream crossings. Evaluate the physical characteristics of the site, volume of water flowing through the project area, and the risk of erosion and sedimentation when selecting the proper techniques. | X |
| R 24 | Limit activities and access points of mechanized equipment to streambank areas or temporary platforms when installing or removing structures. Keep equipment activity in the stream channel to an absolute minimum. | X |
| R 25 | Install stream crossing structures before heavy equipment moves beyond the crossing area. | X |
| R 26 | Disconnect road runoff to the stream channel by outsloping the road approach. If outsloping is not practicable, use runoff control, erosion control and sediment containment measures. These may include using additional cross drain culverts, ditch lining, and catchment basins. Prevent or reduce ditch flow conveyance to the stream through cross drain placement above the stream crossing. | X |
| Temporary Stream Crossings for Roads and Skid Trails | | |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 27 | When installing temporary culverts, use washed rock as a backfill material. Use geotextile fabric as necessary where washed rock will spread with traffic and cannot be practicably retrieved. | X |
| R 28 | Use no-fill structures (e.g., portable mats, temporary bridges, and improved hardened crossings) for temporary stream crossings. When not practicable, design temporary stream crossings with the least amount of fill and construct with coarse material to facilitate removal upon completion. | X |
| R 29 | Remove temporary crossing structures promptly after use. Follow practices under the Closure/Decommissioning section for removing stream crossing drainage structures and reestablishing the natural drainage. | X |
| Surface Drainage | | |
| R 30 | Effectively drain the road surface by using crowning, insloping or outsloping, grade reversals (rolling dips), and waterbars or a combination of these methods. Avoid concentrated discharge onto fill slopes unless the fill slopes are stable and erosion-resistant. | X |
| R 31 | Outslope temporary and permanent low volume roads to provide surface drainage on road gradients up to 6 percent unless there is a traffic hazard from the road shape. | X |
| R 32 | Consider using broad-based drainage dips or lead-off ditches in lieu of cross drains for low volume roads. Locate these surface water drainage measures where they will not drain into wetlands, floodplains, and waters of the State. | X |
| R 33 | Avoid use of outside road berms unless designed to protect road fills from runoff. If road berms are used, breach to accommodate drainage where fill slopes are stable. | X |
| R 34 | Construct variable road grades and alignments (e.g., roll the grade and grade breaks) which limit water concentration, velocity, flow distance, and associated stream power. | X |
| R 35 | Install underdrain structures when roads cross or expose springs, seeps, or wet areas rather than allowing intercepted water to flow down gradient in ditchlines. | X |
| R 36 | Design roads crossing low-lying areas so that water does not pond on the upslope side of the road. Provide cross drains at short intervals to ensure free drainage. | X |
| R 37 | Divert road and landing runoff water away from headwalls, slide areas, high landslide hazard locations, or steep erodible fill slopes. | X |
| R 38 | Design landings to disperse surface water to vegetated stable areas. | X |
| Cross Drains | | |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 39 | Locate cross drains to prevent or minimize runoff and sediment conveyance to waters of the State. Implement sediment reduction techniques such as settling basins, brush filters, sediment fences, and check dams to prevent or minimize sediment conveyance. Locate cross drains to route ditch flow onto vegetated and undisturbed slopes. | X |
| R 40 | Space cross drain culverts at intervals enough to prevent water volume concentration and accelerated ditch erosion. At a minimum, space cross drains at intervals referred to in the BLM Road Design Handbook 9113-1 (USDI/BLM 2011), Illustration 11, 'Spacing for Drainage Lateral. Increase cross drain frequency through erodible soils, steep grades, and unstable areas. | X |
| R 41 | Choose cross drain culvert diameter and type according to predicted ditch flow, debris and bedload passage expected from the ditch. Minimum diameter is 18". | X |
| R 42 | Locate surface water drainage measures (e.g., cross drain culverts, rolling dips and water bars) where water flow will be released on convex slopes or other stable and non-erosive areas that will absorb road drainage and prevent sediment flows from reaching wetlands, floodplains, and waters of the State. Where practicable locate surface water drainage structures above road segments with steeper downhill grade. Locate cross drains at least 50 feet from the nearest stream crossing and allow for a sufficient non-compacted soil and vegetative filter. | X |
| R 43 | Armor surface drainage structures (e.g., broad based dips and lead-off ditches) to maintain functionality in areas of erosive and low-strength soils. | X |
| R 44 | Discharge cross drain culverts at ground level on non-erodible material. Install downspout structures or energy dissipaters at cross drain outlets or drivable dips where alternatives to discharging water onto loose material, erodible soils, fills, or steep slopes are not available. | X |
| R 45 | Cut protruding shotgun culverts at the fill surface or existing ground. Install downspout or energy dissipaters to prevent erosion. | X |
| R 46 | Skew cross drain culverts 45-60 degrees from the ditchline and provide pipe gradient slightly greater than ditch gradient to reduce erosion at cross drain inlet. | X |
| R 47 | Provide for unobstructed flow at culvert inlets and within ditch lines during and upon completion of road construction prior to the wet season. | X |
| Timing of In-water Work | | |
| R 48 | Conduct all nonemergency in-water work during the ODFW instream work window unless a waiver is obtained from permitting agencies. | X |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| | Avoid winter sediment and turbidity entering streams during in-water work to the extent practicable. | |
| R 49 | Remove stream crossing culverts and entire in-channel fill material during ODFW instream work period. | X |
| Low-water Ford Stream Crossings | | |
| R 50 | Harden low-water ford approaches with durable materials. Provide cross drainage on approaches. Limit ford crossings to the ODFW instream work period. | X |
| Maintaining Water Quality -Non-native Invasive Plants, including Noxious Weeds | | |
| R 53 | Locate equipment-washing sites in areas with no potential for runoff into wetlands, Riparian Reserve, floodplains, and waters of the State. Do not use solvents or detergents to clean equipment on site. | X |
| Water Source Development and Use | | |
| R 54 | Limit disturbance to vegetation and modification of streambanks when locating road approaches to in-stream water source developments. Surface these approaches with durable material. Employ erosion and runoff control measures. | X |
| R 55 | Direct pass-through flow or overflow from in-channel and any connected off-channel water developments back into the stream. | X |
| R 56 | Direct overflow from water harvesting ponds to a safe non-eroding dissipation area, and not into a stream channel. | X |
| R 57 | Limit the construction of temporary in-channel water drafting sites. Develop permanent water sources outside of stream channels and wetlands. | X |
| R 58 | Do not place pump intakes on the substrate or edges of the stream channel. When placing intakes instream, place on hard surfaces (e.g., shovel and rocks) to minimize turbidity. Use a temporary liner to create intake site. After completion of use, remove liner and restore channel to natural condition. | X |
| R 59 | Do not locate placement of road fill in the proximity of a public water supply intake (404(f) exemption criteria xi) in waters of the State. | X |
| R 60 | Avoid water withdrawals from fish-bearing streams whenever practicable. Limit water withdrawals in ESA-listed fish habitat and within 1,500 feet of ESA-listed fish habitat to 10 percent of stream flow or less at the point of withdrawal, and in non-ESA-listed fish habitat to 50 percent or less at the point of withdrawal, based on a visual assessment by a fish biologist or hydrologist. The channel must not be dewatered to the point of isolating fish. | X |
| Erosion Control Measures | | |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 61 | During roadside brushing, remove vegetation by cutting rather than uprooting. | X |
| R 63 | Apply native seed and certified weed-free mulch to cut and fill slopes, ditch lines, and waste disposal sites with the potential for sediment delivery to wetlands, Riparian Reserve, floodplains and waters of the State. If needed to promote a rapid ground cover and prevent aggressive invasive plants, use interim erosion control non-native sterile annuals before attempting to restore natives. Apply seed upon completion of construction and as early as practicable to increase germination and growth. Reseed if necessary, to accomplish erosion control. Select seed species that are fast-growing, provide ample ground cover, and have adequate soil-binding properties. Apply mulch that will stay in place and at site-specific rates to prevent erosion. | X |
| R 64 | Place sediment-trapping materials or structures such as straw bales, jute netting, or sediment basins at the base of newly constructed fill or side slopes where sediment could be transported to waters of the State. Keep materials away from culvert inlets or outlets. | X |
| R 65 | Use biotechnical stabilization and soil bioengineering techniques to control bank erosion (e.g., commercially produced matting and blankets, dead plant material, rock, and other inert structures). | X |
| R 66 | Suspend ground-disturbing activity if projected forecasted rain will saturate soils to the extent that there is potential for movement of sediment from the road to wetlands, floodplains, and waters of the State. Cover or temporarily stabilize exposed soils during work suspension. Upon completion of ground-disturbing activities, immediately stabilize fill material over stream crossing structures. Measures could include but are not limited to erosion control blankets and mats, soil binders, soil tackifiers, or placement of slash. | X |
| Road Use and Dust Abatement | | |
| R 68 | Apply water or approved road surface stabilizers/dust control additives to reduce surfacing material loss and buildup of fine sediment that can enter into wetlands, floodplains and waters of the State. Prevent entry of road surface stabilizers/dust control additives into waters of the State during application. For dust abatement, limit applications of lignin sulfonate to a maximum rate of 0.5 gal/yd2 of road surface, assuming a 50:50 (lignin sulfonate to water) solution. | X |
| Road Maintenance | | |
| R 69 | Prior to the wet season, provide effective road surface drainage maintenance. Clear ditch lines in sections where there is lowered capacity or obstructed by dry ravel, sediment wedges, small failures, or fluvial sediment deposition. Remove accumulated sediment and blockages at cross-drain inlets and outlets. Grade natural surface and aggregate roads where the surface is uneven from surface erosion or vehicle rutting. Restore crowning, outsloping or insloping for the road | X |

KSW01836

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| | type for effective runoff. Remove or provide outlets through berms on the road shoulder. After ditch cleaning prior to hauling, allow vegetation to reestablish or use sediment entrapment measures (e.g., sediment trapping blankets and silt fences). | |
| R 70 | Retain ground cover in ditch lines, except where sediment deposition or obstructions require maintenance. | X |
| R 71 | Maintain water flow conveyance, sediment filtering and ditch line integrity by limiting ditch line disturbance and groundcover destruction when machine cleaning within 200 feet of road stream crossings. | X |
| R 72 | Avoid undercutting of cut-slopes when cleaning ditch lines. | X |
| R 73 | Remove and dispose of slide material when it is obstructing road surface and ditch line drainage. Place material on stable ground outside of wetlands, Riparian Reserve, floodplains, and waters of the State. Seed with native seed and weed-free mulch. | X |
| R 74 | Do not sidecast loose ditch or surface material where it can enter wetlands, Riparian Reserve, floodplains, and waters of the State. | X |
| R 75 | Retain low-growing vegetation on cut-and fill slopes. | X |
| R 76 | Seed and mulch cleaned ditch lines and bare soils that drain directly to wetlands, floodplains, and waters of the State, with native species and weed-free mulch. | X |
| Road Stormproofing | | |
| R 77 | Inspect and maintain culvert inlets and outlets, drainage structures and ditches before and during the wet season to diminish the likelihood of plugged culverts and the possibility of washouts. | X |
| R 78 | Repair damaged culvert inlets and downspouts to maintain drainage design capacity. | X |
| R 79 | Blade and shape roads to conserve existing aggregate surface material, retain or restore the original cross section, remove berms and other irregularities that impede effective runoff or cause erosion, and ensure that surface runoff is directed into vegetated, stable areas. | X |
| R 80 | Stormproof open resource roads receiving infrequent maintenance to reduce road erosion and reduce the risk of washouts by concentrated water flows. Stormproof temporary roads if retained over winter. | X |
| R 81 | Suspend stormproofing/decommissioning operations and cover or otherwise temporarily stabilize all exposed soil if conditions develop that cause a potential for sediment-laden runoff to enter a wetland, floodplain, or waters of the State. Resume operations when conditions allow turbidity standards to be met. | X |
| Road Closure and Decommissioning | | |
| R 83 | Decommission temporary roads upon completion of use. | X |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 84 | Prevent use of vehicular traffic utilizing methods such as gates, guard rails, earth/log barricades, to reduce or eliminate erosion and sedimentation due to traffic on roads. | X |
| R 85 | Convert existing drainage structures such as ditches and cross drain culverts to a long-term maintenance free drainage configuration such as an outsloped road surface and waterbars. | X |
| R 86 | Place and remove temporary stream crossings during the dry season, without overwintering, unless designed to accommodate a 100-year flood event. See also R 49. | X |
| R 87 | Place excavated material from removed stream crossings on stable ground outside of wetlands, Riparian Reserve, floodplains, and waters of the State. In some cases, the material could be used for recontouring old road cuts or be spread across roadbed and treated to prevent erosion. | X |
| R 88 | Reestablish stream crossings to the natural stream gradient. Excavate sideslopes back to the natural bank profile. Reestablish natural channel width and floodplain. | X |
| R 89 | Install cross ditches or waterbars upslope from stream crossing to direct runoff and potential sediment to the hillslope rather than deliver it to the stream. | X |
| R 90 | Following culvert removal and prior to the wet season, apply erosion control and sediment trapping measures (e.g., seeding, mulching, straw bales, jute netting, and native vegetative cuttings) where sediment can be delivered into wetlands, Riparian Reserve, floodplains, and waters of the State. | X |
| R 91 | Implement tillage measures, including ripping or subsoiling to an effective depth. Treat compacted areas including the roadbed, landings, construction areas, and spoils sites. | X |
| Wet-season Road Use | | |
| R 93 | On active haul roads, during the wet season, use durable rock surfacing and sufficient rock depth to resist rutting or development of sediment on road surfaces that drain directly to wetlands, floodplains, and waters of the State. | X |
| R 94 | Prior to winter hauling activities, implement structural road treatments such as: increasing the frequency of cross drains, installing sediment barriers or catch basins, applying gravel lifts or asphalt road surfacing at stream crossing approaches, and armoring ditch lines. | X |
| R 95 | Remove snow on surfaced roads in a manner that will protect the road and adjacent resources. Retain a minimum layer (4") of compacted snow on the road surface. Provide drainage through the snowbank at periodic intervals to allow snowmelt to drain off the road surface. | X |

| BMP Number | Best Management Practice | Applicable to this Project? |
|---|---|---|
| R 96 | Avoid removing snow from unsurfaced roads where runoff drains to waters of the State. | X |
| R 97 | Maintain road surface by applying appropriate gradation of aggregate and suitable particle hardness to protect road surfaces from rutting and erosion under active haul where runoff drains to wetlands, Riparian Reserve, floodplains, and waters of the State. | X |
| R 99 | Install temporary culverts and washed rock on top of low-water ford to reduce vehicle contact with water during active haul. Remove culverts promptly after use. | X |

**Table C-2:** Timber Harvest Activities

| BMP Number | Best Management Practice | Applicable to this Project |
|---|---|---|
| Cable Yarding | | |
| TH 01 | Design yarding corridors crossing streams to limit the number of such corridors, using narrow widths, and using the most perpendicular orientation to the stream feasible. Minimize yarding corridor widths and space corridors as far apart as is practicable given physical and operational limitations, through practices such as setting limitations on corridor width, corridor spacing, or the number of corridors in an area. For example, such practices could include, as effective and practicable: -setting yarding corridors at 12±15 foot maximum widths, and -setting corridor spacing where they cross the streams to no less than 100 feet apart when physical, topography, or operational constraints demand, with an overall desire to keep an average spacing of 200 feet apart. | X |
| TH 02 | Directionally fall trees to lead for skidding and skyline yarding to minimize ground disturbance when moving logs to skid trails and skyline corridors. | X |
| TH 03 | Require full suspension overflowing streams, non-flowing streams with highly erodible bed and banks, and jurisdictional wetlands. | X |
| TH 04 | When logging downhill into Riparian Reserve, design the logging system to prevent converging yarding trails from intersecting the stream network. | X |
| TH 05 | Prevent stream banks and hillslope disturbance on steep slopes (generally > 60 percent) by requiring full suspension within 50 feet of definable stream channels. Yard the remaining areas across the Riparian Reserve using at least one-end suspension. | X |
| TH 06 | Implement erosion control measures such as waterbars, slash placement, and seeding in cable yarding corridors where the potential for erosion and delivery to waterbodies, floodplains, and wetlands exists. | X |

| BMP Number | Best Management Practice | Applicable to this Project |
|---|---|---|
| Ground-based Harvesting | | |
| TH 07 | Exclude ground-based equipment on hydric soils, defined by the Natural Resources Conservation Service. | X |
| TH 08 | Limit designated skid trails for thinning or VRH to ≤ 15 percent of the harvest unit area to reduce displacement or compaction to acceptable limits. | X |
| TH 09 | Limit width of skid roads to single width or what is operationally necessary for the approved equipment. Where multiple machines are used, provide a minimum-sized pullout for passing. | X |
| TH 10 | Ensure leading end of logs is suspended when skidding. | X |
| TH 11 | Restrict non-road, in unit, ground-based equipment used for harvesting operations to periods of low soil moisture (dry conditions); generally, from May 15th to October 15th. Low soil moisture varies by texture and is based on site-specific considerations. Low soil moisture limits will be determined by qualified specialists to determine an estimated soil moisture and soil texture. | X |
| TH 12 | Incorporate existing skid trails and landings as a priority over creating new trails and landings where feasible, into a designated trail network for ground-based harvesting equipment, consider proper spacing, skid trail direction and location relative to terrain and stream channel features. | X |
| TH 13 | Limit non-specialized skidders or tracked equipment to slopes less than 35 percent, except when using previously constructed trails or accessing isolated ground-based harvest areas requiring short trails over steeper pitches. | X |
| TH 15 | Designate skid trails in locations that channel water from the trail surface away from waterbodies, floodplains, and wetlands, or unstable areas adjacent to them. | X |
| TH 16 | Apply erosion control measures to skid trails and other disturbed areas with potential for erosion and subsequent sediment delivery to waterbodies, floodplains, or wetlands. These practices may include seeding, mulching, water barring, tillage, and woody debris placement. | X |
| TH 17 | Construct waterbars on skid trails using guidelines in Table C-6 where potential for soil erosion or delivery to waterbodies, floodplains, or wetlands exists. | X |
| TH 18 | Subsoil skid trails, landings, or temporary routes where needed to achieve no more than 20 percent detrimental soil conditions, and minimize surface runoff, improve soil structure, and water movement through the roadbed. | X |
| TH 19 | Block skid trails to prevent public motorized vehicle and other unauthorized use at the end of seasonal use. | X |

| BMP Number | Best Management Practice | Applicable to this Project |
|---|---|---|
| TH 20 | Allow harvesting operations (cutting and transporting logs) when ground is frozen or adequate snow cover exists to prevent soil compaction and displacement. | X |
| TH 21 | Minimize the area where more than half of the depth of the organically enriched upper horizon (topsoil) is removed when conducting forest management operations. | X |
| TH 22 | Maintain at least the minimum percent of effective ground cover needed to control surface erosion, as shown in Table B-3, following forest management operations. Ground cover may be provided by vegetation, slash, duff, medium to large gravels, cobbles, or biological crusts. | X |
| Helicopter | | |
| TH 23 | Consider the use of helicopter or aerial logging systems to prevent water quality impacts from road construction or ground-based timber yarding, where other BMPs would be more costly or have limited effectiveness. | X |
| Horse | | |
| TH 24 | Within Riparian Reserve, limit horse logging to slopes less than 20 percent. | X |
| TH 25 | Construct waterbars on horse skid trails when there is potential for soil erosion and delivery to waterbodies, floodplains, and wetlands. | X |

**Table C-3:** Soil cover based on erosion hazard ratings (Table C-3 from RMP)

| NRCS Erosion Hazard Rating* | Minimum Percent Effective Ground Cover - Year 1 | Minimum Percent Effective Ground Cover - Year 1 |
|---|---|---|
| Very Severe | 60% | 75% |
| Severe | 45% | 60% |
| Moderate | 30% | 40% |
| Slight | 20% | 30% |

* Rating obtained from Natural Resources Conservation Services County Soil Survey information by map unit.

**Table C-4:** Silvicultural Activities

| BMP Number | Best Management Practice | Applicable to this Project |
|---|---|---|
| Planting and Pre-commercial thinning | | |
| S 01 | Limit the crossing of stream channels with motorized support vehicles (e.g., OHVs) and mechanized equipment to existing road crossings or | X |

| BMP Number | Best Management Practice | Applicable to this Project |
|---|---|---|
|  | temporary ford crossings to the ODFW instream work period, unless a waiver is obtained from permitting agencies. |  |
| S 02 | Scatter treatment debris on disturbed soils and water bar any equipment access trails that could erode and deposit sediment in waterbodies, floodplains, and wetlands. | X |

**Table C-5:** Fire and Fuels Management

| BMP Number | Best Management Practices | Applicable to this Project |
|---|---|---|
| Underburn, Jackpot Burn, and Broadcast Burn | | |
| F 01 | Locate fire lines so that open meadows associated with streams do not burn, unless prescribed for restoration. | X |
| F 02 | Reduce fuel loads by whole tree yarding, and piling material, as necessary, prior to under burning in dry forest types where fuel loads are elevated. | X |
| F 03 | Avoid burning of large woody material that is touching the high-water mark of a waterbody or that may be affected by high flows. | X |
| F 04 | Avoid delivery of chemical retardant foam or additives to waterbodies, and wetlands. Store and dispose of ignition devices/materials (e.g. flares and plastic spheres) outside Riparian Reserve or a minimum of 150 feet from waterbodies, floodplains, and wetlands. Maintain and refuel equipment (e.g., drip torches and chainsaws) a minimum of 100 feet from waterbodies, floodplains, and wetlands. Portable pumps can be refueled on-site within a spill containment system. | X |
| F 05 | Limit fire lines inside Riparian Reserve. Construct fire lines by hand on all slopes greater than 35 percent and inside the Riparian Reserve inner zone. Use erosion control techniques such as tilling, waterbarring, or debris placement on fire lines when there is potential for soil erosion and delivery to waterbodies, floodplains, and wetlands. Space the waterbars as shown in Table C-6. Avoid placement of fire lines where water would be directed into waterbodies, floodplains, wetlands, headwalls, or areas of instability. | X |
| F 06 | In broadcast burning, consume only the upper horizon organic materials and allow no more than 15 percent of the burned area mineral soil surface to change to a reddish color. | X |
| Pile and Burn | | |
| F 07 | Avoid burning piles within 35 feet of a stream channel. | X |
| F 08 | Avoid creating piles greater than 16 feet in height or diameter. Pile smaller diameter materials and leave pieces >12" diameter within the | X |

| BMP Number | Best Management Practices | Applicable to this Project |
|---|---|---|
| | unit. Reduce burn time and smoldering of piles by extinguishment with water and tool use. | |
| F 09 | When burning machine-constructed piles, preferably locate and consume organic materials on landings or roads. If piles are within harvested units and more than 15 percent of the burned area mineral soil (the portion beneath the pile) surface changes to a reddish color, then consider that amount of area towards the 20 percent detrimental soil disturbance limit. | X |
| F 10 | Do not operate ground-based machinery for fuels reduction within 50 feet of streams (slope distance), except where machinery is on improved roads, designated stream crossings, or where equipment entry into the 50-foot zone would not increase the potential for sediment delivery into the stream.

Do not operate ground-based machinery for fuels reduction on slopes > 35 percent. Mechanical equipment with tracks may be used on short pitch slopes of greater than 35 percent but less than 45 percent when necessary to access benches of lower gradient (length determined on a site-specific basis, generally less than 50 feet (slope distance)). | X |
| F 11 | Use temporary stream crossings if necessary to access the opposite side with any equipment or vehicles (including OHVs). Follow Temporary Stream Crossing practices under Roads section. | X |
| F 12 | Place residual slash on severely burned areas, where there is potential for sediment delivery into waterbodies, floodplains, and wetlands. | X |

**Table C-6:** Water bar spacing by gradient and erosion class (Table C-6 from RMP)

| Gradient (Percent) | Water Bar Spacing By Erosion Class | | |
|---|---|---|---|
| | High (Feet) | Moderate (Feet) | Low (Feet) |
| 2-5% | 200 | 300 | 400 |
| 6-10% | 150 | 200 | 300 |
| 11-15% | 100 | 150 | 200 |
| 16-20% | 75 | 100 | 150 |
| 21-35% | 50 | 75 | 100 |
| 36+% | 50 | 50 | 50 |

See page 191 of the RMP for further detail.

KSW01843

**Table C-7:** Spill Prevention and Abatement

| BMP Number | Best Management Practices | Applicable to this Project |
|---|---|---|
| Operations Near Waterbodies | | |
| SP 01 | Take precautions to prevent leaks or spills of petroleum products (e.g., fuel, motor oil, and hydraulic fluid) entering the waters of the State. | X |
| SP 02 | Take immediate action to stop and contain leaks or spills of chemicals and contain leaks or spills of chemicals and other petroleum products. Notify the Oregon Emergency Response System, through the District Hazard Materials specialist, of any spill that enters the waters of the State. | X |
| SP 03 | Inspect and clean heavy equipment as necessary prior to moving on to the project site, to remove oil and grease, non-native invasive plants, including noxious weeds, and excessive soil.<br><br>Inspect hydraulic fluid and fuel lines on heavy-mechanized equipment for proper working condition.<br><br>Where practicable, maintain and refuel heavy equipment a minimum of 150 feet away from streams and other waterbodies.<br><br>Refuel small equipment (e.g. chainsaws and water pumps) at least 100 feet from waterbodies (or as far as practicable from the waterbody where local site conditions do not allow a 100-foot setback) to prevent direct delivery of contaminants into a waterbody. Refuel small equipment from no more than 5-gallon containers. Use absorbent material or a containment system to prevent spills when re-fueling small equipment within the stream margins or near the edge of waterbodies.<br><br>In the event of a spill or release, take all reasonable and safe actions to contain the materials. Specific actions are dependent on the nature of the material spilled.<br><br>Use spill containment booms or as required by ODEQ. Have access to booms and other absorbent containment materials.<br><br>Immediately remove waste or spilled hazardous materials (including but not limited to diesel, oil, hydraulic fluid) and contaminated soils near any stream or other waterbody and dispose of it/them in accordance with the applicable regulatory standard. Notify Oregon Emergency Response | X |

| BMP Number | Best Management Practices | Applicable to this Project |
|---|---|---|
| | System of any spill over the material reportable quantities, and any spill not totally cleaned up after 24 hours.<br><br>Store equipment containing reportable quantities of toxic fluids outside of Riparian Reserve. | |
| Spill Abatement | | |
| SP 05 | Spill Prevention, Control, and Countermeasure Plan (SPCC): All operators shall develop a modified SPCC plan prior to initiating project work if there is a potential risk of chemical or petroleum spills near waterbodies. The SPCC plan will include the appropriate containers and design of the material transfer locations. No interim fuel depot or storage location other than a manned transport vehicle would be used. | X |
| SP 06 | Spill Containment Kit (SCK): All operators shall have a SCK as described in the SPCC plan on-site during any operation with potential for run-off to adjacent waterbodies. The SCK will be appropriate in size and type for the oil or hazardous material carried by the operator. | X |
| SP 07 | Operators shall be responsible for the clean-up, removal, and proper disposal of contaminated materials from the site. | X |

**Table C-8:** Instream Restoration Activities

| BMP Numbers | Best Management Practices | Applicable to this Project |
|---|---|---|
| RST 01 | Confine work in the stream channel to the ODFW instream work period unless a waiver is obtained from permitting agencies. | X |
| RST 02 | Do not drive heavy equipment in flowing channels and floodplains instream channels that are sensitive to disturbance (e.g., meadow streams). | X |
| RST 03 | In well-armored channels that are resistant to damage (e.g., bedrock, small boulder, and cobble-dominated), consider conducting most of the heavy-equipment work from within the channel, during low streamflow, to minimize damage to sensitive riparian areas. | X |
| RST 04 | Design access routes for individual work sites to reduce exposure of bare soil and extensive stream bank shaping. | X |
| RST 05 | Limit the number and length of equipment access points through Riparian Reserve. | X |
| RST 06 | Limit the amount of stream bank excavation to the minimum necessary to ensure stability of enhancement structures. Provide isolation from flowing water during excavation. Place excavated material above the | X |

| BMP Numbers | Best Management Practices | Applicable to this Project |
|---|---|---|
| | flood-prone area and cover or place a berm to avoid its reentry into the stream during high-flow events. | |
| RST 07 | Inspect all mechanized equipment daily for leaks and clean as necessary to ensure that toxic materials, such as fuel and hydraulic fluid, so not enter the stream. | X |
| RST 08 | Locate equipment storage areas at least 100 feet from any water feature, including machinery used in stream channels for more than one day. | X |
| RST 09 | When using heavy equipment in or adjacent to stream channels during restoration activities, develop and implement an approved spill containment plan that includes having a spill containment kit on-site and at previously identified containment locations. | X |
| RST 10 | Refuel equipment, including chainsaws and other hand power tools, at least 100 feet from waterbodies (or as far as practicable from the waterbody where local site conditions do not allow a 100-foot setback) to prevent direct delivery of contaminants into a waterbody. | X |
| RST 11 | Use waterbars, barricades, seeding, and mulching to stabilize bare soil areas along project access routes prior to the wet season. | X |
| RST 12 | Prior to the wet season, stabilize disturbed areas where soil will support seed growth, with the potential for sediment delivery to wetlands, and waters of the State. Apply native seed and certified weed-free mulch or erosion control matting in steep or highly erosive areas. | X |
| RST 13 | When replacing culverts, design placement location, crossing type, and installation depth to avoid excessive scour through the site, consider using larger culverts and embedding the culvert to 30 percent bedload. Use bridges on high-gradient stream channels. | X |
| RST 14 | Rehabilitate headcuts and gullies. Use large wood in preference to rock weirs. | X |
| RST 15 | Implement measures to control turbidity. Measures may include installation of turbidity control structures (e.g., isolation, diversion, and silt curtains) immediately downstream of in-stream restoration work areas. Remove these structures following completion of turbidity-generating activities. | X |

**Table C-9:** Dry Forest-Specific Activities That May Affect TPCC Soil Categories of Concern

| BMP Numbers | Best Management Practices that apply to Fragile Non-suitable (FN) and would be applied on a site-specific basis to Fragile Restricted (FR) soils with the same fragile designation. | Applicable to this Project |
|---|---|---|
| DF 01 | Use full log suspension whenever practical on TPCC soils identified as prone to surface erosion (FE) or FM* in Table C-13 (USDI/BLM 2016b p. 205). Use one-end suspension on these soils if full suspension is not | X |

| BMP Numbers | Best Management Practices that apply to Fragile Non-suitable (FN) and would be applied on a site-specific basis to Fragile Restricted (FR) soils with the same fragile designation. | Applicable to this Project |
|---|---|---|
| | practical. Restrict yarding to the dry season, generally from June to end of September. Suspend the leading end over TPCC soils identified as prone to mass movement (FP). Restrict yarding to the dry season. | |
| DF 02 | Limit non-specialized ground-based yarding equipment to slopes less than 20% on TPCC soils identified as category FE or FP, where soils average greater than 20% clay in the top 6" of soil. Avoid tilling on TPCC soils identified as category FE (when moisture is excessive) or FP unless adequate ground cover is present to arrest potential erosion. | X |
| DF 03 | Avoid mechanical piling to limit severe surface disturbance and displacement on TPCC soils identified as FE or FP). | X |
| DF 04 | Implement prescribed burning on FE and FP soils when fuel moisture contents would result in 'cool burns.' Post-burn surface soil characteristics may include litter that is consumed and duff that is deeply charred or consumed or organic matter that is partially charred to a depth of >1 cm but mineral soil is not visibly altered. | X |
| *Note - The old designation for FE was FM and FM was used in the RMP in table C-13 and C-14 (USDI/BLM 2016b). This table has been modified from the RMP for clarity.* | | |

Project Design Features

**Table C-10:** Harvest Operation Project Design Features

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 1 | To caution forest road users of potential hauling and operational activities, warning signs would be placed where appropriate to satisfy Oregon Safety and Health Administration (OSHA) standards. The proper use and maintenance of the signs will be monitored using Oregon OSHA regulations. | X |

**Table C-11:** Botanical Project Design Features

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| Preventing the Introduction and Spread of Non-native Invasive Plants | | |
| PDF 2 | Equipment and vehicles that leave established road surfaces will be cleaned of soil, seeds, vegetative matter, and other debris that could contain noxious weed seeds prior to entering BLM administered lands. If work occurs in an area known to contain priority non-native invasive | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | plants, equipment shall be cleaned before moving to another project area. Areas appropriate for cleaning equipment prior to leaving the project area will be designated as appropriate. Cleaning may be accomplished by using a pressure hose. | |
| PDF 3 | Ensure that there will be no parking of vehicles or mechanical equipment where high priority non-native invasive plant infestations are known to occur that have not been effectively treated prior to disturbance. Equipment, vehicles, and personnel will avoid working within flagged non-native invasive plant sites. Orange flagging labeled in black with "NOXIOUS WEEDS" will be used to delineate avoidance boundaries. | X |
| PDF 4 | Native seed and certified weed-free straw, prescribed by the project botanist, would be used for post-treatment restoration where project activities such as decommissioning and other such activities result in bare soil. Ensure hay, straw, and mulch are certified as free of prohibited noxious vegetative parts or seeds, per 75 FR 159:51102. Straw or hay must be obtained from the BLM or purchased from growers certified by the Oregon Department of Agriculture's Weed Free Forage and Mulch Program. Seeding would occur from September 1 to March 31. | X |
| PDF 5 | All material, including rock and gravel, utilized in the building, reconstruction, or maintenance of roads (temp, permanent, etc.) should be sourced from Oregon Department of Agriculture approved rock sources or from a BLM approved site that has been inspected and approved by a BLM botanist. | X |
| PDF 6 | Identification and/or treatment and/or mitigation of A, B and C list noxious weeds is required prior to implementation. Project areas are subject to monitoring for a minimum of 3 years post implementation and new occurrences or spread of weed populations identified during or post implementation will require treatment. | |
| PDF 7 | Quarries must be inspected for noxious weeds and approved prior to use. Quarry inspections will be completed by a qualified botanist and documented with a quarry inspection form. If a quarry has noxious weed issues the project botanist will determine mitigation options. Noxious weeds may be mitigated by either 1) pre-disturbance treatment, 2) removal of overburden and infested gravel and use of only clean weed-free rock (removal depth typically 6"), 3) partial use of a quarry to include only clean weed, free rock, 4) use of infested gravel where an equal or greater infestation is already present, or 5) If no other options are viable, infested rock may be used but should be recorded for follow-up monitoring and treatment. | X |
| PDF 8 | Sites treated with herbicides will be signed and flagged to increase public awareness and safety. At the discretion of Field Managers, flagging may be restricted in remote locations where public access is | |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | unlikely, within special management areas, or where there are resource concerns. These exceptions would be noted in Annual Treatment Plans. | |
| Threatened, Endangered & Bureau Sensitive species | | |
| PDF 9 | Surveys for bureau sensitive species must be completed prior to implementation of any ground disturbing activity. Any populations located during survey will be flagged for avoidance and buffered according to proposed activity as described on p. B-14 through B-17. Yellow and black striped flagging will delineate plant site boundaries and orange and black "plant buffer" flagging will delineate plant site buffers. | |
| PDF 10 | For timber harvest activities, no project activities will occur within populations of bureau sensitive botanical species. Yellow and black stripe flagging will delineate no activity avoidance zones. Populations of sensitive botanical species will be buffered by 100 feet and with orange and black "Plant Buffer" flagging. Tree falling and shrub removal may occur within the buffer for species and locations outlined in the EA p. B-14 through B-16 only. Ground disturbance within plant sites and plant site buffers is prohibited, except where disclosed in the above EA p. B-14 through B-17. | X |
| PDF 11 | Fuels treatments (hand thinning, pile, and slash scatter only) may occur within the 100-foot buffer for bureau sensitive species populations at the discretion of the project botanist, within a seasonal restriction that project activities must occur during the dormant season (November 1 – March 1) and trees must be directionally felled away from the plant population marked by yellow and black striped flagging. | X |
| PDF 12 | Do not locate anchor trees within plant sites. Plant Sites will be marked with yellow and black striped flagging. | X |
| PDF 13 | Do not burn landing slash within 100 feet of plant sites. Plant Sites will be marked with yellow and black striped flagging. | X |
| PDF 14 | Construct new landings at least 100 feet from plant sites or at a distance approved by the project botanist. Plant sites will be marked with yellow and black striped flagging. Permit use of previously existing landings. | X |
| PDF 15 | No new road construction, corridors, truck turnarounds, or staging areas may occur within 100-foot plant site buffers except in the 2 locations outlined in the EA pp. B-16 and B-17. Permit use of existing roads and route renovation on existing road beds only within existing plant sites and buffers. | X |
| PDF 16 | Broadcast burning or under burning may occur within plant populations and buffer zones as approved by the project botanist and is restricted to the dormant season (November 1 – March 1). | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 17 | Trees would be directionally felled away from all no disturbance buffers marked with yellow and black striped flagging. | X |
| PDF 18 | The use of heavy equipment is not permitted within plant site buffers without prior review and approval by the project botanist. Heavy equipment includes tractors, dozers, loaders, graders, excavators, cranes, skid steers, and similar equipment. Pick-up trucks, ATVs, UTVs, and similar soft-wheeled vehicles may be permitted within a plant site buffer on a limited basis in dry conditions in the dormant season, if authorized by the project botanist. Waivers for heavy equipment operation within plant site buffers will not exceed a total of 5% of the buffer acreage within the entire project area over the lifetime of the project and waivers must be justified to ensure no impact to existing bureau sensitive species populations. | X |

**Table C-12:** Cultural Resources

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| Newly Identified Sites | | |
| PDF 17 | If cultural resources are discovered during project implementation, the project would be redesigned to protect the cultural resource values present, or evaluation or mitigation procedures would be implemented based on recommendations from the Resource Area Archaeologist with input from federally recognized Tribes, approval from the Field Manager, and concurrence from the SHPO. | X |
| Inadvertent Discoveries | | |
| PDF 18 | If previously unidentified cultural resources are discovered during project implementation, work will be halted in the immediately vicinity of the find, and the resource area archaeologist will determine the appropriate course of action which may include: evaluation of the resource for NRHP eligibility (if not eligible, work may proceed); project redesign to avoid impacts; and/or development of mitigation measures in consultation with the SHPO and Native American tribes. | X |
| Mining Ditch Crossings | | |
| PDF 19 | Direct ground disturbance of linear features/mining ditches should be avoided if possible though use of logging systems which utilize overhead suspension cable systems and directional felling of trees away from features. | X |
| PDF 20 | If full suspension cannot be achieved, the timber sale administrator and/or operator should work with archaeologist to identify appropriate location for crossing based on limiting damage to resource. If ditch must | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | be crossed, the operator must fill the mining ditch with logs at the location of yarding corridors. The logs must fill the ditch to ensure that yarding only disturbs the top of the ditch, and all logs must be removed upon completion of yarding, as well as any soil that has been displaced. The ditch should be re-contoured. | |
| PDF 21 | If ground-based machinery must cross a mining ditch, the skid trail should be constructed perpendicular to the ditch. The mining ditch should be filled with logs enough to support the entire length of the machinery. All logs shall be removed following completion of yarding, as well as any soil that was disturbed, and the ditch should be re-contoured. | X |
| Archaeological Avoidance Areas | | |
| PDF 22 | No equipment shall operate the areas flagged for avoidance with orange and black striped flagging within the proposed units. Trees shall be felled away from the flagged avoidance areas. No trees shall be yarded across the flagged avoidance areas. No ground disturbing activities shall take place within the flagged avoidance areas. | X |
| Helicopter Logging Within Mining Sites | | |
| PDF 23 | No heavy equipment shall operate within designated historic mines. All trees shall be cut manually and yarded via full-suspension with a helicopter. | X |
| Abandoned Mine Lands | | |
| PDF 24 | Whenever possible avoid mapped AML features. If unmapped AML features are noted during logging operations, proceed with caution. Avoid moving heavy equipment over open or closed mine shafts and adits. Brief crews on the hazards of open mine shafts and leftover mining materials | X |

**Table C-13:** Terrestrial Wildlife Species

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 32 | Implement conservation measures to mitigate specific threats to Bureau Sensitive and T&E species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions. Conservation measures would be determined based on species, proposed treatment, site-specific environmental conditions, and available management recommendations. (USDI BLM 2016b p. 115) | Apply to any wildlife species as needed |
| PDF 34 | Maintain existing snags (all snags >20 inches DBH; and snags 6-20 inches DBH in decay classes III, IV, V) except those that need to be | All Operations |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | felled for safety reasons or fuels reduction reasons or for logging systems (e.g., skyline corridors). Snags felled for safety reasons would be left on site unless they would also pose a safety hazard as down woody material. | |
| PDF 35 | Retain existing large down woody material in the stands. (>20 inches diameter at the large end and >20 ft length, and 6-20 inches diameter at the large end and >20 ft length in decay classes III, IV, V). | All Operations |
| PDF 36 | Create two snags per acre (1 snag >20 inches DBH and 1 snag >10 inches DBH) in LSR and Riparian Reserve treatment areas. | LSR / RR treatments |
| PDF 38 | Locate skid trails to minimize disturbance to down woody material. Where skid trails encounter large down woody material, a section would be bucked out for equipment access. The remainder would be left in place and would not be disturbed. Snags and down wood in landings would be moved adjacent to the landing. | All Operations |
| PDF 39 | Protect any bureau sensitive species raptor nests or centers of activity as necessary to maintain the integrity of the site. Activities that produce noise above ambient levels that may disturb or interfere with nesting would be prohibited within one-quarter mile of active nesting areas between approximately March 1 and July 15. | As needed |
| PDF 40 | Protect the core area within one-half mile of active peregrine nest sites. No scheduled timber harvest or new road construction would occur within one-half mile of active peregrine nest sites between approximately January 1 and July 15 unless the activity would not adversely affect the integrity of the site. | No Known Peregrine Sites in Planning Area |
| PDF 41 | Any of the following measures may be waived in a particular year if nesting or reproductive success surveys conducted according to the USFWS survey guidelines reveal that NSOs are non-nesting or that no young are present that year. Waivers are valid only until March 1 of the following year. Previously known well-established sites/activity centers are assumed occupied unless protocol surveys indicate otherwise. | All Operations |
| PDF 42 | Activities (such as tree felling, yarding, temporary route construction and re-construction, hauling on roads not generally used by the public, prescribed fire, and muffled blasting) that produce loud noises above ambient levels would not occur within specified distances (Table B-15) of any documented owl site or unsurveyed nesting-roosting and foraging (NRF) habitat between March 1 and July 15 (or until two weeks after the fledging period, typically up to August 31) – unless protocol surveys have determined the activity center or habitat to be not occupied, non-nesting, or failed in their nesting attempt. The distances may be shortened if significant topographical breaks or blast blankets (or other devices) muffle sound traveling between the work location and nest sites.

This PDF is applicable to all NRF units for all treatment types, including timber harvest, fuels reduction, ROW and landing construction. Spot check surveys for NSO in all NRF units must be completed to protocol | All Operations |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | (USDI FWS 2012) each breeding season prior to having restrictions lifted for that year. | |
| PDF 43 | The action agency has the option to extend the restricted season until September 30 during the year of harvest, based on site-specific knowledge (such as a late or recycle nesting attempt) if the project would cause a nesting NSO to flush (See Table B-15) for disturbance distance. | All Operations |
| PDF 44 | The buffer distance (Table B-15) to the prescribed area may be modified by the action agency biologist using topographic features or other site-specific information. Buffer distance for prescribed fire may be reduced if substantial smoke from prescribed fire would not enter the nest stand March 1 – July 15. The restricted area is calculated as a radius from the assumed nest site (tree). | All Operations |
| PDF 45 | Do not authorize timber sales that would cause the incidental take of NSO territorial pairs or resident singles from timber harvest until implementation of a barred owl management program consistent with the assumptions contained in the Biological Opinion on the RMP has begun. | All Operations |
| PDF 46 | Seasonal restrictions would be implemented for any HFR treatments proposed to occur in NRF habitat, where habitat evaluations and spotted owl surveys are not current at the time of implementation.  These seasonal restrictions would be waived if field habitat evaluations determine the units are dispersal-only habitat or if protocol surveys (project clearance or demography protocol) determine resident single or territorial pairs are not present. | Fuels Treatments |
| PDF 47 | Do not remove overstory trees within 330 feet of bald eagle or golden eagle nests, except for removal of hazard trees. This is applicable to the Resting Cow site in T32S-R05W-S29 and any new sites that are established within the planning area. | All Operations |
| PDF 48 | Work activities that cause disturbance above ambient noise levels (hauling, chainsaws, and helicopters) would not take place within 660 feet from an active bald eagle nest or 330 feet from an alternate bald eagle nest between January 1 and August 31. The above restrictions could be waived in a particular year if surveys indicate the site is unoccupied or nesting attempts failed or until 2 weeks after the young have fledged. Waivers would only be valid until January 1 of the following year. | All Operations |
| PDF 49 | Maintain ≥ 80 percent canopy cover within at least 50 feet of documented fisher natal and maternal dens. No activities may occur within stands containing known fisher den sites from March 1 to July 30. Maintain sufficient (at least 60 percent) canopy clover on a within-stand average basis. Protect fisher denning structures by retaining ≥ 24" diameter snags, down woody material, and live trees with cavities in the stand and if, for safety concerns, it is necessary to fall such snags or live trees with cavities, retain those cut trees or snags in the stand as | No Fisher Detections Known in Planning Area |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | additional down woody material. Do not apply vegetation treatments to all portions of the stand. | |
| PDF 50 | In NWPT aquatic habitat: Culvert replacements would be interchanged with culverts that allow for turtle passage. In areas with known turtle populations or a high likelihood of use by turtles, berms or fencing would be installed to direct turtles to the culvert.<br><br>In NWPT nesting habitat: No soil compacting activities would occur and non-compacting activities (hand treatments and minimal ground disturbance) would be seasonally restricted during nesting season, May 15 through July 31.<br><br>In NWPT overwintering habitat: Seasonal restrictions would be implemented in overwintering habitat within 656 ft (200 m) of aquatic habitat between October 1 and March 31 for new road construction, quarry blasting, timber treatments, and for cutting and piling of fuels treatments. For broadcast burning in overwintering habitat within 656 ft of aquatic habitat, only one third of an area would be treated annually. When feasible, such as burning in a small area, exclosures would be utilized to prevent turtles from entering the treatment area. Group selections and landings would avoid NWPT habitat within 656 ft of aquatic habitat.<br><br>Portions of the following timber sale units would be restricted October 1-March 31: 01-03, 01-04, 02-02, 03-05, 03-10, 04-01, 05-01, 09-01, 10-01, 11-02, 11-03, 11-04, 13-01, 13-04, 14-01, 14-02, 15-05, 15-06, 15-07, 15-08, 15-09, 15-10, 15-11, 17-01, 17-02, 19-05, 21-01, 21-02, 23-04, 23-05, 25-01, 25-02, 25-12, 27-01, 29-03, 29-05, 30-05, 31-01, 31-02, 33-03, 33-04, 34-01, 35-01, 35-02, 35-03, and 35-05.<br><br>For broadcast burning, portions of the following fuels units would be implemented incrementally (only 1/3 an area of overwintering habitat annually): Barrens Mine Recl. 25, Bull Trip 1, Coyote Junction 2, Coyote Junction 4, Coyote Pete 27-8A, Coyote Pete 28-11, Dutch Herman 9, Eastman's Grave 2, Eastside 13-1, Eastside 23-2, Eastside 25-1A, Eastside 25-1B, Eastside 3-3A, Eastside 35-1, Grave Creek 14-1, Grave Creek UW10-1, Grave Ford 8A, Gravey 3807, Gravey 7T, King Wolf 10R-2, King Wolf 14-5, King Wolf 14-9B, King Wolf 14R-3, King Wolf 14R-3a, King Wolf 14R-4, King Wolf 15-4, King Wolf 15R-4, King Wolf 3-1B, King Wolf 7-1, King Wolf 9-4, King Wolf 9-6, King Wolf 9R-1, McCollum 2-A, McCollum Creek 2, PP&J 11, and Wildcat B/O 2.<br><br>NWPT PDFs could be waived by the project wildlife biologist if field evaluations reveal habitat is not suitable for NWPTs or if the NWPT is not listed as a threatened or endangered species. If the NWPT is not listed under the ESA, the NWPT will continue to be managed as a Bureau Sensitive species. | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 51 | For any action, no more than one third of an overall site capable of sustaining Franklin's bumble bee would be treated in a single year. Treatments, including prescribed fire, would be seasonally restricted between May 15 and September 30 and skips would be left to provide refugia. | X |

**Table C-15:** Spotted Owl Disruption and Disturbance Seasons and Distances (content adopted from USDI FWS 2016 USDI FWS 2016; Table 227, pp. 597-600 & Table 50, pp. 230-232).

| Project Activity | Disruption Distance | | Disturbance Distance |
|---|---|---|---|
| | March 1 – July 15 | July 16 – Sept. 30 | March 1 – Sept. 30 |
| Light maintenance (*e.g.*, road brushing and grading) at campgrounds, administrative facilities, and heavily-used roads | No Disruption | No Disruption | ≤ 0.25 mile |
| Log hauling on heavily-used roads | No Disruption | No Disruption | ≤ 0.25 mile |
| Chainsaws (includes felling hazard/danger trees) | ≤ 65 yards | No Disruption | 66 yards to 0.25 mile |
| Heavy equipment for logging, road construction, road repairs, bridge construction, culvert replacements, etc. | ≤ 65 yards | No Disruption | 66 yards to 0.25 mile |
| Pile-driving (steel H piles, pipe piles); Rock Crushing and Screening Equipment | ≤ 120 yards | No Disruption | 121 yards to 0.25 mile |
| Burning (prescribed fires, pile burning) | ≤ 0.25 mile | No Disruption | 0.25 mile to 1 mile |
| Blasting | ≤ 0.25 mile | No Disruption | 0.25 mile to 1 mile |
| Helicopter: Chinook 47d | ≤ 265 yards | ≤ 100 yards (hovering only) | 266 yards to 0.5 mile |
| Helicopter: Boeing Vertol 107, Sikorsky S-64 (SkyCrane) | ≤ 150 yards | ≤ 50 yards (hovering only) | 151 yards to 0.25 mile |

| Helicopters: K-MAX, Bell 206 L4, Hughes 500 | ≤ 110 yards | ≤ 50 yards (hovering only) | 111 yards to 0.25 mile |
| Small fixed-wing aircraft (Cessna 185, etc.) | ≤ 110 yards | No Disruption | 111 yards to 0.25 mile |

**Table C-16:** Water Quality, Soil Productivity, and Off-site Erosion

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| Harvest & Yarding Operations | | |
| PDF 93 | When using conventional ground-based yarding systems, whole tree yarding with tops attached is the preferred harvest method as long as the contractor can operate without causing bark slippage, girdling, broken tops, or damage to live crowns. If it is determined by the Authorized Officer that an unacceptable amount of damage is occurring, tree bucking and limbing would be required as directed by the Authorized Officer. Delivered log length would not exceed 41 feet. | X |
| PDF 94 | When ground-based yarding equipment is used off designated skid trails, equipment shall walk on a mat of existing or created slash when practical. | X |
| PDF 95 | Do not operate ground-based machinery for timber harvest within 50 feet of streams (slope distance), except where machinery is on improved roads, designated stream crossings, or where equipment entry into the 50-foot zone would not increase the potential for sediment delivery into the stream. | X |
| PDF 96 | Limit the use of specialized ground-based mechanized equipment (those machines specifically designed to operate on slopes greater than 35 percent) to a slope determined to be safe and operationally feasible given the environmental conditions. | X |
| Prevention and Containment of Hazardous Material Spills | | |
| PDF 97 | The Purchaser would be required to be in compliance with OAR 629-605-0130 of the Forest Practice Administrative Rules. Notification, removal, transport, and disposal of oil, hazardous substances, and hazardous wastes would be accomplished in accordance with OAR 340-142 (OARD, 2018), and the operator will have a Spill Prevention, Control and Countermeasure Plan (SPCC) in place. | X |
| PDF 98 | The Purchaser shall not refuel equipment, store, or cause to have stored, any fuel or other petroleum products within 150 feet of streams, springs or wetlands. All petroleum products shall be stored in durable containers and located so that any accidental releases will be contained and not drain into any stream system. Hydraulic fluid and fuel lines on heavy mechanized equipment would be in the proper working condition in order to minimize the potential for leakage into streams. Absorbent materials shall be onsite to allow for immediate | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | containment of any accidental spills. Spilled fuel or oil and any contaminated soil shall be cleaned up and disposed of at an approved disposal site, according to the SPCC. | |
| **Road Renovation, Timber Hauling and Road Use** | | |
| PDF 99 | Road renovation/maintenance shall generally take place in the dry season (between May 15th and October 15th of the same year). Waivers may be granted for road renovation/maintenance during dry conditions in the wet season. Erosion control measures shall be in place concurrent with ground disturbance to allow for immediate storm proofing | X |
| PDF 100 | Hauling may occur during the wet season, with the Authorized Officer's approval, on roads with durable paved and/or rock surfacing and sufficient rock depth to resist rutting or development of sediment on road surfaces that drain directly to wetlands, floodplains, and waters of the State. | X |
| | Haul may occur during the wet season, with the Authorized Officer's approval, on hydrologically connected rocked and natural surface roads during dry conditions. Haul would not occur on hydrologically connected aggregate or natural surface roads when water is flowing in the ditch lines due to precipitation or during any conditions that would result in any of the following: surface displacement such as rutting or ribbons, continuous mud splash or tire slide, fines being pumped through road surfacing from the subgrade, resulting in a layer of surface sludge, or where turbid runoff is likely to reach stream channels. Refer to Table C-20 for the list of hydrologically connected haul roads in the project area. | |
| | Hauling on hydrologically connected natural surface or rocked roads with insufficient rock depth, that received a ½ inch or more precipitation within a 24-hour period, would not resume for a minimum of 48 hours following any storm event, or until road surface is sufficiently dry, and as approved by the Authorized Officer. | |
| | If hauling activities during the wet season causes or begins to cause road damage or the transport of sediment into streams, the Authorized Officer may suspend wet season haul or require additional erosion control devices to prevent damage or off-site transportation of sediment. Additional rock may be required at the Purchaser's expense to repair any damage that occurs to the road during wet season haul. | |
| **Culvert Installation and Road, Landing Construction, and Rock Quarries** | | |
| PDF 57 | Design culverts, bridges, and other stream crossings for a 100-year flood event, including allowance for bed load and anticipated floatable debris. Culverts will be of adequate width to preclude ponding of water higher than the top of the culvert. For streams with ESA-listed fish, design stream crossings to meet design standards consistent with | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | existing ESA consultation documents that address stream crossings in the decision area. (RMP, p. 92) | |
| PDF 59 | Limit within unit landing, temporary road, and road construction, reconstruction, and decommissioning activities to dry conditions. Activities occurring outside of the dry season (generally May 15 – Oct. 15 of the same year) may occur with an approved waiver from the Authorized Officer. Keep erosion control measures concurrent with ground disturbance to allow immediate stormproofing. (BMP R 62) | X |
| PDF 101 | All temporary roads shall be winterized if access is needed over two dry seasons by October 15th. Winterization includes water barring, seeding, mulching, and barricading. All temporary roads shall be ripped, water barred, barricaded, seeded, and mulched after use unless otherwise specified. | X |
| PDF 60 | Sediment reduction techniques would be implemented to reduce sedimentation into streams containing Bureau Sensitive Species. Sediment reduction techniques include settling basins, brush filters, sediment fences, straw bales and/or check dams to prevent or minimize sediment conveyance to streams. Specifically, these sediment barriers would be installed at stream crossings with a hydrologic connection to perennial surface waters. This would include streams with Coho salmon habitat.  (Refer to Table C-20). | X |
| PDF 102 | Quarry blasting operations will use Tables D-1 and D-2 to determine appropriate charge weights and setback distances based on distance to Coho habitat.  Each charge weight listed will utilize a micro delay of 8 milliseconds or longer to stagger detonation of the charges in time. | X |
| Fuels Treatments and Underburning | | |
| PDF 61 | On all units with fuel maintenance and where underburning may occur, do not have ignition points within a minimum 25 feet from bank full width of intermittent streams and 60 feet for perennial streams to protect streambank stability and riparian vegetation (RMP, pp. 82-83) | X |
| Soils Resources | | |
| PDF 62 | Detrimental Soil Disturbance (DSD) can occur from erosion, loss of organic matter, severe heating to seeds or microbes, soil displacement, or compaction. (RMP p. 109). Limit DSD from forest management operations to a total of < 20 percent of the harvest unit area. Where the combined detrimental soil disturbance from implementation of current forest management operations and detrimental soil disturbance from past management operations exceeds 20 percent of the unit area, apply mitigation or amelioration to reduce the total DSD to < 20 percent of the harvest unit area. | X |
| PDF 63 | Avoid road construction and timber harvest on unstable slopes where there is a high probability to cause a shallow, rapidly moving landslide that would likely damage infrastructure (e.g., BLM or privately owned | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | roads, State highways, or residences) or threaten public safety. (RMP pl. 109-110) | |
| PDF 103 | In TPCC FMR areas, decrease treatment intensity, avoid group selects which require replanting, and lop and scatter slash to increase soil moisture holding capacity for portions of unit 11-2. | X |
| PDF 104 | In TPCC FN-G areas, avoid and buffer sites which are generally greater than 65 percent in concave positions and 80 percent in convex positions – common locations are in inner gorges, above streams, and headwall drainages for portions of units 5-4, 19-5, and 34-1). | X |
| PDF 105 | In TPCC FN-N areas, thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash to increase nutrients. These soils can be found in portions of units 3-8, 3-9, 3-10, 4-1, 9-6, 9-7, 11-6, 14-2, 17-1, 17-2, 21-1, 22-7, 23-9, 25-6, 25-7, 27-1, 27-3. | X |
| PDF 106 | In TPCC FN-W areas, buffer sites with poorly drained soils found to be saturated for portions of unit 11-2. | X |
| PDF 107 | In TPCC NCFL-LPS areas, retain and culture minor species such as pine and oak over small Douglas-fir; lop and scatter slash; apply low intensity prescribed fire. These soils can be found in portions of units 3-1, 4-1, 5-4, 11-6, 22-3, 22-7, 23-2, 23-3, 23-8, 24-1, 24-2, 24-3, 25-6, 27-3, and 34-1. | X |
| PDF 108 | In TPCC NCFL-NCSP areas, consider treating these areas to promote desired minor species such as pine and oak. Reintroduce fire to favor fire tolerant understory species for portions of unit 5-2 and 5-4. | X |
| PDF 109 | In TPCC RN-K areas, thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash, apply low intensity prescribed fire. These soils can be found in portions of units 3-1, 3-4, 4-1, 4-2, 4-3, 4-4, 5-3, 13-6, 14-1, 14-3, 17-1, 23-2, 23-3, 23-11, 24-1, 25-7, 26-2, 31-6, 31-8, 32-2, and 34-1. | X |
| PDF 110 | In TPCC RR-KM areas, thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash, apply low intensity prescribed fire for portions of unit 14-1. | X |
| PDF 111 | In TPCC RR-T areas, avoid group selects and lop and scatter slash for portions of units 6-1, 11-3, and 31-8. | X |
| PDF 112 | In TPCC FR-E areas the Dry Forest BMPs (Table C-9) will be applied for portions of the unit where soils match the descriptions in Table C-13 in the RMP (USDI/BLM 2016b p. 205) in portions of units 11-2, 11-3, 14-1, 24-5, and 29-6) | |

**Table C-17:** Tree Retention Preference

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 65 | Reserve Pacific yew and preferred hardwoods, where operationally feasible, to contribute to monitoring desired stand conditions. Conifer species retention preference, in general: Pacific yew, Western red cedar, ponderosa pine, sugar pine, incense cedar, Douglas-fir, Western hemlock, and true fir. | X |

**Table C-18:** Riparian Reserves

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 66 | Riparian Reserves distances are one site-potential tree (200 feet in Grave Creek, 195 feet in Middle Cow Creek, and 200 feet for Upper Cow Creek) of fish-bearing streams, perennial, and intermittent streams. Extend the Riparian Reserves to include stable areas between such an unstable area where there is potential for the failure to reach the stream (RMP, pp. 75-77).  The project area is in the dry and moist RR west of highway 97, and therefore, stands thinned in the Outer and Middle Riparian Zones may be made available for sale (RMP, pp. 82-84). | X |
| PDF 67 | On all units, commercial extraction would not occur within the Inner Riparian Zone buffer which is a minimum of 50 feet from bankfull width on all intermittent streams and 120 feet from bankfull width on all fish-bearing and perennial streams (RMP, pp. 82-83). | X |
| PDF 68 | In the Inner Riparian Zone, where trees are cut for yarding corridors, skid trails, road construction, maintenance, and improvement, retain cut trees in adjacent stands as down woody material or move cut trees for placement in streams for fish habitat restoration, at the discretion of the BLM (RMP, pp. 75-76). | X |
| PDF 69 | Slumps, intermittent seeps, irrigation ditches, wetlands, ponds and other features would be buffered (no treatment) by leaving one row of overstory trees or a 25-foot diameter buffer (whichever is greatest), from the outer edge of instability, around these areas for soil stabilization (RMP, p. 77). | X |
| PDF 70 | Create two snags per acre, via girdling with a chainsaw or other practice, (1 >20 inches DBH and 1 >10 inches DBH) in Riparian Reserve treatment areas (RMP, p. 73). | X |
| PDF 73 | Maintain access to roads and facilities by removing hazard trees and blowdown from roads and facilities. Retain such logs as down woody material within adjacent stands or move for placement in streams for fish habitat restoration, unless removal of logs, including through | X |

KSW01860

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| | commercial harvest, is necessary to maintain access to roads and facilities (RMP, p. 75). | |
| PDF 74 | In the Riparian LUA, allow yarding corridors, skid trails, road construction, stream crossings, and road maintenance and improvement where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives (RMP, p. 75). | X |
| PDF 75 | In the Riparian LUA, where trees are cut for yarding corridors, skid trails, road construction, maintenance, and improvement in the Inner Zone or Middle Zone, retain cut trees in adjacent stands as down woody material or move cut trees for placement in streams for fish habitat restoration, at the discretion of the BLM. Where trees are cut for yarding corridors, skid trails, road construction, maintenance, and improvement in the Outer Zone or in Riparian Reserves associated with features other than streams, retain cut trees in adjacent stands as down woody material, move cut trees for placement in streams for fish habitat restoration, or sell trees, at the discretion of the BLM. RMP, p. 75-76 | X |
| PDF 76 | When conducting commercial thinning in any portion of the Outer Zone in a stand in all watershed classes, cut or tip from 0 to 15 square feet of basal area per acre of live trees, averaged across the Riparian Reserve portion of the treated stand. Leave cut or tipped trees on site or yard, deck, and make cut or tipped trees available for fish habitat restoration. The cut or tipped trees can be of any size and come from any zone (RMP, p. 76-77). | X |
| Minimizing Impacts to Riparian Reserves from Activity Slash Treatments Aand Prescribed Fire | | |
| PDF 77 | Apply low or moderate-severity prescribed burns where needed to invigorate native deciduous tree species. Moderate severity prescribed burns will be limited to no more than 20 percent of the area of Riparian Reserve sub-watershed (HUC 12) each year (RMP, p. 82). | X |
| PDF 78 | Do not conduct fuels treatments within 60 feet of fish-bearing or perennial streams (RMP, p. 82). | X |
| PDF 79 | When conducting fuels or prescribed fire treatments, retain at least 50 percent canopy cover per acre in the inner zone, do not cut trees > 12" DBH in the inner riparian zone, retain down woody material at greater than 2 percent of pieces > 4 inches in the treatment area, and maintain 30 percent canopy and 60 trees per acre in the middle and outer riparian zones (RMP, p. 82). | X |
| PDF 80 | When conducting fuels or prescribed fire treatments, retain down woody material at 2% cover of down wood greater than 4-inch diameter. Down woody material retention standards would be met as an average at the scale of the treatment area and is not intended to be attained on every acre (RMP, p.82). | X |

KSW01861

**Table C-19:** Activity Slash and Prescribed Fire

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| Reduce Impacts to Resources | | |
| PDF 81 | Merchantable sawlogs (including pole decks) would be removed from yarded material and may be hauled off site for processing. Debris at the landing sites would be burned, chipped, or otherwise removed from these sites within 24 months of unit harvest completion. | X |
| PDF 82 | Hand piles would not be allowed on roadways, turnouts, shoulders, or on the cut bank . | X |
| PDF 83 | The Authorized Officer will determine the location of pole/hardwood decks. | X |
| PDF 84 | Activity slash remaining in units could be lopped-and-scattered, chipped, underburned, machine piled, or hand piled and burned to prevent an increase in fire hazard. | X |
| PDF 85 | For prescribed burning operations, firelines would be constructed by hand. | X |
| PDF 86 | In units that aren't broadcast burned, activity slash within twenty (20) feet of each finished landing pile will be added to the pile. Construct a fireline approximately eighteen (18) inches wide and down to mineral soil within twenty (20) feet of each finished landing pile to prevent escaped fire. Each landing pile would be covered with a large enough piece of four-millimeter-thick black plastic to ensure a dry ignition spot (generally 10 feet x 10 feet or large enough to cover 80 percent of the pile). | X |
| PDF 87 | Landing piles would not be placed adjacent to or within 15 feet of leave trees to minimize scorch and mortality. Landing piles would be as free of dirt as reasonably possible to facilitate desired consumption. | X |
| PDF 88 | Landing and hand piles would be burned in the fall to spring season after 1 or more inches of precipitation has occurred. Patrol and mop-up of burning piles would occur when needed to prevent treated areas from re-burning or becoming an escaped fire. | X |
| PDF 89 | Prescribed fire burn plans would be completed before ignition, as would smoke clearance to minimize impacts on air quality. | X |
| PDF 90 | Each hand pile would be covered with a large enough piece of 4-mil polyethylene black plastic to ensure a dry ignition spot (generally 5 feet x 5 feet or large enough to cover 80 percent of the pile). Hand piles would not be placed adjacent to or within 10 feet of leave trees or large woody debris to minimize scorch and mortality. Residents would be advised of prescribed burning through news releases. | X |

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| PDF 91 | Prescribed burning would occur under atmospheric conditions that allow for the mixing of air to lessen the impact on air quality. All prescribed burning would be administered in a manner consistent with the requirements of the Oregon Smoke Management Plan administered by the Oregon Department of Forestry and the regulations established by the Air Quality Division of the Oregon Department of Environmental Quality. | X |
| PDF 92 | Burning of slash piles would occur after a sufficient period of curing (generally over a year) and adequate seasonal moisture to ensure desired consumption of material and to minimize the risk of fire escape. Smoke clearance(s) would be obtained prior to ignition to minimize impacts on air quality. | X |

**Table C-20**: Hydrologically Connected Perennial Stream Crossings on Proposed Haul Routes

| BLM Road Number and Road Name | Proposed Action | Alt 3 | Surface | Description of Hydrologically Connected Activities to Perennial Surface Waters[+] | Stream System |
|---|---|---|---|---|---|
| Non-BLM Road off 31-5-10.0 | Maintenance | N | Unknown | Unknown structure | Last Chance |
| Non-BLM Road off 32-5-35.0 | Permanent Reconstruction | N | Unknown | Unknown structure, looks like inside ditches on both sides | Quines |
| Non-BLM Road off 32-5-35.0 | Maintenance | Y | Unknown | Unknown structure, looks like inside ditches on both sides | Quines |
| Non-BLM Road off 33-4-31.0 | Maintenance | N | Unknown | Unknown structure, looks like inside ditches on both sides | Last Chance |
| Non-BLM Road off 33-4-31.0 | Permanent Reconstruction | N | Unknown | Unknown structure, looks like inside ditches on both sides | Starveout |
| 32-4-20.0 Starveout Crk | Maintenance | Y | Aggregate | There are two culverts on perennial streams with connected inside ditches. | Starveout |
| 32-4-20.3 Goodwin Crk | Maintenance | Y | Aggregate | There are four culverts on perennial streams with connected inside ditches. Upper Crossing is not in Alt 3 | Jones |
| 32-4-22.0 Whitehorse | Maintenance | N | Aggregate | There are three culverts on perennial streams with connected inside ditches. | Whitehorse |
| 32-4-23.2 Whitehorse Saddle | Maintenance | N | Aggregate | There are two culverts on perennial streams with connected inside ditches. | Whitehorse |

| BLM Road Number and Road Name | Proposed Action | Alt 3 | Surface | Description of Hydrologically Connected Activities to Perennial Surface Waters[+] | Stream System |
|---|---|---|---|---|---|
| 32-4-30.0 Starveout Jones | Maintenance | Y | Aggregate | There are two culverts on perennial streams with connected inside ditches just before the confluence | Jones |
| 32-4-32.4 Starveout MI | Maintenance | N | Aggregate | There are three culverts on perennial streams with connected inside ditches. | Starveout |
| 32-4-33.1 Cedar Spg Mtn | Maintenance | N | Aggregate | One culvert on perennial stream with connected inside ditches and old road. | Last Chance |
| 32-4-35.0 Cedar Spg | Maintenance | N | 3 Aggregate 1 Natural | There are four culverts on perennial streams with connected inside ditches. | Grave |
| 32-4-35.2 Headwaters Grave Crk | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Grave |
| 32-5-22.0 Murphy | Maintenance | Y | Aggregate | One crossing on perennial stream with connected inside ditches. | Woodford |
| 32-5-23.0 Eakin | Maintenance | Y | Aggregate | One crossing on perennial stream with connected inside ditches on the north side | Wildcat |
| 32-5-25.0 Bull Run | Maintenance | Y | Aggregate | There are three crossings on perennial streams with connected inside ditches. | Bull Run |
| 32-5-25.6 Bull Run Spur | Permanent Reconstruction | N | Aggregate | Culvert removed in the past. Temporary crossing proposed | Bull Run |
| 32-5-35.1 lower Quines | Maintenance | Y | Aggregate | One crossing on perennial stream with connected inside ditches. | Quines |
| 32-5-35.1 upper Quines | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Quines |
| 33-4-10.1 Grave Chance Spur | Permanent Reconstruction | N | Unknown | Need to Check in the field, Crossing on perennial, may not be there | Last Chance |
| 33-3-18.0 Evans Grave Connect | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Grave |
| 33-4-11.1 Grave Swamp | Maintenance | N | Aggregate | Two crossings, one is totally inadequate and is frequently plugged by beavers, the second one is a perennial with connected inside ditches. | Grave |
| 33-4-11.2 Section 11 Spur | Maintenance | N | Aggregate | There are two culverts on perennial streams with connected inside ditches. | Quines |

KSW01864

| BLM Road Number and Road Name | Proposed Action | Alt 3 | Surface | Description of Hydrologically Connected Activities to Perennial Surface Waters[+] | Stream System |
|---|---|---|---|---|---|
| 33-4-15.0 Last Chance | Maintenance | Y | Aggregate | These 8 crossings are mostly culverts that cross Last Chance Creek. All 8 are hydrologically connected to surface waters. | Last Chance |
| 33-4-15.1 Boulder Creek | Maintenance | N | Aggregate | There are four crossings on perennial streams with connected inside ditches. | Big Boulder |
| 33-4-15.6 Grave Creek 15 | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Grave |
| 33-4-15.8 Grave Creek 15 | Perm Reconstruction | N | Aggregate | There are two crossings on perennial streams with connected inside ditches. | Grave |
| 33-4-17.2 Little Boulder | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Little Boulder |
| 33-4-17.3 Seventeen W | 1-Maintenance 2-Perm Construct | N | 2-Aggregate 1-unknown | Three crossing all in a row, two will be new culverts. | Little Boulder |
| 33-94-19.0 Channel 5 Spur | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Slate |
| 33-4-21.0 Old Grave Creek | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Lick |
| 33-4-21.1 Upper Green Grave | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches and wetland above the road. | Grave |
| 33-4-21.2 Upper Green Grave | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Grave |
| 33-4-21.3 Morning Star | Maintenance | N | Aggregate | Bridge across Grave Creek, no inside ditches, check 33-4-21.0 | Grave |
| 33-4-22.0 Morning Star | Maintenance | N | Aggregate | Two crossings on perennial streams and one crossing over a failed culvert on Lick Creek, 3ft stream running under | Lick |
| 33-4-29.1 Lucky Buck Spur | Perm Reconstruction | N | Aggregate | One new constructed permanent crossing on Roth Creek | Grave |
| 33-4-3.7 Last Cance Crk S | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches | Last Chance |

KSW01865

| BLM Road Number and Road Name | Proposed Action | Alt 3 | Surface | Description of Hydrologically Connected Activities to Perennial Surface Waters[+] | Stream System |
|---|---|---|---|---|---|
| 33-4-30.0 Lower King Mt | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches | Last Chance |
| 33-4-31.0 Lower Baker Crk | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches | Last Chance |
| 33-4-4.0 Big Boulder Crk | Maintenance | N | Aggregate | There are three crossings on perennial streams with connected inside ditches. | Big Boulder |
| 33-4-9.0 Boulder Crk N | Maintenance | N | Aggregate | There are two crossings on perennial streams with connected inside ditches. | Big Boulder |
| 33-4-9.1 Boulder Ck Spur | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Big Boulder |
| 33-5-1.1 Quines Crk N | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Big Boulder |
| 33-5-1.1 Quines Crk N | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Quines |
| 33-5-10.0 Wolf Creek Rd | Maintenance | N | Aggregate | There are four crossings on perennial streams with connected inside ditches. | Wolf |
| 33-5-10.2 Bummer Gulch | Maintenance | N | Aggregate | There are three crossings on perennial streams with connected inside ditches. | Wolf |
| 33-5-10.5 Wolf Ck | Perm Reconstruction | N | Aggregate | One new permanent constructed crossing on perennial stream. | Wolf |
| 33-5-10.6 Wolf Pup Rd | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Wolf |
| 33-5-10.8 | Perm Reconstruction | N | Aggregate | One new permanent constructed crossing on perennial stream. | Wolf |
| 33-5-10.11 Wolf Head Rd. | Perm Reconstruction | N | Aggregate | One new permanent constructed crossing on perennial stream. | Wolf |
| 33-5-14.4 Dutch Herman Sp | Perm Reconstruction | N | Aggregate | One new permanent constructed crossing on perennial stream. | Wolf |
| 33-5-21.0 Coyote Crk | Maintenance | N | Aggregate | There are four crossings on perennial streams with connected inside ditches. | Coyote |
| 33-5-21.1 Scholey Gulch | Maintenance | N | Aggregate | There are three crossings on perennial streams with connected inside ditches. | Coyote |

| BLM Road Number and Road Name | Proposed Action | Alt 3 | Surface | Description of Hydrologically Connected Activities to Perennial Surface Waters[+] | Stream System |
|---|---|---|---|---|---|
| 33-5-22.1 Coyote Crk | Maintenance | N | Aggregate | There are two crossings on perennial streams with connected inside ditches. | Coyote |
| 33-5-25.0 Upper Baker Crk | Maintenance and Perm Reconstruction | N | Aggregate | There are two crossings on perennial streams with connected inside ditches. One new permanent crossing | Coyote |
| 33-5-25.1 Upper Baker Crk | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Baker |
| 33-5-26.4 Clark Ck Spur | Perm Reconstruction | N | Aggregate | One new permanent constructed crossing on perennial stream. | Clark |
| 33-5-35.0 St Paul Mtn Rd | Maintenance | N | Aggregate | There are three crossings on perennial streams with connected inside ditches. | Clark |
| 33-6-24.0 Miller Gulch | Maintenance | N | Aggregate | There are three crossings on perennial streams with connected inside ditches. | Wolf |
| 34-4-5.0 Baker Crk | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Baker |
| 34-5-1.3 Boise Grave Sp | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Grave |
| 34-5-2.1 Eastman Gulch | Maintenance | N | Aggregate | There are two crossings on perennial streams with connected inside ditches. | Eastman |
| 34-5-3.0 Spotted | Maintenance | N | Aggregate | One crossing on perennial stream with connected inside ditches. | Eastman |
| [+] Hydrologically connected means any road segment that has a continuous surface flow path between any part of the road prism and a natural stream channel. (Furniss et al., 2013). | | | | | |

**Table C-21**: Coho Critical Habitat Crossings within the Last Chance Project Area

| Structure # | Road # | Stream Name | HUC 10 | Road Surface |
|---|---|---|---|---|
| 1 | 33-5-10.0 | Wolf Creek Trib. | Grave Creek | Aggregate |
| 2 | 32-5-23.0 | Wildcat Creek | Middle Cow Creek | Aggregate |
| 3 | 32-5-26.0 | Bull Run Creek | Middle Cow Creek | Bituminous |
| 5 | 32-4-1.0 | Hauck Ranch Creek | Upper Cow Creek | Aggregate |
| 6 | 34-5-10.0 | Grave Creek | Grave Creek | Bituminous |
| 7 | 34-5-10.0 | Grave Creek | Grave Creek | Bituminous |
| 8 | 34-5-10.0 | Grave Creek | Grave Creek | Bituminous |
| 9 | 32-4-35.0 | Cedar Spring | Grave Creek | Natural |
| 10 | 32-4-35.2 | Headwaters Grave Creek | Grave Creek | Aggregate |
| 11 | 34-5-10.0 | Grave Creek | Grave Creek | Bituminous |
| 12 | 34-5-10.0 | Grave Creek | Grave Creek | Bituminous |
| 13 | 33-4-15.0 | Last Chance Creek | Grave Creek | Aggregate |
| 14 | 34-5-10.0 | Grave Creek | Grave Creek | Bituminous |
| 15 | 32-4-4.0 | Whitehorse Creek | Middle Cow Creek | Bituminous |
| 16 | 32-4-22.0 | Whitehorse Creek | Middle Cow Creek | Aggregate |
| 17 | 32-4-20.0 | Starveout Creek | Middle Cow Creek | Aggregate |
| 18 | 32-5-35.1 | Quines Creek | Middle Cow Creek | Aggregate |
| 19 | 32-4-4.0 | Whitehorse Creek | Middle Cow Creek | Bituminous |
| 20 | 32-4-20.0 | Starveout Creek | Middle Cow Creek | Aggregate |
| 21 | 32-5-25.6 | Bull Run Creek | Middle Cow Creek | Aggregate |
| 22 | 32-4-4.0 | Whitehorse Creek | Middle Cow Creek | Bituminous |
| 23 | 33-5-10.0 | Wolf Creek Trib. | Grave Creek | Aggregate |
| 25 | 33-6-24.0 | Miller Gulch | Grave Creek | Aggregate |
| 26 | 33-6-24.0 | Miller Gulch | Grave Creek | Aggregate |
| 28 | 33-4-21.3 | Grave Creek | Grave Creek | Aggregate |
| 29 | 33-4-15.0 | Last Chance Creek | Grave Creek | Aggregate |
| 30 | 34-4-28.0 | Ditch Creek | Evans Creek | Aggregate |

**Table C-22**: Recreation Project Design Features

| PDF Number | Project Design Features | Applicable to this Project |
|---|---|---|
| REC 33 | During active timber harvest and hauling, ensure that roads are open for public access to designated recreation sites on weekends, holidays, and at least intermittently during the week. | X |
| REC 34 | Establish a no commercial harvest buffer of 50 feet from centerline for all linear trails. Allow harvest and fuels reduction within the buffer if needed for public safety, to protect/maintain setting characteristics, and/or to achieve recreation objectives. Fell trees away from trails and recreation routes and avoid skidding logs across trails to prevent damage. | X |
| REC 35 | Camouflage and block skid trails leading off system roads or radiating from landings by placing woody debris or other appropriate barriers (e.g. rocks, logs, slash) on the first 100 feet of the skid trail. Close, block, and rehabilitate unauthorized OHV intrusions to protect sensitive areas and water quality. The intent is to minimize erosion and to prevent unauthorized use by OHVs. | X |

## APPENDIX D: ADDITIONAL INFORMATION

### D.1.      Project Area Location

The Last Chance project area totals 56,885 acres and is located within the following watersheds:

- Grave Creek watershed - 56% of this watershed is within the project area (55,700 project acres of the 104,574-acre watershed)

- Middle Cow Creek Watershed – 42% of this watershed is within the project area (45,364 project acres of the 113,200-acre watershed)

- Upper Cow Creek Watershed – 2% of this watershed is within the project Area (1,229 project acres of the 116,682-acre watershed)

### D.2.      Tree Harvesting and Yarding Systems

Harvest operation systems are comprised of pairing different harvesting mechanisms with various yarding mechanisms. Harvesting mechanisms are comprised of mechanical and manual harvesting methods. Mechanical methods include the use of harvesters or feller-bunchers which cut, fall and/or process logs prior to removal from the treatment unit, and pile the slash. Manual harvesting methods include the use of chainsaws in which trees are felled, limbed and bucked within the treatment unit. Mechanical harvesting is generally limited to slopes of 70 percent, unless the slope greater than 70 percent is determined to be safe and operationally feasible given environmental conditions. In general manual harvesting is utilized on slopes over 50 percent and generally paired with skyline yarding (see below).

Yarding within the Inner Riparian Zone would be avoided when possible but could be allowed when there is no operationally feasible or economically viable alternative. Where trees are cut for yarding corridors in the Inner Riparian Zone, they would be retained either on-site as cut trees, yarded to- and retained in adjacent stands as down woody material, moved for placement in streams for fish habitat restoration, or sold if associated with features other than streams.

#### Ground-based Yarding

Ground-based yarding systems utilize tracked or wheeled tractors to transport logs from the interior of units to landing areas. Trees are either manually or mechanically felled and processed, depending on resource protection concerns. The equipment utilized with this system operates on newly designated skid trails or existing skid trails when possible. Mechanized harvesting operations would occur on slopes up to 50 percent, only with the use of specialized ground-based equipment (harvesters or feller-bunchers) with self-leveling cabs. Tractor swing routes may be utilized to enable yarders to "walk" up designated skid trails.

#### Tethered-Assist Ground-based Yarding

Tethered-assist (synonymous with "cable-assist") yarding systems utilize tracked or wheeled equipment attached via cables to an anchor point or secondary piece of equipment to cut and/or transport logs from the interior of units to landing areas. Mechanized felling operations would use specialized equipment (harvesters or feller-bunchers) that have self-leveling cabs and are attached to a tether-assist winch mechanism. A winch is used to assist the tethered equipment as it moves up or down corridors reducing the amount of soil disturbance caused by ground-based equipment on steeper slopes. Tethered operations would generally occur on ground that is 35% to 70% slope with average corridor spacing of 60 feet apart and running perpendicular to the slope.

<u>Skyline Yarding</u>

Skyline cable yarding systems are in a fixed position, usually attached to a yarder or a tower from which cables, carriages, and winches originate. The yarder, tower, and cables utilized in this system may require the use of tail hold and/or guylines to remain erect. The carriage is a load-carrying device from which logs are suspended and rides into the interior of the unit and returns to the landing along the skyline cable. The tail end of the cable yarding corridors may be on average 150 feet apart; cable yarding corridors may converge near the landing. Often no additional disturbance is created if the landing is located on an existing road and services one or two corridors.

Some areas would require full suspension yarding across streams and would be identified prior to implementation. Under these circumstances, cable yarding corridors would be previously approved to ensure limited impacts to Inner Riparian Zone. Full suspension yarding would require the entire tree to be lifted in complete suspension across an area. All trees within the Inner Riparian Zones required to be cut for yarding operations would be left on site as course woody debris, or yarded to the adjacent stand if necessary for safety or operations, and not yarded to the landing.

<u>Helicopter Yarding</u>

Helicopter yarding uses a helicopter to transport logs from the interior of a unit to a landing. Trees are cut and usually limbed within the interior of the unit. A mechanized harvester may be used on slopes less than 50 percent to process and pre-bunch logs prior to yarding. A person within the unit attaches a cable to a group of trees which are then lifted and transported to a nearby landing location.

<u>Landings</u>

All of the yarding systems described above require some form of landing. Existing disturbance areas would be utilized as the first choice when possible but new landings would be needed. The landing is the area at the end of- or along the road where cut and sold trees are aggregated, processed into logs, sorted and loaded onto log trucks. For skyline systems and ground-based systems landings would generally be ¼ acre in size and placed within or adjacent to the boundary of proposed treatment units. In situations where multiple yarding corridors or skid trails converge at one landing, landing size may be expanded to ½ acre. These areas would be winterized if they are needed for multiple operating seasons and decommissioned once operations, including the burning of landing piles, is conducted. In general, landings would be located outside of the Inner Riparian Zone.

Helicopter landings are generally 1 acre in size. Selected helicopter landings would generally be within ½ mile of treatment units, would be placed where the vegetation is mainly in shrub form or where vegetation is lacking or where vegetation would be cut, placed on or near ridge tops, and at large road junctions. Because helicopter landings are expected to be located near ridges and where vegetation is lacking, they are generally located outside of all Riparian Zones.

**D.3.        Transportation Management**

Alternative 2 and 2a proposes 241 miles of road renovation, 28 miles of road construction, and potential entry into 14 existing rock quarries. Existing roads that are in a decommissioned or long-term closure status are proposed to be renovated for the project. Some of these roads, on BLM-administered lands, may be returned to a decommissioned or long-term closure status after use.  All activities may occur during dry conditions with a seasonal waiver approved by the Authorized Officer.

Alternative 3 proposes no new road construction. Transportation management in Alternative 3 would provide 51 miles of road renovation, and potential entry into 6 existing rock quarries. Like Alternative 2, existing roads that were previously in a decommissioned or long-term closure status are proposed to be

renovated for the project. Some of these roads, on BLM-administered lands, may be put back into a decommissioned or long-term closure status after use. All activities would occur during the dry season.

### Road Construction

Roads allow long-term access to previously inaccessible areas for forest management treatments. New roads would be added to the road system network. These access roads would be designed and constructed to low volume road standards that would facilitate safe and efficient timber operations. The BLM would apply BMP's (See Appendix C) to provide stable, well-draining roads that protect water quality and accommodate access to harvest operations during all stages of the project. Where topography allows, roads would be located on stable areas such as ridges, stable benches, and gentle to moderate slopes. On slopes greater than 60 percent, end hauling of material would occur and would be disposed of on stable locations outside of riparian areas that would minimize risk of sediment delivery to streams and other waterways. New construction activities would include clearing, grubbing, removing, and disposing of all vegetation and debris from within established clearing limits, construction of a road prism by excavating, compacting fill, leveling, and grading. If required, work would also include the installation of drainage features designed to the 100-year flood event plus debris allowances. Roads may have native surfaces or be rocked depending on season of use.

### Road Renovation

Road renovation is work done to an existing road to restore it to its original design standard. This work would involve but is not limited to: road surfaces would be bladed/graded to obtain adequate road surface runoff, road surfaces would be scarified to remove road surface rutting or rilling, slump removal, repairing of road failures, ditches would be cleared of debris and obstructions, catch basins would be cleaned or enlarged, brush growing within a 4-foot radius of culvert inlets or outlets would be removed, installation of new culverts to reduce road-related erosion, undersized culverts or culverts that have met or exceeded their lifespan would be removed and replaced, maintaining and/or constructing water dips to reduce road-related erosion, vegetation would be removed for roadside vegetation management, and roads may be surfaced or spot rocked.

Road renovation also includes work done to a road that was overgrown or previously decommissioned (placed in a long-term closure status) to restore it to its original design standard. This work may include clearing, grubbing, disposing of vegetation and debris from within the road prism, repairing the roads subgrade and running surface, correcting existing drainage patterns, replacing culverts where necessary, installation of culverts from drainages where culverts were previously removed, resurfacing or spot rocking where needed, and other typical maintenance activities described above.

Roadside vegetation management involves the removal of larger vegetation and trees that have grown along BLM roads that prevents maintenance equipment from improving proper road drainage patterns and hinders driver sight distance. The large vegetation and trees impede blading/grading activities resulting in berms being created on the outside shoulder of the road, which causes run-off water to flow down the road surface in a concentrated flow instead of allowing run-off water to disperse off the road at the earliest possible point. The removal of encroaching trees includes trees greater than 7-inch DBH and would occur 15 feet horizontal distance from the edge of the outside shoulder of the road on the fill slope side and 15 feet horizontal distance from the ditch flowline or the hinge point of the roads subgrade and cut bank if no ditch exists. In cases where the resulting tree stumps would interfere with road blading/grading activities, stumps would either be ground down to a depth of six inches below the roads running surface (stump grinding) or the tree roots would be separated from the tree trunk as best possible, and the trunk would be removed (popped) and the subgrade would be repaired.

Road surfacing involves the placement of crushed rock material over the full width of the running surface and to the desired length of the identified road. Surfacing is accomplished through preparation of the road running surface via grading and reshaping, proper placement of crushed rock material, and compaction of

KSW01872

the new surfacing material on the prepared road. Spot rocking involves the placement of crushed rock material on the road in smaller areas identified as having inadequate surface material, as well as a need to help control erosion and maintain the roads running surface. This would restore the road surface and road condition making it suitable for year-round haul and access. Native surface roads may be improved with an aggregate surface to allow for winter haul, upgrades would occur during the dry season.

### Road Decommissioning

Road decommissioning would be accomplished in a variety of ways based upon evaluation of circumstances specific to each road. The road segment would be closed to vehicles on a long-term basis but may be used again in the future. Prior to closure the road would be left in an erosion-resistant condition by establishing cross drains, eliminating diversion potential at stream channels, and stabilizing or removing fills on unstable areas. (USDI/BLM, 2016b, p. 311-312). At a minimum, decommissioning would include leaving roads in a well-drained condition and blocking access to vehicular use with barriers such as trenches, rocks, or logs. It may also include removing drainage structures, mulching with straw or logging slash, or seeding with native grasses to further discourage off-highway vehicle use. Road decommissioning would be subject to stipulations by holders of reciprocal rights-of-way, easements, or other legal interests.

### Existing Developed Rock Quarries

The BLM has identified fourteen potential rock quarries in the Last Chance planning area (see Table D-1 and Map 4) and proposes to allow entry into and purchase of in place quarry rock from the BLM per 43CFR3600.

Quarry entries include the removal of and/or processing of quarry rock for use in road maintenance activities. Removal and/or processing of quarry rock consists of ripping, blasting (drilling and shooting), and breaking down larger rock material with a mobile crusher. Blasting operations would follow the Forest Management Programmatic BO (FOMBO) and the Routine Actions and Maintenance BO (RAMBO) Table (see Table D-1 and D-2) to determine appropriate charge weights and setback distances based on distance to Coho habitat. Each charge weight listed in the table refers to the charge within a single drilled hole or the total charge within a group of holes to be blasted simultaneously and includes the requirement that the separate holes/charges to be blasted would utilize a micro delay of 8 milliseconds or longer to stagger detonation of the charges in time. Setback distance from listed fish habitat is measured horizontally from the center of the drill hole to the edge of the stream or river. This would ensure that the decibel rankings specified by NMFS would not be exceeded. It would also ensure that peak particle velocities transmitted through seismic waves would not rise to a level that would impact fish.

Each entry would primarily provide crushed rock for placement on roads in the Last Chance planning area supporting forest management and the associated maintenance by providing a local source of rock that reduces rock haul costs associated with a timber sale. The quarries could also provide oversized boulders for use in road repairs, or armoring, within the planning area.

Disturbance areas would be limited to the quarry floor area for heavy equipment including a mobile rock crusher, the rock benches/slopes which would be developed for quarry rock, quarry access spurs for heavy equipment to access the quarry benches or the top area of the quarry, clearing and grubbing of vegetation (if present) up to 50 feet past the rock faces or slopes of the site and stripping and stockpiling of overburden. All described impactive disturbance areas are within the existing quarry acreage. If additional area is proposed, it would be considered a quarry expansion and would require additional consultation and NEPA analysis prior to entry.

KSW01873

A quarry entry plan of operations is a required submittal prior to authorization and entry into said quarries. Typical final quarry configuration would have benches no less than 15 feet wide, faces no more than 30 feet tall, and proper drainage to ensure resource protection.

Table D.3-1: Last Chance Quarry Table

| Quarry Name | Quarry No. | Road No. | Location (TRS) | Current Acres | Distance to Coho Stream (FT) | Excavation and Processing | Alt 3 |
|---|---|---|---|---|---|---|---|
| King Mtn | 3 | 33-5-26.0 | T33S R5W Sect 24 | 3.13 | 7,910 | Blast/Crush | No |
| Woodford Quarry | 13 | 32-5-33.4 | T32S R5W Sect 33 | 4.99 | 5,260 | Blast/Crush | Yes |
| Sholey Gulch #1 | 29 | 33-5-21.1 | T33S R5W Sect 28 | 1.82 | 3,790 | Rip/Blast/Crush | No |
| Quartzmill Eastman #2 | 32 | 34-5-2.1 | T34S R5W Sect 03 | 2.04 | 5,050 | Blast/Crush | No |
| Miller Gulch Quarry | 36 | 33-5-32.0 | T33S R5W Sect 32 | 2.55 | 1,930 | Blast/Crush | No |
| Bumkins | 37 | 33-5-10.2 | T33S R5W Sect 15 | 0.94 | 1,280 | Rip/Blast/Crush | Yes |
| Levens Gulch | 39 | 33-5-10.3 | T33S R5W Sect 09 | 1.65 | 2,050 | Rip/Blast/Crush | Yes |
| Bull Run Pit | 45 | 32-5-25.0 | T32S R5W Sect 25 / T32S R4W Sect 31 | 3.53 | 115 | Blast/Crush | Yes |
| Starveout Quarry | 52 | 32-4-20.0 | T32S R4W Sect 33 | 3.74 | 1,700 | Blast/Crush | Yes |
| Unnamed 111 | 111 | 32-5-25.4 | T32S R4W Sect 30 | 2.29 | 3,430 | Rip/Pit Run | Yes |
| Lil Boulder | 355 | 33-4-9.3 | T33S R4W Sect 09 | 3.13 | 5,020 | Blast/Crush | No |
| Unnamed 359 | 359 | 33-4-29.0 | T33S R4W Sect 19 | 1.32 | 8,530 | Rip/Pit Run | No |
| Unnamed 360 | 360 | 33-4-30.0 | T33S R4W Sect 19 | 1.09 | 6,880 | Rip/Pit Run | No |
| Grave Ford | 361 | 33-4-21.0 | T33S R4W Sect 21 | 4.00 | 80 | Rip/Pit Run | No |

Table D.3-2: Expanded Blasting Setback Table

| Horizontal Setback Distance (ft) from Listed Fish Habitat | Maximum Charge Weight (lbs)/with ≥8 ms delay |
|---|---|
| 155 | 3 |
| 200 | 5 |
| 282 | 10 |
| 397 | 20 |
| 564 | 40 |
| 689 | 60 |
| 797 | 80 |
| 889 | 100 |
| 1,053 | 140 |
| 1,089 | 150 |
| 1,260 | 200 |
| 1,991 | 500 |
| 2,815 | 1,000 |
| 6,299 | 5,000 |
| 8,907 | 10,000 |
| 10,909 | 15,000 |

Table D.3-3: Roads

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-4-01.0 | A | Renovation | 2.35 | Open | Open | Aggregate | No |
| 32-4-01.0 | B | Renovation | 1.10 | Open | Open | Natural | No |
| 32-4-01.0 | C1 | Renovation | 0.48 | Open | Open | Natural | No |
| 32-4-04.0 | A | Renovation | 2.93 | Open | Open | Bituminous | No |
| 32-4-04.0 | B1 | Renovation | 0.28 | Open | Open | Aggregate | No |
| 32-4-13.0 | | Renovation | 1.00 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-4-19.1 | | Renovation | 0.58 | Open | Open | Aggregate | No |
| 32-4-19.2 | | Renovation | 0.61 | Open | Open | Aggregate | Yes |
| 32-4-19.4 | | Renovation | 0.28 | Open | Open | Aggregate | No |
| 32-4-19.5 | | Renovation | 0.05 | Open | Open | Aggregate | No |
| 32-4-19.6 | | Renovation | 0.24 | Open | Open | Aggregate | Yes |
| 32-4-20.0 | A | Renovation | 0.10 | Open | Open | Aggregate | Yes |
| 32-4-20.0 | B | Renovation | 0.65 | Open | Open | Aggregate | Yes |
| 32-4-20.0 | C1 | Renovation | 0.47 | Open | Open | Aggregate | No |
| 32-4-20.0 | D1 | Renovation | 1.94 | Open | Open | Aggregate | No |
| 32-4-20.0 | D2 | Renovation | 0.88 | Open | Open | Aggregate | No |
| 32-4-20.3 | A | Renovation | 0.98 | Open | Open | Aggregate | Yes |
| 32-4-20.3 | B | Renovation | 1.12 | Open | Open | Aggregate | No |
| 32-4-22.0 | A | Renovation | 2.03 | Open | Open | Aggregate | No |
| 32-4-22.0 | B | Renovation | 0.10 | Open | Open | Aggregate | No |
| 32-4-23.1 | | Renovation | 0.08 | Decommission | Decommission | Aggregate | No |
| 32-4-23.2 | A | Renovation | 0.16 | Open | Open | Aggregate | No |
| 32-4-23.3 | | Renovation | 0.37 | Open | Open | Aggregate | No |
| 32-4-24.0 | | Renovation | 0.44 | Open | Open | Aggregate | No |
| 32-4-25.0 | | Renovation | 2.35 | Open | Open | Aggregate | No |
| 32-4-25.1 | | Renovation | 0.45 | Open | Open | Aggregate | No |
| 32-4-25.6 | | Renovation | 0.57 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 32-4-29.1 | | Renovation | 0.19 | Open | Open | Aggregate | Yes |
| 32-4-29.3 | | Renovation | 0.21 | Open | Open | Natural | Yes |

KSW01876

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-4-30.0 | A | Renovation | 0.42 | Open | Open | Aggregate | Yes |
| 32-4-30.0 | B | Renovation | 0.84 | Open | Open | Aggregate | Yes |
| 32-4-30.2 | | Renovation | 0.17 | Decommission | Open | Aggregate | Yes |
| 32-4-30.3 | | Renovation | 0.12 | Decommission | Open | Aggregate | Yes |
| 32-4-30.4 | A | Renovation | 0.73 | Open | Open | Aggregate | Yes |
| 32-4-30.4 | B | Renovation | 0.15 | Open | Open | Aggregate | Yes |
| 32-4-30.4 | C | Renovation | 0.29 | Open | Open | Natural | Yes |
| 32-4-30.4 | D | Renovation | 0.17 | Open | Open | Natural | Yes |
| 32-4-31.0 | | Renovation | 0.15 | Open | Open | Aggregate | No |
| 32-4-31.2 | | Renovation | 0.45 | Open | Open | Aggregate | Yes |
| 32-4-31.4 | | Renovation | 0.11 | Open | Open | Aggregate | No |
| 32-4-31.5 | | Renovation | 0.27 | Open | Open | Aggregate | Yes |
| 32-4-32.2 | | Renovation | 0.25 | Open | Open | Aggregate | No |
| 32-4-32.3 | | Renovation | 0.19 | Open | Open | Aggregate | No |
| 32-4-32.4 | A | Renovation | 0.88 | Open | Open | Aggregate | No |
| 32-4-32.4 | B | Renovation | 2.13 | Open | Open | Aggregate | No |
| 32-4-32.4 | C | Renovation | 1.49 | Open | Open | Aggregate | No |
| 32-4-32.5 | | Renovation | 0.43 | Open | Open | Aggregate | No |
| 32-4-33.0 | A1 | Renovation | 0.88 | Open | Open | Aggregate | No |
| 32-4-33.0 | A2 | Renovation | 0.36 | Open | Open | Aggregate | No |
| 32-4-33.0 | B | Renovation | 0.77 | Open | Open | Aggregate | No |
| 32-4-33.1 | A1 | Renovation | 0.34 | Open | Open | Aggregate | No |
| 32-4-33.1 | A2 | Renovation | 1.10 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-4-33.1 | A3 | Renovation | 0.52 | Open | Open | Aggregate | No |
| 32-4-33.1 | B1 | Renovation | 0.38 | Open | Open | Aggregate | No |
| 32-4-33.1 | B2 | Renovation | 0.79 | Open | Open | Aggregate | No |
| 32-4-33.3 | | Renovation | 0.85 | Open | Open | Aggregate | No |
| 32-4-35.0 | A1 | Renovation | 0.23 | Open | Open | Aggregate | No |
| 32-4-35.0 | A2 | Renovation | 0.21 | Open | Open | Aggregate | No |
| 32-4-35.0 | A3 | Renovation | 0.60 | Open | Open | Natural | No |
| 32-4-35.0 | B | Renovation | 0.06 | Open | Open | Natural | No |
| 32-4-35.1 | A | Renovation | 0.92 | Open | Open | Aggregate | No |
| 32-4-35.1 | B | Renovation | 2.59 | Open | Open | Aggregate | No |
| 32-4-35.2 | | Renovation | 0.40 | Open | Open | Aggregate | No |
| 32-5-13.0 | | Renovation | 0.78 | Open | Open | Aggregate | No |
| 32-5-13.1 | | Renovation | 0.22 | Open | Decommission | Aggregate | No |
| 32-5-13.2 | | Renovation | 0.07 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 32-5-22.0 | A | Renovation | 2.01 | Open | Open | Bituminous | Yes |
| 32-5-22.0 | B | Renovation | 0.93 | Open | Open | Aggregate | Yes |
| 32-5-22.0 | C | Renovation | 0.30 | Open | Open | Aggregate | Yes |
| 32-5-22.0 | D1 | Renovation | 0.41 | Open | Open | Aggregate | Yes |
| 32-5-22.0 | D2 | Renovation | 0.15 | Open | Open | Aggregate | Yes |
| 32-5-22.0 | D3 | Renovation | 1.66 | Open | Open | Aggregate | Yes |
| 32-5-22.0 | E | Renovation | 0.90 | Open | Open | Aggregate | Yes |
| 32-5-23.0 | A | Renovation | 0.33 | Open | Open | Bituminous | Yes |
| 32-5-23.0 | B | Renovation | 1.06 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-5-23.0 | B | Renovation | 0.06 | Open | Open | Aggregate | Yes |
| 32-5-23.0 | C | Renovation | 1.73 | Open | Open | Aggregate | No |
| 32-5-23.1 | | Renovation | 0.36 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 32-5-23.1 | | Renovation | 0.41 | Open | Open | Aggregate | Yes |
| 32-5-23.2 | | Renovation | 0.82 | Open | Open | Aggregate | Yes |
| 32-5-23.4 | | Renovation | 0.08 | Open | Open | Aggregate | Yes |
| 32-5-23.6 | | Renovation | 0.04 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 32-5-25.0 | A | Renovation | 1.79 | Open | Open | Aggregate | Yes |
| 32-5-25.0 | B | Renovation | 1.12 | Open | Open | Aggregate | No |
| 32-5-25.0 | C | Renovation | 0.94 | Open | Open | Aggregate | No |
| 32-5-25.1 | | Renovation | 0.24 | Open | Open | Aggregate | Yes |
| 32-5-25.2 | | Renovation | 0.82 | Open | Open | Aggregate | Yes |
| 32-5-25.3 | A | Renovation | 0.69 | Open | Open | Aggregate | Yes |
| 32-5-25.3 | B | Renovation | 0.33 | Open | Open | Aggregate | Yes |
| 32-5-25.4 | | Renovation | 0.37 | Open | Open | Aggregate | Yes |
| 32-5-25.5 | | Renovation | 0.27 | Open | Open | Natural | Yes |
| 32-5-25.5 | | Renovation | 0.17 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | Yes |
| 32-5-25.6 | | Renovation | 0.70 | Decommission | Decommission | Aggregate | No |
| 32-5-25.7 | | Renovation | 0.06 | Open | Temporary / Seasonal / Limited | Aggregate | Yes |
| 32-5-25.8 | | Renovation | 0.23 | Open | Temporary / Seasonal / Limited | Aggregate | Yes |
| 32-5-26.0 | A | Renovation | 0.65 | Open | Open | Bituminous | Yes |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-5-26.0 | B1 | Renovation | 0.57 | Open | Open | Bituminous | Yes |
| 32-5-26.0 | B2 | Renovation | 0.87 | Open | Open | Aggregate | Yes |
| 32-5-26.0 | C1 | Renovation | 1.11 | Open | Open | Aggregate | Yes |
| 32-5-26.0 | C2 | Renovation | 0.66 | Open | Open | Aggregate | Yes |
| 32-5-26.0 | D | Renovation | 0.65 | Open | Open | Aggregate | Yes |
| 32-5-26.0 | E | Renovation | 2.23 | Open | Open | Aggregate | Yes |
| 32-5-27.0 | | Renovation | 0.24 | Decommission | Decommission | Aggregate | Yes |
| 32-5-27.2 | | Renovation | 0.60 | Open | Open | Aggregate | Yes |
| 32-5-29.0 | | Renovation | 0.79 | Decommission | Open | Aggregate | No |
| 32-5-33.0 | | Renovation | 0.34 | Decommission | Decommission | Aggregate | No |
| 32-5-33.1 | | Renovation | 0.46 | Decommission | Decommission | Natural | Yes |
| 32-5-33.2 | A | Renovation | 0.41 | Open | Open | Aggregate | No |
| 32-5-33.2 | B | Renovation | 0.87 | Open | Open | Aggregate | No |
| 32-5-33.2 | C | Renovation | 0.39 | Decommission | Open | Aggregate | No |
| 32-5-33.2 | C | Renovation | 0.22 | Open | Open | Aggregate | No |
| 32-5-33.3 | A | Renovation | 0.49 | Open | Open | Aggregate | No |
| 32-5-33.3 | B | Renovation | 0.49 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 32-5-33.3 | B | Renovation | 0.04 | Open | Open | Aggregate | No |
| 32-5-33.4 | | Renovation | 0.48 | Open | Open | Aggregate | Yes |
| 32-5-33.5 | A | Renovation | 0.11 | Open | Open | Aggregate | Yes |
| 32-5-33.5 | B | Renovation | 0.33 | Open | Open | Aggregate | Yes |
| 32-5-33.5 | C | Renovation | 0.75 | Open | Open | Aggregate | Yes |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 32-5-33.6 | | Renovation | 0.48 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | Yes |
| 32-5-35.0 | A1 | Renovation | 0.19 | Open | Open | Aggregate | Yes |
| 32-5-35.1 | A | Renovation | 0.07 | Temporary / Seasonal / Limited | Open | Aggregate | Yes |
| 32-5-35.1 | B | Renovation | 0.63 | Temporary / Seasonal / Limited | Open | Aggregate | No |
| 32-5-35.2 | A | Renovation | 1.76 | Open | Open | Aggregate | No |
| 32-5-35.2 | A | Renovation | 1.01 | Open | Open | Aggregate | Yes |
| 32-5-35.3 | | Renovation | 0.46 | Open | Open | Aggregate | Yes |
| 32-5-35.3 | | Renovation | 0.26 | Open | Open | Aggregate | No |
| 33-3-18.0 | C | Renovation | 0.47 | Open | Open | Aggregate | No |
| 33-3-18.0 | D | Renovation | 0.27 | Open | Open | Aggregate | No |
| 33-4-02.0 | A | Renovation | 0.42 | Temporary / Seasonal / Limited | Open | Natural | No |
| 33-4-02.0 | B | Renovation | 0.14 | Temporary / Seasonal / Limited | Open | Natural | No |
| 33-4-03.0 | A1 | Renovation | 0.19 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-4-03.0 | A2 | Renovation | 0.40 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-4-03.1 | | Renovation | 0.97 | Open | Open | Aggregate | No |
| 33-4-03.2 | | Renovation | 0.86 | Open | Open | Natural | No |
| 33-4-03.3 | A | Renovation | 0.38 | Open | Open | Aggregate | No |
| 33-4-03.3 | B | Renovation | 0.18 | Open | Open | Aggregate | No |
| 33-4-03.7 | A | Renovation | 0.20 | Open | Open | Aggregate | No |
| 33-4-03.7 | B | Renovation | 0.62 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-4-03.7 | C | Renovation | 0.83 | Open | Open | Aggregate | No |
| 33-4-04.0 | A | Renovation | 1.56 | Open | Open | Aggregate | No |
| 33-4-04.0 | B | Renovation | 2.18 | Open | Open | Aggregate | No |
| 33-4-04.0 | C | Renovation | 0.53 | Open | Open | Aggregate | No |
| 33-4-04.1 | A | Renovation | 0.67 | Open | Open | Aggregate | No |
| 33-4-04.1 | B | Renovation | 0.05 | Open | Open | Aggregate | No |
| 33-4-04.2 | A | Renovation | 0.31 | Open | Open | Aggregate | No |
| 33-4-04.2 | B | Renovation | 0.20 | Open | Open | Aggregate | No |
| 33-4-09.0 | A1 | Renovation | 0.28 | Open | Open | Aggregate | No |
| 33-4-09.0 | A2 | Renovation | 0.14 | Open | Open | Aggregate | No |
| 33-4-09.1 | A1 | Renovation | 0.67 | Open | Open | Aggregate | No |
| 33-4-09.1 | A2 | Renovation | 0.20 | Open | Open | Aggregate | No |
| 33-4-09.1 | A2 | Renovation | 0.03 | Open | Open | Aggregate | No |
| 33-4-09.2 | | Renovation | 0.37 | Open | Open | Aggregate | No |
| 33-4-09.3 | | Renovation | 0.15 | Open | Open | Aggregate | No |
| 33-4-09.4 | | Renovation | 0.10 | Open | Open | Aggregate | No |
| 33-4-10.1 | B | Construction | 0.16 | | Temporary / Seasonal / Limited | N/A | No |
| 33-4-10.1 | A | Renovation | 0.68 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-4-10.1 | C | Renovation | 0.60 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 33-4-11.0 | A | Renovation | 0.66 | Open | Open | Aggregate | No |
| 33-4-11.1 | | Renovation | 0.69 | Open | Open | Aggregate | No |
| 33-4-11.2 | A | Renovation | 0.19 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-4-11.2 | B | Renovation | 0.72 | Temporary / Seasonal / Limited | Open | Aggregate | No |
| 33-4-11.3 | | Renovation | 0.46 | Open | Open | Aggregate | No |
| 33-4-15.0 | A | Renovation | 1.21 | Open | Open | Aggregate | No |
| 33-4-15.0 | B1 | Renovation | 1.56 | Open | Open | Aggregate | No |
| 33-4-15.0 | B2 | Renovation | 0.20 | Open | Open | Aggregate | No |
| 33-4-15.1 | A | Renovation | 0.73 | Open | Open | Aggregate | No |
| 33-4-15.1 | B1 | Renovation | 0.42 | Open | Open | Aggregate | No |
| 33-4-15.1 | B2 | Renovation | 0.85 | Open | Open | Aggregate | No |
| 33-4-15.1 | C | Renovation | 1.00 | Open | Open | Aggregate | No |
| 33-4-15.14 | | Renovation | 0.12 | Open | Open | Aggregate | No |
| 33-4-15.15 | | Renovation | 0.04 | Open | Open | Natural | No |
| 33-4-15.16 | | Renovation | 0.15 | Open | Open | Aggregate | No |
| 33-4-15.3 | A1 | Renovation | 0.35 | Open | Open | Aggregate | No |
| 33-4-15.5 | A | Renovation | 0.94 | Open | Decommission | Aggregate | No |
| 33-4-15.5 | B | Renovation | 0.95 | Open | Open | Aggregate | No |
| 33-4-15.6 | | Renovation | 0.54 | Open | Decommission | Aggregate | No |
| 33-4-15.7 | | Renovation | 0.30 | Decommission | Decommission | Aggregate | No |
| 33-4-15.8 | | Renovation | 0.48 | Decommission | Open | Aggregate | No |
| 33-4-15.8 | | Renovation | 0.08 | Decommission | Decommission | Aggregate | No |
| 33-4-15.8 | | Renovation | 0.12 | Decommission | Decommission | Aggregate | No |
| 33-4-15.9 | | Renovation | 0.31 | Decommission | Decommission | Aggregate | No |
| 33-4-17.0 | A | Renovation | 0.54 | Open | Open | Aggregate | No |
| 33-4-17.0 | B | Renovation | 0.15 | Open | Open | Natural | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-4-17.2 | A1 | Renovation | 0.31 | Open | Open | Aggregate | No |
| 33-4-17.2 | A2 | Renovation | 0.16 | Open | Open | Aggregate | No |
| 33-4-17.3 | | Renovation | 0.21 | Open | Open | Aggregate | No |
| 33-4-17.4 | | Renovation | 0.22 | Open | Open | Aggregate | No |
| 33-4-19.0 | A1 | Renovation | 0.35 | Open | Open | Aggregate | No |
| 33-4-19.0 | A2 | Renovation | 0.14 | Open | Open | Natural | No |
| 33-4-21.0 | A | Renovation | 0.36 | Open | Open | Aggregate | No |
| 33-4-21.0 | B | Renovation | 0.18 | Open | Open | Aggregate | No |
| 33-4-21.0 | C | Renovation | 0.07 | Open | Open | Aggregate | No |
| 33-4-21.1 | A1 | Renovation | 0.92 | Open | Open | Aggregate | No |
| 33-4-21.1 | A2 | Renovation | 0.50 | Open | Open | Aggregate | No |
| 33-4-21.2 | A | Renovation | 0.21 | Open | Open | Aggregate | No |
| 33-4-21.2 | B | Renovation | 0.18 | Open | Open | Aggregate | No |
| 33-4-21.3 | | Renovation | 0.06 | Open | Open | Aggregate | No |
| 33-4-22.0 | A1 | Renovation | 0.75 | Open | Open | Aggregate | No |
| 33-4-22.0 | A2 | Renovation | 0.24 | Open | Open | Aggregate | No |
| 33-4-22.0 | B | Renovation | 0.66 | Open | Open | Aggregate | No |
| 33-4-22.0 | C | Renovation | 0.11 | Open | Open | Aggregate | No |
| 33-4-29.0 | A | Renovation | 0.37 | Open | Open | Aggregate | No |
| 33-4-29.0 | B | Renovation | 0.77 | Open | Open | Aggregate | No |
| 33-4-29.0 | C | Renovation | 0.43 | Open | Open | Aggregate | No |
| 33-4-29.0 | D1 | Renovation | 0.30 | Open | Open | Aggregate | No |
| 33-4-29.0 | D2 | Renovation | 0.76 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-4-29.1 | | Renovation | 0.14 | Open | Open | Aggregate | No |
| 33-4-30.0 | A1 | Renovation | 0.08 | Open | Open | Aggregate | No |
| 33-4-30.0 | A2 | Renovation | 0.97 | Open | Open | Aggregate | No |
| 33-4-30.0 | A3 | Renovation | 0.12 | Open | Open | Natural | No |
| 33-4-30.1 | | Renovation | 0.71 | Open | Temporary / Seasonal / Limited | Aggregate | No |
| 33-4-31.0 | A | Renovation | 0.38 | Open | Temporary / Seasonal / Limited | Aggregate | No |
| 33-4-31.0 | B | Renovation | 0.27 | Open | Temporary / Seasonal / Limited | Aggregate | No |
| 33-4-31.0 | C | Renovation | 0.50 | Open | Temporary / Seasonal / Limited | Aggregate | No |
| 33-4-31.1 | | Renovation | 0.45 | Open | Open | Natural | No |
| 33-4-32.0 | A | Renovation | 0.56 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-4-32.0 | B | Renovation | 0.13 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-5-01.1 | A | Renovation | 0.33 | Open | Open | Aggregate | No |
| 33-5-01.1 | B | Renovation | 0.26 | Open | Open | Aggregate | No |
| 33-5-02.0 | A | Renovation | 0.12 | Open | Temporary / Seasonal / Limited | Natural | Yes |
| 33-5-03.1 | | Renovation | 0.20 | Open | Open | Aggregate | No |
| 33-5-03.2 | A | Renovation | 0.85 | Open | Open | Aggregate | No |
| 33-5-03.2 | B | Renovation | 0.18 | Open | Open | Aggregate | No |
| 33-5-03.2 | C | Renovation | 0.61 | Open | Open | Aggregate | No |
| 33-5-03.3 | | Renovation | 0.20 | Open | Open | Aggregate | No |
| 33-5-03.4 | | Renovation | 0.26 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-5-03.5 | | Renovation | 0.57 | Open | Open | Aggregate | No |
| 33-5-03.5 | | Renovation | 0.07 | Open | Open | Aggregate | No |
| 33-5-03.6 | | Renovation | 0.15 | Open | Open | Aggregate | No |
| 33-5-04.0 | | Renovation | 0.39 | Open | Open | Natural | Yes |
| 33-5-04.1 | A | Renovation | 0.61 | Open | Open | Aggregate | No |
| 33-5-04.1 | A | Renovation | 0.02 | Open | Open | Aggregate | Yes |
| 33-5-04.1 | B | Renovation | 0.63 | Open | Open | Aggregate | No |
| 33-5-04.3 | | Renovation | 0.47 | Open | Open | Aggregate | No |
| 33-5-05.0 | | Renovation | 0.13 | Temporary / Seasonal / Limited | Decommission | Aggregate | Yes |
| 33-5-05.1 | | Renovation | 0.60 | Open | Open | Aggregate | Yes |
| 33-5-05.2 | | Renovation | 0.31 | Open | Open | Aggregate | Yes |
| 33-5-09.0 | A | Renovation | 0.06 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 33-5-09.0 | B | Renovation | 0.30 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 33-5-09.0 | C | Renovation | 0.74 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 33-5-09.2 | | Renovation | 0.30 | Open | Open | Aggregate | No |
| 33-5-10.0 | A | Renovation | 0.20 | Open | Open | Aggregate | Yes |
| 33-5-10.0 | B | Renovation | 0.40 | Open | Open | Aggregate | No |
| 33-5-10.0 | C | Renovation | 0.33 | Open | Open | Aggregate | No |
| 33-5-10.0 | D | Renovation | 0.64 | Open | Open | Aggregate | No |
| 33-5-10.0 | E | Renovation | 0.64 | Open | Open | Aggregate | No |
| 33-5-10.0 | F | Renovation | 0.86 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-5-10.0 | G | Renovation | 0.26 | Open | Open | Aggregate | No |
| 33-5-10.0 | H | Renovation | 0.60 | Open | Open | Aggregate | No |
| 33-5-10.0 | I | Renovation | 1.04 | Open | Open | Aggregate | No |
| 33-5-10.0 | J | Renovation | 1.30 | Open | Open | Aggregate | No |
| 33-5-10.0 | K | Renovation | 0.29 | Open | Open | Aggregate | No |
| 33-5-10.1 | A | Renovation | 1.22 | Open | Open | Aggregate | No |
| 33-5-10.1 | B | Renovation | 1.63 | Open | Open | Aggregate | No |
| 33-5-10.2 | | Renovation | 1.82 | Open | Open | Aggregate | No |
| 33-5-10.3 | A | Renovation | 3.19 | Open | Open | Aggregate | Yes |
| 33-5-10.3 | B | Renovation | 0.49 | Open | Open | Aggregate | Yes |
| 33-5-10.4 | A | Renovation | 0.72 | Open | Open | Aggregate | No |
| 33-5-10.4 | B | Renovation | 0.85 | Open | Open | Aggregate | No |
| 33-5-10.5 | | Renovation | 0.31 | Decommission | Decommission | Aggregate | No |
| 33-5-10.6 | | Renovation | 0.88 | Open | Open | Aggregate | No |
| 33-5-10.7 | | Renovation | 0.08 | Open | Open | Aggregate | No |
| 33-5-10.8 | | Renovation | 0.48 | Decommission | Decommission | Natural | No |
| 33-5-11.1 | | Renovation | 0.43 | Decommission | Decommission | Natural | No |
| 33-5-13.2 | | Renovation | 0.53 | Open | Open | Aggregate | No |
| 33-5-14.0 | | Renovation | 0.39 | Open | Open | Natural | No |
| 33-5-14.3 | | Renovation | 0.02 | Open | Open | Aggregate | No |
| 33-5-14.4 | A1 | Renovation | 0.13 | Open | Open | Aggregate | No |
| 33-5-14.4 | A2 | Renovation | 0.21 | Decommission | Decommission | Aggregate | No |
| 33-5-14.4 | B | Renovation | 0.16 | Decommission | Decommission | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-5-15.0 | | Renovation | 0.13 | Open | Open | Aggregate | No |
| 33-5-15.1 | | Renovation | 0.22 | Open | Decommission | Natural | No |
| 33-5-15.3 | | Renovation | 0.26 | Open | Open | Aggregate | No |
| 33-5-21.0 | A | Renovation | 0.70 | Open | Open | Aggregate | No |
| 33-5-21.0 | B | Renovation | 1.52 | Open | Open | Aggregate | No |
| 33-5-21.0 | C | Renovation | 0.49 | Open | Open | Aggregate | No |
| 33-5-21.0 | D | Renovation | 1.31 | Open | Open | Aggregate | No |
| 33-5-21.1 | | Renovation | 2.04 | Open | Open | Aggregate | No |
| 33-5-22.0 | | Renovation | 1.52 | Open | Open | Aggregate | No |
| 33-5-22.1 | | Renovation | 1.21 | Open | Open | Aggregate | No |
| 33-5-22.2 | | Renovation | 0.52 | Open | Open | Aggregate | No |
| 33-5-22.3 | | Renovation | 0.35 | Open | Open | Aggregate | No |
| 33-5-22.4 | | Renovation | 0.36 | Open | Open | Aggregate | No |
| 33-5-23.3 | A | Renovation | 0.06 | Open | Open | Aggregate | No |
| 33-5-23.3 | B | Renovation | 0.66 | Open | Open | Natural | No |
| 33-5-23.4 | | Renovation | 0.42 | Open | Open | Aggregate | No |
| 33-5-25.0 | A | Renovation | 0.29 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 33-5-25.0 | B | Renovation | 0.86 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-5-25.1 | | Renovation | 0.11 | Open | Decommission | Aggregate | No |
| 33-5-25.2 | | Construction | 0.39 | | Open | N/A | No |
| 33-5-26.0 | A | Renovation | 1.21 | Open | Open | Aggregate | No |
| 33-5-26.2 | A | Renovation | 1.69 | Open | Open | Aggregate | No |

KSW01888

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-5-26.2 | B | Renovation | 0.12 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-5-26.4 | | Renovation | 0.47 | Open | Open | Aggregate | No |
| 33-5-27.0 | | Renovation | 0.19 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-5-31.3 | | Renovation | 0.46 | Open | Open | Aggregate | No |
| 33-5-32.0 | A | Renovation | 0.63 | Open | Open | Aggregate | No |
| 33-5-34.0 | | Renovation | 0.29 | Decommission | Decommission | Natural | No |
| 33-5-34.1 | | Construction | 0.86 | | Open | N/A | No |
| 33-5-34.2 | | Construction | 0.28 | | Open | N/A | No |
| 33-5-35.0 | | Renovation | 1.89 | Open | Open | Aggregate | No |
| 33-5-35.1 | A | Renovation | 0.71 | Open | Open | Aggregate | No |
| 33-5-35.1 | B | Renovation | 0.37 | Open | Open | Aggregate | No |
| 33-5-35.2 | | Renovation | 1.10 | Open | Open | Aggregate | No |
| 33-5-35.3 | | Renovation | 0.03 | Open | Open | Aggregate | No |
| 33-5-35.4 | | Renovation | 0.17 | Open | Decommission | Aggregate | No |
| 33-5-35.5 | | Renovation | 1.19 | Open | Open | Aggregate | No |
| 33-5-36.0 | | Renovation | 0.32 | Decommission | Decommission | Natural | No |
| 33-5-36.1 | | Renovation | 0.28 | Open | Open | Natural | No |
| 33-5-36.2 | A | Renovation | 0.36 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-5-36.2 | B | Renovation | 0.05 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-5-36.2 | C | Renovation | 0.25 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 33-6-24.0 | A | Renovation | 0.98 | Open | Open | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 33-6-24.0 | B1 | Renovation | 2.17 | Open | Open | Aggregate | No |
| 33-6-24.0 | B2 | Renovation | 0.37 | Open | Open | Aggregate | No |
| 34-4-05.0 | A | Renovation | 1.86 | Open | Open | Aggregate | No |
| 34-4-05.0 | B | Renovation | 1.90 | Open | Open | Aggregate | No |
| 34-4-06.2 | B | Construction | 0.33 | | Temporary / Seasonal / Limited | N/A | No |
| 34-4-06.2 | A | Renovation | 0.07 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Natural | No |
| 34-4-28.0 | A | Renovation | 1.24 | Open | Open | Bituminous | No |
| 34-4-28.0 | B | Renovation | 0.19 | Open | Open | Bituminous | No |
| 34-4-28.0 | C | Renovation | 0.46 | Open | Open | Aggregate | No |
| 34-4-28.0 | D | Renovation | 0.57 | Open | Open | Aggregate | No |
| 34-4-28.0 | E | Renovation | 0.64 | Open | Open | Aggregate | No |
| 34-4-28.0 | F | Renovation | 0.68 | Open | Open | Aggregate | No |
| 34-4-28.0 | G | Renovation | 0.14 | Open | Open | Aggregate | No |
| 34-4-28.0 | H | Renovation | 0.98 | Open | Open | Aggregate | No |
| 34-4-28.0 | I | Renovation | 0.59 | Open | Open | Aggregate | No |
| 34-4-28.0 | J | Renovation | 1.15 | Open | Open | Aggregate | No |
| 34-4-28.0 | K | Renovation | 0.57 | Open | Open | Aggregate | No |
| 34-5-01.0 | A | Renovation | 1.29 | Open | Open | Aggregate | No |
| 34-5-01.0 | B | Renovation | 0.68 | Open | Open | Aggregate | No |
| 34-5-01.0 | C | Renovation | 1.27 | Open | Open | Aggregate | No |
| 34-5-01.1 | | Renovation | 0.38 | Open | Temporary / Seasonal / Limited | Aggregate | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 34-5-01.3 | A | Renovation | 0.38 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 34-5-01.3 | B | Renovation | 1.90 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Aggregate | No |
| 34-5-02.1 | A | Renovation | 0.63 | Open | Open | Aggregate | No |
| 34-5-02.1 | B | Renovation | 3.30 | Open | Open | Aggregate | No |
| 34-5-03.0 | | Renovation | 1.66 | Open | Open | Aggregate | No |
| 34-5-03.2 | | Renovation | 0.89 | Open | Open | Aggregate | No |
| 34-5-04.0 | | Construction | 0.74 | | Open | N/A | No |
| 34-5-07.0 | H | Renovation | 1.72 | Open | Open | Aggregate | No |
| 34-5-10.0 | A1 | Renovation | 3.05 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | A2 | Renovation | 0.36 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | A3 | Renovation | 0.64 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | A4 | Renovation | 0.94 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | A5 | Renovation | 0.28 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | A6 | Renovation | 0.93 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | B1 | Renovation | 0.45 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | B2 | Renovation | 1.52 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | B3 | Renovation | 2.50 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | B3 | Renovation | 0.76 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | B5 | Renovation | 0.46 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | C1 | Renovation | 0.64 | Open | Open | Bituminous | No |
| 34-5-10.0 | C1 | Renovation | 0.35 | Open | Open | Bituminous | Yes |
| 34-5-10.0 | C2 | Renovation | 0.48 | Open | Open | Bituminous | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| 34-5-10.0 | C3 | Renovation | 0.83 | Open | Open | Bituminous | No |
| NS-01 | | Renovation | 0.44 | Decommission | Decommission | Unknown | No |
| NS-02 | | Renovation | 0.05 | Decommission | Decommission | Unknown | No |
| NS-03 | | Renovation | 0.23 | Decommission | Decommission | Unknown | No |
| NS-04 | | Renovation | 0.20 | Decommission | Decommission | Unknown | No |
| NS-05 | | Renovation | 0.15 | Decommission | Decommission | Unknown | No |
| NS-06 | | Renovation | 0.02 | Decommission | Decommission | Unknown | Yes |
| NS-07 | | Renovation | 0.07 | Decommission | Decommission | Unknown | Yes |
| NS-08 | | Renovation | 0.06 | Decommission | Decommission | Unknown | Yes |
| NS-09 | | Renovation | 0.06 | Decommission | Decommission | Unknown | No |
| NS-10 | | Renovation | 0.28 | Decommission | Decommission | Unknown | No |
| NS-11 | | Renovation | 0.09 | Decommission | Decommission | Unknown | Yes |
| NS-12 | | Renovation | 0.20 | Unknown | Temporary / Seasonal / Limited | Unknown | No |
| NS-13 | | Renovation | 0.56 | Unknown | Temporary / Seasonal / Limited | Unknown | No |
| NS-14 | | Renovation | 0.25 | Decommission | Decommission | Unknown | No |
| NS-15 | | Renovation | 0.21 | Open | Open | Unknown | No |
| NS-16 | | Renovation | 0.09 | Open | Open | Unknown | No |
| NS-17 | | Renovation | 0.08 | Open | Open | Unknown | Yes |
| NS-18 | | Renovation | 0.60 | Decommission | Decommission | Unknown | Yes |
| NS-19 | | Renovation | 0.35 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | Yes |
| NS-20 | | Renovation | 0.53 | Decommission | Decommission | Unknown | No |
| NS-21 | | Renovation | 0.45 | Decommission | Decommission | Unknown | No |
| NS-22 | | Renovation | 0.06 | Decommission | Decommission | Unknown | No |
| NS-23 | | Renovation | 0.16 | Decommission | Decommission | Unknown | No |
| NS-24 | | Renovation | 0.14 | Open | Open | Unknown | No |
| NS-25 | | Renovation | 0.85 | Open | Open | Unknown | No |
| NS-26 | | Renovation | 0.49 | Open | Open | Unknown | No |
| NS-27 | | Renovation | 0.11 | Decommission | Decommission | Unknown | No |
| NS-28 | | Renovation | 0.25 | Decommission | Decommission | Unknown | No |
| NS-29 | | Renovation | 0.12 | Open | Open | Unknown | No |
| NS-30 | | Renovation | 0.18 | Open | Open | Unknown | No |
| NS-31 | | Renovation | 0.15 | Decommission | Decommission | Unknown | No |
| NS-32 | | Renovation | 0.44 | Decommission | Decommission | Unknown | No |
| NS-33 | | Renovation | 0.19 | Decommission | Decommission | Unknown | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| NS-34 | | Renovation | 1.26 | Open | Open | Unknown | No |
| NS-35 | | Renovation | 0.32 | Decommission | Decommission | Unknown | No |
| NS-36 | | Renovation | 0.14 | Decommission | Decommission | Unknown | No |
| NS-37 | | Renovation | 0.05 | Decommission | Decommission | Unknown | No |
| NS-38 | | Renovation | 0.19 | Open | Open | Unknown | No |
| NS-39 | | Renovation | 0.02 | Decommission | Decommission | Unknown | No |
| NS-40 | | Renovation | 0.57 | Decommission | Decommission | Unknown | No |
| NS-41 | | Renovation | 1.16 | Decommission | Decommission | Unknown | No |
| NS-42 | | Renovation | 0.85 | Decommission | Decommission | Unknown | No |
| NS-43 | | Renovation | 0.61 | Open | Open | Unknown | No |
| NS-44 | | Renovation | 0.31 | Open | Open | Unknown | No |
| NS-45 | | Renovation | 0.21 | Open | Open | Unknown | No |
| NS-46 | | Renovation | 0.26 | Open | Open | Unknown | No |
| NS-47 | | Renovation | 0.29 | Open | Open | Unknown | No |
| NS-48 | | Renovation | 0.50 | Decommission | Decommission | Unknown | No |
| NS-49 | | Renovation | 0.02 | Decommission | Decommission | Unknown | No |
| NS-50 | | Renovation | 0.25 | Decommission | Decommission | Unknown | No |
| NS-51 | | Renovation | 0.14 | Decommission | Decommission | Unknown | No |
| NS-52 | | Renovation | 0.02 | Decommission | Decommission | Unknown | No |
| NS-53 | | Renovation | 0.18 | Open | Open | Unknown | No |
| NS-54 | | Renovation | 0.19 | Open | Open | Unknown | No |
| NS-55 | | Renovation | 1.09 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-56 | | Renovation | 0.35 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-57 | | Renovation | 1.01 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-58 | | Renovation | 0.13 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-59 | | Renovation | 0.88 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-60 | | Renovation | 0.16 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-61 | | Renovation | 0.05 | Open | Open | Unknown | No |
| NS-62 | | Renovation | 0.92 | Open | Open | Unknown | No |
| NS-63 | | Renovation | 0.10 | Decommission | Decommission | Unknown | No |

KSW01893

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| NS-64 | | Renovation | 0.20 | Temporary / Seasonal / Limited | Temporary / Seasonal / Limited | Unknown | No |
| NS-65 | | Renovation | 0.09 | Decommission | Decommission | Unknown | No |
| NS-66 | | Renovation | 0.48 | Decommission | Decommission | Unknown | No |
| NS-67 | | Renovation | 0.40 | Decommission | Decommission | Unknown | No |
| NS-68 | | Renovation | 0.26 | Decommission | Decommission | Unknown | No |
| NS-69 | | Renovation | 0.01 | Open | Open | Unknown | No |
| NS-70 | | Renovation | 0.09 | Decommission | Decommission | Unknown | No |
| PR 01-03 | | Construction | 0.05 | | Decommission | N/A | No |
| PR 02-02 | | Construction | 0.04 | | Decommission | N/A | No |
| PR 03-04 | | Construction | 0.17 | | Open | N/A | No |
| PR 03-05 | | Construction | 0.06 | | Open | N/A | No |
| PR 03-06 | | Construction | 0.22 | | Open | N/A | No |
| PR 03-08 | | Construction | 0.23 | | Temporary / Seasonal / Limited | N/A | No |
| PR 03-10 | | Construction | 0.36 | | Temporary / Seasonal / Limited | N/A | No |
| PR 04-01-A | | Construction | 0.47 | | Open | N/A | No |
| PR 05-04-A | | Construction | 0.58 | | Decommission | N/A | No |
| PR 05-04-B | | Construction | 0.79 | | Open | N/A | No |
| PR 05-05 | | Construction | 0.08 | | Open | N/A | No |
| PR 11-01 | | Construction | 0.18 | | Decommission | N/A | No |
| PR 13-03 | | Construction | 0.10 | | Open | N/A | No |
| PR 14-03-A | | Construction | 0.42 | | Decommission | N/A | No |
| PR 14-03-B | | Construction | 0.23 | | Decommission | N/A | No |
| PR 15-08-A | | Construction | 0.27 | | Decommission | N/A | No |
| PR 15-08-B | | Construction | 0.17 | | Open | N/A | No |

KSW01894

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| PR 15-10 | | Construction | 0.32 | | Open | N/A | No |
| PR 17-01-A | | Construction | 0.48 | | Open | N/A | No |
| PR 17-01-B | | Construction | 0.45 | | Decommission | N/A | No |
| PR 17-01-C | | Construction | 0.13 | | Decommission | N/A | No |
| PR 21-01 | | Construction | 0.34 | | Temporary / Seasonal / Limited | N/A | No |
| PR 22-07 | | Construction | 0.25 | | Open | N/A | No |
| PR 23-02 | | Construction | 0.41 | | Open | N/A | No |
| PR 23-05 | | Construction | 0.33 | | Open | N/A | No |
| PR 24-05-A | | Construction | 0.37 | | Open | N/A | No |
| PR 24-05-B | | Construction | 0.21 | | Open | N/A | No |
| PR 24-05-C | | Construction | 0.24 | | Open | N/A | No |
| PR 25-01 | | Construction | 0.18 | | Open | N/A | No |
| PR 26-01 | | Construction | 0.28 | | Decommission | N/A | No |
| PR 26-02 | | Construction | 0.30 | | Open | N/A | No |
| PR 27-08 | | Construction | 0.13 | | Open | N/A | No |
| PR 29-03 | | Construction | 0.17 | | Open | N/A | No |
| PR 29-07-A | | Construction | 0.17 | | Open | N/A | No |
| PR 29-07-B | | Construction | 0.34 | | Decommission | N/A | No |
| PR 29-09 | | Construction | 0.26 | | Decommission | N/A | No |
| PR 31-02-A | | Construction | 0.87 | | Open | N/A | No |
| PR 31-02-B | | Construction | 0.28 | | Open | N/A | No |
| PR 31-02-C | | Construction | 0.28 | | Open | N/A | No |
| PR 31-05 | | Construction | 0.73 | | Open | N/A | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| PR 31-06-A | | Construction | 0.29 | | Temporary / Seasonal / Limited | N/A | No |
| PR 31-06-B | | Construction | 0.16 | | Temporary / Seasonal / Limited | N/A | No |
| PR 31-10 | | Construction | 0.22 | | Open | N/A | No |
| PR 32-01 | | Construction | 0.53 | | Open | N/A | No |
| PR 33-03 | | Construction | 1.07 | | Decommission | N/A | No |
| PR 33-04 | | Construction | 0.12 | | Temporary / Seasonal / Limited | N/A | No |
| PR 34-02-A | | Construction | 1.03 | | Open | N/A | No |
| PR 34-02-B | | Construction | 0.05 | | Decommission | N/A | No |
| PR 34-02-C | | Construction | 0.14 | | Decommission | N/A | No |
| PR 34-02-D | | Construction | 0.21 | | Decommission | N/A | No |
| PR 35-02 | | Construction | 0.14 | | Open | N/A | No |
| PR 35-04 | | Construction | 0.51 | | Open | N/A | No |
| TR 01-04 | | Construction | 0.11 | | Temporary / Seasonal / Limited | N/A | No |
| TR 03-06 | | Construction | 0.31 | | Decommission | N/A | No |
| TR 03-09 | | Construction | 0.04 | | Decommission | N/A | No |
| TR 04-01-A | | Construction | 0.14 | | Decommission | N/A | No |
| TR 04-05 | | Construction | 0.08 | | Decommission | N/A | No |
| TR 05-02-A | | Construction | 0.20 | | Decommission | N/A | No |
| TR 05-02-B | | Construction | 0.05 | | Decommission | N/A | No |
| TR 05-03 | | Construction | 0.15 | | Decommission | N/A | No |
| TR 09-08-A | | Construction | 0.34 | | Decommission | N/A | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| TR 09-08-B | | Construction | 0.27 | | Decommission | N/A | No |
| TR 09-08-C | | Construction | 0.13 | | Decommission | N/A | No |
| TR 09-09 | | Construction | 0.04 | | Decommission | N/A | No |
| TR 10-01 | | Construction | 0.16 | | Decommission | N/A | No |
| TR 10-02 | | Construction | 0.36 | | Decommission | N/A | No |
| TR 11-04-A | | Construction | 0.17 | | Decommission | N/A | No |
| TR 11-04-B | | Construction | 0.28 | | Decommission | N/A | No |
| TR 11-04-C | | Construction | 0.06 | | Decommission | N/A | No |
| TR 13-03 | | Construction | 0.05 | | Decommission | N/A | No |
| TR 13-04 | | Construction | 0.17 | | Decommission | N/A | No |
| TR 15-08 | | Construction | 0.14 | | Decommission | N/A | No |
| TR 15-10 | | Construction | 0.07 | | Decommission | N/A | No |
| TR 19-01 | | Construction | 0.17 | | Decommission | N/A | No |
| TR 19-04 | | Construction | 0.03 | | Decommission | N/A | No |
| TR 19-06 | | Construction | 0.20 | | Decommission | N/A | No |
| TR 22-01-A | | Construction | 0.12 | | Decommission | N/A | No |
| TR 22-01-B | | Construction | 0.21 | | Decommission | N/A | No |
| TR 22-01-C | | Construction | 0.06 | | Decommission | N/A | No |
| TR 23-02 | | Construction | 0.15 | | Decommission | N/A | No |
| TR 23-10 | | Construction | 0.12 | | Decommission | N/A | No |
| TR 24-02 | | Construction | 0.14 | | Decommission | N/A | No |
| TR 24-05 | | Construction | 0.05 | | Decommission | N/A | No |
| TR 24-06 | | Construction | 0.10 | | Decommission | N/A | No |

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| TR 25-02 | | Construction | 0.07 | | Decommission | N/A | No |
| TR 25-06 | | Construction | 0.02 | | Decommission | N/A | No |
| TR 25-07 | | Construction | 0.17 | | Decommission | N/A | No |
| TR 25-12 | | Construction | 0.22 | | Decommission | N/A | No |
| TR 27-01 | | Construction | 0.07 | | Decommission | N/A | No |
| TR 27-08 | | Construction | 0.04 | | Decommission | N/A | No |
| TR 29-02 | | Construction | 0.08 | | Decommission | N/A | No |
| TR 29-06 | | Construction | 0.15 | | Decommission | N/A | No |
| TR 29-08-A | | Construction | 0.39 | | Decommission | N/A | No |
| TR 29-08-B | | Construction | 0.18 | | Decommission | N/A | No |
| TR 29-08-C | | Construction | 0.09 | | Decommission | N/A | No |
| TR 30-03 | | Construction | 0.15 | | Decommission | N/A | No |
| TR 31-02-A | | Construction | 0.10 | | Decommission | N/A | No |
| TR 31-02-B | | Construction | 0.09 | | Decommission | N/A | No |
| TR 31-02-C | | Construction | 0.06 | | Decommission | N/A | No |
| TR 31-04 | | Construction | 0.03 | | Decommission | N/A | No |
| TR 31-05 | | Construction | 0.26 | | Decommission | N/A | No |
| TR 31-08-A | | Construction | 0.17 | | Decommission | N/A | No |
| TR 31-08-B | | Construction | 0.07 | | Decommission | N/A | No |
| TR 31-08-C | | Construction | 0.06 | | Decommission | N/A | No |
| TR 32-01 | | Construction | 0.22 | | Decommission | N/A | No |
| TR 33-04 | | Construction | 0.04 | | Decommission | N/A | No |
| TR 33-05 | | Construction | 0.19 | | Decommission | N/A | No |

KSW01898

| Road Number | Segment | Road Work | Miles | Current Closure Status | Final Closure Status | Existing Surface Type | Alt 3 |
|---|---|---|---|---|---|---|---|
| TR 33-06-A | | Construction | 0.19 | | Decommission | N/A | No |
| TR 33-06-B | | Construction | 0.03 | | Decommission | N/A | No |
| TR 33-06-C | | Construction | 0.11 | | Decommission | N/A | No |
| TR 35-04-A | | Construction | 0.21 | | Decommission | N/A | No |
| TR 35-04-B | | Construction | 0.05 | | Decommission | N/A | No |
| TR 35-10 | | Construction | 0.37 | | Decommission | N/A | No |
| TR 35-12 | | Construction | 0.12 | | Decommission | N/A | No |

### D.4.        Watershed Analysis

The Last Chance Project Area is located within Douglas, Jackson, and Josephine Counties of Oregon, east of I-5, from Sunny Valley to Quines Creek. The project units are located within Grave Creek, Middle Cow Creek, and Upper Cow Creek watersheds. Middle and Upper Cow drain into the South Umpqua and Grave Creek is tributary to the Rogue River. The Last Chance project area has a climate characterized by moderate temperatures, wet winters, and dry summers. About 80 percent of the precipitation occurs between October and May.

The Grants Pass Field Office (GPFO) is proposing forest management treatment activities including vegetation treatments such as VRH, commercial thinning, HFR, and tree tipping on approximately 32,272 acres of BLM-administered lands within the Last Chance project area. Forest management treatments consist of both commercial and non-commercial treatments. For a complete description of the actions planned review Chapters 1&2.

The analytical questions or issues are either not analyzed in detail (Appendix B) or analyzed in detail in Chapter 3. To make these determinations adequately and scientifically, hydrology metrics need to be calculated based on watershed size, calculations need to be made for the assumptions and detailed table s are needed for the analysis. This appendix details the underlying calculations presented for Issue 8 and Issue 10 AID and the soil and water NAIDs in Appendix B. All makes use of Geographical Information System (GIS) to determine changes to water yield, potential enhancement of peak flows, estimates for road density, roaded areas for proposed haul routes on aggregate roads, maintenance actions, and other surface disturbances is calculated for the 10-digit (5th level) watersheds, 12-digit subwatersheds within LCFMP (Table 4.1). These methodologies and calculation s are based on peer reviewed science and analysis from the Final EIS for Western Oregon Volume 1&2 (USDI/BLM, 2016a, pp. 369-768).

#### D.4.1 Hydrology and Water Quality Calculations and Tables

The existing ECA was estimated from 2020 aerial photography for baseline or current conditions and found to be just over 5,932 acres or about 10.4 percent of the LCFMP. Calculations for ECA for alternative analysis include a 45-ft width for roads. Since the locations for landings are not known, a per acre disturbance number was added to ECA to account for this. Road maintenance is not expected to result in new clearings not considered in the baseline estimates. Quarries footprints would be included in

the ECA footprint since some vegetation clearing could occur. These buffers are applied in GIS and are included in all the ECA calculations (see Table D4.1 shows totals by analysis area).

Table D.4-1: ECA Analysis for Proposed Ground Disturbance for 12-dgit (6th level) subwatersheds.

Calculations for ECA for alternative analysis include a 45-ft width for roads. Since the locations for landings are not known, a per acre disturbance number was added to ECA to account for this. Road maintenance is not expected to result in new clearings not considered in the baseline estimates. Quarries footprints would be included in the ECA footprint since some vegetation clearing could occur. These buffers are applied in GIS and are included in all the ECA calculations (see Table D4.1 shows totals by analysis area).

| Analysis Area Name^ | Analysis Area (acres) * | Current ECA (acres) | Alt 2 & 2a: Proposed ECA (acres)^ | Percent Disturbance | Alt 3: Proposed ECA | Percent Disturbance |
|---|---|---|---|---|---|---|
| McGinnis Creek - Upper Cow | 1,229 | 7 | 4 | 4.05% | 50 | 4.05% |
| Whitehorse Creek - Middle Cow | 7,957 | 57 | 20 | 4.73% | 376 | 4.73% |
| Quines Creek - Middle Cow | 13,481 | 95 | 2 | 3.48% | 469 | 3.48% |
| Fortune Branch - Middle Cow | 2,234 | 15 | 8 | 4.86% | 109 | 4.86% |
| Last Chance – Grave Creek | 16,025 | 123 | 4 | 3.84% | 614 | 3.84% |
| Shanks Creek - Grave Creek | 5,622 | 38 | 5 | 3.72% | 209 | 3.72% |
| Rat Creek - Grave Creek | 891 | 9 | 0 | 4.96% | 44 | 4.96% |
| Wolf Creek - Grave Creek | 9,447 | 79 | 7 | 4.44% | 419 | 4.44% |
| * These are the portions of the 12-digit (6th level) subwatershed areas within the LCFMP | | | | | | |
| ^ This includes disturbance from landings from D4.1 and Roaded Area (45ft width for Road Construction) | | | | | | |

Table D.4-2: Current ECA for 14-dgit (7th level) subwatersheds.

| Analysis Areas | Rain Zone | | Transient Snow | | Seasonal Snow | | Total Acres* |
|---|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % | |
| Middle Starvout Creek (below Jones Creek, above Hogum Creek) | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Middle Hogum Creek (below Boulder Creek, above Fizzleout Creek) | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Jones Creek (Starvout Creek) | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Boulder Creek (Starvout Creek) | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |

| Analysis Areas | Rain Zone | | Transient Snow | | Seasonal Snow | | Total Acres* |
|---|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % | |
| Upper Hogum Creek (above Boulder Creek) | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Upper Starvout Creek (above Jones Creek) | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |
| Lower Bull Run (below Little Bull Run, above Quines Creek confluence) | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| McCollum Creek | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Upper Bull Run (above Little Bull Run) | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Woodford Creek | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Middle Quines Creek (below Tennessee Gulch, above Bull Run) | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Grave Creek above Last Chance Creek | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Little Bull Run | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |
| Last Chance Creek | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| Upper Quines Creek (above Tennessee Gulch) | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Tennessee Gulch | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Sourdough Gulch | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Wolf Creek (Grave Creek) below Bummer Gulch, above Hole in the Ground | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Wolf Creek (Grave Creek) below Hole in the Ground, above Board Tree Creek | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Wolf Creek (Grave Creek) above Bummer Gulch | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |
| Grave Creek below Last Chance Creek, down to (and including) Little Boulder Creek | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| Wolf Creek (Grave Creek) below Board Tree Creek, above Sourdough Gulch | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Bummer Gulch (Grave Creek) | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |

KSW01901

| Analysis Areas | Rain Zone | | Transient Snow | | Seasonal Snow | | Total Acres* |
|---|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % | |
| Hole in the Ground (Wolf Creek) | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Slate Creek (Grave Creek) | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Boulder Creek (King Mountain) | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Grave Creek below Little Boulder Creek, above Slate Creek | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |
| Coyote Creek below Foley Gulch, above Colby Gulch | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| Post Gulch | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Clark Creek (Grave Creek) | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Robinson Gulch | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Coyote Creek above Post Gulch | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Coyote Creek below Post Gulch, above Scholey Gulch | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Baker Creek | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |
| Grave Creek below Slate Creek, above Baker Creek | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| Coyote Creek below Scholey Gulch, above Miller Gulch | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Coyote Creek below Robinson Gulch, above Foley Gulch | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Kennedy Gulch | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Coyote Creek below Miller Gulch, above Robinson Gulch | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Colby Gulch | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Scholey Gulch | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |
| Miller Gulch (Coyote Creek) | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| Eastman Gulch | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Tom East Creek (Shanks Creek-Grave Creek) | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Salmon Creek | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Quartz Mill Gulch (Grave Creek) | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Grave Creek below Baker Creek, above Boulder Creek (King Mountain) | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |
| Benjamin Gulch | 21,600 | 100% | 0 | 0 | 0 | 0 | 21,600 |

KSW01902

| Analysis Areas | Rain Zone | | Transient Snow | | Seasonal Snow | | Total Acres* |
|---|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % | |
| Grave Creek below Boulder Creek (King Mountain), above Clark Creek | 11,140 | 100% | 0 | 0 | 0 | 0 | 11,140 |
| Grave Creek below Clark Creek, above Eastman Gulch | 15,573 | 99.60% | 57 | 0.40% | 0 | 0 | 15,630 |
| Grave Creek below Eastman Gulch, above Quartz Mill Gulch | 14,036 | 99.20% | 106 | 0.80% | 0 | 0 | 14,142 |
| Grave Creek below Quartz Mill Gulch, above Tom East Creek | 16,685 | 99% | 230 | 1% | 0 | 0 | 16,915 |
| Grave Creek below Burgess Gulch, above Salmon Creek | 12,115 | 100% | 0 | 0 | 0 | 0 | 12,115 |
| Grave Creek below Benjamin Gulch, above Burgess Gulch | 21,950 | 99.80% | 35 | 0.20% | 0 | 0 | 21,986 |

D4.2 Soils Calculations and Tables

The LCFMP falls within the Inland Siskiyous ecoregion of the Klamath mountains, which is characterized by steep, rugged mountains, narrow river valleys, and a mix of mixed evergreen and broadleaf trees (Douglas-fir, ponderosa pine, oak, and madrone) (Thorson et al., 2003, Whittaker, 1960). The Klamath mountains are made up of altered volcanic and sedimentary rock and intrusive igneous rock. Granite and peridotite intrusions are present, and in some cases, the peridotite altered to serpentinite, which is the metamorphic derivative of ultramafic rocks. Most soils in the project area are Inceptisols and Ultisols that are dry for long periods of the year.

The LCFMP is within Douglas, Jackson, and Josephine Counties, east of Interstate Highway I-5 and between the Sunny Valley and Quines Creek exits. The LCFMP is composed of portions of three 10-digit HUCs or 5th level watersheds (Grave Creek, Middle Cow Creek, and Upper Cow Creek). Commercial timber harvest and non-commercial HFR as well as Road Renovation and Road Construction have the potential to create ground disturbance and these areas will be evaluated for soils impacts in Issue 10 AID as well as the NAIDs for soils.

The US Department of Agriculture, Natural Resource Conservation Service (NRCS) soil survey data was reviewed for the LCFMP. The project area is located within Josephine (OR033), Jackson (OR632), and Douglas (OR649) counties and soil series are summarized by total and percent area in Table D.4.1 (NRCS, 2020). The NRCS completed mapping in these survey areas at a 1:20,000 to 1:24,000 scale with a minimum size delineation of 4.0 acres. Analyzed acres in the original proposal were 13,224 acres, only 11,686 of these are proposed for a specific treatment, the other acres are associated with roads. Due to the changes in mapping not all the totals will reflect the total acres used in the analysis.

**Table D.4-4**: Soil survey taxonomy summary for the LCFMP alternatives 2 & 2a including commercial timber harvest areas and non-commercial HFR. Alternative 3 shows just the commercial timber harvest and the non-commercial HFR and not new HFR treatments (Also, total Acres are different than in table 2-5 since do to scaling errors with the soils survey (NRCS, 2020).

| Soil Types | Acres | % of Total |
|---|---|---|
| **Alternative 2** | | |
| Loamy-skeletal, mixed, mesic Dystric Xerochrepts | 2,602 | 22.8% |
| Fine-loamy, mixed, mesic Typic Haploxerults | 2,131 | 18.7% |
| Fine-loamy, mixed, mesic Typic Palexerults | 2,036 | 17.8% |
| Fine-loamy, mixed, mesic Ultic Haploxeralfs | 1,106 | 9.7% |
| Loamy-skeletal, mixed, frigid Dystric Xerochrepts | 1,038 | 9.1% |
| Fine, mixed, mesic Ultic Haploxeralfs | 916 | 8.0% |
| Loamy-skeletal, serpentinitic, mesic Dystric Xerochrepts | 613 | 5.4% |
| Clayey-skeletal, serpentinitic, mesic Lithic Xerochrepts | 247 | 2.2% |
| Clayey, kaolinitic, mesic Typic Haploxerults | 210 | 1.8% |
| Fine, serpentinitic, frigid Ultic Haploxeralfs | 132 | 1.2% |
| Loamy-skeletal, mixed Dystric Cryochrepts | 111 | 1.0% |
| Fine-loamy, mixed, mesic Typic Haplumbrepts | 73 | 0.6% |
| Loamy-skeletal, mixed, mesic Ultic Haploxeralfs | 60 | 0.5% |
| Loamy-skeletal, mixed, frigid Lithic Xerumbrepts | 54 | 0.5% |
| Xerorthents | 27 | 0.2% |
| Fine-loamy, mixed, mesic Ultic Haploxerolls | 26 | 0.2% |
| Clayey, kaolinitic, mesic Typic Palexerults | 26 | 0.2% |
| Clayey-skeletal, serpentinitic, mesic Mollic Haploxeralfs | 16 | 0.1% |
| Coarse-loamy, mixed, mesic Pachic Haploxerolls | 1 | 0.0% |
| **Total** | **11,425** | 100% |
| **Alternative 3** | | |
| Loamy-skeletal, mixed, mesic Dystric Xerochrepts | 1,481 | 28.7% |
| Fine-loamy, mixed, mesic Typic Palexerults | 1,342 | 26.0% |
| Fine-loamy, mixed, mesic Typic Haploxerults | 684 | 13.2% |
| Fine, mixed, mesic Ultic Haploxeralfs | 441 | 8.5% |
| Fine-loamy, mixed, mesic Ultic Haploxeralfs | 360 | 7.0% |
| Loamy-skeletal, mixed, frigid Dystric Xerochrepts | 336 | 6.5% |
| Loamy-skeletal, serpentinitic, mesic Dystric Xerochrepts | 143 | 2.8% |
| Fine, serpentinitic, frigid Ultic Haploxeralfs | 105 | 2.0% |
| Clayey, kaolinitic, mesic Typic Haploxerults | 99 | 1.9% |
| Loamy-skeletal, mixed, mesic Ultic Haploxeralfs | 59 | 1.1% |

| Soil Types | Acres | % of Total |
|---|---|---|
| Clayey-skeletal, serpentinitic, mesic Lithic Xerochrepts | 57 | 1.1% |
| Loamy-skeletal, mixed, frigid Lithic Xerumbrepts | 30 | 0.6% |
| Xerorthents | 18 | 0.4% |
| Clayey, kaolinitic, mesic Typic Palexerults | 9 | 0.2% |
| **Total** | **5,164** | 100% |

The LCFMP is dominated by four soil series and are generally characterized by being well drained with a gravelly texture, moderate permeability, and differentiated more so by parent material than other characteristics (Table D.4-5)

**Table D.4-5:** Dominant soil series types for the LCFMP

| Soil Series Name | Summary |
|---|---|
| Acker | Formed from colluvium and residuum from metasedimentary and rhyolitic tuff rocks, fine-loamy texture, mesic Typic Palexerult, 40"-60" of rooting depth, well-drained, moderately slow permeability. |
| Norling | Formed from colluvium and residuum of metavolcanic, metasedimentary, and extrusive igneous rocks, fine-loamy texture, mesic Ultic Haploxeralf, 20"-40" of rooting depth, well-drained, moderately slow permeability. |
| Beekman | Soils formed from colluvium weathered from sedimentary and extrusive igneous rocks, loamy-skeletal, mesic Typic Dystroxerept, 20"-40" of rooting depth, well-drained, moderate permeability. |
| Colestine | Soils formed from colluvium weathered from sedimentary and extrusive igneous rocks, fine-loamy, mesic Typic Dystroxerept, 20"-40" of rooting depth, well-drained, moderate permeability. |

The portion of the LCFMP with treatments proposed consists of 20% serpentine rock formation, which often weathers to form nutrient-limited soils for traditional production rates (Table D.4-6) (Whittaker, 1960). Serpentinite is the metamorphic derivative of ultramafic rocks and form soils usually low in Calcium and high in Magnesium, Chromium, and Nickle (Whittaker, 1954). Despite this unusual nutrient distribution, research indicates that slower growing species may favor serpentine soils where both nutrients and water availability are low (Wright, 2007). On the Grants Pass Field Office, serpentine-derived soils are typically associated with nutrient-poor, withdrawn soils that are discussed in more detail in the Timber Production Capability Classification (TPCC) section, below.

KSW01905

**Table D.4-6:** Geologic rock type in LCFMP (DOGAMI, 2011), acreage of rock type, and percent of project units.

| Geologic Rock Type | Acres | Percent of Area |
|---|---|---|
| Serpentinite | 2,471 | 19% |
| Tuff | 2,330 | 17% |
| Tuffaceous sedimentary rocks | 2,080 | 16% |
| Volcanic rocks | 1,771 | 13% |
| Mafic composition lithologies | 919 | 7% |
| Sandstone | 914 | 7% |
| Greenstone | 742 | 6% |
| Fine grained sediments | 732 | 5% |
| Mixed grained sediments | 604 | 5% |
| Brecciated rock | 473 | 4% |
| Intermediate composition lithologies | 125 | 1% |
| Marine sedimentary rocks | 118 | 1% |
| Mafic composition lithologies | 69 | 1% |
| Coarse grained sediments | 6 | 0% |
|  | 13,354 | 100% |

Approximately half of the project unit area are classified as severe erosion hazard by the NRCS, a metric that incorporates erosion factor and rock fragment, which indicates that unsurfaced roads and trails built in the Last Chance units is expected significant erosion and will require frequent erosion-control maintenance (Table D.4-7).

**Table D.4-7:** Erosion hazard rating indicating potential soil loss from unsurfaced roads and trails in the Last Chance project units in total acres and a percent of the project units (NRCS, 2020).

| Erosion Hazard Rating | Acres | Percent Area |
|---|---|---|
| Very Severe | 4,031 | 30% |
| Severe | 6,290 | 47% |
| Moderate | 2,875 | 22% |
| Slight | 122 | 1% |
| Not rated | 36 | 0% |
| **Total** | **13,354** | **100%** |

**Table D.4-8:** Surface texture in the Last Chance project units (NRCS, 2020).

| Surface Texture Class | Acres | % of Total Area |
|---|---|---|
| Slightly decomposed plant material | 8,305 | 62.4% |
| Moderately decomposed plant material | 1,652 | 12.4% |
| Gravelly loam | 2,913 | 21.9% |
| Extremely stony clay loam | 219 | 1.6% |
| Very gravelly loam | 142 | 1.1% |
| Very gravelly sandy loam | 37 | 0.3% |
| Extremely cobbly clay loam | 27 | 0.2% |
| Very stony clay loam | 22 | 0.2% |
| Loam | 1 | 0.0% |
| **Total** | **13,318** | **100.0%** |

Soils were evaluated within the project area for indications of hydric characteristics, which are formed under conditions of saturation, flooding, or ponding enough to create anaerobic (oxygen limited) conditions during the growing season (Soil Survey Staff, 1993). A broad analysis was conducted using GIS data provided by NRCS and showed only three broad categories of hydric soils: not hydric (0% hydric) and slightly hydric (0-32%). Highly hydric (66-99%). The hydric rating, as a percent, reflects the percentage of an area normally associated with a wetland (Table D.4-9). Under all alternatives ground-based equipment would be excluded from operating on hydric soils (USDI/BLM 2016b p. 183).

**Table D.4-9:** Distribution of hydric soils in the project units (NRCS, 2020).

| Hydric Rating % of map unit | Acres | Percent Area |
|---|---|---|
| No Hydric Soils | 10,884 | 81.5% |
| 1% | 1,348 | 10.1% |
| 2% | 180 | 1.3% |
| 3% | 928 | 7.0% |
| 4% | 14 | 0.1% |
| **Total** | **13,354** | **100.0%** |

**Table D.4-10**: Estimates for DSD using yarding systems on page 746 of the FEIS.

| Analysis Area | | DSD %* | Proposed (acres) | DSD (acres) |
|---|---|---|---|---|
| Alternative 2 & 2a | Ground Based Yarding | 35% | 2,590 | 907 |
| | Cable Yarding | 12% | 5,080 | 610 |
| | Helicopter Yarding | 6% | 570 | 34 |
| | **Treatment Unit Estimated DSD** | **19%** | **8,240** | **1,550** |
| Alternative 3 | Ground Based Yarding | 35% | 387 | 135 |
| | Cable Yarding | 12% | 672 | 81 |

| | | | |
|---|---|---|---|
| Helicopter Yarding | 6% | 0 | 0 |
| **Treatment Unit Estimated DSD** | **20%** | **1,059** | **216** |
| * Estimates of DSD by Yarding Method (USDI BLM, 2016a p. 746) | | | |

**Table D.4-11**: Potential DSD base on DSD Modeling for Units with Logging Systems.

| Analysis Area | | Acres |
|---|---|---|
| **Alternative 2 & 2a** | Commercial Timber Harvest | 8,240 |
| | Estimated DSD from Yarding Methods | 989 |
| | Legacy Disturbance Estimated from past Management | 144 |
| | **Potential DSD for Treatment Areas** | **14%** |
| **Alternative 3** | Commercial Timber Harvest | 1,059 |
| | Estimated DSD from Yarding Methods | 64 |
| | Legacy Disturbance Estimated from past Management | 10 |
| | **Potential DSD for Treatment Areas** | **7%** |

**Table D.4.12:** Proposed Timber Harvest in District Designated Reserves-Timber Productivity Capability Classification

| Unit | Acres | Updated TPCC Symbol | Previous TPCC Symbol / Description | Proposed Treatment Types | Project Design Features |
|---|---|---|---|---|---|
| 11-02 | 0.5 | FMR | RMW – Reforestation Moisture Withdrawn. Low available soil moisture in combination with competing vegetation and low precipitation during the growing season. | Thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash to increase soil moisture holding capacity. | Decrease treatment intensity, avoid group selects, lop and scatter slash. |
| 05-04 19-05 34-01 | 29.5 2 3 | FN-G | FGNW – Fragile Non-suitable Woodland Slope Gradient. Unstable slope or slope with the potential to become unstable. Generally greater than 65 percent concave and 80 percent in convex positions. | Buffer these sites if conditions match those described to the left. | Avoid and buffer sites which are generally greater than 65 percent in concave positions and 80 percent in convex positions – common locations are in inner gorges, above streams, and headwall drainages. |

| Unit | Acres | Updated TPCC Symbol | Previous TPCC Symbol / Description | Proposed Treatment Types | Project Design Features |
|------|-------|---------------------|-----------------------------------|--------------------------|-------------------------|
| 03-08 | 2 | FN-N | FNNW – Fragile Non-suitable Nutrient Woodland.<br><br>Inherently low nutrients or nutrient imbalance. Extremely/cobbly/gravely textured surfaces. | Minimize ground disturbance. Buffer areas with higher nutrient issues. | Thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash to increase nutrients. Consider the application of fertilizer. |
| 03-09 | 1.5 | | | | |
| 03-10 | 3.5 | | | | |
| 04-01 | 6 | | | | |
| 09-06 | 2 | | | | |
| 09-07 | 1 | | | | |
| 11-06 | 5.5 | | | | |
| 14-02 | 4.5 | | | | |
| 17-01 | 65.5 | | | | |
| 17-02 | 14 | | | | |
| 21-01 | 14 | | | | |
| 22-07 | 10 | | | | |
| 23-09 | 4.5 | | | | |
| 25-06 | 10 | | | | |
| 25-07 | 22 | | | | |
| 27-01 | 5 | | | | |
| 27-03 | 1 | | | | |
| 11-02 | 0.5 | FN-W | FWNW – Fragile Non-suitable Woodland Groundwater.<br><br>Poorly drained soils which contain water at or near the soil surface for long periods such that vegetation survival and growth are negatively affected. | Buffer these sites if conditions match those described to the left. | Buffer sites found to be saturated. |
| 03-01 | 3.5 | NCFL-LPS | LSW – Low site potential in suitable woodland and non-forest. | Promote desired species composition by retaining/culturing minor species such as pine and oak and removing small diameter Douglas-fir. Lop and scatter slash to redistribute nutrients. Consider low intensity | Retain/culture minor species over small Douglas-fir, lop and scatter slash, low intensity prescribed fire. |
| 04-01 | 29 | | | | |
| 05-04 | 8.5 | | | | |
| 11-06 | 3.5 | | | | |
| 22-03 | 1 | | | | |
| 22-07 | 1.5 | | | | |
| 23-02 | 3.5 | | | | |

KSW01909

| Unit | Acres | Updated TPCC Symbol | Previous TPCC Symbol / Description | Proposed Treatment Types | Project Design Features |
|------|-------|---------------------|-----------------------------------|--------------------------|-------------------------|
| 23-03 | 0.5 | | | prescribed fire on some sites to emulate ecological conditions produced by historic fire regimes. | |
| 23-08 | 2 | | | | |
| 24-01 | 6 | | | | |
| 24-02 | 15.5 | | | | |
| 24-03 | 1 | | | | |
| 25-06 | 5 | | | | |
| 27-03 | 3.5 | | | | |
| 34-01 | 26 | | | | |
| 05-02 | 22.5 | NCFL-NCSP | NCW – Non-commercial Woodland. Areas generally produce species which are typically utilized as noncommercial products and sold in units other than board feet. | Thin stands and apply prescribed fire to promote minor species such as pine and oaks. Reintroduce fire to favor fire tolerant understory species. | Consider treating these areas to promote desired minor species such as pine and oak. |
| 05-04 | 4 | | | | |
| 03-01 | 4.5 | NF – Nonforest | NF – Nonforest. Sites within the forest zone that are not capable of maintaining at least 10% stocking of forest trees and those sites which have been converted to nontimber uses. | Construction and/or use of cable corridors, skid trails, landings, and roads. | N/A |
| 04-01 | 5 | | | | |
| 05-01 | 1 | | | | |
| 06-01 | 0.5 | | | | |
| 09-01 | 5 | | | | |
| 14-02 | 1.5 | | | | |
| 22-01 | 2.5 | | | | |
| 23-09 | 0.5 | | | | |
| 25-10 | 2.5 | | | | |
| 26-02 | 3 | | | | |
| 32-01 | 0.5 | | | | |
| 33-03 | 6 | | | | |
| 33-06 | 11.5 | | | | |
| 34-01 | 10 | | | | |
| 34-02 | 17 | | | | |
| 35-05 | 1 | NF-RCK – Nonforest Rock | NF – Nonforest. | Construction and/or use of cable corridors, skid trails, landings, and roads. | N/A |

| Unit | Acres | Updated TPCC Symbol | Previous TPCC Symbol / Description | Proposed Treatment Types | Project Design Features |
|---|---|---|---|---|---|
| 03-08 | 4.5 | NF-UTL – Nonforest Utility Site | NF – Nonforest. | Construction and/or use of cable corridors, skid trails, landings, and roads. | N/A |
| 03-10 | 12.5 | | | | |
| 03-12 | 6 | | | | |
| 11-02 | 6 | | | | |
| 11-04 | 6.5 | | | | |
| 03-01 | 2.5 | RN-K | RSW – Suitable Woodland Surface Rock.<br><br>Surface fragment layer that cannot be manipulated to create planting spots, soil beneath surface layer is not sufficient depth to support conifer growth. | To promote desired species composition thin stands at the light to moderate level and avoid large group selects which would require planting. Lop and scatter slash to redistribute nutrients. Consider low intensity prescribed fire on some sites to emulate ecological conditions produced by historic fire regimes. | Thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash, low intensity prescribed fire. |
| 03-04 | 0.5 | | | | |
| 04-01 | 32.5 | | | | |
| 04-02 | 3.5 | | | | |
| 04-03 | 1.5 | | | | |
| 04-04 | 9.5 | | | | |
| 05-03 | 9.5 | | | | |
| 13-06 | 7 | | | | |
| 14-01 | 1 | | | | |
| 14-03 | 15 | | | | |
| 17-01 | 14 | | | | |
| 23-02 | 8 | | | | |
| 23-03 | 7 | | | | |
| 23-11 | 1 | | | | |
| 24-01 | 2 | | | | |
| 25-07 | 1.5 | | | | |
| 26-02 | 3 | | | | |
| 31-06 | 35.5 | | | | |
| 31-08 | 7 | | | | |
| 32-02 | 0.5 | | | | |
| 34-01 | 48 | | | | |
| 14-01 | 0.5 | RR-KM | RSW/RMW – Suitable Woodland Surface Rock/ Reforestation Moisture Withdrawn<br><br>RSW - Suitable Woodland Surface Rock. | To promote desired species composition thin stands at a moderate level and avoid large group selects which would require planting. Lop and scatter slash to redistribute nutrients. | Thin stands moderately, avoid group selects which require replanting, lop and scatter slash, |

| Unit | Acres | Updated TPCC Symbol | Previous TPCC Symbol / Description | Proposed Treatment Types | Project Design Features |
|---|---|---|---|---|---|
| | | | Surface fragment layer that cannot be manipulated to create planting spots, soil beneath surface layer is not sufficient depth to support conifer growth.<br><br>RMW – Reforestation Moisture Withdrawn. Low available soil moisture in combination with competing vegetation and low precipitation during the growing season. | Consider low intensity prescribed fire on some sites to emulate ecological conditions produced by historic fire regimes.<br><br>Thin stands light to moderately, avoid group selects which require replanting, lop and scatter slash to increase soil moisture holding capacity. | low intensity prescribed fire.<br><br>Decrease treatment intensity, avoid group selects, lop and scatter slash. |
| 06-01<br>11-03<br>31-08 | 3.5<br>0.5<br>0.5 | RR-T | RTW – Reforestation Temperature Withdrawn.<br><br>High solar radiation in combination with low available soil moisture. | Thin stands moderately, avoid group selects which require replanting, lop and scatter slash to increase soil moisture holding capacity. | Avoid group selects and lop and scatter slash. |
| 11-02<br>11-03<br>24-05<br>29-06 | 96.5<br>20.8<br>215.7<br>82.7 | FR-E | FM - Surface erosion that can be highly erodible, easily detached, and subject to bouncing or sliding downhill (dry ravel), even if partially vegetated. The soils overlay intrusive volcanic bedrock (e.g., granite, diorite, and schist). | See Table C-9. Yarding, ground-based, prescribed burning and seasonal restrictions may apply. | See Table C-9. |

### D.5.    Wildland Fuel Profile

<u>Background</u>

In the frequent fire-adapted dry forest, there are important stand attributes that improve resistance to stand-replacing fire, reducing "the likelihood of atypical large-scale crown fires (Agee and Skinner 2005; Jain et al. 2012; Franklin et al. 2013). In general, stands with higher fire resistance have reduced surface fuel loading, lower tree density, large diameter trees of fire-resistant species, increased height to live crown (Brown et al. 2004; Peterson et al. 2005; USDI BLM 2008a), and discontinuous horizontal and vertical fuels" (USDI BLM 2016a, p. 243). Patchy stand composition in vegetation or fuel patterns

representative of frequent-fire dry forest low-mixed fire regime fuel loading contributes toward stand resistance to replacement fire (USDI BLM 2016a, pp. 225-226) by disrupting fuel profiles which may inhibit the spread of crown fires, creating variability in litter fall and surface fuel accumulations, and promoting regeneration of diverse species to respond to disturbance (e.g., wildfire, drought, and insects). In these fire-resistant stands, it is more likely that a "wildfire can burn through…without substantially altering its structure, composition, or function (Franklin et al. 2013)." (USDI BLM 2016a, p. 242). These principles are consistent with those articulated in the Rogue Valley Integrated Fire Plan (RVIFP) (CWPP 2019, Table 5-1, p. 103).

Fire hazard refers to the ease of ignition, potential fire behavior (surface, passive or crown fire), and resistance to control of wildland fuels (i.e., surface, ladder, and canopy fuels), which directly influences suppression tactics, for example, crown fires present the greatest resistance to control (USDI BLM 2016a, p. 254-255, Appendix H. 1321-1322). Crown fires create the greatest amount of ember production and spot fires and present the greatest resistance to control among potential fire behavior types (USDI BLM 2016a, p. 254). The primary fuel characteristics associated with potential fire behavior and crown fire potential are canopy base height, canopy bulk density, and surface fuel loading (Scott and Reinhardt 2001).

Fire resistance is inversely related to fire hazard; when fire resistance increases, fire hazard decreases (USDI BLM 2016a, p. 254-255, Appendix H. 1321-1322).

Methods

The PRMP/FEIS found that implementation of the PRMP/FEIS would reduce the acreage in the low or moderate resistance to stand-replacement fire categories within the dry forest, from nearly 50% to 30%, across the Medford District after 50 years. After 50 years, the majority of acres would be in the *mixed* fire resistance category (USDI BLM 2016a, p. 249), (USDI BLM 2016a, Figure 3-29, p.246).

In the PRMP/FEIS, the BLM assumed that vegetation structural stage is an important component affecting resistance to stand replacing fire, and assigned forest structural stages (USDI BLM 2016a, Appendix C pp. 1203-1206) to a relative ranking of resistance to stand-replacement fire (USDI BLM 2016a, p. 243 Table 3-32), based on assumptions regarding horizontal and vertical fuel profile continuity (USDI BLM 2016a, Appendix H pp. 1320-1321). These categories range from low fire resistance (i.e., greater tendency for a stand-replacement) to moderate to high fire resistance (i.e., less probability of a stand-replacement). Very simply put, a crown fire or a very intense surface fire would result in stand-replacement. The PRMP/FEIS also identified a *mixed* fire resistance category, which indicates the potential to exhibit the full range of resistance categories (low, moderate, or high), for example, the PRMP/FEIS acknowledged that some structural stages in certain landscape locations can harbor conditions more likely to result in lowered fire severity (USDI BLM 2016a, Appendix H pp. 1320-1321). The PRMP/FEIS analysis did "…not account for the complex interaction among fuels (including vertical and horizontal composition and moisture), topography (e.g., slope, topographic position, elevation, and aspect), and weather (e.g., wind, temperature, relative humidity, fuel moisture, and drought) that influence fire behavior, resultant burn severity, and fire effects (Andrews and Rothermel 1983, Scott and Reindhardt 2001) and the specific conditions related to crown fire initiation (stand-replacement fire) and spread (Van Wagner 1977)" (USDI BLM 2016a, p. 243). The PRMP/FEIS concluded that "ultimately, fire behavior in the "mixed category" would result from several factors, including weather, fuel moisture, and topographic influences, along with the vertical and horizontal continuity of the fuel profile" (USDI BLM 2016a, Appendix H p. 1320). In short, fire behavior is a product of fuels, weather, and topography.

To provide an informative analysis of this EA's alternatives effects in the *mixed* relative resistance to stand-replacing fire category, the BLM considered the vertical and horizontal continuity of the wildland fuel profile (i.e., canopy, ladder and surface fuels, and fuel heterogeneity) in detailed analysis of stand-

level resistance to compare fuel profiles and predicted fire behavior among alternatives for stands with *mixed* resistance to stand-replacement fire within the Nexus 2.1 crown fire model program (Scott and Reinhardt 2014), which links separate models of surface fire behavior and crown fire behavior to calculate indices of relative crown fire potential (e.g., crowning index [CI] and torching index [TI]).The BLM conducted this analysis under typical fire weather conditions (90th percentile), as assumed in the PRMP/FEIS (p. 228), and average slope across the maximum proposed action footprint (see Affected Environment in Appendix D.5 for more details).

The BLM used a standard approach to derive a relative resistance to stand-replacement fire for mixed relative resistance to stand-replacing fire categories, based on the relationship between indices of relative crown fire potential:  crowning index (CI) and torching index (TI) (See Assumptions below).

For cumulative effects, the BLM considered the incremental impact of proposed actions when added to other past, present, and reasonably foreseeable future actions and natural disturbance and climatic factors.

      Assumptions

*Relative Resistance to Stand-replacement Fire Rating*

**Table 3.5.1:** Explanation of the relationship between crowning index (CI), torching index (TI), and relative stand replacement fire resistance.

| Crowning Index (CI) | Torching Index (TI) | Relative Stand Replacement Fire Resistance |
|---|---|---|
| <20 mph | <20 mph | LOW |
|  | >20 mph | MODERATE-low* |
| 20 – 30 mph | <20 mph | MODERATE-low |
|  | >20 mph | MODERATE-high |
| >30 mph | <30 mph | MODERATE-high |
|  | >30 mph | HIGH |

*If TI is greater than CI, this indicates that within-stand crown fire initiation is unlikely, however stand canopy connectivity may support crown fire spread from adjacent areas under windspeeds equal or below CI windspeeds (i.e., independent crownfire).

*Wildland Fuel Profile*



Figure D.5.1: Forest fuel profile: surface, ladder and canopy fuels.
Image from the Idyllwild Fire Protection District, Idyllwild, CA
https://idyllwildfire.com/defensible-space.html

Canopy base height and surface fire intensity are key variables (along with the moisture content of leaves and branches) in determining the transition between surface fire to torching or passive crown fire. Canopy bulk density (or connectivity) then differentiates between passive and active crown fire (VanWagner 1977).

The wildland fuel profile: canopy fuels (canopy connectivity (canopy cover and canopy bulk density), ladder fuels (canopy base height), surface fuels (surface fuel models) (Scott and Burgan 2005) and fuel heterogeneity and thus influence fire resistance and fire hazard. These fuels are illustrated in Figure D.5.1. Figure D.5.1 provides a visual representation of surface fuels, canopy fuels, and ladder fuels.

The BLM incorporates by reference and applies here the same details regarding the wildland fuel profile (Canopy Fuels, ladder fuels, surface fuels, fuel heterogeneity, maintenance, and resistance to other disturbance) that the BLM discussed in the Rogue Gold Environmental Assessment (EA), Appendix H (BLM 2023) and Integrated Vegetation Management for Resilient Lands EA, Appendix 5 (IVM-RL EA) (BLM 2022) to analyze the effects to relative resistance to stand-replacing fire, particularly the category the FEIS identified as *mixed* relative resistance to stand replacement fire in the FEIS (BLM 2016a).

*Canopy fuels (Canopy Connectivity (Canopy Bulk Density and Canopy Cover)*

Canopy fuels consist of live and dead tree branches and crowns. Tree crowns can be separated or interlocking (i.e., canopy connectivity) and dense or sparse. Large trees, particularly of fire-resistant species, are an important component of fire-resistant stand structure (Martinson and Omi 2013; USDI BLM 2016a, pp. 243, 252).

A necessary input into NEXUS is available canopy fuel. The BLM used a value of 6 tons/acre for all model runs, based on estimates for Douglas-fir and Sierra Nevada mixed conifer, as presented by Scott and Reinhard (2002).

For commercial thinning and group selection actions in *mixed* relative resistance to stand-replacement category, the BLM derived estimated post-harvest canopy cover, based on prescriptive RDI targets and corresponding estimated canopy cover provided by the Silviculturist. The BLM assumes that openings and skips contribute toward the stand-level average canopy cover. The BLM derived corresponding canopy bulk density from canopy cover using LANDFIRE lookup tables (Metlen et al. Appendix 7, Metlen et al 2021) (USDI BLM 2016a, Appendix H). The BLM assumed existing vegetation height in all stands to be greater than 75 feet (25 meters). The BLM assumed canopy fuels would not change

following only small diameter thinning and prescribe fire treatments (i.e. non-commercial fuels reduction).

*Ladder fuels (Canopy Base Height)*

Ladder fuels typically consist of small trees and tall shrubs that span from the forest floor to the overstory canopy. The vertical arrangement of fuels refers to the continuity of fuels from the ground up through the overstory canopy, termed as CBH. Low vertical separation between surface and canopy fuels, or low CBH, is the most common vector for surface fire to transition into crown fire and is commonly identified as the ladder fuel component of the Wildland fuel profile. Canopy base height supplies information used in fire behavior models, to determine the point at which a surface fire would transition to a crown fire.

Removal of ladder fuels increases vertical and horizontal separation or discontinuity in the fuel profile and reduces the probability of surface fire flames ascending into and igniting tree crowns and subsequently decrease the likelihood of tree torching and crown fire initiation (Scott and Reinhard 2001; Van Wagner 1977). Application of prescribed fire, via underburning, can further raise CBH and reduce ladder fuels.

The BLM assumed CBH resulting from the proposed actions (small diameter thinning and prescribed burning) would reflect outcomes indicated by local Medford District monitoring data (USDI BLM 2021b), literature, assumptions in the Rogue Basin Strategy for post-treatment fuel transitions (Metlen et al. 2017; Metlen et al 2021), LANDFIRE post-disturbance rules, and professional local knowledge. In areas of handpile burning, proposed actions would result in CBHs of approximately 8 feet on average following treatment. Areas that are underburned would be expected to have relatively high CBHs of approximately 12 feet on average. Where prescriptions would maintain NSO Nesting-roosting habitat function, CBHs would be relatively low (less than 5 feet on average).

In the 2016 PRMP/FEIS, the BLM incorporated post-harvest tree planting into the vegetation modeling and subsequent post-harvest structural stages (USDI BLM 2016a, Appendix C), thus the 2016 PRMP/FEIS analysis of structural stage resistance to stand-replacement fire, which this analysis tiers to (see Methodology) accounts for presumed post-harvest replanting. Additionally, the moderate-term effects analysis in this issue accounts for re-growth of understory vegetation (i.e., accumulation of surface and ladder fuels), including the varied effects of reforestation within gaps.

*Surface fuels (Fire Behavior Fuel Model)*

The BLM assumed a range of short-term (up to 20 years) surface fuel model transitions resulting from the proposed actions (small diameter thinning and prescribed burning) that would reflect outcomes indicated by local Medford District monitoring data (USDI BLM 2021), literature, assumptions in the Rogue Basin Strategy for post-treatment fuel transitions (Metlen et al. 2017; Metlen et al 2021), LANDFIRE post-disturbance rules, and professional local knowledge.

Specifically, following commercial thinning or selection harvest and subsequent fuels reduction treatments (small diameter thinning and prescribed burning), the BLM assumed a mix of *low* to *moderate* grass-shrub and hardwood litter surface fuel models in stands with <40 percent canopy cover; and a mix of *low* to *moderate* timber understory and timber litter surface fuel models in stands with >40 percent canopy cover for short-term (up to 20 years) (Table 2).

**Table 2:** Surface fuel model transitions following commercial thinning or selection harvest and subsequent fuels reduction treatments (small diameter thinning and prescribed burning).

| Existing Surface Fuel Loading Description Categories (Model) | Canopy Cover | | |
|---|---|---|---|
| | **<40%** | **>40-60%** | **>60%** |
| Low load grass (101,102) | No change | N/A | |

KSW01916

| | | |
|---|---|---|
| Low load grass-shrub (121,141) | | |
| Moderate load grass-shrub (122,123,142) | Low load grass-shrub (GS1/121) | |
| High load shrub (145,147) | Moderate Load grass-shrub (GS2/122) | |
| Low load mixed conifer - hardwood (181,182,161) | Mix 1/3 each: Low load (GS1/121); Moderate load conifer-hardwood (TL6/186) & Moderate load grass-shrub (GS2/122) | No Change |
| Moderate load mixed conifer - hardwood (162,183,186,188) | | |
| High load conifer (184,185,187) | | Mix 1/3 each: Low-load Mixed conifer -understory (161/TU1); Moderate load litter (183/TL3); Moderate load mixed conifer-understory (162/TU2)* |
| Very High load mixed conifer-hardwood (165,189) | | |

*Fuel Heterogeneity*

There is considerable evidence that many historic frequent-fire dry forests were comprised of a fine-scale patchy composition of openings and clumps (Churchill et al. 2013; Hessburg et al. 2015; Larson and Churchill 2008; Taylor 2010; Larson and Churchill 2012; Lydersen et al. 2013; Churchill et al. 2017; Pawlikowski et al. 2019), creating vegetation or fuel patterns representative of frequent-fire dry forest low-mixed fire regime fuel loading (USDI BLM 2016a, pp. 225-226). Among the many ways that variable and complex fine-scale heterogeneous patterning contributes toward stand resistance to replacement fire are heterogenous fuel profiles which may inhibit the spread of crown fires, patchy regeneration of diverse species to respond to disturbance, and variability in litter fall and surface fuel accumulations.

Reference conditions from western sites with low-mixed severity fire regimes provide valuable context for southwestern Oregon to inform ecological relevant fine-scale patterning of forests functioning under a frequent low- mixed severity wildfire disturbance regime. Reference conditions provide a robust guide for management targets related to fine-scale spatial pattering attributed to frequent low-mixed severity fire dry forest. As Churchill and other (2017) eloquently explained "the rationale for using reference conditions to guide management targets in dry forests is that historical forest conditions persisted through centuries of frequent disturbances and significant climatic fluctuation while sustaining native biodiversity and other ecosystem services."

In a review of literature characterizing fine-scale spatial patterning of reference conditions (IVM-RL EA, Appendix 5 BLM 2022) reflective of low to mixed severity fire regimes, gap sizes were typicaly less than 2 acres and generally less than 1 acre. In stem-maps of reference conditions, canopy gaps are typically in complex ameba-like shapes (Pawlikowski et al. 2019; Churchill et al. 2013; Lydersen et al. 2013; Metlen et al. 2013). However, recent characterization of fine-scale spatial patterning for reference conditions has focused on characterizing tree clusters, rather than delineating and identifying gaps, thus it can be challenging to reflect the entire spectrum of historic gap size range, especially in open forest stands. Work still needs to be done to quantify openings in reference patterns to provide more explicit guidelines for creating relevant functional openings in implementation.

*Maintenance*

In forested systems, generally treatment maintenance would not be needed in the short-term (up to 20-years). This is supported by local plot data and locally conducted Fuel Treatment Effectiveness Monitoring (FTEM) of recent wildfire and treatment interactions on nearly 9,000 acres of previously treated areas burned in a wildfire between 2008-2022, where treatments were found to be effective in some areas for up to 14 years (USDI BLM 2021b) and up to 17 years in fuel treatments intersected in the Rum Creek wildfire (2022). Elsewhere, Lydersen and others (2014) found that treatments were effective up to 22 years and other recent findings indicate treatment effectiveness lasts up to two decades (Hood et al. 2023, and Brodie et al. 2024). These findings are consistent with and add to a growing body of evidence throughout western states that demonstrates that vegetation management (mechanical and prescribed fire) has successfully moderated fire behavior and fire effects and has contributed toward more resilient future forest structure and improved safe and effective fire management and response opportunities, even in some instances under extreme fire weather conditions (USDI BLM 2016a, p. 228).

The treatment maintenance timeframe is consistent with estimates of local historic fire-intervals, as Metlen and others (2018) found 90 percent of historic fire return intervals to be between 3 and 30 years, with median return intervals of 8 years. Maintenance treatments would be needed approximately every 10-20 years after initial entry treatments in long departed ecosystems, to maintain high resistance to stand-replacement fire. Maintenance treatments would be needed approximately every 20-30 years after initial entry treatments, to maintain moderate resistance to stand-replacement fire. While higher levels of overstory cover, are associated with increased potential for crown fire, the additional cover may restrict or delay understory regeneration and allow more time between maintenance treatments, thus maintenance would be needed more frequently in stands with canopy cover less than 40%, and less frequently in stands with canopy cover greater than 40% (Agee 2000, USDI BLM 2021b) (Table 3).

**Table 3:** Number of maintenance actions estimated over 50 years by stand-level replacement fire resistance category and canopy cover.

| Stand-level resistance | Objective | Maintenance Frequency | Canopy Cover | |
|---|---|---|---|---|
| | | | <40% | >40% |
| High and Moderate-high | Low load surface fuels & High canopy base | 10-20 years | 4 | 2 |
| Moderate-low | Moderate surface fuels & moderate canopy base | 20-30 years | 1.5 | 1.5 |

*Fire Behavior Inputs Background*

The Nexus 2.1 crown fire assessment software developed by Scott and Reinhardt (2014) and available from Pyrologix http://pyrologix.com/downloads/, is a useful tool to compare crown fire potential for different forest stands and was used to compare the effects of alternative proposed actions for combined commercial, small-diameter, and prescribed fire actions on crown fire potential. Nexus links separate models of surface and crown fire behavior, to calculate indices of relative crown fire potential (e.g., CI and TI).

CI (mph): "The open (20 foot) wind speed at which active crown fire is possible for the specified fire environment" (Scott and Reinhardt 2001). Crowning index can be used to compare relative susceptibility of stands to crown fire. An increase in the CI corresponds to a decreased likelihood of an active crown fire moving through a stand, particularly one impacting a given stand from an adjacent area. Crowning

KSW01918

index provides an index for relative comparison-Fule et al. (2004) note, "…it would be unrealistic to expect that CI values are precise estimates of the exact windspeed at which any real crownfire would be sustained. However, it is reasonable to compare CI values across space and time to assess crown fire susceptibility in relative terms."

Torching index (mph): "The open (20-foot) wind speed at which crown fire activity can initiate for the specified fire environment" (Scott and Reinhardt 2001). An increased torching index would result in a decreased likelihood of torching initiating within the stand. Torching events within a stand can lead to an active crown fire depending on weather, surface, and canopy fuel conditions. As with CI, torching index may be interpreted as the relative susceptibility forests may have to tree torching also called "passive crown fire".

*Weather*

The FEIS, which this issue tiers to, acknowledges the potential sheltering effect that canopy has on surface winds, fuel moisture, and potential fire behavior (USDI/BLM 2016a, Appendix H p. 1320). The difference in fine dead fuel (<0.25 inches in diameter) moisture between "shaded" and "unshaded" areas (i.e., greater than 50 percent canopy cover vs. less than 50 percent canopy cover) is well established in predictive fire behavior modeling (Rothermel 1983; Nexus2, NWCG PMS 437 – referenced as NWCG 2014 in FEIS). Additionally, the sheltering effect of canopy on surface wind speeds is also well-established in predictive fire behavior modeling (Nexus2, NWCG PMS 437). The BLM accounted for these differences of fine dead fuel moisture between "exposed" and "shaded" conditions and sheltering effect of canopy on surface wind speeds in the fire behavior modeling inputs in detailed analysis of alternatives on stand-level fire resistance (or fire hazard). Thus, effects to proposed action on fuel moisture and windspeed have been accounted for in Issue 3.

Fire behavior was modeled under 90th percentile fire weather fuel moisture conditions (Table H-1) fuel moisture and other weather values were determined from analysis EVANS Remote Automated Weather Station (RAWS) data representing eight fire seasons (May to November 2002-2022). For this analysis, a 20 foot windspeed of 15 mph was used for modeling.

According to NEXUS recommendations and guidance for estimating wind speeds in the Fire Behavior Field Reference Guide (NWCG 2021), the BLM applied a standard wind adjustment factor of 0.1 to canopy cover greater than 50 percent, 0.15 for canopy cover of 30-50 percent, and 0.2 for canopy cover 20-30 percent. For canopy cover >50 percent fine dead fuel (or 1 hour fuel) moisture was adjusted to 7 percent to reflect sheltering effect on fine dead fuel moisture (Rothermel 1983; NWCG 2021, Scott and Reinhardt 2014). Increased surface wind speeds in openings could contribute toward localized increased surface winds and fire behavior, however as described in the methods and assumptions, the sheltering effects of canopy fuels have been incorporated into the fire behavior modeling for stand average canopy cover.

Table H-1. Dry (90th Percentile) Fuel Moisture Scenario Inputs for Dead and Live Fuels. These Values are Consistent with an 80 °F Day.

| Fuel Type | Dead fuel Size class/ Live Fuel Type | Percent Moisture |
|---|---|---|
| Dead Fuels | 0 – 0.25 inch (1 hr.) | 5(exposed)/7(shaded) |
| | 0.25 – 1.0 inch (10 hr.) | 6 |
| | 1.0 – 3.0 inch (100 hr.) | 8 |
| Live Fuels | Live Woody | 67 |

| | Live Herbaceous | 35 |
|---|---|---|

*Topography*

Slope is an important input for fire behavior predictions. Slope is variable across the Treatment Area. The mean slope of 84 percent was used in model predictions.

**Affected Environment**

***Fire Activity*** *– current and historic*

There were a total of 93 wildfire ignitions in the planning area between 2000 and 2022. Recently, most (71 percent) wildfire ignitions within the Last Chance project area have been human caused (Map D.5.1). Lightening caused less than half of all wildfire ignitions. (Table 4).

Table 4 Wildfire ignitions (2000-2022) by cause and jurisdictional ownership in the project planning area. Data is from Oregon Department of Forestry (ODF).

| | Human | | Lightning | |
|---|---|---|---|---|
| Ownership and Fire Size Class | Number of Fires | % of Total | Number of Fires | % of Total |
| BLM | 27 | 29% | 20 | 22% |
| Non-BLM | 39 | 42% | 7 | 8% |
| Grand Total | 66 | 71% | 27 | 29% |

Within the project area, landscape patterns of wildfire size distribution and occurrence have shifted over time (Figure H-5, Table H-3). Before the fire suppression and intensive management practices of the twentieth century, the project area would have been characterized by high frequency, low severity fires that would have reduced fuel loadings and maintained a mosaic of open stand conditions different from what we see today. "Historically, frequent low- to mixed- severity fire interacted with the complex landscape, vegetation, and climate to create and maintain patchy, mixed seral stages of shrubland, woodland, and mixed conifer/hardwood forests, in both open and closed conditions" (USDI BLM 2016a, p. 225).

Despite frequent fire activity effectively ending in 1850 in southwest Oregon (Metlen et al. 2018), fire records from 1900 to 1939 still display considerable fire activity compared to more recent time periods. Between 1900 and 1939, the total number of recorded fires greater than 10 acres was approximately two and a half times greater than any recent period between 1940 to present (Figure A-2, Table H-3). The total wildfire acres between 1940 and 1979 was about 17 percent of acres burned between 1900 and 1939, and wildfire acres between 1980 and 1999 account for approximately 8 percent of the acres between 1900 and 1939. Although there has been an increase in total wildfire acres during the past twenty years (2000-2018), this area still only equates to 35 percent of the acres burned from 1900-1939.

For wildfires greater than 10 acres, average wildfire size has also decreased over time (Table H-3). Fires burning between 1900-1939 occurred prior to widespread use of mechanized equipment in fire suppression and establishment of Cave Junction Smoke Jumper Base in 1940 (Atzet 1996). Comparatively, fires burning between 1940 – 1979 were under fuel conditions conducive to effective fire suppression, with the full support of mechanized fire suppression, and during a relatively cooler climatic period than in recent years (Halofsky et al. 2022). Fires burning between 1980 – 1999 were farther removed from fuel conditions under a functioning fire regime and a slightly warming climate, while fires burning between 2000-2022 were in fuels accumulated from years of missed fire cycles, intensely

managed landscapes, and under warming climatic conditions (Westerling et al. 2006), which contributes to the higher total wildfire acres and average wildfire size during that time period (Table H-3).

Table H-3: Number of wildfires, wildfire acres, and average wildfire size for wildfires greater than 10 acres, burning into the Last Chance project boundary, by eras.

| Fire Era (Years) | Total Wildfires | Total Wildfire Acres | Average Wildfire Size |
|---|---|---|---|
| 1900 – 1939 | 21 | 22,103 | 1,052 |
| 1940 – 1979 | 8 | 3,730 | 466 |
| 1980 – 1999 | 5 | 1,858 | 371 |
| 2000 – 2022 | 2 | 7,679 | 3,840 |

Within the Last Chance FMP, thousands of acres of hazardous surface and ladder fuel reduction treatments (handpile burning and underburning) have been implemented in the recent past (Table H-4). However, all of these treatments occurred 20+ years ago and a portion are being proposed for maintenance under this project.

**Table H-4.** Previous acres of Underburn and Handpile burn treatments implemented within the Last Chance maximum proposed action footprint and Last Chance FMP Planning Area.

| | ROGO maximum proposed action footprint | Rogue Gold Planning Area | Grand Total |
|---|---|---|---|
| *Underburn/Broadcast burn* | 884 | 100 | 984 |
| *Hand Pile Burn* | 4,094 | 1,171 | 5,265 |
| *Grand Total* | 4,978 | 1,271 | 6,249 |

Acres represent treatment type, not footprint acreage. Typically underburn and handpile burn acre overlap spatially. All treatments occurred >20 years ago. Much of the Last Chance planning area lies within a quarter mile of Communities at Risk36F[1] (CaR), a focused area within the Wildland Urban Interface (CWPP 2019; Metlen et al. 2017) and Wildland Developed Areas (WDA) (WWRA 2013). Approximately 15% of the maximum proposed action extent (1,620 acres) is within the CaR (USDI BLM 2016a, Appendix H, Figure H-5 and) and 43% of proposed action acreage is within the Wildland Developed Areas (BLM 2016a).

**Table H-5.** Table showing how much of the proposed action footprint and total planning area is within a 1/4mi. of Community and within 1 mile of Wildland Developed Areas (BLM 2016). Approximately 15% of the maximum proposed action extent (1,620 acres) is within the CaR (Figure H-5 and Appendix A) and 43% of proposed action acreage is within the Wildland Developed Areas (WWRA 2013).

| | Last Chance Proposed Action Footprint Overlap | Total Last Chance Planning Area Overlap |
|---|---|---|
| ¼ mi around Communities at | 1,620 acres | 13,970 acres |

---

[1] Communities at Risk (CaR) are defined in the Rogue Valley Integrated Community Wildfire Protection Plan as a "geographic area within and surrounding permanent dwellings (at least 1 home per 40 acres) with basic infrastructure and services, under a common fire protection jurisdiction, government, or tribal trust or allotment for which there is a significant threat due to wildfire (CWPP 2019).

| Risk | | |
|---|---|---|
| 1 mi around Wildland Developed Areas | 4,808 acres | 32,538 acres |

Figure H-5: Wildfire activity within the analytic area for various fire eras: All ODF ignitions (1980-2018). Potential wildfire Operational Delineation (POD) boundaries, Quarter mile buffer around Communities at Risk from Wildfire (lavendar hashed poly). Maximum proposed action acreage (black), non-commercial units are in blue.



Table 3-4: Estimated Canopy Bulk Density (kgm3) and approximate canopy cover distribution across all proposed units. *Data acquired from LANDFIRE (LF 2020).*

| Canopy Bulk Density (kgm3) | Approximate Canopy Cover (%) | Acres | Percent Distribution |
|---|---|---|---|
| 0 | Non-forested | 193 | 2% |
| 0.05 | 10-30 | 275 | 2% |
| 0.06-0.08 | 40-50 | 1085 | 10% |
| 0.09-0.11 | 50-60 | 1110 | 10% |
| >0.12 | >60 | 8421 | 76% |

Table 3-5: Current distribution of canopy base height (feet) across maximum footprint extent of proposed action units. *Canopy base height data acquired from LANDFIRE (LF 2020).*

| CBH (ft) | Acres | Percent Distribution |
|---|---|---|
| Non-forested | 195 | 2% |
| 0 to <2 | 427 | 4% |
| 2 to <5 | 2660 | 24% |
| 5 to <8 | 4007 | 37% |
| 8 to <12 | 2829 | 26% |
| 12+ | 966 | 9% |

Table 3-6: Fuel Loading Description Categories (Fire Behavior Fuel Models)

Approximate acres of surface fuel fire behavior models grouped by loading category descriptions and corresponding Standard Fire Behavior Fuel Models codes (in parentheses) (Scott & Burgan 2005) across the maximum footprint extent of proposed actions. Bolded fuel model codes have the highest frequency across the proposed action area within each category. *Data is from data acquired from LANDFIRE (LF 2020).*

| Fuel Loading Description Categories (Fire Behavior Fuel Models) | Acres | Percent Distribution |
|---|---|---|
| Non-burnable (**91**, 98, 99) | 101 | 0.9% |
| Low load grass (101, **102**) | 26 | 0.2% |
| Low load grass-shrub (**121**) | 25 | 0.2% |
| Moderate load grass-shrub (**122**, 142) | 219 | 2% |
| Low load mixed conifer – hardwood (**161**, 181, 182) | 33 | 0.3% |

KSW01923

| | | |
|---|---|---|
| Moderate load mixed conifer - hardwood (162,**183**, 186, 188) | 605 | 5% |
| High load conifer (184, **185**, 187) | 559 | 5% |
| Very High load mixed conifer-hardwood/understory (**165**,189) | 9517 | 86% |

Ongoing changes to climate in southwestern Oregon include increasing temperatures, increasing drought frequency and severity, reduced snowpack, as well as fewer but more extreme precipitation events (Halofsky et al. 2022). Climate models generally project either no change in annual precipitation or a slight increase (citation?). Because of the large projected temperature increases, the modeled precipitation increases would still lead to a net water loss compared to 1970–1999 given higher evapotranspiration rates." P.32-33 The Climate Change section of the PRMP/FEIS (USDI BLM 2016a, pp. 165-211), to which this EA tiers, analyzes issues associated with climate change. Issue 3 in the PRMP/FEIS, "How would climate interact with BLM management actions to alter the potential outcomes for key natural resources" (USDI BLM 2016a, p. 180), describes potential impacts to tree species (including adaptive genetic variation) and insects and pathogens, and describes the assumptions applied to the climate modelling for use in the ROD/RMP. Issue 3 of the PRMP/FEIS describes the complications and unknowns in predicting the effects of climate change. Douglas fir is anticipated to decline, particularly in lower elevations and this trend has been observed in recent years (Bennet et al. 2023). Douglas-fir tree mortality would likely increase, due to the interactions of changing climate with disturbance events such as drought, fire, insects, and diseases. Species composition would likely shift, and growth rates and overall site productivity would decline (USDI BLM 2016a, pp. 193-196). "Not only does drought reduce tree growth and increase the likelihood and severity of fire, but prolonged or severe moisture stress can also increase the susceptibility of trees to insects and pathogens" (Bennett 2018, p. 7). Tree species differ in their vulnerability ratings to climate-induced stress (USDI BLM 2016a, p. 187). Insects and pathogen outbreaks may increase with hotter temperatures and more frequent periods of drought. Some pathogens, such as *Armillaria* root disease and various canker species which infect water-stressed hosts may become more problematic. Insect development and survival is also impacted by increased temperature. The response of pathogens that depend on insects for spread would likely be complex, depending on how the particular insect vector responds to changing climate (USDI BLM 2016a, pp. 178-188).

The trend for Jackson and Josephine Oregon counties over the past two decades indicates that projections of increased drought are on track (Figure H-6). A recent USDA forest health report for Oregon finds that aerial survey and site visit trends "indicate that drought stress is one of the main causes of tree dieback and decline" (USDA 2020, p. 5).

*Figure H-6.* U.S. Drought Monitor Category Graphs Displaying Percent Area in Various Drought Categories for Josephine and Jackson Counties from January 2000 to September 2021. Data acquired from https://droughtmonitor.unl.edu/DmData/TimeSeries.aspx





Based on trends in the last 30 years, humans and lightning would continue to provide wildfire ignition sources (USDI BLM 2016a, Table 3-22 p. 227), and future trends suggest the suitability for large wildfire growth would increase (USDI BLM 2016a, Appendix D, Figure D-8 p. 1241; Davis et al. 2017). In recent years, total annual area burned has increased, and so has the total area burned at high severity. Several analyses in recent decades have shown a positive correlation between annual area burned and area burned severely (in large patches) in the PNW (Cansler and McKenzie 2014, Dillon et al. 2011, Reilly et al. 2017). Fire suppression efforts are expected to continue; however, these efforts are not 100 percent successful.  In fact, less than 1 percent of fires in the recent past account for the majority of acres burned by wildfire (USDI BLM 2016a, p. 227). These large fires tend to burn during more extreme fire weather conditions, potentially resulting in high fire severity (Long et al. 2017), when fire behavior and growth potential exceed or challenge suppression resource availability and capabilities.  However, successful suppression efforts would continue to exclude fire and disturbance regimes would continue to be altered; these aspects, coupled with other expected climatological changes, such as increased background tree mortality, due to longer periods of hot drought (USDI BLM 2016a, p. 185), increase the likelihood for larger proportions of high severity fire (Mote et al. 2019).

Environmental Effects

Direct and Indirect Short-Term (up to 20 years) Effects Common to All Action Alternatives

Wildland fuel profile

*Canopy fuels (canopy connectivity (canopy cover and canopy bulk density) and large trees)*

Large trees would be protected. Thinning of canopy fuels would decrease the likelihood of tree-to-tree crown fire spread under typical fire weather indices (Scott and Reinhardt 2001). Thinning would also increase stand diameter, thus improving resistance to stand-replacing fire, as thinned stands with remaining large trees have been shown to have less severe fire effects when intersected by wildfires (USDI BLM 2016a, p. 228; Martinson and Omi 2013, Lydersen et al. 2014).

*Surface fuels and Ladder fuels*

Surface fuels consist of grasses, shrubs, small trees, litter, and woody material on the forest floor and up to six feet from the surface (Scott and Burgan 2005) and are usually measured in tons per acre. Fine surface fuels consist of small diameter surface fuels (<3 inches), litter, grass, and shrubs and would ignite

easily and burn rapidly at times producing high rates of spread and high flame lengths. Wildfires in light surface fuels react quickly to diurnal changes in relative humidity and wind. Large surface fuels consist of larger (>3 inches in diameter) limbs, down woody debris, logs, and stumps that ignite and burn more slowly. Large surface fuels are more influenced by seasonal weather patterns and less influenced by changes in daily wind and moisture. Fire Behavior Fuel Models (FBFM) (Scott and Burgan 2005) are used to represent surface fuels and estimate potential surface fire behavior flame lengths and rates of spread under various environmental conditions (fuel moisture and wind scenarios). Surface fire behavior has a direct effect on fire severity, mortality, suppression tactics, and the initiation of crown fire. Rates of spread and flame lengths are key components affecting fire size and resistance to control. Surface fire behavior has a direct effect on fire severity, mortality, suppression tactics, and the initiation of crown fire, lower surface fuel loading produces lower flame lengths.

Thinning of small diameter trees and handpile burning of activity fuels would reduce surface fuels and increase canopy base heights. The changes to the wildland fuel profile would increases vertical and horizontal separation or discontinuity in the fuel profile and help to keep flames from ascending into tree crowns (tree torching) and from spreading through the tree canopy (crown fire) (Scott and Reinhard 2001; Van Wagner 1977). Application of prescribed fire, via underburning, can further raise CBH and reduce ladder fuels. (see assumptions).

In areas thinned to open canopy conditions (e.g., <40 percent canopy cover), regeneration of a diverse understory is expected (Wayman and North 2007) and could contribute toward more rapid live fuel loading accumulation or shift fuel models from moderate timber litter to moderate timber understory or grass-shrub in the moderate-term (10-30 years) (USDI BLM 2021, Agee et al. 2000). While this shift in surface fuel type could increase rates of surface fire spread from low-load surface fuel types (Appendix D.5 Assumptions – Wildland fuel profile – surface fuels), these rates of spread would be approximately 5.75 times less than those presented by crown fires in stands with greater than 50 percent cover under 10 mph 20-foot windspeeds (USDI BLM 2016a, Appendix H).

*Heterogeneity (Species Composition and structural diversity)*

Proposed actions to create openings and leave untreated skips would introduce heterogeneity in uniform stands, promote a disruption of horizontal fuel connectivity and alter patterns of litter fall and surface fuel accumulation. Increased spatial heterogeneity would contribute toward disrupting vertical and horizontal fuel continuity, alter potential fire behavior (Finney 2001), improve stand-level fire resistance and the ability to respond to other disturbances and climatic influences (Jain et al. 2012).

The sheltering effect vegetation has on surface wind speeds is well established in predictive fire behavior modeling (Albini and Baughmann 1979; NWCG 2021) and has been incorporated in the weather inputs in analysis of this issue based on projected post-harvest canopy cover (Appendix D.5). Thus, thinning and group selection openings may indirectly increase surface wind gusts.

An increase in variable sized openings would promote species diversity and growing space for fire adapted species, such as pine and oak. Grulke and others (2020) found that two years following patchy harvest, low vigor trees were not present, while in even-aged and untreated areas low-vigor trees persisted in the same timeframe.

The area in un-thinned skips, would contribute toward heterogeneity through retention of continuous canopy fuels, low CBHs, and existing surface fuel loading. These skips would result in lower relative stand-level fire resistance to group torching of trees during a wildland fire or a prescribed fire. However, these untreated areas, either burned or unburned, would contribute toward heterogeneous vegetative patterns at the stand scale.

KSW01926

*Relative Stand-level Resistance Rating*

Detailed side by side comparison of alternative fire behavior model inputs, outputs and relative resistance rating, fire type and distribution of acres.

**Table 2:** Short-Term Effects on relative resistance to stand-replacement fire categories and approximate percentage of acreage distribution by alternative for proposed actions (i.e., com commercial harvest, small-diameter thinning, and prescribed fire). Table also displays fire modeling inputs and assumptions for canopy cover, wind adjustment factors, canopy bulk density, canopy base height, and surface fuel model. Table also displays Fire Behavior Modeling outputs for Crowning Index, Torching Index, and Fire Type.

| Alternative | Estimated Canopy Cover (wind adjustment factor) | Canopy Bulk Density (kg/m3) | Canopy Base Height (ft) | Surface Fuel Model | Crowning Index (mph) | Torching Index (mph) | Fire Type | Relative Resistance Rating (hazard) | Acreage | Percent Distribution of Acres (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Alternative 1 - No Action - 11,686 acres** | | | | | | | | | | |
| NO ACTION | 40-50 (0.15) | 0.06 | 10 | TL3 | 26.3 | >100 | Surface | Moderate-high* | 935 | 8% |
| | 50-60 (0.15) | 0.09 | >12 | TL5 | 18.4 | | Surface | Moderate-low* | 935 | 8% |
| | | | 10 | TL9 | | 26 | | | 935 | 8% |
| | >60% (0.1) | 0.12 | 8 | TU5 | 12.1 | 0 | Active | Low | 8,765 | 75% |
| | | | <5 | | | | | | | |
| **Alternative 2 - 8,240 acres of commercial harvest and 3,446 HFR – proposed action - both actions are proposed on 1,875 acres** | | | | | | | | | | |
| Commercial Thin Only | 30-40% (0.15) | 0.05 | 8 | SH2/GS2/TL9 | 31.6 | 0 | Passive | Moderate-low* | 1,870 | 16% |
| | | | | | | | | | 1,242 | 11% |
| | | | <5 | | | | | | 1,242 | 11% |
| | 40-50 (0.15) | 0.06 | 8 | TU5 | 26.3 | | | | 319 | 3% |
| | | | 8 | | | | | | 319 | 3% |
| | >60% (0.1) | 0.12 | <5 | | 12.1 | | Active | Low | 57 | 0% |
| Commercial Thin and HFR | 30-40% (0.15) | 0.05 | 8 | TL6 | 31.6 | 58 | Surface | High* | 310 | 3% |
| | | | | GS1 | | 17 | | Moderate-high | 310 | 3% |
| | | | | GS2 | | 0 | Passive | Moderate-low* | 310 | 3% |
| | 40-50 (0.15) | 0.06 | 8 | TU1/TL3 | 26.3 | >100 | Surface | Moderate-high* | 294 | 3% |
| | | | | TU2 | | 21 | | | 147 | 1% |
| | >60% (0.1) | 0.12 | 8 | TU1/TL3 | 12.1 | >100 | Conditional | Moderate-low* | 57 | 0% |
| | | | <5 | TU2 | 12.1 | 0 | Active | Low | 206 | 2% |
| Variable retention harvest (stand establishment) | | | | | | | | Moderate-low (High Hazard) | 787 | 7% |
| HFR (no overlap w/commercial) | 40-50 (0.15) | 0.06 | 8 | TU1/TL3 | 26.3 | >100 | Surface | Moderate-high* | 345 | 3% |
| | | | | TU2 | | 21 | | | 172 | 1% |
| | 50-60 (0.1) | 0.09 | 8 | TU1/TL3 | 18.4 | >100 | | Moderate-low* | 345 | 3% |
| | | | | TU2 | | 46 | | | 172 | 1% |
| | >60% (0.1) | 0.12 | 8 | TU1/TL3 | 12.1 | >100 | Conditional | | 1,378 | 12% |
| | | | <5 | TU2 | | 0 | Active | Low | 1,437 | 12% |
| **Alternative 2a - 8,240 acres of commercial harvest and 3,446 HFR - proposed action - both actions are proposed on 1,875 acres - below represents Alternative 2 VRH acres** | | | | | | | | | | |
| Commercial Thin and HFR | 30-40% (0.15) | 0.05 | 8 | TL6 | 31.6 | 58 | Surface | High* | 209 | 2% |
| | | | | GS1 | | 17 | | Moderate-high | 209 | 2% |
| | | | | GS2 | | 0 | Passive | | 209 | 2% |
| Commercial Thin Only | | | 5 | SH2/GS2/TL9 | | | | Moderate-low* | 81 | 1% |
| | | | | TU5 | | | | | 81 | 1% |
| **Alternative 3 - 1,051 acres of commercial harvest and 10,627 acres of HFR proposed action - both actions are proposed on 456 acres** | | | | | | | | | | |
| Commercial Thin and HFR | 50-60 (0.1) | 0.09 | 8 | TU1/TL3 | 18.4 | >100 | Surface | Moderate-low* | 345 | 3% |
| | | | | TU2 | | 46 | | | 172 | 1% |
| Commercial Thin Only | 50-60 (0.1) | 0.09 | 5 | TL9 | 16.4 | 0 | | Low | 265 | 2% |
| | | | <5 | TU5 | | | Passive | | 265 | 2% |
| HFR (no overlap w/commercial) | 40-50 (0.15) | 0.06 | 8 | TU1/TL3 | 26.3 | >100 | Surface | Moderate-high* | 1,063 | 9% |
| | | | | TU2 | | 21 | | | 531 | 5% |
| | 50-60 (0.1) | 0.09 | 8 | TU1/TL3 | 18.4 | >100 | | Moderate-low* | 1,063 | 9% |
| | | | | TU2 | | 46 | | | 531 | 5% |
| | | | | TU1/TL3 | | >100 | Conditional | | 4,570 | 39% |
| | >60% (0.1) | 0.12 | 8 | TU2 | 12.1 | 46 | | | 624 | 5% |
| | | | <5 | TU2 | | 0 | Active | Low | 1,501 | 13% |

**Table 6:** A Side-by-Side comparison of estimated maintenance frequency needed to maintain high to moderate stand-level relative fire resistance over 50 years on maximum proposed action acres by action alternative for incremental cumulative effects of foreseeable actions.

| Alternative Target Canopy Cover (%) | Relative Stand-level Fire Resistance Rating | Maintenane Frequency (average number of entries over 50 years | Percent distribution among proposed action acreage |
|---|---|---|---|
| **Alternative 2 -  8,240 acres of commercial harvest and 3,446 fuels (small diameter thinning only) proposed action - both actions are proposed on 1,875 acres** | | | |
| 30-40% | HIGH& Moderate-High | 15-20 yr (2.5) | 5% |
| 40-50% | Moderate-high | 15-20 yr (2) | 8% |
| N/A | Moderate-low | 20-30 (1.5) | 69% |
| N/A | LOW | N/A | 14% |
| | | | |
| **Alternative 2a -  8,240 acres of commercial harvest and 3,446 fuels (small diameter thinning only) proposed action – both actions are proposed on 1,875 acres** | | | |
| 30-40% | HIGH& Moderate-High | 15-20 yr (2.5) | 11% |
| 40-50% | Moderate-high | 15-20 yr (2) | 8% |
| N/A | Moderate-low | 20-30 (1.5) | 63% |
| N/A | LOW | N/A | 14% |
| **Alternative 3 - 1,051 acres of commercial harvest and 10,627 acres of fuels (small diameter thinning only) proposed action – both actions are proposed on 456 acres** | | | |
| 30-40% | HIGH& Moderate-High | 10-20 yr (2.5) | 0% |
| 40-50% | Moderate-high | 10-20 yr (2) | 14% |
| 50-60% | Moderate-low | 20-30 (1.5) | 63% |
| >60% | LOW | N/A | 17% |

**APPENDIX E: GLOSSARY**

**A**

**Abiotic:** Non-living elements of an environment.

**Activity Fuel:** The combustible material resulting from or altered by forestry practices such as timber harvest or thinning, as opposed to naturally created fuels.

**Affected Environment:** The area impacted by the Proposed Action.

**Allowable Sale Quantity (ASQ):** The timber volume that a forest can produce continuously under the intensity of management described in the RMP for lands allocated for permanent timber production (USDI 2016, p. 299).

**Alternative:** Other options to the proposed action by which the BLM can meet its purpose and need.

**Analysis Areas:** Varies by resource and include areas that could potentially be affected by the action alternatives. In some cases, the Analysis Area is confined to the Treatment Area and in others, the Analysis Area extends beyond the Project Area.

**Aquatic:** Living or growing in or near the water.

**Authorized Officer:** The Federal employee who has the delegated authority to make a specific decision.

**B**

**Basal Area (BA):** The cross-sectional area of a single stem including the bark, measured at breast height (4.5 ft. above the ground); the cross-sectional area of all stems of a species or all stems in a stand measured at breast height and expressed per unit of land area.

**Baseline:** The starting point for analysis of environmental consequences.

**Best Management Practices (BMPs):** Methods, measures, or practices designed to prevent or reduce water pollution (USDI 2016, p. 300).

**Biotic:** Living elements of an environment.

**C**

**Canopy Class:** The position of the canopy of an individual tree relative to the canopies of other trees in a stand. Classes are defined by relative height and the amount of sunlight a canopy receives.

**Canopy Cover:** A measure of the percent of ground covered by a vertical projection of the tree crowns (USDI 2016, p. 301).

**Coarse woody debris/down woody material**: The portion of a tree that has fallen or been cut and left in the woods. Usually refers to pieces at least 20 inches in diameter (USDI 2016, p. 304).

**Codominant Trees:** Trees with crowns forming the general level of the crown canopy and receiving full light above but comparatively little from the side.

**Commercial (Harvest) Treatments:** Refers to stand harvesting involving the removal of some or all cut trees from the stand for timber volume and an assessed monetary value. The implementation of commercial harvest is through a variety of mechanisms, including timber sale contracts, stewardship agreements, or other types of contracts (2016 ROD/RMP, p. 62).

**Crown Ratio:** The ratio between the length of the green crown of a tree and its total height expressed as a percentage.

**Culmination of mean annual increment**: The age in the growth cycle of a tree or stand at which the mean annual increment (MAI) for which some attribute, e.g., wood volume of a tree or stand growth is at maximum. At culmination, MAI equals the periodic annual increment (PAI).

**Cultural Resources:** Those resources of historical and archaeological significance.

**Cumulative Effects:** Those effects on the environment that result from the incremental effect of the action when added to past, present, and reasonably foreseeable future actions regardless of what agency or person(s) undertakes such other actions. Cumulative

KSW01929

effects can result from individually minor but collectively significant actions taking place over a period of time.

**D**

**Dispersal:** The movement of an individual from their origin to a new site.

**Dispersal Habitat:** Forest stands with average tree diameters of greater than 11 inches, and conifer overstory trees having closed canopies (greater than 40% canopy cover) with open space beneath the canopy to allow owls to fly (USDI 2016, p. 303).

**Diversity:** The aggregate of species assemblages (communities), individual species, the genetic variation within species, and the processes by which these components interact within and among themselves. The elements of diversity are 1) community diversity (habitat, ecosystem), 2) species diversity, and 3) genetic diversity within a species. All three change over time.

**Dominant Trees:** Trees with crowns extending above the general level of the crown canopy and receiving full light from above and partly from the side

**Duff:** The partially decomposed organic material of the forest floor beneath the

litter of freshly fallen twigs, needles, and leaves.

**E**

**Economic Viability:** Economic Viability of wood product contracts: For the purposes of this EA, Economic Viability describes the likelihood that a wood product contract would be sold when offered at auction for competitive bidding. To be considered economically viable, the value of the wood products harvested under the contract must exceed related contract costs, which can be expressed as an estimate of stumpage value.

**Ecosystem:** A system made up of a community of animals, plants, and micro-organisms and its interrelated physical and chemical environment.

**Edge Effect:** The modified environmental conditions or habitat along the margins of forest stands or patches.

**Effects Analysis:** Predicts the degree to which the environment would be affected by an action.

**Endangered Species:** Any animal or plant species in danger of extinction throughout all of a significant portion of its range. The U.S. Fish and Wildlife Service list these species.

**Environmental Assessment (EA):** A concise, public document containing a federal agency's analysis of the significance of potential environmental consequences of a proposed action. The EA need not contain the level of analysis contained in an Environmental Impact Statement (EIS). An EA is used to determine whether an EIS is needed or a "finding of no significant impact" (FONSI) is warranted.

**Ephemeral Stream:** A stream that flows only in direct response to precipitation, and whose channel is at all times above the water table.

**Erosion:** The detachment and movement of soil or rock fragments by water, wind, ice, or gravity.

**F**

**Fauna:** The animals of a specified region or time.

**Finding of No Significant Impact (FONSI):** A finding that explains that an action will not have a significant effect on the environment and, therefore, an EIS will not be required.

**Fire Regime:** The characteristic frequency, extent, intensity, severity, and seasonality of fires within an ecosystem.

**Flora:** The plants of a specified region or time.

**Fuel load:** the oven-dry weight of fuel per unit area.

**Fully Decommission (See Road Closure):** This is a type of road closure that is intended to be permanent as opposed to just decommissioning that is long-term and would allow future use. Prior to closure the road will be left in an erosion-resistant condition by establishing cross drains, eliminating diversion potential at stream channels and stabilizing or removing fills on unstable areas. Exposed soils will be treated to reduce sediment delivery to streams. The road will be closed with an earthen barrier or its

equivalent. This category can include roads that have been or will be closed due to a natural process (abandonment) and may be opened and maintained for future use. (2016, ROD/RMP p. 311, 312

## G

**GTRN (Ground Transportation Road Network):** Roads over which the BLM has jurisdiction and maintenance responsibilities.

## H

**Habitat:** A specific set of physical conditions in a geographic area(s) that surrounds a single species, a group of species, or a large community. In wildlife management, the major components of habitat are food, water, cover, and living space.

**Habitat Fragmentation:** The breakup of extensive habitat into small, isolated patches that are too limited to maintain their species stocks into the indefinite future.

**Hand Pile and Burn:** Is piling of fuels by hand and burned in place (2016 ROD/RMP, p. 312)

**Harvest Activity Fuels:** residual activity fuel (e.g., live and dead tree branches and treetops) remaining following harvest

**Harvest Land Base (HBL):** Those lands on which the determination and declaration of the Annual Productive Capacity/ASQ is based.

**Hazardous Fuels Reduction (HFR):** treatments designed to treat understory vegetation (less than eight (8) inches DBH) to reduce surface fuels, ladder fuels, and to promote retention tree growth and vigor. Includes under-burning.

**Hydric Soils:** These soils form under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions as indicated by by a mucky texture, gley colors and sulfidic odor.

**Hydrology:** The science dealing with the properties, distribution, and circulation of water.

## I

**Impact:** Synonymous with "effects." Includes ecological, aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Impacts may also include those resulting from actions which may have both beneficial and detrimental (adverse) effects. Impacts may be considered as direct, indirect, or cumulative.

**Implementation Action:** An action that implements land use plan decisions.

**Intermediate Trees:** Trees shorter than dominant or codominant trees with crowns below or barely reaching into the main canopy.

**Intermittent Stream:** Seasonal stream; a stream that flows only at certain times of the year when it receives water from springs or from some surface source, such as melting snow in mountainous areas.

## K

## L

**Landing:** A cleared area in the forest to which logs are yarded or skidded for loading onto trucks for transport.

**Late-Successional Forest:** Forest seral stages which include mature and old-growth age classes.

**Lichen:** A composite organism formed from the symbiotic association of a fungus and an alga.

**Long-Term Closure:** The road would be effectively blocked and winterized prior to the wet season. Blockage at the entrance would consist of placing logs, slash, boulders, earthen berms, and other material so the entrance is camouflaged for a minimum distance of 100 feet and vehicle use is precluded. Prior to closure the road will be left in an erosion-resistant condition.

**Lop and Scatter:** To cut vegetation and scatter it randomly around an area. All top and side branches must be free of the central stem so that such stem is reduced to the extent that it is within eighteen (18) inches of the ground at all points. Slash includes all woody material (brush, limbs, tops, unmerchantable stems, or chunks) severed, uprooted, or broken from live plants. All slash shall be arranged in a discontinuous pattern across the forest floor. All slash shall be lopped to no more than eight (8) feet in length.

KSW01931

**M**

**Machine Piling:** is the piling of activity fuels with machinery (2016, ROD/RMP p. 307)

**Mass Movement:** Soil and rock movement downslope (e.g. slumps, earth flows).

**Mitigating Measures:** Constraints, requirements, or conditions imposed to reduce the significance of or eliminate an anticipated impact to environmental, socioeconomic, or other resource value from a proposed land use.

**Mixed-Conifer Forest:** A mix of tree species that include Douglas-fir, ponderosa pine, sugar pine, incense cedar, and white fir.

**Monitoring:** A process of collecting information to evaluate if objective and anticipated or assumed results of a management activity or plan are being realized, or if implementation is proceeding as planned.

**N**

**Non-Commercial Treatments:** (hazardous fuels reductions) For this project, non-commercial treatments include cutting vegetation and trees smaller than 8 inches diameter at breast height (DBH) through fuels reduction treatments. Some stands may require both commercial and non-commercial treatments based on the forest condition.

**Nonvascular:** Plants with specialized methods of transporting water and nutrients without xylem or phloem (e.g. mosses, hornworts, liverworts, algae).

**Noxious Plants:** Those plants which are injurious to public health, agriculture, recreation, wildlife, or any public or private property.

**O**

**O&C Lands:** Public lands managed by the BLM under the O&C Act of 1937 for permanent forest production, in accord with the principle of sustained yield. Lands administered under the O&C Act must also be managed in accordance with other environmental laws.

**Off-Highway Vehicles (OHV):** Any motorized vehicle designed for or capable of cross-country travel over land, water, sand, snow, ice, marsh, swampland, or other terrain.

**Organic Matter:** Plant and animal residues accumulated or deposited at the soil surface; the organic fraction of the soil that includes plant and animal residues at various stages of decomposition; cells and tissues of soil organisms, and the substances synthesized by the soil population.

**ORGANON**: An individual tree growth computer model developed at Oregon State University, College of Forestry for areas of the Pacific Northwest.

**P**

**Perennial Stream:** A stream that flows continuously. Perennial streams are generally associated with the water table in the localities through which they flow.

**Permeability:** The ease with which gases, liquids, or plant roots penetrate or pass through bulk mass of soil or a layer of soil.

**Pile Burn[ing]:** Activity fuels, once piled by hand or machine are burned in place (2016 ROD/RMP p. 309).

**Plant Association Group:** Potential natural vegetation for a site under climax conditions (i.e. undisturbed by fire, insects, disease, flood, wind, erosion, or humans). The associations are primarily described by the presence and abundance of plant species. Environmental variables such as soil are used to classify and often reflect the pattern of vegetation.

**Plant Community:** An association of plants of various species found growing together in different areas with similar site characteristics.

**Preferred Alternative:** The alternative BLM believes would reasonably accomplish the purpose and need for the proposed action while fulfilling its statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors. This alternative may or may not be the same as the proposed action.

KSW01932

**Prescribed Fire:** Controlled application of fire to natural fuels under conditions of weather, fuel moisture, and soil moisture that will allow confinement of the fire to a predetermined area and, at the same time, will produce the intensity of heat and rate of spread required to accomplish certain planned benefits to one or more objectives for wildlife, livestock, and watershed values. The overall objectives are to employ fire scientifically to realize maximum net benefits at minimum environmental damage and acceptable cost.

**Prey species:** An animal taken by a predator as food.

**Project Area:** Overall area of consideration that was reviewed for the development of the Last Chance Forest Management Project.

**Proposed Action:** A proposal for BLM to authorize, recommend, or implement an action to address a clear purpose and need.

**Public Lands:** Any lands administered by a public entity, including (but not limited to) the Bureau of Land Management and the US Forest Service.

**Q**

**Quadratic Mean Diameter (QMD):** The diameter of the tree of average basal area in a stand at breast height.

**R**

**Ravel:** Loose rock material on a hillslope, usually of gravel or cobble size.

**Record of Decision (ROD):** The decision document associated with an environmental impact statement.

**Relative Density (RD):** The degree of crowding in a forest stand. When two stands result in the same relative density they can be thought of as being at the same degree of crowding, although they may differ in age, tree size, or site quality.

**Resource Management Plan (RMP):** A land use plan prepared by the BLM under current regulations in accordance with the Federal Land Policy and Management Act (FLPMA).

**Resource Road:** Roads that provide a point of access to public lands and connect with local or collector roads. (RMP 2016, p. 311).

**Right-Of-Way (ROW):** Federal land authorized to be used or occupied for the construction, operation, maintenance, and termination of a project, pursuant to a ROW authorization.

**Riparian Area:** An area containing an aquatic ecosystem and adjacent upland areas that directly affect it.

**Riparian Habitat:** The living space for plants, animals, and insects provided by the unique character of a riparian area.

**Riparian Reserve (RR):** A federally designated buffer around streams, springs, ponds, lakes, reservoirs, fens, wetlands, and areas prone to slumping, on federal lands only. The Northwest Forest Plan's Aquatic Conservation Strategy defines riparian reserve widths for the above water bodies.

**Road closure** – Closing roads to use in any of the following categories:

- Temporary/Seasonal/Limited Access – These are typically resource roads, closed with a gate or barrier. The road will be closed to public vehicular traffic but may be open for BLM/Permittee commercial activities. The road may or may not be closed to BLM administrative uses on a seasonal basis depending upon impacts to the resources. Drainage structures will be left in place.

- Decommission (long-term) –The road segment will be closed to vehicles on a long-term basis but may be used again in the future. Prior to closure the road will be left in an erosion-resistant condition by establishing cross drains, eliminating diversion potential at

- stream channels and stabilizing or removing fills on unstable areas. Exposed soils will be treated to reduce sediment delivery to streams. The road will be closed with an earthen barrier or its equivalent. This category can include roads that have been or will be closed due to a natural process

(abandonment) and may be opened and maintained for future use.

- Full Decommission (permanent) – Roads determined to have no future need may be subsoiled (or tilled), seeded, mulched, and planted to reestablish vegetation. Cross drains, fills in stream channels, and unstable areas will be removed, if necessary, to restore natural hydrologic flow. The road will be closed with an earthen barrier or its equivalent. The road will not require future maintenance. This category includes roads that have been closed due to a natural process (abandonment) and where hydrologic flow has been naturally restored.

- Obliteration (full site restoration/permanent) – Roads receiving this level of treatment have no future need. All drainage structures will be removed. Fill material used in the original road construction will be excavated and placed on the subgrade in an attempt to reestablish the original ground line. Exposed soil will be vegetated with native trees or other native vegetation. Road closure by obliteration is rarely used.

**Road Decommissioning (long-term)**: See Road Closure. Decommissioning means the road segment will be closed to vehicles on a long-term basis, but may be used again in the future. Prior to closure the road will be left in an erosion-resistant condition by establishing cross drains, eliminating diversion potential at stream channels, and stabilizing or removing fills on unstable area. Exposed soils will be treated to reduce sediment delivery to streams. The road will be closed with an earthen barrier or its equivalent. This category can include roads that have been or will be closed due to a natural process (abandonment) and may be opened and maintained for future use (2016, ROD/RMP p. 311, 312).

**S**

**Salvage Harvest:** The removal of dead trees or of trees damaged or dying because of injurious agents other than competition, to recover their economic value.

**Scope:** The extent of an analysis in a NEPA document.

**Scoping:** The process by which BLM solicits internal and external input on the issues and effects that will be addressed in planning, as well as the degree to which those issues and effects will be analyzed in the NEPA document.

**Sediment Yield:** The quantity of soil, rock particles, organic matter, or other dissolved or suspended debris that is transported through a cross-section of stream during a given period.

**Seed Tree:** A tree of favorable genetic traits and healthy condition that is identified for protection in order to promote the continuation of its genetics.

**Selection Harvest:** Is a method of uneven-aged management involving the harvesting of single trees from stands (single-tree selection) or in groups up to four (4) acres in size (group selection) without harvesting the entire stand at any one time (2016 ROD/RMP, p. 312).

**Sensitive Species:** Those species that (1) have appeared in the Federal Register as proposed for classification and are under consideration for official listing as endangered or threatened species or (2) are on an official state list, or (3) are recognized by a land management agency as needing special management to prevent their being placed on Federal or state lists.

**Seral Stage:** A temporal or intermediate stage in the process of succession.

**Silviculture:** The science of controlling the establishment, growth, composition, health, and quality of forests and woodlands to meet diverse needs.

**Silvicultural System:** A planned sequence of treatments or prescriptions over the entire life of a forest stand needed to meet management objectives.

**Skid:** To drag a log from within a harvest unit to a collection point (landing).

**Slash:** The residual vegetation (e.g. branches, bark, tops, cull logs, and broken or uprooted trees) left on the ground after logging.

**Snag:** Any standing dead, partially dead, or defective (cull) tree at least 10″ DBH (diameter

at breast height) and at least 6 feet tall (USDI 1995, p. 114).

**Soil Series:** The lowest or most basic category of the U.S. system of soil classification.

**Species:** A group of related plants or animals that can interbreed to produce offspring.

**Special Status Species (SSS) include:**

**Proposed species** – species that have been

officially proposed for listing as threatened or endangered by the Secretary of the Interior. A proposed rule has been published in the

Federal Register.

**Listed Species** – species officially listed as

threatened or endangered by the Secretary of the Interior under the provisions of the ESA. A final rule for the listing has been published in the Federal Register.

**Endangered Species** – any species which is

in danger of extinction throughout all or a

significant portion of its range.

**Threatened Species** – any species which is

likely to become an endangered species

within the foreseeable future throughout all or a significant portion of its range.

**Candidate Species** – species designated as

candidates for listing as threatened or

endangered by the FWS and/or NMFS. A list has been published in the Federal Register.

**Stand Density Index (SDI):** Measures density of the stand from the number of trees and the quadratic mean diameter of the stand.

**State Listed Species:** Species listed by a state in a category implying but not limited to potential endangerment or extinction. Listing is by either

legislation or regulation.

**Sub-watershed:** The sixth level in the hydrologic unit hierarchy. A sub-watershed is a subdivision within a fifth level watershed.

**Succession:** A series of dynamic changes by which one group of organisms succeeds another

through stages leading to potential natural community or climax.

**Suppressed Trees:** Trees with crowns entirely below the general canopy receiving no direct light from either above or from the side.

**Sustained Yield:** The board foot volume of timber that a forest can produce in perpetuity at a given intensity of management; the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources.

**Sustained Yield Unit (SYU):** An administrative unit for which an allowable sale quantity is calculated; in western Oregon, the six sustained yield units correspond to the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts, and the western portion of the Klamath Falls Field Office.

**T**

**Temporary Road Construction:** A short-term use road authorized for the development of a project that has a finite lifespan (e.g., a timber sale spur road). Temporary roads are not part of the permanent designated transportation network and must be reclaimed when their intended purpose has been fulfilled (2016 ROD/RMP p. 315).

**Thinning:** A silvicultural treatment made to reduce the density of trees primarily to improve tree/stand growth and vigor, or recover potential mortality of trees, generally for commodity use. See *pre-commercial thinning*, *commercial thinning*, *variable-density thinning* (2016 ROD/RMP p. 315).

**Tiering:** Using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents, allowing the tiered NEPA document to narrow the range of alternatives and concentrate solely on the issues not already addressed.

**Topography:** The configuration of a surface area including its relief, or relative elevations, and position of its natural and anthropogenic features.

**Total Maximum Daily Loads (TMDLs):** Pollution load limits calculated by DEQ for each

pollutant entering a water body. TMDLs describe the amount of each pollutant a waterway can receive and still not violate water quality standards. Both point and nonpoint source pollution are accounted for in TMDLs as one group of organisms that allows for future discharges to a water body without exceeding water quality standards.

**Transient Snow Zone (TSZ):** The area where a mixture of snow and rain occurs, sometimes referred to as the rain-on-snow zone. The snow level in this zone fluctuates throughout the winter in response to alternating warm and cold fronts. Rain-on-snow events originate in the transient snow zone.

**Treatment Area**: Describes where action is

proposed, such as units where forest thinning is proposed and where road construction or road improvements are proposed.

**Tree-tipping:** Mechanically tipping or pulling over trees with root wads attached, generally into or near a stream, to simulate natural wood recruitment.

**Turbidity:** The cloudy condition caused by

suspended solids, dissolved solids, natural or human developed chemicals, algae, etc. in a liquid; a measurement of suspended solids in a liquid.

**U**

**Underburn:** A fire that consumes surface fuels but not the overstory canopy.

**Underburning:** Is prescribed burning under a forest canopy.

**Understory:** That portion of trees or other woody vegetation which forms the lower layer in a forest stand which consists of more than one distinct layer.

**Understory:** That portion of trees or other woody vegetation, which form the lower layer in a forest stand, which consists of more than one distinct layer.

**Uneven-Aged Stand:** A stand composed of at least three (3) distinct age classes intimately mixed or in aggregated groups producing a

multi-layered canopy structure managed as a discrete operational unit.

**V**

**Vascular:** Plants having phloem- and xylem conducting elements that facilitate the moving of water and nutrients.

**Vertebrate Species:** Any animal with a backbone or spinal column. Characterizing watershed and ecological processes to meet specific management and social objectives.

**W**

**Watershed:** All land and water within the confines of a drainage divide.

**Watershed Analysis:** A systematic procedure for Watershed analysis provides a basis for ecosystem management planning.

**Wetlands:** Lands including swamps, marshes, bogs, and similar areas, such as wet meadows, river overflows, mud flats, and natural ponds.

**Wildland-Urban Interface (WUI):** The area where structures and other human development meet or intermingle with undeveloped wildland.

**Windthrow:** A tree or trees uprooted or felled by the wind.

**Y**

**Yarding:** The act or process of conveying logs or whole trees to a landing, particularly by cable, tractor, or helicopter.

KSW01936

**APPENDIX F: MAPS**

Map 1: LCFMP vicinity map



KSW01937

Map 2: LCFMP Commercial Treatment Units & LUAs



KSW01938

Map 3: LCFMP & Past Projects



Map 4: LCFMP Quarry Locations



KSW01940

Map 5: LCFMP AML Locations



KSW01941

Map 6: LCFMP Alternative 2 and 2a Treatments



KSW01942

Map 7: LCFMP Alternative 3 Treatments



KSW01943

## APPENDIX G: BLM RESPONSE TO PUBLIC COMMENTS

The public comments below were made in reference to the 1st draft EA on the ePlanning website. They are summarized and grouped by the resource of concern. BLM responses were provided by the project's interdisciplinary team.

Botany

| Comment | Response |
|---|---|
| The purpose of NEPA is to disclose to the public and the decision maker the environmental conditions and consequences of the agency's action. At B-79 the BLM indicates that the agency has not completed BSS plant surveys prior to publishing the 1st draft EA but assures the reader that surveys will be completed prior to treatment. At B-120 the BLM says the agency "may or may not conduct field surveys" for BSS species as part of the project. Information disclosure to the public or decisionmaker cannot occur if needed surveys do not actually inform the content of the EA. (KSW-55) | All units proposed for timber harvest activities have completed BSS plant surveys. Surveys are still needed in some proposed fuels only treatment units and this is disclosed, along with policy citations, in the EA under Botanical Species NAID p. B-13. BSS plant surveys are required to be completed prior to ground disturbing activity and protection measures implemented per the FEIS. Surveys are required to be done every 10 years per BLM survey protocol. There is no requirement to complete all surveys prior to the signing of the EA, as long as the surveys are completed, protection measures are implemented, and the PDFs for the project reflect protection at the implementation level. |
| | The EA has been edited to reflect that survey records are and will be available to the public by request on p. B-13. |
| | The phrase "may or may not conduct field surveys" is not nor has ever been included in the botany sections. This part of the comment is not substantive. |
| The EA does not disclose the location, frequency, or effects of conducting these logging activities within BSS plant buffers. (KSW-57) | Edits have been made to the EA to identify the locations of these activities on B-15 and B-16 Effects are already addressed in the EA in botanical species NAID, pp B-14 to B-16. |
| The EA does not identify the number of infected quarries or the noxious weed species present at the BLM's rock source. (KSW-64) | We do not currently have this information; however, it is addressed using PDF's that are tiered to BLM internal guidance and citations are provided in botanical species NAID p. B-11. The EA has been edited to reflect that quarry inspection reports are required and are kept on file and will be available to the public upon request. |
| | |

Fuels

KSW01944

| Comment | Response |
|---|---|
| Page 13 of the EA indicates that the BLM intends to implement ground-based machine piling of the activity slash that its logging operations will create but the EA does not disclose the location, acreage or impacts of this activity. (KSW-68) | The exact locations of machine piled activity fuels are unknown at this time. The final locations of slash disposal needed, and the methods prescribed will occur during project implementation and more specific information will be available in the Decision Record. Suitable locations will be identified during the time of implementation. Within the EA, the areas that could be machine piled are the commercial harvest units where the slope is less than 50 percent. The acres of this treatment type are listed in Table 2-5 (Alts. 2/2A= 5,080; Alt. 3 672). More information on where machine piling could occur is described in Appendix D.2. There are multiple BMP's and PDF's which describe conditions and resource concern areas where machine piling could or could not occur. Machine-constructed piles are preferably located and burned on landings or roads. If piles are within harvested units and more than 15 percent of the burned area mineral soil (the portion beneath the pile) surface changes to a reddish color, then BLM considers that amount of area towards the 20 percent detrimental soil disturbance (DSD) limit. |
| We would like the Medford BLM to review the literature cited below and incorporate its findings into your analysis that will shape the level of management proposed in the project:<br><br>North, Malcolm P.; Tompkins, Ryan E.; Bernal, Alexis A.; Collins, Brandon M.; Stephens, Scott L.; York, Robert A. 2022. Operational resilience in western US frequent-fire forests. Forest Ecology and Management. 507: 120004. https://doi.org/10.1016/j.foreco.2021.120004. (AFRC-16) | BLM has reviewed the literature provided. The findings of the research were accounted for in the analysis in the EA. The BLM evaluated direct and indirect effects to temporary (1-2 years) surface fuel hazard and short-term (up to 20 years) stand-level fire resistance and hazard following implementation of proposed actions. The BLM also evaluated direct and indirect effects for the moderate-term time frame (up to 50 years). The BLM discussed cumulative effects at the stand scale over time, considering the incremental impact of proposed actions when added to other past, present, and reasonably foreseeable future actions or natural disturbance (page 57, Sec. 4.2. Fire and Fuels). |
|  |  |

Forestry

| Comment | Response |
|---|---|

| | |
|---|---|
| Page 14 of the 1st draft EA indicates that the BLM intends to create 4-acre "gap creation" throughout the HLB and LSR land use allocations. Yet the number, location, and site-specific impacts of the gaps are not disclosed in the EA. (KSW-12) | BLM follows RMP land use allocation management directions to not create group selection openings more than 4 acres in stands >10 acres, and in stands < 10 acres treated with selection harvest or commercial thinning, do not create group selection openings more than 2.5 acres in size (RMP, p. 72). The Last Chance EA includes a summary and analysis of the affects each alternative would have within the project area, including the consideration of gaps in Appendix B of the EA. The scale of the project is too large to include a discussion on each individual gap location across every treatment area, but gaps were considered as part of the general prescriptive elements of each alternative and post-harvest percent relative density requirement. Additionally, 4-acre group selection openings are not proposed within LSR, "the group selection openings would be less than 1 acre in size" (EA p.15). |
| On page 62, the BLM did not provide quantitative data to support site-specific and cumulative impacts analysis of the effects of its LSR logging scheme. (KSW-16) | Page 60-61 of final EA contains detailed descriptions of modeling effort and process. Detailed individual stand metrics are provided on page 63-70. In addition, 4-acre group selection openings are not proposed within LSR, "the group selection openings would be less than 1 acre in size" (EA p.15). |
| The BLM must disclose how the project is meeting the needs of Executive Order 14072. (KSW-30) | In the RMP/FEIS, "old growth" is not specifically identified at the stand level. Rather, the FEIS refers to the need to manage to favor "large trees with old-growth characteristics, and introduction of heterogeneity into increasingly uniform stands" (p. 354). This occurs at the project level with the retention of tree size and ages as described in the 2016 SWOR RMP for the various land use allocations. |
| | |

Hydro/ Riparian

| Comment | Response |
|---|---|
| In the not analyzed in detail B-14 section, the BLM should disclose the number of cable yarding stream crossings and locations in the analysis. (KWS-19) | Stream crossings for cable yarding systems are avoided unless no other viable option is available. If cable yarding across streams cannot be avoided, mitigations that would be applied include: full-suspension of yarded logs over the stream and within 50 feet of the definable stream channel; one-end suspension of yarded logs within the |

| | remainder of the Riparian Reserve; and implementation of erosion control measures (see TH 03, TH 05, and TH 06 in table C-2 in the EA (p. C-11) and in the RMP (USDI/BLM 2016b p. 182)). These BMPs were analyzed as part of the FEIS and do not require sites to be identified to quantify potential impacts. |
|---|---|
| In the inner riparian zones, the BLM needs to disclose where logging to facilitate yarding, skid trails, and road construction would occur and associate cumulative effects. (KWS-20) | Cable yarding systems are designed perpendicular to streams and both yarding corridors and skid trails avoid the inner riparian zone unless no other viable option is available. If cable corridors and/or skid trails enter the inner riparian zone erosion control measures would be applied (see R 63, TH 01, TH 12, TH 15, and TH 16 in table C-2 in the EA (p. C7-C8, C11-C13) and RMP (USDI/BLM 2016b p. 182-184)). These BMPs were analyzed as part of the FEIS and do not require sites to be identified to quantify potential impacts. Road construction within 200 feet of streams was identified and impacts disclosed and evaluated in Issue 8 including cumulative impacts. The inner riparian zone is contained within 200 feet of streams; therefore, impacts were analyzed. |
| The impacts of the removal of forest canopy from the secondary shade zone of streams throughout project area are not disclosed and analyzed in the EA. (KWS-21) | Impacts were analyzed as part of Issue B-18 on page B-101, "Thinning in the Outer Riparian Zone is expected to reduce some shading in the secondary shade zone during cooler parts of the day (2pm - 10am). The effects from thinning in the secondary shade zone have less impact to stream temperatures than does thinning in the primary shade zone (Leinenbach, et al., 2013, p. 31)." The FEIS assumed timber harvest would occur in the middle and outer riparian zone, leaving a 120-foot buffer for the inner riparian zone. This buffer is sufficient to fully protection of the primary shade zone and provide some protection of the secondary shade zone. The FEIS analysis found this protection would "avoid increases in stream temperature" (USDI/BLM 2016a p. 380). Therefore, impacts were analyzed and disclosed. |
| The EA does not disclose the effects of logging on dead and down wood recruitment over time that is essential for meeting riparian objectives. (KWS-22) | Issue B 22 evaluated wood recruitment for streams and included wood on the forest floor, snag creation and leaving trees felled for other purposed as woody debris or fish restoration as per RMP management direction (USDI/BLM, 2016b, pp. 75-76). Also, Issue B 23 looks specifically at the thinning that is proposed in the middle and outer riparian zones starting on page |

KSW01947

| | B-105. The EA does disclose dead and down wood recruitment and how riparian objectives would be met. |
|---|---|
| The BLM did not disclose cumulative impacts to the proposed riparian reserve logging, the proposed log haul, the proposed bridge construction, and the proposed impacts to peak flows and water timing on Coho. (KSW-26) | The Wildcat Creek crossing is being replaced under the Aquatic Restoration EA to provide for aquatic organism passage for Coho and other fish species. A DNA was completed and is in the process of being finalized for this crossing; no final decision has been made if the final design will be a bridge or culvert, but the crossing will be constructed according to the requirements in ARBO II. Peak flows and summer low flows were analyzed in issue B-15 and were found to not require detailed analysis (p. B-93 – B-95) |
| The EA lacks detailed analysis of the secondary shade zone and maintaining suitable water temperatures. Page B-105 of the EA indicates that "[t]hese areas are vital for reducing water temperatures and supporting diverse riparian ecosystems," yet the BLM provides no data or information. (KSW-86) | Thinning in the secondary shade zone is considered with citations that show the effectiveness of buffers to protect the effective shade for streams and maintain stream temperature (p. B-101). The FEIS analysis found this protection would "avoid increases in stream temperature" (USDI/BLM 2016a p. 380). Therefore, impacts were analyzed and disclosed. |
| The EA should quantify the "periodic monitoring actions. (KSW-84) | The specific reference for "periodic monitoring actions" in the document is not clear from the comment. Monitoring is discussed in many places in the document regarding hydrology and water quality. Page B-101 and B-102 describes stream temperature monitoring. Data collection and reporting is annual and seasonal as per the protocol. Results of the Aquatic and Riparian Effectiveness Monitoring Program (AREMP) 25-year assessment of the Northwest Forest Plan were presented regarding issue 8 for sediment (p. 72) and RMP monitoring requirements for BMP implementation were detailed on p. 92. |
| The EA should have described the cumulative impacts that this project and others will have on water temperature within each watershed. (KSW-85) | Water temperature was analyzed but did not warrant being analyzed in detail due to the effectiveness of stream buffers coupled with inner riparian zone management directions (see issues B 22 and B 23). The FEIS analysis found this protection would "avoid increases in stream temperature" (USDI/BLM 2016a p. 380). Therefore, impacts were analyzed and disclosed. |
| The EA fails to disclose how the project will not contribute to a 7-day rolling temperature increase over 64 degrees in the Middle Cow Creek, Upper Cow Creek, and the Grave Creek watersheds, including but not limited to methods such as road | The FEIS found that with the management direction proposed effective shade would stay above 80% and with less than 0.5 percent of stream channel miles having a potential impact (USDI/BLM 2016a p. 380-381). This FEIS |

| | |
|---|---|
| maintenance, maintaining water flow, and decommissioning roads within the watershed. (KSW-83) | analysis was incorporated by reference. Road maintenance, maintaining water flow, and decommissioning roads within the watershed are not generally seen as increasing stream temperatures other than the loss of shade from the removal of trees. Effective shade and stream temperature are analyzed in B 22 and B 23 along with BMPs and other measures to limit impacts on shade loss near streams. |
| The BLM must disclose if the proposal to log the secondary shade zone of riparian reserves are consistent with the WQRPs and will decrease rather than increase stream temperatures? If so, what is the basis for that rationale? (KSW-82) | The secondary shade zone is not discussed in the Grave Creek, Middle Creek, or Upper Cow WQRP. The basis for the rational that stream temperatures will not be impacted is the FEIS which was incorporated by reference (USDI/BLM 2016a p. 369-384). The FEIS analysis found this protection would "avoid increases in stream temperature" (USDI/BLM 2016a p. 380). Therefore, impacts were analyzed and disclosed. |
| The cumulative (and direct) impacts on sediment and erosion rates from timber haul are particularly important for the Last Chance given that riparian road densities are high, elevated sediment and turbidity levels are occurring because of an extensive road network and other disturbances and hauling and road maintenance activities are expected to result in short-term increases in sediment and turbidity. This may negatively impact already § 303(d) listed streams in the planning area. The BLM must quantify the cumulative impacts of sediment production from haul and explain why it intends to increase sediment loading in this highly impacted watershed. (KSW-79) | Sediment and erosion rates are important that is why it was analyzed it in detail in Issue 8 and looked at potential downstream impacts to water quality and aquatic habitats. Estimates of sediment quantities were disclosed on p. 82 based on methodologies in the FEIS. The analysis found that, "sediment would be transported during peak storm events and would result in impacts to fish habitat and water quality downstream but would be indistinguishable from background conditions since it would be less than a 1% increase." Impaired 303d listed waters were evaluated and disclosed as part of Issue B 17. Both temperature and sediment were analyzed, and no measurable changes were expected in issues 8, B 22, and B 23. |

NEPA Planning

| Comment | Response |
|---|---|
| The EA must disclose how the BLM meets the Conservation and Landscape Health Rule, codified at 43 C.F.R. Parts 1600 and 6100. (KSW-31) | The Last Chance project is implementing the 2016 RMPs for Western Oregon, and specifically the Southwestern Oregon RMP (SWO RMP). The EA is tiered to the SWO RMP and the Final Environmental Impact Statement (FEIS) supporting the RMP. While the RMP and FEIS predate the Conservation and Landscape Health Rule (Rule), the BLM's decisions in the RMP accomplish many of the same purposes as the Rule. The purposes of the RMP include, among other goals, maintaining a network of large blocks |

|  | of forests to be managed as late successional forests and maintaining older and more structurally complex multi-layered conifer forests, and restoring fire-adapted ecosystems (SWO RMP, p. 1). The BLM allocated 381,158 acres to the Late Successional Reserve land use allocation and 190,156 acres to the Riparian Reserves land use allocation (SWO RMP, p. 43). These land use allocations, and the other decisions made in the RMP including the binding management direction, will contribute to: |
|  | the conservation and recovery of listed species through the conservation of large blocks of contiguous habitat and watersheds, |
|  | the protection of older, more structurally complex forests, natural forest development for a resilient landscape, and clean water and improved water quality (SWO RMP, pp. 20-26). |
|  | The RMP therefore accomplishes many of the same goals as the Rule. Because the Last Chance EA is tiered to the RMP, and complies with the RMP, the Last Chance project does comply with the Rule as well. |
|  | In addition, the commenter asserts that the BLM must disclose how the Rule applies to the Last Chance project but does not provide any support for that assertion. The BLM, as any federal executive branch agency, is subject to all applicable statutes and regulations, but is not required in an EA to document compliance with each one. The BLM understands that the Rule here is new and of interest to some members of the public, and so has provided the explanation above. |
|  |  |

Roads

| Comment | Response |
|---|---|
| The BLM must disclose effects to build a bridge to access logging units 13-01, 13-03, 13-04 and 13-05. (KSW-25) | See answer to Wildcat Creek above in the Hydrology section. |
|  |  |

Wildlife

| Comment | Response |
|---|---|
| The BLM should disclose the location and fuels effects to NRF habitat regarding gaps and VRH activity slash. (KSW-28) | The Last Chance EA includes a summary and analysis of the affects each Alternative would have to NRF habitat within the project area, including the consideration of gaps and VRH activity slash in Appendix B of the EA, pp. B-44-55. The scale of the project is too large to include a discussion on each individual gap location across every treatment area, but gaps were considered as part of the general prescriptive elements of each alternative (i.e. 10% of the treatment area). |
| The BLM should disclose the long-term consequences of NRF habitat removal and downgrading, and habitat removal given the uncertainties associated with global climate change. (KSW-37) | The long-term consequences of NRF habitat removal that would occur under each Alternative was incorporated into the EA analysis by tiering to the FEIS analysis (USDI BLM 2016a) that was used for the basis for the final RMP. Specifically, "The effects of the proposed actions are within the estimated effects to spotted owl populations analyzed in the PRMP/FEIS to which this EA is tiered (USDI BLM 2016a, pp. 947-973)". |
| The BLM did not disclose impacts of LSR treatments on barred owl competition. (KSW-38) | The LSR treatment component of the LCFMP is relatively small in comparison to the amount of treatments proposed in other Land Use Allocations (2.5% of all project actions under alternative 2).  Because the LSR treatment component is a relatively small amount compared to all the proposed treatments, the effects of thinning LSR stands were not considered independently, but rather as a whole with all other treatments across all LUAs. The BLM did consider the potential effects that the LCFMP would have on spotted owl and barred owl competition for each alternative (see Appendix B, pp. B-59-61), and concluded: "In summary, the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls. Habitat management by the BLM alone would not be sufficient to produce stable populations of northern spotted owls in the Oregon Coast Range Physiographic Province, the Oregon Western Cascades Physiographic Province, and the Klamath Basin Physiographic Province within the RMP planning area |

| | (USDI/BLM 2016a , pp. 961-962). However, habitat on BLM-administered lands plays an indispensable role in northern spotted owl conservation in the Oregon Eastern Cascades Physiographic Province (USDI/BLM 2016a, p. 962). Therefore, the greatest contribution to conservation and recovery of the northern spotted owl would come from a combination of habitat management and barred owl management (USDI/BLM 2016a, Vol 4; p. 973)" (LCFMP EA p. B-60). |
|---|---|
| The EA lacks quantitative data to support the impacts of habitat removal on NSO or their prey in the project area. (KSW-41) | The LCFMP EA includes an analysis on the impacts of habitat removal to NSOs, including a discussion regarding the generalized effects to spotted owl prey species from habitat removal in Appendix B, pp. B-52-54. |
| The EA should disclose habitat levels, occupancy history, reproductive success (or failure) and Barred owl encroachment in known spotted owl activity centers. (KSW-42) | The LCFMP EA includes a summary of the number of spotted owl sites that are above or below the habitat thresholds for their associated home range and 0.5-mile core use areas (see table B.32.1 LCFMP EA p. B-53). A more complete and comprehensive review of effects to NSOs, including habitat levels, occupancy history and reproductive success, and barred owl observations for all potentially affected NSO sites is included in the Biological Assessment for the LCFMP (USDI BLM 2023). |
| In Appendix B, table B.32.1 (B-119), the table contains no actual numbers. Where the numbers should be located is simply the figure. (KSW-44) | Formatting errors in the draft have been corrected/finished in the final EA. |
| The agency's reliance on generic PDFs and BMPs for project analysis is troubling given that at C-28, C-29 and C-30 the BLM is unable to disclose the content of the PDFs and simply includes the figures "xx" as a surrogate for words or numbers. (KSW-45) | Corrected in the final EA. |
| The removal of 3,420-acres of fire resilient NRF habitat is a significant action necessitating the completion of an EIS. The contention at B-123 that the removal of NRF habitat that will take over a hundred years to re-establish (consisting of many potential generations of NSO) will be "mitigated" by ingrowth and establishment of habitat "during the same time span" is questionable. (KSW-46) | The determination of whether or not to prepare an EIS rests on whether the proposed federal action will have a significant effect on the quality of the human environment. One element that is weighed in determining significance is the intensity, or severity of the potential impact. The impacts presented by the commentor (removal of NRF habitat) are well within the analysis prepared in the 2016 FEIS supporting the Southwestern Oregon ROD/RMP: "In conclusion, there is no potential for significant impacts to NSO habitat |

| | |
|---|---|
| | beyond those already analyzed in the PRMP/FEIS because the project design and site-specific information is consistent with the analysis in the PRMP/FEIS. This project would not result in substantially different effects than what was analyzed for in the PRMP/FEIS and there is no new information that would substantially change the conclusion reached in the PRMP/FEIS" (LCFMP EA, pp. B-45-52:). The BLM has determined that preparation of an EIS is not necessary. |
| There is no scenario in which the vast liquidation of NRF habitat in this project area in these NSO activity centers is mitigated to any degree by habitat establishment "during the same time span." The habitat liquidation occurs now and impacts owls, their prey, their reproduction and their ability to disperse and avoid Barred owls now. (KSW-47) | There is no intent to "mitigate" the effects of habitat removal on HLB LUA with in-growth of habitat. The FEIS predicted a steady rate of decline of habitat on HLB in order to archive sustained yield harvest targets. |
| The BLM did not analyze or disclose the ingrowth and habitat establishment that the BLM relies upon as mitigation would take many decades and is not effective at helping these owls. The BLM acknowledges that NSO are under "severe biological stress" (B-127) and then proposes to increase the primary stressors (habitat removal, fire hazard and Barred owl competition) in order to "maximize the commercial harvest areas treated and [maximize the intensity of the treatment." (1st draft EA p. 22). An EIS is required. (KSW-48) | There is no intent to "mitigate" the effects of habitat removal in the HLB LUA with in-growth of habitat. The FEIS predicted a steady rate of decline of habitat on HLB in order to archive sustained yield harvest targets. Effects to spotted owls and spotted owl habitat are included in the EA in several locations, including the effects of habitat removal and fire hazard (Final EA pp. B-52-56), and barred owl competition (pp. B-59-61)<br><br>The determination of whether or not to prepare an EIS rests on whether the proposed federal action will have a significant effect on the quality of the human environment. One element that is weighed in determining significance is the intensity, or severity of the potential impact. The commentor fails to provide any rationale as to the specific reason an EIS would be needed here. The BLM has appropriately determined that preparation of an EIS is not necessary. |
| At B-127 in response to the issue of Barred owl competition the BLM acknowledges the importance of managing LSRs for "large blocks of unfragmented older forests" and then proposes to further fragment the already fragmented LSR through extensive road construction, logging, yarding and landing establishment across the landscape and throughout the LSR. No data, | The Last Chance FMP would have a relatively minor impact to the habitat found in the LSR LUA as 1) this project includes only 291 acres of LSR treatments (2.5% of all treatments under alt 2) and 2) all "proposed treatments in the LSR are designed to modify, but maintain the NSO habitat type of the treated stand such that the stand would still provide the same level of habitat function as |

| | |
|---|---|
| analysis or site-specific information at all is provided regarding the impacts of Barred owl encroachment on the NSOs in this project area. (KSW-49) | it did prior to treatment (e.g. foraging habitat would remain foraging habitat after treatment and would not be downgraded to a lower habitat category)" (LCFMP EA p. 63).<br><br>The BLM did consider the potential effects that the LCFMP would have on spotted owl and barred owl competition for each alternative (see Appendix B, pp. B-59-61), and concluded: "In summary, the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls. Habitat management by the BLM alone would not be sufficient to produce stable populations of northern spotted owls in the Oregon Coast Range Physiographic Province, the Oregon Western Cascades Physiographic Province, and the Klamath Basin Physiographic Province within the RMP planning area (USDI/BLM 2016a , pp. 961-962). However, habitat on BLM-administered lands plays an indispensable role in northern spotted owl conservation in the Oregon Eastern Cascades Physiographic Province (USDI/BLM 2016a, p. 962). Therefore, the greatest contribution to conservation and recovery of the northern spotted owl would come from a combination of habitat management and barred owl management (USDI/BLM 2016a, Vol 4; p. 973)" (LCFMP EA p. B-60). |
| The BLM assertion at page B-128 that the timber sale was designed to avoid incidental take of NSO is arbitrary and capricious. The BLM fails to account for take as a result of increased Barred owl competition resulting from NRF removal, the fragmentation of LSR, the removal of NRF and RA-32 habitat from forests that were considered "critical" to the survival and recovery of NSO, and the increase in fire hazard that will follow from NRF removal and BLM treatments. (KSW-50) | It is a statutory requirement that "The BLM will not authorize timber sales that would cause the incidental take of northern spotted owl territorial pairs or resident singles from timber harvest until implementation of a barred owl management program consistent with the assumptions contained in the Biological Opinion on the RMP has begun." (USDI/BLM 2016b, p. 30). "The wildlife biologists and foresters for this project worked together to design treatments in occupied spotted owl sites that would not result in an "incidental take" determination by the USFWS, and BLM conducted consultation streamlining with USFWS during project development to ensure incidental take would be avoided. Project units continue to be surveyed according to protocol through harvest implementation, and if |

| | |
|---|---|
| | resident owls are located, the BLM would consult with the USFWS. Units would be dropped or modified to reduce potential adverse effects and avoid incidental take to owls located at new owl sites or previously unoccupied owl sites, consistent with RMP USFWS Biological Opinion…" (LCFMP EA p. B-61). |
| The BLM did not analyze the impacts of the Last Chance on BSS species of concern.  Will the BLM conduct BSS surveys? (KSW-52) | The BLM did assess the impacts of the LCFMP on BSS species of concern, specifically in Appendix B, pp. B-62-69.  "Based on BLM Manual 6840 – Special Status Species Management (USDI/BLM 2008), the BLM would address Bureau Sensitive species and their habitats in land use plans and would implement measures to conserve these species and their habitats, to promote their conservation, and reduce the likelihood and need for these species to be listed under the Endangered Species Act (USDI/BLM 2016a, p. 830). The BLM conducts evaluations of the distribution, abundance, population trends, current threats, or habitat for Bureau Sensitive species using available information in regard to actions the BLM proposes to undertake, consistent with the BLM Special Status Species Management manual. The BLM may or may not conduct field surveys as part of these evaluations for Bureau Sensitive wildlife species (USDI/BLM 2016a, p. 831). BLM Manual 6840, and the RMP do not require project clearance surveys, habitat buffers, or seasonal restrictions for these species" (LCFMP EA p. B-63). |
| At page B-134 in lieu of population or reproductive data about Western Pond Turtles, the BLM refers the reader to "see EA p.xxx" What does this mean and where is the analysis? (KSW-53) | This "EA p. xxx" reference was removed for the final version of the EA. See Issue 3.4 for information about the Northwestern Pond Turtle (NWPT) (Final LCFMP EA, pp. 72-77). |
| The western pond turtle (WPT) is being proposed for an ESA listing. The WPT is a BLM BSS species and BLM should implement reasonable conservation measures (such as seasonal restrictions) to aid BSS species and to prevent the need to list at-risk wildlife under the ESA. It is incontrovertible that WPT populations are in decline and that they are present in the Last Chance timber sale project area. Why not implement seasonal restrictions regardless? (KSW-58) | As stated on page B-63, the BLM Manual 6840 and the RMP do not require project clearance surveys, habitat buffers, or seasonal restrictions for Bureau Special Status Species. The phrase used in the draft EA was "NWPT PDFs could be waived". This does not mean PDFs "would" be waived, in all potential NPWT habitat or for all activity types. The sentence, "If the NWPT is not listed under the ESA, the NWPT will continue to be managed as a Bureau Sensitive species," was added for clarification in the PDFs (Final LCFMP EA, pp. C-25-26). |

| | |
|---|---|
| Information contained in the USFWS listing proposal was not considered in the 2016 RMP such that at no scale has the BLM addressed or provided any data regarding WPT. There have been no surveys. There is no data. There is no analysis. There are generic PDFs. The location of gaps and road construction through overwintering habitat is not disclosed. The proposal to modify nearly half (48% EA page 66) of WPT overwintering habitat is likely a death sentence for the local population and may contribute to the already established need to list the species under the ESA. (KSW-60) | The NWPT was addressed in the FEIS (Vol 4, pp. 1670 and 1970-1971). PDFs were built from a draft interim NWPT guidance document from the BLM state office that was developed with input from biologists across the state, which will be used until the Fish and Wildlife Service develops their own guidance document. As there is currently no protocol approved by the Fish and Wildlife Service for NPWT clearance surveys, modeled habitat and the scientific literature were used to estimate effects to NWPT (LCFMP EA, Issue 3.4). Additionally, gaps and road construction were included in analysis (see Issue 3.4). A footnote was added to the final EA to clarify that Table 7.1 includes associated activities (Final LCFMP EA, p. 76). As discussed in Issue 3.4, habitat that is "modified" would be maintained, and therefore would remain as habitat function for NWPT. Lastly, as described in Issue 3.4, the Fish and Wildlife Service stated NWPT is likely to maintain populations throughout its range in the next 50 to 75 years in Oregon, Nevada, and California (USFWS 2023, p. 68391) regardless of the three key stressors—anthropogenic impacts, predation by bullfrogs, and drought (USFWS 2023, p. 68377). |
| Appendix C contains a generic PDF to "implement conservation measures" for Bureau Sensitive and T&E species. The Last Chance project fails to meaningfully disclose what this PDF means. (KSW-61) | The PDF to "implement conservation measures" for Bureau Sensitive and T&E species includes additional language (LCFMP EA p. C-22) further clarifying what some of these conservation measures are: "Conservation measures include altering the type, timing, location, and intensity of management actions. Conservation measures would be determined based on species, proposed treatment, site-specific environmental conditions, and available management recommendations" (LCFMP EA p. C-22). There are too many wildlife species and too many potential scenarios to list out every possible conservation measure that could be applied so this PDF must remain broad to allow for flexibility and changing circumstances while still providing protective measures should they be needed. |
| The impacts on wildlife connectivity must be fully disclosed and analyzed prior to rendering the decision. (KSW-80) | "Wildlife connectivity" cannot be assessed for all wildlife species as a monolith. Each species has varying needs and dispersal capabilities and respond differently (positively or negatively) to various treatment types. The LCFMP does include an analysis of the effects of the proposed treatments by alternative on NSO dispersal (see |

KSW01956

| | |
|---|---|
| | LCFMP EA pp. B-58-59) and concluded that "the 5th field watersheds [where the project occurs] would retain approximately 60 percent nesting and roosting, foraging, and dispersal habitat, and substantially exceed the minimum 40 percent conditions consistent with recent literature sufficient to support spotted owl dispersal across the landscape" (LCFMP EA p. B-59). |
| The BLM failed to evaluate the impacts of project activities on migratory bird nests, failed to disclose the breeding season for each migratory bird species found in the project area, and refused proposed measures (such as seasonal restrictions) to avoid destruction of nests. (KSW-76) | The LCFMP does include an analysis of the effects of the proposed treatments by alternative on migratory birds (see LCFMP EA pp. B-70-72) and concluded that "The RMP would lead to an increase in habitat in 50 years for a majority (26) of the 34 landbird focal species for whom habitat was modeled, equal to the number of species in the No Action Alternative (USDI/BLM 2016a, p. 850), and twice as many as the No Timber Harvest Alternative. Of 8 species with declining or slightly declining habitat, all areas are early successional habitat groups. The purple finch, also a USFWS Birds of Conservation Concern (BCC) species would have slightly declining habitat (young high-density, mature multilayered, structurally complex) at 97 percent (USDI/BLM 2016a, Appendix S Table S-33 p.1667 and S-37 p.1691)" (LCFMP EA p. B-71). |
| The BLM failed to develop and implement seasonal operational restrictions to avoid project impacts while land birds are nesting in the project area. (KSW-74) | "The BLM would manage landbird species under the Migratory Bird Treaty Act and following guidance provided by WO IB 2010-110, the Memorandum of Understanding between the BLM and USFWS to promote the conservation of migratory birds (August 31, 2010). At the project level, the BLM would implement measures to lessen take of migratory birds under the Migratory Bird Treaty Act focusing on species of concern as identified by the BLM and USFWS (USDI BLM 2016a, p. 851). USFWS BCC potentially breeding in the project area and effected by the Proposed Action include: Peregrine Falcon, Rufous Hummingbird, Allen's Hummingbird, Olive-sided Flycatcher, Willow Flycatcher (c), Horned Lark, Oregon Vesper Sparrow, and Purple Finch. None of these BCC species are closely associated with dense or closed canopy coniferous forests in the project area. One peregrine falcon site within the project area is managed with a seasonal disturbance restriction (EA, Appendix B). Commercial harvest and hazardous fuels reduction treatments would be staggered over a period of several years in multiple projects, and |

| | |
|---|---|
| | seasonal restrictions that were developed to minimize effects to northern spotted owls and peregrine falcon would also benefit migratory birds and minimize the amount of disturbance during their nesting season" (LCFMP EA p. B-71). |

Soils

| Comment | Response |
|---|---|
| The BLM is aware that at several sites its logging, road construction, landing and yarding activities will exceed the 20% soil disturbance threshold established in the 2016 RMP.  The BLM does not consider permanent road construction soil disturbance as a means of masking the actual total amount of disturbance. Similarly, at C-29 PDF 62 the BLM directs itself to utilized unspecific "mitigation or amelioration" at an unspecific number of unspecific sites where the BLM intends to exceed [violate] the 20% standard of the RMP. At EA 13 the BLM reveals that it intends to conduct an unspecified amount of machine slash piling on an unspecified number of sites and unspecified locations containing unspecified soil types, on unspecified slopes with unspecified levels of existing soil disturbance. (KSW-67) | Management direction for soils is to not exceed 20% DSD in any timber unit (USDI/BLM 2016b p. 109). This analysis about detrimental soil disturbance was rewritten in the 2nd draft to clarify the process by which the BLM would use to achieve this RMP requirement.

Road construction is analyzed for potential sediment production in Issue 8.  Road construction is also considered in the soil analysis in calculations for ground disturbance (p. 94). Machine piling would have BMPs applied and would be considered in DSD estimates during implementation and monitoring.  Potential impacts to soils were estimated and analyzed along with other disturbance (p. 95). |
| After electing not to analyze or disclose the impacts of logging on TPCC soils, at C-30 the BLM lists TPCC PDFs that do not complete and use repeated characters "xx." TPCC PDFs have not been written, they have not been disclosed, and do not substitute for actual data and analysis. (KSW-66) | The EA analyzed and disclosed impacts to DDR-TPCC soils in issue B-27. The DDR-TPCC PDFs are disclosed in Table D4.8 and would be implemented during layout of individual timber harvest units. The analysis for DDR-TPCC was revised to include fragile restricted soils for surface erosion and clarify BMPs for dry forests. The problems with numbering and tables have been fixed in the 2nd draft, sorry for any confusion. |