# Exhibit K

U.S. Bureau of Land Management

Medford District, Grants Pass Field Office

Last Chance Forest Management Project

Revised Environmental Assessment Decision Record #1:

Paul's Payoff & Rotor's Up Timber Sales

DOI-BLM-ORWA-M070-2022-0007-EA

May 2025

KSW01959

**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**GRANTS PASS FIELD OFFICE**

**Last Chance Forest Management Project**

**Revised Environmental Assessment**
**Decision Record #1 Paul's Payoff & Rotor's Up Timber Sales**

# Last Chance Forest Management Project
## DOI-BLM-ORWA-M070-2022-0007-EA
## May 2025

Grants Pass Field Office / Medford District
2164 NE Spalding Avenue
Grants Pass, Oregon 97526

KSW01960

## Introduction

The Medford District Bureau of Land Management (BLM), Grants Pass Field Office interdisciplinary team (IDT) has prepared the Last Chance Forest Management Project (LCFMP) Revised Environmental Assessment (REA), DOI-BLM-ORWA-M070-2022-0007-EA. The REA analyzed the effects of commercial and non-commercial treatments and associated activities on 11,686 acres of BLM-administered lands within a 56,888-acre project area. Proposed treatments include variable retention harvest (VRH), commercial thinning, selection harvest, activity fuels reduction, and hazardous fuels reduction. Associated activities include temporary and permanent route/road and landing construction, quarry use, road renovation and reconstruction, timber haul, and road decommissioning.

This Decision Record (DR #1) documents the decision to implement forest management activities proposed and analyzed in the LCFMP REA and is being released concurrently with the final REA, Finding of No Significant Impact (FONSI), and Decision Record (DR #2) authorizing Hazardous Fuels Reduction (HFR) activities. The BLM anticipates releasing future Decision Records authorizing additional forest management actions proposed in the LCFMP REA.

## Decision

Based on the analyses documented in the LCFMP REA, the FONSI, and the associated project record, it is my decision to implement selected actions proposed and analyzed under Alternative 2 (described in more detail below), hereafter referenced as the "Selected Alternative." This Decision will implement actions in the locations described below and will include all associated Best Management Practices (BMP's) and Project Design Features (PDFs) as described in the REA (Appendix C). BMPs and PDFs are an integral part of the Project and were developed to avoid or reduce the potential for adverse impacts to resources. Where applicable, PDFs reflect Best Management Practices (BMPs) as outlined in the 2016 (SWO ROD/RMP) (BLM 2016, Appendix C) and standard operating procedures.

The forest management activities authorized in DR #1 include:

- 475 acres of Harvest Land Base Uneven-Aged Timber Area selection harvest,
- 11 acres of Late-Successional Reserve-Dry selection harvest,
- 38 acres of Outer and Middle Riparian Zone commercial thinning,
- 34 acres of District-Designated Reserve – Timber Productional Capability Classification selection harvest,
- 17 acres of roadside vegetation maintenance treatments,
- 575 acres of activity fuels treatments,
- 1 acre of helicopter landing construction,
- 2.9 miles of road construction,
- 31.5 miles of road renovation, and
- 34.4 miles of haul roads.

These forest management activities authorized in DR #1 are associated with two separate timber

KSW01961

sales: Paul's Payoff Timber Sale and Rotors Up Timber Sale. Paul's Payoff Timber Sale was authorized under the original LCFMP EA and DR#1, and offered for sale on September 26, 2024. Murphy Company was declared the high-bidder of Paul's Payoff Timber Sale at the oral auction. The approval and award of the Paul's Payoff timber sale is pending on the release of the Revised Last Chance Forest Management Project EA and this DR#1/FONSI. Rotors Up Timber Sale is scheduled to be offered on June 26, 2025.

Authorized logging operations include ground-based, cable, and helicopter systems. This commercial timber harvest, road and landing construction, roadside vegetation maintenance, and follow-up activity fuels treatments on approximately 575 acres of BLM-administered lands in the following locations:

- T. 33 S., R. 4 W., Sec. 31;
- T. 33 S., R. 5 W., Sec. 23, 25, 26, 27, 34, 35;
- T. 34 S., R. 5 W., Sec. 1, 2, 3, 4, 5, Willamette Meridian, Oregon.

For an overview of the location of commercial harvest units, road construction, and road renovation authorized in DR #1, see Attachment 1 (Maps). Acres are rounded to the nearest whole acre. The following summarizes the actions authorized by this Decision:

*Table 1. Summary of Commercial Harvest by Treatment Type*

| Commercial Treatments | Total Acres (Rounded) |
|---|---|
| Commercial Thin (CT) | 38 |
| Selection Harvest (SH) | 520 |
| Roadside Vegetation Maintenance (RS) | 17 |
| | |
| *Total* | 575 |

*Table 2. Commercial Timber Harvest Units by Timber Sale (Legend at Bottom of Table)*

| Unit # | Acres | LUA | Logging System | Prescription (Type, Target BA and RD) | EA Alternative |
|---|---|---|---|---|---|
| colspan | | | Paul's Payoff Timber Sale | | |
| 1-3 | 3 | HLB-UTA / RR-dry | GB | SH 150-160 BA / CT 150-160 BA; 20-30% RD | 2 |
| 1-4 | 60 | HLB-UTA / RR-dry | GB / C | SH 80-120 BA / CT 120-130 BA; 25-35% RD | 2 |
| 3-1 | 20 | HLB-UTA / RR-dry | GB / C | SH 80-120 BA / SH 150-180 BA / CT 120-130 BA; 25-35% RD | 2 |
| 25-9 | 15 | HLB-UTA / RR-dry | C | SH 120-130 BA / CT 120-130 BA; 30-40% RD | 2 |
| 25-10 | 11 | HLB-UTA / DDR-TPCC | GB / C | SH 150-160 BA; 30-40% RD | 2 |
| 26-1 | 23 | HLB-UTA / RR-dry | GB / C | SH 120-130 BA / CT 120-130 BA; 30-40% RD | 2 |

KSW01962

| Unit # | Acres | LUA | Logging System | Prescription (Type, Target BA and RD) | EA Alternative |
|---|---|---|---|---|---|
| 26-2 | 31 | HLB-UTA / RR-dry | GB / C | SH 120-160 BA / CT 150-160 BA; 30-40% RD | 2 |
| 27-1 | 2 | HLB-UTA | GB | SH 120-160 BA; 30-40% RD | 2 |
| 27-5 | 6 | HLB-UTA / RR-dry | C | SH 120-130 BA / CT 120-130 BA; 30-40% RD | 2 |
| 31-1 | 2 | HLB-UTA | C | SH 80-120 BA; 30-40% RD | 2 |
| 34-1 | 68 | HLB-UTA / RR-dry / DDR-TPCC | GB | SH 80-160 BA / CT 150-160 BA; 30-40% RD | 2 |
| 34-1D | 3 | HLB-UTA / DDR-TPCC | C | SH 150-160 BA; 30-40% RD | 2 |
| 35-10 | 22 | HLB-UTA LSR-dry | GB / C | SH 120-160 BA; 30-40% RD | 2 |
| 35-12 | 24 | HLB-UTA / RR-dry | GB / C | SH 120-160 BA / CT 120-130 BA; 30-40% RD | 2 |
| 1.0 RS | 4 | DDR-Roads | GB | RS | 2 |
| 1.3 RS | 1 | DDR-Roads | GB | RS | 2 |
| 2.1 RS | 1 | DDR-Roads | GB | RS | 2 |
| 7.0 RS | 1 | DDR-Roads | GB | RS | 2 |
| 21.0 RS | 1 | DDR-Roads | GB | RS | 2 |
| 26.4 RS | 1 | DDR-Roads | GB | RS | 2 |
| 35.0 RS | 1 | DDR-Roads | GB | RS | 2 |
| 35.1 RS | 3 | DDR-Roads | GB | RS | 2 |
| 35.2 RS | 1 | DDR-Roads | GB | RS | 2 |
| **Sub-Total** | **307** | | | | |
| **Rotors Up Timber Sale** | | | | | |
| 4-1 | 148 | HLB-UTA / RR-dry / DDR-TPCC | H | SH 80-120 BA / CT 120-130 BA; 25-35% RD | 2 |
| 5-1 | 120 | HLB-UTA / RR-dry / DDR-TPCC | H | SH 80-120 BA / CT 120-130 BA; 30-40% RD | 2 |
| **Sub-Total** | **268** | | | | |
| **Total** | **575** | | | | |

KSW01963

| Unit # | Acres | LUA | Logging System | Prescription (Type, Target BA and RD) | EA Alternative |
|---|---|---|---|---|---|
| **Land Use Allocation (LUA)**<br><br>HLB-UTA – Uneven-Aged Timber Area<br>LSR-Dry – Late-Successional Reserve-Dry<br>RR-Dry – Riparian Reserve-Dry Outer and Middle Zone<br>DDR-TPCC – District-Designated Reserve – Timber Production Capability Classification<br>DDR-Roads – District-Designated Reserve – Roads | | | **Logging System**<br><br>GB – ground-based<br>C – cable-skyline<br>H – helicopter | **Prescription Types**<br><br>CT – commercial thinning<br>SH – selection harvest<br>BA – basal area<br>RD – relative density post-harvest<br>RS – roadside vegetation maintenance | |

The following helicopter landing construction, road construction, road renovation, road decommissioning, and timber haul are authorized by this Decision. For a visual overview of locations of the road and landing construction, renovation, improvement, and timber haul, see Attachment 1 (Maps). Road lengths are rounded to the nearest tenth of a mile.

- Permanent road construction of approximately 1.7 miles in:
  - T. 33 S. R. 05 W. Sec. 34.
  - T. 34 S. R. 04 W. Sec. 06.
  - T. 34 S. R. 05 W. Sec. 01, 04.

- Temporary road construction of approximately 1.2 miles in:
  - T. 33 S. R. 05 W. Sec. 25, 26, 35.

- Road renovation of approximately 26.6 miles in:
  - T. 33 S. R. 05 W. Sec. 21-23, 25-27, 34-36.
  - T. 34 S. R. 04 W. Sec. 6.
  - T. 34 S. R. 05 W. Sec. 1-3.

- Hauling of timber on approximately 34.4 miles (of which 11.9 miles would be available for wet season haul; an additional 19.8 miles would be available for wet season haul if purchaser chooses to add adequate rock to the road) (Attachment 1, Map 10) of BLM and privately administered roads in:
  - T. 33 S. R. 05 W. Sec. 21-23, 25-27, 34-36.
  - T. 34 S. R. 04 W. Sec. 6.
  - T. 34 S. R. 05 W. Sec. 1-4, 9-11.

- BLM determined that five segments of roads will move forward as long-term closure decommissioning (see Attachment 1, Maps), for an approximate total of 2.9

KSW01964

miles. These road segments are located in the following locations:

- o  T. 33 S. R. 05 W. Sec. 25, 26, 34, 35.
- o  T. 34 S. R. 05 W. Sec. 1, 4.

## Decision Rationale

The rationale for my Decision is based on the consideration and evaluation of how well the Purpose and Need are met, public input, and the associated environmental consequences of implementing or not implementing the LCFMP, as analyzed in the REA, and documented in the FONSI. My Decision to authorize the Selected Alternative, as described in the Decision section above, best fits the Purpose and Need for action as presented in the REA, while providing protection for resources, including ESA listed and Special Status species.

The REA analyzed three alternatives for the management of the BLM-administered lands in the Project Area, a No Action Alternative (Alternative 1), and three action alternatives (Alternatives 2, 2a and 3). The action alternatives vary in number of acres treated per year, areas that can be treated, commercial and non-commercial vegetation treatment types, and hazardous fuels reduction treatments (small diameter thinning and prescribed fire). All action alternatives were designed to meet the Purpose and Need for the project; the degree to which each alternative meets this provides the basis for my Decision.

Alternative 1 would not meet the Purpose and Need for this project. Under the No Action Alternative, no actions would be taken at this time to produce timber to contribute to the attainment of the declared ASQ, forest stands would remain in an overly dense state making them less resilient to disturbance, and fuels would continue to accumulate.

A Finding of No Significant Impact (FONSI) explains that the Selected Alternative that I have chosen has been analyzed in an Environmental Assessment and has been found to have no significant impacts, thus an Environmental Impact Statement is not required and will not be prepared.

## Land Use Plan Conformance

The BLM signed the Southwestern Oregon Record of Decision and Resource Management Plan ROD/RMP (SWO ROD/RMP) on August 5, 2016. All alternatives for the LCFMP have been designed to conform with the management direction in the 2016 SWO ROD/RMP, which addresses how the BLM will comply with applicable laws, regulations, and policies in western Oregon including, but not limited to the: Oregon and California Railroad (O&C) Act, Federal Land Policy and Management Act (FLPMA), Endangered Species Act (ESA), National Environmental Policy Act (NEPA), National Historic Preservation Act (NHPA), Clean Air Act, and Clean Water Act.

## Public Involvement

The GPFO mailed public scoping letters in December of 2020 to adjacent landowners, permittees, agencies, and other interested citizens. The BLM received five comments during the 30-day public

KSW01965

scoping period. On July 15, 2021, a public scoping letter was sent to interested mining claimants. No comments were received. In August of 2022, the Rum Creek Fire ignited via lightning strike in the northwestern portion of the GPFO. This fire did not burn within the LCFMP. However, project development was put on hold while the BLM worked to manage the fire and conduct post-fire Emergency Stabilization and Rehabilitation (ESR). In January of 2023, the planning of the LCFMP resumed. On February 22, 2023, scoping letters were sent to tribal governments including the Cow Creek Band of Umpqua, Confederated Tribes of Grand Ronde, and the Confederated Tribes of the Siletz Indians. No comments were received. On July 8, 2024, a draft Environmental Assessment (EA) was published on ePlanning for a 30-day public comment period and 917 comments were received.

The GPFO posted a revised draft of the EA for the public on ePlanning for an additional 14-day public review comment period from March 14th to March 28th of 2025. BLM responses to these comments are attached to this decision (Attachment 2) and incorporated into the final Revised EA where needed.

## Consultation and Coordination

### U.S. Fish and Wildlife Service

In accordance with regulations pursuant to Section 7 of the Endangered Species Act of 1973, as amended, consultation concerning the potential impacts of the proposed action upon the northern spotted owl and Franklin's bumble bee have been completed within the Biological Assessment for Medford BLM FY23 Batch of Projects on April 21, 2023. The BLM received a Biological Opinion (BO) for the Biological Assessment for Medford BLM FY23 Batch of Projects from the U.S. Fish and Wildlife Service on July 3, 2023.

The proposed action for this project has been reviewed and is in compliance with the Biological Assessment of activities that may affect the federally listed plant species Gentner's Fritillary and Cook's Lomatium, on the Medford District BLM (2020) and associated Letter of Concurrence from the U.S. Fish and Wildlife Service dated November 10, 2020.

### National Marine Fisheries Service

The Last Chance project is within the Rogue and Umpqua Basins, which are in the range of the federally threatened Southern Oregon/Northern California Coast (SONCC) and Oregon Coast (OC) Coho Salmon. Consultation for the Endangered Species Act and Essential Fish Habitat for the Magnuson-Stevens Fishery Conservation and Management Act with the National Marine Fisheries Service (NMFS) is covered under the Endangered Species Act Section 7(a) (2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat for the Programmatic Forest Management Program for Western Oregon (WCR-2017-7574; aka: FOMBO). The BLM complied with the use of the FOMBO and applied design criteria for this project, including transmittal of a Project Notification Form to the NMFS.

The Alternatives are consistent with the appropriate management direction and BMPs described as project design criteria for the FOMBO. Therefore, the Last Chance project is appropriate for inclusion under the opinion. The BLM received verification from the NMFS confirming that the Last Chance project is consistent with the effects analysis and conclusions of the NMFS FOMBO dated March 9, 2018.

KSW01966

**Tribal Consultation**

The Confederated Tribes of the Siletz Indians, the Confederated Tribes of Grand Ronde, and the Cow Creek Band of Umpqua Tribe of Indians were notified of the LCFMP on February 22, 2023, and invited to provide input or formally consult with the BLM. The Tribes did not request consultation.

**State Historic Preservation Office Consultation**

The BLM Medford District consulted with the State Historic Preservation Office (SHPO) per Section 106 of the National Historic Preservation Act. After completing background research and field surveys, the BLM determined LCFMP would not adversely affect any historic properties. The BLM submitted this finding along with a report detailing the results of the inventory to SHPO in March 2023. The SHPO did not respond to this submittal within 30 days. Per the 2015 State Protocol between BLM and SHPO, if BLM does not receive a response from SHPO within 30 days of submitting a no adverse effect determination, BLM assumes SHPO concurrence with their determination of effect.

**Local Agency Coordination**

The Josephine County Board Commissioners, the Josephine County Planning Department, and the Public Works Department were sent scoping letters requesting input on the Last Chance Forest Management Project proposal.

## Administrative Remedies

A person adversely affected by this decision may appeal the decision to the Interior Board of Land Appeals (Board), within the Office of the Secretary, Office of Hearings and Appeals. Appeals to the Board are governed by the Department's regulations at 43 CFR Part 4. The BLM has provided Form 1842-1 on ePlanning as a courtesy to assist a member of the public who chooses to appeal this decision. However, the appellant (the person filing the appeal) bears the responsibility to know, understand, and comply with the appeals regulations.

To appeal this decision, the appellant or designated representative (see 43 CFR § 1.3) must file a notice of appeal within thirty (30) calendar days of the date of this decision in this office, addressed to the deciding official, Justin L. Kelly, Grants Pass Field Office, 2164 NE Spalding Avenue, Grants Pass, Oregon 97526. It is the responsibility of the deciding official to promptly transmit a notice of appeal to the Board. If the notice of appeal does not include a statement of reasons, the appellant must file the statement of reasons with the Board and the BLM within thirty (30) calendar days after the notice of appeal is filed. The appellant must also file a copy of the notice of appeal, any statement of reasons, any written arguments, and any briefs with the Office of the Regional Solicitor, Pacific Northwest Region, U.S. Department of the Interior, 601 SW 2nd Ave, Suite 1950, Portland, OR 97204-3172.

An appellant has the right to petition the Board to stay implementation of the decision. A petition for stay, if any, must be served by the appellant upon the deciding official, the Office of the Regional Solicitor and the Board.

KSW01967

**Effective Date of Decision**

This Decision Record is a forest management decision under 43 Code of Federal Regulations Part 5003.2. 5The BLM is making this forest management decision effective immediately. After the signed date, the BLM will proceed expeditiously with the timber sale contracting process.

JUSTIN
KELLY

Digitally signed by
JUSTIN KELLY
Date: 2025.05.12
11:01:17 -07'00'

_____                    _____
Justin L. Kelly                                      Date
Field Manager
Grants Pass Field Office

KSW01968

**Attachment 1: Maps**



KSW01969



KSW01970



**Last Chance Forest Management Project Decision Record No. 1**

Page No: 3

KSW01971



**Last Chance Forest Management Project**
**Decision Record No. 1**

Page No: 4

**Legend:**

- Last Chance Project Area
- TS Units
- DDR-TPCC
- HLB-UTA
- LSR-dry
- RR
- Roadside Maintenance Units
- Helicopter Landings

- Cable Yarding
- Ground based Yarding
- Helicopter Yarding

- Perm Construction
- Temp Construction
- Temp Reconstruction
- Proposed Haul Routes

- Bureau of Land Management
- County route
- Bureau of Land Management
- U.S. Forest Service
- State
- Local Government
- Private/Unknown

Last Chance Project Area

0    0.1    0.3
Miles

KSW01972

Last Chance Forest Management Project
Decision Record No. 1

Page No: 5

**Legend**

- Last Chance Project Area
- TS Units
- DDR-TPCC
- HLB-UTA
- LSR-dry
- RR
- Roadside Maintenance Units
- Helicopter Landings

- Cable Yarding
- Ground based Yarding
- Helicopter Yarding
- Perm Construction
- Temp Construction
- Temp Reconstruction
- Proposed Haul Routes

- Bureau of Land Management
- County route
- Bureau of Land Management
- U.S. Forest Service
- State
- Local Government
- Private/Unknown

Last Chance Project Area

0   0.1   0.3
Miles

KSW01973

**Last Chance Forest Management Project**
**Decision Record No. 1**

Page No: 6

Legend:
- Last Chance Project Area
- TS Units
- DDR-TPCC
- HLB-UTA
- LSR-dry
- RR
- Roadside Maintenance Units
- Helicopter Landings
- Cable Yarding
- Ground based Yarding
- Helicopter Yarding
- Perm Construction
- Temp Construction
- Temp Reconstruction
- Proposed Haul Routes
- Bureau of Land Management
- County route
- Bureau of Land Management
- U.S. Forest Service
- State
- Local Government
- Private/Unknown

0    0.1    0.3
Miles

Last Chance Project Area

KSW01974

**Last Chance Forest Management Project**
**Decision Record No. 1**

Page No: 7

Legend:

- Last Chance Project Area
- TS Units
- DDR-TPCC
- HLB-UTA
- LSR-dry
- RR
- Roadside Maintenance Units
- Helicopter Landings
- Cable Yarding
- Ground based Yarding
- Helicopter Yarding
- Perm Construction
- Temp Construction
- Temp Reconstruction
- Proposed Haul Routes
- Bureau of Land Management
- County route
- Bureau of Land Management
- U.S. Forest Service
- State
- Local Government
- Private/Unknown

0    0.1    0.3
Miles

Last Chance Project Area

KSW01975



KSW01976

## Attachment 2: BLM Responses to Public Comments

The BLM received 3 letters from Klamath-Siskiyou Wildlands Center (KS Wild), American Forest Resource Council (AFRC), Blue Ribbon Coalition (BRC) in response to the draft Revised Last Chance Forest Management Project Environmental Assessment (EA) posted to ePlanning on March 14, 2025. Additionally, approximately 600 form letters were received. Written comments were reviewed by the BLM interdisciplinary team and responsible official and substantive comments are addressed below.

Substantive Comments are those that:

- Provide new information relevant to the analysis;
- Identify a new relevant issue or expand on an existing issue that would cause changes or revisions in one or more of the alternatives;
- Identify a different way (alternative) to meet the purpose and need;
- Identify a specific flaw in the analysis;
- Ask a specific relevant question that can be meaningfully answered or referenced;
- Identify an additional source of credible research, which if utilized, could result in different effects.

Non-substantive comments are those that:

- Primarily focus on personal values or opinions;
- Simply provide for or identify a preference for an alternative considered;
- Restate existing management direction, laws, or policies that were utilized in the design and analysis of the project (or provide a personal interpretation of such);
- Provide comment that is considered outside of the scope of the analysis (not consistent or in compliance with current laws and policies, is not relevant to the specific project proposal, or is outside of the Responsible Officials decision space);
- Lack sufficient specificity to support a change in the analysis or permit a meaningful response, or are composed of general or vague statements not supported by real data or research.

The responses to comments below are intended to guide the reader towards analysis or information contained in the EA and other applicable documents. Where appropriate, the response provides clarity that further explains BLMs use of the 2016 Southwestern Oregon Record of Decision and Resource Management Plan (SWO ROD/RMP) and other management direction or guiding documents. In addition, the table below includes responses to some comments that, while technically not substantive, present discrete questions to which the Field Office determined there was reasonable value in providing clarifying information. The BLM received numerous submissions of various literature or other reference materials. Submissions of literature were considered substantive only when rationale and specific explanations of how the cited literature presents new information that would affect the analysis in the EA were provided. Submissions consisting of only citations or abstracts, without further explanation as to the relationship of the literature to the Project, were not considered substantive. The Field Office considered only substantive literature submissions.

KSW01977

## BOTANY

| Comment Summary | BLM Response |
|---|---|
| BLM failed to take a "hard look" at the risk of introduction and spread of noxious and invasive weeds. | Effects on the introduction and spread of invasive species were analyzed in Issue NAID B.2. This issue provides a site-specific summary of non-native invasive plant species within the project area by proposed activity

This issue analysis follows policy from BLM Manual 9015 to complete an invasive risk assessment for ground disturbance projects which discloses effects, discusses existing condition, and describes the risk of invasive plant spread. This policy was followed for the LCFMP and existing conditions and infestation levels were analyzed and disclosed. Additionally, PDFs in Table C-11 conform with RMP direction to prevent, detect and control invasive plant infestations. Medford BLM manages invasive plants utilizing an integrated approach under the Medford District Invasive Plant Management EA (DOI-BLM-ORWA-M000-2017-0002-EA).

As stated in the LCFMP EA, Issue NAID B.2, it is not possible to quantify in acreage or road mileage an estimate of actual invasive species spread from the project, only a relative risk characterization based upon a qualitative analysis and the factors as defined in the 9015 Manual. The commenter provided no additional source of data, method to quantify actual weed spread, or alternative PDFs to control invasive species spread, other than to select the "no action" alternative. |
| The BLM refused to analyze the impacts of the Last Chance project on the spread of noxious weeds "in detail" despite ample evidence in the administrative record that the rock quarries that the agency intends to utilize to facilitate log-haul are significant vectors for noxious weed spread. Knowingly utilizing materials from quarries infected with noxious weeds for road construction is fundamentally at odds with the RMP's requirement to | Revisions to the EA have been made in Issue NAID B.2 that provides site-specific information for known infestations at the quarries proposed for use. Issue B.2 does not need to be analyzed in detail because it does not respond directly to the purpose and need for the project and proposed project activities are not expected to have a significant (or potentially significant) impact on the introduction or spread of non-native invasive botanical species – an invasive species risk assessment determined risk level for the proposed project to be the same as the existing condition.

Mitigation measures in the form of PDFs would be implemented and are drawn from reference materials including the 2018 Medford District Integrated Invasive Plant Management EA. PDFs are expected to be effective based on BLM Botanists' professional experience and judgment. The commenter provided no additional source of data, method to quantify actual invasive plant spread, or alternative PDFs to |

| | |
|---|---|
| implement measures to prevent the spread of noxious and invasive species<br><br>The REA does not identify the number of infected quarries or the noxious weed species present in the BLM's rock source let alone the treatment efficacy. | control invasive plant spread, other than to select the "no action" alternative. |
| PDF-11 calls for establishing activity slash piles and felling trees within BSS buffers and makes no mention of the season in which the slash piles might be burned. | This statement is incorrect. PDF 11 (LCFMP EA, Appendix C) states that fuels treatments (hand thinning, pile, and slash scatter only) may occur within the 100-foot buffer for bureau sensitive species populations at the discretion of the project botanist, within a seasonal restriction that project activities must occur during the dormant season (November 1 – March 1) and trees must be directionally felled away from the plant population marked by yellow and black striped flagging. |
| BLM has not completed BSS plant surveys prior to publishing the EA.<br>It appears that the BSS plant protection areas are "buffers" in name only and can be breached at the whim of the timber sale administrator. | In Issue NAID B.6 the BLM discloses that botany surveys have been completed for endangered, threatened, and Bureau Sensitive plants for all proposed commercial treatment units. In accordance with the 2020 Biological Assessment for the Medford District BLM, a decision record cannot be signed for actions proposed in treatment units until survey protocol has been met. All special status plant populations that occur within the project units or other ground disturbance would be buffered in compliance with 6840 manual and the professional judgement of project botanists—not the timber sale administrator-- to ensure conservation of the species and prevent a trend toward ESA listing.<br><br>Additionally, revisions to PDF 10 have been made to clarify that the ability for tree falling, shrub removal, or ground disturbance within plant sites and plant site buffers is prohibited, except where disclosed for the two locations in Issue NAID B.6. |

**CLIMATE**

| Comment Summary | BLM Response |
|---|---|

| | |
|---|---|
| "The BLM failed to take a "hard look" at change in carbon storage and greenhouse gas emissions resulting from the Last Chance logging project.<br><br>BLM acknowledges that its project will increase greenhouse gas emissions yet fails to take a "hard look" at effects of such increase and cumulative effects of its future projects." | Effects to carbon storage and greenhouse gas emissions are analyzed in the REA at Issue NAID B.7. BLM determined that the resulting effects of the proposed action would not exceed those disclosed in the 2016 PRMP/FEIS, to which the REA is tiered.<br><br>The PRMP/FEIS identified that for activities on BLM-administered lands, timber harvesting is the primary activity affecting carbon storage (USDI/BLM 2016a, p. 169) and activity fuels prescribed burning is the primary driver of greenhouse gas emissions (USDI/BLM 2016a, p. 178).<br><br>Issue NAID B.7 disclosed that the implemented harvest levels for the Medford District, including the projected harvest levels from the LCFMP, remain within the range of that analyzed in the 2016 PRMP/FEIS (USDI/BLM 2016a, pp. 165-173). The REA also disclosed that the acres of prescribed burning and expected tonnage consumed for the Medford District, including the projected acres from the LCFMP, remains within the range analyzed in the 2016 PRMP/FEIS (USDI/BLM 2016a, pp. 174-180).<br><br>The REA then states at B-10, "Reasonably foreseeable future projects on the BLM Medford District that would affect implemented harvest levels and acres of prescribed burning would only cumulatively impact decadal averages. Future projects' treatment acres will be accounted for in those projects' respective NEPA documentation in order to confirm whether those future projects' effects, when added to the running total of implemented harvest acres, also are within the effects of the RMP FEIS." |

**CULTURAL**

| Comment Summary | BLM Response |
|---|---|
| BLM fails to take a hard look at impacts to cultural resources after acknowledging that "[g]enerally, these activities may cause a significant impact by affecting the physical integrity of cultural artifacts and features and their setting". | Effects to cultural resources were analyzed in Appendix B, Issues NAID B.9 and B.10.<br><br>The commenters have paraphrased the Revised EA and taken the words "significant impact" out of context to imply wrongly that BLM was describing the effects of the proposed action. As stated in Issue NAID B.9, the LCFMP was specifically designed to avoid significant impacts to historic properties and avoids historic properties whenever possible. In areas where historic properties cannot be avoided, PDFs would be applied to avoid impacting those elements of a historic property that |

| | contribute to NRHP eligibility. In cases where the BLM proposes to implement treatments within cultural resources that are unevaluated or eligible for the NRHP, PDFs were developed (See PDFs, Appendix C, Table C-12, PDFs 17-21) to ensure that the project does not adversely affect those resources. Concurrence was received from SHPO on their determination of "no adverse effect to historic properties" for the project.<br><br>As stated in Issue NAID B.10, tribal consultation was undertaken to identify places of traditional religious or cultural significance to tribes who take an interest in the LCFMP. This consultation did not result in the identification of any sites of concern to tribes, therefore, proposed project activities are not associated with any potential significant impacts. |
|---|---|

**ENGINEERING**

| Comment Summary | BLM Response |
|---|---|
| Page 86 of the REA states: "Wet weather haul would occur during the wet season (Oct. 15 – May 15) only when road renovation has occurred, BLM has evaluated the condition of the road and found it suitable, and a waiver has been asked for and granted. Waivers would be revoked when wet conditions exist, and resource impacts are observed by the Sale Administrator and would not be reinstated until the road network dries out and conditions for hauling improve (See Appendix C).<br><br>It is important to note that every contention in the paragraph above is in fact not true. | BLM has analyzed the proper use of seasonal waivers with the conditions as described in the Revised EA. BLM's determination whether to grant a waiver is based upon operational or logistical considerations and due to the nature of the application of waivers, site specific, condition specific and timing can be a daily decision based on the sales administrator. Also, waivers are often approved with additional conditions required beyond the standard BMPs. These waivers also may include site specific application – for example, allowing for hauling from skyline yarding cable units and not ground based units. All waivers are reviewed by a multi-disciplinary team and require the approval of the Field Manager. The commenters assert that BLM's description is "not true," but offers no evidence to support this bare assertion. |
| BLM refuses to disclose information on closure of | Road closures are described on page 93 of the REA and are disclosed by road segment in Table D-3.3 for the current state |

| | |
|---|---|
| previously decommissioned logging roads upon completion of timber sales. | and the proposed final status and is broken out by construction or renovation. Based on table D-3.3, about half of the constructed roads would remain open after use. Of the 28 miles of constructed roads proposed for Alternative 2, 47% of the constructed roads will be decommissioned after use by the project for timber hauling, 6% would have limited or seasonal closures and 47% would remain open after use. Renovation road work includes 35 miles of roads that are currently decommissioned or have a temporary, seasonal or limited closure and will be used for timber hauling. Most roads uses will have the same status after use (26 miles). Of these roads, 3.93 miles of currently decommissioned or limited roads will be open after use and 4.85 mile of roads that are currently open will be decommissioned and or have a temporary, seasonal or limited closure after use. All of these details can be gleaned from Table D-3.3 (REA, Appendix D.4). |

**FISHERIES**

| Comment Summary | BLM Response |
|---|---|
| BLM planners assert that the conclusions in the REA rest upon the following assumption: "Coho Critical Habitat and Essential Fish Habitat are not going to be degraded due to the application of Riparian buffers on the Inner, Middle, and Outer Riparian Zones, along with the implementation of BMPs and PDFs." This BLM assumption is flawed. | As stated on page 100 of the REA:  "For the LCFMP, using the RMP Management Direction, fish-bearing and perennial streams were given a 120-foot no treatment buffer, while intermittent streams were given a 50-foot no treatment buffer. Many units contained perennial stream no treatment buffers and CH." Additionally: "Many commercial treatments are adjacent to Coho Critical Habitat (CH) and EFH with a no treatment buffer of 120 feet, and many non-commercial treatments are adjacent with a no treatment buffer of 60 feet. The SWO RMP has monitoring requirements for BMPs that include BMPs for the RR (USDI-BLM 2016b, pp.142-143) that to the BLM uses to evaluate effectiveness. BMPs and PDFs have been shown to be effective in reducing timber harvest impacts on Riparian Reserve shade (Rashin, et al., 2006), specifically no-harvest buffers on stream systems, as described in the response to issue B.15 (REA pp. B-19 to B-20). Forestry BMPs to protect water quality when constructed correctly and in adequate numbers have been found to be effective (Cristan, et al., 2016). Values of managing the RR through use of BMPs in ways that benefit water quality by maintaining stream temperatures and sediment loads to natural and background levels are disclosed throughout the document and the resulting benefits to aquatic habitat (REA pp. 79-104). |

KSW01982

|  | Most treatment units are found further away from CH." As stated under Methodology, p. 103: "The LCFMP as proposed and analyzed, is using relevant BMPs and PDFs, would have insignificant effects to SONCC and OC Coho Salmon, their Critical Habitat (CH), and Essential Fish Habitat (EFH), and would be consulted on with NOAA Fisheries under the Programmatic Forest Management Biological Opinion for Western Oregon (FOMBO). The BLM received confirmation from NOAA Fisheries on October 4, 2024 that the LCFMP is consistent with the project design criteria of FOMBO. The commenters offer no data or evidence to support their assertion that BLM's analysis showing the effectiveness of the RMP's aquatic conservation strategy, including application of RMP-based PDFs, is "flawed."<br><br>The commenters call into question the efficacy of PDFs and BMPs to sufficiently reduce effects to some unidentified threshold and implies BLM timber sales must avoid all negative impacts to aquatic habitat and species—this simply is not required by the Endangered Species Act, the RMP, or NEPA. The commenters challenged the 2016 RMP, specifically the adequacy of its aquatic conservation strategy to provide for the conservation and recovery of listed salmonids in western Oregon. Both the District Court of Oregon and the Ninth Circuit Court of Appeals rejected the commenters' litigation challenge. *Pacific Rivers, et al. v. BLM*, No. 6:16-cv-01598-JR (D. Or. Oct. 12, 2018), aff'd No. 19-35384 (9th Cir. 2020). The foundation of that aquatic conservation strategy are the PDFs and BMPs that BLM has incorporated from the RMP into this project. In short, this project implements the same aquatic conservation strategy that commenters previously unsuccessfully challenged. In the REA, BLM demonstrates how the LCFMP is consistent with, and adopts the same PDFs and BMPs from the RMP straight from this strategy. The EA's documentation of the effects of continuing to implement these PDFs and BMPs within this project demonstrate conclusively that there is no potential for effects to Oregon Coastal Coho beyond those already disclosed in the RMP FEIS. In short, BLM need not revisit this aquatic conservation strategy with every project that implements it. The commenter offers no other PDFs or BMPs beyond those already included in the project to address their comment, other than selection of the "no action" alternative. |
| The BLM fails to implement many of the (riparian) conservation | The FOMBO recognizes the need for roadwork associated with timber harvest, including road and landing construction (temporary and permanent), road and landing renovation and |

| | |
|---|---|
| measures contained in the 2018 NMFS FOMBO and implements none of the road density reduction actions it agreed to in that consultation process. | maintenance, and haul. The FOMBO simply covers a suite of potential activities associated with forest management projects the BLM could undertake. There is no directive that states every action or conservation measure covered by the FOMBO must be undertaken in each forest management project. This Project was designed to comply with the management direction of the RMP and the FEIS by incorporating applicable BMPs and includes appropriate General Aquatic Conservation Measures as listed in the FOMBO (p. 44). Therefore, the Last Chance Forest Management Project would not exceed the anticipated effects accounted for in the FEIS and is consistent with FOMBO direction and guidelines. Additionally, the BLM received confirmation from NOAA Fisheries on October 4, 2024 that the LCFMP is consistent with the project design criteria of FOMBO. |
| BLM has not taken a hard look at how its timber harvest actions will affect fish species and habitat. | The RMP management direction (ROD/RMP, p. 75) for RRs allows for treatments within RRs. The actions proposed under the LCFMP are consistent with this RMP management direction. The BLM received confirmation from NOAA Fisheries on October 4, 2024, that the LCFMP is consistent with the project design criteria of FOMBO. See BLM Responses to Hydrology Comments for more detail on how water quality was analyzed regarding stream temperature.<br><br>Macroinvertebrates are often used as indicator for watershed conditions to integrate multiple components of stream habitat (e.g. temperature, sediment, dissolved oxygen). In a 25-year assessment of forested watersheds in the Pacific Northwest, AREMP found metrics for macroinvertebrates appear to be improving and specifically in BLM's Medford District (USDA-PNRS, 2023, p. 72 and 163). This and other citations are disclosed throughout (REA, B-25), which shows that BLM took a hard look at how timber harvest actions might affect fish habitat and water quality. |
| Eaken Road culvert replacement and bridge utilization is a connected action. Page 91 of the REA acknowledges that: "Eakin | Actions are connected if they automatically trigger other actions that may require an EIS; cannot or will not proceed unless other actions are taken previously or simultaneously; or if the actions are interdependent parts of a larger action and depend upon the larger action for their justification.[1] |

[1] Executive Order 14154, Unleashing American Energy (Jan. 20, 2025), and a Presidential Memorandum, Ending Illegal Discrimination and Restoring Merit-Based Opportunity (Jan. 21, 2025), require the Department to strictly adhere to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq. Further, such Order and Memorandum repeal Executive Orders 12898 (Feb. 11, 1994) and 14096 (Apr. 21, 2023). Because Executive Orders 12898 and 14096 have been repealed, complying with such Orders is a legal impossibility. The [bureau] verifies that it has complied with the requirements of NEPA, including the Department's regulations and procedures

KSW01984

| | |
|---|---|
| road accesses proposed timber extraction units 13-01, 13-03, 13-04, and 13-05 and currently has a temporary bridge installed over a failing culvert on Wildcat Creek, a perennial fish bearing stream that is designated for Coho Critical habitat. It is unlikely this crossing could safely be used to haul timber." Despite the fact that the road accesses planned Last Chance timber sale units, the BLM nevertheless contends that "replacement of this Eakin road culvert on Wildcat [creek] is unrelated to this project." We look forward to challenging that arbitrary and capricious contention. | The culvert replacement on Eakin Road is not a connected action with the LCFMP because neither project would trigger other actions that may require an EIS, the projects do not rely on each other in order to proceed, and they are not independent parts of a larger action for which they rely on for justification. As stated on page 92 of the REA, "Planning is in the engineering design stage and replacement would likely occur before these units in section 13 would be harvested. It is also possible that if the purchaser considers the current temporary crossing adequate for hauling, they may use it before the replacement." The culvert replacement is being implemented under the Roseburg and Medford Districts Programmatic Aquatic Restoration Environmental Assessment (DOI-BLM-ORWA-M000-2018-0001-EA) and a Finding of NEPA adequacy from the Wildcat Creek Culvert Replacement DNA (Determinization of NEPA Adequacy) (DOI-BLM-ORWA-M070-2024-0008-DNA) was completed to address other resource concerns. As stated on page 1 of the DNA, "Replacing this culvert with a stream simulation design would provide unimpeded fish and other aquatic organism passage." The culvert replacement is being completed to meet BLM regional goals of improving fish habitat in the Lower Cow Creek Watershed, not to facilitate timber hauling. Each of the two projects would take place with or without the other and thus have independent utility. In response to public input, additional language has been added to the REA in Chapter 3, Issue 8 to provide clarity on anticipated effects from both projects. |
| The public and the BLM decisionmaker know that the BLM intends to log, yard, and haul timber via the 32-5-25.6 road, but BLM timber planners refuse to say, or analyze, what actions the agency will take to facilitate that logging agenda. | The REA clearly discloses that the "BLM proposes to cross Bull Run Creek at the 32-5-25.6 road using either a temporary bridge or an armored low water ford" (REA, p. 106). Pages 105-107 of the REA go on to disclose the effects of each proposed action: the environmental effects of the temporary bridge and the environmental effects of utilizing the low water ford. The proposed crossing is consistent with direction in both the RMP (BMPs beginning on pg. 167) and the FOMBO (e.g. |

implementing NEPA at 43 C.F.R. Part 46 and Part 516 of the Departmental Manual, consistent with the President's January 2025 Order and Memorandum. The BLM has also voluntarily considered the Council on Environmental Quality's rescinded regulations implementing NEPA, previously found at 40 C.F.R. Parts 1500–1508, as guidance to the extent appropriate and consistent with the requirements of NEPA and Executive Order 14154.

KSW01985

| | |
|---|---|
| Are these proposed activities consistent with activities analyzed in the RMP fish BiOp or the programmatic fish BiOp BLM is relying on for this project? | BMPs for temporary stream crossings for roads beginning on pg. 28, Loading and Hauling of Processed Trees/Logs on pg. 29, and New Road and Landing Construction on pg. 30). Additionally, as stated in the REA, the BLM purposely chose a previously disturbed site (an old crossing) instead of a new site for the crossing for the purpose of reducing the overall amount of disturbance.<br><br>The BLM has disclosed in the EA the relevant and applicable information available to the agency. |

**FUELS**

| Comment Summary | BLM Response |
|---|---|
| The BLM's use of the 2024 study by Davis et al. to conclude that "reducing surface and ladder fuels and tree density through varying treatments lowers subsequent wildfire severity by 62-72%" is misleading as the study focuses on coastal areas of Oregon and therefore not applicable to the Last Chance project area. | The geographic scope of the Tamm Review is from seasonally dry conifer-dominated forests in the western US across several dry forest types from mixed conifer forests in the Western U.S., including interior mixed conifer forests in Norther California and Sierra Nevada, which share historic fire regimes to southwest OR. Authors examined several different combinations of treatments, including thin only where activity fuels resulting from mechanical thinning were left on site. It is true that the most effective treatments involve thinning and prescribed fire, and the BLM describes this and that the lack of activity fuel treatments has the potential to increase surface fuel loadings and pose a risk to the residual stand. The BLM has added clarification to the post-treatment assumptions for commercial harvest only treatments (Issue 3.2 – Assumptions). Where only commercial harvest is proposed, post-treatment surface and ladder fuels reflect No Action conditions (affected environment and No Action), because actions are not proposed to adjust existing surface and ladder fuels, so the BLM has no basis on reasonable adjustments to apply to those portions of the fuel profile. The no action or existing condition surface fuels are already very high fuel loading. |
| BLM neither developed nor considered an effective alternative for this project that would reasonably reduce risk of severe wildfire. | Through an iterative process, BLM considered and developed a range of Alternatives responsive to the purpose and need statement. RMP management direction authorizes "silvicultural treatments to enhance timber values and to reduce fire risks and insect and disease outbreaks." (USDI/BLM 2016b, p.62). This management direction does not mandate that every timber management decision be carried out for these purposes or achieve specific outcomes, especially where BLM has proposed the action to achieve a different purpose and need, primarily the |

KSW01986

| | production of timber to contribute to the declared Allowable Sale Quantity (ASQ). This management direction does not impose a commitment to reducing fire risk in every timber management action. All action alternatives would reduce fire hazard by a small amount compared to the no action alternative. Across the maximum proposed action footprint (11,686 acres), stand level fire hazard would shift from majority (75 percent) high hazard, under the no action alternative, to majority (62 to 63 percent) moderate-high high hazard under the action alternatives (environmental consequences discussion for each alternative under Issue 5, Table 3-10). |
|---|---|

**FORESTRY**

| Comment Summary | BLM Response |
|---|---|
| BLM proposes salvage logging in Reserves, citing it as allowable for safety and operation reasons when in fact the 2016 RMP states "[d]o *not* conduct timber salvage [in LSRs], except when necessary to protect public safety, or to keep roads and other infrastructure clear of debris" and " *prohibit* timber salvage [in RRs], except when necessary to protect public safety, or to keep roads and other infrastructure clear of debris." BLM must disclose where it intends to conduct salvage logging in reserves.<br><br>In areas where trees have succumbed to drought and mortality, the BLM proposes "regeneration of healthy trees which would ensure sustained yield timber production from the [HLB]." BLM alleges Alternatives 2 and 3 allow flexibility to swap dead trees with live ones. Analysis must be conducted by the BLM to | Issue NAID B.23, which discussed timber salvage, has been removed from the REA. The LCFMP does not propose timber salvage activities in any LUA.<br><br>There is no NEPA requirement for a "tree-by-tree" disclosure of timber to be cut in a timber sale, especially for safety and operational reasons that can arise at any time, particularly after a timber sale decision has been issued and is in mid-operation. *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1234 (D. Or. 2013), *aff'd* 638 Fed. Appx. 648 (9th Cir. 2016) (rejecting KS Wild's claim that a "tree-by-tree" of mistletoe infected trees was required under NEPA for a timber sale environmental assessment).<br><br>The ability for the BLM to cut and remove dead trees that were marked to leave and swap them with live trees that were marked to cut during project implementation allows the BLM to meet the post-harvest prescription requirements analyzed in the REA and required by federal ESA consultation.<br><br>BLM has reviewed current stand conditions and reviews marking guidelines and implemented marking to ensure relative density and canopy cover conditions are achieved. The silviculture prescription allows tree selection flexibility prior to harvest to achieve RMP objectives, EA purpose and need, and avoid significant effects. Again, the commenter points to no requirement under the RMP, NEPA, or caselaw that would require the "tree-by-tree" analysis they say is required, and such an approach would be unworkable in managing public lands. |

KSW01987

| | |
|---|---|
| determine the impacts of this action. | |
| The BLM has refused to quantify or analyze the number of large trees marked for retention in LSRs that will be killed to facilitate additional logging road construction throughout the Last Chance Project Area. | There is no management direction for the LSR LUA which precludes the construction of roads. In LSR, the RMP allows for trees to be cut for "yarding corridors, skid trails, road construction, maintenance, and improvement," but does not require BLM to quantify the exact number of trees to be cut (USDI/BLM 2016b, p. 71). The Revised EA is consistent with the LSR-dry RMP management direction, which requires the BLM to retain Douglas-fir and pine trees that are both ≥36 inches DBH and which the BLM determines were established prior to 1850, and madrone, bigleaf maple, and oak trees >24" DBH, except where falling is necessary for safety or operational reasons. If such trees need to be cut for safety or operational reasons, retain cut trees in the stand (USDI/BLM 2016b, p. 74; REA, pp. 9-10). BLM has provided a description of the road prism size (REA at p. 87), and maps of the locations of the proposed roads in LSR (REA at Appendix H, Maps 2-6). BLM is not required under the RMP or NEPA to provide a "tree-by-tree" accounting of the trees that must be cut or that may be removed to facilitate this RMP-authorized road construction. *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1234 (D. Or. 2013), *aff'd* 638 Fed. Appx. 648 (9th Cir. 2016)(rejecting KS Wild's claim that a "tree-by-tree" of mistletoe infected trees was required under NEPA for a timber sale environmental assessment).

The Revised EA disclosed, "overall, the proposed logging, yarding, and hauling activities in the LSR-Dry would provide for the conservation and recovery of the NSO in the short and long term" (REA, p. 15). More specifically, the Revised EA disclosed, "under each action alternative, a small amount of project activities would occur in existing NR habitat (Table 6-1), but these actions are not selection harvest or commercial thinning, they would only be actions needed to access other treatment areas (ROW development, cable yarding wedges, and untreated leave areas also called "skips") and would minimally or have no effect to NR habitat" (REA, p. 65). |
| We request the BLM drop prescriptions for treatment in LSR for this project as they are not needed to accomplish BLM's volume objectives. Consider non-commercial | Commercial treatments in LSR do not contribute volume toward BLM's ASQ targets, only timber volume offered from HLB counts towards BLM ASQ targets (USDI/BLM 2016b, p.6). Deferring commercial treatments in the LSR would not meet the purpose and need of this Revised EA to contribute toward the decadal LSR commercial treatment target acres for the Medford District (REA, p. 5). The Revised EA |

| | |
|---|---|
| thinning treatments to address fire risk. | specifically disclosed that, "Reserves" as stated in the SWO RMP are not in reference to areas where no commercial harvest activity is to occur. The management direction for treatment in the LSR-Dry sets a target for commercial thinning treatments on at least 17,000 acres per decade for the Medford District. Currently, for the period of 2017 to present, only 3,063 acres of LSR-Dry have been treated, which is less than 19% of the target for the decadal period starting in 2017 and ending 2026 (REA, p. 3). |
| BLM's statement that "the Last Chance project does not propose any actions in older structurally complex forest" lacks any substantiation or basis in on-the-ground facts.

Rather, road work, skid trails, and logging will potentially remove older trees and forest structure, and such site-specific impacts must be disclosed and analyzed. This analysis is missing here. | The statement in the Revised EA, Issue NAID B.25 that declares the project does not propose any actions in older structurally complex forest was an error in the document and has been removed from the Revised EA.

The REA disclosed the relevant and applicable information available to the agency. This included the disclosure that approximately 10 acres of NSO NR habitat in LSR-dry would be impacted from yarding corridors and/or road and landing construction, and that 29 acres of NSO NR habitat on the LSR-dry would be included in commercial treatment units as untreated areas, also called skips, however these LSR-dry NR acres were not classified as high quality, structurally complex habitat (REA, p. 59). The BLM disclosed that this action in the LSR-dry would minimally or have no effect to NR habitat and treatments would maintain habitat function regardless of NSO occupancy (REA, p. B-55). These actions and their potential effects are consistent with management direction in the SWO RMP (USDI/BLM 2016a, p. 71, footnote 25).

Further, the BLM disclosed that the project would remove 142 acres of NSO high quality, structurally complex habitat in the HLB from harvest prescriptions and road and landing construction (REA, p. B-55), The BLM designed the Last Chance FMP to follow the management direction from the 2016 ROD/RMP for each LUA. The BLM, in the 2016 PRMP/FEIS, analyzed the effect of harvest of NSO habitat together with the effects of other Proposed RMP decisions and concluded that implementation of the Proposed RMP alternative would contribute to a landscape that supports large blocks of NSO habitat that are capable of supporting clusters of reproducing owls, distributed across a variety of ecological conditions and spaced to facilitate owl movement between the blocks (USDI/BLM 2016a, pp. 932-941). Because the BLM will not defer or forego timber harvest of stands in the HLB for reasons not described in the management direction or in Appendix A (USDI/BLM 2016a, p. 29) it is appropriate |

for the BLM to propose the removal of these 142 acres within the HLB and disclose the environmental impacts.

The primary purpose of HLB is to manage forest stands to achieve continual production of timber volume (USDI/BLM 2016a, p. 62). The Revised EA explained that each individual timber sale is designed to be economically viable and operationally feasible (REA, pp. 5, 23). The BLM disclosed that access to harvest areas is one factor that affects the economics of the project, and these various factors individually or collectively have an effect on the economic feasibility of the timber sale (REA, pp. 23-31). The BLM utilizes the most cost-effective method to access and harvest units, especially those within the HLB by using conventional methods of harvest, which rely on access to the unit from roads. Deferring road and landing construction within complex habitat is not reasonable because it would preclude harvesting in an economically feasible manner. The BLM made a comprehensive consideration of the Proposed Action and disclosed that roads are needed to produce economically viable timber sales on the HLB.

Additionally, the BLM considered and disclosed the environmental impacts of removing 142 acres of structurally complex habitat on the HLB (REA, p. B-55).The RMP FEIS specifically contemplated that RMP implementation would result in a regulation of age classes in the HLB over time, including the growth of stands into the 100 to 140+ age class due to longer rotation ages (USDI/BLM 2016a, p. 317). These HLB stand ages do not "age out" of eligibility for harvest under the RMP. Further, the RMP FEIS considered, and the RMP/ROD did not select an alternative that would have reserved all stands over 80 years of age from harvest (USDI/BLM 2016b, p. 64; USDI/BLM 2016a, p. 33). The RMP/ROD requires the retention of certain sized trees which were established prior to 1850 (REA, pp. 9-10). In HLB-UTA and LSR-dry, dominant Douglas-fir and pine trees that are both ≥ 36 inches diameter at breast height and were established prior to 1850 would be retained, as would trees that are both ≥40 inches diameter at breast height that were established prior to 1850 in RR, HLB-LITA, and HLB-MITA, except where falling is necessary for safety or operational reasons. If such trees are cut for safety or operational reasons, cut trees would be retained in the stand (USDI/BLM 2016b, pp. 64-68, 74, 76; REA, pp. 9-10). But outside of these parameters, the RMP/ROD does not require protection of all trees the commenters assert should be reserved because of age or size, and the RMP FEIS disclosed

KSW01990

| | the effects of HLB timber harvest on trees of these ages and sizes. In fact, 14,462 acres of stands 80 years of age or older have been harvested within the Medford District from 2017 through 2024. The actual number of acres harvested that has occurred on the Medford SYU in the first eight years of the decade is 41% of what was projected from the FEIS modeling, or 59% less than was projected in the FEIS (REA, B-55). |
|---|---|

## HYDROLOGY

| Comment Summary | BLM Response |
|---|---|
| The BLM has not attempted to provide a site-specific analysis or rationale for the proposed logging of riparian reserves or the associated road construction and yarding in this land use allocation. | The BLM disclosed the purpose and need for treating RR's on pages 4-5 of the REA. A site-specific analysis of road construction and yarding in the LCFMP RR's is also disclosed in Appendix F of the REA. Commenters did not cite, mention, comment on, or acknowledge the addition of Appendix F in the REA. |
| | Current stream sediment conditions for the LCFMP were described on page 84 of the REA, to give an accurate representation of proposed actions. A monitoring program set up with the Northwest Forest Plan called the Aquatic and Riparian Effectiveness Monitoring Program (AREMP). AREMP recently released a 25-year assessment of the NWFP looking at trends in watershed condition. This report described fine sediment conditions as measured in transect-based data in pools and pool-tail crests. AREMP found that sediments decreased overall in stream data collected from multiple forested watersheds. Improvements in fine sediment conditions over the last 25 years identified in the report were attributed to better road management including reductions in road density, better surfacing, reducing landslides, and reductions in peak flows. These results suggest both active (e.g., road modifications) and passive (e.g., forest management) measures have contributed individually and in combination to reduce fine sediment input to streams and specifically in BLM's Medford District (USDA-PNRS, 2023, p. 64 and 158). |
| | The REA analyzed Issue 8 in detail starting on page 79, "How would the proposed treatments affect sediment production, delivery and transport beyond the historical, existing, and baseline conditions and would predict sedimentation rates have the potential to reduce the quality of aquatic habitats downstream and/or exceed water quality standards?" The analysis in REA is crafted to assess impacts of sedimentation to |

|  | downstream aquatic habitat and evaluate if these impacts are within the impacts disclosed in the SWO RMP EIS. |
|  | The FEIS assumed that if sedimentation from roads stays within historical, existing, and baseline conditions it would not degrade the quality of aquatic habitats downstream (USDI/BLM 2016a p. 277). But if sediment loads increase greater than 1% (picked as a measurable amount) habitats downstream would likely be degraded, and water quality standards might be exceeded (USDI/BLM 2016a p. 369). The REA uses quantitative site-specific proposed road construction, renovation and maintenance in GIS to calculate metrics by subwatershed for metrics such as road density, roaded area, Equivalent Clearcut Area to analyze the potential for sedimentation from project activities (REA, Tables 8.3 – 8.7) by sub-watershed. |
|  | One critical metric when considering sedimentation is the proposed increase in roads within the 200ft sediment delivery buffer on streams. This was done in the REA by using the corporate road layer and calculating current conditions (REA, p. 85). The proposed new road construction was then calculated by analysis area to determine the percent increase. This is a site-specific application of the FEIS and a proper way to evaluate if the proposed actions are within the disclosed effects in the FEIS. This is also a way to calculate predicted sediment yields (REA, pp. 98-100). This was evaluated by subwatershed and a 0.48 increase from project activities of roads within 200 feet of streams was estimated (REA, p. 98). |
|  | The conclusion for cumulative effects for the action alternatives in the REA was, "no cumulatively measurable or significant alterations to the hydrologic function or quality of waters (REA, p. 101). Sediment generation from project activities (6.4 tons per year for 1-2 years following activities and diminished after that) would be indistinguishable from background conditions (less than 1% increase)." With a less than 1% increase in roads within 200 feet within the REA, the FEIS would predict small accumulations of fine sediment in pools and gravel substrates downstream of proposed activities used for spawning, but this sediment would be flushed during annual high flows (USDI BLM 2016a p.298) and not be more than 1% above baseline conditions (REA, p. 101). |
| BLM's BMPs and PDFs for the Last Chance logging project fail to prevent the removal of trees located within the Riparian Reserve | In response to public input, the latest list of impaired waters (303d list) was added to the REA (REA p. B-24). No significant changes have occurred to listings that required further analysis. Many of the streams in the LCFMP are still listed or contribute to reaches that are listed for temperature, |

shade zones that reduce heat pollution to 303(d)-listed streams in the project area.

Both the Rogue River and Umpqua Basin WQMPs suggest and recommend developing or implementing pollutant management strategies involving increasing stream shade through riparian areas. However, the BLM failed to adopt such recommendations as the Last Chance REA is devoid of any BMP or PDF specific to increasing shade for the affected 303(d) temperature impaired streams in the project area. The EA instead authorizes activities to decrease existing stream shade provided by conifer trees within the Riparian Reserves that are targeted for logging.

there are a couple of reaches listed for biocriteria and Galesville is listed for Methylmecury. These updates to the 303d list do not result in changes to the proposed activities and as discussed previously, the actions are consistent with the management recommendations in the WQMPs for these waters. Proposed activities were analyzed in the REA including removal of trees for landings, skid trails and yarding corridors as part of commercial harvest activities. Since these activities would be avoided in the RR and effects would be mitigated by BMPs and PDFs, no significant impacts beyond those disclosed in the FEIS were identified. BLM has responded to public comments asserting violations of the Clean Water Act on 303(d) listed streams, and the REA demonstrates that there is no potential for a significant effect (REA pp. B-22 to B-26).

BMPs and PDFs have been shown to be effective in reducing timber harvest impacts on Riparian Reserve shade (Rashin, et al., 2006), specifically no-harvest buffers on stream systems, as described in the response to Issue NAID B.15.

For the LCFMP, the PDFs in Table C-17 establish where commercial harvest in the middle and outer riparian zones would occur and ensure commercial harvest would not occur in the inner riparian zone. Issue NAID B-18 analyzes the potential effects of these activities in the RR on effective shade and micro-climate zones (REA, pp. B-26 to B-28). This analysis found there would be no reasonably foreseeable effects to stream temperatures beyond those disclosed in the FEIS (USDI/BLM 2016a, pp. 369-384). This analysis reviewed the proposed actions and found them within the scope of the actions analyzed in the FEIS and based on current science, the riparian buffers identified by the PDFs were effective in preventing increase in stream temperature from proposed activities (REA p. B-21).

Strategies in the Umpqua WQMP and Rogue WQMP developed for the TMDLs for these basins were reviewed, including proposed management measures. Proposed management measures for forestry are consistent with the LCFMP since these measures would direct BLM to implement resource management plans, protect the riparian with buffers, conduct pre-harvest planning, implement road maintenance, monitor and evaluate effectiveness, and conduct instream monitoring (ODEQ, 2008 p.4-12). All these strategies are consistent with the BLM proposed activities as part of this project.

In a similar way, specific pollutant strategies for stream temperature including riparian restoration on BLM lands

|  | (ODEQ, 2006 p.7-18) and stream restoration projects. Both riparian and stream restoration are anticipated and/or proposed as part of the LCFMP. Management of the Galesville reservoir to increased streamflow in low flow periods is identified on page 80 of the REA. Therefore, the commentors' contention that BLM failed to adopt or acknowledge recommendations from WQMPs for the Rogue and Umpqua River Basins is demonstrably false. |
|  | Additional references to WQMPs have been added to the EA (REA, p. B-23). The commentors assert that the LCFMP will, "remove shade cover from streams", but commenters have not acknowledged the difference between the primary shade zone and the secondary shade zone. |
|  | The diurnal variation in stream temperatures drives the water quality concerns for stream temperature. The analysis makes clear that the inner riparian zone is fully protective of the primary shade zone (trees that shade streams between 10am and 2pm). This time period has been shown to be critical for increasing maximum daily temperatures that can be lethal or a chronic for fish (REA, Issue NAID B.18). The analysis maintains that the inner riparian buffer is fully protective of the primary shade zone. This point has not changed from previous EA versions other than a clarification of the language or wording choices. The analysis has also been clear that commercial harvest in the middle and outer riparian zones would remove some shade from streams. However, since these zones are in the secondary shade zone, they are not likely to result in higher maximum daily temperatures. |
|  | The commentors are factually incorrect in asserting that thinning in the middle and outer riparian zones reduces shade in the primary shade zone and they do not recognize that thinning in the middle and outer zones would reduce competition, improve stand health, reduce fuels and other factors that could yield taller and healthier trees in these zones in the future. Likely over the long term this will result in more shade in the secondary shade zone. In response to public input, the content of the REA was revised to make this point clearer. |
| BLM timber planners refuse to analyze or disclose the location, number, and impacts of yarding activities through RRs in the Last Chance sale areas. | There is no requirement under the RMP or NEPA that BLM specify the precise location of every timber sale yarding corridor or type of yarding activity. The BLM's estimate of the types, number and surface area of yarding activities within each harvest unit provides a reasonable estimate to evaluate yarding's potential hydrology effects. BLM analyzed the tradeoffs and effects of yarding in the REA in Appendix F and the hydrology analyses (REA, Issue 8). Commenters |

| | |
|---|---|
| | did not cite, mention, comment on, or acknowledge the addition of Appendix F in the REA, which discloses yarding activities.<br><br>Yarding and skid trails in RR are necessary to transport logs to landings when there is no "operationally feasible and economically viable" alternative, and BLM demonstrated consistency with this RMP management direction in the REA (REA, Appendix F). As explained above, the BLM has analyzed the effects of these RR activities on hydrological resources in the REA on p. 83. |
| The BLM is dramatically increasing the Equivalent Clearcut Acreage (ECA) which is a direct measure of watershed health and resiliency. In the Last Chance and Poor Windy project areas, the BLM is increasing, rather than decreasing, road density. Hence the conclusions cited by the BLM in the REA are in direct contradiction to the activities and proposals authorized by the existing and inalterable timber sale DR. | The increase in road density from road construction has been disclosed in the EA and revised in the REA. This road density was evaluated at the project area scale, as well as the 10 digit and 12 digit Hydrologic Unit Code (HUC) scale, and compared to current conditions. This was also evaluated compared to the current road density and past road densities in reports (REA, pp. 85-93 and by Alternative in Table 8.6.<br><br>Proposed increases in ECA are disclosed in Table 8.2, 8.4 and 8.8. Contrary to commenters' narrative, there is no "dramatic" increase in ECA. Commercial timber harvest was considered in ECA calculations by alternative and evaluated for potential changes to watershed response. These areas resulted in a slight increase in ECA by watershed (less than 1%) but did predict a 0.02% difference in ECA for the LCFMP (REA, p B-29).<br><br>The largest proposed change to ECA is expected in the Upper Cow 10-digit HUC at a little less than one percent. This is partly due to the relatively small size of this watershed and relatively lower current ECA (REA, p. 94). Assumptions for the analysis of ECA are on page 83 and are used for determining the potential to enhance peak flows based on snow zones that would indicate the potential for a rain-on-snow event. The commentors indicate that ECA is a direct measure of watershed health and resiliency and yet this is not an accurate assumption from the science. ECA is simply polygons that have less than 30% canopy as determined by the NAIP Imagery (REA, p. 85). This includes areas that naturally do not have a tree canopy such as meadows, low-productivity soils, or even agricultural fields. These types of land cover do not reduce watershed health or resiliency. The BLM considered the potential for the LCFMP, when combined with other projects, to have a significant effect from the increase in ECA. The REA accurately analyzed and disclosed these potential effects and correctly determined those effects are within the impacts analyzed in the RMP FEIS. The commenter provided no information or data showing BLM's calculation of the |

| | cumulative ECA and its conclusions on effects from the small increase in ECA are in error. |
|---|---|
| Proposed activities will "reduce canopy cover, disturb soils and vegetation and change forest hydrology," "increase surface runoff, reduce groundwater storage or change the timing and magnitude of peak events." Yet the BLM failed to take a hard look at any of these impacts by failing to consider the issues of aquatic habitat and water quality in detail. | Effects to the quality of aquatic habitats and water quality standards were analyzed in detail in Chapter 3, Issue 8. |

**NEPA**

| Comment Summary | BLM Response |
|---|---|
| BLM contends it is not "legally required" to analyze potential disproportionate, adverse impacts to environmental justice populations due to recent Trump Executive Orders. This contention is false, and the BLM must analyze impacts of the Last Chance project on environmental justice. | The BLM addressed this in an Issue Not Analyzed in Detail (NAID). Because Executive Orders 12898 and 14096 have been repealed, complying with such Orders is a legal impossibility (REA Appendix B.51). |
| Instead of analyzing or disclosing any of the significant site-specific and cumulative impacts from the Poor Windy project, the BLM's revised analysis consists entirely of conclusory statements unsupported by data or analysis. | As stated at the beginning of Chapter 3 in the REA, "Descriptions of the affected environment establish the baseline conditions for cumulative effects analysis. Unless stated otherwise, cumulative effects analyses were based on the actions discussed below and only included for issue statements where it is relevant. Baseline conditions inherently include effects from past and ongoing land management activities including but not limited to the Poor Windy Forest Management Project, Speaking Coyote Project, Lower Graves Project, Upper Cow LSR Project, and the Grave Creek Fire." |

KSW01996

| | When relevant to an issue, past actions (including Poor Windy) were described by their aggregate effect. |
|---|---|

## SOILS

| Comment Summary | BLM Response |
|---|---|
| Page 94 of the REA indicates that the BLM intends to authorize "tethered assist" yarding at an undisclosed and unanalyzed number of locations. No BLM NEPA document analyzes or discloses the impacts of this yarding methodology on soil, watersheds, and terrestrial forest values. | BLM evaluates potential impacts from tethered assist yarding in multiple places in the LCFMP analysis (REA, pp. 90, 95, B-38, and more). This and other ground disturbing activities associated with timber harvest are analyzed and disclosed in the REA. |
| | Detrimental Soil Disturbance (DSD) from yarding activities regardless of type would be below 20% for all timber harvest (USDI/BLM 2016b, p.109). Yarding methods are decided with the purchaser depending on equipment availability and topography, therefore specific amounts or locations cannot be predicted at this stage of the analysis. The Soils analysis looked at tethered assist yarding methods (REA p. B-38), in addition to other yarding methods. An additional reference was added for clarity. |
| | In addition, BMPs and on-site management by sales administrators would be used to meet requirements for DSD, some of the most relevant are in Appendix C: Table C-2 (USDI/BLM 2016b, p.182). Project Design Features (PDFs) such as not allowing perpendicular yarding corridors in RR and installing water bars after use would reduce hydrologic impacts from these types of yarding activities. Under any type of yarding system a purchaser uses, BLM would conduct post-harvest evaluation and require amelioration to return detrimental soil disturbance below the 20% threshold, as allowed by RMP management direction. |
| | Therefore, the impacts of yarding methods on soils watersheds, and terrestrial forest values were disclosed in the REA. The BLM's estimate of the types, number and surface area of yarding activities within each harvest unit provides a reasonable estimate to evaluate yarding's potential soils effects including cumulative impacts. |

KSW01997

| | |
|---|---|
| BLM either does not know or refuses to analyze and disclose the status of lands to be subject to new road construction.<br><br>BLM's accounting trick of masking significant impacts to forest soils by refusing to count permanent road construction towards the 20% soil disturbance RMP threshold is an unfortunate and arbitrary act of obfuscation. | The statement on page 91 is intended to inform the reader that when selecting locations for new road construction, old jeep trails or old mining roads are often utilized as per the application of BMPs for planning new road routes and does not indicate any "uncertainty." The EA and REA discloses the maximum miles of new road construction considered and the location of these proposed roads is disclosed on the maps provided. The amount of new road construction proposed was considered with metrics such as road density and roaded area in Section 3.5. These metrics were looked at for 12-digit and 10-digit HUCs and potential impacts disclosed. The construction of roads within 200 feet of streams was analyzed and found to be 0.3% and under the 1% disclosed in the FEIS (REA p. 99).<br><br>The RMP specifically states that detrimental soil conditions (that are limited to 20 percent or less) would be assessed from skid trails, landings, and temporary roads (USDI/BLM 2016b, p184). |
| The BLM refuses to analyze or disclose the location, site-specific, or cumulative impacts of yarding corridors, new road construction, and landing establishment on soil impacts at the site-specific timber sale scale.<br><br>he BLM steadfastly refuses to disclose the location of yarding corridors (and their impacts on soil resources) largely because the BLM does not know where yarding will in fact occur. | Detrimental soils disturbance from skid trails, yarding corridors, landings, or temporary roads within logging units would be less than 20% of the unit and would be ameliorated with Best Management Practices (BMPs). BMPs such as limiting yarding corridors, placing woody debris on disturbed soil and other practices have been shown to be effective and practicable in preventing sediment from non-point sources (REA, p. B-25). New road construction is disclosed and site specific (REA, p. 22) estimates for the amount and intensity of yarding corridors and landings comes from an analysis of a portion of the project where logging systems were designed (REA, Issue 10).<br><br>There is no requirement under the RMP or NEPA that BLM specify the precise location of every timber sale yarding corridor or type of yarding activity. The BLM's estimate of the types, number and surface area of yarding activities within each harvest unit provides a reasonable estimate to evaluate yarding's potential soils effects including cumulative impacts. BLM analyzed the tradeoffs and effects of yarding and road construction in the REA in Appendix F. Commenters did not cite, |

| | |
|---|---|
| | mention, comment on, or acknowledge the addition of Appendix F in the REA which discloses yarding activities that would be considered. |
| The assumptions relied upon at page 110 of the REA do not acknowledge the impacts of tethered yarding or machine slash piling and rely upon the erroneous assumption that permanent road construction does not constitute detrimental soil disturbance. | The soils analysis evaluates yarding methods such as tethered assist as well as methods for managing activity fuels such as machine slash piling (REA pp. 109-115). Permanent road construction is often not counted in site specific Detrimental Soil Disturbance (DSD) monitoring, according to RMP direction that the 20% threshold only applies to DSD within harvest units (REA p.110) and new permanent roads are often outside of harvest units. Tethered yarding corridors, machine piling, skid trails and other DSD is assessed by timber harvest unit and must be below 20% by management direction (REA, p. 110). |
| | A GIS modeling effort was performed to determine if potential DSD effects would be within the scope of the analysis in the FEIS. This analysis included areas outside of harvest units and the construction of roads for hauling timber, including those outside of harvest units (REA p.113). This allowed the review of potential impacts to soils by alternative (REA, Table 3.7.1). |
| | The commenters' offer no alternative approach for analyzing and estimating DSD or showed that the BLM's analysis method was in error. The analysis methods for Soils are reasonable and adequate for assessing potential significant impacts and assuring impacts will be within the scope of those disclosed in the FEIS. |
| The agency contends that existing mapped TPCC sites may be "redesignated" at the whim of BLM timber planners and sale administrators – rendering the soil classification system meaningless. | The commentors overlooked the TPCC table D.4.12 in Appendix D in their review where PDFs are listed for all the TPCC soils identified in the LCFMP. With the application of these site-specific PDFs to mitigate potential impacts to these soils, the analysis for DDR-TPCC LUAs in issue B.27 found that activities would not have impacts beyond that which was analyzed in the FEIS. BLM does not redesignate TPCC soils on a whim but instead follows a process that involves a multidisciplinary review before adoption (REA pp B-48 to B-49). |

| | |
|---|---|
| At page 111, the BLM belatedly brings itself to acknowledge that the logging, yarding, and road construction activities in the adjacent Poor Windy timber sale are resulting in (significant) cumulative soil impacts with the Last Chance timber sale. This acknowledgement is half-hearted and much too late. | Neither the Last Chance, nor Poor Windy timber sales, individually or cumulatively, have had or will have "significant" effects beyond those disclosed in the FEIS.<br><br>In the EA, BLM analyzed Equivalent Clearcut Area (ECA), road density, roaded area and other metrics by watershed and subwatershed. BLM adjusted these metrics in the Revised EA to include the proposed actions in the Poor Windy project when they overlapped or were relevant. Because soils are expected to be impacted where management activities occur on the ground (REA p. 115), only the small overlap of boundaries for the projects had the potential for cumulative effects for soil resources.<br><br>BLM specifically evaluated these overlapping areas in GIS and resulted in minor revisions to the REA, but these revisions did not change the conclusions of the analysis for hydrology, water quality, or soils. The commenters' presented no information or data showing that BLM's consideration of overlapping effects, or the overall conclusions are in error. |
| At page 87 of the REA the BLM concludes that: A 25-year assessment of forested watersheds in the Pacific Northwest found a reduction in landslide risk for key watersheds with the greatest reduction in the LSRs attributed to a reduction in road density overall (USDA-PNRS, 2023, p. 55). However, the BLM is knowingly increasing landslide risk. | The potential to risk of landslides is disclosed throughout the document, specifically on page 84 of the REA, "The FEIS found that less than 1 percent of the harvest land base would be susceptible to landslides (USDI BLM, 2016a, p. 394-400.  A 25-year assessment of forested watersheds in the Pacific Northwest found a reduction in landslide risk for key watersheds with the greatest reduction in the LSRs attributed to a reduction in road density overall (USDA-PNRS, 2023, p. 55)." The FEIS analysis is based on the application of BMPs and PDFs that would avoid unstable soils when determine sites for new roads, landings and commercial timber harvest. The identification of unstable soils is based on field surveys and mapping, including LIDAR. BLM used these methods to identify and avoid the unstable slopes in the Last Chance project area.<br><br>The commenters provide no information on any unstable soils or steep slopes that BLM failed to |

KSW02000

| | |
|---|---|
| | detect and avoid, or to substantiate their accusation that "BLM is knowingly increasing landslide risk." |
| BLM fails to analyze detrimental soil disturbance and the impacts in detail resulting in failure to take a "hard look" at impacts of logging operations to soil health and degradation. | Detrimental Soil Disturbance (DSD) was analyzed in detail in Chapter 3, Issue 10, using both quantitative and qualitative information to support analysis. The project complies with the RMP's 20% DSD threshold, and commenters provided no information or data to show error in BLM's conclusion of RMP management direction consistency. |

**WILDLIFE**

| Comment Summary | BLM Response |
|---|---|
| Much of the Northern Spotted Owl (NSO) habitat modeling in the REA rests upon flawed assumptions. There is an acknowledged and longstanding history of overharvest within Medford BLM logging units such that post-logging canopy cover is often lower than modeled by the agency. Additionally, there is also often significant post-logging windthrow and other stand damage that is not accounted for by BLM habitat modeling and NEPA analyses. | The BLM disclosed the relative density, basal area, and canopy cover requirements by LUA and Alternative (REA, pp. 12-18). The Authorized Officer relied on the expertise and judgment of experienced forestry professionals and based on the review of the silvicultural prescriptions written for this Project and the marking review of the Project, it is expected that the relative density and canopy cover targets are achievable and will be consistent with the management direction for each LUA (REA, pp. 10; 12-18). |
| | The BLM is not uncertain about post logging relative density (REA, p. B-42). The BLM silviculturist, in consultation with a wildlife biologist and other specialists, monitors the marking of trees as it is completed to ensure it meets the consultation requirements and stand management objectives. Modifications to the marking of trees are applied as needed (REA, p. B-42). Once all trees are marked a wildlife biologist monitors a subset of units to evaluate consistency between implementation, NEPA analysis, and Endangered Species Act (ESA) consultation requirements. Monitoring includes tree retention and spacing, tree selection, structure retention, and evaluating general canopy cover retention to verify that prescribed marking is appropriately applied according to the NEPA and ESA consultation effects (REA, p. B-42). |

KSW02001

A tally of the trees which are marked in the field and used to calculate RDI or percent basal area retained for each unit (REA, p. B-42). RDI targets are calculated based on the RMP/ROD definition of a stand which permits RDI calculations to be determined at the Field Operation Inventory scale.

As discussed in Appendix B.24, there is no known method to predict unit-level/tree susceptibility to windthrow. Analysis of potential windthrow would be speculative and not lead to a more reasoned decision. Further the FEIS described that windthrow mortality is often irregular or episodic in nature and is inherently difficult to predict the exact time in which it will occur (USDI/BLM 2016a p. 1203). Commenter offered no suggestions on these points.

Management direction on pages 68 and 72 of the RMP states the BLM is authorized to, "Conduct integrated vegetation management for any of the following reasons: Reduce stand susceptibility to disturbances such as a fire, windstorm, disease, or insect infestation" and are just a few of many potential treatment purposes stated in the RMP management direction. Silvicultural prescriptions proposed in LCFMP are designed to remove trees that are most susceptible to windthrow, such as those with low vigor, poor crown ratios and those with high height to diameter ratios (Worthington and Staebler, 1961, p. 21; Moore et al., 2003; Wonn & O'Hara, p. 92; Tappenier et al. 2007, pp. 129-130; O'Hara, 2014; REA, p. B-42). The EA explained that a lack of thinning can prevent stands from attaining vigorous conifer growth. Trees allocate resources to height growth before diameter growth and in the absence of disturbance (thinning) resources become limited and the risk of windthrow increases as tree stability decreases (REA, p. B-35). The result of limited resources within a stand, means diameter growth lags behind height growth which actually increases the risk of windthrow over time, as height to diameter ratios continue to increase and crown ratios decrease (REA, p. B-35).  The EA also described the present conditions of each affected resource, followed by a comparison of the estimated effects

| | |
|---|---|
| | of each of the alternatives. In addition, the EA also includes a discussion (NAID B.29, p. B-41) on the topic of monitoring to assure  canopy cover requirements are met for spotted  owls. The commenter offered no specific  information or data to suggest that BLM's  implementation and monitoring of this project will fail to achieve specified canopy retention.<br><br>In conclusion, the BLM has analyzed and taken a hard look at the effects of treatments on stand susceptibility to disturbances and made an informed decision about whether there are any significant environmental impacts. " |
| The BLM's contention that it may utilize forest stand averaging to log large trees, remove canopy, and create gaps within Nesting & Roosting habitat (NR) and high-quality Recovery Action 32 forest stands (RA 32) is disingenuous. | The BLM does not argue that spotted owl habitat is derived from averaging stand conditions.  The commenter conflates some of the metrics used to describe and evaluate forest conditions through the lens of the forestry discipline are averaged across a stand or treatment area (e.g.  metrics such as basal area, quadratic mean diameter, relative density, etc.) but these metrics are appropriately used to represent a "stand average" in the forestry discipline.  However, for spotted owl habitat, BLM surveyors attempt to categorize the forest landscape into human derived habitat categories at the smallest scale possible, conglomerating areas with similar stand elements into one habitat type. Under this approach, habitat values are not averaged across the treatment area but are split into various habitat categories across the treatment area as described in both the revised EA (NAID B-30) and in the Biological Assessment (BA) covering the Last Chance project (USDI BLM 2023, pp. 6-10). The result of this approach is that proposed treatment areas (i.e. units) are often split into multiple habitat types (USDI BLM 2023, maps 18a and 18b).<br><br>Fine scale habitat breakouts are notoriously difficult because of the highly variable nature of the forest environment in southwestern Oregon. When delineating spotted owl habitat types in the field setting, the BLM uses one acre as the minimum threshold. For example, from the Biological Assessment for Last Chance, the following Project Design Criteria is included: "In |

|  | prescriptions that include the creation of small openings (approximately 0.25 acre to 1 acre) and where the objective is to maintain habitat function, the openings would be distributed throughout the unit in a manner to retain sufficient canopy cover, basal  area, and key habitat features as described above and the total acres of openings would not exceed 20 percent of the treatment area to maintain NRF quality and canopy cover. In order to keep the openings less than one acre, created small openings (patch cuts) would not be placed adjacent to other existing or created openings. Fewer openings would be included in the prescriptions in units with additional thinning in order to retain sufficient basal area (150 ft2/acre minimum for foraging or 180 ft2/acre minimum for nesting-roosting) and canopy cover (at least 60 percent) to maintain habitat function (as described above)" (USDI BLM 2023, p.31). This language demonstrates the careful and nuanced approach the BLM applies to both identifying and determining the effects to spotted owl habitat and the scale at which these determinations are made. |
|---|---|
| Please note that the BLM's Relative Habitat Suitability (RHS) model does not consistently reflect actual NSO occupancy locations, the location of critical habitat, the geography of barred owl competition, or the "large block habitat" LSR assumptions relied upon in the 2016 RMP | Relative Habitat Suitability (RHS) is not mentioned once in the REA.  The BLM did not rely on the RHS model for any planning or analysis related to this REA. |
| The BLM has failed to provide meaningful site-specific analysis of how, where, when, and why it intends to downgrade and remove NSO LSR habitat that has been deemed "critical" for the recovery and survival of the owl by the USFWS. | The REA discusses this topic at NAID B.33 and states "All nesting-roosting habitat in the LSR LUA, treatments would maintain habitat function regardless of NSO occupancy" (USDI/BLM 2016b, p.71). BLM's REA explains the "how, where, when, and why" of LSR treatments—the very site-specific analysis that commenters claim is lacking. Commenters miss a key point: the commercial thinning treatments that would occur under any action alternative would not downgrade or remove NSO habitat within the LSR allocation within this project. |

KSW02004

| | |
|---|---|
| The BLM's stated intent to conduct widespread clearcutting (in unanalyzed and undisclosed locations) throughout LSR forest stands through gap creation logging undermines the habitat assumptions of the 2016 RMP, its Biological Opinion and the NSO Recovery Plan. Further, the BLM must conduct site-specific NEPA to disclose the impacts of clearcutting LSR forest stands. | The BLM does not intend to conduct clearcutting in LSR and the LCFMP Revised EA specifically describes the proposed thinning treatment on 291 acres of LSR-dry by NSO habitat type and Alternative (REA, pp. 15; 27; 65-66). As disclosed in the Revised EA, under Alternatives 2, 2a, and 3, the commercial treatment prescriptions in LSR stands could incorporate group selection openings that are less than 1 acre in size on less than 10 percent of the stand area (REA, pp. 15-18). In LSR-dry commercial harvest units, selection harvest to relative density of 30 +/- 10 percent, including the limited incorporation of small group selection openings, is consistent with modifying but maintaining NSO habitat type of the treated stand (REA, p. 66). The purpose of small group openings, integrated with selection harvest thinning, is to "promote the development and retention of large open grown trees" and "create growing space for hardwood and pine persistence" as stated in the RMP LSR management direction (USDI/BLM 2016b, p.72). Variable density thinning, including gaps, has been shown to increase retention of lower crowns and larger branch sizes (Maguire et al. 1991, Davis et al. 2007). Therefore, treatments that encourage the development of large trees while creating gaps large enough for a second story to develop are important for habitat development for spotted owl nesting and foraging habitat. |
| | Downgrade and/or removal of NSO habitat in LSR-dry is not proposed under any Alternative except to provide access to HLB stands through road construction and/or logging systems (REA, p. 66). Contrary to commenters' assertion, the 2016 RMP FEIS specifically considered "gap creation" in the LSR—and "gap creation" is consistent with the NSO Recovery Plan's call for active management of reserves in the dry forest, like those found in the LCFMP area. PRMP/FEIS, p. 1071 ("group selection" synonymous with "gap"), pp. 308, 329-330; Revised Northern Spotted Owl Recovery Plan, III-11 to III-17, III-20 to III-39. RMP LSR Management Direction allows for gap creation up to 4 acres in size in treated stands 10 acres or larger, (RMP/ROD at 72) but the LCFMP |

| | |
|---|---|
| | only proposes gaps up to 1 acre in size in such stands. |
| The BLM fails to account for floater owls and simply assumes them out of existence. BLM's NEPA analysis needs to account for the long-term consequences of NRF habitat removal and downgrading, and the potentially irreversible nature of habitat removal given the uncertainties associated with global climate change. | The commentors are incorrect stating that the BLM failed to account for "floater" spotted owls within the Last Chance Project area. "The Grants Pass Field Office has completed NSO surveys annually across the project area since 2018 following the USFWS 2012 revised protocol in order to determine occupancy and nesting status" (REA p. B-50). These surveys are designed to detect any spotted owls within the analysis area, including pairs, resident singles, and "floater" owls. In addition, Appendix E: Northern Spotted Owl Carrying Capacity Model of the Revised EA (pp. E-1-7) employees a methodology that evaluates the analysis area's ability to support a theoretical maximum value of spotted owls that could be supported by the habitat configuration within the analysis area both before and after project implementation, by alternative. This modeling "...approach is helpful as it includes a spatial component in GIS that provides context to the arrangement of suitable habitat and the density of territories across the analysis area. These model outputs are useful to compare the potential impacts the proposed action and alternatives would have on the modeled carrying capacity of the analysis area..." (REA, p. E-1). While this approach does not specifically focus on "floater" owls, it accounts for territorial occupancy and the minimum habitat values necessary for spotted owls to establish territories, and therefore the carrying capacity analysis does also address how owl densities across the analysis area may change in relation to the proposed treatments. Commenters' provided no comments on REA Appendix E. BLM's REA expressly accounts for the effects of the LCLFMP on habitat in and outside of known owl home ranges, including the dispersal habitat, dispersal-only habitat, capable habitat, NRF habitat, and overall carrying capacity—this is sufficiently robust to account for any transient "floater" owls. *Klamath-Siskiyou Wildlands Ctr. v.* |

| | |
|---|---|
| | *USFWS,* No. 1:20-cv-00952-AA, 2022 U.S. Dist. LEXIS 178548, at *40-41 (D. Or. Sep. 30, 2022). |
| The agency continues to refuse to acknowledge or address the impacts of late-successional forest liquidation on barred owl competition. | This comment is factually incorrect. BLM is not "liquidating" forests of any kind in western Oregon, including LSRs. Commercial harvest in LSR for restoration and habitat development is specifically allowed under the RMP—and that is not a bad thing. The commercial component of LSR treatments allows BLM to actually accomplish these important ecological objectives that would otherwise be left undone due to limited BLM resources and workforce capacity. Commenters have broad policy disagreements with the use of LSR treatments to achieve RMP objectives—but their disagreement is with the RMP itself, which is beyond the scope of this project. The commenters' challenged the 2016 RMP, specifically the adequacy of its aquatic conservation strategy to provide for the conservation and recovery of listed salmonids in western Oregon, but chose not to include a challenge to the RMPs' owl conservation strategy in their lawsuit. Both the District Court of Oregon and the Ninth Circuit Court of Appeals rejected the commenters' litigation challenge of the RMP. *Pacific Rivers, et al. v. BLM*, No. 6:16-cv-01598-JR (D. Or. Oct. 12, 2018), aff'd No. 19-35384 (9th Cir. 2020). Most recently, the District Court of Oregon rejected commenter Cascadia Wildlands' owl-based arguments in their challenge of the N126 project that also involved LSR habitat restoration. *Cascadia Wildlands v. Adcock,* No. 6:22-cv-00767-AA, 2025 U.S. Dist. LEXIS 60942, *17-29 (D. Or. Mar. 31, 2025). |
| | The BLM included in the REA direct discussions on the topic of barred owl and spotted owl competition in Appendix B, Issue NAID B.37. This discussion concludes: "In summary, the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls. Habitat management by the BLM alone would not be sufficient to produce stable populations of northern spotted owls in the |

| | |
|---|---|
| | Oregon Coast Range Physiographic Province, the Oregon Western Cascades Physiographic Province, and the Klamath Basin Physiographic Province within the RMP planning area (USDI/BLM 2016a, pp. 961-962). However, habitat on BLM-administered lands plays an indispensable role in northern spotted owl conservation in the Oregon Eastern Cascades Physiographic Province (USDI/BLM 2016a, p. 962). Therefore, the greatest contribution to conservation and recovery of the northern spotted owl would come from a combination of habitat management and barred owl management (USDI/BLM 2016a, Vol 4; p. 973)" (REA p. B-60). |
| The BLM presents no compelling reason for logging 193 acres of NSO foraging habitat located in the LSR LUA. The contention that the LSR stands are "dense" is undercut by the reality that the BLM is primarily targeting LSR foraging habitat, not LSR dispersal habitat or suitable habitat for commercial logging. | As stated in multiple locations throughout the Revised EA, one of the overarching needs of the project is to treat forest stands identified as "overly dense, [and/or] at high risk of stand replacing wildfire" (REA, p. 5). Further, the P&N for the LSR-dry LUA included in the revised EA states: "These dense conditions have reduced the quality and developmental trajectory of northern spotted owl (NSO) nesting-roosting (NR) habitat in LSR-Dry", and "the RMP requires the BLM to apply commercial treatments to at least 17,000 acres in the Medford District LSR-Dry per decade (USDI/BLM 2016b.74). As of June 17, 2024, the Medford district has applied such treatments to 3,063 acres, leaving 13,937 more acres to treat between now and the end of fiscal year (FY) 2026" (REA, p. 5). The BLM has determined that the 193 acres of foraging habitat that is proposed for treatment are at a high risk of stand replacement fire and was therefore included in the Last Chance proposed action to reduce the stand density and apply commercial treatments to the LSR-dry land use allocation, as required by the RMP. Commenters point to no RMP management direction that excludes overly dense "foraging" habitat from eligibility or the need for treatment to reduce density and reduce the risk of stand replacement fire. |

KSW02008

| | |
|---|---|
| The REA lacks any quantitative data to support its conclusory statements about the impacts of habitat liquidation on NSO or their prey in the project area. Indeed, habitat levels, occupancy history, reproductive success (or failure), and barred owl encroachment in known spotted owl activity centers are completely ignored in the REA. | The REA includes discussions and analysis on all the topics mentioned in the comment. Specifically, "habitat levels" are discussed in the Revised EA issue NAID B-30, including the amount of spotted owl habitat found across the project area and the effects to spotted owl habitat from the proposed action by alternative. Table B-30.2 includes a summary of the acres of treatment by spotted owl habitat type by alternative, and what the effects to each habitat type are expected to be by alternative (REA p. B-46). Table B-30.3 on page B-47 of the REA provides the reader with the total amount of spotted owl habitat types pre- and post-treatment by alternative across the analysis area. |
| | Effects to spotted owl prey are discussed in the Revised EA in issue NAID B-31, and the effects to prey are incorporated more broadly into the spotted owl effects analysis (NAID B-30 & 31) when considering the effects to spotted owls and spotted owl sites, as the habitat types used in the effects analysis account for prey and foraging needs. In regard to "occupancy history", the REA alternative framework is specifically designed around the occupancy status of the known owl sites, where lighter thinning treatments would be applied to areas inside occupied owl sites (REA, p 11-18). The issue NAID B.31 focuses on spotted owl sites within the project area, including information directly addressing the occupancy status of these owl sites: "The Grants Pass Field Office has completed NSO surveys annually across the project area since 2018 following the USFWS 2012 revised protocol in order to determine occupancy and nesting status. In total, there are 33 historic spotted owl territories known to occur within the LCFMP spotted owl analysis area. Six of the known NSO sites (eight total territories including two alternates) within the NSO Analysis Area are currently occupied (active in the last two years)" (REA, p. B-50). |
| | Issue NAID B-37 focuses entirely on the topic of barred owl encroachment, recognizing "the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately |

KSW02009

|  |  |
|---|---|
|  | due to competitive interactions between northern spotted owls and barred owls" (REA, p B-66).<br><br>In addition, a more complete and comprehensive review of effects to NSOs, including habitat levels, occupancy history and reproductive success, and barred owl observations for all potentially affected NSO sites is included in the Biological Assessment for the LCFMP (USDI BLM 2023). |
| The contention that the removal of NRF habitat that will take over a hundred years to re-establish (consisting of many potential generations of NSO) will be "mitigated" by ingrowth and establishment of habitat "during the same time span" is nonsensical. | There is no intent to "mitigate" the effects of habitat removal in the HLB LUA with in-growth of habitat. The FEIS predicted a steady rate of decline of habitat on HLB in order to archive sustained yield harvest targets. Most recently, the District Court of Oregon rejected commenter Cascadia Wildlands' similar criticisms of the RMP framework for conserving spotted owls in *Cascadia Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 U.S. Dist. LEXIS 60942, *17-29 (D. Or. Mar. 31, 2025). BLM need not revisit the RMP's owl conservation strategy with every project implementing the RMP. |
| The hypothetical ingrowth and habitat establishment (that is neither analyzed or disclosed) that the BLM relies upon as mitigation would take many decades and is in no way effective at helping these owls in this project area. | There is no intent to "mitigate" the effects of habitat removal in the HLB LUA with in-growth of habitat. The FEIS predicted a steady rate of decline of habitat on HLB in order to archive sustained yield harvest targets. |
| The BLM acknowledges that NSO are under "severe biological stress" and then proposes to increase the primary stressors (habitat removal, fire hazard and barred owl competition) in order to "maximize the commercial harvest areas treated and [maximize the intensity of the treatment." | Commenters offer no evidence to counter the recent finding of the District Court of Oregon regarding BLM's management of western Oregon lands: "There is no modeling that indicates that BLM has an opportunity to mitigate the situation through development of northern spotted owl habitat alone, especially if the rate of competition with the non-native barred owl remains unchanged. *Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 U.S. Dist. LEXIS 60942, at *6 (D. Or. Mar. 31, 2025). BLM is not "increasing" harvest—in fact, the REA shows that BLM has offered for sale and harvested far less timber—including timber in spotted owl habitat--to date than projected in the RMP FEIS REA at p B-48. |

The REA includes discussions and analysis on all the topics mentioned in the comment. Specifically, "habitat levels" are discussed in the Revised EA issue NAID B.30, including the amount of spotted owl habitat found across the project area and the effects to spotted owl habitat from the proposed action by alternative. Table B-30.2 includes a summary of the acres of treatment by spotted owl habitat type by alternative, and what the effects to each habitat type are expected to be by alternative (REA p. B-53). Table B-30.3 on page B-54 of the REA provides the reader with the total amount of spotted owl habitat types pre- and post-treatment by alternative across the analysis area.

Regarding "occupancy history", the REA alternative framework is specifically designed around the occupancy status of the known owl sites, where lighter thinning treatments would be applied to areas inside occupied owl sites (REA, pp. 11-18). NAID B.31 focuses on spotted owl sites within the project area, including information directly addressing the occupancy status of these owl sites: "The Grants Pass Field Office has completed NSO surveys annually across the project area since 2018 following the USFWS 2012 revised protocol in order to determine occupancy and nesting status. In total, there are 33 historic spotted owl territories known to occur within the LCFMP spotted owl analysis area. Six of the known NSO sites (eight total territories including two alternates) within the NSO Analysis Area are currently occupied (active in the last two years)" (REA, p. B-50).

Issue NAID B.37 focuses entirely on the topic of barred owl competition, recognizing "the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls" (REA, p B-66).

In addition, a more complete and comprehensive review of effects to NSOs, including habitat levels, occupancy history and reproductive success, and barred owl observations for all potentially affected

KSW02011

| | |
|---|---|
| | NSO sites is included in the Biological Assessment for the LCFMP (USDI BLM 2023). |
| No data, analysis or site-specific information at all is provided regarding the impacts of barred owl encroachment on the NSOs in this project area while the BLM conducts widespread habitat fragmentation of older forests in the Last Chance project area. | See the comment response above. Further, Issue NAID B.37 focuses entirely on the topic of barred owl encroachment, recognizing "the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls" (REA, p B-66). In addition, a more complete and comprehensive review of effects to NSOs, including habitat levels, occupancy history and reproductive success, and barred owl observations for all potentially affected NSO sites is included in the Biological Assessment for the LCFMP (USDI BLM 2023). The Biological Opinion for this project also includes an extensive discussion on barred owl and spotted owl competition, and the effects of project implementation and barred owls on spotted owl habitat (USDI FWS 2023, pp. 75-77).<br><br>"The effects of the actions considered here are consistent with the habitat effects considered in PRMP FEIS and PRMP Biological Opinion (USDI BLM 2016b, USDI FWS 2016) including retention and development of habitat function in the Reserve LUAs. The available evidence suggests barred owls will have a significant effect on the likelihood of successful colonization and subsequent occupancy by northern spotted owls that cannot be substantially ameliorated by more habitat (Dugger et al. 2011; Sovern et al. 2014; Franklin et al. 2021). This is consistent with the analysis in the PRMP FEIS (p. 936, Fig. 3-189), that showed that conserving additional acres of spotted owl nesting-roosting habitat in the HLB did not change the negative estimated spotted owl population trajectories compared to the implementation of the PRMP when barred owls are present" (USDI FWS p. 76). |
| The BLM fails to account for take as a result of increased barred owl competition resulting from widespread NRF liquidation, the further fragmentation of an already fragmented | The BLM is required to avoid incidental take as directed in the RMP and stated in multiple locations throughout the REA: "Timber sales would not cause the incidental take of northern spotted owl (USDI/BLM. 2016b, p. 127)" (REA. |

KSW02012

| | |
|---|---|
| LSR, the liquidation of NRF and RA-32 habitat from forests that were, until recently, considered "critical" to the survival and recovery of NSO, and the increase in fire hazard that will follow from NRF liquidation and BLM clearcutting. | P. 10). "Even though spotted owl sites may be affected by the proposed action, survival and reproduction would not be affected at occupied owl sites because the BLM's commitment to conduct no harvest in the 70-acre site center and only conducting non-commercial work within 0.5 mile of the site center, and only treating NRF in any occupied owl sites with "light touch" treatments (i.e. treat and maintain or modify) would ensure that take would not occur, in compliance with the SWO ROD/RMP's management direction stating, "No Timber harvest that would cause the incidental take of northern spotted owl territorial pairs or resident singles" (USDI/BLM 2016b, p. 30; also wildlife PDF 45)" (REA, p B-59). "The question of whether the effects described above lead to incidental take via harm or harassment is a determination made by the US Fish & Wildlife Service. A more detailed analysis of the effects that this project is expected to have on individual spotted owls and spotted owl habitat across the Project Area is included in the Biological Assessment (USDI BLM 2023) and the Biological Opinion (USDI FWS 2023) covering the terrestrial wildlife Threatened and Endangered species. The Biological Opinion from the US Fish & Wildlife Service concluded that the LCFMP would not cause incidental take of spotted owls (USDI FWS 2023)" (REA. pp B-58-59). |
| The BLM's contention that removal of 3,420-acres of NSO NRF habitat is not a significant action and need not be analyzed "in detail" is arbitrary and capricious. | The determination of whether or not to prepare an EIS rests on whether the proposed federal action will have a significant effect on the quality of the human environment. One element that is weighed in determining significance is the intensity, or severity of the potential impact. The impacts presented by the commentors (removal of NRF habitat) are well within the analysis prepared in the 2016 FEIS supporting the Southwestern Oregon ROD/RMP: "In conclusion, there is no potential for significant impacts to NSO habitat beyond those already analyzed in the PRMP/FEIS because the project design and site-specific information is consistent with the analysis in the PRMP/FEIS. This project would not result in substantially different effects than what was analyzed for in the PRMP/FEIS and there is no new information that |

KSW02013

| | |
|---|---|
| | would substantially change the conclusion reached in the PRMP/FEIS" (REA, p. B-49). The BLM has determined that preparation of an EIS is not necessary. |
| At REA page B-55, the BLM acknowledges that stochastic disturbance events including "extensive conifer mortality from drought and insects" have undermined the NSO habitat assumptions present in the 2016 SWO RMP and its Biological Opinion such that the "events [have] altered the baseline habitat conditions . . .." Remarkably the BLM contends that this new information is immaterial to its NRF removal logging agenda and need not be analyzed in detail. According to the BLM timber planners, the amount of existing NRF habitat is not a consideration that the BLM is willing to incorporate into project planning or decision making. This approach to land management violates the NEPA, FLPMA, APA, and ESA.<br><br>The significant loss of NRF habitat due to drought and insects is new information that was not originally considered in the 2016 RMP and BiOp, and the BLM must reinitiate consultation for NSO under the ESA. | The commentors misconstrue the information presented around stochastic disturbance events and the context of how it relates to the RMP FEIS analysis and baseline habitat information. The information presented in the REA in full states: "Since the publication of the FEIS in 2016, stochastic disturbance events, including large scale high-severity wildfires and extensive conifer mortality from drought and insects has occurred across the planning area and the Medford SYU. The effect of these disturbance events on the baseline conditions for spotted owls and what consequence they are to the overall FEIS analysis are explained in more detail in the Western Oregon's RMP 5-year Monitoring Report (USDI/BLM 2022, pp. A-17-20) and are incorporated in full here by reference. The effect of these disturbance events has altered the baseline habitat conditions compared with the RMP modeled "starting point". That change in the context of the effects does not alter basic analytical conclusions in the RMP EIS. Additionally, that change in the context of the effects does not alter the scope of resource uses or the ability to make progress towards achieving the desired conditions described in the RMP management objectives. In summary, "The changed baseline conditions of spotted owl habitat do not alter the scope of resource uses or the ability to make progress towards achieving the desired conditions described in the RMP management objective to conserve and recover the northern spotted owl and the ecosystem on which it depends" (USDI/BLM 2022, p. A-20)." (REA, p. B-48).  These stochastic disturbance events have occurred throughout the range of the spotted owl, and the impacts of these disturbance events are localized to the region of the disturbance (i.e. the fire footprint or areas of heavy overstory tree mortality).  Although there have been large areas of conifer mortality occurring in some areas of the Medford SYU (areas with less than 35 inches of average annual |

| | rainfall and under 3,500 feet in elevation are at highest risk of Douglas-fir mortality (Bennet and Adlam 2023)), there has not been any large-scale conifer mortality within the Last Chance analysis area (see REA pp. 4, 41, and D-60 to D-61). Nonetheless, any habitat loss that may have occurred from these types of disturbance events has been incorporated into the project specific habitat baseline for this project during the project development.  Any habitat changes from large scale stochastic disturbance events (as well as anthropogenic caused changes to habitat for cumulative effects analysis) were incorporated into the Revised Last Chance EA analysis and therefore has been considered and would be part of the underlying information used for decision making. |
|---|---|
| | Additional information on conifer mortality has been incorporated into the REA for clarity. |
| PDF 41 specifically allows BLM timber sale administrators to waive otherwise required NSO protection measures based upon the results of unreliable nesting/reproductive surveys that are not in fact funded for FY 2025. | The commenter is mis-informed. Spotted owl surveys are on-going and will be completed to protocol prior to implementation of any treatments. |
| The proposal to remove canopy and large trees from LSRs to such an extent that the establishment of NR habitat is precluded for more than 20 years due to the lack of canopy and basal area violates FLPMA. | The Last Chance FMP would have a relatively minor impact to the habitat found in the LSR as all "proposed treatments in the LSR are designed to modify, but maintain the NSO habitat type of the treated stand such that the stand would still provide the same level of habitat function as it did prior to treatment (e.g. foraging habitat would remain foraging habitat after treatment and would not be downgraded to a lower habitat category)" (REA p. 66.  The small amount of LSR treatment included in this project "would occur in stands currently functioning as foraging, dispersal-only, or non-habitat and do not currently display the characteristics of NSO NR habitat" which "lack at least one or more elements of diversity, structure, layering, large trees, higher canopy cover, and other important habitat elements required to function as NR habitat" (REA p. 65). Heavy thinning examples cited in the comment are not comparable to the proposed treatments in the Last Chance REA because the proposed treatments in |

KSW02015

| | |
|---|---|
| | this project are "light thinning" treatments that would not reduce the canopy cover of any NRF stand below 60 percent on average across the treatment area. The proposed LSR treatments included for this project target stands "characterized by densely stocked small diameter trees" with an "average QMD in the treatment areas less than 10 inches DBH, which indicates that the trees are smaller than necessary for NSO NR" and are at an "…increased risk of loss to wildfire" (REA, p. 65). The REA analysis shows that the LSR treatments would comply with the RMP LSR management direction's 20-year standard. (REA, Issue 6). |
| How many barred owls are present in the Poor Windy and Last Chance project areas? How will the widespread removal of NSO habitat impact individual and population dynamics between these two species? The public and the decisionmaker cannot know because the BLM refuses to say. | The "tree by tree" accounting or barred owl surveys the commenters request are not required by NEPA or the RMP. *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1234 (D. Or. 2013), *aff'd* 638 Fed. Appx. 648 (9th Cir. 2016)(rejecting KS Wild's claim that a "tree-by-tree" of mistletoe infected trees was required under NEPA for a timber sale environmental assessment). There is no single method with which an agency must identify the "baseline conditions" of an area or resource. "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). |
| | The BLM did consider the potential effects that the LCFMP would have on spotted owl and barred owl competition for each alternative (REA, Issue NAID B.38), and concluded: "In summary, the northern spotted owl population is under severe biological stress in much of western Oregon, and this population risk is predominately due to competitive interactions between northern spotted owls and barred owls. Habitat management by the BLM alone would not be sufficient to produce stable populations of northern spotted owls in the Oregon Coast Range Physiographic Province, the Oregon Western Cascades Physiographic |

<table>
<tr>
<td></td>
<td>Province, and the Klamath Basin Physiographic Province within the RMP planning area (USDI/BLM 2016a, pp. 961-962). The District Court of Oregon recently rejected spotted owl-based litigation claims from commenter Cascadia Wildlands, finding that "There is no modeling that indicates that BLM has an opportunity to mitigate the situation through development of northern spotted owl habitat alone, especially if the rate of competition with the non-native barred owl remains unchanged. <em>Wildlands v. Adcock</em>, No. 6:22-cv-00767-AA, 2025 U.S. Dist. LEXIS 60942, at *6 (D. Or. Mar. 31, 2025).  Habitat on BLM-administered lands plays an indispensable role in northern spotted owl conservation in the Oregon Eastern Cascades Physiographic Province (USDI/BLM 2016a, p. 962). Therefore, the greatest contribution to conservation and recovery of the northern spotted owl would come from a combination of habitat management and barred owl management (USDI/BLM 2016a, Vol 4; p. 973)" (REA p. B-60). Commenters have repeatedly litigated and lost on their theory that <em>more</em> protection of habitat on BLM lands would change the outcome for spotted owls. BLM has appropriately balanced owl conservation and recovery and a small amount of sustained yield timber harvest from the lands remaining available for such timber production. BLM need not revisit the RMP with every new project.</td>
</tr>
<tr>
<td>Has the BLM analyzed the impacts of removing NSO habitat on barred owl competitive pressure while the agency continues to log RA-32 habitat while refusing to implement barred owl control? No.</td>
<td>As discussed in the REA (Issue NAID B.37), barred owl competition is a principle cause of spotted owl decline, and no habitat management alone would be sufficient to produce stable populations of spotted owls in the proposed project area. The BLM is not proposing LSR or HLB treatments in stands characterized as RA-32 and the treatments are consistent with RMP management direction and within the effects analysis of the RMP FEIS (Issue NAID B.30, see REA p. B-60).  The BLM has begun implementation of barred owl control with an agreement with APHIS and has funded barred owl removal work.  Since the barred owl nesting season began prior to on-the-ground work, the BLM is waiting to begin actual removal work until</td>
</tr>
</table>

| | |
|---|---|
| | late summer or early fall. While barred owl removal can occur year round, the USFWS barred owl removal plan recommends initiating barred owl removal in the fall at a time when there are no dependent young (USDI-USFWS 2024). |
| The BLM provides no data about the status and trends of Western Pond Turtles (WPT) in the Last Chance timber sale area. The BLM refuses to look for turtles prior to logging their habitat. Instead of analyzing the impacts of removing 42% of the overwintering habitat in this project area, the BLM makes generalized references to WPT populations and dynamics at the scale of the west coast. | Analysis within the Last Chance EA was based off NWPT aquatic habitat modeling (LCFMP REA, pp. 78-80) and field evaluations suggested that the model overestimates habitat (and therefore would adequately account for the population of turtles within LCFMP). Although it is not ideal to have an overestimate of habitat, this is the best available tool at this time to estimate habitat at a larger landscape scale (REA, p. 78), and commenters offer no alternative besides requesting surveys, which may show turtle effects at the project level (although there is no protocol that reliably detects northwestern pond turtles with a known detection probability), but would not help in evaluating how the project may impact the turtle population as a whole, which is the requirement for special status species. Additionally, the statement that 42 percent of overwintering habitat would be removed within LCFMP is false. This number represents the amount of NWPT overwintering habitat that would be modified, but would maintain function for NWPT under Alternative 2 (REA, p. 81). As the NWPT is proposed threatened at this time, the BLM needed to ensure LCFMP would not cause jeopardy for the species [50 CFR §402.10]. A jeopardy analysis and threshold is based on the species' range-wide scale; however, the NWPT aquatic modeling is only available for Oregon, which is why the analysis was conducted at the Oregon scale (LCFMP REA, pp. 78-80). Because BLM's action is not jeopardizing the NWPT at the Oregon scale, it follows that BLM's action is also not jeopardizing the species at the range-wide scale. |
| The information contained in the USFWS listing proposal was not considered in the 2016 RMP such that at no scale has the BLM addressed or provided any data regarding WPT. | As the Last Chance EA analyzed for maximum potential impact to NWPT—in the case that NWPT remains as bureau sensitive and is not listed under the ESA—and analyzed the potential for the LCFMP to have a "significant" effect on |

| | |
|---|---|
| There have been no surveys, data, or analysis for the WPT.<br><br>The BLM cites Holland's 1994 report on the History and Habitat of WPT in the REA but fails to utilize such science appropriately. | NWPT in the project area, as well as the species as a whole Oregon-wide (REA, Issue 7). If the NWPT is listed under the ESA, then PDFs would be applied (REA, p. 78), which would reduce the impacts to the NWPT. It is not uncommon for a BLM project to conditionally propose and then implement PDFs when a species is eventually listed, in order to comply with ESA. The RMP does not authorize BLM to defer or forego HLB treatments for reasons not provided for in the RMP management direction or Appendix A, and thus BLM cannot withhold treatments within HLB to wait for a listing determination. Best available information at that moment in time has to be used when writing an EA. At this time, it is unknown if the NWPT will be listed under the ESA. Therefore, BLM included a clause that PDFs would be applied if the species is listed. Contrary to commenters' assertion, the LCFMP is not a "death sentence for the local population," as the commenters fail to offer any data of information supporting their view that the project's level of modifying overwintering habitat would lead to extirpation. The 42 percent of NWPT overwintering habitat modified would continue to support NWPT after implementation (LCFMP REA, pp. 80-82). Additionally, the FEIS did consider NWPT (RMP FEIS, p. 1670) as it was a bureau sensitive species at the time of analysis. BLM decided to conduct a detailed analysis within the Last Chance EA to ensure there was no substantial question as to the potential for the project to have significant effects on NWPT. Furthermore, the BLM stated the intent to work with the U.S. Fish and Wildlife Service to create appropriate PDFs and apply them to the project's timber sales and timber sale contracts if the NWPT listed under the ESA (LCFMP REA, pp. 78 and C-25). Based on current knowledge and guidance that was developed by a panel of NWPT experts (LCFMP REA, p. 79), not just one scientist (i.e. Holland), proposed PDFs were included to give the public an idea of what PDFs would look like if the species is listed. The commenter offers no specifics on how they believe BLM failed to "utilize such science appropriately." |

KSW02019

| | |
|---|---|
| The REA indicates hazardous fuels treatments would not occur within 25 ft of small ponds or within 60 ft of perennial streams, "where approximately 45 and 43 percent of turtles overwinter." First, the statistics provided – that 45 and 43 percent of turtles overwinter within 25 ft of small ponds or 60 ft of perennial streams, respectively – are not readily substantiated by the articles referenced by the BLM. It is unclear where the BLM drew such numbers from. | Based on a literature analysis, the majority of NWPT nesting occurs within 100 m of aquatic habitat (LCFMP REA, p. 77). Overwintering can occur up to 500 m from aquatic habitat, but typically occurs within 200 m (LCFMP REA, p. 77). A BLM statistician compiled the data from the multiple articles cited to determine the approximate percent of turtles that would overwinter with respect to distance from aquatic habitat. The commenter offers no data, or information—just the bare assertion that BLM's distances are not "readily substantiated" --this fails to show error in BLM's distances. In response to public input, revisions have been made to pp. 77-82 of the REA to provide clarity. |
| If the BLM properly utilized Holland's report, the BLM would know Holland cites the "average canopy closure at overwintering sites" as 60%. The 30-year recovery timeline is seemingly erroneous as the BLM cites 30 years for canopy cover to return to 50 percent, which the BLM claims is needed to support NWPT overwintering habitat. | According to Reese (1996), the majority of NWPT overwintering sites have 50 percent or greater canopy cover (LCFMP REA, p. 79). Please see Reese 1996, page 206, for more details. The BLM recognizes that Holland collected data at overwintering sites of seven turtles (Holland 1994). The majority of these sites had 60 percent canopy closure, but one site was as low as 40 percent. If 60 percent was used for analysis instead of 50 percent, based on Reese's conclusions, then areas with possible groups of NWPT would not be included in analysis, potentially underestimating effects of the action to such NWPTs. BLM decided to analyze for maximum impact (LCFMP REA, p. 78).<br><br>The 30-year recovery timeline was included to show how long it would take for NWPT overwintering habitat to recover back to overwintering habitat (50% canopy) if it was removed through treatments (LCFMP REA, p. 80). Citations for these studies were included in the literature cited. |
| The BLM seemingly does not consider or analyze impacts of road construction on habitat fragmentation and connectivity, even though it proposes removing almost half of WPT | "Habitat loss from road construction was included within the NWPT analysis and there would be some loss of overwintering habitat from road construction (LCFMP REA, p. 78). Dispersal of NWPT between watersheds is not well understood—but it's not a requirement of the RMP or NEPA that BLM gain a complete understanding of |

KSW02020

| | |
|---|---|
| overwintering habitat in undisclosed areas. | NWPT dispersal before undertaking this timber sale implementing the RMP. BLM relied on the best available information: according to the Species Status Assessment Report produced by the U.S. Fish and Wildlife Service, genetic analyses suggest that the major of movements occur within drainages (LCFMP REA, p. 77) and that overland movements are uncommon. Based on this knowledge, it is unlikely that logging and road construction in overwintering habitat would cause fragmentation, isolate populations, limit dispersal, or reduce the capability of NWPT to respond to stochastic or catastrophic events.

The BLM is not proposing to remove half of NWPT overwintering habitat through LCFMP. Alternative 2 would have the greatest impact, which may result in a loss of 13 percent of overwintering habitat within the Analysis Area (LCFMP REA, p. 81). This would only be a loss of 0.13 percent of overwintering habitat available throughout OR on federal lands (LCFMP REA, p. 81), which is only a portion of the NWPT range (LCFMP REA, p. 77). LCFMP REA determined that treatments would not have a significant effect on the overall NWPT population (LCFMP REA, p. 80).

In response to public input, revisions have been made to Issue 7 of the REA. |
| How is removing almost half of WPT overwintering habitat a proactive measure that reduces the need for listing of the WPT? | The BLM is not proposing to remove half of NWPT overwintering habitat through LCFMP. Alternative 2 would have the greatest impact, which may result in a loss of 13 percent of overwintering habitat within the Analysis Area (LCFMP REA, p. 80). This would only be a loss of 0.13 percent of overwintering habitat available throughout OR on federal lands (LCFMP REA, p. 80), which is only a portion of the NWPT range (LCFMP REA, p. 80). LCFMP REA determined that treatments would not have a significant effect on the overall NWPT population (LCFMP REA, p. 80). |
| The BLM failed to mention the primary threat to WPT listed by the USFWS – anthropogenic impacts. | Under the no action alternative, BLM determined that there would not be an increase in anthropogenic impacts within LCFMP (LCFMP REA, p. B-49). The Federal Register for the NPWT |

| | |
|---|---|
| The BLM also removed the Grave Creek Fire from its original analysis of cumulative impacts on the NWPT. Why? | proposed listing references the Species Status Assessment report for additional information on anthropogenic impacts (USDI FWS 2023, p. 68377). The alternatives 2, 2a, and 3 analyzed for anthropogenic impacts—such as logging—which would occur under these alternatives, but not under the no action alternative, and concluded that there would not be a significant effect (including anthropogenic effects) to NWPT (LCFMP REA, pp. 80-82). |
| | BLM did not remove the Grave Creek Fire from the cumulative impacts for NWPT. Grave Creek fire was included in analysis for NWPT. It is mentioned under the Cumulative Effects section of the NWPT issue analyzed in detail (LCFMP REA, p. 82). Additionally, it is discussed in an overview of projects included for cumulative effects analyses under the revision (LCFMP REA, p. 23), eliminating the need for each issue to repeatedly mention individual projects and occurrences. |
| Please note that no actual quantitative and qualitative information is provided in the REA about the baseline Pacific fisher population dynamics or habitat in the planning area in the context of the No Action Alternative. | LCFMP is outside of the known fisher distribution regionally and there are no credible detections in the project units or planning area (LCFMP REA, p. B-79 to B-80). Commenter offers no reason why the REA was required under NEPA to provide "quantitative" or "qualitative" information on pacific fisher that do not exist within the LCFMP area. |
| Where the BLM can quantify cumulative impacts to fisher habitat on federal lands, it fails to do so. The BLM fails to even disclose the location of NRF habitat it intends to downgrade and remove, let alone the impacts of that removal. There is no analysis or data to support the cursory conclusions reached in the REA. | LCFMP is outside of the known fisher distribution regionally and there are no credible detections in the project units or planning area (LCFMP REA, pp. B-79 to B-80). The effects to spotted owl habitat are discussed in the Revised EA issue NAID B.30, including the amount of spotted owl habitat found across the project area and the effects to spotted owl habitat from the proposed action by alternative. Table B-30.2 includes a summary of the acres of treatment by spotted owl habitat type by alternative, and what the effects to each habitat type are expected to be by alternative (REA p. B-46). Table B-30.3 on page B-47 of the REA provides the reader with the total amount of spotted owl habitat types pre- and post-treatment by alternative across the analysis area. In addition, a more complete and |

| | |
|---|---|
| | comprehensive review of effects to NSOs, including habitat levels and maps of where treatments would remove or modify spotted owl habitat are in the Biological Assessment for the LCFMP (USDI BLM 2023, maps 18a and 18b). |
| The BLM is unwilling to gather, provide, or analyze actual population or reproductive data about BSS species. | While BLM policy provides that BLM actions must "preclude the need to list" BSS, BLM accomplishes this in western Oregon by implementing the RMP. The FEIS, to which the REA tiers, evaluates the effects of RMP implementation to Special Status Species (USDI/BLM 2016, pp. 830-851). The RMP concluded that implementation of the RMP "would lead to an increase in habitat for a majority of Bureau Sensitive, Bureau Strategic, Survey and Manage wildlife species, and landbird focal species in 50 years." The REA evaluated the effects of the proposed project on Bureau Special Status Wildlife species (REA, Issue NAID B.43). As explained in the REA for other wildlife species (e.g. Northern spotted owl), the FEIS effects to BSS are based upon presumed acreages and intensities of treatments in the FEIS vegetation modeling, and the acreage BLM has treated to date in the Medford District has been well below the FEIS projected level. It follows that impacts to BSS and their habitat are below the impacts projected in the FEIS. In short, BLM's implementation of the FEIS is on course to develop habitat for BSS consistent with the projection in the FEIS. Additionally, the REA's project design would minimize effects to those species that are known or suspected to be in the proposed project area and the BLM concludes that the effects to BSS species would be within those analyzed in the FEIS. |
| BLM alleges that surveys for narrow-leaf milkweed will be conducted during the inflorescence season; however, as noted above, it is unlikely these surveys will be realized, and BLM must analyze impacts of insufficiency of funding for such surveying and mitigation efforts. | The project biologist stated they would conduct milkweed surveys in T33S-R05W-S23 (LCFMP REA, p. B-64 and C26). These surveys are currently scheduled to be conducted in June when narrow-leaf milkweed is in bloom. PDFs are included in the Last Chance EA to prevent disturbance to milkweed (and in turn the monarch butterfly) within this section (LCFMP REA, p. C-26). |

| | |
|---|---|
| The REA contains no population or reproductive data about WPTs in the project area whatsoever. Quotations from the generalized 2016 SW Oregon RMP are not an adequate substitute for site-specific data and reasoned analysis that are required before the BLM implements a project designed to liquidate large swaths of BSS wildlife habitat. | It is unknown what KSW is referring to when stating "quotations from the generalized 2016 SW Oregon RMP…." The issue analyzed in detail for NWPT does not include quotations from the RMP. |
| The Last Chance REA fails to analyze the direct and cumulative impacts of this massive timber sale and road construction project on migratory birds and their habitat. The migratory bird analysis relies exclusively on the Resource Management Plan, Riparian Reserves, and LSRs to provide for species viability into the future despite the fact that it is the collective and cumulative impact of individual habitat removing actions that is pushing these species towards extinction. | The LCFMP REA does include an analysis of the effects of the proposed treatments by alternative on migratory birds (see LCFMP REA pp. B-77 to 79) and concluded that "The RMP would lead to an increase in habitat in 50 years for a majority (26) of the 34 landbird focal species for whom habitat was modeled, equal to the number of species in the No Action Alternative (USDI/BLM 2016a, p. 850), and twice as many as the No Timber Harvest Alternative. Of eight species with declining or slightly declining habitat, all areas are early successional habitat groups. The purple finch, also a USFWS Birds of Conservation Concern (BCC) species would have slightly declining habitat (young high-density, mature multilayered, structurally complex) at 97 percent (USDI/BLM 2016a, Appendix S Table S-33 p.1667 and S-37 p.1691)" (LCFMP EA p. B-78). |
| Simply concluding that the scale of the project is small, relative to the size of the nation, hence migratory bird populations will not be affected, will not suffice. | Migratory species of concern were discussed within LCFMP REA. USFWS BCC potentially breeding in the project area and effected by the Proposed Action include: Peregrine Falcon, Rufous Hummingbird, Allen's Hummingbird, Olive-sided Flycatcher, Willow Flycatcher (c), Horned Lark, Oregon Vesper Sparrow, and Purple Finch (LCFMP REA, p. B-79). None of these BCC species are closely associated with dense or closed canopy coniferous forests in the project area. One peregrine falcon site within the project area is managed with a seasonal disturbance restriction (LCFMP REA, C-25). Additionally, commenters are incorrect that the relevant "significance" threshold is individuals of a species and not species as a whole. *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. |

KSW02024

| | |
|---|---|
| | 2006)( NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species). |
| The BLM failed to evaluate the impacts of project activities on migratory bird nests, failed to disclose the breeding season for each migratory bird species found in the project area, and refused proposed measures, such as seasonal restrictions, to avoid destruction of nests. | The BLM would manage landbird species under the Migratory Bird Treaty Act and following guidance provided by WO IB 2010-110, the Memorandum of Understanding between the BLM and USFWS to promote the conservation of migratory birds (August 31, 2010). At the project level, the BLM would implement measures to lessen take of migratory birds under the Migratory Bird Treaty Act focusing on species of concern as identified by the BLM and USFWS (USDI BLM 2016a, p. 851). USFWS BCC potentially breeding in the project area and effected by the Proposed Action include: Peregrine Falcon, Rufous Hummingbird, Allen's Hummingbird, Olive-sided Flycatcher, Willow Flycatcher (c), Horned Lark, Oregon Vesper Sparrow, and Purple Finch (LCFMP REA, p. B-79). None of these BCC species are closely associated with dense or closed canopy coniferous forests proposed for treatment in the project area. There is no requirement under the RMP or NEPA that BLM conduct surveys for migratory birds or their nests (other than ESA-listed species such as NSO) prior to conducting timber harvest. One peregrine falcon site within the project area is managed with a seasonal disturbance restriction (LCFMP REA, C-25). Commercial harvest and hazardous fuels reduction treatments would be staggered over a period of several years in multiple projects, and seasonal restrictions that were developed to minimize effects to northern spotted owls and peregrine falcon would also benefit migratory birds and minimize the amount of disturbance during their nesting season (LCFMP REA p. B-79). |
| Due to the BLM's inability to survey for NSO in FY25 and due to the BLM's failure to implement a barred owl control program as required by the 2016 SW Oregon RMP, the BLM must reinitiate consultation with the U.S. Fish and Wildlife Service prior to | Surveys for NSO are ongoing in 2025 and will be completed per the 2012 protocol.  The BLM has begun implementation of barred owl control with an agreement with APHIS and has funded barred owl removal work. Since the barred owl nesting season began prior to on-the-ground work, the BLM is waiting to begin actual removal work until late summer or early fall.  While barred owl |

KSW02025

| | |
|---|---|
| removing yet more NSO habitat in the Last Chance timber sale project. | removal can occur year-round, the USFWS barred owl removal plan recommends initiating barred owl removal in the fall at a time when there are no dependent young (USDI-USFWS 2024e). |
| The BLM contends in the REA that the effects and consequences on baseline conditions for NSO and NRF habitat due to "stochastic disturbance events, including large scale high-severity wildfires and extensive conifer mortality from drought and insects has occurred across the planning area" are discussed in detail in Western Oregon's RMP 5-year Monitoring Report. However, that document analyzes only wildfire and fails to analyze loss of habitat or update baseline due to drought and insects, so BLM's contention is false and the impact of drought and insects on NRF habitat has not been adequately addressed or analyzed. The details of such cannot be "incorporated in full here by reference" as BLM alleges. | While Douglas-fir mortality has been increasing in areas of southwest Oregon in recent years, this trend has not manifested within the Last Chance planning area. Areas with less than 35 inches of average annual rainfall and under 3,500 feet in elevation are at highest risk of Douglas-fir mortality (Bennet and Adlam, 2023) and only 5 percent of the Last Chance planning area receives less than 35 inches of average annual rainfall, based on review of the Average Annual Precipitation (1971-2000) data developed and applied by Chris Daly of OSU PRISM Group. Additionally, based on BLM Continuous Vegetation Survey (CVS) plot data, mortality in three percent of trees represents typical background conditions, while mortality of trees greater than ten percent represents atypical conditions. Within the Last Chance planning area only 167 acres (0.3 percent) have accumulated greater than 10 percent mortality between 2018 and 2023. Commenters offer no data of their own to support their contention. Nor do they offer any reason why 0.3 percent mortality, well below background conditions, and outside the geographic scope of the conifer mortality area they reference, would alter BLM's description of baseline NSO habitat conditions relevant to the LCFMP.<br><br>In response to this comment and for additional clarify, BLM has incorporated this information into the REA. |