

August 8, 2024

Heidi Lowery
Field Manager
Grants Pass Field Office, Medford District
3040 Biddle Road
Medford, OR 97504

**In Reply to:** Last Chance Forest Management Project

Dear Ms. Lowery,

American Forest Resource Council (AFRC) is a regional trade association whose purpose is to advocate for sustained yield timber harvests on public timberlands throughout the West to enhance forest health and resistance to fire, insects, and disease. We do this by promoting active management to attain productive public forests, protect adjoining private forests, and assure community stability. We work to improve federal and state laws, regulations, policies and decisions regarding access to and management of public forest lands and protection of all forest lands. AFRC represents over 50 forest product businesses and forest landowners throughout the West. Many of our members have their operations in communities adjacent to the Grants Pass Field Office, and the management on these lands ultimately dictates not only the viability of their businesses, but also the economic health of the communities themselves. The state of Oregon's forest sector employs approximately 61,000 Oregonians, with AFRC's membership directly and indirectly constituting a large percentage of those jobs. Rural communities, such as the ones affected by this project, are particularly sensitive to the forest product sector in that more than 50% of all manufacturing jobs are in wood manufacturing.

**PURPOSE AND NEED**

AFRC is pleased to see the Grants Pass Field Office list "produce timber to contribute to the attainment of the declared ASQ for the Medford Annual Sustained Yield Unit" as a purpose and need of the Last Chance FMP EA. Our members depend on a predictable and economical supply of timber products off BLM land to run their businesses and to provide useful wood products to the American public, and we thank the Medford BLM for continuing to provide this supply year after year. Effective management of lands designated as Harvest Land Base (HLB) in the 2016 SWO RMP are critical to AFRC's membership. Achieving that plan's direction of sustainable

timber production consistent with the O&C Act is paramount to the BLM meeting its statutory obligations.

**SUSTAINABLE FOREST MANAGEMENT**

In our scoping comments, we asked the GPFO to consider the distinction between "contributing to the ASQ" and "managing forest stands to achieve continual timber production that can be sustained through a balance of growth and harvest," which is a clear objective in your RMP for the HLB and also the essence of the O&C Act. We urged the BLM to include this distinction in the Purpose and Need statement of the Last Chance FMP EA. Unfortunately, such a distinction is not included in the analysis.

The difference between these two statements is not trivial. Simply "contributing to the ASQ" is a short-term goal with little indication for long-term planning. The SYU's ASQ of 53 MMBF wasn't pulled out of thin air; it was carefully calculated through an assumed mix of regeneration harvest and thinning. The only way the BLM can produce this ASQ annually without compromising its ability to produce it in the future is to follow the vegetation models that were used to calculate it.

Alternative 2a provides a good example of why this distinction is so important. Alternative 2, as it's described in your draft EA, proposes management in the HLB that, more or less, follows the aforementioned vegetation models and proposes harvest intensity based on stand conditions. Alternative 2a, on the other hand, ignores the vegetation models and proposes only commercial thinning regardless of stand age or land use allocation.

Alternative 3 is also wholly inadequate to meeting the stated purpose of the Last Chance FMP EA. Like Alternative 2a, Alternative 3 checks the box for "contributing to ASQ" but does so by flouting growth models and ignoring clear direction from the RMP. The goal of any BLM vegetation management project should be to meet the stated project objectives to the maximum extent across as many acres of the project area as possible. The scope, measured in acres treated and ASQ attained for this project, should be the metric that indicates how well the BLM is meeting its stated objectives on any given project. In other words, meeting the stated Purpose & Need on 1,000 acres and producing 5 MMbf of ASQ is inferior to meeting the stated Purpose & Need on 8,000 acres and producing 40 MMbf of ASQ.

Furthermore, Alternative 3's strict diameter limit of 20 inches comes from the failed notion that every tree has the potential to become old growth; therefore, "more is more." It should be readily apparent to anyone tracking the spread of Douglas-fir mortality impacting the Medford District that such thinking is antiquated and scientifically flawed. Stocking beyond this region's historical norm is among the many causes for declining forest health across the federal forested landscape. Much of the region's overstocking is comprised of trees larger than 20 inches. There is no scientific basis to justify imposing diameter limits and doing so would only intensify this region's inexorable decline.

The failure of Alternatives 2a and 3 to follow the growth models would cut local purchasers twice. In the short term, less volume would be offered from the HLB for any sale resulting from this analysis. In the long term, the absence of regeneration harvest ensures that a younger, faster-growing, cohort will not replace the older trees whose growth will continue to slow into maturity. By flattening the distinction between land use allocations, Alternatives 2a and 3 buck the growth models that were the basis for determining the ASQ, ignores the intentions in the 2016 RMP for HLB, and sets a troubling precedent in which land managers are encouraged to propose treatments as though each acre across the Medford District were in a reserved LUA. **We urge the GPFO to recognize the distinct nature of HLB LUA and include language which identifies the need to achieve continual timber production now, and into the future for every stand in HLB.**

PREFERRED ALTERNATIVE

In our scoping comments, we urged the GPFO to develop an alternative which treats stands to the lowest relative density allowed by the RMP, creates the minimum amount of "skips", and the maximum amount of group selections in those HLB units proposed for treatment in the Last Chance FMP. We are pleased to see that Alternatives 2 proposes treatments in the HLB which reflect this management intensity. Considering that 77% of the westside lands of the Southwestern Oregon RMP have been placed in some type of reserve land allocation, where sustainable timber production is not permitted, the management on the remaining 23% is the Agency's only opportunity to employ the widest range of treatment intensities to achieve the District's ASQ requirement. The proposed treatments in HLB in Alternative 2 adequately consider the entire BLM land base in proper proportion, and treats the LUA in accordance with the SWO RMP.

Furthermore, we believe that Alternative 2 will give the GPFO the greatest flexibility in treating the remaining LUAs in accordance with the SWO RMP. Specifically, we believe that the objective described in the SWO RMP for Dry LSR to "enable forests to… respond positively to climate-driven stresses, wildfire, and other disturbances with resilience" and to "ensure positive or neutral ecological impacts from wildfire" can only be achieved by an alternative that allows the widest range of possible management intensities. Forest restoration projects with the intent of improving "resilience" should consider the stand condition from a period when the forest was naturally resilient, prior to the age of fire exclusion. With this in mind, we would like the Medford BLM to review the literature cited below and incorporate its findings into your analysis that will shape the level of management proposed in the project:

> North, Malcolm P.; Tompkins, Ryan E.; Bernal, Alexis A.; Collins, Brandon M.; Stephens, Scott L.; York, Robert A. 2022. Operational resilience in western US frequent-fire forests. Forest Ecology and Management. 507: 120004. https://doi.org/10.1016/j.foreco.2021.120004.

Key points of the North paper include:

- Historical relative SDI values suggest that treatments for restoring forest resilience may need to be much more intensive than the current focus on fuels reduction.

- In the past, frequent-fire forests had mean relative SDIs that were much lower than the threshold associated with the onset of competition and the vast majority of stands had densities below the level of full site occupancy.
- Historic forest conditions, produced by an active fire regime suggest historic stand densities were so low that vigorous tree growth from lack of competition may have been the essential characteristic of their ecological resilience.
- Treatments for restoring forest resilience may need to be much more intensive than current forest management practices.

The underlying finding of the paper shows that, prior to the age of fire exclusion, the natural resilience of stands depended on stocking that was well-below the BLM's typical target for restoration and resilience projects. Although the study area for this paper is the Central/Southern Sierra Nevada Mountain range, the findings are generally focused on frequent-fire landscapes, which describes the Last Chance FMP project area well. Alternative 2 is the only action alternative which gives the BLM the ability to fully implement the SWO RMP to achieve the need for improved stand-level resilience across the greatest number of acres. **We urge the BLM to choose Alternative 2 as the preferred alternative**, as it will give the GPFO the ability to manage each stand according to the level of management needed, rather than impose limits in stands where more intensive management may be required to meet the purpose and need of the EA.

**UNIT SELECTION**

We are extremely disappointed at the amount of commercial harvest units proposed for treatment in the scoping letter for the Last Chance FMP that were ultimately deferred from treatment in this Draft EA. Not only do many of these deferred units exhibit the same stand conditions as those proposed for treatment, but several also coexist along roadways where maintenance is proposed; meaning, the cost of road renovation and repair cannot be spread across more acres and make sales resulting from this analysis more appealing to purchasers.

The timber industry is in the midst of an unprecedented market condition where historically low lumber prices are coinciding with historically high operating costs. These two factors combine to make the already marginal business of timber harvest uneconomical for many purchasers. Every effort should be taken to make federal timber sales (which remain some of the most expensive logs on the market) more affordable to purchasers. Road building is among the most expensive costs associated with timber harvest. It should be in the BLM's best interest to maximize the investment made by the purchaser during road building and include any stand along those proposed roadways where commercial harvest can or should take place.

The included photos provide examples of units which were proposed for treatment during scoping, but which have been excluded in this EA. Photos 1 and 2 provide examples of deferred treatment along a renovated roadway, while Photos 3 and 4 show stands along spurs which are currently drivable and within close proximity to a road proposed for renovation. **We would like the BLM**

**to explain the rationale for the deferral of each stand identified in the scoping notice that was removed in the Draft EA.**

**DRY-LSR**

We are pleased to see the GPFO propose commercial treatments on lands designated as Dry LSR. The 2016 RMP advises active management on Dry LSRs, and specifically directs the BLM to "apply selection harvest or commercial thinning treatments to at least 17,000 acres per decade in the Medford District." As of our latest accounting, the Medford District has treated 3,000 acres of these 17,000 acres and will be compelled to treat the remainder of this requirement by FY 2026. It goes without saying that the District is woefully behind this requirement and should look for every opportunity to "catch up" through increased efforts at treating Dry-LSR through commercial harvest.

**RIPARIAN RESERVES**

We are pleased to see the BLM incorporate commercial thinning in the Riparian Reserve LUA for the Last Chance FMP. Often, stands proposed for thinning treatment in the uplands have the same undesired forest conditions (overly dense and uniform stands) in riparian areas. The forest health benefits that you expect to attain through upland thinning treatments can also be achieved in riparian areas with similar active management prescriptions. Allowing some commercial harvest will not only produce usable forest products, but it will also promote greater resiliency in the RR LUA.

**NSO MANAGEMENT**

We are pleased to read in the Last Chance EA the GPFO's recognition of the scientific consensus that active management is needed in reserved lands to speed the development of high-quality NSO habitat. As your EA points out, this need is most apparent in dense even-aged and single-layer canopies which lack the structural complexity necessary to support NSO survival. Apart from aiding in the development of nesting habitat for the NSO, active management in these stands will reduce the likelihood of high-intensity stand-replacing wildfires from destroying current or future nesting habitat.

**ROAD DECOMMISSIONING**

The land base covered in the project area is to be managed for a variety of forest management objectives. Removal of adequate access to these lands would compromise the agency's ability to achieve these objectives. With this in mind, we are concerned with those road segments in the project area which currently function as open public roads but will be decommissioned upon completion of operations. When determining which roads to remove from the District's open road network, the SWO RMP advises BLM staff to "**Decommission roads that are no longer needed for resource management and are at risk of failure or are contributing sediment to streams**" (page 93).

The Federal road system functions not only to grant the visiting public access to their national forestlands, but they are critical for fire suppression and, by extension, public safety and resource protection. We have travelled along several of the roads proposed for decommissioning in the Last Chance FMP project area. From our experience, they each exhibit varying levels of drivability from unpassable with a vehicle to perfectly drivable in their present condition. Following renovation, each should be perfectly suited to retaining their "open" status. We urge the GPFO to reevaluate those roads which are currently open, but are proposed for decommissioning. Please ensure that these roads are, in fact, no longer suited for resource management or that they are at risk of failure or sedimentation.

**ROCK SOURCE DEVELOPMENT**

We are pleased to see the BLM incorporate rock source development under Transportation Management Activities in the Last Chance FMP EA. Maintaining a nearby rock source will help the economic viability of future timber sales resulting from the project.

AFRC is happy to be involved in the planning, environmental assessment (EA), and decision-making process for the Last Chance Forest Management Project EA. Should you have any questions regarding the above comments, please contact me at 541-521-9143 or cbingaman@amforest.org.


Sincerely,

Corey Bingaman
Western Oregon Field Coordinator
American Forest Resource Council



*Photo 1: BLM Rd. 33-5-10.0 looking east from Unit 13-07*



*Photo 2: Looking uphill from Photo Point 1. HLB unit deferred from treatment, despite proposal to renovate road and stand conditions which warrant regeneration harvest*



*Photo 3: Looking north into HLB stand from BLM Rd. 33-5-13.4*



*Photo 4: HLB stand north of BLM Rd. 34-5-2.1*