

March 28, 2025

Justin Kelly, Field Manager
Grants Pass Field Office, Medford District
3040 Biddle Road
Medford, OR 97504

**In Reply to:** Last Chance Forest Management Project Revised EA

Dear Mr. Kelly:

The American Forest Resource Council (AFRC) is a regional trade association whose purpose is to advocate for sustained yield timber harvests on public timberlands throughout the West to enhance forest health and resistance to fire, insects, and disease. We do this by promoting active management to attain productive public forests, protect adjoining private forests, and assure community stability. We work to improve federal and state laws, regulations, policies and decisions regarding access to and management of public forest lands and protection of all forest lands. AFRC represents over 50 forest product businesses and forest landowners throughout the West. Many of our members have their operations in communities adjacent to the Grants Pass Field Office, and the management on these lands ultimately dictates not only the viability of their businesses, but also the economic health of the communities themselves. The state of Oregon's forest sector employs approximately 61,000 Oregonians, with AFRC's membership directly and indirectly constituting a large percentage of those jobs. Rural communities, such as the ones affected by this Project, are particularly sensitive to the forest product sector in that more than 50% of all manufacturing jobs are in wood manufacturing.

We appreciate the Medford BLM for revising and publishing this EA in a timely manner. Considering the substantial additional substance added since the original draft EA was published, this effort is worth commending. As a result, sales which have been advertised, or were planned for advertisement in FY 2025, will be able to proceed with limited delay.

**SUSTAINABLE FOREST MANAGEMENT**

In our comments on the Draft EA, we asked the GPFO to consider the distinction between "contributing to the ASQ" and "managing forest stands to achieve continual timber production that can be sustained through a balance of growth and harvest," which is a clear objective in your

**Geissler Decl.
Exhibit C - Pg. 1**

RMP for the HLB and also the essence of the O&C Act. We urged the BLM to include this distinction in the Purpose and Need statement of the Last Chance FMP EA. Unfortunately, such a distinction is not included in the analysis.

The difference between these two statements is not trivial. Simply "contributing to the ASQ" is a short-term goal with little indication for long-term planning. The SYU's ASQ of 53 MMBF wasn't pulled out of thin air; it was carefully calculated through an assumed mix of regeneration harvest and thinning. The only way the BLM can produce this ASQ annually without compromising its ability to produce it in the future is to follow the vegetation models that were used to calculate it.

Alternative 2a provides a good example of why this distinction is so important. Alternative 2, as it's described in your Draft EA, proposes management in the HLB that, more or less, follows the aforementioned vegetation models and proposes harvest intensity based on stand conditions. Alternative 2a, on the other hand, ignores the vegetation models and proposes only commercial thinning regardless of stand age or land use allocation.

Alternative 3 is also wholly inadequate to meeting the stated purpose of the Last Chance FMP EA. Like Alternative 2a, Alternative 3 checks the box for "contributing to ASQ" but does so by flouting growth models and ignoring clear direction from the RMP. The goal of any BLM vegetation management project should be to meet the stated project objectives to the maximum extent across as many acres of the project area as possible. The scope, measured in acres treated, and ASQ attained for this Project, should be the metric that indicates how well the BLM is meeting its stated objectives on any given project. In other words, meeting the stated Purpose & Need on 1,000 acres and producing 5 MMbf of ASQ is inferior to meeting the stated Purpose & Need on 8,000 acres and producing 40 MMbf of ASQ.

Furthermore, Alternative 3's strict diameter limit of 20 inches comes from the failed notion that every tree has the potential to become old growth; therefore, "more is more." It should be readily apparent to anyone tracking the spread of Douglas-fir mortality impacting the Medford District that such thinking is antiquated and scientifically flawed. Stocking beyond this region's historical norm is among the many causes for declining forest health across the federal forested landscape. Much of the region's overstocking is comprised of trees larger than 20 inches. There is no scientific basis to justify imposing diameter limits and doing so would only intensify this region's inexorable decline.

The failure of Alternatives 2a and 3 to follow the growth models would cut local purchasers twice. In the short term, less volume would be offered from the HLB for any sale resulting from this analysis. In the long term, the absence of regeneration harvest ensures that a younger, faster-growing, cohort will not replace the older trees whose growth will continue to slow into maturity. By flattening the distinction between land use allocations, Alternatives 2a and 3 buck the growth models that were the basis for determining the ASQ, ignores the intentions in the 2016 RMP for HLB, and sets a troubling precedent in which land managers are encouraged to propose treatments as though each acre across the Medford District were in a reserved LUA. **We urge the GPFO to**

**recognize the distinct nature of HLB LUA and include language which identifies the need to achieve continual timber production now, and into the future for every stand in HLB.**

PREFERRED ALTERNATIVE

We are pleased to see that Alternatives 2 proposes treatments in the HLB which reflect the highest intensity of management described in your SWO RMP for that LUA. Considering that 77% of the westside lands of the SWO RMP have been placed in some type of reserve land allocation, where sustainable timber production is not permitted, the management on the remaining 23% is the Agency's only opportunity to employ the widest range of treatment intensities to achieve the District's ASQ requirement. The proposed treatments in HLB in Alternative 2 adequately consider the entire BLM land base in proper proportion, and treats the LUA in accordance with the SWO RMP.

Furthermore, we believe that Alternative 2 will give the GPFO the greatest flexibility in treating the remaining LUAs in accordance with the SWO RMP. Specifically, we believe that the objective described in the SWO RMP for Dry LSR to "enable forests to… respond positively to climate-driven stresses, wildfire, and other disturbances with resilience" and to "ensure positive or neutral ecological impacts from wildfire" can only be achieved by an alternative that allows the widest range of possible management intensities.

Alternative 2 is the only action alternative which gives the BLM the ability to fully implement the SWO RMP to achieve the need for improved stand-level resilience across the greatest number of acres. **We urge the BLM to choose Alternative 2 as the preferred alternative for projects resulting from this analysis**, as it will give the GPFO the ability to manage each stand according to the level of management needed, rather than impose limits in stands where more intensive management may be required to meet the purpose and need of the EA.

Similarly, for the reasons outlined above, **we urge the BLM not to select Alternatives 2a or 3 for projects resulting from this analysis** as they fail to adequately meet the stated purpose and needs of this Project.

**WET SEASON OPERATIONS**

We appreciate the GPFO including allowance for haul, road maintenance, and ground-based logging operations during the wet season (Oct. 15 – May 15) in situations where soil moisture is low. Proper road design and layout should pose little to no negative impacts on water quality or slope stability. Meanwhile, consistent and steady operation time throughout the year is important for our members not only to supply a steady source of timber for their mills, but also to keep their employees working. These two values are intangible and hard to quantify as dollar figures in a graph or table, but they are important factors to consider. The ability to operate in the winter months will often make the difference between a sale selling and not.

**Geissler Decl.
Exhibit C - Pg. 3**

**RIPARIAN RESERVES**

We are pleased to see the BLM incorporate commercial thinning in the Riparian Reserve LUA for the Last Chance FMP. Often, stands proposed for thinning treatment in the uplands have the same undesired forest conditions (overly dense and uniform stands) in riparian areas. The forest health benefits that you expect to attain through upland thinning treatments can also be achieved in riparian areas with similar active management prescriptions. Allowing some commercial harvest will not only produce usable forest products, but it will also promote greater resiliency in the RR LUA.

**DRY-LSR**

We are pleased to see the GPFO propose commercial treatments on lands designated as Dry LSR within the Last Chance FMP EA. The 2016 RMP advises active management on Dry LSRs and specifically directs the BLM to "apply selection harvest or commercial thinning treatments to at least 17,000 acres per decade in the Medford District." As of our latest accounting, the Medford District has treated 3,000 acres of these 17,000 acres and will be compelled to treat the remainder of this requirement by FY 2026. It goes without saying that the District is woefully behind this requirement and should look for every opportunity to "catch up" through increased efforts at treating Dry-LSR through commercial harvest.

**TETHERED ASSIST YARDING**

We are pleased that the GPFO has analyzed the use of tethered assist (TA) logging as an acceptable method of yarding in the Last Chance FMP EA for slopes up to 70% (EA Page D-1). TA is quickly becoming an industry-standard in Western Oregon. In the right circumstances, the practice is safer, more economical, and can even deliver greater resource protection than conventional logging operations.

**ROCK SOURCE DEVELOPMENT**

We are pleased to see the GPFO incorporate rock source development for existing quarries within the Last Chance FMP Planning Area. Maintaining a nearby rock source will help the economic viability of future timber sales resulting from the Project. Similarly, we are also pleased to see the GPFO list mitigations necessary to reduce or eliminate weed spread as a result of hauling and applying rock. AFRC's members are aligned with the BLM's goal of minimizing the spread of noxious weeds resulting from harvest activities on federal land. It is in the best interest of the Agency and contractors to make sure that forestry operations do not contribute to this growing issue on federal lands.

**ECONOMIC VIABILITY**

We appreciate the detailed discussion about feasibility and economics in Appendix F of the Last Chance FMP EA. In particular, we are pleased with the following statement from Appendix F: "BLM must necessarily minimize the use of helicopter yarding to ensure that resulting wood product sale contracts are economically viable." (Page F-6).

AFRC and our members have been critical, at times, with past Agency decisions which require helicopter logging for some projects where new road construction would be the most economically viable alternative. We agree that there are situations where economic or resource considerations may favor helicopter logging over roadbuilding. Oftentimes, our disagreement stems from a lack of transparency from the Agency during their planning process.

Appendix F provides the most detailed cost/benefit analysis that we have seen from a BLM analysis document to-date. This level of detail is extremely helpful in providing transparency for the Agency's decision-making process as it pertains to economic viability. We hope that future planning documents from the District will include this same level of detail.

AFRC is happy to be involved in the planning, environmental assessment (EA), and decision-making process for the Last Chance Forest Management Project EA. Should you have any questions regarding the above comments, please contact me at 541-521-9143 or cbingaman@amforest.org.

Sincerely,

Corey Bingaman
Western Oregon Field Coordinator
American Forest Resource Council