DOMINIC M. CAROLLO, OSB #093057
NOLAN G. SMITH, OSB #215034
AUDREY F. BOYER, OSB #106560
Carollo Law Group
Mail:   P.O. Box 2456
          Roseburg, OR 97470
Office: 2315 Old Highway 99 South
          Roseburg, OR 97471
Telephone: (541) 957-5900
Fax: (541) 957-5923
Email: dcarollo@carollolegal.com
Email: nsmith@carollolegal.com
Email: aboyer@carollolegal.com

SARA GHAFOURI, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
Email: sghafouri@amforest.org
*Attorneys for Proposed Defendant-Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and CASCADIA WILDLANDS,** | Civil Case No. 1:25-cv-02296-CL |
| Plaintiffs, | **[PROPOSED] DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM** |
| vs. | |
| **DOUGLAS JAMES BURGUM in his official capacity as Secretary of the Interior, U.S. FISH & WILDLIFE SERVICE, and U.S. BUREAU OF LAND MANAGEMENT,** | THE HONORABLE MARK D. CLARKE |
| Defendants, | |
| **MURPHY COMPANY**, | |
| Defendant-Intervenor, | |
| and | |

**AMERICAN FOREST RESOURCE COUNCIL,** an Oregon non-profit corporation, and **ASSOCIATION OF O&C COUNTIES,** an unincorporated Association,

       Proposed Defendant-Intervenors.

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................... 1

   A.    THE O&C ACT................................................................................................ 1

   B.    THE 2016 RMP. ............................................................................................. 3

   C.    THE LAST CHANCE FOREST MANAGEMENT PROJECT. ................................... 5

III.   LEGAL STANDARD .................................................................................... 6

IV.    ARGUMENT ................................................................................................. 7

   A.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........................... 7

     1.    Plaintiffs' Objection to the Biological Opinion's Analysis Does Not Demonstrate a Likelihood of Success. ..................................................................................... 7

     2.    The Fish and Wildlife Service Relied on the Best Available Science............................. 8

       i.    Review of the Fish and Wildlife Service's NSO Survey Protocol............................... 8

       ii.    Review of Appel et al. (2022). ..................................................................... 10

       iii.    The BiOp's Consideration of the Best Available Science........................................ 10

       iv.    The Last Chance Project EA's Consideration of the Best Available Science. .......... 12

       v.    The Last Chance Project's NSO Baseline Fully Complies with the "Best Available Science" Standard. ................................................................................... 12

     3.    The Last Chance Project Complies with the RMP's Bureau Sensitive Species Guidelines. .................................................................................................. 16

   B.    PLAINTIFFS WILL NOT BE IRREPARABLY HARMED. .................................... 18

     1.    The NSO and NWPT Will Not Suffer Likely Harms Absent an Injunction. ................ 18

     2.    Plaintiffs Will Not Suffer Irreparable Harms to Their Interests.................................... 19

   C.    THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES DO NOT SUPPORT AN INJUNCTION. ......................................................................................... 21

     1.    An Injunction Would Harm Northern Spotted Owls. ........................................... 22

     2.    An Injunction Would Cause Serious Harm to the Public........................................ 23

     3.    An Injunction Would Frustrate the Will of Congress. ......................................... 26

   D.    PLAINTIFFS ARE NOT EXEMPT FROM THE BOND REQUIREMENT. ................. 27

V.     CONCLUSION.............................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Adair v. England*,
　417 F. Supp. 2d 1 (D.D.C. 2006) ............................................................. 26

*All for The Wild Rockies v. Cottrell*,
　632 F.3d 1127 (9th Cir. 2011) ................................................. 6, 7, 18, 20

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
　38 F. Supp. 2d 114 (D.D.C. 1999) ......................................................... 27

*Bark v. Bureau of Land Mgmt.*,
　998 F. Supp. 2d 981 (D. Or. 2014) ......................................................... 17

*Cascadia Wildlands v. Scott Timber Co.*,
　715 F. App'x 621 (9th Cir. 2017) ........................................................... 19

*Cascadia Wildlands v. Thrailkill*,
　806 F.3d 1234 (9th Cir. 2015) ............................................................... 15

*Chang v. Cnty. of Siskiyou*,
　No. 2:22-CV-01378-KJMAC, 2024 WL 5159653 (E.D. Cal. Dec. 18, 2024) ......................... 28

*Conservation Cong. v. United States Forest Serv.*,
　No. 2:15-00249 WBS AC, 2016 WL 727272 (E.D. Cal. Feb. 24, 2016) ................................ 15

*Ctr. for Food Safety v. Vilsack*,
　636 F.3d 1166 (9th Cir. 2011) ................................................................. 7

*Delux Pub. Charter, LLC v. Cnty. of Westchester*,
　No. 22-CV-01930 (PMH), 2024 WL 3744167 (S.D.N.Y. July 25, 2024) ............................... 20

*Flavorland Foods v. Washington Cnty. Assessor*,
　334 Or. 562, 54 P.3d 582 (2002) ........................................................... 24

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
　607 F.3d 453 (7th Cir. 2010) ................................................................. 27

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
　914 F.2d 1174 (9th Cir. 1990) ......................................................... 2, 26

*Kern Cnty. Farm Bureau v. Allen*,
　450 F.3d 1072 (9th Cir.2006) ............................................................... 13

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
　No. 22-35035, 2022 WL 17222416 (9th Cir. Nov. 25, 2022) ..................................... 15

*Klein v. City of San Clemente*,
　584 F.3d 1196 (9th Cir. 2009) ................................................................. 6

*Molloy v. Metro Transp. Auth.*,
　94 F.3d 808 (2d Cir. 1996) ................................................................. 20

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
  23 F.3d 1508 (9th Cir. 1994) ................................................................................. 18

*Native Ecosystems Council v. Mehlhoff*,
  No. 20-CV-19-BLG-SPW-TJC, 2020 WL 3969343 (D. Mont. July 6, 2020) ...................... 27

*Oregon Nat. Desert Ass'n v. Bushue*,
  594 F. Supp. 3d 1259 (D. Or. 2022) ......................................................................... 21

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ..................................................................... 12, 13, 15

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
  161 F.4th 590 (9th Cir. 2025) .................................................................................. 21

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ........................................................................... 27, 28

*Save the Park & Build the Sch. v. Nat'l Park Serv.*,
  No. 3:20-CV-1080-LAB-AHG, 2020 WL 4260801 (S.D. Cal. July 24, 2020) .................... 28

*Skagit Cnty. Dike, Drainage & Irrigation Improvement Dist. No 12 v. Nat'l Marine Fisheries
  Serv.*, No. 2:23-CV-01954-BAT, 2025 WL 1222238 (W.D. Wash. Apr. 28, 2025).................. 13

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) .................................................................................... 6

*Van Raden v. City of Portland*,
  No. CV 01-233-BR, 2001 WL 34047031 (D. Or. May 31, 2001) ................................... 27

*Walters v. Nat'l Ass'n of Radiation Survivors*,
  473 U.S. 305 (1985) ................................................................................................ 26

*Winter v. Nat. Res. Defense Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................. 6, 7

**Statutes**

16 U.S.C. § 1536 ......................................................................................................... 12

16 U.S.C. § 7111 ........................................................................................................... 3

43 U.S.C. § 2601 ................................................................................................. 1, 2, 26

43 U.S.C. §1181a ........................................................................................................... 2

**Rules**

Federal Rule of Civil Procedure 65(c) ......................................................................... 27

**Regulations**

50 CFR § 402.14 ........................................................................................................... 12

## TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|---|---|
| ASQ | Allowable Sale Quantity |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BLM | U.S. Bureau of Land Management |
| BMP | Best Management Practices |
| dbh | Diameter at Breast Height |
| DDR | District Designated Reserve |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FOI | Forest Operations Inventory |
| FOIA | Freedom of Information Act |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish & Wildlife Service |
| HLB | Harvest Land Base |
| ITS | Incidental Take Statement |
| LITA | Low Intensity Timber Areas |
| LSR | Late-Successional Reserve |
| LUA | Land Use Allocation |
| MAMU | Marbled Murrelet |
| MITA | Moderate Intensity Timber Areas |
| MBF | Thousand Board Feet     (1 MBF = 1,000 board feet) |
| MMbf | Million Board Feet     (1 MMbf = 1,000 MBF = 1,000,000 board feet) |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NRF | Nesting, Roosting, and Foraging |
| NSO | Northern Spotted Owl |
| NWFP | Northwest Forest Plan |
| PDF | Project Design Features |
| RA32 | Recovery Action 32 |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| RR | Riparian Reserve |
| SCC | Social Cost of Carbon |
| SYU | Sustained Yield Unit |
| VRH | Variable Retention-Regeneration Harvest |
| WDA | Wildland Developed Areas |

## MEMORANDUM

### I.    INTRODUCTION

Plaintiffs' motion to enjoin parts of the Last Chance Forest Management Project (Last Chance Project) should be denied because their attempt to poke holes in the Bureau of Land Management's (BLM) decision-making process and analyses lacks merit. Moreover, the equities do not support an injunction because prohibiting the sustainable and responsible harvest of the timberlands managed pursuant to the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 (O&C Act, 43 U.S.C. § 2601) would needlessly threaten to cause reduced economic and employment opportunities in the forest products industry and local communities, as well as the loss of essential services in the counties which host those O&C Act timberlands (O&C timberlands). In short, each preliminary injunction factor weighs sharply against Plaintiffs' requested relief and, therefore, Defendant-Intervenors urge the Court to deny Plaintiffs' Motion for Preliminary Injunction, ECF 16.

### II.    FACTUAL BACKGROUND

#### A.  The O&C Act.

The O&C Act is the governing land management act for nearly all of the Bureau of Land Management's western Oregon timberlands. Declaration of Tim Freeman (Freeman Decl.) at ¶ 2. The O&C Act draws its history from the United States' land grant to the Oregon and California Railroad Company to subsidize the development of a railroad through Oregon. *Id*. at ¶ 3. The lands conveyed were eventually to be sold by the Railroad Company but were subject to the conditions that they be resold only in 160-acre parcels to "actual settlers" for no more than $2.50 per acre. *Id*. The railroad was built, but the lands were never resold to settlers. *Id*. Congress responded with the Chamberlain-Ferris Act of June 9, 1916, which declared that all grant lands

still held by the Railroad Company—over two million acres—were "revested" to ownership by the United States, removing the lands from local tax rolls. *Id*.

The impact of revesting ownership of the O&C timberlands in the federal government, removing these lands from local taxation, is still felt today. In 1937, in response to advocacy from the counties with O&C timberlands (the O&C counties), Congress designated the O&C timberlands for sustained-yield timber production. 43 U.S.C. § 1181a; 43 U.S.C. § 2601. The "sustained yield" mandate of the O&C Act represents the dominant use of these lands. The Ninth Circuit's binding precedent in *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1184 (9th Cir. 1990), declared that "the O&C Act envisions timber production as a dominant use" and "[n]owhere does the legislative history suggest that wildlife habitat conservation or conservation of old growth forest is a goal on a par with timber production, or indeed that it is a goal of the O&C Act at all."

The "dominant use" of timber production was intended to make up for counties' lost tax revenue caused by the revestment. When the O&C Act was passed in 1937, it declared that 50 percent of the revenue generated from timber receipts would be earmarked for the O&C counties, with an additional 25 percent owed to the counties once the U.S. Department of Treasury was reimbursed for the cost paid to the railroad when the lands were revested. Freeman Decl. at ¶ 5. Unfortunately, Congress prohibited counties from receiving the full 75 percent by making the 25 percent allocation a recurring charge against the O&C fund. *Id*. Regardless, for decades the O&C timberlands generated significant timber volume and the O&C counties benefited from their receipt of timber dollars. Everything changed in the 1990s, when the Northern Spotted Owl (NSO) was listed as a threatened species, and federal timber harvest came to a screeching halt under the Northwest Forest Plan. *Id*. at ¶ 7. Suddenly, reduced timber

receipts resulted in immense budget shortfalls for the O&C counties and mass-layoffs shrank western Oregon's forest products industry. *Id*.

A myriad of cascading effects resulted from the discontinuation of sustained yield management of the O&C timberlands. Forests became overstocked and a subject of catastrophic wildfire, counties lacked the authority to make up for reduced revenue due to Oregon's constitutional limits on property taxes, drought and forest conditions caused landscape-scale tree mortality on the O&C timberlands, the forest products industry experienced continued layoffs and mill closures due to shrinking timber availability, and the NSO continued its slow decline due to invasive species and increasing wildfire. *Id*. at ¶¶ 7-15.

The Secure Rural Schools Act (SRS) (16 U.S.C. § 7111) was intended to provide a lifeline to the counties once dependent on timber receipts, but the SRS payments have declined over time, and reauthorizations have become less reliable. *Id*. at ¶¶ 8-9. In 2026, AOCC successfully lobbied Congress to provide the O&C counties with the full 75 percent share of timber receipts envisioned when the O&C Act was first passed. *Id*. at ¶ 5. Now, counties are likely to elect to receive the O&C Act share rather than the SRS lifeline, making every project on O&C timberlands a source of funds for the O&C counties. *Id*. at ¶ 9.

### B. The 2016 RMP.

In 2016 the BLM developed two resource management plans (RMPs) for the agency's western Oregon lands: the Northwestern and Coastal Oregon RMP which "provides direction for management of resources on BLM-administered lands in the Coos Bay District, Eugene District, Salem District, and the Swiftwater Field Office of the Roseburg District," and the Southwestern Oregon RMP (2016 SWO RMP) which "provides direction for management of resources on approximately 1.2 million acres of BLM administered lands in the Klamath Falls Field Office of

the Lakeview District, the Medford District, and the South River Field Office of the Roseburg District." KSW02030 (ECF 17-12 at 4).

In combination, the 2016 RMPs provided direction for the management of approximately 2.5 million acres of BLM-administered lands—the vast majority of those are the O&C timberlands revested to the government and managed pursuant to the dominant uses envisioned by Congress.

The 2016 RMPs made various land use allocations. For example, the "late successional reserve" (LSR) lands were allocated for the purpose of supporting habitat for NSO and marbled murrelets. KSW02107 (ECF 17-12 at 81). The riparian reserve (RR) lands were allocated for the purpose of promoting fish and fish habitat, water quality, and streamflows. KSW02112 (ECF 17-12 at 86). The harvest land base (HLB) was the *only* land use allocated for the purpose of managing lands for continual timber production. KSW02103 (ECF 17-12 at 77). The BLM is directed to offer for sale the declared Allowable Sale Quantity (ASQ) of timber each year from the HLB. *Id*.; KSW02042 (ECF 17-12 at 16). The HLB represents only 20 percent of the lands in the 2016 SWO RMP. KSW02080 (ECF 17-12 at 54).

The 2016 SWO RMP also recognized that commercial timber harvest is a tool that can be used to improve the health, vigor, and quality of lands allocated to the LSR. It provided instruction to the BLM to apply selection harvest or commercial thinning treatments to at least 17,000 acres in the LSR-Dry[1] allocation per decade in the Medford District. KSW02111 (ECF 17-12 at 85). In the decade since the 2016 SWO RMP was authorized, the BLM has only

---

[1] The LSR-Dry is a subset of the LSR land use allocation in the 2016 SWO RMP. KSW02111 (ECF 17-12 at 85). Due to the forest, climate, and tree species present in the LSR-Dry, it is given unique management direction in the 2016 SWO RMP.

[PROPOSED] DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM - 4

implemented 3,063 acres of selection harvest or commercial thinning treatments to the LSR-Dry. KSW00584 (ECF 17-3 at 8).

### C.  The Last Chance Forest Management Project.

The Last Chance Project was developed in the BLM's Medford District with numerous goals in mind. The Last Chance Project proposed commercial treatments in the HLB, LSR-Dry, and RR. KSW00586 (17-3 at 10). On the HLB, the Last Chance Project was developed to contribute timber to the Medford District's ASQ. *Id*. Within the LSR-Dry, the Last Chance Project was developed to improve NSO habitat, which included the implementation of commercial treatments in the manner mandated by the 2016 SWO RMP. *Id*. Within the RR, commercial treatments were developed to create structurally complex stands, contribute stable wood to streams, and reduce the risk of stand replacing crown fires. *Id*. The Last Chance Project also proposed non-commercial fuels reduction treatments in all land use allocations as a strategy intended to reduce fuel loads and the risk of catastrophic wildfire. *Id*.

The Last Chance Project area contains 32,272 acres of BLM-administered lands[2], of which 30,573 acres (94 percent) are O&C timberlands. KSW00582 (ECF 17-3 at 6). A revised environmental assessment (EA) was prepared for the Last Chance Project and published in May of 2025. KSW00578 (ECF 17-3 at 2).

Timber sales have been auctioned as part of the Last Chance Project. AFRC's member Murphy Company purchased the "Paul's Payoff" timber sale, and AFRC's member Boise Cascade purchased the "Take a Chance" timber sale. Declaration of Andy Geissler (Geissler Decl.) at ¶ 15. As part of the Take a Chance timber sale, Boise Cascade has been engaged in

---

[2] The project area *is not the same* as the area where treatments are proposed, nor the same as the analysis acres evaluated in the Last Chance Project Environmental Assessment. Both treatment acres and the analysis acres fall within the broader project area.

[PROPOSED] DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM - 5

roadside vegetation management work, which involves removing trees and vegetation which have encroached within road prisms, reducing visibility and causing poor drainage along roads. Declaration of Ryan Hite (Hite Decl.) at ¶¶ 3-4. Boise Cascade's intention after completion of the roadside vegetation management work is to start with the road construction/maintenance that is required as part of the Take a Chance sale, with the hopes that it may be prepared for timber harvest in the fall of 2026. *Id.* at ¶¶ 5-8.

## III.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). The party seeking the injunction bears the burden of proof as to each of these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All for The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Id.* at 1131–32 (internal quotation omitted). Put differently, "'serious questions going to the merits' and a hardship balance that tips sharply

toward the plaintiff can support issuance of an injunction, assuming the other two elements

[likelihood of irreparable injury and public interest] of the *Winter* test are also met." *Id*. at 1132.

Regardless of the strength of its showings on the other factors, a plaintiff may not obtain a

preliminary injunction unless he or she establishes that irreparable harm is likely to result in the

absence of the requested injunction, as opposed to merely possible. *Id*. at 1131; *Ctr. for Food*

*Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011).

## IV.    ARGUMENT

### A.  Plaintiffs Are Unlikely to Succeed on the Merits.

Each of Plaintiffs' merits arguments fails to satisfy the "serious questions" threshold, let

alone demonstrate a "likelihood of success" in this case. Therefore, for the following reasons,

this factor does not support a preliminary injunction.

> *1.  Plaintiffs' Objection to the Biological Opinion's Analysis Does Not*
> *Demonstrate a Likelihood of Success.*

Plaintiffs start by arguing that the U.S. Fish and Wildlife Service's (FWS) Biological

Opinion (BiOp), and the Bureau of Land Management's reliance on that BiOp in the Last Chance

Project EA, was arbitrary and capricious because the treatment acres evaluated in the BiOp are

less than the treatment acres proposed in the EA. ECF 16 at 21.

Plaintiffs' argument relies on Table 21 in the BiOp (KSW00425 (ECF 17-2 at 147)). This

table is titled "Effects to Spotted Owl Critical Habitat from the Rogue Gold, Trail Creek, and

Last Chance Projects. Medford District BLM." *Id*. Table 21 indicates that the "Total Habitat

Acres Treated" in the Last Chance Project will be 3,093—less than the 7,300 acres proposed for

treatment in the Last Chance Project EA. *Id*.

However, in Table 15 of the BiOp, titled "Summary of Effects to Spotted Owl Habitat in

the Action Area" (KSW00376 (ECF 17-2 at 98)) the Fish and Wildlife Service explains that the

"Total Habitat Acres Treated" is 10,153—*more than* the 7,300 acres proposed for treatment in the Last Chance Project EA. *Id.*

Additionally, the Last Chance Project EA is not self-executing. Only the BLM's Decision Records authorize on-the-ground activities. Those decision records authorize fewer acres of harvest than were analyzed for potential impacts in the BiOp. *See* KSW01961 (ECF 17-11 at 3). Therefore, actual treatment acres remain lower than the scope of the FWS's evaluation.

In short, the BiOp does not "analyze[] a fraction of the Project's actual impacts," but, rather, analyzes *more* total habitat acres of treatment than is approved in the Last Chance Project. Accordingly, Plaintiffs have failed to raise serious questions on the merits of this issue.

2. *The Fish and Wildlife Service Relied on the Best Available Science.*

Plaintiffs next argue that the FWS's baseline for NSO occupancy in the BiOp is in error due to the agency's reliance on its rigorous-and-tested NSO detection protocol, rather than a single study that evaluates a different type of detection methodology. ECF 16 at 23. In essence, Plaintiffs argue that one study represents better science than the FWS's vetted protocol. This argument fails under the facts of this case, as well as the law of the Ninth Circuit, and therefore does not demonstrate serious questions on the merits.

i. Review of the Fish and Wildlife Service's NSO Survey Protocol.

When the FWS is tasked with identifying an action's impacts to NSOs, it relies on its "Protocol for Surveying Proposed Management Activities that May Impact Northern Spotted Owls" (NSO Survey Protocol). *See* KSW01023 (ECF 17-5 at 2). This NSO Survey Protocol was initially developed in 1992 to promote "consistent and scientifically rigorous procedures to survey for northern spotted owls … in areas where management activities may remove or modify spotted owl nesting, roosting, or foraging habitat[.]" KSW01026 (ECF 17-5 at 5). In 2011, the

[PROPOSED] DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM - 8

NSO Survey Protocol addressed "concerns regarding the effectiveness of surveys, particularly those which do not result in spotted owl detections." *Id*. In particular, the concern was that "the invasion of the Pacific Northwest by the barred owl … has resulted in a suppression effect on spotted owl response rates[.]" *Id*. Therefore, the NSO Survey Protocol was modified based on NSO detection rates evaluated in long-term spotted owl demography studies. *Id*. (citing studies). The FWS explained that "to improve the efficacy and practicality of this protocol, the professional opinion of researchers, survey practitioners, and regulators were integrated into this product." *Id*.

The NSO Survey Protocol describes the procedures that are followed when conducting NSO surveys. *See* KSW01028—1046 (ECF 17-5 at 7-25). Based on those surveys, the NSO Survey Protocol applies survey results to determine NSO occupancy. Where surveys detect a male and female spotted owl within 1.4 miles on the same visit, a male taking a mouse to a female, a female on a nest, one or both adults with young, or where young are observed, the NSO Survey Protocol dictates that "Territorial Pair Status" be assigned to the survey area. KSW01047 (ECF 17-5 at 25-26). Where surveys detect the presence of two spotted owls of the opposite sex and where at least one of those owls meets the resident single requirement, the NSO Survey Protocol dictates that "Two Birds, Pair Status Unknown" be assigned to the survey area. *Id*. Where surveys detect a single spotted owl within the same general area on three or more occasions within the breeding season, or multiple responses over several years, the NSO Survey Protocol dictates that "Resident Single Status" be assigned to the survey area. *Id*. Finally, where a survey detects a spotted owl, but it does not fit within any of the above-described determinations, the NSO Survey Protocol dictates that the detection be assigned as "Status Unknown." *Id*.

ii.  Review of Appel et al. (2022).

In 2022, Cara Appel et al. published a study titled: "Using passive acoustic monitoring to estimate northern spotted owl landscape use and pair occupancy." KSW01000 (ECF 17-4 at 2). In summary, Appel et al. (2022) used passive acoustic monitoring and found that detecting female spotted owls can be difficult, especially considering the influence of barred owls, "suggesting that pairs may often go undetected even after repeated sampling." KSW01017 (ECF 17-4 at 19). Therefore, the study advocated for further protections to forests based on any detection of spotted owls. *Id*. However, the study also acknowledged that "[f]urther consideration will be needed to weigh the likelihood and acceptable level of risk associated with errors of omission or commission." *Id*. And, moreover, Appel et al. (2022) acknowledged that it *did not* create a new NSO Survey Protocol. The study was not even a test of the existing NSO Survey Protocol. Rather, it concluded by acknowledging that, "with multiple years of data, our methods *may be extended* using a dynamic multistate modeling approach to directly estimate the probability of sites transitioning between pairs and unpaired status." *Id*. (emphasis added). Appel et al. (2022) did not advocate that this single study represented the best available science, but rather that "passive acoustic monitoring coupled with remotely sensed forest data shows great promise for spotted owl conservation and management[.]" *Id*.[3]

iii.  The BiOp's Consideration of the Best Available Science.

The FWS BiOp for the Last Chance Project (among others) was published on July 3,

---

[3] The results of Appel et al. (2022) are based on a different type of owl detection methodology—passive acoustic monitoring—than the callback surveys used as part of the NSO Survey Protocol. Plaintiffs provide no evidence, from a qualified expert or otherwise, demonstrating that Appel et al.'s conclusions regarding detection rates under passive acoustic monitoring are comparable with, or applicable too, results achieved under callback surveys. The passive acoustic surveys completed by Appel et al. (2022) were not designed to test the efficacy of the callback survey approach utilized under the FWS' NSO Survey Protocol.

[PROPOSED] DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM - 10

2023. KSW00279 (ECF 17-2 at 1). While the BiOp did not specifically cite to Appel et al. (2022), the BiOp did evaluate the most recent science relevant to NSO surveying, including studies that addressed the same questions raised in Appel et al. (2022). For example, the BiOp discussed a 2023 study by Katie Dugger et al. (2023) titled: "Estimating Northern Spotted Owl (*Strix occidentalis caurina*) Pair Detection Probabilities Based on Call-Back Surveys Associated with Long-Term Mark-Recapture Studies, 1993–2018." KSW00362 (ECF 17-2 at 84); Declaration of Nolan Smith (Smith Decl.), Exhibit A. Similar to Appel et al. (2022), Dugger et al. (2023) evaluated the probability of detecting NSO pairs based on seasonal survey periods using data from a recent range-wide meta-analysis, acknowledging that "per-visit detection rates" of single owls were generally higher than detections of pairs. Smith Decl. Exhibit A at 2. The BiOp explained that "Dugger et al. (2023a) affirmed that barred owls influence spotted owl detectability, <u>which is not new information</u> … and for which the survey protocol incorporates." KSW00362 (ECF 17-2 at 84) (emphasis added). The BiOp then explained that the FWS and BLM would "evaluate spotted owl detections for occupancy status and for consideration of Dugger et al. (2023a) and modify projects as necessary to avoid incidental take. As survey results become available *or if information suggests a methodology change* … this consultation will be amended or will be reinitiated as appropriate." KSW00363 (ECF 17-2 at 85) (emphasis added).

The BiOp also discussed the use of passive acoustic monitoring (the subject of Appel et al. (2022)) (KSW00366 (ECF 17-2 at 88)), and cited studies evaluating the use of passive acoustic monitoring. *See* KSW00456 (ECF 17-2 at 178) (citing Lesmeister et al. (2022), titled "Passive Acoustic Monitoring within the Northwest Forest Plan Area: 2021 Annual Report"); KSW00543 (ECF 17-2 at 265) (citing the 2021 version of the NSO Survey Protocol, titled

"Protocol for Surveying Proposed Management Activities that may impact Northern Spotted

Owls Using Passive Autonomous Recording Unit Methods").

    iv.  <u>The Last Chance Project EA's Consideration of the Best Available
Science.</u>

The BLM's Last Chance Project EA also addressed the detectability issue discussed in

Appel et al. (2022) in a manner similar to how the FWS addressed the issue. Specifically, the

BLM explained:

> There is some evidence that spotted owls call less in the presence of barred owls (Crozier
> et al., 2006) and detectability of pairs by the 2011 protocol had decreased in the presence
> of barred owls (Dugger et al., 2023). However, the call-back protocol detection rate is
> still high (Dugger et al. 2023, Kramer et al. 2024) and the BLM considers all detections
> of spotted owls in our evaluation of whether a site is occupied, not just evidence of pairs.
> Therefore, the BLM concludes that the call-back survey protocol still adequately detects
> if a resident spotted owl (either single or pair) is present in the analysis area.

KSW00790 (ECF 17-3 at 214). The Kramer et al. (2024) study cited in the EA specifically

addressed Appel et al. (2022). Kramer et al. (2024) acknowledged "recent advances in passive

acoustic survey methods and data processing" and "detection algorithms" (citing Appel et al.

(2022) and others) but concluded that these passive acoustic surveys "have not yet been used (or

assessed) as a tool for explicitly conducting or improving the effectiveness of long-standing

standard survey protocols being used by land and wildlife management agencies." Smith Decl.

Exhibit B at 3.

    v.  <u>The Last Chance Project's NSO Baseline Fully Complies with the "Best
Available Science" Standard.</u>

The ESA requires that the FWS use "'the best scientific and commercial data available'

when formulating a BiOp." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995

(9th Cir. 2014) (quoting 16 U.S.C. § 1536(a)(2); 50 CFR § 402.14(g)(8)). "The purpose of the

best available science standard is to prevent an agency from basing its action on speculation and

surmise." *Id*. (citation omitted). "Under this standard, an agency must not 'disregard available scientific evidence that is in some way better than the evidence it relies on.'" *Id*. (simplified, quoting *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006)). "An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them." *Id*. (citation omitted). "[W]hat constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference." *Id*. (citation omitted). "Courts must be at their most deferential when considering decisions requiring a high level of expertise[.]" *Skagit Cnty. Dike, Drainage & Irrigation Improvement Dist. No 12 v. Nat'l Marine Fisheries Serv.*, No. 2:23-CV-01954-BAT, 2025 WL 1222238, at *11 (W.D. Wash. Apr. 28, 2025).

Here, the FWS and BLM satisfied the "best available science" standard, and the Court must be at its most deferential to that conclusion. To start, in the BiOp, the FWS determined that its NSO Survey Protocol is the "best available methodology[y]." KSW00362 (ECF 17-2 at 84). This determination must be given great deference. Moreover, this is not a case wherein the agency disregarded available scientific evidence that is better than what it did rely on. As explained above, the NSO Survey Protocol was rigorously developed with significant technical input. KSW01026 (ECF 17-5 at 5). Moreover, the NSO Survey Protocol *acknowledged* an issue addressed in Appel et al. (2022)—that barred owl influence has an effect on the detectability of NSOs. *Id*. The NSO Survey Protocol was modified for that very reason and the FWS explained that "bared owls['] influence" on "spotted owl detectability [] is not new information" and is already incorporated into the protocol. KSW00362 (ECF 17-2 at 84).

In addition, both the FWS and BLM address the most recent science on the issue, including the use of passive acoustic monitoring. The BiOp discusses Dugger et al. (2023).

KSW00362-363 (ECF 17-2 at 84-85). Dugger et al. (2023) evaluated NSO pair occupancy, just like Appel et al. (2022). Smith Decl. Exhibit A at 20-21. The BiOp explained that pair occupancy would be evaluated consistent with Dugger et al. (2023), and that consultation would be amended or reinitiated if new evidence indicated that a methodology change was required. KSW00363 (ECF 17-2 at 84). The BLM's EA took the evaluation of the most recent science a step further. The EA discussed Kramer et al. (2024), wherein the studies' authors directly evaluated Appel et al. (2022). KSW00790 (ECF 17-3 at 214); Smith Decl. Exhibit B at 3. The BLM concluded, based on Dugger et al. (2023) and Kramer et al. (2024), that the NSO Survey Protocol is still the best existing methodology. KSW00790 (ECF 17-3 at 214). The agencies' collective reliance on Dugger et al. (2023), Kramer et al. (2024), and a lengthy list of other recent studies ensured that the detectability issue discussed in Appel et al. (2022) did not go unconsidered. Rather, the issue was fully vetted by both the FWS and BLM in order to ensure utilization of the best available science.

The FWS and BLM are under no obligation to create new studies, protocols, methodologies, or information based on Appel et al. (2022). In Appel et al. (2022), the authors acknowledged that multiple additional years of data would be needed before the results of that study could be extended to a dynamic multistate modeling approach. KSW01017 (ECF 17-4 at 19). Likewise, Kramer et al. (2024) acknowledged that the "recent advances in passive acoustic survey methods and data processing" and "detection algorithms" "have not yet been used (*or assessed*) as a tool for explicitly conducting or improving the effectiveness of long-standing standard survey protocols being used by land and wildlife management agencies." Smith Decl. Exhibit B at 3 (emphasis added). The FWS and BLM were not required to *create* their own studies to determine whether Appel et al. (2022) or any other information may be used to inform

protocols. *See San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995 (noting that the best available science standard does not "require an agency to conduct new tests or make decisions on data that does not yet exist."). However, the BiOp does indicate that the FWS modified the protocol slightly to use autonomous recording units based on "the probability of detecting northern spotted owls when barred owls are present." KSW00481 (ECF 17-2 at 203) (citing Service 2021a, titled "Protocol for Surveying Proposed Management Activities that may impact Northern Spotted Owls Using Passive Autonomous Recording Unit Methods.").

Lastly, multiple cases have given deference to the FWS's and BLM's conclusion that the NSO Survey Protocol represents the best available science. In *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1241 (9th Cir. 2015), the Ninth Circuit found that the NSO Survey Protocol "recognized the potential impact barred owls have on the efficacy of spotted owl surveying" and that the plaintiffs did "not dispute that the Service cited the best available science." The same is true here. The FWS and BLM cited recent studies, including those that post-date Appel et al. (2022), that discuss the detectability issue that is the focus of the Appel study. Further, in *Conservation Cong. v. United States Forest Serv.*, No. 2:15-00249 WBS AC, 2016 WL 727272, at *9 (E.D. Cal. Feb. 24, 2016), the court found that the plaintiffs failed to establish that there was any superior evidence regarding the presence of NSOs, beyond what was shown by the NSO Survey Protocol. Finally, in *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, No. 22-35035, 2022 WL 17222416, at *2 (9th Cir. Nov. 25, 2022) the Ninth Circuit deferred to the FWS's scientific judgment and the validity of its NSO Survey Protocol. This Court should follow the Ninth Circuit and defer to the FWS and BLM, both in their reliance on the NSO Survey Protocol and their consideration of the best available science regarding owl surveying techniques and methodologies.

In summary, the agencies' analyses in the BiOp and EA rely on the rigorous and tested NSO Survey Protocol, acknowledges how the presence of barred owls effects NSO detectability, considers recent studies which describe the detectability of NSO pairs such as Appel et al. (2022), and applies the NSO Survey Protocol in the manner directed, and in the same manner deemed the "best available science" by multiple courts including the Ninth Circuit. Consequently, this Court should conclude that Plaintiffs are unlikely to succeed on this claim.

   3.   *The Last Chance Project Complies with the RMP's Bureau Sensitive Species Guidelines.*

Plaintiffs' last argument is that the Last Chance Project violates the Federal Land Policy and Management Act (FLPMA) on the grounds that the BLM failed to uphold the 2016 SWO RMP with respect to the creation of protections for the northwestern pond turtle (NWPT), a bureau sensitive species. *See* ECF 16 at 29. Plaintiffs fail to raise serious questions on the merits of this claim.

The 2016 SWO RMP contains management objectives and direction for the maintenance of "bureau sensitive species," which includes the NWPT. KSW02152 (ECF 17-12 at 126). As Plaintiffs note in their Motion for Preliminary Injunction, the RMP directs the BLM to "[i]mplement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions." *Id.*

The Last Chance Project EA dedicates an entire section to evaluating impacts to the NWPT. The EA explains that the BLM conducted field evaluations and desktop evaluations to identify NWPT nesting, aquatic, and overwintering habitat. KSW00659-664 (ECF 17-3 at 83-88). Based on this evaluation, the EA concluded that NWPT "[n]esting habitat was not identified in proposed treatment units." KSW00661 (ECF 17-3 at 85). The EA also explained that "no work

is planned in NWPT aquatic habitat." *Id*.; KSW00662. As for overwintering habitat, the EA acknowledges that there is not a consensus on how timber harvest and fuels treatments affect NWPT. KSW00662 (ECF 17-3 at 86). Regardless, the design of the Last Chance Project ensures that overwintering habitat for the NWPT would be maintained within commercial thinning, selection harvest, and fuels reduction treatments because important features—such as canopy cover—would be retained at appropriate levels for the species. *Id*. Moreover, treatments would not be implemented within 60 feet of perennial streams or within 25 feet of small ponds, where nearly *half* of NWPT overwinter. KSW00663 (ECF 17-3 at 87). The BLM ultimately concluded that the Last Chance Project would not affect NWPT at the population level. *Id*.

Much to Plaintiffs' chagrin, the 2016 SWO RMP simply does not require implementation of any particular conservation measure for the NWPT. The purpose of the management objectives for bureau sensitive species is to minimize the likelihood of and need for the ESA listing of these species. The EA explains that the Last Chance Project minimizes the likelihood of, and need for, the listing of the NWPT. KSW00663 (ECF 17-3 at 87) (evaluating potential effects and concluding that the Last Chance Project would not affect NWPT populations); *see also Bark v. Bureau of Land Mgmt.*, 998 F. Supp. 2d 981, 1000 (D. Or. 2014) (concluding that the BLM did not violate its bureau sensitive species guidelines when it explained that there was little habitat in the project area suitable for the special status bat species and that the project would not detrimentally impact bats because the project would retain adequate snag habitat). Additionally, the Last Chance Project will *benefit* the NWPT through stream restoration actions, such as log and boulder placement and the addition of structure to stream channels that would create additional pools and slow-flowing, shallow areas. KSW00798 (ECF 17-3 at 222).

The Last Chance Project's stream and pond buffers are a sufficient conservation measure to protect the NWPT and satisfy the 2016 SWO RMP. By directing that treatments will not occur within 60 feet of perennial streams or 25 feet of small ponds, the BLM is actively protecting NWPT habitat. KSW00663 (ECF 17-3 at 87). This satisfies the 2016 SWO RMP's Management Direction. Therefore, Plaintiffs' FLPMA claim regarding the NWPT does not present serious questions on the merits.

### B.  Plaintiffs Will Not Be Irreparably Harmed.

Plaintiffs claim that they will be irreparably harmed in the absence of an injunction. ECF 16 at 32. To satisfy this element, Plaintiffs "must establish that irreparable harm is *likely,* not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original). The Ninth Circuit requires a "definitive threat of future harm to protected species, not mere speculation." *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 (9th Cir. 1994).

#### 1.   The NSO and NWPT Will Not Suffer Likely Harms Absent an Injunction.

Plaintiffs' claim of irreparable harm to the NSO and NWPT (ECF 16 at 32-34) is entirely tied to its arguments on the merits. With respect to the NSO, Plaintiffs argue that irreparable harm will result because the FWS and BLM did not rely on the "best available science" and that the Last Chance Project authorizes the removal of more NSO habitat than was evaluated in the BiOp. ECF 16 at 32-33. As explained above, both of these arguments lack merit and, likewise, do not create a likelihood of irreparable harm. Indeed, with respect to Plaintiffs' "best available science" argument, Plaintiffs fail to demonstrate with any likelihood that more spotted owls are present in the action area than were revealed by the FWS's and BLM's surveys following rigorous survey protocols. This cannot support a preliminary injunction. *See Cascadia Wildlands*

*v. Scott Timber Co.*, 715 F. App'x 621, 625 (9th Cir. 2017) (overturning preliminary injunction where this court treated the "serious questions" element as also applying to the threat of irreparable harm and explaining that "the district court was actually required to find that it was *likely* that marbled murrelets inhabited the area in question and would be harmed by the project." (emphasis in original)).

With respect to the NWPT, Plaintiffs once again rely on a purely speculative argument. Plaintiffs argue that parts of the Last Chance Project will occur within overwintering habitat for the NWPT. ECF 16 at 33. However, neither the EA nor Plaintiffs' Motion for Preliminary Injunction indicates that this habitat is actually *used* by NWPT. Rather, the EA explained that nearly half of NWPTs will winter near streams and ponds where no ground disturbing activities are going to occur. KSW00663 (ECF 17-3 at 87). Since 1995 there have only been two observations of NWPT within units proposed in the Last Chance Forest Management Project analysis area, the last of which occurred in 1997. KSW00661 (ECF 17-3 at 85). Therefore, it is entirely speculative that the NWPT lives in the project area, let alone that it lives in the project area *and* will be irreparably harmed (an additional layer of speculation). Moreover, because the Last Chance Project will improve aquatic habitat for the NWPT, whatever speculative harms may be alleged are not irreparable. KSW00798 (ECF 17-3 at 222).

### 2.  *Plaintiffs Will Not Suffer Irreparable Harms to Their Interests.*

Next, Plaintiffs claim that the Last Chance Project will cause irreparable harm to their "recreational, aesthetic, and professional interests[.]" ECF 16 at 34. As an example, Plaintiffs argue that the Last Chance Project will cause irreparable harm because it will remove "mature trees." *Id*. at 34-35. However, the 2016 SWO RMP provides a mandatory directive which prohibits the harvest of trees which are both 40 inches diameter at breast height (DBH) and were

established prior to 1850. KSW02101 (ECF 17-12 at 75). This RMP directive will adequately protect Plaintiffs' interest in maintaining mature forests. Moreover, while Plaintiffs argue that the Last Chance Project area is "irreplaceable" and "not replicable elsewhere," this argument is both spurious and completely unsupported. ECF 16 at 34. Plaintiffs have put forth zero evidence indicating that there are insufficient forests where they could exercise their same "recreational, aesthetic, and professional interests" if the Last Chance Project were implemented.[4] Just in the lands managed under the 2016 SWO RMP, only 251,552 acres out of a total of 1,228,635 are part of the HLB. KSW02080 (ECF 17-12 at 54). This means that only *20 percent* of the lands subject to the 2016 SWO RMP are managed for timber harvest—the remainder are largely in reserves where the RMP requires management objectives centered around NSO habitat and water quality. The "interests" that Plaintiffs claim to be at risk in the Last Chance Project are the same "interests" being promoted on 80 percent of lands managed under the 2016 SWO RMP. Plaintiffs cannot demonstrate that the 977,083 acres of non-HLB managed under the 2016 SWO RMP are insufficient to exercise their "recreational, aesthetic, and professional interests."

Additionally, while Defendant-Intervenors acknowledge that the Last Chance Project does include 2,251 acres of commercial treatments in reserve areas (KSW02363 (ECF 17-13 at 4)), these treatments are being implemented solely to protect and enhance NSO habitat and to provide resilience to large-scale high-intensity/high-severity wildfire—and all in conformance with RMP direction. KSW02362 (ECF 17-13 at 3). The 2016 SWO RMP explained that the

---

[4] While the Ninth Circuit has rejected this reasoning in other cases (*see All. for the Wild Rockies*, 632 F.3d at 1135), other circuits have recognized that "irreparable harm does not exist where alternatives are available to a movant, even if these alternatives are less convenient." *Delux Pub. Charter, LLC v. Cnty. of Westchester*, No. 22-CV-01930 (PMH), 2024 WL 3744167, at *2 (S.D.N.Y. July 25, 2024) (simplified, *citing Molloy v. Metro Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996)).

management objectives for LSR-Dry are to enable forests to recover from past management measures, respond positively to climate-driven stresses, wildfire, and other disturbance, ensure positive or neutral impacts from wildfire, and contribute to NSO recovery. KSW02111 (ECF 17-12 at 85). The first two management directions identified to accomplish these goals are to apply selection harvest or commercial thinning to at least 21,500 acres per decade (17,000 acres in the Medford District). This harvest direction is a necessary tool for obtaining the ecological objectives of the LSR-Dry allocation. Therefore, this project feature will not cause irreparable harm because it will *enhance* Plaintiffs' interests.

### C. The Public Interest and Balance of the Equities Do Not Support an Injunction.

The final elements under the Supreme Court's four-factor test for a preliminary injunction—the public interest and balance of the equities—also do not support Plaintiffs' requested injunctive relief. Therefore, Plaintiffs' Motion for Preliminary Injunction should be denied.

While Plaintiffs are correct that, previously, the public interest and equities factors were not subject to discretion in ESA cases (ECF 16 at 35-36), the Ninth Circuit recently found that rule inapplicable where an injunction may threaten to cause *harm* to a listed species, instilling judicial discretion to consider the traditional public interest and equities factors. *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 600 (9th Cir. 2025). Even if the presumption of the public interest and equities could apply to Plaintiffs' ESA claim, it would not apply to Plaintiffs' FLPMA claim. *See, e.g.*, *Oregon Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1270 (D. Or. 2022) (evaluating the public interest and equities in weighing injunction on FLPMA claim).

    *1.   An Injunction Would Harm Northern Spotted Owls.*

Starting again with Plaintiffs' ESA claim, an injunction would not serve the public's interest because it would have a detrimental impact on listed species. The revised recovery plan for the Northern Spotted Owl acknowledged that one of the most important range-wide threats to the species was "habitat loss or degradation from stand replacing wildfire and other disturbances." KSW00010 (ECF 17-1 at 10). That acknowledgment has been reinforced since publication of the recovery plan. In the U.S. Forest Service's draft environmental impact statement for the Northwest Forest Plan Amendment, it concluded that "large, high-severity wildfires have resulted in losses of mature and old-growth forests, eliminating gains achieved during the first 25 years of implementation." Smith Decl. Exhibit C at 5. In other words, the reserves created in accordance with the Northwest Forest Plan (and, subsequently, the BLM's RMPs) *exacerbated* wildfire risk and created forest conditions prone to high-severity wildfire, which has wiped out any habitat gains that were initially achieved. This has been well documented in scientific papers. Cova et al. (2025) acknowledged that the fire frequency and severity have increased on lands managed as reserves under the Northwest Forest Plan and found that an adaptive management strategy (like thinning) is required to achieve the plan's goals. *See generally* Smith Decl. Exhibit D.

The 2016 SWO RMP sought to get ahead of this increasingly severe threat to the NSO's persistence. The RMP directed the BLM to apply selection harvest or commercial thinning treatments to *at least* 17,000 acres of LSR-Dry lands per decade. KSW02111 (ECF 17-12 at 85). This directive was intended to treat overly dense stands that pose a high risk of wildfire, and which are generally incapable of developing into NSO habitat. KSW00586 (ECF 17-3 at 10). Unfortunately, to date, the BLM has come nowhere close to reaching this RMP directive, having

treated only 3,063 acres of LSR-Dry in the decade since the RMP's adoption. KSW00584 (ECF 17-3 at 8).

These facts show that Plaintiffs' requested relief poses a serious threat to the persistence of the NSO. Today, wildfire causes significantly more habitat loss for NSOs than timber harvest. The management directives under the Northwest Forest Plan and the BLM's RMPs are exacerbating wildfire risks. While the 2016 SWO RMP has a management directive aimed at alleviating these risks in the LSR-Dry land use allocation, Plaintiffs' injunction would prohibit the BLM from achieving this directive. That will have a direct, negative effect on NSOs. Therefore, an injunction *would not be* in the public interest.

### 2. An Injunction Would Cause Serious Harm to the Public.

Risk of wildfire aside, there are an abundance of additional reasons why an injunction would not be in the public's interest. Plaintiffs' arguments about public interest are myopic and self-centered. Plaintiffs focus with tunnel vision on their perception of theoretical harms to NSOs and the NWPT, while ignoring the risk wildfires create for these species and the very real human costs caused by their litigiousness.

Starting first with the impacts to Oregon's rural O&C counties, the injunction requested by Plaintiffs will mean less funding for cash-strapped county governments. Federal lands are not subject to taxation, which is important to recognize because many of the O&C counties have *a lot* of federal lands—2.1 million acres managed under the O&C Act alone. Freeman Decl. at ¶ 4. The O&C Act was intended to make up for this lost tax base by way of shared timber receipts, but those receipts declined precipitously after the listing of the NSO and have never recovered. *Id*. at ¶ 7. As explained above, the 2016 SWO RMP dedicates only *20 percent* of the O&C timberlands in southwestern Oregon for sustained yield timber production, representing a

substantial limitation of the revenue-generating capacity of those O&C timberlands. KSW02080 (ECF 17-12 at 54). While the SRS was intended to replace the revenue lost by declines in timber harvest, SRS payments have also declined and been subject to less frequent and less predictable reauthorizations. Freeman Decl. at ¶¶ 8-9. Now, counties are almost certain to opt to receive shared timber receipts under the O&C Act going forward, meaning every timber sale on the O&C timberlands is a direct source of county funding. *Id*. at ¶ 9.

Unfortunately, many of the O&C counties lack sufficient funding to maintain essential services. This is a direct result of timber receipts that are too low to account for the tax base lost to the federal government. In Douglas County, Oregon, this has meant the closure of library services and the termination of around 500 staff persons. *Id*. at ¶ 13. In Polk County, the county is on the brink of closing its fairgrounds—a source of education, community involvement, shelter, and refuge—because there simply are not enough funds to keep it operational. *Id*. This budget crisis is further exacerbated by the fact that, under the Oregon constitution, county authority to raise property tax is capped. *See Flavorland Foods v. Washington Cnty. Assessor*, 334 Or. 562, 565, 54 P.3d 582, 584 (2002). This means that for Oregon's O&C counties, the only "reliable" way to increase county revenue is to increase timber receipts. If timber receipts do not increase, then the ever-increasing need for policing, social services, children and senior services, waste management parks, fairgrounds, and more will be lost. Freeman Decl. at ¶ 13. Thus, while Plaintiffs in this case cry foul and seek an injunction in the name of species that will *benefit* from the Last Chance Project, the local communities and citizens of Oregon's O&C counties— particularly rural counties—will undoubtedly be *harmed* if an injunction issues. Citizens will bear the burden of the loss of essential services that will not survive the budget cuts if timber

receipts do not provide sufficient county funding. All these community and human interests overwhelmingly outweigh the public interests presented by Plaintiffs.

Moreover, the harm to the public interest from an injunction will not stop at county funding. Western Oregon has suffered from frequent mill closures over the past two years due to a lack of timber supply. Freeman Decl. at ¶ 15. In 2024, seven mills closed, taking 700 jobs with them. *Id*. In 2025, a mill closure in Douglas County cost another 146 jobs. *Id*. These are well-paid, family-wage positions that the public relies on. Oregon's forest sector employs over 62,000 Oregonians, and rural communities are sensitive to the health of this industry. Geissler Decl. at ¶ 6. The Last Chance Project means continued work for loggers, mill workers, road builders, and more. *Id*. at ¶¶ 7-10, 17-19. For every one million board feet of timber harvested on the BLM lands in western Oregon, 13 local non-federal jobs are created, and an estimated $647,000 of non-federal employment income is introduced into local economies. *Id*. at ¶ 19. The Last Chance Project will generate 80 million board feet. *Id*. at ¶ 18.

The equities are particularly severe for sale-purchaser Boise Cascade. Boise Cascade purchased the Take a Chance timber sale as a means of providing a reliable supply of timber to its mills in Medford and White City, Oregon. Hite Decl. at ¶¶ 2, 9. Boise Cascade has paid a purchase deposit for the sale, invested time and money clearing ditches and culverts in the sale area, and has spent around $48,000 just in culverts alone. *Id*. at ¶ 4. Not only does this work provide jobs for the community, but it improves safety on the roads leading to public O&C timberlands. *Id*. An injunction means a less reliable timber supply for Boise Cascade's mills, lost work for Boise Cascade's road and logging contractors, and a threat of down time and layoffs. *Id*. at ¶¶ 9-10. An injunction also means lost economic opportunity and delayed recovery of the funds already spent to prepare for implementation of the Take a Chance sale. *Id*. ¶¶ 6-7. For all

these reasons, the public interest and the equities do not support the injunction Plaintiffs are seeking.

### 3.  An Injunction Would Frustrate the Will of Congress.

Finally, the injunction Plaintiffs seek would frustrate the will of Congress because, by law, the BLM must manage O&C timberlands for sustained yield timber production. The Ninth Circuit in *Headwaters* explained that the O&C Act is a "dominant use" statute. *Headwaters*, 914 F.2d at 1184. Therefore, while Plaintiffs loosely claim that their vague "recreational, aesthetic, and professional interests" will be harmed if commercial harvests are allowed to proceed, accepting this argument would place those interests above Congress's clear directive that the O&C timberlands be managed for permanent timber production. The Court cannot elevate Plaintiffs' interests and speculative claims of harm in this matter above the will of Congress, particularly on the 20 percent of lands designated as HLB, which the BLM has identified for management in accordance with the O&C Act's sustained yield mandate. *Compare* ECF 16 at 35 (claiming that Plaintiffs will be harmed because commercial harvests will disturb forested stands) *with* 43 U.S.C. § 2601 (requiring that the O&C timberlands be managed for "permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal of sustained yield").

In effect, Plaintiffs are seeking to enjoin the implementation of the O&C Act's "permanent forest production" and "sustained yield" directives. *See, e.g.*, *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319 (1985) (finding that a judge's interlocutory decision that an Act of Congress should not be enforced frustrates the will of Congress); *Adair v. England*, 417 F. Supp. 2d 1, 10 (D.D.C. 2006) (denying an injunction on the grounds that it would impose the court on the legislature's prerogative); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F.

Supp. 2d 114, 141 (D.D.C. 1999) (denying an injunction because it would "gravely frustrate the will of Congress."). Therefore, the public interest and balance of the equities do not support the injunction Plaintiffs seek.

### D.  Plaintiffs Are Not Exempt from the Bond Requirement.

Federal Rule of Civil Procedure 65(c) requires that no preliminary injunction "shall issue except upon the giving of security by the applicant in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." This requirement applies in environmental cases just like any other where an injunction is sought. *See Van Raden v. City of Portland*, No. CV 01-233-BR, 2001 WL 34047031, at *8 (D. Or. May 31, 2001) (denying bond waiver request in case raising NEPA violations). The purpose of the bond requirement is to: "discourage a moving party from seeking relief to which it is not entitled"; "assure that if such relief is errantly granted, the wrongfully enjoined party does not bear the cost of the error"; and "provide the wrongfully enjoined party a ready source to collect damages." *Native Ecosystems Council v. Mehlhoff*, No. 20-CV-19-BLG-SPW-TJC, 2020 WL 3969343, at *8 (D. Mont. July 6, 2020).

The Seventh Circuit addressed the bond requirement in a challenge to a Forest Service timber sale brought by "a nonprofit enterprise dedicated to promoting environmental quality," where the district court required a $10,000 bond. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 455 (7th Cir. 2010). The Seventh Circuit determined that non-profit organizations are not entitled to an automatic exemption from FRCP 65(c)'s bond requirement. *Id.* at 460. The Ninth Circuit has emphasized that "each case is fact-specific" and where "a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

To determine whether requiring a bond would effectively deny access to judicial review, courts should first receive and analyze evidence from a movant regarding its financial ability to post a bond. *See, e.g.*, *id.* (affirming imposition of $50,000 bond against environmental organization); *Save the Park & Build the Sch. v. Nat'l Park Serv.*, No. 3:20-CV-1080-LAB-AHG, 2020 WL 4260801, at *7 (S.D. Cal. July 24, 2020) (ordering the plaintiff "to show cause" "why bond should not be set at $20,000"); *Chang v. Cnty. of Siskiyou*, No. 2:22-CV-01378-KJMAC, 2024 WL 5159653, at *5 (E.D. Cal. Dec. 18, 2024) (imposing a $56,300 bond).

Notably, only Plaintiffs' declarant Madeline Cowen provides any testimony regarding the financial standing of the plaintiff organizations. *See* ECF 20 at 9. However, this testimony is woefully insufficient to show that anything more than a nominal bond would deny their "access to judicial review." In fact, publicly available form 990s from the plaintiff organizations reveal that each hold significant assets. *See* Smith Decl. Exhibits E, F, G. For instance, in the most recent form 990 available on Cascadia Wildland's website (from 2024), the organization reports end-of-year net assets or fund balances of $1,846,130. Smith Decl. Exhibit E. In the most recent form 990 available for Klamath Siskiyou Wildlands Center, the organization reports end-of-year net assets or fund balances of $923,998. Smith Decl. Exhibit F. And, in the most recent form 990 available for Oregon Wild, the organization reports end-of-year net assets or fund balances of $3,030,156. Smith Decl. Exhibit G. Collectively, the three plaintiff organizations have net assets or fund balances nearing six million dollars.

Additionally, there should be little doubt that a chilling effect <u>would not result</u> from a bond. The plaintiff organizations in this lawsuit have participated in *dozens* of lawsuits over the past decade, causing untold amounts of financial harm to counties, the forest products industry, the federal government, and more. Lawsuits wherein the plaintiff organizations have participated

[PROPOSED] DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM - 28

as parties include, *but are not limited to*: (1) U.S. District Court, District of Oregon Case No. 6:24-cv-01641-MK (challenging the Blue and Gold Harvest Plan, authorizing commercial treatments on HLB lands); (2) U.S. District Court, District of Oregon Case No. 6:26-cv-126 (challenging the 42 Divide Forest Management Plan, authorizing commercial treatments and fuels reduction treatments); (3) U.S. District Court, District of Oregon Case No. 1:23-cv-00519-CL (challenging the Integrated Vegetation Management for Resilient Lands program, authorizing commercial treatments and fuels reduction treatments); (4) U.S. District Court, District of Oregon Case No. 6:22-cv-01344-MTK (challenging the Siuslaw Harvest Land Base Landscape Plan Environmental Assessment, authorizing commercial treatments on HLB land); (5) U.S. District Court, District of Oregon Case No. 6:21-cv-01487-MC (challenging the BLM's timber sale protest rule revision); (6) U.S. District Court, District of Oregon Case No. 1:20-cv-00952-AA (challenging the Poor Windy and Evans Creek commercial projects); (7) U.S. District Court, District of Oregon Case No. 1:21-cv-00058-CL (challenging the Bear Grub Project and Round Oak Project commercial treatments and fuels management treatments); (8) U.S. District Court, District of Oregon Case No. 1:19-cv-02069-CL (challenging the Griffin Half Moon Timber Sale); (9) U.S. District Court, District of Oregon Case No. 1:19-cv-01810-CL (challenging the North Landscape Project, authorizing commercial treatments); (10) U.S. District Court, Northern District of California Case No. 4:21-cv-00344-JSW (challenging gray wolf delisting); (11) U.S. District Court, District of Oregon Case No. 6:19-cv-00247-MC (challenging the Thurston Hills Non-Motorized Trails and Forest Management Project which authorized commercial treatments and trail construction); (12) U.S. District Court, District of Oregon Case No. 1:17-cv-00997-CL (challenging Lower Grave timber sale); (13) U.S. District Court, District of Oregon Case No. 3:18-cv-01645-MO (challenging Crystal Clear Restoration (CCR) Project, which authorized

commercial treatments and noncommercial fuels work); (14) U.S. District Court, District of Oregon Case No. 1:14-cv-00737-CL (challenging Antelope Allotment grazing decision); (15) U.S. District Court, District of Oregon Case No. 6:16-cv-01598-JR (challenging adoption of 2016 RMPs); (16) U.S. District Court, District of Oregon Case No. 6:18-cv-00858-TC (challenging Quartz Integrated Project authorizing commercial treatments); (17) U.S. District Court, District of Oregon Case No. 1:12–cv–01166–PA (challenging Rio Climax Forest Management Project, authorizing commercial treatments); (18) U.S. District Court, District of Oregon Case No. 6:16-cv-01710-AA (challenging harvest plan on private lands); (19) U.S. District Court, District of Oregon Case No. 3:25-cv-01259-AN (challenging decision not to list population segment of the red tree vole); (20) U.S. District Court, District of Oregon Case No. 6:22-cv-00204-AA (challenging authorization of post-fire salvage from Archie Creek Fire); (21) .S. District Court, District of Oregon Case No. 3:23-cv-01033-IM (challenging authorization of FEMA funds for reconstruction of destroyed road); (22) U.S. District Court, District of Columbia Case No. 1:25-cv-01048-RJL (intervening in lawsuit challenging NSO critical habitat designation); Oregon State Court, Multnomah County Case No. 21CV14589 (challenging post-fire salvage on Santiam State Forest). This shows that Plaintiffs have significant resources available to put towards litigation, and putting funds towards a bond would not meaningfully impact their ability to litigate. Additionally, since the Plaintiffs (unlike the O&C counties and forest products industry) do not have a financial stake in the forest management projects they litigate, a lack of bond incentivizes them to litigate and seek injunctions to delay important projects.

While Plaintiffs claim that requiring a bond would deny access to judicial review, their financial statements and litigation history show otherwise. Defendant-Intervenors, however, do

stand to be gravely harmed by this lawsuit. As explained above, AOCC's member counties are on

the cusp of cutting essential services and shuttering vital infrastructure. Freeman Decl. at ¶ 13.

Meanwhile, hundreds of jobs are being lost due to reduced timber availability on federal land. *Id*.

at ¶ 15. And, for sale purchaser Boise Cascade, an injunction means no opportunity to recoup the

tens-of-thousands of dollars already spent preparing for the Take a Chance timber sale (including

$48,000 spent on culverts alone), and the cost of delay and uncertainty which continue to accrue.

Hite Decl. at ¶ 4. Therefore, Defendant-Intervenors request a bond to be set in an amount that

would be equitable, given its members would suffer real and substantial damages if wrongfully

enjoined.

## V.    CONCLUSION.

For the forgoing reasons, the American Forest Resource Council and Association of O&C

Counties respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

Dated this 27th day of February, 2026.

/s/ Dominic M. Carollo
DOMINIC M. CAROLLO, OSB #093057         SARA GHAFOURI, OSB #111021
NOLAN G. SMITH, OSB #215034             American Forest Resource Council
AUDREY F. BOYER, OSB#106560             700 N.E. Multnomah, Suite 320
Carollo Law Group                       Portland, Oregon 97232
Mail:   P.O. Box 2456                   Telephone: (503) 222-9505
Roseburg, OR 97470                      Fax: (503) 222-3255
Office: 2315 Old Highway 99 South       Email: sghafouri@amforest.org
Roseburg, OR 97471
Telephone: (541) 957-5900
Fax: (541) 957-5923
Email: dcarollo@carollolegal.com
 *Attorneys for Proposed Defendant-Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I, Dominic Carollo, hereby certify that on February 27, 2026, I caused the foregoing to be served upon counsel of record through the Court's electronic service system.

Dated this 27th day of February, 2026.


<u>/s/ Dominic M. Carollo</u>