Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
2177 SW Broadway
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenor
Murphy Company

THE HONORABLE MARK D. CLARKE

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | | |
|---|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and CASCADIA WILDLANDS,** | ) ) ) ) | Case No. 1:25-cv-02296-CL |
| **Plaintiffs,** | ) ) ) | **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS'** |
| v. | ) ) ) | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM** |
| **DOUGLAS JAMES BURGUM in his official capacity as Secretary of the Interior, U.S. FISH & WILDLIFE SERVICE, and U. S. BUREAU OF LAND MANAGEMENT,** | ) ) ) ) ) ) | |
| **Defendants,** | ) ) | |
| **and** | ) ) | |
| **MURPHY COMPANY,** | ) ) | |
| **Defendant-Intervenor,** | ) ) ) | |
| **and** | ) ) | |
| **AMERICAN FOREST RESOURCE COUNCIL, an Oregon non-profit corporation, and ASSOCIATION OF O&C COUNTIES, an unincorporated Association,** | ) ) ) ) ) | |
| **Proposed Defendant-Intervenors.** | ) ) | |

**DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

**TABLE OF CONTENTS**

I.    INTRODUCTION AND BACKGROUND.................................................................1

II.   RELEVANT FACTUAL OVERVIEW ....................................................................4

      A.   The Last Chance Project ...............................................................................4

      B.   Paul's Payoff Timber Sale and Intervenor Murphy Company's
           Planned Operations for the Sale.....................................................................5

III.  LEGAL STANDARDS ...........................................................................................6

      A.   Preliminary Injunction Standard ................................................................. 6

      B.   Review Under the APA ..................................................................................9

IV.   ARGUMENT ...........................................................................................................9

      A.   Plaintiffs Are Unlikely to Succeed on the Merits ........................................ 9

           1.   The BiOp Appropriately Analyzed the Project's Anticipated Effects on
                Northern Spotted Owl Critical Habitat....................................................... 9

           2.   The BiOp Appropriately Analyzed the Project's Environmental
                Baseline for the Northern Spotted Owl ..................................................... 13

                i. BLM correctly applied the 2012 spotted owl survey protocol.................13

                ii. Plaintiffs' claim that BLM failed to follow the best available
                    science in interpreting the survey results for the Project area is
                    baseless......................................................................................................17

           3.   The Project Complies with FLPMA With Respect to Bureau Sensitive
                Species ....................................................................................................... 17

      B.   Plaintiffs Have Not Met Their Burden of Showing a Clear Likelihood of
           Irreparable Harm..........................................................................................19

           1.   Plaintiffs' delay in filing for a preliminary injunction
                weights strongly against a finding of irreparable harm...............................20

           2.   Plaintiffs fail to demonstrate irreparable harm to the
                northern spotted owl under the ESA ......................................................... 21

Page i - **DEFENDANT-INTERVENOR MURPHY
COMPANY'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

        3.   Plaintiffs fail to establish irreparable harm to NWPT ................................23

        4.   Plaintiffs' generalized concerns for their own interests are insufficient to establish irreparable harm fail to establish irreparable harm ................................................................................24

   C.   The Balance of the Equities and Public Interest Strongly Disfavor an Injunction ................................................................26

   D.   A Bond is Required for Any Injunction ................................................28

V.   CONCLUSION ................................................................................29

Page ii - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ........................................................................8, 20

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987)........................................................................................20, 23

*Bennett v. Spear,*
520 U.S. 154 (1997)..........................................................................................7, 15

*Boardman v. Pac. Seafood Grp.,*
822 F.3d 1011 (9th Cir. 2016) ..............................................................................24

*Cascadia Wildlands v. Carlton,*
341 F. Supp. 3d 1195 (D. Or. 2018) .....................................................................28

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
789 F.3d 1075 (9th Cir. 2015), cert. denied, 580 U.S. 916 (Oct. 11, 2016) .........22

*Environmental Protection Information Center v. Van Atta,*
No. 22-cv-03520-TLT, 2025 WL 3760628 (N.D. Cal. Dec. 22, 2025)....................7

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) (en banc) ...........................................................20, 22

*Monsanto Company. v. Geertson Seed Farms,*
561 U.S. 139 (2010)............................................................................................8, 9

*Muzarek v. Armstrong,*
520 U.S. 968 (1997)................................................................................................7

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF),*
886 F.3d 803 (9th Cir. 2018) ................................................................................22

*Oakland Trib., Inc. v. Chron. Pub. Co.,*
762 F.2d 1374 (9th Cir. 1985) ........................................................................20, 21

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ........................................................................2, 9, 15

*San Luis & Delta-Mendota Water Auth. v. Locke,*
776 F.3d 971 (9th Cir. 2014) ..................................................................................7

Page iii - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

*Save Our Sonoran, Inc. v. Flowers,*
    408 F.3d 1113 (9th Cir. 2005) ...................................................................................28

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024)...............................................................................................8, 10

*The Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) (en banc) .......................................................................9

*TVA v. Hill,*
    437 U.S. 153 (1978)......................................................................................................7

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..........................................................................................................7

**Statutes**

5 U.S.C. § 706..................................................................................................................7

5 U.S.C. § 706(2)(A)........................................................................................................9

16 U.S.C. § 1540(g)(1)(A)................................................................................................7

43 U.S.C. §§ 2601 et seq...........................................................................................3, 4, 13

**Other Authorities**

50 C.F.R. § 402.16 .........................................................................................................11

86 Fed. Reg. 62606, 62606 (Nov. 10, 2021)..................................................................12

Page iv - **DEFENDANT-INTERVENOR MURPHY
COMPANY'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

## I.    **INTRODUCTION AND BACKGROUND**.

Plaintiffs ask this Court for the extraordinary remedy of a preliminary injunction after voluntarily dismissing their first lawsuit challenging the Last Chance Forest Management Project (the Project) and then inexplicably waiting months to ask this Court for injunctive relief in round two.   Murphy Company was an intervenor in plaintiffs' first lawsuit (Case No. 24-1930), which was dismissed at plaintiffs' request last summer.   While plaintiffs waited, Murphy Company began operating its Paul's Payoff Timber Sale and investing significant resources into the effort. Murphy Company did so in good faith, after having first given notice to the plaintiffs in August 2025 (in round 1) that it intended to commence Paul's Payoff operations, after which plaintiffs threw in the towel.   This unusual procedural history alone demonstrates that there is no real imminent risk of irreparable harm in this case.   Plaintiffs' deliberate choice to delay in seeking injunctive relief imposed significant costs on Murphy Company.   Had plaintiffs litigated their original case diligently, this matter could be close to an ultimate resolution at this point.

In any event, and for the reasons explained in detail below, plaintiffs cannot make the required clear showing that they are likely to prevail on the merits, likely to suffer irreparable harm, and that the balance of equities and public interest favor the drastic step of halting Murphy Company's ongoing work.

Plaintiffs' merits theories are unusually weak for at least three independent reasons. First, the supposed discrepancy in acres of northern spotted owl critical habitat treated is irrelevant to the ultimate analysis plaintiffs criticize.   The discrepancy also does not actually exist, and, in any event, is irrelevant to the decisions of the Bureau of Land Management (BLM) and Fish and Wildlife Service to authorize the Project.   Plaintiffs' alleged discrepancy is an apples to oranges comparison.   The acreage cited in the relevant 2023 biological opinion

Page 1 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

correctly states the relevant number of critical habitat acres affected, while the table in the revised environmental assessment (REA) cited by plaintiffs as contradictory notes the total number of acres within treatment units, even if those treatment units overlap.   Because they overlap, the numbers appear higher, but that is because the table double counts.   Technology is not perfect, but imperfection does not equate to a likelihood of success on the merit, certainly where the information was not central to the Project's authorization.

Second, plaintiffs attack the Project's analysis of the northern spotted owl environmental baseline for failing to apply an inapplicable 2023 scientific research study about a nascent owl detection methodology.   In plaintiffs' estimation, that 2023 study is better science than the best available science currently being employed in the Project area.   But plaintiffs do not get to make that call—it is black letter law that a "determination of what constitutes the '*best* scientific data available' belongs to the agency's 'special expertise.'"   *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (italics in original) (quoting Supreme Court authority).   Further, even a cursory read of the document shows that it does not support plaintiffs' armchair scientist advocacy for its use.

Third, plaintiffs' Federal Land Policy and Management Act (FLPMA) claim distorts BLM's sensitive species framework and outright ignores the REA's detailed explanation. Contrary to plaintiffs' truncated analysis, BLM designed the project to avoid impacts on the Northwestern Pond Turtle (NWPT).   BLM reasonably concluded that the Project's design would protect the NWPT, and plaintiffs present no reason to doubt that conclusion.

Even setting the merits aside, plaintiffs cannot show irreparable harm.   Their owl-based theory is based on their attorneys' interpretation of an inapplicable study.   The record reveals that FWS carefully analyzed the Project's projected impacts and appropriately determined that

Page 2 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

they would not jeopardize the owl.   This is not surprising because the Project is largely on O&C

Act lands—a full 99% of Murphy Company's Paul's Payoff Timber Sale is on O&C lands—

which per congressional mandate are to be managed for the dominant use of permanent forest

production under the principles of sustained-yield timber management.   See 43 U.S.C. §§ 2601

et seq.   The governing Resource Management Plan (RMP) does not rely on these acres to

support the northern spotted owl.

Plaintiffs' habitat arithmetic argument also ignores that the REA, which supposedly

created the discrepancy, does not even authorize action and thus cannot be a source of harm, and

that cumulative authorizations under the Project to date remain well within the BiOp's vetted

acreage limitations.   Faring no better are plaintiffs' aesthetic preferences assertions, which claim

that their aesthetic preferences would be harmed despite describing only generalized use of

southern Oregon public lands untethered to site-specific, irreparable harm tied to project

implementation.

By contrast, enjoining Paul's Payoff now would upend Murphy Company's ongoing

operations, which commenced last year after notice to plaintiffs, jeopardize mill supply, and

threaten six-figure investments Murphy Company already has made on the faith of BLM's

decisions and with the knowledge that plaintiffs had dismissed their first lawsuit against the

Project.   As explained below, those concrete harms to Murphy Company along with the harm to

BLM, the proposed-intervenors, and the surrounding communities dwarf plaintiffs' speculative

assertions and counsel strongly against a preliminary injunction.

The Court should deny plaintiffs' belated request for preliminary relief.   Their merits

claims are unlikely to succeed, their irreparable harm allegations are both speculative and

insubstantial, and the equities and public interest strongly weigh against disrupting ongoing

Page 3 - **DEFENDANT-INTERVENOR MURPHY
COMPANY'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

Project implementation.   An injunction is not warranted, certainly not against Murphy

Company's ongoing operations.

## II.     **RELEVANT FACTUAL OVERVIEW**.

### A.     **The Last Chance Project**.

The Last Chance Forest Management Project (the Project) covers 11,686 treatment acres

within 32,272 acres of BLM's Medford District.   KSW00815.[1]   The landscape is characterized

by overly dense, fire-prone stands.   KSW00586.   These conditions contribute to heightened

wildfire risk in an area where several nearby communities rank among Oregon's highest for

wildfire vulnerability.   *Id*.   BLM identified a need to treat these forests to reduce hazardous

fuels, restore stand vigor, improve resistance to drought, insects, and disease, and address the

risk of stand-replacing wildfire.   *Id*.   The Project also seeks to fulfill BLM's responsibilities to

produce timber from the Harvest Land Base (HLB) and meet the Medford Sustained Yield Unit's

ASQ (Allowable Sale Quantity) requirements, while reducing fire risk.   *Id*.   Finally, the Project

seeks to accelerate or improve northern spotted owl habitat development.   *Id.*

BLM issued its Revised Environmental Assessment (REA) analyzing the Last Chance

Project in May of 2025.   The REA is a non–self-executing NEPA document.   It analyzes

environmental effects and compares alternatives, but it does not itself authorize any

ground-disturbing activity or timber harvest.   The EA explicitly states that the Authorized

Officer must make separate implementation decisions, and that those decisions determine

whether timber will be offered for sale and what specific actions will occur on the landscape.

As the REA explains in a section titled "Decision to Be Made," the "Authorized Officer would

---

[1] Citations to KSW are citations to exhibits to the declaration of Sangye Ince-Johannsen (ECF No. 17).   During drafting, the federal defendants had not yet filed the administrative record.

Page 4 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

decide whether to offer timber for sale . . . .   These decisions would be documented through

Decision Record documents that would identify specific approved actions . . . ."  KSW00585.

Thus, the REA provides the environmental analysis for the Project area but does not initiate any

project activity on its own.

Because the REA is only NEPA analysis, the Decision Records (DRs) for individual

timber sales are the documents that execute the Project.   Thus far, BLM has signed four DRs in

connection with the Last Chance Project, the most recent being DR # 4 approving the King

Graves Timber Sale on February 10, 2026.   Second Griffith Decl. Ex. B; *see also*

https://eplanning.blm.gov/Documents/?id=2eb004d1-a7f2-f011-8407-

001dd806295a&spid=1b682883-a8f2-f011-8407-001dd80c29f3 (website containing Last

Chance Project documents).   Each DR selects specific units, authorizes particular harvest

prescriptions, approves road construction or renovation, and determines which components of

the analyzed alternative will be implemented.   In short, the REA provides the required NEPA

analysis, but Decision Records are what actually implement the Project.

### B.   Paul's Payoff Timber Sale and Intervenor Murphy Company's Planned Operations for the Sale.

Intervenor Murphy Company purchased the Paul's Payoff Timber Sale in September of

2024.  KSW01962.   The Paul's Payoff Timber Sale is one of two commercial timber sales

authorized under DR # 1 for the Last Chance Forest Management Project.   *See* KSW01960.   It

was initially authorized under the original Project EA and offered for auction on September 26,

2024, after which BLM declared Murphy Company the high bidder.   KSW0192.   However,

final award of the sale was conditioned on completion of the REA and issuance of the Decision

Record, and thus approval and award remained pending until release of the REA, FONSI, and

Page  5  - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

DR #1 in May 2025.   KSW01961.   The sale consists of commercial treatment units analyzed

under Alternative 2 in the REA.   *Id.*   In total, only 307 acres of commercial harvest are

included in Paul's Payoff, using a mix of ground-based and cable logging systems, with units

designed to comply with the REA.   *See* KSW01962-3.   Implementation of the Paul's Payoff

sale also includes construction of permanent and temporary roads, landing construction,

renovation of existing road segments, timber haul, and post-harvest activity fuels treatments.

KSW01964.

Murphy Company intervened in plaintiffs' first lawsuit challenging the Project and, after

giving notice (voluntarily) to plaintiffs, began roadwork and roadside vegetation management

last year.   Declaration of Sam Wheeler (Wheeler Decl.) ¶¶ 2-3.   Murphy Company has been

operating the sale since last November and has been wrapping up timber falling in certain

cable-yarding units expected to be completed by the end of February.   After that work is

complete, timber falling will pause until May due to agency restrictions, although yarding

(meaning, removing the logs) will likely begin in April.   *Id.* ¶¶ 6-8.   During the remainder of

2026, Murphy Company plans to log approximately 2,200–2,400 thousand board feet and

perform road construction, completing an estimated 56% of the sale by the end of 2026

operations.   *Id.* ¶ 10.   Murphy Company has invested at least $163,258.50 in the sale to date,

including about $72,458.50 in roadwork, $40,800 invested in cable unit cutting, plus a $50,000

down payment.   *Id.* ¶ 11.

## III.   LEGAL STANDARDS.

### A.   Preliminary Injunction Standard.

A movant seeking a preliminary injunction must demonstrate by a *clear* showing that it is

entitled to such extraordinary relief.   *Muzarek v. Armstrong*, 520 U.S. 968, 972 (1997).   To

Page 6 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

meet its burden, the movant must clearly show that it is likely to succeed on the merits, likely to suffer irreparable harm in the absence of an injunction, that the balance of harm tips in its favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In cases arising under the ESA, the balance arguably "has been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194 (1978). But any such presumption is inapplicable where a movant's challenge to a Biological Opinion (BiOp) arises under the APA, 5 U.S.C. § 706, rather than under the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1)(A).[2] *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 176, 179 (1997) (stating that petitioners' best available science claims under ESA section 7(a)(2) were "found not to be covered by the ESA's citizen-suit provision," but were "reviewable under the APA"). *See also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (stating that judicial review of the ESA's best available science requirement is under the APA). That is the case here, certainly with respect to plaintiffs' section 7(a)(2) best available science claims against FWS, the consulting agency.

The APA does not alter a court's equitable discretion for a grant of injunctive relief. A reviewing court therefore must apply the *Winter* four-part test when evaluating a movant's request for an injunction on a claim arising under the APA and should decline to apply any other approach to the preliminary injunction standard. *Starbucks Corp. v. McKinney*, 602 U.S. 339,

---

[2] Section 11(g)(1)(A) of the ESA's citizen suit provision is the only provision of section 11 that could possibly give rise to a claim under ESA section 7(a)(2), 16 U.S.C. 1536(a)(2), the best available science provision relied on by plaintiffs. For a recent discussion on this issue, and on the issue of a claim arising under the ESA versus the APA more generally, see *Environmental Protection Information Center v. Van Atta*, No. 22-cv-03520-TLT, 2025 WL 3760628, at *3-*4 (N.D. Cal. Dec. 22, 2025).

Page 7 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

346 (2024). This includes the Ninth Circuit's "serious questions" alternative to the preliminary injunction standard, which plaintiffs recite, PI Mem. at 11, but do not appear to rely on in their argument. The relaxed "serious questions" standard is inconsistent with *Starbucks*, which held that "absent a clear command from Congress, courts must adhere to the traditional four-factor test" as set forth in *Winter*. *Starbucks*, 602 U.S. at 346.

Plaintiffs also opened the door to considering public interest and equities by arguing those factors themselves, PI Mem. at 27-30, thereby conceding that the traditional *Winter* four-part test for an injunction is the appropriate standard. And to be clear, under *Winter*, the movant must show that irreparable harm is *likely*, not just possible. "*Winter* tells us that plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of an injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). *Cf.* PI Mem. at 12 (falsely stating that "all that is required for an injunction" is for plaintiffs to meet their burden on the merits prong of the injunctive relief test). The Supreme Court in *Monsanto Company. v. Geertson Seed Farms*, 561 U.S. 139 (2010), emphasized the need to demonstrate irreparable harm by rejecting a line of Ninth Circuit authority which "appear[ed] to presume that an injunction is the proper remedy for [an environmental law] violation." *Id.* at 157.

As discussed below, plaintiffs have not made a clear showing that they are likely to succeed on the merits, nor shown that irreparable harm is likely in the absence of an injunction. The public interest and balance of harms factors also strongly disfavor an injunction. Thus, plaintiffs have not carried their burden for obtaining the extraordinary remedy of a preliminary injunction.

Page 8 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

B.    <u>Review Under the APA</u>.

The APA arbitrary and capricious standard of review applies to the Court's determination of whether plaintiffs have shown a likelihood of success on the merits. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc); 5 U.S.C. § 706(2)(A). Under this narrow standard of review, a court may not substitute its judgment (or that of plaintiffs) for that of an agency. *McNair*, 537 F.3d at 987. Rather, an agency may only be reversed as arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal citation omitted).

Agency scientific decision-making under the ESA is afforded highly deferential review. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02 (9th Cir. 2014). Here, the agency decisions at issue are sound and entitled to deference under the APA.

IV.    <u>ARGUMENT</u>.

A.    <u>Plaintiffs Are Unlikely to Succeed on the Merits</u>.[3]

1.    <u>The BiOp Appropriately Analyzed the Project's Anticipated Effects on Northern Spotted Owl Critical Habitat</u>.

Plaintiffs' argument that BLM's reliance on the 2023 BiOp is arbitrary and capricious because it failed to analyze the effects of the Project on northern spotted owl critical habitat is incorrect for three reasons.

---

[3] While the proper standard here is likelihood of success on the merits given the *Starbucks* decision, plaintiffs' claims do not even satisfy the "serious questions" standard. Plaintiffs' claims are simply contradicted by the very documents they cite, and none of the claims stand a fair chance of success.

Page 9 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

First, plaintiffs' argument that the EA and BiOp disclose different acres of affected critical habitat is incorrect.   The tables cited analyze two distinct criteria, with different methodologies.   In the BiOp and BA, the agencies analyzed the number of critical habitat acres that Project implementation will degrade, remove, or modify.   Thus, the BiOp and BA quantify the number of acres with anticipated habitat effects, whereas the EA table quantifies gross acreage within treatment units, regardless of whether the treatment units overlap leading to double counting.   In an erratum to Decision Record # 2, BLM explained the double counting explicitly in terms of the activities authorized therein:

> These HFR [Hazardous Fuels Reduction] treatments will all occur within the same footprint as depicted in the DR # 2 map packet.   This Erratum removes 989 acres of duplication in HFR maintenance treatments (HFR on top of HFR) which were unintentionally double-counted in the project's acreage data in the REA and DR#2. For example, double-counting of acres unintentionally occurred when a treatment unit had a handpile and handpile burn HFR prescription and an underburn HFR prescription on the same footprint area.   This was a GIS data error resulting in an overstatement of treatment acres in the REA.

> The Correct acreage of HFR treatments authorized in DR#2 is 5,081 acres. Because the treatment acreage totals were overstated compared to the acreage authorized in DR#2, the REA effects analysis remains unchanged and valid.   This Erratum clarifies the HFR acreage authorized in DR#2 and corrects the acreage totals as presented in the REA for accuracy of the administrative record.   BLM is not reopening or supplementing the REA, and DR#2 remains unchanged.

> The BLM tracks acres by habitat type being treated in each Decision Record to ensure that the acres treated and the associated effects of those treatments do not exceed the effects disclosed in the Biological Opinion.   Any future Decision Records not yet issued for the project will include additional information regarding overlapping HFR and commercial treatments and an accounting of all previous work authorized in other Decision Records.

Second Griffith Decl. Ex. C.   In short, the alleged discrepancy stems from a difference in mapping techniques.

Second, even if there were a discrepancy, plaintiffs' criticism is misplaced because the

Page 10 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

REA does not provide the operative analysis of the environmental effects of the Project to the northern spotted owl.   Rather, the REA tiers to the 2016 Programmatic Resource Management Plan/Final Environmental Impact Satatemet (PRMP/FEIS) and its associated consultation documents.   KSW00787.   In the 2016 programmatic Biological Opinion for the Southwestern Oregon RMP, the FWS concluded that the Medford District's timber program, as implemented through the RMP's Harvest Land Base, Late-Successional Reserves, and Riparian Reserves, would not jeopardize the northern spotted owl or destroy or adversely modify its critical habitat, provided BLM adhered to the RMP.

In terms of the Project itself, the 2023 BiOp found that the Project's activities were within the range of impacts already analyzed at the programmatic scale, and that future project-level actions like the Last Chance Project would remain compliant so long as they stayed within those effects, applied the RMP's restrictions, and triggered re-initiation under 50 C.F.R. § 402.16 if effects exceeded RMP-level limits.   KSW00281.   The project BiOp is tiered to the 2016 RMP-level Biological Opinion because it incorporates the 2016 BiOp's habitat baselines, northern spotted owl protective sideboards, barred-owl conditions, take-avoidance framework, and reinitiation triggers, and evaluates only the project's incremental effects relative to the RMP-level analysis rather than re-doing jeopardy or adverse-modification determinations. Rather than analyzing the Project in a vacuum, the 2023 BiOp confirmed that the Project complied with the 2016 RMP and therefore would not jeopardize the northern spotted owl.   That is why the document plaintiffs point to as the key to their argument – KSW00787, which is page B-54 in REA Appendix B – is in a section titled, "Issues Considered But Not Analyzed in Detail."   See KSW00724.   The cited page plainly states that BLM did not analyze in detail whether the Project would affect northern spotted owl critical habitat because "there is no

Page 11 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

potential for significant effects beyond those already analyzed in the 2016 PRMP/FEIS, to which this EA is tiered."   KSW00787.

Third, also as explained in the Erratum for DR#2, BLM is carefully tracking the cumulative number of critical habitat acres treated during Project implementation to ensure compliance with the 2023 BiOp.   Most recently, in DR # 4, BLM disclosed that, through the King Graves sale approved by that decision record, 2,303 acres (cumulatively) of the 3,093 approved by FWS in the 2023 BiOp would be treated.   If BLM decided to treat critical habitat acres that were *not* cleared in the 2023 BiOp, it would reinitiate consultation.   KSW00281.   But BLM has not exceeded that threshold, so there is no need to reinitiate consultation at this stage.

Finally, Murphy Company notes that this critical habitat issue is almost completely academic as to its timber sale, Paul's Payoff.   The sale's logging units are located on Harvest Land Base acres comprised almost entirely of Oregon & California Railroad Act (O&C) lands, which do not include critical habitat.   *See* KSW01962-3; *see also* Wheeler Decl. ¶ 14.   In 2021, FWS revised its northern spotted owl critical habitat rule to specifically exclude Harvest Land Base acres from designated owl critical habitat because harvest on such acres will not impair owl recovery.   86 Fed. Reg. 62606, 62606 (Nov. 10, 2021); KSW00466 ("This acreage resulted from the November 10, 2021 Final Rule's exclusions of approximately 204,294 acres within the Harvest Land Base for BLM and some tribal lands in Oregon (Service 2021b, entire) from the 2012 critical habitat designation (Service 2012a, entire).").   Thus, even if the Court finds plaintiffs' argument persuasive (which it should not), Paul's Payoff should be excluded from the scope of any preliminary injunction because it poses no threat to northern spotted owl critical habitat.   O&C Act lands per congressional mandate are to be managed for the dominant use of permanent forest production under the principles of sustained-yield timber management.   43

Page 12 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

U.S.C. § 2601 (mandating that O&C Act timberlands are to be managed for sustained-yield timber production).

### 2.     The BiOp Appropriately Analyzed the Project's Environmental Baseline for the Northern Spotted Owl.

FWS's conclusion that the Project will result in zero incidental take of northern spotted owls is well-founded and supported by the record.   While planning the Project, BLM completed comprehensive surveys of the Project area to identify spotted owls.   Plaintiffs claim, incorrectly, that BLM misclassified seven spotted owl detection sites identified during those surveys as unoccupied.   That argument rests on plaintiffs' disagreement with the expert agencies regarding survey methodology.   Far from promoting the best available science, plaintiffs' claim is an attempt to substitute their own counsel's interpretation of an inapplicable study for the judgment of FWS and BLM, the expert agencies.

### i.     BLM correctly applied the 2012 spotted owl survey protocol.

Here, BLM properly utilized the 2012 U.S. Fish and Wildlife Service Northern Spotted Owl Survey Protocol (2012 protocol) to assess spotted owl occupancy in the Project area.     The 2012 protocol prescribes a survey method designed to identify all northern spotted owls in all suitable nesting, roosting, and foraging habitat within the designated survey area before federal action agencies or permittees rely on no detection results.   The basic components of the 2012 protocol surveys are as follows: surveyors establish calling stations at approximately 0.25–0.5-mile intervals and conduct nighttime spot-calling using high-quality digital callers, broadcasting standardized sequences of spotted owl vocalizations for at least ten minutes per station.   KSW01032.   The protocol requires coverage sufficient to ensure that any owl within the survey area could hear the surveyor and that the surveyor could hear a response from the owl.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

*Id.* Surveys must occur during the official survey period, avoid adverse weather conditions that reduce detectability, and vary start times to avoid temporal bias. *See* KSW01030, KSW01034.

Whenever a spotted owl is detected, the protocol mandates a daytime follow-up outing to visually confirm species, determine status, and document location, behavior, and occupancy indicators such as pellets, whitewash, and roosting patterns. KSW01035, KSW01036–7. A nighttime survey followed by a daytime follow-up if a detection occurs constitutes a single "complete visit," and the protocol requires six complete visits per year for two consecutive years to reliably determine presence or absence. *See* KSW01036. The 2012 Protocol was designed to reduce false negatives, particularly given the documented suppression effect of barred owls on spotted owl responsiveness. KSW01026.

A site is interpreted as occupied only when surveyors obtain repeated detections consistent with the protocol's definitions of a territorial pair or resident single. *See* KSW01046–7. In contrast, isolated responses are insufficient to establish residency and instead indicate status unknown under the 2012 protocol. *Id.* Multiple detections support classification as a resident single or territorial pair. *Id.* These interpretive rules, including the requirement for repeated detections, are designed to minimize false positives and false negatives.

Here, BLM completed extensive surveys under the 2012 protocol and will continue to complete surveys during project implementation. Under the 2023 BiOp, "[i]f [during the surveys that occur during implementation] resident spotted owls are located, the District will drop units or modify the treatment prescriptions to avoid an incidental take determination by the Service." KSW00304. BLM's reliance on the 2012 protocol was fully justified because the 2012 protocol is the official, FWS-approved method for determining occupancy during ESA section 7 consultation, and it is the same protocol expressly incorporated into the Last Chance

Page 14 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

BiOp.   *See* KSW00317.   In fact, had the agencies failed to use the 2012 protocol's survey method, plaintiffs certainly would have filed claims criticizing the Project on that basis.

      ii.      **Plaintiffs' claim that BLM failed to follow the best available science in interpreting the survey results for the Project area is baseless.**

Plaintiffs do not, in fact, criticize BLM's use of the 2012 protocol to determine occupancy or raise any concern with how the surveys were conducted.   Rather, plaintiffs ask the Court to impose on BLM and FWS as the consulting agency an obligation to apply a completely untested methodology for interpreting the results of the surveys.   Specifically, plaintiffs argue that BLM ignored the best available science by not incorporating the findings of a 2023 study entitled "Using passive acoustic monitoring to estimate northern spotted owl landscape use and pair occupancy" (hereinafter referred to as the Appel study) in interpreting the survey results. That is not so.

The purpose of the best available science standard is to ensure that agencies do not base their decision on "speculation or surmise."   *Bennett*, 520 U.S. at 176.   BLM and FWS are entitled to deference on determining the best available science.   *Jewell*, 747 F.3d at 602.   Here, plaintiffs fail to demonstrate that the agencies did not utilize the best available science for four separate reasons.

First, plaintiffs provide absolutely no scientific opinion supporting their preferred application of the Appel study to the survey results for the Project.   Not that they could in an APA case, but plaintiffs do not even try.   None of the declarations submitted in support of the motion even attempt to explain the study's significance, and none of the declarants claim to be qualified to do so.[4]   To be clear, even when a plaintiff presents competing experts, the Ninth

---

[4] Notably, declarant George Sexton submitted comments in connection with the draft revised

Page 15 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

Circuit has emphasized that the district court must defer to the expert agency. *Jewell*, 747 F.3d at 621 ("The district court's determination to the contrary was heavily influenced by experts supplied by the parties which, for the reasons that we have explained, was inappropriate."). Plaintiffs have not even tried to supply expert evidence (which they could not). Rather, they rely solely on their attorneys' characterization of the study and its implications. Thus, far from demonstrating that BLM failed to utilize the best available science, plaintiffs fail to demonstrate even a shadow of scientific controversy. They present only legal advocacy and spin in support of their position.

Second, even without the benefit of scientific opinion, a cursory review of the Appel study reveals it to be wholly inapplicable to interpreting the results of the 2012 protocol. The study analyzed an entirely different survey method than the 2012 protocol, looking at passive surveys using "autonomous recording units" (ARUs). KSW01003, KSW01004, Figure 1. Rather than using a calling method where a surveyor electronically mimics spotted owl calls and listens for a response, ARU surveys place passive recording systems in the forest and note owl noises.

Third, the specific section of the study plaintiffs rely on makes no mention of its applicability to the results of 2012 protocol surveys. In the cited section, the authors state that they "estimated Pr(site occupied by pair|any owl detected) = .72, suggesting that when any owl was detected at an ARU station, it was highly likely that the owl belonged to a pair." KSW01012. Thus, on its face, the authors are *estimating* the likelihood of *pair* occupancies based on the results of passive, not active surveys, meaning it has no applicability to

---

EA. While included a lengthy list of article he wished BLM to consider, he did not include the Appel article. Second Griffith Decl. Ex. A.

Page 16 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

the results of 2012 protocol surveys.   Far from advocating for the use of the best available

science, plaintiffs argue that the Court should find that the agency failed to take estimated results

from a study about passive surveys capable of detecting owl pairs and apply them to survey

results from the 2012 protocol.   There is no basis in the article to support that position, and the

Court should not replace the scientific opinion of the expert agency with that of plaintiffs'

counsel on how to interpret and conduct owl surveys.

Fourth, the study itself makes clear that it is a preliminary study of passive methods

which are still in development.   The study concludes:

> Overall, passive acoustic monitoring coupled with remotely sensed forest data
> shows great promise for spotted owl conservation and management, especially
> when combined with automated workflows to allow rapid processing of data and
> further methods to extract information on owl sex and pair status.   These and future
> developments will permit accurate and timely detections of changes in spotted owl
> populations.

KSW01017.   The authors do not purport to reach conclusions that should apply to 2012 protocol

surveys and make clear that their results are preliminary.   In fact, their conclusion is that passive

survey methods show promise and should be developed further.   While interesting science and

perhaps indicative of things to come, the study is nothing close to (and does not purport to be)

the best available science for interpreting the results of 2012 protocol surveys.

**3.    The Project Complies with FLPMA With Respect to Bureau Sensitive Species.**

The 2016 RMP directs BLM to "[i]mplement conservation measures to mitigate specific

threats to Bureau Sensitive species during planning of activities and projects.   Conservation

measures include altering the type, timing, location, and intensity of management actions."

KSW02152.   The record demonstrates that BLM complied with that requirement with respect to

the Northwestern Pond Turtle (NWPT).   Specifically, section 3.4 of the Final EA details BLM's

Page 17 **- DEFENDANT-INTERVENOR MURPHY
COMPANY'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

analysis of the project's effects on turtles, detailing how BLM planned the project to avoid effects on NWPT and concluding that the design features prevented any meaningful risk to the species.   That section and the Project's Finding of No Significant Impact demonstrate that BLM analyzed the conservation measures associated with the Project during the planning phase, found them to be sufficient, and made the following findings with regards to the three NWPT habitat categories, aquatic, nesting, and overwintering.

BLM conducted a detailed analysis to identify aquatic habitat within the Project area. BLM applied a model to identify aquatic habitat, identified seven potential sites, and then did field visits to investigate.   Upon in person inspection, four of the seven were "found to be unsuitable because they were either not aquatic features (upland forest) or swift flowing water with a closed canopy and no solar exposure."   KSW00660.   The hydrologist then identified additional ponds which BLM investigated, and staff reviewed databases to identify known detections.   *Id.*   Last, "LiDAR and satellite imagery was utilized to assist in classifying aquatic habitat."   *Id.*   Having carefully identified the aquatic habitat, the agency then concluded that since the Project "implements riparian buffers and no work is planned in NWPT aquatic habitat, "[t]here are no anticipated effects to NWPT aquatic habitat.   Proposed new stream crossings are not in NWPT aquatic habitat."   KSW00662.

In terms of nesting habitat, BLM concluded that "[b]ased on LiDAR and satellite imagery review, there is no nesting habitat within the proposed units, quarries, or new road construction. Roads classified as road renovation (work done to an existing road; RMP. P. 311) are considered non-habitat for NWPT.   Therefore, there are no anticipated effects to nesting habitat or nesting turtles, eggs, or hatchlings."   *Id.*   Thus, BLM concluded that no conservation measures were needed, because the Project would not affect nesting habitat.

Page 18 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

BLM also analyzed projected impacts on overwintering habitat and found that each of the alternatives would remove only .13 percent of overwintering habitat in Oregon and "concluded that this would not affect the species at the overall population level (ranging across WA, OR, CA, NV) and would not lead to a measurable increase in the likelihood of the species to be listed as threatened." KSW00663. BLM also found that the buffers around aquatic features built into the project would protect a large portion of overwintering habitat. KSW00662-3 (120 foot buffers for perennial streams and 25 foot buffers for small ponds). Thus, BLM concluded that, given the Project's design and conservation measures, it would have negligible effect on NWPT. *See* KSW00663 (REA analysis); *see also* KSW02372 (conclusions regarding NWPT in FONSI).

Plaintiffs ignore BLM's thorough analysis of NWPT entirely and instead point to PDF 50, which would impose additional requirements on the Project if the NWPT was listed as threatened under the ESA. KSW00842-3 (PDF 50 in REA). There is nothing nefarious about that requirement. Bureau sensitive species are not afforded the same protection as threatened and endangered species. Specifically, the ESA prohibits take of threatened and endangered species, so it becomes illegal to kill or injure a member of the species. If the NWPT became listed, take would then be prohibited under the ESA. Because the NWPT is proposed for listing, BLM sensibly built a contingency into the Project to make sure that implementation did not violate the ESA if FWS decides to list the species during project implementation. Far from some failure, PDF 50 is a commonsense safeguard built so that the Project will continue to comply with the law in the event a change in the legal protection of the species were to occur.

### B.    Plaintiffs Have Not Met Their Burden of Showing a Clear Likelihood of Irreparable Harm.

Even had plaintiffs demonstrated a likelihood of success on the merits, they have not

Page 19 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

satisfied the likelihood of irreparable harm prong of the preliminary injunction test.    Again, plaintiffs must demonstrate that irreparable harm is *likely,* not just a mere possibility. "*Winter* tells us that plaintiffs may not obtain a preliminary injunction unless they can show irreparable harm is likely to result in the absence of the injunction."    *Cottrell*, 632 F.3d at 1135.

As a general matter, mere assertions of environmental injury do not lessen a party's burden to demonstrate irreparable harm to obtain an injunction.    *See, e.g., Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (affirming district court decision not to enjoin project despite violation of environmental law where defendant's certain financial loss outweighed uncertain injury to substance resources).

### 1.    Plaintiffs' delay in filing for a preliminary injunction weighs strongly against a finding of irreparable harm.

The Court should weigh plaintiffs' delay in filing for a preliminary injunction heavily in analyzing their current allegations of irreparable harm.    *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc).    That principle is common-sense.    A request for a preliminary injunction seeks extraordinary relief on the basis that a party's interests will be fatally and irreparably compromised if the court does not intervene before a final decision on the merits.    Such a request can, as it will here for Murphy Company, Boise Cascade, and the communities of southern Oregon, have dramatic consequences for the other parties, and courts reasonably require movants to pass a high bar before intervening to impose those costs.    A movant is starting on the back foot if they themselves have delayed in seeking such extraordinary relief to protect their own interests.

Page 20 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

Here, plaintiffs' delay has been extreme, certainly with respect to Murphy Company. The present lawsuit is plaintiffs' *second* challenge to the Last Chance Project, the first having been voluntarily dismissed *five months* before plaintiffs filed the present motion.   After dismissing their first lawsuit (in which Murphy Company had intervened), plaintiffs in December 2025—without any notice to Murphy Company—again filed suit seeking the same relief with new counsel and new claims.   Wheeler Decl. ¶ 4.   Murphy Company only learned of the lawsuit in mid-January.  *Id.*   Plaintiffs delayed in seeking a preliminary injunction with full knowledge that Murphy Company was working on the sale, thereby acquiescing in Murphy Company's operations.

During this long period of inexplicable delay, Murphy Company got to work.   In August of 2025, Murphy Company informed plaintiffs' former counsel that it intended to begin operations.  *Id.* ¶ 3.   Again, rather than seek a preliminary injunction to halt those operations, much less protest at all, plaintiffs voluntarily dismissed their case.   After a delay due to high fire risk, Murphy Company commenced operations in November of 2025, including building and improving roads, cutting units, and investing significant sums into the sale.  *Id.*

Plaintiffs provide no explanation for their delay, which "implies a lack of urgency and irreparable harm."  *Oakland Trib., Inc.*, 762 F.2d at 1377.   The delay reveals this motion for what it is: a litigation tactic designed to secure plaintiffs' land management preferences and impose cost on Murphy Company and others rather than an effort to prevent genuine irreparable harm.

**2.    Plaintiffs fail to demonstrate irreparable harm to the northern spotted owl under the ESA.**

Should the Court find that plaintiffs are likely to succeed on the merits of their ESA claim

Page 21 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

(which it should not), plaintiffs must demonstrate a likelihood of irreparable harm to the northern spotted owl to secure an injunction.   Even where an ESA procedural claim has been found meritorious, "[a] plaintiff must show [a likelihood] of irreparable injury to justify injunctive relief."   *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015), cert. denied, 580 U.S. 916 (Oct. 11, 2016) (holding, in the context of permanent rather than preliminary injunctive relief, that "there is no presumption of irreparable injury where there has been a procedural violation in the ESA cases").

Irreparable harm under the ESA generally is harm to the species at issue, or to a population of the species.[5]   More fundamentally, allegations of irreparable harm cannot be divorced from the statute giving rise to an alleged claim.   *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF)*, 886 F.3d 803, 818 (9th Cir. 2018) ("Irreparable harm should be determined by reference the purpose of the statute being enforced."); *Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015) (finding no likelihood of irreparable harm where there is a "mismatch" between the plaintiff's substantive claim and the harm sought to be remedied). Thus, to the extent plaintiffs complain about alleged timber harvest harms untethered to northern spotted owl, plaintiffs' irreparable harm allegations gain no traction.

Plaintiffs claim that the Project will cause irreparable harm to the northern spotted owl in two ways, neither of which are meritorious.   First, plaintiffs claim that the Project will result in the direct unauthorized take of resident owls at the seven sites they believe should be categorized as occupied based on the Appel study.   For the reasons stated above, that is not so.   The expert

---

[5] The standards for irreparable injury differ between the ESA and FLPMA claims.   Both lack merit, but if the Court were to find that plaintiffs are likely to succeed on one but not the other, its analysis of irreparable harm must track to that claim.

Page 22 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

agencies, BLM and FWS, applied the correct survey methodology and interpreted the results correctly.   Plaintiffs present absolutely no scientific opinion or evidence supporting their novel, and incorrect, interpretation of the Appel study's application to the Project.

Second, plaintiffs' claim that the Project authorized the removal of "nearly triple the amount FWS considered to make its no-jeopardy analysis" is false.   Plaintiffs cite to the REA table they claim contradicts the approved critical habitat impacts in the BiOp.   Setting aside plaintiffs' confusion regarding the meaning of the acreage numbers, the plaintiffs cannot rely on that table to establish irreparable harm because the REA does not authorize anything.   The REA provides NEPA analysis, while the individual decision records implement the Project.   Here, the most recent decision record, DR # 4, states that BLM has cumulatively authorized the removal of much *less* critical habitat than approved by the 2023 BiOp as posing no threat to the spotted owl.   Thus, there is no imminent risk (or any risk) of irreparable harm to the species.

### 3.    Plaintiffs fail to establish irreparable harm to the NWPT.

Plaintiffs likewise fail to establish any potential harm, much less irreparable harm, to NWPT.   Plaintiffs' only argument is that "[f]or a long-lived species with low reproductive rates and delayed sexual maturity, the loss of individuals, including juveniles and adults of breeding age, constitutes an irreparable loss to the local population's viability that cannot be remedied by money damages."   Plfs. Mot. at 26.[6]   Plaintiffs provide no citation for that conclusion and present zero scientific evidence.   They also present no evidence that the Project threatens to irreparably harm the NWPT.

NWPT are a bureau sensitive species, not endangered or threatened under the ESA.

---

[6] Plaintiffs cite only *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987), which provides no support for plaintiffs' conclusions regarding the pond turtle.

Page 23  - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

Under the RMP, BLM must analyze the effects on NWPT and design the project with the sensitive species in mind, but need not avoid impacts to them entirely.    Again, BLM's analysis shows that the Project would remove only .13 percent of overwintering habitat in Oregon and "concluded that this would not affect the species at the overall population level (ranging across WA, OR, CA, NV) and would not lead to a measurable increase in the likelihood of the species to be listed as threated. . . ."  KSW00663.   BLM concluded that there would be absolutely no impacts on aquatic or nesting habitat.  *See* KSW00662.   Because the Project's design avoids the vast majority of NWPT in the Project area, unsurprisingly BLM notes that they are only aware of two detections of NWPT in logging units, with the most recent occurring nearly thirty years ago in 1997.  KSW00661.   Far from irreparable harm, the only evidence in the record demonstrates that any impacts on the NWPT are speculative, likely illusory, and negligible.

### 4.  Plaintiffs' generalized concerns for their own interests are insufficient to establish irreparable harm.

Plaintiffs' final argument on irreparable harm is that project implementation will "injure the recreational, aesthetic, and professional interests of Plaintiffs' members."   That interest is likewise not adequate to establish irreparable harm.   "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co.*, *Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original).   Here, the Project will not prevent plaintiffs from visiting the Project area after implementation and, in fact, the Project is designed to improve forest health, not detract from it.   Plaintiffs' preference that the Project area remain in its current unhealthy condition does not equate to irreparable harm, particularly where

Page 24  - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

plaintiffs have done very little to explain any particularized interest in the Project area.

A careful review of the declarations in support of plaintiffs' arguments demonstrate that the interests the declarants claim in the Project area are really interests in the public lands of southern Oregon generally. The declarants make clear that they visited the site in connection with the litigation. Cowen Decl. ¶ 8 (stating that she first visited the site in summer 2024); Sexton Decl. ¶¶ 8-9 (stating that he visited specific units of the sale); Legue Decl. ¶ 9 (discussing only one specific visit to the site in September of 2024 and stating that he visited specific logging units). While the only specific visits cited by any of the declarants are clearly linked to preparing for this litigation given the citation to logging units, the claimed harm to their use of the area in the future is generic. For example, Mr. LeGue says that he has planned trips down I-5 and wants to take a stop in the area "to enjoy the diversity of birds, native wildflowers, trees, and shrubs . . . ." *Id.* ¶ 14. Mr. Sexton says that he plans to "spend considerable time in the future using and enjoying native forests on public lands located in the Last Chance timber sale units." Sexton Decl. ¶ 10. Ms. Cowen, who says she first visited the area in the summer of 2024, states that she "intends to visit this area again the spring of 2025, and again the summer, with the hope of seeing an owl. I also plan to continue visiting a few spots that I return to year after year to collect chanterelle and hedgehog mushrooms to enjoy and share with family and friends." Cowen Decl. ¶ 13.

What the declarants fail to explain is why, if BLM is allowed to continue implementing the Project to *protect* the area, implementation would harm their interests or why they could not just drive to the next I-5 exit to engage in their preferred recreational activities. None of them establish any kind of concrete interest in the Project area that does not exist elsewhere, and all three make clear that the harm they feel they would suffer is activity based: enjoying public

Page 25 **- DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

lands, visiting mature stands, seeing owls, hiking, rest stops.   Even assuming those recreational activities would be inconvenienced by Project implementation (which they do not establish), they are all free to continue their recreation in other stands within a very short drive from the Project area.   That harm, if any, is hardly irreparable.

    **C.**    **The Balance of the Equities and Public Interest Strongly Disfavor an Injunction.**

    The public interest and balance of harms counsel overwhelmingly in favor of project implementation here.   The harms of defendants, Murphy Company, and proposed-intervenors are concrete, imminent, and irreparable if the Court were to enjoin operations.   As explained above, plaintiffs' alleged harms are imagined, speculative and, in any event, mitigated by the Project's design features and agency restrictions already in place.

    Murphy Company is actively implementing Paul's Payoff.   It has been since last year with the full knowledge of plaintiffs.   Enjoining Paul's Payoff now would disrupt Murphy Company's log supply schedules and threaten its production for 2026.   Murphy has also already invested approximately $163,258.50 in Paul's Payoff ($72,458.50 in roadwork, $40,800 in cutting timber, and a $50,000 down payment).   Wheeler Decl. ¶ 11.   An injunction would tie that investment up and deprive the Company of the planned volume and related cash flow.

    Murphy Company's crews are currently mobilized, commenced roadwork and roadside vegetation management in 2025, and are presently finishing timber falling in certain cable-yarding units and will begin yarding those logs as soon as April.   The sale will supply Murphy Company with important timber volume in 2026 to keep its mills running.   Wheeler Decl. ¶ 10.   These phased operations reflect careful sequencing around environmental windows and crew availability and were influenced by plaintiffs' acquiescence in Murphy Company's

**Page 26** - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

operations since last year (and dismissal of their first lawsuit).    An injunction now would disrupt Murphy Company's ongoing operations and threaten their log supply for 2026.

Murphy Company is also concerned about the harm to the communities of southern Oregon that would flow from plaintiffs' proposed injunction.    While proposed-intervenor Association of O&C Counties is well positioned to discuss the impacts on the Community, Murphy Company also is well-aware of the importance of sales like Paul's Payoff for the local Community.    Wheeler Decl. ¶ 14.    An injunction would delay or destroy those benefits.

By contrast, Plaintiffs' harms, as discussed above, are speculative and ill-defined. Plaintiffs fail to demonstrate any genuine risk to the northern spotted owl or NWPT, and their concerns for their own alleged interests are clearly outweighed by the burden on Murphy Company and the Community.

The lack of actual irreparable harm is also revealed by plaintiffs' delay in filing this Motion of nearly a year from when BLM finalized the REA and months after Murphy Company notified plaintiffs in August 2025 that operations would soon commence.    For the same reasons the delay undercuts plaintiffs' claims of irreparable harm, that extreme delay tips the balance of harms towards the defendants and intervenors, particularly Murphy Company.

In a very similar challenge to a timber sale, this Court found an eight-month delay in filing a motion for preliminary injunction nearly dispositive on the balance of harms prong. There, Judge McShane made the following findings:

> By waiting eight months after the sale to file the complaint, plaintiffs turned what could have been speculative harms to the plaintiffs into, essentially, vested interests.    Roads have been built.    Logging has begun.    The defendant intervenors are depending on the lumber to keep their mills open and active now and during the coming months.
>
> . . . Had plaintiffs not waited eight months, the administrative record would have

Page 27 - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

> been filed months ago, and plaintiffs would have had plenty of time to "present countervailing evidence." [footnote omitted].    This ruling would likely be one for summary judgment, on a full record, as opposed to a somewhat rushed ruling after an expedited hearing, with a limited record on an issue with high stakes for all involved parties (not to mention the environment itself).

*Cascadia Wildlands v. Carlton*, 341 F. Supp. 3d 1195, 1204–05 (D. Or. 2018).

The facts here are far more egregious.    Plaintiffs promptly filed suit and the litigation progressed without a preliminary injunction.    Then, after being given notice that Murphy Company planned to commence operations, plaintiffs dismissed their case voluntarily.    Months later, plaintiffs refiled their lawsuit (with no notice to Murphy Company), and they still did not promptly pursue a preliminary injunction for nearly three more months.    That delay exacerbated the harm Murphy Company would suffer if the Court enjoins the Project.    A preliminary injunction at this stage would be unjust in those circumstances.

The balance of harms favors defendants, intervenors, and the community.    It strongly favors Murphy Company.

### D.    A Bond is Required for Any Injunction.

Under Federal Rule of Civil Procedure 65 (c), the Court *must* require plaintiffs to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."    According to the Ninth Circuit, "each case is fact-specific" and "[s]o long as a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion."    *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125-26 (9th Cir. 2005) (upholding $50,000 bond).

Here, Murphy Company has already invested at least $165,258.50 in the Paul's Payoff Timber Sale.    Wheeler Decl. ¶ 11.    Murphy Company would also incur mobilization and demobilization costs and would be delayed in harvesting the timber on the sale in the event of an

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

injunction, with any down wood remaining in the sale area deteriorating beyond use and posing a potential fire risk due to its deteriorating.  *Id.* ¶ 12.

Litigating a timber sale is serious business that creates substantial uncertainty and causes a purchaser to defend its contract interest.   The statutory bond requirement is a natural consequence of plaintiffs' choice.   No injunction should issue without a bond.

But on the facts of the case, the Court need not reach the bond issue because the Court should not impose a preliminary injunction on the Project, and particularly not on Murphy Company's Paul's Payoff timber sale.   The Paul's Payoff logging units are in the harvest land base where timber production is the goal.   Plaintiffs have made no showing of how or where the sale would affect their interests in owls, NWPT, or recreation.   Murphy Company's operations are well underway, with full knowledge and long acquiescence of plaintiffs, and with felled trees currently laying on the ground in anticipation of being taken to the mill and being put to important, productive uses in the coming months.   On the facts of this case, a preliminary injunction is unwarranted and would be unjust.   The parties should instead focus on expeditiously briefing the merits.

## IV.    <u>CONCLUSION</u>.

For the foregoing reasons, Murphy Company respectfully requests that the Court deny plaintiffs' motion for a preliminary injunction.

DATED this 27th day of February, 2026.

**HAGLUND KELLEY LLP**

By:    /s/ Christopher T. Griffith
    Michael E. Haglund, OSB No. 772030
    Julie A. Weis, OSB No. 974320
    Christopher T. Griffith, OSB No. 154664
    Attorneys for Defendant-Intervenor

Page 29  - **DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW BROADWAY
PORTLAND, OR 97201

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of February, 2026, I served the foregoing

**DEFENDANT-INTERVENOR MURPHY COMPANY'S OPPOSITION TO**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM**

with the Clerk of the Court using the CM/ECF system, which will send notification of this filing

to the attorneys of record and all registered participants.


/s/ Christopher T. Griffith
Christopher T. Griffith

**CERTIFICATE OF SERVICE**