ADAM R. F. GUSTAFSON, Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
SHANNON BOYLAN (DC Bar No. 1724269)
Natural Resources Section
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9584 (Boylan)
(202) 598-9736 (Carrara)
shannon.boylan@usdoj.gov
christian.carrara@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER**, *et al.*, | Case No.: 1:25-cv-02296-CL |
| Plaintiffs, | |
| v. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 16)** |
| **BURGUM**, *et al.*, | |
| Defendants. | |

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

STATUTORY BACKGROUND ..........................................................................................2

    I.    The Endangered Species Act ...................................................................................2

    II.    The Federal Land and Management Policy Act .....................................................3

    III.    Oregon & California Revested Lands Act ...............................................................3

FACTUAL & PROCEDURAL BACKGROUND .................................................................4

    I.    Factual Background ..................................................................................................4

        A.    The Northern Spotted Owl .............................................................................4

        B.    Northwestern Pond Turtle ..............................................................................5

        C.    The 2016 Southwestern Oregon Resource Management Plan .......................6

        D.    The Last Chance Project ................................................................................7

        E.    The Biological Opinion ..................................................................................9

        F.    Project Implementation ................................................................................11

STANDARD OF REVIEW .................................................................................................12

    I.    Preliminary Injunctions Are Extraordinary Remedies .........................................12

    II.    Review Of Agency Decisions Under The Administrative Procedure Act .............12

ARGUMENT ......................................................................................................................13

    I.    Plaintiffs Are Not Likely To Succeed on the Merits ...........................................13

        A.    BLM reasonably relied on the BiOp. ...........................................................13

        B.    The BiOp rationally explained why the Project would not jeopardize the continued existence of the NSO. ..................................................................15

        C.    The Project Conforms to the RMP as Required by FLPMA. .......................19

    II.    Plaintiffs Do Not Show Irreparable Harm............................................................23

        A.    Plaintiffs fail to show Project activities will irreparably harm NSOs. ........24

        B.    Plaintiffs fail to show Project activities will irreparably harm NWPT.........28

        C.    Plaintiffs fail to show Project activities will irreparably harm their interests. ........28

    III.    Plaintiffs Fail To Demonstrate That The Balance Of Harms And Public Interest Weigh In Favor Of An Injunction.........................................................................30

    IV.    If An Injunction Is Granted, Plaintiffs Should Be Required To Post A Bond. ....33

CONCLUSION ...................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*All. for the Wild Rockies v. Krueger,*
   35 F. Supp. 3d 1259 (D. Mont. 2014) ..................................................................30

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,*
   273 F.3d 1229 (9th Cir. 2001).......................................................................19

*Butte Env't Council v. U.S. Army Corps of Eng'rs.,*
   620 F.3d 936 (9th Cir. 2010) .......................................................................27

*Cascadia Wildlands v. BLM,*
   No. 6:12-CV-01739-AA, 2013 WL 5723315 (D. Or. Oct. 18, 2013) ........................................23

*Cascadia Wildlands v. Thrailkill,*
   49 F. Supp. 3d 774 (D. Or. 2014)...................................................................16

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.,*
   153 F.4th 869 (9th Cir. 2025)..........................................................16, 20, 21, 22

*City of Tacoma, Wash. v. Fed. Energy Regul. Comm'n,*
   460 F.3d 53 (D.C. Cir. 2006) .......................................................................14

*Conservation Cong. v. U.S. Forest Serv.,*
   No. 2:13-cv-1977-JAM-DB, 2018 WL 4007093 (E.D. Cal. Aug. 17, 2018)............................26

*Conservation Cong. v. U.S. Forest Serv.,*
   720 F.3d 1048 (9th Cir. 2013).......................................................................12

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
   698 F.3d 1101 (9th Cir. 2012) ......................................................................15

*Ctr. for Biological Diversity v. Zinke,*
   900 F.3d 1053 (9th Cir. 2018).......................................................................15

*Earth Island Inst. v. Carlton,*
   626 F.3d 462 (9th Cir. 2010)........................................................................27

*Earth Island Inst. v. Elliott,*
   290 F. Supp. 3d 1102 (E.D. Cal. 2017) ..............................................................25

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
   98 F.4th 1180 (9th Cir. 2024).....................................................................23, 24

*Friends of Bitterroot v. Marten*,
No. CV 20-19-M-DLC, 2020 WL 2062139 (D. Mont. Apr. 29, 2020)......................................27

*Friends of the Clearwater v. Higgins*,
472 F. Supp. 3d 859 (D. Idaho 2020)......................................................................31

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000)......................................................................................28

*Friends of the Wild Swan v. Weber*,
955 F. Supp. 2d 1191 (D. Mont. 2013) ...................................................................33

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)...........................................................................13

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
914 F.2d 1174 (9th Cir. 1990)..........................................................................30

*Idaho Rivers United v. Army Corps of Eng'rs*,
156 F. Supp. 3d 1252 (W.D. Wash. 2015)...............................................................26

*Klamath Forest All. v. Jones*,
No. 2:25-CV-3424-DMC, 2025 WL 3640859 (E.D. Cal. Dec. 15, 2025) .................................24

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
962 F. Supp. 2d 1230 (D. Or. 2013) .....................................................................3

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)......................................................................................27

*Miller for & on Behalf of NLRB v. Cal. Pac. Med. Ctr.*,
991 F.2d 536 (9th Cir. 1993).............................................................................29

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018).............................................................................30

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)........................................................................................3

*Oakland Trib. v. Chron. Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985).............................................................................29

*Oceana, Inc. v. Pritzker*,
75 F. Supp. 3d 469 (D.D.C. 2014) .......................................................................26

*Or. Nat. Res. Council Fund v. Brong*,
  492 F.3d 1120 (9th Cir. 2007) .................................................................................3, 20

*Pac. Rivers v. U.S. Bureau of Land Mgmt.*,
  No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018) ...........................31

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*,
  898 F.2d 1410 (9th Cir. 1990) ..................................................................................14

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
  499 F.3d 1108 (9th Cir. 2007) ..................................................................................12

*Res. Ltd., Inc. v. Robertson*,
  35 F.3d 1300 (9th Cir. 1993) ....................................................................................15

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) .............................................................................12, 13

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  No. 2:13-cv-00042-MCE, 2013 WL 4094777 (E.D. Cal. Aug 13, 2013).....................24

*Salmon Spawning & Recovery All. v. NMFS*,
  342 F. App'x 336 (9th Cir. 2009) ..............................................................................13

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ....................................................................................15

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ..................................................................................33

*Sierra Forest Legacy v. Rey*,
  691 F. Supp. 2d 1204 (E.D. Cal. 2010).....................................................................31

*Souza v. Cal. Dep't of Transp.*,
  No. 13-cv-04407-JD, 2014 WL 1760346 (N.D. Cal. May 2, 2014)...........................12

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) ..................................................................................19

*U.S. Citrus Sci. Council v. U.S. Dep't of Agric.*,
  312 F. Supp. 3d 884 (E.D. Cal. 2018)........................................................................13

*Wild Equity Inst. v. City & Cnty. of San Francisco*,
  No. C 11-00958 SI, 2011 WL 5975029 (N.D. Cal. Nov. 29, 2011)...........................26

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008)................................................................................................12, 23

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................12

16 U.S.C. § 1531(b) ................................................................................................26

16 U.S.C. § 1532(15) ................................................................................................2

16 U.S.C. § 1533 ................................................................................................2

16 U.S.C. § 1536(a)(2) ...............................................................................2, 15, 26

16 U.S.C. § 1536(b)(4) ................................................................................................3

16 U.S.C. § 1536(c)(1) ......................................................................................2, 14

16 U.S.C. § 1536(o) ................................................................................................26

16 U.S.C. § 1539(a) ................................................................................................26

16 U.S.C. § 1539(b) ................................................................................................26

43 U.S.C. § 1701 ................................................................................................4

43 U.S.C. §§ 1701–1785 ......................................................................................3, 4

43 U.S.C. § 2601 ..........................................................................................3, 30, 31

**Regulations**

43 C.F.R. § 1610.5–3(a) ................................................................................................3

50 C.F.R. § 17.11 ................................................................................................2

50 C.F.R. § 402.01(b) ................................................................................................2

50 C.F.R. § 402.02 ........................................................................................3, 9, 16

50 C.F.R. § 402.14 ................................................................................................2

**Other Authorities**

11A Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed.) ......................................24

55 Fed. Reg. 26114 (June 26, 1990) ......................................................................4, 5

Fed. R. Civ. P. 65(c) ................................................................................................33

**TABLE OF EXHIBITS**

Exhibit 1: Declaration of Justin Kelly

Exhibit 2: Declaration of Michael Asch

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| O&C Act | Oregon & California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| HLB | Harvest Land Base |
| LSR | Late-Successional Reserves |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NRF | Nesting, Roosting, and Foraging |
| NSO | Northern Spotted Owl |
| NWPT | Northwestern Pond Turtle |
| PAM | Passive Acoustic Monitoring |
| PDFs | Project Design Features |
| Project | Last Chance Forest Management Project |
| REA | Revised Environmental Assessment |
| RMP | Resource Management Plan |
| Survey Protocol | NSO Survey Protocol |
| 2016 RMP | 2016 Southwestern Oregon Resource Management Plan |

## INTRODUCTION

Plaintiffs have created an emergency for this Court. They seek to enjoin the agencies from "authorizing or implementing ground disturbing activities" under the U.S. Bureau of Land Management's ("BLM") Last Chance Forest Management Project ("Project"). ECF No. 16 ("Pls.' Br.") at 9. Yet, BLM issued its finding of no significant impact ("FONSI") for the Project and two decision records, authorizing forest management activities associated with two timber sales, Paul's Payoff Timber Sale and Rotors Up Timber Sale, and hazardous fuel reduction activities in May 2025. ECF Nos. 17-11, 17-12, 17-13. Now, eight months after those activities were authorized, Plaintiffs ask the Court for emergency injunctive relief.

Although Plaintiffs label their request as "limited" to "logging and road construction" within northern spotted owl ("NSO") and northwestern pond turtle ("NWPT") habitat, Pls.' Br. 9, in effect, Plaintiffs' request would serve as a total roadblock, preventing any logging activities from moving forward until there is a final ruling on the merits. But the U.S. Fish and Wildlife Service ("FWS") already determined that the Project is not likely to jeopardize the continued existence of the NSO or adversely modify designated critical habitat as part of an Endangered Species Act ("ESA") Section 7 consultation undertaken by the agencies with respect to the Project. Further, BLM determined the Project neither presents "specific threats" to NWPT requiring project-level conservation measures, nor contributes to the need to list that species consistent with BLM's Bureau Sensitive Species Policy and 6840 Manual. Therefore, the Project complies with the 2016 Southwestern Oregon Resource Management Plan ("RMP") and Federal Land Policy and Management Act ("FLPMA").[1] Moreover, the work that Plaintiffs seek to enjoin will further public

---

[1] Plaintiffs' Complaint also challenges the Project under the National Environmental Policy Act ("NEPA"), ECF No. 1 ¶ 4. Because Plaintiffs' Motion does not raise arguments under the law, Defendants do not address NEPA here but maintain the Project also complies with it.

interests in timber production and public safety, as the Project was designed to produce a permanent supply of timber, reduce the risk of wildfire and insect outbreaks, and improve the development of NSO nesting-roosting habitat. ECF No. 17-3 (Revised Environmental Assessment or "REA") at 8-10. Importantly, Plaintiffs can neither demonstrate that they are likely to succeed on the merits nor suffer irreparable injury if the Project work that they now challenge goes forward. The Court should therefore deny Plaintiffs' motion for a preliminary injunction.

## STATUTORY BACKGROUND

### I.    The Endangered Species Act

The ESA provides for the listing of species as threatened or endangered, 16 U.S.C. § 1533, and protects listed species in several ways. As relevant here, ESA Section 7 directs each federal agency to ensure,[2] that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. *Id.* § 1536(a)(2). An agency proposing to take an action ("action agency"), generally prepares a biological assessment ("BA") to determine whether any listed species present "is likely to be affected" by the action. *Id.* § 1536(c)(1).  If the BA determines that project is likely to adversely affect a listed species, the action agency must formally consult with either FWS or the National Marine Fisheries Service ("NMFS").[3]

Formal consultation results in the issuance of a biological opinion ("BiOp") by FWS which states FWS's expert opinion on whether the proposed agency action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. *Id.* § 1536(a)(2); 50 C.F.R. § 402.14. FWS may issue an incidental take statement with the BiOp, which

---

[3] The relevant consulting agency here is FWS, as Congress has delegated responsibilities for terrestrial and resident aquatic species to the Secretary of the Interior, as administered by FWS. 16 U.S.C. §§ 1533, 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

exempts liability for any taking of a species under Section 9. 16 U.S.C. § 1536(b)(4). Not all harm or "take" of listed species rises to the level of causing "jeopardy;" rather, to "jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

## II.    The Federal Land and Management Policy Act

FLPMA establishes requirements for land use planning on public lands. 43 U.S.C. §§ 1701–1785. Under FLPMA, BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield." *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotations omitted). Once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a). FLPMA "leaves BLM a great deal of discretion in deciding how to achieve" compliance with the applicable land use plan. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004); *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016).

## III.    Oregon & California Revested Lands Act

The Oregon & California Revested Lands Act ("O&C Act") governs 2.2 million acres of western Oregon BLM lands, including the lands at issue here. 43 U.S.C. § 2601. O&C lands must be managed "for permanent forest production, . . . with the principal of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities[.]" *Id*. The O&C Act takes precedence over FLPMA in the event of a conflict

or inconsistency, "insofar as they relate to the management of timber resources." *Id.* § 1701, Savings Provision.

## FACTUAL & PROCEDURAL BACKGROUND

### I.    Factual Background

#### A.  The Northern Spotted Owl

In 1990, the NSO was listed as threatened under the ESA. 55 Fed. Reg. 26114 (June 26, 1990); FWS_017886. The NSO is the largest of three subspecies of spotted owls and is dark brown with a barred tail and white spots on its head and breast, and it has dark brown eyes surrounded by prominent facial disks. FWS_00369.

Evaluations of NSO habitat are usually conducted at two spatial scales: the home range and core areas. ECF No. 17-2 at 190. The home range is the "area traversed by the individual in its normal activities of food gathering, mating, and caring for young" and varies geographically likely due to differences in habitat quality. *Id*. at 192. Within home ranges, areas receiving concentrated use, typically surrounding the nest site and favored foraging areas, are the "core-use areas." *Id*. The habitat composition, specifically sufficient amounts of nesting, roosting, and foraging habitat (collectively, "NRF"), within cores and annual home ranges has been found to be directly correlated with demographic responses such as occupancy, reproductive success, survival, and fitness. *Id*. at 193; FWS_000372.

Although NSOs are territorial, the home ranges of adjacent pairs overlap, suggesting that the area defended is smaller than the area used for foraging. ECF No. 17-2 at 192; FWS_000371. Some are not territorial, however, and either remain as residents within the territory of a pair or move among territories. ECF No. 17-2 at 192. These birds—called "floaters"—have significance in NSO populations because they may buffer the territorial population from decline. *Id*. Despite

their importance, little is known about floaters other than that they exist and typically do not respond to calls as vigorously as their territorial counterparts.[4]  *Id.*

The NSO was initially listed under the ESA as threatened throughout its range "due to loss and adverse modification of [suitable] habitat as a result of timber harvesting and exacerbated by catastrophic events such as fire, volcanic eruption, and wind storms." *Id.* at 188; FWS_000367, FWS_017886; 55 Fed. Reg. at 26114. At that time, threats to the NSO included low populations, declining populations, limited habitat, declining habitat, inadequate distribution of habitat or populations, isolation of provinces, predation and competition, lack of coordinated conservation measures, and vulnerability to natural disturbance. ECF No. 17-2 at 188. In 2019, FWS completed the most recent five-year review, which concluded that competition with barred owls is likely now driving population declines across the range, that habitat loss has slowed but remains a threat, and that climate change is expected to drive increases in habitat loss due to fire. *Id.* at 200; FWS_000379.

**B. Northwestern Pond Turtle**

The NWPT is a semi-aquatic freshwater turtle native to the Pacific Coast. AR000821. On October 3, 2023, FWS proposed listing the species as threatened under the ESA. *Id.* The species is not currently listed but is designated as a Bureau Sensitive Species under BLM policy. *Id.* Its range includes portions of Washington, Oregon, Nevada, and northern and central California.

NWPTs require both aquatic habitat and nearby uplands. *Id.* They use ponds, rivers, and wetlands for foraging and breeding, while adjacent terrestrial areas are necessary for nesting and overwintering. *Id.* Most nesting occurs within a few hundred feet of water, while overwintering

---

[4] Territorial defense is primarily carried out by hooting, barking, and whistle type calls. ECF No. 17-2 at 192; FWS_000371.

sites—where NWPTs go to hibernate—are typically farther upslope in areas with canopy cover and leaf litter. *Id.*

The proposed listing rule identifies multiple threats affecting the species across its range, including habitat loss and fragmentation, altered hydrology, predation (particularly by invasive bullfrogs), drought, contaminants, and climate-driven stressors such as wildfire and extreme weather. AR000822. At the same time, status assessments indicate that populations in Oregon and northern California remain relatively well distributed and connected, with sufficient resiliency to persist in the near term. *Id.* Modeling nevertheless predicts declining adaptability and increased vulnerability over the next several decades, leading the Service to conclude the species is likely to become endangered within the foreseeable future. *Id.* As discussed in Section III.B below, these ecological characteristics—and the distinction between current Bureau Sensitive Species management and additional protections that would apply only if the species is listed—inform BLM's evaluation of whether project activities create a "specific threat" requiring the implementation of additional conservation measures.

### C. The 2016 Southwestern Oregon Resource Management Plan

Following a decades-long public process conducted under NEPA and FLPMA, and after consultation with both FWS and NMFS under the ESA, BLM issued the 2016 Southwestern Oregon Resource Management Plan ("2016 RMP"). ECF No. 17-12 at 1-333; AR012809-13139. Under the 2016 RMP, BLM distributed the land in the planning area into six different land use allocations, including Late-Successional Reserves ("LSR") and the Harvest Land Base ("HLB"). ECF No. 17-12 at 54; AR012860. LSR are federal lands primarily, but not solely, dedicated to developing, maintaining, and promoting the development of habitat for the NSO. ECF No. 17-12 at 81; AR012887. HLB are federal lands primarily dedicated to "achiev[ing] continual timber production that can be sustained through a balance of growth and harvest." ECF No. 17-12 at 73; AR012879.

Harvesting timber in the HLB allows BLM to comply with the O&C Act by selling the annual allowable sale quantity of timber. ECF No. 17-12 at 16; AR012822.

The RMP requires BLM to refrain from offering any timber sale that would result in incidental take of NSO until a barred owl management program has been implemented. ECF No. 17-12 at 21-22; AR012827-828. BLM uses survey protocols based on the best available science to determine whether NSO are present before habitat can be modified. ECF No. 17-12 at 138; AR012944. If a resident owl is detected, BLM is required to drop or modify the proposed harvest unit to avoid incidental take. ECF No. 17-12 at 41-42; AR012847-848 In its BiOp on the 2016 RMP, FWS concluded that, notwithstanding adverse effects to NSOs associated with habitat removal in the HLB, the RMP provides a net benefit to the species and its designated critical habitat, based on considerations including: that the RMP "will conform to the Spotted Owl Recovery Plan, including the location and function of large blocks of habitat for reproducing spotted owls and the ability of the landscape to support spotted owl movement between those blocks"; that there will be "a net increase in designated forest reserve acreage from the current baseline and [that] overall forest ingrowth will outpace the amount of habitat lost to harvest during the life of the []RMP"; that "BLM will avoid take of spotted owl territorial pairs or resident singles from timber harvest until implementation of a barred owl management program has begun"; and that "BLM will support barred owl management as informed by the outcome of the barred owl removal experiment that is currently underway." FWS_016494.

### D.    The Last Chance Project

In May 2025, the BLM Grants Pass Field Office issued a REA proposing the Project on up to approximately 11,686 analysis acres of BLM-administered lands within Douglas, Jackson, and Josephine counties of Oregon. ECF No. 17-3 at 6; Exhibit 1, Declaration of Justin Kelly ("Kelly Decl.") ¶ 5; AR000740-1160. Five primary reasons led BLM to select this particular Project area

for forest treatments: (1) 50% of the project area is designated as HLB, (2) stands identified for treatment are overly dense and are at greater risk of competition-induced tree mortality and stand replacing disturbances, (3) recent studies show that in southwest Oregon more Douglas-fir trees died between 2015-2019 than in the previous four decades, (4) the stands provide an opportunity for commercial treatment based on economic viability, and (5) portions of the Project are on lands BLM and FWS determined that active management is needed to promote the development of habitat for the NSO. ECF No. 17-3 at 8-9; AR000746-47. To fulfill those goals, proposed treatments include variable retention harvest, commercial thinning, selection harvest, activity fuels reduction, and hazardous fuels reduction. ECF No. 17-3 at 7-8; AR000745-46. Associated activities include temporary and permanent route/road and landing construction, quarry use, road renovation and reconstruction, timber haul, and road decommissioning. ECF No. 17-3 at 101-103; AR000839-841. The REA is not self-executing; rather, BLM "would decide whether to implement the actions" outlined therein, and "would decide whether to offer timber for sale, and if timber is offered for sale, how many commercial sales to offer, and whether to implement other actions, including HFR, road construction and road renovation." ECF No. 17-3 at 9; AR000747. These decisions would be documented through decision records that would identify specific approved actions. ECF No. 17-3 at 9; AR000747; Kelly Decl. ¶ 8; AR000008.

The Project contains design features which are conservation measures applied to activities to reduce and minimize potential detrimental effects to listed species. ECF No. 17-2 at 37; AR000980. For reducing impacts to NSOs, the Project contains fifteen design features including seasonal restrictions on activities, restrictions on how close timber harvest can occur to any occupied NSO site, and requirements to avoid incidental take and conduct surveys of the Project area until completion of the project, among others. ECF No. 17-2 at 38-43; AR001002-1006. The design features note that BLM follows the NSO Survey Protocol ("Survey Protocol") and shares

that information with FWS for evaluation.[5] ECF No. 17-2 at 39. If resident NSOs are located during surveys before implementation is complete, design features require units within any detected resident owl home ranges to be dropped or modified to eliminate potential adverse effects that could lead to incidental take. *Id*.; AR001157.

### E.    The Biological Opinion

BLM formally initiated ESA Section 7 consultation with FWS over the Project's impact on NSOs in April 2023. ECF No. 17-2 at 7; FWS_000186. FWS finalized the BiOp in July 2023. *Id*. at 4; FWS_000183. In its jeopardy analysis, FWS first considered the status of the species and environmental baseline, including occupancy in the action area.[6] ECF No. 17-2 at 84. FWS defined NSO site occupancy as evidence of continued use by NSOs (including breeding), repeated detections of a pair or single birds, presence of young before dispersal, or some other strong indication of continued occupancy. *Id*. To determine occupancy, FWS relied on the Survey Protocol, which provides all NRF habitat will be surveyed within 1.3 miles of the proposed units and within NSO sites affected by the proposed action. *Id*. In the Survey Protocol, FWS acknowledged that while barred owls influence NSO detectability (because they are less likely to respond to calls when barred owls are present), the Survey Protocol was designed to incorporate reduced NSO calling probability in the presence of barred owls. *Id*.; ECF No. 17-5 at 5; FWS_015213. Considering BLM surveys from at least two years, FWS noted that eight NSO sites are considered occupied (six

---

[5] The Survey Protocol was developed by FWS to promote consistent and scientifically rigorous procedures to survey for NSOs in areas where management activities may remove or modify NRF habitat. ECF No. 17-5 at 5; FWS_015213.

[6] The environmental baseline evaluates the past and current conditions of the species in the action area relative to its reproduction, numbers, and distribution absent the effects of the proposed action. ECF No. 17-2 at 43; FWS_000222; 50 C.F.R. § 402.02.

unique/two alternate), twenty-four are unoccupied, and one is currently unknown. ECF No. 17-2 at 86; FWS_000265 (Table 10).

FWS next considered that the Project will result in adverse impacts to NSO habitat, but, after careful analysis, concluded it did not anticipate the proposed actions will incidentally take any NSOs. ECF No. 17-2 at 92-165; FWS_000271-000344. FWS noted that in all occupied sites, BLM will implement take avoidance measures, including generally avoiding NRF removal and downgrade in the 0.5-mile core-use area of occupied sites.[7] ECF No. 17-2 at 164. FWS also considered the treatments that are proposed in those territories and concluded they will not reduce the habitat-fitness conditions (through habitat degradation) at the site that will significantly impair essential behavioral patterns, including breeding, feeding, or sheltering of the NSO. *Id*. To ensure actions will not impair NSO life history functions, the BiOp explains that BLM will continue to conduct NSO surveys at known NSO sites and timber harvest areas before on the ground timber activities commence. ECF No. 17-2 at 39; FWS_000218. BLM will defer harvest in the unknown site until two years of surveys are completed and occupancy status is determined. *Id*.  If NSOs (territorial pairs or resident singles) are located during surveys, the proposed actions within those sites would be dropped or modified to eliminate potential adverse effects that could result in take of the species. ECF No. 17-2 at 164; FWS_000343.

Considering the above, FWS determined the Project is not anticipated to reduce the reproduction, numbers, or distribution of the spotted owl. ECF No. 17-2 at 165; FWS_000344. Although the Project will result in adverse impacts to NSO habitat, FWS reasoned the Project will retain sufficient NRF habitat both within occupied owl sites and in unoccupied sites, with sufficient habitat connectivity function, to support the continued breeding, feeding, and sheltering of NSOs

---

[7] Core use areas represent the areas that are defended by territorial owls and generally do not overlap the core-use areas of other owl pairs. ECF No. 17-2 at 10; FWS_000189.

in the Action Area. *Id*. Given the design features and limitations within occupied owl sites, the commitment to further surveys to ensure continued avoidance of incidental take, and because of seasonal restrictions on activities, FWS concluded the Project is not likely to jeopardize the continued existence of the NSO or result in the destruction or adverse modification of its designated critical habitat. *Id*. at 166; FWS_000345.

### F. Project Implementation

Four decision records authorizing Project activities have been issued to date. Kelly Decl. ¶ 11. In May 2025, BLM released Decision Record 1, authorizing activities associated with Paul's Payoff Timber Sale (which was later awarded to Intervenor Murphy Company) and Rotors Up Timber Sale. ECF No. 17-11 at 3-4; Kelly Decl. ¶ 10; AR000654-720. The Paul's Payoff Timber Sale authorizes felling, yarding, road construction, and log hauling within occupied NSO sites are planned to begin in May 2026, and is expected to be completed in July 2026. Kelly Decl. at 14. Three acres total will be in NWPT overwintering habitat. *Id*. The Rotors Up Timber Sale package has neither been finalized nor offered for sale. *Id.* ¶ 10.

Decision Record 2 authorizes hazardous fuels reduction treatments. *Id*. ¶ 11. Treatments will occur in areas which aid in wildland fire fighting operations and were evaluated as in need of treatment. AR000644.

Decision Record 3, issued in August 2025, authorizes the Take A Chance Timber Sale. AR000468-81. Zero acres of occupied NSO sites are planned for harvest over the next six months. Kelly Decl. at 14. Zero acres within NWPT overwintering habitat have been felled. *Id*. ¶ 20.

Decision Record 4, authorizing the King Graves timber sale and non-commercial HFR, was signed on February 10, 2026. *Id*. ¶ 10. The contract package is still being assembled for the sale, and a start date for activities is unknown. *Id*.; AR000001-22.

## STANDARD OF REVIEW

### I.    Preliminary Injunctions Are Extraordinary Remedies

A preliminary injunction is "an extraordinary remedy" which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (citation omitted). A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 20). Failure to meet any of these prongs is grounds for denial. *Id*. Not every "potential environmental injury automatically merits an injunction." *Souza v. Cal. Dep't of Transp.*, No. 13-cv-04407-JD, 2014 WL 1760346, at *7 (N.D. Cal. May 2, 2014) (quotations and citation omitted).

### II.    Review Of Agency Decisions Under The Administrative Procedure Act

Under the Administrative Procedure Act's ("APA") applicable standard of review, a plaintiff must satisfy a "high threshold" to establish that agency action is unlawful: "An agency's decision may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067, 1070 (9th Cir. 2010) (per curiam) (quoting 5 U.S.C. § 706(2)(A)). This standard "is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (citations omitted)). The Court's role is "not to make its own judgment" on the matters resolved by the agency, as the APA simply "does not allow the court to overturn an agency decision because it disagrees with the decision." *River Runners*, 593

F.3d at 1070. Rather, a plaintiff must show the agency has made "a clear error of judgment." *U.S. Citrus Sci. Council v. U.S. Dep't of Agric.*, 312 F. Supp. 3d 884, 893 (E.D. Cal. 2018) (citation omitted); *see Salmon Spawning & Recovery All. v. NMFS*, 342 F. App'x 336, 339 (9th Cir. 2009) (declining to "second guess" a no-jeopardy finding that relied on a comprehensive analysis of the available scientific data).

## ARGUMENT

### I.    Plaintiffs Are Not Likely To Succeed on the Merits

The threshold inquiry for injunctive relief is whether plaintiffs have demonstrated a likelihood of success on the merits warranting an injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (courts need not consider the remaining elements where a plaintiff fails to show a likelihood of success on the merits). Plaintiffs present three arguments under the ESA and FLPMA to support their claim that they are likely to succeed on the merits, or, raise serious questions involving a fair chance of success on the merits. Pls.' Br. 20. None withstand scrutiny.

### A. BLM reasonably relied on the BiOp.

Plaintiffs contend that BLM's reliance on the BiOp was arbitrary and capricious because the BiOp failed to analyze the Project's impacts on NSO critical habitat in violation of the ESA. *Id.* at 21-23. Specifically, Plaintiffs assert the BiOp "relies on acreage figures from BLM's Biological Assessment" that "significantly understate the Project's authorized impact" as shown in the Project's REA. *Id.* at 22. This argument fails for two reasons. First, FWS's BiOp thoroughly analyzed the impacts to NSO designated critical habitat based on the acreages BLM provided in their BA. Thus, it was reasonable for BLM to rely on FWS's analysis of that data. Second, the REA does not authorize projects, as Plaintiffs suggest. *Id.* It is a tool for analyzing a range of alternatives

and impacts under NEPA; not the ESA. Therefore, any clerical error contained in the Revised EA does not challenge the BiOp's conclusions or BLM's reliance on them.

First, the analyses considered during ESA Section 7 consultation—those in the BiOp and BA—are identical. Both documents contain the same acreage calculations concerning Project impacts on NSO habitat. *Compare* ECF No. 17-9 at 58 (BA), *with* ECF No. 17-2 at 92, FWS_000271 (BiOp); *see also* 16 U.S.C. § 1536(c)(1) (instructing the action agency to "conduct a biological assessment" for Section 7 consultation). Because "the critical question is whether [BLM's] reliance was arbitrary and capricious, not whether the BiOp itself is somehow flawed," BLM's reliance on the BiOp, which considers the same figures from BLM's BA, was eminently reasonable. *City of Tacoma, Wash. v. Fed. Energy Regul. Comm'n*, 460 F.3d 53, 75 (D.C. Cir. 2006).

Second, an agency's reliance on a BiOp is not arbitrary and capricious and "will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information . . . which challenges the [BiOp's] conclusions," and such new information was available to the action agency but withheld from the consulting agency. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Plaintiffs fail to make either showing. Although the REA analyzed different amounts of acreage than the BiOp, the REA is not self-executing. ECF No. 17-3 at 9. Rather, BLM must issue decision records authorizing timber sales before timber sale activities may occur. *Id*.; Kelly Decl. ¶ 5. Also, although BLM's REA mistakenly double-counted certain NSO habitat acres, those do not represent additional, distinct acres available for potential authorization. *Id.* ¶10; AR000023 (clarifying discrepancy). Thus, BLM has authorized Project activities on a total acreage well below the acreage analyzed in the BiOp and will not authorize activities that exceed that threshold. Kelly Decl. ¶ 9; AR000008 (tracking authorized acreage); *see* ECF No. 17-2 at 38, FWS_000217 ("[i]f the impacts are no longer consistent" with the BiOp, the

Project will stop to ensure that effects remain as described in the BiOp, restrictions are implemented, and/or consultation is reinitiated). So, even if there were additional actual acres authorized under the EA than the BA (there are not), activities on those acres would not be authorized without further analysis. Plaintiffs, thus, can point to "no new information," FWS did not consider, which challenges the BiOp's conclusion.[8] *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993), *as amended on denial of reh'g* (July 5, 1994).

### B. The BiOp rationally explained why the Project would not jeopardize the continued existence of the NSO.

Plaintiffs also challenge FWS's conclusion that the Project will result in "zero incidental take" of NSOs. Plaintiffs argue that the "no jeopardy" determination ignores the best available science on detecting NSO occupancy rendering FWS's no jeopardy determination flawed because the analysis failed to account for an accurate environmental baseline (e.g. the correct occupancy rate of NSO in the Project area). Pls.' Br. 23-29. First, a correction of Plaintiffs' reading of the law is required. *Id.* at 25. It is true that the ESA requires FWS to use the "best scientific and commercial data available" in its jeopardy analysis. *Id.*; 16 U.S.C. § 1536(a)(2). However, to succeed on a claim challenging an agency's determination of what constitutes the best-available-science, a plaintiff must identify relevant scientific evidence that the agency ignored *and* show that it "is in some way better than the evidence [the agency] relies on." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). And Plaintiffs must show that any disregarded scientific evidence would materially affect the agency's conclusion. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018). Against this heightened standard, Plaintiffs' "nitpick[ing] issues" with

---

[8] Thus, Plaintiffs misrely on *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012). There, BLM authorized the construction of a pipeline, whereas here, the EA is not self-executing; decision records authorize actions. *Compare id.* at 1106 (pipeline authorization), *with* ECF No. 17-3 at 9 (BLM must authorize decision records before activities begin).

the agencies' reliance on the Survey Protocol for determining NSO occupancy—and FWS's jeopardy determination—are insufficient to show FWS violated the ESA. *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 906 (9th Cir. 2025).

FWS reasonably relied on the Survey Protocol to capture the environmental baseline and explained why the Project would not jeopardize the continued existence of the NSO.[9] FWS considered, first, whether NSO are reasonably certain to occupy the affected sites, and if so, whether altered habitat conditions resulting from the Project are reasonably certain to create a biological response that results in take. ECF No. 17-2 at 164-166; FWS_000343-000345. To evaluate occupancy, FWS has relied on the methodology in the Survey Protocol since 2011. *Id.* at 38; FWS_000217. The Survey Protocol is based upon the best available science on locating NSOs and determining occupancy. ECF No. 17-2 at 203; FWS_000382; *see also* ECF No. 17-5 at 1-43; FWS_015210-015251 (Survey Protocol). The Survey Protocol is built on decades of research and results, has been updated to incorporate advancements in scientific knowledge on the NSO, and has been upheld by this Court and the Ninth Circuit. *See Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 779-80 (D. Or. 2014), *aff'd*, 806 F.3d 1234 (9th Cir. 2015). Indeed, evidence that NSOs were responding less frequently during call-back surveys—due to the risk of detection by barred owl—was considered and led the FWS to update the Survey Protocol in 2012. ECF No 17-2 at 203; FWS_000382. Further, the Service referenced applying conclusions from Dugger *et al.* (2023) ("Dugger Report") to future survey results. *Id*. at 84-85; FWS_000263-000264. The Dugger Report notes that despite low NSO detection rates when barred owls are present, the probability that a territory was occupied when an NSO pair was not detected over six within-season call-back surveys

---

[9] The environmental baseline evaluates the past and current conditions of the species in the action area relative to its reproduction, numbers, and distribution, absent the effects of the proposed action. ECF No. 17-2 at 43; 50 C.F.R. § 402.02.

(i.e., as outlined in the Survey Protocol) was very low. FWS_002754, FWS_002774. Contrary to Plaintiffs' assertions, it was not arbitrary or capricious for FWS to describe an environmental baseline that relies on BLM's Survey Protocol results.

Plaintiffs argue that a study by Appel *et al*. (2023) ("Appel Study") is, instead, the best available science for interpreting occupancy. Pls.' Br. 26-27. First, Plaintiffs assert that rather than relying on callback surveys, passive acoustic monitoring ("PAM"), which records natural owl vocalizations without human presence, is more effective at detecting NSO site occupancy. *Id*. Second, Plaintiffs contend that because the Survey Protocol uses call-back surveys and defines single detections as "status unknown," whereas the Appel Study treats them as evidence of occupancy, FWS undercounted NSOs. [10] *Id*. at 28. Both arguments lack merit. What is missing from Plaintiffs' arguments is any evidence that PAM-based estimation would be more accurate than the Survey Protocol. Due to NSO behavioral response differences between call-back and PAM surveys, conclusions associated with the PAM methodologies in the Appel Study cannot be directly applied to occupancy interpretations associated with call-back surveys. Exhibit 2, Declaration of Michael Asch ("Asch Decl.") ¶ 8. Additionally, FWS reviewed the Dugger Report, which evaluated effectiveness of call-back surveys and is directly applicable to the survey methodologies in the BA.

---

[10] Occupancy is defined by the presence of a resident single or a territorial pair. ECF No. 17-2 at 84; FWS_000236. Resident single status is assumed if 1) the presence or response of a single owl within the same general area on three or more occasions within the breeding season, with no response by an owl of the opposite sex after a complete survey; or 2) multiple responses over several years (e.g., two responses in year 1 and one response in year 2) from the same general area occurs then resident single status is assumed. ECF No. 17-2 at 11. However, observations that do not meet these criteria would result in a "status unknown" determination and not a Resident Single determination. *Id*. Territorial pair status is assumed if any of the following criteria from protocol surveys are met: 1) a male and female are heard and/or observed (either initially or through their movement) in close proximity (< ¼ mile apart) to each other on the same visit; or 2) a male takes a mouse to a female; or 3) a female is detected (seen or heard) on a nest; or 4) one or both adults are observed with young; or 5) young identifiable based on plumage characteristics are observed late in the season by knowledgeable surveyors, or young identifiable based on molecular data are documented. *Id*.

*Id.* ¶ 9. Plaintiffs do not show that utilizing their preferred occupancy methodology would have materially altered the FWS's conclusion.

Plaintiffs also argue the Appel Study shows that traditional survey methods systemically undercount resident owls, compared to PAM; but the Appel Study neither made that finding nor conducted call-back surveys. *Compare* Pls.' Br. 13 (contending the study found pair occupancy is 1.3 to 4.1 times greater than rates observed using traditional methods), *with* ECF No. 17-4 at 15 (estimating "the rate of hexagon occupancy by pairs was between 1.3 and 4.1 times greater than the proportion of hexagons where a female and male were both detected"); *see also* Pls.' Br. 28 (noting only that the Appel Study analyzed vocalization patterns using PAM). Indeed, the Appel Study's reference to automated recording methods is not a critique of the call-back method, but in relation to whether a PAM-surveyed hexagon had detections of both males and females. *Id.* at 18. Contrary to Plaintiffs' characterization, the Appel Study does not make any comparison or draw NSO behavioral conclusions between PAM and call-back monitoring.

Thus, Plaintiffs' contention that the environmental baseline fails to capture seven NSO sites it classified as "status unknown" (or unoccupied)—ignoring the best available science—lacks basis. *Id.* at 27. The Appel Study considered PAM, which found that a single unsolicited detection of an NSO has a high probability (0.72) of belonging to a resident pair. ECF No. 17-4 at 15. Unsolicited detections (using PAM) capture natural calling behavior from birds broadcasting territorial vocal signals (i.e., these are inferred to be resident, territorial birds which are actively defending a territory via unsolicited calling behavior). *Id.* at 17. In contrast, call-back surveys, as deployed in the Survey Protocol, are designed to use human controlled calls that elicit a response from an NSO that may not have called otherwise. ECF No. 17-2 at 143, 190; FWS_000322, FWS_000371. Because of the difference in NSO behavioral response between the two survey methodologies, the PAM results described in the Appel Study cannot be directly applied to the

occupancy methodology in the call-back protocol. Asch Decl. ¶ 8. The fact that PAM, a different monitoring methodology with different results, has a high probability of detecting resident pairs from individual responses it gathers, does not challenge the environmental baseline analysis. Plaintiffs' attempt to have this Court "choose[] among scientific studies" fails. *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012).

Because Plaintiffs' challenge to the BiOp's "zero incidental take" conclusion was premised upon the environmental baseline being flawed (which it is not), Plaintiffs' attack on FWS's jeopardy determination fails. Pls.' Br. 23. FWS reasonably described the environmental baseline by relying on BLM's Survey Protocol results to determine the sites that are occupied, considered Project effects on NSOs, and explained that Project measures limit any potential impacts to the species. ECF No. 17-2 at 164; FWS_000343. Further, FWS noted that for all known owl sites, including "status unknown," BLM must conduct further surveys and, if NSO (territorial pairs or resident singles) are located, BLM will alter its proposed actions to avoid incidental take. ECF No. 17-2 at 165; FWS_000344. Accordingly, FWS's reliance on BLM's use of the Survey Protocol for its jeopardy analysis is a reasonable exercise of the agency's scientific expertise. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1244-47 (9th Cir. 2001) (holding incidental take was not established where the evidence indicated that the species at issue were not present on the land in question).

**C.  The Project Conforms to the RMP as Required by FLPMA.**

Plaintiffs fail to raise a serious question going to the merits simply by raising a conceivable alternative interpretation of BLM's RMP. In deciding whether the Project conforms to the RMP under FLPMA, the Court must first "interpret the RMP to determine when the protective requirements of the [] Management Direction must be carried out," and then second, "determine whether, under the proper interpretation, the [] Project violates the requirements of the RMP."

*Cascadia Wildlands*, 153 F.4th at 893 (citing *Brong* 492 F.3d at 1125, 1127-32). Plaintiffs' FLPMA claim rests on a fundamental misreading of the governing RMP. They contend that the RMP required BLM to implement Project Design Features ("PDFs") for the northwestern pond turtle, and that BLM violated the plan by making those measures contingent on ESA listing. That argument fails for three reasons. First, the RMP's plain text does not impose the categorical mandate Plaintiffs assert. Second, even if the language were ambiguous, BLM's interpretation is reasonable and entitled to deference under controlling Ninth Circuit precedent. Third, the administrative record supports BLM's determination that the Project does not create the type of "specific threat" that would trigger additional mitigation under the plan. At minimum, Plaintiffs cannot demonstrate a clear inconsistency with the RMP and therefore cannot show a likelihood of success.

Here, the relevant RMP Management Direction directs BLM to "implement conservation measures to mitigate specific threats to Bureau Sensitive species." AR012932. The limiting phrase "specific threats" is pivotal. In the context of the RMP, "specific threats" refers exclusively to threats that would cause the species to be listed under the ESA. This is evident from the RMP's Management Objective[11] for Bureau Sensitive species, which is "to reduce or eliminate *threats* to Bureau Sensitive species *to minimize the likelihood of and need for the ESA listing* of these species." AR012932 (emphasis added); *see also* AR014973 (RMP FEIS) ("the BLM will consider providing measures to conserve Bureau Sensitive species and their habitats on O&C lands to the extent that the conservation measures are necessary to prevent the need to list Bureau Sensitive species under the [ESA]"). BLM's manual on special status species management reflects the same understanding

---

[11] Management Objectives are "descriptions of desired outcomes for BLM-administered lands and resources in an RMP; the resource conditions that the BLM envisions or desires would eventually result from implementation of actions consistent with the RMP." AR012942. Management Direction, on the other hand, "identifies where future actions may or may not be allowed and what restrictions or requirements may be placed on those future actions to achieve the objectives set for the BLM-administered lands and resources." *Id.*

– that "BLM shall manage Bureau sensitive species and their habitats to minimize or eliminate threats affecting the status of the species." AR022636 (SSS 6840 Manual).

By its plain terms, therefore, the Management Direction applies only where a project creates a discrete *threat* that would contribute to the need to list the species under the ESA—not whenever a project overlaps with potentially suitable habitat or presents generalized habitat modification. Plaintiffs' interpretation reads that limiting language out of the plan. Their theory effectively equates any habitat disturbance with a "specific threat," converting conditional management direction into a blanket prohibition on timber harvest wherever sensitive species habitat exists.

Context further confirms the error in Plaintiffs' reading. The RMP allocates large areas to reserves while designating the HLB for sustained timber production. Interpreting the "specific threats" provision as a general habitat-protection mandate would effectively nullify that allocation scheme by placing large portions of the HLB off limits whenever sensitive species habitat might occur. Kelly Decl. at ¶ 25 (detailing effect to HLB from NWPT general habitat protection) . FLPMA does not require—and the RMP does not support—such a result.

Most directly on point, the Ninth Circuit recently emphasized that plan provisions must be interpreted in light of the RMP's overall objectives and land-allocation structure. *Cascadia Wildlands*, 153 F.4th at 895–96. There, the court upheld BLM's narrow reading of a species-protection directive because it aligned with the RMP's sustained-yield goals and the modeling assumptions underlying the HLB. *Id.* Similarly here, the RMP expressly designates HLB as lands available for sustained yield timber production and the RMP modeling did not constrain timber harvest for general Bureau Sensitive Species habitat protection in the HLB. Thus, the RMP necessarily contemplates that habitat modification will occur in the HLB and in other land use allocations in support of sustained yield timber harvest, wildfire management, and habitat restoration, without requiring avoidance of all habitat. Plaintiffs ask the court for what amounts to

a monumental amendment of the RMP—without NEPA analysis, or public notice and comment. Kelly Decl. at ¶ 25.

Even if the Court finds the RMP language ambiguous, however, Plaintiffs cannot establish a likelihood of success because BLM's interpretation is reasonable and entitled to substantial deference. The Ninth Circuit has made clear that courts must defer to an agency's reasonable interpretation of its own land-use plan, particularly where the interpretation reflects technical and substantive expertise and is consistent with the planning framework. *Cascadia Wildlands*, 153 F.4th at 889–90. Indeed, "it is hard to conceive of a regulatory document that more clearly is derived from an agency's substantive expertise. It is clear beyond peradventure that Congress would delegate interpretive power to BLM in this context." *Id.* at 900. At minimum, BLM's interpretation—that mitigation is required only where the RMP provides specific management direction dictating species protections (e.g., Bureau Sensitive plants, red tree voles, bald eagles, bat species) or a project creates a discrete, project-specific threat to the species as a whole, not general habitat protection—is reasonable and entitled to deference. Plaintiffs' alternative interpretation is not compelled by the RMP and cannot support a finding that BLM acted arbitrarily or contrary to the plan.

Finally, BLM's determination that the Project does not create a "specific threat" to the northwestern pond turtle requiring implementation of the PDFs is reasonable and entitled to deference. The REA acknowledges that Project activities may affect approximately 3,118 acres of overwintering habitat but explains that the risk of direct harm to turtles is limited and the total number of turtles in the project area is unknown. AR000825-826.[12] The analysis further places these impacts in a broader context, showing they represent a small fraction (0.13%) of statewide

---

[12] There is no evidence of occupancy in the proposed harvest units. The REA mentions two historic observances in project units from 1995 and 1997. AR000823.

overwintering habitat—which is itself only a portion of the species' full range. AR000825. BLM thus reasonably concluded that such localized impacts do not threaten the species' overall status or contribute to the need for ESA listing—the central inquiry under the Bureau Sensitive Species framework. Courts consistently uphold similar determinations where agencies reasonably conclude that project impacts do not rise to the level of a population-level threat. *See Cascadia Wildlands v. BLM*, No. 6:12-CV-01739-AA, 2013 WL 5723315, at *17 (D. Or. Oct. 18, 2013) (holding that BLM "satisfied its 'obligation [under the relevant RMP] to manage lands so as not to contribute to the need to list the species'" (citation omitted)).

Plaintiffs offer no contrary evidence. They identify no known occupied overwintering sites within treatment units and rely instead on generalized assertions about habitat overlap and speculative risks to individual turtles. That is insufficient to demonstrate a clear violation of the RMP under the APA's deferential standard and therefore cannot show likely success or serious questions going to the merits.

## II.    Plaintiffs Do Not Show Irreparable Harm.

A preliminary injunction serves a specific purpose—preventing imminent, irreparable harm that will occur "before a decision on the merits can be rendered." *Winter*, 555 U.S. at 7, 20, 22 (citation omitted). The standard requires "a definitive threat of future harm to protected species, not mere speculation." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1193 (9th Cir. 2024). Plaintiffs complain that near-term implementation of Project activities will cause irreparable harm to NSOs and NWPT and, therefore, to themselves. Pls.' Br. 32-35. This is insufficient to clearly show that irreparable harm is *likely* in the absence of their requested injunction. *Winter*, 555 U.S. at 22. In the Paul's Payoff Timber Sale, felling, yarding, road construction, and log activities in several units are planned to begin in May 2026. Kelly Decl. at

14. The Take A Chance Timber Sale does not plan to harvest any acres within occupied NSO sites over the next six months. *Id*. And the Rotors Up and King Graves contract packages have not been fully assembled or auctioned yet. *Id*. Plaintiffs have failed to meet "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 (3d ed.).

### A. Plaintiffs fail to show Project activities will irreparably harm NSOs.

Plaintiffs fail to carry their burden of showing that the NSO is likely to be irreparably harmed between now and when the case is decided on the merits. *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. 2:13-cv-00042-MCE, 2013 WL 4094777, *7 (E.D. Cal. Aug 13, 2013). Plaintiffs claim that they will be irreparably harmed by the "unauthorized take of resident owls at the seven sites where FWS dismissed evidence of occupancy," Pls.' Br. 32-33. This assertion is insufficient to make the showing of likely irreparable harm as Plaintiffs do not show that unauthorized take is likely to occur in the absence of an injunction. Kelly Decl. ¶ 8. Plaintiffs' theory rests on the possibility that resident owls may be present and that project activities could result in take. But BLM is not proceeding in a vacuum. BLM continues to conduct protocol surveys and spot checks specifically designed to detect occupancy before activities occur. ECF No. 17-2 at 84. If owls are detected, BLM must implement avoidance and protective measures to prevent take. *Id*. Those non-waivable measures substantially undercut any claim that take is reasonably certain. At most, Plaintiffs identify a chain of contingencies: that owls are present but undetected, that surveys fail, and that protective measures are not triggered. That type of speculative sequence does not satisfy the Ninth Circuit's requirement that irreparable harm be likely. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1193. Given the layered survey and protection framework in place, Plaintiffs cannot demonstrate that take is reasonably certain to occur absent an injunction. *Klamath Forest All. v. Jones*, No. 2:25-CV-3424-DMC, 2025 WL 3640859, at *5–6 (E.D. Cal. Dec. 15, 2025)

(plaintiffs failed to show there is a likelihood of irreparable injury where logging contracts were tailored to prevent harm to the NSO, particularly occupied cores).

Plaintiffs rely on the Appel Study's probability analysis to argue the sites may be occupied by resident pairs, Pls.' Br. 32, overlooking that *call-back* surveys (not PAM) were the methodology used for those sites. Thus, Plaintiffs' assertion that resident owls are present in the seven sites (let alone will be harmed) lacks support and is speculation. Plaintiffs have not provided any actual evidence that take will occur because of the Project. *Cf. id.* (relying wholly on the theoretical application of the Appel study). Rather, Plaintiffs ask the Court to enjoin the Project solely based on an estimate of the odds from one study that was not actually used here and is based on generalized results from eight years ago. *See* ECF No. 17-4 at 15 ("estimates from the fully parameterized model to estimate . . . pair occupancy, and detection probability . . .using detections from passive acoustic monitoring in 2018"). Plaintiffs' attempt to play the odds here is insufficient to warrant an injunction. *See Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1124 (E.D. Cal. 2017) ("A mere *possibility* of irreparable harm is insufficient.")

In fact, all the evidence suggests that take will not occur. For the BA, BLM surveyed all known NSO home ranges that could be impacted by the Project and all NRF habitat within 1.3 miles of the proposed treatment units.[13] ECF No. 17-2 at 84. There are thirty-three known NSO home ranges contained within the Project action area. *Id*. at 86 (Table 10). Surveys from at least two years showed that twenty-four of those sites are unoccupied, eight are occupied, and one occupancy status is currently unknown. *Id*. Harvest will be deferred until additional surveys are completed for the site where occupancy status is unknown. *Id*. at 143. Also, the agencies considered

---

[13] The Medford District uses the median home range estimated for southwestern Oregon of 2,895 acres or a circle with a radius of 1.2 miles for the West Cascades Province and 3,400 acres or a circle with a radius of 1.3 miles for the Klamath Province. ECF No. 17-2 at 15.

seven unoccupied sites that have detected incidental NSO responses and noted that protocol surveys will continue in the action area and would discover any recolonization by floaters of the current unoccupied territories. ECF Nos. 17-9 at 52; 17-2 at 142-144. If those owls become resident at the unoccupied sites, BLM will adjust the Project as appropriate. ECF No. 17-2 at 144. In sum, Plaintiffs fail to show that irreparable harm will occur absent an injunction because they fail to show that there are any resident NSOs in the unoccupied sites. Moreover, if a floater establishes residency in an unoccupied site, the Survey Protocol would likely catch it, and BLM would adjust Project implementation to avoid take of resident owls.

Even if Plaintiffs had managed to produce some evidence of take (they have not), mere take of any magnitude does not constitute irreparable harm. ESA Section 7 protects against jeopardizing "species," not individual members. 16 U.S.C. §§ 1531(b), 1536(a)(2); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014). Obviously, ESA Section 9, which prohibits take, also contains exceptions reflecting Congress' judgment that not all take is forbidden under the ESA. 16 U.S.C. § 1539(a), (b); *id*. § 1536(o); *Idaho Rivers United v. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262 n.9 (W.D. Wash. 2015). So, while Plaintiffs "need not demonstrate a threat of extinction to the species to meet its burden," they must show irreparable injury and "harm 'significant' to the 'overall population.'" *Conservation Cong. v. U.S. Forest Serv.*, No. 2:13-cv-1977-JAM-DB, 2018 WL 4007093, at *2 (E.D. Cal. Aug. 17, 2018) (citations omitted); *see Wild Equity Inst. v. City & Cnty. of San Francisco*, No. C 11-00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011) ("The plaintiff may be simply assuming that the death of any listed animal, or any of its eggs, constitutes irreparable harm for purposes of issuing a preliminary injunction. However, the law does not go quite so far. No court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm."). Because Plaintiffs do not (and

cannot) show that unauthorized take is likely to occur, they cannot make the required showing of harm to the species.

As Plaintiffs' assertion that imminent, irreparable harm will occur to NSOs incidentally observed in seven sites rests wholly on an inappropriate application of a conclusion based on a survey method, Plaintiffs fail to make "a clear showing" that a single NSO will be taken let alone that the take would be significant to the overall population of NSO. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

Plaintiffs' second argument, that the Project will permanently destroy designated critical habitat that FWS never analyzed fares no better. Pls.' Br. 32-33. Irreparable harm is not presumed simply where there are environmental impacts caused by logging. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010). General allegations of harm to habitat, such as those asserted by Plaintiffs, are insufficient to establish irreparable harm, because such general allegations do not address the circumstances of the proposed project. *See Friends of Bitterroot v. Marten*, No. CV 20-19-M-DLC, 2020 WL 2062139, at *2 (D. Mont. Apr. 29, 2020) (criticizing "stock allegation[s] of harm"). Thus, Plaintiffs' reliance on the "outsized importance" of habitat in the connectivity corridor, an unsupported claim that many private lands no longer support NSO habitat, and alleged harm to "generations of spotted owls" is insufficient. Pls.' Br. 32-33. Although Plaintiffs repeat their claim that FWS did not analyze removal of critical habitat authorized by the Project, the actual amount authorized for the sales at issue is far below what FWS analyzed in the BiOp.[14] *See supra* 14-15. Plaintiffs' second argument also fails to show irreparable harm is likely.

---

[14] Accordingly, Plaintiffs fail to allege specific allegations of irreparable harm to critical habitat warranting an emergency injunction. *See Butte Env't Council v. U.S. Army Corps of Eng'rs.,* 620 F.3d 936, 948 (9th Cir. 2010) ("An area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival or recovery.").

**B. Plaintiffs fail to show Project activities will irreparably harm NWPT.**

Plaintiffs provide no evidence, beyond bare speculation, that the Project will "irreparably harm" the NWPT. As explained in the REA, under Alternative 2, there will be no effects to NWPT aquatic habitat, or to nesting habitat or nesting turtles, eggs, or hatchlings because there is no nesting habitat in the proposed units. AR000824. With respect to impacts to overwintering habitat in the Project area, BLM reasonably concluded that the Project "would not affect the species at the overall population level (ranging across Washington, Oregon, California, Nevada) and would not lead to a measurable increase in the likelihood of the species to be listed as threatened because the removal of 0.13 percent of overwintering habitat in Oregon (only a portion of the overall species range) is not significant." AR000825. Moreover, even if BLM applied the PDFs that Plaintiffs argue it must, because the Project is not in nesting habitat, some of the PDFs would not even apply. AR001004-1005. And the remaining PDFs that impose seasonal restrictions on activities in overwintering habitat would have limited benefit to the NWPT because of the low likelihood of NWPT presence. AR000823 (no records of NWPT presence in overwintering habitat). Plaintiffs' alleged harm is entirely speculative; thus they have failed to show that there is a likelihood of irreparable harm to the NWPT from the Project.

**C. Plaintiffs fail to show Project activities will irreparably harm their interests.**

Nor have Plaintiffs shown that they themselves are likely to be irreparably harmed if take of NSO were to occur (which it will not). The relevant harm "is not injury to the environment but injury to the plaintiff." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000). Although Plaintiffs have submitted declarations regarding irreparable harm, the declarations speak in general terms ("I am harmed by these significant adverse impacts to [NSOs] and their habitat," ECF No. 18 ¶ 12), without explaining how the Plaintiff organizations or the declarants will be irreparably harmed if take of the NSO were to occur. *See id*. ¶ 7 (alleging interests "would be

directly harmed by BLM logging prescriptions that remove and downgrade late-successional forest habitat character"); ¶ 9 ("This old-growth felling and road construction will irreparably harm my interests in late-successional forests and [NSO] habitat."). The same is true for the NWPT. *See id*. ¶ 7 ("I derive personal and professional satisfaction and happiness from . . . [NWPTs]"). Notably, Plaintiffs' brief states that "[t]he extirpation or displacement of [the NSO and NWPT] due to habitat destruction or direct mortality would permanently deprive [its] members of the opportunity to observe them in the wild," Pls.' Br. 35. However, Plaintiffs' declarants do not state that they have ever seen an NSO or NWPT, much less seen either species in the Project area. They only intend to do so. ECF No. 18 ¶ 8; ECF No. 19 ¶ 8; ECF No. 20 ¶ 12. Plaintiffs' declarants say even less about the NWPT. *See generally* ECF Nos. 18, 19. These bare allegations are insufficient to show that Plaintiffs will be irreparably harmed even if an NSO was taken, or a NWPT harmed, because of the Project.

Plaintiffs' argument that they are irreparably harmed is also undercut by their own delay in seeking injunctive relief. *Oakland Trib. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (a "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm"). Plaintiffs bring their ESA challenges against the BiOp, which was issued in July 2023. ECF No. 17-2. Plaintiffs' other challenges are to the REA and decision records for the Paul's Payoff and Rotors Up Timber Sales, which were issued in May 2025. *See sura* 1. Thus, the basis for both of Plaintiffs' claims existed in May 2025. Yet Plaintiffs waited about nine months before moving for emergency relief. ECF No. 16. At bottom, this emergency is a result of Plaintiffs' own delay. A lack of planning on Plaintiffs' part does not constitute irreparable harm. *Miller for & on Behalf of NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("[T]he district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim relief has allowed the status quo to change through unexplained delay.") (citation omitted).

Plaintiffs have not clearly shown that they would be irreparably harmed absent relief before the Court could issue a decision on the merits and, therefore, Plaintiffs' motion should be denied.

### III.    Plaintiffs Fail To Demonstrate That The Balance Of Harms And Public Interest Weigh In Favor Of An Injunction.

Finally, the public interest and balance of harms weigh against emergency injunctive relief. Plaintiffs argue that no balancing of harms is required because their claims stem from the ESA. Pls.' Br. 35-36. In cases involving the ESA, courts employ a presumption that the balance of interests weighs in favor of ESA-listed species; they do not avoid the inquiry entirely. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018) (citation omitted). Nor may a court "merely assume that the Plaintiffs are acting in the species' best interest." *All. for the Wild Rockies v. Krueger*, 35 F. Supp. 3d 1259, 1270 (D. Mont. 2014), *aff'd*, 664 F. App'x 674 (9th Cir. 2016). Here, Plaintiffs have not established an interest in NSO (i.e., that they have seen NSO, that their organizations act in the best interest of NSO), nor any imminent threat to the NSO.

Moreover, through the O&C Act, Congress identified a strong public interest in providing for sustained-yield timber harvest on O&C lands. *See supra* 3-4. Congress provided that O&C lands designated as timberlands "shall be managed . . . for permanent forest production," 43 U.S.C. § 2601, and the Ninth Circuit has characterized sustained-yield timber production as the "dominant use" of O&C timberlands under the Act. *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1184 (9th Cir. 1990). The timber sales at issue in this case support BLM's compliance with the O&C Act. Kelly Decl. ¶¶ 6, 14. The 2016 RMP under which the timber sales were approved carefully allocated lands to reserves to be managed for the benefit of ESA-listed species, including the NSO, and the HLB to provide for sustained-yield timber harvest under the O&C Act. *Id*. BLM determined the allowable sale quantity of the lands allocated to the HLB, and the O&C Act provides that timber in that amount "shall be sold, cut, and removed . . ." and "shall

be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." 43 U.S.C. § 2601. Enjoining the timber sales would foreclose the benefits that sustained-yield timber harvest under the O&C Act provides to local communities and industries, as expressly determined by Congress. *See Pac. Rivers v. U.S. Bureau of Land Mgmt.*, Case No. 6:16-cv-01598-JR, 2018 WL 6735090, at *17 (D. Or. Oct. 12, 2018) ("[M]anaging O&C lands pursuant to sustained-yield principles by definition protects watersheds, regulates stream flows, and contributes to the economic stability of surrounding communities."), *adopted by* 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, 815 F. App'x 107 (9th Cir. 2020). Proceeds from these sales directly benefit southwestern Oregon counties. Kelly Decl. ¶ 6.

Further, these timber sales provide an important boost to the local economy. *Id.* ¶¶ 6, 15-19. Courts have found that these types of benefits, even for timber harvest on non-O&C Act lands, weigh against preliminary injunctive relief. *See Friends of the Clearwater v. Higgins*, 472 F. Supp. 3d 859, 877 (D. Idaho 2020) (finding public interest and balance of harms weighs against a preliminary injunction in part because "[t]he project will also contribute to the local economy and is broadly supported by the local community."), *aff'd*, 847 F. App'x 394 (9th Cir. 2021); *Sierra Forest Legacy v. Rey*, 691 F. Supp. 2d 1204, 1213-14 (E.D. Cal. 2010) (finding public interest supported, among other things, by providing timber production and supporting industry and local communities). That weight is even stronger in this case where the timber sales Plaintiffs seek to halt come from O&C lands and are intended to directly contribute to the economic stability of local communities and industries. *Cf. Pac. Rivers*, 2018 WL 6735090, at *18 (emphasizing economic benefits of sustained-yield timber harvest under the O&C Act). Moreover, planning for sustained yield timber harvest requires ensuring a timely balance of growth and harvest. Kelly Decl. ¶ 14. A preliminary injunction of these timber sales would disrupt this careful planning contrary to the

public interest as reflected in Congress's direction to sell, cut, and remove timber using sustained-yield principles. *Id.* ¶¶ 14, 22.

Although Plaintiffs claim that injunctive relief would have a limited impact on timber harvest and wildfire management activities, Pls.' Br. 36-37, their request is anything but limited. Without road construction—which Plaintiffs seek to enjoin—limited, if any, timber harvest will be accomplished. *See* ECF No. 17-2 at 37 ("Access to some units would require road construction to extract timber"); Pls.' Br. 9. As Plaintiffs concede, approximately 65% of the acres authorized for commercial and non-commercial treatments under the Project would be implicated by their requested relief. *Id.* at 36; Kelly Decl. ¶ 17 ("A preliminary injunction of even 4-6 months would likely eliminate the entire 2026 operating season."); *id.* ¶ 23. Thus, there is nothing limited about Plaintiffs' request.

Moreover, Plaintiffs' request flies against the public interest as it would restrict BLM's ability to manage wildfire risks. Kelly Decl. ¶¶ 6, 24. Decision Record 2 for the Project authorizes Hazardous Fuels Reduction maintenance treatments of 4,332 acres and 749 acres of new treatments.AR000023-25. A portion of these acres overlap with commercial treatments authorized in Decision 1, *id.*, which are challenged here. Pls.' Br. 9-10 ("[t]he urgency of this motion is driven by imminent implementation of the 'Paul's Payoff and 'Take A Chance' timber sales"). Yet, Plaintiffs do not distinguish between road construction authorized for the timber sales or Decision Record 2. *Id.* at 9 (seeking to enjoin road any road construction within NSO NRF habitat and NWPT overwintering habitat); AR000645 (associated activities include road construction). This is particularly concerning given the wildfires the Medford District experienced in 2021, and the increased "likelihood of uncharacteristic fire behavior and high severity fire" due to the buildup of fuels from missing several fire return cycles. ECF No. 17-2 at 16-17, 79. That Plaintiffs' request relief would enjoin critical Hazardous Fuels Reduction activities from moving forward further tips

the scale in favor of allowing the Project to proceed. *See Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1196 (D. Mont. 2013) (finding the equities favored allowing the project to proceed because it "will reduce both the likelihood and severity of forest fires in the area").

The balance of harms and public interest, thus, weigh heavily against emergency injunctive relief.

## IV.    If An Injunction Is Granted, Plaintiffs Should Be Required To Post A Bond.

Before a court may award preliminary injunctive relief, a plaintiff must post a compensatory security bond. Fed. R. Civ. P. 65(c). The posting of a bond is a precondition to the issuance of an injunction, regardless of the plaintiff. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). If the Court concludes that injunctive relief is warranted, it should require Plaintiffs to post a security of $9,197, an amount appropriate to pay costs and damages. Kelly Decl. ¶ 18.

## CONCLUSION

For all these reasons, Plaintiffs' motion for emergency injunctive relief must be denied.

Respectfully submitted this 27th day of February 2026.

ADAM R. F. GUSTAFSON,
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

SHANNON BOYLAN (DC Bar No. 1724269)
Natural Resources Section

*/s/ Christian H. Carrara*
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9584 (Boylan)
(202) 598-9736 (Carrara)

shannon.boylan@usdoj.gov
christian.carrara@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2026, a true and correct copy of the above document was electronically filed with the Clerk of Court using CM/ECF. Copies of the document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

<u>/s/ Christian H. Carrara</u>
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
Trial Attorney
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9736
christian.carrara@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,983 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

*/s/ Christian H. Carrara*
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
Trial Attorney
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9736
christian.carrara@usdoj.gov

*Counsel for Defendants*
