ADAM R. F. GUSTAFSON, Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
SHANNON BOYLAN (DC Bar No. 1724269)
Natural Resources Section
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9584 (Boylan)s
(202) 598-9736 (Carrara)
shannon.boylan@usdoj.gov
christian.carrara@usdoj.gov

*Counsel for Defendants*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER**, *et al.*, | Case No.: 1:25-cv-02296-CL |
| Plaintiffs, | Honorable Magistrate Judge Mark D. Clarke |
| v. | **DECLARATION OF JUSTIN KELLY** |
| **BURGUM**, *et al.*, | |
| Defendants. | |

I, Justin Kelly, in accordance with the requirements of 28 U.S.C. § 1746, declare:

1. I am the Grants Pass Field Manager, Medford District, U.S. Bureau of Land Management (BLM) in Grants Pass, Oregon. I have been employed by BLM in this position since January 2025. Previously, I was employed by BLM as Assistant Field Manager in the Ashland, Oregon Field Office for four years, and prior to that, as a BLM Planning and Environmental Specialist in Butte Falls Field Office, Oregon for one and a half years.

2. I became the Grants Pass Field Manager after the BLM issued the original Last Chance Forest

Management Project (Project) Decision Record (DR) #1. I have reviewed DR#1, and the associated Finding of No Significant Impact and am familiar with their contents. I have supervised the Interdisciplinary Team's preparation of a Revised Environmental Assessment (REA) for the Project and signed the Project's DR#2, DR#3, and DR#4.

3. In my experience as Field Manager, BLM Planner, and Environmental Specialist, among other timber sale program administration requirements and tasks, I am familiar with BLM's timber sale program and timber sale planning, including the 2016 Southwestern Oregon Resource Management Plan (RMP) and RMP Final Environmental Impact Statement (FEIS), RMP management direction, the RMP's declared Allowable Sale Quantity (ASQ), Medford District 5–year sale plans and timber targets, timber sale planning, operations, layout, logging and road engineering needs, timber cruising and appraising needs, timber sale contracting steps, timber sale administration including the preparation and maintenance of inspection reports, and compliance with law such as the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), Federal Land Policy and Management Act (FLPMA), and 1937 Oregon & California Revested Railroad Lands Act (O&C Act). Based upon my experience administering timber sales and working directly with purchasers, I have observed firsthand how delays in offering or implementing timber sales disrupt logging schedules, mill supply chains, workforce planning, and equipment utilization, reduce bid values, and economic returns to the United States, and correspondingly diminish the timber sale receipts distributed to O&C counties.

4. The Project implements the RMP, which harmonized BLM's statutory obligations to provide for the conservation and recovery of ESA-listed species, such as the Northern spotted owl, while providing for sustained yield timber production required by the O&C Act. To date, and after nine years of RMP implementation, the Medford District has implemented only 38% of the District's Final Environmental

Impact Statement (FEIS) projected harvest in the first decade of the RMP, (AR000904-905), and specifically within stands 80 years of age or older, the Medford District has harvested only 41% of District's FEIS-projected harvest in the first decade of the RMP. (*Id.* at B-53).

5.  The Project REA analyzed commercial and non-commercial forest management activities including Variable Retention Harvest (VRH), commercial thinning, selection harvest, and hazardous fuels reduction (HFR) on up to a total of 11,686 acres of BLM-administered lands in several land use allocations made by the RMP, among which include the Harvest Land Base (HLB). The REA analyzed up to 8,240 acres of commercial treatments in the total 11,686 treatment acres analyzed. AR000764-66 The Project's REA is not self-executing but must be implemented through DRs authorizing actual timber sales and associated ground disturbing activities. (*Id.* at AR000771).

6.   The Project is intended to contribute timber volume towards meeting BLM's declared ASQ as required by the O&C Act and RMP, while conducting active management of reserves in furtherance of the Northern spotted owl recovery plan's goals of speeding the development of habitat and preventing its loss to catastrophic wildfire. The Project's commercial and non-commercial treatments contribute to the overall economic wellbeing of local communities by generating revenue that is distributed to western Oregon O&C counties, as well as safety by addressing hazardous fuels and improving overall stand resilience. Proceeding with the Project as planned is essential for the Medford District to deliver on the promise of the 2016 RMP's provision of habitat protection *and* the expected modicum of commercial timber volume from the limited HLB—roughly the remaining 20% of O&C timberlands after first allocating large contiguous blocks of present and future habitat to reserves on 80% of O&C timberlands for the conservation and recovery of ESA-listed species. A preliminary injunction would only serve to second-guess and recalibrate this careful balancing.

7. BLM has heard the concerns and comments of Plaintiffs in this case. After an initial Complaint challenging this Project (now dismissed), BLM sought a stay of litigation to revisit and revise the original EA, ensuring that the REA documents the Project's consistency with the 2016 RMP's management direction. BLM took its NEPA obligations seriously here--the REA reflects a rigorous "hard look," under NEPA, and took care to address Plaintiffs' concerns and comments on the draft REA made available for public comment. Demonstrating how BLM took Plaintiffs' comments to heart, we made additional changes to the REA in direct response to their public comments. The REA analysis shows clearly that the Project complies with the 2016 RMP and there is no potential for significant effects at the site-specific level, nor beyond the levels disclosed in the 2016 RMP FEIS. As it stands, the REA is nearly 500 pages long, including appendices. More analysis—either in yet another revised EA or project-level EIS—would not result in different project design features (PDFs) for wildlife, soils, invasive species, hydrologic resources, or any of the other resources evaluated in the REA. More analysis, reconnaissance, or on-the-ground non-ESA wildlife species surveys (which are not required by law, regulation, policy, or the RMP), would not afford me the discretion as decision maker to defer or forego timber harvest in the HLB or to add additional management direction, harvest prescriptions, canopy retention, species protections or buffers, seasonal restrictions, or invasive species treatment measures to the Project beyond what is provided for in the RMP management direction and ESA Section 7 consultation as carried into the Project's existing PDFs. In short, the Project provides all the protective measures possible while harvesting the trees and treating the hazardous fuels the BLM told the public would be allocated for harvest and treatment in the 2016 RMP FEIS. Plaintiffs were given the opportunity in the public comment period on the RMP DEIS to suggest different land use allocations for this Project area, and during the public comment period on the original EA and again on the REA to suggest better or different Project Design Features or Best Management Practices, and offered none—other than to call on BLM to provide

generalized habitat protection through seasonal restrictions that would effectively prohibit timber harvest on nearly half of the Project. AR005725.

8. I have read Plaintiffs' complaint and preliminary injunction motion and am aware Plaintiffs do not allege BLM's action is likely to "jeopardize" the existence of northern spotted owls, that it "adversely modifies" spotted owl critical habitat, or that BLM's action is reasonably certain to cause unauthorized "take" of spotted owls. Rather, Plaintiffs' Complaint alleges BLM's violated the ESA because REA-analyzed acreage "exceeds" the acreage of NSO nesting, roosting, foraging (NRF) habitat and critical habitat analyzed in the Fish and Wildlife Service's Biological Opinion #2023-0084354 (BiOp). AR007208. Plaintiffs' claim is based upon a fundamentally erroneous premise: that the REA is self-executing and has "authorized" activity. The REA is not self-executing, nor does it "authorize" activity. BLM must issue Decision Records authorizing timber sales before timber sale activities may occur. DR#4 demonstrates that BLM has authorized Project activities on a total acreage well below the acreage analyzed in the BiOp:

Table 4. Total NSO Habitat Acres Treated to Date in Existing Last Chance DRs

| | All Treatments | | |
|---|---|---|---|
| Treatment Acres by Habitat Effect Type | Acres in Biological Opinion | Acres Authorized in DRs 1 – 4 | Remaining Acres in Biological Opinion Not Authorized in DRs |
| NRF Modified | 2,252 | 1,780 | 472 |
| NRF Downgraded | 0 | 0 | 0 |
| NRF Removed | 3,662 | 1,634 | 2,028 |
| Dispersal-only Modified | 1,731 | 1,324 | 407 |
| Dispersal-only Removed | 2,508 | 1,167 | 1,341 |
| Treatments in Non-Habitat (No Effect)* | 1,934* | 1,140* | 794* |
| GRAND TOTAL | 12,087 | 7,044 | 5,043 |

| Critical Habitat Only | | | |
|---|---|---|---|
| Treatment Acres by Habitat Effect Type | Acres in Biological Opinion | Acres Authorized in DRs 1 – 4 | Remaining Acres in Biological Opinion not Authorized in DRs |
| NRF Modified | 1,295 | 1,054 | 241 |
| NRF Downgraded | 0 | 0 | 0 |
| NRF Removed | 791 | 241 | 550 |
| Dispersal-only Modified | 671 | 489 | 182 |
| Dispersal-only Removed | 336 | 122 | 214 |
| Treatments in Non-Habitat (No Effect)* | NA* | 397* | NA* |
| GRAND TOTAL | 3,093 | 2,303 | 1,187 |

* No effect treatments are identified in the Biological Assessment and Biological Opinion, but are not carried forward for further analysis and are not split out for critical habitat analysis in the Biological Opinion because those treatments do not present any pathway, individually or collectively when considered with the entirety of the project, for effects to the species or its critical habitat.

9.  As shown in Table #4 from DR#4, (AR000008), to date BLM has authorized 7,044 acres in DRs in NRF habitat, or 58% of the acreage analyzed in the BioP. With regard to spotted owl critical habitat, BLM has authorized 2,303 total acres in DRs; excluding 397 acres of "no effect" treatments in critical habitat for a total of 1,906 acres of treatments authorized, this equates to 62% of the acreage of critical habitat analyzed in the BiOp. BLM will not issue DRs for this Project that authorize acreage totals that exceed the acreage evaluated in the BiOp or other applicable ESA Section 7 consultation.

10. The difference in acreage reported in BLM's EA and the FWS BiOp result from minor refinements to the proposed action and differences in analytical methodology. In particular, the EA separately tallied overlapping treatment prescriptions occurring on the same geographic footprint, including within northern spotted owl critical habitat. As a result, double-counting of acres occurred in the EA where multiple HFR treatments—such as

handpile and handpile burn prescriptions combined with underburn treatments—were applied to the same acreage. This was a GIS accounting error that overstated EA treatments acres within northern spotted owl critical habitat by approximately 5,218 acres. These double-counted acres do not represent additional acres of disturbance, effects, expanded Project footprint, or acres available for potential authorization; they reflect multiple treatment prescriptions occurring on the same ground. As reflected in Table 4 of DR#4, (AR000008), BLM tracks treatment acres by habitat type cumulatively and ensures that the acreage treated—and the associated effects of all treatments—do not exceed those analyzed and disclosed in the BiOp. BLM issued an Erratum to DR#2 to clarify the corrected acreage of HFR treatments where there had been this overlap. AR000023. Accordingly, Plaintiffs claim is wrong—the Project as authorized does not and will not exceed the acreage or effects evaluated in the BiOp.

11. BLM intends to implement the Project DRs signed for each sale and/or HFR project or grouping of sales and/or HFR projects. The Project's final commercial timber sales will be offered in Fiscal Years 2026-2029, with non-commercial HFR work continuing for 15 years.  To date, I have signed the following DRs for the Project:

• The Revised DR #1 for the Paul's Payoff and Rotor's Up timber sales, dated May 12, 2025. AR000654. Murphy Co. of Eugene, Oregon is the high-bidder on the Paul's Payoff timber sale on September 26, 2024. BLM awarded the Paul's Payoff timber sale to Murphy Co. on October 23, 2024, and approved the timber sale contract on September 18, 2025. The Rotor's Up timber sale package has not yet been finalized and has not yet been offered for sale.

• DR#2 for non-commercial HFR on 5,081 acres, dated May 12, 2025 (and Erratum issued February 9, 2026). AR000644, AR000023 . The non-commercial HFR work will be performed through a

combination of in-house BLM labor and service contracts through the Wildland Fire Service.

- DR #3 for Take A Chance timber sale, dated August 13, 2025. AR000468. Boise Cascade Wood Products of Medford, Oregon is the high-bidder on the Take A Chance timber sale on September 25, 2025. BLM awarded Take A Chance timber sale to Boise Cascade Wood Products on November 5, 2025, and approved the timber sale contract on January 23, 2026;

- DR#4 for King Graves timber sale and non-commercial HFR on 708 acres, dated February 10, 2026. AR000001. I intend to auction the King Gravest timber sale on March 26, 2026. The non-commercial HFR work will be performed through a combination of in-house BLM labor and service contracts through the Wildland Fire Service.

12. The Project would produce an estimated total of 63.5 million board feet (Mmbf) in Fiscal Year 2026 through Fiscal Year 2029. AR000779. The Paul's Payoff, Take A Chance, and King Graves timber sales will contribute 4.37 Mmbf,  9.393 Mmbf, and 7.453 Mmbf, respectively, to the Project's total ASQ volume to be offered. The Paul's Payoff, Take A Chance, and King Graves timber sales will contribute 1.283 Mmbf, 1.196 Mmbf, and 0.954 Mmbf, respectively, to the Project's total non-ASQ volume to be offered. If the Project is enjoined for six months to a year, BLM would likely be unable to proceed with the scheduled auction for the King Graves, Rotor's Up, Peter's Folly, and Buckhorn Draw timber sales during FY2026. The uncertainty associated with ongoing litigation, including the risk of further delay, would undermine market confidence and materially affect bidder participation and bid prices.

13. The RMP declared an ASQ for the Medford Sustained Yield Unit of 47 Mmbf, with a rate of annual variation of +/- 20% (-20% would be 37.6 Mmbf). AR012822-12823. If enjoined, Medford BLM would have a shortfall of 28.496 Mmbf in Medford's 2026 ASQ volume. Medford BLM does not have "shelf stock" of alternative timber sale volume that could be moved up in the planning cycle to replace the loss of this 28.496 Mmbf in FY26. Planned FY26 timber sales in other Medford field offices are projected to

produce 25.8 Mmbf of ASQ volume, and thus an injunction of this Project's sales would directly cause Medford BLM to fall below the -20% margin of the RMP's declared ASQ in FY26.

14. Enjoining a forest management project not only has immediate impacts on BLM's ability to manage HLB lands consistent with RMP management direction to achieve the declared ASQ but also has long-term and lasting consequences on BLM's ability to manage O&C lands in accordance with sustained yield principles under the O&C Act and the applicable RMP. Timber sale planning and implementation occur years in advance and follow a carefully sequenced pipeline designed to maintain a predictable and sustained flow of timber volume from the HLB while also accomplishing RMP-required fuels reduction and restoration treatments in reserve allocations. When a planned project is enjoined or delayed, BLM must reallocate limited staff and resources to address the delay, including potentially revisiting environmental analysis, project design, contract preparation, suspension, or re-negotiation, and planning timelines. This reordering disrupts the sequencing of future projects in the planning pipeline and delays implementation of other planned timber sales and associated fuels reduction treatments. For example, if the court enjoins the Project, Grants Pass staff would be tasked with addressing whatever aspect of the Project is necessary to request lifting the injunction and lifting contract suspensions to allow purchasers to restart harvest activities. Staff would be required to stop work on projects in planning for FY26 through FY28, such as the Cedar Flat thinning project intended to reduce wildfire risks near Williams, Oregon, and the Galesville Forest Management Project intended to provide the Grants Pass Field Office contribution to the Medford District's declared ASQ starting in FY27. These projects are in various stages of planning, and an injunction-induced work stoppage on those projects would cause delay to the completion schedules of those projects. An injunction on the Project would thereby cause cascading delays in other projects that interfere with BLM's ability to maintain sustained yield from HLB lands, reduce hazardous fuels across all lands including reserves, and meet long-term forest management objectives. These disruptions impair

BLM's ability to efficiently implement the RMP and fulfill its statutory obligation to manage O&C lands in accordance with sustained yield principles.

15. The Project includes road management activities and improvement that will eliminate chronic sources of sedimentation within the Project's watersheds, and restoration activities such as weed treatments, brush disposal and tree planting. The harvesting and processing of timber, road management and restoration activities all serve to contribute jobs and income to the local economy, both directly through jobs in the woods and in the mills and indirectly through ripple effects such as business to business purchases and when households spend earnings from these activities at local establishments. In addition to the jobs and income contributed, there are non-market benefits the public will realize from the Project, such as improved forest health and increased vegetation resilience to large disturbances such as severe fire and insect or disease outbreaks.

16. The harvesting and processing of forest products resulting from management activities on BLM lands in western Oregon will contribute to the local economy and to the sustainability of the local forest products industry. A delay from a preliminary injunction would delay these economic benefits. Timber receipts are apportioned between the U.S. Treasury and western Oregon counties, with Oregon counties receiving 75% of O&C receipts. Public Law No: 119-74.

17. A preliminary injunction of even 4-6 months would likely eliminate the entire 2026 operating season. The typical western Oregon BLM timber sale operating season generally begins in late February in unusually dry years, but more commonly in March. Because of seasonal operating restrictions to avoid Northern spotted owl disruption and for fire season, the operating season for these sales in calendar year 2026 is likely now through May, with small portions of the sales operable through the summer months but with full shutdowns likely due to fire

restrictions. Even if an injunction is lifted by September 2026, BLM's experience in past timber sales shows it is unlikely that a purchaser would mobilize equipment in September to only conduct one month of work before fall shutdowns due to wet weather in October. A preliminary injunction would result in Murphy Co. and Boise Cascade Wood Products procuring less raw material inputs this year. If alternative log sourcing could not be found, it would inevitably result in sawmill downtime, reduced hours for employees, and possible layoffs. In addition to the direct impacts to the purchaser, numerous subcontractors would be affected. Several subcontractors are scheduled to perform weed spraying, road reconstruction, and logging, slash disposal work, and trucking. The subcontractors are from the local Grants Pass and Medford area. With operations planned ongoing and scheduled to continue over the next several months, there may be little opportunity to find alternative work.

18. If the Paul's Payoff and Take A Chance timber sale contracts are enjoined, BLM would suspend performance under those contracts for the duration of the injunction. If enjoined for six months to a year, the BLM would not receive anticipated timber sale revenue during that period, as timber purchasers pay the United States upon cutting and removing timber under the timber sale contracts. Based on current contract timber prices in the Paul's Payoff of $119/MBF and Murphy's stated intent to harvest 2,400 MBF over the next six months, BLM estimates that approximately $285,600 in revenue would be received from the Paul's Payoff timber sale contract during the next six-month period. Based on current contract timber prices in the Take A Chance timber sale contract price of $263.50/MBF, and Boise Cascades' stated intent to harvest approximately 634 MBF over the next six months, BLM estimates that approximately $166,742 in revenue would be received from the Take A Chance timber sale contract during the next six-

month period. Delaying timber harvest and collection of those receipts from Paul's Payoff an Take A Chance timber sale totaling $452,342 would result in a measurable loss in the time value of money to the United States, which equates to approximately $8,187 when applying the applicable February 20, 2026 U.S. 6-Month Treasury Yield (3.62% annualized) over a six-month period (Principal x. 0.0362 x 0.5). In addition, BLM would incur administrative costs of approximately $1,000 associated with the extra staff time to suspend contracts, modify contracts, and later lift suspensions.

19. An injunction of these planned harvest activities over the next six months would not only result in a measurable loss in the time value of money to the United States, but also would delay payment of approximately $339,256 in anticipated payments to western Oregon counties through either receipts payments, or Secure Rural Schools payments (that are funded first with available O&C timber harvest receipts before the Treasury makes up any shortfall), that would not be available to support county schools, public safety, road maintenance, and libraries during the current budget cycle. Although revenue may eventually be received, delayed receipt within a fixed fiscal-year budgeting framework results in concrete financial disruption to counties and the United States.

20. Based upon BLM information on timber sale work completed to date, and purchaser's planned operations over the next six months in the Paul's Payoff and Take A Chance timber sales, I directed my staff to cross-walk those units with BLM information showing acreages of spotted owl NRF habitat and Northwestern pond turtle overwintering habitat present in those timber sale units and rights-of-way. Some acres listed below represent overlaps of NRF and Northwestern pond turtle overwintering habitat:

**NSO NRF acres**

1. Acres of NSO NRF that are felled, yarded, and hauled, with slash pile burning unfinished:

    a. Paul's Payoff TS: 11.5 acres of NRF total in roadside maintenance units 1.0 RS, 1.3 RS, 2.1 RS, 7.0 RS, 21.0 RS, 26.4 RS, 35.0 RS, 35.1 RS, 35.2 RS. Slash pile burning is expected to be completed in November 2026-March 2027.

    b. Take A Chance TS: 2 acres of NRF total in roadside maintenance unit 15.1. Slash pile burning is expected to be completed in November 2026-March 2027.

2. Acres of NSO NRF that are felled or are currently being felled, with yarding, hauling and slash disposal work unfinished:

    a. Paul's Payoff TS: 0.1 total acres of NRF in unit 34-1D. Yarding and hauling planned for April, expected to be completed in May 2026.

    b. Take A Chance TS: 0 acres of NRF currently being felled.

3. Acres of NSO NRF where new work is planned over the next 6 months:

    a. Paul's Payoff TS: 1.1 acres of NRF total (1 acre NFR in road construction clearing limits for roads TR 35-10 and 33-5-34.1 and 0.1 acre of NRF in unit 35-10). Felling, yarding, road construction, and log hauling are planned to begin in May 2026 and is expected to be completed in July 2026. Slash pile burning is expected to be completed in November 2027-March 2028. This work overlaps with work in occupied NSO sites listed below.

    b. Take A Chance TS:3 acres of NRF total (spread over partial units 3.1 RS, 3.7 RS, 9.2 RS, 15.5 RS, 22.0 RS, 33.1 RS, and road construction clearing limits for roads TR 9-8-C, 33-4-15.16 (unit 15.6 RW), and 33-4-15.08 (unit 5.8 RW)). Felling, yarding, and log hauling in the roadside maintenance units are planned to begin in late February 2026 and are expected to be completed before October 31, 2026. Felling, yarding, road construction, and log hauling in units 5.8 RW, 15.6 RW, and for TR 9-8-C are planned to begin in May 2026 and are expected to be completed before October 31, 2026. Slash pile burning is expected to be completed in November 2027-March 2028.

    c. HFR units: 261 acres spread over 27 partial HFR treatment units.

**Occupied NSO Sites**

1. Acres within Occupied NSO Sites that are felled, yarded, and hauled, with slash disposal work unfinished:

    a. Paul's Payoff TS: 19 acres total (16 acres total in roadside maintenance units 1.0 RS, 2.1 RS, 7.0 RS, 21.0 RS, 26.4 RS, 35.0 RS, 35.1 RS, 35.2 RS, and 3 acres total in unit 34.1 RW). Slash pile burning is expected to be completed in November 2026-March 2027.

    b. Take A Chance TS: 0 acres within Occupied NSO Sites have been felled.

2. Acres within Occupied NSO Sites that are felled or are currently being felled, with yarding, hauling and slash disposal work unfinished:

   a. Paul's Payoff TS: 59 acres total (units 25-9, 26-2, 34-1D, and 35-12). Felling in cable portions is expected to be completed before March 2026, felling in ground-based portions is expected to be completed before July 2026. Yarding and log hauling are planned to begin in March 2026 and is expected to be completed in July 2026. Slash pile burning is expected to be completed in November 2027-March 2028.

   b. Take A Chance TS: 0 acres within Occupied NSO Sites are being felled.

3. Acres within Occupied NSO Sites where new work is planned over the next 6 months:

   a. Paul's Payoff TS: 42.5 acres total (units 1-3, 26-2, 27-5, and 35-10). Felling, yarding, road construction, and log hauling are planned to begin in May 2026 and is expected to be completed in July 2026. Slash pile burning is expected to be completed in November 2027-March 2028.

   b. Take A Chance TS: 0 acres within Occupied NSO Sites are planned for harvest over the next 6 months at this time.

   c. HFR units: 989 acres within 33 complete treatment units.

**NWPT overwintering habitat acres**

1. Acres within NWPT OW habitat that are felled, yarded, and hauled, with slash disposal work unfinished:

   a. Paul's Payoff TS: 3 acres total (portions of roadside maintenance units 2.1 RS, 7.0 RS, and 35.2 RS). Slash pile burning is expected to be completed in November 2026-March 2027.

   b. Take A Chance TS: 0 acres within NWPT OW habitat have been felled.

2. Acres within NWPT OW habitat that are felled, partially yarded & hauled, with yarding, hauling and slash disposal work unfinished:

   a. Paul's Payoff TS: 6 acres total (unit 34-1D and a portion of unit 1-4). Felling in cable portions is expected to be completed before March 2026, felling in ground-based portions is expected to be completed before July 2026. Yarding and log hauling are planned to begin in March 2026 and is expected to be completed in July 2026. Slash pile burning is expected to be completed in November 2027-March 2028.

   b. Take A Chance TS: 0 acres within NWPT OW habitat have been felled.

3. Acres within NWPT OW habitat where new work is planned over the next 6 months

   a. Paul's Payoff TS: 61 acres units 1-3, 1-4, and 6.2 RW. Felling in cable portions is expected to be completed before March 2026, felling in ground-based portions is expected to be completed before July 2026. Yarding and log hauling are planned to begin

in March 2026 and is expected to be completed in July 2026. Slash pile burning is expected to be completed in November 2027-March 2028.

    d.   Take A Chance TS: 12.5 acres total spread across portions of units 3.1 RS, 10.0 RS, 15.5 RS, 22.0 RS, 15.6 RW, and 15.8 RW At this time, felling, yarding, and log hauling in the roadside maintenance units are planned to begin in late February 2026 and are expected to be completed before October 31, 2026. Felling, yarding, road construction, and log hauling in units 15.6 RW, and 15.8 are planned to begin in May 2026 and are expected to be completed before October 31, 2026. Slash pile burning is expected to be completed in November 2027-March 2028.

    b.   HFR treatments: 382 acres spread over 17 partial treatment units.

21. Plaintiffs' preliminary injunction motion asserts that a limited injunction of Project activities in NRF and NWPT overwintering habitat would leave sufficient areas where harvest could continue in the Project area during the length of any preliminary injunction. This is untrue. Plaintiffs do not assert in their declarations that they possess the knowledge or experience to offer opinions on any matter related to the timing, method, or location of implementing the Project's timber sale contracts, or any basis for me to consider staggering the timing or location of the purchasers' timber harvest activities outside of NRF or NW pond turtle overwintering habitat. NRF and NWPT overwintering habitat within the Project are not confined to discrete, easily segregated units or road segments that can be avoided while allowing efficient harvest elsewhere. Rather, these features are interspersed throughout the harvest units and along necessary access routes. Timber harvest operations are conducted at the scale of entire units using integrated harvesting systems, road access, and equipment configuration designed for continuous, efficient operations. Requiring a purchaser to harvest only isolated portions of units while avoiding interspersed areas would require repeated mobilization and demobilization of logging equipment, reconstruction or repeated maintenance of access routes, and multiple entries into the same harvest units. This type of piecemeal operation is operationally inefficient, significantly increases costs, and is inconsistent with standard industry practices.

22. BLM's timber sale appraisal and minimum bid determination assume efficient, continuous harvest of entire

units using conventional logging practices. The appraised value does not account for repeated equipment moves, interrupted operations, multiple entries, or prolonged project timelines caused by litigation-driven uncertainty. As a result, requiring piecemeal harvest would materially reduce the economic viability of awarded sales, and would likely deter bidder participation or result in substantially lower bid prices on sales scheduled to be auctioned.

23. For these reasons, Plaintiffs' proposed "limited" injunction would, in practical effect, function as a complete injunction of harvest activities. This is because, in BLM's experience, prudent operators would not mobilize equipment and incur substantial fixed costs to conduct fragmented and inefficient operations under uncertain and potentially changing restrictions, where the operational inefficiencies and financial risks would outweigh any reasonable expectation of economic return.

24. Enjoining the Project's HFR work authorized in DR#2 and DR#4 would have a substantial negative impact on fire hazard and risk to local communities. DR#2 and DR#4's HFR work covers 5,789 acres of non-commercial to reduce surface fuel loading. In the next 6-12 months, BLM in-house personnel and contractors intend to implement 1,460 acres of these HFR treatments. In a particularly dry year with a record low snowpack, there is potential for 2026 to be a particularly bad fire season. An injunction of the Project's HFR treatments would increase the likelihood of higher-severity fire behavior, reduced firefighter effectiveness, and great potential impacts to nearby residents and infrastructure during the period of any injunction, thereby imposing harms that are immediate and irreparable. Even a "limited" injunction prohibiting HFR treatments in NRF or NWPT overwintering habitat would be a complete injunction of all 1,460 acres of HFR treatments planned for the next 6 months, as there is no operational feasible or economically viable way to segment treatments within treatment units based on habitat and non-habitat. The same mobilization issues described above for commercial treatments apply to the HFR treatment units. An injunction requiring BLM to segment HFR treatments based on habitat and non-habitat would severely

reduce BLM's capacity to carry out the Project's full suite of HFR treatments, as increased mobilization costs per acre would quickly exhaust BLM's available funding to complete planned acres this fiscal year. An injunction would also disrupt BLM's contractual and interagency service agreements for HFR treatments with the Wildland Fire Service. Those service contracts are structured around planned acreage, mobilization schedules, and seasonal workforce allocation. Enjoining the HFR acres would strand resources scheduled for mobilization, reduce the efficiency of interagency coordination, and undermine BLM's ability to complete planned HFR treatments within the operational window and fiscal year implementation obligations.

25. Plaintiffs' interpretation of FLPMA and RMP management direction for Bureau Sensitive Species (BSS) would effectively prohibit timber harvest and HFR treatments in NWPT overwintering habitat, regardless of species absence or absence of a "specific threat" that would contribute to the need to list the species under the ESA. The RMP directs BLM to implement conservation measures to mitigate "specific threats" to BSS identified through project-level analysis, not a categorical bar on management activities. In the HLB and O&C lands, timber production is the dominant land use allocation established by Congress in the O&C Act and implemented through the RMPs. AR23553 (BLM 6840 Manual). If Plaintiffs' interpretation were adopted, it would prohibit sustained yield timber harvest on approximately 107,600 acres, or 22% of the lands presently allocated to HLB. Because the HLB comprises approximately 20% of BLM managed lands in western Oregon, removing 22% of that base would reduce the effective HLB allocation to roughly 16%, altering the RMP's implementation of sustained yield timber production under the O&C Act. Further, Plaintiffs' interpretation would substantially constrain BLM's ability to implement HFR and habitat restoration treatments across late-successional reserves on up to 230,323 acres, or 39% of late-successional reserve lands.

Plaintiffs' interpretation would effectively impose a substantive, project-level, categorical habitat protection mandate that does not appear in the adopted RMPs and was not subjected to NEPA analysis or public review and comment during the planning process.

26. Requiring even a seasonal restriction for NWPT overwintering habitat from October to April— covering both overwintering and movement between aquatic and upland habitats—would materially constrain timber harvest and related operations on the same HLB acreage and associated access routes. When layered with the March 1- July 15 seasonal restriction for northern spotted owls and typical July-August industrial fire precaution restrictions, the cumulative effect would reduce the annual operating window for timber harvest on these lands to only a short late-summer period, if any. Under standard 36 and 48-month O&C timber sale contracts, operating windows limited to only a few weeks per year would not provide sufficient time to complete harvest activities within the contract performance period. This cumulative effect illustrates that Plaintiffs' interpretation of the RMP management direction for Bureau Sensitive Species would operate as a categorical constraint on timber harvest and fuels treatments, rather than the project-level mitigation of "specific threats" contemplated by the RMP.

27. I have reviewed the Plaintiffs' declarations submitted in support of their motion for preliminary injunction. Declarants assert that the Last Chance Forest Management Project logs "old growth." The cruise data for Paul's Payoff, Take A Chance, and King Graves timber sales demonstrate that these timber sales are not targeting old growth trees for removal. The quadratic mean diameter-at-breast-height of the trees designated for cutting in each of these sales is 16.1 inches, 15.6 inches, and 14.8 inches respectively. Per RMP management direction, the Project protects trees established on or before 1850 and a diameter larger than 36 inches diameter at

breast height (dbh) in HLB-Uneven-aged Timber Area (UTA) and Late Successional Reserve (LSR)-dry. Per RMP management direction, the Project protects trees established on or before 1850 and a diameter larger than 40 inches dbh in HLB-Low Intensity Timber Area (LITA) and HLB-Moderate Intensity Timber Area (MITA). Section 44 of each timber sale contract incorporates these RMP-mandated protections.

28. I have reviewed photographs submitted within the declaration of Chandra Legue. None of the trees depicted in photos within Ms. Legue's declaration are "old growth" trees. The Incense-cedar depicted in the photo in Paragraph 10 of Ms. Legue's declaration is not "large" for an Incense-cedar tree in southwestern Oregon where such trees commonly reach 24-30 inches dbh, and the tree is not "old growth."

29. I have also reviewed the photographs submitted within the declaration of Madeline Cowen. None of the trees depicted in photos within Ms. Cowen's declaration are "old growth" trees. Contrary to Ms. Cowen's assertion in Paragraph 15, road clearing near reserved trees does not "destroy[] any chance of survival" or those reserve trees. Per RMP management direction, new roads shall be constructed to established BLM engineering design standards, which include safety requirements. To the extent feasible, roads are designed to minimize disturbance to large trees because it is time consuming and expensive to remove large root systems from the roadbed. Prior to establishing the road construction clearing limits on the ground, the BLM engineer collected data in the field and designed the road to BLM engineering specifications and adhered to all Last Chance EA Best Management Practices and Project Design Features. Following the design process, the engineer established the road construction clearing limits on the ground to encompass the trees and vegetation that would be cut or likely damaged as a result of the road construction. Constructing a road with the expectation that reserve trees

outside the established clearing limits will subsequently fail and create hazards to newly

constructed infrastructure would be inconsistent with BLM engineering design standards and

safety requirements. In BLM's experience within the Grants Pass Field Office, anecdotal

evidence shows that 98% of reserve trees outside of road construction clearing limits survive.

30. I have reviewed the declaration of George Sexton submitted in support of Plaintiffs' motion for

preliminary injunction. Mr. Sexton asserts in Paragraph 8 that the 34-1 right-of-way was

constructed in a Northern spotted owl activity center. This is false. The 34-1 right-of-way is

within the 1.3 mile home range of an occupied spotted owl site, and the 0.5 mile core use area

of an unoccupied Northern spotted owl site, but not within the core use area of any occupied

owl site.



Map of spotted owl sites in relation to Unit 34-1 (Concentric circles illustrate, in descending

size and order, the estimated home range, core use area, and nest patch for each site. Occupied

NSO sites are encircled in blue). BLM's ESA Section 7 consultation for the Project included the

34-1 right-of-way construction as well as timber harvest within the depicted harvest units and

FWS determined that no take of the spotted owls at these occupied sites would occur because

sufficient habitat—on mostly BLM land (shaded tan on the map) within the site will remain

either unharvested or be treated (i.e. with HFR treatments) such that the habitat function of the

home ranges will be is maintained.

31. Mr. Sexton also asserts in Paragraph 9 that "BLM has authorized extensive logging road

construction throughout logging unit 34-1 that appears to target many of the largest and oldest

forest stands for felling to facilitate the extensive road construction. Scores of old-growth trees

that have been properly marked for retention will instead be felled to facilitate extremely long

logging spur roads thus frustrating the purpose of the leave tree marking." The road in unit 34-1

was not designed to target the cutting of large trees. It was designed to avoid road construction

in the Riparian Reserve and limit disturbance to Bureau Sensitive plant sites outside of the unit,

while providing safe and efficient logging systems and haul route access to the whole unit. Per

RMP management direction, the Project protects trees established on or before 1850 and a dbh

larger than 36 inches dbh (or 40 inches dbh, depending on LUA), except where falling is

necessary for safety or operational reasons, and no alternative harvesting method is

economically viable or practically feasible. This road was designed per RMP management

direction. The Paul's Payoff timber sale contract clearly designates that leave trees within the

34-1 right-of-way unit are marked with orange paint. No "old growth" trees were felled to

construct the 34-1 right-of-way, nor was the purpose of leave tree marking "frustrated"--the

purchaser strictly adhered to the BLM timber sale contract and contractual reserve tree

designations. On February 1, 2026, at my direction, BLM timber sale administrator Sean

McClusky conducted an inspection of felling on the 34-1 right-of-way in the Paul's Payoff

timber sale and prepared an inspection report documenting his observations. Sale inspection

reports of this type are prepared by BLM sale administrators as a part of their official duties in

administering timber sales. Such reports are routinely prepared in the ordinary course of BLM's management of timber sales, are based on field observations made at or near the time of inspection and are maintained as a part of BLM's official records. Mr. McClusky's inspection report included photos of trees felled within the 34-1 right-of-way and reported that "[t]he photographs provided confirm that all timber, including those marked in purple, has been removed exclusively from the designated right of way. Mr. McClusky told the purchaser that before any purple marked timber can be removed, Mr. McClusky personally needs to inspect and use blue paint to mark each decked log in confirmation that each tree felled within the right-of-way did not come from the adjacent unit. AR000056, 59. BLM's inspection report directly refutes Mr. Sexton's assertion-- felling in the 34-1 right-of-way unit did not cut trees marked for reservation.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this     26     day of February 2026, in Grants Pass, Oregon.

JUSTIN KELLY   Digitally signed by JUSTIN KELLY
Date: 2026.02.26 09:24:25 -08'00'

_____
Justin Kelly
Field Manager
Grants Pass Field Office, Medford District BLM