ADAM R. F. GUSTAFSON, Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
SHANNON BOYLAN (DC Bar No. 1724269)
Natural Resources Section
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9584 (Boylan)s
(202) 598-9736 (Carrara)
shannon.boylan@usdoj.gov
christian.carrara@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **BURGUM**, *et al.*, <br><br> Defendants. | Case No.: 1:25-cv-02296-CL <br><br> Honorable Magistrate Judge Mark D. Clarke <br><br> **DECLARATION OF MICHAEL ASCH** |

I, Michael Asch, in accordance with the requirements of 28 U.S.C. § 1746, declare:

1. I am the Supervisor of the U.S. Fish and Wildlife Service (FWS) Roseburg Field Office, based in Roseburg, Oregon. I have held this position since the start of 2025. In this position I am responsible for overseeing the Service's Ecological Services program throughout southwest Oregon. This responsibility includes overseeing Endangered Species Act ("ESA") Section 7 consultations between the FWS and federal agencies regarding the effects of federal actions on threatened and endangered species, like the

    northern spotted owl (NSO).  I have been employed by the FWS for 9 years, implementing the ESA. I have a Master of Environmental Management and a Master of Forestry (Duke University, 2016) as well as a Bachelor of Arts in Environmental Studies, and a Bachelor of Arts in Sociology (Emory University, 2013).

2. This declaration was prepared in consultation with Colleen Holland and Trinity Harvey. Ms. Holland is the Senior Fish and Wildlife Biologist in the Roseburg Field Office and Forest Consultation Team Lead. She has a Bachelor of Science in Wildlife Ecology and Management (University of Wisconsin-Stevens Point, 2006) and a Bachelor of Science in Biology (University of Wisconsin-Stevens Point, 2006) and has worked for the Oregon FWS for 5 years. Prior to that, she was a Field Office Wildlife Biologist for the Bureau of Land Management for 7 years.  During this time, Ms. Holland has worked on multiple complex Section 7 projects in Western Oregon, many of which have focused on NSO. She is one of the Oregon FWS experts on NSO biology and conservation efforts. Ms. Harvey has been a Fish and Wildlife Biologist with the Roseburg Field Office since 2022, working on various Section 7 projects in southwest Oregon as part of the office's Forest Consultation Team. She also worked for the Bureau of Land Management as a Wildlife Biologist in 2021-2022. Ms. Harvey has a Master of Science in Wildlife (Cal Poly Humboldt, 2017) and a Bachelor of Science in Ecology, Organismal and Field Biology (Southern Oregon University, 2014). Ms. Harvey's research experience includes seasonal field monitoring efforts for a multi-decade NSO population demography study in southern Oregon for 8 years (2011-2015, 2019-2021). As such, Ms. Harvey has expertise on NSO biology, behavior, and habitat requirements.

3. I have reviewed the 2023 Biological Opinion—Medford District Bureau of Land Management's FY23 Batch of Projects ("BiOp"), FWS_000181-000477, which was drafted by Ms. Harvey with support from Ms. Holland and other FWS biologists in our office. I am familiar with its contents and the methodology used therein.

4. The BiOp concluded "no jeopardy" and "zero take" for Northern Spotted Owl (NSO). These conclusions are predicated on a survey and avoidance strategy; thus, these determinations are valid only if surveys are effective at detecting northern spotted owls present in the project area.

5. FWS's *Protocol for Surveying Proposed Management Activities that may Impact Northern Spotted Owls—2011 NSO Survey Protocol—2012 Revision* ("Survey Protocol"), FWS_015210-015251, is FWS's estimation of the best available science for interpreting NSO occupancy from call-back survey results. BLM exclusively used the Survey Protocol for the projects analyzed in the BiOp.

6. The Appel et al. (2023) study ("Appel Study"), "Using passive acoustic monitoring to estimate northern spotted owl landscape use and pair status" was published approximately five months before the FWS signed the BiOp. It is important to first clarify that the Appel Study exclusively reviewed and reported results from passive acoustic surveys completed using long-term deployments of autonomous recording units (ARUs) and cannot be directly compared to results from active call-back and response surveys, such as those completed under the Survey Protocol. FWS did not include the Appel Study as cited literature because ARU monitoring is a separate survey framework from call-back surveys and is not applicable or relevant to the survey methods used by the BLM. Instead, FWS cited conclusions from Dugger et al. (2023) ("Dugger Report"), FWS_002747-2780, a

review of the probability of spotted owl pair detection rates with call-back surveys. FWS_000263-64. BLM committed to consider the results reported in the Dugger Report in annual reviews of call-back survey results and harm avoidance measures.

7. FWS has heard the concerns and comments of Plaintiffs in this case. In reviewing Plaintiff's sixty-day notice of intent to sue (September 24, 2025), we did re-evaluate the relevance of the conclusions from the Appel Study in our final determinations in the BiOp. The Appel Study focuses on pair response rates, which as Plaintiffs indicate, may be under-reported in survey results[1]. This is not new information and has been long identified as a potential weakness in spotted owl surveying where determining pair occupancy specifically is the focus (rather than detection of any owl, single or pair). FWS_002755. As highlighted in the Appel Study, after noting the passive acoustic monitoring (PAM) framework had similar pair detection probabilities as the call-back surveys evaluated in Olson (2005), the authors wrote: *"We agree with Olson et al. (2005) that these detection probabilities are sufficient for many studies, but the consequences of missing a pair or of misidentifying a pair as a single owl are high when management actions are dependent on correctly classifying*

---

[1] In their sixty-day notice, Plaintiffs contended that:
1) The Appel Study provides scientific information that invalidates the central assumption that survey results are valid. Specifically, using passive acoustic monitoring to capture natural calling behavior—which is more reliable than using broadcasted calls, as female northern spotted owls are less likely to respond to surveyors—the study found that true pair occupancy is between 1.3 and 4.1 times greater than observed rates. This reveals that the Opinion's analysis rests on an inaccurate and artificially low baseline for northern spotted owl occupancy.
2) The study showed a high probability (0.72) that any single detected northern spotted owl belonged to a pair, which directly contradicts the agencies' practice of downgrading a site's status based on detecting only one owl. The Opinion's stringent definition for confirming a "Territorial Pair" is therefore not supported by the best available science.

*states. Using only naïve survey results and requiring both sexes to be detected as the basis of pair determinations would likely result in loss of habitat and be detrimental for spotted owl pairs*" (Appel et al. 2023, p. 15).

8. Importantly, the above conclusion from the Appel Study does not apply in this consultation. Conclusions associated with the PAM methodology in the Appel Study cannot be directly applied to occupancy interpretations associated with call-back surveys. This is because NSO exhibit different behavior in response to passive acoustic monitoring as opposed to call-back surveys. Interpretations of NSO behavior from unsolicited PAM are not comparable with interpretations of NSO behavior from call-back surveys in which a human initiates a call that elicits a response. The call-back survey fundamentally alters an NSO's behavior. FWS_003031 (describing a call-back survey: "[t]o locate spotted owls we imitated spotted owl calls in forest areas at night, either vocally or with a tape recorder. This incited the resident owls to call and reveal their presence.") The Appel Study does **not** invalidate the requirements set forth in the Survey Protocol, FWS_015234, for identifying a single owl as a territorial resident. The Appel Study did not evaluate territorial behaviors or call patterns in non-pair detections, nor did they consider non-pair detections in occupancy assessments; thus, their conclusions cannot be used to evaluate the validity of the "stringent definition" of a "Territorial Pair." Furthermore, the BLM does not apply avoidance and minimization measures only to sites with identified pair occupancy. Instead, the BLM includes detections of territorial single owls when making occupancy determinations and applying avoidance and minimization measures. This means that sites are considered and managed as occupied whether a pair is detected or an owl from a single sex is heard defending the territory (see Survey Protocol, FWS_015234,

for behavior patterns indicating resident single status). BLM's avoidance and minimization measures are applied in the same manner and extent to all occupied sites, regardless of whether the sites are determined to be occupied by known pairs or resident singles. As such, we are confident the BLM's survey efforts informing avoidance and minimization measures for occupied sites are sufficient for avoiding harm to spotted owls.

9. Plaintiffs contend that FWS undercounted NSO occupancy by not citing the Appel Study, ECF No. 16 at 27, stating "Appel found that resident spotted owls, particularly females, exhibit cryptic behavior and reduced vocalization rates in the presence of barred owls. This behavioral suppression makes detecting both members of a pair—or eliciting repeated responses from a single owl—more difficult than in previous decades." However, the effect of barred owl presence and calling on spotted owl behavior is well-documented in literature and in the BiOp. FWS_000235-40; FWS_000291-93; FWS_000316. The BiOp includes these influences in our analysis of effects to individual spotted owls, and thus this point was already considered. Additionally, the FWS directly addressed this concern in development of the Survey Protocol. FWS_015213. We further feel it is essential to mention that while the Appel Study (p. 1) concludes "The intensity of calling by barred owls had a weak, negative effect on the probability of spotted owls being paired when present", the authors further conclude "We found no effect of barred owl calling intensity on detection probability of spotted owls and only weak evidence of a negative effect on the probability of landscape use" (Appel et al. 2023, p. 16). This is consistent with the results in the Dugger Report, FWS_002773, for call-back survey pair detection probabilities. Both the Dugger Report and the Appel Study affirm the continued and appropriate use of either call-back or passive acoustic survey types in a landscape

    with high barred owl occupancy rates.

10. To summarize, the BiOp did not cite the Appel Study because FWS determined the specific pair detection probabilities derived from ARU monitoring were not applicable to the call-back surveys completed by the BLM. Further, the generalized conclusions from the Appel Study, such as discussions regarding the conditions around lower pair detection probabilities and the influences of barred owl presence on spotted owl detections, are not novel and are discussed in detail in the BiOp. FWS_000235-40; FWS_000263-64; FWS_000291-93; FWS_000316. As such, our conclusions in the BiOp remain sound, were based on the best available science at the time, and would not change if we were to incorporate the results from the Appel Study.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 26th day of February, 2026, in Roseburg, Oregon.

_____
Michael Asch
Field Supervisor
Roseburg, Oregon Office
U.S. Fish and Wildlife Service

*Digitally signed by MICHAEL ASCH, Date: 2026.02.26 17:46:03 -08'00'*