Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
541.778.6626
971.285.3632

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER**, **OREGON WILD**, and **CASCADIA WILDLANDS**, | Case No. 1:25-cv-2296-CL |
| *Plaintiffs*, | |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| **DOUGLAS JAMES BURGUM** in his official capacity as Secretary of the Interior, **U.S. FISH & WILDLIFE SERVICE**, and **U.S. BUREAU OF LAND MANAGEMENT**, | |
| *Defendants;* | |
| and | |
| **MURPHY COMPANY,** | |
| *Defendant-Intervenor,* | |
| and | |
| **AMERICAN FOREST RESOURCE COUNCIL** and **ASSOCIATION OF O&C COUNTIES**, | |
| *Applicant-Defendant-Intervenors.* | |

# TABLE OF CONTENTS

Table of Contents......................................................................................................... i

Table of Authorities.................................................................................................... iii

Glossary of Acronyms.................................................................................................. vi

Introduction ................................................................................................................. 1

Argument ..................................................................................................................... 1

I.    Likelihood of Success on the Merits. ...................................................................... 1

    A.    BLM Arbitrarily Relies on a BiOp that Fails to Analyze the Full Scope of the Authorized Project. ...................................................................... 1

        1.    The Alleged Geographic Information Error Fails to Account for the Discrepancy in Critical Habitat Removal. ............................................ 2

        2.    BLM's Tracking Mechanism Constitutes Unlawful Project Segmentation. ................................................................................... 3

        3.    Programmatic "Tiering" Does Not Excuse the Failure to Analyze the Site-Specific Project Footprint........................................................ 5

        4.    Murphy Cannot Insulate the Paul's Payoff Sale. ................................ 6

    B.    FWS's "Zero Take" Conclusion Relies on an Environmental Baseline that Defies the Best Available Science. ...................................................... 7

        1.    The Agency Failed to Apply the Best Available Science to the Survey Data. ................................................................................. 8

        2.    FWS Violated the Legal Standards for Baseline and Take Determinations. ........................................................................... 13

        3.    Future Surveys Provide No Protection for Sites Yielding Single Detections. ................................................................................... 14

    C.    BLM Must Implement Project Design Features to Mitigate Specific Threats to the Northwestern Pond Turtle.................................................. 15

II.    Irreparable Harm ................................................................................................ 20

    A.    Plaintiffs Acted Diligently and Did Not Acquiesce. ................................... 20

    B.    Plaintiffs Have Established a Likelihood of Irreparable Harm. .............. 22

        1.    Irreparable Harm to the Spotted Owl................................................ 23

            a.    The Record Establishes a Likelihood of Occupancy and Unauthorized Take. .................................................................... 23

            b.    The Project Will Cause Irreparable Harm to Spotted Owl Critical Habitat. .......................................................................... 25

        2.    Irreparable Harm to Northwestern Pond Turtle. ............................. 26

   3. Irreparable Harm to Plaintiffs' Interests. ......................................... 27

     a. Plaintiffs Have No Duty to Go Elsewhere. ................................. 28

     b. The Project Does Not Enhance Plaintiffs' Interests. ................. 29

III. Balance of the Equities and Public Interest ....................................... 29

 A. The Balance of Equities And Public Interest Favor Plaintiffs. ................. 29

 B. The Public Interest and Balance of Equities Favor Plaintiffs. ................. 32

IV. Bond ................................................................................................... 35

Conclusion ................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011)...................................................................... 28, 32, 33

*Alliance for the Wild Rockies v. Gassman,*
604 F. Supp 3d 1022 (D. Mont. 2022) ................................................................ 33

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987)........................................................................... 23, 27, 33

*Ariz. Cattle Growers' Ass'n v. FWS,*
273 F.3d 1229 (9th Cir. 2001)........................................................................... 14

*Blue Mtns. Biodiversity Proj. v. Blackwood,*
161 F.3d 1208 (9th Cir. 1998)............................................................................. 4

*Cascadia Wildlands v. BLM,*
153 F.4th 869 (9th Cir. 2025) ........................................................................... 17

*Cascadia Wildlands v. Scott Timber Co.,*
715 F. App'x 621 (9th Cir. 2017) ................................................................. 23, 24

*Cent. Or. Landwatch v. Connaughton,*
905 F. Supp. 2d 1192 (D. Or. 2012)................................................................... 35

*Cottonwood Envtl. Law Ctr. v. USFS,*
789 F.3d 1075 (9th Cir. 2015)........................................................................... 29

*Ctr. for Biological Diversity v. BLM,*
698 F.3d 1101 (9th Cir. 2012).............................................................................. 1

*Conner v. Burford,*
848 F.2d 1441 (9th Cir. 1988).............................................................................. 5

*Friends of the Earth v. Laidlaw Env't Servs.,*
528 U.S. 167 (2000) ........................................................................................ 23

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015)....................................................................... 22, 23

*Greenpeace v. NMFS,*
80 F. Supp. 2d 1137 (W.D. Wash. 2000) ............................................................ 6

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) .................................................................. 17, 18

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
    No. 1:24-cv-01930-CL (D. Or.) .................................................... 21

*League of Wilderness Defs. v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ........................................... 23, 32, 33, 34

*Marbled Murrelet v. Babbitt,*
    83 F.3d 1060 (9th Cir. 1996) ...................................................... 24

*Nat'l Wildlife Fed'n v. Burlington N. R.R.,*
    23 F.3d 1508 (9th Cir. 1994) .................................................. 24, 31

*Nat'l Wildlife Fed'n v. NMFS,*
    422 F.3d 782 (9th Cir. 2005) ...................................................... 31

*Nat'l Wildlife Fed'n v. NMFS,*
    886 F.3d 803 (9th Cir. 2018) .................................................. 23, 30

*Native Ecosystems Council v. USFS,*
    418 F.3d 953 (9th Cir. 2005) .................................................. 17, 20

*Or. Nat. Desert Ass'n v. BLM,*
    625 F.3d 1092 (9th Cir. 2010) ...................................................... 4

*Or. Nat. Desert Ass'n v. Bushue,*
    594 F. Supp. 3d 1259 (D. Or. 2022) ............................................. 32

*Or. Nat. Desert Ass'n v. Raby,*
    780 F. Supp. 3d 1085 (D. Or. 2025) ............................................. 35

*Res. Ltd. v. Robertson,*
    35 F.3d 1300 (9th Cir. 1993) ........................................................ 1

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo,*
    161 F.4th 590 (9th Cir. 2025) .................................................. 30, 31

*Save Our Sonoran,*
    408 F.3d 1113 (9th Cir. 2005) .................................................... 35

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ................................................................. 4

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ............................................. 32

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ............................................. 32

*Tennessee Valley Authority v. Hill.*
    437 U.S. 153 (1978) .................................................... 29, 34

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ............................................... 5

**Statutes**

16 U.S.C. § 1536 ................................................... 2, 11, 12
16 U.S.C. § 1540 ....................................................... 21
43 U.S.C. § 1732 ....................................................... 15

**Regulations**

43 C.F.R. § 1610.5-3 ................................................... 15
50 C.F.R. § 402.14 ...................................................... 5

**Federal Register**

*12-Month Finding for the Northern Spotted Owl*,
    85 Fed. Reg. 81,144 (Dec. 15, 2020). ................................ 24

*Threatened Species Status With Section 4(d) Rule for the Nw. and Sw. Pond Turtle*,
    88 Fed. Reg. 68,370 (Oct. 3, 2023) .............................. 18, 32

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BLM | U.S. Bureau of Land Management |
| DBH | Diameter at Breast Height |
| DR | Decision Record |
| EA | Environmental Assessment |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish & Wildlife Service |
| HFR | Hazardous Fuels Reduction |
| NEPA | National Environmental Policy Act |
| NRF | Nesting, Roosting, and Foraging |
| O&C Act | Oregon and California Revested Lands Sustained Yield Management Act of 1937 |
| ODFW | Oregon Department of Fish and Wildlife |
| PDF | Project Design Feature |
| RMP | Resource Management Plan |

## INTRODUCTION

Congress has declared protecting imperiled species to be the highest of priorities. Yet Defendants' compounding errors place two of these species—the northern spotted owl and northwestern pond turtle—at risk. Defendants botch the math, ignore the best available science, and refuse to implement common sense protective measures in violation of the ESA and FLPMA. Plaintiffs respectfully request this Court issue a narrow injunction to pause the most detrimental Project activities until it has a chance to rule on the merits of this case.

## ARGUMENT

### I.      Likelihood of Success on the Merits.

#### A.      BLM Arbitrarily Relies on a BiOp that Fails to Analyze the Full Scope of the Authorized Project.

An action agency cannot satisfy its ESA Section 7 duties by relying on a BiOp that fails to discuss information undercutting its conclusions. *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1127–28 (9th Cir. 2012). An agency's own internal studies or NEPA documents that contradict the BiOp constitute such information. *See Res. Ltd. v. Robertson*, 35 F.3d 1300, 1304–05 (9th Cir. 1993).

Defendants argue their reliance on the 2023 BiOp is valid because the BA matches the BiOp acreage and Plaintiffs offer no new information. Def. Br., 14–15. These defenses ignore the 2025 Final EA. The EA authorizes a 15-year project involving the removal wilkof spotted owl habitat in 3,252 acres of critical habitat. KSW00787. The 2023 BiOp evaluates the removal of 1,127 acres of the species' critical habitat. KSW00425. Consistency between the BA and the BiOp does not cure the ESA violation because both documents evaluate only a fraction of the project authorized in the Final EA. Furthermore, the Defendants' argument that the EA is not "self-executing" does not relieve BLM of its substantive legal duties. *See* Def. Br., 15 n.8. BLM issued a Finding of No Significant Impact (FONSI)

concluding the full project "will not result in any incidental take" based on its analysis in the EA. KSW02366. Because the FONSI represents a final agency determination regarding the environmental impacts in the entire project footprint, BLM cannot evade review by claiming it will revisit those impacts incrementally. When issuing Decision Records 1 through 4, BLM relied on a BiOp evaluating 1,127 acres of habitat removal while possessing a final EA authorizing 3,252 acres of removal. Under *Center for Biological Diversity*, BLM cannot rely on a BiOp that is undercut by the geographic scope of its own NEPA document.

The opposition's attempts to bridge this 2,125-acre gap in critical habitat removal rely on factual errors and unlawful project segmentation.

### 1. The Alleged Geographic Information Error Fails to Account for the Discrepancy in Critical Habitat Removal.

Defendants attribute the acreage discrepancy between the Final EA and the BiOp to a geographic information system mapping error. Def. Br., 14; Mur. Br., 10. The Final EA analyzes 8,311 acres of impacts to spotted owl critical habitat. KSW00787. The BiOp analyzes 3,093 acres. KSW00425.[1] Field Manager Justin Kelly declares this 5,218-acre difference resulted from double-counting "where multiple [Hazardous Fuels Reduction (HFR)] treatments . . . were applied to the same acreage." Kelly Decl. ¶ 10. The agency's erratum to Decision Record 2 similarly describes the error as resulting from an overlap of "HFR on top of HFR." AR000025. This is impossible.

The discrepancy in the amount of NRF and dispersal-only habitat removed

---

[1] AFRC errs by substituting the BiOp's analysis of impacts to general spotted owl habitat for the required analysis of designated critical habitat. AFRC relies on BiOp Table 15, which tallies 10,153 acres of general habitat across the entire action area. AFRC Br., 7–8; KSW00376. The ESA requires a distinct analysis of a project's effects on designated <u>critical</u> habitat. 16 U.S.C. § 1536(a)(2). BiOp Table 21 provides the analysis for the 3,093 acres of designated critical habitat at issue here KSW00425.

within critical habitat demonstrates that overlapping HFR treatments cannot account for the difference. The BiOp reflects that the Project will remove 791 acres of NRF in critical habitat. KSW00425. The Final EA describes a project removing nearly three times this—2,137 acres. KSW00787. It is the same for removal of dispersal-only habitat. The BiOp indicates the Project will remove 336 acres of spotted owl dispersal-only habitat in critical habitat units. KSW00425. The number in the Final EA is *over* three times that—1,115 acres. KSW00787. In total, the Final EA reflects 3,252 acres of commercial timber removal in critical habitat, while the BiOp analyzes only 1,127 acres.

Double-counting or overlapping HFR treatments cannot explain this 2,125-acre gap because HFR treatments target ladder and ground fuels, maintaining the existing canopy structure that defines spotted owl habitat. KSW00313, 00636–37. Because HFR treatments do not remove NRF nor dispersal habitat, they cannot account for the discrepancy in 'removal' treatment acreages between the EA and the BiOp. *See* KSW00406.[2]

### 2.    BLM's Tracking Mechanism Constitutes Unlawful Project Segmentation.

Defendants do not dispute the Final EA authorizes a project footprint larger than that evaluated in the BiOp. Instead, Defendants argue this discrepancy is immaterial because the EA is not "self-executing." Def. Br., 14. They contend that because BLM tracks authorized acreage in individual Decision Records, it can halt implementation or seek further consultation before exceeding the limits evaluated

---

[2] The administrative record also contradicts Murphy's assertion that the Final EA and BiOp employ different metrics to measure habitat impacts. Murphy Opp. at 10. Both documents calculate physical habitat effects using the same operational parameters. Final EA Table B-32.1 categorizes project impacts by "Habitat Effect Type," enumerating impacts under the headings "NRF Removed," "NRF Downgraded," "NRF Modified," "Dispersal-only Removed," and "Dispersal-only Modified." KSW00787. The BiOp utilizes these same classifications. KSW00425.

in the BiOp. Def. Br., 14–15; Kelly Decl. ¶ 9. This argument fails under both the APA and the ESA.

Under the APA, the Court's review is confined to the agency's final decisions at the time they were made, not positions adopted during litigation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). The rationale that BLM will track acreage and halt implementation early is absent from the Final EA and the FONSI. It must be disregarded as an impermissible "post-hoc rationalization advanced . . . to defend past agency action against attack." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1120 (9th Cir. 2010); *see also Blue Mtns. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (the EA is "where the Forest Service's defense of its position must be found"). The administrative record presents two incompatible final decisions: the Final EA describes a project that will remove or modify 7,300 acres of spotted owl critical habitat including removing 3,252 acres,[3] whereas the BiOp evaluates a project resulting in 3,093 acres of habitat modification of which only 1,127 acres constitute removal. KSW00787, 00425. If BLM intends to reduce the scope of the Last Chance project to match the BiOp, it must revise its NEPA analysis. If BLM intends to implement the project authorized in the EA, the agencies must reinitiate consultation to evaluate the entire project footprint. BLM has done neither. Judicial review evaluates the final action authorized in the decision documents, not the agency's litigation promises of future restraint.

Instead, BLM attempts to reconcile these incompatible documents by tracking its timber sales incrementally. DR#4 at 7. This approach violates the ESA. The Ninth Circuit prohibits agencies from segmenting a comprehensive project into

---

[3]  As explained in Plaintiffs' opening brief, 1,011 acres of the 8,311 acres of impacted designated critical habitat analyzed in the EA are not suitable habitat for the spotted owl. Plaintiffs are concerned with the other 7,300 acres that are suitable habitat.

piecemeal phases to avoid evaluating the overall impacts upfront. *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988). Section 7 requires the consulting agency to evaluate the effects of the action "as a whole" to determine whether the aggregate impacts cause adverse modification. 50 C.F.R. § 402.14(c). FWS evaluated the ecological impact of 1,127 acres of habitat removal. It never evaluated the aggregate impact of the 3,252 acres of removal authorized in the Final EA. A commitment by the action agency to halt implementation early or seek further consultation later does not cure the consulting agency's failure to conduct the comprehensive analysis the ESA requires. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 525 (9th Cir. 2010). Because FWS evaluated a fraction of the authorized project, the BiOp is invalid.

### 3.    Programmatic "Tiering" Does Not Excuse the Failure to Analyze the Site-Specific Project Footprint.

Murphy's argument that the 2023 BiOp "tiered" its critical habitat analysis to the 2016 RMP BiOp is factually inaccurate and legally insufficient to cure the defect in the site-specific consultation. Mur. Br., 11–12. As a threshold matter, the 2023 BiOp does not state that it is tiering its spotted owl critical habitat analysis to the 2016 RMP programmatic document. When FWS intends to tier a species analysis, it does so formally. For example, the 2023 BiOp introduction states that it tiers its gray wolf analysis to a separate 2017 programmatic consultation. KSW00280. It contains no parallel statement for the spotted owl.

Even if the 2023 BiOp did tier to the 2016 RMP BiOp, it would not relieve FWS of its obligation to evaluate the actual footprint of the Last Chance project. The 2016 RMP BiOp is a framework programmatic document. It states that it "does not provide a detailed list of proposed actions" and mandates that "subsequent section 7 consultations under the ESA will occur" to guarantee that "individual actions occurring on the ground are appropriately evaluated." AR013179.

Because the programmatic document deferred site-specific analysis, FWS was required to conduct that analysis in the 2023 BiOp. The 2023 BiOp acknowledges this duty by establishing its own "Analytical Framework for the Jeopardy and Destruction or Adverse Modification Determinations," KSW00321–22, and reaching an independent conclusion regarding critical habitat impacts. KSW00281.

A site-specific BiOp must be "coextensive in scope" with the underlying federal action. *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000). The 2023 BiOp failed this requirement by evaluating a 3,093-acre footprint rather than the 8,311-acre footprint stated in the EA. The existence of a programmatic framework document does not excuse the consulting agency's failure to analyze the actual geographic scope of the site-specific action authorized.

### 4.    Murphy Cannot Insulate the Paul's Payoff Sale.

Anticipating the flaw in the BiOp, Murphy advances a severability argument. Murphy argues that even if the critical habitat analysis is invalid, the Court should exempt the Paul's Payoff sale from any injunction because it is located on Harvest Land Base excluded from critical habitat by a 2021 FWS rule. Mur. Br., 12–13. This argument rests on a factual error and mischaracterizes the requested relief.

First, the administrative record contradicts Murphy's premise that Paul's Payoff "do[es] not include critical habitat." Mur. Br., 12. The authorized project map depicts Decision Record 1 (Paul's Payoff) units intersecting with the 2021-designated critical habitat unit in multiple locations, including T33S R06W Sections 25, 26, and 35, and T34S R06W Section 04. AR000060. The map further indicates these operations will modify NRF habitat within the critical habitat boundary. *Id*.

Second, Murphy misapprehends the requested relief. Plaintiffs do not seek a blanket injunction of the Paul's Payoff timber sale. Rather, Plaintiffs request a tailored injunction of ground-disturbing activities within specific habitat types:

spotted owl nesting, roosting, and foraging habitat, and northwestern pond turtle overwintering habitat. Pls.' Mot. at 1. If a logging unit does not contain these habitats, it is not subject to the requested injunction. To the extent Paul's Payoff units do contain these habitats, they present a risk of irreparable harm and remain subject to the injunction regardless of the 2021 critical habitat boundary.

**B.     FWS's "Zero Take" Conclusion Relies on an Environmental Baseline that Defies the Best Available Science.**

Plaintiffs demonstrated that FWS reached a zero-take conclusion by defining an environmental baseline that treats seven sites with spotted owl detections as unoccupied. The opposing parties frame Plaintiffs' claim as a challenge to agency scientific methodology, arguing Plaintiffs ask the Court to abandon the 2012 Survey Protocol. Def. Br., 15, 16, 19; Mur. Br., 13–15; AFRC Br., 13, 15. Plaintiffs do not challenge the 2012 Survey Protocol. Plaintiffs accept the execution of the surveys, the resulting data, and the classification of the seven sites as "Status Unknown." The ESA violation occurs in the agency's interpretation of that classification as applied to the Project.

The 2012 Protocol provides a classification label, not a biological conclusion. It assigns a "Status Unknown" determination to survey responses falling short of residency requirements. KSW01047. The Protocol stops there; it contains no instruction to treat these sites as unoccupied. FWS took a label that literally means the occupancy status is unknown and arbitrarily translated it into a zero percent probability of occupancy.

To justify this assumption of zero, FWS ignored the best available science. Federal scientists authored *Appel* to solve this exact monitoring problem. The study does not compete with the Protocol; it completes the analysis. The Protocol records the presence of an owl. FWS assumed that owl was a transient and the territory was empty. *Appel* demonstrates that isolated detections provide strong evidence of

resident pairs. FWS disregarded the only peer-reviewed science in the record that gives biological meaning to a "Status Unknown" classification. Even if methodological differences prevent an exact translation of the 0.72 probability metric to callback surveys, the study proves the likelihood of occupancy is substantially greater than zero. FWS's decision to assign a zero percent probability of occupancy across these seven locations ignores this evidence, severing the rational connection between the facts found and the choice made. The failure to evaluate a take risk of this magnitude violates the ESA.

1. **The Agency Failed to Apply the Best Available Science to the Survey Data.**

Defendants (p. 16–17) and AFRC (p. 11, 14) cite *Dugger et al.* (2023) to validate the 2012 Survey Protocol and justify the decision to ignore *Appel*. The two studies address distinct scientific questions. *Dugger* evaluates the probability of detecting a spotted owl pair at a site already known to contain a pair. To model this probability, the *Dugger* authors applied a data-filtering mechanism: they removed all single owl detections from their dataset. As the study notes, "detections of NSO singles were replaced with '0'." AR008429. By reducing single detections of individual owls to statistical zeros, the *Dugger* study offers no biological conclusion regarding the residency status of those birds. The study establishes that if surveyors conduct six visits and detect *zero* owls, the probability of an undetected pair existing at that site remains low.

The seven sites at issue, however, *did* generate isolated responses. The 2012 Protocol labels these responses "Status Unknown" because the owls failed to meet frequency thresholds. Because *Dugger* discards data on lone owls, it offers no insight into what an isolated response represents. *Appel* answers that question, establishing a 72 percent probability that detecting any owl indicates the presence

of a resident pair.[4] In evaluating these locations, FWS relied on a protocol that assumes sites where a single owl survey response occurred are empty of owls, and defended that choice with a study (*Dugger*) that treats the detected owls as mathematical zeros. The agency ignored the only science in the record (*Appel*) that gives biological meaning to the survey data.[5]

AFRC cites *Kramer et al.* (2024) to argue the agency evaluated current science and rejected passive monitoring. AFRC Br., 12, 14. This argument mischaracterizes the research and relies on a *post hoc* rationalization. The journal accepted *Kramer* for publication in November 2023, four months after FWS issued the BiOp. The agency could not have reasonably relied upon this study during consultation. The study also evaluates a different subspecies—the California spotted owl—in a different region. Beyond the timeline, AFRC quotes the study out of context to argue *Kramer* dismisses passive monitoring. AFRC Br., 12. The text of the study proves the opposite. The quoted sentence does not state a conclusion; it identifies the research gap the authors intend to fill. After noting the absence of passive monitoring in standard protocols, the authors state the purpose of their research: "Our goal was to develop an acoustically assisted survey design for California spotted owls[.]" *Kramer*, at 3. Rather than rejecting passive monitoring, *Kramer* integrates it with traditional surveys to improve their accuracy.

The opposing parties argue Plaintiffs failed to connect the science of passive

---

[4] Defendants note the Plaintiffs' opening brief incorrectly characterized the 1.3 to 4.1 multiplier in the *Appel* study. Def. Br., 18. This correction leaves the ESA claim intact, as Plaintiffs rely on the study's separate finding that a single acoustic detection carries a 72 percent probability of indicating a resident pair.

[5] AFRC argues the ESA does not require agencies to conduct new tests or generate new data. AFRC Br., 14–15. Plaintiffs seek no new tests. Plaintiffs challenge the agency's refusal to evaluate existing data. The ESA requires agencies to apply the best science available at the time of the decision. FWS possessed the callback data for the seven sites. FWS possessed the *Appel* study. The ESA prohibits the agency from ignoring existing science to preserve a flawed baseline.

monitoring to the results of traditional callback surveys. Their defense relies on a lack of expert declarations, differences in owl behavior, and author intent. Def. Br., 17, 18; Mur. Br., 15–17; AFRC Br., 10, fn. 3.

Demanding new expert testimony misstates the standard of review under the Administrative Procedure Act. The statute limits judicial review to the administrative record. During consultation, that record contained both the survey data showing isolated responses at the seven sites and the *Appel* study showing a 72 percent chance that an isolated detection belongs to a resident pair. Despite this evidence, FWS assumed a zero percent chance of occupancy. The BiOp offers no explanation for ignoring the science. Defendants offer a new litigation declaration to supply the missing analysis. Def. Br., 17 (citing Asch Decl. ¶ 8). This *post hoc* rationalization cannot excuse the agency's failure to evaluate the issue during consultation. The submission of the declaration functions as an admission that the Biological Opinion lacks the analysis required by the APA.

The argument regarding owl behavior ignores the reality of spotted owl behavior in the presence of barred owls and the text of the *Appel* study. Spotted owls adopt cryptic behavior and stay quiet to avoid detection by barred owls. If a single, unprompted hoot on a passive monitor carries a 72 percent probability of indicating a resident pair, a direct response to a human surveyor provides comparable evidence of residency. To answer a surveyor, a spotted owl must break its silence and risk detection by a competitor. Furthermore, *Appel* confirms that the biological mechanism driving the 72 percent metric—cryptic female behavior— applies to callback surveys. The authors cite callback literature to note that male owls are "more than twice as detectable as females using the commonly employed 10-min nighttime callback protocol." KSW01014. The biological reality remains constant across methodologies: when a male owl vocalizes, the female hides in silence. FWS's assumption that these rare responses represent transient floaters

contradicts both the biological consensus and the best available science.

The opposing parties argue the *Appel* authors did not apply their 72 percent probability to the 2012 Survey Protocol. Mur. Br., 16–17; AFRC Br., 10. The ESA requires FWS to use the best scientific data available. 16 U.S.C. § 1536(a)(2). The statute does not allow agencies to ignore relevant science over minor methodological differences. FWS faced a choice between evaluating the callback data using the 72 percent probability derived from passive monitoring, or assuming a zero percent probability of occupancy with no scientific support. *Appel* answers the core biological question: what does a single spotted owl detection mean in a forest dominated by barred owls? FWS labeled the seven sites unoccupied because the owls failed to respond on multiple occasions. *Appel* proves that requiring repeated detections to establish occupancy fails to account for silent, hiding females. FWS's decision to adopt a zero percent occupancy assumption without considering the probability metrics in *Appel* renders the environmental baseline arbitrary and capricious.

The opposing parties argue the 2012 Survey Protocol incorporates the premise of the *Appel* study because it acknowledges that the presence of barred owls silences spotted owls. Defs. Br., 16, Mur. Br., 14; AFRC Br., 9, 13. This argument conflates recognizing a biological problem with applying a statistical solution. The 2012 Protocol recognizes that spotted owl responses are suppressed in the presence of barred owls, so it directs surveyors to conduct additional visits. When cryptic spotted owls fail to respond to these extra visits, the Protocol labels the site "Status Unknown" and assumes it is empty. *Appel* provides the missing data: a single detection in a barred owl territory carries a 72 percent probability of indicating a resident pair. FWS's acknowledgment that suppression of vocalized responses exists provides no excuse for ignoring the science that measures it.

AFRC claims FWS evaluated passive monitoring science during consultation,

pointing to citations in the BiOp's bibliography. AFRC Br., 11–12. While FWS referenced passive monitoring to discuss barred owl populations, it never applied passive monitoring science to interpret the spotted owl survey results. *See* KSW00366. Highlighting the phrase "Passive Acoustic Monitoring" in a paragraph about an invasive competitor fails to show the agency considered the best available science regarding spotted owl occupancy. FWS failed to articulate a rational connection between a bibliography entry about barred owls and a decision to treat seven spotted owl sites in which spotted owl responses were detected as empty.

The opposing parties rely on incomplete quotes to excuse the agency's failure to apply *Appel*. Murphy argues the study is "preliminary" because the authors note that future technology and modeling will improve data collection. Mur. Br., 17; AFRC Br., 10. Acknowledging that science evolves does not invalidate current, peer-reviewed findings. The ESA requires federal agencies to use the best scientific data available at the time of the decision. 16 U.S.C. § 1536(a)(2). The statute prohibits an agency from ignoring published data under the guise of waiting for future models.

The *Appel* study defines the specific risk FWS accepted in the BiOp. AFRC notes the *Appel* authors call on agencies to "weigh the likelihood and acceptable level of risk associated with errors of omission or commission." AFRC Br., 10 (quoting KSW01017). The authors define the error of omission as "falsely classifying sites as not occupied by a pair," which "may result in insufficient protections." KSW01017. The authors warn this error occurs when agencies demand "the observed presence of a female and male to define pair status," calling such a requirement "a threshold too high and unachievable." *Id*.

FWS committed this error of omission. The agency demanded multiple survey responses to prove residency, causing it to classify seven sites with owl detections as empty "Status Unknown" locations. The *Appel* authors define the opposite mistake—the error of commission—as "falsely classifying a site as used by a

resident owl when the site is used by a nonresident owl." *Id*. The study concludes this error of commission is "[l]ess probable" and carries the "unintended benefit" of preserving habitat for future pairs. *Id*. Faced with a choice between under-protecting resident pairs and over-protecting transient owls, FWS adopted a zero-take baseline that guarantees the error of omission.

### 2. FWS Violated the Legal Standards for Baseline and Take Determinations.

Defendants (at 15) and AFRC (at 13) argue Plaintiffs failed to prove *Appel* is better than the science FWS used. This argument fails because the agency's chosen science avoids the dispute. The 2012 Protocol labels isolated responses "Status Unknown." *Dugger* removes lone owls from its analysis. Neither source evaluates the likelihood of a pair residing at a site yielding an isolated response. *Appel* answers this exact question, providing the only peer-reviewed data in the record that explains what an isolated spotted owl detection means. A study that analyzes data is superior to a methodology that discards it.

Defendants argue the application of *Appel* would not alter the agency's "zero take" conclusion. Def. Br., 15, 18. This assertion defies math. The BiOp identified seven specific sites with survey detections and assumed zero occupancy. *Appel* establishes a 72 percent probability of a resident pair at each site. FWS cannot reach a "zero take" conclusion while authorizing logging across seven sites that each carry a substantial probability of supporting a resident pair.

The distinction between zero take and non-zero take determines the fate of the project. The 2016 Resource Management Plan prohibits BLM from authorizing timber sales that result in incidental take. If applying the *Appel* data increases the take estimate from zero, the management plan blocks the timber sale. The disregarded science dictates the outcome of the project.

The baseline error guarantees future, unanalyzed harm. The BiOp

establishes a framework that treats "Status Unknown" sites as empty habitat. Because the project spans 15 years, this flawed framework ensures the agency will ignore resident pairs discovered during future surveys. Applying *Appel* fixes the current take determination and prevents the agency from treating occupied habitat as empty timber throughout the life of the project.

Defendants cite *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229 (9th Cir. 2001), to argue the ESA requires absolute proof of presence before an agency can find incidental take. Def. Br., 19. This argument misreads the Ninth Circuit's holding and the administrative record. In *Arizona Cattle Growers*, the Ninth Circuit struck down a take statement because the agency found zero evidence of the species in the project area. 273 F.3d at 1244. The Court held an agency must provide "evidence that the listed species exist on the land in question." *Id.* at 1248. The record in this case meets that standard. Surveyors heard spotted owls at all seven sites, prompting FWS to label them "Status Unknown." The parties dispute what those detections mean, not whether the owls exist.

*Arizona Cattle Growers* requires an agency to possess a "reasonable basis to conclude that a take will occur." *Id.* at 1243. FWS possesses survey data confirming the owls' presence and peer-reviewed science (*Appel*) proving a high probability that those owls are resident pairs. A substantial chance of finding resident pairs inside an active logging unit provides a reasonable basis to anticipate take. By treating a high probability of occupancy as a zero percent probability of take, FWS severed the rational connection between the facts found and the choice made, violating the APA.

### 3. Future Surveys Provide No Protection for Sites Yielding Single Detections.

Defendants (p. 19) and Murphy (p. 14) argue BLM will prevent unauthorized take by conducting additional callback surveys during logging operations. This defense fails because the agency plans to evaluate these future surveys using the

exact same logic it applied to the initial survey data.

The BiOp requires BLM to drop or modify timber harvest units only if surveyors locate "territorial pairs or resident singles." Def. Br., 19. The document provides no site-specific protection for locations where surveyors hear a single spotted owl response. BLM will conduct these upcoming surveys using the 2012 Protocol. When a future survey yields an isolated response, BLM will apply the "Status Unknown" label. Because that label falls short of the "resident single" trigger, the agency will authorize logging. BLM will cut the timber despite the high probability that a resident pair occupies the site. A mitigation measure that ignores a substantial chance of occupancy guarantees the take it claims to prevent.

### C.    BLM Must Implement Project Design Features to Mitigate Specific Threats to the Northwestern Pond Turtle.

FLPMA requires projects "strictly conform" to the RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). The 2016 RMP includes a mandatory "Management Directive" requiring BLM to "[i]mplement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects . . . including altering the type, timing, location, and intensity of management actions." FWS_010413. Bureau Sensitive Species are species BLM has determined require special management consideration to avoid the need for listing under the ESA. AR022646.

BLM failed to comply with this mandatory directive for Bureau Sensitive Species in two ways. First, BLM refused to require specific Project Design Features (PDFs) it developed to mitigate threats to overwintering northwestern pond turtles—a Bureau Sensitive Species—unless the species is listed under the ESA. These PDFs would limit project operations in pond turtle overwintering habitat during certain times of year to avoid crushing and killing overwintering turtles. KSW00842–43. Second, BLM failed to adequately explain how its decision to defer

mitigation is consistent with the RMP's directive to "implement" the very types of measures for Bureau Sensitive Species that BLM developed as PDFs for the pond turtle.

Defendants contend the Management Directive only requires BLM to mitigate "discrete, project-specific threat[s] to the species as a whole" that, if not mitigated, "would cause the species to be listed under the ESA." Def. Br., 20, 22. Defendants cite the 2016 RMP's Management Objective for Bureau Sensitive Species and BLM's manual on special status species in support of their interpretation. Yet this broader context supports Plaintiffs' reading of the Management Directive. The 2016 RMP's goal for Bureau Sensitive Species management, as expressed in the Management Objective, is "to reduce or eliminate threats to Bureau Sensitive Species to *minimize the likelihood of and need for* the ESA listing of these species." AR012932 (emphasis added). "Minimize" means to "reduce or keep to a minimum." Merrian-Webster, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/minimize (last accessed Mar. 8, 2026). The 2016 RMP's goal is thus to reduce the likelihood of or need for the listing of Bureau Sensitive Species. In other words, to improve their overall condition, not simply prevent their listing.

This reading is supported by the BLM's manual on special status species. The BLM manual is particularly informative here as it provides the agency's policy and guidance for the conservation of Bureau Sensitive Species. AR022602. This is carried out, in part, through land-management planning and project-level implementation. AR022636. The manual is the impetus behind the 2016 RMP's Management Objective and Management Directive for Bureau Sensitive Species. AR014973.

The manual details the overarching objective of BLM Bureau Sensitive Species management. It is to "initiate *proactive conservation measures* to *reduce or*

*eliminate* threats to Bureau sensitive species to minimize the likelihood of and need for" ESA listing. AR022602 (emphasis added). It also stipulates how BLM should advance this objective through RMP and project-level planning. The manual directs implementation-level planning to "consider all site-specific methods and procedures needed to bring species their habitats to the condition under which management under the Bureau sensitive species policies would no longer be necessary." AR022636. The manual, in other words, directs BLM to act proactively to reduce or eliminate threats to improve the condition of the species such that special management as a Bureau Sensitive Species is no longer necessary.

Defendants interpretation of the Management Directive cannot be squared with the Management Objective and BLM's own policy. According to Defendants, BLM is only required to address project-level threats to a Bureau Sensitive Species when an individual project's impacts are so significant that they would lead directly to a species being listed under the ESA. Def. Br., 20. Such a reading would lead to the inevitable decline of these species. On Defendant's reading, BLM could approve a project so detrimental to a Bureau Sensitive Species that it takes it to the brink of listing, so long as it does not push it over the edge. This does not comport with the purpose of the Management Direction—to reduce threats to the species to improve their overall condition. *Cascadia Wildlands v. BLM*, 153 F.4th 869, 896–97 (9th Cir. 2025). As such, it is plainly inconsistent with the RMP. *Native Ecosystems Council v. USFS*, 418 F.3d 953, 960 (9th Cir. 2005) (agency's interpretation does not control in such circumstances).

Defendants argue their interpretation of the Management Direction is entitled to deference. That is only so when the agency's reading is "reasonable." *Id.* (citing *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019)). Defendants' reading is not. It is contrary to BLM's own Bureau Sensitive Species management goals and the 2016 RMP's objective to reduce threats and improve the condition of these species.

AR012932; AR022602. Furthermore, Defendants do not point to anywhere BLM has formally advanced its interpretation of the Management Directive. The interpretation is not mentioned in the Last Chance project documents; the Final EA's pond turtle discussion does not even mention the Management Directive. Defendants' interpretation is no more than a "convenient litigation position" and "*post hoc* rationalization not entitled to deference." *Kisor*, 588 U.S. at 579.

Defendants argue Plaintiffs equate "specific threat" with habitat disturbance, creating a blanket prohibition on timber harvest wherever sensitive species' habitat exists. Def. Br., 21. This is a fundamental misunderstanding of Plaintiffs' position that permeates the opposing parties' briefs. What constitutes a "specific threat" to a sensitive species is a factually intensive case-by-case determination. There may be instances where planned harvest activities need to be reduced to mitigate a "specific threat" to a sensitive species. This is not that case. Plaintiffs' concern here is the potential crushing of pond turtles due to harvest operations in the species' overwintering habit during the time they overwinter in the duff. BLM recognized this specific threat and developed PDFs that would allow harvest to still occur while avoiding killing turtles. The core of these PDFs are seasonal restrictions in certain timber sale units that overlap pond turtle overwintering habitat that restrict activities between October 1 to March 31. KSW00842–43. These restrictions do not implicate the RMP's structure by "placing large portions of the [Harvest Land Base off limits" to harvest. Def. Br., 21. They do not impact timber output from the Harvest Land Base, merely the timing of activities.

Finally, the potential crushing of overwintering pond turtles is a "specific threat" to the species. It is elementary that the direct killing of individuals of a species is a discrete threat. In the case of the pond turtle, vehicles are a known risk to the species. *Threatened Species Status With Section 4(d) Rule for the Nw. and Sw. Pond Turtle*, 88 Fed. Reg. 68,370, 68,377 (Oct. 3, 2023); KSW01202 (noting

numerous reports of western pond turtles found dead along roads in Oregon). While instances of vehicle-based mortality are ordinarily associated with roads given that is where vehicles ordinarily drive, it logically extends to wherever they operate. BLM and FWS have both recognized it extends to timber harvesting equipment. Both agencies contributed to the development of the Oregon Department of Fish and Wildlife's (ODFW) Oregon Conservation Strategy for the pond turtle. KSW01332. This is a peer-reviewed, science-based strategy for protecting and conserving the pond turtle. *Id.* The Conservation Strategy acknowledges heavy machinery used for logging is a threat to turtles. KSW01390. It recommends best management practices such as "tim[ing] harvest to avoid hibernating or aestivating turtles"—the very PDFs BLM developed for the Last Chance project. *Id.*; KSW00842–43. BLM developed these PDFs to mitigate this discrete threat, and must implement them.

Moreover, BLM's own policy directs it to implement these types of best management practices for Bureau Sensitive Species. BLM's manual directs the agency to "implement[] conservation strategies for BLM special status species as contained in . . . cooperative agreements, and other instruments the BLM has cooperatively participated in the development of." AR022605. These conservation strategies and agreements are to, in part, outline steps to "reduce, eliminate, or mitigate specific threats to sensitive species." AR022637. Not only did BLM contribute to ODFW's Oregon Conservation Strategy, but it is also a signatory to the multi-agency Western Pond Turtle Range-wide Management Strategy. The Management Strategy identifies measures "necessary to ensure western pond turtle long-term viability in the wild." *Western Pond Turtle Range-wide Management Strategy*, Western Pond Turtle Range-wide Conservation Coalition, at 15 (2020), *archived at* https://perma.cc/A6Y4-YVPR. These measures include to "avoid and minimize direct and indirect adverse effects to western pond turtles" by

"implement[ing] best management practices within western pond turtle habitat." *Id.* at 18. The Oregon Conservation Strategy outlines what the best available science indicates are best management practices for timber harvest, which are consistent with BLM's PDFs for the Last Chance project. KSW01390.

The opposing parties argue BLM demonstrated consistency with the Management Direction in concluding the Project's habitat impacts in isolation would not lead to the pond turtle's listing as threatened. This is not the test for whether BLM mitigated "specific threats," as Plaintiffs demonstrate above. Moreover, BLM did not analyze how the threat of crushing turtles while they hibernate would impact the species. It is BLM's obligation to demonstrate consistency with the Management Direction. *Native Ecosystems Council*, 418 F.3d at 963. It failed to do so here.

The opposing parties downplay the Project's impacts on the pond turtle by noting the limited number of sightings in the Project area. The limited sightings are not surprising: BLM did not survey for the species, nor is there any indication surveying has ever occurred in the Project area. KSW00661. Yet despite not looking for pond turtles, BLM still observed them in the area indicating their possible abundance. *Id.* BLM cannot rely on its own failure to assess the pond turtle population in the Project area as it falls to BLM to demonstrate compliance with the Management Directive. *Native Ecosystems Council*, 418 F.3d at 963.

## II.    IRREPARABLE HARM

### A.    Plaintiffs Acted Diligently and Did Not Acquiesce.

Defendants argue this motion is premature, while Murphy argues it is inexplicably late and a "bad faith tactic." Defs. Br., 23–24; Mur. Br., 20–21. Both ignore the statutory mandates that governed Plaintiffs' timeline and Murphy's own contradictory sworn statements.

First, Plaintiffs' prior dismissal was a forced procedural necessity. After

cooperatively staying the case from January to May 2025 so BLM could address its deficient NEPA analysis, *see Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 1:24-cv-01930-CL (D. Or.), Dkt. No. 6 (Joint Stay Motion), Plaintiffs sought a second stay to secure new counsel. BLM refused unless Plaintiffs waived their right to seek preliminary injunctive relief, amend their complaint, or supplement the administrative record. *See Klamath-Siskiyou Wildlands*, No. 1:24-cv-01930-CL, Dkt. No. 28 (Stay Motion). Murphy endorsed BLM's demand. *Id.* To preserve their rights, Plaintiffs dismissed the case without prejudice on September 11, 2025. *Klamath-Siskiyou Wildlands*, No. 1:24-cv-01930-CL (D. Or.), Dkt. No. 30. Murphy cannot characterize a dismissal as a "bad faith tactic" when its own counsel demanded the conditions that made the dismissal necessary.

Second, the ESA statutorily barred Plaintiffs from filing earlier. Following the dismissal, Plaintiffs served a 60-day ESA notice of intent to sue on September 25. FWS_018087. The ESA's strict jurisdictional bar prevented Plaintiffs from filing suit until December 2025. 16 U.S.C. § 1540(g)(2). Compliance with a jurisdictional prerequisite is not "acquiescence."

Third, Plaintiffs reasonably relied on Murphy's stated schedule. Murphy claims Plaintiffs stood by while it incurred "sunk costs" in late 2025. Yet, in its motion to intervene in the prior litigation, Murphy stated it intended only to "commence road rehabilitation and roadside vegetation management on the Paul's Payoff sale in 2025 in order to be prepared to begin harvesting in 2026." *Klamath-Siskiyou Wildlands*, No. 1:24-cv-01930-CL, Dkt. No. 13 at 2 (May 30, 2025). Plaintiffs reasonably utilized the fall to satisfy the 60-day ESA notice rather than filing a premature motion against 2026 harvesting.

Fourth, Murphy concealed the imminent harm and is actively obstructing Plaintiffs' ability to monitor it. On January 28, 2026, Murphy submitted a sworn declaration in this Court stating it "intends to begin logging in April 2026." Dkt. No.

10 at ¶ 6. After discovering Murphy's on-the-ground logging contradicted its sworn declarations, Plaintiffs attempted to verify the scope of the operations on a non-operating weekend. Murphy finally admitted on February 2 that it was "falling trees currently" for timber, Declaration of Sangye Ince-Johannsen ¶ 4 (Dkt. No. 17), but after learning of Plaintiffs' visit, Murphy physically barricaded the public access road with heavy logging equipment. Second Sexton Decl. ¶ 13, Exh. E.[6] Seeking emergency judicial intervention after discovering undisclosed logging behind an unauthorized barricade is not a delay tactic; it is the exact purpose of a preliminary injunction.

Finally, Plaintiffs' timing promotes orderly review. The opposing briefs inadvertently demonstrate Plaintiffs filed this motion at the exact right time. While Murphy argues Plaintiffs filed too late, Defendants argue Plaintiffs filed prematurely because operations "do not begin until May 2026." Def. Br., 23. In reality, Plaintiffs navigated the strict 60-day jurisdictional bar to file suit in December, and filed this motion in February to precede those spring logging operations.

## B.    Plaintiffs Have Established a Likelihood of Irreparable Harm.

Defendants argue Plaintiffs rely on speculation, Article III standing allegations, or a presumption of harm under the ESA. *See* Def. Br., 23–24, 28–29; Mur. Br., 20, 22, 24. Plaintiffs agree a preliminary injunction requires a showing of likely irreparable harm. Plaintiffs meet this standard with empirical evidence, not legal presumptions.[7]

---

[6] These closures have continued. On March 1, Plaintiffs' declarant was again blocked from entering the Paul's Payoff sale. Second Sexton Decl. ¶ 16. Murphy placed this barricade unilaterally; BLM was initially unaware of the blockade and issued no formal order closing the public road. Second Sexton Decl. ¶ 14.

[7] Murphy argues Plaintiffs' harms are divorced from the statutes being enforced. Murphy Br., 22 & fn. 5 (citing *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015)).

The harm here is concrete and ongoing. On February 9, 2026, DOJ confirmed that logging and right-of-way clearance were already established or ongoing in multiple units containing spotted owl nesting, roosting, and foraging habitat and pond turtle overwintering habitat. Ince-Johannsen Decl. ¶ 5. The Sexton photographs document this destruction and the physical barricading of public lands. Second Sexton Decl. Exs. 1–4. The logging of mature trees constitutes irreparable injury because it cannot be undone. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).

Defendants suggest that unless Plaintiffs have physically seen a cryptic owl or a buried turtle, the destruction of that species and its habitat does not harm them. Def. Br., 28–29 (citing *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167 (2000)). The Ninth Circuit rejects this standard. Plaintiffs establish irreparable harm by showing "harm to their own interests stemming from the irreparable harm to the listed species." *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 822 (9th Cir. 2018). The permanent destruction of the habitat Plaintiffs visit to observe these species constitutes an irreparable injury to Plaintiffs themselves.

### 1.    Irreparable Harm to the Spotted Owl.

#### a.    The Record Establishes a Likelihood of Occupancy and Unauthorized Take.

AFRC argues Plaintiffs must prove the species "actually inhabits" the specific timber units, citing the unpublished decision *Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621 (9th Cir. 2017). AFRC Br., 18–19. This misstates that case. In *Scott Timber*, the Ninth Circuit reversed a preliminary injunction because the

---

In *Garcia*, the plaintiff attempted to use copyright law to prevent death threats. *Id.* at 744–45. No such mismatch exists here. Plaintiffs rely on the ESA to prevent the unauthorized and unanalyzed impacts to an ESA-listed species. Plaintiffs rely on FLPMA to enforce a land-use plan's wildlife directives.

district court conflated "serious questions" with "likelihood." *Id.* at 624–25. The Court required a finding that it was *likely* the species inhabited the area.

Plaintiffs meet this bar. Survey data confirm spotted owls are present at the seven sites in question. While the 2012 Protocol labels these single responses "Status Unknown," *Appel et al.* (2023) demonstrates a single detection indicates a greater-than-not likelihood of a resident pair. A 72 percent probability of a resident pair establishes that occupancy is likely.

Defendants similarly argue Plaintiffs rely on a "speculative sequence" where surveys fail to find owls, and asserting ongoing surveys and mitigation measures will prevent any take. Def. Br., 24–26. This mischaracterizes the record. The harm does not depend on surveys failing to find owls; surveys already detected owls at these seven sites. The harm stems from the agency denying them protection. The BiOp's mitigation framework requires BLM to drop or modify timber units only if surveyors locate "territorial pairs or resident singles." *Id.* at 19. Because the agency evaluates all future surveys using the same 2012 Protocol, any subsequent callback survey yielding a single detection will again be labeled "Status Unknown" and bypass mitigation. A mitigation measure that treats a 72 percent probability of occupancy as a zero percent chance of take ensures the harm it claims to prevent.

Finally, Defendants argue ESA § 7 protects species, not individuals. Def. Br., 26–27. The Ninth Circuit rejects the premise that plaintiffs must prove a species-level threat of extinction to enjoin a take. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996). Regardless, the record establishes population-level significance. FWS's 2020 12-month finding concluded the spotted owl is in a spiraling decline and warrants uplisting to Endangered status. *12-Month Finding for the Northern Spotted Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020). With the species so close to extinction, the unauthorized take of up to 14 resident owl pairs and the

permanent destruction of their established territories constitutes a population-level harm.

### b.    The Project Will Cause Irreparable Harm to Spotted Owl Critical Habitat.

The Project will also cause irreparable harm by destroying critical habitat. AFRCs' reliance on *Scott Timber* to demand proof of physical inhabition is particularly misplaced here. Because that case involved the § 9 take of individual birds, it has no bearing on Plaintiffs' § 7 claim regarding the unanalyzed destruction of designated critical habitat. The destruction of this habitat constitutes irreparable harm regardless of whether an individual owl occupies a specific tree at the moment it falls.

Defendants argue Plaintiffs rely on "stock allegations" regarding the connectivity corridor and adjacent private lands, contending the destruction of critical habitat does not necessarily diminish its overall value. Def. Br., 27 (citing *Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936 (9th Cir. 2010)). This argument ignores the administrative record. The vulnerability of this habitat is the documented reality of the Last Chance project area. The Final EA and the BiOp acknowledge the "checkerboard" ownership pattern of this landscape and note that adjacent private industrial timberlands are logged on short 40- to 60-year rotations. *See* KSW00813; KSW00439. Because these private lands lack suitable habitat, FWS determined the federal lands in this critical habitat subunit (KLE-2) act as an essential connectivity corridor between the Cascades and the coast. *See* 77 Fed. Reg. at 71,934. The irreplaceable nature of this specific habitat is established by the agencies' own scientific findings.

The destruction of this habitat is documented and ongoing. On February 9, DOJ confirmed Murphy had already felled 16 acres of spotted owl NRF habitat in roadside units, 1 acre in the right-of-way, and that felling of 1.5 acres of NRF in

Unit 34-1D was currently ongoing. Ince-Johannsen Decl. ¶ 5. The removal of these designated old-growth habitat features constitutes irreparable harm.

### 2.    Irreparable Harm to Northwestern Pond Turtle.

Defendants argue harm to the northwestern pond turtle is speculative because there is no nesting habitat in the proposed units and the last detection occurred in 1997. Def. Br., 28; Mur. Br., 23–24. But as with the spotted owl, the record establishes a likelihood of inhabitation satisfying *Scott Timber*. BLM concedes it did not survey the Project area for the species. KSW00661. Defendants cannot weaponize their failure to survey as proof of absence, especially given BLM observed turtles in the Project Area *despite* not even looking for them. KSW00661. Furthermore, harm to the habitat is actively occurring to Plaintiffs' a great concern. Wilkins Decl. ¶ 9 On February 9, DOJ and Murphy confirmed logging was ongoing in multiple units containing overwintering habitat. Ince-Johannsen Decl. ¶¶ 5–6.

Murphy argues the loss of individual turtles does not irreparably injure local viability and the RMP does not require avoidance of unlisted Bureau Sensitive Species. Mur. Br., 23–24 & fn. 6. The harm here is the physical crushing of dormant turtles. The Oregon Conservation Strategy identifies heavy logging machinery as a fatal, "specific threat" to turtles and recommends timing harvests to avoid hibernating individuals. KSW013390. BLM drafted PDFs with seasonal restrictions for this project to prevent this crushing. KSW00842-843. The 2016 RMP mandates that BLM mitigate specific threats to Bureau Sensitive Species to prevent the need for ESA listing. Gating these safety measures behind a future ESA listing guarantees the fatal harm the measures were designed to prevent.

Defendants attempt to dilute this harm, noting the Project removes only 0.13 percent of overwintering habitat statewide. Def. Br., 28. Irreparable harm, however, focuses on the local population and Plaintiffs' localized interests. The Project will

modify or remove up to 3,118 acres—55 percent—of the available overwintering habitat in the analysis area. KSW00663. Under *Amoco*, environmental injury "is often permanent or at least of long duration, i.e., irreparable." 480 U.S. at 545. A crushed turtle cannot be rehabilitated, and the destruction of over half the local winter refuge constitutes a permanent injury.

Finally, AFRC argues aquatic habitat improvements negate Plaintiffs' claims of harm. AFRC Br., 19. This is a false equivalency. The species requires aquatic habitat for summer foraging and upland terrestrial habitat for winter hibernation. Improving a stream channel provides no benefit to a hibernating turtle crushed by logging machinery in the upland forest. Habitat improvements in one lifecycle stage do not mitigate fatal harm in another.

### 3.    Irreparable Harm to Plaintiffs' Interests.

Defendants argue Plaintiffs plead only generalized harm because declarants state an intent to see listed species but do not claim to have actually observed a spotted owl or pond turtle in the Project area. Def. Br., 28–29 (citing *Friends of the Earth*). Murphy similarly claims Plaintiffs' interests in public lands are "generic" and their specific site visits were merely litigation-driven. Mur. Br., 24–26.

Defendants ignore the record. Plaintiffs' declarants have utilized these specific forests for decades. Declarant George Sexton, for example, has visited the area for 23 years to enjoy its unique old-growth characteristics and native biodiversity. Sexton Decl. ¶¶ 6, 8, 12. As to the recent site visits, they were driven by necessity, not litigation preparation. On January 28, 2026, Murphy filed a sworn declaration stating logging would not commence until April 2026. Dkt. 10 at ¶ 6. Plaintiffs' members visited the site to verify this claim, discovered it was false, and documented ongoing timber felling and yarding. Second Sexton Decl. ¶¶ 9–12. Attempting to verify an intervenor's false timeline does not render a plaintiff's

decades-long connection to the land "generic." Furthermore, Plaintiffs do not need to physically spot a cryptic owl or buried turtle to establish harm; the permanent destruction of the habitat they regularly visit to try to observe those species constitutes an irreparable injury. Wilkins Decl. ¶¶ 8-9.

### a.    Plaintiffs Have No Duty to Go Elsewhere.

Murphy argues Plaintiffs will not suffer irreparable harm because they can simply "drive to the next I-5 exit to engage in their preferred recreational activities." Mur. Br., 25–26. AFRC echoes this, suggesting the remaining 977,083 acres of non-harvest land in the RMP area are sufficient, and citing unpublished out-of-circuit case law for the proposition that irreparable harm does not exist where alternatives are available. AFRC Br., 20 & fn. 4 (citing *Delux Pub. Charter, LLC v. Cnty. of Westchester*, 2024 WL 3744167 (S.D.N.Y. 2024)).

The Ninth Circuit explicitly rejects this argument. In *Alliance for the Wild Rockies v. Cottrell*, the Forest Service argued plaintiffs were not harmed by a logging project because they could recreate in other unharmed areas of the forest. 632 F.3d 1127, 1135 (9th Cir. 2011). The Ninth Circuit forcefully rebuked this premise: "This argument proves too much. Its logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed." *Id*. Old-growth forests are not interchangeable widgets, and the permanent destruction of the specific 11,686 acres Plaintiffs utilize is "hardly a de minimis injury." *Id.*

More importantly, Murphy's actions have transformed a theoretical loss of use into actual, physical exclusion. When Plaintiffs' members attempted to visit the area on Sundays—specifically to avoid interfering with operations—they found the road barricaded by Murphy's logging equipment. Second Sexton Decl. ¶¶ 13–16, Exs. 4, 7. A private timber purchaser's unilateral barricading of public lands to

prevent citizen access concretizes Plaintiffs' immediate loss of use and enjoyment.

### b.    The Project Does Not Enhance Plaintiffs' Interests.

Murphy and AFRC argue that the Project will actually enhance Plaintiffs' interests by improving forest health, responding to climate stress, and reducing wildfire risk in the LSR-Dry allocation as directed by the 2016 RMP. They assert Plaintiffs' preference for maintaining the forest in its current "unhealthy condition" does not constitute harm, and note the RMP prohibits harvesting trees over 40 inches DBH established prior to 1850. Mur. Br., 24–25; AFRC Br., 19–21. This is a merits dispute disguised as an equitable argument. To a recreationist or ecologist whose concrete interest lies in viewing undisturbed mature and old-growth forests, a "variable retention harvest" that converts mature stands into early-seral "stand establishment" conditions is the definition of an irreparable aesthetic injury.[8]

## III.    BALANCE OF EQUITIES AND PUBLIC INTEREST
### A.    The Balance of Equities And Public Interest Favor Plaintiffs.

The balance of equities and public interest favor Plaintiffs as a matter of law. In cases involving the ESA, these factors "always tip in favor of the protected species." *Cottonwood Envtl. Law Ctr. v. USFS*, 789 F.3d 1075, 1090–91 (9th Cir. 2015). This principle is rooted in the Supreme Court's seminal ESA case, *Tennessee Valley Authority v. Hill*. 437 U.S. 153 (1978) ("*TVA*"). In *TVA*, the Supreme Court established that through the ESA, Congress made conservation and recovery of threatened species the highest priority, "whatever the cost." *Id.* at 184. The Ninth Circuit has since expanded the rule of *TVA*—"that courts have no discretion to

---

[8]  Murphy's argument is also entirely inconsistent. Murphy previously argued irreparable harm must be measured strictly by the injury to the plaintiff, not the environment. Murphy Br., 24. Now, Murphy argues the Court should deny an injunction because the logging allegedly benefits the environment. Defendants cannot have it both ways. The fact remains that replacing intact, complex forest ecosystems with logged stumps and a handful of leave-trees irreparably injures Plaintiffs' aesthetic and recreational interests.

balance equities or the public interest when considering whether a permanent injunction is warranted under section 7—to the consideration of any injunction, preliminary or permanent, sought in any ESA case." *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 599 (9th Cir. 2025).

The opposing parties contort themselves and the law to try to get around this presumption. These efforts are to no avail. Defendants allege that while courts presume the balance of interests weighs in favor of ESA-listed species, they do not avoid the inquiry entirely. Def. Br., 30. Yet this is contradicted by the very case Defendants cite in support. That case recognized the ESA "removes" the balance of equities and public interest from courts' equitable discretion. *Nat'l Wildlife Fed.*, 886 F.3d at 817. The court then omitted any consideration of those factors. *Id.* at 818–24. Despite Defendants' contention, the Ninth Circuit has continually reiterated the presumption towards listed species applies when analyzing a request for preliminary injunctive relief under the ESA. *San Luis Obispo Coastkeeper*, 161 F.4th at 599 (citing four Ninth Circuit cases repeating this principle).

AFRC attempts to backdoor their way into a debate on the equities by mischaracterizing the Ninth Circuit's recent holding in *San Luis Obispo Coastkeeper*. AFRC describes that case as holding that a court may consider the public interest and equities in ESA cases whenever an injunction may forestall a project that could be characterized as providing some benefit to a listed species. AFRC Br., 21. This characterization creates a canyon out of the crack the Ninth Circuit opened to the traditional presumption in ESA cases. *San Luis Obispo Coastkeeper* concerned a mandatory injunction that would benefit one listed species but harm two others. 161 F.4th at 596–97. The Court, in a narrow holding, stated that "district courts retain their equitable discretion when considering a *mandatory* preliminary injunction under the ESA that could endangerer *other* listed species." *Id.* at 600 (emphasis added). This exception is inapplicable here for two reasons.

First, the Ninth Circuit was clear it only applies to mandatory injunctions, not the prohibitory injunction at issue here. *Id.* ("Ordering a party to stop harmful conduct is one thing; compelling it to act affirmatively in a way that could harm other species is another."). Second, the exception only allows for balancing interests between multiple ESA listed species. *Id.* The only listed species at issue in this case is the spotted owl. AFRC does not identify any way Plaintiffs' requested relief would harm *other* listed species. *Id.* at 601.

Murphy alleges the presumption in favor of protecting listed species is inapplicable to ESA claims that arise under the APA instead of the ESA citizen suit provision. Mur. Br., 7. This distinction is illogical. The presumption arises from Congress' determination that the protection of listed species is afforded the highest priority. Congress certainly did not intend for the procedural nature of a claim to affect this priority—that protecting spotted owls is the highest priority unless an ESA violation arises under the APA. That would be an absurd result. Moreover, Murphy does not cite a single case where a court has drawn this distinction.[9] Nor could it. Courts do not consider the equities or public interest "[i]n cases involving the ESA," not just claims arising under the ESA citizen suit provision. *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 793–94 (9th Cir. 2005) (applying presumption in challenge to issuance of a biological opinion arising under the APA).

Lastly, AFRC argues that while the presumption may apply to Plaintiffs' ESA claims, it does not apply to Plaintiffs' FLPMA claim. This ignores that it applies in "cases involving the ESA," not just to claims arising under the ESA. *Nat'l Wildlife Fed'n,* 23 F.3d at 1510–11. AFRC does not cite any cases to the contrary, relying on a single case that did not involve the ESA. AFRC. Br., 21 (citing *Or. Nat.*

---

[9] The cases Murphy cites merely state that some ESA claims arise under the ESA citizen suit provision and others under the APA. They do not discuss the preliminary injunction standard in these contexts. Dkt 33 at 7.

*Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1270 (D. Or. 2022)). The pond turtle is further entitled to this presumption because it is proposed for ESA listing. 88 Fed. Reg. 68,399 (Oct. 3, 2023). FWS has determined that listing the species "is warranted," and the pond turtle is entitled to the "benefit of the doubt" and presumption that conserving the species is of the highest priority. *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) (*abrogated on other grounds recognized by Cottonwood Envtl. Law Ctr.,* 789 F.3d at 1088).

**B.    The Public Interest and Balance of Equities Favor Plaintiffs.**

Even if the Court were to reach these factors, they weigh heavily in Plaintiffs' favor. The harm to Plaintiffs and the ecological communities in the Last Chance project area are irreversible. Once an old-growth stand is logged, a spotted owl is taken, or a pond turtle crushed under a skidder or harvester, the resource is irreparably lost. *Alliance for the Wild Rockies*, 632 F.3d at 1138. This damage cannot be undone. That is why the Ninth Circuit has recognized the well-established public interest in "preserving nature and avoiding irreparable environmental injury." *Id.* The "careful consideration of environmental impacts before major federal projects go forward" is imperative to furthering this interest. *Id.* Countervailing harms are, by contrast, temporary and limited by the narrow scope of Plaintiffs' requested relief. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (noting harms must be assessed in context of narrow injunction).

Plaintiffs seek solely to halt logging and roadbuilding activities in spotted owl nesting, roosting, and foraging and pond turtle overwintering habitat until this Court has an opportunity to resolve this case on the merits. The Court must only weigh the harms within this narrow scope and "proportionally diminish total harms to reflect only the time when a preliminary injunction would be in place." *League of Wilderness Defenders*, 752 F.3d at 765.

All opposing parties point to the loss of income and jobs if an injunction is issued. Yet the balance of equities and public interest regularly tip toward the conservation of natural resources due to the irreparable nature of environmental harm. *Id*. at 765–66; *see also Amoco Prod. Co.,* 480 U.S. at 545 (noting balance of harms usually favors issuance of an injunction to protect the environment because injury is irreparable); *All. for the Wild Rockies*, 632 F.3d at 1138–39 (irreparable environmental injury outweighed creation of 18 to 26 temporary jobs in struggling local economy). Defendants, Murphy, and AFRC can still realize the full benefits of income, jobs, and tax dollars from the Project if they ultimately prevail in this litigation. As such, their marginal harm is no more than the value of "moving those jobs and tax dollars to a future year, rather than the present." *League of Wilderness Defenders*, 752 F.3d at 765–66.

Moreover, Plaintiff's requested relief would not forestall their ability to realize many of these benefits now. Last Chance project activities will be staged over a 15-year period, averaging approximately 780 acres per year. KSW02362. Even if Plaintiffs injunction is granted, The opposing parties would still be able to carry out Project activities, and realize the associated benefits, on thousands of acres in the Project area. This 15-year Project period also diminishes the proportional harms of injunctive relief. *Alliance for the Wild Rockies v. Gassman*, 604 F. Supp 3d 1022, 1037 (D. Mont. 2022).

Defendants argue the inclusion of road construction in Plaintiffs' injunction request would severely limit, if not completely forestall, timber harvest. Defendants first mischaracterize Plaintiffs' request. The request would not halt all road construction—only road construction through NRF and overwintering habitat. More importantly, Defendants' claim this would bar all harvest activities is demonstrably false. Defendants' own parenthetical betrays their argument. Def. Br., 32 (citing ECF No. 17-2 at 37 ("Access to *some units* would require road construction to

extract timber") (emphasis added)). A significant portion of the Project treatment units are largely or entirely accessible without road construction. KSW00964–68.

Defendants and AFRC also allege an injunction would harm the public interest by restricting BLM's ability to manage wildfire risks. While mitigating such risks is a valid public interest, *League of Wilderness Defenders*, 752 F.3d at 766, the opposing parties do not present any information indicating Plaintiffs narrow injunction would completely forestall these activities. Defendants can continue carrying out fules management in areas not covered by Plaintiff's requested injunction in the short term.

Intervenors also allege the Project will, in fact, be beneficial to the spotted owl. Intervenors' rosy portrayal overlooks two critical facts. First, BLM itself determined the Project is "likely to adversely affect the threatened northern spotted owl" and the species' critical habitat. KSW01436; KSW01525. FWS, for its part, found project activities will adversely affect habitat fitness in 29 of the 33 known spotted owl sites in the Project area. BiOp at 115, 163. Second, as Plaintiffs outline above, the Project is likely to cause unaccounted take and unanalyzed impacts to the species' critical habitat.

Finally, Defendants and AFRC allege an injunction would frustrate the legislative intent behind the 1937 O&C Act's sustained yield directive. This ignores Congress' intent in enacting the 1973 ESA: to "reverse the trend toward species extinction, whatever the cost." *TVA*, 437 U.S. at 184. Through the ESA, Congress gave conserving listed species "priority over the 'primary missions' of federal agencies." *Id.* at 185. This includes BLM's administration of public lands under the O&C Act. Furthermore, Defendants can still work toward its' timber targets during the short period this injunction is in place through harvest on lands not covered by this injunction and on other O&C Act lands outside of the Project area.

## IV.    BOND

This Court has adopted the general rule that a bond is not required in public interest environmental cases to avoid chilling citizen enforcement. *Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012); *see also Or. Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085, 1110 (D. Or. 2025) (waiving bond). Federal Defendants mischaracterize *Save Our Sonoran*, 408 F.3d 1113 (9th Cir. 2005), to argue a bond is always a precondition to an injunction. To the contrary, the Ninth Circuit explicitly reaffirmed in that case that district courts retain discretion to eliminate the bond requirement when security would thwart citizen action, specifically citing waivers for environmental groups. *Id.* at 1126.

AFRC argues Plaintiffs past litigation shows a bond would not chill Plaintiffs' advocacy, but the opposite is true: Plaintiffs can pursue these cases only *because* this Court routinely waives the security requirement. AFRC Br., 29–30. Imposing the requested $9,197 bond would consume nearly the entirety of plaintiff Cascadia Wildlands' $12,000 annual litigation budget. Cowen Dec. ¶ 25. Because requiring a bond would effectively deny non-profit Plaintiffs access to judicial review and severely limit their capacity to enforce federal environmental statutes, the Court should follow its well-established precedent and waive the security requirement.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion for Preliminary Injunction.

Respectfully submitted this 9th day of March, 2026,

<u>/s/ Sangye Ince-Johannsen</u>
Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org

woodsmall@westernlaw.org
+1 541.778.6626
+1 971.285.3632