UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KLAMATH-SISKIYOU WILDLANDS
CENTER, *et al.*,

       Plaintiffs,

    v.

DOUGLAS JAMES BURGUM, *et al.*,

       Defendants.

Case No. 1:25-cv-02296-CL

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

Klamath-Siskiyou Wildlands Center, Oregon Wild, and Cascadia Wildlands ("Plaintiffs")

bring claims against the Secretary of the Interior, the United States Fish and Wildlife Service,

and the United States Bureau of Land Management ("Defendants") alleging violations of the

Endangered Species Act, the National Environmental Policy Act, and the Federal Land Policy

and Management Act. Plaintiffs' Motion for a Preliminary Injunction (ECF No. 16) is before the

Court. For the reasons below, Plaintiffs' motion is denied.

**BACKGROUND**

Plaintiffs challenge the Last Chance Project, a forest management project authorized by

Defendant Bureau of Land Management ("BLM") in Southern Oregon. AR000744. Plaintiffs

move for a preliminary injunction on two claims: (1) that the Defendants violated Section 7 of

the Endangered Species Act in assessing the Last Chance Project's impact on the northern

Page 1 — OPINION AND ORDER

spotted owl and (2) that the project violates the Federal Land Policy and Management Act because it fails to implement conservation measures for the northwestern pond turtle. Compl. 18-25, ECF No. 1.

## I.     The Parties

Plaintiffs are non-profit environmental organizations. Compl. ¶¶ 9-11. Defendant BLM authorized the Last Chance Project. Compl. ¶ 14; Answer ¶ 14, ECF No. 15. Defendant United States Fish and Wildlife Service ("FWS") prepared the biological opinion for the Last Chance Project. Compl. ¶ 13; Answer ¶ 13. Defendant James Burgum is the Secretary of the Interior. Compl. ¶ 12; Answer ¶ 12. Defendant-Intervenor Murphy Company is an Oregon wood products company that purchased the Paul's Payoff portion of the Last Chance Project from BLM in September 2024. Griffith Decl. Ex. A. ¶ 1, ECF No. 9. Defendant-Intervenor American Forest Resource Council is a regional trade association that advocates for sustained-yield timber harvests and represents forest product businesses that frequently purchase timber sales offered by BLM. Geissler Decl. ¶¶ 3, 6, ECF No. 24. Defendant-Intervenor Association of O&C Counties is made up of Oregon counties, including eighteen counties that would receive funds from the sale of timber authorized by the Last Chance Project. Freeman Decl. ¶¶ 11, 16, ECF No. 25.

## II.     The Last Chance Project

The Last Chance Project ("Project") is located in Douglas, Jackson, and Josephine Counties in Southern Oregon. AR000744. BLM, private parties, counties, and the state of Oregon, all own land in the area, creating a checkerboard pattern of land management. AR000744. The Project calls for different management objectives and "treatments" including timber harvesting, commercial thinning, and hazardous fuels reduction in different parts of the Project area. AR000745-46. The Project authorizes timber sales via separate Decision Records. *E.g.*, AR000001 (Decision Record #4 authorizing King Graves Timber Sale); AR000468-69

(Decision Record #3 authorizing Take a Chance Timber Sale); AR000654-55 (Decision Record #1 authorizing Paul's Payoff and Rotor's Up Timber Sales). The Project area includes habitat for the northern spotted owl and the northwestern pond turtle. AR007747; AR000822-23.

## III.    The Northern Spotted Owl

The northern spotted owl is a threatened species under the Endangered Species Act ("ESA"). FWS_000224. The owl requires specific habitat, primarily late-successional and old-growth coniferous forests, to survive and propagate. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26114 (June 26, 1990); Endangered and Threatened Wildlife and Plants; 12-Month Finding for the Northern Spotted Owl, 85 Fed. Reg. 81144 (Dec. 15, 2020); FWS_000248. Habitat loss was the primary factor causing the owl to be listed as a threatened species and continues to threaten the northern spotted owl along with timber harvest, wildfire, disease, and competition from nonnative barred owls. 85 Fed. Reg. 81145.

## IV.    The Northwestern Pond Turtle

The northwestern pond turtle is not a listed species under the ESA, but BLM designates it as a bureau sensitive species. AR000821. The turtle requires aquatic habitat as well as nearby uplands where the turtle nests and hibernates over winter. AR000821. Habitat loss, predation, drought, wildfire, road impacts, and extreme weather threaten the species. AR000822. Conservation strategies include "buffering wetlands and waterbodies capable of supporting [the turtle], or to utilize seasonal 'no-entry' restrictions to minimize human-related disturbances in key turtle habitats (i.e., nesting, overwintering) when buffering is not feasible." AR000821.

## V.    Statutory and Regulatory Background

Public land management is governed by a broad, and sometimes overlapping, network of statutes and regulations, creating procedural and substantive obligations that dictate how federal

agencies should use, may use, or may not use specific lands. *See Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (stating Congress has broad "power to determine what are 'needful' rules 'respecting' the public lands.") (quoting *United States v. San Francisco*, 310 U.S. 16, 29 (1940)); *Ctr. for Biological Diversity v. U.S. Bureau Land Mgmt.*, 141 F.4th 976, 989 (9th Cir. 2025) (considering the application of four different statutes to an Alaskan oil project). The Court therefore considers the statutory and regulatory authority governing the actions of BLM and FWS and regulating the unique public lands at issue in this case.

### A.    The Oregon and California Lands Act

More than 30,000 acres within the project area are on BLM land subject to the Oregon and California Lands Act of 1937 ("O&C Act"). AR000744. Congress instructed federal agencies to manage these lands for "permanent forest production . . . in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational [facilities]." 43 U.S.C. § 2601; *see also Headwaters, Inc. v. Bureau Land Mgmt.*, 914 F.2d 1174, 1184 (9th Cir. 1990) (upholding a BLM interpretation that the O&C Act establishes timber production as the dominant use on O&C lands). O&C lands are nevertheless subject to later enacted statutes like the National Environmental Policy Act and the ESA. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1134-35 (9th Cir. 2023) (citing *Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993)); *Rivers v. Bureau of Land Mgmt.*, No. 16-cv-01598, 2018 WL 6735090, at *17 n.20 (D. Or. Oct. 12, 2018).

**B.**     **The Federal Land Policy and Management Act and the Southwestern Oregon Resource Management Plan**

BLM lands are subject to the Federal Land Policy and Management Act ("FLPMA"). 43 U.S.C. § 1732(a). FLPMA requires BLM to manage public lands in accordance with land use plans. *Id.* §§ 1732(a), 1712. The 2016 Southwestern Oregon Resource Management Plan ("RMP"), the land use plan relevant to the Project, distributes BLM lands into six categories, including Late Successional Reserves and the Harvest Land Base. AR012812; AR012860. Late Successional Reserves are dedicated primarily to protecting habitat for the northern spotted owl. AR012887. The Harvest Land Base is primarily dedicated to sustainable timber production. AR012879. The Project proposes treatments in the Harvest Land Base and in Late Successional Reserves over a fifteen-year period. AR000722.

The RMP adopts a case-by-case approach to assess whether specific timber projects would result in incidental take of the northern spotted owl. AR012944. As part of this process, BLM surveys whether the owl is present in the harvest area using the best available science to comply with the ESA. AR012944.

The RMP sets forth directives and objectives for managing bureau sensitive species, like the northwestern pond turtle. AR012932. The RMP requires BLM to "implement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions." AR012932. The RMP lists the objective to "[i]mplement conservation measures that reduce or eliminate threats to Bureau Sensitive species to minimize the likelihood of and need for the ESA listing of these species." AR012932.

### C.    The Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). When enacted, the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

### 1.    Consultation Requirements

Section 7 of the ESA requires all federal agencies to insure their actions are not "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). If the agency has reason to believe that its actions will likely affect an endangered or threatened species, the acting agency must consult with the Secretary of the Interior and the appropriate consulting agency.[1] *Id.* §§ 1536(a); 1532(15). The acting agency prepares a biological assessment to determine whether the action is "likely to adversely affect any listed species or critical habitat." 50 C.F.R. §§ 402.14(a)-(b), 402.12(a)-(b). If the action is likely to adversely affect the species or habitat, the acting agency initiates a formal consultation with the consulting agency. 50 C.F.R. § 402.14(a)-(b).

The consulting agency then must prepare a biological opinion that determines whether the proposed action is "[l]ikely to jeopardize[2] the continued existence of a listed species or result

---

[1] FWS is the consulting agency for freshwater and terrestrial species. *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1054 & n.1 (9th Cir. 2024).

[2] Jeopardy "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

in the destruction or adverse modification[3] of critical habitat." 50 C.F.R. §§ 402.14(g)-(h) (call numbers added). In making this determination, the consulting agency must assess the environmental baseline of the species and "use the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(4), (8). If the consulting agency finds no jeopardy or adverse modification is likely, it issues a written statement that specifies the incidental taking on the species. 16 U.S.C. § 1536(b)(4). Incidental takings are harm or harassment to a species "that result[s] from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the [acting agency]." 50 C.F.R. § 402.02; 16 U.S.C. § 1532(19) (defining take).

2.      Section 7 Consultation History of the Project

BLM, the acting agency here, prepared a biological assessment for its Fiscal Year 2023 batch of projects, including the Last Chance Project. AR007747. The biological assessment examined the Project's effects on 3,093 acres of northern spotted owl critical habitat. AR007835. BLM found that the Project was "likely to adversely affect" the northern spotted owl and its designated critical habitat. AR007747. BLM requested formal consultation with FWS, the appropriate consulting agency. AR007747. FWS formulated the biological opinion ("BiOp") on July 3, 2023. FWS_000183. The BiOp also examined the Project's effects on 3,093 acres of northern spotted owl critical habitat. FWS_000326. FWS concluded that the Project "[is] not likely to jeopardize the continued existence of the spotted owl" and "will not destroy or adversely modify designated critical habitat for the spotted owl." FWS_000182.

---

species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

[3] "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

D.      The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires federal agencies to issue an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment," considering the environmental impact of the action and its alternatives. *Env't Def. Ctr. v. Bureau Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (quoting 42 U.S.C. § 4332(C)). To determine whether an action will have significant environmental impacts, an agency may first conduct an environmental assessment ("EA"). *Id.* "An EA is a 'concise, public document' providing 'sufficient evidence and analysis' for the agency to determine 'whether to prepare an environmental impact statement.'" *Id.* (citation omitted). If an agency concludes a project has no significant impact, it issues a finding stating so. *See, e.g.*, *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014).

BLM issued its final EA and found the project would have no significant impact in May 2025. AR000740; AR000739. The final EA leaves open whether BLM will offer timber for sale and how much timber would be offered for sale. AR000747. Those decisions are documented in specific "Decision Record" documents for each specific approved action. AR000747. The final EA discloses treatments on more than 7,000 acres of spotted owl critical habitat, more than double the acreage listed in the BiOp. AR000949. In Decision Records, issued after Plaintiffs filed the complaint in this action, BLM attributes this difference to data errors resulting in unintentional overcounting. *E.g.*, AR000007-08 (stating that BLM tracks the authorized acres "ensuring that the acres treated and the associated effects do not exceed what is disclosed in the associated Biological Opinion.") (issued February 2026); AR000025 (clarifying discrepancy with respect to hazardous fuel reduction treatments) (issued February 2026).

The Final EA also discusses impacts to the northwestern pond turtle relevant to this motion. BLM, assuming maximum possible impact to the turtle, found that the Project "would

Page 8 — OPINION AND ORDER

not affect the species at the overall population level (ranging across WA, OR, CA, NV) and would not lead to a measurable increase in the likelihood of the species to be listed as threatened because the removal of 0.13 percent of overwintering habitat in OR (only a portion of the overall species range) is not significant." AR000825. The final EA contains several "Project Design Features" which are mitigation measures that BLM would adopt in the event the turtle is listed under the ESA. AR001004. The Project Design Features include measures to protect the turtle's habitat, including the overwintering habitat at issue here. AR001004-05.

## VI.      Procedural Background

Plaintiffs filed this action on December 9, 2025, seeking declaratory and injunctive relief against Defendants BLM and FWS. Compl. 26-28. In early February, Plaintiffs learned that Defendant-Intervenor Murphy Company was falling trees in preparation for timber harvest to begin in April. Ince-Johannsen Decl. ¶ 4. On February 13, Plaintiffs filed the instant motion, seeking to enjoin logging and road construction within northern spotted owl nesting, roosting, and foraging habitat and northwestern pond turtle overwintering habitat.

STANDARDS

## I.      Preliminary Injunction Motion

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20, 22 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

"[W]hen applying the 'serious questions' test to ESA claims, the last two factors—balance of hardships and the public interest—always 'tip[ ] heavily in favor of protected species'" because Congress has already commanded that balance. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994)); *cf. Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) The Court accordingly need only assess "the first two factors—serious questions on the merits and likelihood of irreparable injury—. . . when analyzing ESA claims under the 'serious questions' test." *Flathead-Lolo*, 98 F.4th at 1190. (citation omitted).

## II.     The Administrative Procedure Act

Judicial review of agency action is governed by the Administrative Procedure Act. 5 U.S.C. § 706. The reviewing court:

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such review is deferential to the agency action taken, the court must not "rubber-stamp" the agency action as correct. *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). "[I]f an agency 'fails to consider an important aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence,' its action is 'arbitrary and capricious.'" *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

### I.      Standing

Defendants contend that Plaintiffs lack standing because their harm is too speculative and not sufficiently concrete or imminent. The U.S. Constitution confers limited authority on the federal courts to hear only active cases or controversies brought by persons who demonstrate standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016); *Already, LLC v. Nike, Inc.*,

568 U.S. 85, 90 (2013). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 578 U.S. at 338.

To have standing, a plaintiff must have "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The required personal interest must satisfy three elements throughout the litigation: (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection between the injury-in-fact and the defendant's challenged behavior; and (3) likelihood that the injury-in-fact will be redressed by a favorable ruling. *Id.* at 180-81, 189; *see also Spokeo*, 578 U.S. at 338 (reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed by a favorable judicial decision") (citation omitted).

Mere intent to "some day" visit places and observe endangered species is insufficient to establish an actual or imminent injury in fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). A plaintiff can establish an injury in fact "by showing a connection to the area of concern sufficient to make credible" their allegation that they will be harmed by environmental degradation of an area. *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 11149 (9th Cir. 2000). An organization establishes injury-in-fact if one of its members has a longstanding use in the area that would be harmed by the challenged activity. *Id.* at 1148, 1150.

Plaintiffs supported their motion with declarations from their members. Declarant George Sexton is the Conservation Director for Plaintiff Klamath-Siskiyou Wildlands Center and a member of Plaintiffs Oregon Wild and Cascadia Wildlands. Sexton Decl. ¶¶ 1, 4, ECF No. 18. In the past 23 years, Sexton has regularly visited forest units that are set to be logged in the Last

Chance timber sale. Sexton Decl. ¶ 6. He has led numerous public hikes to specific units in the area. Sexton Decl. ¶ 8. He has definite plans to continue his regular visits and observe habitat for the northern spotted owl and northwestern pond turtle. Sexton Decl. ¶ 7. He states that the Project will diminish his recreational and aesthetic enjoyment of the area. Sexton Decl. ¶¶ 7, 12, 15.

Declarant Chandra LeGue is an employee of Plaintiff Oregon Wild, and a member of Plaintiffs Klamath-Siskiyou Wildlands Center and Cascadia Wildlands. LeGue Decl. ¶ 1, 3, ECF No. 19. Declarant LeGue uses areas proposed for logging within the Project for hiking, foraging, appreciating nature, and photography. LeGue Decl. ¶ 8. They visited specific units within the Project area in September 2024. LeGue Decl. ¶ 9. They have plans to return to the Project area in May or June of 2023 to enjoy the diversity of birds, trees, and plants in the area. LeGue Decl. ¶ 14. They state that their enjoyment of the area will be harmed by the Project and express particular concern for harm to habitat for the northern spotted owl and northwestern pond turtle. LeGue Decl. ¶¶ 15, 19.

Declarant Madeline Cowen is also a member of all three Plaintiff organizations. Cowen Decl. ¶¶ 3, 7, ECF No. 20. Declarant Cowen first visited the Project area in the summer of 2024 and has foraged for mushrooms, observed old growth forests, and recreated in the area. Cowen Decl. ¶ 8. Cowen often stops by the Project area on their visits to see their partner's family in Southern Oregon. Cowen Decl. ¶ 10. Cowen returns to a few spots in the Paul's Payoff timber area year after year. Cowen Decl. ¶ 12. Cowen states that the proposed project will significantly and negatively impact their ability to recreate in the area. Cowen Decl. ¶ 20.

These declarants routinely use the Project area for hiking, foraging, and recreation. They have concrete plans to continue their regular use and have stated that the project will lessen their

enjoyment of the area. Plaintiffs' members express more than a "some day" intent to visit the project area and enjoy the habitat it provides. They offer sufficient evidence to bring their claim that the project would harm their regular and longstanding use of the land. Plaintiffs have established an injury-in-fact through their members for purposes of standing.

**II.    ESA § 7 Claims Associated with the Northern Spotted Owl**

Plaintiffs challenge the Project and the BiOp on three grounds. First, Plaintiffs contend FWS' "zero take" determination in the BiOp is arbitrary and capricious because it ignores the best available science to determine owl occupancy. Next, Plaintiffs argue the "zero take" determination is inadequately explained. Finally, Plaintiffs argue that BLM arbitrarily relied on a BiOp studying a fraction of the critical habitat affected by the Project.

BLM, as the action agency, has the ultimate responsibility of ensuring compliance with Section 7. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127 (9th Cir. 2012). A federal agency fails to meet this responsibility if it relies on a "legally flawed" BiOp or "fail[s] to discuss information that would undercut the opinion's conclusions." *Id.* at 1127-28 (holding that BLM violated the ESA when it relied on a BiOp that did not assess other disclosed impacts). The biological opinion must rely on "the best scientific and commercial data available" and "state a rational connection between the facts found and the decision made." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1253 (9th Cir. 2017).

**A.    Best Available Science**

Plaintiffs argue that the BiOp's "no take" conclusion is arbitrary and capricious because it ignores the best available science. An agency violates the ESA when it fails to use "the best scientific and commercial data available" in formulating a BiOp. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (citations omitted). The determination of what is the best available science is itself an area in the "agency's 'special expertise'" such that

Page 14 — OPINION AND ORDER

the Court's review "must generally be at its most deferential." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). An agency may not "disregard available scientific evidence that is in some way better than the evidence it relies on." *Id.* "[I]nsufficient . . . [or] incomplete information . . . does not excuse [an agency's] failure" to rely on the best available scientific data. *Id.* (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1998)) (alteration in original). An agency need not rely on the best *possible* scientific data. *Id.* (emphasis added).

Plaintiffs argue specifically that FWS failed to use the best scientific data available in assessing how many spotted owls would be affected by the Project's timber sales. To determine owl occupancy in the relevant area, agency officials used the FWS 2012 survey protocol ("Protocol"). AR012944. The Protocol is designed to "survey for northern spotted owls . . . in areas where management activities may remove or modify spotted owl nesting, roosting or foraging habitat." FWS_015213. The Protocol generally calls for "spot calling" in which agency officials visit areas, mimic a spotted owl call, and listen for the response. FWS_015213; FWS_015219-20. FWS revised the Protocol because competition from the barred owl "resulted in a suppression effect on spotted owl response rates." FWS_015213. In response to this effect, FWS increased the number of visits required from three visits per year over the course of two years (six visits total) to six visits per year over the course of two years (twelve visits total). FWS_015213; FWS_015223. FWS concluded that "[t]he 2-year, 6-visits per year, surveys establish a reasonably high likelihood of detecting spotted owls in occupied activity centers within the survey area." FWS_015226. If a single owl responds on the fifth or sixth visit, surveyors must conduct additional visits to survey for the owl. FWS_015223.

Page 15 — OPINION AND ORDER

The Protocol assigns specific guidance to assess whether owls occupy survey sites. FWS_015233. At a minimum, a single owl must respond or be seen "within the same general area on 3 or more occasions within the breeding season" or respond multiple times "over several years (e.g., 2 responses in year 1 and 1 response in year 2) from the same general area." FWS_015234. If an owl responded only once or twice during all the site visits, it would not establish resident status and would be assigned to "status unknown." FWS_015233-34.

Seven "status unknown" sites are recognized by FWS in the BiOp. FWS_000267 ("Seven of the unoccupied sites have detected incidental spotted owl responses (responses that do not meet residency status) in the last two years.") The BiOp considers these incidental responses as indicative of "non-territorial (non-breeding)" "floater" owls. FWS_000267.

Plaintiffs argue that this conclusion ignores the best available science on the meaning of isolated or infrequent spotted owl calls. Plaintiffs rely on the *Appel* study. Ince-Johannsen Decl. Ex. D ("Appel"), ECF No. 17-4. [4] *Appel* studied the merits of using passive acoustic monitoring to detect spotted owls, noting reduced vocalization of spotted owls around the barred owl. Appel 3, 15-16. In contrast to the Protocol which elicits calls through mimicking, passive acoustic monitoring passively records spotted owl habitat to document calls. Appel 2-3. *Appel* estimated that "when any owl was detected" through passive acoustic monitoring, it was seventy-two percent likely "that the owl belonged to a pair." Appel 13.

Plaintiffs take no issue with the Protocol relied on by BLM and FWS, and they do not request that Defendants conduct further surveys. Plaintiffs argue that the incidental responses should not have been treated as "floater" owls because those responses are 72% likely to belong

---

[4] Appel et al., *Using Passive Acoustic Monitoring to Estimate Northern Spotted Owl Landscape Use and Pair Occupancy*, Ecosphere (2023).

to a pair. In Plaintiffs' view, the BiOp failed to rely on the best available science because it did not apply *Appel's* conclusions to the Protocol survey's results. It is undisputed that the BiOp did not directly discuss *Appel*. As discussed above, the *Appel*'s results are premised on a different survey methodology than those in the BiOp, and *Appel* makes no reference to its applicability to completed callback surveys. Plaintiffs have not shown it is methodologically appropriate to transpose the conclusions from passive acoustical monitoring surveys to callback surveys, and it is not the role of this Court to make that finding.

Nor does *Appel* indicate that Defendants failed to address the effect of the barred owl on a spotted owl's tendency to respond to a callback survey. FWS amended the callback survey to address that specific issue. FWS_015213; FWS_015223; FWS_015226. BLM relies on the Protocol as the best available science. AR012944. That determination is adequately explained and entitled to deference in the absence of available and superior scientific information. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 602.

### B.    Rational Explanation

Plaintiffs also argue that the "no take" determination is inadequately explained, particularly when the callback survey produced incidental responses at seven spotted owl sites.[5] As an initial matter, the BiOp discusses passive acoustical monitoring studies of the barred owl and the northern spotted owl. FWS_000267. FWS stated that it and BLM "will evaluate spotted owl detections for occupancy status and for consideration" of Dugger et al. (a study employing passive acoustical monitoring). FWS_000263-64; *see also* FWS_002747 (the *Dugger* study).

---

[5] At oral argument, Plaintiffs clarified the scope of their argument on this point, focusing on the decision to classify the seven sites with incidental owl responses as unoccupied. The Court addresses it here because the parties have had an opportunity to be heard. *Flathead-Lolo*, 98 F.4th at 1188 ("A district court does not abuse its discretion in considering new arguments or evidence if the opposing party had an opportunity to respond.").

The BiOp notes that the barred owl influence on spotted owl detections "is not new information." FWS_000263.

With respect to the incidental responses in the Project area, the BiOp treats the incidental calls from owls in areas designated as "status unknown" as indicative of floater owls. FWS_000322. Floater owls are a documented portion of the species. FWS_000322. Non-territorial spotted owls rely on "closed canopy forest habitat . . . until they recruit into the breeding population." FWS_000322. They "are difficult to detect in surveys because they either do not respond to surveys or respond in a very tenuous fashion such that they are difficult to capture or resight." FWS_000322 (citing a study, FWS_003088, noting that "floating" occurs because younger owls are excluded by the territorial behavior of resident owls). The Project does not affect eighty percent of the available nesting, roosting, and foraging habitat. FWS_000322. The Project area currently has a surplus of available habitat that would remain after the Project is completed. FWS_000322-23. The BiOp concludes that the available habitat in the action area and in the surrounding area provide "favorable conditions" such that it is "highly likely" floater owls will find suitable habitat to become resident owls. FWS_000322-23. Finally, the BiOp states that continued surveys for spotted owls across the action area, including floater owls that may become resident owls, will "provide a reasonable likelihood of detecting [resident] owls," allowing BLM to adjust the Project as needed. FWS_000323; FWS_000267 ("Protocol surveys will continue within the Action Area and would discover any future recolonization by floaters of the currently unoccupied territories, or colonization of other NRF habitat outside of known territories within 1.2 or 1.3 miles of the proposed actions.").

Relying on the ability of the surveys to detect future residency of spotted owls and the amount of available nesting, roosting, and foraging habitat altered by the Project, the FWS

Page 18 — OPINION AND ORDER

concluded that "no incidental take" of the spotted owl will result from the Project. FWS_000316-17.

Plaintiffs have not shown serious questions that FWS failed to explain how the Project will result in zero incidental take despite the seven sites with incidental responses. The recognition that floater owls do not respond as frequently to callback surveys supports FWS's determination that the incidental responses at the seven sites in question are indicative of floater owls. FWS explained that amount of unaffected habitat remains sufficient for floater owls to find sites for residency, and the Project will not prevent them from finding suitable habitat. To the extent floater owls may colonize currently unoccupied sites, continuing surveys allow BLM to avoid incidental take from the Project.

### C.    The Scope of the BiOp and the Project

Plaintiffs contend that BLM arbitrarily and capriciously relied on a BiOp that analyzed only a small fraction of the Project's actual effects. As detailed above, it is not reasonably disputed that BLM's final EA describes the Project's effects on far more acres of critical spotted owl habitat than are listed in the biological assessment and the BiOp.[6] It is also clear that the Project will not exceed the scope of the BiOp as stated in the Decision Records. AR000025 (explaining discrepancy with respect to fuel reduction treatments); AR000007 (tracking acreage for the timber sales at issue here).

Plaintiffs take issue with the Decision Records themselves as an unlawful piecemealing of the Project to avoid considering its overall impacts. A BiOp must analyze "the effect of the *entire* agency action." *Conner*, 848 F.2d at 1453 (emphasis in original). This requirement

---

[6] The fact that the BiOp analyzes 10,153 acres of *general* owl habitat does not, on its face, cure the EA's error with respect to *critical* owl habitat. 16 U.S.C. § 1536(a)(2); FWS_000277; AR000949.

Page 19 — OPINION AND ORDER

prevents agencies from preparing or relying on BiOps that fail to consider "all stages of the agency action." *Id.* at 1454. In this case, the EA recognizes that timber sales will be authorized in Decision Records, and the Decision Records show that the authorized timber sales do not, and will not, exceed what is studied in the BiOp. AR000007-08. *Burford* does not prevent BLM from implementing the project studied in the BiOp through separate timber sales, so long as those sales do not exceed the scope of the BiOp.

Plaintiffs also contend that any explanation for the EA's error offered after the EA is a "post-hoc" rationalization and should not be considered. Under the APA, agency action is generally not justified by a post hoc rationalization. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50). An agency offers a post hoc rationalization when an agency defends its action through arguments not raised in the administrative record when it made the decision at issue. *See, e.g., Or. Nat. Desert Ass'n*, 625 F.3d at 1120-21 (rejecting BLM's explanations defending its environmental impact statement where those explanations were missing from the environmental impact statement); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1069 ("The explanation must be evidenced from the . . . decision itself."); *see also Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068-69 (9th Cir. 2021) (rejecting a later document's explanation justifying a change in the listing status for the Pacific walrus because "the actual decision document" did not explain the change).

Plaintiffs state that any explanation must have been contained in the EA, quoting NEPA case law for the proposition that the EA is "where the [agency's] defense of its position must be found." *See Blue Mtns. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1214, 1216 (9th Cir.

Page 20 — OPINION AND ORDER

1998). While the application of NEPA cases to Plaintiffs' ESA claim is somewhat unclear, they illustrate that the Decision Records might be properly characterized as post hoc attempts to remedy the error in the EA.

In this case, the EA does not state that acreage for the Project would be modified in the Decision Records or that the Decision Records would track acreage, but it explicitly calls for individual timber sales to be made in Decision Records. AR000747. Some of those Decision Records, issued after Plaintiffs filed their complaint, clarify the scope of the Project. AR000025; AR000007. On the record and arguments before the Court, it is unclear as to whether the Decision Records may properly cure the discrepancy in the EA. As a result, Plaintiffs have presented serious questions as to whether the Decision Records are improper post hoc rationalizations that fail to remedy the error in the EA.[7] *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'") (citation omitted).

To succeed on their motion for a preliminary injunction, Plaintiffs must also show irreparable harm resulting from the discrepancy between the EA and the BiOp. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015), ("[T]here is no presumption of irreparable injury where there has been a procedural violation in ESA cases."). Plaintiffs' theories of irreparable harm resulting from the discrepancy are premised on the Project exceeding the acreage in the BiOp because the Court has found that the BiOp's "no take"

---

[7] The Court declines to consider Defendant BLM's Notice of Revision to the Administrative Record to explain the discrepancy between the EA and the BiOp. Notice of Admin. Corr. 2, ECF No. 52. This document was filed after the Court heard oral argument on the instant motion, and it is a post hoc rationalization.

determination is not likely arbitrary or capricious. The Decision Records put forth evidence that the Project will not exceed the scope of the BiOp. While whether the Decision Records are a post hoc attempt to cure the EA's error is subject to further merits litigation, they suffice to show that the Project will not exceed the BiOp and that no irreparable harm is likely to result from the discrepancy between the EA and the BiOp. Plaintiffs therefore fail to show they are entitled to a preliminary injunction with respect to their ESA claims.

### III.    FLPMA Claim Associated with the Northwestern Pond Turtle

Plaintiffs claim that the Project violates FLPMA because it fails to implement mitigation measures to protect the northwestern pond turtle. BLM projects must conform to their respective land use plans. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). The parties dispute centers on what the relevant land use plan, the RMP, requires. Defendants argue that the RMP only requires BLM to mitigate threats that would cause the turtle to be listed under the ESA. Plaintiffs argue that (1) the RMP requires BLM to adopt a specific seasonal restriction on activity in the turtle's habitat and (2) BLM failed to explain how the Project's mitigation measures were consistent with the RMP.

#### A.    Standard

Defendant Murphy Company argues that this Court must apply the *Winters* factors to Plaintiffs claims. While the Court rejects that argument with respect to the ESA claims, FLPMA's Multiple Use mandate requires BLM to manage its land according to a wide range of priorities, including timber harvest and wildlife preservation. 43 U.S.C. §§ 1701(a)(7), 1702(c). FLPMA may not contain the same "clear command from Congress" to draw the balance of the equities and the public interest in favor of wildlife species. *See Starbucks*, 602 U.S. at 346. The Court declines to reach the issue because Plaintiffs fail to satisfy the serious questions test.

## B.        Interpreting the RMP

The Court first interprets the RMP to determine what it requires and then assesses whether the Project violates it. *See Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 893 (9th Cir. 2025).

The court interprets the land use plan in three steps: First, it applies the plain meaning if the regulation "'is unambiguous' and 'there is only one reasonable construction of [the] regulation.'" *Id.* at 894 (quoting *United States v. Cal. Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1222 (9th Cir. 2025)). Next, "[i]f the text seems to have more than one plausible meaning, then [the court] must try to resolve the ambiguity by 'carefully consider[ing] the text, structure, history, and purpose of [the] regulation.'" *Id.* (citation omitted). If the ambiguity remains, the court asks "whether the agency's interpretation is reasonable, and, if so, whether it is entitled to deference." *Id.* (citation omitted).

The RMP contains a management directive requiring BLM to "[i]mplement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions." AR012932. Management directives identify what "future actions may or may not be allowed and what restrictions or requirements" constrain those actions. AR012942. The RMP contains a management objective that aims to "[i]mplement conservation measures that reduce or eliminate threats to Bureau Sensitive species to minimize the likelihood of and need for the ESA listing of these species." AR012932. Management objectives are not rules or requirements but are "descriptions of desired outcomes for BLM-administered lands." AR012942. The RMP does not require BLM to survey for the northwestern pond turtle, relying instead on the allocation of reserved lands. AR012932; AR012845.

Page 23 — OPINION AND ORDER

BLM reads the RMP narrowly to apply only to "specific threats" that would cause the species to be listed under the ESA. Plaintiffs read the RMP broadly, arguing that BLM must alter the type, timing, location, and intensity of the Project to mitigate effects on the pond turtle. The RMP is clear. It requires BLM to mitigate known threats to bureau sensitive species in the planning stages. By its text, it is not limited to threats that would cause the pond turtle to be listed under the ESA. The crushing of pond turtles through road construction and human disturbances in overwintering habitat is a known threat to the species recognized by BLM. *See* Ince-Johannsen Decl. Ex. H KSW01390, KSW01332, ECF No. 17-8 (noting BLM's participation in a report addressing crushing threats to the turtle); AR022605 (recognizing conservation strategies that BLM helps develop); AR001004 (recognizing implementing seasonal restrictions around the turtle's overwintering habitat); AR000822 (stating road impacts and habitat loss are threats to the turtle); AR000821 (recognizing "seasonal 'no-entry' restrictions to minimize human-related disturbances" as a conservation strategy). *But see* AR000824 ("The literature lacks discussion on how timber harvest and fuels treatments affect [the turtle]."). The RMP requires BLM to implement mitigation measures for crushing in its "planning of activities and projects." AR012932.

It is also clear, however, that the RMP does not call for any specific type of mitigation planning beyond that it must be responsive to a "specific threat" as well as consistent with the purpose of the mitigation requirement (to reduce the likelihood that the species will be listed under the ESA), the RMP, and the overall statutory structure. Plaintiffs are therefore incorrect that the RMP's text requires BLM to implement a specific Project Design Feature it developed to use if the turtle was listed under the ESA.

C.      **Applying the RMP**

1.      Mitigation Efforts

The record shows that BLM adopted mitigation efforts that avoid harmful effects on the pond turtle. Some of these efforts are not responsive to the specific threat to the turtle's *overwintering* habitat like the facts that BLM would do "no work" in the turtle's aquatic habitat or would make additional *aquatic* habitat for the turtle by restoring streams. AR000823; AR000960. Other efforts address overwintering habitat but not the specific threat posed by road construction and heavy machinery. For example, the Project selects treatments in the overwintering area to maintain overwintering habitat features like canopy cover. AR000824.

One mitigation effort, however, is responsive to the risk posed by road construction and timber harvest. BLM designed the Project to avoid overwintering habitat. AR000824-25. Commercial thinning would not occur within 120 feet of perennial streams where 48% of turtles overwinter. AR000824. Timber harvest and hazardous fuels reduction would not occur within 25 feet of small ponds where 43% of turtles overwinter. AR000825. Hazardous fuels reduction would also not occur within 60 feet of perennial streams where 45% of turtles overwinter. AR000825. By creating buffer zones where high concentration of pond turtles overwinter, BLM responds to the risk posed by "human-related disturbances" in overwintering habitat with a recognized conservation measure "altering . . . the location . . . of management actions." AR012932; AR000821.

The Court cannot say that BLM's use of buffer zones to protect overwintering habitat is inconsistent with the RMP. BLM must manage public lands for multiple use and sustained yield—two broad concepts that include both sustainable timber harvesting and wildlife preservation. 43 U.S.C. §§ 1701(a)(7), 1702(c). This mandate requires BLM to balance preserving bureau sensitive species with ensuring a sustained timber harvest, particularly in the

Harvest Land Base[8] and on O&C Lands.[9] *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 872 (9th Cir. 2017) (recognizing the broad discretion of an agency acting under FLPMA to evaluate economic benefits against other goals); *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125-26 (9th Cir. 2007) (acknowledging that a land use plan struck a balance between resource extraction and environmental protection but accounting for the plan's directives for specific areas). BLM implemented buffer zones to protect overwintering habitat but allowed timber harvest to occur during the turtle's overwintering period. This action was within the agency's discretion to balance the competing objectives of FLPMA and the RMP. Plaintiffs do not raise serious questions that BLM's mitigation strategy is inconsistent with the RMP.

      2.      <u>Adequate Explanation</u>

A federal agency must still offer a rational explanation connecting the facts to its action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 56. In explaining the Project's effects on the turtle, BLM focused on the amount of habitat affected by the Project, stating that it represents less than one half of a percent of the turtle's habitat in Oregon. AR000825-26. BLM concluded the Project "would not affect the species at the overall population level." AR000825. The record shows that BLM considered seasonal restrictions like those Plaintiffs propose. AR000821(stating seasonal restrictions like those Plaintiffs seek are recommended "when buffering is not feasible"). BLM responded to the specific threat posed by road construction and the presence of machinery in overwintering habitat. AR000824-25. BLM relied on FWS special status reports that "genetic research suggests that most dispersal activity occurs within drainages or watersheds . . . and that overland movements are uncommon." AR000821 (citation omitted). BLM recognized that road

---

[8] "Fifty percent (50%) of the [Project] area is designated as HLB, which are lands allocated for sustained-yield forest management to produce a permanent supply of timber." AR000746.

[9] Ninety-four percent of the BLM lands in the Project area are O&C lands. *See* AR000744.

construction and certain treatments would harm overwintering habitat, AR000824, but concluded that the harm would not be significant because of the small amount of the overwintering habitat affected. AR000822; *see also* AR000715 (summarizing the EA's findings and stating "it is unlikely that logging and road construction in overwintering habitat would cause fragmentation, isolate populations, limit dispersal, or reduce the capability of NWPT to respond to stochastic or catastrophic events"). Plaintiffs do not identify inconsistencies or contrary evidence to undermine these conclusions. The APA limits this Court's review to whether BLM's actions are arbitrary and capricious or unsupported by the evidence. 5 U.S.C. § 706(2). Plaintiffs have not raised serious questions that BLM's use of location-based mitigation efforts (aquatic buffer zones) instead of timing-based efforts (seasonal harvest restrictions) was arbitrary and capricious or inadequately explained.

The Court does not address the remaining preliminary injunction factors with respect to the FLPMA claim.

**CONCLUSION**

For the reasons discussed above, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 16) is DENIED.

DATED this 9th day of April 2026.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (he/him)
United States District Judge

Page 27 — OPINION AND ORDER