Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
541.778.6626
971.285.3632

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

**KLAMATH-SISKIYOU WILDLANDS CENTER**, **OREGON WILD**, and **CASCADIA WILDLANDS**,

*Plaintiffs*,

v.

**DOUGLAS JAMES BURGUM** in his official capacity as Secretary of the Interior, **U.S. FISH & WILDLIFE SERVICE**, and **U.S. BUREAU OF LAND MANAGEMENT**,

*Defendants;*

and

**MURPHY COMPANY,**

*Defendant-Intervenor.*

and

**AMERICAN FOREST RESOURCE COUNCIL** AND **ASSOCIATION OF O&C COUNTIES,**

*Defendant-Intervenors.*

Case No. 1:25-cv-2296-MTK

**MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD AND MEMORANDUM IN SUPPORT**

## MOTION

PLEASE TAKE NOTICE that Plaintiffs Klamath-Siskiyou Wildlands Center, et al. hereby move this Court for an order granting leave to introduce and consider extra-record evidence—specifically, the Declaration of Erich Reeder—pursuant to the first and third exceptions to the record-review rule established in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). This motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Erich Reeder and exhibits attached thereto, the Declaration of Counsel, the transcript of the March 17, 2026 preliminary injunction hearing, and the pleadings and records on file in this action.

Pursuant to Local Rule 7-1, and this Court's order of June 24, 2026 (ECF No. 62), counsel for Plaintiffs have conferred in good faith with counsel for Federal Defendants and Defendant Intervenors. Both parties have stated they intend to oppose this motion.

## INTRODUCTION

Plaintiffs respectfully move to supplement the record with the Declaration of Erich Reeder, a retired Biological Science Technician who spent over two decades conducting northern spotted owl surveys for the Bureau of Land Management's Roseburg District. The declaration is offered under the first and third exceptions recognized in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) – to explain the technical subject matter at the heart of this case, and enable the Court to determine whether the agencies considered the relevant factors bearing on their spotted owl occupancy determinations.

This motion addresses a practical difficulty identified during the proceedings before this Court. At the March 17, 2026 hearing on Plaintiffs' Motion for Preliminary Injunction, the parties and the Court recognized that the biological and

statistical premises underlying the 2023 Biological Opinion are not self-evident on the face of the record. The Court accordingly received testimony from Federal Defendants' Senior Biologist to obtain the "background information" needed to understand "the science and methodology behind" the agency's conclusions. PI Hearing 87:12–16. Intervenors agreed it was "appropriate for Your Honor to hear from her on complex subject matter." *Id.* 88:21–22.

The Reeder Declaration performs this same explanatory function for the written record. The Biological Opinion's take and jeopardy analyses rely on specialized distinctions—how the 2012 call-back protocol operates in a landscape dominated by barred owls, the statistical probability of detecting an owl, and the demographic difference between a resident owl and a transient "floater." These concepts dictate the agencies' occupancy determinations, but as recognized at the Preliminary Injunction hearing, the administrative record does not define them in terms accessible to a reviewing court. Mr. Reeder supplies the field context necessary to read that record and understand the methodology employed.

Plaintiffs do not offer this declaration to introduce post-decisional facts or to present a rival scientific opinion. It is offered exclusively to explain the survey methodology and statistical terminology the agencies used. This explanation is a procedural necessity. Under *Motor Vehicle Mfrs. Ass'n v. State Farm*, this Court must determine whether the agencies considered the relevant factors—including imperfect detection of resident spotted owls and current transient owl dynamics—in reaching their decision. 463 U.S. 29, 43 (1983). The Court cannot perform that APA review without first understanding what the underlying science measures and what the record's demographic data measures. The Reeder Declaration bridges that gap.

## BACKGROUND

### A. The Northern Spotted Owl, Barred Owl Competition, and the Survey Framework.

The northern spotted owl (*Strix occidentalis caurina*) is a bird of the mature and old-growth forests of the Pacific Northwest and is listed as threatened under the Endangered Species Act. *Determination of Threatened Status for Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990). The owl's continued decline is driven in significant part by competition from the barred owl (*Strix varia*), a larger and more aggressive species that has expanded into the spotted owl's range. As the agencies themselves recognize, the barred owl competes with the spotted owl for the same nesting habitat and prey, and its presence suppresses the spotted owl's tendency to vocalize. FWS 229–30. Mr. Reeder describes the same dynamic from his years in the field, observing barred owls flying in, harassing, and displacing spotted owls that had responded to survey calls. Reeder Decl. ¶¶ 10, 12.

The agencies detect spotted owls using two survey methods. The first is the call-back survey, in which surveyors travel to a survey area at night and broadcast recorded spotted owl calls, logging any owls that respond. AR 20266. The second is passive acoustic monitoring, or "PAM," in which autonomous recording units are deployed in the field to capture owl vocalizations passively, without any broadcast call to elicit a response; the recordings are later processed to identify spotted owl calls. Reeder Decl. ¶ 14. This case concerns the call-back method, which the agencies used to survey for owls in connection with the Project.

The call-back protocol at issue is the 2012 revision. The Fish and Wildlife Service revised the earlier protocol in 2012 — increasing the required survey effort frequency — specifically to account for the barred owl's suppression of spotted owl responses to call-back surveys. AR 20266; Reeder Decl. ¶ 10. Under the 2012

protocol, positive detections are classified into one of several categories bearing on occupancy, including "Resident Single," "Territorial Pair," and "Status Unknown." AR 20286–87. The meaning and consequences of those classifications are central to the Biological Opinion and to this motion.

### B. The Last Chance Project and the Biological Opinion.

The Last Chance Forest Management Project authorizes timber harvest across the action area. In authorizing the Project, BLM relies on the July 3, 2023 Biological Opinion issued by the Fish and Wildlife Service, which in turn rests on BLM's April 24, 2023 Biological Assessment. FWS 1, 181.

The Biological Opinion applies the 2012 protocol's occupancy classifications to determine where spotted owls are present and what protections apply. To establish "Resident Single Status," the protocol requires the presence or response of a single owl in the same general area on three or more occasions within a breeding season, or multiple responses across several years. AR 20286–87. To establish "Territorial Pair Status," the protocol requires observation of a male and female in close proximity, observation of nesting behavior, or observation of adults with young. *Id*. A detection that does not satisfy these criteria is classified "Status Unknown." *Id*. at 20287. A site with no detections during the survey term is considered unoccupied. *Id*. at 20286-87.

The Biological Opinion applies this classification system to determine whether sites are occupied, which receive site-specific protections, or unoccupied, which do not receive such protections. In the Biological Opinion, the agencies treat all "Status Unknown" detections as non-territorial "floater" or "transient" owls, classify the associated sites as unoccupied, and afford those sites no site-specific protection. FWS 190, 265, 267. Sites that meet the residency thresholds, by contrast, are treated as occupied and trigger management measures designed to avoid take.

### C. The Preliminary Injunction Proceedings and the Court's Receipt of Testimony.

Plaintiffs moved for a preliminary injunction, and the Court heard argument on March 17, 2026. During that hearing, the Court questioned the basis for the Biological Opinion's treatment of "Status Unknown" detections as unoccupied, pressing counsel to identify the "rational grounds" on which the agencies concluded that status unknown means unoccupied for purposes of the governing management plan. PI Hearing 86:1–13; 93:9–13.

As the argument turned to the survey science, the parties treated the subject as a technical issue beyond what counsel could adequately convey. Federal Defendants proposed to rely on their biologist to explain the occupancy methodology, and Intervenors agreed that the court should hear from her given the complexity of the subject matter. PI Hearing 88:21–23. The Court, for its part, indicated that hearing from a biologist would aid its "understanding [of] some of the science and methodology" and provide helpful "background information." PI Hearing 87:12–16.

Federal Defendants then presented Colleen Holland, the Fish and Wildlife Service's Senior Biologist out of the Roseburg Field Office, who testified that she served as the lead in reviewing the consultation for the project and was involved in developing the Biological Opinion. PI Hearing 118:22–24, 119:3–9. The Court placed Ms. Holland under oath and received her testimony as background to aid its understanding of the science, while declining to make the testimony part of the administrative record. PI Hearing 87:12–16; 117:13–118:9.

The testimony and the questioning that followed addressed the technical subjects at the core of this case. They covered the probability that call-back surveys detect resident owls, and the studies underlying the protocol's detection figures, PI Hearing 120:15–121:5; the relationship between the call-back method and passive

acoustic monitoring, including the Appel and Dugger studies, *id.* 121:6–14; 122:8–14; 129:4–13; how each survey method is implemented in the field, *id.* 126:18–128:12; and the classification of sub-threshold "Status Unknown" detections and their treatment in the Biological Opinion, *id.* 131:1–134:8; 139:15–140:12.

The Court denied Plaintiffs' motion for preliminary injunction on April 9, 2026. Dkt. No. 55. Plaintiffs do not contend that the hearing entitles them to present responsive evidence, and they do not rely on the Court's questions as findings. They cite the hearing for a narrower proposition: that the technical subject matter at issue required explanation beyond what the record and the briefing supplied, and that all parties agreed.

**D. The Reeder Declaration.**

Erich Reeder is a recently retired Biological Science Technician who spent 23 years, from 2002 to 2024, surveying spotted owls for the BLM's Roseburg District, and who conducted both call-back and passive acoustic monitoring surveys in the field. Reeder Decl. ¶¶ 3–5, 13–14. Mr. Reeder's experience maps onto the methodology and geography at issue in this case. He surveyed within the Swiftwater Resource Area of the Roseburg District and worked alongside surveyors in the adjacent South River Resource Area, which shares the Project area's topography, forest composition, and prey base. Reeder Decl. ¶ 9. Crucially, the 2012 call-back protocol he implemented for over a decade is the exact same protocol the agencies applied in the Project here. AR 20266; Reeder Decl. ¶ 10. Further, approximately two-thirds of the Project area lies within the Klamath Mountain Province demographic study area, the long-term federal monitoring program whose annual reports the declaration explains. Reeder Decl. ¶ 9. Plaintiffs offer his declaration to explain the technical subjects the Court and the parties identified at the hearing and to situate within the record the data bearing on the agencies' occupancy determinations.

Addressing the detection-probability questions raised at the hearing, the declaration identifies the call-back pair-detection data reported in Dugger (2023) — showing that the probability of detecting a known pair falls to 73 percent when barred owls are present — and explains the biological mechanisms of imperfect detection discussed in Appel (2023). Reeder Decl. ¶¶ 24–25.

Addressing the Biological Opinion's classification of sub-threshold detections as non-territorial "floaters," the declaration defines the "floater" concept as it is used in the record's own sources and identifies how the record's demographic data bears on it. It points to the Klamath Study Area reports' figures on pair occupancy — 99 sites in 2005, declining to 9 in 2020 — and on reproductive output, declining to zero fledglings by 2020, and it situates those figures alongside the Biological Opinion's own acknowledgment of a diminished floater population. Reeder Decl. ¶¶ 26–29; FWS 230.

The declaration also describes the field conditions in which call-back surveys now operate. It relates, for example, that Mr. Reeder's last three spotted owl detections in the years leading up to the Biological Opinion's publication were silent "fly-ins" — owls that approached without vocalizing — including a confirmed pair at a known pair site that remained silent throughout the encounter. Reeder Decl. ¶ 16. Finally, the declaration states that the demographic and operational information it explains predates the 2023 Biological Opinion and was available to the agencies at the time of their decision. Reeder Decl. ¶ 31.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a reviewing court must set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although deferential, the Court's review must be "searching and careful," undertaking a "thorough, probing, in-depth review" to ensure the agency considered

all relevant factors and articulated a rational connection between the facts found and the choice made. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

While judicial review of agency action under the APA is generally focused on the administrative record before the agency at the time of its decision, *Overton Park*, 401 U.S. at 415, the Ninth Circuit has long recognized that this general principle is not an unyielding bar. A reviewing court is never "required to take the agency's word that it considered relevant matters." *Asarco, Inc. v. U.S. Env't Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980). To the contrary, the Ninth Circuit has emphasized that it is "both unrealistic and unwise to 'straightjacket' the reviewing court with the administrative record." *Id.* Indeed, as the Ninth Circuit explained in *Inland Empire*, it "will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 760 n.5 (9th Cir. 1996) (citing *Asarco*, 616 F.2d at 1160).

Accordingly, the Ninth Circuit recognizes four narrow exceptions where consideration of extra-record evidence is appropriate in APA record review cases:

1. When necessary to determine whether the agency has considered all relevant factors and has explained its decision;
2. When the agency has relied on documents not in the record;
3. When supplementing the record or admitting extra-record evidence is necessary to explain technical terms or complex subject matter; or
4. When plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (quoting *Sw. Ctr. for*

*Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)); *see also Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988). While these exceptions are narrowly construed and Plaintiffs bear the burden of demonstrating their application, *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992–93 (9th Cir. 2014), such evidence is properly admitted as background information to facilitate the Court's searching inquiry and ensure effective judicial review. *Asarco*, 616 F.2d at 1159–60.

Where, as here, extra-record evidence is proffered under the first and third *Lands Council* exceptions, the evidence is not offered to substitute the expert judgment of the declarant for that of the agency, but rather "to help the court understand the scientific and technical complexities" of the issue and to assess whether the agency ignored crucial, relevant information in making its determination. *San Luis & Delta-Mendota*, 776 F.3d at 993; *see also Asarco*, 616 F.2d at 1159 (holding that extra-record explanatory evidence is admissible to "give the court background information" and "judge whether the agency considered all relevant factors").

## ARGUMENT

### I. The Reeder Declaration Is Necessary to Explain the Technical Terms and Complex Subject Matter in the BiOp.

The third *Lands Council* exception permits extra-record evidence where it is "necessary to explain technical terms or complex subject matter." 395 F.3d at 1030. That standard is met here. The Biological Opinion's central conclusions rest on survey methodology, statistical detection concepts, and demographic terminology that the record does not define in terms a reviewing court can readily apply. The proceedings before this Court confirm as much: the parties and the Court agreed that these subjects required explanation from a biologist, and the testimony the

Court received identified—but did not resolve—the very technical questions on which the agencies' occupancy determinations turn. The Reeder Declaration supplies the explanation necessary for the Court to understand and evaluate the record the agencies compiled.

### A. The Parties and the Court Have Already Recognized That This Subject Matter Requires Expert Explanation.

The technical complexity of the science underlying the Biological Opinion is not a matter Plaintiffs assert for the first time in this motion; it is common ground. At the March 17, 2026 hearing, Federal Defendants brought their Senior Biologist to the courthouse to explain the agency's occupancy methodology precisely because counsel recognized that the subject exceeded what the briefing and argument could convey—she could explain it, in counsel's words, "better than my lawyer brain could." PI Hearing 86:22–23. Intervenors agreed that it was "appropriate for Your Honor to hear from her on complex subject matter." PI Hearing 88:21–22. The Court, in turn, received the testimony to obtain "background information" and to aid "my understanding [of] some of the science and methodology behind" the agency's determinations. PI Hearing 87:12–16.

That shared recognition is significant for the question now before the Court. The issue at summary judgment is not whether any particular participant understood the science, but whether the record itself contains the technical explanation necessary for effective judicial review of a decision "when highly technical matters are involved." *Asarco*, 616 F.2d at 1160. The parties' agreement that this subject matter called for a biologist's explanation, and the Court's decision to receive that explanation under oath, confirm that the survey biology and occupancy science here are the kind of complex subject matter the third *Lands*

*Council* exception is designed to address.[1]

### B. The Declaration Explains the Biological Basis for Imperfect Detection Addressed in the Record's Studies.

The Biological Opinion and the studies underlying it employ several distinct statistical measures of survey performance that are easily conflated but that mean very different things. The hearing illustrated the problem. When the Court asked whether the survey protocol's probability of locating resident owls was quantified, the Senior Biologist explained that the underlying statistics derived from "a whole litany of citations" that are "not in the appendix of this protocol," and that she "would have to go back to those citations" to identify the figures. PI Hearing 120:19–23. Asked whether the probability was "more or less than 72 percent," she responded by reference to a general design target—"our usual target is around 90 percent"—while noting that she "can't be 100 percent confident." PI Hearing 121:1–5.

These figures are not interchangeable, and understanding the difference is essential to reading the record. The Reeder Declaration explains the biological mechanisms of imperfect detection underlying these statistics. It identifies the call-back pair-detection data reported in Dugger (2023)—which the Biological Opinion itself cites—and explains how Appel (2023) addresses the risks of misclassification caused by that imperfect detection. Reeder Decl. ¶¶ 24–25. Supplying this technical explanation is necessary for the Court to accurately read and weigh the statistical

---

1 The standard governing supplementation at summary judgment does not turn on the procedural history of the case, and Plaintiffs do not contend that the Court's receipt of testimony at the preliminary injunction stage entitles them to present responsive evidence as a matter of parity. That the Court found it necessary to receive sworn testimony on these precise questions does, however, confirm that the subject matter is sufficiently complex to warrant explanation under the third *Lands Council* exception.

data on which the agencies relied.

### C. The Declaration Explains How the Record's Science Bears on Call-Back Surveys.

A central technical question in this case is how research on spotted owl detectability informs the interpretation of the call-back surveys the agencies used. The Court raised that question at the hearing, asking whether "one [could] apply Appel to the call-back surveys that were conducted here." PI Hearing 129:7–9. The Senior Biologist explained that comparing the two survey methods "would have to [involve] an understanding of the assumptions of the two different survey protocols and how they correlate." PI Hearing 122:11–14.

That testimony establishes that the question the Court asked is a genuinely technical one that requires specialized knowledge of how the two methods relate. The Reeder Declaration provides that framework. It does not purport to resolve the merits or to substitute a competing scientific judgment for that of the agencies. It explains an undisputed biological premise—the same barred-owl-driven suppression of spotted owl vocalizations that prompted the 2012 revision of the survey protocol—and describes how that premise bears on the interpretation of detections across both passive acoustic and call-back methods. Reeder Decl. ¶¶ 21, 25. Furnishing that analytical vocabulary is necessary for the Court to understand how the studies in the record relate to the surveys the agencies conducted, and to evaluate the agencies' treatment of that relationship.

### D. The Declaration Supplies the Field Context the Court Sought Regarding How the Surveys Are Conducted.

Finally, understanding the record requires a concrete sense of how the competing survey methods operate on the ground. The Court sought exactly that at the hearing, asking for "a very brief summary of how PAM is implemented in the

field and then how call-back survey is implemented in the field," so that it would have "a clear sense of it and [would] not [be] operating on any assumptions." PI Hearing 126:18–24. The Senior Biologist provided a general description but deferred to the action agency on the operational details, explaining that certain survey decisions were "an internal conversation" at the BLM on which she would "have to defer to the BLM." PI Hearing 123:24–124:2. The Reeder Declaration supplies that operational context from the perspective of a BLM surveyor who implemented both the 2012 call-back protocol and the Service's 2021 draft ARU protocol, describing how each is carried out in the field. Reeder Decl. ¶¶ 13–15. This background places the record's survey terminology in practical context and equips the Court to understand what the agencies' survey results reflect.

## II. The Reeder Declaration Is Necessary to Enable the Court to Determine Whether the Agencies Considered All Relevant Factors.

Under *State Farm*, this Court must determine whether the agency considered all "relevant factors" in reaching its decision. 463 U.S. 29 at 43. The first *Lands Council* exception permits extra-record evidence where it is necessary "to determine whether the agency has considered all relevant factors and has explained its decision." 395 F.3d at 1030. The exception reflects the principle that a court is not "required to take the agency's word that it considered relevant matters," *Asarco*, 616 F.2d at 1160, but it does not permit a plaintiff to introduce post-decisional facts or rival opinions to attack the agency's conclusions, *see Blue Mountains Biodiversity Project*, No. 6:24-cv-01641-MTK, Dkt. No. 72 at 16–17.

The Reeder Declaration is calibrated to this distinction. A pivotal step in the Biological Opinion's reasoning—the treatment of survey detections that do not meet the protocol's residency thresholds—rests on a biological premise that the record does not explain in terms the Court can evaluate. The declaration is offered not to

show that the agencies reached the wrong conclusion, but to define the relevant terms and organize the record's own demographic data. This translation is necessary for the Court to determine whether the agencies accounted for the factors that bear on that premise.

### A. The Record Does Not Explain Why "Status Unknown" Detections Are Treated as Unoccupied.

The Biological Opinion's take and jeopardy analyses depend on a classification step: sites where owls were detected, but where the detections did not satisfy the 2012 protocol's criteria for a "Resident Single" or "Territorial Pair," are treated as unoccupied and afforded no site-specific protection. The record does not explain the basis for equating a detection-bearing "status unknown" result with an affirmative determination of non-occupancy, and the connection is not self-evident. This Court's inquiries at the hearing highlighted this issue, pressing counsel to identify "on what rational grounds . . . the agency [is] concluding that status unknown means unoccupied." PI Hearing 93:9–13. The Court further noted that the source of that classification decision was not apparent from the protocol itself. PI Hearing 95:24–96:2.

The testimony the Court received did not resolve the question. The Senior Biologist agreed that nothing in the survey protocol directs that status-unknown sites be treated as unoccupied, PI Hearing 139:15–17, and confirmed that the Biological Opinion treats all "status unknown" detections as "transient or floater owls" that receive no site-specific protection, *id.* 140:7–12. The Biological Opinion's classification therefore rests on a biological premise: that a detection falling short of the protocol's "Resident Single" or "Territorial Pair" thresholds represents a non-territorial "floater" rather than a resident owl. Whether the agencies considered the relevant factors bearing on that premise, and whether they adequately explained

their decision, cannot be assessed without first understanding what the premise means and what the record says about it.

### B. The Declaration Defines the "Floater" Concept and Situates the Record's Demographic Data Bearing on It.

Evaluating the agencies' floater premise requires an understanding of what a "floater" is as a matter of spotted owl demography. It is a technical concept the Biological Opinion relies upon but does not fully contextualize for the reviewing court. The Reeder Declaration supplies that biological context, explaining that the term historically describes dispersing juveniles and young non-breeding owls prospecting for territorial vacancies, as characterized in Forsman (2002) and in the Fish and Wildlife Service's 2012 critical habitat designation. Reeder Decl. ¶ 26. That context matters because the existence of such a floater population is what gives the agencies' classification its biological content: the inference that a "status unknown" detection reflects a transient rather than a resident spotted owl depends on the presence and size of a pool of transients on the landscape to draw from.

The declaration then identifies the demographic data in the record that bears on that factor. It identifies the Klamath Study Area demography reports—covering much of the Project area—showing the collapse in pair occupancy and reproductive output over the relevant period, including the record of zero fledglings produced in the study area's final years. Reeder Decl. ¶ 27. And it situates that data alongside the Biological Opinion's own acknowledgment that, "[w]ith the barred owl impact reducing spotted owl populations and demographic rates[,] it is likely the floater population has decreased," while "the true proportion of these individuals within the population is unknown." Reeder Decl. ¶ 28 (quoting FWS 230). This is not new science and it is not a competing opinion; it fills an analytical gap in the record by explaining the biological premise on which the agency's classification rests.

### C. This Explanation Is Necessary for the Court to Perform Its Review Function.

With those definitions and that data identified, the Court is equipped to do what the first *Lands Council* exception contemplates: determine whether the agencies "considered all relevant factors and ... explained [their] decision." 395 F.3d at 1030. The presence and size of a floater population is a factor directly relevant to the agencies' treatment of sub-threshold detections, and the record contains data—the demography reports and the Biological Opinion's own statements about the diminished floater pool—that speaks to it. But that data is technical, dispersed across multiple documents, and stated in terms the record never defines. Without an explanation of what a "floater" is and where the record addresses the factor, the Court would be left "to take the agency's word" that the classification rests on a considered judgment. *Asarco*, 616 F.2d at 1160.

Consistent with the limits of the exception, the Reeder Declaration is offered for this evaluative purpose alone. It does not ask the Court to find that the agencies' floater premise is biologically incorrect, to resolve whether any particular detection reflects a resident owl, or to substitute Mr. Reeder's judgment for the agencies'. Those are merits questions for briefing on the administrative record. The declaration's function at this stage is narrower and properly within the first *Lands Council* exception: to define the relevant terms so that the Court can determine whether the agencies grappled with a factor plainly relevant to a premise on which their occupancy determinations depend.

## III. The Reeder Declaration Explains Information That Was Available to the Agencies at the Time of Decision, Not Post-Decisional Science.

Plaintiffs anticipate Federal Defendants will argue the declaration should be excluded because it is dated 2026 and therefore postdates the July 2023 Biological Opinion. That objection misunderstands both the nature of the declaration and the

function of the first *Lands Council* exception. The declaration is not offered to supply a post-decisional justification for the agencies' action, nor to introduce scientific developments that emerged after the decision was made. It is offered to explain information that was before the agencies when they decided—and to do so is the very purpose of the exception, which permits a court to look beyond the record precisely to determine "what matters the agency should have considered but did not." *Asarco*, 616 F.2d at 1160.

### A. A Declaration's Date Does Not Disqualify It Where It Explains Information Available to the Agencies at the Time of Decision.

The Ninth Circuit prohibits the use of post-decisional information as a basis for evaluating an agency's prior decision. *See, e.g., Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012). This Court has similarly held that extra-record declarations may not be used to introduce "additional facts or opinions" that were not before the agency. *Blue Mountains Biodiversity Project*, No. 6:24-cv-01641-MTK, Dkt. No. 72 at 16. But that limitation governs the *subject matter* of the evidence, not the date the declaration was signed. Every declaration offered under the *Lands Council* exceptions postdates the agency decision it addresses; what matters is not the date of the document but whether the information it explains was available to the agency at the relevant time. *See Lands Council*, 395 F.3d at 1030; *Asarco*, 616 F.2d at 1160.

Plaintiffs are careful to observe the distinction that governs here. They do not contend that the declaration itself belongs in the administrative record, and they do not offer Mr. Reeder's continuing field experience—which extended through 2024—as post-decisional proof of any fact bearing on the merits. That experience is relevant to his qualification to explain the record, not to introduce new facts into it. Indeed, the core materials Mr. Reeder explains—the 2012 survey protocol, the

Klamath Study Area demography reports, and the Dugger (2023) and Appel (2023) studies—were published and available to the agencies prior to the July 2023 Biological Opinion. Reeder Decl. ¶ 31. The declaration is offered for the narrow, permissible purpose of explaining information that predated and was available to the agencies in 2023.

### B. The Information the Declaration Explains Was Before the Agencies When They Decided.

The substantive material the declaration identifies and explains was in the agencies' possession well before the 2023 Biological Opinion was issued. As Mr. Reeder describes, the demographic data documenting the decline of resident spotted owls and the collapse of reproductive output—including the Klamath Study Area annual reports discussed in Section II—were generated by long-running federal monitoring programs and were available to and discussed by agency staff for years. Reeder Decl. ¶¶ 17, 31. The published literature the declaration situates within the record, and the barred-owl-driven dynamics affecting call-back detection that prompted the 2012 revision of the survey protocol, were likewise known to the agencies at the time of decision. *Id.* ¶¶ 10, 31. Mr. Reeder states that, apart from his own field observations shared with BLM staff, the information he explains "consists of published science and agency data that was already in the agencies' possession." *Id.* ¶ 31.

That the agencies possessed this information is confirmed by the Biological Opinion, which acknowledges the findings in Dugger (2023) and the diminished floater population. FWS 230; Reeder Decl. ¶¶ 28, 31. The declaration does not introduce this information for the first time; it explains information the agencies already held in terms that allow the Court to determine whether the agencies grappled with it.

### C. Admission Is Consistent with the Purpose of the First Exception.

Because the declaration explains demographic context and operational realities that were available to the agencies when they made their decision, it fits squarely within the first *Lands Council* exception and complies with the rule against post-decisional evidence. It does not introduce new facts or rival merits opinions, and it does not ask the Court to weigh scientific developments the agencies never had the chance to consider. It does the opposite: it equips the Court to determine whether the agencies "considered all relevant factors and . . . explained [their] decision," *Lands Council*, 395 F.3d at 1030, by explaining information those agencies already possessed. Admitting the declaration for that purpose serves the exception's core function and is fully consistent with the principle that a reviewing court need not "take the agency's word that it considered relevant matters." *Asarco*, 616 F.2d at 1160.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant leave to supplement the record with the Declaration of Erich Reeder.

Respectfully submitted this 20th day of August, 2026,

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
+1 541.778.6626
+1 971.285.3632