ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Energy and Natural Resources Division
SHANNON BOYLAN (DC Bar No. 1724269)
Natural Resources Section
ALISON C. FINNEGAN
Senior Trial Attorney (PA Bar No. 88519)
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
(202) 598-9584 (Boylan)
(202) 532-3312 (Finnegan)
shannon.boylan@usdoj.gov
alison.c.finnegan@usdoj.gov

*Counsel for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**MEDFORD DIVISION**

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER**, **OREGON WILD**, and **CASCADIA WILDLANDS**,<br><br>Plaintiffs,<br><br>v.<br><br>**DOUGLAS JAMES BURGUM**, in his official capacity as Secretary of the Interior, **U.S. FISH & WILDLIFE SERVICE**, and **U.S. BUREAU OF LAND MANAGEMENT**,<br><br>Defendants. | Case No. 1:25-cv-2296-MTK<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD** |

## TABLE OF CONTENTS

Page


I. INTRODUCTION ........................................................ 1

II. FACTUAL BACKGROUND ........................................................ 2

III. STANDARD OF REVIEW ........................................................ 4

IV. ARGUMENT ........................................................ 6

A. The Reeder Declaration Does Not Satisfy The Requirements Of The "Relevant Factors" Exception. ........................................................ 7

B. Plaintiffs Have Not Satisfied The Required Elements Of The "Technical Terms Or Complex Subject Matter" Exception. ........................................................ 13

C. The Reeder Declaration Is Post-Decisional And Was Not Before the Agencies When they Made their Decisions ........................................................ 16

D. Additional Explanation, If Necessary, Should Come From The Agency. ........................................................ 17

E. Federal Defendants Did Not Agree To Extra-Record Evidence On The Topics In The Reeder Declaration (Or Any Other Topic). ........................................................ 17

F. The Reeder Declaration Has Inaccuracies And Other Flaws That Render It Unreliable And, Therefore, Unfit For The Court's Consideration. ........................................................ 19

V. CONCLUSION ........................................................ 21

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alsea Valley All. v. Evans*,
143 F. Supp. 2d 1214 (D. Or. 2001) ... 13

*Animal Def. Council v. Hodel*,
840 F.2d 1432 (9th Cir. 1988) ... 1, 6

*Asarco Inc. v. U.S. Env't Prot. Agency*,
616 F.2d 1153 (9th Cir. 1980) ... 7, 15, 17

*Bundorf v. Jewell*,
142 F. Supp. 3d 1138 (D. Nev. 2015) ... 13

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
889 F.3d 584 (9th Cir. 2018) ... 13

*Camp v. Pitts*,
411 U.S. 138 (1973) ... 17

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
Case No. 6:24-cv-01641-MTK, 2026 WL 1346855 (D. Or. May 14, 2026) ... 17

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ... 5

*Cook Inletkeeper v. U.S. Env't Prot Agency*,
400 F. App'x 239 (9th Cir. 2010) ... 8

*Ctr. for Biological Diversity v. Skalski*,
61 F. Supp. 3d 945 (E.D. Cal. 2014) ... 13

*Earth Island Inst. v. Evans*,
256 F. Supp. 2d 1064 (N.D. Cal. 2003) ... 18

*Friends of Rapid River v. Probert*,
427 F. Supp. 3d 1239 (D. Idaho 2019) ... 8, 11, 13

*Friends of the Earth v. Hintz*,
800 F.2d 822 (9th Cir. 1986) ... 8

*Greater Hells Canyon Council v. Stein*,
Case No. 2:17-cv-00843-SU, 2018 WL 3966289 (D. Or. June 11, 2018) ... 11

*In Re Delta Smelt Consol. Cases*,
No. 1:09–CV–1053 OWW DLB, 2010 WL 2520946 (E.D. Cal. June 21, 2010) ... 7

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
379 F. Supp. 2d 1071 (N.D. Cal. 2005) ... 6

*Klamath-Siskiyou Wildlands Center et al. v. U.S. Bureau of Land Mgmt., et al.*,
Case. No. 19-cv-1810, 2021 WL 5356969 (D. Or. Aug. 24, 2021) ... 21

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) ... 5, 6, 7

*Mississippi v. Env't Prot. Agency*,
744 F.3d 1334 (D.C. Cir. 2013) .......... 16

*Morgan v. United States*,
304 U.S. 1 (1938) .......... 5

*Native Ecosystems Council v. Weldon*,
232 F. Supp. 3d 1142 (D. Mont. 2017) .......... 15

*Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv*.,
460 F.3d 1125 (9th Cir. 2006) .......... 16

*Nw. Env't Advocs. v. U.S. Fish & Wildlife Serv.*,
No. 3:18-cv-01420-AC, 2019 WL 6977406 (D. Or. Dec. 20, 2019) .......... 6, 12

*Pinnacle Armor v. United States*,
923 F. Supp. 2d 1226 (E.D. Cal. 2013) .......... 7, 10

*Rybacheck v. U.S. Env't Prot. Agency*,
904 F.2d 1276 (9th Cir. 1990) .......... 6

*San Luis & Delta–Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) .......... 21

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) .......... 7, 12

*Save the Colo. v. U.S. Dep't of the Interior*,
517 F. Supp. 3d 890 (D. Ariz. 2021) .......... 5

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
100 F.3d 1443 (9th Cir. 1996) .......... 5, 17

*Thompson v. U.S. Dep't of Labor*,
885 F.2d 551 (9th Cir. 1989) .......... 5, 17

*United States v. Morgan*,
313 U.S. 409 (1941) .......... 5

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
435 U.S. 519 (1978) .......... 5

**Statutes**

5 U.S.C. § 706 .......... 1, 4, 5

5 U.S.C. § 706(2)(A) .......... 1

16 U.S.C. § 1536(a)(2) .......... 16

## I. INTRODUCTION

The administrative records lodged by the U.S. Bureau of Land Management ("BLM") and the U.S. Fish and Wildlife Service ("FWS") comprise thousands of pages of analysis and reflect the careful decision-making applied to the Last Chance Project, a forest management project in southern Oregon. The administrative records are more than sufficient to review Plaintiffs' challenges to the agencies' decisions, including FWS's biological opinion ("BiOp") regarding the effects of the Last Chance Project on the northern spotted owl ("NSO"), a species listed as threatened under the Endangered Species Act ("ESA"). And here, because Plaintiffs' claims arise under the Administrative Procedure Act ("APA"), the court may only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, this Court's task is to apply this standard of review to the administrative records the agencies presented to the Court, not to engage in de novo fact-finding or substitute its judgment for that of the agency. *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), *modified*, 867 F.2d 1244 (9th Cir. 1989); 5 U.S.C. § 706.

Plaintiffs nonetheless seek to introduce extra-record evidence in the form of a declaration from Erich Reeder, a recently retired BLM employee. *See* Dkt. 65 ("Pl. Br."); Dkt. 66 ("Reeder Decl."). But Plaintiffs fall well short of demonstrating that two of the narrow exceptions to the well-established rule against consideration of extra-record evidence apply. Under the relevant factors exception, extra record evidence may be considered only if it points out an entirely new general subject matter that the defendant agency failed to consider. Here, however, Plaintiffs fail to make that showing because documents in the administrative record discuss and analyze the topics in the Reeder Declaration at length. Nor does the Reeder Declaration satisfy the "technical terms and complex subject matter" exception. Rather than explain complex and

technical material, Plaintiffs rely on the Reeder Declaration to elevate the field experience of a former agency employee over the analysis and opinions of the expert agency about the appropriate method for determining when a NSO territory should be deemed occupied. Case law is clear that Plaintiffs' proposed approach is forbidden.

The Reeder Declaration also mischaracterizes scientific literature, misapprehends the facts, and demonstrates that the declarant lacks qualifications to opine on the extensive and thorough ESA Section 7 analysis undertaken for the Last Chance Project. Perhaps recognizing these fatal flaws, Plaintiffs suggest that the other parties consented to the admission of extra record evidence because the Court heard testimony from a FWS biologist at the hearing on Plaintiffs' motion for preliminary injunctive relief. This argument is flawed both factually and legally. The administrative record is more than sufficient for the Court's review, the Reeder Declaration is improper extra-record evidence that does not satisfy any exception to the record review rule, and Plaintiffs' motion should be denied.

## II. FACTUAL BACKGROUND

The Last Chance Project is a forest management project authorized by BLM in Douglas, Jackson, and Josephine Counties, in southern Oregon. *See* Dkt. 55 at 2. The Project calls for different management objectives and treatment to implement BLM's 2016 Southwestern Oregon Resource Management Plan and the 1937 Oregon & California Revested Lands Act, including timber harvesting, commercial thinning, and hazardous fuels reduction in different parts of the project area, and authorizes timber sales through separate decision records. *Id*. The Project area includes habitat for the threatened NSO. Accordingly, BLM initiated consultation under ESA Section 7 with FWS over the Project's impacts on NSOs in April 2023. FWS finalized the BiOp in July 2023. FWS000181-477. To determine occupancy, BLM conducted surveys pursuant to

FWS's 2012 Survey Protocol, which utilizes call-back surveys in the field. FWS015210-51; *see also* FWS000264-65. For the Last Chance Project, all nesting, roosting, and foraging ("NRF") habitat has been and will continue to be surveyed within 1.3 miles of the proposed treatment units and within NSO sites to be affected by the proposed action. FWS000263-65; *see also* BLM09789-10082. In the Survey Protocol, FWS acknowledged that while barred owls influence NSO detectability (because they are less likely to respond to calls when barred owls are present), the protocol was designed to incorporate reduced NSO calling probability in the presence of barred owls. *Id*.; *see also* FWS015213. The prior two years of BLM surveys indicated that eight NSO sites in the Last Chance Project area are considered occupied (six unique/two alternate), twenty-four are unoccupied, and one is currently unknown. FWS000265 (Table 10).

Although the Project will result in adverse impacts to NSO habitat, FWS concluded that the proposed actions were unlikely to result in the incidental take of NSOs. FWS000271-344. FWS noted that in all occupied sites, BLM will implement take avoidance measures, including generally avoiding removal and downgrade of NRF habitat in the 0.5-mile core-use area of occupied sites. FWS000343-44. FWS also considered the treatments that are proposed in those territories and concluded that habitat-fitness conditions (through habitat degradation) will not be reduced within any of these sites so as to significantly impair essential behavioral patterns, including breeding, feeding, or sheltering of the NSO. *Id*. To ensure actions will not result in adverse effects to actual NSOs in the Project area, the BiOp explains that BLM will continue to conduct NSO surveys at known NSO sites and timber harvest areas before on-the-ground timber activities commence. FWS000218. BLM will defer harvest in sites where occupancy status is unknown until two years of surveys are completed and occupancy status is determined. *Id*. If NSOs (territorial pairs or resident singles) are located during surveys, the proposed actions

within those sites would be dropped or modified to eliminate potential adverse effects that could result in take of the species. FWS000343.

In light of the Project's design features (including seasonal restrictions on activities, restrictions on how close timber harvest can occur to any occupied NSO site, and requirements to avoid incidental take by conducting surveys of the Project area until completion of project activities), limitations within occupied NSO sites, and the commitment to conduct further surveys to ensure continued avoidance of incidental take, FWS concluded the Last Chance Project is not likely to jeopardize the continued existence of the NSO or result in the destruction or adverse modification of its designated critical habitat. FWS000345.

Plaintiffs filed their lawsuit on December 9, 2025. Dkt. 1. The Complaint includes claims arising under the ESA, the Federal Land Policy and Management Act ("FLPMA"), and the National Environmental Policy Act. *See id*. Plaintiffs filed a motion for preliminary injunctive relief on February 13, 2026, *see* Dkt. 16, arguing in part that Plaintiffs were likely to succeed on the merits of their ESA and FLPMA claims. *Id*. On February 27, 2026, the agencies lodged their administrative records and filed their opposition to Plaintiffs' motion. *See* Dkt. 32, 36. The Court held a hearing on Plaintiffs' motion for preliminary injunctive relief on March 17, 2026. Dkt. 48. The Court denied Plaintiffs' motion in a written order and opinion on April 9, 2026. Dkt. 55. Plaintiffs now seek to have the Court consider extra-record evidence in ruling on the parties' forthcoming cross-motions for summary judgment. Dkt. 65.

## III. STANDARD OF REVIEW

Judicial review in this case is governed by the record review principles embodied in the APA, 5 U.S.C. § 706. A court's task in cases like this one "is to assess the lawfulness of the agency's action based on the reasons offered by the agency. . . not to 'probe the mental processes'

of agency decision-makers." *Save the Colo. v. U.S. Dep't of the Interior*, 517 F. Supp. 3d 890, 897 (D. Ariz. 2021) (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938) (per curiam)). The focal point of judicial review is "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "The whole . . . record . . . consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation modified).

When an agency has compiled its administrative record and certified its completeness, that certification is entitled to a strong presumption of regularity. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The presumption of regularity reflects the judiciary's respect for a coordinate branch of government. *United States v. Morgan*, 313 U.S. 409, 422 (1941). A motion to "supplement" the administrative record with extra-record documents that an agency did not consider should only be granted in limited circumstances. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Ordinarily, if an agency's stated reasons for acting are "not sustainable on the administrative record made," then the matter should be "remanded to [the agency] for further consideration." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978). In only four exceptional circumstances may a court depart from the ordinary course and consider extra-record material in a record-review case: (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith." *Lands Council*, 395 F.3d at 1030; *see Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). "The

scope of these exceptions . . . is constrained, so that the exception does not undermine the general rule." *Lands Council*, 395 F.3d at 1030. Although "widely accepted, these exceptions are narrowly construed and applied." *Id.* "[A] party seeking to invoke [any of] the *Lands Council* exceptions must first show the administrative record is inadequate to effectively review the challenged action." *Nw. Env't Advocs. v. U.S. Fish & Wildlife Serv.*, No. 3:18-cv-01420-AC, 2019 WL 6977406, *7-8 (D. Or. Dec. 20, 2019).

## IV. ARGUMENT

Before extra-record material may be considered, a movant must first prove that the existing administrative record is inadequate. *Hodel*, 840 F.2d at 1437 (review of extra-record evidence inappropriate where plaintiff "makes no showing that the district court needed to go outside the administrative record to determine whether the [agency] ignored information"). The administrative records in this case document the agencies' thorough analysis and show that they considered all relevant information as required by the ESA and APA. Plaintiffs make no effort to satisfy their threshold burden of showing that the administrative record is so bare on the facts that it would "effectively frustrate[] judicial review." *Id.* at 1436; *see also Rybacheck v. U.S. Env't Prot. Agency*, 904 F.2d 1276, 1296 n. 25 (9th Cir. 1990) (denying motion to supplement where "original record [ ] adequately explains the basis of [the agency's decision] and demonstrates that the [agency] considered the relevant factors"); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1087 (N.D. Cal. 2005) (for "extra-record material to be considered, a plaintiff must first make a showing that the record is inadequate."). Rather, they characterize the Reeder Declaration as necessary for the Court's review and contend that it satisfies two different *Lands Council* exceptions. On this basis alone, the Court should deny Plaintiffs' motion. Moreover, as explained below, Plaintiffs fail to satisfy the requirements of

either *Lands Council* exception on which they rely. In short, the Reeder Declaration is not fit for the Court's consideration for multiple reasons.

### A. The Reeder Declaration Does Not Satisfy The Requirements Of The "Relevant Factors" Exception.

The first *Lands Council* exception is called the "relevant factors" exception. 395 F.3d at 1030. This exception has been described as the most difficult to apply. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014). The exception does not permit district courts to use extra-record evidence to judge the wisdom of the agency's action. *Id.* (citing *Asarco Inc. v. U.S. Env't Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980)). That is, "[r]eviewing courts may admit evidence under this exception only to help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious." *Id*. A court is "never permitted" to use extra record evidence under the relevant factors exception in order "to determine the correctness or wisdom of the agency's decision." *Id*.

"[T]o satisfy the 'relevant factors' exception, a plaintiff must establish more than just that the document is relevant. In fact, the document in question must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider." *Pinnacle Armor v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) (quoting *In Re Delta Smelt Consol. Cases*, No. 1:09–CV–1053 OWW DLB, 2010 WL 2520946, at *5 (E.D. Cal. June 21, 2010)). "[T]he 'relevant factors' exception only applies when [agencies] fail to consider a general subject matter that is demonstrably relevant to the outcome of the agency's decision, not when specific hypotheses and/or conclusions are omitted from consideration." *Id.* Where the record contains sufficient information to explain how the agency used the information before it and why it reached its

decision, the exception does not apply. *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1263 (D. Idaho 2019); *Cook Inletkeeper v. U.S. Env't Prot Agency*, 400 F. App'x 239, 240-41 (9th Cir. 2010). Nor is supplementation permitted to bolster the record or supply background information. *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986) ("The discovery sought by the appellants might have supplied a fuller record, but otherwise does not address issues not already there.") (footnote omitted). Here, the Reeder Declaration addresses topics that already are considered at length in the administrative record, making the "relevant factors" exception inapplicable.

***First***, Plaintiffs incorrectly argue that the Reeder Declaration "supplies that biological context" and "identifies the demographic data" regarding non-territorial floater NSOs. Pl. Br. at 15. But the BiOp itself defines and explains the term "floater" multiple times, in plain language. *E.g.*, FWS0000229-30 (NSO populations include a territorial and a non-territorial component, the latter of which is sometimes referred to as floaters); *see also* FWS000267. The BiOp also assessed the effects of the Last Chance Project on non-territorial NSOs and explained that habitat will remain available to support this component of the population. FWS000229-30 (a substantial amount of dispersal quality habitat outside of known home ranges will retain function and continue to support transient non-territorial floater NSOs post-treatment); FWS000322-23; FWS000324. The BiOp also addresses the likely effects of barred owls on the floater component of the NSO population. FWS000229.[1] Thus, the administrative record already contains ample information about floater NSOs. The citations above further demonstrate there is no merit to

[1] Recent scientific literature discusses the possibility of barred owls increasing the floater component of the NSO population through displacement of breeding NSOs from territories where they become undetectable floaters. This information also is in the administrative record, *e.g.*, FWS002620 (Dugger et al. 2016 p. 95), rendering the Reeder Declaration's commentary as cumulative.

Plaintiffs' assertion that "data is technical, dispersed across multiple documents, and stated in terms the record never defines." *Id*. Indeed, elsewhere in their brief, Plaintiffs appear to concede that information about floater NSOs can be found in "the demography reports and the Biological Opinion's own statements about the diminished floater pool." Pl. Br. at 16. And the Reeder Declaration itself quotes discussion on floater NSOs from the BiOp. Reeder Decl. ¶ 28. In short, the BiOp includes ample discussion and analysis of the effects of the Last Chance Project on this component of the NSO population. Plaintiffs simply cannot demonstrate that the administrative record omits consideration of these issues and, therefore, cannot satisfy the "relevant factors" exception.

***Second***, the Court should reject any argument that the Reeder Declaration supplies entirely new information on "[m]any of the biological factors which make [barred owls] such a problem for NSOs[.]" Reeder Decl. ¶ 12. This issue is addressed in detail in at least two sections of the BiOp, and covers the very same issues (competition for habitat and prey, larger size, greater nesting density, and higher reproductive output) that the Reeder Declaration purports to describe. *See* FWS000235-44; FWS000291-93. The Reeder Declaration also contains personal observations about barred owls "harassing, and chasing off NSOs[.]" Reeder Decl. ¶ 10. But the Court does not need firsthand observations to substantiate this barred owl behavior. It is well established that competition with barred owls "is the current primary driver of [NSO] population decline" throughout the species' range, a fact discussed at length in the BiOp. FWS000235-44.

***Third***, the Reeder Declaration unnecessarily opines at length on issues that are already in the record. Specifically, the Declaration states that NSOs are "becoming increasingly harder to detect," all as part of the declarant's position that FWS's 2012 Survey Protocol is insufficient for

detecting NSOs. Reeder Decl. ¶ 16. But the difficulty in detecting NSOs is not new information and cannot be the basis of invoking the "relevant factors" exception. *See Pinnacle Armor*, 923 F. Supp. 2d at 1234 ("[T]he document in question must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider.") (citation omitted). Scientific studies considered by FWS and included in the administrative record indicate that NSO pairs are rare on the landscape and thus detection rates are substantially lower. FWS000236 (citing Dugger et al. 2023); FWS000254 (same); FWS000292 (noting that occupancy of NSO sites continues to decline, likely due to widespread barred owl occupation). The Reeder Declaration itself quotes language from the BiOp that the NSO floater population likely has decreased, thus undercutting any notion that the declaration presents new information for the Court's consideration. *See* Reeder Decl. ¶ 28 (quoting from the BiOp, FWS000230). The graph in the Reeder Declaration documenting the increase in barred owl detections and decrease in NSO detections similarly fails to provide any new information for the Court's consideration. *See id.* at ¶ 18.[2] To the contrary, the graph is reproduced from a report that is in the administrative record, *see* FWS004955, as the declaration acknowledges. Reeder Decl. ¶ 18.

***Fourth***, similarly the Reeder Declaration expresses the declarant's view on another issue already covered in the record: that the occupancy threshold that requires the observed presence of a female and male to define pair status may be too high. *Id.* at ¶ 21. But on this matter, neither the Reeder Declaration nor the study that it repeatedly cites (Appel et al. (2023)) offer anything new for the Court to consider. For the Last Chance Project, resident singles were given

---

[2] Elsewhere, the report addresses movement of NSOs in their territories in response to barred owls. FWS004960.

the same protection as identified pairs. FWS000297-98; FWS000317. In other words, sites are considered occupied whether a territorial individual or a territorial pair is detected. *See id*. The BiOp discusses detections that did not meet occupancy status thresholds as outlined under the 2012 Survey Protocol and describes how the Last Chance Project will retain sufficient habitat to provide for the life history needs of non-territorial floater NSOs. FWS000322-23. The Reeder Declaration simply does not explain the survey methodology and statistical terminology in a way that already has not been presented. To the contrary, the survey methodology that supplied the data on which the BiOp is based is fully addressed in the administrative record. *See* FWS000253. And to the extent the Reeder Declaration appears to urge that "status unknown" sites actually should be treated as occupied for the purposes of management considerations, this too is improper. *See* Reeder Decl. ¶ 20. FWS made its determination pursuant to the 2012 Survey Protocol. The protocol is designed to ensure a high probability of locating resident NSOs and identifying NSO territories that may be affected by a proposed management activity, thereby minimizing the potential for unauthorized take. FWS015213-14. Courts have declined to consider extra-record declarations of former agency employees on similar facts where it is clear, despite protestations to the contrary, that the declarations are offered to suggest that the agency should have taken a different course of action. *E.g.*, *Friends of Rapid River*, 427 F. Supp. 3d at 1263-64; *Greater Hells Canyon Council v. Stein*, Case No. 2:17-cv-00843-SU, 2018 WL 3966289, at *6 (D. Or. June 11, 2018) (submissions were "an attempt to provide an alternate and preferred version of the facts" to persuade the Court that the agency's decision was in error, which "is precisely the type of extra-record evidence that the court may not consider"), *report & recommendation adopted*, 2018 WL 3964801 (D. Or. Aug. 17, 2018), *aff'd*, 796 F. Appx. 396 (9th Cir. 2020). This Court should do the same.

***Finally***, Mr. Reeder's statements about his personal observations and experiences are not "explanatory background" as that term has been interpreted regarding the first *Lands Council* objection. To the contrary, they are field observations offered to substantiate Plaintiffs' effort to undermine the reliability of the 2012 Survey Protocol.[3] Field observations are not a substitute for FWS's expert analysis and judgment under ESA Section 7(a)(2) about whether an action is likely to jeopardize the continued existence of NSOs, as set forth in the BiOp. In short, Mr. Reeder's observations do not "explain the survey methodology and statistical terminology the agencies used." Pl. Br. at 2.

Thus, as shown, the administrative record amply addresses the issues presented in the Reeder Declaration. Plaintiffs characterize the Reeder Declaration as serving an "explanatory function," "defin[ing]" concepts and relevant terms, "[f]urnishing that analytical vocabulary," demonstrating "context," and otherwise "provid[ing]… background." Pl. Br. at 2, 5, 7, 12, 16. But these phrases are code for evading the well-established rule against using the "relevant factors" exception to present the Court with "extra-record evidence to judge the wisdom of agency action" *Nw. Env't Advocs.*, 2019 WL 6977406, at *7. It is "<u>never permitted</u>" for a court to use extra-record evidence "to determine the correctness or wisdom of the agency's decision." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993 (citations omitted) (emphasis added). The administrative records contain sufficient information to explain how the agencies used the

[3] Mr. Reeder recounts three visual observations of otherwise non-responsive NSOs during surveys from 2020 to 2022. Reeder Decl. ¶ 16. Notably, the PAM that Mr. Reeder apparently favors as a survey methodology would not have assisted detecting the NSOs that Mr. Reeder observed. Call-back surveys, on the other hand, do allow for visual detections and would result in positive detections under the 2012 Survey Protocol. *See* FWS15232 (requiring notation of type of detection, e.g., audio, visual, or both).

information before them and why they reached their decisions, thus the relevant factors exception does not apply. *Friends of Rapid River*, 427 F. Supp. 3d at 1263.

**B. Plaintiffs Have Not Satisfied The Required Elements Of The "Technical Terms Or Complex Subject Matter" Exception.**

The third *Lands Council* exception—allowing extra-record evidence as background information on complex issues—also is inapplicable here. *Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1147 (D. Nev. 2015). Supplementation under the "technical terms or complex subject matter" exception is inappropriate if it is offered to suggest that the federal agency did not give some information sufficient weight or if it is used to challenge the correctness of the agency's decisionmaking. *Ctr. for Biological Diversity v. Skalski*, 61 F. Supp. 3d 945, 952 (E.D. Cal. 2014) (rejecting several declarations offered by the plaintiffs because they attacked the agency's conclusions). Similarly, a declaration that submits interpretation, opinion, and argument about what ultimate conclusions the administrative record can and cannot support, and that ultimately constitutes the declarant's own scientific and expert opinion, does not satisfy this exception and cannot be used to supplement the administrative record. *Alsea Valley All. v. Evans*, 143 F. Supp. 2d 1214, 1217 (D. Or. 2001); *see also Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (finding that the district court did not abuse its discretion in finding that the declaration was not necessary to explain technical terms or complex subject matter where it was provided to rebut information, not explain it). The "distinction between an affidavit that 'explains' complex and technical material" compared to "an affidavit that characterizes the record with new expert opinion" is "critical" because the "former is allowed where the latter is not." *Alsea*, 143 F. Supp. 2d at 1217. As explained below, the Reeder Declaration fails to satisfy this exception and the Court should not consider it.

Although Plaintiffs contend that the Reeder Declaration is not intended "substitute a competing scientific judgment," Pl. Br. at 12, it repeatedly articulates opinion on the agency's decisionmaking, thus violating these principles. For example, Mr. Reeder contends that he and (unnamed) others who surveyed for NSOs in Oregon "lost faith in the effectiveness of the 2012 Survey Protocol to detect NSO and accurately capture NSO resident status with a high degree of confidence." Reeder Decl. ¶ 17. Citing the 2012 Survey Protocol, Mr. Reeder relies on his "experience as a field biologist" to advocate that a "status unknown" site determination represents a "statement of uncertainty." *Id*. at ¶ 20. The Reeder Declaration then contends that equating "status unknown" sites with an "unoccupied" site determination for management purposes leads to the "biological consequence" that "forest stands currently being used by spotted owls are cleared for immediate timber harvest[.]" *Id*. Plaintiffs characterize the Reeder Declaration's discourse on this issue as offering an explanation for "the basis for equating a detection-bearing 'status unknown' result with an affirmative determination of non-occupancy, [because] the connection is not self-evident." Pl. Br. at 14. But that is not what the Reeder Declaration does. One need only read the next paragraph of the Reeder Declaration to see that it articulates a preference for a "conservative approach" as purportedly set forth in Appel et al. (2023). Reeder Decl. ¶ 21. This is plainly inappropriate, and does not contribute to any understanding of the agencies' decision-making. To the contrary, the BiOp addresses any "uncertainty" by explaining its assumptions and analysis, and further accounts for "uncertainty" by explaining that surveys will continue throughout the project area to document if any sites become occupied by territorial individuals so that BLM can drop or modify units within those sites to avoid take. FWS000322-23.

Nor is it appropriate to characterize the Reeder Declaration as explaining "technical terms and complex subject matter" where it expresses the declarant's "professional opinion" that it is proper to transpose the conclusions from passive acoustic monitoring ("PAM") surveys to callback surveys. *See* Reeder Decl. ¶ 25. As it explains, the Reeder Declaration outlines a preference that FWS "take[] the more conservative approach when interpreting survey results suggested by Appel et al.," *id.*, which simply cannot be described as explaining any "technical terms or complex subject matter." Relying on an extra-record declaration to urge an approach different than the one utilized by the expert agencies is not a proper use of the "technical terms and complex subject matter exception." Rather, it treads impermissibly into the agency's expertise. As one other district court within the Ninth Circuit has explained, "[e]xtra-record declarations by scientists are of heightened concern as they implicate the deference due the agency and essentially lead to de novo review of the agency's action rather than the more deferential review required by the APA." *Native Ecosystems Council v. Weldon*, 232 F. Supp. 3d 1142, 1148 (D. Mont. 2017) (citing *Asarco*, 616 F.2d at 1160).

The Reeder Declaration oversteps these boundaries repeatedly. In addition to advocating for a "conservative" approach, the Reeder Declaration also states that Appel et al. (2023) proposes an "alternative benchmark to ensure protection of sites" used by NSO pairs. Reeder Decl. ¶ 24. The Reeder Declaration then acknowledges that the statement refers to the results of PAM and pair detection, but claims that "the idea behind it. . . directly applies to callback surveys and single owl occupancy if the detection rates no longer have an acceptably high level of confidence." *Id.* at ¶ 23.[4] Elsewhere, relying on the declarant's "professional experience," the

[4] The assertions in the Reeder Declaration also lack scientific support because they fail to cite any scientific literature or other information to substantiate the personal opinion that it expresses, significantly undercutting any possibility that it explains technical or complex subject matter,

Reeder Declaration expresses the opinion that the 2012 survey protocol requires "too high a level of repeated detections of NSOs to achieve the habitat protections afforded to an occupied site[.]" *Id.* ¶ 30. The Ninth Circuit has consistently rejected the notion that consideration of extra-record evidence is ever proper for the purpose of attacking an agency's underlying analysis and conclusions. *Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv*., 460 F.3d 1125, 1144-45 (9th Cir. 2006); *accord Mississippi v. Env't Prot. Agency*, 744 F.3d 1334, 1348 (D.C. Cir. 2013) (per curiam) ("it is not our job to referee battles among experts; ours is only to evaluate the rationality of [the agency's] decision. . ."). In short, the Reeder Declaration does not explain technical terms or complex subject matter. It urges the Court to select an approach and draw different conclusions than the agencies did. This is an improper use of this *Lands Council* exception.

**C. The Reeder Declaration Is Post-Decisional And Was Not Before the Agencies When they Made their Decisions**

The Court should also reject Plaintiffs' argument that the Reeder Declaration is not post-decisional because the "core materials" on which it relies were before the agencies when they made their decisions, Pl. Br. at 17, thus it is appropriate for the Court to consider it. This argument misses the point. Underlying source materials may predate the BiOp, but the declarant's synthesis, causal interpretation, extrapolation from PAM to callback methodology, anecdotes, and opinions about appropriate occupancy thresholds certainly were not before the agencies. Nor is the problem confined to discrete paragraphs that can be excised: the Reeder Declaration's post-decisional judgments are woven throughout its text and supply the analytical foundation for its purported explanations. Thus, the entire declaration is post-decisional evidence that was not and could not have been considered by the agencies, making it improper

much less constitutes "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

for the Court to consider it as well. *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 (post decisional information "may not be advanced as a new rationalization either for sustaining or attacking an agency's decision"); *see also Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, Case No. 6:24-cv-01641-MTK, 2026 WL 1346855, at *8 (D. Or. May 14, 2026) (declining to supplement administrative record with declarations that contained post-decisional information). Plaintiffs' efforts to dodge the post-decisional nature of the Reeder Declaration cannot save it.

**D. Additional Explanation, If Necessary, Should Come From The Agency.**

Even if, contrary to the foregoing, the Court concludes Plaintiffs have met their burden of demonstrating that the administrative records are so sparse as to frustrate judicial review, the Supreme Court and the Ninth Circuit have held that any further explanation must come from the agency—and only the agency. *See Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (per curiam) (where there is "such failure to explain administrative action as to frustrate effective judicial review," the remedy is not to "hold a de novo hearing," but "to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary"); *Thompson*, 885 F.2d at 555; *Asarco*, 616 F.2d at 1160. Thus, if the Court finds that supplementation is necessary to effectively review the BiOp, it should ask FWS to provide more explanation instead of accepting extra-record documents from Plaintiffs.

**E. Federal Defendants Did Not Agree To Extra-Record Evidence On The Topics In The Reeder Declaration (Or Any Other Topic).**

To try to bolster their argument that it is proper for the Court to consider the Reeder Declaration, Plaintiffs argue that the "parties and the Court have already recognized that this subject matter requires expert explanation." Pl. Br. at 10. According to Plaintiffs, the Court's decision to hear testimony from a FWS senior biologist, Colleen Holland, at the preliminary injunction hearing in March 2026 demonstrates agreement among the parties about the "technical

complexity" purportedly associated with designation of sites as occupied, unoccupied, or status unknown. *See id*. But this position misstates the prior proceedings and, to be clear, there simply is no "common ground" between Plaintiffs and Federal Defendants on this issue. *See id*.

As a threshold matter, it is not unusual for a court to hear witness testimony during a preliminary injunction motion hearing. A court's review typically is not limited to an administrative record when determining appropriate relief in that context. Evidence outside the administrative record can be considered in connection with the equitable and public interest considerations that must be addressed to determine the propriety of preliminary injunctive relief. *Earth Island Inst. v. Evans*, 256 F. Supp. 2d 1064, 1078 n.16 (N.D. Cal. 2003).

In this case, the Court specifically stated that Ms. Holland's testimony would be "for my benefit in understanding some of the science and methodology" and "to understand. . . some of the background information." *See* Mar. 17, 2026 Hearing Transcript ("Hr'g Tr.") at 87 (excerpts attached as Exhibit 1).[5] And that decision was appropriate, particularly given the number of briefs submitted by the parties over a short period of time and the need for the Court to issue a decision in an accelerated timeframe. Notably, the Court stated at the hearing that it was "not going to entertain making [the Holland testimony] part of. . . the administrative record." *Id*. This decision, too, was appropriate because there was no indication at that time that the administrative record (which already had been lodged with the Court) was inadequate for the Court's review. Although Plaintiffs now attempt to characterize those proceedings as having embodied a concession by Federal Defendants and the other parties that it also is appropriate for

[5] The Court also acknowledged that its decision was going to turn on whether there was a likelihood of success on the merits, Hr'g Tr. at 115, thus the adequacy of the agency's analysis was at the forefront.

the Court to consider the Reeder Declaration in adjudicating summary judgment,[6] there is a significant difference between allowing testimony to assist the Court in understanding information that is already in the administrative record as was done at the preliminary injunction hearing versus advocating for the Court to consider extra-record evidence at the merits stage on the grounds that the administrative record lacks the information needed, as Plaintiffs attempt to do here.

At the March 2026 hearing, Ms. Holland's testimony focused on explaining the 2012 Survey Protocol (Hr'g Tr. at 120-21, 128-29, 135-36) and the Appel study on which Plaintiffs' entire legal theory relies (Hr'g Tr. at 128), answering background questions from the Court on how PAM works (Hr'g Tr. at 127-29), and discussing the status of unknown determinations as outlined in the BiOp, even citing to specific pages. Hr'g Tr. at 130-36. Ms. Holland's testimony, therefore, served as a primer on basic concepts already in the administrative record, but did not offer improper advocacy as the Reeder Declaration does. Thus, the Court should reject Plaintiffs' implication that the other parties made any express or implied agreement that it was appropriate for the Court to consider extra-record evidence in the form of the Reeder Declaration, the topics addressed therein, or any other topic.

**F. The Reeder Declaration Has Inaccuracies And Other Flaws That Render It Unreliable And, Therefore, Unfit For The Court's Consideration.**

Even if the Court were to find that Plaintiffs met their burden to show that the administrative records are inadequate for the Court's review and that either of the *Lands Council*

[6] On the one hand, Plaintiffs say that they do not contend that the hearing entitles them to present responsive evidence or to respond to the hearing testimony. Pl. Br. at 6. On the other hand, Plaintiffs state that they are, in fact, "[a]ddressing the detection probability questions raised at the hearing" through the Reeder Declaration. *Id.* at 7; *see also id.* at 9-10 (stating that the testimony at the hearing "identified—but did not resolve—the very technical questions on which the agencies' occupancy determinations turn"). These inconsistent positions demonstrate the weakness of their entire argument on this point.

exceptions applies, the Court should still deny Plaintiffs' motion because the Reeder Declaration contains inaccurate statements that render it unreliable for the Court's consideration. For example, it states that a barred owl removal study began in a certain demographic study area in 2018. Reeder Decl. ¶ 18. But the report that discusses that study specifically states that the demographic area "is considered the control area for this proposal, therefore barred owl removal will not occur on the [Klamath Study Area]." FWS004923; *see also* FWS004951 (more recent annual demography report for the same area, providing the same language). The Reeder Declaration also opines that requiring pair detections during a single visit "can misclassify occupied sites as 'Status Unknown,' which FWS then interprets as unoccupied." Reeder Decl. ¶ 25; *see id.* ¶¶ 21, 22. For the Last Chance Project, however, sites are considered occupied whether a territorial individual or a territorial pair is detected. FWS000297-98; FWS000317. Thus, on this point too, the Reeder Declaration is inaccurate.

Plaintiffs also contend that the Reeder Declaration supplies "operational context from the perspective of a BLM surveyor who implemented both the 2012 call back protocol and the Service's 2021 draft ARU protocol, describing how each is carried out in the field." Pl. Br. at 13. While Mr. Reeder may have familiarity with conducting surveys, he is not qualified to know BLM's survey decisions in this matter. Indeed, the Reeder Declaration makes clear that the professional experience described in its early paragraphs is generalized past experience, opinions, and judgment. *See* Reeder Decl. ¶¶ 3-5. The Reeder Declaration contains no indication that he was directly involved in BLM's analysis of the effects of the Last Chance Project on NSOs. Nor does it describe any experience applying the best available science in interpreting occupancy results or otherwise undertaking the ESA Section 7(a)(2) analysis that

FWS, the expert consulting agency charged by Congress with implementing the ESA, undertook here. These are the specific issues before the Court in this case.

The Reeder Declaration apparently also takes issue with the BiOp's statement that "[p]rotocol surveys will continue within the Action Area and would discover any future recolonization by floaters of the currently unoccupied territories or colonization of other NRF habitat outside of known territories." Reeder Decl. ¶ 29 (quoting FWS000267). Continued surveys are a key component of BLM's action and FWS's conclusions regarding incidental take in this case. In discussing the issue, however, the Reeder Declaration states that FWS "then assure[s] us that without a doubt" those surveys will continue. *Id*. This phrase seems intended to inject doubt about whether BLM will continue future protocol surveys. There is no merit to this suggestion, however, and BLM is entitled to the presumption of regularity about its commitment on this point, which was part of the action analyzed by FWS. *San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Indeed, at least one other case in this district has recognized BLM's demonstrated commitment to the survey and avoid approach set forth in the BiOp. *See Klamath-Siskiyou Wildlands Center et al. v. U.S. Bureau of Land Mgmt., et al*., Case. No. 19-cv-1810, 2021 WL 5356969 (D. Or. Aug. 24, 2021), *findings & recommendations adopted*, 2021 WL 5355919 (D. Or. Nov. 16, 2021), *aff'd*, Case No. 22-35035, 2022 WL 17222416 (9th Cir. Nov. 25, 2022).

## V. CONCLUSION

For all these reasons, Federal Defendants the should Court deny Plaintiffs' Motion to Supplement the Administrative Record. The administrative record is more than sufficient for this Court's review without injecting improper extra-record opinions, which plainly contravene the record review principles set forth in the APA. Plaintiffs have not shown that either of the

exceptions on which their motion rests apply to the Reeder Declaration. Plaintiffs have failed to meet their burden of showing that the administrative records are inadequate to effectively review the challenged actions or that either of the two *Lands Council* exceptions on which they rely is applicable here. Nor did Federal Defendants agree that extra-record evidence was appropriate at the merits stage of this case. For these reasons and all the others stated herein, the Court should deny Plaintiffs' motion.

Respectfully submitted this 10th day of September, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division
United States Department of Justice

/s/ Alison C. Finnegan
ALISON C. FINNEGAN
Senior Trial Attorney (PA Bar No. 88519)
Wildlife and Marine Resources Section
SHANNON BOYLAN
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
(202) 598-9584 (Boylan)
(202) 532-3312 (Finnegan)
shannon.boylan@usdoj.gov
alison.c.finnegan@usdoj.gov

*Counsel for Federal Defendants*