# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, et al., Plaintiffs, v. DOUGLAS JAMES BURGUM, in his official capacity as Secretary of the Interior, et al., Defendants, and MURPHY COMPANY, et al., Intervenor Defendants. | No. 1:25-cv-02296-MTK |

Motion Hearing

FTR-RECORDED TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT JUDGE

March 17, 2026

APPEARANCES

FOR THE PLAINTIFFS:

DAVID WOODSMALL
Western Environmental Law Center
120 Shelton McMurphey Boulevard
Suite 340
Eugene, OR 97401

FOR THE PLAINTIFFS:

SANGYE INCE-JOHANNSEN
Western Environmental Law Center
120 Shelton McMurphey Boulevard
Suite 340
Eugene, OR 97401

FOR THE DEFENDANTS:

SHANNON BOYLAN
U.S. Department of Justice, E.N.R.D.
150 M Street N.E.
Washington, DC 20044

FOR THE DEFENDANTS:

CHRISTIAN CARRARA
U.S. Department of Justice, E.N.R.D.
150 M Street N.E.
Washington, DC 20044

FOR INTERVENOR DEFENDANT MURPHY COMPANY:

JULIE A. WEIS
Haglund Kelley LLP
2177 S.W. Broadway
Portland, OR 97201

FOR INTERVENOR DEFENDANT MURPHY COMPANY:

CHRISTOPHER T. GRIFFITH
Haglund Kelley LLP
2177 S.W. Broadway
Portland, OR 97201

FOR INTERVENOR DEFENDANT AMERICAN FOREST RESOURCE COUNCIL:

SARA GHAFOURI
American Forest Resource Council
700 N.E. Multnomah
Suite 320
Portland, OR 97232

FOR INTERVENOR DEFENDANT AMERICAN FOREST RESOURCE COUNCIL:

DOMINIC M. CAROLLO
Carollo Law Group LLC
P.O. Box 2456
Roseburg, OR 97470

FOR INTERVENOR DEFENDANT AMERICAN FOREST RESOURCE COUNCIL:

NOLAN GRANT SMITH
Carollo Law Group LLC
P.O. Box 2456
Roseburg, OR 97470

TRANSCRIBER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, OR 97204
(503)326-8047

THE COURT: -- because I do also need to give a few minutes for each of the parties to say a piece or two before we break. And, trust me, I'll try to give you all the time you need after lunch to also make your arguments.

So, first, any objections to hearing a biologist describe what apparently lawyers can't?

MR. CARRARA: Or maybe just this lawyer, Your Honor.

THE COURT: Any objections, plaintiff, Mr. Ince-Johannsen?

MR. INCE-JOHANNSEN: I think I would just notice that it -- excuse me -- just note that it would be a post hoc rationalization. I certainly don't object to it occurring, but --

THE COURT: Okay. And maybe that's for the -- for the benefit -- for my benefit in understanding some of the science and methodology behind it to -- I mean, this -- I'm not going to entertain making this part of the -- part of the administrative record, but I think it would be helpful for me to understand some of the -- some of the background information.

MR. INCE-JOHANNSEN: No objection.

THE COURT: Okay. Mr. Griffith.

MR. GRIFFITH: Thank you, Your Honor.

Just so that I have a sense of what your plan is, how long -- what time would you like to take a lunch break, so I

THE COURT: All right.
MR. GRIFFITH: -- hear from her first.
THE COURT: All right.
MR. GRIFFITH: And then I do have some comments on that first claim, the acreage issue, but I'll make --
THE COURT: Yes.
MR. GRIFFITH: -- that maybe after the biologist.
THE COURT: All right. Well, then we'll take you up after we hear from the biologist.
MR. GRIFFITH: Thank you, Your Honor.
THE COURT: All right. What's your name?
THE WITNESS: Colleen Holland, Your Honor.
THE COURT: Okay. And is anyone anticipating -- or asking that this be taken under oath?
Mr. Ince-Johannsen?
MR. INCE-JOHANNSEN: If the Court is going to consider it as part of its decision, I think that would be appropriate, yes.
THE COURT: Okay. All right. Well, then if you would be kind enough to come to the witness stand, I will have my courtroom deputy swear you in.
Why don't you climb on up into the witness stand there and --
THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***COLLEEN HOLLAND***

Was thereupon called as a witness on behalf of the Defendants; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Colleen Holland, H-o-l-l-a-n-d.

THE COURT: All right. Thank you.

Please have a seat.

And you're the one who suggested we should go ahead and do this, Mr. Carrara. So do you want to go ahead and ask questions first?

MR. CARRARA: Yes, Your Honor.

THE COURT: All right.

DIRECT EXAMINATION

BY MR. CARRARA

Q. Could you state for the record: What's your name?

A. Colleen Holland.

Q. And who do you work for?

A. U.S. Fish and Wildlife Service.

Q. And what do you do for them?

A. I'm the senior biologist out of our Roseburg Field Office for the Oregon Fish and Wildlife Service.

Q. And how long have you been doing that for them?

A. Five years.
Q. And what's your relation to this case?
A. I'm the lead. I worked with the author on reviewing it. And I've worked on and reviewed all of our consultations in the most recent years and most in the first few years that I worked with the Fish and Wildlife Service.
THE COURT: Were you involved in the development of the biological opinion?
THE WITNESS: Yes.
THE COURT: Okay.
BY MR. CARRARA
Q. So you're familiar with the survey protocol?
A. Yes.
Q. And you're familiar with call-back surveys conducted in this project?
A. Correct.
Q. Could you tell us a little bit about the survey protocol?
A. Yes. And prior to working for the Service, I did work for the BLM for seven years and implemented these protocols and wrote biological assessments, and then I've switched over.
So the protocol -- the call-back protocol was developed and updated in response to the barred owl influence, like we discussed earlier. And in that there was an increased survey effort.
And further on in the introduction of the opinion --

or the -- sorry -- the protocol, from what was read earlier, the protocol serves two purposes, a method so that you can -- we know that the surveys are covering an adequate space around proposed projects, and also so that it ensures a high probability of locating resident owls, and that we can identify owl territories that may be affected by the proposed management activity. And that's on KSW 01026.

And so this protocol is a long-standing protocol. We've used it for years to do just that. And the determinations out of this protocol, while I know that one of them is an unknown, at that point there's a -- a high probability that we've located the resident pairs.

We can never have an absolute positive. There's always going to be --

THE COURT: Is that probability quantified in any way?

THE WITNESS: I was looking for that prior, if the -- the detection probabilities are based on the demography -- there's a -- there's a whole litany of citations in the introduction that the authors of this protocol used to come up with their statistics. Unfortunately, it's not in the appendix of this protocol, and I'd have to go back to those citations and figure out what the --

THE COURT: Well, do you --

THE WITNESS: -- exact statistics were.

THE COURT: -- happen to recall if it's more or less than 72 percent?

THE WITNESS: I -- our usual target is around 90 percent, so I would assume it's close to that, but I can't be 100 percent confident.

THE COURT: Okay. And does the Dugger study provide any other guidance about -- about the efficacy?

THE WITNESS: So the Dugger study reviewed 20 years of call-back surveys under the demography protocol; so it's a three visit a year, whereas the new call-back is a six visit a year. And they did just look at pairs and said that there was a very similar detection of probability in recent years as there was at the beginning of their -- of their time frame.

THE COURT: With respect to pairs or resident owl --

THE WITNESS: Pairs. They focused on pairs.

THE COURT: And does the current study -- survey protocol focus on pairs?

THE WITNESS: The -- it allows -- I mean, the target is to try to find pairs, but it does provide the resident owl determination as well.

THE COURT: Okay. Go ahead.

BY MR. CARRARA

Q. And are you familiar with the Appel study?

A. Yes.

Q. How are you familiar with it?

A. Through reviewing it over the years, especially when it first came out.
Q. Was Appel study used here?
A. No.
Q. Were PAM, or passive acoustic monitoring, calls used here?
A. No.
Q. Could you tell us if a direct comparison could be made between PAM and call-back, as applied here, in the technology?
A. I would say a direct comparison cannot be made. There would have to be an understanding of the assumptions of the two different survey protocols and how they correlate.
THE COURT: And when you say the two survey protocols, you're talking about the call-back survey and then PAM?
THE WITNESS: Correct.
THE COURT: All right.
THE WITNESS: Correct. Yeah. The assumptions versus the two different methodologies and how they interact.
Are there some biological conclusions that correlate between them? Probably. But there's usually more research -- the Appel paper was one of the first studies that came out on how to interpret spotted owl responses in PAM studies. It was very early on in that. And, you know, at that time there wasn't very much information on what to do with that in terms of the greater survey protocol world in spotted owls.

THE COURT: Well, are any biological assessments employing PAM?

THE WITNESS: They are starting -- we have current ones that are starting to incorporate survey results from passive acoustic monitoring, yes.

THE COURT: All right. And what are the -- what are the considerations for using PAM in these -- in these more recent studies and biological assessments?

THE WITNESS: The -- there's a range-wide monitoring effort that historically used call-back surveys that has switched to passive acoustic monitoring. And so that's the -- where we're starting to see detections showing up in our BAs, is this widespread passive acoustic monitoring that's showing up outside of individual survey efforts.

THE COURT: And what's the -- what's the agency decision-making around moving from call-back surveys to PAM?

THE WITNESS: That's -- the Service is not involved with that. I couldn't answer how the action agencies are --

THE COURT: The --

THE WITNESS: -- are making that determination.

THE COURT: -- Fish and Wildlife Service isn't involved in that?

THE WITNESS: No, we have not --

THE COURT: But BLM is moving towards using PAM?

THE WITNESS: I would have to defer to the BLM. I

know that's an internal conversation that they're having.

THE COURT: Okay. But your observation is that they're moving to using PAM?

THE WITNESS: No.

THE COURT: I thought -- so I misunderstood your testimony. So I thought you indicated that some recent BAs are employing PAM.

THE WITNESS: Some recent BAs are incorporating results from passive acoustic studies. At this point we have not had a BA come in that's used only passive acoustic pre-project monitoring.

THE COURT: Okay. So it's in the pipeline; it just hasn't come to Fish and Wildlife Service?

THE WITNESS: We have not -- I -- I and/or the -- my department has not coordinated with our action agencies on any even upcoming projects that are exclusively using passive acoustic monitoring.

THE COURT: Okay. All right. But I just want to confirm then: You understand anecdotally that the BLM is employing data collection through PAM in their biological assessments?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: No. The -- where -- there's a separate project that goes on.

THE COURT: Okay.

THE WITNESS: And where that -- it's a range-wide thing. It's not correlated with specific projects.

THE COURT: So you say "range-wide," like, as probably a term of art that I'm not understanding.

THE WITNESS: Sorry. The --

THE COURT: That's all right.

THE WITNESS: Yeah, the entire range of the northern spotted owl.

THE COURT: Okay.

THE WITNESS: It's a -- it's a long-term monitoring effort.

THE COURT: So I think the failure of my question is that I tied the use of PAM to biological assessments. They're -- BLM is using it, but not necessarily for -- for gathering data for biological assessments?

THE WITNESS: It's a Forest Service-lead project. And so -- but some of their efforts overlap BLM projects. And where the --

THE COURT: Got it. So --

THE WITNESS: -- data is available, we incorporate it.

THE COURT: -- the failure of my question is it's not the BLM, but it's the Forest Service; and it's not for biological assessments; it's for some range-wide studies?

THE WITNESS: Yes. But we do incorporate it --
THE COURT: Got it.
THE WITNESS: -- where it matters.
THE COURT: Got it. Okay.
And you're familiar with both of them. I mean, you're familiar with both the -- I'll call them methodologies, if that's --
THE WITNESS: Yes.
THE COURT: -- okay. And that being call-back and -- call-back survey and then the PAM -- we'll just call it -- we'll call it PAM.
THE WITNESS: Yes.
THE COURT: So -- and you're familiar -- are -- do you -- based on your training as a biologist in working both with BLM, but also now with the Fish and Wildlife Service, are you comfortable understanding the differences between the two?
THE WITNESS: Yes.
THE COURT: All right. And I think -- on a surface level, I think I understand how they're conducted differently. But maybe you can give me a very brief summary of what -- how PAM is implemented in the field and then how -- how call-back survey is implemented in the field, just so that I have a clear sense of it and I'm not operating on any assumptions.
THE WITNESS: Sure. Both protocols use a survey area. So both are -- are completing the efforts over a

designated area. And that area is intended to capture territorial pairs that could be affected by the proposed action by the agencies. So both of these are designed to meet that need.

Passive acoustic monitoring has four passive just recording units per survey unit, which is going to vary depending on the size of the area you're looking at, that are left out for six weeks and have specific times that they're recording during that six weeks.

THE COURT: So it's not 24/7?

THE WITNESS: No, it's not 24/7. It's during the prime spotted owl behavior hours.

THE COURT: Okay.

THE WITNESS: And then that data is brought back and processed through various auto-processing programs.

THE COURT: So somebody doesn't have to listen to a thousand hours of recording?

THE WITNESS: Correct.

THE COURT: Okay.

THE WITNESS: And then we're -- we're learning how to interpret that data in terms of what it means for spotted owl use on the landscape. And that is an evolving data -- you know, this is -- the passive acoustics are only four years old, really, as even being available. And it has not been widely used. And so data's just coming out on how to interpret that

information.

Call-back surveys have a similar setup, similar survey area, but it requires six nights over a six-month period that you're going out and you're broadcasting calls for ten-minute time frames at specific points scattered all throughout the survey area.

And each survey area has to be completed within a certain window in order for that visit to be complete. And then if you have detections, there's additional visits required: A daytime follow-up or, if it's later in the season, additional nighttime visits.

THE COURT: All right. Any additional questions?

BY MR. CARRARA

Q. I just want to go back to -- could you explain a little bit the difference of the biological responses between owls to PAM and call-back?

A. Sure. You know, when you're eliciting a call, you're triggering a response that may have been caught up on a -- caught on a passive acoustic recorder, PAM, but may not have been. And -- and -- whereas the passive recorders are capturing natural behavior, which was described earlier, unadulterated behavior. It's not artificially triggered.

THE COURT: Okay. And I take it's from some recording that's being used to broadcast a call.

THE WITNESS: Correct. The call-back surveys use a

recording to broadcast a call.

THE COURT: Okay. Anything else, Mr. --

BY MR. CARRARA

Q. And so Appel only considers PAM; is that correct?

A. That's correct.

Q. And so could you -- you know, with your background, your knowledge, could one apply Appel to the call-back surveys that were conducted here?

A. I -- I do not have the expertise to be able to make that conclusion beyond that I would need more research to understand questions that Appel didn't answer. You know, that was one study in a small area.

Is it repeatable? Are there different things that would change that detection rate? They did explore different lengths of time and how that influenced survey conclusions. They did say after five weeks they were -- had a high level of confidence you'd pick up a pair if it was there.

THE COURT: And this is with PAM?

THE WITNESS: PAM, yeah.

THE COURT: Okay.

THE WITNESS: Yeah. And they found similar pair occupancy rates as an earlier review of call-back studies they cite. It's Olson 2005, which is also -- the Dugger report also cited to -- back to Olson 2005 for similar detection probabilities.

THE COURT: Okay. All right. Anything else, Mr. Carrara?

BY MR. CARRARA

Q. And the final question I want to ask about is kind of going back to the end of my argument, and if you could clear up the status-unknown determination and kind of how that plays into all of this.

A. Correct. I can definitely do that. And I can cite to our opinion and how we talk about it in our opinion, so it's not sort of an ad hoc discussion or analysis.

We have -- you know, walking through a take analysis requires the conclusion that assumptions are true. And one of the first assumptions we establish is, is there even a reasonable likelihood of take occurring? And we have past litigation to help us navigate that a little bit. It's not a solid line on the ground, though.

And so we use reasonable likelihood. Often we lean on the protocols and their confidence. And so the call-back protocol has a reasonable high likelihood that it will detect pairs and resident singles when you've completed the protocol as it's written.

And we use that as our threshold for reasonable likelihood. Unfortunately, we don't make that exact statement in -- in our opinion. We do have an entire section, though, on take avoidance. And in that we talk about how we apply

reasonable likelihood of take to occupied sites and sites with resident singles in them. And --

THE COURT: So is the reasonable likelihood based on satisfying the three -- three recorded, I guess, responses -- or three responses in six -- in six surveys?

THE WITNESS: Yes.

THE COURT: All right. So reasonable likelihood is hit with three responses in six -- six field -- field observations?

THE WITNESS: Yeah. Six to 12.

THE COURT: Six to 12 field --

THE WITNESS: Yeah.

THE COURT: -- surveys?

THE WITNESS: Yeah.

THE COURT: Okay. But if there are two, then it's no longer reasonable likelihood under the survey?

THE WITNESS: We don't automatically -- we often lean that way. We often take those into consideration and evaluate --

THE COURT: So twos could go either way?

THE WITNESS: Twos don't usually go either way. But if there's a longer history of surveys at that site, we may look beyond two years to see if there's additional information to gather. But we usually defer to the protocol --

THE COURT: Okay. And --

THE WITNESS: -- and determine that --

THE COURT: -- in this biological opinion, was -- were twos given unoccupied?

THE WITNESS: I don't remember. I would have to go back and look at the exact --

THE COURT: But if --

THE WITNESS: -- number of detections associated with these --

THE COURT: But there should be something in the opinion that describes whether twos were given an unoccupied or occupied status?

THE WITNESS: Not necessarily. We often refer on the determinations from the action agency. We often work with them on that data. For this opinion, I believe that information, we would have to go back to the BA. I think we cite the conclusions in the BA for that.

THE COURT: Got it. So Fish and Wildlife were not making the determinations about whether to give a one, two, or three unoccupied or occupied status?

THE WITNESS: A three would be -- would be occupied. And one or two --

THE COURT: But was Fish and Wildlife making that determination, or you were accepting the determinations from BLM?

THE WITNESS: We will accept determinations from the

BLM. We often like to work with them and see -- and have them walk through that with us.

THE COURT: Okay. Everyone -- but is it fair to say that everyone would've agreed, both BLM and Fish and Wildlife, that a three would've been occupied?

THE WITNESS: Correct.

THE COURT: Okay. But whether two was occupied or not occupied, you're not sure at this -- at least, as we sit here, you're not sure?

THE WITNESS: It was probably un -- or it was probably considered incidental, which we would treat as a nonterritorial individual.

THE COURT: Okay. Well, would it have been classified as incidental or classified as unoccupied?

THE WITNESS: It would be classified as incidental and not considered an occupied site.

THE COURT: Okay. So unoccupied?

THE WITNESS: Unoccupied. We -- we like to use the term --

THE COURT: Are there different kinds of degrees of unoccupied?

THE WITNESS: Not likely occupied.

THE COURT: Okay. Not likely --

THE WITNESS: Likely not occupied.

THE COURT: That would be two?

THE WITNESS: Yeah.

THE COURT: And one?

THE WITNESS: Likely not occupied.

THE COURT: Okay. And there's different degrees of "likely not"?

THE WITNESS: Right.

THE COURT: And is that quantified in the report?

THE WITNESS: No.

THE COURT: Okay. And is there a -- is zero -- would be not occupied?

THE WITNESS: Correct.

THE COURT: All right. So -- all right. So earlier -- and I may have misunderstood arguments. I heard argument that described that one and twos were labeled as not occupied and three would be occupied.

THE WITNESS: Correct.

THE COURT: All right. And you're adding some different text to that.

THE WITNESS: I would -- I mean, we, in the Service, prefer to use the term "not likely occupied" because a protocol is not a definite no.

THE COURT: Okay.

THE WITNESS: But, because of that, we rely on that for that reasonable likelihood conclusion in our take analysis.

THE COURT: Okay. All right. Anything else,

Mr. Carrara, before I give Mr. Griffith and Mr. Carollo a chance? And then Mr. Ince-Johannsen will have an opportunity, too.

MR. CARRARA: With the Court's indulgence, one more, please.

THE COURT: Yeah.

BY MR. CARRARA

Q. Ones and twos, even if they don't rise to the level of three, are they captured in the environmental baseline?

A. Correct. They're captured in the environmental baseline, and they're captured in our effects analysis in the effects to nonterritorial individuals. We actually call them out specifically in this opinion on FWS 0033 -- 000322.

We acknowledge that there were nonterritorial detections in the action area and that surveys would continue to monitor those -- those detections to make sure that we could capture and modify the action, should they indicate territorial behavior.

THE COURT: And how often is -- is it the Fish and Wildlife Service that's going out there to monitor?

THE WITNESS: No. The BLM monitors --

THE COURT: The BLM.

THE WITNESS: -- and they report back to us.

THE COURT: Okay. And, at least with respect to this project, do you know how often BLM is going to go out and

monitor?

THE WITNESS: Yeah. It's listed in the protocol. They continue to -- the call-back protocol, after you complete the first two years of six visits, has a two-year -- two- to three-year three-visit protocol early in the season so you can detect changes close to your projects.

And after that three years, we work with the agencies to see how much project is left as to whether or not they need to re-initiate and go back to the full six visits again.

THE COURT: So why would a northern spotted owl go back to a place that's been logged?

THE WITNESS: Because there's a lot of area around these projects that often aren't logged. That's why -- I mean, that's why -- the survey protocol goes way beyond the project's -- the project footprint.

THE COURT: All right. Did that beg more questions, Mr. Carrara?

MR. CARRARA: No further questions, Your Honor.

THE COURT: All right. Mr. Griffith.

MR. GRIFFITH: No questions from me, Your Honor.

THE COURT: Mr. Carollo.

MR. CARROLLO: Yeah, just a couple questions.

CROSS-EXAMINATION

BY MR. CARROLLO

Q. Good afternoon -- Ms. Holland, right?

A. Yes.
Q. So what's the primary purpose of doing the protocol surveys for the biological opinion?
A. It's to establish a reasonable likelihood of occupancy.
Q. Okay. And is it to aid the agency in its incidental take findings?
A. Correct.
Q. Can you explain that a little bit more?
A. The -- following the protocol, we believe, gives us a reasonable likelihood of identifying the pairs and resident singles that are -- the ones that are tied to a specific territory on the landscape.
And we need that tie to the landscape to be able to translate habitat effects to effects to individuals. So the resident singles are using a much more condensed portion of the landscape that they're actively defending and using. And if a project is removing essential pieces of that territory, that's where we assign take.
Whereas, if we have just the incidental detections, we don't have that strong tie of the individual to the landscape requiring that smaller footprint, which is why we do not carry them through the take assessment as a reasonable likelihood.
Q. Okay. So is it fair to say then that the Fish and Wildlife Service's call-back protocol is designed to be a

take-avoidance protocol; is that right?
A. It's designed to contribute to a take-avoidance practice.
Q. Okay. All right. And I think in the biological opinion -- it sounded like you're familiar with it -- at ECF 17-2 at 84, the Fish and Wildlife determined that the survey -- the NS -- the Fish and Wildlife Service's call-back survey protocol is the best available methodology; is that right?
A. I -- I would have to see -- I would have to look back and verify.
Q. Okay. But are you aware of the Fish and Wildlife Service considering it to be the best available methodology for the take-avoidance purposes that we've talked about?
A. We do not weight one protocol over the other at this time.
Q. Is there -- but is there PAM protocol that's designed to accomplish take avoidance?
A. We have a draft protocol that's in its final versions of -- final process of finalization; but, in the meantime, we have been accepting projects designed under that draft protocol.
Q. Okay. So the Fish and Wildlife Service has been developing a protocol, but it's not -- it's not finished yet?
A. It's not finalized, no.
Q. Okay. And it wasn't finalized at the time of this 2023 BiOp for this case?
A. Correct.

MR. CARROLLO: Okay. I think that's all the questions I have.

THE COURT: All right. And there's something with our audio. I think this happened before.

THE COURTROOM DEPUTY CLERK: It usually is somebody's wireless device is too close to a microphone.

THE COURT: Oh, all right. Well, to be fair, I'll move mine, too. We're all potentially involved in that one.

All right. Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Thank you.

CROSS-EXAMINATION

BY MR. INCE-JOHANNSEN

Q. Just a few questions for you, Ms. Holland.

First, is there anything in the survey protocol that directs status-unknown sites to be treated as unoccupied?

A. The call-back protocol?

Q. Correct.

A. No.

Q. What site-specific protections does the BiOp apply to sites with one to two detections, so-called status-unknown sites?

A. It wouldn't because we don't consider them occupied.

Q. If I understood you correctly a moment ago, you said that the BiOp does factor those detections into the environmental baseline. Could you clarify what you meant by that then?

A. I would have to go back and double-check, but this -- we almost always have a survey update section in our environmental baseline that summarizes the survey results. I did not double-check the page numbers prior to this.
Q. Yeah. I'm just looking at the page that you cited a moment ago, and it's discussing those owls as transient owls or floater owls. So is that -- am I correct in understanding that that's how the BiOp treats these incidental detections, the so-called status-unknown sites, as just -- categorically as transient or floater owls?
A. That's correct. I was citing that from the effects section, not the baseline section.
Q. Okay.
A. And in the effects section, we acknowledge that those incidentals are nonterritorial -- likely -- likely nonterritorial individuals because they did not meet the standards under the protocol.
Q. And, therefore, they have no site-specific protections?
A. Correct, because we don't have a territory to apply those -- the site-specific protections are required -- are designed based on the knowledge of a territory used of a spotted owl. And so, without having that information, there's not a way to apply site-specific protections.
Q. So, looking beyond the relevance of, you know, occupancy status to the ultimate take determination, is it relevant to

anything else in the BiOp, like, for instance, you know, the determination that treatments are not likely to adversely affect owls there?

In other words, if a site is deemed occupied versus unoccupied, will that play into likely adverse effects analysis and, ultimately, the jeopardy analysis?

A. So a treatment can affect the habitat fitness of a site, which can be adverse. But the only way it'll adversely affect an owl is if an owl is present.

So our -- we have a section of the opinion that discusses effects to sites, and we describe it as such: "The project will or will not degrade a site such that it is likely to support an owl in the future if it is not currently occupied."

If it is occupied, that's where we complete the take analysis, whether or not the -- that those treatments would then result in take.

Q. And, just to be clear, when you say whether a site is occupied or not, what you're essentially saying is whether it is -- has three or more detections, in which it's treated as occupied; or if it's less than that, even though the survey protocol only specifies that it be regarded as status unknown, the biological opinion treats it as unoccupied.

So there's no specific protections for the status-unknown sites, and impacts at those sites would not

be -- you know, they're not considered in the jeopardy analysis then, separate from the impacts to floater owls, essentially?

A. Because the two are not interchangeable. We can't assign protections to individuals that aren't using a territory like a territorial pair would. You know, that's the foundation, sort of, of our differentiation between -- why we have a separate section for the nonterritorial individuals.

They have a very ambiguous use of the landscape. It varies from owl to owl. They don't call, so we can't really track their movements. But they're a lot more fluid, and they aren't forced -- you know, a territorial individual defends a nest patch or an activity center, a core-use area where they do most of their feeding.

And they use the rest of the home range to meet the rest of their needs. And that's the foundation for our take analysis. A floater does not -- we do not have that same argument pattern for a nonterritorial individual, and so we can't describe how modifying a project would minimize impacts to that owl. They have a much larger use of the landscape. And that's described in our effects to nonterritorial individual section.

Q. Just a couple more questions for you. Thank you.

Why did the Fish and Wildlife Service come up with a new protocol?

A. The acoustic protocol?

Q. Yeah.
A. Because it's a field that has had incredible developments in terms of data processing in recent years. And the ability was there to start -- and I should say that this is founded on work done by other agencies.
The Forest Service has really been a foundation in exploring passive acoustic monitoring with the range-wide effort. And, based on that, we've been able to get a lot of data to support the development of an acoustic recording protocol.
Q. Okay. Just one more question. Earlier, if I understood you correctly, you testified that, you know, detections of two owls could go either way. I think I'm quoting you accurately.
What guidance, if any -- you know, published guidance, maybe in the record -- would inform that -- what sounds to me like maybe a subjective judgment that it can go either way?
A. I would have to go look at the administrative record to see what's been included, to know what to cite back to the record.
Q. But if you were the one making that determination, deciding what to do with two detections -- so it's less than three. It's, under the survey protocol, status unknown -- what kind of, you know, guidance would you look to, to make that assessment?

A. If there was more than two years of survey history.

THE COURT: What does that look like in terms of numbers? So if there were four years of survey history --

THE WITNESS: If there were four years of survey history and no detections, I would not -- I would definitely not consider it an occupied site.

THE COURT: But if there were four years of -- of history and two detections --

THE WITNESS: I would map the detections on the landscape. Each survey area is fairly large. They can be over a mile-and-a-half wide. And you -- if you can map the detections and see how far apart they are in that survey area, the timing -- there's a lot of information that we can derive from the call-back surveys to indicate any sort of pattern of use.

THE COURT: Okay. I take that northern spotted owls don't have distinct calls.

THE WITNESS: Very distinct calls.

THE COURT: Oh, so can you actually determine if -- if one --

THE WITNESS: Oh, in terms of -- no.

THE COURT: Individual.

THE WITNESS: No. They do not have calls that are unique to individuals.

THE COURT: Okay. All right. So you'd look at the

geographic pattern --

THE WITNESS: Correct.

THE COURT: -- in a four-year history if there were two calls. And if it was -- now I'm just surmising if -- if the location of those detections were close in space, then that would suggest more likely occupied than less likely occupied?

THE WITNESS: It would warrant discussions with the action agency, yes.

THE COURT: What would those discussions involve?

THE WITNESS: It would be really site specific.

THE COURT: And so at that point it becomes a bit subjective?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: There's often subjectivity in some of our discussions. There's only so much -- unfortunately, there's only so much information science can give us.

THE COURT: All right. And, on top of that, everyone having really good hearing.

THE WITNESS: Yeah.

THE COURT: I mean, so -- any other questions?

MR. INCE-JOHANNSEN: No further questions. Thank you.

THE COURT: All right. Thank you -- is it Dr. Holland?

THE WITNESS: No. No.

THE COURT: Okay.

THE WITNESS: No.

THE COURT: You wouldn't want to -- you don't want that accolation. Okay.

THE WITNESS: No. I really enjoy my on-the-job training I've gotten --

THE COURT: All right. Thank you, Ms. Holland.

THE WITNESS: -- over the years.

THE COURT: I appreciate it. And you're welcome to step down.

THE WITNESS: Okay. Thanks.

Mr. Griffith, I know you've been waiting a while.

MR. GRIFFITH: Thank you, Your Honor.

THE COURT: Yeah.

MR. GRIFFITH: I'd like to talk about the acreage issues for a few minutes.

THE COURT: Right. Which is, I think, the first -- first of the claims, I think, the plaintiff has made.

MR. GRIFFITH: Correct. That's right. And I believe these two parties have had a chance to talk about it. Mr. Carollo have -- Mr. Carollo and I have a few things to say, but I'll try to keep it brief because I think Mr. Carrara did a good job of explaining this error or discrepancy between these tables.