Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
541.778.6626
971.285.3632

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

**KLAMATH-SISKIYOU WILDLANDS CENTER**, **OREGON WILD**, and **CASCADIA WILDLANDS**,

*Plaintiffs*,

v.

**DOUGLAS JAMES BURGUM** in his official capacity as Secretary of the Interior, **U.S. FISH & WILDLIFE SERVICE**, and **U.S. BUREAU OF LAND MANAGEMENT**,

*Defendants;*

and

**MURPHY COMPANY,**

*Defendant-Intervenor.*

and

**AMERICAN FOREST RESOURCE COUNCIL** AND **ASSOCIATION OF O&C COUNTIES,**

*Defendant-Intervenors.*

Case No. 1:25-cv-2296-MTK

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

## INTRODUCTION

Plaintiffs ask the Court to consider Erich Reeder's declaration for a limited purpose: to help the Court understand technical material in the existing administrative record and to supply the background against which the Court can determine whether FWS considered how imperfect detection bears on "Status Unknown" results. Plaintiffs do not ask the Court to decide through this motion whether the Biological Opinion is arbitrary and capricious, whether passive acoustic monitoring is preferable to call-back surveys, or whether any particular detection shows that an owl is resident.

Federal Defendants' and Intervenors' principal objections are directed at the declaration's inferences and recommendations. Plaintiffs identify those passages below, and the Court may choose to set them aside. *See infra* § V. What remains is a modest request that fits the exceptions recognized in *Lands Council v. Powell*: explanation of how the record's survey methods, statistical measures, and occupancy classifications differ from one another. The protocol assigns status classifications based on responses across specified survey visits. Dugger reports a seasonal probability of detecting a pair under its own definition of a pair detection. Appel's findings derive from passive acoustic monitoring rather than call-back surveys. Reeder's descriptions of field methods, protocol terminology, and the studies in the record are offered to help the Court keep those distinctions straight.

Neither the declaration's August 2026 execution date nor the presence of scientific studies in the record changes that analysis. Plaintiffs ask the Court to consider the declaration for the limited purposes described below.

## ARGUMENT

### I. Plaintiffs seek limited extra-record consideration, not completion of the agency's record or a competing merits determination.

The parties agree that APA review ordinarily proceeds on the administrative record, subject to narrow exceptions. Plaintiffs invoke those exceptions; they do not seek to complete the record. Plaintiffs do not contend that the agencies considered Reeder's declaration or that it belongs in the historical record of their decisionmaking. Pls.' Mot. 17. Intervenors' reliance on the "clear evidence" needed to overcome the presumption of record completeness therefore addresses a different question. Ints.' Opp. 5.

Plaintiffs contend the Reeder Declaration falls within two well-established circumstances, under *Lands Council v. Powell*, when a court may consider extra-record material: (1) when necessary to determine whether the agency considered all relevant factors and explained its decision, and (2) when necessary to explain technical terms or complex subject matter. 395 F.3d 1019, 1030 (9th Cir. 2005). As this Court recognized in *Cascadia Wildlands v. U.S. Bureau of Land Management*, a request to supplement the record with an extra-record declaration—such as Plaintiffs' at issue here—is separate from resolving a record-completion dispute. No. 6:24-cv-01641-MTK, 2026 WL 1346855, at *6–8 (D. Or. May 14, 2026).[1]

Plaintiffs also readily acknowledge the limited permitted use of extra-record materials. Plaintiffs provide the Reeder Declaration to help the Court understand scientific complexities central to this case and evaluate whether the agency considered relevant factors. *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 992–93 (9th Cir. 2014); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159–60 (9th Cir. 1980). They do not ask the Court to find that a Last Chance site contains a

---

[1] Plaintiffs' opening memorandum incorrectly identified this case as *Blue Mountains Biodiversity Project*.

resident owl, to adopt a different detection threshold, to choose between survey methods based on Reeder's opinions, or otherwise supply a basis for concluding that the agency's scientific judgment was wrong. Federal Defendants' and Intervenors' contentions to the contrary are misguided.

## II. The Reeder Declaration explains technical material the Court must understand to review the Biological Opinion.

Plaintiffs ask the Court to consider three categories of explanation in the Reeder Declaration: (1) what the 2012 protocol's "Status Unknown" classification is and how it relates to the occupancy categories the BiOp uses; (2) what the record's principal detection studies measure; and (3) how the two survey methods the record discusses are carried out. Each concerns terminology or methods that appear in the record and whose meaning depends on technical distinctions that cut across documents in the record.

Federal Defendants contend the Reeder Declaration is unnecessary because the record already addresses subject matter such as barred owls, floaters, survey methods, and occupancy. Fed. Defs.' Opp. 8–15. Plaintiffs agree there is overlapping subject matter. But overlap does not answer the necessity question. The court in *National Wildlife Federation v. National Marine Fisheries Service* rejected the same argument, that "there already is a voluminous record that has addressed all of the relevant factors and, thus, extra-record material is unnecessary." No. 3:01-cv-00640-SI, 2015 WL 423090, at *4 (D. Or. Feb. 2, 2015). Overlap is inherent in the third *Lands Council* exception, which permits consideration of extra-record evidence when "necessary to explain technical terms or complex subject matter." 395 F.3d at 1030. The terms and subject matter a court must understand are, by definition, already in the record. The inquiry, then, is not whether the declaration concerns matters already in the record, but whether additional explanation is

necessary for the Court to understand them.

**A. The Reeder Declaration explains the protocol's "Status Unknown" classification.**

Plaintiffs' claims concern how the BiOp treats sites where completed protocol surveys produced "Status Unknown" results. Evaluating that treatment requires understanding what the classification is. The Court asked that question at the preliminary-injunction hearing, inquiring what "Status Unknown" means and how it relates to occupancy. Hr'g Tr. 131:15–134:10; *see also id*. at 76:13–21, 83:5–16, 95:10–96:8.

The protocol defines "Status Unknown" as the result, following a complete survey, when responses do not satisfy the survey protocol requirements for a Territorial Pair, Two Birds/Pair Status Unknown, or Resident Single. AR020287. A complete survey ordinarily includes six visits in each of two years. AR020284. Drawing on his experience conducting protocol surveys, Reeder explains what "Status Unknown" signifies—a statement of uncertainty under the protocol—and distinguishes that classification from an affirmative determination of an owl's residency status. Reeder Decl. ¶ 20.

The record's terminology makes that explanation necessary. The BiOp does not use the protocol's classifications directly. It uses "Occupied" for pairs and resident singles and applies a similar label, "Occupancy Status Currently Unknown," to a different category: sites where protocol surveys were not completed. FWS_000265. The protocol itself cautions that its status definitions may differ from those used in demographic surveys because the surveys serve different objectives. AR020286. Reading the protocol and the BiOp together requires understanding what the protocol's classification records. Plaintiffs offer Reeder's explanation for that purpose, not to establish how any detection should be classified or managed.

### B. The Reeder Declaration identifies what the record's detection studies measure.

Each of the protocol's status categories turns on which owls a survey detects, and how often. AR020286–87. Understanding a "Status Unknown" result therefore also requires understanding what the record's studies say about the probability that a survey detects an owl, or a pair, that is present. The record's principal studies on imperfect detection, Dugger and Appel, measure different quantities. Reeder explains what each measures. Reeder Decl. ¶¶ 23–25.

Reeder explains what Dugger's Table 8 measures and how its measure relates to the protocol's pair classification. *Id.* ¶ 24. Table 8 gives the probability of detecting a spotted-owl pair at least once during a season, given that the pair is present. For the Klamath study area's six-survey scenario, it reports 0.730 with barred owls present and 0.976 without them. AR008447–48. Reeder also explains that Dugger defines a pair detection across a two-week window, while the protocol's same-visit criterion for Territorial Pair status turns on observations during a single visit. Reeder Decl. ¶ 24; *compare* AR008445, *with* AR020287. Reading Table 8 alongside the protocol requires understanding that the two use different units. Reeder likewise identifies which of Appel's statements derive from its passive acoustic data and which address call-back surveys, and he notes that Appel does not quantify the probability that a single call-back detection represents a resident pair. Reeder Decl. ¶¶ 22–23, 25.

### C. Reeder's explanation of the two survey methods is necessary to understand what Appel's findings address.

Appel's findings derive from passive acoustic monitoring; the Last Chance surveys used the call-back method the protocol prescribes. A detection means something different under each method. Understanding what Appel's findings do

and do not address therefore requires understanding how each method produces a detection. Reeder, who has conducted both, describes how recording units are deployed and their recordings analyzed, and explains that the protocol relies principally on audible responses. Reeder Decl. ¶¶ 13–14, 16 (final sentences).

Intervenors characterize Plaintiffs' position as a request to substitute PAM for the call-back surveys used here. Ints.' Opp. 3, 10. That is not the relief requested, nor is it Plaintiffs' intent in seeking consideration of the Reeder Declaration. Plaintiffs do not take issue with BLM's use of call-back surveys for the Last Chance project or the 2012 Survey Protocol. The Reeder Declaration is offered to explain the two types of survey methods, how Appel applied PAM, and how the protocol classifies survey results. The declaration in fact expressly separates the question of which method to use from the question of how detections are interpreted. Pls.' Mot. 3; Reeder Decl. ¶ 21.

Appel's empirical study used PAM, but its discussion is not confined to PAM results. It compares its findings with call-back research by Olson and discusses research documenting differences in male and female responsiveness to nighttime call-back surveys. AR000129–31. Explaining that discussion does not introduce a new scientific theory linking the two methods. Its quantitative findings cannot simply be transferred to isolated call-back detections at Last Chance, and Reeder says as much: Appel does not quantify the probability that a single call-back detection represents a resident pair. Reeder Decl. ¶ 25.

## III. The preliminary injunction hearing illustrates the explanatory function at issue.

Plaintiffs do not argue Federal Defendants or Intervenors waived their objections, that Holland's testimony became part of the administrative record, or that Plaintiffs are entitled to introduce responsive evidence as a matter of parity.

Plaintiffs' motion is clear on these points. Pls.' Mot. 6, 11 n.1.

The hearing matters for a narrower reason. The Court received Holland's testimony to assist its understanding of the science while expressly declining to add it to the administrative record. Hr'g Tr. 86–88.[2] That testimony addressed detection probability, the relationship between survey methods, field implementation, and occupancy classifications. *Id*. at 120–34. Its subject was not confined to irreparable harm or other equitable considerations. The Court identified likelihood of success as the principal focus of the preliminary-injunction inquiry, *id*. at 114–15, and Federal Defendants acknowledge that the adequacy of the agency's analysis was at the forefront, Fed. Defs.' Opp. 18 n.5. The hearing thus shows both that this subject matter benefited from additional explanation and that the Court can receive such explanation without receiving a new evidentiary basis for deciding the merits.

Federal Defendants call Holland's testimony a "primer on basic concepts already in the administrative record." Fed. Defs.' Opp. 19. Plaintiffs do not dispute that her testimony explained concepts in the record. That is the function the third exception contemplates: explanation of record material, received to assist the Court's understanding. Hr'g Tr. 86–88. The identified portions of the Reeder Declaration serve the same function.

## IV. The post-decisional-evidence cases require examination of substance and use, not execution date alone.

Intervenors argue that the Reeder Declaration's August 2026 execution date alone requires exclusion. Ints.' Opp. 6.[3] The decisions they cite, however, do not

[2] Plaintiffs' opening memorandum misdescribed two exchanges. Government counsel, not the Court, asked whether Appel could be applied to the call-back surveys here. Hr'g Tr. 129. And Holland's deferral to BLM concerned agency decisions about using PAM; she went on to describe both methods. *Id*. at 123–28.

[3] Plaintiffs agree that pre-existing sources do not make every later interpretation of them admissible, and that a new scientific judgment remains new even when it

support this conclusion. Those cases turned on the nature and use of the proposed material, not on the date of signature alone.

Courts applying the third exception regularly consider declarations prepared for the litigation itself. In *Audubon Society of Portland v. U.S. Fish & Wildlife Service*, the court considered portions of a declaration the plaintiffs filed with their reply brief that explained "what does it mean to say that an action will reduce the rate of growth of a population," a subject "on which [the court] could use a tutorial." No. 04-670-KI, 2005 WL 1713086, at *2 (D. Or. July 21, 2005). The Ninth Circuit likewise affirmed consideration of declarations submitted at summary judgment that "merely condensed and explained existing material in the record." *W. Watersheds Project v. U.S. Forest Serv.*, 753 F. App'x 465, 467 (9th Cir. 2019). And in *National Wildlife Federation*, the court admitted declarations submitted in support of summary judgment where they might help "explain complex scientific or technical analyses." 2015 WL 423090, at *4. None of these courts treated preparation after the agency decision as disqualifying. Each asked whether the material explained the record, which is permitted, or instead supplied a new basis for judging the agency's decision, which is not.

In *Tri-Valley CAREs v. U.S. Department of Energy*, the proposed addition was a later NRC report challenging the applicability and adequacy of the agency's modeling, and the plaintiff did not explain specifically how the report satisfied a record-review exception. 671 F.3d 1113, 1130–31 (9th Cir. 2012). Plaintiffs do not seek consideration of a later study challenging FWS's analysis, and they tie each requested use to a specific explanatory function.

---

draws on old material. Plaintiffs also do not offer Reeder's post–July 2023 observations as evidence of the conditions the agencies faced when issuing the BiOp. His later experience is relevant only to his familiarity with the methods he describes.

*Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zinke* rejected an economist's competing analysis of a proposed casino's effects. The declaration criticized the agency study's data, did not disclose the data underlying its own conclusions, and did not establish when they originated. 889 F.3d 584, 600–01 (9th Cir. 2018). The court emphasized that the declaration was offered to rebut the agency's study, not explain it. *Id.* at 600. Plaintiffs do not seek a new estimate of Last Chance occupancy or a competing model of survey performance.

This Court's *Cascadia Wildlands* decision rejected declarations offering additional facts or opinions not before the agency and found them unnecessary to evaluate whether BLM adequately considered the information before it. 2026 WL 1346855, at *8. Plaintiffs' request differs because it is defined by the specific passages and uses identified in this reply, and it does not depend on the declaration's additional opinions. Plaintiffs do not rely on the age of Reeder's sources to distinguish that ruling.

For the same reason, the concern in *Alsea Valley Alliance v. Evans*, 143 F. Supp. 2d 1214, 1217 (D. Or. 2001), that a declaration styled as explanation may in substance advance a competing scientific position, is answered by defining the request by passage and use rather than by the label "explanatory."

## V. The Court can consider the explanatory material without the declaration's additional opinions.

Federal Defendants argue that the declaration's explanation and opinion are too interwoven to separate. Fed. Defs.' Opp. 16. They are not, and the presence of opinion does not require excluding the whole declaration. Courts reviewing agency action consider the explanatory portions of a declaration while disregarding the rest. In *Audubon Society*, the court admitted the portions of a plaintiff's declaration that explained technical subject matter and struck those addressing whether the

agency erred. It did so down to "the phrases in paragraphs 8 and 9 that refer to FWS mistakes or confusion" and all but the last sentence of another paragraph. 2005 WL 1713086, at *2. In *Western Watersheds*, the district court struck "the majority" of three declarations from agency employees but considered specified paragraphs that "do help to explain complex subject matter." *W. Watersheds Project v. U.S. Forest Serv.*, No. 1:15-cv-00218-REB, ECF No. 81 at 2 (D. Idaho Mar. 31, 2017), *aff'd*, 753 F. App'x at 467; *see also Nat'l Wildlife Fed'n*, 2015 WL 423090, at *4 n.3 (declining to exclude declarations in which "a few assertions may push the boundaries of the limited *Lands Council* exceptions," because the court "will not rely on any assertions that do not fall within a proper exception").[4] The Ninth Circuit likewise distinguishes admitting extra-record evidence from the uses to which it may be put: "[e]ven if a reviewing court properly admits extra-record evidence under *Lands Council*, it may not use" that evidence "to determine the correctness or wisdom of the agency's decision." *Locke*, 776 F.3d at 993 (quoting *Asarco*, 616 F.2d at 1160). The Reeder Declaration is separable in the same way. His explanations of protocol terminology, the record's studies, and the survey methods he has conducted rest on his field experience. The passages identified below draw further inferences. The Court can consider the former without the latter.

The Court need not consider the declaration's further inferences to resolve this motion. The explanation described in Section II, *supra*, does not depend on paragraph 23's statement that Appel's recommendation "directly applies to callback surveys"; paragraph 24's "absolute upper bound" or its statement that the BiOp's

---

[4] The same rule governs affidavits generally. *See, e.g.*, *Lee v. Nat'l Life Assurance Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980) (reversing exclusion of an affidavit in which a witness's description of her own work practices was intermixed with speculation, because a court "will disregard only the inadmissible portions of a challenged affidavit").

approach "ensures" misclassification; paragraph 25's bracketed equation of "landscape use" with "nonresident use" and its opinion that Appel shows the protocol can misclassify occupied sites; paragraphs 26 and 27's conclusions about the floater population;[5] paragraph 30's view that the protocol requires too many detections; or the observations from other projects in paragraphs 16 and 17. Each of those passages is identifiable by paragraph and, for the most part, by sentence. If the Court concludes that any of them goes beyond explanation, it can disregard them without affecting the material identified in Section II.

Federal Defendants also correctly note that paragraph 18 misstates where barred-owl removal occurred. The Klamath Study Area was the control area, and removal did not take place there. FWS_004951. Plaintiffs do not rely on paragraph 18's statement that removal began there in 2018 or on its attribution of the change in detections to removal.

The requested consideration also does not depend on any suggestion that failure to identify a pair leaves a site without occupied-site treatment. The protocol provides multiple routes to pair status and separately recognizes resident singles, AR020287, and the BiOp treats resident singles and pairs within its occupied-site analysis, FWS_000298–99. Failure to identify a pair therefore does not necessarily mean that a site lacks occupied-site treatment. The BiOp describes the incidental observations as "potential floaters," distinguishes sites awaiting complete surveys, and provides for continued surveys and project modification. FWS_000263–65, FWS_000322–23. Appel's own analysis reports no effect of barred-owl calling intensity on detection probability, AR000131, and the Dugger figures compare conditions with and without barred owls rather than showing a historical decline from one figure to the other, AR008448.

---

[5] The demographic counts Reeder reports in paragraph 27 appear in the record itself. FWS_004965 (pair-occupied sites); FWS_004967 (fledglings).

Finally, Federal Defendants read paragraph 29 as questioning whether BLM will conduct its promised surveys. Fed. Defs.' Opp. 21. Plaintiffs do not suggest that BLM will disregard its survey commitments. Whether continued reliance on the same interpretive approach is reasonable is a merits question, and Plaintiffs do not seek to resolve it through this motion.

## VI. The relevant-factors inquiry and the qualifications objection do not call for a different proceeding.

The first *Lands Council* exception permits consideration necessary to determine whether the agency considered relevant factors and explained its decision. *Lands Council*, 395 F.3d at 1030. Plaintiffs do not invoke it to introduce barred-owl competition, diminished reproduction, or imperfect detection as subjects the agency never mentioned. The BiOp addresses each, cites Dugger, and assumes that barred owls likely saturate available habitat. FWS_000229–30, FWS_000263–64, FWS_000268. The exception instead permits consideration of extra-record material "to develop a background against which [the Court] can evaluate the integrity of the agency's analysis." *Locke*, 776 F.3d at 993; *see Nat'l Wildlife Fed'n*, 2015 WL 423090, at *4 (admitting declarations that "may be necessary to identify factors [the agency] did or did not consider"). Plaintiffs' claims turn on how the BiOp treats completed-survey "Status Unknown" results. The explanation described in Section II supplies the background against which the Court can determine whether the BiOp considered how imperfect detection bears on those results. Plaintiffs do not ask the Court to find, from the declaration, that it did not.

Federal Defendants also argue that any further explanation must come from the agency. Fed. Defs.' Opp. 17. Reeder cannot supply FWS's reasons, reconstruct its deliberations, or cure an inadequately explained decision, and Plaintiffs seek none of those uses. *Camp v. Pitts* addresses obtaining further explanation of the

agency's own reasons when needed for review. 411 U.S. 138, 142–43 (1973). That is different from explaining technical material the Court must understand to evaluate the reasons already given.

Reeder's experience is offered as a foundation for the subjects he explains. He worked as a Biological Science Technician and implemented call-back and passive acoustic surveys. Reeder Decl. ¶¶ 5, 8, 13–14. Participation in the Last Chance consultation is not necessary to describe those methods. His experience does not, however, support Last Chance-specific conclusions or statistical extrapolations, and Plaintiffs do not offer it for those purposes.

Intervenors' proposed sequence of expert discovery, rebuttal testimony, and a *Daubert* challenge assumes that Plaintiffs seek to establish competing scientific conclusions through expert testimony. Ints.' Opp. 14. Plaintiffs do not seek that. The Court can resolve this motion by identifying the permitted explanatory uses and disregarding the declaration's additional opinions.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and consider the Reeder Declaration for the limited purposes Plaintiffs request.

Respectfully submitted this 1st day of October, 2026,

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen, OSB # 193827
David T. Woodsmall, OSB # 240631
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
sangyeij@westernlaw.org
woodsmall@westernlaw.org
+1 541.778.6626
+1 971.285.3632