IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, et al., | ) |
| Plaintiffs, | ) |
| v. | ) No. 1:25-cv-02296-MTK |
| DOUGLAS JAMES BURGUM, in his official capacity as Secretary of the Interior, et al., | ) |
| Defendants, | ) |
| and | ) |
| MURPHY COMPANY, et al., | ) |
| Intervenor Defendants. | ) |

Motion Hearing

FTR-RECORDED TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT JUDGE

March 17, 2026

APPEARANCES

FOR THE PLAINTIFFS:

DAVID WOODSMALL
Western Environmental Law Center
120 Shelton McMurphey Boulevard
Suite 340
Eugene, OR 97401

FOR THE PLAINTIFFS:

SANGYE INCE-JOHANNSEN
Western Environmental Law Center
120 Shelton McMurphey Boulevard
Suite 340
Eugene, OR 97401

FOR THE DEFENDANTS:

SHANNON BOYLAN
U.S. Department of Justice, E.N.R.D.
150 M Street N.E.
Washington, DC 20044

FOR THE DEFENDANTS:

CHRISTIAN CARRARA
U.S. Department of Justice, E.N.R.D.
150 M Street N.E.
Washington, DC 20044

FOR INTERVENOR DEFENDANT MURPHY COMPANY:

JULIE A. WEIS
Haglund Kelley LLP
2177 S.W. Broadway
Portland, OR 97201

FOR INTERVENOR DEFENDANT MURPHY COMPANY:

CHRISTOPHER T. GRIFFITH
Haglund Kelley LLP
2177 S.W. Broadway
Portland, OR 97201

FOR INTERVENOR DEFENDANT AMERICAN FOREST RESOURCE COUNCIL:

SARA GHAFOURI
American Forest Resource Council
700 N.E. Multnomah
Suite 320
Portland, OR 97232

FOR INTERVENOR DEFENDANT AMERICAN FOREST RESOURCE COUNCIL:

DOMINIC M. CAROLLO
Carollo Law Group LLC
P.O. Box 2456
Roseburg, OR 97470

FOR INTERVENOR DEFENDANT AMERICAN FOREST RESOURCE COUNCIL:

NOLAN GRANT SMITH
Carollo Law Group LLC
P.O. Box 2456
Roseburg, OR 97470

TRANSCRIBER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, OR 97204
(503)326-8047

(Tuesday, March 17, 2026, 9:36 a.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURTROOM DEPUTY CLERK: -- now in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT: Good morning.

Please call the case.

THE COURTROOM DEPUTY CLERK: Now is the time set for Civil Case Number 1:25-02296, Klamath-Siskiyou Wildlands Center, et al., versus Burgum, et al., for oral argument.

THE COURT: All right. Good morning, counsel. Thanks for making yourselves available for argument today. I'd like counsel to please introduce themselves. And it looks like we have a full -- a full deck here.

So we'll start with plaintiffs' counsel first. Give me your full name and honorific, such as Mr., Ms., or Mx. And let me know who will be leading argument, so I know who I can turn my attention to when questions are going to be asked.

So, plaintiff, who's --

MR. INCE-JOHANNSEN: Good morning, Your Honor. My name is Sangye Ince-Johannsen, Mr., he/him pronouns. I'm joined at counsel's bench by my colleague, David Woodsmall, also Mr. and he/him pronouns. I'm also joined as well by Mr. George Sexton, who is the conservation director of

Klamath-Siskiyou Wildlands Center, one of the plaintiff organizations in this case.

THE COURT: All right. Thank you very much.

Oh, that's right. We also have intervenors. So that's why there are extra folks at the table.

How about we just start our way around the table. Please introduce yourself and which party you represent.

MR. CARRARA: Good morning, Your Honor. Christian Carrara, Mr., counsel for federal defendants. With me is Ms. Shannon Boylan. And we'll be splitting the argument. I'll be handling the ESA arguments, Endangered Species Act. And Ms. Boylan will be handling the FLPMA, the Federal Land Management Policy Act, arguments.

THE COURT: All right. Thank you both very much.

MR. GRIFFITH: Good morning, Your Honor. Mr. Christopher Griffith. I represent intervenor Murphy Company. With me today is Ms. Julie Weis, co-counsel. I'll be presenting the argument today.

THE COURT: All right. Thank you.

MR. CAROLLO: Good morning, Your Honor. Dominic Carollo for intervenor defendants American Forest Resource Council and Association of O&C Counties, Mr. And then I'm joined by my co-counsel Mr. Nolan Smith.

THE COURT: Okay. And will you be leading argument today, Mr. Carollo?

MR. CAROLLO: Yes. I'll be leading argument, Your Honor.

THE COURT: All right. Thank you.

All right. This is plaintiffs' motion for preliminary injunction. Are there any other matters that need to be addressed, other than the questions raised from that motion of -- and I want to make sure I'm pronouncing your last name correctly. Can you tell me it again?

MR. INCE-JOHANNSEN: Ince-Johannsen.

THE COURT: Ince-Johannsen. All right.

So, Mr. Ince-Johannsen, any other issues that need to be taken up today, outside of that motion for preliminary injunction?

MR. INCE-JOHANNSEN: None for plaintiffs, Your Honor.

THE COURT: All right. And then, Mr. Carrara --

MR. CARRARA: Yes, Your Honor. And none from federal defendants.

THE COURT: Okay. And then, Mr. Griffith, any other issues?

MR. GRIFFITH: Nothing for Murphy Company.

THE COURT: All right. And Mr. Carollo?

MR. CAROLLO: No, nothing for AFRC or AOCC.

THE COURT: All right. So it'll be straightforward then, is what you all are telling me.

Okay. All right. I want to be able to give

everybody an opportunity to make your arguments. And if some of you -- I think some of you have been in my court before. I think Mr. Carollo, I think, a few months ago. All right. And so perhaps others may be aware of my processes here.

I will -- we'll try and take a break about on the hour so that people can stretch, get refreshed, come back in, and we'll continue with argument.

I can tend to ask questions, so please know that my interruptions are not intending to be disrespectful. But you're here to try to convince me and educate me. And, to that end, my questions are focused on getting myself educated and trying to get the information that I need to be able to make a decision.

Now, it may be that you also have some ideas about what you think I need. And I will give you the opportunity to fill in any blanks you think I've left open. So don't feel the need to rush.

So focus on, please, answering the question, even if you think it might be off base. You can always redirect me to what you think I ought to be thinking about after you answer my question. So that way -- that way we're building a full record and, frankly, filling me with all the information both helpful and that may be -- that which I might not need at all, but will at least satisfy my exploration here.

Environmental law issues are cases that tend to come

through our district court on somewhat of a frequent level, but it also is a different language from much of what we also do. So some of these questions I have are going to help me get reoriented to the specific issues in this case.

So please bear with me as we work through the day. And I say "work through the day." Don't expect this to be a one-hour oral argument or two-hour oral argument. I mean, if you think you might be lucky, maybe we get out by noon.

I think I'll be lucky if I -- everyone is fully exhausted by the end of the day, and I feel like I actually have everything that I need to know and then some. To that end, we'll take a break at noon for lunch and, again, try to take breaks every hour.

If anyone needs a break, and I have not attended to a break, just raise your hand and let me know. I don't need a reason. Just simply let me know you need a break, and we'll take a brief break for you to -- for -- you know, for you to stretch your legs or do whatever it is you need.

All right. Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Thank you, Your Honor. May it please the Court.

Plaintiffs are asking for a temporary and narrowly tailored pause on logging.

THE COURT: How temporary?

MR. INCE-JOHANNSEN: Until the Court has a chance to

rule on the merits of this case.

THE COURT: Okay. Which would turn into what? A permanent injunction?

MR. INCE-JOHANNSEN: We would be seeking a vacatur of the biological opinion and of the decision records and of the environmental assessment, and remand to the agency to prepare new documents.

THE COURT: Consistent with what you understand to be the legal requirements?

MR. INCE-JOHANNSEN: That's correct, Your Honor, with the Endangered Species Act and the Federal Land Policy and Management Act specifically.

THE COURT: All right.

MR. INCE-JOHANNSEN: We're also not trying to stop the intervenors from recouping their investments in areas outside of the specific ecologically critical units at issue.

And, if I may, I would love to use the evidentiary system here, just to share an image of the Last Chance project area.

THE COURT: You know, it was referred to as Take a Chance in one section. And then I saw Last Chance. Is it Last Chance?

MR. INCE-JOHANNSEN: So the overall project is Last Chance. And that project is constituted of a number of individual timber sales, which includes Take a Chance, Paul's

Payoff, King's Grave. And there will certainly be more. Rotors Up is another recently planned one.

THE COURT: Was it Rotors Up?

MR. INCE-JOHANNSEN: Rotors Up. That's correct.

THE COURT: Rotor as in r-o-t-o-r, rotor?

MR. INCE-JOHANNSEN: Yeah. I believe it's a references to helicopter logging. It's on relatively steep slopes --

THE COURT: Got it.

MR. INCE-JOHANNSEN: -- in the project area.

THE COURT: So who comes up with these names?

MR. INCE-JOHANNSEN: That's an excellent question. Staff at BLM, I believe.

THE COURT: Okay. All right. So if we refer to Last Chance, that's the umbrella name for all of these logging projects?

MR. INCE-JOHANNSEN: That's exactly right.

THE COURT: All right. And there will be a meaningful distinction that I will need to be taking into account when discussing Last Chance versus Take a Chance or any of the other -- any of the other individually named projects?

MR. INCE-JOHANNSEN: I think when I'm referring to Last Chance, I'm referring to the project as a whole. I don't think that there are, at this point, necessarily meaningful distinctions between the individual sales planned under

Last Chance to be aware of.

Certainly, each has its own impacts. And, to the extent that we are seeking -- we allege a claim related to critical habitat, you know, the distribution of critical habitat across the different timber sales varies, of course.

THE COURT: Okay. Now, there wasn't much of a discussion, if any, on King's Grave or Rotors Up. But it seemed like the focus was on Paul's Payoff and Take a Chance.

MR. INCE-JOHANNSEN: So the injunction the plaintiffs are seeking is not specific to any individual timber sale, just to be clear. It's specific to where there is northern spotted owl nesting, roosting, and foraging habitat.

THE COURT: And is that -- is the Last Chance -- do we call that the project and then the -- for example, Paul's Payoff and Take a Chance as separate timber sales within the project?

MR. INCE-JOHANNSEN: That's exactly right.

THE COURT: All right. So is the Last Chance project the 11- to some-odd 12,000 acres? It might have been even 13. I can't remember, but in that range.

MR. INCE-JOHANNSEN: That's correct. That's the overall footprint of all of the timber sales that will be planned over the 15-year period. I should also emphasize that the Last Chance project is a 15-year project that will have a number of timber sales over the course of those 15 years.

We've talked about just a few of them that have already been planned. You know, we expect that we'll continue to see decision records issued by BLM pursuant to the Last Chance EA for further timber sales over that 15-year period.

But right now the ones that we're aware of, that we've been looking at, are Paul's Payoff and the other ones that we've discussed.

THE COURT: All right. Thank you.

MR. INCE-JOHANNSEN: And I am not sure if I'm sharing my image here. I do not mean to be sharing the Himalaya, if that's what folks see.

Sorry. Just one moment.

THE COURT: Sure.

MR. INCE-JOHANNSEN: If this does not work, I will --

THE COURT: And I take it the -- this image is coming off of your computer?

MR. INCE-JOHANNSEN: It is.

THE COURT: Okay. So at least we know that we're connected -- or that you're connected to the system. Here we go.

MR. INCE-JOHANNSEN: Yes.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Here we go.

So this is an image of a stand of mature and

old-growth forest within the Last Chance project area with some staff of the Klamath-Siskiyou Wildlands Center. You can see the very wide, large-diameter trees.

You can see the complex forest structure, the multistory canopy, with the -- you see in the background behind the individuals there, you know, just sort of a textbook example of a late seral forest with downed woody debris.

This is exactly the kind of forest structures that provide essential habitat to northern spotted owls higher up in the canopy and, on the forest floor, essential prey species for northern spotted owl.

This -- I should say this photo is specifically within Paul's Payoff. And this is one of the locations where there -- where BLM has planned a right-of-way for new road construction.

This is a previously intact old-growth stand. And in order to access units planned under the Last Chance EA, and specifically the Paul's Payoff decision record -- that's Decision Record 1 -- BLM is planning to cut a right-of-way right through what we're looking at here.

So these trees would be --

THE COURT: So right down that path?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: Okay. And how much of a roadway will be developed?

MR. INCE-JOHANNSEN: My understanding is this would be a 60-foot right-of-way, I believe.

UNIDENTIFIED SPEAKER: It varies. But, yeah, at its widest points, we've measured it as 60. I would say the average is 45.

MR. INCE-JOHANNSEN: Okay. If you didn't hear, an average of 45 feet with -- for the right-of-way.

THE COURT: In width and the length?

MR. INCE-JOHANNSEN: I'm sorry. Could you repeat?

THE COURT: And the length?

MR. INCE-JOHANNSEN: I'm not immediately sure of the length of this particular road, how long this road -- this right-of-way would be.

UNIDENTIFIED SPEAKER: There are two segments to it, and combined they total less than a mile out of 26 miles total authorized in the plan.

MR. INCE-JOHANNSEN: It sounds like a little bit less than one mile. And I should say that there's a total of 26 miles of new road construction planned under the Last Chance EA, including many examples like this, where there would be a new road cut through an intact old-growth stand looking very much like this example here.

THE COURT: Okay.

MR. INCE-JOHANNSEN: And, of course, these huge-diameter trees would be cut to enable that. To the extent

that they're within the right-of-way, as these ones here are, they would need to be cut.

And, you know, that's, I think, one of the plaintiffs' main concerns in this case, is just the amount of new road construction through mature and old-growth forest. Certainly, we are very much concerned as well about the individual logging units.

But, you know, having litigated a few timber sale cases by now, what stands out to me -- and I think what stands out to my clients -- about this one is, among other things, just the amount of new road construction through intact old-growth forest.

It's a unique forest ecosystem. You know, there isn't very much higher elevation intact old-growth left on BLM land in Southwestern Oregon. So it's relatively unique in that respect. It's also home to rare plant communities associated with the serpentine soil ecosystem, which is also relatively rare in this part of Southwestern Oregon.

THE COURT: What kind of plant communities are there that are unique?

MR. INCE-JOHANNSEN: So, among other things -- I should say I visited the site a few months ago. And, you know, we saw towering sugar pine trees, very large-diameter trees; a number of oaks in the understory, not -- not like you would see, you know, in an oak savanna type of ecosystem, just

sprawling oaks in a relatively closed forest canopy, which is relatively unusual and is a -- sort of a hallmark of what you'd see with an intact old-growth ecosystem in this part of Oregon. And there's just so little of that left.

There also -- you know, in the serpentine soil communities, you can see, like, Darlingtonia, for example, in fens. It's a species that's very closely associated with that soil type. There is more of that soil type in Northwestern California and in the Kalmiopsis region, but in this part of Oregon it's relatively rare.

Serpentine soils, they're characterized by low nitrogen, lots of metals in the soil. So it just has a different evolutionary process associated with it for plants that will grow there.

THE COURT: Okay. And this case isn't about addressing the impact on those -- those plant systems, primarily focusing -- or, actually, not just primarily -- but only focusing on the northern spotted owl and the western pond turtle, right?

MR. INCE-JOHANNSEN: That's correct. For purposes of this motion for preliminary relief, we're pursuing three of our claims in our complaint. You know, it's beyond the scope of this injunction. But, just because you asked, we also have alleged a National Environmental Policy Act claim that we would ultimately pursue at summary judgment, that would go into these

impacts.

But, for purposes of this motion, we are specifically concerned about northern spotted owl habitat, which you very much see in this image with this late seral forest type here.

THE COURT: And late seral forest versus what other kind of forest are we -- I mean, you've used the term a few times. I want to make sure --

MR. INCE-JOHANNSEN: Sure.

THE COURT: -- I understand the scope of its meaning.

MR. INCE-JOHANNSEN: Absolutely.

So there's early seral forests. So these are -- you know, it essentially refers to the successional stage of the forest. So an early seral forest is, you know, a younger, more immature forest, whether that be because of recent logging or, you know, some other disturbance events, wildfire or wind blow-down.

Mid seral forests is sort of an interim stage between, you know, a young forest and what you see in this image here, which is very much a late seral forest.

THE COURT: All right. Okay.

MR. INCE-JOHANNSEN: You know, in terms of age class, to reach -- I'm not sure how old these specific trees are. But, you know, to reach a stage where a forest looks like this, you're looking at many decades, likely well over a century, for trees to grow to that size, with that degree of forest

complexity, with the decadent components like the -- or the downed woody debris on the forest floor and the snags in the background.

THE COURT: All right.

MR. INCE-JOHANNSEN: So we are seeking a narrowly tailored injunction to protect this type of habitat for northwestern -- excuse me -- for northern spotted owls.

And, separately, we also are seeking a narrowly tailored injunction to protect the upland habitat associated with the -- and required by northwestern pond turtles. As part of their life cycle, they'll -- you know, in fall, around October, they'll head upland to overwinter in upland overwintering habitat.

I should note, you know, in our -- in our motion for preliminary relief, we estimated roughly how much area would be covered by this -- by this injunction, you know, what the geographic scope of it is.

I think we emphasized in the briefing -- and I would like to emphasize again -- that that was an overestimate because there is a lot of overlap between, you know, northern spotted owl habitat, specifically the nesting --

THE COURT: And what was an overestimate? Tell me again.

MR. INCE-JOHANNSEN: I think we estimated roughly 60 percent of the -- 65 percent of the project area. So that

includes, in terms of nesting, roosting, foraging habitat -- I'll keep using that term, so I'll just call it NRF, if you -- if you don't mind. That's what folks in the know will call it, the NRF habitat: Nesting, roosting, foraging.

So there are 791 acres of NRF habitat slated for removal within critical habitat units. So this is designated critical habitat the Fish and Wildlife Service specifically found is essential to the conservation of the species.

Not only that, in its designation of critical habitat, the Fish and Wildlife Service found that all occupied -- excuse me -- all unoccupied and likely occupied sites -- so not just the occupied ones, but also the unoccupied sites -- within that critical habitat unit are essential for the species.

So that is, you know, the scope of the injunction we're seeking. It is to protect those essential areas: The nesting, roosting, foraging habitat that the species depends on in this part of Southwestern Oregon.

Also, within the scope of the -- of the injunction would be, you know, the northwestern pond turtle uplands overwintering habitat. Again, those do overlap somewhat. We are not able to tell from the record exactly what that overlap looks like.

I believe that BLM would certainly have that within its means to -- to determine, you know, what would be necessary

to comply --

THE COURT: And you had previously mentioned that in your brief you overstated the acres involved. And so you would be asking, if I were to grant a preliminary injunction, for even a narrower -- narrower range to be protected in some way during the phase of the PI?

MR. INCE-JOHANNSEN: So we would be -- we are asking the Court to enjoin logging activities under the Last Chance EA within the critical habitat. There is a live dispute, and one of the claims in this case is over the actual amount of critical habitat that would be impacted by implementation of the Last Chance EA.

And if you don't mind, I'd be glad to pivot to that issue now, on the likelihood of success on the merits of that particular claim, because I think that that -- you know, that does speak to both the breadth of the -- or I should say the relatively narrow breadth of the injunction that we're seeking and just, you know, fundamental mistakes that were made by the agencies that we're challenging in this litigation, Your Honor.

So BLM is relying on a BiOp that analyzes only a fraction of the critical habitat destruction that's disclosed in its own final EA. The math between these two sets of documents is irreconcilable.

Both documents use the exact same categories, which are NRF removal, NRF modify, dispersal habitat removal,

dispersal habitat modify. So you can think of those as four categories of -- of impacts.

Now, the biological opinion evaluated a total of 791 acres of NRF removal, 336 acres of dispersal removal, for a total of 1,127 acres of critical habitat removal. The final EA, on the other hand, the environmental assessment, published May 2025, discloses removal of 3,252 acres of critical habitat total.

THE COURT: Which is larger than what the biological opinion --

MR. INCE-JOHANNSEN: Substantially. Substantially.

THE COURT: And what's the reason for the difference?

MR. INCE-JOHANNSEN: So the -- opposing counsel have offered a number of explanations for that, that discrepancy. You know, I think in a declaration that was submitted to the Court there was some talk of a potential GIS, so geospatial information system, error that resulted in double-counting of -- of specifically hazardous fuel reduction treatments.

Respectfully, that explanation doesn't add up because we're specifically looking at NRF removal. HFR treatments -- that's hazardous fuel reduction treatments -- are an understory treatment.

They don't, by the terms of the EA and the -- you know, as is evidenced in the record, those types of treatments don't affect -- they don't -- they're not tantamount to NRF

removal. Those are modify treatments in the understory that leaves the forest structure, specifically the canopy, intact.

So, you know, to the extent that there may be a GIS error -- there may well be. I don't doubt that -- it cannot explain the discrepancy in the type of habitat that we are most concerned about, specifically the NRF removal.

That's when logging limitation results in a forest like this no longer providing the features that are required for nesting, roosting, and foraging habitat.

I will also just point out that that explanation that was offered is a post hoc rationalization. You know, the evidence before the Court is the decisions that the agency actually made.

THE COURT: And they didn't take into account this error in GIS at the time that the decisions were made?

MR. INCE-JOHANNSEN: That's correct, Your Honor.

THE COURT: All right. So, at least on that ground, you would say that the -- the agency's determinations are -- are not in accordance with what? With its own internal rules? With a particular statute in play? Or a combination of both?

MR. INCE-JOHANNSEN: Yeah. So the Endangered Species Act requires that the Fish and Wildlife Service analyzes the project as a whole. And this is in 50 CFR 402.14(c)(4) that states that requirement.

And the Ninth Circuit has also addressed that

specific requirement and held in Conner v. Burford, 848 F.2d 1441 at 1453 -- and this is cited in our briefing -- that, you know, an agency can't do a piecemeal analysis, specifically --

THE COURT: Has that also been described as tiered? Or maybe that's another reference. Because I think one of the issues that you may have raised, either in your -- in your motion or on the reply, is that this approach of "When we get there, and if we see a need to modify practices, we'll do it in the field or on the fly or in real time," but that tiered approach isn't -- isn't -- isn't appropriate under -- under agency rules?

MR. INCE-JOHANNSEN: Yeah. I think it's actually -- that is a distinct issue. I'd be happy to address that now. The tiering argument that the other side raised essentially, as I understand it, is that, you know, to the extent that there is any deficiency in the analysis in the F -- excuse me -- the fiscal year 2023 biological opinion, which is the document that analyzes the Last Chance timber sale, you know, to cover any -- any gaps in that analysis, you can tier back to the biological opinion prepared for the 2016 resource management program.

Now, under the Federal Land Policy and Management Act, BLM will periodically update its resource management plans, or RMPs. It most recently did that for Southwestern Oregon in 2016. And that went through ESA consultation, just like this timber sale did.

And then every -- after that, every subsequent activity -- action on -- on that land, so in this case this timber sale, must be planned in accordance with that -- with that resource management plan.

But the ESA analysis is fundamentally operating at a different level between the two. And that is to say that -- sorry -- the 2016 RMP is a programmatic document. It doesn't authorize or dictate or plan any site-specific actions.

And it specifically contemplates that any site-specific actions, like the Last Chance timber sale, will require ESA consultation as to the specific impacts at the specific site.

You know, this is consistent with how BLM plans any number of actions across its lands and -- and, you know, the tiering argument can't cover the specific -- site-specific gaps in the biological opinion for the Last Chance timber sale. So that's the tiering issue.

THE COURT: And then the issue you were previously discussing is not tiering, but what is it called?

MR. INCE-JOHANNSEN: The -- so we're talking about the gap in the numbers in the critical -- of critical habitat impacts as between the biological opinion and the EA. And what I was discussing a moment ago refers -- relates to the -- the requirement that the biological opinion consider the action as a whole.

It does not -- the Endangered Species Act does not permit piecemeal consultation. It doesn't allow segmentation of a project into multiple parts. And the -- as I understand it, the arguments that the other side has, you know, offered on this point is any -- before they would exceed the figures disclosed and authorized in the biological opinion, that there would be a pause on logging and that any further logging would require further ESA consultation.

That would be a piecemeal approach that the Ninth Circuit has rejected. And specifically the regulations for the Endangered Species Act don't countenance. There is, again, a requirement in the regulations to consider the activity as a whole.

Here the activity as a whole is --

THE COURT: The activity as a whole prior to approval?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Absolutely.

So, you know, faced with this kind of discrepancy, I think the agencies have two lawful options. They could re-initiate ESA consultation on the project as a whole to the extent that it's been modified.

Again, the biological opinion from 2023 discloses impacts to a total of 3,093 acres of critical habitat. The EA

discloses impacts to 8,311 -- or, maybe more fairly, 7,300 because the 8,011 does include just over a thousand acres of non-habitat -- but, at the very least, 7,300 acres, so more than double what was disclosed in the -- in the biological opinion.

That is tantamount to a modification of the project. And that is one of the specific triggers for re-initiation of consultation under 50 CFR 402.16(a). So, you know, if they intend, in fact, to go beyond what the biological opinion disclosed, it's a modification of the project that would require further ESA consultation on the project as a whole -- not segmented, but on the project as a whole -- so re-initiation on that biological opinion.

Or, you know, if they have no intention of going beyond the figures disclosed in the biological opinion, they can certainly revise their NEPA analysis to match the figures disclosed in the -- in the biological opinion.

If it's true that they -- it's simply a mistake in the environmental assessment, and they intend to abide by the -- you know, the figures and stay within the impacts that the biological opinion disclosed, that's all well and good, but they would need to revise their EA to match that.

On the record before the Court, there is a fundamental discrepancy and a massive gap between the two final decisions of the agencies, so the -- on the Fish and Wildlife

Service side, the biological opinion, which is final agency action, subject to challenge and judicial review. And on BLM's side, it's the final EA from May 2025.

There is an irreconcilable --

THE COURT: So there's a lot for me to digest there. So I want to take it up in a few bite-size chunks.

First, talk to me a little bit about sort of the -- sort of the hierarchy and priority of -- of both -- just some of these plans, the relationship between some of these assessment requirements, and -- and the statutes that I'm supposed to be considering.

So, first, we have an RMP. And it sounds to me like that's an overarching plan for a very large region and -- and that no actions could really violate or -- or sort of veer off what the RMP might generally sort of require or call for. Is that fair to say?

MR. INCE-JOHANNSEN: Absolutely.

THE COURT: All right. So RMP's like the Constitution?

MR. INCE-JOHANNSEN: Sure.

THE COURT: I mean, I'm trying to find relatable language in everyday legal disputes.

MR. INCE-JOHANNSEN: That works, yeah.

THE COURT: Okay. But tell me also where you might want to play with the metaphor and elaborate, and you're

welcome to sort of extend them as needed.

Then, after the RMP, I mean -- and I know this isn't a linear analogue, but we -- but we also have both FLPMA and NEPA. And how do FLPMA and NEPA -- NEPA engage, if at all, with how the RMP is regarded?

MR. INCE-JOHANNSEN: So FLPMA is the organic act that -- that BLM is, you know, organized under. And FLPMA includes specific provisions that are, you know, relevant to your question.

The requirement that every action that BLM plans be consistent with the RMP, that is in FLPMA. That's 43 U.S.C. 1732(a). Specifically FLPMA requires strict conformity with the 2016 RMP.

It's also elaborated further by regulation. So BLM has its own regulations that implement the -- implement FLPMA. When I say "FLPMA," I mean the Federal Land Policy Management Act. And that regulation specifically, 43 CFR 1,610.5-3(a), that further elaborates that requirement that BLM --

THE COURT: So maybe if I'm -- as I'm envisioning this sort of ad hoc scheme in my -- or scheme in my mind, FLPMA and the resource management plan are sort of -- sort of coequal. FLPMA sort of authorizes the -- or creates the authority for the RMP to sort of rule over the BLM's actions.

MR. INCE-JOHANNSEN: I'm sorry. That it's coequal with what?

THE COURT: Well, I'm just looking at the hierarchy. So RMP and FLPMA are sort of coequal in that sort of -- sort of linear hierarchy that I'm trying to sort of work with here.

MR. INCE-JOHANNSEN: I think, for purposes of this case, you could think of it that way. You know, if we were challenging the RMP, certainly then FLPMA governs. The RMP needs to be consistent with FLPMA. That's not at issue in this case. So, for purposes of this case, you could think of them as coequal, I believe.

THE COURT: All right. Well, then you can modify the metaphor the next time we see each other --

MR. INCE-JOHANNSEN: Will do.

THE COURT: -- on another case.

All right. So -- all right. So we have the RMP and FLPMA. Okay. And then if I were to try to say that there's something below that, would it be NEPA that kind of -- that sort of helps regulate the way in which decision-making is to occur?

MR. INCE-JOHANNSEN: I think NEPA plays an interesting and maybe relatively minor role in the claims before the Court right now because we aren't alleging -- we've not pressed any NEPA claims for purposes of this preliminary injunction.

You know, I think, taking a step back, I wouldn't say that NEPA is in any way subsidiary to FLPMA. It is an

overarching statute that binds every federal agency any time it may take an action that significantly affects the environment, as this one does.

And that's -- well, I should say NEPA applies to any federal agency any time it takes an action if it rises to a certain level of -- excuse me -- of significance. Then it -- further requirements are associated with that. That's one of the claims that we've brought, but are not pursuing at this -- at this stage.

THE COURT: In the context of the PI?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: So I don't have to -- we don't have to talk about NEPA.

MR. INCE-JOHANNSEN: I think, just to understand the context for the environmental assessment, that that is a document prepared under and pursuant to NEPA.

THE COURT: Got it. All right. And we'll get to the EA in just a bit.

And then, of course, there's the ESA. So where does the ESA fit in this hierarchy?

MR. INCE-JOHANNSEN: I'd say the very top.

THE COURT: Along with the RMP and FLPMA?

MR. INCE-JOHANNSEN: You know, I think when you look at the legislative history of the ESA and specifically -- you don't even need to go to the legislative history. When you

look at how the Supreme Court has discussed the ESA, it's clear that it is an overarching mandate on every agency to afford the highest priorities -- and this is what the Supreme Court said in Tennessee Valley Authority v. Hill --

THE COURT: So the ESA can also challenge an RMP?

MR. INCE-JOHANNSEN: Absolutely.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Yeah.

THE COURT: All right. All right. So now we have BiOps or, as -- biological opinions. And they flow from what authority or requirement?

MR. INCE-JOHANNSEN: Sure. Great question.

So under the Endangered Species Act, and Section 7 specifically, every agency is required --

THE COURT: So BiOps are a product of ESA -- of the ESA?

MR. INCE-JOHANNSEN: Yes, of Section 7(a)(2) of the ESA.

THE COURT: Okay. And do BiOps come through any other -- any other statutory authority, or is it just the ESA?

MR. INCE-JOHANNSEN: That term refers specifically to the ESA.

THE COURT: Okay. Biological assessments, where do they come from?

MR. INCE-JOHANNSEN: So they're also a creature of

Section 7(a)(2) of the ESA.

THE COURT: Okay.

MR. INCE-JOHANNSEN: And if you'll permit me just to go a little bit into the nuances of Section 7(a)(2) because I think they are relevant here, when an agency undertakes an action that may affect a listed species under the Endangered Species Act, it is required to ensure that that action will not jeopardize the continued existence of the species or destroy or adversely modify designated critical habitat for that species. This is in Section 7(a)(2) of the ESA. That's 16 U.S.C. 1536(a)(2).

And the initial question is whether it may affect the listed species. If the answer to that is yes, it prepares a biological assessment. And that analyzes whether -- so, given that it's likely to -- or that it may affect the species, whether it is likely to adversely affect the species or just affect it without being an adverse affect. So the biological assessment is the document that analyzes those questions.

THE COURT: So the ESA first authorizes a biological assessment?

MR. INCE-JOHANNSEN: Yeah. And, to be clear, the biological assessment is a document prepared by the action agency. There's an important distinction in Section 7(a)(2) between the action agency, which is here BLM, and the consulting agency or the expert agency, which is the Fish and

Wildlife Service, which is charged with administering the ESA as applied to terrestrial species.

So BLM prepares -- well, it gets a little more complicated than this because often --

THE COURT: But is the complication necessary for my decision-making today?

MR. INCE-JOHANNSEN: I don't think so, Your Honor.

THE COURT: Okay.

MR. INCE-JOHANNSEN: So the --

THE COURT: We can -- we can geek out on the other stuff later, but just make sure that -- or maybe it's "nerd out." Maybe "nerd out." We'll nerd out later. But I just want to make sure that I'm understanding the structure as -- as is necessary for this problem that I have to -- have to resolve.

MR. INCE-JOHANNSEN: Absolutely.

THE COURT: So the biological assessment would be that which the ESA authorizes -- or requires BLM to -- to engage in?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: The biological opinion comes from FWS?

MR. INCE-JOHANNSEN: That's correct. Just a little -- just a small wrinkle in that. The biological assessment is prepared by BLM. It needs to seek concurrence from the Fish and Wildlife Service that the action is not

likely to adversely affect.

Here because the action -- the Last Chance timber sale -- and, actually, it was batched together with other sales, the fiscal year 2023 batch of projects -- because it was found to be likely to adversely affect northern spotted owls, that triggers the requirement to engage in formal consultation with the Fish and Wildlife Service, which culminates in the Fish and Wildlife Service issuing a biological opinion, as it did here.

THE COURT: Okay. In the absence of adverse impact, then no biological opinion would be required?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: Okay. And just the biological assessment, and then it would stop there?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: But in this instance, because there was a finding of some -- is "adverse impact" the correct term of art?

MR. INCE-JOHANNSEN: Adverse effects.

THE COURT: -- adverse effects, then a biological opinion would be required. And FW -- and how does FWS engage in -- what's required to -- to produce a biological opinion?

MR. INCE-JOHANNSEN: So a biological opinion needs -- it gets a little complicated in that, and I'm not going to go into all the unnecessary complications, unless you ask me. But the -- essentially it turns on two analyses.

The Fish and Wildlife Service needs to consider whether the action at issue, here the batch of projects from 2023, is likely to -- or, I should say, may jeopardize the continued existence of the listed species.

And that analysis involves looking at the environmental baseline, you know, what is just the status in the planning area of the species and its habitat. And add to that the effects of the action, both direct and indirect, and also add cumulative effects, which are not at issue in this case.

But just add those three kinds of effects to the baseline to determine whether that is tantamount to jeopardy to the species. And jeopardy just means whether it's likely to appreciably reduce the likelihood of survival or recovery for that species. So that's one of the analytical, you know, pathways and requirements for a biological opinion to consider.

The other relates to critical habitat, which very much tracks the same sort of conceptual flow of considering the baseline, but focusing on designated critical habitat, considering impacts, effects to that critical habitat, adding them to the baseline, and determining whether that appreciably reduces the value of the critical habitat network as a whole.

So the biological opinion ultimately considers the question of jeopardy and the question of destruction or adverse modification of critical habitat.

THE COURT: Okay. And then an EA was also performed?

MR. INCE-JOHANNSEN: Yes. BLM prepared a series of EAs. The one that's operant now was issued in May 2025.

THE COURT: Okay. And they were required to conduct an EA because?

MR. INCE-JOHANNSEN: So under NEPA, which is a little bit beyond the scope of this lawsuit because we are not currently pressing a NEPA claim for this motion, but NEPA just requires that federal agencies take a hard look at the effects of the actions they're planning.

THE COURT: And that's not part of the preliminary injunction motion considerations that you're asking me to take into account?

MR. INCE-JOHANNSEN: No. I think it just provides context --

THE COURT: Okay.

MR. INCE-JOHANNSEN: -- but I think we've covered the relevant context of it.

THE COURT: All right. And there's references, at least to the western pond turtle, that it is considered -- is it an agency -- I mean, I know it's not endangered. I'm looking for the term here in my notes.

MR. INCE-JOHANNSEN: It's a bureau sensitive species.

THE COURT: Bureau sensitive. Thank you.

So I know we should probably start talking about the

species involved in your preliminary injunction and how either the biological opinion didn't account for it -- account for the impacts in an appropriate way. Is that -- is this an appropriate time to segue to that topic? Or are there some more foundational points that you want to make sure that I have --

MR. INCE-JOHANNSEN: So I think we've covered the foundational points relevant to the northern spotted owl. And just in terms of, you know, separating out the different arguments and making sure we don't confuse them, it probably would be sensible to proceed to northern spotted owl issues now.

And then, for purposes of the northwestern pond turtle, there's a little bit more context related to the bureau sensitive species designation and the requirements that attend to that designation --

THE COURT: All right.

MR. INCE-JOHANNSEN: -- which are not relevant to the northern spotted owl, for purposes of this lawsuit.

So there's this fundamental discrepancy in the critical habitat acreage as disclosed in the EA and the biological opinion. And to address that, you know, on the record before the Court, you know, the explanations that have been offered are -- they are post hoc rationalizations. They do not explain the discrepancy in the NRF removal.

And, you know, even setting that aside, you know, whether or not the discrepancy is adequately explained, I think, more importantly, the -- the proposed solution that the other side has offered, that it would just -- that BLM would conduct further specific consultation -- or engage in further specific consultation with Fish and Wildlife Service on any decision records that exceed the metes and bounds of the 2023 BiOp, that would be prescribed segmentation of the project.

It would be piecemeal consultation that the Ninth Circuit --

THE COURT: If it's clear that all of this is post hoc and not appropriate, then why even -- why would the defendants even make that suggestion?

MR. INCE-JOHANNSEN: You know, I mean, there's just a glaring discrepancy between the documents that certainly calls for some explanation. And I don't fault my colleagues for offering explanations for it.

I just would flag and emphasize that they cannot explain -- the explanations that have been offered cannot explain the gap between the NRF removal, which is very much of the most concern -- not exclusively the concern, but the most concern to my clients, is the removal of those features that provide nesting, roosting, and foraging habitat to northern spotted owls. That's the late seral forest types that I shared an image of earlier.

So the explanations that have been offered don't address that. And they are, again, post hoc rationalizations.

THE COURT: And the explanations are post hoc, but my legal question is -- there must be some rational -- rationale that would be considered legally appropriate to make post hoc -- to suggest sort of these post hoc, you know -- you know, revisions or modifications; otherwise, then the defendants are -- would otherwise be making clearly legally erroneous arguments to the Court.

MR. INCE-JOHANNSEN: If I understand your question right, I think that the solution for the agency is to either re-initiate consultation on the activity as a whole, as defined in the final EA; or if it has no intention of going beyond the figures stated in the biological opinion, if it's true that, you know, it's simply a series of mistakes -- setting aside the fact that the explanations don't seem to add up, but let's assume that there are just a series of mistakes that explain the discrepancy -- then it can certainly prepare a revised EA, and that would probably moot our claim in this -- on this particular issue.

We're focused on --

THE COURT: And a PI wouldn't be necessary?

MR. INCE-JOHANNSEN: I -- just shooting from the hip right now, I don't think that it would be. I don't want to necessarily commit myself to that. But, I mean, it would

depend on what the EA discloses and how it goes about it. But certainly --

UNIDENTIFIED SPEAKER: Only on this issue.

MR. INCE-JOHANNSEN: And only on this issue -- that's absolutely right -- because we do have other claims that we are pressing for purposes of this motion.

But the record before the Court is the biological opinion and the final EA published in May 2025. There is an irreconcilable difference in the critical habitat acreages disclosed, the impacts disclosed --

THE COURT: Okay.

MR. INCE-JOHANNSEN: -- to critical habitat between the two.

THE COURT: And maybe my question is not framed properly, but I know you've described at least one of the reasons why these discrepancies -- these discrepancies cannot be resolved is because it's really being done -- or at least the defendants are trying to argue that they can be addressed after these decisions have already been made by BLM, that they can be addressed -- and you're describing it as post hoc explanations or solutions.

And you say it in a way that that would be clearly inappropriate and in violation of either their own rules and regulations or the statute. So is it that clear cut that if these are, in fact, post hoc and not appropriate, then they

lose and you should get the -- at least you can then establish that there's a likelihood of success on the merits for the purposes of the PI?

I -- just to -- I'm trying to show you all my cards because I'm not trying to hide the ball. I mean, I suppose that if it's as clear as what you say, then what they're suggesting as post hoc explanations for the discrepancies would be -- well, not reporting the state of the law accurately to the Court.

MR. INCE-JOHANNSEN: So, you know, I think reasonable minds might disagree over the status of the subsequent decision record, whether that is post hoc. You know, I think --

THE COURT: Okay.

MR. INCE-JOHANNSEN: -- my position, for purposes of this case, is that it is an explanation that is contrary to the analysis in the environmental assessment, which is the final agency action that -- that states the much larger figures.

So I think there is a distinction to be made, though, between the explanations offered in the decision records and the explanations offered in declarations associated with this litigation. I think those are very much in the category of post hoc rationalizations.

THE COURT: So it's unlikely that the defendants are going to say, "Oh, post hoc is appropriate here." They might just simply argue, "Well, this isn't post hoc."

MR. INCE-JOHANNSEN: I think that may -- that certainly may be the case. And I would draw a distinction between the declarations filed in this litigation, positions adopted that are convenient for this litigation, and decisions that BLM has actually made, memorialized in its decision records. Those carry the force and effect of law. They're not -- they're not merely litigation positions.

But I think this is -- you know, this is why I would emphasize that, you know, whatever the explanation may be for this discrepancy -- and perhaps there is a convincing explanation that is ultimately offered for it -- I'm more concerned with the -- and my clients are more concerned with the proposed solution, that the agency just promises to stop before it violates the ESA, before it exceeds the critical habitat numbers disclosed in the EA; and that any further implementation of the Last Chance EA, so to the extent that they would go beyond those limits and those figures specified in the BiOp, that they would undertake further consultation specifically on those decision records and --

THE COURT: So that sounds like the tiering argument. Is that -- tell me -- but you don't -- tell me what -- if it's not tiering, what is it? Piecemeal?

MR. INCE-JOHANNSEN: Maybe it would be -- I think it's more piecemeal. You know, maybe if they say that they're tiering back to the biological opinion, they might frame it as

a tiering solution. But I will say tiering is not -- not really a concept under the Endangered Species Act. That's a -- that's a NEPA concept.

THE COURT: Okay.

MR. INCE-JOHANNSEN: The NEPA regulations contemplate that there may be tiering between a site-specific project and a programmatic plan. Nothing in the ESA, statute, or regulations discusses tiering.

You know, there is sort of an analogous concept with a programmatic biological opinion, like the 2016 RMP, and then specific projects planned under it. But there's also a recognition in those documents, in the 2016 RMP, that -- you know, that any further actions would require a complete consultation on that site-specific project.

So this is more a matter of segmentation and piecemeal consultation. You know, the issue that I see here is the proposed solution that the other side has offered, that further implementation beyond the scope of the 2023 biological opinion for the Last Chance timber sale would have further consultation, that doesn't satisfy the ESA because there's a requirement to consider the activity as a whole.

And the activity as a whole here is the Last Chance project as a whole, this 15-year project that will be constituted of a series of individual timber sales, of which we've seen just a handful now. And there will be more over

that 20 -- over that 15-year span.

You know, the agency can't just look at those, you know, myopically one at a time or just batch them together and satisfy the ESA. It needs to undertake formal consultation with the Fish and Wildlife Service, as it did, culminating in the 2023 BiOp, and either stick to the limits and the figures that are stated in that biological opinion or go back, re-initiate consultation on the whole project as a whole.

THE COURT: But aren't those numbers in the BiOp inaccurate?

MR. INCE-JOHANNSEN: I think that's a live question. You know --

THE COURT: Is that a decision -- or a question that I have to answer in order to grant the preliminary injunction, that that is an inaccurate number? Because -- or at least that's one of the bases for your arguments for why a PI -- why there's a likelihood of success on the merits, which is that they've got the numbers all messed up.

MR. INCE-JOHANNSEN: It's hard to say if it's inaccurate. We won't know until we see whether BLM exceeds the figures in the biological opinion. You know, if it's true that it has no intention of exceeding those figures and it sticks to, you know, what the project as defined in the biological opinion was, you know, then the fact that the environmental assessment has wildly different figures is, you know, somewhat

extraneous.

But the -- the record before the Court is the biological opinion and the Last Chance EA, and they are inconsistent. Which one of the two is wrong, I don't -- I don't know.

THE COURT: But the fact that they don't -- they can't -- they aren't reconciled is where there is the presumption of error, such that you're likely to succeed on arguing there was something there, but -- while we don't know which one was wrong, one of them is wrong; so, therefore, there's -- there's a violation?

MR. INCE-JOHANNSEN: I think that's exactly right, yes.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Yeah.

THE COURT: All right. You know, I was really interested in talking about PAM. It seemed to me that was mostly what this case was going to be about, although we've already consumed almost an hour on some other topics. Do you want to -- do you want to talk about the science and methodology and best -- I guess, best scientific practices?

MR. INCE-JOHANNSEN: Absolutely. I think we covered everything with critical habitat for now.

So the zero-take conclusion in the biological opinion for northern spotted owls rests on a fundamental analytical

defect; and, that is --

THE COURT: Well, the protocol uses human observation?

MR. INCE-JOHANNSEN: That's correct, yeah.

THE COURT: Of -- was it three calls within a certain period of time?

MR. INCE-JOHANNSEN: Yeah, I believe three calls over the span of two years.

THE COURT: Okay. And the passive acoustic monitoring doesn't require a human observation in the field, but review of data collected through recordings?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Yes.

THE COURT: And the Appel study is part of the record?

MR. INCE-JOHANNSEN: Yes. We attached it to our notice of intent to sue letter, so it's -- you know, it was before the agency in the context of a request to re-initiate consultation based on it.

THE COURT: Okay.

MR. INCE-JOHANNSEN: And it was -- I should also note it was published before the biological opinion was issued five -- excuse me -- five months prior. It was published in February of 2023. The biological opinion was issued, I

believe, in June or July of 2023.

It had already been published for a number of months and -- as well, you know, some of the authors of that study both were involved in devising the 2020 -- excuse me -- the 2012 survey protocol and also included federal employees. I believe -- I believe it was Forest Service and USGS.

But, in any event, this study was available to the agency at the time that it prepared its biological opinion. And --

THE COURT: Has BLM used the -- used PAM in other settings?

MR. INCE-JOHANNSEN: I'm not sure if it has.

THE COURT: Okay. And would it be BLM or Fish and Wildlife Service or -- or both?

MR. INCE-JOHANNSEN: That's a great question. I mean, this claim is -- the defendant of it is Fish and Wildlife Service, and we're challenging analytical defects in the biological opinion. But, in terms of the actual monitoring that forms the predicate for it, that was disclosed in the -- I believe, the biological assessment that BLM prepared and submitted to the Fish and Wildlife Service, as -- in regard to the seven sites with incidental detections that are sort of the gravamen of this claim.

So both agencies are involved. The actual data collection, I believe, is BLM staff. But the analytical issue

that we're taking -- that we point out with this claim is in the biological opinion, which the Fish and Wildlife Service prepared.

THE COURT: But they relied on the data provided by BLM through the survey protocol?

MR. INCE-JOHANNSEN: That is my understanding, that BLM collected that data, yes.

THE COURT: Okay. So ostensibly BLM would've -- I mean, if, in fact, anybody was using PAM, it probably would've been BLM that would've gathered the data using PAM at the -- at the biological assessment stage?

MR. INCE-JOHANNSEN: I don't believe that BLM did perform PAM at the -- at the --

THE COURT: Right. I understand that they didn't. But if -- in the context of how this case has sort of unfolded, that would've been the likely place where that data would've been collected and then forwarded on to Fish and Wildlife Service to perform the biological opinion?

MR. INCE-JOHANNSEN: I think that's -- I think that's right. You know, it's certainly not my role -- or maybe even the Court's role -- to, you know, tell the expert agency how they necessarily go about the business of collecting data and performing their scientific analysis.

This claim is not --

THE COURT: But isn't that what that argument of

yours is about, that they should've been using PAM and not their survey protocol?

MR. INCE-JOHANNSEN: Not precisely.

What this claim is about is the unsupported assumption that every site that had an incidental detection in the past two years, that, pursuant to the survey protocol, is treated as -- or defined as status unknown, that those seven status-unknown sites are unoccupied.

The Appel, et al., 2023 --

THE COURT: But -- well, and I'm saying this out loud so I -- I'm also wanting to make sure I test my recollection, so -- since I have somebody who's going to be able to help correct me. This is going to be helpful for me to try to make sure it sticks in my head.

The unknown characterization was based on what I think you're arguing -- the plaintiffs are arguing was based on maybe an outdated or incomplete, at least in relation to the Appel -- or the passive acoustic monitoring, it's incomplete; and so, therefore, the, I guess, rating as unknown leads to many false negatives or -- or false negative findings of no pairs in the area?

MR. INCE-JOHANNSEN: That's our concern.

THE COURT: Okay. So it's partially about best practices, best evidence, best scientific practice, but mostly -- but also about how they classified those findings

even under the survey protocol?

MR. INCE-JOHANNSEN: That's exactly right.

THE COURT: Okay. So which one should I be turning to primarily in making my decision here?

MR. INCE-JOHANNSEN: So I don't think that -- you know, the Court isn't asked to decide which of the two approaches is more -- is more sound. That's not what this claim is about. It's about the assumption that status-unknown sites -- and that's as far as the survey protocol goes.

When there's an incidental detection over the course of those three surveys over two years, just one isolated detection -- or two, for that matter, although the seven sites at issue here only had one -- the survey protocol only states that those sites are status unknown.

And I think that term -- actually, it's --

THE COURT: And that's required under the survey protocol?

MR. INCE-JOHANNSEN: That's what the survey protocol --

THE COURT: Calls for?

MR. INCE-JOHANNSEN: Yes.

THE COURT: That if you can't confirm three calls in two years --

MR. INCE-JOHANNSEN: Yes.

THE COURT: -- then it's status unknown?

So if you had -- well, if you have no calls in two years, then it's -- how is that classified?

MR. INCE-JOHANNSEN: I believe it's unoccupied.

THE COURT: Unoccupied.

MR. INCE-JOHANNSEN: Yeah.

THE COURT: And then one call in two years, that's status unknown?

MR. INCE-JOHANNSEN: Yes.

THE COURT: Two calls in two years?

MR. INCE-JOHANNSEN: Also status unknown.

THE COURT: Status.

MR. INCE-JOHANNSEN: Thank you.

THE COURT: I'm just teasing.

But three calls would be occupied?

MR. INCE-JOHANNSEN: Yes, under the survey protocol.

THE COURT: Okay.

MR. INCE-JOHANNSEN: That's right.

THE COURT: And under the PAM, one call passively monitored would've been sufficient -- at least there'd be a 72 percent probability that that would relate to an occupied -- a pair in the area?

MR. INCE-JOHANNSEN: Yeah. You know, I think what I would say about that is the only -- the only record evidence before the Court that tries to quantify what the chance of occupancy is when there are incidental detections is the Appel,

et al., 2023 study.

Now, the other side points out that, you know, passive acoustic monitoring is not an identical methodology to surveys. And there's a question over whether you can directly apply that 72 percent chance.

You know, whether or not that specific statistic directly translates over, again, it's the only record before the Court. And it is probative of the fact that there are owls on the landscape that are not responding to -- or are -- they exhibit what's called cryptic behavior.

These are --

THE COURT: And that's, in part, because of the barred owl presence?

MR. INCE-JOHANNSEN: Exactly right. It's a well-known phenomenon that the presence of the barred owls inhibits --

THE COURT: Does the survey protocol quantify the probability of pairs based on the three -- three observed calls in two years?

MR. INCE-JOHANNSEN: So if there are three observed calls in two years, it's treated as there being a resident owl. And I should just correct myself. A moment ago I said that the survey protocol speaks to occupancy. It talks about whether there are resident owls there, which is essentially the same concept.

THE COURT: And resident owls as pairs or resident owls as individuals? Is there such a thing as a resident individual, or are they always going to be resident pairs?

MR. INCE-JOHANNSEN: I -- there can be a resident individual owl. And the survey protocol, I don't believe that it gets at the likelihood of an individual or a pair.

UNIDENTIFIED SPEAKER: I think three calls is resident single, and there's a different process for determining pairs as well.

MR. INCE-JOHANNSEN: So the three positive survey calls are associated with a resident single.

And then to determine whether there's a pair present, that's a separate analysis?

UNIDENTIFIED SPEAKER: It's a separate analysis, yes.

MR. INCE-JOHANNSEN: Okay.

THE COURT: And is that separate analysis part of this record?

MR. INCE-JOHANNSEN: I believe it would be in the record. The survey protocol itself is in the record. I think it's a little bit beyond the scope of this -- of this claim, though.

THE COURT: Okay. So at least for the purpose of determining what efficacy of the -- of the -- of the findings of status unknown can turn on the information we've talked about already, which is one, two, or three observed calls

meaning something, and then the Appel survey -- or the Appel study that talks about PAM, identifying that there's 72 percent probability of a resident owl -- or I think -- I thought you also referred to them as pairs under the PAM -- under the PAM study.

MR. INCE-JOHANNSEN: That's correct. So the Appel 2023 study, the PAM study, it looks at the -- or it found that the likelihood of an individual isolated detection on passive acoustic monitoring, on PAM, is associated with a resident pair. It didn't look at the question of, you know, the presence of a single owl in the landscape.

THE COURT: Is preserving critical habitat higher priority when pairs are identified versus resident singles?

MR. INCE-JOHANNSEN: Yeah. So this claim isn't -- not really within the critical habitat category under the Endangered Species Act. This is more about the separate requirement to avoid an incidental take or at least to quantify it and go through the analysis and determine that that will not --

THE COURT: But is there a higher priority to maintaining pairs?

MR. INCE-JOHANNSEN: Yes, definitely. You know, spotted owls exhibit -- they have a relatively long life span and relatively low fecundity. And they reach sexual maturity at a relatively late age for other raptors. So what all that

means, taken together, is that, you know, a mating pair is critically important for the species' survival.

THE COURT: Okay. And is that consideration something I need to account for in any of my decisions today?

MR. INCE-JOHANNSEN: I don't think so.

THE COURT: Okay.

MR. INCE-JOHANNSEN: No.

So I think I just would -- I'd like to emphasize just that, you know, what this claim is ultimately about is the unsupported assumption that every status-unknown site -- so these are the sites that have more than zero detections and less than three, so it's either one or two detections over that two-year period under the --

THE COURT: And that --

MR. INCE-JOHANNSEN: -- survey protocol --

THE COURT: -- only matters because we have the Appel study, right?

MR. INCE-JOHANNSEN: I don't think so.

THE COURT: So would the plaintiffs have a claim here if the defendants identified, instead of status unknown, when there was -- when there were two calls, occupied?

MR. INCE-JOHANNSEN: That would address our concern. We would not have a complaint -- a claim on this particular issue then.

THE COURT: But then it would also suggest a wider

area that needed to be managed without take?

MR. INCE-JOHANNSEN: Right. So if these sites that are currently, you know, under the survey protocol, status unknown and, under the biological opinion, categorically treated as unoccupied, if they were instead treated as occupied, applying the precautionary principle that the ESA embodies --

THE COURT: So the other problem here is that status unknown is treated -- is treated, for the purposes of -- or was treated in these -- in this biological opinion as unoccupied?

MR. INCE-JOHANNSEN: That's exactly the issue.

THE COURT: Okay. So that's the other problem that you've claimed. And I'm just trying to make sure I'm teasing them out because you -- for my purposes, again, I have to make sure that I'm articulating and understanding what it is you're arguing.

So there's both just the classification of status unknown for one or two calls, but then when -- when they -- when the defendants were considering what to do with status-unknown sites, they treated them as unoccupied?

MR. INCE-JOHANNSEN: That's exactly right.

THE COURT: In the biological opinion?

MR. INCE-JOHANNSEN: Correct.

THE COURT: Okay. And when they treat them as unoccupied, what was the impact on the decision-making about

what to do with this habitat?

MR. INCE-JOHANNSEN: Yeah. So I think two main categories of impact. One is the biological opinion has different conservation measures that attend to occupied sites. There is an explicit assumption in the biological opinion -- I'm afraid I don't have the page number in front of me. It's in a briefing, though -- that these sites that are deemed unoccupied are sufficiently protected just by landscape-level protections.

On the other hand, occupied sites have site-specific protections. There are limits on how much logging can occur within the -- I believe a 500-acre area around the site. And those protections apply specifically to the occupied sites. So the determination of whether a site is occupied or unoccupied does matter a whole lot for any owls that may be there, notwithstanding the classification of them.

And that, in turn -- you know, the failure to identify these sites as -- or treat them as occupied, again, applying the precautionary principle that the Endangered Species Act embodies, when there is some uncertainty, you know, over the actual status, presence of owls in the sites, we know that there are individual detections, the precautionary principle militates in favor of treating them as occupied.

If they were treated as occupied -- well, sorry -- the fact that they're treated as unoccupied calls into question

the incidental take statement and the finding of Fish and Wildlife Service that there will be no incidental take resulting from implementation of this project.

THE COURT: Okay. So that's what -- so, following the bread crumbs here, that's what -- that's what the error was, by finding that there was no incidental take by classifying these unknown sites as unoccupied?

Otherwise -- setting aside for the moment that the conclusion was there would be no incidental take, is there anything, I guess, legally inappropriate -- or is it outside of the authority of the agency to be able to say, "No, we're going to go ahead and identify status unknowns as unoccupied"?

MR. INCE-JOHANNSEN: So I think that that issue in the analysis infects more than just the incidental take statement. It also upends the jeopardy analysis. Again, just going back to the analytical pathway for determining jeopardy, the initial question is, what is the environmental --

THE COURT: And this is under ESA Section 7?

MR. INCE-JOHANNSEN: Exactly.

THE COURT: Okay.

MR. INCE-JOHANNSEN: So the initial question is, what is the environmental baseline? And that needs to reflect the actual state of affairs on the ground, including the presence of owls at various known sites. So --

THE COURT: So is it a violation of both ESA

Section 7 --

MR. INCE-JOHANNSEN: Yes.

THE COURT: -- to -- and a violation of FLPMA? I mean, is it -- is it both? I mean, is the fact that there was an ineffective -- or inaccurate, incomplete baseline just a violation of Section 7 of the ESA?

MR. INCE-JOHANNSEN: You know, we've alleged this is an ESA claim. You know, whether or not there's a FLPMA issue, it's an interesting question, but I -- it's not before the Court right now in any of the claims that we've alleged.

This is ultimately an Endangered Species Act claim arising under Section 7 that relates both to the deficient analysis, the failure to apply the best available science in the biological opinion --

THE COURT: Which is really relating to the Appel study?

MR. INCE-JOHANNSEN: That's correct.

THE COURT: But you told me that I didn't -- I wasn't supposed to be making sort of a -- you know, a substantive decision about what's best available science.

MR. INCE-JOHANNSEN: I apologize. I realize this has become confusing.

So there are, I think, essentially three prongs to this argument, three separate distinct violations, all wrapped into one. There is the failure to -- or to accurately define

the environmental baseline, which should reflect the actual presence of owls on the landscape and applying the precautionary principle and --

THE COURT: And that's in Subsection 7, the baseline issue?

MR. INCE-JOHANNSEN: Yes. So all of these arise under Section 7.

THE COURT: Okay.

MR. INCE-JOHANNSEN: So there's the failure to define the baseline correctly, which taints the jeopardy analysis. There's a failure to apply the best available science in regard to -- you know, just what -- what to make of these isolated detections.

And in the absence of any other scientific literature on that question, Appel, et al., 2023 is the best available science on that point. Even if it is a slightly different methodology, it is still the only record evidence that answers that question, like what to do with these isolated owl calls that are detected.

THE COURT: And so how is that not a substantive decision on my part? I mean, is there in the record a finding from the agency that the PAM -- that PAM is best available science?

MR. INCE-JOHANNSEN: I don't think that there's an explicit finding on that point.

THE COURT: So lay out for me why there's a violation of the -- of the failure to use best available science here. Like, how do I get to that point? How do I get to that finding?

MR. INCE-JOHANNSEN: Yeah. So I think it starts with the lacuna, if you will, in the analysis here. There's a phenomenon where there are individual isolated owl detections pursuant to the survey protocol. And literally that status -- the status of the sites is unknown, pursuant to the survey protocol, which, again, I would emphasize we're not challenging the survey protocol.

All the survey protocol says is that those sites have an unknown status. So that's the gap. And the only science in the record before the Court that begins to address that question is Appel, et al., 2023. And, for that reason, it is the best available science on this point.

THE COURT: Okay. Let's take a break. We're at that one-hour mark. It goes by fast. Or at least it goes by fast for me. So let's take ten minutes. We'll return and maybe -- I do want to explore a little bit more because I'm not -- I'm not quite grasping the difference between having to make a substantive decision on what's best available science, because I'm not sure I have the authority to do that -- I'm fairly certain I don't have the authority to do that, so I need to look to where the agency has failed in its consideration of

best available science. And if you tell me I have the authority to do it, then that will be another part of the discussion.

All right. Thank you. Ten minutes.

THE COURTROOM DEPUTY CLERK: This court is in recess.

(Recess taken, 10:46 a.m. - 11:14 a.m.)

THE COURT: Mr. Ince-Johannsen, I think we left off with trying to help me understand the difference between a substantive decision on best available science versus an agency determination or decision that I have to -- I have to give deference to and then consider whether they were somehow conducting themselves, in applying the science, inappropriately.

MR. INCE-JOHANNSEN: You know, so case law on the deference that is due to scientific questions within the agency's area of expertise talks about when there's, you know, conflicting science on some point. And I just wanted to, you know, emphasize again that we don't take issue with the survey protocol.

The survey protocol only -- it sets forth the methodology for conducting these -- these on-the-ground surveys. It leaves open the question of what to do with individual isolated detections at sites. And at the time that the biological opinion was prepared, there were seven such sites that had incidental isolated detections in them.

The survey protocol defines those sites as status unknown. So there's -- in other words, there's doubt over the status of those sites. The Ninth Circuit in Conner v. Burford held that, you know, Congress' intent with the Endangered Species Act is to give the benefit of the doubt to the species.

This isn't a situation where the Court is asked to resolve between two competing methodologies or reconcile some conflict between different scientific literature.

The only scientific literature in the record before the Court that addresses the specific question here of, you know, what -- are there owls at these sites that have isolated detections -- setting aside the slightly different methodologies between that study and the survey protocol -- but the only literature on this point of, you know, when there is isolated detections of owls, is there a pair present there, or is there an owl present there, there's only one study on that; and that is Appel, et al., 2023.

And it is appropriate, I believe, for the Court to hold that that is the best available science, given that it is the only science on that point.

THE COURT: So that's what my opinion should say?

MR. INCE-JOHANNSEN: I believe so.

THE COURT: And it wouldn't be crossing over into making substantive decisions on which methodology is prevailing?

MR. INCE-JOHANNSEN: I don't think that it would. And I think that -- you know, if the agency -- ultimately, the issue here is an analytical gap. There is -- the survey protocol stops at the point of defining these sites as status unknown. It doesn't say what to do with that designation.

Fish and Wildlife Service, without any analysis, concluded that those sites are unoccupied, treats them as unoccupied, doesn't afford protections to them that -- that extend to designated -- or sites that are found to be occupied.

THE COURT: Could I make the finding that the designation as status unknown equates to unoccupied isn't consistent with regulatory -- the regulatory obligations on the part of the agencies, as opposed to finding that one scientific method is better than another or one scientific testing measure is better than another --

MR. INCE-JOHANNSEN: So I --

THE COURT: -- and still accomplish what it is you're asking me to do?

MR. INCE-JOHANNSEN: I think so. And I think that the relevant principle there is, again, the Ninth Circuit in Conner v. Burford identifying the intent of Congress to give the benefit of the doubt where there is doubt, as there is here, as to these status-unknown sites.

They had incidental detections. They didn't meet the thresholds that would determine that they are necessarily

absolutely occupied. They also are not of the kind that are unoccupied. They're somewhere in between.

There's an uncertainty of their status. So affording, you know, the benefit of the doubt to the species in the context means --

THE COURT: Well -- and it's really -- it comes down to how this needs to be described and framed that can withstand any kind of review. I mean, would it be better to say that the Appel study is what creates doubt; and so the benefit of the doubt, as contemplated under the ESA, is triggered by virtue of the Appel study?

MR. INCE-JOHANNSEN: I think that the doubt is actually created by the survey protocol -- or it's -- I should say its application to these facts in the BiOp.

THE COURT: But only in the context of the Appel study. Or -- or, independent of the Appel study, are you suggesting that there's enough doubt by virtue of the survey protocol, these classifications?

MR. INCE-JOHANNSEN: I think that there is enough doubt, even if you set aside the Appel, et al., 2023 study. Just looking at the --

THE COURT: Okay. So you do take issue with the survey protocol?

MR. INCE-JOHANNSEN: No. We don't take issue with the protocol itself. We take issue with the inferences drawn

from a status unknown in the biological opinion.

THE COURT: So the status unknown is not part of the survey protocol; it's something outside of the survey protocol?

MR. INCE-JOHANNSEN: The decision to treat status unknown as unoccupied is not in the protocol.

THE COURT: Okay. And where does that come from?

MR. INCE-JOHANNSEN: It's the Fish and Wildlife Service's approach that it adopted in this biological opinion.

THE COURT: Okay.

MR. INCE-JOHANNSEN: I'm not aware of any scientific basis for it. It's an unanalyzed, unsupported assumption of non-occupancy.

THE COURT: So is that -- what? -- a finding of arbitrariness and capriciousness? Or is it some other contrary-to-law determination? Which -- which --

MR. INCE-JOHANNSEN: Yeah.

THE COURT: -- which form of violation does the application of unoccupied to status unknown fall in?

MR. INCE-JOHANNSEN: So I think it is arbitrary and capricious. And, more specifically, it's a disconnect between the facts found, which here refers to isolated detections at those sites -- those are the facts, that owls have been detected at those seven sites at the time -- and the decision made, which is to treat them as unoccupied, without any clear scientific basis for making that assumption.

There's no analysis underpinning it. It's just a categorical treatment of status unknown as unoccupied. And that disconnect, I think, represents a disconnect between the facts found and the decision made, which is arbitrary and capricious.

THE COURT: Okay. And if I find in favor -- if I find that it's more likely that you would succeed on that, then that's enough for us to then address the other remaining issues for preliminary injunction?

MR. INCE-JOHANNSEN: I think that's right. I think that the last --

THE COURT: And would you also say that -- I mean, if there's a -- if there's a question -- or a likelihood of success on this, that by virtue of this also falling under an ESA claim, that irreparable harm is also triggered and established by virtue of a likelihood of success on the merits of the claim?

MR. INCE-JOHANNSEN: I think that's right, because what we're talking about here is owls present on the landscape that are not being afforded protection, that are not being considered in the incidental take analysis, that may well be harmed and taken as a result of implementation. And that is, per se, irreparable harm.

THE COURT: Okay. And the zero-take finding as well, right, also implicates the reality that there would be harm.

MR. INCE-JOHANNSEN: That's right, because the incidental take finding and the analysis that underpinned it looked at sites that were deemed occupied and, therefore, excluded sites that are deemed unoccupied.

Those sites that are deemed unoccupied are considered just at the landscape level as -- you know, that there may be transient owls passing through, but the assumption is that they're not resident pairs and -- and the -- you know, the unilateral assumption that unknown equals unoccupied calls into question that finding and raises the prospect of unaccounted for take of the owls that are present.

THE COURT: Okay. All right. I do want to note the time. I know -- I know you've been -- you've been in the hot seat for a bit. How about we turn to -- is it Mr. Carrara? How do I pronounce your name?

MR. CARRARA: Yes, Your Honor. That's right.

THE COURT: Mr. Carrara.

And I know that you have more to say because we haven't even talked about the western pond turtle, and so we'll need to talk about that and its relationship to, like, the range or the acreage that we're talking about as well.

All right. Mr. Carrara, you're on.

MR. CARRARA: Good morning, Your Honor.

THE COURT: Good morning.

MR. CARRARA: I'll begin with plaintiffs' Endangered

Species Act arguments and respond to opposing counsel's. So, first, plaintiffs don't show likelihood of success on the merits.

So I'll first turn to the BLM's reliance on the biological opinion, which was eminently reasonable. I think one of the things that came up, Your Honor, that was glossed over was there was a biological assessment, which was prepared here.

So counsel got to it; but the acreage impacted by project activities is the same in the biological assessment, which BLM prepared, as the biological opinion, which the Service prepared. And you can see that. Fish and Wildlife Service 57, the AR cite for the BA. Fish and Wildlife Service 271 is the BiOp site. And that's comparing the same exact acreage of spotted owl.

THE COURT: So what was the discrepancy that Mr. Ince-Johannsen was describing?

MR. CARRARA: There is a discrepancy, Your Honor. And that is in the EA -- the revised EA, but it is a limited part of the revised EA. So that's at BLM AR 949. And that's -- that's incorrect numbers.

And, you know, as BLM had stated in their declaration, it was a miscalculation based on a multiple counting of acres of --

THE COURT: A what counting?

MR. CARRARA: -- a multiple counting, so double-counting and then a little bit more -- of -- of treatments on the same acres, if that makes sense.

THE COURT: Okay. And so it's a discrepancy, but a discrepancy not with respect to the impact to the acreage that was also addressed in the BA?

MR. CARRARA: Correct. It does not affect the BA, Your Honor. It does not --

THE COURT: Why do you say it doesn't affect the BA, the discrepancy that Mr. Ince-Johannsen was describing?

MR. CARRARA: Yes, Your Honor, because, as counsel was stating, under the ESA, you know, the BA and the BiOp are the two relevant decisions for your analysis. So 16 U.S.C. 1536 instructs the action agency to conduct the biological assessment for Section 7.

THE COURT: That's BLM, the action agency?

MR. CARRARA: Yes, Your Honor.

THE COURT: They did the BA.

MR. CARRARA: And, you know, counsel conceded earlier this morning that Section 7(a)(2) governs both the BA and the BiOp. You know, those are the relevant documents. You know, 50 CFR 402. --

THE COURT: So the fact that there's a discrepancy in the EA doesn't even matter for an ESA claim?

MR. CARRARA: That's right, Your Honor.

THE COURT: Okay.

MR. CARRARA: So, you know, what counsel has stated, and what you're getting at, is the environmental assessment is a document for NEPA compliance. It analyzes alternatives and impacts. And it needs a decision record to be implemented. So -- and that's what's happened here. So you see the Decision Records 1 through 4 have implemented those activities, each specific project.

You know, plaintiffs also cite 42 U.S.C. 4332 in their complaint. And, I mean, that hits the nail on the head, Your Honor. That is what provides an EA, an environmental assessment, or an EIS should be prepared under NEPA. That's Complaint 125.

THE COURT: Now, these are considerations that aren't part of the arguments for preliminary injunction, as I understand Mr. Ince-Johannsen's arguments today. Is there a reason why you would want me to consider an EIS or EA under NEPA when determining whether to grant or deny the motion for a preliminary injunction?

MR. CARRARA: Not at all, Your Honor. Just making clear that that's the regulatory language.

THE COURT: Okay.

MR. CARRARA: And you're right. NEPA is not brought in the instant motion. There's no argument there.

THE COURT: All right. So, from the Government's

position, perspective, the acreage that is considered in the relevant documents, the BA and the biological opinion, are consistent with the impacted acreage that's being considered; and so there is no failure in considering the impact on the entire project?

MR. CARRARA: That's correct, Your Honor. And I would just foot stomp that in the EA, at BLM AR 766, that matches the proposed action acres in the BiOp. And that's Fish and Wildlife Service 206.

So, again, you know, to the extent there was an error -- and I think BLM has been clear that, you know, there was one -- it was limited to this one section, which, again --

THE COURT: Are you saying it's harmless error?

MR. CARRARA: Yes, Your Honor.

THE COURT: Okay.

MR. CARRARA: In this instance.

THE COURT: Is there a different kind of instance in which it wouldn't be harmless error? I mean, you're the one who threw in the word --

MR. CARRARA: Yeah.

THE COURT: -- "this instance."

MR. CARRARA: Yeah.

THE COURT: So you threw a piece of cheese at the mouse, so I needed to track it down. So why did you -- why did you throw in "in this instance"?

MR. CARRARA: That's right. Just -- I just meant before the Court today, Your Honor. I didn't mean anything -- I'll be more careful with my language.

THE COURT: All right.

MR. CARRARA: Or try to be.

So -- and then one other thing that I think is important is the environmental assessment is not self-executing. So we talked about these decision records. They're all documented, right?

So at AR 8 it's documented Decision Record 4, which shows the acres authorized to date through each decision record. As stated in the EA, BLM would decide whether to implement the actions, would decide whether to offer timber for sale, how many acres to offer, including road work, construction. And that's, again, at AR 747.

And I say this because, you know, a little bit of this morning was talking about a post hoc justification or rationalization. And this was the EA. And the first DR, decision record, was issued in May, at the same time as the EA. So it's not a post hoc rationalization.

And, you know, going back to Conner v. Burford, I'd like to take a minute or two to talk about that, you know, because this isn't a matter of unlawful segmenting where your piecemeal projects are approved without fully considering effects. Here the effects were considered upfront.

THE COURT: And when you say "effects," what effects are we talking about? Effects on the northern spotted owl? Effects on the western pond turtle? Effects to something else?

MR. CARRARA: For the ESA, effects to the northern spotted owl, Your Honor.

THE COURT: Okay. And we haven't even began talking about the western pond turtle.

MR. CARRARA: Not yet.

THE COURT: Okay.

MR. CARRARA: But, yes, so the opposite's true here. They impacted -- they evaluated the impacts upfront, and the authorized treatments are well below. And, to just go into that, the BiOp, biological opinion, analyzes 3093 acres of spotted owl critical habitat. And that's Fish and Wildlife Service 326. Acres authorized by decision records are well below that. They're just over 2300. So you're looking at a difference of nearly 800 acres.

And I want to talk about initiation of Section 7 consultation because, you know, we -- I mentioned it -- and we mentioned it in the brief just as an additional sideboard, right? This is a -- the BA and the BiOp are the ones that matter.

But, even if there was some concern about additional activities being authorized past what was analyzed, there's these sideboards in place, which, you know, are both in the

record, Fish and Wildlife Service 217, which states, you know, for activities included above, re-initiation of consultation would occur if additional effects exceed anticipated effects described.

THE COURT: Who makes that decision?

MR. CARRARA: For re-initiation of consultation?

THE COURT: Yes.

MR. CARRARA: That would be the action agency.

THE COURT: The BLM?

MR. CARRARA: Yes, sir.

THE COURT: On its own decision-making authority? Or does somebody else trigger it?

MR. CARRARA: It would be their decision, but they would most likely be consulting with Fish and Wildlife Service.

THE COURT: Okay.

MR. CARRARA: And I want to stop before I get to plaintiffs' PAM, in case we want to --

THE COURT: No, yeah, let's -- let's address the arguments around the best available science. And what I want to try to do is -- I'm going to segment the arguments here. And I want to hear from Murphy and from the -- what's the acronym?

MR. CARROLLO: AFRC and AOCC, Your Honor.

THE COURT: All right. That one. I'll hear from Mr. Carollo. How's that? So I want to hear from Mr. Carollo,

too. So -- and I do want to also make sure that we break in time for you to get a bite to eat and come back for continued arguments that'll delve a little bit more deeply and un-layer more of this when we come back in the afternoon.

All right. So talk to me about PAM.

MR. CARRARA: Certainly, Your Honor.

So the Service reasonably relied on the 2012 call-back protocol to capture the environmental baseline and explained why the project would not jeopardize the continued existence of the spotted owl under the Endangered Species Act.

Now, the --

THE COURT: I mean, the issue that Mr. Ince-Johannsen brings up is that it was, as I understand it, inappropriate for -- whether it be Fish and Wildlife or -- I think it's Fish and Wildlife that took the data and concluded that unknown -- status unknown should be equated with unoccupied. I mean, I -- it sounds to me like they're two very different -- you know, different understandings. So tell me why -- tell me why that decision is appropriate.

MR. CARRARA: So they are. They're very different studies, Your Honor. The 2012 call-back protocol relies on call-backs, so elicited responses from owls based on, you know, a noise and then the owls --

THE COURT: Right.

MR. CARRARA: -- respond.

THE COURT: Does it take into account the barred owl presence?

MR. CARRARA: It does, Your Honor. And, specifically, it cites the Dugger report, which talks about barred owl presence. That's Fish and Wildlife Service 2754. And the Dugger report also talks about the probability that a territory was not occupied when a spotted owl pair was not detected over six within surveys --

THE COURT: Six what surveys?

MR. CARRARA: -- six surveys within two years. So we have been saying it was three surveys.

THE COURT: It's six?

MR. CARRARA: Six surveys within two years.

THE COURT: So there would have to be six -- six observations of a call within two years?

MR. CARRARA: So it'll be the three observations -- and there's a few different metrics -- but it's generally three observations to hit a pair. But what they do is six different observations -- or surveys over a two-year period, so there's these six different opportunities to --

THE COURT: All right. So somebody goes out into the field six times --

MR. CARRARA: Right. Right.

THE COURT: -- over two years. And if they, within those six visits, observe three calls, then it's considered

occupied?

MR. CARRARA: Correct.

THE COURT: Occupied with a pair or a single resident?

MR. CARRARA: So they do break it up, Your Honor. It would be a resident for the three. And it's -- it's a little -- it's nuanced because the survey -- there we go -- the survey protocol has been around since 2011. And it talks about three different survey -- or three different captures, both over a single-year period, but it also has the option for a multiyear period as well.

THE COURT: Okay. So the survey protocol method has been around since 2011. Has it been -- and I think you -- the Dugger report or review, the study confirms its validity and reliability?

MR. CARRARA: The Dugger survey report certainly does underlie and confirm its validity.

And then, getting -- I think getting to -- maybe one of your questions was -- it was challenged before. It was in Cascadia Wildlands v. Thrailkill. That's 49 F. Supp. 3d 774. It was a similar challenge to the protocol.

And there the court -- the district court stated, "The agencies have wide latitude to determine what the best available science is. And the courts presume the agencies have used it, unless those challenging agency actions can identify

relevant data not considered."

And the Ninth Circuit affirmed that, and it gave the wide latitude. And that's really what you have here, Your Honor, is you have these call-back surveys in the 2012 protocol on one hand; and then you have the Appel study and PAM, which is -- it's a passive acoustic monitoring, right?

So you're just listening for these owls. And, you know, I highlight this because they're different biological responses. And we didn't really hear much about that this morning, but Appel even talks about it. And that's ECF -- I'm going into ECF numbers -- ECF 17-4 at 11.

And it talks about listening distance. And then the same ECF at 17, it talks about the natural calling behavior. And so what plaintiffs are trying to do here is they're trying to apply this, you know, different methodology to call-back surveys. So the BLM has only done call-back surveys in this project.

THE COURT: Well, I mean -- and PAM is a -- is a survey of -- a survey of -- well, which northern -- or whether northern spotted owls are -- are resident, correct? I mean, it's measuring the same thing as a call-back survey.

MR. CARRARA: That's correct. And I think, you know, we wouldn't take the position that one is better than the other. You know, they're just different. And because call-back surveys were done here, you can't apply the Appel

study, you know, which says, "Okay. You know, one response means residency," because they're different biological responses. And --

THE COURT: What's a different biological response?

MR. CARRARA: The owl's response to a call-back versus the PAM.

THE COURT: All right. So in a call-back survey, is a call being artificially, I guess, broadcast?

MR. CARRARA: That's right, Your Honor.

THE COURT: All right. And in a PAM, there is no call being broadcast; it's just simply recording whether there are just independent unsolicited calls from -- from owls in the area?

MR. CARRARA: That's correct, Your Honor. And I think that really is where we get down to it. And I want to go back to the record. In Fish and Wildlife Service 322, Fish and Wildlife Service 267, they discuss the concept of floaters. And we heard a little bit about that this morning, too, your incidental, your transient, your -- they're called floater owls, is kind of the terminology.

And these owls, they don't have, you know, your distinct residency. They're coming and going. So the different biological responses matter because, if you're a resident, you're more likely to call out on your own, you know, sua sponte versus the call-back would capture those floaters

because floaters, since they don't have that same residency -- they're just going back and forth -- they're not likely to make that same --

THE COURT: So the call-back would be in the survey methodology -- the survey protocol?

MR. CARRARA: Correct. Yep, it goes to the survey protocol.

THE COURT: Well, then are you suggesting that the survey protocol might overstate the presence of resident owls?

MR. CARRARA: Well, they're different methodology, right? I don't know if it overstates the present --

THE COURT: Well, I mean --

MR. CARRARA: -- the presence of --

THE COURT: But if it's capturing transients or floaters, then -- then a response to a call-back -- or a call and receiving a call-back, and if that's being recorded as one of the responses of three that's -- that are needed within a -- within six visits, then floaters are being accounted for in the call-back survey.

MR. CARRARA: Correct, Your Honor. And that is why -- one of the reasons why it's different and it requires a different metric for capturing residency. And, you know --

THE COURT: Then --

MR. CARRARA: Go.

THE COURT: -- with respect to the PAM, it's more

likely that resident owls are independently just simply calling out, rather than responding to an artificial call?

MR. CARRARA: I'm not -- I don't believe PAM actually makes that comparison. And PAM, actually -- and this is the Appel study -- actually removed call-backs from their determination. So at Appel study -- ECF 17-4 at 5, the study states, "We removed potential detections that were human call-back surveys and spotted owls responded to the surveys."

And then another annual report by Lesmeister, at Fish and Wildlife Service 4976, likewise, explains that the surveys are not used at the same time because -- because they're different. And so because, you know, they weren't used and call-backs weren't studied in the Appel study, we really can't make the comparison here, Your Honor.

THE COURT: Wouldn't it be complementary then? And I know I'm getting into the substance, but I -- at some point I have to ask these questions, just to understand what these studies all -- all mean.

So you're saying that call-back surveys are done at a different time than PAM is; and so it would seem to me that, if you combined those studies -- or combined those surveys, that you'd get a -- you'd get a fuller picture of the presence of resident owls.

MR. CARRARA: That's -- I mean, that's a good question. I'm not sure. I would say that was -- that would be

within the agency's discretion to determine what would be the best to --

THE COURT: Okay.

MR. CARRARA: -- determine occupancy.

THE COURT: So then, setting aside which study's better from a scientific standpoint for the moment, I think we're dealing with another error that is being alleged, which is classifying unknown -- status unknown as unoccupied would be leading to the decision to harvest timber in areas that are more critical.

So talk to me about why it's appropriate for the agency -- or Fish and Wildlife in its biological opinion to have equated status unknown to unoccupied because it seems to me that's what -- that did, in fact, change substantively the acreage impacted.

MR. CARRARA: Certainly, Your Honor.

And, yeah, I mean, one of the things, I think, plaintiff stated in their briefing gets to this, that agencies assumed sites are empty or have zero owls, site unoccupied. And I think that mischaracterizes really how the Fish and Wildlife Service looked at the survey data.

So the Fish and Wildlife Service looks at the survey data and considers whether the territorial resident owl is reasonably certain to have established occupancy in the site. And you'll see that language in the BiOp at Fish and Wildlife

Service 36 -- or 316, where they talk about reasonably likely to be present, incidental take reasonably likely to occur.

So it's -- it's not an all-or-nothing approach. And I also -- so it's not an all-or-nothing approach. And it's also -- these floater owls, it's not like, you know, Fish and Wildlife is saying, "Well, we captured the one owl, but, you know, we're going to start all over again."

It's -- you know, you have the three -- the metrics. So if the owls come back, you'll capture them as residents, if they give a response. And then it also captures floater owls, so -- I gave the cite earlier, but --

THE COURT: I'm sorry. Which one -- it's the -- the call-back survey captures --

MR. CARRARA: Call-back survey, yep, captures floater owls. And I say that because it's in the environmental baseline. So it's not like they're just, you know, discounting that these owls exist. Even if they're not -- don't satisfy residents, they would still be captured as floaters.

THE COURT: So is the -- I haven't delved deeply enough into the methodology on the call-back -- the call-back survey -- but is there some attempt by classifying status unknown as unoccupied sort of trying to account for maybe the overstating of -- or the -- I guess, yeah, the overstating of call-backs themselves because -- obviously, trying to account for or discount the presence of floaters?

MR. CARRARA: Certainly, yeah.

THE COURT: But it seems like that's sort of a blunt instrument, isn't it? I mean, just to simply -- I mean, because you don't know whether they're -- whether they're floaters or not, I mean, when you get -- when you get a call-back.

But then by just simply saying status unknown when there's only two or one out of three in the six visits -- so you're, in essence, calling them as unoccupied to try to account for the fact that there may have been some floaters? It feels like one blunt instrument striking another blunt instrument and making them more blunt.

MR. CARRARA: I wouldn't say it, you know, is dependent on -- completely based on these floaters, Your Honor. But, I mean, ultimately, it seems like it's a matter of, you know, one, the agency's discretion in order to say, you know, "This is the methodology that's the best way to capture" --

THE COURT: I mean, discretion doesn't have to -- doesn't it have to be somewhat rational?

MR. CARRARA: Certainly, Your Honor.

THE COURT: Okay.

MR. CARRARA: And I think, based on the Dugger report and years of the different studies and testing it out and application --

THE COURT: Well --

MR. CARRARA: -- we've shown that.

THE COURT: Well, if I end up relying on some reports, am I not now engaging in some sort of substantive analysis, as opposed to just simply considering the agency's decision-making at the end of the day classifying status unknown as unoccupied as being arbitrary and capricious?

If there's something meaningful -- a difference between status unknown as like -- we're saying we don't know, but we're using an "I don't know" with a, "Well, we're going to conclude at the end of the day that it's, in fact, known and they're not present," I'm just -- I mean, using common sense and maybe a little bit of logic, that that -- that sounds like one equals zero.

MR. CARRARA: Yeah, Your Honor, I know plaintiffs have said the one equals zero. And on that point I also saw that Appel also uses zeros and ones. It's a typical methodology. They do that at 17-4 at 8. And it just stands for owls not being detected.

But I want to answer your question more fully on, you know, really this question of occupancy. And so we actually have a biologist here. I was wondering if I could defer to her to explain it better than my lawyer brain could.

THE COURT: Yes. I mean, I'm certainly open to that. And we're going to have to do that after the lunch break --

MR. CARRARA: Okay.

THE COURT: -- because I do also need to give a few minutes for each of the parties to say a piece or two before we break. And, trust me, I'll try to give you all the time you need after lunch to also make your arguments.

So, first, any objections to hearing a biologist describe what apparently lawyers can't?

MR. CARRARA: Or maybe just this lawyer, Your Honor.

THE COURT: Any objections, plaintiff, Mr. Ince-Johannsen?

MR. INCE-JOHANNSEN: I think I would just notice that it -- excuse me -- just note that it would be a post hoc rationalization. I certainly don't object to it occurring, but --

THE COURT: Okay. And maybe that's for the -- for the benefit -- for my benefit in understanding some of the science and methodology behind it to -- I mean, this -- I'm not going to entertain making this part of the -- part of the administrative record, but I think it would be helpful for me to understand some of the -- some of the background information.

MR. INCE-JOHANNSEN: No objection.

THE COURT: Okay. Mr. Griffith.

MR. GRIFFITH: Thank you, Your Honor.

Just so that I have a sense of what your plan is, how long -- what time would you like to take a lunch break, so I

can split a little time with Mr. Carollo potentially?

THE COURT: Say you want to do what?

MR. GRIFFITH: Just what time do you plan to take a lunch break, just so --

THE COURT: Well, you know, close to the noon hour. So that really doesn't give anybody a whole lot of time. But I'm hoping that you might be able to tackle maybe the scientific issue at least before we break for lunch because if we're going to hear from a biologist that might explain it, I'm happy to hear your arguments, so -- so yes.

So if you want to take a few moments or -- I'm not sure if you said you were going to cede the time to Mr. Carollo.

MR. GRIFFITH: Well, you just said you wanted to give both of us --

THE COURT: I did.

MR. GRIFFITH: -- an opportunity to speak. So I'll take about five minutes, and then I'll let Mr. Carollo have --

THE COURT: Okay. And then any objections to hearing from a biologist?

MR. GRIFFITH: No objection from me.

THE COURT: Mr. Carollo, any objections?

MR. CARROLLO: No. I think it's appropriate for Your Honor to hear from her on complex subject matter.

THE COURT: All right. Very good then.

Mr. Griffith.

MR. GRIFFITH: So you'd like me to talk about the best available science --

THE COURT: Well, is it something you want to talk about in your five minutes?

MR. GRIFFITH: Oh, that's --

THE COURT: How about this: You've got five minutes. You can tell me anything you want right now.

MR. GRIFFITH: Let's talk best available science, Your Honor.

So I just want to start from the beginning here. I think your north star in this analysis is deference to agency expertise. I am not an owl scientist. To my knowledge, none of the attorneys in the room are owl scientists. To my knowledge, you are not an owl scientist. We are going to hear from an owl scientist or biologist after the lunch hour.

And those -- the law says that you should defer to reasoned decisions in -- within the agency's expertise. And this is right in the teeth of agency expertise, Your Honor. I mean, the issue that the plaintiffs are raising is a concern that the owls are -- that the spotted owls are shy because of the barred owls. They're not calling back --

THE COURT: Is there a dispute about that?

MR. GRIFFITH: I -- I don't dispute that, but I also am not qualified to say. But I can say this --

THE COURT: Well, I think the -- it seems to me like the -- that the -- at least the briefs point to that, and studies that say as much, and that it seems to be beyond question that the barred owl -- I mean, in fact, if I'm not mistaken, I think -- wasn't there some decisions to cull barred owls from northern spotted territory because of the sort of predatory or invasive nature of their -- their presence in -- on northern spotted owl habitat?

MR. GRIFFITH: Correct, Your Honor.

THE COURT: Okay.

MR. GRIFFITH: And that's outside the scope of this case, but my understanding is there is a cull program --

THE COURT: Right.

MR. GRIFFITH: -- and that --

THE COURT: Yeah, and you're right. It's outside of the case, but I --

MR. GRIFFITH: Yeah.

THE COURT: -- recite that with just sort of the -- sort of maybe community common knowledge that there is an issue with respect to barred owls and northern spotted owls.

MR. GRIFFITH: Right.

THE COURT: But I also think it is included in some of the studies that have been cited in these briefs.

MR. GRIFFITH: Agreed. And, on that point, I think it's actually in the core document in this case. If you look

at the 2011 protocol, which is the survey method with the call-back survey method --

THE COURT: Yeah.

MR. GRIFFITH: -- we've been discussing, if you look at the introduction, it states that the updated protocol was developed in part to address those very concerns.

THE COURT: Back in 2011?

MR. GRIFFITH: Back in 2011, which -- so there was a previous protocol, a 1995 protocol, that, to make a complicated story simple, used less surveys per year. I believe it was a three-survey versus a six-survey protocol.

And there was some concern raised that, "Hey, wait a second. Because the spotted owls aren't calling back as reliably, we need to update the science in order to address that question." And so the --

THE COURT: I mean, so the update in the methodology would just say "increase the visits," right?

MR. GRIFFITH: Correct.

THE COURT: I mean --

MR. GRIFFITH: Which is significant, Your Honor, because they don't just -- if they hear an owl, they don't just ignore that site again. They go back repeatedly in order to determine if the owl is still there. They need to know whether or not this owl is a floater or it's an owl in transit or if -- if you're looking at the owl's home, right? And --

THE COURT: So are they able to determine that with a call-back survey?

MR. GRIFFITH: Well, that's what the agency expertise has used to determine. If you get two call-back -- if you get multiple responses, then that site is deemed occupied.

And in the time I've got, I'd like to put that in context a little bit in terms of what an occupied site means. There's been this issue of the status unknown versus unoccupied --

THE COURT: Yeah.

MR. GRIFFITH: -- distinction. And where the rubber meets the road, Your Honor, for what these -- the results of these surveys actually mean in practice is found in the RMP in Appendix A.

So basically these surveys show how -- how the agencies are going to go out and search for these owls and then decide whether or not it's an occupied site. It's the RMP that then imposes the legal obligations -- the protections on that site in order to protect that owl.

And so the trigger is occupation, is that it's an occupied site. If you look at the RMP, on -- I'm citing the KSW citations. This is at ECF 1712, KSW 02166. It's -- Footnote 41 at the very bottom of the page says, "For the purpose of this guidance, sites currently occupied means northern spotted owl sites that the BLM has determined are

occupied at the time of implementation of the management action. The BLM will determine occupancy using the best available science at the time, such as through pre-project northern spotted owl surveys," exactly what they did here.

THE COURT: Well, I think on a superficial level, yes. But I think my question is a little bit -- you know, tries to peel away sort of the presumption that -- that status unknown is the equivalent of unoccupied. I mean, you know, why -- where did that come from? On what -- on what rational grounds is the agency concluding that status unknown means unoccupied for the purposes of the RMP?

MR. GRIFFITH: Yeah. The presumption that it's occupied or the decision that it's occupied is based on multiple detections at a site, which means, in the agency's expertise, that the owls likely live there, right?

If you find the same owl at the site multiple times, it's likely to live there. If you just see him once, it's likely a floater. And so they have designated --

THE COURT: Okay.

MR. GRIFFITH: -- those occupied sites, which then trigger the RMP requirements.

THE COURT: Okay.

MR. GRIFFITH: In terms of --

THE COURT: But there's nothing in the RMP that identifies that is the protocol that has to be used; it's --

the protocol is developed after the RMP is in place?
MR. GRIFFITH: The protocol was actually developed before the RMP --
THE COURT: Okay.
MR. GRIFFITH: -- is in place.
THE COURT: Okay.
MR. GRIFFITH: The protocol was developed in 2011. The RMP was developed in 2016.
THE COURT: All right.
MR. GRIFFITH: And I point out --
THE COURT: Does the RMP cite to this as the methodology to use?
MR. GRIFFITH: It doesn't. It actually makes -- it does one better, I think. It says it will determine occupancy using the best science available at that time, such as through pre-project northern spotted owl surveys. So it anticipates --
THE COURT: So at that time in 2016?
MR. GRIFFITH: No. I think it's saying that --
THE COURT: At the time that --
MR. GRIFFITH: -- it could change.
THE COURT: -- that the studies are being conducted?
MR. GRIFFITH: Exactly, yeah.
THE COURT: Okay.
MR. GRIFFITH: So it anticipates the fact that it's a 2011 protocol; we could have a 2031 protocol. And this RMP is

still going to be in place, and they'll do the surveys according to the best available science at that time, which is developed by Fish and Wildlife Service.

THE COURT: So, in essence, what you're telling me is that, because the survey protocol says we identify status unknowns as unoccupied, that is the -- that requires deference?

MR. GRIFFITH: Yeah. The survey protocol actually doesn't say that you should treat status-unknown locations as unoccupied. It just doesn't say that you should treat them as occupied. And then the trigger is in --

THE COURT: Well, is there something in between? Between unoccupied and status unknown? Or it doesn't even -- it doesn't even talk about how to classify; it just records the number of calls?

MR. GRIFFITH: It talks about how to classify occupied sites.

THE COURT: Okay. All right. So --

MR. GRIFFITH: And so -- and that is the legal trigger for these enhanced protections.

THE COURT: Okay.

MR. GRIFFITH: So without that trigger --

THE COURT: So where does --

MR. GRIFFITH: -- there is no --

THE COURT: -- the decision -- where does the decision come from to characterize status unknown as

unoccupied? It's not in the status -- it's not in the protocol.

MR. GRIFFITH: Yeah. It's -- it's in the RMP because if you're not treating a site as occupied, then it's unoccupied. It's one or the other. It's a binary decision.

THE COURT: Well, why not status unknown as occupied then?

MR. GRIFFITH: The biologist may be able to shed light --

THE COURT: Especially if you're wanting to err on the side of, I guess, maybe, you know, giving -- giving the benefit of the doubt under the ESA.

MR. GRIFFITH: Well, Your Honor, they go back and check these sites. And if they go back and check the sites and they don't get a call-back, the presumption is that there's no owl living there.

And one -- I know my time is running out, but one point I wanted to make is that there's actually monitoring that goes on after the -- after the project -- during project implementation.

So, for example, Murphy Company, my client, has the Paul's Payoff timber sale. And just last week BLM actually reached out and said, "Hey, we were doing surveys in anticipation of harvest, and we actually got a detection."

And that's -- what's going to happen is still in

progress, but it looks like they're going to remove a unit in accordance with the RMP -- or a part of a unit -- in order to protect that owl that -- it's now an occupied site.

So this is an ongoing survey protocol. So if they get a -- if they get one call-back, they go back multiple times to see whether or not that owl is still there.

THE COURT: Okay. All right. Thank you.

MR. GRIFFITH: And just one point. The "status unknown" definition is at KSW 01047. It's 16 -- Section 16.1.4, Status Unknown. "Status unknown is the appropriate determination following a complete survey whenever the response of a male and/or female does not meet any of the above site status definitions." So that's -- that's where that definition is in the 2011 protocol.

THE COURT: All right. Thank you.

Mr. Carollo, I know you're probably capable of talking very quickly, but I ask that you not. I'll give you -- I'll give you equal time to make your points.

MR. CARROLLO: Thank you, Your Honor. Dominic Carollo for AFRC and AOCC.

I'd like to dovetail off kind of Mr. Griffith's comments a little bit. So I'll try to step back a little bit here. I think we want to try to understand -- and I think you were getting to this a little bit with your questions to plaintiffs' counsel -- is, like, why are we doing this?

And, you know, you were asking them if they were challenging the no-takes opinion in the biological opinion. And I think that -- you need to think about that for a second 'cause really what this is about is it's a protocol to try to determine whether spotted owls are occupied, using it as their home or for mating, and avoiding take because, if there is going to be take, they're going to have -- they have a problem with the Service. They have to remove or modify the unit.

I mean, it's essentially a no-take protocol -- a no-take strategy. That's what's attempting to be implemented, right?

THE COURT: That's what's required.

MR. CARROLLO: Well, I mean, under the ESA, under Section 7, the Fish and Wildlife Service can issue a biological opinion that authorizes incidental take; but the strategy that the Fish and Wildlife Service is imposing here is, as I understand it, a no-take policy. And that's why this protocol is being implemented. It is a very conservative strategy, to begin with.

And I think we've got to recognize that in the BiOp the Fish and Wildlife Service determined specifically that for accomplishing this objective, protecting owls from take, that the NSO survey protocol is the best available methodology. That's ECF 17-2 at 84. I mean, so that determination has been made by the Fish and Wildlife Service.

And so -- and, again --

THE COURT: And the determination being made, nevertheless, could still be overturned if it's not -- if it's found to be arbitrary and capricious.

MR. CARROLLO: So -- then that gets to the best available science standard. But, I mean -- again, I mean, these -- I think it's important to understand the best available, you know, science -- scientific data information, the Fish and Wildlife Service had no PAM data. The plaintiffs have no PAM data. There's no PAM data for them to input into anything. Zero.

THE COURT: No one conducted any PAM studies on these sites?

MR. CARROLLO: Right. That data's not available, and they're not required to go get that data. I mean, they chose to use this methodology. And so I think, you know, they're not comparable.

But at the same time Appel does address this issue of how -- the detectability of northern spotted owls in light of the barred owl and that it affects their detectability. And that issue specifically was acknowledged and addressed by the survey protocol.

I mean, we -- we provided cites to this. I mean, that's at ECF 17-5 at 5, 17-2 at 84. And what the Fish and Wildlife Service explained is that barred owls' influence on

spotted owl detectability is not new information.

That determination about this issue deserves the utmost deference by this Court. They're saying that what Appel is reporting about the detectability of spotted owls is not new information. That's something that they've already vetted; they've already gone through with their scientists; they've already addressed as part of their protocol.

So I don't know where you can go from there. I think really what it comes down to is you got into this issue about they -- they cited Conner v. Burford. And I think what they're really trying to ask the Court to do is replace a best available science data information standard with the most conservative science requirement.

And that's not what the ESA requires. That would be changing the law. They're entitled to deference about what the best available science is. And they've made the appropriate determinations in the decision documents and in the BiOp.

And to your -- you know, you're asking questions of, like, "Well, what do we do with this?" I think -- I would actually maybe ask you to look at it from an evidentiary standpoint.

I mean, if somebody comes into court and said, "Hey, I heard an owl, you know, so there's going to be take," that one isolated observation is going to be enough evidence? You don't know how that owl was using the habitat. You don't know

if it was flying through, going from here to there, or if they're using it as their home.

I mean, we'll hear from the scientist, the expert agency. But that's the whole point of a protocol that requires some --

THE COURT: From an evidentiary --

MR. CARROLLO: -- corroborating evidence --

THE COURT: From -- in an evidentiary hearing, I'd also be considering if there was a burden of proof.

MR. CARROLLO: Right.

THE COURT: Right?

MR. CARROLLO: Sure. Well --

THE COURT: And who has the burden of proof in this setting?

MR. CARROLLO: Well, for irreparable harm, that's certainly the plaintiff.

THE COURT: For what?

MR. CARROLLO: For irreparable harm, it's certainly the plaintiff. But, I mean, we're just talking about --

THE COURT: Or for a likelihood of success. Right.

MR. CARROLLO: Yeah.

THE COURT: But I'm -- but in the context of the recording of the presence of owls --

MR. CARROLLO: Yeah.

THE COURT: -- on -- you're right. I mean, one call

isn't enough for me to understand whether there's a resident owl or a resident pair.

MR. CARROLLO: Exactly.

THE COURT: I get that. But is an "I don't know" -- I mean, what's the standard to which I apply that, to understand and evaluate, appreciate the weight of that evidence?

MR. CARROLLO: Sure. And I think if the Fish and Wildlife Service stopped and said, "We went out. We got a detection. We're done," I totally understand. But that's not what they do. As Mr. Griffith explained, they keep surveying all the way up until the time of implementation.

And if they get that corroborating evidence, "Hey, we've heard an owl in the same place two, three times," now the protocol says, based on a lot of science -- again, we've provided you the cites of all the peer review and different things that's happened with the protocol -- they say, "Yeah, no, we're going to now assume that it's likely that there's an owl using that habitat." They're calling it its home because you've gotten that corroborating evidence.

So I would suggest -- I mean, that -- you used the word "common sense" earlier. The protocol's common sense. It's not going to classify something as the owl's home just because we heard an owl call back one time. That's not common sense.

So I just -- those are the points I'd like to make to you for now before lunch.

THE COURT: All right. Appreciate that.

You know, there was something that was also mentioned in the reply. Maybe a brief -- brief response to make sure I understand what, if any, concern I need to take up on this, which was that there was some agreement that logging would not happen after a certain point, after a certain date or before a certain date, but that -- but I think plaintiff, Mr. Ince-Johannsen, you indicated in your reply that -- that there's some breach of that agreement.

MR. INCE-JOHANNSEN: Yes, Your Honor.

I think that that goes to the equities and, you know, the retelling of the timeline of this litigation in the context of rebutting arguments that -- that Murphy advanced in this litigation that somehow plaintiff slept on their rights.

And, you know, the specific issue that you are, I think, referring to is in late January of this year, you know, when we were operating under the understanding that logging would not begin until spring of this year --

THE COURT: In April.

MR. INCE-JOHANNSEN: -- in April, a declaration was filed with the Court that indicated that -- that that remained the case, that logging wouldn't begin until later this year. And then we learned, first from the federal defendants, that,

in fact, implementation had already begun. And I believe there was an erratum filed.

THE COURT: And was that in February?

MR. INCE-JOHANNSEN: Yes. I think the date that we learned with -- with specificity and certainty of what was occurring on the ground was February 2nd. You know, we -- or Klamath-Siskiyou Wildlands Center staff tried to ground truth some of that information and were blocked by a tractor blocking the road.

So, you know, we raised that in the reply brief just to point out the difficulty that we've faced tracking what's actually happening on the ground and the conflicting information that we've gotten that, you know, necessitated filing this motion now.

I think it speaks to just the timeliness of our motion. You know, when we understood that it wouldn't begin until later this year, it would not have been timely to file back then. So I think we filed the motion at exactly the right time, you know, based on the information --

THE COURT: Okay.

MR. INCE-JOHANNSEN: -- that we had.

THE COURT: So all that information goes to the issue of equities?

MR. INCE-JOHANNSEN: I think that's right.

THE COURT: All right. I know you're going to need

to -- you need to respond before lunch.

MR. GRIFFITH: I have to respond to that, Your Honor.

First of all, I think it weighs most heavily on irreparable harm because I think what's going on here is there's some mud being thrown to distract from the fact that the plaintiffs delayed for a very long time before filing this preliminary injunction.

This case has a strange procedural history. Before I talk about that, I mean, Murphy Company hasn't done anything wrong here. It hasn't done anything unusual here. Murphy Company --

THE COURT: Was there some representation that logging wouldn't begin until April?

MR. GRIFFITH: Your Honor, in Nate Root's first declaration, the cause of this confusion, in Nate Root's first declaration --

THE COURT: Nate Root is who?

MR. GRIFFITH: Nate Root is the timber manager for Murphy Company. He's a -- he's an employee for Murphy Company. And he put in a declaration that said that logging would begin in April. And that was -- that declaration was -- was submitted on January 28th, if my memory serves.

THE COURT: Okay.

MR. GRIFFITH: In Mr. Sexton's declaration he says, to my surprise, that they had actually been out there on

January 26th and discovered the harvest going on. So they actually knew about it before that declaration was submitted, it appears.

But, regardless, logging in the timber industry means actually bringing the logs out of the woods. It doesn't necessarily just mean felling. So Mr. Root was relying on his logging plan.

And once the plaintiffs raised the issue, we immediately filed an erratum clarifying --

THE COURT: Well, I mean, I can appreciate that that would be the understanding in the logging industry. But once a tree's cut, it's done, I mean, right? I mean, it's not going to be set upright again if there was a violation.

MR. GRIFFITH: That's true, Your Honor.

THE COURT: Right. So I'm not sure I need -- I'm not sure logging industry understandings is appropriate for me to take into account. I mean, it's part of the general context. But --

MR. GRIFFITH: Right.

THE COURT: -- I think the whole point about what we're here for is about whether to log or not -- about whether to fell a tree or not.

MR. GRIFFITH: Fair. I appreciate your clarification.

The -- this episode is completely irrelevant to this

motion. The logging, the felling that was going on during the late January through February time frame was -- was -- it's over. It's done.

And the plaintiffs knew that immediately and still waited weeks to file their preliminary injunction motion. They haven't even tried to stop the logging that they claim to be ambushed with. That's not at issue at all.

THE COURT: So the representation that logging wouldn't -- well, I guess it is a matter of industry characterization. So you're saying -- was it Nate Root that said the logging wouldn't begin until April?

MR. GRIFFITH: It was in his first declaration. That's correct.

THE COURT: So -- and you're going to tell me that his understanding of logging meant bringing the trees out of the -- out of the forest?

MR. GRIFFITH: Your Honor, that he was -- he was relying on the logging --

THE COURT: All right.

MR. GRIFFITH: -- plan --

THE COURT: Have trees been actually removed from the forest?

MR. GRIFFITH: There -- that's actually an issue we'll talk about later, but there has been --

THE COURT: Well, I'm giving you the chance to

actually tell me the answer now.

MR. GRIFFITH: Well, there's been cutting that's gone on, so the logs are laying --

THE COURT: No, I get -- I've now appreciated the difference between the logging industry understandings and my common sense understanding from --

MR. GRIFFITH: Right.

THE COURT: -- a non-logging background perspective. So I want to know whether trees have been removed from the site.

MR. GRIFFITH: There --

THE COURT: Have they been moved away from the stump from which it was cut?

MR. GRIFFITH: Yeah. My understanding is not in the cable cutting units in the -- in the units -- the actual logging units.

THE COURT: Any units.

MR. GRIFFITH: There have been some logs removed from the roadside vegetation management that's been going on since, I think it was, October or November.

THE COURT: Well, it's going to be timber that's going to be harvested. It's not just waste, is it?

MR. GRIFFITH: Well, if -- we need to talk about that later on. If a preliminary injunction were to issue, we'd request --

THE COURT: Well, I'm just interested in understanding what's -- you know, feet on the ground, what's going on. So, I mean --

MR. GRIFFITH: Yeah.

THE COURT: -- I'm not interested in addressing whether I'm granting the preliminary injunction. I just want to know what's happening.

MR. GRIFFITH: Right. So in August of 2025, my client, through me, notified plaintiffs' prior counsel that we were going -- that Murphy Company intended to start operations on the sale.

THE COURT: Start operations on the?

MR. GRIFFITH: On Paul's Payoff timber sale.

THE COURT: Okay.

MR. GRIFFITH: After that, the plaintiffs dismissed their case. And we thought that it was over. We thought it was done. Then in December the plaintiffs refiled their case. And in the interim Murphy Company began operating, thinking that they just -- without any reference to this litigation, they were just operating the timber sale.

Plaintiffs refile in December. We find out about the case in January. And after that January date is when we moved to intervene. And, to my knowledge, that's the first time that any representation was made about an April date.

THE COURT: It was made by Nate Root.

MR. GRIFFITH: Nate Root in his declaration in support of our motion to intervene.

THE COURT: Okay. And, I mean, there's no amendment or modification to that. I mean, I take it it stood on its own, and no one -- no one's attempted to correct it, that logging wasn't going to -- operations weren't going to begin until April.

MR. GRIFFITH: We filed an erratum clarifying this, a brief declaration clarifying that tree felling had occurred, because everyone recognizes that that's what the plaintiffs are concerned about.

THE COURT: All right.

MR. GRIFFITH: The intention wasn't to hide the ball. The intention was to be accurate.

THE COURT: Okay. So what should we do about it? Nothing? Why did you bring it to my attention?

MR. INCE-JOHANNSEN: You know, I think it's just part of the timeline of the litigation that counsel for Murphy just referred to and the sense that they're expressing that they've somehow been prejudiced by plaintiffs' delay. You know, at no step of this process have plaintiffs delayed.

Initially, the case was filed in November of -- the prior case was filed November of 2024. In response to filing it, BLM quickly withdrew its EA and revised it. That was a different lawsuit. It brought different NEPA claims than ours

does.

But BLM sought to withdraw the relevant analysis documents, revised them, didn't promulgate a new one until May of 2025. You know, shortly thereafter, the administrative record was issued and lodged with the Court.

You know, within a few weeks -- or, I think, just within really one week, plaintiffs' counsel in the prior litigation, you know, reviewed the administrative record and decided that a dismissal was -- of those -- of claims was necessary or advisable.

There was also some intervening case law at the time from the Supreme Court that sort of changed the framing of some of their claims. So, very quickly, plaintiffs' counsel in the prior litigation -- and I should say this is all set forth in my declaration that I filed with the opening memo.

You know, plaintiffs' counsel reached out to the other side to try to obtain a stay of the litigation so that they could obtain new counsel that would proceed with the existing complaint.

The other side -- the Fish and Wildlife Service, BLM, and, I believe, Murphy as well -- indicated that they would not agree to a 90-day stay, which plaintiffs' counsel felt would be necessary to secure new counsel, unless plaintiffs waived their right to seek preliminary relief, you know, as we have now, as well as waive their right to object to the AR, object to -- or

excuse me -- amend the pleadings.

So there were a whole bunch of conditions that would've been required by the other side to, you know, consent to a stay. And my understanding is that plaintiffs' counsel in the prior litigation just felt that it would be, you know, more protective of their clients' rights and interests, just to preserve them moving forward, to dismiss that case, which they did.

You know, sometime after that, we were retained as plaintiffs' counsel. And we quickly filed a notice of intent letter, which started a 60-day mandatory jurisdictional period before we could file this lawsuit.

That, I'll say, coincided with a government shut-down. So there was some time spent researching whether that would've tolled the 60-day period. Ultimately, we filed only 71 days, I believe, after the notice letters were delivered on defendants. That initiated this lawsuit.

For the -- you know, the period of December and early January, we were operating under the belief, based on what was represented to prior counsel in the prior litigation, that logging would not commence until spring of 2026, meaning that a motion would not be, you know, necessary or timely quite yet.

As soon as we learned, based on, as -- as opposing counsel correctly noted, on-the-ground, you know, observation of trees having been cut in late January, that we might need

a -- might need to file this motion, as we've done, immediately, once we learned of that, we reached out to the other side, tried to get some clarity on what was actually happening on the ground, what was planned.

We learned from federal defendants that this implementation was underway. That was on the same exact day that we received a declaration from -- or a declaration was filed with this Court from Mr. Nate Root by Murphy counsel that contradicted that.

We spent another few days trying to, you know, just suss out what was actually the case, given the conflicting information.

Once we learned that, in fact, implementation had begun, we immediately reached out to opposing counsel to discuss, you know, the potential that we might be filing this motion for preliminary relief, potentially a temporary restraining order as well, tried to negotiate in good faith, of course, with the other side to avoid the latter part of that at least and potentially avoid the need for expedited briefing.

You know, those discussions culminated, I think, on February 12th, and we filed this motion. So I -- at no step in that timeline do I see, you know, any delay whatsoever on plaintiffs' part that unfairly, you know, prejudiced Murphy Company or any timber company's interest in this -- in this lawsuit. I think we've moved very expeditiously and -- based

on the information that we had at the time, which was at times conflicting.

THE COURT: All right. And I appreciate the detail. My focus here really just had been on whether there was some agreement and whether somebody breached that agreement, whether it was by a handshake or otherwise.

It just looks like -- I mean, you know, complicated litigation sometimes results in complicated outcomes and consequences. I'm not sure there's anything more here that I need to consider, but I think it was -- it was raised in the reply, and I wanted to make sure whether there was something there -- there. So I don't think there is.

I'll offer that I'm -- this case doesn't turn on whether this -- this was in some way filed too late, at least not the motion for the preliminary injunction.

Again, by virtue of me just simply observing the fact that complicated litigation ends up in sometimes complicated consequences and perhaps misunderstandings between what people are saying, I'll leave it at that. But I think, in terms of evaluating the equities, this is not something for anyone to probably take their last stand on.

I'll also offer this: You know, we've been focusing on likelihood of success on the merits. And this is also where I think this case either rises or falls in terms of the motion for the preliminary injunction.

I'm not sure equities or public interest are going to be weighing -- are going to need any significant heavy consideration. I'm not going to -- I'm not saying that you shouldn't argue it. Make your record and help me understand if I'm wrong. I'm certainly open to being able to reconsider my position. I'm just showing you my cards.

I think this case, again, turns on whether I'm granting the preliminary injunction, on whether there's a likelihood of success on the merits of -- of the underlying claims.

Any questions about what I've just said? Any need for clarification?

All right. That way you can decide whether you want to focus just on that, element number one, or whether you want me to really reconsider what I've just shared with you and tell me why I need to consider public interest and equities. That's not to say I'm not going to consider it, but any more than I already have received in terms of the briefing on that.

All right. Counsel, it's 12:20. How much time do you need to take to eat? And don't be bashful. I want to make sure that you have the energy for the afternoon. You can't live on coffee alone. Would an hour be sufficient?

I think Mr. Carollo is saying, "Please."

MR. CARRARA: Sufficient for the Government, Your Honor.

THE COURT: All right. So let's take an hour, which really means let's get back here at 1:30. And we'll continue with -- I'd like to give Mr. Griffith and Mr. Carollo some more time to delve into the substance of what has already been discussed, and then we'll keep going from there.

All right. Thank you. We're in recess.

* * *

(Noon Recess taken at 12:21 p.m.)

***AFTERNOON SESSION***

(Open court, 1:32 p.m.:)

THE COURTROOM DEPUTY CLERK: Please remain seated.

This court is back in session.

THE COURT: All right. Good afternoon, counsel.

Mr. Griffith, I think we're going to let you take the -- oh, were we also going to take up maybe the biologist? Talk to me about what the plan might have been. Do we have our biologist here in the courtroom?

MR. CARRARA: We do, Your Honor.

THE COURT: Okay.

MR. CARRARA: So --

THE COURT: Mr. Griffith, do you want to take up the biologist first and then lead into argument?

MR. GRIFFITH: I am happy to do whatever you'd like to do. So if we have our biologist here, I'm happy to --

THE COURT: All right.
MR. GRIFFITH: -- hear from her first.
THE COURT: All right.
MR. GRIFFITH: And then I do have some comments on that first claim, the acreage issue, but I'll make --
THE COURT: Yes.
MR. GRIFFITH: -- that maybe after the biologist.
THE COURT: All right. Well, then we'll take you up after we hear from the biologist.
MR. GRIFFITH: Thank you, Your Honor.
THE COURT: All right. What's your name?
THE WITNESS: Colleen Holland, Your Honor.
THE COURT: Okay. And is anyone anticipating -- or asking that this be taken under oath?
Mr. Ince-Johannsen?
MR. INCE-JOHANNSEN: If the Court is going to consider it as part of its decision, I think that would be appropriate, yes.
THE COURT: Okay. All right. Well, then if you would be kind enough to come to the witness stand, I will have my courtroom deputy swear you in.
Why don't you climb on up into the witness stand there and --
THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***COLLEEN HOLLAND***

Was thereupon called as a witness on behalf of the Defendants; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Colleen Holland, H-o-l-l-a-n-d.

THE COURT: All right. Thank you.

Please have a seat.

And you're the one who suggested we should go ahead and do this, Mr. Carrara. So do you want to go ahead and ask questions first?

MR. CARRARA: Yes, Your Honor.

THE COURT: All right.

DIRECT EXAMINATION

BY MR. CARRARA

Q. Could you state for the record: What's your name?

A. Colleen Holland.

Q. And who do you work for?

A. U.S. Fish and Wildlife Service.

Q. And what do you do for them?

A. I'm the senior biologist out of our Roseburg Field Office for the Oregon Fish and Wildlife Service.

Q. And how long have you been doing that for them?

A. Five years.
Q. And what's your relation to this case?
A. I'm the lead. I worked with the author on reviewing it. And I've worked on and reviewed all of our consultations in the most recent years and most in the first few years that I worked with the Fish and Wildlife Service.
THE COURT: Were you involved in the development of the biological opinion?
THE WITNESS: Yes.
THE COURT: Okay.
BY MR. CARRARA
Q. So you're familiar with the survey protocol?
A. Yes.
Q. And you're familiar with call-back surveys conducted in this project?
A. Correct.
Q. Could you tell us a little bit about the survey protocol?
A. Yes. And prior to working for the Service, I did work for the BLM for seven years and implemented these protocols and wrote biological assessments, and then I've switched over.
So the protocol -- the call-back protocol was developed and updated in response to the barred owl influence, like we discussed earlier. And in that there was an increased survey effort.
And further on in the introduction of the opinion --

or the -- sorry -- the protocol, from what was read earlier, the protocol serves two purposes, a method so that you can -- we know that the surveys are covering an adequate space around proposed projects, and also so that it ensures a high probability of locating resident owls, and that we can identify owl territories that may be affected by the proposed management activity. And that's on KSW 01026.

And so this protocol is a long-standing protocol. We've used it for years to do just that. And the determinations out of this protocol, while I know that one of them is an unknown, at that point there's a -- a high probability that we've located the resident pairs.

We can never have an absolute positive. There's always going to be --

THE COURT: Is that probability quantified in any way?

THE WITNESS: I was looking for that prior, if the -- the detection probabilities are based on the demography -- there's a -- there's a whole litany of citations in the introduction that the authors of this protocol used to come up with their statistics. Unfortunately, it's not in the appendix of this protocol, and I'd have to go back to those citations and figure out what the --

THE COURT: Well, do you --

THE WITNESS: -- exact statistics were.

THE COURT: -- happen to recall if it's more or less than 72 percent?

THE WITNESS: I -- our usual target is around 90 percent, so I would assume it's close to that, but I can't be 100 percent confident.

THE COURT: Okay. And does the Dugger study provide any other guidance about -- about the efficacy?

THE WITNESS: So the Dugger study reviewed 20 years of call-back surveys under the demography protocol; so it's a three visit a year, whereas the new call-back is a six visit a year. And they did just look at pairs and said that there was a very similar detection of probability in recent years as there was at the beginning of their -- of their time frame.

THE COURT: With respect to pairs or resident owl --

THE WITNESS: Pairs. They focused on pairs.

THE COURT: And does the current study -- survey protocol focus on pairs?

THE WITNESS: The -- it allows -- I mean, the target is to try to find pairs, but it does provide the resident owl determination as well.

THE COURT: Okay. Go ahead.

BY MR. CARRARA

Q. And are you familiar with the Appel study?

A. Yes.

Q. How are you familiar with it?

A. Through reviewing it over the years, especially when it first came out.

Q. Was Appel study used here?

A. No.

Q. Were PAM, or passive acoustic monitoring, calls used here?

A. No.

Q. Could you tell us if a direct comparison could be made between PAM and call-back, as applied here, in the technology?

A. I would say a direct comparison cannot be made. There would have to be an understanding of the assumptions of the two different survey protocols and how they correlate.

THE COURT: And when you say the two survey protocols, you're talking about the call-back survey and then PAM?

THE WITNESS: Correct.

THE COURT: All right.

THE WITNESS: Correct. Yeah. The assumptions versus the two different methodologies and how they interact.

Are there some biological conclusions that correlate between them? Probably. But there's usually more research -- the Appel paper was one of the first studies that came out on how to interpret spotted owl responses in PAM studies. It was very early on in that. And, you know, at that time there wasn't very much information on what to do with that in terms of the greater survey protocol world in spotted owls.

THE COURT: Well, are any biological assessments employing PAM?

THE WITNESS: They are starting -- we have current ones that are starting to incorporate survey results from passive acoustic monitoring, yes.

THE COURT: All right. And what are the -- what are the considerations for using PAM in these -- in these more recent studies and biological assessments?

THE WITNESS: The -- there's a range-wide monitoring effort that historically used call-back surveys that has switched to passive acoustic monitoring. And so that's the -- where we're starting to see detections showing up in our BAs, is this widespread passive acoustic monitoring that's showing up outside of individual survey efforts.

THE COURT: And what's the -- what's the agency decision-making around moving from call-back surveys to PAM?

THE WITNESS: That's -- the Service is not involved with that. I couldn't answer how the action agencies are --

THE COURT: The --

THE WITNESS: -- are making that determination.

THE COURT: -- Fish and Wildlife Service isn't involved in that?

THE WITNESS: No, we have not --

THE COURT: But BLM is moving towards using PAM?

THE WITNESS: I would have to defer to the BLM. I

know that's an internal conversation that they're having.

THE COURT: Okay. But your observation is that they're moving to using PAM?

THE WITNESS: No.

THE COURT: I thought -- so I misunderstood your testimony. So I thought you indicated that some recent BAs are employing PAM.

THE WITNESS: Some recent BAs are incorporating results from passive acoustic studies. At this point we have not had a BA come in that's used only passive acoustic pre-project monitoring.

THE COURT: Okay. So it's in the pipeline; it just hasn't come to Fish and Wildlife Service?

THE WITNESS: We have not -- I -- I and/or the -- my department has not coordinated with our action agencies on any even upcoming projects that are exclusively using passive acoustic monitoring.

THE COURT: Okay. All right. But I just want to confirm then: You understand anecdotally that the BLM is employing data collection through PAM in their biological assessments?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: No. The -- where -- there's a separate project that goes on.

THE COURT: Okay.

THE WITNESS: And where that -- it's a range-wide thing. It's not correlated with specific projects.

THE COURT: So you say "range-wide," like, as probably a term of art that I'm not understanding.

THE WITNESS: Sorry. The --

THE COURT: That's all right.

THE WITNESS: Yeah, the entire range of the northern spotted owl.

THE COURT: Okay.

THE WITNESS: It's a -- it's a long-term monitoring effort.

THE COURT: So I think the failure of my question is that I tied the use of PAM to biological assessments. They're -- BLM is using it, but not necessarily for -- for gathering data for biological assessments?

THE WITNESS: It's a Forest Service-lead project. And so -- but some of their efforts overlap BLM projects. And where the --

THE COURT: Got it. So --

THE WITNESS: -- data is available, we incorporate it.

THE COURT: -- the failure of my question is it's not the BLM, but it's the Forest Service; and it's not for biological assessments; it's for some range-wide studies?

THE WITNESS: Yes. But we do incorporate it --

THE COURT: Got it.

THE WITNESS: -- where it matters.

THE COURT: Got it. Okay.

And you're familiar with both of them. I mean, you're familiar with both the -- I'll call them methodologies, if that's --

THE WITNESS: Yes.

THE COURT: -- okay. And that being call-back and -- call-back survey and then the PAM -- we'll just call it -- we'll call it PAM.

THE WITNESS: Yes.

THE COURT: So -- and you're familiar -- are -- do you -- based on your training as a biologist in working both with BLM, but also now with the Fish and Wildlife Service, are you comfortable understanding the differences between the two?

THE WITNESS: Yes.

THE COURT: All right. And I think -- on a surface level, I think I understand how they're conducted differently. But maybe you can give me a very brief summary of what -- how PAM is implemented in the field and then how -- how call-back survey is implemented in the field, just so that I have a clear sense of it and I'm not operating on any assumptions.

THE WITNESS: Sure. Both protocols use a survey area. So both are -- are completing the efforts over a

designated area. And that area is intended to capture territorial pairs that could be affected by the proposed action by the agencies. So both of these are designed to meet that need.

Passive acoustic monitoring has four passive just recording units per survey unit, which is going to vary depending on the size of the area you're looking at, that are left out for six weeks and have specific times that they're recording during that six weeks.

THE COURT: So it's not 24/7?

THE WITNESS: No, it's not 24/7. It's during the prime spotted owl behavior hours.

THE COURT: Okay.

THE WITNESS: And then that data is brought back and processed through various auto-processing programs.

THE COURT: So somebody doesn't have to listen to a thousand hours of recording?

THE WITNESS: Correct.

THE COURT: Okay.

THE WITNESS: And then we're -- we're learning how to interpret that data in terms of what it means for spotted owl use on the landscape. And that is an evolving data -- you know, this is -- the passive acoustics are only four years old, really, as even being available. And it has not been widely used. And so data's just coming out on how to interpret that

information.

Call-back surveys have a similar setup, similar survey area, but it requires six nights over a six-month period that you're going out and you're broadcasting calls for ten-minute time frames at specific points scattered all throughout the survey area.

And each survey area has to be completed within a certain window in order for that visit to be complete. And then if you have detections, there's additional visits required: A daytime follow-up or, if it's later in the season, additional nighttime visits.

THE COURT: All right. Any additional questions?

BY MR. CARRARA

Q. I just want to go back to -- could you explain a little bit the difference of the biological responses between owls to PAM and call-back?

A. Sure. You know, when you're eliciting a call, you're triggering a response that may have been caught up on a -- caught on a passive acoustic recorder, PAM, but may not have been. And -- and -- whereas the passive recorders are capturing natural behavior, which was described earlier, unadulterated behavior. It's not artificially triggered.

THE COURT: Okay. And I take it's from some recording that's being used to broadcast a call.

THE WITNESS: Correct. The call-back surveys use a

recording to broadcast a call.

THE COURT: Okay. Anything else, Mr. --

BY MR. CARRARA

Q. And so Appel only considers PAM; is that correct?

A. That's correct.

Q. And so could you -- you know, with your background, your knowledge, could one apply Appel to the call-back surveys that were conducted here?

A. I -- I do not have the expertise to be able to make that conclusion beyond that I would need more research to understand questions that Appel didn't answer. You know, that was one study in a small area.

Is it repeatable? Are there different things that would change that detection rate? They did explore different lengths of time and how that influenced survey conclusions. They did say after five weeks they were -- had a high level of confidence you'd pick up a pair if it was there.

THE COURT: And this is with PAM?

THE WITNESS: PAM, yeah.

THE COURT: Okay.

THE WITNESS: Yeah. And they found similar pair occupancy rates as an earlier review of call-back studies they cite. It's Olson 2005, which is also -- the Dugger report also cited to -- back to Olson 2005 for similar detection probabilities.

THE COURT: Okay. All right. Anything else, Mr. Carrara?

BY MR. CARRARA

Q. And the final question I want to ask about is kind of going back to the end of my argument, and if you could clear up the status-unknown determination and kind of how that plays into all of this.

A. Correct. I can definitely do that. And I can cite to our opinion and how we talk about it in our opinion, so it's not sort of an ad hoc discussion or analysis.

We have -- you know, walking through a take analysis requires the conclusion that assumptions are true. And one of the first assumptions we establish is, is there even a reasonable likelihood of take occurring? And we have past litigation to help us navigate that a little bit. It's not a solid line on the ground, though.

And so we use reasonable likelihood. Often we lean on the protocols and their confidence. And so the call-back protocol has a reasonable high likelihood that it will detect pairs and resident singles when you've completed the protocol as it's written.

And we use that as our threshold for reasonable likelihood. Unfortunately, we don't make that exact statement in -- in our opinion. We do have an entire section, though, on take avoidance. And in that we talk about how we apply

reasonable likelihood of take to occupied sites and sites with resident singles in them. And --

THE COURT: So is the reasonable likelihood based on satisfying the three -- three recorded, I guess, responses -- or three responses in six -- in six surveys?

THE WITNESS: Yes.

THE COURT: All right. So reasonable likelihood is hit with three responses in six -- six field -- field observations?

THE WITNESS: Yeah. Six to 12.

THE COURT: Six to 12 field --

THE WITNESS: Yeah.

THE COURT: -- surveys?

THE WITNESS: Yeah.

THE COURT: Okay. But if there are two, then it's no longer reasonable likelihood under the survey?

THE WITNESS: We don't automatically -- we often lean that way. We often take those into consideration and evaluate --

THE COURT: So twos could go either way?

THE WITNESS: Twos don't usually go either way. But if there's a longer history of surveys at that site, we may look beyond two years to see if there's additional information to gather. But we usually defer to the protocol --

THE COURT: Okay. And --

THE WITNESS: -- and determine that --

THE COURT: -- in this biological opinion, was -- were twos given unoccupied?

THE WITNESS: I don't remember. I would have to go back and look at the exact --

THE COURT: But if --

THE WITNESS: -- number of detections associated with these --

THE COURT: But there should be something in the opinion that describes whether twos were given an unoccupied or occupied status?

THE WITNESS: Not necessarily. We often refer on the determinations from the action agency. We often work with them on that data. For this opinion, I believe that information, we would have to go back to the BA. I think we cite the conclusions in the BA for that.

THE COURT: Got it. So Fish and Wildlife were not making the determinations about whether to give a one, two, or three unoccupied or occupied status?

THE WITNESS: A three would be -- would be occupied. And one or two --

THE COURT: But was Fish and Wildlife making that determination, or you were accepting the determinations from BLM?

THE WITNESS: We will accept determinations from the

BLM. We often like to work with them and see -- and have them walk through that with us.

THE COURT: Okay. Everyone -- but is it fair to say that everyone would've agreed, both BLM and Fish and Wildlife, that a three would've been occupied?

THE WITNESS: Correct.

THE COURT: Okay. But whether two was occupied or not occupied, you're not sure at this -- at least, as we sit here, you're not sure?

THE WITNESS: It was probably un -- or it was probably considered incidental, which we would treat as a nonterritorial individual.

THE COURT: Okay. Well, would it have been classified as incidental or classified as unoccupied?

THE WITNESS: It would be classified as incidental and not considered an occupied site.

THE COURT: Okay. So unoccupied?

THE WITNESS: Unoccupied. We -- we like to use the term --

THE COURT: Are there different kinds of degrees of unoccupied?

THE WITNESS: Not likely occupied.

THE COURT: Okay. Not likely --

THE WITNESS: Likely not occupied.

THE COURT: That would be two?

THE WITNESS: Yeah.
THE COURT: And one?
THE WITNESS: Likely not occupied.
THE COURT: Okay. And there's different degrees of "likely not"?
THE WITNESS: Right.
THE COURT: And is that quantified in the report?
THE WITNESS: No.
THE COURT: Okay. And is there a -- is zero -- would be not occupied?
THE WITNESS: Correct.
THE COURT: All right. So -- all right. So earlier -- and I may have misunderstood arguments. I heard argument that described that one and twos were labeled as not occupied and three would be occupied.
THE WITNESS: Correct.
THE COURT: All right. And you're adding some different text to that.
THE WITNESS: I would -- I mean, we, in the Service, prefer to use the term "not likely occupied" because a protocol is not a definite no.
THE COURT: Okay.
THE WITNESS: But, because of that, we rely on that for that reasonable likelihood conclusion in our take analysis.
THE COURT: Okay. All right. Anything else,

Mr. Carrara, before I give Mr. Griffith and Mr. Carollo a chance? And then Mr. Ince-Johannsen will have an opportunity, too.

MR. CARRARA: With the Court's indulgence, one more, please.

THE COURT: Yeah.

BY MR. CARRARA

Q. Ones and twos, even if they don't rise to the level of three, are they captured in the environmental baseline?

A. Correct. They're captured in the environmental baseline, and they're captured in our effects analysis in the effects to nonterritorial individuals. We actually call them out specifically in this opinion on FWS 0033 -- 000322.

We acknowledge that there were nonterritorial detections in the action area and that surveys would continue to monitor those -- those detections to make sure that we could capture and modify the action, should they indicate territorial behavior.

THE COURT: And how often is -- is it the Fish and Wildlife Service that's going out there to monitor?

THE WITNESS: No. The BLM monitors --

THE COURT: The BLM.

THE WITNESS: -- and they report back to us.

THE COURT: Okay. And, at least with respect to this project, do you know how often BLM is going to go out and

monitor?

THE WITNESS: Yeah. It's listed in the protocol. They continue to -- the call-back protocol, after you complete the first two years of six visits, has a two-year -- two- to three-year three-visit protocol early in the season so you can detect changes close to your projects.

And after that three years, we work with the agencies to see how much project is left as to whether or not they need to re-initiate and go back to the full six visits again.

THE COURT: So why would a northern spotted owl go back to a place that's been logged?

THE WITNESS: Because there's a lot of area around these projects that often aren't logged. That's why -- I mean, that's why -- the survey protocol goes way beyond the project's -- the project footprint.

THE COURT: All right. Did that beg more questions, Mr. Carrara?

MR. CARRARA: No further questions, Your Honor.

THE COURT: All right. Mr. Griffith.

MR. GRIFFITH: No questions from me, Your Honor.

THE COURT: Mr. Carollo.

MR. CARROLLO: Yeah, just a couple questions.

CROSS-EXAMINATION

BY MR. CARROLLO

Q. Good afternoon -- Ms. Holland, right?

A. Yes.
Q. So what's the primary purpose of doing the protocol surveys for the biological opinion?
A. It's to establish a reasonable likelihood of occupancy.
Q. Okay. And is it to aid the agency in its incidental take findings?
A. Correct.
Q. Can you explain that a little bit more?
A. The -- following the protocol, we believe, gives us a reasonable likelihood of identifying the pairs and resident singles that are -- the ones that are tied to a specific territory on the landscape.
And we need that tie to the landscape to be able to translate habitat effects to effects to individuals. So the resident singles are using a much more condensed portion of the landscape that they're actively defending and using. And if a project is removing essential pieces of that territory, that's where we assign take.
Whereas, if we have just the incidental detections, we don't have that strong tie of the individual to the landscape requiring that smaller footprint, which is why we do not carry them through the take assessment as a reasonable likelihood.
Q. Okay. So is it fair to say then that the Fish and Wildlife Service's call-back protocol is designed to be a

take-avoidance protocol; is that right?
A. It's designed to contribute to a take-avoidance practice.
Q. Okay. All right. And I think in the biological opinion -- it sounded like you're familiar with it -- at ECF 17-2 at 84, the Fish and Wildlife determined that the survey -- the NS -- the Fish and Wildlife Service's call-back survey protocol is the best available methodology; is that right?
A. I -- I would have to see -- I would have to look back and verify.
Q. Okay. But are you aware of the Fish and Wildlife Service considering it to be the best available methodology for the take-avoidance purposes that we've talked about?
A. We do not weight one protocol over the other at this time.
Q. Is there -- but is there PAM protocol that's designed to accomplish take avoidance?
A. We have a draft protocol that's in its final versions of -- final process of finalization; but, in the meantime, we have been accepting projects designed under that draft protocol.
Q. Okay. So the Fish and Wildlife Service has been developing a protocol, but it's not -- it's not finished yet?
A. It's not finalized, no.
Q. Okay. And it wasn't finalized at the time of this 2023 BiOp for this case?
A. Correct.

MR. CARROLLO: Okay. I think that's all the questions I have.

THE COURT: All right. And there's something with our audio. I think this happened before.

THE COURTROOM DEPUTY CLERK: It usually is somebody's wireless device is too close to a microphone.

THE COURT: Oh, all right. Well, to be fair, I'll move mine, too. We're all potentially involved in that one.

All right. Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Thank you.

CROSS-EXAMINATION

BY MR. INCE-JOHANNSEN

Q. Just a few questions for you, Ms. Holland.

First, is there anything in the survey protocol that directs status-unknown sites to be treated as unoccupied?

A. The call-back protocol?

Q. Correct.

A. No.

Q. What site-specific protections does the BiOp apply to sites with one to two detections, so-called status-unknown sites?

A. It wouldn't because we don't consider them occupied.

Q. If I understood you correctly a moment ago, you said that the BiOp does factor those detections into the environmental baseline. Could you clarify what you meant by that then?

A. I would have to go back and double-check, but this -- we almost always have a survey update section in our environmental baseline that summarizes the survey results. I did not double-check the page numbers prior to this.
Q. Yeah. I'm just looking at the page that you cited a moment ago, and it's discussing those owls as transient owls or floater owls. So is that -- am I correct in understanding that that's how the BiOp treats these incidental detections, the so-called status-unknown sites, as just -- categorically as transient or floater owls?
A. That's correct. I was citing that from the effects section, not the baseline section.
Q. Okay.
A. And in the effects section, we acknowledge that those incidentals are nonterritorial -- likely -- likely nonterritorial individuals because they did not meet the standards under the protocol.
Q. And, therefore, they have no site-specific protections?
A. Correct, because we don't have a territory to apply those -- the site-specific protections are required -- are designed based on the knowledge of a territory used of a spotted owl. And so, without having that information, there's not a way to apply site-specific protections.
Q. So, looking beyond the relevance of, you know, occupancy status to the ultimate take determination, is it relevant to

anything else in the BiOp, like, for instance, you know, the determination that treatments are not likely to adversely affect owls there?

In other words, if a site is deemed occupied versus unoccupied, will that play into likely adverse effects analysis and, ultimately, the jeopardy analysis?

A. So a treatment can affect the habitat fitness of a site, which can be adverse. But the only way it'll adversely affect an owl is if an owl is present.

So our -- we have a section of the opinion that discusses effects to sites, and we describe it as such: "The project will or will not degrade a site such that it is likely to support an owl in the future if it is not currently occupied."

If it is occupied, that's where we complete the take analysis, whether or not the -- that those treatments would then result in take.

Q. And, just to be clear, when you say whether a site is occupied or not, what you're essentially saying is whether it is -- has three or more detections, in which it's treated as occupied; or if it's less than that, even though the survey protocol only specifies that it be regarded as status unknown, the biological opinion treats it as unoccupied.

So there's no specific protections for the status-unknown sites, and impacts at those sites would not

be -- you know, they're not considered in the jeopardy analysis then, separate from the impacts to floater owls, essentially?
A. Because the two are not interchangeable. We can't assign protections to individuals that aren't using a territory like a territorial pair would. You know, that's the foundation, sort of, of our differentiation between -- why we have a separate section for the nonterritorial individuals.
They have a very ambiguous use of the landscape. It varies from owl to owl. They don't call, so we can't really track their movements. But they're a lot more fluid, and they aren't forced -- you know, a territorial individual defends a nest patch or an activity center, a core-use area where they do most of their feeding.
And they use the rest of the home range to meet the rest of their needs. And that's the foundation for our take analysis. A floater does not -- we do not have that same argument pattern for a nonterritorial individual, and so we can't describe how modifying a project would minimize impacts to that owl. They have a much larger use of the landscape. And that's described in our effects to nonterritorial individual section.
Q. Just a couple more questions for you. Thank you.
Why did the Fish and Wildlife Service come up with a new protocol?
A. The acoustic protocol?

Q. Yeah.
A. Because it's a field that has had incredible developments in terms of data processing in recent years. And the ability was there to start -- and I should say that this is founded on work done by other agencies.
The Forest Service has really been a foundation in exploring passive acoustic monitoring with the range-wide effort. And, based on that, we've been able to get a lot of data to support the development of an acoustic recording protocol.
Q. Okay. Just one more question. Earlier, if I understood you correctly, you testified that, you know, detections of two owls could go either way. I think I'm quoting you accurately.
What guidance, if any -- you know, published guidance, maybe in the record -- would inform that -- what sounds to me like maybe a subjective judgment that it can go either way?
A. I would have to go look at the administrative record to see what's been included, to know what to cite back to the record.
Q. But if you were the one making that determination, deciding what to do with two detections -- so it's less than three. It's, under the survey protocol, status unknown -- what kind of, you know, guidance would you look to, to make that assessment?

A. If there was more than two years of survey history.

THE COURT: What does that look like in terms of numbers? So if there were four years of survey history --

THE WITNESS: If there were four years of survey history and no detections, I would not -- I would definitely not consider it an occupied site.

THE COURT: But if there were four years of -- of history and two detections --

THE WITNESS: I would map the detections on the landscape. Each survey area is fairly large. They can be over a mile-and-a-half wide. And you -- if you can map the detections and see how far apart they are in that survey area, the timing -- there's a lot of information that we can derive from the call-back surveys to indicate any sort of pattern of use.

THE COURT: Okay. I take that northern spotted owls don't have distinct calls.

THE WITNESS: Very distinct calls.

THE COURT: Oh, so can you actually determine if -- if one --

THE WITNESS: Oh, in terms of -- no.

THE COURT: Individual.

THE WITNESS: No. They do not have calls that are unique to individuals.

THE COURT: Okay. All right. So you'd look at the

geographic pattern --

THE WITNESS: Correct.

THE COURT: -- in a four-year history if there were two calls. And if it was -- now I'm just surmising if -- if the location of those detections were close in space, then that would suggest more likely occupied than less likely occupied?

THE WITNESS: It would warrant discussions with the action agency, yes.

THE COURT: What would those discussions involve?

THE WITNESS: It would be really site specific.

THE COURT: And so at that point it becomes a bit subjective?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: There's often subjectivity in some of our discussions. There's only so much -- unfortunately, there's only so much information science can give us.

THE COURT: All right. And, on top of that, everyone having really good hearing.

THE WITNESS: Yeah.

THE COURT: I mean, so -- any other questions?

MR. INCE-JOHANNSEN: No further questions. Thank you.

THE COURT: All right. Thank you -- is it Dr. Holland?

THE WITNESS: No. No.

THE COURT: Okay.

THE WITNESS: No.

THE COURT: You wouldn't want to -- you don't want that accolation. Okay.

THE WITNESS: No. I really enjoy my on-the-job training I've gotten --

THE COURT: All right. Thank you, Ms. Holland.

THE WITNESS: -- over the years.

THE COURT: I appreciate it. And you're welcome to step down.

THE WITNESS: Okay. Thanks.

Mr. Griffith, I know you've been waiting a while.

MR. GRIFFITH: Thank you, Your Honor.

THE COURT: Yeah.

MR. GRIFFITH: I'd like to talk about the acreage issues for a few minutes.

THE COURT: Right. Which is, I think, the first -- first of the claims, I think, the plaintiff has made.

MR. GRIFFITH: Correct. That's right. And I believe these two parties have had a chance to talk about it. Mr. Carollo have -- Mr. Carollo and I have a few things to say, but I'll try to keep it brief because I think Mr. Carrara did a good job of explaining this error or discrepancy between these tables.

And what I'd like to do is provide some context for what that table in the revised environmental assessment is, the one that the plaintiffs claim authorizes acres in excess of what the BiOp authorized.

And I'd like to point you to the REA. What -- what Mr. Carrara explained is that the double-counting was because multiple treatments are going to occur on single acres -- on sets of acres; and, therefore, when BLM ran that table that's -- that's on page KSW 00787, it double-counted acres. Their methodology double-counted acres.

THE COURT: So basically, for each of the treatments, they just added them -- the acreage.

MR. GRIFFITH: Correct. Yeah. So if one acre had two treatments, then that acre was counted twice. If it had three treatments, that was counted three times.

And, just to provide a little bit of context for that, I'd direct you to -- direct you to KSW 00592. And it provides an explanation of noncommercial hazardous fuels reduction. And it does two things. I want to point out two things about this section here.

For one thing, it calls out the fact that acres overlap in this section. It explains that some of these HRF, hazardous fuel reduction, treatments are going to be applied on commercial treated -- commercially treated acres.

So it's saying that individual acres are going to

be -- are going to be subject to multiple treatments. So that's number one.

Number two, it just -- it also just provides some detail. I've gathered today that you like -- you like to understand the details about the facts and the science behind this. And this explains the kinds of treatments we're talking about here.

It's -- it says treatments could include slashing, hand piling, hand piling -- hand pile burning, chipping, lop and scatter, and/or understory burning. So those are the kinds of activities that can go on in conjunction with other types of treatments.

So there could be a thinning project, that then there's some of these hazardous fuel treatments that occur on that same acre. So that's -- that's the source of that double-counting. I just wanted to provide that context.

THE COURT: And that double-counting is in the EA?

MR. GRIFFITH: It is in the EA.

THE COURT: All right.

MR. GRIFFITH: Right.

THE COURT: And that's what led it to be described as -- what is it? About 8,000 acres?

MR. GRIFFITH: 8,311, Your Honor, is the number listed in the -- in the EA.

THE COURT: Okay. And then the biological opinion

and maybe the BA both are describing the impacts on about 3,000 acres.

MR. GRIFFITH: If my memory serves, I believe it's 3,093 acres.

THE COURT: Okay.

MR. GRIFFITH: I could be off by a few, but I believe that's --

THE COURT: Well, now you're just --

MR. GRIFFITH: -- the number.

THE COURT: -- showing me up or showing off.

MR. GRIFFITH: So the BiOp is what authorizes the number of acres. So the BiOp here --

THE COURT: Would the impact be different, or -- or what I would be looking at, if the EA addressed only 3,000 acres and the biological opinion was accounting for 8,000 acres? I mean, which one is a greater error on the part of the agency -- the action agency?

MR. GRIFFITH: Well, I don't -- I don't think that the -- I don't think that that hypothetical would track with the plaintiffs' claims.

THE COURT: Well, I know, but this is -- that's why it's --

MR. GRIFFITH: Right.

THE COURT: -- purely hypothetical. And I'm just trying to understand -- I mean --

MR. GRIFFITH: Yeah.

THE COURT: -- when we're -- and maybe it doesn't have anything to do with numbers at the end of the day; it's what you're -- what you're doing to the acres themselves or what's been considered --

MR. GRIFFITH: Right.

THE COURT: -- with -- how those acres have been considered. And if that's the case, then does it matter at all why the EA addresses 8,000 acres and the BiOp and BA only addressed 3,000?

MR. GRIFFITH: For purposes of the Endangered Species Act, this challenge -- their challenge to the consultation, I don't think it does really matter what's in the REA. The question is what did the BiOp authorize in terms of impacts on acreage and whether or not the projects have exceeded that amount or will exceed that amount. And the evidence in the record shows that it has not. And if it does, they'll re-initiate consultation. That's what was discussed earlier.

THE COURT: Is the 8,000 a ghost number for which there isn't actually going to be 8,000 acres that are subject to some kind of treatment at the end of the day?

MR. GRIFFITH: Well, I'd push back a bit on it being a ghost number because I think --

THE COURT: Well, I was trying to throw you a softball, but if you want --

MR. GRIFFITH: Yeah.
THE COURT: If you want to just --
MR. GRIFFITH: Well --
THE COURT: -- watch it pass over, that's fine.
MR. GRIFFITH: I think that the 8,000 -- it's -- that's not tracking the number of acres that will be treated; but there is a basis for that number, which is it's double-counting the --
THE COURT: Right. Right. So you're double-counting acres, so you're dealing with -- I mean, if you corrected the number, it -- are you saying that it would essentially be the equivalent of the number -- the 3,000 in BiOp and the BA?
MR. GRIFFITH: I think that's right, Your Honor, yes.
THE COURT: You think or you know?
MR. GRIFFITH: I think. There is -- we haven't seen the backup data behind that double-counting. But, based on Mr. Kelly's declaration, that's the explanation they provided.
THE COURT: But since we don't know for a fact, I think isn't that really what -- probably the primary issue that the plaintiffs are raising, is that we don't know whether it's, in fact, a double-counting or how it's being double-counted --
MR. GRIFFITH: Yeah.
THE COURT: -- there isn't an adequate explanation?
And I appreciate that the agency has acknowledged that it's an error, but do I do any -- just like I think you're

going to ask me not to be considering substantive evidence with respect to call-back and the survey protocol, is it a problem I get to resolve? Or is it a problem that I remand for the agencies to resolve?

MR. GRIFFITH: I don't think that it requires any remand in this case, Your Honor. And for -- the other piece of context that I want to provide is that this REA, if you look at page KSW 00787, it explains right underneath that table that this analysis -- the BLM was relying on their prior analysis to provide the northern spotted owl NEPA analysis.

It says right here, "The BLM did not analyze in detail the effects of the proposed alternatives on NSO critical habitat in the planning area because there is no potential for significant effects beyond those already analyzed in the 2016 PRMP/FEIS to which this EA is tiered."

THE COURT: So if it's an error, it's harmless?

MR. GRIFFITH: I think that's right, Your Honor. I think that's right. It just --

THE COURT: So, I mean, this might be a note to environmental lawyers. If you can translate it to normal legal jurisprudence, it's a heck of a lot easier for me to track.

MR. GRIFFITH: Sure. Yeah, I think that's accurate.

THE COURT: Okay.

MR. GRIFFITH: And if you look at the -- this is in Section B of the -- of the revised environmental assessment.

And if you look at the very first page of that section, it explains that these are issues considered, but not analyzed in detail.

So issues that were considered -- I'm reading from it here: "Issues that were considered, but not analyzed in detail are concerns raised by the public or BLM specialists during scoping, which did not relate to how an alternative responded to the purpose and need, did not point to a potentially significant environmental effect beyond what was anticipated and accounted for in the PRMP/FEIS" -- that's the 2016 analysis -- "or otherwise would not assist in making a reasoned choice among alternatives." That's at KSW 00724.

So what the plaintiffs are criticizing here is effectively a statement that they're not doing this analysis; they're relying on that 2016 -- the 2016 analysis of the RMP; because, Your Honor, what that RMP does is it basically provides the game plan for how BLM is going to manage this area.

And this project is tiered under that. So they fully analyzed the impacts associated with this project for NEPA purposes in that 2016 RMP in terms of the impact on habitat. So this document, it's important to keep it in context.

They're saying that it was arbitrary and capricious for BLM to have this supposed discrepancy, but this isn't even fundamental to the agency's decision. They're saying, "We

relied on the 2016 analysis" --

THE COURT: "They" being?

MR. GRIFFITH: BLM.

THE COURT: BLM.

MR. GRIFFITH: Correct. And the BLM is the one that prepares the NEPA documentation, the environmental assessment or EIS if it's a different project, but here it's the environmental assessment.

Fish and Wildlife Service is the agency that provides -- that prepares the biological opinion after getting the biological assessment from -- from the action agency, which is BLM. I believe you talked to the other lawyers about that this morning.

But it's important to keep that in mind in the context of the exact claim that the plaintiffs are bringing here. They're arguing that it was arbitrary and capricious for -- for BLM to rely on the biological opinion because there was this alleged discrepancy.

But that's -- what Mr. Carrara was getting at earlier -- and I think it's very important -- is that there is no discrepancy. The place that matters, in terms of where BLM actually quantified how many acres are going to be impacted, is in the BA.

They did that analysis, and they provided it to the Fish and Wildlife Service and said, "Look, these are the acres

we're going to affect." And the biological opinion blessed that analysis. They said, "Yes, it's -- you're good to go." So that -- I think that's very important context here.

The other thing is that the REA does not authorize any action itself. It's the decision records --

THE COURT: And the REA is?

MR. GRIFFITH: Is the revised environmental assessment.

THE COURT: Okay.

MR. GRIFFITH: So it provided an environmental analysis for a variety of projects within the action area, but then it's the individual decision records that authorize projects, like Paul's Payoff. My client's sale was authorized in Decision Record Number 1.

And now we're up to Decision Record Number 4, which came out, I believe, just a couple weeks ago, in February sometime. And it confirms that, to date, only 2,303 of 3,093 BiOp-authorized acres have been treated or will be -- will be treated through that Decision Record 4.

So what -- one thing that was mentioned earlier is if that number is exceeded in Decision Record 5 or 6 or 7, the remedy then -- or not even remedy -- what the agencies would need to do is re-initiate consultation to analyze the project as a whole, what's been done to date and what they plan to do on a going-forward basis, to make sure that they're still in

compliance with the Endangered Species Act.

THE COURT: Okay.

MR. GRIFFITH: So, again, I think that context is very important. And, again, that's not --

THE COURT: And that wouldn't be considered improper segmenting?

MR. GRIFFITH: Absolutely not, Your Honor. I mean, I think that what plaintiffs are getting at is a hypothetical world where the agencies violate the ESA in the future.

There is case law that says that you can't take a big project and analyze it piece by piece and say, "Well, this piece doesn't cause a problem. This piece doesn't cause a problem. This piece doesn't cause a problem," and ignore the fact that, when you put them together, they do cause a problem. Does that make sense?

But that's not what's happening here, presumably. It hasn't happened yet, so we don't know. If they ever have to re-initiate consultation, what they'll do is analyze the project as a whole from DR Number 1 to DR -- wherever they end up. So it's not segmented. They'll be doing it as an entire analysis.

And, presumably, if they got to DR Number 6 and Fish and Wildlife Service didn't approve the project, then they wouldn't be able to implement it. So there's safe -- there's strong safeguards to make sure that the critical habitat is

protected on a going-forward basis and the owls individually are protected on a going-forward basis.

So I think -- I mean, we're getting into irreparable harm, which I'd like to talk about at some length later on today. I think that we -- I'll turn it over to Mr. Carollo at this point 'cause I assume we'll come back to irreparable harm at some point, but those are my points on the acreage issue.

THE COURT: All right. Thank you.

Mr. Carollo.

MR. CARROLLO: Yes. Couple things, Your Honor.

So, yeah, I think on this -- I did want to address the habitat acreage issue briefly. So, as I understand it, plaintiffs are arguing that they believe the EA contemplates or authorizes a project that exceeds the scope of the BiOp, right?

And I think if BLM actually was doing that, authorizing on-the-ground activities that exceeded the scope of the BiOp, there's potentially a Section 7 problem there, right, that there's -- but, again, I think, as Mr. Carrara and Mr. Griffith explained, like, this decision that's happening, they're being implemented, the decisions themselves, in individual decision records.

And so the EA itself doesn't authorize anything. So even if there was a discrepancy, which, again, I think Mr. Carrara's explained why there isn't and that they're not authorizing more; but, even if they were, it hasn't happened

yet.

And I want to point you to something I think is really important because earlier this morning plaintiffs talked about -- they were speaking, I think, to Mr. Kelly's declaration and saying that that's a post hoc rationalization about what BLM's going to do in the future, but it's actually in the decision record.

This is at AR 7, AR 000007. This is Decision Record Number 4. And BLM said -- it says, "BLM is tracking areas by NSO habitat type being treated in each decision record, ensuring that the acres treated and the associated effects do not exceed what is disclosed in the associated biological opinion."

So that's not a post hoc rationalization. That's in the BLM's decision record. They've told -- they've told the public that's what they're doing. And that -- that statement deserves a presumption of regularity.

Frankly, Your Honor, I think that's the end of that claim because I think we heard a concession earlier that if BLM wasn't going to authorize more acres than was authorized in the BiOp, that, you know, essentially this is, you know, an extraneous issue -- or I don't know. I got it here somewhere -- but I believe that concession was made earlier.

And, I mean, BLM stated affirmatively in the decision record they're not going to do that. So I think --

THE COURT: And that's sufficient to --

MR. CARROLLO: Yeah.

THE COURT: -- affirm the BLM on -- on that issue?

MR. CARROLLO: 100 percent, it is.

THE COURT: Because it was made during --

MR. CARROLLO: It was in the decision record. It's in the decision.

THE COURT: All right.

MR. CARROLLO: Yeah. And, you know, Seven County --

THE COURT: But if it were post hoc, then you agree that there's a problem?

Come on, you've got to concede something, Mr. Carollo. The only way a tree grows is by pruning it sometimes.

MR. CARROLLO: Yeah, I -- post hoc rationalization could be problematic, depending on the context.

THE COURT: All right. Well, that's important for you to have to say. You feel better when you finally said it out loud, right?

MR. CARROLLO: Fair enough.

But, I mean, just to hit that point a little bit more, I mean, the Supreme Court said that recently in the Seven County case, too, right? I mean, they said that -- the Supreme Court emphasized that an EIS, an environmental impact statement under NEPA, is not the same thing as review of the agency's

final decision.

The ultimate question is not whether an EIS, in and of itself, is inadequate, but whether the agency's final decision was reasonable and reasonably explained. So the final decisions are these decision records. There's four of them so far.

There's no dispute that they don't authorize more treatment of NSO acres than what was analyzed in the BiOp. It's less. That's undisputed. And in the decision record I just quoted for you, BLM has stated affirmatively they're not going to authorize more than what was authorized under the BiOp. So, again, I think that's case closed on Count 1.

I'd like to -- well, I do want to mention that, like, even if you disagreed with me on that, there's no irreparable harm that flows from that violation because it kind of becomes circular, but at the same time you come back to the fact that they haven't -- BLM hasn't authorized more treatment of NSO habitat than what has already been authorized under --

THE COURT: So, even if it were post hoc, there's no irreparable harm?

MR. CARROLLO: There is no irreparable harm. Even if there was a violation, there's not. So I don't see how that claim, that count, Count 1 of their ESA claim, gets them any closer to preliminary injunction. I really don't think it does.

I do want to briefly talk about sort of this whole issue about Appel. So I think the testimony we heard was helpful. I want to point you back to two studies. One was Dugger. The other one was Cramer. That was the one that -- the 2024 study that BLM cited in the EA.

So, I mean, you know, we heard from Ms. Holland that, like, this is a developing area, right? And even the Fish and Wildlife Service is developing an alternative protocol that could be used, using passive acoustic monitoring.

But, I mean, I think what we heard is that this is kind of a fastly emerging field. But in the Dugger study, which is 2023, after the Appel study, at that time that study said that passive acoustic monitoring are not directly comparable to our estimates of the probability of detecting NSO pairs using call-back surveys.

So, I mean, that was the state of the science in '23. And then when -- Cramer is 2024. And they said in there that, "While passive acoustic monitoring appears suitable for monitoring changes in spotted owl occupancy rates, this survey method has not been used or assessed as a tool for explicitly conducting or improving the effectiveness of long-standing survey protocols being used by land and wildlife management agencies," AKA the 2012 Fish and Wildlife Service protocol.

So, again, I mean, the agencies are tracking the state of the science on this issue all along, both in the BiOp

in '23 and in the EA in '24 and '25. It's just, ultimately, Your Honor, what they're asking you to do -- they say they're not, but what they're asking you to do is to substitute your judgment for the Fish and Wildlife Service's, both about what the best methodology was to use in 2023 and, two, how to interpret the results from the protocol.

And I think under the case law you can't do either one. And -- 'cause they're entitled to substantial deference in both cases. And --

THE COURT: So, you know, I was, you know, wrestling with that question over the lunch break and trying to, you know, reconcile that issue because, you know, trying -- you know, being asked to make a substantive decision about which -- which practice methodology -- survey methodology is the better methodology, I agree, isn't part of my consideration, shouldn't be part of any of my consideration.

So we're all on -- I think we're all on the same page. But, to the extent -- I can also appreciate, I think, what Mr. Ince-Johannsen was -- was aiming at, was that because -- and I'm inviting you to respond to this, as opposed to me telling you this is how it's going to be -- because one and two detections were classified as -- now the word's escaping me -- as --

MR. INCE-JOHANNSEN: Status unknown.

THE COURT: -- status unknown -- thank you -- but

then treated as --

MR. INCE-JOHANNSEN: Unoccupied.

THE COURT: -- thank you -- as unoccupied, that that -- you know, just -- and maybe this is false -- imperfect logic, but I'm just trying to put, like, sort of a math equation, which boils it down nicely and simply for me, is -- is trying to say like one and two equals zero, right?

That -- that the -- the Appel study with the 72 percent probability of, you know, one detection, you know, indicating that there's either a pair or a resident owl is -- is evidence to establish or is probative of the idea that one and two equals zero is arbitrary and capricious.

MR. CARROLLO: Sure.

THE COURT: So I don't think the -- and I don't know if that's the argument in a nutshell that you might be -- you're asking me to take into account, Mr. Ince-Johannsen?

MR. INCE-JOHANNSEN: I think that's an accurate statement, yes.

THE COURT: Okay. So no one's asking me to say -- or find that PAM is better than -- than the survey protocol, but that it's probative of this idea that one and two don't equal zero, and that's where -- that's the -- sort of the fallacy or the arbitrariness of the -- of the agency's decision is found.

So go ahead.

MR. CARROLLO: Yeah. So I guess a couple comments on

that. So I appreciate that question. So I think one thing is -- I think both in their briefing and this morning, though, I mean, we heard plaintiffs sort of tacitly acknowledge that the two methods aren't necessarily comparable and that it may not be a 72 percent probability that you could transfer from PAM to call-back surveys.

I think we heard that -- we saw that in the briefs. We heard that today. So then that, itself, begs the question: If we don't know what the percentage is, there's -- there's no evidence in the record -- they have none to inform Your Honor about what that probability would be. We're just simply sitting here guessing, right?

I mean, we know it's not -- I mean, we know they're not comparable. We know it's not 72 percent. It's some other number, but we don't know what it is. What we do know from the studies I just cited for you, which were done at the time of these decisions, is that they are not directly comparable. That's a quote from the Dugger study. That's what they said.

And they said in 2024 that it had not even been yet used or assessed as a tool for the type of monitoring that the call-back survey protocol is designed to do, which is determine a likely occupancy of a resident that you need to avoid take for.

So, I mean, that was the state of the science in '23, '24, '25 when these decisions were made. So I --

THE COURT: Let's forget about PAM for a minute.

MR. CARROLLO: Okay.

THE COURT: I still have a problem with the math. It's hard for me to, you know, reconcile the -- sort of the common sense idea that one and two equals zero.

MR. CARROLLO: Well, I don't think that's what it's designed to do, though, right? It's -- and I think we heard testimony about it. It's designed to get to the reasonable likelihood of a resident or an occupancy, right?

So it -- like, in our world, I think in the legal world, it's like preponderance of the evidence, right? It's like it has to be more than 50 percent likely that a fact is true, right?

The way I understood the testimony is that the protocol is designed to achieve that level of confidence, which in a statistical world is usually 90 percent confidence interval of something being more likely than not. That's the way I understood the testimony.

So it may be that one detection or two detections -- maybe it's -- maybe there is a 20 percent chance. Maybe there's a 25 percent chance. But what the Fish and Wildlife Service has decided, you know, based on their science, their analysis, is that if you follow this protocol, you can be confident that it's reasonably likely that that -- those detections equal a resident or resident pair once you've got

those three detections.

And that's the sound judgment of the Fish and Wildlife Service. It doesn't mean that one or two detections equals zero. I mean, I think that's sort of a straw man argument that they've put together in their briefs by juxtaposing 72 percent and zero.

But I think they're just making that up. I don't -- it's just unknown. Unknown just means we don't know. It doesn't mean the percent chance is zero.

THE COURT: Okay.

MR. CARROLLO: Last thing I'll say is, I mean, this -- I think it shouldn't be lost on the Court, too -- there've been several citations in the brief -- it was mentioned earlier, including the Cascadia Wildlands v. Thrailkill case -- I mean, this isn't the first time that the protocol has been challenged.

And, I mean, the Ninth Circuit deferred to it in Thrailkill. What plaintiffs are asking you to do here is really significant. We're talking about a protocol that's been used for take avoidance for, I mean, going on decades. And they're asking you to disturb that based on a single study, not even comparable --

THE COURT: I'm not accepting anyone's invitation to throw out protocols. I think it's a question about whether the agency used the findings from these protocols -- or this one

protocol in an appropriate way under their own regulations.

MR. CARROLLO: I think, though, that -- can I turn you back to the standard real quick --

THE COURT: Go ahead.

MR. CARROLLO: -- a little bit? Because if we go back to, like, Kern County Farm Bureau v. Allen -- that's a Ninth Circuit case, 2006 -- I mean, they talk about how an agency complies with the best available science standard as long as it does not ignore available studies, even if it disagrees with or discredits them.

And so -- and, you know, they say that what constitutes the best available science and commercial data available is, itself, a scientific determination deserving of deference.

And this is what I was trying to explain to you this morning, right, is that the Fish and Wildlife Service hasn't ignored this issue about detectability of spotted owls that's raised in Appel.

They haven't ignored it. We've -- it's established in the record that the Fish and Wildlife Service has considered that issue, and it's incorporated in its protocol. I mean -- and really, too, like, if you were to say, "Well, I don't see Appel cited in the BiOp," or something like that, like, yeah, I mean, you could remand it back to them and say, "Well, I want you to tell me something about Appel."

But, I mean, under Kern County, I mean, again, they can't -- they can't ignore issues. They can't ignore science that's out there. But you have to defer if they disagree or discredit it.

And here they specifically found in the BiOp that the protocol was the best methodology available at the time that they issued its decision in 2023. Yeah, so, I mean -- oh, I'm sorry. I gave you the -- I gave you the Kern County cite. I should've given you San Luis Delta. So that's 776 F.3d 971 at 995. But same standard applies, right?

So -- and I would also argue, Your Honor, that irreparable harm doesn't flow from that either. Like, even if you say, "Well, I'm not satisfied with the attention you gave Appel" -- which, I mean, you shouldn't find. I mean, they clearly have grappled with this issue about detectability -- irreparable harm doesn't flow from that.

They carry the burden on irreparable harm. They have to demonstrate that there's actually harm or take likely to occur. They have no expert, no declarant, anybody, to tell you or inform Your Honor that, merely because they didn't discuss Appel sufficiently for their purposes, that that means there's likely to be take if these timber sales are implemented.

There's no evidence in the record to support that, other than the 72 percent number, which they acknowledge doesn't even mean 72 percent under the protocol. It doesn't

get them there. It doesn't get them there on the merits. It doesn't get them there on irreparable harm.

THE COURT: All right. Thank you.

Mr. Ince-Johannsen, an opportunity to reply to these varied arguments, and then we'll move on to the northwestern pond turtle.

MR. INCE-JOHANNSEN: Thank you. Just a few points.

Counsel for AFRC and AOCC just argued that the Ninth Circuit in the Thrailkill case upheld the 2012 survey protocol. That's actually not the case. It was not at issue in that case. And it's not at issue in this case either. We're not challenging the survey protocol. We don't take issue with its methodologies.

The issue here is very narrowly focused on the assumption that status unknown -- in other words, these sites with one or two detections -- are not occupied. There's no justification for that in the record. There's no analysis of that in the record.

And the only evidence that is in the record that looks at this question of, you know, what does an individual isolated owl call represent, what does that mean on the landscape, is the Appel, et al., 2023 study.

And granted that the methodologies are not necessarily interchangeable, that point is -- I think we all agree on that, but it does remain the only science in the

record that looks at this question at all.

And, you know, when you pair that with the precautionary principle that the Endangered Species Act embodies and the conscious decision of -- of Congress through the ESA to afford listed species the highest of priorities and to afford them the benefit of the doubt, as the Supreme Court recognized --

THE COURT: How do I -- when that pushes up against agency deference, how do I -- how do I navigate that space?

MR. INCE-JOHANNSEN: I don't know what there is to defer to here because, again, there's no analysis of the possibility that those owl sites are, in fact, occupied, that the possibility -- or maybe, conversely, there's, you know, no real justification for treating them categorically as unoccupied.

You know, related to that point --

THE COURT: Does the BiOp or the BA describe them as more likely not occupied, or are they just occupied or not occupied for the purposes of determining how to treat this space -- this area?

MR. INCE-JOHANNSEN: So it is a binary clarification. These sites are treated as unoccupied in the BiOp. And that affects not just the take determination. It affects the question of whether there are likely adverse effects to individual sites.

And that isn't -- again, it's not just relevant to the take determination. It's also relevant to the jeopardy analysis.

Now, we heard testimony that, you know, there's a requirement that there be a reasonable certainty of take in order to find nonzero take. There is case law certainly saying that, but that's looking just at the question of take. It's not looking at the question of occupancy.

Occupancy is relevant beyond the universe of -- or the question of whether there's going to be take or not. It's relevant to the jeopardy analysis. And there isn't a requirement in that context that there be a reasonable certainty. That standard is really only applicable to the question of take.

So, you know, essentially, if I understand it correctly, the -- the approach that Fish and Wildlife Service has adopted here is reasonable certainty squared. It's requiring reasonable certainty both as to the question of occupancy and then, again, as to the question of take. That's not what the ESA requires.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Just a couple other points, if I may.

THE COURT: There was some pushback on the numbers, the acreage set out in the EA versus the BiOp.

MR. INCE-JOHANNSEN: Thank you. Yeah, a few points on that.

First, just on the -- on the numbers and the rationale -- or the explanation for the discrepancy, the notion that the HFR treatments could account for that discrepancy is clearly contradicted by the record because, again, as we discussed this morning, the acreages affected by NRF removal that is disclosed in the biological opinion versus the EA are wildly discrepant. It's a three-times greater figure disclosed in the EA.

HFR treatments don't affect -- they're not NRF-modify treatments. They're -- excuse me -- they're not NRF-removal treatments. They're modify treatments. They don't affect the canopy, and they don't affect the ability -- they don't reduce the habitat fitness below the level of the requirements for nesting, roosting, and foraging.

So, to the extent that that explanation, you know, could hold muster as to HFR treatments, maybe it does; but it doesn't address the discrepancy of most concern to us and of, certainly, the most significance to the species, which is the much larger number of acres that would be a NRF-removal situation disclosed in the EA compared to the BiOp.

THE COURT: And the issue about -- yeah, I think earlier you described any explanations are post hoc. I believe Mr. Carollo described something in the record -- was it 00007,

Mr. Carollo?

MR. CARROLLO: Yes, that's right. AR 000007.

MR. INCE-JOHANNSEN: That would not be post hoc. It's part of the record.

THE COURT: Okay. So --

MR. INCE-JOHANNSEN: Yeah.

THE COURT: And I haven't looked at 00007, so I'll -- I'll go back and review it, but can you -- anything substantively you want to argue about whether that does or doesn't address the arguments that you've raised about the adequacy of the explanation --

MR. INCE-JOHANNSEN: Yeah.

THE COURT: -- for why there's overcounting of the acreage in the EA?

MR. INCE-JOHANNSEN: You know, unless I'm missing something -- and I'm looking at AR 000007 right now -- this only documents the, I think, unremarkable fact that BLM is treating -- it's tracking implementation as it goes. I certainly would hope that that would be the case.

That doesn't resolve the discrepancy between the two figures. It just shows that BLM is keeping track of -- of how much is logged. Now, elsewhere in the record, you know -- or I believe it came up in briefing that BLM would stop before it exceeds the numbers in the BiOp. Just it offers its promise that it would do so.

THE COURT: Is it a promise or a requirement?

MR. INCE-JOHANNSEN: Well, it is a requirement under the Endangered Species Act, certainly, that it cannot go beyond what the biological opinion considered. And yet the EA shows that it -- that the project, as defined at the time, that it would go beyond.

So the fact that it's tracking implementation -- and I will also just quickly note on that point, you know, if you look at those figures -- this is a 15-year project. And the BiOp discloses impacts to 3,093 acres of critical habitat.

Already BLM has implemented more than -- well, basically three-quarters of that in -- what? -- just two years. So for me it raises questions -- it suggests that there's, you know, some underlying flaw here in how BLM is approaching this that it would've already implemented three-quarters of the critical habitat treatments that the BiOp disclosed in just the first two years of the 15-year project time frame.

Actually -- I'm sorry -- just eight months, not two years, because they only started implementation last year with road building. Thank you.

I think just the last point I just want to make on the critical habitat piece is, you know, whether or not the explanations add up is not ultimately the issue here. I mean, that, I think, kind of collapses down into arguably a harmless error if there isn't more to it.

But there is more to it; and, that is, this notion that BLM can rectify this with further consultation. That's where the ESA violation shows up.

So on the record before the Court, BLM consulted on a small project, relatively. In the intervening time, it's prepared EAs that disclose a much larger project. There is -- are contentions that there are mistakes in that document and an assurance that -- that it'll be resolved by further consultation.

And that is where the piecemeal, segmented, you know, prescribed approach shows up that courts have consistently rejected as inconsistent with the Endangered Species Act.

THE COURT: Okay.

MR. INCE-JOHANNSEN: I think that's all that I have right now.

MR. GRIFFITH: Your Honor, may I add a point or two?

THE COURT: Go ahead, Mr. Griffith.

MR. GRIFFITH: Two points.

I believe this 15-year argument is a red herring. If you look back at that section I pointed you to earlier about noncommercial hazardous fuels reduction -- that's at KSW 00592 -- it points out that that -- that hazardous fuels reduction project, which has already been approved, was approved basically immediately, is going to take 15 years.

It says, "The BLM anticipates the first phase of this

project to be implemented in fiscal year 2025 and could take up to 15 years for small-diameter HFR thinning and prescribed fire actions to occur and would be dependent on availability of funding, staffing, and contracting."

So, I mean, these projects, they don't just happen immediately. They're multiyear -- the individual sales and project activities, they're long activities sometimes. It's not like it just lasts one season or two seasons. Here they're saying that that one activity could last 15 years.

So the idea that just because it's -- they authorized things on the front end, we're -- they're necessarily going to exceed the BiOp acreage, I think, isn't true.

The other thing, there was some discussion about post hoc rationalization. And I'd like to provide another cite from the EA itself, from the revised EA itself, where it describes that the EA doesn't authorize anything and anticipates this decision record process.

So at KSW 00585 there's a section called "Decision to be Made." And it says, "The authorized officer would decide whether to offer timber for sale. These decisions will be documented through decision record documents that would identify specific approved actions."

And if you read the rest of that section, it talks about how sometimes those decisions haven't even been made yet. So, just to complete the line of reasoning, to take a

hypothetical situation where, one month from now, BLM posts on their website another decision record that pushes them in excess of that biological opinion, we're all going to be right back here talking about violations of the ESA.

But that's hypothetical. That hasn't happened yet. And BLM is saying it isn't going to happen. So I think that, at best, they have hypothetical concern about future issues. So that's what I have to say about the acreage issue.

Shifting --

THE COURT: So, Mr. Griffith, I do want to be conscious of the time.

MR. GRIFFITH: Sure.

THE COURT: We haven't even talked about the northwestern pond turtle and FLPMA. So maybe in some closing arguments, if we have time for those, I'll be happy to revisit some of these points.

MR. GRIFFITH: Fair enough, Your Honor.

THE COURT: Thank you.

Mr. Ince-Johannsen, is it time for FLPMA?

MR. INCE-JOHANNSEN: Yes. Thank you.

THE COURT: All right.

MR. INCE-JOHANNSEN: Your Honor, FLPMA requires strict conformity with every RMP. Here relevant is the 2016 RMP for Southwestern Oregon. And BLM bears the affirmative burden of demonstrating compliance with the RMP.

An RMP -- this RMP provides a mandatory management directive for bureau sensitive species. And I'm quoting, "BLM must implement conservation measures to mitigate specific threats to bureau sensitive species during the planning of activities and projects."

Now, here the record is abundantly clear and graphically clear that a specific threat to northwestern pond turtle is crushing, namely, by heavy machinery involved in logging and forestry operations.

You know, this can occur during overwintering when turtles are burrowed under ground. And it can also occur when turtles are moving between aquatic and upland habitats. It can also occur, as well, when turtles are estivating, which means essentially basking in the sun.

Now, northwestern pond turtles have a specific life cycle, just -- I mean, just as northern spotted owls do, although it's quite distinct. They leave the water in fall and burrow into upland forest duff and remain dormant and, in some cases, invisible under the duff all through winter.

You can imagine, with heavy machinery going through a forest, when there's no effort to survey for the species, which there is not, it's all but inevitable the turtles will be crushed in the course of the conduction of those activities.

And that's exactly why the ODF&W, Oregon Department of Fish and Wildlife, with BLM and Fish and Wildlife Service as

contributors on this, prepared a strategy for management of -- of -- or prepared a strategy for avoiding this kind of impact to -- to pond turtles.

There's a recognition in this document -- this is at KSW 1390 -- that heavy logging equipment does, indeed, pose a fatal threat of crushing northwestern pond turtles. And that's why ODF&W and BLM in that document direct timing harvests to avoid hibernating or estivating turtles; in other words, seasonal restrictions in that habitat type to avoid this risk of crushing turtles.

Moreover, in this -- in a multiagency strategy -- this is the western pond turtle range-wide management strategy, which we cite in our reply brief at page 19, a document that BLM is also, again, a signatory to -- it directs agencies to implement best management practices within western pond turtle habitat to ensure their long-term viability.

So BLM, even in the environmental assessment for the Last Chance project, recognized this threat implicitly by drafting a project design feature to address it. This is PDF, project design feature, 50, which entails seasonal restrictions between October 1st and March 31st to prevent crushing. That's at KSW 842.

And yet the final EA conditions the application of that measure, of PDF 50, on the future ESA listing of the species.

THE COURT: So nothing -- these mitigation efforts wouldn't even happen until -- until the turtle is listed?

MR. INCE-JOHANNSEN: Precisely.

THE COURT: So there's no value to being identified as a bureau sensitive species?

MR. INCE-JOHANNSEN: No, that's right.

THE COURT: Or at least that's the way that BLM is approaching efforts at mitigating harm to the -- to the turtle?

MR. INCE-JOHANNSEN: That's right. And it defeats the purpose of -- the explicit purpose of the BLM's own bureau sensitive species policy.

I would point the Court to the BLM manual, Directive 6840 -- this is at AR 22602 -- that states that the objective of the bureau sensitive species management program is to -- quote, "to initiate -- to initiate proactive conservation measures that reduce or eliminate threats to bureau sensitive species, to minimize the likelihood of and need for listing of these species under the ESA."

So, in other words, the whole purpose of this policy is to avoid the need for listing. And yet in the EA the BLM has taken the position that there's no need to protect a bureau sensitive species, the pond turtle specifically, unless and until it becomes listed.

It's directly contrary to its own policy and the purpose behind it, as memorialized in its own manual. So, you

know, that's sort of the substantive aspect of this. There's also, just running through the EA, a fundamental analytical shortcoming.

There's no consideration of crushing threat specifically in the EA. There's a discussion of impacts to northwestern pond turtle habitat. But, you know, crushing is -- you know, in the ESA parlance, it's direct take.

It's not through the proxy of habitat modification. It is a very direct, very, again, graphic or visceral reality for these turtles. They're literally crushed by heavy machinery.

So the consideration of impacts to habitat are no substitute for analysis of that specific direct threat to the species, crushing. And --

THE COURT: And your proposed -- well, the action you want me to enjoin is only seasonal, right?

MR. INCE-JOHANNSEN: So I think that there needs to be -- yes, I think that that would be one -- that is one prong of it. The other is BLM just needs to do its homework and look at this question.

I think that remand of the EA to consider the specific threat of crushing and to demonstrate compliance with the RMP management directive -- so, in other words, either apply the PDF or, you know, offer a reasoned explanation for, you know, why it's -- it should not be applied, despite the

clear and unambiguous purpose of -- of that -- of that policy, which is to avoid listing of the species.

THE COURT: Okay. All right. Let me hear from counsel and then -- then we'll address the issue of irreparability in more detail and then see where we are with our time.

Mr. Carrara.

Oh, Counsel?

MS. BOYLAN: Oh, yeah.

THE COURT: Oh, will you be arguing?

MS. BOYLAN: Yes, Your Honor.

THE COURT: All right. And Ms. --

MS. BOYLAN: Ms. Boylan.

THE COURT: -- Boylan?

Ms. Boylan, please go ahead.

MS. BOYLAN: Good afternoon.

THE COURT: Good afternoon.

MS. BOYLAN: So plaintiffs' claims under FLPMA and irreparable harm both fail for the same basic reason. Plaintiffs have failed to identify any meaningful threat to the species from this project.

So I first want to look at what does the RMP actually require here and then did BLM reasonably apply it. And we can look to the interpretive framework outlined in Kisor v. Wilkie, which was recently spoken to in Cascadia Wildlands v. BLM, the

Ninth Circuit case from last year. That's at 153 F.4th 869.

So, first, the RMP management direction unambiguously ties the need for conservation measures to the risk of the species being listed under the ESA. And you can look to the RMP management objective, which says "to reduce or eliminate threats to bureau sensitive species, to minimize the likelihood of and need for the ESA listing of these species." That's AR 012932.

And then in the RMP final environmental impact statement, it says that the proposed RMP would include, quote, "conservation measures to the extent necessary to prevent the need to list bureau sensitive species under the Endangered Species Act." And that's at AR 014976.

And then, looking to the bureau sensitive species manual itself, it says, quote, "The BLM shall manage bureau sensitive species and their habitats to minimize or eliminate threats affecting the status of the species." And that's AR 022636.

So under this framework the first step is for BLM to see if there are any specific threats affecting the status of the species, i.e., meaningfully contributing to the need to list the species. If yes, then BLM would try to minimize or eliminate those threats. And if no, then the inquiry ends.

Plaintiffs in their reply incorrectly frame BLM's position as only requiring mitigation measures where the

impacts from the project would directly cause the species to be listed.

That is incorrect. As we stated in our briefing, the test is whether the project would contribute to the need to list the species. And this was also stated in the EA itself where it -- BLM concludes that the project would not lead to a measurable increase in the likelihood of the species to be listed as threatened.

And --

THE COURT: Is there any dispute that the turtles would be crushed if they were -- I mean, in the areas that would be -- that's --

MS. BOYLAN: Well, there's no --

THE COURT: -- that have been targeted for --

MS. BOYLAN: There's been no --

THE COURT: -- for logging?

MS. BOYLAN: There's been no sightings of turtles in the proposed units since 1997. There, of course, is a possibility that there are turtles there. But whether or not they would be crushed is a pretty remote possibility.

THE COURT: Has there been a survey -- does the record provide any evidence of a survey of that area recently?

MS. BOYLAN: There's no requirements for surveys for turtles under the RMP. And there's actually no known survey protocol for terrestrial turtles. And, actually, there's no

known detection probability for turtles.

So surveying wouldn't be super helpful, and it would be also very time- and resource-intensive. And, again, we have to look at what the RMP --

THE COURT: So does that really boil down to the plaintiff saying -- or plaintiffs' position being speculative?

MS. BOYLAN: Yes, it is extremely speculative. They're speculating that there are -- turtles are present. They're speculating that those turtles could be crushed. And then they're speculating that the crushing of maybe one or multiple turtles would contribute to the need to list the species. None of that satisfies the standard for irreparable harm.

So I also want to note that this court has previously endorsed this approach of tying conservation measures to the threat to listing. In Cascadia Wildlands v. BLM -- that's the District of Oregon case from 2013 that we cite in our briefing where this court found that, even where a BLM forestry project would impact individual red tree voles by removing the trees that they lived in -- and that was a bureau sensitive species -- because BLM reasonably concluded that it would not contribute to the need to list the species, because it would not affect species persistence across its entire range, that was all that was required.

And while that was under a prior RMP to this one, it

shows the consistency of BLM's interpretation of the BSS policy. And, you know, that's exactly what BLM did here. They used habitat, in the absence of surveys, as a proxy for impacts to species.

And, notably, there's no impacts to the other two types of habitat, nesting and aquatic habitat. And the overwintering habitat that they talk about -- they talk about how it's actually overestimated.

But, even when you consider that, it only amounts to the removal of less than .13 percent of overwintering habitat in Oregon, which is only, itself, a portion of the species' overall range. They also exist in other states. And, therefore, BLM reasonably concluded that this would not affect the species at the overall population level.

And I'll also note that the species going to be -- or the likelihood of crushing is even less because there are already riparian buffers around streams and ponds within the treatment units. And within those buffers is where almost 50 percent of turtles have been found to overwinter. So none of those turtles would be affected by this potential for crushing.

And I also want to just talk -- as a practical matter, it's not like these logging vehicles are traversing every acre of the logging -- of the unit like a Zamboni. Like, they are existing in certain designated areas, especially for,

like, cable yarding where you have the machines out, you know, in the road in a yarding area and then you have a cable pulling the trees from down the slope.

And, even ground-based logging, the machines -- like, they can't traverse every area because that would impact the soil too much, so they have to be at designated distances away from channels where they're going through the trees. And then they have these long arms that go out and pluck the trees. I'm not a forester, so that's my basic understanding.

The EA also talks about how stream restoration activities under the project would benefit the northwestern pond turtle. That's at AR 960.

And I wanted to just talk about discretion here a little bit. As this court has explained, BLM retains, quote, "a great deal of discretion in deciding how to achieve compliance with the RMP." And that's from Klamath-Siskiyou Wildlands Center v. Gerritsma.

BLM --

THE COURT: I take part of the plaintiffs' position and argument is -- is that BLM hasn't even taken a look at -- or -- and I think, by your recognition, there hasn't been any survey of any of this area; it would be difficult to do so --

MS. BOYLAN: It would be difficult to --

THE COURT: -- is that right?

MS. BOYLAN: -- do so, and it's not required by the

RMP. And there are other bureau sensitive species that the RMP does require surveys for explicitly. So if BLM wanted to do that, it could've written that into the RMP, but it didn't.

And I can point you to where plants and fungis, which is at AR 012923 -- and plants are actually a good example of where this contribution to need to list standard would, like, be the most obvious because these were plants -- sometimes they exist in only a few locations across the landscape; and, therefore, if you removed or impacted one of those locations, it would clearly measurably contribute to the need to list the species.

And so in that case BLM would, you know -- well, they're required to survey for those, and then they would have to avoid that location. But for the turtles, which are widely distributed across Oregon, you know, looking at just percentage of habitat impact is the proxy that BLM is using to -- to determine impacts and whether there is a need to list.

So I also want to -- so essentially BLM has the discretion to -- and the expertise to find this middle ground between the high bar of the project will directly cause a species to be listed and plaintiffs' low bar of the project could potentially harm a single turtle.

And that discretion is evident from the bureau sensitive species manual itself, which directs BLM to, quote, "prioritize bureau sensitive species and their habitats for

conservation action based on considerations such as human and financial resource availability, immediacy of threats, and relationship to other BLM priority programs and activities." And that's at AR 022636.

Also, in that manual it states that BLM must ensure that application of the BSS policy is consistent with timber production as the dominant use of O&C lands. And that's at AR 022638.

So it's true that the policy is for BLM to do what it can to avoid listing, because listing is going to make it difficult for BLM to achieve its mandate under the O&C Act to provide these lands for sustained yield timber harvests, as well as all the other mandates that it is trying to fulfill under its multiple-use mandate statute.

But what the RMP and the BSS manual do not require for turtles is locating every individual, surveying every timber sale area, or preventing all mortality or impacts to habitat. The BSS policy specifically addresses risks to species' listing status, not the protection of every individual animal that might occur in a timber sale area.

And, to the extent there's any ambiguity that you find in what this management direction requires, you must defer to BLM's reasonable interpretation of its own land use plan.

I'll point you back to the Ninth Circuit case Cascadia Wildlands that came out last year where they were

deciding an interpretive question under this same RMP with respect to marbled murrelets where the bureau was -- had a less protective interpretation than plaintiffs would have liked.

And they said that "It is clear beyond any doubt that Congress would delegate interpretive power to BLM in this context because the RMP was prepared by BLM and balances multiple interests, including wildlife conservation."

And, you know, for sort of all the same reasons that I just discussed about the low impacts on habitat, the very speculative nature of whether a turtle could be injured by crushing, plaintiffs just can't meet the standard for a preliminary injunction because they have not shown any definitive threat of future harm that's not mere speculation.

Do you have any specific questions I can answer?

THE COURT: Well, I think I understand the Government's position in that -- or BLM's position in that there is no likelihood of success on this claim. And I think you touched on some of the other aspects of preliminary injunction, which I don't need to address for the moment. So I don't think I -- I don't have any questions, not yet. I might come back to you, though.

MS. BOYLAN: Okay.

THE COURT: All right. Just a reminder, I'm interested in likelihood of success. And I guess you can throw in a little bit of irreparability -- or irreparable harm if you

can sneak it in before I catch you.

MR. GRIFFITH: I think it's speculative, Your Honor, the irreparable harm.

THE COURT: All right. Well, then you snuck it in at the front end.

MR. GRIFFITH: Okay.

THE COURT: All right.

MR. GRIFFITH: I just want to make a few points. I thought that my colleague covered the waterfront pretty well.

The key here, I believe, is that the RMP focuses on protecting the species, not individual animals. It's the goal of the RMP that the management --

THE COURT: Well, I mean, isn't that the case with all of what we're talking about? I mean, individual animals or the -- I mean, the species -- I mean, the owl is subject to the same sort of scope. We're not -- I mean, these statutes -- these laws aren't designed to protect individuals.

MR. GRIFFITH: Well, that's actually not true, Your Honor.

THE COURT: Okay.

MR. GRIFFITH: So the ESA provides -- and I think that this is getting at the issue here. The plaintiffs are attempting to impose basically an ESA requirement, Endangered Species Act requirement, on the western pond turtle -- the northwest pond turtle.

THE COURT: Okay.

MR. GRIFFITH: Under the Endangered Species Act, with certain exceptions, you're not allowed to take individuals of the species. You can if you get authorization from Fish and Wildlife Service.

THE COURT: All right.

MR. GRIFFITH: But, as a general matter, there's a very high bar for taking individual members of the species. That is not the case with bureau sensitive species. They are not subject to those same restrictions.

And I actually think -- and I made this point in my briefing, but I just want to say it again -- that PD 50 that the plaintiffs point to, it's pretty clear what purpose it's serving, in my view, because it says, "If the pond turtle is listed, then we apply these additional protections."

And when you look at it in context, what they're saying is "If the pond turtle obtains these additional legal protections under the ESA, we need to impose additional requirements to make sure that individual turtles aren't harmed."

So it's building it in. The northwest pond -- northwestern pond turtle is a candidate species. It's -- or it's been proposed for listing. So it's possible that, during project implementation, it will end up as an ESA species with that heightened level of protection.

But that hasn't happened yet. And so right now it's just subject to protection --

THE COURT: So what happens, if during logging operations, Murphy finds that it is crushing turtles in the upland areas?

MR. GRIFFITH: As of now? I mean, I don't --

THE COURT: Going forward, I mean, if, you know, there's some kind of finding, observation, that pond turtles are getting crushed.

MR. GRIFFITH: Yeah. The analysis would change if there was an ESA listing. Then that would be legally --

THE COURT: Well --

MR. GRIFFITH: -- significant.

THE COURT: And there's no ESA listing at the point, but -- but, as a bureau sensitive species, what, if anything, are the defendants obligated to do?

MR. GRIFFITH: The defendants aren't obligated to do anything on a going-forward basis. Your Honor, I'm actually not certain of the exact answer to that question because some bureau sensitive species do have survey requirements, like my colleague was mentioning.

But the pond turtles don't. And in this overwintering habitat, they're buried. So I don't think, as a realistic matter, anyone will ever know. It's just pure speculation that there's -- that there's a turtle out there or

would be at any time during project implementation.

Now, if they were listed under the Endangered Species Act, that would come -- certainly come with a lot of additional protections for the turtle, which would very, very, very likely include survey protocols, like we've been talking about at length with the northwest --

THE COURT: Okay.

MR. GRIFFITH: -- spotted owl -- the northern spotted owl.

THE COURT: All right.

MR. GRIFFITH: So the other point I'd just like to make is I think that this claim really can rise and fall -- or fall, rather, if -- if the Court carefully reviews the detailed analysis of the pond turtle and the potential impacts that's in the revised environmental assessment. And that starts at KSW 00659.

The plaintiffs barely mention it in their briefing, if they mentioned it at all, but it's a detailed analysis explaining why this project isn't going to threaten the species or lead to its listing -- increased likelihood that it's listed, which is the conclusion the bureau reached.

And, again, we don't know if there's any turtles there. Nobody's ever seen turtles there since 1997. There's no demonstration of irreparable harm. It's just completely speculative.

THE COURT: All right. And you snuck that in twice.

MR. GRIFFITH: Thank you, Your Honor.

THE COURT: Mr. Carollo.

MR. CARROLLO: Yes. Thank you, Your Honor.

I don't have a whole lot to add. Ms. Boylan did a good job covering most of the points I wanted to cover. I think two points.

One is that -- I was a little taken aback when I saw the reply brief, and there was all this focus -- I think the plaintiffs said at the end of the day that, like, their overarching concern, or maybe even sole concern, is this issue about crushing. I think that's in the reply brief. I think we heard that again today.

I mean, I get that it's notice pleading in federal court. But, I mean, under Claim 2 in their complaint --

THE COURT: I'm sorry. It's what in --

MR. CARROLLO: It's notice pleading in federal court. I understand that. But, I mean, if we look at Claim 2, there's no mention of crushing or that the BLM failed to analyze crushing as an issue. I searched the complaint. I don't see the word "crushing" anywhere in the complaint.

What Claim 2 is about, it says that BLM's failure to perform the 2016 RMP by authorizing the Last Chance project without implementing mandatory conservation measures for the northwest pond turtle is arbitrary and capricious and violates

FLPMA.

And the only measures that they identify is the PDFs. And that's the way I understood their motion, was that the issue was that they weren't implementing these PDFs, which I think Ms. Boylan explained pretty well why they don't have to do that.

So it seems like in their reply they're trying to sort of --

THE COURT: And they don't have to do that until they're listed as -- under -- as an endangered species?

MR. CARROLLO: Yeah. They're developing, though, so they have something ready to go if they were to be listed, sure. But to, like, impose the PDFs, if the Court were to do that, you would essentially be imposing ESA-like restrictions on the agency, which would be inconsistent with the plan.

So I guess my point is that I don't think that this issue about not analyzing crushing, or really this issue about crushing at all, is even incapsulated within their complaint. It just seems like sort of a late-timed argument they threw in their reply, perhaps because they realized that there's really not very solid grounds for the Court to impose the PDFs. That's really all I have to say.

THE COURT: Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Yes. Thank you.

THE COURT: So the RMP doesn't address specifically

how to address northwestern pond turtles or -- or what is it -- let me frame it this way: What does the RMP provide for northwestern pond turtles?

MR. INCE-JOHANNSEN: So I think of relevance here is the directive that is applicable to bureau sensitive species generally. The RMP directed specifically that BLM implement conservation measures to mitigate specific threats to bureau sensitive species.

BLM recognized the threat of crushing to northwestern pond turtles by preparing PDF 50. If you read PDF 50, it's clearly about that issue. So, you know, in our complaint the claim is broadly stated as a failure to -- to consider the application of measures pursuant to the bureau sensitive species policy. And here the PDF that was prepared and provided in the EA is clearly about crushing.

Now, a couple points, if I may just quickly make them. BLM has seen turtles at the project site without even surveying for them. This is at KSW 661. There is documentation --

THE COURT: Are they upland or within the -- sort of their sort of seasonally active sites?

UNIDENTIFIED SPEAKER: They were seen in aquatic, but they said they did not where they (indiscernible).

MR. INCE-JOHANNSEN: So they were seen in aquatic habitat --

THE COURT: So we know that they're there?

MR. INCE-JOHANNSEN: Yes.

THE COURT: So that's not a question?

MR. INCE-JOHANNSEN: It's not.

And, actually, if I may, I would just love to use the evidentiary system one more time quickly to share a map. This is at AR -- sorry, just one moment. Excuse me.

So this map is at AR 3729. And this is, you know, one of the relatively few population surveys provided in the AR. This is Manzo, et al., 2021. And this shows known populations of northwestern pond turtles across its range.

And if you zoom in to Oregon, you'll see one green dot, which represents the largest known population of northwestern pond turtles. If you know the area, or certainly if you cross-reference it with maps of the Last Chance project area, that's right smack dab in the Last Chance project area.

This is the junction between Douglas County, Josephine County, and Jackson County. The Last Chance timber sale spans those three counties. It's right where that green dot is, and that is the largest known population in Oregon.

So the notion that there are not pond turtles in the project area, it's contradicted by the record in multiple places. And not only that, you know, it appears that this is, in fact, the largest population in Oregon. And, therefore, the likelihood of crushing is especially high there.

You know --

THE COURT: And is the standard likelihood of -- of harm, destruction, crushing the standard I apply when determining whether there were supposed to be mitigation efforts considered?

MR. INCE-JOHANNSEN: So I think, at the very least, BLM needs to have considered this issue, the specific threat of crushing on the turtle.

THE COURT: And their obligation to do so is found in what -- what sources?

MR. INCE-JOHANNSEN: To demonstrate compliance with the RMP, it's a fundamental requirement under FLPMA that BLM must demonstrate compliance with the RMP. And here specifically it's the -- at issue is the 2016 RMP directive that implement conservation measures to mitigate specific threats to bureau sensitive species.

And that's further elaborated by BLM's policy in its manual to -- that the purpose -- excuse me -- the purpose of that program, the bureau sensitive species program, is to avoid the requirement for listing.

So there's this regulatory framework around northwestern pond turtles that flows from the RMP generally through that directive related to the bureau sensitive species as elaborated through BLM's manual.

And to demonstrate compliance with that measure,

there needs to be some analysis of the specific threat of crushing to the species.

So I think, to answer your question, you know, it flows from the RMP. And the BLM's manual provides context, sort of just clarifies --

THE COURT: Okay.

MR. INCE-JOHANNSEN: -- what that actually means.

THE COURT: And, given that there's between 51 and 100 northwestern pond turtles in the same area where these projects are going to be taking place, it also -- I mean, and -- and if there -- there have been sightings, that means that there've been sightings while they've been in their aquatic environments?

MR. INCE-JOHANNSEN: I would need to look back at the methodology that this survey used.

THE COURT: And is this part of the record?

MR. INCE-JOHANNSEN: It is. It's at 3729 in the BLM AR.

THE COURT: I mean, and if all northwestern pond turtles hibernate, then these same pond turtles are going to be in the upland areas?

MR. INCE-JOHANNSEN: That's exactly right. That's just a fundamental part of their life cycle.

THE COURT: Okay.

MR. INCE-JOHANNSEN: The last part of the life cycle,

I just would like to briefly highlight --

THE COURT: So maybe it isn't so much the need to actually find western pond turtles hibernating at all. I mean, that's just the wrong way to even think about it. It's just if they are sighted in their natural habitat during their non-hibernating season, then they're going to be the same ones who are hibernating during their hibernating season.

MR. INCE-JOHANNSEN: I think to -- yeah, I think that's exactly right, to establish that there are pond turtles in the project area, which the record does establish, you know, the presence of them. Whether it's in riparian areas, you know, basking on a log, or burrowed in forest duff in winter, their presence is established by, you know, any sighting.

And because, you know, their life cycle just involves those -- those behaviors --

THE COURT: And remind me: What part of the RMP is it that directs mitigation efforts --

MR. INCE-JOHANNSEN: So it's the --

THE COURT: -- for the northwestern pond turtle?

MR. INCE-JOHANNSEN: Well, so the 2016 RMP directive is not specific to northwestern pond turtles. It's specific to bureau sensitive species, of which northwestern pond turtle is one.

THE COURT: Okay. And is there any other description about mitigation efforts, what that means?

(Whispered discussion, off the record, 3:19 p.m.)

MR. INCE-JOHANNSEN: No, I don't think -- in the RMP there's not anything applicable here. It all flows from the bureau sensitive species program.

THE COURT: Okay. In this case it would appear that there -- there has been no mitigation in any way, shape, or form taken --

MR. INCE-JOHANNSEN: That's correct.

THE COURT: -- so however we might define it.

MR. INCE-JOHANNSEN: That's correct, yeah.

THE COURT: Okay. Anything else on -- I do want to return to that one question about, you know, not sighting or finding or identifying any and whether that's really almost a red herring -- or is it a straw man? Maybe it's -- maybe it's a straw man. I think we've used the term "red herring" too many times today.

So, I mean, it seems logical, but -- that if you find living pond turtles in the aquatic regions, those are going to be the same pond turtles who hibernate. So the idea of not -- of not being able to practically find or identify hibernating turtles, I mean, I -- yeah, I think they're sort of -- sort of misdirecting the appreciation for the presence of pond turtles at all, for which there would be a need to consider mitigation efforts.

Ms. Boylan --

MS. BOYLAN: Are you asking me?

THE COURT: -- do you want to respond to that?

Yeah.

MS. BOYLAN: So I think it'd be helpful to look at the structure and history of the RMP for a second. So under the prior plan, the northwest forest plan, under what was called the survey-and-manage approach, BLM was required to survey sensitive species prior to harvest and apply conservation measures if it was found.

The 2016 RMP abandoned that approach and instead relied on the allocation of 80 percent of the O&C lands to the reserves where no sustained yield timber harvest would occur to conserve these species.

And, to the extent that is not sufficient and a proposed action would contribute to the need to list the species, then BLM would implement conservation measures in those cases. And you can see this history outlined in the RMP at AR 012844 and AR 014975 to 76.

And, as I said, again, if BLM wanted to require additional conservation measures, like requirements for surveys, it could have and would have done so, like it did for other species, like the red tree vole.

And I would also note that, like, even if there are turtles in these aquatic habitats, that doesn't mean that they're going to overwinter where logging equipment is moving

around.

As I said, almost 50 percent of the turtles that would overwinter next to streams and ponds are going to be in the riparian buffers where there's -- no treatment is allowed. So that is considered in the EA.

THE COURT: Okay. Mr. Griffith, any other comments on just that narrow question?

I mean, if I understood the general arguments from intervenors and defendant, that, "Hey, look, there aren't any western pond turtles that are hibernating. And we couldn't see them even if -- even if there were, so there's no -- I mean, how do we even account for and mitigate?"

I mean, again, it's -- I can appreciate that maybe some pond turtles are going to end up hibernating closer to the aquatic environments. But, I mean, if the evidence is such that they are, in fact, going to the upland areas, then there are going to be some that are hibernating that could be exposed to crushing. Or the likelihood, because if they're hibernating and we know that there they exist, so --

MR. GRIFFITH: It's --

THE COURT: Maybe I should --

MR. GRIFFITH: Yeah.

THE COURT: -- frame that a different way. We know pond turtles are there because they're in the aquatic spaces. And maybe you disagree with that, but it seems that the map

suggests that there are.

MR. GRIFFITH: Well, that map is covering a very large area. I mean, that point on the map isn't even -- I mean, it's close to the project area, but we're talking about hundreds of miles of square area.

THE COURT: Well, I think the term was "smack dab."

MR. GRIFFITH: Well, I disagree with the "smack dab" characterization.

THE COURT: All right.

MR. GRIFFITH: But at the end of the day what the RMP requires is that for bureau sensitive species -- and, again, there's nothing illegal about harm to an individual turtle here -- there's no obligation for Murphy Company or --

THE COURT: But we're dealing with the term "mitigation." So can you move away from this idea of -- of protecting individual animals, but -- but there's a requirement that bureau sensitive species -- there's some considerations and mitigation are -- are taken into account.

MR. GRIFFITH: And where that's required is at the planning stage. So when they're planning the project, when they're putting together this revised environmental assessment and the associated FONSI and then the decision records, they're required -- or, actually, they completed the analysis in this REA and the associated FONSI here -- they're required to analyze the impacts on these bureau sensitive species to

determine whether or not conservation measures are needed to prevent the project from increasing the likelihood of listing.

And here they did just that analysis, and they determined that -- we're talking about .13 percent of the overwintering habitat, like a tenth of a percent --

THE COURT: Do I take into account that number in determining whether the agency did what they were supposed to do?

MR. GRIFFITH: BLM took it into account. They said, "We are affecting" -- which you're required to defer to the agency on this issue, on these matters of scientific expertise. And what the agency did was they looked at it, and they said, "Look, we are not going to affect aquatic habitat, not going to affect nesting habitat. There will be some impact on overwintering habitat, but it is such a tiny amount of the overall habitat within the state that there's no -- it's not going to increase the likelihood of -- of impacts on" -- or --

THE COURT: The species?

MR. GRIFFITH: -- excuse me -- "of listing of the turtle."

So I think they complied with the RMP regulations, which, again, is at that planning stage, the planning stage.

THE COURT: Okay. Mr. Carollo.

MR. CARROLLO: Yeah. Just to tag onto that, I mean, for the purposes of NEPA, they're analyzing the issues that are

relevant for carrying out their RMP and disclosing the impacts to --

THE COURT: I want to make sure that the mic is picking up because --

MR. CARROLLO: Okay. Is that better?

THE COURT: Yes.

MR. CARROLLO: Okay.

THE COURT: And it's also because we're using FTR for the record, so I want to make sure that everything that you say is recorded.

Go ahead.

MR. CARROLLO: Sure. Thank you.

Yeah. So, I mean, for the purposes of the NEPA analysis, I mean, obviously they're focusing on making sure they comply with the RMP. They want to look at the relevant questions for their decision-making process and disclose those impacts.

And I guess the one thing that may have been lost in this discussion that has been brought up a little bit, but could be brought up more, I think, is, like, starting at AR -- let me put it back up -- AR 00082, I mean, the BLM does have an analysis of what they did, you know, to evaluate pond turtles.

You know, they talk about how they did field evaluations at seven locations of aquatic habitat that were identified according to a model that was developed by Oregon

State University.

And they found that only three of the model sites to actually even be suitable for northwest pond turtle. And they found the other four were to be unsuitable because they didn't have the characteristics that were needed for the pond turtle.

And, I mean, I agree with Mr. Griffith, too. I mean, a dot on a large-scale map doesn't actually really tell us that there are identified pond turtles or a population in the project area. That's not in the EA. The EA talks about them not being observed since, I think, the '90s.

So I don't think we can -- I think plaintiffs are asking you to assume a lot from that map that's not in the record, not in the analysis, in the EA. And, to Mr. Griffith's point, I mean, they did this analysis. It goes on for several pages.

And, ultimately, they are looking at the key issue for the purposes of their RMP, which is, is -- is this -- what we're going to do, is this going to have a significant impact in the context of this species potentially being listed? They said, no, this action is not going to contribute to the species being listed.

In fact, I mean, as we explained in our brief, because of the purpose of this project and what it's supposed to do to improve forest health and resiliency, it's going to be a net benefit to the pond turtle over the long term.

So, again, if you're looking at it from a species standpoint, which is what the RMP requires BLM to do, ultimately, what BLM is doing is they're implementing a project that's going to provide a net benefit for the pond turtles.

THE COURT: And how is that?

MR. CARROLLO: Because they're improving the habitat for -- they're improving the habitat as part of the project. That's in our brief at -- give me a second. Sorry. I'm going off of memory. That's always tricky.

That was at page -- give me a second, please. That would be -- the cite we provided for that was at ECF 17-3 at 222, because they're doing stream restoration activity as part of this, like stream and boulder placement and the addition of stream channels and pools, because one of the reasons that BLM said that the habitat was unsuitable at some of the sites they looked at is because it was too swift of water.

And that's one of the things a lot of these stream projects are trying to do, is they're adding logs, boulders, creating off-channel habitat, slow pools, and things like that, to improve stream habitat.

Obviously, that benefits for fish and other aquatic life, but turtles as well, because some of the sites they found that were modeled as suitable were actually unsuitable because the water was too swift and had close canopy and no solar exposure.

So, again, the net benefit of the project is to actually improve some of those conditions for the pond turtle. So, again, I mean, when you look at it in that context, as far as is this project going to contribute to the listing of the species, no, it's not. In fact, it's going to help the species recover so that it doesn't become listed.

THE COURT: All right. And I really only consider that in the context of whether they -- whether BLM accounted for or took into account or considered any potential mitigation or impact on the western pond turtle.

MR. CARROLLO: Well, I think the implication is that there were --

THE COURT: Right. So, I mean, your -- I don't look at the substance of, "Oh, well, they're helping pond turtle. All is good." I have to filter that through the question of "Are they -- are they taking into account mitigation efforts?"

MR. CARROLLO: But if they -- what I'm telling you, Your Honor, is if the analysis had turned out different, then it may have pointed them to do specific measures. If the analysis pointed to, yeah, this is going to cause a specific threat that could impact -- contribute to the species to be listed, then I think what Ms. Boylan is trying to explain is that, yeah, then the policies would kick in, and they would maybe have to design some specific mitigation measures to deal with that threat.

But the analysis --

THE COURT: So what was BLM's interest in even developing any part of the project to benefit the pond turtle?

MR. CARROLLO: I think they're incidental, but they're mentioned as part of the project because they're providing better aquatic habitat for all species that use the aquatic habitat, 'cause they're trying to balance some of the multiple, you know, purposes that they manage under FLPMA.

Now, obviously, you know, our client's really focused on the O&C Act. And that's the dominant purpose of these lands. But, you know, this project, I think, is 50 percent HLB, harvest land base, which is only 20 percent of the pie for harvest.

But there's other lands that are part of the 80 percent reserves that Ms. Boylan talked about. And they're designed to try to -- under this plan, to try to benefit species.

THE COURT: Thank you.

Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Yeah. I just wanted to again flag for the Court -- this is at record -- excuse me -- KSW 00661. This is the Last Chance EA, the revised one from May 2025, that states, "There are three recently identified groups of northwestern pond turtle within the Last Chance management area."

And, again, it recites that there have been a handful of specific detections in the project area. So, clearly, pond turtles are present there.

And I think if someone will cross-reference the map that I put on the document system a moment ago with a map of the Last Chance area, you'll see that it is very close. Referring back to that 50 to 100 population, the largest in Oregon is, indeed, very, very close to the Last Chance project area.

And the point is well taken that that -- that circle is -- it reflects a broader area. All the more so, that indicates that, you know --

THE COURT: Well, is there -- is the information in the record in which I could be able to superimpose or try to track that -- that record you showed on the screen with the actual maps of -- of the project areas?

MR. INCE-JOHANNSEN: So I was just looking through the record for a county map showing the Last Chance project area to try to cross-reference it. Unfortunately, I came up short on that.

There are maps of the Last Chance project area that show where I-5 is. I think you can kind of cross-reference based on that. But, unfortunately, I don't have a visual aid prepared that will show it for you.

THE COURT: All right.

MR. INCE-JOHANNSEN: So I think, you know, ultimately, there's just a failure to consider this issue of direct take, of crushing of northwestern pond turtles. And it matters a lot.

And we've heard that, you know, this is a small subset of the overall population of the species. I don't think that we should be, you know, deceived by that -- that -- the statistics or understate or underestimate the potential impact here because for a species like northwestern pond turtle -- which, actually, in this respect is similar to the northern spotted owl -- it has a relatively long life span, around 50 years.

It also has low fecundity, like the northern spotted owl does. And it's also very slow to reach sexual maturity, like the northern spotted owl is. I believe they don't start breeding until around age ten -- don't start mating until around age ten.

And what that means is that impacts to individual -- individual turtles have an outsized impact on the population as a whole because, once a turtle reaches reproductive age, you know, it's running gauntlet.

It's -- it's critical for the local population at that point that that turtle continue to reproduce successfully because it's gotten to that -- that point; and it will not have that many offspring, given its low fecundity.

That's, I think, further exacerbated by -- there's record evidence that I believe we cited in our reply brief that these impacts can disproportionately affect female northwestern pond turtles, just given their life cycle behavior of -- it has to do with nesting, right?

As turtles find their way to their nesting sites, female turtles, they're especially exposed to the risk of crushing. And, you know, when there's a systemic --

THE COURT: So that would doubly compound the population reduction?

MR. INCE-JOHANNSEN: Exactly. Exactly right.

And, you know, all we're asking for here, ultimately, is that BLM take the requisite hard look at this issue. And the analysis of impacts to habitat is not a substitute for that.

There is discussion of habitat impacts in the EA, but that does not concern the specific threat of crushing that is well documented across the record, as we've cited in our opening and reply briefs.

So I think, on that basis, you know, it would be -- it's entirely appropriate and, I think, legally required that -- that the EA be remanded to BLM to take a hard look at this and demonstrate compliance with the RMP and that management directive for bureau sensitive species.

And that probably will require application of the PDF

to prevent the need for listing of the species, but I think that a remand would be an excellent start.

THE COURT: So I think there was some reference to PDFs only be employed for endangered species. Is that your understanding?

MR. INCE-JOHANNSEN: Well, I think that's directly contrary to the purpose of the bureau sensitive species program, as stated in the bureau -- the BLM's manual, that requires application of measures -- and PDF is just kind of a specific kind of measure, just another word for a measure.

THE COURT: So they're not -- they're not triggered at the time of an endangered species designation?

MR. INCE-JOHANNSEN: Well, this PDF, PDF 50, as it is written, is. And that's kind of the problem because the bureau sensitive species program. Its whole purpose is to avoid the need for listing by applying measures to species that are bureau sensitive, not yet listed, so that they don't need to become listed, sort of a prophylactic measure to avoid listing.

And here the one measure that's in the EA on this point, PDF 50, which was developed specifically to address the threat of crushing, is contingent on listing. It just runs directly contrary to the purpose of the bureau sensitive species program. And there's no underlying analysis to support that approach.

THE COURT: All right. Counsel, I'd like to take the

remaining time that we have to address the irreparable harm.

Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Thank you.

Yeah, so for irreparable harm, we're concerned with, you know, exactly what the narrowly tailored injunction seeks to address; and that's harm to northern spotted owl, harm to northwestern pond turtle, and the corollary harm to plaintiffs' interests.

So on harm to northern spotted owl, the specific harm at issue here is logging in status-unknown sites. I'd just like to clearly emphasize on this point -- it kind of goes back somewhat to the merits -- but, you know, at the time the BiOp was adopted, there were seven of those sites.

But this is an ongoing systemic problem in the approach the Fish and Wildlife Service has adopted. And what I mean by that is that it has treated these sites with incidental detections as unoccupied.

At the time of the BiOp, that was sort of a snapshot in time. There were seven at the time. Now it's a different set because it's always looking back the past two years over the span of those less than three detections over the course of six or more surveys.

So the harm to northern spotted owl is harm to status-unknown sites under the survey protocol that are categorically, without analysis, deemed unoccupied. And this

raises the very real risk of take.

You know, if we apply the Appel, et al., 2023 probability metric of 72 percent over the span of seven sites, since that's what the BiOp considered, that is tantamount to 99.99 percent chance of one or more of those sites being occupied.

If you look at the chance of seven sites, each with a 72 percent probability, and do the statistical math on it, that reaches 99.9 --

THE COURT: I can only use -- I can only do addition, so -- that's why I stuck with one and two equals zero. Beyond that, I'm done for. So walk me through this 99.99 calculation. At least -- at least roughly get me through it, so we --

MR. INCE-JOHANNSEN: Sure.

THE COURT: 'Cause I'm not sure how you --

MR. INCE-JOHANNSEN: Your Honor, I had to refer back to my high school statistics textbook last night.

Yeah, so what the math is, is it's just -- you subtract the probability at issue, so 72 percent, from one; so you get 28 percent. You do 28 percent times -- well, you do 28 -- excuse me -- .28 to the seventh power. Subtract that from one. That gets you the probability that none of those individual instances are true in the sense of being occupied.

So it's 72 percent -- well, 28 percent to the seventh power is 0.00 -- well, I can tell you real quick, actually --

0.0001349, which comes out to -- it's a .013 percent probability that none of those sites are occupied if we apply Appel, et al., 2023.

THE COURT: Any one of them or none of them? Are we talking about them as a set of seven?

MR. INCE-JOHANNSEN: Exactly. As a set of seven, the chance that none of them are occupied, if we apply the Appel, et al., 2023 probability -- I want to be clear about that because that is a disputed point --

THE COURT: Yeah.

MR. INCE-JOHANNSEN: -- it would be a vanishingly small chance that none of them, as a set, are occupied.

THE COURT: Am I supposed to be considering them as a set? Would the -- would the consideration for what needs to happen, or what BLM should've been doing, just turn on how many -- how many of them would have been considered occupied as opposed to all seven being occupied?

MR. INCE-JOHANNSEN: You know, I think that our -- so plaintiffs' interests are very much rooted in interest in seeing these species in the wild, of recreating in areas where they are present.

And the more individuals that are likely to be harmed as -- by implementation of this project, I think the deeper the harm goes. But, you know, I think a single -- given the status of the species -- the northern spotted owl is in a precipitous

decline and has been for decades now. There's no leveling off of its populations. It's on a downward trajectory.

THE COURT: Well, so if one of them ended up being occupied and the other six not, I mean, is there irreparable harm?

MR. INCE-JOHANNSEN: I would say yes, given the status of the species.

THE COURT: Okay.

MR. INCE-JOHANNSEN: Yeah. And I -- you know, there's case law that discusses irreparable harm in the Endangered Species Act context. And, you know, I think -- we cite a number of cases in our reply brief; but, in particular, what comes to mind is the Burlington Northern case, which acknowledged that harm to a single grizzly bear can constitute irreparable harm.

That species, like the northern spotted owl, is not doing well. And, you know, when plaintiffs like -- like the plaintiffs in this case, you know, have a determined interest in that species and observing it in the wild and recreating around it, any loss of an individual, you know, constitutes irreparable harm both to the species, given its status, and also to plaintiffs' interests in -- in seeing that species in the wild.

THE COURT: Does the Endangered Species Act make some kind of qualitative assessment or weight depending on the

species? So, for example, would a grizzly be considered somehow more valuable than a northern spotted owl? Or is one life equal to one life?

MR. INCE-JOHANNSEN: That's a fascinating philosophical question. I don't think that the --

THE COURT: I wasn't trying to be philosophical. I was wondering if the Endangered Species Act makes that -- makes a distinction between, you know, the life of one species over that of another species.

MR. INCE-JOHANNSEN: I think, for better or for worse, if you look across the case law, you might find patterns that speak to something like that. The Endangered Species -- to answer your question specifically, the Endangered Species Act absolutely does not create, like, a sliding scale or weigh individuals of one more highly than another.

But I think in the case law you may see that certain species -- more charismatic species, perhaps -- tend to attract more concern about individuals being killed, like grizzly bears, and northern spotted owl, I believe, as well.

THE COURT: All right.

MR. INCE-JOHANNSEN: And I think the other point on irreparable harm to the species is that it's not just a question of take or harm in the ESA Section 9 meaning of the term that's at issue here.

The potential loss of critical habitat beyond what

the biological opinion discloses can also, and does, represent irreparable harm, again, because that -- I think we cite this in our reply brief.

In the designation of critical habitat from November 2021, Fish and Wildlife Service explicitly found that all unoccupied and likely occupied sites across the relevant critical habitat subunit here -- this is Klamath East. KLE-2 is the code for it -- that all of those sites, whether unoccupied or occupied, are essential to the survival of the species -- or the conservation of the species, which includes survival and recovery.

So there's been a finding by Fish and Wildlife Service, you know, just the importance of all of these sites. And the loss of any of them, you know, logging treatments that will diminish these sites below the thresholds that northern spotted owls can use and occupy them successfully, that is irreparable harm here.

So there's a question of the individuals that are affected, so take. We were talking about the possibility that one or more of those seven may be occupied and may be take as a result. That certainly represents irreparable harm here, but the habitat loss does as well.

THE COURT: Is habitat loss part of your claim?

MR. INCE-JOHANNSEN: So the critical habitat claim is about habitat, yes.

THE COURT: And is that in the -- am I addressing that also in the context of the preliminary injunction? Or is that part of your overall substance of your claims that aren't -- for which you're not seeking a preliminary injunction at this time?

MR. INCE-JOHANNSEN: Sorry. To be clear, I'm referring to the critical habitat discrepancy. The prospect there's more -- that there is substantially more critical habitat that'll be impacted and removed than is disclosed in the BiOp, that also represents irreparable harm to the species.

And by extension --

THE COURT: And you're specifically referring to the EA, which is the BA and BiOp --

MR. INCE-JOHANNSEN: That's right.

THE COURT: -- discrepancy?

MR. INCE-JOHANNSEN: Yeah.

THE COURT: Got it. All right.

MR. INCE-JOHANNSEN: And then, just lastly, on northwestern pond turtle, it's the very real prospect of crushing of individual turtles that are known to be in the project area. We know that there are three populations in the project area.

We know that there have been incidental sightings, despite the agency not even surveying for the species. So not even looking for them, they come across them. They are present

there. There is that large -- largest population in Oregon in that general area.

So there's a very high risk of, you know, turtles being crushed. And the ripple effects that we talked about a minute ago to the species, the population, when a single turtle is crushed, that constitutes irreparable harm to the species.

And to plaintiffs' interests in that area, the declarations that we have filed, I think, clearly establish a long history of -- of plaintiff organizations and their members using, recreating in, finding immense fulfillment in -- in this landscape and the species that exist on it, and specifically these two species that we're talking about today.

So I think that this establishes the irreparable harm to -- to the species at issue and to plaintiffs.

THE COURT: All right. And the overall balance between the four factors in considering -- that I have to consider for a preliminary injunction -- I know we're not addressing the -- for argument purposes, we're not -- we're not going to have time to address interests and equities -- public interest and equities, but we're talking about irreparable harm.

If those are met with a high degree of confidence, but the probability of success -- or likelihood of success is low, how low can it go, the likelihood of success, before there is no preliminary injunction available to you?

MR. INCE-JOHANNSEN: So I think the case law talks about substantial questions being raised as sort of a lower showing for -- there's sort of a sliding scale. The better the showing -- the stronger the showing of irreparable harm, the lesser required showing of likelihood of success on the merits.

And I believe that the lowest showing that could be required, corresponding with the highest showing of irreparable harm, would be substantial questions going to the merits.

THE COURT: Okay. All right. Thank you.

Mr. Carrara, are you back on?

MR. CARRARA: Yes, Your Honor. I'll --

THE COURT: All right.

MR. CARRARA: I'll start, and then I'll let Ms. Boylan speaking about the turtle.

So I think this was very telling, Your Honor. You know, counsel talks about a probability and did a lot of math to try to crunch the numbers to say that, really, if you look at this study that doesn't apply here, and you look at this PAM, which wasn't carried out here, one owl might be taken, maybe.

And you've got to look at the standard. You know, the Ninth Circuit, just as recently as 2024, Flathead v. Montana, 98 F.4th 1180, "Plaintiffs must show a definitive threat of future harm to protected species, not mere speculation."

And that's all we have here, Your Honor. We have a probability based on an estimate, based on one study, based on results that were done eight years ago. It's not enough.

And, in addition to that, you know, to go back through each claim, I think on the first claim regarding the acreage, you know, there's a lot of things that need to happen. Earlier on you mentioned ghost acres, and I think that's a correct way to state it because this was a multiple-counting of treatments on acres, right?

There's not these -- all these additional acres that projects can just be authorized on. So you'd have to overcome this first issue. And, second, plaintiffs are presupposing that the agencies are going to violate their requirements under ESA Section 7, consultation, and, you know, violate the ESA by authorizing over this 3093-acre threshold.

And there's a presumption of regularity that the agencies enjoy. And, you know, I think the agencies, you know, are entitled to that. And, you know, to find that there's a -- you know, irreparable harm based on something that hasn't happened yet, I think, is a bridge too far, certainly for -- for this first claim.

For the second claim as well, you know, for those reasons I stated, a probability based on an estimate, based on an inapplicable survey. But then let's just take a step back and go into the protocol surveys.

So we talk about, you know, BLM's going to continue to conduct these protocol surveys and spot checks specifically designed to detect occupancy before activities occur. That's FWS at 50.

And, you know, that's under the call-back survey protocol, 2012. And that's Fish and Wildlife Service 15224. And if a single owl responds, and after six complete visits resident status has not been determined, up to two additional visits may be necessary in that year. And that's ECF 17-5 at 15.

So you have protocol surveys. You have spot checks. And then if owls are detected, BLM will implement avoidance and protective measures. And, as explained, Fish and Wildlife Service 15229, "All ongoing operations that have a likelihood of direct harm to the owls shall be postponed."

And so just this definitive threat of future harm, if that's the standard, you know, both of these allegations fall so far below that. And everything shows that take won't occur because of all of these different sideboards in place.

As for -- and I'll be quick -- as for plaintiffs' allegations that, you know, activities will irreparably harm their interests, plaintiffs' allegations are, again, speculation. I think Lujan demands more.

You know, I think based on their allegations from the complaint, they have to show more than just an intent to at

some point return. There was no definitive "We've even seen these owls," or, "We're going to return on this date" --

THE COURT: You're talking about the plaintiffs --

MR. CARRARA: Yes, Your Honor.

THE COURT: -- or the owls?

MR. CARRARA: The plaintiffs, Your Honor.

THE COURT: Okay.

MR. CARRARA: I'm sorry. That was --

THE COURT: So, in the context of standing and -- and an injury --

MR. CARRARA: Correct.

THE COURT: -- you're suggesting there's no evidence that the plaintiffs have -- have put forward their intent to return?

MR. CARRARA: Correct. Correct.

THE COURT: Huh. Okay.

MR. CARRARA: Or not concrete. They've said they're going to return, though we haven't seen a concrete -- both that they will return, and we haven't seen a concrete injury.

THE COURT: What more evidence would there need to be than saying, I mean, for somebody who wants to recreate in an area, that they've been there before; they plan on returning? How much more concrete do you need for -- for standing in this -- in this kind of a case? Please go ahead.

MR. CARRARA: Certainly. Well, I mean, I think a

definitive "We will return on this date, within this year," I mean, that's what Lujan was all about when you look at -- right? -- whether they had --

THE COURT: Well -- and I guess some of them -- didn't some of them actually return, and that's where they found that the roads had been blocked?

MR. CARRARA: One member had. Yes, Your Honor.

THE COURT: Okay. So there's at least one member that has standing.

MR. CARRARA: One member.

THE COURT: Okay.

MR. CARRARA: And -- oh, the intervenors will get to this, so I will be quick. And we talked about this earlier. But, just to touch upon it, plaintiffs did wait nine months to bring this motion.

And I understand plaintiffs have said that they had to wait 60 days for a notice of intent to sue. But if the EA and the first decision record were issued in May 2025, I -- this is an emergency, you know, by their making, so --

THE COURT: All right. Thank you.

Ms. Boylan, I'm going to come back to you. I want to give Mr. Griffith and Mr. Carollo an opportunity, since there's, I guess, only one of each of their team who's speaking. Then I'll give you a chance to.

MS. BOYLAN: Sure.

THE COURT: All right. Mr. Griffith.

MR. GRIFFITH: Thank you, Your Honor.

I just want to start by emphasizing that an order -- if you were -- if an injunction were to issue in this case, it is absolutely necessary that the Court find irreparable harm. That comes from --

THE COURT: And none of the other elements of a preliminary injunction can satisfy the lack or absence of irreparable harm.

MR. GRIFFITH: Exactly, Your Honor. And it sounds like --

THE COURT: But do you think that -- that -- all of them have to be met on some level and to some degree, so it's -- there is no zero in any one of those columns.

MR. GRIFFITH: That's right, Your Honor. And it sounds like we're on the same page there. That comes from --

THE COURT: Oh, so you were --

MR. GRIFFITH: -- the Winter case --

THE COURT: -- saying that to make sure that I didn't go rogue. Is that what you were --

MR. GRIFFITH: I just want to make the record clear that our position is that all four have to be met.

THE COURT: All right.

MR. GRIFFITH: And the case law has developed since that Winter case, which is the foundation of that principle

that, even under the ESA, all four of the elements have to be met.

The Cottonwood case in the Ninth Circuit -- and that is 789 F.3d 1075, 2015 -- applied that principle and said there's no presumption of irreparable harm under the ESA. You have to actually demonstrate that there's going to be harm to the species, which I don't think they've done here. We'll talk about that in a moment.

And then, most recently, it was in the NLRB context. The U.S. Supreme Court in a case called Starbucks Corporation v. McKinney, 602 U.S. 339 -- that's a 2024 case -- said that, absent clear instruction from Congress, you can't alter that traditional four-part test for a preliminary injunction.

So there are cases where Congress has altered that balance, but that has not happened in the ESA. The ESA, it's the traditional four-part test applied directly.

Your Honor --

THE COURT: The four-part test of a -- for a preliminary injunction?

MR. GRIFFITH: Correct. Yes. Yes, Your Honor.

THE COURT: Well, I mean, so is the -- is the consideration for preliminary injunction -- or the elements of a preliminary injunction different depending on what -- what claims are being made?

I mean, I think -- I think there are some --

sometimes where we talk about, you know, some kind of a -- like a significant question consideration. And I think that was a Wild Rockies -- there's a -- there's a wildlife case that refers to sort of, like, important questions -- I think maybe Mr. Ince-Johannsen spoke to that -- where it can make up for having to address each of the elements with the level of -- of granularity that it would normally require.

MR. GRIFFITH: Yeah. So, Your Honor, I believe -- if I know the case you're talking about, I believe that's a NEPA case, for one thing. And, for two, I think that the Starbucks decision from the U.S. Supreme Court casts serious doubt on that proposition.

I think that, very clearly, the Supreme Court said -- was reining in these types of -- of mechanisms that some of the circuits had applied. So I want to make my record on that -- on that proposition, that that Starbucks case has changed the state of the law on that issue. So, for what it's worth, that's our position.

THE COURT: No, no. I also interpret that as you're making your record so I don't go rogue.

MR. GRIFFITH: Well --

THE COURT: So -- but here's the thing. I've never really thought of the preliminary injunction -- I mean, the elements that are required are always the elements. I mean, so I'm not sure what the issue is that you're -- you're -- you're

terrified about that might happen here. I consider them all, so --

MR. GRIFFITH: Very good. I think we're on --

THE COURT: -- so what's the concern?

MR. GRIFFITH: -- the same page.

I think -- I think we're on the same page. I had some concerns that -- I just want to make sure that that irreparable harm isn't speculative, that it actually is satisfied. They have to prove that there was -- or demonstrate that there's a likelihood of irreparable harm. So I'm just making sure that that's --

THE COURT: Okay.

MR. GRIFFITH: -- part of the analysis.

And on that front --

THE COURT: I always -- actually, I -- to be clear, I will always expect Mr. Carollo to tell me when he's concerned I might do something. So you need to also be as blunt as you might otherwise be because, otherwise, I'm going to -- I'm going to be more -- more concerned about the phantoms and shadows than the reality of whatever your concern might be, so --

MR. GRIFFITH: Well, Your Honor, I think you --

THE COURT: -- so you've got to be blunt with me.

MR. GRIFFITH: It sounds like you've dispelled my concern. I was concerned that there was going to be a lack of

irreparable harm here. But it sounds like we're on the same page, that that's --

THE COURT: Well --

MR. GRIFFITH: -- required.

THE COURT: Yeah. So it comes down -- frankly, it comes down to also the issue of what it means to have irreparable harm.

MR. GRIFFITH: Correct.

THE COURT: I understand you're concerned about it, and it cannot be speculative.

MR. GRIFFITH: Right. And let's talk about that briefly. And I'm not going to belabor this point 'cause we talked about it earlier, and Mr. Carrara just mentioned it. But actions speak louder than words, Your Honor.

And the plaintiffs, they provide an explanation for why they waited so long to bring this preliminary injunction, but they didn't provide any excuse. This has been a long time -- the REA was issued nine months ago.

There is no reason that they -- they needed to wait all this time to bring -- bring the motion for preliminary injunction. It should've been brought long ago if they were going to bring it.

And that's imposed real cost on my client. My client, in the interim, has been out there investing time, money, resources, building roads, felling trees, getting ready

for this -- for this project, implementing this project.

They've invested a lot of money into it to date. So I think that that weighs --

THE COURT: So even if I don't grant the preliminary injunction, the case itself survives. They would still be investing now even more time, effort, and money until a resolution of the underlying merits of the case get resolved. So, I mean, at some point you can't -- I mean, it's -- I mean, I have to be thoughtful and conscious about this idea that "We already started. Too late" as an argument.

MR. GRIFFITH: Well, Your Honor --

THE COURT: It's something I can consider, and probably consider in terms of both determining the dilatory nature of actions that have been -- you know, or the lack of action, certainly.

But, yeah, I -- I'm a little cautious about this idea, particularly in the context of a -- of -- of this case involving the Endangered Species Act, to say, "Too late."

MR. GRIFFITH: So, in terms of this delay, the significance of this delay is that it cast doubt on whether or not harm's actually irreparable. It's a very common sense principle.

If plaintiffs are facing actual irreparable harm that they cannot -- they need emergency relief for, they're going to run right to the courthouse and take action to stop it. And

that's not what happened here.

And there's, actually -- Your Honor, I cited the case from Judge McShane, Cascadia Wildlands v. Carlton, where he talked about some of these principles. And I think that those are directly applicable here. Admittedly, that wasn't an ESA case.

But other districts have applied that -- that principle to ESA cases. And I'll cite for you Friends of the Clearwater v. Higgins, 472 F. Supp. 3d 859. And that's an Idaho case from the District of Idaho from 2020. And there they applied that same principle to an ESA claim. So I think it definitely does apply in this circumstance.

THE COURT: And the Ninth Circuit?

MR. GRIFFITH: Upheld, although I don't believe they addressed that issue.

THE COURT: Okay.

MR. GRIFFITH: So, moving on to the three claims of irreparable harm, first addressing the spotted owl, this whole concept of the .72 multiplied, I -- I was having trouble following the math myself, but the -- that's all based on the false premise that this passive acoustic monitoring conclusion can be applied to the call-back data.

And, as we've been discussing extensively today, that's simply not the case. We heard the agency expert -- one of the agency experts tell us that you can't apply those

results to the call-back data.

So there's no evidence -- no evidence that they've presented that those -- that any of those seven sites are actually occupied, that there's actually an owl living there that's going to be harmed. That's just complete speculation.

And, again, the plaintiffs don't criticize the use of the 2011 protocol -- they've made that very clear today -- or raise any problem with the results that they -- they -- that the agency obtained from those surveys.

THE COURT: If somebody tried to submit evidence today that they've identified a pair in one of those seven sites, would that matter to me?

MR. GRIFFITH: Your Honor, if somebody had evidence that there was a pair in the -- that there was a pair on one of those sites, it would definitely matter to the BLM. I mean --

THE COURT: But that's not my question --

MR. GRIFFITH: Yeah.

THE COURT: -- because we're here on -- on -- on this Court having to review agency action. So, I mean, do I -- to what degree do I even consider any after-record evidence?

MR. GRIFFITH: Yeah, I think -- I think in the context of the ESA, if they were to come in and present evidence that there were owls in a site that was about to be logged, that would be -- that -- that is the kind of evidence that moves it from speculation to concrete.

And they haven't even come close to that. To our knowledge, they haven't even surveyed these sites themselves to see what the status is.

THE COURT: Okay.

MR. GRIFFITH: So, again, the plaintiffs' owl claim, about the owls themselves, rests entirely on a misapplication of an inapplicable study that the agencies reasonably did not use, they made a reasoned decision not to use.

And in terms of impacts on critical habitat, again, it's undisputed that BLM has not authorized treatments in excess of what Fish and Wildlife Service approved in the 2023 BiOp.

That's an undisputed fact at this point that that Decision Record Number 4 does not authorize anything in excess of what Fish and Wildlife Service has said is appropriate and won't jeopardize the species.

And that -- therefore, there's no irreparable harm from my client's sale, the Paul's Payoff sale, or any of the other four -- four project activities that have been authorized so far.

Again, we're dealing with this hypothetical where, "Well, maybe in the future they'll authorize something in excess," and then there may be a different conversation. But that's not the facts we have today.

As of today, there is no likelihood -- they have not

demonstrated any likelihood of irreparable harm based on acreage because all of the acres that are planned for treatment right now have been approved by Fish and Wildlife Service.

Your Honor, are we talking about pond turtles later on, or would you like me to address that?

THE COURT: Address it now.

MR. GRIFFITH: Okay. So the pond turtles, in similar ways, they've just not demonstrated that there's any risk to the species, which is the category -- which is what we're supposed to be looking at here.

And that's actually true for the spotted owl as well. Even if there was an individual owl there, I mean, that would be very important evidence, but really the analysis here is harm to the species.

And that comes from the Endangered Species Act itself at 16 United States Code Section 1536(a)(2), and then also from Lujan v. Defenders of Wildlife, where they made it clear that the purpose of the ESA -- Section 7 of the ESA is to protect the species here.

Now, under the ESA that often translates to high degrees of protection for individual animals, but that's really -- for the irreparable harm standard, what we're talking about is the harm to the species.

So even under the spotted owl analysis, that's the standard, but it's even more clear for the northwestern pond

turtle because they're not an ESA-listed species. This whole issue of any kind of harm at all comes from the RMP that says that they're protecting the species, not individual animals.

So, Your Honor, they haven't presented any evidence that even individual animals are going to be harmed. That's totally speculative. But, even if there were harm to individual animals here, there's zero evidence -- they haven't even offered any speculative evidence that that translates to harm to the species.

So all they've got is speculation that an individual turtle could be harmed, and that's not enough per irreparable harm under that standard.

In terms of plaintiffs' aesthetic injury or their -- their interest in going back to the project, I just wanted to address that very briefly. First, I just want to point out that the irreparable harm that they're claiming has to fit the claim.

So we've got some separate claims here. And, actually, the standards -- we need to focus a little bit on exactly what the standards are. We've got Count 1 and Count 2 of their ESA claims. That's the acreage argument, and that's the -- the Appel study, the PAM argument. And then we've got a FLPMA claim.

Now, under the ESA irreparable harm, for purposes of a preliminary injunction, has to be harm to a species. So for

the ESA claims, their interest in revisiting the site or hiking or taking rest stops on the way to Ashland, I think it was, that -- those are not relevant categories of irreparable harm under the ESA.

Now, under FLPMA they could be. So that's only the northwestern pond turtle argument. So if the Court were to issue a preliminary injunction, which, again, we very much think that it should not, it -- the harm needs to track. The finding of irreparable harm has to track to the -- to the claim where a likelihood of success on the merits is found. So I just wanted to make that point.

And, also, the declarations do show a broad appreciation of public lands. But they don't demonstrate specific harm tied to those logging units or project activities. There's really no demonstration of any specificity about why their interests in public lands are going to be compromised if these units are harvested.

And, Your Honor, if an injunction were to issue, which we -- we don't think is appropriate, I just want to make a couple of kind of practical comments about what that would mean for Murphy Company in order to avoid having to come back to the Court.

And, again, we do not think that the preliminary injunction should issue. We don't think they've met the standards. But if it were to, there's some -- there's --

there's a logger up there at the property right now who needs to get his equipment out.

He's done felling. He's done with his work, but there's still some equipment up there that needs to come out of the project units. And we would just want to make sure that any injunction wouldn't prohibit him from doing that.

And the other very big issue is that there's all these downed trees that are out in the logged units. And if they're left out there, they're going to deteriorate and they're going to become a public hazard in terms of fire and people getting hurt going up into these --

THE COURT: How many logs are we talking about?

MR. GRIFFITH: You know, I don't know the exact answer to that, Your Honor, but it's a substantial amount. It's a very substantial amount.

THE COURT: How many acres?

MR. GRIFFITH: I don't know the answer to that question. I can -- after a break I could come back with an answer to that. But I don't know right now, but it is a lot.

So what -- if -- we would request that if an injunction issues, which, again, we don't think is warranted, but if it were to issue, we request that Murphy Company be allowed to not fell any more trees, but remove the logs that have already been felled --

THE COURT: And what --

MR. GRIFFITH: -- in order to --

THE COURT: -- method would they use to remove the logs? Would it require machinery to -- or would you be using cabling to pull them out?

MR. GRIFFITH: It's -- I believe it's both. It's definitely cabling, but it takes some equipment to set up the cabling; so it may be a bit of an academic issue for our purpose today. But I believe it's both ground-based and cable yarding, is what it's called, to remove the logs. So that's -- that's the -- that's another issue.

And then, also, there's certain right-of-ways that have already been cut. I think that we saw a couple pictures of them earlier today. And my client would request that in those acres that have already been cut and those roadways that have already been cut, that they have the flexibility to be able to finish the work on those roadways, not fell any more trees, but finish the work rocking, making sure they're good to go, so that if we were to prevail, we could continue with the project quickly.

THE COURT: Would the -- would the roadway development end up degrading if it wasn't completed?

MR. GRIFFITH: Your Honor, I -- there are -- there's, like, rocking standards that are -- that are necessary to keep these roads in place. It's a little bit fact specific. There are some that really need to be improved; and there's others

where it's been harvested, and there hasn't been much done.

But, regardless, it's important that they finish that work, both in terms of -- there's very specific timing restrictions. And, also, I mean, I think that the plaintiffs really are concerned about the trees, right? And with the work we're talking about, the trees have already been felled, so we'd be working in the boundaries of those right-of-ways.

THE COURT: Well, between now and the foreseeable -- well, immediate future, is there -- in the absence of this Court ordering anything or if I were to deny the preliminary injunction, would felling trees resume?

MR. GRIFFITH: Yes, Your Honor.

THE COURT: And when?

MR. GRIFFITH: In May, I believe.

THE COURT: So there isn't any -- there won't be any other activity between now until May?

MR. GRIFFITH: No. There will be yarding. What's -- that's -- that was the source of the confusion. They're going to be removing logs in April.

THE COURT: So, to be clear then, between now and May, there won't be any felling of trees?

MR. GRIFFITH: I believe that's right, but can I verify it in declaration?

THE COURT: Sure.

MR. GRIFFITH: Sure. That's in the declaration of

Sam Wheeler, I believe.

MR. CARRARA: Your Honor, while counsel's looking, if I may, if we were headed towards an injunction, which I agree I don't think it's warranted here, but if we were, perhaps BLM would be in a position to submit the most recent survey results to narrowly craft an injunction, if that's something Your Honor would find useful?

THE COURT: What survey results are you --

MR. CARRARA: For the seven sites we were talking about, so -- to determine, you know, how narrow an injunction could be crafted.

THE COURT: Okay.

MR. CARRARA: I mean, if that's something -- I leave it to your discretion, Your Honor, but that would be something BLM would be willing to offer up.

THE COURT: All right. Well, let me also offer this. If I'm granting a preliminary injunction, I may get everybody back together to have a deeper conversation about how to craft these things with more particularity.

I mean, I won't pretend to know how to properly craft one myself, if I were going to grant one, because the terminology is very specific to the industry, and I wouldn't want to say something that causes an unintended consequence. Although I presume all of you would catch it, I'd just as soon get it -- get it right at the front end.

MR. GRIFFITH: Thank you, Your Honor. Obviously, we urge you not to issue the preliminary injunction, but --

THE COURT: Yeah. I've heard that three times now.

MR. GRIFFITH: Yeah.

THE COURT: So I get it. But you're also wanting to be prophylactic and making sure that, if I grant it, you're putting these things out. And you don't want me to consider by -- by even saying any of this, Mr. Griffith, you're conceding any arguments, any positions on -- on behalf of your client.

MR. GRIFFITH: It's very important to my client. It would be a very large financial and logistical burden if they weren't allowed to remove those trees from -- from the yard.

And, just for the record -- it sounds like we can talk about it -- well, hopefully we won't talk about it at a later date; but if we do, that -- I appreciate you being sensitive to these issues -- but Sam Wheeler's declaration, which is ECF 34, paragraph seven lays out the immediate plans.

THE COURT: Okay. Thank you, Mr. Griffith.

MR. GRIFFITH: Thank you.

THE COURT: Mr. Carollo.

MR. CARROLLO: Yes. Thank you, Your Honor.

Yeah, I guess dovetailing off that, I guess I want to sort of start talking about irreparable harm in the sense that, you know, Mr. Griffith is correct that, like, under Google v.

Garcia, I mean --

THE COURT: Can you check your mic?

MR. CARROLLO: Oh. Uh-oh.

THE COURT: We might have another mic. That battery may have died.

MR. CARROLLO: Yeah, maybe. Okay. Yeah.

There we go. Okay. I think we're all set now.

I wanted to start by saying that it is -- it's a little confusing for me what the scope of the injunction is that plaintiffs are requesting at this point because I think their motion was seeking injunction of essentially all NSO habitat, including NSO habitat outside of critical habitat.

And then I thought I heard this morning that they're seeking injunction against critical habitat. Now I hear them saying that they're seeking injunction against the seven sites, as they call them. So I just wanted to point that out. I think that would be a really important as far as --

THE COURT: So I haven't -- I didn't interpret what Mr. Ince-Johannsen indicated earlier -- maybe 10, 15 minutes ago -- to indicate an injunction on just those seven sites, but that it was at least broader, but maybe -- your question does raise an important fact that we all might want to make sure we're on the same page with it.

Is it -- so, Mr. Ince-Johannsen, go ahead and tell us what it is that you're seeking.

MR. INCE-JOHANNSEN: Very simple (indiscernible), just simply NRF habitat -- nesting, roosting, foraging habitat -- whether it is designated critical or not --

THE COURT: So NRF habitat?

MR. INCE-JOHANNSEN: Yeah.

THE COURT: That's all I needed to know, is that you're asking for enjoining of any of this -- of any of the logging on NRF habitat.

MR. CARROLLO: Okay.

THE COURT: All right. Okay.

MR. CARROLLO: So then -- yeah, 'cause I think that's going to influence a little bit how I talk about irreparable harm because, I mean, I think if we're talking about, like, which -- the claim and what kind of harms flow from it, I mean, there's no dispute that all of the habitat acreage that's been authorized for treatment by the four decision records was covered by the BiOp.

There's no dispute about that. And the only part of the BiOp that the plaintiffs take issue with is with respect to the survey protocol and these seven sites. So I would just suggest to you that, I mean, if there -- if you find that there is not a likelihood of success on the first claim regarding critical habitat, I mean, there's no basis to enjoin the treatments to be applied across NRF habitat, critical habitat, any of that, for any of the treatments that have been

authorized.

It doesn't -- there's no claim from which that irreparable harm would flow from. If we're talking about their second claim, we're just talking about the seven sites. And I think they've correctly framed it as, like, essentially they have a burden to demonstrate a likelihood of take.

And on that point, I mean, to be honest with Your Honor, I'm kind of perplexed 'cause I don't see how you could find on this record that they've demonstrated a likelihood of irreparable harm in the context of demonstrating that it's likely that any of those seven sites are occupied; and, therefore, if they were logged or treated, that there would be irreparable harm.

I mean, I've litigated two different five-day bench-trial Section 9 cases. And, I mean, the level of the proof and the type of evidence we're talking about, we're so far removed from this. We have counsel doing statistical math for you.

It's hard for me to imagine you using that as a basis in your opinion to determine there's some kind of likelihood of irreparable harm to spotted owls. To present you with a study and plaintiffs' counsel's interpretation of it, that doesn't meet the standard for what they have to demonstrate for a likelihood of irreparable harm.

They have to demonstrate, at minimum, that it's

likely that owls are using that habitat as their residence in some way. And they haven't demonstrated that. They have no expert stating that for you. They don't even have an expert interpreting the study. There's nothing.

THE COURT: All of that would only be admitted at the record -- at the development of the record, right? I mean, it's not something that would be argued or litigated in front of me at this point. So, I mean, you're posing questions that aren't even appropriately --

MR. CARROLLO: I disagree, for purposes of irreparable harm. I've actually -- I mean, as many cases as I've litigated, I've not ever litigated a case where someone was trying to demonstrate irreparable harm to a species where they didn't have expert declarations --

THE COURT: Well, maybe you missed my point. I'm saying -- you're -- when you talk about somebody not presenting expert evidence to me for consideration, that's not really the focus. It's, was it developed at the administrative record stage? Or are you saying that it would be appropriate for people to present evidence in front of me today to consider in determining whether there's irreparable harm?

MR. CARROLLO: Well, it wasn't presented. I would tell you --

THE COURT: I know that, but I'm saying, are you suggesting that that would be an appropriate -- appropriate

consideration for this Court if people came in here with new evidence beyond the record to determine whether -- whether there's irreparable harm for the purposes of a preliminary injunction?

MR. CARROLLO: It could be. And, in my experience -- in my experience litigating a variety of cases dealing with Section 9 and Section 7, I've not seen it where someone has attempted to prove that without it.

THE COURT: Okay.

MR. CARROLLO: Instead they're just relying on the study and asking you to do math based on it. It doesn't even come close to meeting the standard of them demonstrating that owls are likely using those seven sites as habitat.

I mean, you've heard testimony. The whole protocol is designed around take avoidance and answering this question. And they're asking you to essentially substitute your -- your judgment for the Service's and finding that, "No, I'm going to -- I'm going to say that, even though your protocol" -- it doesn't just tell the surveyors how to go out and do the surveys and how to record the data. It provides a classification system for how to interpret those results.

And they're essentially asking you to take this study and tell the agencies that they need to make a different conclusion from that, even though this is, like, a long-established protocol for answering this precise question

to avoid take.

And so I just don't see how on this record you could possibly find that they've satisfied their burden to demonstrate to you with competent evidence that it's likely that any of those seven sites are occupied and that cutting those would cause harm or take to spotted owls.

The record just doesn't support it. It's entirely speculative. And even counsel's saying "it may" or "may" -- or "it raises the -- raises the risk." I mean, that's -- that's not the standard. It has to be likely under Winters.

So there is no --

THE COURT: I didn't catch that. "It has to be likely"?

MR. CARROLLO: It has to be likely, not just about raising a risk. It's not about "may." It's not about that it could be. It's not about, "Well, it could or it couldn't be occupied."

They have an affirmative burden to demonstrate that the take and the harm is likely. And they've boxed themselves into that corner by framing it that way. And they don't have the evidence to demonstrate that.

And, you know, I think really the pond turtle is the same thing. It's just speculation upon speculation. They have no evidence to demonstrate that this is going to happen or that it will happen.

The other thing is that there can be no dispute that all the equities certainly come into play heavily if we're talking about a FLPMA claim.

I mean, so I think, you know, to the point earlier with Ms. Boylan, I mean, the dominant act here that we're talking about is the O&C Act. Congress' directive was that these lands be used for the dominant purpose of timber production.

And it would not be in the public interest to enjoin this based on a speculative concern about harm to the pond turtle. Congress designated these lands for the dominant purpose of timber production. And these receipts are essential for counties.

THE COURT: I'm going to stop you there because I also mentioned that I wasn't going to take argument on public interest and equities.

MR. CARROLLO: Okay. Fair enough. Well, I got a little bit of it.

THE COURT: So a little off the rails, off track.

Anything else on irreparable harm?

MR. CARROLLO: No. I mean, I really don't. I mean, at the end of the day it's just speculative, Your Honor. There's no proof that the plaintiffs have come forward that gets you to likely.

THE COURT: All right. Ms. Boylan, briefly, please.

MS. BOYLAN: Yes.

Plaintiffs' irreparable harm theory rests on the assumption that any harm to an individual animal is prohibited, which it's not. It's not -- this is not a species that is listed under the ESA. There's no take prohibition.

The RMP protects bureau sensitive species to the extent necessary to avoid the need to list. So saving every undiscovered turtle is not required to avoid contributing to the need to list.

And plaintiffs have to show a meaningful risk to the species' viability or a risk that contributes to listing pressure, and they have not even attempted to do that. They're nowhere close to meeting the irreparable harm standard.

Their theory depends on speculation about turtles might be present; the project might encounter them; and harm might occur. And that's -- there's no proof or -- or even likelihood that that will happen for all the reasons I talked about earlier. So --

THE COURT: All right.

MS. BOYLAN: -- thank you, Your Honor.

THE COURT: Thank you.

Mr. Ince-Johannsen.

MR. INCE-JOHANNSEN: Thank you. Just a few quick points.

In response to counsel for Murphy's point of raising,

you know, Murphy's economic interests in this litigation and, if I understand it correctly, alleging some form of harm if an injunction were to issue to it, that's not properly part of the inquiry under irreparable harm.

Irreparable harm -- the inquiry of irreparable harm looks exclusively at harm to the moving party and their interests in the litigation, not to the nonmoving party. That gets folded into the balance of the equities inquiry, which in the context of an Endangered Species Act case tips in favor of the listed species. That's blackletter law.

THE COURT: I'll offer to all of you that I interpreted what Mr. Griffith was saying is that, in the event that I grant a preliminary injunction, he would want it to be narrowly -- narrowly constructed. I'm not going to consider any economic harm for the purposes of determining the irreparable harm that you've just described.

MR. INCE-JOHANNSEN: Okay. I appreciate that.

THE COURT: But that was a pretty adept way to sneak in something about equities, Mr. Griffith. I didn't catch that one.

MR. GRIFFITH: Thank you, Your Honor.

MR. INCE-JOHANNSEN: Just in terms of the so-called dilatory timing or delay, I think I spoke to this earlier in the day, and I don't know if I have too much more to say beyond that, just that, you know, plaintiffs filed this injunction

really shortly after learning that logging was occurring in the habitat for the species that they are concerned with.

They previously operated under the understanding, based on representations made, that logging would not begin until spring of this year. And then suddenly we learned that, in fact, it had begun.

And, you know, within two weeks of learning that, during which time negotiations were occurring between counsel to try to avoid a TRO, for instance, or a need for expedited briefing, after two weeks of those negotiations, we filed this motion. So I don't think that there's any undue delay on plaintiffs' part here.

As to the scope of the injunction, you know, I mentioned earlier we're mainly, for spotted owl, concerned with NRF habitat, and that would be the requested scope of the injunction.

Now, to the extent that -- you know, if the Court were to rule in -- against plaintiffs on the critical habitat argument and, only for spotted owls, in our favor on the take issue -- the determination of occupancy based on status unknown, we're not just concerned about those seven sites.

In fact, we're actually not concerned about those seven sites at all right now. We don't know which specific sites now, because the data has not been provided, have had detections in the last one to two years, isolated detections

that didn't rise to the level of determining occupancy pursuant to Fish and Wildlife Service methodology.

So I think that the Court should accept the invitation of counsel for Murphy -- or perhaps it was counsel for the federal defendants -- to -- yes, sorry, it was federal defendants that suggested that they could provide data on, you know, recent survey detections.

I think that that should be the basis for the scope of an injunction for NRF habitat if the Court ruled only on our favor on that of the two NSO claims.

THE COURT: Well, I mean, that raises this interesting question, you know, and -- and perhaps might sort of facilitate in appreciating how we conduct preliminary injunction hearings. I mean, Mr. Carollo seems to suggest that I should have -- or could have taken quite a bit of evidence on irreparable harm at this hearing.

MR. INCE-JOHANNSEN: It's an interesting point. You know, he mentioned prior experience with Section 9 cases. Section 9 cases, of course, are not record review cases. They're not subject to the APA limitation.

THE COURT: Which is what we have here.

MR. INCE-JOHANNSEN: Which is what we have here, yes. So --

THE COURT: So to compare a Section 9 evidentiary hearing with a record review case that we have here and -- and

identify or suggest or argue that you haven't presented any evidence or expert or otherwise for me to consider is sort of -- well, it's a comparison that can't be made between -- between those two kinds of hearings?

MR. INCE-JOHANNSEN: I think that's fair. Just to be clear, though, I think there's a distinction between evidence probative of irreparable harm and evidence probative of likelihood of success on the merits.

Of course, we did submit declarations establishing irreparable harm to plaintiffs' interests, which is extra record. But, of course, that's necessary to establish irreparable harm, just as it's necessary to establish standing.

So I think that the record review limitation, it -- it -- my understanding, certainly, from cases that I've litigated under Section 7 of the ESA would prohibit the introduction of extra-record testimony unless it can fit into the narrow exceptions the Ninth Circuit has recognized, which I don't think would cover the -- this situation, for purposes of likelihood of success on the merits.

But on irreparable harm, we can and did provide extra-record declarations establishing plaintiffs' interests and that they would -- that they do face irreparable harm and will be irreparably harmed by implementation of the timber sale.

THE COURT: All right. All right, counsel. I know

it's been a very full day. I have a feeling that some of you probably want to still get a few more words in edgewise. But I think I've been able to consider quite a bit and -- of what you had to share, so I think we should stop here, at the risk of opening up too many -- too many tied knots and then having to start all over again tomorrow.

So let's do this. I have your very thorough briefs. I've, I think, benefited a great deal from everybody's arguments today. It's actually brought quite a bit more context and texture to what it is that's been placed in writing, so I can appreciate better the structure of the -- of both the statute and the regulatory requirements in determining whether -- whether there's anything to be done about a preliminary injunction at this stage.

So I will take it under advisement, but also I'm going to try to -- try to conduct this on an expedited basis because -- you know, for the -- not because these are elements to consider in the -- in considering a preliminary injunction, but I want to be mindful of the fact that we're dealing with humans, jobs, and the environment, all of which are important to just simply be mindful of and respect.

And, to that end, you know, I will try to get you my decision as quickly as I can, and I'm hoping within the next couple of weeks in written form, so you have an idea of where we're headed from here.

If I were to grant it, I -- you know, Mr. Griffith, your suggestions and comments would be well taken. I think we just simply schedule a status conference to have a conversation. And I'd, frankly, punt and just ask that all of you confer and then come back to me.

But we haven't even come to that bridge, so don't read into anything that I'm saying at this stage. I really am going to have to go back and look at all the material all over again after all of the arguments that have been presented here to more fully appreciate the legal obligations on my part in determining whether a preliminary injunction is appropriate. But you'll have my decision more quickly than -- than others, so -- so we'll get this to everybody to consider soon.

Any other questions, housekeeping-wise, that I can address, Mr. Ince-Johannsen?

MR. INCE-JOHANNSEN: None for plaintiffs. Thank you.

THE COURT: All right. Mr. -- did I ever come back -- I came back to you, yes. I gave you time.

MS. BOYLAN: Nothing else from me.

THE COURT: All right. Thank you.

I think --

MR. CARRARA: Nothing further, Your Honor.

THE COURT: Mr. Griffith.

MR. GRIFFITH: Nothing from Murphy Company.

THE COURT: Thank you.

And Mr. Carollo.

MR. CARROLLO: No, Your Honor. Thank you.

THE COURT: All right. Thank you all very much. This matter's under advisement. We're in recess -- or we're adjourned. Have a good day.

* * *

(Court adjourned, 3-17-26 at 4:32 p.m.)

C E R T I F I C A T E

Klamath-Siskiyou Wildlands Center, et al., v. Burgum, et al.

Case No. 1:25-cv-02296-MTK

Motion Hearing

March 17, 2026

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the FTR-recorded proceedings in the above-entitled cause. Where (indiscernible) has been indicated, the audio file was unable to be heard due to simultaneous crosstalk, fast speaking, mumbling, or other room noises overriding what was being said. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

Official Court Reporter — Signature Date: 8/5/2026
Oregon CSR No. 14-0427 — CSR Expiration Date: 6/30/2029